Exhibit 1

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/04   Page 2 of 467 PageID #:<br>7132



US007571014B1

(12) **United States Patent**
Lambourne et al.

(10) **Patent No.:** **US 7,571,014 B1**
(45) **Date of Patent:** **Aug. 4, 2009**

(54) **METHOD AND APPARATUS FOR CONTROLLING MULTIMEDIA PLAYERS IN A MULTI-ZONE SYSTEM**

(75) Inventors: **Robert A. Lambourne**, Santa Barbara, CA (US); **Nicholas A. J. Millington**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1091 days.

(21) Appl. No.: **10/861,653**

(22) Filed: **Jun. 5, 2004**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/816,217, filed on Apr. 1, 2004.

(51) **Int. Cl.**
*G06F 17/00* (2006.01)
*G06F 3/00* (2006.01)

(52) **U.S. Cl.** ........................................ **700/94**; 715/716

(58) **Field of Classification Search** .................... 700/94; 715/716, 734, 735; 709/220, 221; 381/56
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,239,458 A * 8/1993 Suzuki ......................... 700/83

| | | | |
|---|---|---|---|
| 5,299,266 A | * | 3/1994 | Lumsden .................... 381/119 |
| 5,751,819 A | * | 5/1998 | Dorrough .................... 381/56 |
| 7,218,708 B2 | * | 5/2007 | Berezowski et al. .......... 379/37 |
| 2002/0109710 A1 | * | 8/2002 | Holtz et al. ................. 345/723 |
| 2002/0124097 A1 | * | 9/2002 | Isely et al. .................. 709/231 |
| 2002/0188762 A1 | * | 12/2002 | Tomassetti et al. ......... 709/251 |
| 2003/0126211 A1 | * | 7/2003 | Anttila et al. .............. 709/205 |
| 2004/0008852 A1 | * | 1/2004 | Also et al. .................. 381/119 |
| 2004/0252400 A1 | * | 12/2004 | Blank et al. ................. 360/70 |
| 2005/0047605 A1 | * | 3/2005 | Lee et al. .................... 381/56 |
| 2007/0038999 A1 | * | 2/2007 | Millington ................. 718/100 |

* cited by examiner

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Daniel R Sellers
(74) *Attorney, Agent, or Firm*—Joe Zheng

(57) **ABSTRACT**

Techniques for controlling zone group and zone group characteristics such as audio volume in a multi-zone system are disclosed. The multi-zone system includes a number of multimedia players, each preferably located in a zone. A controller may control the operations of all of the zone players remotely from any one of the zones. Two or more zone players may be dynamically grouped as a zone group for synchronized operations. According to one aspect of the techniques, a zone group configuration can be managed, updated, modified via an interactive user interface provided in a controlling device. The zone group configuration may be saved in one of zone players. According to another aspect of the techniques, the audio volume control of a zone group can be performed individually or synchronously as a group.

**44 Claims, 14 Drawing Sheets**



Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 3 of 467 PageID #: 7133



*FIG. 1*

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 4 of 467 PageID #: 7134



*FIG. 2A*

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 5 of 467 PageID #: 1135



**FIG. 2B**

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 6 of 467 PageID #: 7136



*FIG. 2C*

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 7 of 467 PageID #: 7137



**FIG. 3A**

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 8 of 467 PageID #: 7136



*FIG. 3B*



*FIG. 3C*

The Living, Dining and Kitchen are playing a 'Counting Crows' album

**Living Room + Dining Room + Kitchen**

Now Playing ▶
**American Girls**
**Counting Crows**
**Hard Candy**
**(2002)**

image

0.33 / 4.56

Next track Good time – Counting Crows

12 songs in Queue

Add to Queue   View Queue

350

352

Music Button On physical Product

**Living Room + Dining Room + Kitchen**

**Music Collection**
Artists         ⌄
Albums       ⌄
Genres       ⌄
Composers   ⌄
Playlists       ⌄
Play Music From Other Rooms ⌄

12 songs in Queue

Add to Queue   View Queue

360

362

Select "Play Music From Other Rooms"

**Living Room + Dining Room + Kitchen**

Play same music as other rooms
**Office**
Master Bedroom

12 songs in Queue

Add to Queue   View Queue

370

372

374

376

Select a room

**Living Room+DiningRoom+Kitchen+Office**

Now Playing ▶
**Blue in Green**
**Mile Davis**
**Kind Of Blue**
**(1959)**

image

0.33 / 4.56

Next track Good time – Counting Crows

12 songs in Queue

Add to Queue   View Queue

380

382

The Living, Dining and Kitchen are now playing the same as the Office ('Miles Davis')

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 10 of 467 PageID #: 7140



FIG. 4A

FIG. 4B



*FIG. 5*



*FIG. 6*

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 13 of 467 PageID #: 7143



*FIG. 7A*



**FIG. 7B**



*FIG. 7C*

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 16 of 467 PageID #: 7146



*FIG. 7D*

US 7,571,014 B1

1

**METHOD AND APPARATUS FOR CONTROLLING MULTIMEDIA PLAYERS IN A MULTI-ZONE SYSTEM**

CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation-in-part of U.S. patent application Ser. No. 10/816,217, filed Apr. 1, 2004, in the name of Nicholas A. J. Millington, and entitled "System and method for synchronizing operations among a plurality of independently clocked digital data processing devices" filed on Apr. 1, 2004.

BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention is generally related to the area of audio technologies and human-computer interaction. In particular, the invention is related to method and apparatus for controlling or manipulating a plurality of multimedia players in a multi-zone system.

2. The Background of Related Art

An enduring passion for quality audio reproduction or system is continuing to drive demands from users. One of the demands includes an audio system in a house in which, for example, one could grill to classic rock on a patio while another one may cook up his/her own music selections in a kitchen. This is all at the same time while a teenager catches a ballgame in a family room, and another one blasts pop in a bedroom. And the best part of such audio system is that each family member does not need his or her own stereo system— one system gives everyone access to all the music sources.

Currently, one of the systems that can meet part of such demand is a conventional multi-zone audio system that usually includes a number of audio players. Each of the audio players has its own amplifier(s) and a set of speakers and typically installed in one place (e.g., a room). In order to play an audio source at one location, the audio source must be provided locally or from a centralized location. When the audio source is provided locally, the multi-zone audio system functions as a collection of many stereo systems, making source sharing difficult. When the audio source is provided centrally, the centralized location may include a juke box, many compact discs, an AM or FM radio, tapes, or others. To send an audio source to an audio player demanding such source, a cross-bar type of device is used to prevent the audio source from going to other audio players that may be playing other audio sources.

In order to achieve playing different audio sources in different audio players, the traditional multi-zone audio system is generally either hard-wired or controlled by a pre-configured and pre-programmed controller. While the pre-programmed configuration may be satisfactory in one situation, it may not be suitable for another situation. For example, a person would like to listen to broadcast news from his/her favorite radio station in a bedroom, a bathroom and a den while preparing to go to work in the morning. The same person may wish to listen in the den and the living room to music from a compact disc in the evening. In order to satisfy such requirements, two groups of audio players must be established. In the morning, the audio players in the bedroom, the bathroom and the den need to be grouped for the broadcast news. In the evening, the audio players in the den and the living room are grouped for the music. Over the weekend, the audio players in the den, the living room, and a kitchen are grouped for party music. Because the morning group, the

2

evening group and the weekend group contain the den, it can be difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups.

Other than the above mentioned problem, the control of the audio players as a group does not exist. For example, the audio volume of the audio players in the traditional multi-zone audio system needs to be adjusted one at a time, resulting in an inconvenient and non-homogenous audio environment.

There is, therefore, a need for solutions in a multi-zone audio system to control a plurality of audio players and their audio characteristics from one controlling device.

SUMMARY OF THE INVENTION

This section is for the purpose of summarizing some aspects of the present invention and to briefly introduce some preferred embodiments. Simplifications or omissions in this section as well as in the abstract or the title of this description may be made to avoid obscuring the purpose of this section, the abstract and the title. Such simplifications or omissions are not intended to limit the scope of the present invention.

In general, the present invention pertains to control of audio characteristics of a plurality of multimedia players, or simply players, from a controller. The characteristics include, but are not limited to, an audio source and an audio volume being played in each of the players. In particular, the present invention enables the user to remotely control the audio characteristics of the players either as a group or as an individual player. According to one aspect of the present invention, the same audio source is selected to be played synchronously in a group of players via a controlling device operated by a user. The group may be flexibly formed in a dynamic manner. Within the group, any one of the audio sources may be chosen and made available to each of the players. All audio playback control operations such as pause/play, forward/rewind, next/previous track are synchronously controlled, while the audio volume adjustment may be applied to a selected player or all of the players in the group.

According to another aspect of the present invention, a configurable module is implemented in the controlling device that provides interactive graphic user interface for controlling playback of the audio source, grouping a plurality of players together, de-grouping a group or adjusting audio volume of individual players or a group of players.

According to yet another aspect of the present invention, a player in a group of players is configured to synchronously play an audio source by selecting a source, making the source available or retrieving the source if the source is not found locally

The present invention may be implemented in many forms including software, hardware or a combination of both. According to one embodiment, the present invention is directed to a method for controlling a plurality of players, the method comprising: displaying on a screen a first list showing at least available players, selecting at least one of the players as a zone group head, displaying on the screen a second list showing at least some of the players that are eligible to be grouped with the zone group head, selecting one or more players from the at least some of the players to be a group being formed by the group head, and synchronizing all players in the group.

According to another embodiment, the present invention is a method for controlling a plurality of players, the method comprising displaying on a screen a list showing a plurality of volume meters, at least one of the volume meters representing

## US 7,571,014 B1

**3**

an audio volume of one of the players, and another one of the volume meters representing an audio volume of a group of players, if there is such group, selecting one of the volume meters from the list, and adjusting the one of the volume meters as desired.

According to still another embodiment, the present invention is an apparatus for controlling a plurality of players, the apparatus comprises a screen, a screen driver commanding the screen, an input interface, a network interface, a memory for storing code for an application module, a processor coupled to the memory, the input interface, the screen driver and the network interface, the processor executing the code in the memory to cause the application module and the screen driver to perform operations of: displaying on the screen a first list showing at least available players; selecting at least one of the players as a zone group head; displaying on the screen a second list showing at least some of the players that are eligible to be grouped with the zone group head; selecting one or more players from the at least some of the players to be a zone group being formed by the zone group head; and synchronizing all players in the zone group.

The operations further include displaying on a screen a list showing a plurality of volume meters, at least one of the volume meters representing an audio volume of one of the players, and another one of the volume meters representing an audio volume of a group of players, if there is such group; selecting one of the volume meters from the list; and adjusting the one of the volume meters as desired.

One of the objects, features, and advantages of the present invention is to remotely control a plurality of multimedia players in a multi-zone system, playing and controlling the audio source synchronously if the players are grouped together, or playing and controlling the audio source individually if the players are disassociated with each other.

Other objects, features, and advantages of the present invention will become apparent upon examining the following detailed description of an embodiment thereof, taken in conjunction with the attached drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the present invention will become better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. **1** shows an exemplary configuration in which the present invention may be practiced;

FIG. **2**A shows an exemplary functional block diagram of a player in accordance with the present invention;

FIG. **2**B shows an example of a controller that may be used to remotely control one of more players of FIG. **2**A;

FIG. **2**C shows an exemplary internal functional block diagram of a controller in accordance with one embodiment of the present invention;

FIGS. **3**A and **3**B illustrate a sequence of screen displays in accordance with one embodiment of the present invention for controlling a plurality of players;

FIG. **3**C shows a sequence of screen displays in accordance with one embodiment of the present invention for alternatively controlling players;

FIGS. **4**A and **4**B show a sequence of screen displays in accordance with one embodiment of the present invention for controlling players regarding audio volume;

FIG. **5** shows a flowchart or process of controlling a plurality of zones players according to one embodiment of the present invention;

**4**

FIG. **6** shows a flowchart or process of controlling audio volume of a plurality of players in a zone group according to one embodiment of the present invention; and

FIGS. **7**A-**7**D show a sequence of screen displays in accordance with one embodiment of the present invention on a computing device for alternatively controlling players.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention pertains to techniques for controlling a plurality of players, grouping some of the players, manipulating audio characteristics of the players individually or in groups. The audio characteristics include, but are not limited to, audio volume, audio bass, and audio treble. The players, also referred to as zone players, are part of in a multi-zone system that may be installed in a complex with multiple zones. In general, each zone player is located in one of the zones. Each of the zone players in the multi-zone system is coupled to a data network to communicate not only with each other but with other devices. According to one aspect of the present invention, through a controlling device, not only can each of the zone players be individually controlled, but also two or more of the zone players may be grouped as one or more groups and controlled as if they were a single unit. The audio playback for the zone players in a zone group can be synchronized.

According to another aspect of the techniques, a zone group configuration can be manipulated via a user interface provided in a controlling device. The user interface provides a mechanism to manage, create, delete or modify zone groups. All audio playback operations, such as pause/play, forward/rewind, next/previous track, are synchronized for the zone players in a zone group. The zone group configuration may be saved in any one of zone players for easy retrieval in any of the zones at anytime.

The detailed description of the present invention is presented largely in terms of procedures, steps, logic blocks, processing, or other symbolic representations that directly or indirectly resemble the operations of devices or systems that can be used on networks. These descriptions and representations are typically used by those skilled in the art to most effectively convey the substance of their work to others skilled in the art.

Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

Referring now to the drawings, in which like numerals refer to like parts throughout the several views. FIG. **1** shows an exemplary configuration **100** in which the present invention may be practiced. The configuration may represent, but not be limited to, a part of a residential home, a business building or a complex with multiple zones. There are a number of multimedia players of which three examples **102**, **104** and **106** are shown as audio devices. Each of the audio devices may be installed or provided in one particular area or zone and hence referred to as a zone player herein.

5

As used herein, unless explicitly stated otherwise, an audio source or audio sources are in digital format and can be transported or streamed over a data network. To facilitate the understanding of the present invention, it is assumed that the configuration **100** represents a home. Thus, the zone player **102** and **104** may be located in two of the bedrooms respectively while the zone player **106** may be installed in a living room. All of the zone players **102**, **104** and **106** are coupled directly or indirectly to a data network **108**. In addition, a computing device **110** is shown to be coupled on the network **108**. In reality, any other devices such as a home gateway device, a storage device, or an MP3 player may be coupled to the network **108** as well.

The network **108** may be a wired network, a wireless network or a combination of both. In one example, all devices including the zone players **102**, **104** and **106** are coupled to the network **108** by wireless means based on an industry standard such as IEEE 802.11. In yet another example, all devices including the zone players **102**, **104** and **106** are part of a local area network that communicates with a wide area network (e.g., the Internet).

Many devices on the network **108** are configured to download and store audio sources. For example, the computing device **110** can download audio sources from the Internet and store the downloaded sources locally for sharing with other devices on the Internet or the network **108**. The computing device **110** can also be configured to receive streaming audio. Shown as a stereo system, the device **112** is configured to receive an analog audio source (e.g., from broadcasting) or retrieve a digital audio source (e.g., from a compact disk). The analog audio sources can be converted to digital audio sources. In accordance with the present invention, the audio source may be shared among the devices on the network **108**.

Two or more zone players may be grouped together to form a new zone group. Any combinations of zone players and an existing zone group may be grouped together. In one instance, a new zone group is formed by adding one zone player to another zone player or an existing zone group. A first chosen zone player to form the new zone group may be referred to as a zone group head. Depending on implementation, all other zone players in the group are synchronized to play an audio source or a queue of sources being played or provided by the zone group head or any one zone player in the group may be selected to synchronize others. For example, when the zone player **106** is added to the zone player **102** to form a new zone group, the zone players **102** is the zone group head of the new zone group. Both players will synchronously playback audio sources that are accessible to any one of the zone players in the multi-zone system. In one embodiment, the audio source being played or provided by the zone player **102** will be also played in the zone player **106**. In another embodiment, the audio source being played or provided by the newly added zone player **106** will be played in all players in the group.

In spite of an existing zone group including the zone players **102** or **106**, it is still possible to add another zone player (e.g., player **104**) to the existing zone group containing the zone players **102** and **106**. In one embodiment, when this zone group is selected to play an audio source, the zone players **102** and **106** will synchronize with the zone player **104**, playing whatever the zone player **104** is playing or ready to play. In another embodiment, when this zone group is selected to play an audio source, the zone player **104** will synchronize with the zone players **102** and **106**, playing whatever the zone players **102** and **106** are playing or ready to play. In an exemplary deployment, a zone group includes the zone players **102**, **104** and **106** located in a bedroom, a kitchen and a bathroom of a house, respectively. When an audio source is

6

played in the zone group, the playback is synchronized among the zone players **102**, **104** and **106** in the group. As a result, a user may hear the same music or song regardless of whether the user is in the bedroom, the kitchen or the bathroom.

Many devices on the network **108** may be configured to control operations of the zone players **102**, **104** and **106**. In particular, one or more controlling devices **140** and **142** are used to control zone players **102**, **104** and **106** as shown in FIG. **1**. The controlling devices **140** and **142** are preferably portable and remotely control the zone players via wireless means (e.g., infrared, radio, wireless standard IEEE 802.11b or 802.11g). In one embodiment, besides controlling an individual zone player, the controlling device **140** or **142** is configured to manage audio sources and audio characteristics of all the zone players regardless where the controlling device **140** or **142** is located in a house or a confined complex.

Referring now to FIG. **2**A, there is shown an exemplary functional block diagram of a zone player **200** in accordance with the present invention. The zone player **200** includes a network interface **202**, a processor **204**, a memory module **206**, an audio processing circuit **210**, a digital signal processing module **212**, an audio amplifier **214** and a RF interface **216**. The network interface **202** facilitates a data flow between a data network (i.e., the data network **108** of FIG. **1**) and the zone player **200** and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the assembling of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface **202** handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player **200**.

The network interface **202** may include one or both of a wireless interface **216** and a wired interface **217**. The wireless interface **216**, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player **200** to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g). The wired interface **217** provides network interface functions by a wired means (e.g., an Ethernet cable). In one embodiment, a zone player, referred to as an access zone player, includes both of the interfaces **216** and **217**, and other zone players include only the RF interface **216**. Thus these other zone players communicate with other devices on a network or retrieve audio sources via the access zone player. The processor **204** is configured to control the operation of other parts in the zone player **200**. The memory **206** may be loaded with one or more software modules that can be executed by the processor **204** to achieve desired tasks. According to one aspect of the present invention, a software module implementing one embodiment of the present invention is executed, the processor **204** operates in accordance with the software module in reference to a saved zone group configuration characterizing a zone group created by a user, the zone player **200** is caused to retrieve an audio source from another zone player or a device on the network.

According to one embodiment of the present invention, the memory **206** is used to save one or more saved zone configuration files that may be retrieved for modification at any time. Typically, a saved zone group configuration file is transmitted to a controller (e.g., the controlling device **140** or **142** of FIG. **1**) when a user operates the controlling device. The zone

US 7,571,014 B1

7

group configuration provides an interactive user interface so that various manipulations or control of the zone players may be performed.

The audio processing circuit 210 resembles most of the circuitry in an audio playback device and includes one or more digital-to-analog converters (DAC), an audio preprocessing part, an audio enhancement part or a digital signal processor and others. In operation, when an audio source is retrieved via the network interface 202, the audio source is processed in the audio processing circuit 210 to produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier 214 for playback on speakers. In addition, the audio processing circuit 210 may include necessary circuitry to process analog signals as inputs to produce digital signals for sharing with other devices on a network.

Depending on an exact implementation, the digital signal processing module 212 may be implemented within the audio processing circuit 210 or as a combination of hardware and software. The audio amplifier 214 is typically an analog circuit that powers the provided analog audio signals to drive one or more speakers.

Referring now to FIG. 2B, there is shown an example of a controller 240, which may correspond to the controlling device 140 or 142 of FIG. 1. The controller 240 may be used to facilitate the control of multi-media applications, automation and others in a complex. In particular, the controller 240 is configured to facilitate a selection of a plurality of audio sources available on the network, controlling operations of one or more zone players (e.g., the zone player 200) through a RF interface corresponding to the RF interface 216 of FIG. 2A. According to one embodiment, the wireless means is based on an industry standard (e.g., infrared, radio, wireless standard IEEE 802.11a, 802.11b or 802.11g). When a particular audio source is being played in the zone player 200, a picture, if there is any, associated with the audio source may be transmitted from the zone player 200 to the controller 240 for display. In one embodiment, the controller 240 is used to synchronize more than one zone players by grouping the zone players in a group. In another embodiment, the controller 240 is used to control the volume of each of the zone players in a zone group individually or together.

The user interface for the controller 240 may include some of a screen 242 (e.g., a LCD screen) and a set of functional buttons as follows: a "zones" button 244, a "back" button 246, a "music" button 248, a scroll wheel 250, "ok" button 252, a set of transport control buttons 254, a mute button 262, a volume up/down button 264, a set of soft buttons 266 corresponding to the labels 268 displayed on the screen 242.

The screen 242 displays various screen menus in response to a user's selection. In one embodiment, the "zones" button 244 activates a zone management screen or "Zone Menu", which is described in more details below. The "back" button 246 may lead to different actions depending on the current screen. In one embodiment, the "back" button triggers the current screen display to go back to a previous one. In another embodiment, the "back" button negates the user's erroneous selection. The "music" button 248 activates a music menu, which allows the selection of an audio source (e.g., a song) to be added to a zone player's music queue for playback.

The scroll wheel 250 is used for selecting an item within a list, whenever a list is presented on the screen 242. When the items in the list are too many to be accommodated in one screen display, a scroll indicator such as a scroll bar or a scroll arrow is displayed beside the list. When the scroll indicator is displayed, a user may rotate the scroll wheel 250 to either

8

choose a displayed item or display a hidden item in the list. The "ok" button 252 is use to confirm the user selection on the screen 242.

There are three transport buttons 254, which are used to control the effect of the currently playing song. For example, the functions of the transport buttons may include play/pause and forward/rewind a song, move forward to a next song track, or move backward to a previous track. According to one embodiment, pressing one of the volume control buttons such as the mute button 262 or the volume up/down button 264 activates a volume panel. More detailed description of the volume panel will be discussed below. In addition, there are three soft buttons 266 that can be activated in accordance with the labels 268 on the screen 242. It can be understood that, in a multi-zone system, there may be multiple audio sources being played. The music transport functions described herein shall apply selectively to one of the sources when a corresponding one of the zone players or zone groups is selected.

FIG. 2C illustrates an internal functional block diagram of an exemplary controller 270, which may correspond to the controller 240 of FIG. 2B. The screen 272 on the controller 270 may be a LCD screen. The screen 272 communicates with and is commanded by a screen driver 274 that is controlled by a microcontroller (e.g., a processor) 276. The memory 282 may be loaded with one or more application modules 284 that can be executed by the microcontroller 276 with or without a user input via the user interface 278 to achieve desired tasks. In one embodiment, an application module is configured to facilitate grouping a number of selected zone players into a zone group and synchronizing the zone players for one audio source. In another embodiment, an application module is configured to control together the audio volumes of the zone players in a zone group. In operation, when the microcontroller 276 executes one of the application modules 284, the screen driver 274 generates control signals to drive screen 272 to display an application specific user interface accordingly, more of which will be described below.

The controller 270 includes a network interface 280 referred to as a RF interface 280 that facilitates wireless communication with a zone player via a corresponding RF interface thereof. In one embodiment, the commands such as volume control and audio playback synchronization are sent via the RF interfaces. In another embodiment, a saved zone group configuration is transmitted between a zone player and a controller via the RF interfaces. The controller 270 may control one or more zone players, such as 102, 104 and 106 of FIG. 1. Nevertheless, there may be more than one controllers, each in a zone (e.g., a room) and configured to control any one and all of the zone players.

In one embodiment, a user creates a zone group including at least two zone players from the controller 240 that sends signals or data to one of the zone players. As all the zone players are coupled on a network, the received signals in one zone players can cause other zone players in the group to be synchronized so that all the zone players in the group playback an identical audio source or a list of identical audio sources. Similarly, when a user increases the audio volume of the group from the controller, the signals or data of increasing the audio volume for the group are sent to one of the zone players and causes other zone players in the group to be increased together in volume and in same scale.

According to one implementation, an application module is loaded in memory 282 for zone group management. When a predetermined key (e.g. the "zones" button 244) is activated on the controller 240, the application module is executed in the microcontroller 276. The input interface 278 coupled to and controlled by the microcontroller 276 receives inputs

9

from a user. A "Zone Menu" is then displayed on the screen
**272**. The user may start grouping zone players into a zone
group by activating a "Link Zones" or "Add Zone" soft but-
ton, or de-grouping a zone group by activating an "Unlink
Zones" or "Drop Zone" button. The detail of the zone group
manipulation will be further discussed below.

As described above, the input interface **278** includes a
number of function buttons as well as a screen graphical user
interface. It should be pointed out that the controller **240** in
FIG. **2B** is not the only controlling device that may practice
the present invention. Other devices that provide the equiva-
lent control functions (e.g., a computing device, a hand-held
device) may also be configured to practice the present inven-
tion. In the above description, unless otherwise specifically
described, it is clear that keys or buttons are generally referred
to as either the physical buttons or soft buttons, enabling a
user to enter a command or data.

FIGS. **3**A and **3**B illustrate a sequence of screens in accor-
dance with one embodiment of the present invention for
manipulating a plurality of zone players for an enabled
four-zone distributed audio system. There are four zone play-
ers in four zones and referred to as: "Zone **1**", "Zone **2**",
"Zone **3**" and "Zone **4**".

FIG. **3A** shows a grouping process. A first "Zone Menu"
**302** shows a first list **303** of available zone players. One of the
zone players or existing zone group is selected as a zone
group head **304**, which is indicated with uniformly high-
lighted texts. It is noted the highlighted texts may also be
expressed as grouped icons, concatenated texts or other rep-
resentations of a current selection on the screen. The high-
lighted texts react to a user's scrolling selection (e.g., via a
scroll wheel **250** of FIG. **2B**). Also shown as one of the bottom
labels on the first "Zone Menu" **302** is the "Link Zones" or
"Add Zone" label **306** that corresponds to a soft button (e.g.,
soft button **266** of FIG. **2B**). A scroll indicator is displayed
beside the first display **302** when the number of items is too
many to be accommodated in one display.

When the soft button corresponding to "Link Zones" or
"Add Zone" **306** is activated, a second "Zone Menu" **308** is
displayed. A second list shows eligible zone groups or zone
players **309** for the zone group head **304**. Since "Zone **2**" has
been selected as the zone group head to form a zone group, the
eligible zone groups and zone players are now "Zone **1**",
"Zone **3**" and "Zone **4**". As shown as highlighted texts, the
zone player (Zone **4**) **310** is selected to be grouped with the
zone group head (Zone **2**) **304** to form a new zone group.

After the user confirms the selection, the newly formed
zone group configuration is updated and the audio source can
be played synchronously for all of the zone players in the
newly formed zone group as shown in FIG. **3A**. The first
"Zone menu" **312** is displayed again with the newly formed
zone group **314** as one of the choices along with other avail-
able zone players. Depending on implementation, any zone
players that have been used in a group may or may not be used
in another group. As shown in FIG. **3A**, the zone players **2** and
**4** are in a zone group started by the zone player **2**, the zone
player **4** (even the zone player **2**) can be in another zone group,
for example, while a player in a living room is grouped with
a player in a dinning room, the same player in the living room
can be grouped with a player in a family room.

In another embodiment, a display shows a list of available
zone players for grouping. An interactive graphic interface
allows a user to interactively select some of the available zone
players that are automatically grouped. Anyone of the
selected zone players in the group may be elected to be a
group head such that other players in the group are synchro-
nized to follow the group head.

10

According to one embodiment, the synchronization of all
zone players in the new zone group is achieved with the
following steps: 1) choosing an audio source from one of the
zone players in the group, 2) checking if the chosen audio
source is available locally on each of the zone players, 3)
retrieving the audio source from another device (e.g., other
zone players) which has the audio source via the data net-
work, if the audio source is not available locally, and 4)
playing the audio source on each of the zone players synchro-
nously. In another embodiment, the audio source in the group
or player to be added is chosen as default for other zone
players. As shown in FIG. **3A**, the audio source for "Zone **4**"
is track **10** with artist D. Accordingly, the zone player "Zone
**2**" will play track **10** with artist D synchronously with "Zone
**4**" after the new zone group is formed.

FIG. **3B** shows a de-grouping process in reference to FIG.
**3A.1**. A first "Zone Menu" **322** shows a first list **323** of
available zone players and zone groups, if there is any. One of
the zone groups ("Zone **2**+Zone **4**") to be de-grouped is
selected as shown in highlight texts **324**. When the "Unlink
Zones" or "Drop Zone" soft button **326** is activated, the sec-
ond "Zone Menu" **328** displays a list **329** that shows all of the
member zone players in the selected zone group. One of the
zone players **330** (Zone **4**) in the selected zone group is
chosen to be disassociated from the zone group **324**. When the
de-grouping is confirmed by user, the "Zone Menu" **332** is
presented to reflect the de-grouping of a zone group (e.g.,
"Zone **2**") **334**. When zone players are grouped together, all of
the zone players play the same audio source synchronously. If
a zone player is disassociated or dropped from the zone
group, the remaining zone players in the zone group continue
playing the audio source. In the "Zone Menu" **332**, it shows
the zone player (Zone **4**) has no music **336** after the disasso-
ciation from the zone group, while the remaining player
(Zone **2**) continues to play the same music—track **10** with
artist D.

Referring now to FIG. **3C**, there shows a sequence of
screens depicting alternative steps of creating a zone group.
An exemplary five-zone audio system is used to describe
these alternative steps. There are five zone players located in
a living room, a dining room, a kitchen, an office and a master
bedroom. It is assumed that three of the five rooms, the living
room, the dining room and the kitchen, are grouped to form a
zone group called "LivingRoom+DiningRoom+Kitchen".
The Screen display **350** shows that an audio source called
"Counting Crows" **352** is being played on all the zone players
in the group. When a user activates the "music" button **248** on
a controller **240** of FIG. **2B**, the screen display **360** shows a
"Music Menu" page which shows a list of choices **362**. One of
the choices is "Play Music From Other Rooms" **364**. When
the user selects this option, the screen display **370** for "Play
Same Music As Other Rooms" displays a list **372** of eligible
rooms or zone players to be grouped with the current group
"Living Room+Dining Room+Kitchen". In this example the
eligible rooms are Office **374** and Master Bedroom **376**. It is
assumed that the "Office" **374** which is indicated with the
highlighted bar is chosen. As a result, the zone player "Office"
is grouped with the original zone group to become a new
group called "LivingRoom+DiningRoom+Kitchen+Office"
as shown in screen display **380**. And the audio source "Miles
Davis" **382** from the zone player "Office" is played synchro-
nously on all zone players in the new group.

Referring now to FIGS. **4**A and **4**B, there is shown a
sequence of screens in accordance with one embodiment of
the present invention for controlling audio volume of zone
players in a zone group. These screens are activated and
displayed when one of the volume control buttons is acti-

US 7,571,014 B1

11

vated. According to one embodiment, the volume control buttons are "mute" button **262** and "volume up/down" button **264** on the controller **240** of FIG. **2**B.

FIG. **4**A shows that the current active zone player is in a living room of a house. The "Volume" panel **410** is displayed for the current zone player "Living Room". A volume meter **412** is included to indicate a volume adjustment made by a user. A mute icon **414** is shown when the "mute" button is activated while the audio is on.

FIG. **4**B shows that the current active zone group includes five rooms: living room, dining room, kitchen, den and study. A "Volume" panel **430** for the zone group is displayed for the convenience of a user. In the display, a plurality of volume meters **431** is shown. One of the volume meters is for the entire zone group **432**. Other volume meters are for all the zone players in the group, one for each room or zone player. A scroll indicator is shown as a downward arrow **436** that indicates the screen is too small to hold all volume meters in one screen display. There are more hidden choices that can be viewed by scrolling down. The scrolling cursor **436** is highlighted (e.g., Den **434**). As a user scrolls down the list of volume meters **431**, the contents on "Volume" panel **440** includes the volume meter of the next zone player on the list (e.g., Study **444**). Similarly, when the scroll indicator is an upward arrow **442**, other hidden choices within the list can be viewed by scrolling up.

When a user adjusts the audio volume, only the highlighted zones or zone players are affected. If the highlighted selection is one zone player, the audio adjustment will only apply to that particular chosen player. If multiple zone players are selected, the adjustment applies to all of the chosen players similar to the volume adjustment to the group volume meter described below. The audio volume of all zone players in the zone group will be affected, if the highlighted selection is at the volume meter of the entire zone group **432**. Any audio volume adjustment to the zone group applies to all of the zone players equally within the entire zone group. Depending on implementation, the relative difference of the audio volume among zone players in the group remains unchanged either in percentage or graphic strength.

FIG. **5** shows a flowchart or process **500** of implementing one embodiment of the present invention for manipulating zone players. The process **500**, which is preferably understood in conjunction with the previous figures especially with FIGS. **2**B, **2**C, **3**A and **3**B, may be implemented in software, hardware, or a combination of both. According to one embodiment, an application module implementing the process **500** is embedded in a controller, for example, the device **240** of FIG. **2**C. The module may be loaded in the memory **282** to be executed by the microcontroller (processor) **276** and operating in conjunction with user input commands via the input interface **278**.

The process **500** starts with a display at **502** showing a list of zone players or existing zone groups, if there are any. When the available zone players and zone groups in the list is too long to be presented on the display, a scroll indicator will be displayed beside the list. A user may access the hidden items within the list by scrolling either upward or downward. At **503**, the process **500** splits into two branches based on the following tasks: 1) grouping a plurality of zone players to form a zone group, or 2) de-grouping a zone group.

If the process **500** performs the grouping task, the process moves onto **504**. The user selects one of the zone players as a zone group head or the zone group from the list. Once the selection is made and a key is activated (e.g., a soft button **306** as shown in FIG. **3**A), a new list (e.g., screen **308** as shown in FIG. **3**A) showing all of the zone players and zone groups that

12

are eligible to be grouped with the selection at **504** is displayed at **508**. In one embodiment as shown in FIG. **3**A, when the zone player "Zone **2**" is selected as the zone group head in a four-zone audio system, the eligible zone players are all other zone players ("Zone **1**", "Zone **3**" and "Zone **4**") except for the zone player "Zone **2**". At **510**, the end user is then given the option to select one or more of the eligible zone players (e.g., "Zone **4**" in FIG. **3**A) or one of the eligible zone groups to be grouped into the selection at **504**.

At **512**, the user has the option to confirm to accept or to discard the selection made at **510**. When a confirmation is made, the process **500** creates the zone group by synchronizing all of the zone players in the zone group at **514**. In one embodiment, the synchronization is performed first to determine the audio source in the selected player to be grouped (e.g., Zone **4** in FIG. **3**A). Then the audio source is transmitted to all other zone players in the same zone group before playing the audio source synchronously. In the meantime, this newly formed zone group configuration is updated. For example, the zone group configuration is saved to the memory **206** on the zone player **200** of FIG. **2**A via the wireless communication. After the zone player in the newly formed zone group has been synchronized, the process **500** moves back to **502**. An updated list of available zone players and zone groups is displayed. As an example shown in "Zone Menu" **312** of FIG. **3**A, the newly formed zone group is listed as one of the items.

Going back to **512**, if the selection made at **510** can not be confirmed or is to be discarded, the process **500** goes back to **502** without updating any zone group configuration. In this case, the original list is intact (e.g., "Zone Menu" **302** of FIG. **3**A).

Going back to the grouping task test at **503**, when the process **500** performs the de-grouping task, the process **500** moves to **524**. A user selects one zone group from the first list. Once the selection is made, a list (e.g., screen **328** as shown in FIG. **3**B) showing all of the zone players in the selected zone group is displayed at **528**. In one embodiment as shown in FIG. **3**B, "Zone **2**+Zone **4**" is the selected zone group, the zone players in the selected zone group are "Zone **2**" and "Zone **4**". At **530**, the end user selects one or more of the zone players (e.g., Zone **4**) from the list to be disassociated from the zone group. At **532**, the user has the option to confirm or to discard the selection made at **530**.

When the selection is confirmed, the process **500** updates the selected zone group by disassociating the zone player from the zone group at **534**. As a result of the disassociation, the audio source being played in the zone group is no longer available to the disassociated zone player. In the meantime, the updated zone group configuration is saved. For example, the zone configuration is saved to the memory **206** on the zone player **200** (FIG. **2**A). After the zone player has been disassociated, the process **500** moves back to **502**. The list of available zone players and zone groups is displayed. This time the newly updated zone group is listed as one of the items (e.g., "Zone Menu" **332** of FIG. **3**B).

Going back to **532**, if the selection made at **530** is to be discarded, the process **500** moves back to **502** directly without updating the zone group configuration. In this case, the original list is presented (e.g., "Zone Menu" **322** of FIG. **3**B).

Referring now to FIG. **6**, there is shown a flowchart or process **600** of controlling audio volume of a plurality of zone players in a zone group. The process **600**, which is preferably understood in conjunction with the previous figures especially with FIGS. **2**B, **2**C, **4**A and **4**B, may be implemented in software, hardware, or a combination of both. According to one embodiment, an application module implementing the

US 7,571,014 B1

13

process **600** is embedded in a controller, for example, the device **240** of FIG. **2**C. The module may be loaded in the memory **282** to be executed by the microcontroller (processor) **276** and operating in conjunction with user input commands. In one embodiment, the module is configured to control the audio volume of a group of zone players. It should be noted that zone group and a group of zone players are used interchangeably in the description for FIG. **6**.

At **605**, the process **600** starts when one of the volume control buttons, for example, "mute" button **262** or "volume up/down" button **264**, on the controller **240** of FIG. **2**B, is activated. The process **600** splits into two branches depending on whether a single zone player or a group of zone players is to be controlled at **610**.

If it is for a single zone player, a volume meter (e.g., "Volume" panel **410** in FIG. **4**A) is presented at **612**. At **614**, the end user has option to adjust the volume for the zone player with one of the volume control buttons. The volume control signals are sent from the controller **240** (FIG. **2**C) to the zone player **200** (FIG. **2**A). In one embodiment, the volume panel displays a moving volume meter showing an increasing or decreasing bar as the audio volume of the selected zone player is adjusted up or down. In another embodiment, the mute icon is shown instead of a volume meter, when the "mute" button is activated while the audio is on.

At **616**, the process **600** is waiting for a user's command. If a predetermined amount of time (e.g., 1 second) has lapsed, the process **600** ends, which means the user is not going to change the volume. Otherwise, the process **600** goes back to **612** waiting for another action from the end user.

Referring back to **610**, if process **600** is for a group of zone players, then the process **600** moves to the zone group branch at **622**, in which a plurality of volume meters is presented. The plurality of volume meters includes one for each of the zone players in the zone group, plus one more for the entire zone group. In one embodiment as shown in FIG. **4**B, a "Volume" panel **430** for a plurality of zone players in a zone group is presented. When the screen is too small to display all the zone players, a scroll indicator is displayed beside the list of the volume meters to indicate that there are hidden volume meters. At **624**, the user selects one of the volume meters. At **626**, the audio volume is adjusted with one of the volume control buttons. When the volume adjustment is made to one of the zone players, only the selected zone player is affected. The audio volume of the rest of the zone players remains unchanged. However, when the volume adjustment is made to the zone group, the entire group will respond to the volume adjustment in an identical scale. In one embodiment, the identical scale is based on percentage of the audio volume. In another embodiment, the identical scale is based on graphic representation of the volume meter.

In one embodiment, an end user increases the audio volume for the zone group by 5%. The volume for each of the zone players in the zone group will be increased by 5%, and the relative volume loudness difference among each of the zone players remains unchanged. In another embodiment, if a user had muted one of the zone players of the zone group, the volume of all other zone players would have been unchanged.

The group audio volume is calculated based on a predetermined formula. In one embodiment, the group audio volume is the averaged value of the audio volume of all the zone players within the zone group. In another embodiment, the median value may be chosen as the group audio volume. The user uses a scrolling device (e.g., scroll wheel **250** of FIG. **2**B) to select a zone player or the entire zone group and then adjust the volume with one of the volume control buttons.

14

At **628**, the process **600** is waiting for a user's command. If a predetermined amount of time has lapsed, the process **600** ends, which means the user is not going to change the volume of the zone group. Otherwise, the process **600** goes back to **622** waiting for another action from the end user.

FIGS. **7**A-**7**D are a series of screenshots according to one embodiment of the present invention on a computing device on a network. The computing device may correspond to the device **110** of FIG. **1** and be configured to control operations of the zone players installed in a complex. With a larger screen of the computing device than that of a portable controller, the graphic user interface on the larger screen appears different from that, for example, shown in FIGS. **3**A-**4**B, the underlying principle nevertheless does not depart from the above description for the portable controller. A user is able to control any one or all of the zone players from the computing device. FIG. **7**A shows all individual available zone players with the one in the Dining Room being selected to play a track entitled "A Charlie Brown Christmas". FIG. **7**B shows a pop-up window listing remaining available players to be grouped with the one in the Dining Room. Depending on a desirable group, the user can select from the remaining available players to be grouped with the one in the Dining Room to form a zone group. FIG. **7**C shows, as a result, the players in the Dining Room and the living room are in one group and play synchronously a song entitled "Christmas time is here". FIG. **7**D shows the control of some exemplary acoustic characteristics of the zone players in a group with the volume being controlled.

The present invention can be implemented in many ways, each of which may yield one or more of the following benefits, advantages or features. One of them is a mechanism provided to enable a user to remotely control audio characteristics of the zone players either as a group or as an individual player. Second, an interactive graphic user interface is provided to enable a user to manage, create, delete or modify zone groups. Another one of the benefits, advantages or features is to provide a user interface to facilitate a user to control audio characteristics of an individual zone player or a group of zone players. Other benefits, advantages or features can be appreciated by those skilled in the art given the detailed description herein.

While the present invention has been described with reference to specific embodiments, the description is illustrative of the invention and is not to be construed as limiting the invention. Various modifications to the present invention can be made to the preferred embodiments by those skilled in the art without departing from the true spirit and scope of the invention as defined by the appended claim. For example, the present invention can be implemented in a multi-zone multimedia system providing other than audio entertainment. Accordingly, the scope of the present invention is defined by the appended claims rather than the forgoing description of embodiments.

We claim:

**1**. A method for controlling a plurality of players, the method comprising:

displaying on a screen a first list showing at least available players;

displaying, when at least one of the players is selected as a zone group head, on the screen a second list showing at least some of the players that are eligible to be grouped with the zone group head;

forming a zone group started with the zone group head, after one or more players from the at least some of the players are selected to join the zone group; and

synchronizing all players in the zone group;

US 7,571,014 B1

15

adjusting a volume meter represented by an averaged value of audio volumes of the slayers in the group, wherein said adjusting of the volume meter includes changing a volume of each of the group of slayers synchronously in accordance with an adjustment made by a user.

**2**. The method of claim **1**, wherein the first list becomes scrollable, when the available players do not fit in the screen.

**3**. The method of claim **1**, wherein said synchronizing all players in the zone group comprises:

determining an audio source for the zone group;

making the audio source available to each of the players in the zone group; and

playing the audio source synchronously in all players in the zone group.

**4**. The method of claim **3**, wherein said determining an audio source for the zone comprises selecting the audio source being played or ready to be played by the zone group head.

**5**. The method of claim **3**, wherein said of determining an audio source for the zone comprises selecting the audio source being played or ready to be played by one of the players in the zone group.

**6**. The method of claim **3**, wherein said making of the audio source available comprises:

determining whether the audio source is available locally; and

retrieving the audio source from a device on a network, if the audio source is not available locally.

**7**. The method of claim **6**, wherein said making of the audio source available comprises:

determining the audio source from one of the players in the zone group; and

causing the audio source available to every other player in the zone group.

**8**. The method of claim **1**, wherein said synchronizing of all players in the zone group comprises:

causing all players in the zone group to play an identical audio source; and

presenting the zone group in a manner that indicates a grouping.

**9**. The method of claim **8**, wherein the manner includes one or more of highlighting, colors, explicit texts and graphs.

**10**. The method of claim **1**, wherein the first list further shows at least one zone group.

**11**. The method of claim **10**, wherein the zone group includes at least two players.

**12**. The method of claim **9**, wherein a configuration of the zone group is stored in at least one of the players or a controller for remotely controlling one or more of the players, the configuration including information on how the two players are grouped.

**13**. The method of claim **8**, further including:

selecting the zone group to be de-grouped from the first list;

displaying on the screen another list showing all the players within the zone group to be de-grouped;

selecting one or more players from the another list; and

disassociating the selected players from the zone group.

**14**. The method of claim **13**, wherein said disassociating the selected players comprises making the selected players available for grouping with a zone group.

**15**. The method of claim **13**, wherein the another list becomes scrollable, when all the players within the zone group to be de-grouped do not fit in the screen.

**16**. A method for controlling a plurality of players, the method comprising:

displaying on a screen list showing a plurality of volume meters, at least one of the volume meters representing an

16

audio volume of one of the players, and another one of the volume meters representing an audio volume of a group of players, when there is such a group; and

adjusting one of the volume meters as desired after one of the volume meters from the list is selected, wherein the one of the volume meters is for the group of players, represented by an averaged value of audio volumes of the players in the group, and said adjusting of the one of the volume meters includes

changing a volume of each of the group of slayers synchronously in accordance with an adjustment made by a user.

**17**. The method of claim **16**, wherein said adjusting the one of the volume meters includes:

causing the audio volume to be adjusted in accordance with an adjustment to the volume meter; or

causing the audio volume to be off, when a mute button is activated while the audio volume is on; and

causing the audio volume to be on, when a mute button is activated while the audio volume is off.

**18**. The method of claim **16**, further comprising adjusting the one of the volume meters for the group of players in a predetermined manner that appears that the group of players are being adjusted at the same time.

**19**. The method of claim **16**, further comprising maintaining relative volume loudness difference among each of the players in the group.

**20**. The method of claim **16**, further comprising playing an identical audio source in the group of players.

**21**. The method of claim **20**, wherein the audio source is retrieved in form of audio data packets over the network.

**22**. The method of claim **21**, wherein at least part of the audio source is retrieved or being streamed from one of the players.

**23**. The method of claim **16**, wherein the one of the volume meters from the list selected is for the group of players, and wherein said adjusting the one of the volume meters includes causing an equal change to a volume of each of the players in the group.

**24**. The method of claim **16**, wherein the one of the volume meters from the list selected is for the group of players, and wherein said adjusting the one of the volume meters includes causing a predetermined unit change in volume for ever action by a user.

**25**. An apparatus for controlling a plurality of players, the apparatus comprising:

a screen;

a screen driver commanding the screen;

an input interface;

a network interface;

a memory for storing code for an application module;

a processor coupled to the memory, the input interface, the screen driver and the network interface, the processor executing the code in the memory to cause the application module and the screen driver to perform operations of:

displaying on a screen a first list showing at least available players;

displaying a zone group including players from the available players when at least two of the available players are selected to form the zone group, wherein any one of the players in the group serves as a zone group head;

synchronizing all players in the zone group in accordance with the zone group head; and

adjusting a volume meter represented by an averaged value of audio volumes of the slayers in the group, wherein said adjusting of the volume meter includes

US 7,571,014 B1

**17**

changing a volume of each of the group of players synchronously in accordance with an adjustment made by a user.

**26**. The apparatus of claim **25**, wherein the first list becomes scrollable, when the available players do not fit in the screen.

**27**. The apparatus of claim **25**, wherein said synchronizing all players in the zone group comprises:

determining an audio source for the zone group;

making the audio source available to each of the players in the zone group; and

playing the audio source synchronously in all players in the zone group.

**28**. The apparatus of claim **27**, wherein said determining an audio source for the zone comprises selecting the audio source being played or ready to be played by the zone group head.

**29**. The apparatus of claim **27**, wherein said determining an audio source for the zone comprises selecting the audio source being played or ready to be played by one of the players in the zone group.

**30**. The apparatus of claim **27**, wherein said making the audio source available comprises:

determining whether the audio source is available locally; and

retrieving the audio source from a device on a network, if the audio source is not available locally.

**31**. The apparatus of claim **27**, wherein said making the audio source available comprises:

determining the audio source from one of the players in the zone group; and

causing the audio source available to every other player in the zone group.

**32**. The apparatus of claim **25**, wherein said synchronizing all players in the zone group comprises:

causing all players in the zone group to play an identical audio source; and

presenting the zone group in a manner that indicates a grouping.

**33**. The apparatus of claim **32**, wherein the manner includes one or more of highlighting, colors, explicit texts and graphs in the screen.

**34**. The apparatus of claim **25**, wherein the first list further shows at least one zone group.

**35**. The apparatus of claim **25**, wherein the processor executing the code in the memory to cause the application module and the screen driver to perform operations of:

selecting the zone group to be de-grouped from the first list;

displaying on the screen an another list showing all the players within the zone group to be de-grouped;

selecting one or more players from the another list; and

disassociating the selected players from the zone group.

**36**. The apparatus of claim **35**, wherein said disassociating the selected players comprises making the selected players available for grouping with a zone group.

**37**. The apparatus of claim **35**, wherein the another list becomes scrollable, when all the players within the zone group to be de-grouped do not fit in the screen.

**38**. An apparatus for manipulating a plurality of players, the apparatus comprising:

**18**

a screen;

a screen driver commanding the screen;

an input interface;

a network interface;

a memory for storing code for an application module;

a processor coupled to the memory, the input interface, the screen driver and the network interface, the processor executing the code in the memory to cause the application module and the screen driver to perform operations of:

displaying on a screen a list showing a plurality of volume meters, at least one of the volume meters representing an audio volume of one of the players, and another one of the volume meters representing an audio volume of a group of players, if there is such a group; and

adjusting one of the volume meters as desired after one of the volume meters from the list is selected, wherein the one of the volume meters is for the group of players, represented by an averaged value of audio volumes of the slayers in the group, and said adjusting of the one of the volume meters includes changing a volume of each of the group of players synchronously in accordance with an adjustment made by a user.

**39**. The apparatus of claim **38**, wherein said adjusting the one of the volume meters includes:

causing the audio volume to be adjusted in accordance with an adjustment to the volume meter; or

causing the audio volume to be off, when a mute button is activated while the audio volume is on; and

causing the audio volume to be on, when a mute button is activated while the audio volume is off.

**40**. The apparatus of claim **38**, wherein the one of the volume meters from the list selected is for the group of players, and wherein said adjusting the one of the volume meters includes:

changing a volume of each of the group of players synchronously in accordance with an adjustment made by a user.

**41**. The apparatus of claim **38**, wherein the processor executing the code in the memory causes the application module and the screen driver to perform operations of adjusting the one of the volume meters for the group of players in a predetermined manner that appears that the group of players are being adjusted at the same time.

**42**. The apparatus of claim **38**, wherein the processor executing the code in the memory causes the application module and the screen driver to perform operations of maintaining relative volume loudness difference among each of the players in the group.

**43**. The apparatus of claim **38**, wherein the one of the volume meters from the list selected is for the group of players, and wherein said adjusting the one of the volume meters includes causing an equal change to a volume of each of the players in the group.

**44**. The apparatus of claim **38**, wherein the one of the volume meters from the list selected is for the group of players, and wherein said adjusting the one of the volume meters includes causing a predetermined unit change in volume for ever action by a user.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,571,014 B1                                    Page 1 of 1
APPLICATION NO.    : 10/861653
DATED               : August 4, 2009
INVENTOR(S)         : Robert A. Lambourne and Nicholas A. J. Millington

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the claims:

Claim 1, column 15, line 2, delete "slayers" and replace with --players--

Claim 16, column 16, line 10, delete "slayers" and replace with --players--

Claim 24, column 16, line 42, delete "ever" and replace with --every--

Claim 25, column 16, line 66, delete "slayers" and replace with --players--

Claim 38, column 18, line 21, delete "slayers" and replace with --players--

Claim 44, column 18, line 59, delete "ever" and replace with --every--

Signed and Sealed this
Nineteenth Day of March, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 27 of 467 PageID #: 1167



US007571014C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (11172nd)

# United States Patent
### Lambourne et al.

(10) **Number:** US 7,571,014 C1

(45) **Certificate Issued:** Sep. 1, 2017

(54) **METHOD AND APPARATUS FOR CONTROLLING MULTIMEDIA PLAYERS IN A MULTI-ZONE SYSTEM**

(75) Inventors: **Robert A. Lambourne**, Santa Barbara, CA (US); **Nicholas A. J. Millington**, Santa Barbara, CA (US)

(73) Assignee: **SONOS, INC.**, Santa Barbara, CA (US)

**Reexamination Request:**
No. 90/013,882, Dec. 27, 2016

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,571,014** |
| Issued: | **Aug. 4, 2009** |
| Appl. No.: | **10/861,653** |
| Filed: | **Jun. 5, 2004** |

Certificate of Correction issued Mar. 19, 2013

### Related U.S. Application Data

(63) Continuation-in-part of application No. 10/816,217, filed on Apr. 1, 2004, now Pat. No. 8,234,395.

(51) **Int. Cl.**
**H04R 27/00** (2006.01)
**H04S 7/00** (2006.01)

(52) **U.S. Cl.**
CPC .............. **H04R 27/00** (2013.01); **H04S 7/00** (2013.01); **H04R 2227/005** (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,882, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Mary Steelman

(57) **ABSTRACT**

Techniques for controlling zone group and zone group characteristics such as audio volume in a multi-zone system are disclosed. The multi-zone system includes a number of multimedia players, each preferably located in a zone. A controller may control the operations of all of the zone players remotely from any one of the zones. Two or more zone players may be dynamically grouped as a zone group for synchronized operations. According to one aspect of the techniques, a zone group configuration can be managed, updated, modified via an interactive user interface provided in a controlling device. The zone group configuration may be saved in one of zone players. According to another aspect of the techniques, the audio volume control of a zone group can be performed individually or synchronously as a group.



US 7,571,014 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **16**, **18**, **21**, **25** and **38** is confirmed.

Claim **1** is determined to be patentable as amended.

Claim **8**, dependent on an amended claim, is determined to be patentable.

Claims **2-7**, **9-15**, **17**, **19**, **20**, **22-24**, **26-37** and **39-44** were not reexamined.

**2**

**1**. A method for controlling a plurality of players, the method comprising:

displaying on a screen a first list showing at least available players;

displaying, when at least one of the players is selected as a zone group head, on the screen a second list showing at least some of the players that are eligible to be grouped with the zone group head;

forming a zone group started with the zone group head, after one or more players from the at least some of the players are selected to join the zone group; and

synchronizing all players in the zone group;

adjusting a volume meter represented by an averaged value of audio volumes of the players in the group, wherein said adjusting of the volume meter includes changing a volume of each of the group of [slayers] *players* synchronously in accordance with an adjustment made by a user.

\* \* \* \* \*

# Exhibit 2

US009164532B2

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 9,164,532 B2**

Millington　　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Oct. 20, 2015**

(54) **METHOD AND APPARATUS FOR DISPLAYING ZONES IN A MULTI-ZONE SYSTEM**

(75) Inventor: **Nicholas A. J. Millington**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 655 days.

(21) Appl. No.: **13/435,776**

(22) Filed: **Mar. 30, 2012**

(65) **Prior Publication Data**

US 2012/0192071 A1　　Jul. 26, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 13/297,000, filed on Nov. 15, 2011, which is a continuation of application No. 10/816,217, filed on Apr. 1, 2004, now Pat. No. 8,234,395.

(60) Provisional application No. 60/490,768, filed on Jul. 28, 2003.

(51) **Int. Cl.**
　　*G06F 15/177*　　(2006.01)
　　*G06F 1/00*　　　(2006.01)
　　　　(Continued)

(52) **U.S. Cl.**
　CPC　*G06F 1/00* (2013.01); *G05B 15/02* (2013.01); *G06F 3/048* (2013.01); *G06F 3/0482* (2013.01);
　　　　(Continued)

(58) **Field of Classification Search**
　CPC ..... G06F 3/167; G06F 17/00; G06F 17/3074; G06F 3/048; G06F 3/0482; G06F 3/0484; G06F 3/126; G06F 3/16; H04L 65/60; H04L 12/2812

USPC .................................................. 709/219, 231
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,296,278 A　10/1981　Cullison et al.
4,816,989 A　3/1989　Finn
　　　　(Continued)

FOREIGN PATENT DOCUMENTS

EP　0251584　1/1988
EP　0672985　9/1995
　　　(Continued)

OTHER PUBLICATIONS

Blakowski G. et al., "A Media Synchronization Survey: Reference Model, Specification, and Case Studies", Jan. 1996, vol. 14, No. 1, 5-35.

(Continued)

*Primary Examiner* — Oleg Survillo
(74) *Attorney, Agent, or Firm* — McDonnell Boehnen Hulbert & Berghoff LLP

(57) **ABSTRACT**

A system is described for maintaining synchrony of operations among a plurality of devices having independent clocking arrangements. A task distribution device is to distribute tasks to a synchrony group comprising a plurality of devices to perform tasks distributed by the task distribution device in synchrony. The task distribution device distributes each task to synchrony group members over a network. Each task is associated with a time stamp that indicates a time, relative to a clock maintained by the task distribution device, at which synchrony group members are to execute the task. Each synchrony group member periodically obtains from the task distribution device an indication of current time indicated by its clock, determines a time differential between the task distribution device's clock and its respective clock and determines there from a time at which, according to its respective clock, the time stamp indicates that it is to execute the task.

**34 Claims, 5 Drawing Sheets**



US 9,164,532 B2

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *H04J 3/06* | (2006.01) |
| *H04R 27/00* | (2006.01) |
| *G06F 17/00* | (2006.01) |
| *H03G 3/20* | (2006.01) |
| *H04L 29/06* | (2006.01) |
| *G06F 3/048* | (2013.01) |
| *G06F 3/16* | (2006.01) |
| *H04L 29/08* | (2006.01) |
| *G06F 3/0484* | (2013.01) |
| *H04R 3/12* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *G06F 3/0482* | (2013.01) |
| *H03G 3/00* | (2006.01) |
| *H04H 20/10* | (2008.01) |
| *H04H 20/26* | (2008.01) |
| *G05B 15/02* | (2006.01) |
| *G11B 20/10* | (2006.01) |
| *H04N 5/04* | (2006.01) |
| *H04N 9/79* | (2006.01) |
| *H04N 21/43* | (2011.01) |
| *H04N 21/436* | (2011.01) |

(52) **U.S. Cl.**
CPC ................ *G06F 3/0484* (2013.01); *G06F 3/16* (2013.01); *G06F 3/165* (2013.01); *G06F 3/167* (2013.01); *G06F 17/00* (2013.01); *G06F 17/3074* (2013.01); *G11B 20/10527* (2013.01); *H03G 3/00* (2013.01); *H03G 3/20* (2013.01); *H04H 20/103* (2013.01); *H04H 20/26* (2013.01); *H04J 3/0664* (2013.01); *H04L 65/60* (2013.01); *H04L 65/80* (2013.01); *H04L 67/1095* (2013.01); *H04L 67/26* (2013.01); *H04L 69/28* (2013.01); *H04N 5/04* (2013.01); *H04N 9/7904* (2013.01); *H04N 21/4307* (2013.01); *H04N 21/43615* (2013.01); *H04R 3/12* (2013.01); *H04R 27/00* (2013.01); *G11B 2020/10592* (2013.01); *H04H 2201/20* (2013.01); *H04L 65/4076* (2013.01); *H04R 2227/003* (2013.01); *H04R 2227/005* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,153,579 | A | 10/1992 | Fisch et al. |
| 5,182,552 | A | 1/1993 | Paynting |
| 5,239,458 | A | 8/1993 | Suzuki |
| 5,299,266 | A | 3/1994 | Lumsden |
| 5,406,634 | A | 4/1995 | Anderson et al. |
| 5,440,644 | A | 8/1995 | Farinelli et al. |
| 5,467,342 | A | 11/1995 | Logston et al. |
| 5,491,839 | A | 2/1996 | Schotz |
| 5,553,222 | A | 9/1996 | Milne et al. |
| 5,602,992 | A | 2/1997 | Danneels |
| 5,668,884 | A | 9/1997 | Clair, Jr. et al. |
| 5,673,323 | A | 9/1997 | Schotz et al. |
| 5,696,896 | A | 12/1997 | Badovinatz et al. |
| 5,726,989 | A | 3/1998 | Dokic |
| 5,751,819 | A | 5/1998 | Dorrough |
| 5,761,320 | A | 6/1998 | Farinelli et al. |
| 5,787,249 | A | 7/1998 | Badovinatz et al. |
| 5,808,662 | A | 9/1998 | Kinney et al. |
| 5,815,689 | A | 9/1998 | Shaw et al. |
| 5,867,691 | A | 2/1999 | Shiraishi |
| 5,875,354 | A | 2/1999 | Charlton et al. |
| 5,887,143 | A | 3/1999 | Saito |
| 5,923,869 | A | 7/1999 | Kashiwagi et al. |
| 5,923,902 | A | 7/1999 | Inagaki |
| 5,946,343 | A | 8/1999 | Schotz et al. |
| 5,956,088 | A | 9/1999 | Shen et al. |

| | | | |
|---|---|---|---|
| 6,009,457 | A | 12/1999 | Moller |
| 6,026,150 | A | 2/2000 | Frank et al. |
| 6,031,818 | A | 2/2000 | Lo et al. |
| 6,108,485 | A | 8/2000 | Kim |
| 6,108,686 | A | 8/2000 | Williams, Jr. |
| 6,122,668 | A | 9/2000 | Teng et al. |
| 6,128,318 | A | 10/2000 | Sato |
| 6,157,957 | A | 12/2000 | Berthaud |
| 6,175,872 | B1 | 1/2001 | Neumann et al. |
| 6,185,737 | B1 | 2/2001 | Northcutt et al. |
| 6,195,436 | B1 | 2/2001 | Scibora et al. |
| 6,199,169 | B1 | 3/2001 | Voth |
| 6,255,961 | B1 | 7/2001 | Van Ryzin et al. |
| 6,256,554 | B1 | 7/2001 | DiLorenzo |
| 6,308,207 | B1 | 10/2001 | Tseng et al. |
| 6,324,586 | B1 | 11/2001 | Johnson |
| 6,332,147 | B1 | 12/2001 | Moran et al. |
| 6,343,028 | B1 | 1/2002 | Kuwaoka |
| 6,349,339 | B1 | 2/2002 | Williams |
| 6,351,821 | B1 | 2/2002 | Voth |
| 6,404,811 | B1 | 6/2002 | Cvetko et al. |
| 6,430,353 | B1 | 8/2002 | Honda et al. |
| 6,449,653 | B2 | 9/2002 | Klemets et al. |
| 6,487,296 | B1 | 11/2002 | Allen et al. |
| 6,522,886 | B1 | 2/2003 | Youngs et al. |
| 6,526,325 | B1 | 2/2003 | Sussman et al. |
| 6,535,121 | B2 | 3/2003 | Matheny et al. |
| 6,587,127 | B1 | 7/2003 | Leeke et al. |
| 6,598,172 | B1 | 7/2003 | Vandeusen et al. |
| 6,611,537 | B1 | 8/2003 | Edens et al. |
| 6,631,410 | B1 | 10/2003 | Kowalski et al. |
| 6,674,803 | B1 | 1/2004 | Kesselring |
| 6,687,664 | B1 | 2/2004 | Sussman et al. |
| 6,757,517 | B2 | 6/2004 | Chang |
| 6,778,493 | B1 | 8/2004 | Ishii |
| 6,778,869 | B2 | 8/2004 | Champion |
| 6,816,818 | B2 | 11/2004 | Wolf et al. |
| 6,823,225 | B1 | 11/2004 | Sass |
| 6,826,283 | B1 | 11/2004 | Wheeler et al. |
| 6,836,788 | B2 | 12/2004 | Kim et al. |
| 6,839,752 | B1 | 1/2005 | Miller et al. |
| 6,898,642 | B2 | 5/2005 | Chafle et al. |
| 6,907,458 | B2 | 6/2005 | Tomassetti et al. |
| 6,912,610 | B2 | 6/2005 | Spencer |
| 6,920,373 | B2 | 7/2005 | Xi et al. |
| 6,934,766 | B1 | 8/2005 | Russell |
| 6,970,482 | B2 | 11/2005 | Kim |
| 6,985,694 | B1 | 1/2006 | De Bonet et al. |
| 7,007,106 | B1 | 2/2006 | Flood et al. |
| 7,020,791 | B1 | 3/2006 | Aweya et al. |
| 7,043,651 | B2 | 5/2006 | Aweya et al. |
| 7,047,308 | B2 | 5/2006 | Deshpande |
| 7,068,596 | B1 | 6/2006 | Mou |
| 7,113,999 | B2 | 9/2006 | Pestoni et al. |
| 7,115,017 | B1 | 10/2006 | Laursen et al. |
| 7,130,368 | B1 | 10/2006 | Aweya et al. |
| 7,130,608 | B2 | 10/2006 | Hollstrom et al. |
| 7,130,616 | B2 | 10/2006 | Janik |
| 7,136,934 | B2 | 11/2006 | Carter et al. |
| 7,143,141 | B1 | 11/2006 | Morgan et al. |
| 7,143,939 | B2 | 12/2006 | Henzerling |
| 7,162,315 | B2 | 1/2007 | Gilbert |
| 7,185,090 | B2 | 2/2007 | Kowalski et al. |
| 7,187,947 | B1 | 3/2007 | White et al. |
| 7,206,367 | B1 * | 4/2007 | Moore ........................ 375/354 |
| 7,206,967 | B1 | 4/2007 | Marti et al. |
| 7,209,795 | B2 | 4/2007 | Sullivan et al. |
| 7,218,708 | B2 | 5/2007 | Berezowski et al. |
| 7,236,739 | B2 | 6/2007 | Chang |
| 7,236,773 | B2 | 6/2007 | Thomas |
| 7,293,060 | B2 | 11/2007 | Komsi |
| 7,312,785 | B2 | 12/2007 | Tsuk |
| 7,313,593 | B1 | 12/2007 | Pulito et al. |
| 7,324,857 | B2 | 1/2008 | Goddard |
| 7,333,519 | B2 | 2/2008 | Sullivan et al. |
| 7,372,846 | B2 | 5/2008 | Zwack |
| 7,392,102 | B2 | 6/2008 | Sullivan et al. |
| 7,412,499 | B2 | 8/2008 | Chang et al. |
| 7,483,538 | B2 | 1/2009 | McCarty et al. |

US 9,164,532 B2

Page 3

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,483,958 | B1 | 1/2009 | Elabbady et al. |
| 7,519,667 | B1 | 4/2009 | Capps |
| 7,571,014 | B1 | 8/2009 | Lambourne et al. |
| 7,574,274 | B2 | 8/2009 | Holmes |
| 7,599,685 | B2 | 10/2009 | Goldberg et al. |
| 7,606,174 | B2 | 10/2009 | Ochi et al. |
| 7,643,894 | B2 | 1/2010 | Braithwaite et al. |
| 7,657,224 | B2 | 2/2010 | Goldberg et al. |
| 7,657,644 | B1 | 2/2010 | Zheng |
| 7,657,910 | B1 | 2/2010 | McAulay et al. |
| 7,668,990 | B2 | 2/2010 | Krzyzanowski et al. |
| 7,669,219 | B2 | 2/2010 | Scott, III |
| 7,675,943 | B2 | 3/2010 | Mosig et al. |
| 7,676,142 | B1 | 3/2010 | Hung |
| 7,702,279 | B2 | 4/2010 | Ko et al. |
| 7,702,403 | B1 | 4/2010 | Gladwin et al. |
| 7,711,774 | B1 * | 5/2010 | Rothschild ................... 709/205 |
| 7,720,096 | B2 | 5/2010 | Klemets |
| 7,742,740 | B2 | 6/2010 | Goldberg et al. |
| 7,743,009 | B2 | 6/2010 | Hangartner et al. |
| RE41,608 | E | 8/2010 | Blair et al. |
| 7,835,689 | B2 | 11/2010 | Goldberg et al. |
| 7,853,341 | B2 | 12/2010 | McCarty et al. |
| 7,865,137 | B2 | 1/2011 | Goldberg et al. |
| 7,885,622 | B2 | 2/2011 | Krampf et al. |
| 7,916,877 | B2 | 3/2011 | Goldberg et al. |
| 7,917,082 | B2 | 3/2011 | Goldberg et al. |
| 7,934,239 | B1 | 4/2011 | Dagman |
| 7,996,588 | B2 | 8/2011 | Subbiah et al. |
| 8,014,423 | B2 | 9/2011 | Thaler et al. |
| 8,020,023 | B2 | 9/2011 | Millington et al. |
| 8,023,663 | B2 | 9/2011 | Goldberg |
| 8,028,038 | B2 | 9/2011 | Weel |
| 8,028,323 | B2 | 9/2011 | Weel |
| 8,045,952 | B2 | 10/2011 | Qureshey et al. |
| 8,050,652 | B2 | 11/2011 | Qureshey et al. |
| 8,074,253 | B1 | 12/2011 | Nathan |
| 8,086,752 | B2 | 12/2011 | Millington et al. |
| 8,103,009 | B2 | 1/2012 | McCarty et al. |
| 8,112,032 | B2 | 2/2012 | Ko et al. |
| 8,131,390 | B2 | 3/2012 | Braithwaite et al. |
| 8,169,938 | B2 | 5/2012 | Duchscher et al. |
| 8,214,873 | B2 | 7/2012 | Weel |
| 8,230,099 | B2 | 7/2012 | Weel |
| 8,234,395 | B2 | 7/2012 | Millington |
| 8,290,603 | B1 | 10/2012 | Lambourne |
| 8,315,555 | B2 | 11/2012 | Ko et al. |
| 8,370,678 | B2 | 2/2013 | Millington et al. |
| 8,423,659 | B2 | 4/2013 | Millington |
| 8,473,844 | B2 | 6/2013 | Kreifeldt et al. |
| 8,588,949 | B2 | 11/2013 | Lambourne et al. |
| 2001/0009604 | A1 | 7/2001 | Ando et al. |
| 2001/0022823 | A1 | 9/2001 | Renaud |
| 2001/0027498 | A1 | 10/2001 | Van De Meulenhof et al. |
| 2001/0032188 | A1 | 10/2001 | Miyabe |
| 2001/0042107 | A1 | 11/2001 | Palm |
| 2001/0046235 | A1 | 11/2001 | Trevitt et al. |
| 2001/0047377 | A1 | 11/2001 | Sincaglia et al. |
| 2002/0002039 | A1 | 1/2002 | Qureshey et al. |
| 2002/0002562 | A1 | 1/2002 | Moran et al. |
| 2002/0002565 | A1 | 1/2002 | Ohyama |
| 2002/0003548 | A1 | 1/2002 | Krusche et al. |
| 2002/0022453 | A1 | 2/2002 | Balog et al. |
| 2002/0026442 | A1 | 2/2002 | Lipscomb et al. |
| 2002/0034374 | A1 | 3/2002 | Barton |
| 2002/0042844 | A1 | 4/2002 | Chiazzese |
| 2002/0049843 | A1 | 4/2002 | Barone et al. |
| 2002/0062406 | A1 | 5/2002 | Chang et al. |
| 2002/0065926 | A1 | 5/2002 | Hackney et al. |
| 2002/0072816 | A1 | 6/2002 | Shdema et al. |
| 2002/0073228 | A1 | 6/2002 | Cognet et al. |
| 2002/0080783 | A1 | 6/2002 | Fujimori |
| 2002/0090914 | A1 | 7/2002 | Kang et al. |
| 2002/0093478 | A1 | 7/2002 | Yeh |
| 2002/0095460 | A1 | 7/2002 | Benson |
| 2002/0109710 | A1 | 8/2002 | Holtz et al. |
| 2002/0112244 | A1 | 8/2002 | Liou et al. |
| 2002/0114354 | A1 | 8/2002 | Sinha et al. |
| 2002/0114359 | A1 | 8/2002 | Ibaraki et al. |
| 2002/0124097 | A1 | 9/2002 | Isely et al. |
| 2002/0129156 | A1 | 9/2002 | Yoshikawa |
| 2002/0143998 | A1 | 10/2002 | Rajagopal et al. |
| 2002/0159596 | A1 | 10/2002 | Durand et al. |
| 2002/0163361 | A1 | 11/2002 | Parkin |
| 2002/0165721 | A1 | 11/2002 | Chang et al. |
| 2002/0165921 | A1 | 11/2002 | Sapieyevski |
| 2002/0168938 | A1 | 11/2002 | Chang |
| 2002/0173273 | A1 | 11/2002 | Spurgat et al. |
| 2002/0177411 | A1 | 11/2002 | Yajima et al. |
| 2002/0184310 | A1 | 12/2002 | Traversat et al. |
| 2002/0188762 | A1 | 12/2002 | Tomassetti et al. |
| 2002/0194309 | A1 * | 12/2002 | Carter et al. .................. 709/219 |
| 2003/0002609 | A1 | 1/2003 | Faller et al. |
| 2003/0018797 | A1 | 1/2003 | Dunning et al. |
| 2003/0020763 | A1 | 1/2003 | Mayer et al. |
| 2003/0023741 | A1 | 1/2003 | Tomassetti et al. |
| 2003/0035072 | A1 | 2/2003 | Hagg |
| 2003/0035444 | A1 | 2/2003 | Zwack |
| 2003/0041173 | A1 | 2/2003 | Hoyle |
| 2003/0041174 | A1 | 2/2003 | Wen et al. |
| 2003/0043924 | A1 | 3/2003 | Haddad et al. |
| 2003/0055892 | A1 | 3/2003 | Huitema et al. |
| 2003/0061428 | A1 | 3/2003 | Garney et al. |
| 2003/0066094 | A1 | 4/2003 | Van Der Schaar et al. |
| 2003/0067437 | A1 | 4/2003 | McClintock et al. |
| 2003/0073432 | A1 * | 4/2003 | Meade, II ................... 455/420 |
| 2003/0099212 | A1 | 5/2003 | Anjum et al. |
| 2003/0099221 | A1 | 5/2003 | Rhee |
| 2003/0110329 | A1 | 6/2003 | Higaki et al. |
| 2003/0126211 | A1 | 7/2003 | Anttila et al. |
| 2003/0157951 | A1 | 8/2003 | Hasty |
| 2003/0195964 | A1 | 10/2003 | Mane |
| 2003/0198254 | A1 | 10/2003 | Sullivan et al. |
| 2003/0198255 | A1 | 10/2003 | Sullivan et al. |
| 2003/0198257 | A1 | 10/2003 | Sullivan et al. |
| 2003/0200001 | A1 | 10/2003 | Goddard |
| 2003/0204273 | A1 | 10/2003 | Dinker et al. |
| 2003/0204509 | A1 | 10/2003 | Dinker et al. |
| 2003/0210796 | A1 | 11/2003 | McCarty et al. |
| 2003/0219007 | A1 | 11/2003 | Barrack et al. |
| 2003/0227478 | A1 | 12/2003 | Chatfield |
| 2003/0231871 | A1 | 12/2003 | Ushimaru |
| 2003/0235304 | A1 | 12/2003 | Evans et al. |
| 2004/0001484 | A1 | 1/2004 | Ozguner |
| 2004/0001591 | A1 | 1/2004 | Mani et al. |
| 2004/0008852 | A1 | 1/2004 | Also et al. |
| 2004/0010727 | A1 | 1/2004 | Fujinami |
| 2004/0012620 | A1 | 1/2004 | Buhler et al. |
| 2004/0015252 | A1 | 1/2004 | Aiso et al. |
| 2004/0019497 | A1 | 1/2004 | Volk et al. |
| 2004/0024478 | A1 | 2/2004 | Hans et al. |
| 2004/0024925 | A1 | 2/2004 | Cypher et al. |
| 2004/0027166 | A1 | 2/2004 | Mangum et al. |
| 2004/0032348 | A1 | 2/2004 | Lai et al. |
| 2004/0041836 | A1 | 3/2004 | Zaner et al. |
| 2004/0048569 | A1 | 3/2004 | Kawamura |
| 2004/0066736 | A1 | 4/2004 | Kroeger |
| 2004/0075767 | A1 | 4/2004 | Neuman et al. |
| 2004/0078383 | A1 | 4/2004 | Mercer et al. |
| 2004/0080671 | A1 | 4/2004 | Siemens et al. |
| 2004/0093096 | A1 | 5/2004 | Huang et al. |
| 2004/0098754 | A1 * | 5/2004 | Vella et al. ................... 725/135 |
| 2004/0131192 | A1 | 7/2004 | Metcalf |
| 2004/0133689 | A1 | 7/2004 | Vasisht |
| 2004/0143368 | A1 | 7/2004 | May et al. |
| 2004/0143852 | A1 | 7/2004 | Meyers |
| 2004/0148237 | A1 | 7/2004 | Bittmann et al. |
| 2004/0170383 | A1 | 9/2004 | Mazur |
| 2004/0203178 | A1 | 10/2004 | Powers |
| 2004/0208158 | A1 | 10/2004 | Fellman et al. |
| 2004/0213230 | A1 | 10/2004 | Douskalis et al. |
| 2004/0224638 | A1 | 11/2004 | Fadell et al. |
| 2004/0228367 | A1 | 11/2004 | Mosig et al. |
| 2004/0248601 | A1 | 12/2004 | Chang |

**US 9,164,532 B2**

Page 4

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2004/0249965 A1 | 12/2004 | Huggins et al. |
| 2004/0249982 A1 | 12/2004 | Arnold et al. |
| 2004/0252400 A1 | 12/2004 | Blank et al. |
| 2005/0010691 A1 | 1/2005 | Oyadomari et al. |
| 2005/0011388 A1 | 1/2005 | Kouznetsov |
| 2005/0013394 A1 | 1/2005 | Rausch et al. |
| 2005/0015551 A1 | 1/2005 | Eames et al. |
| 2005/0021590 A1 | 1/2005 | Debique et al. |
| 2005/0027821 A1 | 2/2005 | Alexander et al. |
| 2005/0047605 A1 | 3/2005 | Lee et al. |
| 2005/0058149 A1 | 3/2005 | Howe |
| 2005/0062637 A1 | 3/2005 | El Zabadani et al. |
| 2005/0081213 A1 | 4/2005 | Suzuki et al. |
| 2005/0114538 A1 | 5/2005 | Rose |
| 2005/0120128 A1 | 6/2005 | Willes et al. |
| 2005/0125357 A1 | 6/2005 | Saadat et al. |
| 2005/0131558 A1 | 6/2005 | Braithwaite et al. |
| 2005/0166135 A1* | 7/2005 | Burke et al. ............... 715/500.1 |
| 2005/0168630 A1 | 8/2005 | Yamada et al. |
| 2005/0177643 A1 | 8/2005 | Xu |
| 2005/0181348 A1 | 8/2005 | Carey et al. |
| 2005/0195205 A1 | 9/2005 | Abrams, Jr. |
| 2005/0195823 A1 | 9/2005 | Chen et al. |
| 2005/0216556 A1 | 9/2005 | Manion et al. |
| 2005/0281255 A1 | 12/2005 | Davies et al. |
| 2005/0283820 A1 | 12/2005 | Richards et al. |
| 2005/0288805 A1 | 12/2005 | Moore et al. |
| 2005/0289224 A1 | 12/2005 | Deslippe et al. |
| 2006/0095516 A1 | 5/2006 | Wijeratne |
| 2006/0098936 A1 | 5/2006 | Ikeda et al. |
| 2006/0119497 A1 | 6/2006 | Miller et al. |
| 2006/0143236 A1 | 6/2006 | Wu |
| 2006/0193454 A1 | 8/2006 | Abou-Chakra et al. |
| 2007/0038999 A1 | 2/2007 | Millington et al. |
| 2007/0043847 A1 | 2/2007 | Carter et al. |
| 2007/0047712 A1 | 3/2007 | Gross et al. |
| 2007/0048713 A1 | 3/2007 | Plastina et al. |
| 2007/0054680 A1 | 3/2007 | Mo et al. |
| 2007/0142022 A1 | 6/2007 | Madonna et al. |
| 2007/0142944 A1 | 6/2007 | Goldberg et al. |
| 2007/0143493 A1 | 6/2007 | Mullig et al. |
| 2007/0169115 A1 | 7/2007 | Ko et al. |
| 2007/0180137 A1 | 8/2007 | Rajapakse |
| 2007/0192156 A1 | 8/2007 | Gauger |
| 2007/0249295 A1 | 10/2007 | Ukita et al. |
| 2007/0271388 A1 | 11/2007 | Bowra et al. |
| 2007/0299778 A1* | 12/2007 | Haveson et al. ............... 705/51 |
| 2008/0022320 A1 | 1/2008 | Ver Steeg |
| 2008/0091771 A1 | 4/2008 | Allen et al. |
| 2008/0120429 A1 | 5/2008 | Millington et al. |
| 2008/0126943 A1 | 5/2008 | Parasnis et al. |
| 2008/0144861 A1 | 6/2008 | Melanson et al. |
| 2009/0031336 A1 | 1/2009 | Chavez et al. |
| 2009/0157905 A1 | 6/2009 | Davis |
| 2009/0193345 A1 | 7/2009 | Wensley et al. |
| 2009/0222115 A1 | 9/2009 | Malcolm et al. |
| 2009/0228919 A1 | 9/2009 | Zott et al. |
| 2010/0004983 A1 | 1/2010 | Dickerson et al. |
| 2010/0049835 A1 | 2/2010 | Ko et al. |
| 2010/0228740 A1 | 9/2010 | Cannistraro et al. |
| 2010/0284389 A1 | 11/2010 | Ramsay et al. |
| 2010/0299639 A1 | 11/2010 | Ramsay et al. |
| 2011/0066943 A1 | 3/2011 | Brillon et al. |
| 2012/0029671 A1 | 2/2012 | Millington et al. |
| 2012/0030366 A1 | 2/2012 | Collart et al. |
| 2012/0060046 A1 | 3/2012 | Millington |
| 2012/0129446 A1 | 5/2012 | Ko et al. |
| 2012/0290621 A1 | 11/2012 | Heitz, III et al. |
| 2013/0018960 A1 | 1/2013 | Knysz et al. |
| 2013/0022221 A1 | 1/2013 | Kallai et al. |
| 2013/0080599 A1 | 3/2013 | Ko et al. |
| 2013/0174100 A1 | 7/2013 | Seymour et al. |
| 2013/0191454 A1 | 7/2013 | Oliver et al. |
| 2013/0197682 A1 | 8/2013 | Millington |
| 2014/0181569 A1 | 6/2014 | Millington et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1111527 | 6/2001 |
| EP | 1122931 A2 | 8/2001 |
| EP | 2713281 | 4/2004 |
| GB | 2284327 A | 5/1995 |
| GB | 2338374 | 12/1999 |
| JP | 07-210129 | 8/1995 |
| JP | 2003037585 | 2/2003 |
| JP | 2003101958 | 4/2003 |
| JP | 2005108427 | 4/2005 |
| WO | 9525313 | 9/1995 |
| WO | 9961985 | 12/1999 |
| WO | 0153904 | 7/2001 |
| WO | 02073851 | 9/2002 |
| WO | 03093950 A2 | 11/2003 |
| WO | 2005013047 A2 | 2/2005 |

OTHER PUBLICATIONS

"European Extended Search Report for Application No. 13184747.7
mailed on Feb. 28, 2014, 8 pages ".
"Final Office Action mailed Jul. 3, 2012 for U.S. Appl. No.
13/298,090, filed Nov. 16, 2011".
"Final Rejection mailed on Jan. 21, 2010 for U.S. Appl. No.
11/906,702, filed Oct. 2, 2007".
"Maniactools, "Identify Duplicate Files by Sound," Sep. 28, 2010,
http://www.maniactools.com/soft/music-duplicate-remover/iden-
tify-duplicate-files-by-sound.shtml".
"Non-Final Office Action mailed Dec. 5, 2013 for U.S. Appl. No.
13/827,653, filed Mar. 14, 2013".
"Non-Final Office Action mailed Mar. 19, 2013 for U.S. Appl. No.
13/724,048, filed Dec. 21, 2012".
"Non-Final Office Action mailed Apr. 30, 2012 for U.S. Appl. No.
13/204,511, filed Aug. 5, 2011".
"Non-Final Office Action mailed Jul. 30, 2013 for U.S. Appl. No.
13/724,048, filed Dec. 21, 2012".
"Non-Final Rejection mailed on Aug. 20, 2009 for U.S. Appl. No.
11/906,702, filed Oct. 2, 2007".
"Notice of Allowance mailed Mar. 6, 2014 for U.S. Appl. No.
13/827,653, filed Mar. 14, 2013".
"Notice of Allowance mailed Nov. 10, 2011 for U.S. Appl. No.
11/906,702, filed Oct. 2, 2007".
"Notice of Allowance mailed Nov. 13, 2013 for U.S. Appl. No.
13/724,048, filed Dec. 21, 2012".
"Notice of Allowance mailed Jan. 21, 2013 for U.S. Appl. No.
13/298,090, filed Nov. 16, 2011".
"Notice of Allowance mailed Oct. 5, 2012 for U.S. Appl. No.
13/204,511, filed Aug. 5, 2011".
"Final Office Action mailed Mar. 27, 2014 for U.S. Appl. No.
13/533,105, filed Jun. 26, 2012".
"Non-Final Office Action mailed May 1, 2014 for U.S. Appl. No.
14/184,522, filed Feb. 19, 2014".
"Non-Final Office Action mailed May 6, 2014 for U.S. Appl. No.
13/705,176, filed Dec. 5, 2012".
"Non-Final Office Action mailed May 12, 2014 for U.S. Appl. No.
14/184,528, filed Feb. 19, 2014".
Non-Final Office Action mailed May 14, 2014 for U.S. Appl. No.
13/848,932, filed Mar. 22, 2013.
"Final Office Action mailed Jun. 5, 2014 for U.S. Appl. No.
13/907,666, filed May 31, 2013".
"Non-Final Office Action mailed Jan. 5, 2012 for U.S. Appl. No.
13/298,090, filed Nov. 16, 2011, 40 pages".
"Non-Final Office Action mailed Jun. 17, 2014 for U.S. Appl. No.
14/176,808, filed Feb. 10, 2014".
"Non-Final Office Action mailed Dec. 18, 2013 for U.S. Appl. No.
13/907,666, filed May 31, 2013".
"Non-Final Office Action mailed May 27, 2014 for U.S. Appl. No.
14/186,850, filed Feb. 21, 2014".
"Yamaha DME Designer software manual: Copyright 2004", p.
1-250.
"Yamaha DME Designer software manual: Copyright 2004", p. 251-
482.

**US 9,164,532 B2**

Page 5

(56)         **References Cited**

OTHER PUBLICATIONS

"International Bureau,"Search Report" issued in connection with International Patent application No. PCT/US2013/046372, mailed Aug. 26, 2013, 3 pages."

"International Bureau,"Written opinion" issued in connection with International Patent application No. PCT/US2013/046372, mailed Aug. 26, 2013, 4 pages."

"International Search Report, issued by the International Searching Authority in connection with PCT Application No. PCT/US2013/046386, on Sep. 30, 2013, 3 pages."

M. Nilsson., "ID3 Tag Version 2", Mar. 26, 1998, 28 Pages.

"Non-final Office Action in connection with U.S. Appl. No. 13/619,237, mailed Apr. 10, 2013", United States Patent and Trademark Office, 10 pages.

"Non-Final Office Action mailed Nov. 25, 2013 for U.S. Appl. No. 13/533,105, filed Jun. 26, 2012."

"Notice of Allowability in U.S. Appl. No. 13/619,237", Sep. 6, 2013, 4 pages.

"Polycom Conference Composer manual: copyright 2001".

"Written Opinion of the International Searching Authority issued by the International Searching Authority in connection with PCT Application No. PCT/US2013/046386, on Sep. 30, 2013, 6 pages."

"Yamaha DME 32 manual: copyright 2001".

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 10/816,217, mailed on Jan. 18, 2008, 62 pages.

Huang et al., "A Synchronization Infrastructure for Multicast Multimedia at the Presentation Layer," in: IEEE Transactions on Consumer Electronics, vol. 43, No. 3, August 1007, (Aug. 1977), pp. 370-380.

Ishibashi et al., "A Group Synchronization Mechanism for Live Media in Multicast Communications," in: IEEE Globecom, Nov. 1997, pp. 746-752.

Jo et al., "Synchronized One-to-Many Media Streaming with Adaptive Playout Control," in: Proceedings of SPIE, vol. 4861, edited by Tescher et al., Dec. 2002, pp. 71-82.

Biersack, E. et al., "Intra- and Inter- Stream Synchronization for Stored Multimedia Streams," IEEE International Conference on Multimedia Computing and Systems, Jun. 1996, Hiroshima, Japan.

Mills, D.L., "Network Time Protocol (Version 3) Specification, Implementation and Analysis," Network Working Group, Mar. 1992, located at http:toi.iriti.cnr.it/rfc/rfc1305.txt.

Park, S. et al., "Group Synchronization in MultiCast Media Communications," Proc. the 5th Research on Multicast Technology Workshop, Nov. 2003, Daejon, Korea.

Rothermel, K. et al., "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, Apr. 1995, Durhham, New Hampshire, USA.

"The MPEG-2 Transport Stream," located at http://www.coolstf.com/mpeg/#ts; retrieved on Aug. 24, 2006.

Akyildiz et al."Multimedia Group Synchronization Protocols for Integrated Services Networks," Jan. 1996, IEEE Journal on Selected Areas in Communications, vol. 14, No. 1, pp. 162-173.

Schulzrinne et al. "RTP: A Transport Protocol for Real-Time Applications," Jul. 2003, IEFT Network Working Group; RFC 3550; pp. 1-89.

Benslimane, Abderrahim, "A Multimedia Synchronization Protocol for Multicast Groups," 2000, IEEE, Proceedings of the 26th Euromicro Conference, 2000, vol. 1, pp. 456-463.

Mills, David, "Precision Synchronization of Computer Network Clocks," 1994, ACM Computer Communication Review; vol. 24, pp. 28-43.

Ishibashi et al., "A Group Synchronization Mechanism for Stored Media in Multicast Communications," in: IEEE INFOCOM, pp. 692-700; year 1997.

United States Patent and Trademark Office, "Notice of Allowance," issued in connection with U.S. Appl. No. 10/816,217, mailed on Dec. 27, 2011, 34 pages.

United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 10/816,217, mailed on Oct. 21, 2011, 23 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 10/816,217, mailed on Jun. 21, 2011, 16 pages.

United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 10/816,217, mailed on Jan. 28, 2011, 40 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 10/816,217, mailed on Jun. 25, 2010, 41 pages.

United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 10/816,217, mailed on Jul. 13, 2009, 39 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 10/816,217, mailed on Jan. 22, 2009, 52 pages.

United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 10/816,217, mailed on Jun. 30, 2008, 51 pages.

Bretl et al., "MPEG2 tutorial," 2000, www.bretl.com, retrieved http://www.bretl.com/mpeghtml/MPEGindex.htm on Jan. 13, 2009, pp. 1-23.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 13/297,000, mailed on Feb. 29, 2012, 10 pages.

International Search Report for Application No. PCT/US04/23102, mailed on Aug. 1, 2008, 5 pages.

Motorola., "Simplefi, Wireless Digital Audio Receiver, Installation and User Guide", Dec. 31, 2001.

PRISMIQ; Inc., "PRISMIQ Media Player User Guide", 2003, 44 pages.

Final Office Action mailed Sep. 13, 2012 for U.S. Appl. No. 13/297,000, Sep. 13, 2012, 17 pages.

UPnP; "Universal Plug and Play Device Architecture"; Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54.

VOYETRA; Turtle Beach Inc., "AudioTron Quick Start Guide, Version 1.0", Mar. 2001, 24 pages.

VOYETRA; Turtle Beach Inc., "AudioTron Reference Manual, Version 3.0", May 2002, 70 pages.

VOYETRA; Turtle Beach Inc., "AudioTron Setup Guide, Version 3.0", May 2002, 38 pages.

"Advisory Action mailed Sep. 18, 2008 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 8 pages".

"Japanese Intellectual Property Office, "Decision of Rejection," issued in connection with Japanese patent application No. 2012-178711, mailed on Jul. 4, 2014, 3 pages".

"Japanese Intellectual Property Office, "Office Action Summary," issued in connection with Japanese patent application No. 2012-178711, mailed on Nov. 19, 2013, 5 pages".

"Non-Final Office Action mailed Apr. 19, 2010 for U.S. Appl. No. 11/801,468, filed May 9, 2007, 16 pages".

"Non-Final Office Action mailed Jul. 25, 2014 for U.S. Appl. No. 14/184,526, filed Feb. 19, 2014".

"Non-Final Office Action mailed Nov. 29, 2010 for U.S. Appl. No. 11/801,468, filed May 9, 2007, 17 pages".

"Non-Final Office Action mailed Jul. 31, 2014 for U.S. Appl. No. 13/533,105, filed Jun. 26, 2012".

"Notice of Allowance mailed May 6, 2011 for U.S. Appl. No. 11/801,468, filed May 9, 2007, 14 pages".

"Advisory Action mailed Sep. 5, 2014 for U.S. Appl. No. 13/907,666, filed May 31, 2013, 3 pages".

"Bluetooth. "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity" Core, Version 1.0 A, Jul. 26, 1999, 1068 pages".

"Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy" Core, Version 1.0 B, Dec. 1, 1999, 1076 pages".

"Dell, Inc. "Dell Digital Audio Receiver: Reference Guide" Jun. 2000, 70 pages".

"Dell, Inc. "Start Here" Jun. 2000, 2 pages".

"Final Office Action mailed on Oct. 22, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 12 pages".

**US 9,164,532 B2**

Page 6

(56)          **References Cited**

OTHER PUBLICATIONS

"Final Office Action mailed on Oct. 23, 2014, issued in conection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 23 pages".
"Jones, Stephen. "Dell Digital Audio Receiver: Digital upgrade for your analog stereo" Analog Stereo. Jun. 24, 2000 < http://www.reviewsonline.com/articles/961906864.htm> retrieved Jun. 18, 2014, 2 pages".
"Louderback, Jim. "Affordable Audio Receiver Furnishes Homes With MP3" TechTV Vault. Jun. 28, 2000 <http://www.g4tv.com/articles/17923/affordable-audio-receiver-furnishes-homes-with-mp3/> retrieved Jul. 10, 2014, 2 pages".
"Non-Final Office Action mailed Jul. 25, 2014 for U.S. Appl. No. 14/184,935, filed Feb. 20, 2014".
"Non-Final Office Action mailed on Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 11 pages".
"Non-Final Office Action mailed on Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 11 pages".
"Non-Final Office Action mailed on Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 9 pages".
"Notice of Allowance mailed on Sep. 25, 2014, issued in connection with U.S. Appl. No. 14/176,808, filed Feb. 10, 2014, 5 pages".
"Palm, Inc. "Handbook for the Palm VII Handheld" May 2000, 311 pages".
"Welcome. You're watching Apple TV." Apple TV 1st Generation Setup Guide, Apr. 8, 2008 <http://manuals.info.apple.com/MANU-ALS/0/MA403/en_US/AppleTV_SetupGuide.pdf> Retrieved Oct. 14, 2014, 40 pages.
"Welcome. You're watching Apple TV." Apple TV 2nd Generation Setup Guide, Mar. 10, 2011 <http://manuals.info.apple.com/MANUALS/1000/MA1555/en_US/Apple_TV_2nd_gen_Setup_Guide.pdf> Retrieved Oct. 16, 2014, 35 pages.
"Welcome. You're watching Apple TV." Apple TV 3rd Generation Setup Guide, Mar. 16, 2012 <http://http://manuals.info.apple.com/MANUALS/1000/MA1607/en_US/apple_tv_3rd_gen_setup.pdf> Retrieved Oct. 16, 2014, 35 pages.
"WinHec 2000 slide deck, "Building an Audio Appliance" 138 pages".
"Advisory Action mailed on Nov. 12, 2014, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 6 pages".
"Advisory Action mailed on Nov. 26, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 9 pages".
"Advisory Action mailed on Jan. 8, 2015, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 4 pages".
"Crown PIP Manual available for sale at least 2004, 68 pages".
"Final Office Action mailed on Dec. 17, 2014, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 36 pages".
"Final Office Action mailed on Dec. 3, 2014, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 12 pages".
"Final Office Action mailed on Jan. 7, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 14 pages".
"Non-Final Office Action mailed on Dec. 17, 2014, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 11 pages".
"Non-Final Office Action mailed on Nov. 17, 2014, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 11 pages".
"Non-Final Office Action mailed on Nov. 18, 2014, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 10 pages".
"Non-Final Office Action mailed on Nov. 19, 2014, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 9 pages".
"Renkus Heinz Manual; available for sale at least 2004, 6 pages".
Presentations at WinHEC 2000, May 2000, 139 pages.
"Advisory Action mailed on Jun. 1, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 11 pages".
"Baldwin, Roberto. "How-To: Setup iTunes DJ on Your Max and iPhone", available at http://www.maclife.com/article/howtos/howto_setup_itunes_dj_your_mac_and_iphone, archived on Mar. 17, 2009, 4 pages".

"Final Office Action mailed on Jun. 15, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 25 pages".
"Non-Final Office Action mailed on Jun. 12, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 16 pages".
"Non-Final Office Action mailed on Jun. 19, 2015, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 38 pages.".
"Non-Final Office Action mailed on Jun. 23, 2015, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 30 pages".
"Non-Final Office Action mailed on Jun. 3, 2015, issued in connection with U.S. Appl. No. 14/564,544, filed Dec. 9, 2014, 7 pages.".
"Non-Final Office Action mailed on Jun. 4, 2015, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 16 pages.".
"Notice of Allowance mailed on Jul. 2, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 17 pages".
"Notice of Allowance mailed on Jul. 2, 2015, issued in connection with U.S. App. No. 13/888,203, filed May 6, 2013, 19 pages".
"Notice of Allowance mailed on Jul. 2, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 23 pages".
"Notice of Allowance mailed on Jul. 6, 2015, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 24 pages.".
"European Extended Search Report for Application No. 14181454.1 mailed on Mar. 31, 2015, 9 pages.".
"Final Office Action mailed on Apr. 28, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 20 pages".
"Notice of Allowance mailed on May 19, 2015, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 7 pages".
"Re-Exam Non-Final Office Action mailed on Apr. 22, 2015, issued in connection with U.S. Appl. No. 90/013,423, filed Jan. 5, 2015, 16 pages.".
"Advisory Action mailed on Feb. 26, 2015, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 3 pages.".
"Final Office Action mailed on Feb. 11, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 13 pages".
"Final Office Action mailed on Feb. 11, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 17 pages".
"Final Office Action mailed on Feb. 12, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 20 pages".
"International Bureau,"International Preliminary Report on Patentability" issued in connection with International Patent application No. PCT/US2013/046372, mailed Dec. 31, 2014, 5 pages.".
"International Preliminary Report on Patentability and Written Opinion, issued by the International Searching Authority in connection with International Patent Application No. PCT/US2013/046386, mailed on Jan. 8, 2015, 8 pages".
"Non-Final Office Action mailed on Feb. 26, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 25 pages.".
"Non-Final Office Action mailed on Jan. 30, 2015, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 13 pages".
"Non-Final Office Action mailed on Jan. 30, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 29 pages.".
Advisory Action mailed on Mar. 2, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 3 pages.
Final Office Action mailed on Mar. 3, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 13 pages.
"Advisory Action mailed on Mar. 25, 2015, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 5 pages.".
"Final Office Action mailed Mar. 26, 2015, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 18 pages".
"Final Office Action mailed on Mar. 4, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 16 pages".
"Final Office Action mailed on Mar. 5, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 13 pages".
"Final Office Action mailed on Mar. 9, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 14 pages.".
"Non-Final Office Action mailed on Mar. 12, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 13 pages.".
"Non-Final Office Action mailed on Mar. 13, 2015, issued in connection with U.S. Appl. No. 13/705,177, filed Dec. 5, 2012, 15 pages.".
"Non-Final Office Action mailed on Mar. 27, 2015, issued in connection with U.S. Appl. No. 13/705,178, filed Dec. 5, 2012, 14 pages.".

**US 9,164,532 B2**

Page 7

(56)          **References Cited**

OTHER PUBLICATIONS

"Pre-Interview First Office Action mailed on Mar. 10, 2015, issued in connection with U.S. Appl. No. 14/505,027, filed Oct. 2, 2014, 4 pages.".

"Advisory Action mailed on Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 9 pages.".

"Advisory Action mailed on Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 9 pages.".

"Advisory Action mailed on Jul. 28, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 7 pages.".

"Baudisch et al., "Flat vol. Control: Improving Usability by Hiding the Volume Control Hierarchy in the User Interface", 2004, 8 pages.".

"Chakrabarti et al., "A Remotely Controlled Bluetooth Enabled Environment", IEEE, 2004, pp. 77-81.".

"Schmandt et al., "Impromptu: Managing Networked Audio Applications for Mobile Users", 2004, 11 pages.".

"Final Office Action mailed on Aug. 10, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 26 pages.".

"Final Office Action mailed on Aug. 11, 2015, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 15 pages".

"Final Office Action mailed on Jul. 15, 2015, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 18 pages".

"Final Office Action mailed on Aug. 3, 2015, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 13 pages".

"Fulton et al., "The Network Audio System: Make Your Application Sing (As Well As Dance)!", The X Resource, 1994, 14 pages.".

"Hans et al., "Interacting with Audio Streams for Entertainment and Communication", 2003, 7 pages.".

"Levergood et al., "AudioFile: A Network-Transparent System for Distributed Audio Applications", Digital Equipment Corporation, 1993, 109 pages.".

"Notice of Allowance mailed on Aug. 10, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 9 pages".

"Notice of Allowance mailed on Aug. 12, 2015, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 27 pages".

"Notice of Allowance mailed on Jul. 13, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 22 pages".

"Notice of Allowance mailed on Jul. 15, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 18 pages".

"Notice of Allowance mailed on Jul. 17, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 20 pages".

"Notice of Allowance mailed on Jul. 29, 2015, issued in connection with U.S. Appl. No. 13/359,976, filed Jan. 27, 2012, 28 pages".

"Notice of Allowance mailed on Jul. 29, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 9 pages".

"Notice of Allowance mailed on Jul. 30, 2015, issued in connection with U.S. Appl. No. 13/705,178, filed Dec. 5, 2012, 18 pages".

"Notice of Allowance mailed on Aug. 4, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 13 pages".

"Nutzel et al., "Sharing Systems for Future HiFi Systems", IEEE, 2004, 9 pages.".

"Re-Exam Final Office Action mailed on Aug. 5, 2015, issued in connection with U.S. Appl. No. 90/013,423, filed Jan. 5, 2015, 25 pages.".

\* cited by examiner

U.S. Patent        Oct. 20, 2015        Sheet 1 of 5        US 9,164,532 B2



*FIG. 1*



*FIG. 2*



*F I G. 2A*



*FIG. 3*



*FIG. 4*

US 9,164,532 B2

**1**

## METHOD AND APPARATUS FOR DISPLAYING ZONES IN A MULTI-ZONE SYSTEM

### INCORPORATION BY REFERENCE

This application claims priority under 35 USC §120 of U.S. application Ser. No. 13/297,000, filed Nov. 15, 2011, entitled "System And Method For Synchronizing Operations Among A Plurality Of Independently Clocked Digital Data Processing Devices", which is a continuation of patent application Ser. No. 10/816,217, now U.S. Pat. No. 8,234,395, filed on Apr. 1, 2004, entitled "System and Method for Synchronizing Operations Among a Plurality of Independently Clocked Digital Data Processing Devices", which is a nonprovisional application claiming priority under 35 USC §119 to Provisional Patent Application Ser. No. 60/490,768, filed on Jul. 28, 2003, entitled "Method for Synchronizing Audio Playback Between Multiple Networked Devices," all of which are assigned to the assignee of the present application and are incorporated herein by reference.

The present invention relates generally to the field of digital data processing devices, and more particularly to systems and methods for synchronizing operations among a plurality of independently-clocked digital data processing devices. The invention is embodied in a system for synchronizing operations among a plurality of devices, in relation to information that is provided by a common source. One embodiment of the invention enables synchronizing of audio playback as among two or more audio playback devices that receive audio information from a common information source, or channel.

More generally, the invention relates to the field of arrangements that synchronize output generated by a number of output generators, including audio output, video output, combinations of audio and video, as well as other types of output as will be appreciated by those skilled in the art, provided by a common channel. Generally, the invention will find utility in connection with any type of information for which synchrony among independently-clocked devices is desired.

### BACKGROUND OF THE INVENTION

There are a number of circumstances under which it is desirable to maintain synchrony of operations among a plurality of independently-clocked digital data processing devices in relation to, for example, information that is provided thereto by a common source. For example, systems are being developed in which one audio information source can distribute audio information in digital form to a number of audio playback devices for playback. The audio playback devices receive the digital information and convert it to analog form for playback. The audio playback devices may be located in the same room or they may be distributed in different rooms in a residence such as a house or an apartment, in different offices in an office building, or the like. For example, in a system installed in a residence, one audio playback device may be located in a living room, while another audio playback device may be located in a kitchen, and yet other audio playback devices may be located in various bedrooms of a house. In such an arrangement, the audio information that is distributed to various audio playback devices may relate to the same audio program, or the information may relate to different audio programs. If the audio information source provides audio information relating to the same audio program to two or more audio playback devices at the same time, the audio playback devices will generally contemporane-

ously play the same program. For example, if the audio information source provides audio information to audio playback devices located in the living room and kitchen in a house at the same time, they will generally contemporaneously play the same program.

One problem that can arise is to ensure that, if two or more audio playback devices are contemporaneously attempting to play back the same audio program, they do so simultaneously. Small differences in the audio playback devices' start times and/or playback speeds can be perceived by a listener as an echo effect, and larger differences can be very annoying. Differences can arise because for a number of reasons, including delays in the transfer of audio information over the network. Such delays can differ as among the various audio playback devices for a variety of reasons, including where they are connected into the network, message traffic and other reasons as will be apparent to those skilled in the art.

Another problem arises from the following. When an audio playback device converts the digital audio information from digital to analog form, it does so using a clock that provides timing information. Generally, the audio playback devices that are being developed have independent clocks, and, if they are not clocking at precisely the same rate, the audio playback provided by the various devices can get out of synchronization.

### SUMMARY OF THE INVENTION

The invention provides a new and improved system and method for synchronizing operations among a number of digital data processing devices that are regulated by independent clocking devices. Generally, the invention will find utility in connection with any type of information for which synchrony among devices connected to a network is desired. The invention is described in connection with a plurality of audio playback devices that receive digital audio information that is to be played back in synchrony, but it will be appreciated that the invention can find usefulness in connection with any kind of information for which coordination among devices that have independent clocking devices would find utility.

In brief summary, the invention provides, in one aspect, a system for maintaining synchrony of operations among a plurality of devices that have independent clocking arrangements. The system includes a task distribution device that distributes tasks to a synchrony group comprising a plurality of devices that are to perform the tasks distributed by the task distribution device in synchrony. The task distribution device distributes each task to the members of the synchrony group over a network. Each task is associated with a time stamp that indicates a time, relative to a clock maintained by the task distribution device, at which the members of the synchrony group are to execute the task. Each member of the synchrony group periodically obtains from the task distribution device an indication of the current time indicated by its clock, determines a time differential between the task distribution device's clock and its respective clock and determines therefrom a time at which, according to its respective clock, the time stamp indicates that it is to execute the task.

In one embodiment, the tasks that are distributed include audio information for an audio track that is to be played by all of the devices comprising the synchrony group synchronously. The audio track is divided into a series of frames, each of which is associated with a time stamp indicating the time, relative to the clock maintained by an audio information channel device, which, in that embodiment, serves as the task distribution device, at which the members of the synchrony

US 9,164,532 B2

3

group are to play the respective frame. Each member of the synchrony group, using a very accurate protocol, periodically obtains the time indicated by the audio information channel device, and determines a differential between the time as indicated by its local clock and the audio information channel device's clock. The member uses the differential and the time as indicated by the time stamp to determine the time, relative to its local clock, at which it is to play the respective frame. The members of the synchrony group do this for all of the frames, and accordingly are able to play the frames in synchrony.

BRIEF DESCRIPTION OF THE DRAWINGS

This invention is pointed out with particularity in the appended claims. The above and further advantages of this invention may be better understood by referring to the following description taken in conjunction with the accompanying drawings, in which:

FIG. 1 schematically depicts an illustrative networked audio system, constructed in accordance with the invention;

FIG. 2 schematically depicts a functional block diagram of a synchrony group utilizing a plurality of zone players formed within the networked audio system depicted in FIG. 1;

FIG. 2A schematically depicts two synchrony groups, illustrating how a member of one synchrony group can provide audio information to the members of another synchrony group;

FIG. 3 depicts an functional block diagram of a zone player for use in the networked audio system depicted in FIG. 1; and

FIG. 4 is useful in understanding an digital audio information framing methodology useful in the network audio system depicted in FIG. 1.

DETAILED DESCRIPTION OF AN ILLUSTRATIVE EMBODIMENT

FIG. 1 depicts an illustrative network audio system 10 constructed in accordance with the invention. With reference to FIG. 1, the network audio system 10 includes a plurality of zone players 11(1) through 11(N) (generally identified by reference numeral 11(n)) interconnected by a local network 12, all of which operate under control of one or more user interface modules generally identified by reference numeral 13. One or more of the zone players 11(n) may also be connected to one or more audio information sources, which will generally be identified herein by reference numeral 14(n)(s), and/or one or more audio reproduction devices, which will generally be identified by reference numeral 15(n) (r). In the reference numeral 14(n)(s), index "n" refers to the index "n" of the zone player 11(n) to which the audio information source is connected, and the index "s" (s=1, . . . , S$_n$) refers to the "s-th" audio information source connected to that "n-th" zone player 11(n). Thus, if, for example, a zone player 11(n) is connected to four audio information sources 14(n)(1) through 14(n)(4), the audio information sources may be generally identified by reference numeral 14(n)(s), with S$_n$=4. It will be appreciated that the number of audio information sources S$_n$ may vary as among the various zone players 11(n), and some zone players may not have any audio information sources connected thereto. Similarly, in the reference numeral 15(n)(r), index "n" refers to the index "n" of the zone player 11(n) to which the audio reproduction device is connected, and the index "r" (r=1, . . . , R$_n$) refers to the "r-th" audio information source connected to that "n-th" zone player 11(n). In addition to the audio information sources 14(n)(s), the network audio system 10 may include one or more audio

4

information sources 16(1) through 16(M) connected through appropriate network interface devices (not separately shown) to the local network 12. Furthermore, the local network may include one or more network interface devices (also not separately shown) that are configured to connect the local network 12 to other networks, including a wide area network such as the Internet, the public switched telephony network (PSTN) or other networks as will be apparent to those skilled in the art, over which connections to audio information sources may be established.

The zone players 11(n) associated with system 10 may be distributed throughout an establishment such as residence, an office complex, a hotel, a conference hall, an amphitheater or auditorium, or other types of establishments as will be apparent to those skilled in the art or the like. For example, if the zone players 11(n) and their associated audio information source(s) and/or audio reproduction device(s) are distributed throughout a residence, one, such as zone player 11(1) and its associated audio information source(s) and audio reproduction device(s) may be located in a living room, another may be located in a kitchen, another may be located in a dining room, and yet others may be located in respective bedrooms, to selectively provide entertainment in those rooms. On the other hand, if the zone players 11(n) and their associated audio information source(s) and/or audio reproduction device(s) are distributed throughout an office complex, one may, for example, be provided in each office to selectively provide entertainment to the employees in the respective offices. Similarly, if the zone players 11(n) and associated audio information source(s) and/or audio reproduction device(s) are used in a hotel, they may be distributed throughout the rooms to provide entertainment to the guests. Similar arrangements may be used with zone players 11(n) and associated audio information source(s) and/or audio reproduction device(s) used in an amphitheater or auditorium. Other arrangements in other types of environments will be apparent to those skilled in the art. In each case, the zone players 11(n) can be used to selectively provide entertainment in the respective locations, as will be described below.

The audio information sources 14(n)(s) and 16(m) may be any of a number of types of conventional sources of audio information, including, for example, compact disc ("CD") players, AM and/or FM radio receivers, analog or digital tape cassette players, analog record turntables and the like. In addition, the audio information sources 14(n)(s) and 16(m) may comprise digital audio files stored locally on, for example, personal computers (PCs), personal digital assistants (PDAs), or similar devices capable of storing digital information in volatile or non-volatile form. As noted above, the local network 12 may also have an interface (not shown) to a wide area network, over which the network audio system 10 can obtain audio information. Moreover, one or more of the audio information sources 14(n)(s) may also comprise an interface to a wide area network such as the Internet, the public switched telephony network (PSTN) or any other source of audio information. In addition, one or more of the audio information sources 14(n)(s) and 16(m) may comprise interfaces to radio services delivered over, for example, satellite. Audio information obtained over the wide area network may comprise, for example, streaming digital audio information such as Internet radio, digital audio files stored on servers, and other types of audio information and sources as will be appreciated by those skilled in the art. Other arrangements and other types of audio information sources will be apparent to those skilled in the art.

Generally, the audio information sources 14(n)(s) and 16(m) provide audio information associated with audio pro-

US 9,164,532 B2

**5**

grams to the zone players for playback. A zone player that receives audio information from an audio information source $14(n)(s)$ that is connected thereto can provide playback and/or forward the audio information, along with playback timing information, over the local network $12$ to other zone players for playback. Similarly, each audio information source $16(m)$ that is not directly connected to a zone player can transmit audio information over the network $12$ to any zone player $11(n)$ for playback. As will be explained in detail below, the respective zone player $11(n)$ can transmit the audio information that it receives either from an audio information source $14(n)(s)$ connected thereto, or from an audio information source $16(m)$, to selected ones of the other zone players $11(n')$, $11(n'')$, ... (n not equal to n', n'', ...) for playback by those other zone players. The other zone players $11(n')$, $11(n'')$, ... to which the zone player $11(n)$ transmits the audio information for playback may be selected by a user using the user interface module $13$. In that operation, the zone player $11(n)$ will transmit the audio information to the selected zone players $11(n')$, $11(n'')$, ... over the network $12$. As will be described below in greater detail, the zone players $11(n)$, $11(n')$, $11(n'')$, ... operate such that the zone players $11(n')$, $11(n'')$, ... synchronize their playback of the audio program with the playback by the zone player $11(n)$, so that the zone players $11(n)$, $11(n')$, $11(n'')$ provide the same audio program at the same time.

Users, using user interface module $13$, may also enable different groupings or sets of zone players to provide audio playback of different audio programs synchronously. For example, a user, using a user interface module $13$, may enable zone players $11(1)$ and $11(2)$ to play one audio program, audio information for which may be provided by, for example, one audio information source $14(1)(1)$. The same or a different user may, using the same or a different user interface module $13$, enable zone players $11(4)$ and $11(5)$ to contemporaneously play another audio program, audio information for which may be provided by a second audio information source, such as audio information source $14(5)$ (2). Further, a user may enable zone player $11(3)$ to contemporaneously play yet another audio program, audio information for which may be provided by yet another audio information source, such as audio information source $16(1)$. As yet another possibility, a user may contemporaneously enable zone player $11(1)$ to provide audio information from an audio information source connected thereto, such as audio information source $14(1)(2)$, to another zone player, such as zone player $11(6)$ for playback.

In the following, the term "synchrony group" will be used to refer to a set of one or more zone players that are to play the same audio program synchronously. Thus, in the above example, zone players $11(1)$ and $11(2)$ comprise one synchrony group, zone player $11(3)$ comprises a second synchrony group, zone players $11(4)$ and $11(5)$ comprise a third synchrony group, and zone player $11(6)$ comprises yet a fourth synchrony group. Thus, while zone players $11(1)$ and $11(2)$ are playing the same audio program, they will play the audio program synchronously. Similarly, while zone players $11(4)$ and $11(5)$ are playing the same audio program, they will play the audio program synchronously. On the other hand, zone players that are playing different audio programs may do so with unrelated timings. That is, for example, the timing with which zone players $11(1)$ and $11(2)$ play their audio program may have no relationship to the timing with which zone player $11(3)$, zone players $11(4)$ and $11(5)$, and zone player $11(6)$ play their audio programs. It will be appreciated that, since "synchrony group" is used to refer to sets of zone players that are playing the same audio program synchro-

**6**

nously, zone player $11(1)$ will not be part of zone player $11(6)$'s synchrony group, even though zone player $11(1)$ is providing the audio information for the audio program to zone player $11(6)$.

In the network audio system $10$, the synchrony groups are not fixed. Users can enable them to be established and modified dynamically. Continuing with the above example, a user may enable the zone player $11(1)$ to begin providing playback of the audio program provided thereto by audio information source $14(1)(1)$, and subsequently enable zone player $11(2)$ to join the synchrony group. Similarly, a user may enable the zone player $11(5)$ to begin providing playback of the audio program provided thereto by audio information source $14(5)$ (2), and subsequently enable zone player $11(4)$ to join that synchrony group. In addition, a user may enable a zone player to leave a synchrony group and possibly join another synchrony group. For example, a user may enable the zone player $11(2)$ to leave the synchrony group with zone player $11(1)$, and join the synchrony group with zone player $11(6)$. As another possibility, the user may enable the zone player $11(1)$ to leave the synchrony group with zone player $11(2)$ and join the synchrony group with zone player $11(6)$. In connection with the last possibility, the zone player $11(1)$ can continue providing audio information from the audio information source $14(1)(1)$ to the zone player $11(2)$ for playback thereby.

A user, using the user interface module $13$, can enable a zone player $11(n)$ that is currently not a member of a synchrony group to join a synchrony group, after which it will be enabled to play the audio program that is currently being played by that synchrony group. Similarly, a user, also using the user interface module $13$, can enable a zone player $11(n)$ that is currently a member of one synchrony group, to disengage from that synchrony group and join another synchrony group, after which that zone player will be playing the audio program associated with the other synchrony group. For example, if a zone player $11(6)$ is currently not a member of any synchrony group, it, under control of the user interface module $13$, can become a member of a synchrony group, after which it will play the audio program being played by the other members of the synchrony group, in synchrony with the other members of the synchrony group. In becoming a member of the synchrony group, zone player $11(6)$ can notify the zone player that is the master device for the synchrony group that it wishes to become a member of its synchrony group, after which that zone player will also transmit audio information associated with the audio program, as well as timing information, to the zone player $11(6)$. As the zone player $11(6)$ receives the audio information and the timing information from the master device, it will play the audio information with the timing indicated by the timing information, which will enable the zone player $11(6)$ to play the audio program in synchrony with the other zone player(s) in the synchrony group.

Similarly, if a user, using the user interface module $13$, enables a zone player $11(n)$ associated with a synchrony group to disengage from that synchrony group, and if the zone player $11(n)$ is not the master device of the synchrony group, the zone player $11(n)$ can notify the master device, after which the master device can terminate transmission of the audio information and timing information to the zone player $11(n)$. If the user also enables the zone player $11(n)$ to begin playing another audio program using audio information from an audio information source $14(n)(s)$ connected thereto, it will acquire the audio information from the audio information source $14(n)(s)$ and initiate playback thereof. If the user enables another zone player $11(n')$ to join the synchrony

US 9,164,532 B2

7

group associated with zone player $11(n)$, operations in connection therewith can proceed as described immediately above.

As yet another possibility, if a user, using the user interface module **13**, enables a zone player $11(n)$ associated with a synchrony group to disengage from that synchrony group and join another synchrony group, and if the zone player is not the master device of the synchrony group from which it is disengaging, the zone player $11(n)$ can notify the master device of the synchrony group from which it is disengaging, after which that zone player will terminate transmission of audio information and timing information to the zone player $11(n)$ that is disengaging. Contemporaneously, the zone player $11(n)$ can notify the master device of the synchrony group that it (that is, zone player $11(n)$) is joining, after which the master device can begin transmission of audio information and timing information to that zone player $11(n)$. The zone player $11(n)$ can thereafter begin playback of the audio program defined by the audio information, in accordance with the timing information so that the zone player $11(n)$ will play the audio program in synchrony with the master device.

As yet another possibility, a user, using the user interface module **13**, may enable a zone player $11(n)$ that is not associated with a synchrony group, to begin playing an audio program using audio information provided to it by an audio information source $14(n)(s)$ connected thereto. In that case, the user, also using the user interface module **13** or a user interface device that is specific to the audio information source $14(n)(s)$, can enable the audio information source $14(n)(s)$ to provide audio information to the zone player $11(n)$. After the zone player $11(n)$ has begun playback, or contemporaneously therewith, the user, using the user interface module **13**, can enable other zone players $11(n')$, $11(n'')$, . . . to join zone player $11(n)$'s synchrony group and enable that zone player $11(n)$ to transmit audio information and timing information thereto as described above, to facilitate synchronous playback of the audio program by the other zone players $11(n')$, $11(n'')$ . . . .

A user can use the user interface module **13** to control other aspects of the network audio system **10**, including but not limited to the selection of the audio information source $14(n)(s)$ that a particular zone player $11(n)$ is to utilize, the volume of the audio playback, and so forth. In addition, a user may use the user interface module **13** to turn audio information source(s) $14(n)(s)$ on and off and to enable them to provide audio information to the respective zone players $11(n)$.

Operations performed by the various devices associated with a synchrony group will be described in connection with FIG. **2**, which schematically depicts a functional block diagram of a synchrony group in the network audio system **10** described above in connection with FIG. **1**. With reference to FIG. **2**, a synchrony group **20** includes a master device **21** and zero or more slave devices **22(1)** through **22** (G) (generally identified by reference numeral $22(g)$), all of which synchronously play an audio program provided by an audio information channel device **23**. Each of the master device **21**, slave devices $22(g)$ and audio information channel device **23** utilizes a zone player $11(n)$ depicted in FIG. **1**, although it will be clear from the description below that a zone player may be utilized both for the audio information channel device for the synchrony group **20**, and the master device **21** or a slave device $22(g)$ of the synchrony group **20**. As will be described below in more detail, the audio information channel device **23** obtains the audio information for the audio program from an audio information source, adds playback timing information, and transmits the combined audio and playback timing information to the master device **21** and slave devices $22(g)$ over

8

the network **12** for playback. The playback timing information that is provided with the audio information, together with clock timing information provided by the audio information channel device **23** to the various devices **21** and $22(g)$ as will be described below, enables the master device **21** and slave devices $22(g)$ of the synchrony group **20** to play the audio information simultaneously.

The master device **21** and the slave devices $22(g)$ receive the audio and playback timing information, as well as the clock timing information, that are provided by the audio information channel device **23**, and play back the audio program defined by the audio information. The master device **21** is also the member of the synchrony group **20** that communicates with the user interface module **13** and that controls the operations of the slave devices $22(g)$ in the synchrony group **20**. In addition, the master device **21** controls the operations of the audio information channel device **23** that provides the audio and playback timing information for the synchrony group **20**. Generally, the initial master device **21** for the synchrony group will be the first zone player $11(n)$ that a user wishes to play an audio program. However, as will be described below, the zone player $11(n)$ that operates as the master device **21** can be migrated from one zone player $11(n)$ to another zone player $11(n')$, which preferably will be a zone player that is currently operating as a slave device $22(g)$ in the synchrony group.

In addition, under certain circumstances, as will be described below, the zone player $11(n)$ that operates as the audio information channel device **23** can be migrated from one zone player to another zone player, which also will preferably will be a zone player that is currently operating as a member of the synchrony group **20**. It will be appreciated that the zone player that operates as the master device **21** can be migrated to another zone player independently of the migration of the audio information channel device **23**. For example, if one zone player $11(n)$ is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the master device **21** can be migrated to another zone player $11(n')$ while the zone player $11(n)$ is still operating as the audio information channel device **23**. Similarly, if one zone player $11(n)$ is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the audio information channel device **23** can be migrated to another zone player $11(n')$ while the zone player $11(n)$ is still operating as the master device **21**. In addition, if one zone player $11(n)$ is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the master device **21** can be migrated to another zone player $11(n')$ and the audio information channel device can be migrated to a third zone player $11(n'')$.

The master device **21** receives control information from the user interface module **13** for controlling the synchrony group **20** and provides status information indicating the operational status of the synchrony group to the user interface module **13**. Generally, the control information from the user interface module **13** enables the master device **21** to, in turn, enable the audio information channel device **23** to provide audio and playback timing information to the synchrony group to enable the devices **21** and $22(g)$ that are members of the synchrony group **20** to play the audio program synchronously. In addition, the control information from the user interface module **13** enables the master device **21** to, in turn, enable other zone players to join the synchrony group as slave devices $22(g)$ and to enable slave devices $22(g)$ to disengage from the synchrony group. Control information from the user interface module **13** can also enable the zone player $11(n)$ that

US 9,164,532 B2

**9**

is currently operating as the master device **21** to disengage from the synchrony group, but prior to doing so that zone player will enable the master device **21** to transfer from that zone player **11**(*n*) to another zone player **11**(*n′*), preferably to a zone player **11**(*n′*) that is currently a slave device **22**(*g*) in the synchrony group **20**. The control information from the user interface module **13** can also enable the master device **21** to adjust its playback volume and to enable individual ones of the various slave devices **22**(*g*) to adjust their playback volumes. In addition, the control information from the user interface module **13** can enable the synchrony group **20** to terminate playing of a current track of the audio program and skip to the next track, and to re-order tracks in a play list of tracks defining the audio program that is to be played by the synchrony group **20**.

The status information that the master device **21** may provide to the user interface module **13** can include such information as a name or other identifier for the track of the audio work that is currently being played, the names or other identifiers for upcoming tracks, the identifier of the zone player **11**(*n*) that is currently operating as the master device **21**, and identifiers of the zone players that are currently operating as slave devices **22**(*g*). In one embodiment, the user interface module **13** includes a display (not separately shown) that can display the status information to the user.

It will be appreciated that the zone player **11**(*n*) that is operating as the audio information channel device **23** for one synchrony group may also comprise the master device **21** or any of the slave devices **22**(*g*) in another synchrony group. This may occur if, for example, the audio information source that is to provide the audio information that is to be played by the one synchrony group is connected to a zone player also being utilized as the master device or a slave device for the other synchrony group. This will be schematically illustrated below in connection with FIG. 2A. Since, as noted above, the zone player **11**(*n*) that is operating as the audio information channel device **23** for the synchrony group **20** may also be operating as a master device **21** or slave device **22**(*g*) for another synchrony group, it can also be connected to one or more audio reproduction devices **15**(*n*)(*r*), although that is not depicted in FIG. **2**. Since the master device **21** and slave devices **22**(*g*) are all to provide playback of the audio program, they will be connected to respective audio reproduction devices **15**(*n*)(*r*). Furthermore, it will be appreciated that one or more of the zone players **11**(*n*) that operate as the master device **21** and slave devices **22**(*g*) in synchrony group **20** may also operate as an audio information channel device for that synchrony group or for another synchrony group and so they may be connected to one or more audio information sources **14**(*n*)(*s*), although that is also not depicted in FIG. **2**. In addition, it will be appreciated that a zone player **11**(*n*) can also operate as a audio information channel device **23** for multiple synchrony groups.

If the audio information channel device **23** does not utilize the same zone player as the master device **21**, the master device **21** controls the audio information channel device by exchanging control information over the network **12** with the audio information channel device **23**. The control information is represented in FIG. **2** by the arrow labeled CHAN_DEV_CTRL_INFO. The control information that the master device **21** provides to the audio information channel device **23** will generally depend on the nature of the audio information source that is to provide the audio information for the audio program that is to be played and the operation to be enabled by the control information. If, for example, the audio information source is a conventional compact disc, tape, or record player, broadcast radio receiver, or the like, which is

**10**

connected to a zone player **11**(*n*), the master device **21** may merely enable the zone player serving as the audio information channel device **23** to receive the audio information for the program from the audio information source. It will be appreciated that, if the audio information is not in digital form, the audio information channel device **23** will convert it to digital form and provide the digitized audio information, along with the playback timing information, to the master device **21** and slave devices **22**(*g*).

On the other hand, if the audio information source is, for example, a digital data storage device, such as may be on a personal computer or similar device, the master device **21** can provide a play list to the audio information channel device **23** that identifies one or more files containing the audio information for the audio program. In that case, the audio information channel device **23** can retrieve the files from the digital data storage device and provide them, along with the playback timing information, to the master device **21** and the slave devices **22**(*g*). It will be appreciated that, in this case, the audio information source may be directly connected to the audio information channel device **23**, as, for example, an audio information source **14**(*n*)(*s*), or it may comprise an audio information source **16**(*m*) connected to the network **12**. As a further alternative, if the audio information source is a source available over the wide area network, the master device **21** can provide a play list comprising a list of web addresses identifying the files containing the audio information for the audio program that is to be played, and in that connection the audio information channel device **23** can initiate a retrieval of the files over the wide area network. As yet another alternative, if the audio information source is a source of streaming audio received over the wide area network, the master device **21** can provide a network address from which the streaming audio can be received. Other arrangements by which the master device **21** can control the audio information channel device **23** will be apparent to those skilled in the art.

The master device **21** can also provide control information to the synchrony group's audio information channel device **23** to enable a migration from one zone player **11**(*n*) to another zone player **11**(*n′*). This may occur if, for example, the audio information source is one of audio information sources **16** or a source accessible over the wide area network via the network **12**. The master device **21** can enable migration of the audio information channel device **23** for several reasons, including, for example, to reduce the loading of the zone player **11**(*n*), to improve latency of message transmission in the network **12**, and other reasons as will be appreciated by those skilled in the art.

As noted above, the audio information channel device **23** provides audio and playback timing information for the synchrony group to enable the master device **21** and slave devices **22**(*g*) to play the audio program synchronously. Details of the audio and playback timing information will be described in detail below in connection with FIGS. **3** and **4**, but, in brief, the audio information channel device **23** transmits the audio and playback timing information in messages over the network **12** using a multi-cast message transmission methodology. In that methodology, the audio information channel device **23** will transmit the audio and playback timing information in a series of messages, with each message being received by all of the zone players **11**(*n*) comprising the synchrony group **20**, that is, by the master device **21** and the slave devices **22**(*g*). Each of the messages includes a multi-cast address, which the master device **21** and slave devices **22**(*g*) will monitor and, when they detect a message with that address, they will receive and use the contents of the message. The audio and playback timing information is represented in

US 9,164,532 B2

11

FIG. **2** by the arrow labeled "AUD+PBTIME_INF**0**," which has a single tail, representing a source for the information at the audio information channel device **23**, and multiple arrowheads representing the destinations of the information, with one arrowhead extending to the master device **21** and other arrowheads extending to each of the slave devices **22**(*g*) in the synchrony group **20**. The audio information channel device **23** may make use of any convenient multi-cast message transmission methodology in transmitting the audio and playback timing information to the synchrony group **20**. As will be described in detail in connection with FIG. **4**, the audio and playback timing information is in the form of a series of frames, with each frame having a time stamp. The time stamp indicates a time, relative to the time indicated by a clock maintained by the audio information channel device **23**, at which the frame is to be played. Depending on the size or sizes of the messages used in the selected multi-cast message transmission methodology and the size or sizes of the frames, a message may contain one frame, or multiple frames, or, alternatively, a frame may extend across several messages.

The audio information channel device **23** also provides clock time information to the master device **21** and each of the slave devices **22**(*g*) individually over network **12** using a highly accurate clock time information transmission methodology. The distribution of the clock time information is represented in FIG. **2** by the arrows labeled "AICD_CLK_INF (M)" (in the case of the clock time information provided to the master device **21**) and "AICD_CLK_INF (S$_g$)" through "AICD_CLK_INF (S$_G$)" (in the case of audio information channel device clock information provided to the slave devices **22**(*g*)). In one embodiment, the master device **21** and slave devices **22**(*g*) make use of the well-known SNTP (Simple Network Time Protocol) to obtain current clock time information from the audio information channel device **23**. The SNTP makes use of a unicast message transfer methodology, in which one device, such as the audio information channel device **23**, provides clock time information to a specific other device, such as the master device **21** or a slave device **22**(*g*), using the other device's network, or unicast, address. Each of the master device **21** and slave devices **22**(*g*) will periodically initiate SNTP transactions with the audio information channel device **23** to obtain the clock time information from the audio information channel device **23**. As will be described below in more detail, the master device **21** and each slave device **22**(*g*) make use of the clock time information to determine the time differential between the time indicated by the audio information channel device's clock and the time indicated by its respective clock, and use that time differential value, along with the playback time information associated with the audio information and the respective device's local time as indicated by its clock to determine when the various frames are to be played. This enables the master device **21** and the slave devices **22**(*g*) in the synchrony group **20** to play the respective frames simultaneously.

As noted above, the control information provided by the user to the master device **21** through the user interface module **13** can also enable the master device **21** to, in turn, enable another zone player **11**(*n'*) to join the synchrony group as a new slave device **22**(*g*). In that operation, the user interface module **13** will provide control information, including the identification of the zone player **11**(*n'*) that is to join the synchrony group to the master device **21**. After it receives the identification of the zone player **11**(*n'*) that is to join the synchrony group, the master device **21** will exchange control information, which is represented in FIG. **2** by the arrows labeled SLV_DEV_CTRL_INF (S$_1$) through SLV_DEV_CTRL_INF (S$_G$) group slave control information, over the

12

network **12** with the zone player **11**(*d*) that is identified in the control information from the user interface module **13**. The control information that the master device **21** provides to the new zone player **11**(*n'*) includes the network address of the zone player **11**(*n*) that is operating as the audio information channel device **23** for the synchrony group, as well as the multi-cast address that the audio information channel device **23** is using to broadcast the audio and playback timing information over the network. The zone player that is to operate as the new slave device **22**(*g'*) uses the multi-cast address to begin receiving the multi-cast messages that contain the audio information for the audio program being played by the synchrony group.

It will be appreciated that, if the zone player **11**(*n*) that is operating as the master device **21** for the synchrony group **20** is also operating the audio information channel device **23**, and if there are no slave devices **22**(*g*) in the synchrony group **20**, the audio information channel device **23** may not be transmitting audio and playback timing information over the network. In that case, if the new slave device **22**(*g'*) is the first slave device in the synchrony group, the zone player **11**(*n*) that is operating as both the master device **21** and audio information channel device **23**, can begin transmitting the audio and playback timing information over the network **12** when the slave device **22**(*g'*) is added to the synchrony group **20**. The zone player **11**(*n*) can maintain a count of the number of slave devices **22**(*g*) in the synchrony group **20** as they join and disengage, and, if the number drops to zero, it can stop transmitting the audio and playback timing information over the network **12** to reduce the message traffic over the network **12**.

The new slave device **22**(*g'*) added to the synchrony group **20** uses the network address of the audio information channel device **23** for several purposes. In particular, the new slave device **22**(*g'*) will, like the master device **21** (assuming the zone player **11**(*n*) operating as the master device **21** is not also the audio information channel device **23**), engage in SNTP transactions with the audio information channel device **23** to obtain the clock timing information from the audio information channel device **23**. In addition, the new slave device **22**(*g'*) can notify the audio information channel device **23** that it is a new slave device **22**(*g'*) for the synchrony group **20** and provide the audio information channel device **23** with its network address. As will be described below, in one embodiment, particularly in connection with audio information obtained from a source, such as a digital data storage device, which can provide audio information at a rate that is faster than the rate at which it will be played, the audio information channel device **23** will buffer audio and timing information and broadcast it over the network **12** to the synchrony group **20** generally at a rate at which it is provided by the source. Accordingly, when a new slave device **22**(*g'*) joins the synchrony group **20**, the playback timing information may indicate that the audio information that is currently being broadcast by the audio information channel device **23** using the multi-cast methodology is to be played back some time in the future. To reduce the delay with which the new slave device **22**(*g'*) will begin playback, the audio information channel device **23** can also retransmit previously transmitted audio and timing information that it had buffered to the new slave device **22**(*g'*) using the unicast network address of the slave device **22**(*g'*).

The master device **21** can also use the slave device control information exchanged with the slave devices **22**(*g*) for other purposes. For example, the master device **21** can use the slave device control information to initiate a migration of the master from its zone player **11**(*n*) to another zone player **11**(*n'*).

**13**

This may occur for any of a number of reasons, including, for example, that the master device **21** is terminating playback by it of the audio program and is leaving the synchrony group **20**, but one or more of the other devices in the synchrony group is to continue playing the audio program. The master device **21** may also want to initiate a migration if it is overloaded, which can occur if, for example, the zone player **11**(*n*) that is the master device **21** for its synchrony group is also operating as an audio information channel device **23** for another synchrony group.

The user can also use the user interface module **13** to adjust playback volume by the individual zone players **11**(*n*) comprising the synchrony group. In that operation, the user interface module **13** provides information identifying the particular device whose volume is to be adjusted, and the level at which the volume is to be set to the master device **21**. If the device whose volume is to be adjusted is the master device **21**, the master device **21** can adjust its volume according to the information that it receives from the user interface module **13**. On the other hand, if the device whose volume is to be adjusted is a slave device **22**(*g*), the master device **21** can provide group slave control information to the respective slave device **22**(*g*), to enable it to adjust its volume.

The user can also use the user interface module **13** to enable a synchrony group **20** to cancel playing of the track in an audio program that is currently being played, and to proceed immediately to the next track. This may occur, for example, if the tracks for the program is in the form of a series of digital audio information files, and the user wishes to cancel playback of the track that is defined by one of the files. In that case, when the master device **21** receives the command to cancel playback of the current track, it will provide channel device control information to the audio information channel device **23** so indicating. In response, the audio information channel device **23** inserts control information into the audio and playback timing information, which will be referred to as a "resynchronize" command. In addition, the audio information channel device **23** will begin transmitting audio information for the next track, with timing information to enable it to be played immediately. The resynchronize command can also enable playback of a track to be cancelled before it has been played. Details of these operations will be described below.

As noted above, there may be multiple synchrony groups in the network audio system **10**, and further that, for example, a zone player **11**(*n*) may operate both as a master device **21** or a slave device **22**(*g*) in one synchrony group, and as the audio information channel device **23** providing audio and playback timing information and clock timing information for another synchrony group. An illustrative arrangement of this will be described in connection with FIG. **2**A. With reference to FIG. **2**A, that FIG. depicts elements of two synchrony groups, identified by reference numerals **20**(1) and **20**(2), respectively. For clarity, FIG. **2**A does not show a number of elements, the presence of which would be evident from FIGS. **1** and **2** as described above. For example, FIG. **2**A does not depict the audio information sources from which audio information is obtained for the synchrony groups or the audio reproduction devices that are used to produce sound for the master and slave devices, which are depicted in both FIGS. **1** and **2**. In addition, FIG. **2**A does not depict arrows that represent control information provided by the respective master devices to the slave devices in the respective synchrony groups, or to the audio information channel devices that provide audio and timing information for the respective synchrony groups, which are depicted in FIG. **2**. In addition, FIG. **2**A does not depict the arrows that represent the clock timing information provided by the audio information channel

**14**

devices to the respective members of the respective synchrony groups, which are also depicted in FIG. **2**. As will be noted below, however, FIG. **2**A does depict arrows representing the audio and playback timing information provided by the respective audio information channel devices for the respective synchrony groups **20**(1), **20**(2), to the master and slave devices comprising the respective synchrony groups **20**(1), **20**(2).

Each synchrony group **20**(1), **20**(2) comprises elements of a number of zone players. A functional block diagram of a zone player will be described below in connection with FIG. **3**. Synchrony group **20**(1) includes a master device **21**(1) and "K" slave devices **22**(1)(1) through **22**(K)(1) (the index "1" in reference numeral **21**(1) and the last index in reference numeral **22**(1)(1) through **21**(K)(1) corresponds to the index of the synchrony group **20**(1) to which they belong) utilize zone players **11**(1) and **11**(K+1) respectively. Similarly, synchrony group **20**(2) includes a master device **21**(2) and "L" slave devices **22**(1)(2) through **22**(L)(2) that utilize zone players **11**(K+2) through **11**(K+L+2). In the illustrative arrangement depicted in FIG. **2**A, both synchrony groups **20**(1) and **20**(2) are controlled by the user interface module **13**, which can provide control information to, and receive status information from, the master devices **21**(1) and **21**(2) independently. It will be appreciated that separate user interface modules may be provided to provide control information to, and receive status information from, the respective master devices **21**(1), **21**(2).

As noted above, the slave device **22**(1)(2) in synchrony group **20**(2) utilizes zone player **11**(K+3). In the illustrative arrangement depicted in FIG. **2**A, the audio information channel device **23**(1) that provides audio and playback timing information to the master and slave devices **21**(1), **22**(1)(1), . . . , **22**(K)(1) of synchrony group **20**(1) also utilizes zone player **11**(K+3). As noted above, this may occur if, for example, the audio information source that is to provide audio information to be played by the synchrony group **20**(1) is connected to the zone player **11**(K+3). Thus, when the master device **21**(1) of synchrony group **20**(1) exchanges channel device control information with the audio information channel device **23**(1), it is effectively exchanging channel device control information with the zone player **11**(K+3). Similarly, when the master and slave devices **21**(1), **22**(1)(1), . . . , **22**(K)(1) of synchrony group **20**(1) receive audio and playback timing information, as well as clock timing information, from the audio information channel device **23**(1), they are effectively receiving the information from the zone player **11**(K+3). FIG. **2**A depicts a multi-headed arrow representing audio and playback timing information transmitted by the zone player **11**(K+3), as audio information channel device **23**(1), to the master and slave devices **21**(1), **22**(1)(1), . . . , **11**(K)(1) comprising synchrony group **20**(1).

On the other hand, in the illustrative arrangement depicted in FIG. **2**A, the synchrony group **20**(2) utilizes a zone player **11**(K+L+3) as its audio information channel device **23**(2). As with synchrony group **20**(1), when the master device **21**(2) of synchrony group **20**(2) exchanges channel device control information with the audio information channel device **23**(2), it is effectively exchanging channel device control information with the zone player **11**(K+L+3). Similarly, when the master and slave devices **21**(2), **22**(1)(2), . . . , **22**(L)(2) of synchrony group **20**(2) receive audio and playback timing information, as well as clock timing information, from the audio information channel device **23**(2), they are effectively receiving the information from the zone player **11**(K+L+3). FIG. **2**A depicts a multi-headed arrow representing audio and playback timing information transmitted by the zone player

US 9,164,532 B2

15

$11(K+3)$ as audio information channel device $23(2)$ to the master and slave devices $21(2)$, $22(1)(2)$, . . . , $22(L)(2)$ comprising synchrony group $20(2)$.

In the illustrative arrangement depicted in FIG. 2A, zone player $11(K+L+3)$, which is the audio information channel device $23(2)$ for synchrony group $20(2)$, is not shown as being either a master or a slave device in another synchrony group. However, it will be appreciated that zone player $11(K+L+3)$ could also be utilized as the master device or a slave device for another synchrony group. Indeed, it will be appreciated that the zone player that is utilized as the audio information channel device for synchrony group $20(2)$ may also be a zone player that is utilized as the master device $21(1)$ or a slave device $22(1)(1)$, . . . , $22(K)(1)$ in the synchrony group $20(1)$.

A zone player $11(n)$ that is utilized as a member of one synchrony group may also be utilized as the audio information channel device for another synchrony group if the audio information source that is to supply the audio information that is to be played by the other synchrony group is connected to that zone player $11(n)$. A zone player $11(n)$ may also be utilized as the audio information channel device for the other synchrony group if, for example, the audio information source is an audio information source $16(m)$ (FIG. 1) that is connected to the network $12$ or an audio information source that is available over a wide area network such as the Internet. The latter may occur if, for example, the zone player $11(n)$ has sufficient processing power to operate as the audio information channel device and it is in an optimal location in the network $12$, relative to the zone players comprising the other synchrony group (that is the synchrony group for which it is operating as audio information channel device) for providing the audio and playback timing information to the members of the other synchrony group. Other circumstances under which the zone player $11(n)$ that is utilized as a member of one synchrony group may also be utilized as the audio information channel device for another synchrony group will be apparent to those skilled in the art.

As was noted above, the master device $21$ for a synchrony group $20$ may be migrated from one zone player $11(n)$ to another zone player $11(n')$. As was further noted above, the audio information channel device $23$ for a synchrony group $20$ may be migrated from one zone player $11(n)$ to another zone player $11(n')$. It will be appreciated that the latter may occur if, for example, the audio information source that provides the audio program for the synchrony group is not connected to the zone player $11(n)$ that is operating as the audio information channel device $23$, but instead is one of the audio information sources $16(m)$ connected to the network $12$ or a source available over a wide area network such as the Internet. Operations performed during a migration of an audio information channel device $23$ from one zone player $11(n)$ to another zone player $11(n')$ will generally depend on the nature of the audio information that is being channeled by the audio information channel device $23$. For example, if the audio information source provides streaming audio, the zone player $11(n)$ that is currently operating as the audio information channel device $23$ for the synchrony group $20$, can provide the following information to the other zone player $11(n')$ that is to become the audio information channel device $23$ for the synchrony group $20$:

(a) the identification of the source of the streaming audio information,

(b) the time stamp associated with the frame that the zone player $11(n)$ is currently forming, and

(c) the identifications of the zone players that are operating as the master device $21$ and slave devices $22(g)$ comprising the synchrony group $20$.

16

After the zone player $11(n')$ receives the information from the zone player $11(n)$, it will begin receiving the streaming audio from the streaming audio information source identified by the zone player $11(n)$, assemble the streaming audio information into frames, associate each frame with a time stamp, and transmit the resulting audio and playback timing information over the network $12$. The zone player $11(n')$ will perform these operations in the same manner as described above, except that, instead of using the time indicated by its digital to analog converter clock $34$ directly in generating the time stamps for the frames, the initial time stamp will be related to the value of the time stamp that is provided by the zone player $11(n)$ (reference item (b) above), with the rate at which the time stamps are incremented corresponding to the rate at which its (that is, the zone player $11(n')$'s) clock increments. In addition, the zone player $11(n')$ will notify the zone players that are operating as the master device $21$ and slave devices $22(g)$ of the synchrony group $20$ that it is the new audio information channel device $23$ for the synchrony group $20$, and provide the multi-cast address that it will be using to multi-cast the audio and playback timing information, as well as its unicast network address. After the members of the synchrony group $20$ receive the notification from the zone player $11(n')$ indicating that it is the new audio information channel device $23$ for the synchrony group $20$, they will receive the audio and playback timing information from the zone player $11(n')$ instead of the zone player $11(n)$, using the multi-cast address provided by the zone player $11(n')$. In addition, they can utilize the zone player $11(n')$'s unicast network address to obtain current time information therefrom. It will be appreciated that the zone player $11(n')$ will determine its current time in relation to the time stamp that is provided by the zone player $11(n)$ (reference item (b) above) or the current time information that it received from the zone player $11(n)$ using the SNTP protocol as described above.

Generally similar operations can be performed in connection with migrating the audio information channel device from one zone player $11(n)$ to another zone player $11(n')$ if the audio information is from one or more audio information files, such as may be the case if the audio information comprises MP3 or WAV files that are available from sources such as sources $16(m)$ connected to the network $12$ or over from sources available over a wide area network such as the Internet, except for differences to accommodate the fact that the audio information is in files. In that case, the zone player $11(n)$ that is currently operating as the audio information channel device $23$ for the synchrony group $20$ can provide the following information to the zone player $11(n')$ that is to become the audio information channel device $23$ for the synchrony group $20$:

(d) a list of the audio information files containing the audio information that is to be played;

(e) the identification of the file for which the zone player $11(n)$ is currently providing audio and playback timing information, along with the offset into the file for which the current item of audio and playback timing information is being generated and the time stamp that the zone player $11(n)$ is associating with that frame, and

(f) the identifications of the zone players that comprise the master device $21$ and slave devices $22(g)$ comprising the synchrony group $20$.

After the zone player $11(n')$ receives the information from the zone player $11(n)$, it will begin retrieving audio information from the file identified in item (e), starting at the identified offset. In addition, the zone player $11(n')$ can assemble the retrieved audio information into frames, associate each frame with a time stamp and transmit the resulting audio and play-

US 9,164,532 B2

17

back timing information over the network **12**. The zone player **11**($n'$) will perform these operations in the same manner as described above, except that, instead of using the time indicated by its digital to analog converter clock **34** directly in generating the time stamps for the frames, the value of the initial time stamp will be related to the time stamp that is provided by the zone player **11**($n$) (reference item (e) above), with the rate at which the time stamps are incremented corresponding to the rate at which its (that is, the zone player **11**($n'$)'s) clock increments. In addition, the zone player **11**($n'$) will notify the zone players that are operating as the master device **21** and slave devices **22**($g$) of the synchrony group **20** that it is the new audio information channel device **23** for the synchrony group **20**, and provide the multi-cast address that it will be using to multi-cast the audio and playback timing information, as well as its unicast network address. After the members of the synchrony group **20** receive the notification from the zone player **11**($n'$) indicating that it is the new audio information channel device **23** for the synchrony group **20**, they will receive the audio and playback timing information from the zone player **11**($n'$) instead of the zone player **11**($n$), using the multi-cast address provided by the zone player **11**($n'$). In addition, they can utilize the zone player **11**($n'$)'s unicast network address to obtain current time information therefrom. It will be appreciated that the zone player **11**($n'$) will determine its current time in relation to the time stamp that is provided by the zone player **11**($n$) (reference item (b) above) or the current time information that it received from the zone player **11**($n$) using the SNTP protocol as described above. The zone player **11**($n'$) will process successive audio information files in the list that it receives from the zone player **11**($n$) (reference item (d)).

Operations performed by the zone players **11**($n$) and **11**($n'$) in connection with migration of the audio information channel device **23** for other types of audio information will be apparent to those skilled in the art. In any case, preferably, the zone player **11**($n$) will continue operating as an audio information channel device **23** for the synchrony group **20** for at least a brief time after it notifies the zone player **11**($n'$) that it is to become audio information channel device for the synchrony group, so that the zone player **11**($n'$) will have time to notify the zone players in the synchrony group **20** that it is the new audio information channel device **23** for the synchrony group.

Before proceeding further in describing operations performed by the network audio system **10**, it would be helpful to provide a detailed description of a zone player **11**($n$) constructed in accordance with the invention. FIG. **3** depicts a functional block diagram of a zone player **11**($n$) constructed in accordance with the invention. All of the zone players in the network audio system **10** may have similar construction. With reference to FIG. **3**, the zone player **11**($n$) includes an audio information source interface **30**, an audio information buffer **31**, a playback scheduler **32**, a digital to analog converter **33**, an audio amplifier **35**, an audio reproduction device interface **36**, a network communications manager **40**, and a network interface **41**, all of which operate under the control of a control module **42**. The zone player **11**($n$) also has a device clock **43** that provides timing signals that control the general operations of the zone player **11**($n$). In addition, the zone player **11**($n$) includes a user interface module interface **44** that can receive control signals from the user interface module **13** (FIGS. **1** and **2**) for controlling operations of the zone player **11**($n$), and provide status information to the user interface module **13**.

Generally, the audio information buffer **31** buffers audio information, in digital form, along with playback timing

18

information. If the zone player **11**($n$) is operating as the audio information channel device **23** (FIG. **2**) for a synchrony group **20**, the information that is buffered in the audio information buffer **31** will include the audio and playback timing information that will be provided to the devices **21** and **22**($g$) in the synchrony group **20**. If the zone player **11**($n$) is operating as the master device **21** or a slave device **22**($g$) in the synchrony group, the information that is buffered in the audio information buffer **31** will include the audio and playback timing information that the zone player **11**($n$) is to play.

The audio information buffer **31** can receive audio and playback timing information from two sources, namely, the audio information source interface **30** and the network communications manager **40**. In particular, if the zone player **11**($n$) is operating as the audio information channel device **23** for a synchrony group **20**, and if the audio information source is a source **14**($n$)($s$) connected to the zone player **11**($n$), the audio information buffer **31** will receive and buffer audio and playback timing information from the audio information source interface **30**. On the other hand, if the zone player **11**($n$) is operating as the audio information channel device **23** for a synchrony group **20**, and if the audio information source is a source **16**($m$) connected to the network **12**, or a source available over the wide area network, the audio information buffer **31** will receive and buffer audio and playback timing information from the network communications manager **40**. It will be appreciated that, if the zone player **11**($n$) is not a member of the synchrony group, the zone player **11**($n$) will not play this buffered audio and playback timing information.

On yet another hand, if the zone player **11**($n$) is operating as the master device **21** or a slave device **22**($g$) in a synchrony group, and if the zone player **11**($n$) is not also the audio information channel device **23** providing audio and playback timing information for the synchrony group **20**, the audio information buffer **31** will receive and buffer audio and playback timing information from the network communications manager **40**.

The audio information source interface **30** connects to the audio information source(s) **14**($n$)($s$) associated with the zone player **11**($n$). While the zone player **11**($n$) is operating as audio information channel device **23** for a synchrony group **20**, and if the audio information is to be provided by a source **14**($n$)($s$) connected to the zone player **11**($n$), the audio information source interface **30** will selectively receive audio information from one of the audio information source(s) **14**($n$)($s$) to which the zone player is connected and store the audio information in the audio information buffer **21**. If the audio information from the selected audio information source **14**($n$)($s$) is in analog form, the audio information source interface **30** will convert it to digital form. The selection of the audio information source **14**($n$)($s$) from which the audio information source interface **30** receives audio information is under control of the control module **42**, which, in turn, receives control information from the user interface module through the user interface module interface **44**. The audio information source interface **30** adds playback timing information to the digital audio information and buffers the combined audio and playback timing information in the audio information buffer **21**.

More specifically, as noted above, the audio information source interface **30** receives audio information from an audio information source **14**($n$)($s$), converts it to digital form if necessary, and buffers it along with playback timing information in the audio information buffer **21**. In addition, the audio information source interface **30** will also provide formatting and scheduling information for the digital audio information, whether as received from the selected audio information

US 9,164,532 B2

**19**

source $14(n)(s)$ or as converted from an analog audio information source. As will be made clear below, the formatting and scheduling information will control not only playback by the zone player $11(n)$ itself, but will also enable other zone players $11(n')$, $11(n'')$, . . . that may be in a synchrony group for which the zone player $11(n)$ is the master device, to play the audio program associated with the audio information in synchrony with the zone player $11(n)$.

In one particular embodiment, the audio information source interface **30** divides the audio information associated with an audio work into a series of frames, with each frame comprising digital audio information for a predetermined period of time. As used herein, an audio track may comprise any unit of audio information that is to be played without interruption. On the other hand, an audio program may comprise a series of one or more audio tracks that are to be played in succession. It will be appreciated that the tracks comprising the audio program may also be played without interruption, or alternatively playback between tracks may be interrupted by a selected time interval. FIG. **4** schematically depicts an illustrative framing strategy used in connection with one embodiment of the invention for a digital audio stream comprising an audio work. More specifically, FIG. **4** depicts a framed digital audio stream **50** comprising a sequence of frames **51**(**1**) through **51**(F) (generally identified by reference numeral **51**(f)). Each frame **51**(f), in turn, comprises a series of audio samples **52**(f)(**1**) through **52**(f)(S) (generally identified by reference numeral **52**(f)(s)) of the audio track. Preferably all of the frames will have the same number "S" of audio samples, although it will be appreciated from the following that that is primarily for convenience. On the other hand, it will be appreciated that, the number of audio samples may differ from "S"; this may particularly be the case if the frame **51**(f) contains the last audio samples for the digital audio stream for a particular audio work. In that case, the last frame **51**(F) will preferably contain samples **52**(F)(**1**) through **52**(F)(x), where "x" is less than "S." Generally, it is desirable that the number of samples be consistent among all frames **51**(f), and in that case padding, which will not be played, can be added to the last frame **51**(F).

Associated with each frame **51**(f) is a header **55**(f) that includes a number of fields for storing other information that is useful in controlling playback of the audio samples in the respective frame **51**(f). In particular, the header **55**(f) associated with a frame **51**(f) includes a frame sequence number field **56**, an encoding type field **57**, a sampling rate information field **58**, a time stamp field **60**, an end of track flag **61**, and a length flag field **62**. The header **55**(f) may also include fields (not shown) for storing other information that is useful in controlling playback. Generally, the frame sequence number field **56** receives a sequence number "f" that identifies the relative position of the frame **51**(f) in the sequence of frames **51**(**1**) . . . **51**(f) . . . **51**(F) containing the digital audio stream **50**. The encoding type field **57** receives a value that identifies the type of encoding and/or compression that has been used in generating the digital audio stream. Conventional encoding or compression schemes include, for example, the well-known MP3 and WAV encoding and/or compression schemes, although it will be appreciated that other schemes may be provided for as well. The sampling rate information field **58** receives sampling rate information that indicates the sampling rate for the audio samples **52**(f)(s). As will be apparent to those skilled in the art, the sampling rate determines the rate at which the zone player $11(n)$ is to play the audio samples **52**(f)(s) in the frame, and, as will be described below, determines the period of the digital to analog converter clock **34**.

**20**

The condition of the end of work flag **61** indicates whether the frame **51**(f) contains the last digital audio samples for the audio track associated with the framed digital audio work **50**. If the frame **51**(f) does not contain the audio samples that are associated with the end of the digital audio stream **50** for a respective audio work, the end of work flag will be clear. On the other hand, if the frame **51**(f) does contain the audio samples that are associated with the end of the digital audio stream **50** for a respective audio work, the end of work flag **61** will be set. In addition, since the number of valid audio samples **52**(F)(s) in the frame **51**(F), that is, the samples that are not padding, may be less than "S," the default number of audio samples in a frame **51**(f), the length flag field **62** will contain a value that identifies the number of audio samples in **52**(F)(s) in the last frame **51**(F) of the audio work **50**. If, as noted above, the frames have a consistent number "S" of samples, the samples **52**(F)(x+1) through **52**(F)(S) will contain padding, which will not be played.

The time stamp field **60** stores a time stamp that identifies the time at which the zone player $11(n)$ is to play the respective frame. More specifically, for each frame of a framed digital audio stream **50** that is buffered in the audio information buffer **21**, the audio information source interface **30**, using timing information from the digital to analog converter clock **34**, will determine a time at which the zone player $11(n)$ is to play the respective frame, and stores a time stamp identifying the playback time in the time stamp field **60**. The time stamp associated with each frame will later be used by the playback scheduler **32** to determine when the portion of the digital audio stream stored in the frame is to be coupled to the digital to analog converter **33** to initiate play back. It will be appreciated that the time stamps that are associated with frames in sequential frames **51**(**1**), **51**(**2**), . . . , **51**(F), will be such that they will be played back in order, and without an interruption between the sequential frames comprising the digital audio stream **50**. It will further be appreciated that, after a time stamp has been determined for the first frame, stored in frame **51**(**1**), of a digital audio stream **50**, the audio information source interface **30** can determine time stamps for the subsequent frame **51**(**2**), **51**(**3**), . . . , **51**(F) in relation to the number of samples "S" in the respective frames and the sample rate. The time stamps will also preferably be such that frames will be played back after some slight time delay after they have been buffered in the audio information buffer **21**; the purpose for the time delay will be made clear below.

Returning to FIG. **3**, in addition to dividing the digital audio information into frames, the audio information source interface **30** also aggregates and/or divides the frames **51**(f) as necessary into packets, each of which will be of a length that would fit into a message for transmission over the network, and associates each packet with a packet sequence number. For example, if a packet will accommodate multiple frames **51**(f), **51**(f+1), . . . **51**(f+y−1), it will aggregate them into a packet and associate them with a packet sequence number, for example p(x). If the entire frames **51**(f) and **51**(f+y−1) was accommodated in packet p(x), where "x" is the sequence number, which will occur if the size of a packet is an exact multiple of the frame size, the next packet, p(x+1) will begin with frame **51**(f+y) and will include frames **51**(f+y), . . . , **51**(f+2y−1). Subsequent packets p(x+2), . . . will be formed in a similar manner. On the other hand, if the packet length will not accommodate an exact multiple of the frame size, the last frame in the packet will be continued at the beginning of the next packet.

If the audio information source interface **30** is aware of track boundaries, which may be the case if the tracks are divided into files, the packets will reflect the track boundaries,

US 9,164,532 B2

21

that is, the packets will not contain frames from two tracks. Thus, if the last frames associated with a track are insufficient to fill a packet, the packet will contain padding from the last frame associated with the track to the end of the packet, and the next packet will begin with the first frames associated with the next track.

In one embodiment, the audio information source interface 30 stores the packets in the audio information buffer 31 in a ring buffer. As is conventional, a ring buffer includes a series of storage locations in the buffer. Each entry will be sufficient to store one packet. Four pointers are used in connection with the ring buffer, a first pointer pointing to the beginning of the ring buffer, a second pointer pointing to the end of the ring buffer, an third "write" pointer pointing to the entry into which a packet will be written and a fourth "read" pointer pointing to the entry from which packet will be read for use in playback. When a packet is read from the ring buffer for playback, it will be read from the entry pointed to by the read pointer. After the packet has been read, the read pointer will be advanced. If the read pointer points beyond the end of the ring buffer, as indicated by the end pointer, it will be reset to point to the entry pointed to by the beginning pointer, and the operations can be repeated.

On the other hand, when the audio information source interface 30 stores a packet in the ring buffer, first determine whether the entry pointed to by the write pointer points to the same entry as the entry pointed to by the read pointer. If the write pointer points to the same entry as the entry pointed to by the read pointer, the entry contains at least a portion of a packet that has not yet been read for playback, and the audio information source interface 30 will delay storage of the packet until the entire packet has been read and the read pointer advanced. After the read pointer has been advanced, the audio information source interface 30 can store the packet in the entry pointed to by the write pointer. After the packet has been stored, the audio information source interface 30 will advance the write pointer. If the write pointer points beyond the end of the ring buffer, as indicated by the end pointer, it will be reset to point to the entry pointed to by the beginning pointer, and the operations can be repeated.

As noted above, the zone player 11(n) can operate both as an audio information channel device 23 and a member of the synchrony group 20 of which it is a member. In that case, the audio information buffer 31 can contain one ring buffer. On the other hand, the zone player 11(n) can operate as an audio information channel device 23 for one synchrony group 20(1) (FIG. 2A) and a member of another synchrony group 20(2). In that case, the audio information buffer 31 would maintain two ring buffers, one for the audio and timing information associated with synchrony group 20(1), and the other for the audio and timing information associated with synchrony group 20(2). It will be appreciated that, in the latter case, the zone player 11(n) will only use the audio and timing information that is associated with synchrony group 20(2) for playback.

The playback scheduler 32 schedules playback of the audio information that is buffered in the audio information buffer 31 that is to be played by the zone player 11(n). Accordingly, under control of the playback scheduler 32, the digital audio information that is buffered in the audio information buffer 21 that is to be played by the zone player 11(n) is transferred to the digital to analog converter 33 for playback. As noted above, if the zone player 11(n) is operating as an audio information channel device 23 for a synchrony group 20 for which it is not a member, the playback scheduler 32 will not schedule the digital audio information that is to be played by that synchrony group 20 for playback. The playback scheduler 32 only schedules the digital audio information, if any, that is

22

buffered in the audio information buffer 31 that is associated with a synchrony group for which the zone player 11(n) is a member, whether as master device 21 or a slave device 22(g).

Essentially, the playback scheduler 32 makes use of the read pointer associated with the circular buffer that contains the audio and playback timing information that is to be played by the zone player 11(n). The playback scheduler 32 retrieves the packet information from the entry of the ring buffer pointed to by the read pointer, and then advances the ring pointer as described above. The playback scheduler 32 determines the boundaries of the frames in the packet and uses the time stamps in the time stamp fields 60 associated with the respective frame 51(f), along with timing information provided by the zone player 11(n)'s digital to analog converter clock 34, to determine when the respective frame is to be transferred to the digital to analog converter 33. Generally, when the time stamp associated with a buffered digital audio information frame corresponds to the current time as indicated by the digital to analog converter clock 34, the playback scheduler 32 will enable the respective frame to be transferred to the digital to analog converter 33.

The digital to analog converter 33, also under control of the digital to analog converter clock 34, converts the buffered digital audio information to analog form, and provides the analog audio information to the audio amplifier 35 for amplification. The amplified analog information, in turn, is provided to the audio reproduction devices 15(n)(r) through the audio reproduction device interface 36. The audio reproduction devices 15(n)(r) transform the analog audio information signal to sound thereby to provide the audio program to a listener. The amount by which the audio amplifier 35 amplifies the analog signal is controlled by the control module 42, in response to volume control information provided by the user through the user interface module 13.

The network communications manager 40 controls network communications over the network 12, and the network interface 41 transmits and receives message packets over the network 12. The network communications manager 40 generates and receives messages to facilitate the transfer of the various types of information described above in connection with FIG. 2, including the channel device control information, slave device control information, audio and playback timing information and the audio information channel device's clock timing information. In connection with the channel device control information and the slave device control information, the network communications manager 40 will generate messages for transfer over the network 12 in response to control information from the control module 42. Similarly, when the network communications manager 40 receives messages containing channel device control information and slave device control information, the network communications manager will provide the information to the control module 42 for processing.

With regards to the audio information channel device's clock timing information, as noted above, the master device 21 and slave devices 22(g) of the synchrony group 20 obtain the clock timing information from the audio information channel device 23 using the well-known SNTP. If the zone player 11(n) is operating as the audio information channel device 23 for a synchrony group, during the SNTP operation, it will provide its current time, particularly a current time as indicated by its digital to analog converter clock 34. On the other hand, if the zone player 11(n) is operating as the master device 21 or slave device 22(g) of a synchrony group 20, it will receive the clock timing information from the audio information channel device 23. After the respective device 21, 22(g) has obtained the audio information channel device's

US 9,164,532 B2

23

clock timing information, it will generate a differential time value ΔT representing the difference between the time T indicated by its digital to analog converter clock 34 and the current time information from the audio information channel device 23. The differential time value will be used to update the time stamps for the frames of the digital audio stream 50 (FIG. 4) that are received from the audio information channel device.

With regards to the audio and playback timing information, operations performed by the network communications manager 40 will depend on whether

(i) the audio and playback timing information has been buffered in the audio information buffer 31 for transmission, as audio information channel device 23, over the network 12 to the master device 21 and/or slave devices 22(g) of a synchrony group, or

(ii) the audio and playback timing information has been received from the network 12 to be played by the zone player 11(n) as either the master device 21 for a synchrony group or a slave device in a synchrony group.

It will be appreciated that the network communications manager 40 may be engaged in both (i) and (ii) contemporaneously, since the zone player 11(n) may operate both as the audio information channel device 23(1) for a synchrony group 20(1) (reference FIG. 2A) of which it is not a member, and a member of another synchrony group 20(2) for which another zone player 11(n') is the audio information channel device 23(2). With reference to item (i) above, after a packet that is to be transmitted has been buffered in the respective ring buffer, the network communications manager 40 retrieves the packet, packages it into a message and enables the network interface 41 to transmit the message over the network 12. If the control module 42 receives control information from the user interface module 13 (if the master device 21 is also the audio information channel device 23 for the synchrony group 20) or from the master device (if the master device 21 is not the audio information channel device 23 for the synchrony group 20) that would require the transmission of a "resynchronize" command as described above, the control module 42 of the audio information channel device 23 enables the network communications manager 40 to insert the command into a message containing the audio and playback timing information. Details of the operations performed in connection with the "resynchronize" command will be described below. As noted above, the "resynchronize" command is used if the user enables a synchrony group to terminate the playback of a track that is currently being played, or cancel playback of a track whose playback has not begun.

On the other hand, with reference to item (ii) above, if network interface 41 receives a message containing a packet containing frames of audio and playback timing information that the zone player 11(n) is to play either as a master device 21 or a slave device for a synchrony group 20, the network interface 41 provides the audio and playback timing information to the network communications manager 40. The network communications manager 40 will determine whether the packet contains a resynchronize command and, if so, notify the control module 42, which will enable operations to be performed as described below. In any case, the network communications manager 40 will normally buffer the various frames comprising the audio and playback timing information in the audio information buffer 31, and in that operation will generally operate as described above in connection with the audio information source interface 30. Before buffering them, however, the network communications manager 40 will update their time stamps using the time differential value

24

described above. It will be appreciated that the network communications manager 40 will perform similar operations whether the messages that contain the packets were multicast messages or unicast messages as described above

The updating of the time stamps by the master device 21 and the slave devices 22(g) in the synchrony group 20 will ensure that they all play the audio information synchronously. In particular, after the network communications manager 40 has received a frame 51(f) from the network interface 41, it will also obtain, from the digital to analog converter clock 34, the zone player 11(n)'s current time as indicated by its digital to analog converter clock 34. The network communications manager 40 will determine a time differential value that is the difference between the slave device's current clock time, as indicated by its digital to analog converter 34, and the audio information channel device's time as indicated by the audio information channel device's clock timing information. Accordingly, if the master or slave device's current time has a value $T_S$ and the audio information channel device's current time, as indicated by the clock timing information, has a value $T_C$, the time differential value $\Delta T = T_S - T_C$. If the current time of the master or slave device in the synchrony group 20, as indicated by its digital to analog converter clock 34, is ahead of the audio information channel device's clock time as indicated by the clock timing information received during the SNTP operation, the time differential value will have a positive value. On the other hand, if the master or slave device's current time is behind the audio information channel device's clock time, the time differential value ΔT will have a negative value. If the zone player 11(n) obtains clock timing information from the audio information channel device 23 periodically while it is a member of the synchrony group 20, the network communications manager 40 can generate an updated value for the time differential value ΔT when it receives the clock timing information from the audio information channel device 23, and will subsequently use the updated time differential value.

The network communications manager 40 uses the time differential value ΔT that it generates from the audio information channel device timing information and zone player 11(n)'s current time to update the time stamps that will be associated with the digital audio information frames that the zone player 11(n) receives from the audio information channel device. For each digital audio information frame that is received from the audio information channel device, instead of storing the time stamp that is associated with the frame as received in the message in the audio information buffer 21, the network communications manager 40 will store the updated time stamp with the digital audio information frame. The updated time stamp is generated in a manner so that, when the zone player 11(n), as a member of the synchrony group plays back the digital audio information frame, it will do so in synchrony with other devices in the synchrony group.

More specifically, after the zone player 11(n)'s network interface 41 receives a message containing a packet that, in turn, contains one or more frames 51(0, it will provide the packet to the network communications manager 40. For each frame 51(f) in the packet that the network communications manager 40 receives from the network interface 41, the network communications manager 40 will add the time differential value ΔT to the frame's time stamp, to generate the updated time stamp for the frame 51(f), and store the frame 51(f), along with the header 55(f) with the updated time stamp in the audio information buffer 31. Thus, for example, if a frame's time stamp has a time value $T_F$, the network communications manager 40 will generate an updated time stamp $T^U_F$ having a time value $T^U_F = T_F + \Delta T$. Since time value $T^U_F$

US 9,164,532 B2

25

according to the slave device's digital to analog converter clock **34** is simultaneous to the time value $T_F$ according to the audio information channel device's digital to analog converter clock **34**, the zone player **11**(*n*) device will play the digital audio information frame at the time determined by the audio information channel device **23**. Since all of the members of the synchrony group **20** will perform the same operations, generating the updated time stamps $T^U_F$ for the various frames **51**(*f*) in relation to their respective differential time values, all of the zone players **11**(*n*) in the synchrony group **20** will play them synchronously. The network communications manager **40** will generate updated time stamps $T^U_F$ for all of the time stamps **60** in the packet, and then store the packet in the audio information buffer **31**.

It will be appreciated that, before storing a packet in the audio information buffer **21**, the network communications manager **40** can compare the updated time stamps $T^U_F$ associated with the frames in the packet to the slave device's current time as indicated by its digital to analog converter clock **34**. If the network communications manager **40** determines the time indicated by the updated time stamps of frames **51**(*f*) in the packet are earlier than the zone player's current time, it can discard the packet instead of storing it in the audio information buffer **21**, since the zone player **11**(*n*) will not play them. That is, if the updated time stamp has a time value $T^U_F$ that identifies a time that is earlier than the zone player's current time $T_S$ as indicated by the zone player's digital to analog converter clock **34**, the network communications manager **40** can discard the packet.

If the zone player **11**(*n*) is operating as the master device **21** of a synchrony group **20**, when the user, through the user interface module **13**, notifies the zone player **11**(*n*) that another zone player **11**(*n'*) is to join the synchrony group **20** as a slave device **22**(*g*), the control module **42** of the zone player **11**(*n*) enables the network communications manager **40** to engage in an exchange of messages, described above in connection with FIG. **2**, to enable the other zone player **11**(*n'*) to join the synchrony group **20** as a slave device. As noted above, during the message exchange, the messages generated by the network communications manager **40** of the zone player **11**(*n*) will provide the network communications manager of the zone player **11**(*n'*) that is to join the synchrony group **20** with information such as the multi-cast address being used by the audio information channel device **23** that is providing the audio program to the synchrony group **20**, as well as a unicast network address for the audio information channel device **23**. After receiving that information, the network communications manager and network interface of the zone player **11**(*n'*) that is to join the synchrony group **20** can begin receiving the multi-cast messages containing the audio program for the synchrony group, engage in SNTP transactions with the audio information channel device **23** to obtain the latter's current time, and also enable the audio information channel device **23** to send the zone player **11**(*n'*) frames **51**(*f*) that it had previously broadcast using the unicast message transmission methodology as described above.

On the other hand, if the network communications manager **40** and network interface **41** of the zone player **11**(*n*) receive a message over the network **12** indicating that it is to become a slave device **22**(*g*) of a synchrony group for which another zone player **11**(*n'*) is the master device, the network communications manager **40** for zone player **11**(*n*) will provide a notification to the control module **42** of zone player **11**(*n*). Thereafter, the control module **42** of zone player **11**(*n*) can enable the network communications manager **40** of zone player **11**(*n*) to perform the operations described above to enable it to join the synchrony group **20**.

26

As noted above, the user, using user interface module **13**, can enable the synchrony group to terminate playback of a track of an audio program that is currently being played. After playback of a track that is currently being played has been terminated, playback will continue in a conventional manner with the next track that has been buffered in the audio information buffer **31**. It will be appreciated that that could be the next track that is on the original play list, or a previous track. In addition, the user can enable the synchrony group **20** to cancel playback of a track that it has not yet begun to play, but for which buffering of packets has begun in the synchrony group **20**. Both of these operations make use of the "resynchronize" command that the master device **21** of the synchrony group **20** can enable the audio information channel device **23** to include in the multi-cast message stream that it transmits to the synchrony group **20**. Generally, in response to receipt of the resynchronize command, the members of the synchrony group **20** flush the ring buffer containing the packets that they are to play in the future. In addition, if the members of the synchrony group provide separate buffers for their respective digital to analog converters **33**, the members will also flush those buffers as well. After the audio information channel device transmits a packet containing the resynchronize command:

(i) in the case of the use of the resynchronize command to terminate playing of a track that is currently being played, the audio information channel device **23** will begin multi-casting packets for the next track, to begin play immediately, and will continue through the play list in the manner described above; and

(ii) in the case of the use of the resynchronize command to cancel play of a track for which buffering has begun, but which is to be played in the future, the audio information channel device **23** will begin multi-casting packets for the track after the track that has been cancelled, to be played beginning at the time the cancelled track was to begin play, and will also continue through the play list in the manner described above.

It will be appreciated that,

(a) in the first case (item (i) directly above), the resynchronize command can enable the read pointer to be set to point to the entry in the circular buffer into which the first packet for the next track will be written, which will correspond to the entry to which the write pointer points, but

(b) in the second case (item (ii) directly above), the resynchronize command can enable the write pointer for the circular buffer to be set to point to the entry that contains the first packet for the track whose play is being cancelled.

It will further be appreciated that, if a track is cancelled for which buffering has not begun, the resynchronize command will generally not be necessary, since the audio information channel device for the synchrony group **20** need only delete that track from the play list.

Operations performed in connection with use of the resynchronize command to cancel playback of a track that is currently being played will be described in connection with Packet Sequence A below, and operations performed in connection with the use of the resynchronize command to cancel playback of a track that is has not yet begun to play, but for which buffering of packets has begun, will be described in connection with Packet Sequence B below.

Packet Sequence A

(A1.0) [packet **57**]

(A1.1 [continuation of frame **99**]

(A1.2) [frame **100**, time=0:00:01, type=mp3 audio]

(A1.3) [frame **101**, time=0:00:02, type=mp3 audio]

(A1.4) [frame **102**, time=0:00:03, type=mp3 audio]

US 9,164,532 B2

27

(A2.0) [packet **58**]
(A2.1) [continuation of frame **102**]
(A2.2) [frame **103**, time=0:00:04, type=mp3 audio]
(A2.3) [frame **104**, time=0:00:05, type=mp3 audio]
(A2.4) [frame **105**, time=0:00:06, type=mp3 audio]
(A3.0) [packet **59**]
(A3.1) [continuation of frame **105**]
(A3.2) [frame **106**, time=0:00:07, type=mp3 audio]
(A3.3) [frame **107**, time=0:00:08, type=mp3 audio]
(A3.4) [frame **108**, time=0:00:09, type=mp3 audio]
(A4.0) [packet **60**]
(A4.1) [continuation of frame **108**]
(A4.2) [frame **109**, time=0:00:10, type=mp3 audio]
(A4.3) [Resynchronize command]
(A4.4) [Padding, if necessary]
(A5.0) [packet **61**]
(A5.1) [frame **1**, time=0:00:07, type=mp3 audio]
(A5.2) [frame **2**, time=0:00:08, type=mp3 audio]
(A5.3) [frame **3**, time=0:00:09, type=mp3 audio]
(A5.4) [frame **4**, time=0.00.10, type=mp3 audio]
(A6.0) [packet **62**]
(A6.1) [continuation of frame **4**]
(A6.2) [frame **5**, time=0:00:11, type=mp3 audio]
(A6.3) [frame **6**, time=0:00:12, type=mp3 audio]
(A6.4) [frame **7**, time=0:00:13, type=mp3 audio]

Packet Sequence A comprises a sequence of six packets, identified by packet **57** through packet **62**, that the audio information channel device **23** multi-casts in respective messages to the members of a synchrony group **20**. It will be appreciated that the series of messages that the audio information channel device **23** may multi-cast to the synchrony group **20** may include a messages prior to the packet **57**, and may also include messages after packet **62**. Each packet comprises a packet header, which is symbolized by lines (A1.0), (A2.0), . . . (A6.0) in Packet Sequence A, and will generally also include information associated with at least a portion of a frame. In the packets represented in Packet Sequence A, each packet includes information associated with a plurality of frames. Depending on the lengths of the packets, each packet may contain information associated with a portion of a frame, an entire frame, or multiple frames. In the illustration represented by Packet Sequence A, it is assumed that each packet may contain information associated with multiple frames. In addition, it is assumed that a packet does not necessarily contain information associated with an integral number of frames; in that case, a packet may contain information associated with a portion of a frame, and the next packet will contain the information associated with the rest of a frame.

The frames and associated header playback timing information contained in the various packets are symbolized by lines (A1.1), (A1.2), . . . , (A1.4), (A2.1), . . . (A6.4) of Packet Sequence A. Thus, for example, line (A1.2) of packet **57** represents the one-hundredth frame, that is, frame **51**(**100**) (reference FIG. **4**), of the track whose audio information is being transmitted in the sequence of packets that includes packet **57**. The frame **51**(**100**) is to be played at an illustrative time, according to the audio information channel device's digital to analog converter clock, of "time=0:00:01," and the frame is encoded and/or compressed using the well-known MP3 encoding and compression methodology. In that case, the legend "time=0:00:01" represents the time stamp that would be included in field **60** (FIG. **4**) of the header associated with the frame **50**(**100**) as multi-cast by the audio information channel device for the synchrony group. It will be appreciated that the playback time and encoding/compression methodology will be referred in the header **55**(**100**) that is associated

28

with the frame **51**(**100**). It will also be appreciated that the header may also contain additional information as described above.

Similarly, line (A1.3) of packet **57** represents the one-hundred and first frame, that is, frame **51**(**101**), of the track whose audio information is being transmitted in the sequence of packets that includes packet **57**. The frame **51**(**101**) is to be played at an illustrative time, according to the audio information channel device's digital to analog converter clock, of "0:00:02," and the frame is also encoded and/or compressed using the MP3 encoding and compression methodology. Line (A1.4) of packet **57** represents similar information, although it will be appreciated that, depending on the length of packet **57**, the line may not represent the information for an entire frame **51**(**102**) and/or its associated header. If the length of packet **57** is not sufficient to accommodate the information for the entire frame **51**(**102**) and/or associated header, the information will continue in packet **58**, as represented by line (A2.1) in Packet Sequence A. Similarly, if the length of packet **56** was not sufficient to contain the information for an entire frame **51**(**99**) preceding frame **51**(**100**), packet **57** (lines (A1.0) through 1.4) may contain any information from frame **51**(**99**) that packet **56** was unable to accommodate.

As noted above, when the master device **21** or a slave device **22**(*g*) in the synchrony group **20** receives the packet **57**, its respective network communications manager **40** will update the time stamps associated with the various frames **51**(*f*) as described above before buffering the respective frames in the respective audio information buffer **31**.

Packets **58** and **59** contain information that is organized along the lines described above in connection with packet **57**.

Packet **60** also contains, as represented by lines (A4.1) and (A4.2), information that is organized along the lines of the information represented by lines (Ax.1) and (Ax.2) ("x" equals an integer) described above in connection with packets **57** through **59**. On the other hand, packet **60** contains a resynchronize command, as represented by line (A4.3). Packet **60** also may contain padding, as represented by line 4.4, following the resynchronize command. As noted above, the master device **21** of a synchrony group **20** will enable the audio information channel device **23** that is providing audio information to the synchrony group **20** to multi-cast a message containing the resynchronize command when it receives notification from the user interface module **13** that the user wishes to cancel playback of a track that is currently being played. In the example depicted in Packet Sequence A, as will be described below, the audio information channel device **23** receives notification from the master device **21** that the user wishes to cancel playback of a track at a time corresponding to "time=0:00:07" according to its digital to analog converter clock **34**, and, in line (A4.3) of packet **60** it will provide the resynchronize command, followed by padding, if necessary.

As will be apparent from examining lines (A3.1) through (A3.4) of packet **59** and lines (A4.1) and (A4.2) of packet **60**, although the audio information channel device **23** has received the notification from the synchrony group's master device **21** to multi-cast the resynchronize command at a time corresponding to "time=0:00:07" according to the clock time indicated by its digital to analog converter clock **34**, it (that is, the audio information channel device **23**) has already multi-cast messages containing frames that are to be played at that time and subsequently. That is, the audio information channel device **23** has, multi-cast in packet **59**, frames **51**(**106**) through **51**(**108**) that contain time stamps "time=0:00:07," "time=0:00:08" and "time=0:00:09," respectively, and, in packet **60**, in addition to the continuation of frame **51**(**108**), frame **51**(**109**) that contains time stamp "time=0:00:10." (It

29

will be appreciated that the times indicated by the illustrative time stamps are for illustration purposes only, and that in an actual embodiment the time stamps may have different values and differentials.)

As noted above, the audio information channel device **23** multi-casts a message containing a packet that, in turn, contains the resynchronize command when it receives the notification from the master device **21** to do so. In the example depicted in Packet Sequence A, the packet will be multi-cast when the audio information channel device's digital to analog converter clock time corresponds to "0:00:07." Subsequently, two things happen. In one aspect, when the master device **21** and slave devices **22**(*g*) receive the packet that contains the resynchronize command, they will stop playing the audio program that they are playing.

In addition, the audio information channel device **23** will begin transmitting frames containing audio information for the next track, including therewith time stamps immediately following the digital to analog converter clock time at which the packet including the resynchronize command was transmitted. Accordingly, and with further reference to Packet Sequence A, the audio information channel device **23** will multi-cast a message containing packet **61**. As indicated above, packet **61** contains, as represented in lines (A5.1) through (A5.3), frames **51**(**1**) through **51**(**3**), which are the first three frames of the next track of the audio program that is to be played. It is also compressed and encoded using the MP3 encoding and compression scheme, and it is accompanied by time stamps "time=0:00:07," "time=0:00:08" and "time=0:00:10." As noted above, the time stamp "time=0:00:07" corresponds to the clock time at which the audio information channel device **23** multi-casts the resynchronize command, and, when the master device **21** and slave devices **22**(*g*) receive these frames, they would be expected to begin playing them very shortly, if not immediately after the audio information channel device **23** multi-casts the message containing the packet that, in turn, contains the resynchronize command. Packet **61** also includes at least a portion of the next frame, that is, frame **51**(**4**), for that track. In addition, Packet Sequence A depicted above further includes a subsequent packet, namely, packet **62**, that contains any necessary continuation of frame **51**(**4**), as well as three subsequent frames. If any additional packets are required for the track, as well as for subsequent tracks, they can be multi-cast in a similar manner.

As further noted above, the resynchronize command can also be used to cancel playing of one or more tracks for which playback has begun. This will be illustrated in connection with Packet Sequence B:

Packet Sequence B
(B1.0) [packet **157**]
(B1.1) [continuation of frame **99**]
(B1.2) [frame **100**, time=0:00:01, type=mp3 audio]
(B1.3) [frame **101**, time=0:00:02, type=mp3 audio]
(B1.4) [frame **102**, time=0:00:03, type=mp3 audio]
(B2.0) [packet **158**]
(B2.1) [continuation of frame **102**]
(B2.2) [frame **103**, time=0:00:04, type=mp3 audio]
(B2.3) [frame **104**, time=0:00:05, type=mp3 audio]
(B2.4) [frame **105**, time=0:00:06, type=mp3 audio]
(B3.0) [packet **159**]
(B3.1) [continuation of frame **105**]
(B3.2) [frame **106**, time=0:00:07, type=mp3 audio]
(B3.3) [track boundary notification]
(B3.4) [Padding, if necessary]

30

(B4.0) [packet **160**]
(B4.1) [frame **1**, time=0:00:08, type=mp3 audio]
(B4.2) [frame **2**, time=0:00:09, type=mp3 audio]
(B4.3) [frame **3**, time=0:00:10, type=mp3 audio]
(B5.0) [packet **161**]
(B5.1) [continuation of frame **3**]
(B5.2) [frame **4**, time=0:00:11, type=mp3 audio]
(B5.3) [Resynchronize, after packet **159**]
(B5.4) [Padding, if necessary]
(B6.0) [packet **162**]
(B6.1) [frame **1**, time=0:00:08, type=mp3 audio]
(B6.2) [frame **2**, time=0:00:09, type=mp3 audio]
(B6.3) [frame **3**, time=0:00:10, type=mp3 audio].
(B6.4) [frame **4**, time=0:00:11, type=mp3 audio]
(B7.0) [packet **163**]
(B7.1) [continuation of frame **4**]
(B7.2) [frame **5**, time=0:00:12, type=mp3 audio]
(B7.3) [frame **6**, time=0:00:13, type=mp3 audio]
(B7.4) [frame **7**, time=0:00:14, type=mp3 audio]

Packet Sequence B comprises a series of seven packets, identified by packet **157** through **163**, that the audio information channel device **23** multi-casts to the members of a synchrony group **20**. As with Packet Sequence A, it will be appreciated that the series of packets that the audio information channel device **23** may multi-cast to the synchrony group **20** may include packets prior to the packet **157**, and may also include packets after packet **162**. Each packet comprises a packet header, which is symbolized by lines (B1.0), (B2.0), . . . (B7.0) in Packet Sequence B. As in Packet Sequence A, each packet will also generally include information associated with at least a portion of a frame **51**(*f*) along with its associated frame **55**(*f*). As in the packets represented in Packet Sequence A, each packet includes information associated with a plurality of frames. Depending on the lengths of the packets, each packet may contain information associated with a portion of a frame, an entire frame, or multiple frames. Further, as with Packet Sequence A, it is assumed that each packet may contain information associated with multiple frames. In addition, it is assumed that a packet does not necessarily contain information associated with an integral number of frames; in that case, a packet may contain information associated with a portion of a frame, and the next packet will contain the information associated with the rest of a frame.

The structures of the packets represented by Packet Sequence B are similar to those described above in connection with Packet Sequence A, and will not be repeated here. Generally, Packet Sequence B illustratively contains a sequence of packets that represent at least portions of three tracks that may have been selected from, for example, a play list. In particular, packets **157** through **159** represent frames from a portion of one track, packets **160** and **161** represent frames from a second track and packets **162** and **163** represent frames from a third track. The play list indicated that the first, second and third tracks were to be played in that order. With particular reference to Packet Sequence B, it should be noted that line (B3.3) indicates that packet **159** includes an indication that that packet contains the last frame for the track, and line (B3.4) provides for padding to the end of the packet. The first frame of the next track begins in packet **160**.

In connection with the use of the resynchronize command to cancel playback of a track, at least a portion of which the audio information channel device **23** has multi-cast to the members of the synchrony group, packet **161**, in line (B5.3) represents a resynchronize command that indicates that resynchronization is to occur after packet **159**, that is, immediately after the packet that contains the last frame of the first

US 9,164,532 B2

**31**

of the three tracks represented by the packets in Packet Sequence B. It should be noted that the resynchronize command is in the packet **161**, while the resynchronization is to occur at packet **160**, that is, the synchrony group is to not play the track starting with packet **160**, but instead is to begin playing the track frames for which begin with the next packet, that is, packet **162**. As with Packet Sequence A, in Packet Sequence B the audio information channel device **23**, in packet **162** and **163**, multi-casts frames whose time stamps indicate that they are to be played when the frames that were multi-cast in packets **160** and **161** were to be played. By use of the resynchronize command and specifying a packet in this manner, the audio information channel device can cancel playback of a track for which playback has not yet begun.

It will be appreciated that the resynchronize command is generally not necessary for cancelling play back of a track that the audio information channel device **23** has not started multi-casting to the synchrony group **20**, since the audio information channel device **23** itself can re-order the play list to accommodate the cancellation.

The invention provides a number of advantages. In particular, the invention provides a network audio system in which a number of devices share information can reproduce audio information synchronously, notwithstanding the fact that packets, which may contain digital audio information, transmitted over the network to the various zone players connected thereto may have differing delays and the zone players operate with independent clocks. Moreover, although the invention has been described in connection with audio information, it will be appreciated that the invention will find utility in connection with any type of isochronous information for which synchrony among devices is desired. The system is such that synchrony groups are created and destroyed dynamically, and in such a manner as to avoid requiring a dedicated device as the master device.

It will be appreciated that a number of changes and modifications may be made to the network audio system **10** as described above. For example, although the invention has been described as providing that the audio information channel device **23** provides digital audio information to the members synchrony group **20** that has been encoded using particular types of encoding and compression methodologies, it will be appreciated that the audio information channel device **23** can provide digital audio information to various members of the synchrony group **20** that have been encoded and compressed using different types of encoding and compression methodologies, and, moreover, for which different sampling rates have been used. For example, the audio information channel device **23** may provide digital audio information to the master device **21** and slave devices **22(1)** through **22($g_1$)** using the MP3 methodology at a specified sampling rate, the digital audio information for the same program to slave devices **22($g_1$+1)** through **22($g_2$)** using the WAV methodology at one specified sampling rate, and to slave devices **22($g_2$+1)** through **22(G)** using the WAV methodology at another specified sampling rate. In that case, the audio information channel device **23** can specify the particular encoding and compression methodology that has been used in the encoding type field **57** associated with each frame and the sampling rate in the sampling rate field **58**. Moreover, since the encoding and compression type and sampling rate are specified for each frame, the encoding and compression type and sampling rate can be changed from frame to frame. The audio information channel device **23** may use different multi-cast addresses for the different encoding and compression types and sampling rates, but it will be appreciated that that would not be required.

**32**

It will be appreciated that two advantages of providing that the encoding and compression methodology and the sampling rate is provided on a frame-by-frame basis, instead of on, for example, a track-by-track basis, is that that would facilitate a slave device joining the synchrony group **20** at a frame mid-track, without requiring, for example, the master device **21** or the audio information channel device **23** to notify it of the encoding and compression methodology or the sampling rate.

Another modification is that, instead of the network communications manager **40** of a member of a synchrony group **20** generating the updated time stamp T$^U_F$ for a digital audio information frame by adding the time differential value ΔT to the time stamp T$_F$ associated with a frame, the network communications manager **40** may instead generate the updated time stamp T$^U_F$ by subtracting the differential time value ΔT from the member's current time T$_S$ as indicated by the member's digital to analog converter clock **34** at the time at which the digital audio information is received. It will be appreciated, however, that there may be variable time delays in processing of messages by the slave device's network communications manager **40**, and so it may be preferable to generate the time differential value ΔT using the time stamp T$_F$ provided by the audio information channel device **23**.

In addition, instead of the network communications manager **40** of a member of a synchrony group generating an updated time stamp to reflect the difference between the times indicated by the member's digital to analog converter clock and the audio information channel device's digital to analog converter clock, the network communications manager **40** can generate the time differential value ΔT and provide it to the member's playback scheduler **32**. In that case, the member's network communications manager **40** can store each digital audio information frame along with the time stamp T$_F$ as received from the master device in the audio information buffer **21**. The playback scheduler **32** can utilize the time differential value ΔT, and the time stamps T$_F$ associated with the digital audio information frames, to determine when the respective digital audio information frames are to be played. In determining when a digital audio information frame is to be played, the playback scheduler can add the time differential value to the time stamp T$_F$ associated with the digital audio frame, and enable the digital audio frame to be coupled to the digital to analog converter **33** when the time indicated by the sum corresponds to the current time as indicated by the slave device's digital to analog converter clock **34**. Alternatively, when the member's digital to analog converter clock **34** updates its current time T$_S$ the playback scheduler can generate an updated current time T'$_S$ by subtracting the differential time value ΔT from the current time T$_S$, and using the updated current time T'$_S$ to determine when to play a digital audio information frame.

As described above, the members of a synchrony group **20** periodically obtain the audio information channel device's current time value and uses the current time value that it receives from the audio information channel device to periodically update the time differential value ΔT that it uses in updating the time stamps associated with the various frames. It will be appreciated that, if digital to analog converter clock(s) associated with the member(s) of a synchrony group **20** are ensured to have the same rate as the digital to analog converter clock, a member need only obtain the current time value from the audio information channel device once, at the beginning of playback.

As another alternative, if the zone players are provided with digital to analog converter clock **34** whose time and rate can be set by an element such as the network communications

US 9,164,532 B2

33

manager **40**, when a zone player **11**(*n*) is operating as a member of a synchrony group **20**, its network communications manager **40** can use the various types of timing information that it receives from the audio information channel device **23**, including the current time information and the playback timing information indicated by the time stamps that are associated with the various frames **51**(*f*) comprising the audio and playback timing information that it receives, to adjust the synchrony group member's digital to analog converter clock's time value and/or the clock rate that it uses for playback. If the clock's time value is to be adjusted, when the synchrony group member's network communications manager **40** initially receives the current time information from the audio information channel device **23** for the synchrony group **20**, the network communications manager **40** can set the synchrony group member's digital to analog converter clock **34** to the current time value as indicated by the audio information channel device's current time information. The network communications manager **40** can set the clock **34** to the current time value indicated by the audio information channel device's current time information once, or periodically as it receives the current time information.

Alternatively or in addition, the synchrony group member's network communications manager **40** can use one or both of the current time information and/or the playback timing information in the time stamps associated with the respective frames **51**(*f*) to adjust the clock rate of the clock **34** that it uses for playback. For example, when the synchrony group member's network communications manager **40** receives a frame **51**($f_x$) having a time stamp having a time value $T_{f_X}$ it can generate the updated time value $T^U_{f_X} = T_{f_X} + \Delta T$ as described above, and store the frame with the time stamp with the updated time value in the audio information buffer **30**. In addition, since both the number of samples in a frame and the sampling rate, which determines the rate at which the frame is to be played, are known to the network communications manager **40**, it can use that information, along with the updated time value $T^U_{f_X}$ that is to be used for frame **51**($f_x$) to generate an expected updated time value $T^E_{f_{X+1}}$ that is expected for the updated time stamp of the next frame **51**($f_{x+1}$). After the synchrony group member's network communications manager **40** receives the next frame **51**($f_{x+1}$), it can generate the updated time value $T^U_{f_{X+1}}$ and compare that value to the expected updated time value $T^E_{f_{X+1}}$. If the two time values do not correspond, or if the difference between them is above a selected threshold level, the clock that is used by the audio information channel device **23** to generate the time stamps is advancing at a different rate than the synchrony group member's digital to analog converter clock **34**, and so the network communications manager **40** can adjust the rate of the digital to analog converter clock **34** to approach that of the clock used by the audio information channel device **23** so that the differential time value $\Delta T$ is constant. On the other hand, if the two time values do correspond, then the time differential value $\Delta T$ is constant, and the difference is below a threshold level, the network communications manager **40** need not change the clock rate of the digital to analog converter clock **34**. It will be appreciated that, if the clock rate is to be adjusted, the rate adjustment can be fixed, or it can vary based on, for example, the difference between the updated time value $T^U_{f_{X+1}}$ and the expected updated time value $T^E_{f_{X+1}}$.

It will also be appreciated that, if no rate adjustment is performed for one frame **51**($f_{x+1}$), the synchrony group member's network communications manager **40** can generate an expected updated time value $T^E_{f_{X+2}}$ that is expected for the updated time stamp of the next frame **51**($f_{x+2}$) using the updated time value $T^U_{f_X}$ determined for frame **51**($f_X$), along

34

with the number of samples in a frame and the sampling rate, and compare the expected updated time value $T^E_{f_{X+2}}$ to the updated time value $T^U_{f_{X+2}}$ that it generates when it receives frame **51**($f_{x+2}$). At that point, if the network communications manager **41** determines that two time values do not correspond, or if the difference between them is above a selected threshold level, it can adjust the rate of the digital to analog converter clock **34**. Similar operations can be performed if no rate adjustment is performed for several successive frames **51**($f_{x+1}$), **51**($f_{x+2}$), . . . . This will accommodate the possibility that the rate differential between the clock **34** and the clock used by the audio information channel device **23** in generating the time stamps have rates that differ by an amount sufficiently small that it cannot be detected using time stamps of two or more successive frames.

Instead or in addition to adjusting the clock rate as described above, the synchrony group member's network communications manager **40** can perform similar operations in connection with adjusting the clock rate in connection with the current time information that it receives from the audio information channel device **23**.

Furthermore, although the network audio system **10** has been described such that the master device **21** of a synchrony group **20** can, in response to control information provided thereto by a user through the user interface module **13**, provide a notification to a zone player **11**(*n*) that it is to become a member of its synchrony group **20** as a slave device **22**(*g*), it will be appreciated that the user interface module **13** can provide the notification directly to the zone player **11**(*n*) that is to become a member of the synchrony group **20**. In that case, the zone player **11**(*n*) can notify the master device **21** that it is to become a slave device **22**(*g*) in the synchrony group **20**, after which the master device **21** can provide information regarding the synchrony group **20**, including the multi-cast and unicast addresses of the audio information channel device and other information as described above.

Similarly, although the network audio system **10** has been described such that the master device **21** of a synchrony group **20** can, in response to control information provided thereto by a user through the user interface module **13**, provide a command to a slave device **22**(*g*) to enable the slave device **22**(*g*) to adjust its volume, it will be appreciated that the user interface module **13** can provide control information directly to the slave device **22**(*g*) to enable the slave device **22**(*g*) to adjust its volume.

In addition, although the network audio system **10** has been described such that each frames **51**(*f*) is associated with a frame sequence number (reference field **56**, FIG. **4**), it will be appreciated that, if the packets described above in connection with Packet Sequence A and Packet Sequence B are provided with packet sequence numbers, the frame sequence numbers need not be provided, since the packet sequence numbers can suffice for defining the frame sequencing.

Furthermore, although the network audio system **10** has been described such that the zone players **11**(*n*) are provided with an audio amplifier **35** for amplifying the analog signal provided by the respective digital to analog converters **33**, it will be appreciated that a zone player may be provided that does not itself include an audio amplifier. In that case, the analog signal may be coupled to an external amplifier for amplification as necessary before being provided to the audio reproduction device(s) **15**(*n*)(*r*). It will be appreciated that a single zone player **11**(*n*) may be provided with multiple audio amplifiers and audio reproduction device interfaces, and, if necessary, multiple digital to analog converters **33**, to provide audio programs for corresponding numbers of synchrony groups.

US 9,164,532 B2

35                                                                                                          36

Similarly, although the zone players $11(n)$ have been described such that they may be connected to one or more audio information sources, it will be appreciated that an audio information source may form part of and be integrated into a zone player $11(n)$. For example, a zone player may include a compact disk player, cassette tape player, broadcast radio receiver, or the like, that has been integrated into it. In addition, as noted above, an individual zone player $11(n)$ may be connected to multiple audio information sources and may contemporaneously operate as the audio information channel device 23 for multiple synchrony groups.

In addition, although FIG. 1 shows the network audio system 10 as including one user interface module 13, it will be appreciated that the system 10 may include a plurality of user interface modules. Each user interface module be useful for controlling all of the zone players as described above, or alternatively one or more of the user interface modules may be useful for controlling selected subsets of the zone players.

Moreover, it will be appreciated that, although the invention has been described in connection with audio information, it will be appreciated that the invention will find utility in connection with any type of information for which synchrony among devices connected to a network is desired.

As noted above, while a zone player $11(n)$ is operating as audio information channel device 23 for a synchrony group 20, when the zone player $11(n)$'s audio information source interface 30 or network communications manager 40 stores digital audio information frames based on audio information from an audio information source $14(n)(s)$ in the audio information buffer 31, it will provide time stamps for the respective frames to schedule them for playback after some time delay after they have been buffered in the audio information buffer 31. The delay is provided so that, for other zone players $11(n')$, $11(n'')$, . . . that are operating as members of a synchrony group, there will be sufficient time for the audio and playback timing information to be transferred over the network 12 to those other zone players $11(n')$, $11(n'')$, . . . so that it can be processed and played by them at the appropriate time as described above. The time period that is selected for the time delay may be fixed or variable, and in either case may be based on a number of factors. If the time period selected for the time delay is fixed, it may be based on, for example, factors such as an estimate of the maximum latency in the network 12, the estimated maximum loading of the various components comprising the zone players $11(n)$, and other estimates as will be appreciated by those skilled in the art.

The time delay may be the same for audio information from all types of audio information sources, and may be constant over the entire period that the synchrony group 20 is playing an audio work. Alternatively, different time delays may be utilized based on various criteria. For example, if the audio information is to be played independently of information associated with other types of media, the time delay may be selected to be relatively long, on the order of a significant fraction of a second, or longer. On the other hand, if the audio information is to be played contemporaneously with, for example, video information, which may be supplied by, for example, a video disk, video tape cassette, over cable, satellite, or broadcast television, which may not be buffered or which may be displayed independently of the network audio system 10, it may be undesirable to provide for such a lengthy delay, since the time delay of the audio playback, in relation to the video display, may be noticeable. In that case, the zone player $11(n)$ may provide for a much shorter time delay. In one embodiment, the time delay provided for audio information to be played concurrently with video information is selected to be generally on the order of fifty milliseconds, which would barely, if at all, be perceptible to someone viewing the video. Other desirable time delays for information from other types of sources will be apparent to those skilled in the art.

As yet a further possibility, the zone player $11(n)$, when operating as an audio information channel device 23 for a synchrony group 20, can dynamically determine the time delay based on a number of conditions in the network audio system 10, including, for example, the message transfer latency in network 12, the loading of microprocessors or other components that are used in the various zone players $11(n')$, $11(n'')$, . . . that may comprise a synchrony group 20, as well as other factors. For example, if the audio information channel device 23 determines that the latency in the network 12 has increased beyond a selected threshold, the audio information channel device 23 can adjust the delay to increase the likelihood that the members of the synchrony group 20 will be able to receive the packets and process the frames so that they will be able to play them at the appropriate times. Similarly, if the audio information channel device 23 is notified that a member of the synchrony group 20 to which it provides audio information requires additional time to receive and process the frames that it transmits, the audio information channel device 23 can adjust the delay accordingly. It will be appreciated that, to reduce or minimize possible discontinuities in the audio playback by the members of the synchrony group, the audio information channel device 23 can, instead of adjusting the time delay during a particular audio track, adjust the time delay between tracks, during silent periods of a track or otherwise as will be appreciated by those skilled in the art. In addition, the audio information channel device 23 can use conventional audio compression methodologies to facilitate a speeding up and/or slowing down of playback of an audio track while it is in the process of providing additional time delay. Generally, the members of the synchrony group 20 can provide notifications to the audio information channel device 23 if they determine that they will need an additional time delay, and the audio information channel device 23 can adjust the time delay in accordance with the notifications from the members of the synchrony group 20.

It will be appreciated that a system in accordance with the invention can be constructed in whole or in part from special purpose hardware or a general purpose computer system, or any combination thereof, any portion of which may be controlled by a suitable program. Any program may in whole or in part comprise part of or be stored on the system in a conventional manner, or it may in whole or in part be provided in to the system over a network or other mechanism for transferring information in a conventional manner. In addition, it will be appreciated that the system may be operated and/or otherwise controlled by means of information provided by an operator using operator input elements (not shown) which may be connected directly to the system or which may transfer the information to the system over a network or other mechanism for transferring information in a conventional manner.

The foregoing description has been limited to a specific embodiment of this invention. It will be apparent, however, that various variations and modifications may be made to the invention, with the attainment of some or all of the advantages of the invention. It is the object of the appended claims to cover these and such other variations and modifications as come within the true spirit and scope of the invention.

US 9,164,532 B2

37

38

What is claimed as new and desired to be secured by Letters Patent of the United States is:

**1**. A method comprising:

receiving, at a controller, information identifying a plurality of zones on a local area network (LAN) on which the controller is connected, each zone comprising a zone player that includes a digital to analog converter and amplifier and configured to form, under control of the controller, a group of two or more zones that play audio content in synchrony with each other, wherein the controller communicates with the plurality of zone players via the LAN;

displaying the plurality of zones on a screen of the controller;

the controller receiving a command to form a first group of two or more zones of the plurality of zones;

in response to receiving the command to form the first group of two or more zones, the controller configuring the first group, wherein configuring the first group comprises the controller configuring, over the LAN, a first zone player in the first group to (a) transmit audio content, playback timing for the audio content, and device clock information to every other zone player in the first group, and (b) play back the audio content in synchrony with every other zone player in the first group according to the playback timing and the device clock information, wherein the zone players in the first group remain independently clocked while playing the audio content in synchrony, and wherein the controller is not a member of the first group; and

after configuring the first group of two or more zones, the controller receiving status information over the LAN from at least one zone player of the first group.

**2**. The method of claim **1**, further comprising:

receiving a command at the controller to play audio content in synchrony by the first group; and

in response to receiving the command to play audio content in synchrony by the first group, controlling, over the LAN, at least one of the zone players to play the audio content in synchrony with the first group.

**3**. The method of claim **1**, further comprising:

the controller displaying a playlist of audio content to be played in synchrony by the first group.

**4**. The method of claim **1**, further comprising:

the controller receiving a command to advance to a next track in a set of multimedia tracks for playback from an audio information source; and

in response to receiving the command to advance to the next track in the set of multimedia tracks, the controller controlling, over the LAN, at least one of the zone players to (a) obtain the next track in the set of multimedia tracks from the audio information source and (b) play the next track in synchrony with the first group.

**5**. The method of claim **1**, further comprising:

the controller receiving a command to re-order tracks in a playlist of tracks to be played from an audio information source; and

in response to receiving the command to re-order the tracks in the playlist, the controller re-ordering the tracks in the playlist.

**6**. The method of claim **1**, further comprising:

the controller receiving a command to form a second group of two or more zones of the plurality of zones; and

in response to receiving the command to form the second group of two or more zones, the controller configuring the second group, wherein configuring the second group comprises configuring, over the LAN, at least a second zone player of the plurality of zones to form the second group of two or more zones, wherein after the at least a second zone player has formed the second group, the controller is not a member of the second group.

**7**. The method of claim **1**, further comprising:

the controller receiving a command to un-group a particular zone player from the first group of zones while the first group is playing back audio content in synchrony; and

in response to receiving the command to un-group the particular zone player from the first group of zones, the controller configuring, over the LAN, the particular zone player to leave the first group, wherein after the particular zone player has left the first group, one or more zone players remaining in the first group continue playing the audio content.

**8**. The method of claim **1**, further comprising:

the controller receiving a command to add a particular zone to the first group of zones while the first group of zones is playing audio content in synchrony; and

in response to receiving the command to add the particular zone to the first group of zones, the controller configuring, over the LAN, at least one zone player of the particular zone to join the first group of zones, wherein after the at least one zone player of the particular zone has joined the first group of zones, (i) the at least one zone player of the particular zone plays the audio content in synchrony with all other zone players in the first group and (ii) the controller is not a member of the first group.

**9**. The method of claim **1**, further comprising:

the controller receiving a command to cease playback of audio content by the first group; and

in response to receiving the command to cease playback of the audio content by the first group, the controller controlling, over the LAN, a master zone player of the first group to cease playback of the audio content, and wherein after the master zone player of the first group has ceased playback of the audio content, all other members of the first group cease playback of the audio content.

**10**. A tangible, non-transitory computer readable memory having instructions stored therein, wherein the instructions, when executed by one or more processors, cause a controller to perform a method comprising:

receiving, at the controller, information identifying a plurality of zones on a local area network (LAN) on which the controller is connected, each zone comprising a zone player that includes a digital to analog converter and amplifier and configured to form, under control of the controller, a group of two or more zones that play audio content in synchrony with each other, wherein the controller communicates with the plurality of zone players via the LAN;

displaying the plurality of zones on a screen of the controller;

receiving a command at the controller to form a first group of two or more zones of the plurality of zones;

in response to receiving the command to form the first group of two or more zones, configuring the first group, wherein configuring the first group comprises configuring, over the LAN, a first zone player in the first group to (a) transmit audio content, playback timing for the audio content, and device clock information to every other zone player in the first group, and (b) play back the audio content in synchrony with every other zone player in the first group according to the playback timing and the device clock information, wherein the zone players in

US 9,164,532 B2

39

the first group remain independently clocked while playing the audio content in synchrony, and wherein the controller is not a member of the first group; and

after configuring the first group of two or more zones, the controller receiving status information over the LAN from at least one zone player of the first group.

**11**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to adjust volume for a particular zone player.

**12**. The computer readable memory of claim **11**, wherein the method further comprises:

in response to receiving the command to adjust the volume for the particular zone player, adjusting the volume of the particular zone player.

**13**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to play audio content in synchrony by the first group; and

in response to receiving the command to play audio content in synchrony by the first group, controlling, over the LAN, at least one of the zone players to play the audio content in synchrony with the first group.

**14**. The computer readable memory of claim **10**, wherein the method further comprises:

displaying, at the controller, a playlist of audio content to be played in synchrony by the first group.

**15**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to turn an audio information source on or off; and

in response to receiving the command to turn the audio information source on or off, either (a) when the command is a command to turn the audio information source on, turn on the audio information source or (b) when the command is a command to turn the audio information source off, turn off the audio information source.

**16**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to advance to a next track in a set of multimedia tracks for playback from an audio information source; and

in response to receiving the command to advance to the next track in the set of multimedia tracks, controlling, over the LAN, at least one of the zone players to (a) obtain the next track in the set of multimedia tracks from the audio information source and (b) play the next track in synchrony with the first group.

**17**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to re-order tracks in a playlist of tracks to be played from an audio information source; and

in response to receiving the command to re-order the tracks in the playlist, re-ordering the tracks in the playlist.

**18**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to form a second group of two or more zones of the plurality of zones; and

in response to receiving the command to form the second group of two or more zones, configuring the second group, wherein configuring the second group comprises configuring, over the LAN, at least a second zone player of the plurality of zones to form the second group of two or more zones, wherein after the at least a second zone player has formed the second group, the controller is not a member of the second group.

40

**19**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to un-group a particular zone player from the first group of zones while the first group is playing back audio content in synchrony; and

in response to receiving the command to un-group the particular zone player from the first group of zones, configuring, over the LAN, the particular zone player to leave the first group, wherein after the particular zone player has left the first group, one or more zone players remaining in the first group continue playing the audio content.

**20**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to add a particular zone to the first group of zones while the first group of zones is playing audio content in synchrony; and

in response to receiving the command to add the particular zone to the first group of zones, configuring, over the LAN, at least one zone player of the particular zone to join the first group of zones, wherein after the at least one zone player of the particular zone has joined the first group of zones, (i) the at least one zone player of the particular zone plays the audio content in synchrony with all other zone players in the first group and (ii) the controller is not a member of the first group.

**21**. The computer readable memory of claim **10**, wherein the method further comprises:

receiving a command at the controller to cease playback of audio content by the first group; and

in response to receiving the command to cease playback of the audio content by the first group, controlling, over the LAN, a master zone player of the first group to cease playback of the audio content, and wherein after the master zone player of the first group has ceased playback of the audio content, all other members of the first group cease playback of the audio content.

**22**. A non-transitory computer readable storage medium including a computer program, which when executed by one or more processors, causes an audio system controller to implement a method comprising:

receiving, at the controller, information identifying a plurality of zone players on a local area network (LAN) on which the controller is connected, each zone player comprising a digital to analog converter and amplifier, wherein each zone player is configured to form, under control of the controller, a group of two or more zone players that play audio content in synchrony with each other, wherein the controller communicates with the plurality of zone players via the LAN;

displaying the plurality of zone players on a screen of the controller;

receiving a command at the controller to form a first synchrony group comprising a first zone player and a second zone player, wherein the first and second zone players are zone players of the plurality of zone players;

in response to receiving the command to form the first synchrony group, configuring the first synchrony group, wherein configuring the first synchrony group comprises configuring one of the first or second zone players to (a) transmit audio content, playback timing for the audio content, and device clock information to the other of the first or second zone players, and (b) play back the audio content in synchrony with the other of the first or second zone players according to the playback timing and the device clock information, wherein the first and

US 9,164,532 B2

**41**

second zone players remain independently clocked while playing the audio content in synchrony; and

after configuring the first synchrony group, receiving status information over the LAN at the controller from at least one of the first or second zone players.

**23**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises receiving a command at the controller to adjust volume for the first zone player in the first synchrony group.

**24**. The non-transitory computer readable storage medium of claim **23**, wherein the method further comprises, in response to receiving the command to adjust the volume for the first zone player, adjusting the volume for the first zone player.

**25**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

receiving a command at the controller to play audio content in synchrony by the first synchrony group; and

in response to receiving the command to play the audio content in synchrony by the first synchrony group, instructing, over the LAN, at least one of the first or second zone players to play the audio content, wherein after instructing the at least one of the first or second zone players to play the audio content, the first and second zone players play the audio content in synchrony.

**26**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

displaying, at the controller, a playlist of audio content for playback in synchrony by the first synchrony group.

**27**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

receiving a command at the controller to turn an audio information source on or off; and

in response to receiving the command to turn the audio information source on or off, either (a) turning off the audio information source when the command is a command to turn the audio information source off and (b) turning on the audio information source when the command is a command to turn the audio information source on.

**28**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

receiving a command at the controller to advance to a next track in a set of multimedia tracks for playback by the first synchrony group from an audio information source; and

in response to receiving the command to advance to the next track in the set of multimedia tracks, controlling, over the LAN, the one of the first or second zone players to (a) obtain the next track in the set of multimedia tracks from the audio information source, (b) stream the obtained next track from the one of the first or second zone players to the other of the first or second zone players, and (c) play the obtained next track in synchrony with the other of the first or second zone players.

**29**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

receiving a command at the controller to re-order tracks in a playlist of tracks to be played by the first synchrony group from an audio information source; and

in response to receiving the command to re-order the tracks in the playlist, re-ordering the tracks in the playlist.

**30**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

receiving a message from at least one of the first or second zone players of the first synchrony group indicating a

**42**

configuration change to the first synchrony group caused by configuration changes implemented by a second controller.

**31**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

receiving a command at the controller to un-group the second zone player from the first synchrony group while the first synchrony group is playing back audio content in synchrony; and

in response to receiving the command to un-group the second zone player from the first synchrony group, configuring, over the LAN, the second zone player to leave the first synchrony group, wherein after the second zone player has left the first synchrony group, the first zone player and any other zone players remaining in the first synchrony group continue playing the audio content in synchrony.

**32**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

receiving a command at the controller to add a third zone player to the first synchrony group while the first synchrony group is playing audio content in synchrony; and

in response to receiving the command to add the third zone player to the first synchrony group, configuring, over the LAN, the third zone player to join the first synchrony group, wherein after the third zone player has joined the first synchrony group, (i) the third zone player plays the audio content in synchrony with all other zone players in the first synchrony group and (ii) the controller is not a member of the first synchrony group.

**33**. The non-transitory computer readable storage medium of claim **22**, wherein the method further comprises:

receiving a command at the controller to cease playback of audio content by the first synchrony group; and

in response to receiving the command to cease playback of the audio content by the first synchrony group, controlling, over the LAN, the one of the first or second zone players to cease playback of the audio content, and wherein after the one of the first or second zone players has ceased playback of the audio content, all other members of the first synchrony group cease playback of the audio content.

**34**. A controller device comprising:

one or more processors; and

tangible, non-transitory, computer-readable memory comprising instructions that, when executed by the one or more processors, cause the controller device to perform a method comprising:

receiving a command at the controller device to form a synchrony group comprising a first zone player and a second zone player;

in response to receiving the command to form the synchrony group, configuring the synchrony group, wherein configuring the synchrony group comprises configuring, over a Local Area Network (LAN), the first zone player to (a) transmit audio content, playback timing for the audio content, and device clock information to the second zone player and (b) play back the audio content in synchrony with the second zone player according to the playback timing and the device clock information, wherein the first and second zone players remain independently clocked while playing the audio content in synchrony, and wherein the controller device is not a member of the synchrony group; and

US 9,164,532 B2

**43**

**44**

after the controller device has configured, the synchrony
group, the controller device receiving status information
over the LAN from at least one of the first or second zone
players indicating that the first and second zone players
in the synchrony group are configured to playback audio  5
in synchrony with each other.

\*    \*    \*    \*    \*

Exhibit 3

US009213357B2

(12) **United States Patent**
Millington

(10) **Patent No.:**     **US 9,213,357 B2**
(45) **Date of Patent:**     **Dec. 15, 2015**

(54) **OBTAINING CONTENT FROM REMOTE SOURCE FOR PLAYBACK**

(71) Applicant: **Sonos, Inc.**, Santa Barbara, CA (US)

(72) Inventor: **Nicholas A. J. Millington**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/516,867**

(22) Filed:    **Oct. 17, 2014**

(65)         **Prior Publication Data**
US 2015/0039109 A1     Feb. 5, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/297,000, filed on Nov. 15, 2011, which is a continuation of application No. 10/816,217, filed on Apr. 1, 2004, now Pat. No. 8,234,395.

(60) Provisional application No. 60/490,768, filed on Jul. 28, 2003.

(51) **Int. Cl.**
*G06F 15/16*     (2006.01)
*G06F 1/00*     (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC    *G06F 1/00* (2013.01); *G05B 15/02* (2013.01); *G06F 3/048* (2013.01); *G06F 3/0482* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... G06F 3/167; G06F 17/00; G06F 17/3074; G06F 3/048; G06F 3/0482; G06F 3/0484; G06F 3/126; G06F 3/16; H04L 65/60; H04L 12/2812
USPC ........................................ 709/219, 220, 231
See application file for complete search history.

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,296,278 | A | 10/1981 | Cullison et al. |
| 4,816,989 | A | 3/1989 | Finn et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0251584 | A2 | 1/1988 |
| EP | 0672985 | A1 | 9/1995 |

(Continued)

OTHER PUBLICATIONS

"Advisory Action mailed Sep. 18, 2008 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 8 pages".

(Continued)

*Primary Examiner* — Oleg Survillo
(74) *Attorney, Agent, or Firm* — McDonnell Boehnen Hulbert & Berghoff LLP

(57)         **ABSTRACT**

Examples include a playback device with a network interface and memory with program instructions that, when executed by the processor, cause the playback device to (a) receive, via the network interface from a network device communicatively coupled to the playback device over a LAN, an address identifying a network location of audio information available at an audio information source, where the audio information source is outside of the LAN, (b) obtain, via the network interface from the audio information source, the audio information, (c) transmit, via the network interface to another playback device, the audio information, and (d) play back the audio information.

**20 Claims, 5 Drawing Sheets**



**US 9,213,357 B2**

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *H04J 3/06* | (2006.01) |
| *H04R 27/00* | (2006.01) |
| *G06F 17/00* | (2006.01) |
| *H03G 3/20* | (2006.01) |
| *H04L 29/06* | (2006.01) |
| *G06F 3/048* | (2013.01) |
| *G06F 3/16* | (2006.01) |
| *H04L 29/08* | (2006.01) |
| *G06F 3/0484* | (2013.01) |
| *H04R 3/12* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *G06F 3/0482* | (2013.01) |
| *H03G 3/00* | (2006.01) |
| *H04H 20/10* | (2008.01) |
| *H04H 20/26* | (2008.01) |
| *G05B 15/02* | (2006.01) |
| *G11B 20/10* | (2006.01) |
| *H04N 5/04* | (2006.01) |
| *H04N 9/79* | (2006.01) |
| *H04N 21/43* | (2011.01) |
| *H04N 21/436* | (2011.01) |

(52) **U.S. Cl.**
CPC ............... *G06F 3/0484* (2013.01); *G06F 3/16* (2013.01); *G06F 3/165* (2013.01); *G06F 3/167* (2013.01); *G06F 17/00* (2013.01); *G06F 17/3074* (2013.01); *G11B 20/10527* (2013.01); *H03G 3/00* (2013.01); *H03G 3/20* (2013.01); *H04H 20/103* (2013.01); *H04H 20/26* (2013.01); *H04J 3/0664* (2013.01); *H04L 65/60* (2013.01); *H04L 65/80* (2013.01); *H04L 67/1095* (2013.01); *H04L 67/26* (2013.01); *H04L 69/28* (2013.01); *H04N 5/04* (2013.01); *H04N 9/7904* (2013.01); *H04N 21/4307* (2013.01); *H04N 21/43615* (2013.01); *H04R 3/12* (2013.01); *H04R 27/00* (2013.01); *G11B 2020/10592* (2013.01); *H04H 2201/20* (2013.01); *H04L 65/4076* (2013.01); *H04R 2227/003* (2013.01); *H04R 2227/005* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,153,579 | A | 10/1992 | Fisch et al. |
| 5,182,552 | A | 1/1993 | Paynting |
| 5,239,458 | A | 8/1993 | Suzuki |
| 5,299,266 | A | 3/1994 | Lumsden |
| 5,406,634 | A | 4/1995 | Anderson et al. |
| 5,440,644 | A | 8/1995 | Farinelli et al. |
| 5,467,342 | A | 11/1995 | Logston et al. |
| 5,491,839 | A | 2/1996 | Schotz |
| 5,553,222 | A | 9/1996 | Milne et al. |
| 5,602,992 | A | 2/1997 | Danneels |
| 5,668,884 | A | 9/1997 | Clair, Jr. et al. |
| 5,673,323 | A | 9/1997 | Schotz et al. |
| 5,696,896 | A | 12/1997 | Badovinatz et al. |
| 5,726,989 | A | * 3/1998 | Dokic ........................... 370/509 |
| 5,751,819 | A | 5/1998 | Dorrough |
| 5,761,320 | A | 6/1998 | Farinelli et al. |
| 5,787,249 | A | 7/1998 | Badovinatz et al. |
| 5,808,662 | A | 9/1998 | Kinney et al. |
| 5,815,689 | A | 9/1998 | Shaw et al. |
| 5,867,691 | A | 2/1999 | Shiraishi |
| 5,875,354 | A | 2/1999 | Charlton et al. |
| 5,887,143 | A | 3/1999 | Saito et al. |
| 5,923,869 | A | * 7/1999 | Kashiwagi et al. ........... 713/501 |
| 5,923,902 | A | 7/1999 | Inagaki |
| 5,946,343 | A | 8/1999 | Schotz et al. |
| 5,956,088 | A | 9/1999 | Shen et al. |

| | | | |
|---|---|---|---|
| 6,009,457 | A | 12/1999 | Moller |
| 6,026,150 | A | 2/2000 | Frank et al. |
| 6,031,818 | A | 2/2000 | Lo et al. |
| 6,108,485 | A | 8/2000 | Kim |
| 6,108,686 | A | 8/2000 | Williams, Jr. |
| 6,122,668 | A | 9/2000 | Teng et al. |
| 6,128,318 | A | 10/2000 | Sato |
| 6,157,957 | A | 12/2000 | Berthaud |
| 6,175,872 | B1 | 1/2001 | Neumann et al. |
| 6,185,737 | B1 | 2/2001 | Northcutt et al. |
| 6,195,436 | B1 | 2/2001 | Scibora et al. |
| 6,199,169 | B1 | 3/2001 | Voth |
| 6,255,961 | B1 | 7/2001 | Van Ryzin et al. |
| 6,256,554 | B1 | 7/2001 | DiLorenzo |
| 6,308,207 | B1 | 10/2001 | Tseng et al. |
| 6,324,586 | B1 | 11/2001 | Johnson |
| 6,332,147 | B1 | 12/2001 | Moran et al. |
| 6,343,028 | B1 | 1/2002 | Kuwaoka |
| 6,349,339 | B1 | 2/2002 | Williams |
| 6,351,821 | B1 | 2/2002 | Voth |
| 6,404,811 | B1 | 6/2002 | Cvetko et al. |
| 6,430,353 | B1 | 8/2002 | Honda et al. |
| 6,449,653 | B2 | 9/2002 | Klemets et al. |
| 6,487,296 | B1 | 11/2002 | Allen et al. |
| 6,522,886 | B1 | 2/2003 | Youngs et al. |
| 6,526,325 | B1 | 2/2003 | Sussman et al. |
| 6,535,121 | B2 | 3/2003 | Matheny |
| 6,587,127 | B1 | 7/2003 | Leeke et al. |
| 6,598,172 | B1 | 7/2003 | VanDeusen et al. |
| 6,611,537 | B1 | 8/2003 | Edens et al. |
| 6,631,410 | B1 | 10/2003 | Kowalski et al. |
| 6,674,803 | B1 | 1/2004 | Kesselring |
| 6,687,664 | B1 | * 2/2004 | Sussman et al. .............. 704/201 |
| 6,757,517 | B2 | 6/2004 | Chang |
| 6,778,493 | B1 | 8/2004 | Ishii |
| 6,778,869 | B2 | 8/2004 | Champion |
| 6,816,818 | B2 | 11/2004 | Wolf et al. |
| 6,823,225 | B1 | 11/2004 | Sass |
| 6,826,283 | B1 | 11/2004 | Wheeler et al. |
| 6,836,788 | B2 | 12/2004 | Kim et al. |
| 6,839,752 | B1 | 1/2005 | Miller et al. |
| 6,898,642 | B2 | 5/2005 | Chafle et al. |
| 6,907,458 | B2 | 6/2005 | Tomassetti et al. |
| 6,912,610 | B2 | 6/2005 | Spencer |
| 6,920,373 | B2 | 7/2005 | Xi et al. |
| 6,934,766 | B1 | 8/2005 | Russell |
| 6,970,482 | B2 | 11/2005 | Kim |
| 6,985,694 | B1 | 1/2006 | De et al. |
| 7,007,106 | B1 | 2/2006 | Flood et al. |
| 7,020,791 | B1 | 3/2006 | Aweya et al. |
| 7,043,651 | B2 | 5/2006 | Aweya et al. |
| 7,047,308 | B2 | 5/2006 | Deshpande |
| 7,068,596 | B2 | 6/2006 | Mou |
| 7,113,999 | B2 | 9/2006 | Pestoni et al. |
| 7,115,017 | B1 | 10/2006 | Laursen et al. |
| 7,130,368 | B1 | 10/2006 | Aweya et al. |
| 7,130,608 | B2 | 10/2006 | Hollstrom et al. |
| 7,130,616 | B2 | 10/2006 | Janik |
| 7,136,934 | B2 | 11/2006 | Carter et al. |
| 7,143,141 | B1 | 11/2006 | Morgan et al. |
| 7,143,939 | B2 | 12/2006 | Henzerling |
| 7,162,315 | B2 | 1/2007 | Gilbert |
| 7,185,090 | B2 | 2/2007 | Kowalski et al. |
| 7,187,947 | B1 | 3/2007 | White et al. |
| 7,206,367 | B1 | * 4/2007 | Moore ........................... 375/354 |
| 7,206,967 | B1 | 4/2007 | Marti et al. |
| 7,209,795 | B2 | 4/2007 | Sullivan et al. |
| 7,218,708 | B2 | 5/2007 | Berezowski et al. |
| 7,236,739 | B2 | 6/2007 | Chang |
| 7,236,773 | B2 | 6/2007 | Thomas |
| 7,293,060 | B2 | 11/2007 | Komsi |
| 7,312,785 | B2 | 12/2007 | Tsuk et al. |
| 7,313,593 | B1 | 12/2007 | Pulito et al. |
| 7,324,857 | B2 | 1/2008 | Goddard |
| 7,333,519 | B2 | 2/2008 | Sullivan et al. |
| 7,372,846 | B2 | 5/2008 | Zwack |
| 7,392,102 | B2 | 6/2008 | Sullivan et al. |
| 7,412,499 | B2 | 8/2008 | Chang et al. |
| 7,483,538 | B2 | 1/2009 | McCarty et al. |

## US 9,213,357 B2
Page 3

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,483,958 | B1 | 1/2009 | Elabbady et al. |
| 7,519,667 | B1 | 4/2009 | Capps |
| 7,571,014 | B1 | 8/2009 | Lambourne et al. |
| 7,574,274 | B2 | 8/2009 | Holmes |
| 7,599,685 | B2 | 10/2009 | Goldberg et al. |
| 7,606,174 | B2 | 10/2009 | Ochi et al. |
| 7,643,894 | B2 | 1/2010 | Braithwaite et al. |
| 7,657,224 | B2 | 2/2010 | Goldberg et al. |
| 7,657,644 | B1 | 2/2010 | Zheng |
| 7,657,910 | B1 | 2/2010 | McAulay et al. |
| 7,668,990 | B2 | 2/2010 | Krzyzanowski et al. |
| 7,669,219 | B2 | 2/2010 | Scott, III |
| 7,675,943 | B2 | 3/2010 | Mosig et al. |
| 7,676,142 | B1 | 3/2010 | Hung |
| 7,702,279 | B2 | 4/2010 | Ko et al. |
| 7,702,403 | B1 | 4/2010 | Gladwin et al. |
| 7,711,774 | B1 * | 5/2010 | Rothschild .................... 709/205 |
| 7,720,096 | B2 | 5/2010 | Klemets |
| 7,742,740 | B2 | 6/2010 | Goldberg et al. |
| 7,743,009 | B2 | 6/2010 | Hangartner et al. |
| RE41,608 | E | 8/2010 | Blair et al. |
| 7,835,689 | B2 | 11/2010 | Goldberg et al. |
| 7,853,341 | B2 | 12/2010 | McCarty et al. |
| 7,865,137 | B2 | 1/2011 | Goldberg et al. |
| 7,885,622 | B2 | 2/2011 | Krampf et al. |
| 7,916,877 | B2 | 3/2011 | Goldberg et al. |
| 7,917,082 | B2 | 3/2011 | Goldberg et al. |
| 7,934,239 | B1 | 4/2011 | Dagman |
| 7,996,588 | B2 | 8/2011 | Subbiah et al. |
| 8,014,423 | B2 | 9/2011 | Thaler et al. |
| 8,020,023 | B2 | 9/2011 | Millington et al. |
| 8,023,663 | B2 | 9/2011 | Goldberg |
| 8,028,038 | B2 | 9/2011 | Weel |
| 8,028,323 | B2 | 9/2011 | Weel |
| 8,045,952 | B2 | 10/2011 | Qureshey et al. |
| 8,050,652 | B2 | 11/2011 | Qureshey et al. |
| 8,074,253 | B1 | 12/2011 | Nathan |
| 8,086,752 | B2 | 12/2011 | Millington et al. |
| 8,103,009 | B2 | 1/2012 | McCarty et al. |
| 8,112,032 | B2 | 2/2012 | Ko et al. |
| 8,131,390 | B2 | 3/2012 | Braithwaite et al. |
| 8,169,938 | B2 | 5/2012 | Duchscher et al. |
| 8,214,873 | B2 | 7/2012 | Weel |
| 8,230,099 | B2 | 7/2012 | Weel |
| 8,234,395 | B2 | 7/2012 | Millington |
| 8,290,603 | B1 | 10/2012 | Lambourne |
| 8,315,555 | B2 | 11/2012 | Ko et al. |
| 8,370,678 | B2 | 2/2013 | Millington et al. |
| 8,423,659 | B2 | 4/2013 | Millington |
| 8,473,844 | B2 | 6/2013 | Kreifeldt et al. |
| 8,588,949 | B2 | 11/2013 | Lambourne et al. |
| 8,775,546 | B2 | 7/2014 | Millington |
| 2001/0009604 | A1 | 7/2001 | Ando et al. |
| 2001/0022823 | A1 | 9/2001 | Renaud |
| 2001/0027498 | A1 | 10/2001 | Van et al. |
| 2001/0032188 | A1 | 10/2001 | Miyabe et al. |
| 2001/0042107 | A1 | 11/2001 | Palm |
| 2001/0046235 | A1 | 11/2001 | Trevitt et al. |
| 2001/0047377 | A1 | 11/2001 | Sincaglia et al. |
| 2002/0002039 | A1 | 1/2002 | Qureshey et al. |
| 2002/0002562 | A1 | 1/2002 | Moran et al. |
| 2002/0002565 | A1 | 1/2002 | Ohyama |
| 2002/0003548 | A1 | 1/2002 | Krusche et al. |
| 2002/0022453 | A1 | 2/2002 | Balog et al. |
| 2002/0026442 | A1 | 2/2002 | Lipscomb et al. |
| 2002/0034374 | A1 | 3/2002 | Barton |
| 2002/0042844 | A1 | 4/2002 | Chiazzese |
| 2002/0049843 | A1 | 4/2002 | Barone et al. |
| 2002/0062406 | A1 | 5/2002 | Chang et al. |
| 2002/0065926 | A1 | 5/2002 | Hackney et al. |
| 2002/0072816 | A1 | 6/2002 | Shdema et al. |
| 2002/0073228 | A1 | 6/2002 | Cognet et al. |
| 2002/0080783 | A1 | 6/2002 | Fujimori |
| 2002/0090914 | A1 | 7/2002 | Kang et al. |
| 2002/0093478 | A1 | 7/2002 | Yeh |
| 2002/0095460 | A1 | 7/2002 | Benson |
| 2002/0109710 | A1 | 8/2002 | Holtz et al. |
| 2002/0112244 | A1 | 8/2002 | Liou et al. |
| 2002/0114354 | A1 | 8/2002 | Sinha et al. |
| 2002/0114359 | A1 | 8/2002 | Ibaraki et al. |
| 2002/0124097 | A1 | 9/2002 | Isely et al. |
| 2002/0129156 | A1 | 9/2002 | Yoshikawa |
| 2002/0143998 | A1 | 10/2002 | Rajagopal et al. |
| 2002/0159596 | A1 | 10/2002 | Durand et al. |
| 2002/0163361 | A1 | 11/2002 | Parkin |
| 2002/0165721 | A1 | 11/2002 | Chang et al. |
| 2002/0165921 | A1 | 11/2002 | Sapieyevski |
| 2002/0168938 | A1 | 11/2002 | Chang |
| 2002/0173273 | A1 | 11/2002 | Spurgat et al. |
| 2002/0177411 | A1 * | 11/2002 | Yajima et al. .................. 455/41 |
| 2002/0184310 | A1 | 12/2002 | Traversat et al. |
| 2002/0188762 | A1 | 12/2002 | Tomassetti et al. |
| 2002/0194309 | A1 | 12/2002 | Carter et al. |
| 2003/0002609 | A1 | 1/2003 | Faller et al. |
| 2003/0018797 | A1 | 1/2003 | Dunning et al. |
| 2003/0020763 | A1 | 1/2003 | Mayer et al. |
| 2003/0023741 | A1 | 1/2003 | Tomassetti et al. |
| 2003/0035072 | A1 | 2/2003 | Hagg |
| 2003/0035444 | A1 | 2/2003 | Zwack |
| 2003/0041173 | A1 | 2/2003 | Hoyle |
| 2003/0041174 | A1 | 2/2003 | Wen et al. |
| 2003/0043924 | A1 | 3/2003 | Haddad et al. |
| 2003/0055892 | A1 | 3/2003 | Huitema et al. |
| 2003/0061428 | A1 | 3/2003 | Garney et al. |
| 2003/0066094 | A1 | 4/2003 | Van et al. |
| 2003/0067437 | A1 | 4/2003 | McClintock et al. |
| 2003/0073432 | A1 | 4/2003 | Meade |
| 2003/0099212 | A1 | 5/2003 | Anjum et al. |
| 2003/0099221 | A1 | 5/2003 | Rhee |
| 2003/0110329 | A1 | 6/2003 | Higaki et al. |
| 2003/0126211 | A1 | 7/2003 | Anttila et al. |
| 2003/0157951 | A1 | 8/2003 | Hasty |
| 2003/0195964 | A1 | 10/2003 | Mane |
| 2003/0198254 | A1 | 10/2003 | Sullivan et al. |
| 2003/0198255 | A1 | 10/2003 | Sullivan et al. |
| 2003/0198257 | A1 | 10/2003 | Sullivan et al. |
| 2003/0200001 | A1 * | 10/2003 | Goddard ......................... 700/94 |
| 2003/0204273 | A1 | 10/2003 | Dinker et al. |
| 2003/0204509 | A1 | 10/2003 | Dinker et al. |
| 2003/0210796 | A1 | 11/2003 | McCarty et al. |
| 2003/0219007 | A1 | 11/2003 | Barrack et al. |
| 2003/0227478 | A1 | 12/2003 | Chatfield |
| 2003/0231871 | A1 | 12/2003 | Ushimaru |
| 2003/0235304 | A1 | 12/2003 | Evans et al. |
| 2004/0001484 | A1 | 1/2004 | Ozguner |
| 2004/0001591 | A1 | 1/2004 | Mani et al. |
| 2004/0008852 | A1 | 1/2004 | Also et al. |
| 2004/0010727 | A1 | 1/2004 | Fujinami |
| 2004/0012620 | A1 | 1/2004 | Buhler et al. |
| 2004/0015252 | A1 | 1/2004 | Aiso et al. |
| 2004/0019497 | A1 | 1/2004 | Volk et al. |
| 2004/0024478 | A1 | 2/2004 | Hans et al. |
| 2004/0024925 | A1 | 2/2004 | Cypher et al. |
| 2004/0027166 | A1 | 2/2004 | Mangum et al. |
| 2004/0032348 | A1 | 2/2004 | Lai et al. |
| 2004/0041836 | A1 | 3/2004 | Zaner et al. |
| 2004/0048569 | A1 | 3/2004 | Kawamura |
| 2004/0066736 | A1 | 4/2004 | Kroeger |
| 2004/0075767 | A1 | 4/2004 | Neuman et al. |
| 2004/0078383 | A1 | 4/2004 | Mercer et al. |
| 2004/0080671 | A1 | 4/2004 | Siemens et al. |
| 2004/0093096 | A1 * | 5/2004 | Huang et al. .................... 700/17 |
| 2004/0098754 | A1 * | 5/2004 | Vella et al. .................... 725/135 |
| 2004/0131192 | A1 | 7/2004 | Metcalf |
| 2004/0133689 | A1 | 7/2004 | Vasisht |
| 2004/0143368 | A1 * | 7/2004 | May et al. .................... 700/241 |
| 2004/0143852 | A1 * | 7/2004 | Meyers .................... 725/133 |
| 2004/0148237 | A1 | 7/2004 | Bittmann et al. |
| 2004/0170383 | A1 | 9/2004 | Mazur |
| 2004/0203378 | A1 | 10/2004 | Powers |
| 2004/0208158 | A1 | 10/2004 | Fellman et al. |
| 2004/0213230 | A1 * | 10/2004 | Douskalis et al. ............ 370/390 |
| 2004/0224638 | A1 | 11/2004 | Fadell et al. |
| 2004/0228367 | A1 | 11/2004 | Mosig et al. |

## US 9,213,357 B2

Page 4

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2004/0248601 A1 | 12/2004 | Chang |
| 2004/0249965 A1 | 12/2004 | Huggins et al. |
| 2004/0249982 A1 | 12/2004 | Arnold et al. |
| 2004/0252400 A1 | 12/2004 | Blank et al. |
| 2005/0010691 A1 | 1/2005 | Oyadomari et al. |
| 2005/0011388 A1 | 1/2005 | Kouznetsov |
| 2005/0013394 A1 | 1/2005 | Rausch et al. |
| 2005/0015551 A1 | 1/2005 | Eames et al. |
| 2005/0021590 A1 | 1/2005 | Debique et al. |
| 2005/0027821 A1* | 2/2005 | Alexander et al. ........... 709/218 |
| 2005/0047605 A1 | 3/2005 | Lee et al. |
| 2005/0058149 A1 | 3/2005 | Howe |
| 2005/0062637 A1 | 3/2005 | El et al. |
| 2005/0081213 A1 | 4/2005 | Suzuoki et al. |
| 2005/0114538 A1 | 5/2005 | Rose |
| 2005/0120128 A1 | 6/2005 | Willes et al. |
| 2005/0125357 A1 | 6/2005 | Saadat et al. |
| 2005/0131558 A1 | 6/2005 | Braithwaite et al. |
| 2005/0166135 A1* | 7/2005 | Burke et al. ............... 715/500.1 |
| 2005/0168630 A1 | 8/2005 | Yamada et al. |
| 2005/0177643 A1 | 8/2005 | Xu |
| 2005/0181348 A1 | 8/2005 | Carey et al. |
| 2005/0195205 A1 | 9/2005 | Abrams |
| 2005/0195823 A1 | 9/2005 | Chen et al. |
| 2005/0216556 A1 | 9/2005 | Manion et al. |
| 2005/0281255 A1 | 12/2005 | Davies et al. |
| 2005/0283820 A1 | 12/2005 | Richards et al. |
| 2005/0288805 A1 | 12/2005 | Moore et al. |
| 2005/0289224 A1 | 12/2005 | Deslippe et al. |
| 2006/0095516 A1 | 5/2006 | Wijeratne |
| 2006/0098936 A1* | 5/2006 | Ikeda et al. ..................... 386/46 |
| 2006/0119497 A1 | 6/2006 | Miller et al. |
| 2006/0143236 A1 | 6/2006 | Wu |
| 2006/0193454 A1 | 8/2006 | Abou-chakra et al. |
| 2007/0038999 A1 | 2/2007 | Millington |
| 2007/0043847 A1 | 2/2007 | Carter et al. |
| 2007/0047712 A1 | 3/2007 | Gross et al. |
| 2007/0048713 A1 | 3/2007 | Plastina et al. |
| 2007/0054680 A1 | 3/2007 | Mo et al. |
| 2007/0142022 A1 | 6/2007 | Madonna et al. |
| 2007/0142944 A1 | 6/2007 | Goldberg et al. |
| 2007/0143493 A1 | 6/2007 | Mullig et al. |
| 2007/0169115 A1 | 7/2007 | Ko et al. |
| 2007/0180137 A1 | 8/2007 | Rajapakse |
| 2007/0192156 A1 | 8/2007 | Gauger |
| 2007/0249295 A1* | 10/2007 | Ukita et al. ..................... 455/88 |
| 2007/0271388 A1 | 11/2007 | Bowra et al. |
| 2007/0299779 A1 | 12/2007 | Haveson et al. |
| 2008/0022320 A1 | 1/2008 | Ver |
| 2008/0091771 A1 | 4/2008 | Allen et al. |
| 2008/0120429 A1 | 5/2008 | Millington et al. |
| 2008/0126943 A1 | 5/2008 | Parasnis et al. |
| 2008/0144861 A1 | 6/2008 | Melanson et al. |
| 2009/0031336 A1 | 1/2009 | Chavez et al. |
| 2009/0157905 A1 | 6/2009 | Davis |
| 2009/0193345 A1 | 7/2009 | Wensley et al. |
| 2009/0222115 A1 | 9/2009 | Malcolm et al. |
| 2009/0228919 A1 | 9/2009 | Zott et al. |
| 2010/0004983 A1 | 1/2010 | Dickerson et al. |
| 2010/0049835 A1 | 2/2010 | Ko et al. |
| 2010/0228740 A1 | 9/2010 | Cannistraro et al. |
| 2010/0284389 A1 | 11/2010 | Ramsay et al. |
| 2010/0299639 A1 | 11/2010 | Ramsay et al. |
| 2011/0066943 A1 | 3/2011 | Brillon et al. |
| 2012/0029671 A1 | 2/2012 | Millington et al. |
| 2012/0030366 A1 | 2/2012 | Collart et al. |
| 2012/0060046 A1 | 3/2012 | Millington |
| 2012/0129446 A1 | 5/2012 | Ko et al. |
| 2012/0290621 A1 | 11/2012 | Heitz, III et al. |
| 2013/0018960 A1 | 1/2013 | Knysz et al. |
| 2013/0022221 A1 | 1/2013 | Kallai et al. |
| 2013/0080599 A1 | 3/2013 | Ko et al. |
| 2013/0174100 A1 | 7/2013 | Seymour et al. |

| | | |
|---|---|---|
| 2013/0191454 A1 | 7/2013 | Oliver et al. |
| 2013/0197682 A1 | 8/2013 | Millington |
| 2014/0181569 A1 | 6/2014 | Millington et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1111527 A2 | 6/2001 |
| EP | 1122931 A2 | 8/2001 |
| EP | 2713281 | 4/2004 |
| GB | 2284327 A | 5/1995 |
| GB | 2338334 | 12/1999 |
| JP | 07-210129 | 8/1995 |
| JP | 2003037585 | 2/2003 |
| JP | 03101958 | 4/2003 |
| JP | 2005108427 | 4/2005 |
| WO | 9525313 A1 | 9/1995 |
| WO | 9961985 A1 | 12/1999 |
| WO | 0153994 | 7/2001 |
| WO | 02073851 | 9/2002 |
| WO | 03093950 A2 | 11/2003 |
| WO | 2005013047 A2 | 2/2005 |

OTHER PUBLICATIONS

"Advisory Action mailed Sep. 5, 2014 for U.S. Appl. No. 13/907,666, filed May 31, 2013, 3 pages".

Akyildiz I.F., et al., "Multimedia Group Synchronization Protocols for Integrated Services Networks," IEEE Journal on Selected Areas in Communications, 1996, vol. 14 (1), pp. 162-173.

"AudioTron Quick Start Guide, Version 1.0", Voyetra Turtle Beach, Inc., Mar. 2001, 24 pages.

"AudioTron Reference Manual, Version 3.0", Voyetra Turtle Beach, Inc., May 2002, 70 pages.

"AudioTron Setup Guide, Version 3.0", Voyetra Turtle Beach, Inc., May 2002, 38 pages.

Benslimane A., "A Multimedia Synchronization Protocol for Multicast Groups," Proceedings of the 26th Euromicro Conference, 2000, vol. 1, pp. 456-463.

Biersack E., et al., "Intra- and Inter-Stream Synchronisation for Stored Multimedia Streams," IEEE International Conference on Multimedia Computing and Systems, 1996, pp. 372-381.

Blakowski G. et al., "A Media Synchronization Survey: Reference Model, Specification, and Case Studies", Jan. 1996, vol. 14, No. 1, 5-35.

"Bluetooth. "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity" Core, Version 1.0 A, Jul. 26, 1999, 1068 pages".

"Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy" Core, Version 1.0 B, Dec. 1, 1999, 1076 pages".

Bretl W.E., et al., MPEG2 Tutorial [online], 2000 [retrieved on Jan. 13, 2009] Retrieved from the Internet< http://www.bretl.com/mpeghtml/MPEGindex.htm>, pp. 1-23.

"Dell, Inc. "Dell Digital Audio Receiver: Reference Guide" Jun. 2000, 70 pages".

"Dell, Inc. "Start Here" Jun. 2000, 2 pages".

"European Extended Search Report for Application No. 13184747.7 mailed on Feb. 28, 2014, 8 pages".

"Final Office Action mailed Jun. 5, 2014 for U.S. Appl. No. 13/907,666, filed May 31, 2013".

Final Office Action mailed Jul. 13, 2009 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

"Final Office Action mailed Sep. 13, 2012 for U.S. Appl. No. 13/297,000", United States Patent and Trademark Office, Sep. 13, 2012, 17 pages.

Final Office Action mailed Oct. 21, 2011 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

"Final Office Action mailed Mar. 27, 2014 for U.S. Appl. No. 13/533,105, filed Jun. 26, 2012.".

Final Office Action mailed Jan. 28, 2011 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

"Final Office Action mailed Jul. 3, 2012 for U.S. Appl. No. 13/298,090, filed Nov. 16, 2011".

Final Office Action mailed Jun. 30, 2008 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

**US 9,213,357 B2**

Page 5

(56)         **References Cited**

OTHER PUBLICATIONS

"Final Office Action mailed on Oct. 22, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed on Feb. 21, 2014, 12 pages".

"Final Office Action mailed on Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 23 pages".

"Final Rejection mailed on Jan. 21, 2010 for U.S. Appl. No. 11/906,702, filed Oct. 2, 2007".

Huang C.M., et al., "A Synchronization Infrastructure for Multicast Multimedia at the Presentation Layer," IEEE Transactions on Consumer Electronics, 1997, vol. 43 (3), pp. 370-380.

"International Bureau, "Search Report" issued in connection with International Patent application No. PCT/US2013/046372, mailed Aug. 26, 2013, 3 pages.".

"International Bureau, "Written opinion" issued in connection with International Patent application No. PCT/US2013/046372, mailed Aug. 26, 2013, 4 pages.".

International Search Report for Application No. PCT/US04/23102, mailed on Aug. 1, 2008, 5 pages.

"International Search Report, issued by the International Searching Authority in connection with PCT Application No. PCT/US2013/046386, on Sep. 30, 2013, 3 pages.".

Ishibashi Y., "A Group Synchronization Mechanism for Live Media in Multicast Communications," IEEE Global Telecommunications Conference, 1997, vol. 2, pp. 746-752.

Ishibashi Y., "A Group Synchronization Mechanism for Stored Media in Multicast Communications," IEEE Information Revolution and Communications, 1997, vol. 2, pp. 692-700.

"Japanese Intellectual Property Office, "Decision of Rejection," issued in connection with Japanese patent application No. 2012-178711, mailed on Jul. 4, 2014, 3 pages".

"Japanese Intellectual Property Office, "Office Action Summary," issued in connection with Japanese patent application No. 2012-178711, mailed on Nov. 19, 2013, 5 pages".

Jo J., et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, vol. 4861, pp. 71-82.

"Jones, Stephen. "Dell Digital Audio Receiver: Digital upgrade for your analog stereo" Analog Stereo. Jun. 24, 2000 <http://www.reviewsonline.com/articles/961906864.htm> retrieved Jun. 18, 2014, 2 pages".

"Louderback, Jim. "Affordable Audio Receiver Furnishes Homes With MP3" TechTV Vault. Jun. 28, 2000 <http://www.g4tv.com/articles/17923/affordable-audio-receiver-furnishes-homes-with-mp3/> retrieved Jul. 10, 2014, 2 pages".

M. Nilsson., "ID3 Tag Version 2", Mar. 26, 1998, 28 Pages.

"Maniactools, "Identify Duplicate Files by Sound," Sep. 28, 2010, http://www.maniactools.com/soft/music-duplicate-remover/identify-duplicate-files-by-sound.shtml".

Mills D.L., "Network Time Protocol (Version 3) Specification, Implementation and Analysis," Network Working Group, Mar. 1992, <http://www.ietf.org/rfc/rfc1305.txt>.

Mills D.L., "Precision Synchronization of Computer Network Clocks," ACM SIGCOMM Computer Communication Review, 1994, vol. 24 (2), pp. 28-43.

Motorola., "Simplefi, Wireless Digital Audio Receiver, Installation and User Guide", Dec. 31, 2001.

"Non-final Office Action in connection with U.S. Appl. No. 13/619,237, mailed Apr. 10, 2013", United States Patent and Trademark Office, 10 pages.

"Non-Final Office Action mailed May 1, 2014 for U.S. Appl. No. 14/184,522, filed Feb. 19, 2014".

"Non-Final Office Action mailed Dec. 5, 2013 for U.S. Appl. No. 13/827,653, filed Mar. 14, 2013".

"Non-Final Office Action mailed Jan. 5, 2012 for U.S. Appl. No. 13/298,090, filed Nov. 16, 2011, 40 pages".

"Non-Final Office Action mailed May 6, 2014 for U.S. Appl. No. 13/705,176, filed Dec. 5, 2012".

"Non-Final Office Action mailed May 12, 2014 for U.S. Appl. No. 14/184,528, filed Feb. 19, 2014".

"Non-Final Office Action mailed May 14, 2014 for U.S. Appl. No. 13/848,932, filed Mar. 22, 2013".

"Non-Final Office Action mailed Jun. 17, 2014 for U.S. Appl. No. 14/176,808, filed Feb. 10, 2014".

"Non-Final Office Action mailed Dec. 18, 2013 for U.S. Appl. No. 13/907,666, filed May 31, 2013".

Non-Final Office Action mailed Jan. 18, 2008 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

"Non-Final Office Action mailed Apr. 19, 2010 for U.S. Appl. No. 11/801,468, filed May 9, 2007, 16 pages".

"Non-Final Office Action mailed Mar. 19, 2013 for U.S. Appl. No. 13/724,048, filed Dec. 21, 2012".

Non-Final Office Action mailed Jun. 21, 2011 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Non-Final Office Action mailed Jan. 22, 2009 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

"Non-Final Office Action mailed Jul. 25, 2014 for U.S. Appl. No. 14/184,526, filed Feb. 19, 2014".

"Non-Final Office Action mailed Jul. 25, 2014 for U.S. Appl. No. 14/184,935, filed Feb. 20, 2014".

"Non-Final Office Action mailed Jun. 25, 2010 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

"Non-Final Office Action mailed Nov. 25, 2013 for U.S. Appl. No. 13/533,105, filed Jun. 26, 2012.".

"Non-Final Office Action mailed May 27, 2014 for U.S. Appl. No. 14/186,850, filed Feb. 21, 2014".

Non-Final Office Action mailed Feb. 29, 2012 for U.S. Appl. No. 13/297,000, filed Nov. 15, 2011.

"Non-Final Office Action mailed Nov. 29, 2010 for U.S. Appl. No. 11/801,468, filed May 9, 2007, 17 pages".

"Non-Final Office Action mailed Apr. 30, 2012 for U.S. Appl. No. 13/204,511, filed Aug. 5, 2011".

"Non-Final Office Action mailed Jul. 30, 2013 for U.S. Appl. No. 13/724,048, filed Dec. 21, 2012".

"Non-Final Office Action mailed Jul. 31, 2014 for U.S. Appl. No. 13/533,105, filed Jun. 26, 2012".

"Non-Final Office Action mailed on Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 11 pages".

"Non-Final Office Action mailed on Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 11 pages".

"Non-Final Office Action mailed on Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 9 pages".

"Non-final Office Action mailed on Oct. 24, 2014, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 14 pages".

"Non-Final Rejection mailed on Aug. 20, 2009 for U.S. Appl. No. 11/906,702, filed Oct. 2, 2007".

"Notice of Allowability in U.S. Appl. No. 13/619,237", Sep. 6, 2013, 4 pages.

Notice of Allowance Dec. 27, 2011 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

"Notice of Allowance mailed Mar. 6, 2014 for U.S. Appl. No. 13/827,653, filed Mar. 14, 2013".

"Notice of Allowance mailed May 6, 2011 for U.S. Appl. No. 11/801,468, filed May 9, 2007, 10 pages".

"Notice of Allowance mailed Nov. 10, 2011 for U.S. Appl. No. 11/906,702, filed Oct. 2, 2007".

"Notice of Allowance mailed Nov. 13, 2013 for U.S. Appl. No. 13/724,048, filed Dec. 21, 2012".

"Notice of Allowance mailed Jan. 31, 2013 for U.S. Appl. No. 13/298,090, filed Nov. 16, 2011".

"Notice of Allowance mailed Oct. 5, 2012 for U.S. Appl. No. 13/204,511, filed Aug. 5, 2011".

"Notice of Allowance mailed on Sep. 25, 2014, issued in connection with U.S. Appl. No. 14/176,808, filed Feb. 10, 2014, 5 pages".

"Palm, Inc. "Handbook for the Palm VII Handheld" May 2000, 311 pages".

Park S., et al., "Group Synchronization in MultiCast Media Communications," Proceedings of the 5th Research on Multicast Technology Workshop, 2003.

"Polycom Conference Composer manual: copyright 2001".

PRISMIQ; Inc., "PRISMIQ Media Player User Guide", 2003, 44 pages.

## US 9,213,357 B2

Page 6

(56)    **References Cited**

OTHER PUBLICATIONS

Rothermel K., et al., "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995.

Schulzrinne H., et al., "RTP: A Transport Protocol for Real-Time Applications, RFC 3550," Network Working Group, 2003, pp. 1-89. The MPEG-2 Transport Stream. Retrieved from the Internet< URL: http://www.coolstf.com/mpeg/#ts>; retrieved on Aug. 24, 2006.

"UPnP; "Universal Plug and Play Device Architecture"; Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54".

""Welcome. You're watching Apple TV." Apple TV 1st Generation Setup Guide, Apr. 8, 2008 <http://manuals.info.apple.com/MANUALS/0/MA403/en_US/AppleTV__SetupGuide.pdf> Retrieved Oct. 14, 2014, 40 pages".

""Welcome. You're watching Apple TV." Apple TV 2nd Generation Setup Guide, Mar. 10, 2011 <http://manuals.info.apple.com/MANUALS/1000/MA1555/en_US/Apple_TV_2nd_gen_Setup_Guide.pdf> Retrieved Oct. 16, 2014, 35 pages".

""Welcome. You're watching Apple TV." Apple TV 3rd Generation Setup Guide, Mar. 16, 2012 <http://http://manuals.info.apple.com/MANUALS/1000/MA1607/en_US/apple_tv_3rd_gen_setup.pdf> Retrieved Oct. 16, 2014, 35 pages".

"Presentations at WinHEC 2000" May 2000, 138 pages.

"Written Opinion of the International Searching Authority. issued by the International Searching Authority in connection with PCT Application No. PCT/US2013/046386, on Sep. 30, 2013, 6 pages.".

"Yamaha DME 32 manual: copyright 2001".

"Yamaha DME Designer software manual: Copyright 2004, 482 pages".

Advisory Action mailed on Nov. 12, 2014, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 6 pages.

Advisory Action mailed on Nov. 26, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 6 pages.

Crown PIP Manual available for sale at least 2004, 6 pages.

Final Office Action mailed on Dec. 3, 2014, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 12 pages.

Non-Final Office Action mailed on Nov. 17, 2014, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 11 pages.

Non-Final Office Action mailed on Nov. 18, 2014, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 10 pages.

Non-Final Office Action mailed on Nov. 19, 2014, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 9 pages.

Renkus Heinz Manual; available for sale at least 2004, 68 pages.

"Advisory Action mailed on Jan. 8, 2015, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 4 pages".

"Final Office Action mailed on Dec. 17, 2014, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 2012, 36 pages".

"Final Office Action mailed on Jan. 7, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 14 pages".

"Advisory Action mailed on Mar. 2, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 3 pages.".

"Advisory Action mailed on Feb. 26, 2015, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 3 pages".

"Final Office Action mailed on Feb. 11, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 13 pages".

"Final Office Action mailed on Feb. 11, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 17 pages".

"Final Office Action mailed on Feb. 12, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 20 pages".

"International Bureau,"International Preliminary Report on Patentability" issued in connection with International Patent application No. PCT/US2013/046372, mailed Dec. 31, 2014, 5 pages".

"International Preliminary Report on Patentability and Written Opinion, issued by the International Searching Authority in connection with International Patent Application No. PCT/US2013/046386, mailed on Jan. 8, 2015, 8 pages".

"Non-Final Office Action mailed on Feb. 26, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 25 pages".

"Non-Final Office Action mailed on Jan. 30, 2015, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 13 pages".

"Non-Final Office Action mailed on Jan. 30, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 30 pages.".

Final Office Action mailed on Mar. 3, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 13 pages.

Final Office Action mailed on Mar. 4, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 16 pages.

Final Office Action mailed on Mar. 5, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 13 pages.

Non-Final Office Action mailed on Mar. 4, 2015, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 16 pages.

Pre-Interview First Office Action mailed on Mar. 10, 2015, issued in connection with U.S. Appl. No. 14/505,027, filed Oct. 2, 2014, 4 pages.

"Advisory Action mailed on Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 9 pages".

"Advisory Action mailed on Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 9 pages".

"Advisory Action mailed on Mar. 25, 2015, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 5 pages.".

"European Extended Search Report for Application No. 14181454.1 mailed on Mar. 31, 2015, 9 pages.".

"Final Office Action mailed on Apr. 28, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 20 pages".

"Non-Final Office Action mailed on Mar. 12, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 13 pages.".

"Non-Final Office Action mailed on Mar. 13, 2015, issued in connection with U.S. Appl. No. 13/705,177, filed Dec. 5, 2012, 15 pages.".

"Non-Final Office Action mailed on Mar. 26, 2015, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 18 pages".

"Non-Final Office Action mailed on Mar. 27, 2015, issued in connection with U.S. Appl. No. 13/705,178, filed Dec. 5, 2012, 14 pages.".

"Notice of Allowance mailed on May 19, 2015, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 7 pages".

"Re-Exam Non-Final Office Action mailed on Apr. 22, 2015, issued in connection with U.S. Appl. No. 90/013,423, filed Jan. 5, 2015, 16 pages.".

"Baldwin, Roberto. "How-To: Setup iTunes DJ on Your Max and iPhone", available at http://www.maclife.com/article/howtos/howto_setup_itunes_dj_your_mac_and_iphone, archived on Mar. 17, 2009, 4 pages.".

"Final Office Action mailed on Jun. 15, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 25 pages".

"Non-Final Office Action mailed on Jun. 12, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 16 pages".

"Non-Final Office Action mailed on Jun. 19, 2015, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 38 pages.".

"Non-Final Office Action mailed on Jun. 23, 2015, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 30 pages".

"Non-Final Office Action mailed on Jun. 3, 2015, issued in connection with U.S. Appl. No. 14/564,544, filed Dec. 9, 2014, 7 pages".

"Non-Final Office Action mailed on Jun. 4, 2015, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 16 pages".

"Notice of Allowance mailed on Jul. 2, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 17 pages".

"Notice of Allowance mailed on Jul. 2, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 19 pages".

"Notice of Allowance mailed on Jul. 2, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 23 pages".

"Notice of Allowance mailed on Jul. 6, 2015, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 24 pages".

Advisory Action mailed on Jul. 28, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 7 pages.

Baudisch et al., "Flat Volume Control: Improving Usability by Hiding the Volume Control Hierarchy in the User Interface", 2004, 8 pages.

Chakrabarti et al., "A Remotely Controlled Bluetooth Enabled Environment", IEEE, 2004, pp. 77-81.

Schmandt et al., "Impromptu: Managing Networked Audio Applications for Mobile Users", 2004, 11 pages.

**US 9,213,357 B2**

Page 7

(56) **References Cited**

OTHER PUBLICATIONS

Final Office Action mailed on Aug. 10, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 26 pages.
Final Office Action mailed on Aug. 11, 2015, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 15 pages.
Final Office Action mailed on Jul. 15, 2015, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 18 pages.
Final Office Action mailed on Aug. 3, 2015, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 13 pages.
Fulton et al., "The Network Audio System: Make Your Application Sing (As Well As Dance)!", The X Resource, 1994, 14 pages.
Hans et al., "Interacting with Audio Streams for Entertainment and Communication", 2003, 7 pages.
Levergood et al., "AudioFile: A Network-Transparent System for Distributed Audio Applications", Digital Equipment Corporation, 1993, 109 pages.
Notice of Allowance mailed on Aug. 10, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 9 pages.
Notice of Allowance mailed on Aug. 12, 2015, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 27 pages.

Notice of Allowance mailed on Jul. 13, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 22 pages.
Notice of Allowance mailed on Jul. 15, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 18 pages.
Notice of Allowance mailed on Jul. 17, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 20 pages.
Notice of Allowance mailed on Jul. 29, 2015, issued in connection with U.S. Appl. No. 13/359,976, filed Jan. 27, 2012, 28 pages.
Notice of Allowance mailed on Jul. 29, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 9 pages.
Notice of Allowance mailed on Jul. 30, 2015, issued in connection with U.S. Appl. No. 13/705,178, filed Dec. 5, 2012, 18 pages.
Notice of Allowance mailed on Aug. 5, 2015, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 26 pages.
Nutzel et al., "Sharing Systems for Future HiFi Systems", IEEE, 2004, 9 pages.
Re-Exam Final Office Action mailed on Aug. 5, 2015, issued in connection with U.S. Appl. No. 90/013,423, filed Jan. 5, 2015, 25 pages.

* cited by examiner



*FIG. 1*



*FIG. 2*

U.S. Patent        Dec. 15, 2015        Sheet 3 of 5        US 9,213,357 B2



*F I G. 2A*

U.S. Patent          Dec. 15, 2015          Sheet 4 of 5          US 9,213,357 B2



*FIG. 3*



*F I G. 4*

US 9,213,357 B2

**1**

## OBTAINING CONTENT FROM REMOTE SOURCE FOR PLAYBACK

### INCORPORATION BY REFERENCE

This application claims priority under 35 U.S.C. §120 to, and is a continuation of, U.S. Non-provisional patent application Ser. No. 13/297,000, filed on Nov. 15, 2011, entitled "System and method for synchronizing operations among a plurality of independently clocked digital data processing devices," which claims priority under 35 U.S.C. 120 to, and is a continuation of, U.S. Non-provisional application Ser. No. 10/816,217, now issued as U.S. Pat. No. 8,234,395, filed on Apr. 1, 2004, entitled "System and method for synchronizing operations among a plurality of independently clocked digital data processing devices," which claims priority under 35 U.S.C. §119 to U.S. Provisional Application No. 60/490,768, filed on Jul. 28, 2003, entitled "Method for Synchronizing Audio Playback Between Multiple Networked Devices," each of which are assigned to the assignee of the present application and are incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention relates generally to the field of digital data processing devices, and more particularly to systems and methods for synchronizing operations among a plurality of independently-clocked digital data processing devices. The invention is embodied in a system for synchronizing operations among a plurality of devices, in relation to information that is provided by a common source. One embodiment of the invention enables synchronizing of audio playback as among two or more audio playback devices that receive audio information from a common information source, or channel.

More generally, the invention relates to the field of arrangements that synchronize output generated by a number of output generators, including audio output, video output, combinations of audio and video, as well as other types of output as will be appreciated by those skilled in the art, provided by a common channel. Generally, the invention will find utility in connection with any type of information for which synchrony among independently-clocked devices is desired.

### BACKGROUND OF THE INVENTION

There are a number of circumstances under which it is desirable to maintain synchrony of operations among a plurality of independently-clocked digital data processing devices in relation to, for example, information that is provided thereto by a common source. For example, systems are being developed in which one audio information source can distribute audio information in digital form to a number of audio playback devices for playback. The audio playback devices receive the digital information and convert it to analog form for playback. The audio playback devices may be located in the same room or they may be distributed in different rooms in a residence such as a house or an apartment, in different offices in an office building, or the like. For example, in a system installed in a residence, one audio playback device may be located in a living room, while another audio playback device is be located in a kitchen, and yet other audio playback devices may be located in various bedrooms of a house. In such an arrangement, the audio information that is distributed to various audio playback devices may relate to the same audio program, or the information may relate to different audio programs. If the audio information source

**2**

provides audio information relating to the same audio program to two or more audio playback devices at the same time, the audio playback devices will generally contemporaneously play the same program. For example, if the audio information source provides audio information to audio playback devices located in the living room and kitchen in a house at the same time, they will generally contemporaneously play the same program.

One problem that can arise is to ensure that, if two or more audio playback devices are contemporaneously attempting to play back the same audio program, they do so simultaneously. Small differences in the audio playback devices' start times and/or playback speeds can be perceived by a listener as an echo effect, and larger differences can be very annoying. Differences can arise because for a number of reasons, including delays in the transfer of audio information over the network. Such delays can differ as among the various audio playback devices for a variety of reasons, including where they are connected into the network, message traffic and other reasons as will be apparent to those skilled in the art.

Another problem arises from the following. When an audio playback device converts the digital audio information from digital to analog form, it does so using a clock that provides timing information. Generally, the audio playback devices that are being developed have independent clocks, and, if they are not clocking at precisely the same rate, the audio playback provided by the various devices can get out of synchronization.

### SUMMARY OF THE INVENTION

The invention provides a new and improved system and method for synchronizing operations among a number of digital data processing devices that are regulated by independent clocking devices. Generally, the invention will find utility in connection with any type of information for which synchrony among devices connected to a network is desired. The invention is described in connection with a plurality of audio playback devices that receive digital audio information that is to be played back in synchrony, but it will be appreciated that the invention can find usefulness in connection with any kind of information for which coordination among devices that have independent clocking devices would find utility.

In brief summary, the invention provides, in one aspect, a system for maintaining synchrony of operations among a plurality of devices that have independent clocking arrangements. The system includes a task distribution device that distributes tasks to a synchrony group comprising a plurality of devices that are to perform the tasks distributed by the task distribution device in synchrony. The task distribution device distributes each task to the members of the synchrony group over a network. Each task is associated with a time stamp that indicates a time, relative to a clock maintained by the task distribution device, at which the members of the synchrony group are to execute the task. Each member of the synchrony group periodically obtains from the task distribution device an indication of the current time indicated by its clock, determines a time differential between the task distribution device's clock and its respective clock and determines therefrom a time at which, according to its respective clock, the time stamp indicates that it is to execute the task.

In one embodiment, the tasks that are distributed include audio information for an audio track that is to be played by all of the devices comprising the synchrony group synchronously. The audio track is divided into a series of frames, each of which is associated with a time stamp indicating the time,

US 9,213,357 B2

**3**

relative to the clock maintained by an audio information channel device, which, in that embodiment, serves as the task distribution device, at which the members of the synchrony group are to play the respective frame. Each member of the synchrony group, using a very accurate protocol, periodically obtains the time indicated by the audio information channel device, and determines a differential between the time as indicated by its local clock and the audio information channel device's clock. The member uses the differential and the time as indicated by the time stamp to determine the time, relative to its local clock, at which it is to play the respective frame. The members of the synchrony group do this for all of the frames, and accordingly are able to play the frames in synchrony.

BRIEF DESCRIPTION OF THE DRAWINGS

This invention is pointed out with particularity in the appended claims. The above and further advantages of this invention may be better understood by referring to the following description taken in conjunction with the accompanying drawings, in which:

FIG. **1** schematically depicts an illustrative networked audio system, constructed in accordance with the invention;

FIG. **2** schematically depicts a functional block diagram of a synchrony group utilizing a plurality of zone players formed within the networked audio system depicted in FIG. **1**;

FIG. **2A** schematically depicts two synchrony groups, illustrating how a member of one synchrony group can provide audio information to the members of another synchrony group;

FIG. **3** depicts an functional block diagram of a zone player for use in the networked audio system depicted in FIG. **1**; and

FIG. **4** is useful in understanding an digital audio information framing methodology useful in the network audio system depicted in FIG. **1**.

DETAILED DESCRIPTION OF AN ILLUSTRATIVE EMBODIMENT

FIG. **1** depicts an illustrative network audio system **10** constructed in accordance with the invention. With reference to FIG. **1**, the network audio system **10** includes a plurality of zone players **11(1)** through **11(N)** (generally identified by reference numeral **11(n)**) interconnected by a local network **12**, all of which operate under control of one or more user interface modules generally identified by reference numeral **13**. One or more of the zone players **11(n)** may also be connected to one or more audio information sources, which will generally be identified herein by reference numeral **14(n)(s)**, and/or one or more audio reproduction devices, which will generally be identified by reference numeral **15(n)(r)**. In the reference numeral **14(n)(s)**, index "n" refers to the index "n" of the zone player **11(n)** to which the audio information source is connected, and the index "s" (s=1, . . . , S_n) refers to the "s-th" audio information source connected to that "n-th" zone player **11(n)**. Thus, if, for example, a zone player **11(n)** is connected to four audio information sources **14(n)(1)** through **14(n)(4)**, the audio information sources may be generally identified by reference numeral **14(n)(s)**, with S_n=4. It will be appreciated that the number of audio information sources S_n may vary as among the various zone players **11(n)**, and some zone players may not have any audio information sources connected thereto. Similarly, in the reference numeral **15(n)(r)**, index "n" refers to the index "n" of the zone player **11(n)** to which the audio reproduction device is connected, and the index "r" (r=1, . . . , R_n) refers to the

**4**

"r-th" audio information source connected to that "n-th" zone player **11(n)**. In addition to the audio information sources **14(n)(s)**, the network audio system **10** may include one or more audio information sources **16(1)** through **16(M)** connected through appropriate network interface devices (not separately shown) to the local network **12**. Furthermore, the local network may include one or more network interface devices (also not separately shown) that are configured to connect the local network **12** to other networks, including a wide area network such as the Internet, the public switched telephony network (PSTN) or other networks as will be apparent to those skilled in the art, over which connections to audio information sources may be established.

The zone players **11(n)** associated with system **10** may be distributed throughout an establishment such as residence, an office complex, a hotel, a conference hall, an amphitheater or auditorium, or other types of establishments as will be apparent to those skilled in the art or the like. For example, if the zone players **11(n)** and their associated audio information source(s) and/or audio reproduction device(s) are distributed throughout a residence, one, such as zone player **11(1)** and its associated audio information source(s) and audio reproduction device(s) may be located in a living room, another may be located in a kitchen, another may be located in a dining room, and yet others may be located in respective bedrooms, to selectively provide entertainment in those rooms. On the other hand, if the zone players **11(n)** and their associated audio information source(s) and/or audio reproduction device(s) are distributed throughout an office complex, one may, for example, be provided in each office to selectively provide entertainment to the employees in the respective offices. Similarly, if the zone players **11(n)** and associated audio information source(s) and/or audio reproduction device(s) are used in a hotel, they may be distributed throughout the rooms to provide entertainment to the guests. Similar arrangements may be used with zone players **11(n)** and associated audio information source(s) and/or audio reproduction device(s) used in an amphitheater or auditorium. Other arrangements in other types of environments will be apparent to those skilled in the art. In each case, the zone players **11(n)** can be used to selectively provide entertainment in the respective locations, as will be described below.

The audio information sources **14(n)(s)** and **16(m)** may be any of a number of types of conventional sources of audio information, including, for example, compact disc ("CD") players, AM and/or FM radio receivers, analog or digital tape cassette players, analog record turntables and the like. In addition, the audio information sources **14(n)(s)** and **16(m)** may comprise digital audio files stored locally on, for example, personal computers (PCs), personal digital assistants (PDAs), or similar devices capable of storing digital information in volatile or non-volatile form. As noted above, the local network **12** may also have an interface (not shown) to a wide area network, over which the network audio system **10** can obtain audio information. Moreover, one or more of the audio information sources **14(n)(s)** may also comprise an interface to a wide area network such as the Internet, the public switched telephony network (PSTN) or any other source of audio information. In addition, one or more of the audio information sources **14(n)(s)** and **16(m)** may comprise interfaces to radio services delivered over, for example, satellite. Audio information obtained over the wide area network may comprise, for example, streaming digital audio information such as Internet radio, digital audio files stored on servers, and other types of audio information and sources as will

US 9,213,357 B2

**5**

be appreciated by those skilled in the art. Other arrangements and other types of audio information sources will be apparent to those skilled in the art.

Generally, the audio information sources $14(n)(s)$ and $16(m)$ provide audio information associated with audio programs to the zone players for playback. A zone player that receives audio information from an audio information source $14(n)(s)$ that is connected thereto can provide playback and/or forward the audio information, along with playback timing information, over the local network **12** to other zone players for playback. Similarly, each audio information source $16(m)$ that is not directly connected to a zone player can transmit audio information over the network **12** to any zone player $11(n)$ for playback. In addition, as will be explained in detail below, the respective zone player $11(n)$ can transmit the audio information that it receives either from an audio information source $14(n)(s)$ connected thereto, or from an audio information source $16(m)$, to selected ones of the other zone players $11(n')$, $11(n'')$, . . . (n not equal to n', n'', . . . ) for playback by those other zone players. The other zone players $11(n')$, $11(n'')$, . . . to which the zone player $11(n)$ transmits the audio information for playback may be selected by a user using the user interface module **13**. In that operation, the zone player $11(n)$ will transmit the audio information to the selected zone players $11(n')$, $11(n'')$, . . . over the network **12**. As will be described below in greater detail, the zone players $11(n)$, $11(n)$, $11(n'')$, . . . operate such that the zone players $11(n')$, $11(n'')$, . . . synchronize their playback of the audio program with the playback by the zone player $11(n)$, so that the zone players $11(n)$, $11(n')$, $11(n'')$ provide the same audio program at the same time.

Users, using user interface module **13**, may also enable different groupings or sets of zone players to provide audio playback of different audio programs synchronously. For example, a user, using a user interface module **13**, may enable zone players $11(1)$ and $11(2)$ to play one audio program, audio information for which may be provided by, for example, one audio information source $14(1)(1)$. The same or a different user may, using the same or a different user interface module **13**, enable zone players $11(4)$ and $11(5)$ to contemporaneously play another audio program, audio information for which may be provided by a second audio information source, such as audio information source $14(5)$ (**2**). Further, a user may enable zone player $11(3)$ to contemporaneously play yet another audio program, audio information for which may be provided by yet another audio information source, such as audio information source $16(1)$. As yet another possibility, a user may contemporaneously enable zone player $11(1)$ to provide audio information from an audio information source connected thereto, such as audio information source $14(1)(2)$, to another zone player, such as zone player $11(6)$ for playback.

In the following, the term "synchrony group" will be used to refer to a set of one or more zone players that are to play the same audio program synchronously. Thus, in the above example, zone players $11(1)$ and $11(2)$ comprise one synchrony group, zone player $11(3)$ comprises a second synchrony group, zone players $11(4)$ and $11(5)$ comprise a third synchrony group, and zone player $11(6)$ comprises yet a fourth synchrony group. Thus, while zone players $11(1)$ and $11(2)$ are playing the same audio program, they will play the audio program synchronously. Similarly, while zone players $11(4)$ and $11(5)$ are playing the same audio program, they will play the audio program synchronously. On the other hand, zone players that are playing different audio programs may do so with unrelated timings. That is, for example, the timing with which zone players $11(1)$ and $11(2)$ play their audio

**6**

program may have no relationship to the timing with which zone player $11(3)$, zone players $11(4)$ and $11(5)$, and zone player $11(6)$ play their audio programs. It will be appreciated that, since "synchrony group" is used to refer to sets of zone players that are playing the same audio program synchronously, zone player $11(1)$ will not be part of zone player $11(6)$'s synchrony group, even though zone player $11(1)$ is providing the audio information for the audio program to zone player $11(6)$.

In the network audio system **10**, the synchrony groups are not fixed. Users can enable them to be established and modified dynamically. Continuing with the above example, a user may enable the zone player $11(1)$ to begin providing playback of the audio program provided thereto by audio information source $14(1)(1)$, and subsequently enable zone player $11(2)$ to join the synchrony group. Similarly, a user may enable the zone player $11(5)$ to begin providing playback of the audio program provided thereto by audio information source $14(5)$ (**2**), and subsequently enable zone player $11(4)$ to join that synchrony group. In addition, a user may enable a zone player to leave a synchrony group and possibly join another synchrony group. For example, a user may enable the zone player $11(2)$ to leave the synchrony group with zone player $11(1)$, and join the synchrony group with zone player $11(6)$. As another possibility, the user may enable the zone player $11(1)$ to leave the synchrony group with zone player $11(2)$ and join the synchrony group with zone player $11(6)$. In connection with the last possibility, the zone player $11(1)$ can continue providing audio information from the audio information source $14(1)(1)$ to the zone player $11(2)$ for playback thereby.

A user, using the user interface module **13**, can enable a zone player $11(n)$ that is currently not a member of a synchrony group to join a synchrony group, after which it will be enabled to play the audio program that is currently being played by that synchrony group. Similarly, a user, also using the user interface module **13**, can enable a zone player $11(n)$ that is currently a member of one synchrony group, to disengage from that synchrony group and join another synchrony group, after which that zone player will be playing the audio program associated with the other synchrony group. For example, if a zone player $11(6)$ is currently not a member of any synchrony group, it, under control of the user interface module **13**, can become a member of a synchrony group, after which it will play the audio program being played by the other members of the synchrony group, in synchrony with the other members of the synchrony group. In becoming a member of the synchrony group, zone player $11(6)$ can notify the zone player that is the master device for the synchrony group that it wishes to become a member of its synchrony group, after which that zone player will also transmit audio information associated with the audio program, as well as timing information, to the zone player $11(6)$. As the zone player $11(6)$ receives the audio information and the timing information from the master device, it will play the audio information with the timing indicated by the timing information, which will enable the zone player $11(6)$ to play the audio program in synchrony with the other zone player(s) in the synchrony group.

Similarly, if a user, using the user interface module **13**, enables a zone player $11(n)$ associated with a synchrony group to disengage from that synchrony group, and if the zone player $11(n)$ is not the master device of the synchrony group, the zone player $11(n)$ can notify the master device, after which the master device can terminate transmission of the audio information and timing information to the zone player $11(n)$. If the user also enables the zone player $11(n)$ to begin playing another audio program using audio information from

US 9,213,357 B2

7

an audio information source **14**(*n*)(*s*) connected thereto, it will acquire the audio information from the audio information source **14**(*n*)(*s*) and initiate playback thereof. If the user enables another zone player **11**(*n*') to join the synchrony group associated with zone player **11**(*n*), operations in connection therewith can proceed as described immediately above.

As yet another possibility, if a user, using the user interface module **13**, enables a zone player **11**(*n*) associated with a synchrony group to disengage from that synchrony group and join another synchrony group, and if the zone player is not the master device of the synchrony group from which it is disengaging, the zone player **11**(*n*) can notify the master device of the synchrony group from which it is disengaging, after which that zone player will terminate transmission of audio information and timing information to the zone player **11**(*n*) that is disengaging. Contemporaneously, the zone player **11**(*n*) can notify the master device of the synchrony group that it (that is, zone player **11**(*n*)) is joining, after which the master device can begin transmission of audio information and timing information to that zone player **11**(*n*). The zone player **11**(*n*) can thereafter begin playback of the audio program defined by the audio information, in accordance with the timing information so that the zone player **11**(*n*) will play the audio program in synchrony with the master device.

As yet another possibility, a user, using the user interface module **13**, may enable a zone player **11**(*n*) that is not associated with a synchrony group, to begin playing an audio program using audio information provided to it by an audio information source **14**(*n*)(*s*) connected thereto. In that case, the user, also using the user interface module **13** or a user interface device that is specific to the audio information source **14**(*n*)(*s*), can enable the audio information source **14**(*n*)(*s*) to provide audio information to the zone player **11**(*n*). After the zone player **11**(*n*) has begun playback, or contemporaneously therewith, the user, using the user interface module **13**, can enable other zone players **11**(*n*'), **11**(*n*"), . . . to join zone player **11**(*n*)'s synchrony group and enable that zone player **11**(*n*) to transmit audio information and timing information thereto as described above, to facilitate synchronous playback of the audio program by the other zone players **11**(*n*'), **11**(*n*") . . . .

A user can use the user interface module **13** to control other aspects of the network audio system **10**, including but not limited to the selection of the audio information source **14**(*n*)(*s*) that a particular zone player **11**(*n*) is to utilize, the volume of the audio playback, and so forth. In addition, a user may use the user interface module **13** to turn audio information source(s) **14**(*n*)(*s*) on and off and to enable them to provide audio information to the respective zone players **11**(*n*).

Operations performed by the various devices associated with a synchrony group will be described in connection with FIG. **2**, which schematically depicts a functional block diagram of a synchrony group in the network audio system **10** described above in connection with FIG. **1**. With reference to FIG. **2**, a synchrony group **20** includes a master device **21** and zero or more slave devices **22**(**1**) through **22** (G) (generally identified by reference numeral **22**(*g*)), all of which synchronously play an audio program provided by an audio information channel device **23**. Each of the master device **21**, slave devices **22**(*g*) and audio information channel device **23** utilizes a zone player **11**(*n*) depicted in FIG. **1**, although it will be clear from the description below that a zone player may be utilized both for the audio information channel device for the synchrony group **20**, and the master device **21** or a slave device **22**(*g*) of the synchrony group **20**. As will be described below in more detail, the audio information channel device **23**

8

obtains the audio information for the audio program from an audio information source, adds playback timing information, and transmits the combined audio and playback timing information to the master device **21** and slave devices **22**(*g*) over the network **12** for playback. The playback timing information that is provided with the audio information, together with clock timing information provided by the audio information channel device **23** to the various devices **21** and **22**(*g*) as will be described below, enables the master device **21** and slave devices **22**(*g*) of the synchrony group **20** to play the audio information simultaneously.

The master device **21** and the slave devices **22**(*g*) receive the audio and playback timing information, as well as the clock timing information, that are provided by the audio information channel device **23**, and play back the audio program defined by the audio information. The master device **21** is also the member of the synchrony group **20** that communicates with the user interface module **13** and that controls the operations of the slave devices **22**(*g*) in the synchrony group **20**. In addition, the master device **21** controls the operations of the audio information channel device **23** that provides the audio and playback timing information for the synchrony group **20**. Generally, the initial master device **21** for the synchrony group will be the first zone player **11**(*n*) that a user wishes to play an audio program. However, as will be described below, the zone player **11**(*n*) that operates as the master device **21** can be migrated from one zone player **11**(*n*) to another zone player **11**(*n*'), which preferably will be a zone player that is currently operating as a slave device **22**(*g*) in the synchrony group.

In addition, under certain circumstances, as will be described below, the zone player **11**(*n*) that operates as the audio information channel device **23** can be migrated from one zone player to another zone player, which also will preferably will be a zone player that is currently operating as a member of the synchrony group **20**. It will be appreciated that the zone player that operates as the master device **21** can be migrated to another zone player independently of the migration of the audio information channel device **23**. For example, if one zone player **11**(*n*) is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the master device **21** can be migrated to another zone player **11**(*n*') while the zone player **11**(*n*) is still operating as the audio information channel device **23**. Similarly, if one zone player **11**(*n*) is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the audio information channel device **23** can be migrated to another zone player **11**(*n*') while the zone player **11**(*n*) is still operating as the master device **21**. In addition, if one zone player **11**(*n*) is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the master device **21** can be migrated to another zone player **11**(*n*') and the audio information channel device can be migrated to a third zone player **11**(*n*").

The master device **21** receives control information from the user interface module **13** for controlling the synchrony group **20** and provides status information indicating the operational status of the synchrony group to the user interface module **13**. Generally, the control information from the user interface module **13** enables the master device **21** to, in turn, enable the audio information channel device **23** to provide audio and playback timing information to the synchrony group to enable the devices **21** and **22**(*g*) that are members of the synchrony group **20** to play the audio program synchronously. In addition, the control information from the user interface module **13** enables the master device **21** to, in turn,

US 9,213,357 B2

9

enable other zone players to join the synchrony group as slave devices $22(g)$ and to enable slave devices $22(g)$ to disengage from the synchrony group. Control information from the user interface module **13** can also enable the zone player $11(n)$ that is currently operating as the master device **21** to disengage from the synchrony group, but prior to doing so that zone player will enable the master device **21** to transfer from that zone player $11(n)$ to another zone player $11(n')$, preferably to a zone player $11(n')$ that is currently a slave device $22(g)$ in the synchrony group **20**. The control information from the user interface module **13** can also enable the master device **21** to adjust its playback volume and to enable individual ones of the various slave devices $22(g)$ to adjust their playback volumes. In addition, control information from the user interface module **13** can enable the synchrony group **20** to terminate playing of a current track of the audio program and skip to the next track, and to re-order tracks in a play list of tracks defining the audio program that is to be played by the synchrony group **20**.

The status information that the master device **21** may provide to the user interface module **13** can include such information as a name or other identifier for the track of the audio work that is currently being played, the names or other identifiers for upcoming tracks, the identifier of the zone player $11(n)$ that is currently operating as the master device **21**, and identifiers of the zone players that are currently operating as slave devices $22(g)$. In one embodiment, the user interface module **13** includes a display (not separately shown) that can display the status information to the user.

It will be appreciated that the zone player $11(n)$ that is operating as the audio information channel device **23** for one synchrony group may also comprise the master device **21** or any of the slave devices $22(g)$ in another synchrony group. This may occur if, for example, the audio information source that is to provide the audio information that is to be played by the one synchrony group is connected to a zone player also being utilized as the master device or a slave device for the other synchrony group. This will be schematically illustrated below in connection with FIG. 2A. Since, as noted above, the zone player $11(n)$ that is operating as the audio information channel device **23** for the synchrony group **20** may also be operating as a master device **21** or slave device $22(g)$ for another synchrony group, it can also be connected to one or more audio reproduction devices $15(n)(r)$, although that is not depicted in FIG. **2**. Since the master device **21** and slave devices $22(g)$ are all to provide playback of the audio program, they will be connected to respective audio reproduction devices $15(n)(r)$. Furthermore, it will be appreciated that one or more of the zone players $11(n)$ that operate as the master device **21** and slave devices $22(g)$ in synchrony group **20** may also operate as an audio information channel device for that synchrony group or for another synchrony group and so they may be connected to one or more audio information sources $14(n)(s)$, although that is also not depicted in FIG. **2**. In addition, it will be appreciated that a zone player $11(n)$ can also operate as a audio information channel device **23** for multiple synchrony groups.

If the audio information channel device **23** does not utilize the same zone player as the master device **21**, the master device **21** controls the audio information channel device by exchanging control information over the network **12** with the audio information channel device **23**. The control information is represented in FIG. **2** by the arrow labeled CHAN_DEV_CTRL_INFO. The control information that the master device **21** provides to the audio information channel device **23** will generally depend on the nature of the audio information source that is to provide the audio information for

10

the audio program that is to be played and the operation to be enabled by the control information. If, for example, the audio information source is a conventional compact disc, tape, or record player, broadcast radio receiver, or the like, which is connected to a zone player $11(n)$, the master device **21** may merely enable the zone player serving as the audio information channel device **23** to receive the audio information for the program from the audio information source. It will be appreciated that, if the audio information is not in digital form, the audio information channel device **23** will convert it to digital form and provide the digitized audio information, along with the playback timing information, to the master device **21** and slave devices $22(g)$.

On the other hand, if the audio information source is, for example, a digital data storage device, such as may be on a personal computer or similar device, the master device **21** can provide a play list to the audio information channel device **23** that identifies one or more files containing the audio information for the audio program. In that case, the audio information channel device **23** can retrieve the files from the digital data storage device and provide them, along with the playback timing information, to the master device **21** and the slave devices $22(g)$. It will be appreciated that, in this case, the audio information source may be directly connected to the audio information channel device **23**, as, for example, an audio information source $14(n)(s)$, or it may comprise an audio information source $16(m)$ connected to the network **12**. As a further alternative, if the audio information source is a source available over the wide area network, the master device **21** can provide a play list comprising a list of web addresses identifying the files containing the audio information for the audio program that is to be played, and in that connection the audio information channel device **23** can initiate a retrieval of the files over the wide area network. As yet another alternative, if the audio information source is a source of streaming audio received over the wide area network, the master device **21** can provide a network address from which the streaming audio can be received. Other arrangements by which the master device **21** can control the audio information channel device **23** will be apparent to those skilled in the art.

The master device **21** can also provide control information to the synchrony group's audio information channel device **23** to enable a migration from one zone player $11(n)$ to another zone player $11(n')$. This may occur if, for example, the audio information source is one of audio information sources **16** or a source accessible over the wide area network via the network **12**. The master device **21** can enable migration of the audio information channel device **23** for several reasons, including, for example, to reduce the loading of the zone player $11(n)$, to improve latency of message transmission in the network **12**, and other reasons as will be appreciated by those skilled in the art.

As noted above, the audio information channel device **23** provides audio and playback timing information for the synchrony group to enable the master device **21** and slave devices $22(g)$ to play the audio program synchronously. Details of the audio and playback timing information will be described in detail below in connection with FIGS. **3** and **4**, but, in brief, the audio information channel device **23** transmits the audio and playback timing information in messages over the network **12** using a multi-cast message transmission methodology. In that methodology, the audio information channel device **23** will transmit the audio and playback timing information in a series of messages, with each message being received by all of the zone players $11(n)$ comprising the synchrony group **20**, that is, by the master device **21** and the slave devices $22(g)$. Each of the messages includes a multi-

US 9,213,357 B2

11

cast address, which the master device 21 and slave devices 22(g) will monitor and, when they detect a message with that address, they will receive and use the contents of the message. The audio and playback timing information is represented in FIG. 2 by the arrow labeled "AUD+PBTIME_INFO," which has a single tail, representing a source for the information at the audio information channel device 23, and multiple arrowheads representing the destinations of the information, with one arrowhead extending to the master device 21 and other arrowheads extending to each of the slave devices 22(g) in the synchrony group 20. The audio information channel device 23 may make use of any convenient multi-cast message transmission methodology in transmitting the audio and playback timing information to the synchrony group 20. As will be described in detail in connection with FIG. 4, the audio and playback timing information is in the form of a series of frames, with each frame having a time stamp. The time stamp indicates a time, relative to the time indicated by a clock maintained by the audio information channel device 23, at which the frame is to be played. Depending on the size or sizes of the messages used in the selected multi-cast message transmission methodology and the size or sizes of the frames, a message may contain one frame, or multiple frames, or, alternatively, a frame may extend across several messages.

The audio information channel device 23 also provides clock time information to the master device 21 and each of the slave devices 22(g) individually over network 12 using a highly accurate clock time information transmission methodology. The distribution of the clock time information is represented in FIG. 2 by the arrows labeled "AICD_CLK_INF (M)" (in the case of the clock time information provided to the master device 21) and "AICD_CLK_INF (S₁)" through "AICD_CLK_INF (S_G)" (in the case of audio information channel device clock information provided to the slave devices 22(g)). In one embodiment, the master device 21 and slave devices 22(g) make use of the well-known SNTP (Simple Network Time Protocol) to obtain current clock time information from the audio information channel device 23. The SNTP makes use of a unicast message transfer methodology, in which one device, such as the audio information channel device 23, provides clock time information to a specific other device, such as the master device 21 or a slave device 22(g), using the other device's network, or unicast, address. Each of the master device 21 and slave devices 22(g) will periodically initiate SNTP transactions with the audio information channel device 23 to obtain the clock time information from the audio information channel device 23. As will be described below in more detail, the master device 21 and each slave device 22(g) make use of the clock time information to determine the time differential between the time indicated by the audio information channel device's clock and the time indicated by its respective clock, and use that time differential value, along with the playback time information associated with the audio information and the respective device's local time as indicated by its clock to determine when the various frames are to be played. This enables the master device 21 and the slave devices 22(g) in the synchrony group 20 to play the respective frames simultaneously.

As noted above, the control information provided by the user to the master device 21 through the user interface module 13 can also enable the master device 21 to, in turn, enable another zone player 11(n') to join the synchrony group as a new slave device 22(g). In that operation, the user interface module 13 will provide control information, including the identification of the zone player 11(n') that is to join the synchrony group to the master device 21. After it receives the identification of the zone player 11(n') that is to join the

12

synchrony group, the master device 21 will exchange control information, which is represented in FIG. 2 by the arrows labeled SLV_DEV_CTRL_INF (S₁) through SLV_DEV_CTRL_INF (S_G) group slave control information, over the network 12 with the zone player 11(n') that is identified in the control information from the user interface module 13. The control information that the master device 21 provides to the new zone player 11(n') includes the network address of the zone player 11(n) that is operating as the audio information channel device 23 for the synchrony group, as well as the multi-cast address that the audio information channel device 23 is using to broadcast the audio and playback timing information over the network. The zone player that is to operate as the new slave device 22(g') uses the multi-cast address to begin receiving the multi-cast messages that contain the audio information for the audio program being played by the synchrony group.

It will be appreciated that, if the zone player 11(n) that is operating as the master device 21 for the synchrony group 20 is also operating the audio information channel device 23, and if there are no slave devices 22(g) in the synchrony group 20, the audio information channel device 23 may not be transmitting audio and playback timing information over the network. In that case, if the new slave player 22(g') is the first slave device in the synchrony group, the zone player 11(n) that is operating as both the master device 21 and audio information channel device 23, can begin transmitting the audio and playback timing information over the network 12 when the slave device 22(g') is added to the synchrony group 20. The zone player 11(n) can maintain a count of the number of slave devices 22(g) in the synchrony group 20 as they join and disengage, and, if the number drops to zero, it can stop transmitting the audio and playback timing information over the network 12 to reduce the message traffic over the network 12.

The new slave device 22(g') added to the synchrony group 20 uses the network address of the audio information channel device 23 for several purposes. In particular, the new slave device 22(g') will, like the master device 21 (assuming the zone player 11(n) operating as the master device 21 is not also the audio information channel device 23), engage in SNTP transactions with the audio information channel device 23 to obtain the clock timing information from the audio information channel device 23. In addition, the new slave device 22(g') can notify the audio information channel device 23 that it is a new slave device 22(g') for the synchrony group 20 and provide the audio information channel device 23 with its network address. As will be described below, in one embodiment, particularly in connection with audio information obtained from a source, such as a digital data storage device, which can provide audio information at a rate that is faster than the rate at which it will be played, the audio information channel device 23 will buffer audio and timing information and broadcast it over the network 12 to the synchrony group 20 generally at a rate at which it is provided by the source. Accordingly, when a new slave device 22(g') joins the synchrony group 20, the playback timing information may indicate that the audio information that is currently being broadcast by the audio information channel device 23 using the multi-cast methodology is to be played back some time in the future. To reduce the delay with which the new slave device 22(g') will begin playback, the audio information channel device 23 can also retransmit previously transmitted audio and timing information that it had buffered to the new slave device 22(g') using the unicast network address of the slave device 22(g').

US 9,213,357 B2

**13**

The master device **21** can also use the slave device control information exchanged with the slave devices **22**(*g*) for other purposes. For example, the master device **21** can use the slave device control information to initiate a migration of the master from its zone player **11**(*n*) to another zone player **11**(*n'*). This may occur for any of a number of reasons, including, for example, that the master device **21** is terminating playback by it of the audio program and is leaving the synchrony group **20**, but one or more of the other devices in the synchrony group is to continue playing the audio program. The master device **21** may also want to initiate a migration if it is overloaded, which can occur if, for example, the zone player **11**(*n*) that is the master device **21** for its synchrony group is also operating as an audio information channel device **23** for another synchrony group.

The user can also use the user interface module **13** to adjust playback volume by the individual zone players **11**(*n*) comprising the synchrony group. In that operation, the user interface module **13** provides information identifying the particular device whose volume is to be adjusted, and the level at which the volume is to be set to the master device **21**. If the device whose volume is to be adjusted is the master device **21**, the master device **21** can adjust its volume according to the information that it receives from the user interface module **13**. On the other hand, if the device whose volume is to be adjusted is a slave device **22**(*g*), the master device **21** can provide group slave control information to the respective slave device **22**(*g*), to enable it to adjust its volume.

The user can also use the user interface module **13** to enable a synchrony group **20** to cancel playing of the track in an audio program that is currently being played, and to proceed immediately to the next track. This may occur, for example, if the tracks for the program is in the form of a series of digital audio information files, and the user wishes to cancel playback of the track that is defined by one of the files. In that case, when the master device **21** receives the command to cancel playback of the current track, it will provide channel device control information to the audio information channel device **23** so indicating. In response, the audio information channel device **23** inserts control information into the audio and playback timing information, which will be referred to as a "resynchronize" command. In addition, the audio information channel device **23** will begin transmitting audio information for the next track, with timing information to enable it to be played immediately. The resynchronize command can also be enable playback of a track to be cancelled before it has been played. Details of these operations will be described below.

As noted above, there may be multiple synchrony groups in the network audio system **10**, and further that, for example, a zone player **11**(*n*) may operate both as a master device **21** or as a slave device **22**(*g*) in one synchrony group, and as the audio information channel device **23** providing audio and player timing information and clock timing information for another synchrony group. An illustrative arrangement of this will be described in connection with FIG. **2**A. With reference to FIG. **2**A, that FIG. depicts elements of two synchrony groups, identified by reference numerals **20**(**1**) and **20**(**2**), respectively. For clarity, FIG. **2**A does not show a number of elements, the presence of which would be evident from FIGS. **1** and **2** as described above. For example, FIG. **2**A does not depict the audio information sources from which audio information is obtained for the synchrony groups or the audio reproduction devices that are used to produce sound for the master and slave devices, which are depicted in both FIGS. **1** and **2**. In addition, FIG. **2**A does not depict arrows that represent control information provided by the respective master devices to the slave devices in the respective synchrony

**14**

groups, or to the audio information channel devices that provide audio and timing information for the respective synchrony groups, which are depicted in FIG. **2**. In addition, FIG. **2**A does not depict the arrows that represent the clock timing information provided by the audio information channel devices to the respective members of the respective synchrony groups, which are also depicted in FIG. **2**. As will be noted below, however, FIG. **2**A does depict arrows representing the audio and playback timing information provided by the respective audio information channel devices for the respective synchrony groups **20**(**1**), **20**(**2**), to the master and slave devices comprising the respective synchrony groups **20**(**1**), **20**(**2**).

Each synchrony group **20**(**1**), **20**(**2**) comprises elements of a number of zone players. A functional block diagram of a zone player will be described below in connection with FIG. **3**. Synchrony group **20**(**1**) includes a master device **21**(**1**) and "K" slave devices **22**(**1**)(**1**) through **22**(K)(**1**) (the index "1" in reference numeral **21**(**1**) and the last index in reference numeral **22**(**1**)(**1**) through **21**(K)(**1**) corresponds to the index of the synchrony group **20**(**1**) to which they belong) utilize zone players **11**(**1**) and **11**(K+1) respectively. Similarly, synchrony group **20**(**2**) includes a master device **21**(**2**) and "L" slave devices **22**(**1**)(**2**) through **22**(L)(**2**) that utilize zone players **11**(K+2) through **11**(K+L+2). In the illustrative arrangement depicted in FIG. **2**A, both synchrony groups **20**(**1**) and **20**(**2**) are controlled by the user interface module **13**, which can provide control information to, and receive status information from, the master devices **21**(**1**) and **21**(**2**) independently. It will be appreciated that separate user interface modules may be provided to provide control information to, and receive status information from, the respective master devices **21**(**1**), **21**(**2**).

As noted above, the slave device **22**(**1**)(**2**) in synchrony group **20**(**2**) utilizes zone player **11**(K+3). In the illustrative arrangement depicted in FIG. **2**A, the audio information channel device **23**(**1**) that provides audio and playback timing information to the master and slave devices **21**(**1**), **22**(**1**)(**1**), . . . , **22**(K)(**1**) of synchrony group **20**(**1**) also utilizes zone player **11**(K+3). As noted above, this may occur if, for example, the audio information source that is to provide audio information to be played by the synchrony group **20**(**1**) is connected to the zone player **11**(K+3). Thus, when the master device **21**(**1**) of synchrony group **20**(**1**) exchanges channel device control information with the audio information channel device **23**(**1**), it is effectively exchanging channel device control information with the zone player **11**(K+3). Similarly, when the master and slave devices **21**(**1**), **22**(**1**)(**1**), . . . , **22**(K)(**1**) of synchrony group **20**(**1**) receive audio and playback timing information, as well as clock timing information, from the audio information channel device **23**(**1**), they are effectively receiving the information from the zone player **11**(K+3). FIG. **2**A depicts a multi-headed arrow representing audio and playback timing information transmitted by the zone player **11**(K+3), as audio information channel device **23**(**1**), to the master and slave devices **21**(**1**), **22**(**1**)(**1**), . . . , **11**(K)(**1**) comprising synchrony group **20**(**1**).

On the other hand, in the illustrative arrangement depicted in FIG. **2**A, the synchrony group **20**(**2**) utilizes a zone player **11**(K+L+3) as its audio information channel device **23**(**2**). As with synchrony group **20**(**1**), when the master device **21**(**2**) of synchrony group **20**(**2**) exchanges channel device control information with the audio information channel device **23**(**2**), it is effectively exchanging channel device control information with the zone player **11**(K+L+3). Similarly, when the master and slave devices **21**(**2**), **22**(**1**)(**2**), . . . , **22**(L)(**2**) of synchrony group **20**(**2**) receive audio and playback timing

US 9,213,357 B2

15

information, as well as clock timing information, from the audio information channel device **23**(**2**), they are effectively receiving the information from the zone player **11**(K+L+3). FIG. **2**A depicts a multi-headed arrow representing audio and playback timing information transmitted by the zone player **11**(K+3) as audio information channel device **23**(**2**) to the master and slave devices **21**(**2**), **22**(**1**)(**2**), . . . , **22**(L)(**2**) comprising synchrony group **20**(**2**).

In the illustrative arrangement depicted in FIG. **2**A, zone player **11**(K+L+3), which is the audio information channel device **23**(**2**) for synchrony group **20**(**2**), is not shown as being either a master or a slave device in another synchrony group. However, it will be appreciated that zone player **11**(K+L+3) could also be utilized as the master device or a slave device for another synchrony group. Indeed, it will be appreciated that the zone player that is utilized as the audio information channel device for synchrony group **20**(**2**) may also be a zone player that is utilized as the master device **21**(**1**) or a slave device **22**(**1**)(**1**), . . . , **22**(K)(**1**) in the synchrony group **20**(**1**).

A zone player **11**(n) that is utilized as a member of one synchrony group may also be utilized as the audio information channel device for another synchrony group if the audio information source that is to supply the audio information that is to be played by the other synchrony group is connected to that zone player **11**(n). A zone player **11**(n) may also be utilized as the audio information channel device for the other synchrony group if, for example, the audio information source is an audio information source **16**(m) (FIG. **1**) that is connected to the network **12** or an audio information source that is available over a wide area network such as the Internet. The latter may occur if, for example, the zone player **11**(n) has sufficient processing power to operate as the audio information channel device and it is in an optimal location in the network **12**, relative to the zone players comprising the other synchrony group (that is the synchrony group for which it is operating as audio information channel device) for providing the audio and playback timing information to the members of the other synchrony group. Other circumstances under which the zone player **11**(n) that is utilized as a member of one synchrony group may also be utilized as the audio information channel device for another synchrony group will be apparent to those skilled in the art.

As was noted above, the master device **21** for a synchrony group **20** may be migrated from one zone player **11**(n) to another zone player **11**(n'). As was further noted above, the audio information channel device **23** for a synchrony group **20** may be migrated from one zone player **11**(n) to another zone player **11**(n'). It will be appreciated that the latter may occur if, for example, the audio information source that provides the audio program for the synchrony group is not connected to the zone player **11**(n) that is operating as the audio information channel device **23**, but instead is one of the audio information sources **16**(m) connected to the network **12** or a source available over a wide area network such as the Internet. Operations performed during a migration of an audio information channel device **23** from one zone player **11**(n) to another zone player **11**(n') will generally depend on the nature of the audio information that is being channeled by the audio information channel device **23**. For example, if the audio information source provides streaming audio, the zone player **11**(n) that is currently operating as the audio information channel device **23** for the synchrony group **20**, can provide the following information to the other zone player **11**(n') that is to become the audio information channel device **23** for the synchrony group **20**:

16

(a) the identification of the source of the streaming audio information,

(b) the time stamp associated with the frame that the zone player **11**(n) is currently forming, and

(c) the identifications of the zone players that are operating as the master device **21** and slave devices **22**(g) comprising the synchrony group **20**.

After the zone player **11**(n') receives the information from the zone player **11**(n), it will begin receiving the streaming audio from the streaming audio information source identified by the zone player **11**(n), assemble the streaming audio information into frames, associate each frame with a time stamp, and transmit the resulting audio and playback timing information over the network **12**. The zone player **11**(n') will perform these operations in the same manner as described above, except that, instead of using the time indicated by its digital to analog converter clock **34** directly in generating the time stamps for the frames, the initial time stamp will be related to the value of the time stamp that is provided by the zone player **11**(n) (reference item (b) above), with the rate at which the time stamps are incremented corresponding to the rate at which its (that is, the zone player **11**(n')'s) clock increments. In addition, the zone player **11**(n') will notify the zone players that are operating as the master device **21** and slave devices **22**(g) of the synchrony group **20** that it is the new audio information channel device **23** for the synchrony group **20**, and provide the multi-cast address that it will be using to multi-cast the audio and playback timing information, as well as its unicast network address. After the members of the synchrony group **20** receive the notification from the zone player **11**(n') indicating that it is the new audio information channel device **23** for the synchrony group **20**, they will receive the audio and playback timing information from the zone player **11**(n') instead of the zone player **11**(n), using the multi-cast address provided by the zone player **11**(n'). In addition, they can utilize the zone player **11**(n')'s unicast network address to obtain current time information therefrom. It will be appreciated that the zone player **11**(n') will determine its current time in relation to the time stamp that is provided by the zone player **11**(n) (reference item (b) above) or the current time information that it received from the zone player **11**(n) using the SNTP protocol as described above.

Generally similar operations can be performed in connection with migrating the audio information channel device from one zone player **11**(n) to another zone player **11**(n') if the audio information is from one or more audio information files, such as may be the case if the audio information comprises MP3 or WAV files that are available from sources such as sources **16**(m) connected to the network **12** or over from sources available over a wide area network such as the Internet, except for differences to accommodate the fact that the audio information is in files. In that case, the zone player **11**(n) that is currently operating as the audio information channel device **23** for the synchrony group **20** can provide the following information to the zone player **11**(n') that is to become the audio information channel device **23** for the synchrony group **20**:

(d) a list of the audio information files containing the audio information that is to be played;

(e) the identification of the file for which the zone player **11**(n) is currently providing audio and playback timing information, along with the offset into the file for which the current item of audio and playback timing information is being generated and the time stamp that the zone player **11**(n) is associating with that frame, and

US 9,213,357 B2

17

(f) the identifications of the zone players that comprise the master device 21 and slave devices 22(g) comprising the synchrony group 20.

After the zone player 11(n') receives the information from the zone player 11(n), it will begin retrieving audio information from the file identified in item (e), starting at the identified offset. In addition, the zone player 11(n') can assemble the retrieved audio information into frames, associate each frame with a time stamp and transmit the resulting audio and playback timing information over the network 12. The zone player 11(n') will perform these operations in the same manner as described above, except that, instead of using the time indicated by its digital to analog converter clock 34 directly in generating the time stamps for the frames, the value of the initial time stamp will be related to the time stamp that is provided by the zone player 11(n) (reference item (e) above), with the rate at which the time stamps are incremented corresponding to the rate at which its (that is, the zone player 11(n')'s) clock increments. In addition, the zone player 11(n') will notify the zone players that are operating as the master device 21 and slave devices 22(g) of the synchrony group 20 that it is the new audio information channel device 23 for the synchrony group 20, and provide the multi-cast address that it will be using to multi-cast the audio and playback timing information, as well as its unicast network address. After the members of the synchrony group 20 receive the notification from the zone player 11(n') indicating that it is the new audio information channel device 23 for the synchrony group 20, they will receive the audio and playback timing information from the zone player 11(n') instead of the zone player 11(n), using the multi-cast address provided by the zone player 11(n'). In addition, they can utilize the zone player 11(n')'s unicast network address to obtain current time information therefrom. It will be appreciated that the zone player 11(n') will determine its current time in relation to the time stamp that is provided by the zone player 11(n) (reference item (b) above) or the current time information that it received from the zone player 11(n) using the SNTP protocol as described above. The zone player 11(n') will process successive audio information files in the list that it receives from the zone player 11(n) (reference item (d)).

Operations performed by the zone players 11(n) and 11(n') in connection with migration of the audio information channel device 23 for other types of audio information will be apparent to those skilled in the art. In any case, preferably, the zone player 11(n) will continue operating as an audio information channel device 23 for the synchrony group 20 for at least a brief time after it notifies the zone player 11(n') that it is to become audio information channel device for the synchrony group, so that the zone player 11(n') will have time to notify the zone players in the synchrony group 20 that it is the new audio information channel device 23 for the synchrony group.

Before proceeding further in describing operations performed by the network audio system 10, it would be helpful to provide a detailed description of a zone player 11(n) constructed in accordance with the invention. FIG. 3 depicts a functional block diagram of a zone player 11(n) constructed in accordance with the invention. All of the zone players in the network audio system 10 may have similar construction. With reference to FIG. 3, the zone player 11(n) includes an audio information source interface 30, an audio information buffer 31, a playback scheduler 32, a digital to analog converter 33, an audio amplifier 35, an audio reproduction device interface 36, a network communications manager 40, and a network interface 41, all of which operate under the control of a control module 42. The zone player 11(n) also has a device

18

clock 43 that provides timing signals that control the general operations of the zone player 11(n). In addition, the zone player 11(n) includes a user interface module interface 44 that can receive control signals from the user interface module 13 (FIGS. 1 and 2) for controlling operations of the zone player 11(n), and provide status information to the user interface module 13.

Generally, the audio information buffer 31 buffers audio information, in digital form, along with playback timing information. If the zone player 11(n) is operating as the audio information channel device 23 (FIG. 2) for a synchrony group 20, the information that is buffered in the audio information buffer 31 will include the audio and playback timing information that will be provided to the devices 21 and 22(g) in the synchrony group 20. If the zone player 11(n) is operating as the master device 21 or a slave device 22(g) for a synchrony group, the information that is buffered in the audio information buffer 31 will include the audio and playback timing information that the zone player 11(n) is to play.

The audio information buffer 31 can receive audio and playback timing information from two sources, namely, the audio information source interface 30 and the network communications manager 40. In particular, if the zone player 11(n) is operating as the audio information channel device 23 for a synchrony group 20, and if the audio information source is a source 14(n)(s) connected to the zone player 11(n), the audio information buffer 31 will receive and buffer audio and playback timing information from the audio information source interface 30. On the other hand, if the zone player 11(n) is operating as the audio information channel device 23 for a synchrony group 20, and if the audio information source is a source 16(m) connected to the network 12, or a source available over the wide area network, the audio information buffer 31 will receive and buffer audio and playback timing information from the network communications manager 40. It will be appreciated that, if the zone player 11(n) is not a member of the synchrony group, the zone player 11(n) will not play this buffered audio and playback timing information.

On yet another hand, if the zone player 11(n) is operating as the master device 21 or a slave device 22(g) in a synchrony group, and if the zone player 11(n) is not also the audio information channel device 23 providing audio and playback timing information for the synchrony group 20, the audio information buffer 31 will receive and buffer audio and playback timing information from the network communications manager 40.

The audio information source interface 30 connects to the audio information source(s) 14(n)(s) associated with the zone player 11(n). While the zone player 11(n) is operating as audio information channel device 23 for a synchrony group 20, and if the audio information is to be provided by a source 14(n)(s) connected to the zone player 11(n), the audio information source interface 30 will selectively receive audio information from one of the audio information source(s) 14(n)(s) to which the zone player is connected and store the audio information in the audio information buffer 21. If the audio information from the selected audio information source 14(n)(s) is in analog form, the audio information source interface 30 will convert it to digital form. The selection of the audio information source 14(n)(s) from which the audio information source interface 30 receives audio information is under control of the control module 42, which, in turn, receives control information from the user interface module through the user interface module interface 44. The audio information source interface 30 adds playback timing infor-

US 9,213,357 B2

**19**

mation to the digital audio information and buffers the combined audio and playback timing information in the audio information buffer **21**.

More specifically, as noted above, the audio information source interface **30** receives audio information from an audio information source **14**(*n*)(*s*), converts it to digital form if necessary, and buffers it along with playback timing information in the audio information buffer **21**. In addition, the audio information source interface **30** will also provide formatting and scheduling information for the digital audio information, whether as received from the selected audio information source **14**(*n*)(*s*) or as converted from an analog audio information source. As will be made clear below, the formatting and scheduling information will control not only playback by the zone player **11**(*n*) itself, but will also enable other zone players **11**(*n'*), **11**(*n''*), . . . that may be in a synchrony group for which the zone player **11**(*n*) is the master device, to play the audio program associated with the audio information in synchrony with the zone player **11**(*n*).

In one particular embodiment, the audio information source interface **30** divides the audio information associated with an audio work into a series of frames, with each frame comprising digital audio information for a predetermined period of time. As used herein, an audio track may comprise any unit of audio information that is to be played without interruption. On the other hand, an audio program may comprise a series of one or more audio tracks that are to be played in succession. It will be appreciated that the tracks comprising the audio program may also be played without interruption, or alternatively playback between tracks may be interrupted by a selected time interval. FIG. **4** schematically depicts an illustrative framing strategy used in connection with one embodiment of the invention for a digital audio stream comprising an audio work. More specifically, FIG. **4** depicts a framed digital audio stream **50** comprising a sequence of frames **51**(**1**) through **51**(F) (generally identified by reference numeral **51**(*f*)). Each frame **51**(*f*), in turn, comprises a series of audio samples **52**(*f*)(**1**) through **52**(*f*)(S) (generally identified by reference numeral **52**(*f*)(*s*)) of the audio track. Preferably all of the frames will have the same number "S" of audio samples, although it will be appreciated from the following that that is primarily for convenience. On the other hand, it will be appreciated that, the number of audio samples may differ from "S"; this may particularly be the case if the frame **51**(*f*) contains the last audio samples for the digital audio stream for a particular audio work. In that case, the last frame **51**(F) will preferably contain samples **52**(F)(**1**) through **52**(F) (x), where "x" is less than "S." Generally, it is desirable that the number of samples be consistent among all frames **51**(*f*), and in that case padding, which will not be played, can be added to the last frame **51**(F).

Associated with each frame **51**(*f*) is a header **55**(*f*) that includes a number of fields for storing other information that is useful in controlling playback of the audio samples in the respective frame **51**(*f*). In particular, the header **55**(*f*) associated with a frame **51**(*f*) includes a frame sequence number field **56**, an encoding type field **57**, a sampling rate information field **58**, a time stamp field **60**, an end of track flag **61**, and a length flag field **62**. The header **55**(*f*) may also include fields (not shown) for storing other information that is useful in controlling playback. Generally, the frame sequence number field **56** receives a sequence number "f" that identifies the relative position of the frame **51**(*f*) in the sequence of frames **51**(**1**) . . . **51**(*f*) . . . **51**(F) containing the digital audio stream **50**. The encoding type field **57** receives a value that identifies the type of encoding and/or compression that has been used in generating the digital audio stream. Conventional encoding

**20**

or compression schemes include, for example, the well-known MP3 and WAV encoding and/or compression schemes, although it will be appreciated that other schemes may be provided for as well. The sampling rate information field **58** receives sampling rate information that indicates the sampling rate for the audio samples **52**(*f*)(*s*). As will be apparent to those skilled in the art, the sampling rate determines the rate at which the zone player **11**(*n*) is to play the audio samples **52**(*f*)(*s*) in the frame, and, as will be described below, determines the period of the digital to analog converter clock **34**.

The condition of the end of work flag **61** indicates whether the frame **51**(*f*) contains the last digital audio samples for the audio track associated with the framed digital audio work **50**. If the frame **51**(*f*) does not contain the audio samples that are associated with the end of the digital audio stream **50** for a respective audio work, the end of work flag will be clear. On the other hand, if the frame **51**(*f*) does contain the audio samples that are associated with the end of the digital audio stream **50** for a respective audio work, the end of work flag **61** will be set. In addition, since the number of valid audio samples **52**(F)(s) in the frame **51**(F), that is, the samples that are not padding, may be less than "S," the default number of audio samples in a frame **51**(*f*), the length flag field **62** will contain a value that identifies the number of audio samples in **52**(F)(s) in the last frame **51**(F) of the audio work **50**. If, as noted above, the frames have a consistent number "S" of samples, the samples **52**(F)(x+1) through **52**(F)(S) will contain padding, which will not be played.

The time stamp field **60** stores a time stamp that identifies the time at which the zone player **11**(*n*) is to play the respective frame. More specifically, for each frame of a framed digital audio stream **50** that is buffered in the audio information buffer **21**, the audio information source interface **30**, using timing information from the digital to analog converter clock **34**, will determine a time at which the zone player **11**(*n*) is to play the respective frame, and stores a time stamp identifying the playback time in the time stamp field **60**. The time stamp associated with each frame will later be used by the playback scheduler **32** to determine when the portion of the digital audio stream stored in the frame is to be coupled to the digital to analog converter **33** to initiate play back. It will be appreciated that the time stamps that are associated with frames in sequential frames **51**(**1**), **51**(**2**), . . . , **51**(F), will be such that they will be played back in order, and without an interruption between the sequential frames comprising the digital audio stream **50**. It will further be appreciated that, after a time stamp has been determined for the first frame, stored in frame **51**(**1**), of a digital audio stream **50**, the audio information source interface **30** can determine time stamps for the subsequent frame **51**(**2**), **51**(**3**), . . . , **51**(F) in relation to the number of samples "S" in the respective frames and the sample rate. The time stamps will also preferably be such that frames will be played back after some slight time delay after they have been buffered in the audio information buffer **21**; the purpose for the time delay will be made clear below.

Returning to FIG. **3**, in addition to dividing the digital audio information into frames, the audio information source interface **30** also aggregates and/or divides the frames **51**(*f*) as necessary into packets, each of which will be of a length that would fit into a message for transmission over the network, and associates each packet with a packet sequence number. For example, if a packet will accommodate multiple frames **51**(*f*), **51**(*f*+1), . . . **51**(*f*+*y*−1), it will aggregate them into a packet and associate them with a packet number, for example p(x). If the entire frames **51**(*f*) and **51**(*f*+*y*−1) was accommodated in packet p(x), where "x" is the sequence number,

US 9,213,357 B2

21

which will occur if the size of a packet is an exact multiple of the frame size, the next packet, $p(x+1)$ will begin with frame $51(f+y)$ and will include frames $51(f+y), \ldots, 51(f+2\ y-1)$. Subsequent packets $p(x+2), \ldots$ will be formed in a similar manner. On the other hand, if the packet length will not accommodate an exact multiple of the frame size, the last frame in the packet will be continued at the beginning of the next packet.

If the audio information source interface 30 is aware of track boundaries, which may be the case if the tracks are divided into files, the packets will reflect the track boundaries, that is, the packets will not contain frames from two tracks. Thus, if the last frames associated with a track are insufficient to fill a packet, the packet will contain padding from the last frame associated with the track to the end of the packet, and the next packet will begin with the first frames associated with the next track.

In one embodiment, the audio information source interface 30 stores the packets in the audio information buffer 31 in a ring buffer. As is conventional, a ring buffer includes a series of storage locations in the buffer. Each entry will be sufficient to store one packet. Four pointers are used in connection with the ring buffer, a first pointer pointing to the beginning of the ring buffer, a second pointer pointing to the end of the ring buffer, an third "write" pointer pointing to the entry into which a packet will be written and a fourth "read" pointer pointing to the entry from which packet will be read for use in playback. When a packet is read from the ring buffer for playback, it will be read from the entry pointed to by the read pointer. After the packet has been read, the read pointer will be advanced. If the read pointer points beyond the end of the ring buffer, as indicated by the end pointer, it will be reset to point to the entry pointed to by the beginning pointer, and the operations can be repeated.

On the other hand, when the audio information source interface 30 stores a packet in the ring buffer, first determine whether the entry pointed to by the write pointer points to the same entry as the entry pointed to by the read pointer. If the write pointer points to the same entry as the entry pointed to by the read pointer, the entry contains at least a portion of a packet that has not yet been read for playback, and the audio information source interface 30 will delay storage of the packet until the entire packet has been read and the read pointer advanced. After the read pointer has been advanced, the audio information source interface 30 can store the packet in the entry pointed to by the write pointer. After the packet has been stored, the audio information source interface 30 will advance the write pointer. If the write pointer points beyond the end of the ring buffer, as indicated by the end pointer, it will be reset to point to the entry pointed to by the beginning pointer, and the operations can be repeated.

As noted above, the zone player 11($n$) can operate both as an audio information channel device 23 and a member of the synchrony group 20 of which it is a member. In that case, the audio information buffer 31 can contain one ring buffer. On the other hand, the zone player 11($n$) can operate as an audio information channel device 23 for one synchrony group 20(1) (FIG. 2A) and a member of another synchrony group 20(2). In that case, the audio information buffer 31 would maintain two ring buffers, one for the audio and timing information associated with synchrony group 20(1), and the other for the audio and timing information associated with synchrony group 20(2). It will be appreciated that, in the latter case, the zone player 11($n$) will only use the audio and timing information that is associated with synchrony group 20(2) for playback.

The playback scheduler 32 schedules playback of the audio information that is buffered in the audio information buffer 31

22

that is to be played by the zone player 11($n$). Accordingly, under control of the playback scheduler 32, the digital audio information that is buffered in the audio information buffer 21 that is to be played by the zone player 11($n$) is transferred to the digital to analog converter 33 for playback. As noted above, if the zone player 11($n$) is operating as an audio information channel device 23 for a synchrony group 20 for which it is not a member, the playback scheduler 32 will not schedule the digital audio information that is to be played by that synchrony group 20 for playback. The playback scheduler 32 only schedules the digital audio information, if any, that is buffered in the audio information buffer 31 that is associated with a synchrony group for which the zone player 11($n$) is a member, whether as master device 21 or a slave device 22($g$).

Essentially, the playback scheduler 32 makes use of the read pointer associated with the circular buffer that contains the audio and playback timing information that is to be played by the zone player 11($n$). The playback scheduler 32 retrieves the packet information from the entry of the ring buffer pointed to by the read pointer, and then advances the ring pointer as described above. The playback scheduler 32 determines the boundaries of the frames in the packet and uses the time stamps in the time stamp fields 60 associated with the respective frame 51($f$), along with timing information provided by the zone player 11($n$)'s digital to analog converter clock 34, to determine when the respective frame is to be transferred to the digital to analog converter 33. Generally, when the time stamp associated with a buffered digital audio information frame corresponds to the current time as indicated by the digital to analog converter clock 34, the playback scheduler 32 will enable the respective frame to be transferred to the digital to analog converter 33.

The digital to analog converter 33, also under control of the digital to analog converter clock 34, converts the buffered digital audio information to analog form, and provides the analog audio information to the audio amplifier 35 for amplification. The amplified analog information, in turn, is provided to the audio reproduction devices 15($n$)($r$) through the audio reproduction device interface 36. The audio reproduction devices 15($n$)($r$) transform the analog audio information signal to sound thereby to provide the audio program to a listener. The amount by which the audio amplifier 35 amplifies the analog signal is controlled by the control module 42, in response to volume control information provided by the user through the user interface module 13.

The network communications manager 40 controls network communications over the network 12, and the network interface 41 transmits and receives message packets over the network 12. The network communications manager 40 generates and receives messages to facilitate the transfer of the various types of information described above in connection with FIG. 2, including the channel device control information, slave device control information, audio and playback timing information and the audio information channel device's clock timing information. In connection with the channel device control information and the slave device control information, the network communications manager 40 will generate messages for transfer over the network 12 in response to control information from the control module 42. Similarly, when the network communications manager 40 receives messages containing channel device control information and slave device control information, the network communications manager will provide the information to the control module 42 for processing.

With regards to the audio information channel device's clock timing information, as noted above, the master device 21 and slave devices 22($g$) of the synchrony group 20 obtain

US 9,213,357 B2

23

the clock timing information from the audio information channel device **23** using the well-known SNTP. If the zone player **11**(*n*) is operating as the audio information channel device **23** for a synchrony group, during the SNTP operation, it will provide its current time, particularly a current time as indicated by its digital to analog converter clock **34**. On the other hand, if the zone player **11**(*n*) is operating as the master device **21** or slave device **22**(*g*) of a synchrony group **20**, it will receive the clock timing information from the audio information channel device **23**. After the respective device **21**, **22**(*g*) has obtained the audio information channel device's clock timing information, it will generate a differential time value ΔT representing the difference between the time T indicated by its digital to analog converter clock **34** and the current time information from the audio information channel device **23**. The differential time value will be used to update the time stamps for the frames of the digital audio stream **50** (FIG. **4**) that are received from the audio information channel device.

With regards to the audio and playback timing information, operations performed by the network communications manager **40** will depend on whether

(i) the audio and playback timing information has been buffered in the audio information buffer **31** for transmission, as audio information channel device **23**, over the network **12** to the master device **21** and/or slave devices **22**(*g*) of a synchrony group, or

(ii) the audio and playback timing information has been received from the network **12** to be played by the zone player **11**(*n*) as either the master device **21** for a synchrony group or a slave device in a synchrony group.

It will be appreciated that the network communications manager **40** may be engaged in both (i) and (ii) contemporaneously, since the zone player **11**(*n*) may operate both as the audio information channel device **23**(**1**) for a synchrony group **20**(**1**) (reference FIG. 2A) of which it is not a member, and a member of another synchrony group **20**(**2**) for which another zone player **11**(*n'*) is the audio information channel device **23**(**2**). With reference to item (i) above, after a packet that is to be transmitted has been buffered in the respective ring buffer, the network communications manager **40** retrieves the packet, packages it into a message and enables the network interface **41** to transmit the message over the network **12**. If the control module **42** receives control information from the user interface module **13** (if the master **21** device **21** is also the audio information channel device **23** for the synchrony group **20**) or from the master device (if the master device **21** is not the audio information channel device **23** for the synchrony group **20**) that would require the transmission of a "resynchronize" command as described above, the control module **42** of the audio information channel device **23** enables the network communications manager **40** to insert the command into a message containing the audio and playback timing information. Details of the operations performed in connection with the "resynchronize" command will be described below. As noted above, the "resynchronize" command is used if the user enables a synchrony group to terminate the playback of a track that is currently being played, or cancel playback of a track whose playback has not begun.

On the other hand, with reference to item (ii) above, if network interface **41** receives a message containing a packet containing frames of audio and playback timing information that the zone player **11**(*n*) is to play either as a master device **21** or a slave device for a synchrony group **20**, the network interface **41** provides the audio and playback timing information to the network communications manager **40**. The net-

24

work communications manager **40** will determine whether the packet contains a resynchronize command and, if so, notify the control module **42**, which will enable operations to be performed as described below. In any case, the network communications manager **40** will normally buffer the various frames comprising the audio and playback timing information in the audio information buffer **31**, and in that operation will generally operate as described above in connection with the audio information source interface **30**. Before buffering them, however, the network communications manager **40** will update their time stamps using the time differential value described above. It will be appreciated that the network communications manager **40** will perform similar operations whether the messages that contain the packets were multicast messages or unicast messages as described above

The updating of the time stamps by the master device **21** and the slave devices **22**(*g*) in the synchrony group **20** will ensure that they all play the audio information synchronously. In particular, after the network communications manager **40** has received a frame **51**(*f*) from the network interface **41**, it will also obtain, from the digital to analog converter clock **34**, the zone player **11**(*n*)'s current time as indicated by its digital to analog converter clock **34**. The network communications manager **40** will determine a time differential value that is the difference between the slave device's current clock time, as indicated by its digital to analog converter **34**, and the audio information channel device's time as indicated by the audio information channel device's clock timing information. Accordingly, if the master or slave device's current time has a value $T_S$ and the audio information channel device's current time, as indicated by the clock timing information, has a value $T_C$, the time differential value $\Delta T = T_S - T_C$. If the current time of the master or slave device in the synchrony group **20**, as indicated by its digital to analog converter clock **34**, is ahead of the audio information channel device's clock time as indicated by the clock timing information received during the SNTP operation, the time differential value will have a positive value. On the other hand, if the master or slave device's current time is behind the audio information channel device's clock time, the time differential value ΔT will have a negative value. If the zone player **11**(*n*) obtains clock timing information from the audio information channel device **23** periodically while it is a member of the synchrony group **20**, the network communications manager **40** can generate an updated value for the time differential value ΔT when it receives the clock timing information from the audio information channel device **23**, and will subsequently use the updated time differential value.

The network communications manager **40** uses the time differential value ΔT that it generates from the audio information channel device timing information and zone player **11**(*n*)'s current time to update the time stamps that will be associated with the digital audio information frames that the zone player **11**(*n*) receives from the audio information channel device. For each digital audio information frame that is received from the audio information channel device, instead of storing the time stamp that is associated with the frame as received in the message in the audio information buffer **21**, the network communications manager **40** will store the updated time stamp with the digital audio information frame. The updated time stamp is generated in a manner so that, when the zone player **11**(*n*), as a member of the synchrony group plays back the digital audio information frame, it will do so in synchrony with other devices in the synchrony group.

More specifically, after the zone player **11**(*n*)'s network interface **41** receives a message containing a packet that, in turn, contains one or more frames **51**(*f*), it will provide the

US 9,213,357 B2

25

packet to the network communications manager **40**. For each frame **51**(*f*) in the packet that the network communications manager **40** receives from the network interface **41**, the network communications manager **40** will add the time differential value ΔT to the frame's time stamp, to generate the updated time stamp for the frame **51**(*f*), and store the frame **51**(*f*), along with the header **55**(*f*) with the updated time stamp in the audio information buffer **31**. Thus, for example, if a frame's time stamp has a time value $T_F$, the network communications manager **40** will generate an updated time stamp $T^U{}_F$ having a time value $T^U{}_F = T_F + \Delta T$. Since time value $T^U{}_F$ according to the slave device's digital to analog converter clock **34** is simultaneous to the time value $T_F$ according to the audio information channel device's digital to analog converter clock **34**, the zone player **11**(*n*) device will play the digital audio information frame at the time determined by the audio information channel device **23**. Since all of the members of the synchrony group **20** will perform the same operations, generating the updated time stamps $T^U{}_F$ for the various frames **51**(*f*) in relation to their respective differential time values, all of the zone players **11**(*n*) in the synchrony group **20** will play them synchronously. The network communications manager **40** will generate updated time stamps $T^U{}_F$ for all of the time stamps **60** in the packet, and then store the packet in the audio information buffer **31**.

It will be appreciated that, before storing a packet in the audio information buffer **21**, the network communications manager **40** can compare the updated time stamps $T^U{}_F$ associated with the frames in the packet to the slave device's current time as indicated by its digital to analog converter clock **34**. If the network communications manager **40** determines the time indicated by the updated time stamps of frames **51**(*f*) in the packet are earlier than the zone player's current time, it can discard the packet instead of storing it in the audio information buffer **21**, since the zone player **11**(*n*) will not play them. That is, if the updated time stamp has a time value $T^U{}_F$ that identifies a time that is earlier than the zone player's current time $T_S$ as indicated by the zone player's digital to analog converter clock **34**, the network communications manager **40** can discard the packet.

If the zone player **11**(*n*) is operating as the master device **21** of a synchrony group **20**, when the user, through the user interface module **13**, notifies the zone player **11**(*n*) that another zone player **11**(*n'*) is to join the synchrony group **20** as a slave device **22**(*g*), the control module **42** of the zone player **11**(*n*) enables the network communications manager **40** to engage in an exchange of messages, described above in connection with FIG. **2**, to enable the other zone player **11**(*n'*) to join the synchrony group **20** as a slave device. As noted above, during the message exchange, the messages generated by the network communications manager **40** of the zone player **11**(*n*) will provide the network communications manager of the zone player **11**(*n*) that is to join the synchrony group **20** with information such as the multi-cast address being used by the audio information channel device **23** that is providing the audio program to the synchrony group **20**, as well as a unicast network address for the audio information channel device **23**. After receiving that information, the network communications manager and network interface of the zone player **11**(*n'*) that is to join the synchrony group **20** can begin receiving the multi-cast messages containing the audio program for the synchrony group, engage in SNTP transactions with the audio information channel device **23** to obtain the latter's current time, and also enable the audio information channel device **23** to send the zone player **11**(*n'*) frames **51**(*f*) that it had previously broadcast using the unicast message transmission methodology as described above.

26

On the other hand, if the network communications manager **40** and network interface **41** of the zone player **11**(*n*) receive a message over the network **12** indicating that it is to become a slave device **22**(*g*) of a synchrony group for which another zone player **11**(*n'*) is the master device, the network communications manager **40** for zone player **11**(*n*) will provide a notification to the control module **42** of zone player **11**(*n*). Thereafter, the control module **42** of zone player **11**(*n*) can enable the network communications manager **40** of zone player **11**(*n*) to perform the operations described above to enable it to join the synchrony group **20**.

As noted above, the user, using user interface module **13**, can enable the synchrony group to terminate playback of a track of an audio program that is currently being played. After playback of a track that is currently being played has been terminated, playback will continue in a conventional manner with the next track that has been buffered in the audio information buffer **31**. It will be appreciated that that could be the next track that is on the original play list, or a previous track. In addition, the user can enable the synchrony group **20** to cancel playback of a track that it has not yet begun to play, but for which buffering of packets has begun in the synchrony group **20**. Both of these operations make use of the "resynchronize" command that the master device **21** of the synchrony group **20** can enable the audio information channel device **23** to include in the multi-cast message stream that it transmits to the synchrony group **20**. Generally, in response to receipt of the resynchronize command, the members of the synchrony group **20** flush the ring buffer containing the packets that they are to play in the future. In addition, if the members of the synchrony group provide separate buffers for their respective digital to analog converters **33**, the members will also flush those buffers as well. After the audio information channel device transmits a packet containing the resynchronize command:

(i) in the case of the use of the resynchronize command to terminate playing of a track that is currently being played, the audio information channel device **23** will begin multi-casting packets for the next track, to begin play immediately, and will continue through the play list in the manner described above; and

(ii) in the case of the use of the resynchronize command to cancel play of a track for which buffering has begun, but which is to be played in the future, the audio information channel device **23** will begin multi-casting packets for the track after the track that has been cancelled, to be played beginning at the time the cancelled track was to begin play, and will also continue through the play list in the manner described above.

It will be appreciated that,

(a) in the first case (item (i) directly above), the resynchronize command can enable the read pointer to be set to point to the entry in the circular buffer into which the first packet for the next track will be written, which will correspond to the entry to which the write pointer points, but

(b) in the second case (item (ii) directly above), the resynchronize command can enable the write pointer for the circular buffer to be set to point to the entry that contains the first packet for the track whose play is being cancelled.

It will further be appreciated that, if a track is cancelled for which buffering has not begun, the resynchronize command will generally not be necessary, since the audio information channel device **23** for the synchrony group **20** need only delete that track from the play list.

Operations performed in connection with use of the resynchronize command to cancel playback of a track that is currently being played will be described in connection with

US 9,213,357 B2

27

Packet Sequence A below, and operations performed in connection with the use of the resynchronize command to cancel playback of a track that is has not yet begun to play, but for which buffering of packets has begun, will be described in connection with Packet Sequence B below.

Packet Sequence A

(A1.0) [packet 57]

(A1.1 [continuation of frame 99]

(A1.2) [frame 100, time=0:00:01, type=mp3 audio]

(A1.3) [frame 101, time=0:00:02, type=mp3 audio]

(A1.4) [frame 102, time=0:00:03, type=mp3 audio]

(A2.0) [packet 58]

(A2.1) [continuation of frame 102]

(A2.2) [frame 103, time=0:00:04, type=mp3 audio]

(A2.3) [frame 104, time=0:00:05, type=mp3 audio]

(A2.4) [frame 105, time=0:00:06, type=mp3 audio]

(A3.0) [packet 59]

(A3.1) [continuation of frame 105]

(A3.2) [frame 106, time=0:00:07, type=mp3 audio]

(A3.3) [frame 107, time=0:00:08, type=mp3 audio]

(A3.4) [frame 108, time=0:00:09, type=mp3 audio]

(A4.0) [packet 60]

(A4.1) [continuation of frame 108]

(A4.2) [frame 109, time=0:00:10, type=mp3 audio]

(A4.3) [Resynchronize command]

(A4.4) [Padding, if necessary]

(A5.0) [packet 61]

(A5.1) [frame 1, time=0:00:07, type=mp3 audio]

(A5.2) [frame 2, time=0:00:08, type=mp3 audio]

(A5.3) [frame 3, time=0:00:09, type=mp3 audio]

(A5.4) [frame 4, time=0.00.10, type=mp3 audio]

(A6.0) [packet 62]

(A6.1) [continuation of frame 4]

(A6.2) [frame 5, time=0:00:11, type=mp3 audio]

(A6.3) [frame 6, time=0:00:12, type=mp3 audio]

(A6.4) [frame 7, time=0:00:13, type=mp3 audio]

Packet Sequence A comprises a sequence of six packets, identified by packet 57 through packet 62, that the audio information channel device 23 multi-casts in respective messages to the members of a synchrony group 20. It will be appreciated that the series of messages that the audio information channel device 23 may multi-cast to the synchrony group 20 may include a messages prior to the packet 57, and may also include messages after packet 62. Each packet comprises a packet header, which is symbolized by lines (A1.0), (A2.0), . . . (A6.0) in Packet Sequence A, and will generally also include information associated with at least a portion of a frame. In the packets represented in Packet Sequence A, each packet includes information associated with a plurality of frames. Depending on the lengths of the packets, each packet may contain information associated with a portion of a frame, an entire frame, or multiple frames. In the illustration represented by Packet Sequence A, it is assumed that each packet may contain information associated with multiple frames. In addition, it is assumed that a packet does not necessarily contain information associated with an integral number of frames; in that case, a packet may contain information associated with a portion of a frame, and the next packet will contain the information associated with the rest of a frame.

The frames and associated header playback timing information contained in the various packets are symbolized by lines (A1.1), (A1.2), . . . , (A1.4), (A2.1), . . . (A6.4) of Packet Sequence A. Thus, for example, line (A1.2) of packet 57 represents the one-hundredth frame, that is, frame 51(100) (reference FIG. 4), of the track whose audio information is being transmitted in the sequence of packets that includes

28

packet 57. The frame 51(100) is to be played at an illustrative time, according to the audio information channel device's digital to analog converter clock, of "time=0:00:01," and the frame is encoded and/or compressed using the well-known MP3 encoding and compression methodology. In that case, the legend "time=0:00:01" represents the time stamp that would be included in field 60 (FIG. 4) of the header associated with the frame 50(100) as multi-cast by the audio information channel device for the synchrony group. It will be appreciated that the playback time and encoding/compression methodology will be referred in the header 55(100) that is associated with the frame 51(100). It will also be appreciated that the header may also contain additional information as described above.

Similarly, line (A1.3) of packet 57 represents the one-hundred and first frame, that is, frame 51(101), of the track whose audio information is being transmitted in the sequence of packets that includes packet 57. The frame 51(101) is to be played at an illustrative time, according to the audio information channel device's digital to analog converter clock, of "0:00:02," and the frame is also encoded and/or compressed using the MP3 encoding and compression methodology. Line (A1.4) of packet 57 represents similar information, although it will be appreciated that, depending on the length of packet 57, the line may not represent the information for an entire frame 51(102) and/or its associated header. If the length of packet 57 is not sufficient to accommodate the information for the entire frame 51(102) and/or associated header, the information will continue in packet 58, as represented by line (A2.1) in Packet Sequence A. Similarly, if the length of packet 56 was not sufficient to contain the information for an entire frame 51(99) preceding frame 51(100), packet 57 (lines (A1.0) through 1.4) may contain any information from frame 51(99) that packet 56 was unable to accommodate.

As noted above, when the master device 21 or a slave device 22(g) in the synchrony group 20 receives the packet 57, its respective network communications manager 40 will update the time stamps associated with the various frames 51(f) as described above before buffering the respective frames in the respective audio information buffer 31.

Packets 58 and 59 contain information that is organized along the lines described above in connection with packet 57.

Packet 60 also contains, as represented by lines (A4.1) and (A4.2), information that is organized along the lines of the information represented by lines (Ax.1) and (Ax.2) ("x" equals an integer) described above in connection with packets 57 through 59. On the other hand, packet 60 contains a resynchronize command, as represented by line (A4.3). Packet 60 also may contain padding, as represented by line 4.4, following the resynchronize command. As noted above, the master device 21 of a synchrony group 20 will enable the audio information channel device 23 that is providing audio information to the synchrony group 20 to multi-cast a message containing the resynchronize command when it receives notification from the user interface module 13 that the user wishes to cancel playback of a track that is currently being played. In the example depicted in Packet Sequence A, as will be described below, the audio information channel device 23 receives notification from the master device 21 that the user wishes to cancel playback of a track at a time corresponding to "time=0:00:07" according to its digital to analog converter clock 34, and, in line (A4.3) of packet 60 it will provide the resynchronize command, followed by padding, if necessary.

As will be apparent from examining lines (A3.1) through (A3.4) of packet 59 and lines (A4.1) and (A4.2) of packet 60, although the audio information channel device 23 has received the notification from the synchrony group's master

US 9,213,357 B2

29

device 21 to multi-cast the resynchronize command at a time corresponding to "time=0:00:07" according to the clock time indicated by its digital to analog converter clock 34, it (that is, the audio information channel device 23) has already multi-cast messages containing frames that are to be played at that time and subsequently. That is, the audio information channel device 23 has, multi-cast in packet 59, frames 51(106) through 51(108) that contain time stamps "time=0:00:07," "time=0:00:08" and "time=0:00:09," respectively, and, in packet 60, in addition to the continuation of frame 51(108), frame 51(109) that contains time stamp "time=0:00:10." (It will be appreciated that the times indicated by the illustrative time stamps are for illustration purposes only, and that in an actual embodiment the time stamps may have different values and differentials.)

As noted above, the audio information channel device 23 multi-casts a message containing a packet that, in turn, contains the resynchronize command when it receives the notification from the master device 21 to do so. In the example depicted in Packet Sequence A, the packet will be multi-cast when the audio information channel device's digital to analog converter clock time corresponds to "0:00:07." Subsequently, two things happen. In one aspect, when the master device 21 and slave devices 22(g) receive the packet that contains the resynchronize command, they will stop playing the audio program that they are playing.

In addition, the audio information channel device 23 will begin transmitting frames containing audio information for the next track, including therewith time stamps immediately following the digital to analog converter clock time at which the packet including the resynchronize command was transmitted. Accordingly, and with further reference to Packet Sequence A, the audio information channel device 23 will multi-cast a message containing packet 61. As indicated above, packet 61 contains, as represented in lines (A5.1) through (A5.3), frames 51(1) through 51(3), which are the first three frames of the next track of the audio program that is to be played. It is also compressed and encoded using the MP3 encoding and compression scheme, and it is accompanied by time stamps "time=0:00:07," "time=0:00:08" and "time=0:00:10." As noted above, the time stamp "time=0:00:07" corresponds to the clock time at which the audio information channel device 23 multi-casts the resynchronize command, and, when the master device 21 and slave devices 22(g) receive these frames, they would be expected to begin playing them very shortly, if not immediately after the audio information channel device 23 multi-casts the message containing the packet that, in turn, contains the resynchronize command. Packet 61 also includes at least a portion of the next frame, that is, frame 51(4), for that track. In addition, Packet Sequence A depicted above further includes a subsequent packet, namely, packet 62, that contains any necessary continuation of frame 51(4), as well as three subsequent frames. If any additional packets are required for the track, as well as for subsequent tracks, they can be multi-cast in a similar manner.

As further noted above, the resynchronize command can also be used to cancel playing of one or more tracks for which playback has begun. This will be illustrated in connection with Packet Sequence B:

Packet Sequence B

(B1.0) [packet 157]
(B1.1) [continuation of frame 99]
(B1.2) [frame 100, time=0:00:01, type=mp3 audio]
(B1.3) [frame 101, time=0:00:02, type=mp3 audio]
(B1.4) [frame 102, time=0:00:03, type=mp3 audio]
(B2.0) [packet 158]

30

(B2.1) [continuation of frame 102]
(B2.2) [frame 103, time=0:00:04, type=mp3 audio]
(B2.3) [frame 104, time=0:00:05, type=mp3 audio]
(B2.4) [frame 105, time=0:00:06, type=mp3 audio]
(B3.0) [packet 159]
(B3.1) [continuation of frame 105]
(B3.2) [frame 106, time=0:00:07, type=mp3 audio]
(B3.3) [track boundary notification]
(B3.4) [Padding, if necessary]
(B4.0) [packet 160]
(B4.1) [frame 1, time=0:00:08, type=mp3 audio]
(B4.2) [frame 2, time=0:00:09, type=mp3 audio]
(B4.3) [frame 3, time=0:00:10, type=mp3 audio]
(B5.0) [packet 161]
(B5.1) [continuation of frame 3]
(B5.2) [frame 4, time=0:00:11, type=mp3 audio]
(B5.3) [Resynchronize, after packet 159]
(B5.4) [Padding, if necessary]
(B6.0) [packet 162]
(B6.1) [frame 1, time=0:00:08, type=mp3 audio]
(B6.2) [frame 2, time=0:00:09, type=mp3 audio]
(B6.3) [frame 3, time=0:00:10, type=mp3 audio]
(B6.4) [frame 4, time=0:00:11, type=mp3 audio]
(B7.0) [packet 163]
(B7.1) [continuation of frame 4]
(B7.2) [frame 5, time=0:00:12, type=mp3 audio]
(B7.3) [frame 6, time=0:00:13, type=mp3 audio]
(B7.4) [frame 7, time=0:00:14, type=mp3 audio]

Packet Sequence B comprises a series of seven packets, identified by packet 157 through 163, that the audio information channel device 23 multi-casts to the members of a synchrony group 20. As with Packet Sequence A, it will be appreciated that the series of packets that the audio information channel device 23 may multi-cast to the synchrony group 20 may include packets prior to the packet 157, and may also include packets after packet 162. Each packet comprises a packet header, which is symbolized by lines (B1.0), (B2.0), . . . (B7.0) in Packet Sequence B. As in Packet Sequence A, each packet will also generally include information associated with at least a portion of a frame 51(f) along with its associated frame 55(f). As in the packets represented in Packet Sequence A, each packet includes information associated with a plurality of frames. Depending on the lengths of the packets, each packet may contain information associated with a portion of a frame, an entire frame, or multiple frames. Further, as with Packet Sequence A, it is assumed that each packet may contain information associated with multiple frames. In addition, it is assumed that a packet does not necessarily contain information associated with an integral number of frames; in that case, a packet may contain information associated with a portion of a frame, and the next packet will contain the information associated with the rest of a frame.

The structures of the packets represented by Packet Sequence B are similar to those described above in connection with Packet Sequence A, and will not be repeated here. Generally, Packet Sequence B illustratively contains a sequence of packets that represent at least portions of three tracks that may have been selected from, for example, a play list. In particular, packets 157 through 159 represent frames from a portion of one track, packets 160 and 161 represent frames from a second track and packets 162 and 163 represent frames from a third track. The play list indicated that the first, second and third tracks were to be played in that order. With particular reference to Packet Sequence B, it should be noted that line (B3.3) indicates that packet 159 includes an indication that that packet contains the last frame for the track, and

US 9,213,357 B2

**31**

line (B3.**4**) provides for padding to the end of the packet. The first frame of the next track begins in packet **160**.

In connection with the use of the resynchronize command to cancel playback of a track, at least a portion of which the audio information channel device **23** has multi-cast to the members of the synchrony group, packet **161**, in line (B5.**3**) represents a resynchronize command that indicates that resynchronization is to occur after packet **159**, that is, immediately after the packet that contains the last frame of the first of the three tracks represented by the packets in Packet Sequence B. It should be noted that the resynchronize command is in the packet **161**, while the resynchronization is to occur at packet **160**, that is, the synchrony group is to not play the track starting with packet **160**, but instead is to begin playing the track frames for which begin with the next packet, that is, packet **162**. As with Packet Sequence A, in Packet Sequence B the audio information channel device **23**, in packet **162** and **163**, multi-casts frames whose time stamps indicate that they are to be played when the frames that were multi-cast in packets **160** and **161** were to be played. By use of the resynchronize command and specifying a packet in this manner, the audio information channel device can cancel playback of a track for which playback has not yet begun.

It will be appreciated that the resynchronize command is generally not necessary for cancelling play back of a track that the audio information channel device **23** has not started multi-casting to the synchrony group **20**, since the audio information channel device **23** itself can re-order the play list to accommodate the cancellation.

The invention provides a number of advantages. In particular, the invention provides a network audio system in which a number of devices share information that can reproduce audio information synchronously, notwithstanding the fact that packets, which may contain digital audio information, transmitted over the network to the various zone players connected thereto may have differing delays and the zone players operate with independent clocks. Moreover, although the invention has been described in connection with audio information, it will be appreciated that the invention will find utility in connection with any type of isochronous information for which synchrony among devices is desired. The system is such that synchrony groups are created and destroyed dynamically, and in such a manner as to avoid requiring a dedicated device as the master device.

It will be appreciated that a number of changes and modifications may be made to the network audio system **10** as described above. For example, although the invention has been described as providing that the audio information channel device **23** provides digital audio information to the members synchrony group **20** that has been encoded using particular types of encoding and compression methodologies, it will be appreciated that the audio information channel device **23** can provide digital audio information to various members of the synchrony group **20** that have been encoded and compressed using different types of encoding and compression methodologies, and, moreover, for which different sampling rates have been used. For example, the audio information channel device **23** may provide digital audio information to the master device **21** and slave devices **22**(**1**) through **22**($g_1$) using the MP3 methodology at a specified sampling rate, the digital audio information for the same program to slave devices **22**($g_1$+1) through **22**($g_2$) using the WAV methodology at one specified sampling rate, and to slave devices **22**($g_2$+1) through **22**(G) using the WAV methodology at another specified sampling rate. In that case, the audio information channel device **23** can specify the particular encoding and compression methodology that has been used in the

**32**

encoding type field **57** associated with each frame and the sampling rate in the sampling rate field **58**. Moreover, since the encoding and compression type and sampling rate are specified for each frame, the encoding and compression type and sampling rate can be changed from frame to frame. The audio information channel device **23** may use different multicast addresses for the different encoding and compression types and sampling rates, but it will be appreciated that that would not be required.

It will be appreciated that two advantages of providing that the encoding and compression methodology and the sampling rate is provided on a frame-by-frame basis, instead of on, for example, a track-by-track basis, is that that would facilitate a slave device joining the synchrony group **20** at a frame mid-track, without requiring, for example, the master device **21** or the audio information channel device **23** to notify it of the encoding and compression methodology or the sampling rate.

Another modification is that, instead of the network communications manager **40** of a member of a synchrony group **20** generating the updated time stamp $T''_F$ for a digital audio information frame by adding the time differential value $\Delta T$ to the time stamp $T_F$ associated with a frame, the network communications manager **40** may instead generate the updated time stamp $T''_F$ by subtracting the differential time value $\Delta T$ from the member's current time $T_S$ as indicated by the member's digital to analog converter clock **34** at the time at which the digital audio information is received. It will be appreciated, however, that there may be variable time delays in processing of messages by the slave device's network communications manager **40**, and so it may be preferable to generate the time differential value $\Delta T$ using the time stamp $T_F$ provided by the audio information channel device **23**.

In addition, instead of the network communications manager **40** of a member of a synchrony group generating an updated time stamp to reflect the difference between the times indicated by the member's digital to analog converter clock and the audio information channel device's digital to analog converter clock, the network communications manager **40** can generate the time differential value $\Delta T$ and provide it to the member's playback scheduler **32**. In that case, the member's network communications manager **40** can store each digital audio information frame along with the time stamp $T_F$ as received from the master device in the audio information buffer **21**. The playback scheduler **32** can utilize the time differential value $\Delta T$, and the time stamps $T_F$ associated with the digital audio information frames, to determine when the respective digital audio information frames are to be played. In determining when a digital audio information frame is to be played, the playback scheduler can add the time differential value to the time stamp $T_F$ associated with the digital audio frame, and enable the digital audio frame to be coupled to the digital to analog converter **33** when the time indicated by the sum corresponds to the current time as indicated by the slave device's digital to analog converter clock **34**. Alternatively, when the member's digital to analog converter clock **34** updates its current time $T_S$, the playback scheduler can generate an updated current time $T'_S$ by subtracting the differential time value $\Delta T$ from the current time $T_S$, and using the updated current time $T'_S$ to determine when to play a digital audio information frame.

As described above, the members of a synchrony group **20** periodically obtain the audio information channel device's current time value and uses the current time value that it receives from the audio information channel device to periodically update the time differential value $\Delta T$ that it uses in updating the time stamps associated with the various frames.

US 9,213,357 B2

33

It will be appreciated that, if the digital to analog converter clock(s) associated with the member(s) of a synchrony group **20** are ensured to have the same rate as the digital to analog converter clock, a member need only obtain the current time value from the audio information channel device once, at the beginning of playback.

As another alternative, if the zone players are provided with digital to analog converter clock **34** whose time and rate can be set by an element such as the network communications manager **40**, when a zone player **11**(*n*) is operating as a member of a synchrony group **20**, its network communications manager **40** can use the various types of timing information that it receives from the audio information channel device **23**, including the current time information and the playback timing information indicated by the time stamps that are associated with the various frames **51**(*f*) comprising the audio and playback timing information that it receives, to adjust the synchrony group member's digital to analog converter clock's time value and/or the clock rate that it uses for playback. If the clock's time value is to be adjusted, when the synchrony group member's network communications manager **40** initially receives the current time information from the audio information channel device **23** for the synchrony group **20**, the network communications manager **40** can set the synchrony group member's digital to analog converter **25** clock **34** to the current time value as indicated by the audio information channel device's current time information. The network communications manager **40** can set the clock **34** to the current time value indicated by the audio information channel device's current time information once, or periodically as it receives the current time information.

Alternatively or in addition, the synchrony group member's network communications manager **40** can use one or both of the current time information and/or the playback timing information in the time stamps associated with the respective frames **51**(*f*) to adjust the clock rate of the clock **34** that it uses for playback. For example, when the synchrony group member's network communications manager **40** receives a frame **51**($f_X$) having a time stamp having a time value $T_{f_X}$, it can generate the updated time value $T^U_{f_X} = T_{f_X} + \Delta T$ as described above, and store the frame with the time stamp with the updated time value in the audio information buffer **30**. In addition, since both the number of samples in a frame and the sampling rate, which determines the rate at which the frame is to be played, are known to the network communications manager **40**, it can use that information, along with the updated time value $T^U_{f_X}$ that is to be used for frame **51**($f_X$) to generate an expected updated time value $T^E_{f_{X+1}}$ that is expected for the updated time stamp of the next frame **51**($f_{X+1}$). After the synchrony group member's network communications manager **40** receives the next frame **51**($f_{X+1}$), it can generate the updated time value $T^U_{f_{X+1}}$ and compare that value to the expected updated time value $T^E_{f_{X+1}}$. If the two time values do not correspond, or if the difference between them is above a selected threshold level, the clock that is used by the audio information channel device **23** to generate the time stamps is advancing at a different rate than the synchrony group member's digital to analog converter clock **34**, and so the network communications manager **40** can adjust the rate of the digital to analog converter clock **34** to approach that of the clock used by the audio information channel device **23** so that the differential time value $\Delta T$ is constant. On the other hand, if the two time values do correspond, then the time differential value $\Delta T$ is constant, or the difference is below a threshold level, and the network communications manager **40** need not change the clock rate of the digital to analog converter clock **34**. It will be appreciated that, if the clock rate is

34

to be adjusted, the rate adjustment can be fixed, or it can vary based on; for example, the difference between the updated time value $T^U_{f_{X+1}}$ and the expected updated time value $T^E_{f_{X+1}}$.

It will also be appreciated that, if no rate adjustment is performed for one frame **51**($f_{X+1}$), the synchrony group member's network communications manager **40** can generate an expected updated time value $T^E_{f_{X+2}}$ that is expected for the updated time stamp of the next frame **51**($f_{X+2}$) using the updated time value $T^U_{f_{X}}$ determined for frame **51**($f_X$), along with the number of samples in a frame and the sampling rate, and compare the expected updated time value $T^E_{f_{X+2}}$ to the updated time value $T^U_{f_{X+2}}$ that it generates when it receives frame **51**($f_{X+2}$). At that point, if the network communications manager **41** determines that two time values do not correspond, or if the difference between them is above a selected threshold level, it can adjust the rate of the digital to analog converter clock **34**. Similar operations can be performed if no rate adjustment is performed for several successive frames **51**($f_{X+1}$), **51**($f_{X+2}$), . . . . This will accommodate the possibility that the rate differential between the clock **34** and the clock used by the audio information channel device **23** in generating the time stamps have rates that differ by an amount sufficiently small that it cannot be detected using time stamps of two or more successive frames.

Instead or in addition to adjusting the clock rate as described above, the synchrony group member's network communications manager **40** can perform similar operations in connection with adjusting the clock rate in connection with the current time information that it receives from the audio information channel device **23**.

Furthermore, although the network audio system **10** has been described such that the master device **21** of a synchrony group **20** can, in response to control information provided thereto by a user through the user interface module **13**, provide a notification to a zone player **11**(*n*) that it is to become a member of its synchrony group **20** as a slave device **22**(*g*), it will be appreciated that the user interface module **13** can provide the notification directly to the zone player **11**(*n*) that is to become a member of the synchrony group **20**. In that case, the zone player **11**(*n*) can notify the master device **21** that it is to become a slave device **22**(*g*) in the synchrony group **20**, after which the master device **21** can provide information regarding the synchrony group **20**, including the multi-cast and unicast addresses of the audio information channel device and other information as described above.

Similarly, although the network audio system **10** has been described such that the master device **21** of a synchrony group **20** can, in response to control information provided thereto by a user through the user interface module **13**, provide a command to a slave device **22**(*g*) to enable the slave device **22**(*g*) to adjust its volume, it will be appreciated that the user interface module **13** can provide control information directly to the slave device **22**(*g*) to enable the slave device **22**(*g*) to adjust its volume.

In addition, although the network audio system **10** has been described such that each frames **51**(*f*) is associated with a frame sequence number (reference field **56**, FIG. **4**), it will be appreciated that, if the packets described above in connection with Packet Sequence A and Packet Sequence B are provided with packet sequence numbers, the frame sequence numbers need not be provided, since the packet sequence numbers can suffice for defining the frame sequencing.

Furthermore, although the network audio system **10** has been described such that the zone players **11**(*n*) are provided with an audio amplifier **35** for amplifying the analog signal provided by the respective digital to analog converters **33**, it will be appreciated that a zone player may be provided that

US 9,213,357 B2

**35**

does not itself include an audio amplifier. In that case, the analog signal may be coupled to an external amplifier for amplification as necessary before being provided to the audio reproduction device(s) $15(n)(r)$. It will be appreciated that a single zone player $11(n)$ may be provided with multiple audio amplifiers and audio reproduction device interfaces, and, if necessary, multiple digital to analog converters $33$, to provide audio programs for corresponding numbers of synchrony groups.

Similarly, although the zone players $11(n)$ have been described such that they may be connected to one or more audio information sources, it will be appreciated that an audio information source may form part of and be integrated into a zone player $11(n)$. For example, a zone player may include a compact disk player, cassette tape player, broadcast radio receiver, or the like, that has been integrated into it. In addition, as noted above, an individual zone player $11(n)$ may be connected to multiple audio information sources and may contemporaneously operate as the audio information channel device $23$ for multiple synchrony groups.

In addition, although FIG. **1** shows the network audio system **10** as including one user interface module **13**, it will be appreciated that the system **10** may include a plurality of user interface modules. Each user interface module be useful for controlling all of the zone players as described above, or alternatively one or more of the user interface modules may be useful for controlling selected subsets of the zone players.

Moreover, it will be appreciated that, although the invention has been described in connection with audio information, it will be appreciated that the invention will find utility in connection with any type of information for which synchrony among devices connected to a network is desired.

As noted above, while a zone player $11(n)$ is operating as audio information channel device $23$ for a synchrony group **20**, when the zone player $11(n)$'s audio information source interface $30$ or network communications manager $40$ stores digital audio information frames based on audio information from an audio information source $14(n)(s)$ in the audio information buffer $31$, it will provide time stamps for the respective frames to schedule them for playback after some time delay after they have been buffered in the audio information buffer $31$. The delay is provided so that, for other zone players $11(n')$, $11(n'')$, . . . that are operating as members of a synchrony group, there will be sufficient time for the audio and playback timing information to be transferred over the network **12** to those other zone players $11(n')$, $11(n'')$, . . . so that it can be processed and played by them at the appropriate time as described above. The time period that is selected for the time delay may be fixed or variable, and in either case may be based on a number of factors. If the time period selected for the time delay is fixed, it may be based on, for example, factors such as an estimate of the maximum latency in the network **12**, the estimated maximum loading of the various components comprising the zone players $11(n)$, and other estimates as will be appreciated by those skilled in the art.

The time delay may be the same for audio information from all types of audio information sources, and may be constant over the entire period that the synchrony group **20** is playing an audio work. Alternatively, different time delays may be utilized based on various criteria. For example, if the audio information is to be played independently of information associated with other types of media, the time delay may be selected to be relatively long, on the order of a significant fraction of a second, or longer. On the other hand, if the audio information is to be played contemporaneously with, for example, video information, which may be supplied by, for example, a video disk, video tape cassette, over cable, satel-

**36**

lite, or broadcast television, which may not be buffered or which may be displayed independently of the network audio system **10**, it may be undesirable to provide for such a lengthy delay, since the time delay of the audio playback, in relation to the video display, may be noticeable. In that case, the zone player $11(n)$ may provide for a much shorter time delay. In one embodiment, the time delay provided for audio information to be played concurrently with video information is selected to be generally on the order of fifty milliseconds, which would barely, if at all, be perceptible to someone viewing the video. Other desirable time delays for information from other types of sources will be apparent to those skilled in the art.

As yet a further possibility, the zone player $11(n)$, when operating as an audio information channel device $23$ for a synchrony group **20**, can dynamically determine the time delay based on a number of conditions in the network audio system **10**, including, for example, the message transfer latency in network **12**, the loading of microprocessors or other components that are used in the various zone players $11(n')$, $11(n'')$, . . . that may comprise a synchrony group **20**, as well as other factors. For example, if the audio information channel device $23$ determines that the latency in the network **12** has increased beyond a selected threshold, the audio information channel device $23$ can adjust the delay to increase the likelihood that the members of the synchrony group **20** will be able to receive the packets and process the frames so that they will be able to play them at the appropriate times. Similarly, if the audio information channel device $23$ is notified that a member of the synchrony group **20** to which it provides audio information requires additional time to receive and process the frames that it transmits, the audio information channel device $23$ can adjust the delay accordingly. It will be appreciated that, to reduce or minimize possible discontinuities in the audio playback by the members of the synchrony group, the audio information channel device $23$ can, instead of adjusting the time delay during a particular audio track, adjust the time delay between tracks, during silent periods of a track or otherwise as will be appreciated by those skilled in the art. In addition, the audio information channel device $23$ can use conventional audio compression methodologies to facilitate a speeding up and/or slowing down of playback of an audio track while it is in the process of providing additional time delay. Generally, the members of the synchrony group **20** can provide notifications to the audio information channel device $23$ if they determine that they will need an additional time delay, and the audio information channel device $23$ can adjust the time delay in accordance with the notifications from the members of the synchrony group **20**.

It will be appreciated that a system in accordance with the invention can be constructed in whole or in part from special purpose hardware or a general purpose computer system, or any combination thereof, any portion of which may be controlled by a suitable program. Any program may in whole or in part comprise part of or be stored on the system in a conventional manner, or it may in whole or in part be provided in to the system over a network or other mechanism for transferring information in a conventional manner. In addition, it will be appreciated that the system may be operated and/or otherwise controlled by means of information provided by an operator using operator input elements (not shown) which may be connected directly to the system or which may transfer the information to the system over a network or other mechanism for transferring information in a conventional manner.

The foregoing description has been limited to a specific embodiment of this invention. It will be apparent, however,

US 9,213,357 B2

37

that various variations and modifications may be made to the invention, with the attainment of some or all of the advantages of the invention. It is the object of the appended claims to cover these and such other variations and modifications as come within the true spirit and scope of the invention.

What is claimed as new and desired to be secured by Letters Patent of the United States is:

**1**. A method comprising:

receiving, by a first playback device from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information (i) obtaining, by the first playback device from the audio information source outside of the LAN, the audio information; (ii) transmitting, by the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) playing back, by the first playback device, the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

**2**. The method of claim **1**, further comprising:

after receiving the control information, additionally (i) generating, by the first playback device, the playback timing information associated with the audio information; and (ii) generating, by the first playback device, the device clock information of the first playback device.

**3**. The method of claim **1**, wherein the control information further comprises one or more instructions for the first playback device and the second playback device to playback audio information.

**4**. The method of claim **3**, wherein the first and second playback devices are members of a synchrony group, and wherein the method further comprises:

transmitting, by the first playback device to the network device, status information that comprises a status of the synchrony group.

**5**. The method of claim **4**, wherein the status information further comprises an identification of each playback device in the synchrony group.

**6**. The method of claim **5**, wherein the status information further comprises an identification of a master playback device of the synchrony group.

**7**. The method of claim **6**, wherein the first playback device is the master playback device of the synchrony group.

**8**. A tangible non-transitory computer-readable medium having instructions stored thereon that, when executed, cause a first playback device to:

receive, from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information, (i) obtain, from the audio information source outside of the LAN, the audio information; (ii) transmit, to a second playback device,

38

the audio information, playback timing information associated with the audio information, and clock time information for the first playback device; and (iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the clock time information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

**9**. A first playback device comprising:

one or more processors;

a network interface; and

tangible, non-transitory computer-readable memory comprising program instructions that, when executed by the one or more processors, cause the first playback device to:

receive, via the network interface from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a network location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information, (i) obtain, via the network interface from the audio information source outside of the LAN, the audio information; (ii) transmit, via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

**10**. The first playback device of claim **9**, wherein the program instructions, when executed by the one or more processors, further cause the first playback device to:

generate the playback timing information associated with the audio information; and

generate the device clock information of the first playback device.

**11**. The first playback device of claim **9**, wherein the control information further comprises one or more instructions for the first playback device and the second playback device to playback audio information.

**12**. The first playback device of claim **11**, wherein the first and second playback devices are members of a synchrony group, and wherein the program instructions, when executed by the one or more processors, further cause the first playback device to:

transmit, to the network device, status information that comprises a status of the synchrony group.

**13**. The first playback device of claim **12**, wherein the status information further comprises an identification of each playback device in the synchrony group.

**14**. The first playback device of claim **12**, wherein the status information further comprises an identification of a master playback device of the synchrony group.

US 9,213,357 B2

**39**

**15**. The first playback device of claim **14**, wherein the first playback device is the master playback device of the synchrony group.

**16**. The first playback device of claim **12**, wherein the status information further comprises an identification of one or more slave playback devices in the synchrony group, and wherein the second playback device is one of the one or more slave playback devices in the synchrony group.

**17**. The first playback device of claim **16**, wherein the instructions, when executed by the one or more processors, further cause the first playback device to:

generate a plurality of frames, wherein an individual frame comprises at least a portion of the audio information and the playback timing information associated with the audio information, and wherein the first playback device transmitting to the second playback device the audio information, playback timing information, and device

**40**

clock information of the first playback device comprises transmitting the plurality of frames to the second playback device.

**18**. The first playback device of claim **9**, wherein the audio information comprises one of audio files or packetized streaming audio information.

**19**. The first playback device of claim **9**, wherein the audio information source outside of the LAN is an Internet-accessible audio information source, and wherein obtaining, from the audio information source outside of the LAN, the audio information, comprises obtaining the audio information from the Internet-accessible audio information source.

**20**. The first playback device of claim **9**, wherein obtaining, from the audio information source outside of the LAN, the audio information, comprises sending, to the audio information source, a request for the audio information.

\*    \*    \*    \*    \*

Case 1:24-cv-00131-JNR    Document 120-... Filed ... Page ... PageID #: ...

US009213357C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11583rd)

# United States Patent

Millington

(10) **Number:** US 9,213,357 C1

(45) **Certificate Issued:** *Oct. 4, 2019

(54) **OBTAINING CONTENT FROM REMOTE SOURCE FOR PLAYBACK**

(71) Applicant: **Sonos, Inc.**, Santa Barbara, CA (US)

(72) Inventor: **Nicholas A. J. Millington**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**

**Reexamination Request:**
No. 90/013,959, Jun. 16, 2017

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **9,213,357** |
| Issued: | **Dec. 15, 2015** |
| Appl. No.: | **14/516,867** |
| Filed: | **Oct. 17, 2014** |

(*) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 13/297,000, filed on Nov. 15, 2011, now Pat. No. 9,182,777, which is a
(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *G06F 3/0484* | (2013.01) |
| *G06F 3/0482* | (2013.01) |
| *H03G 3/00* | (2006.01) |
| *H04H 20/10* | (2008.01) |
| *H04H 20/26* | (2008.01) |
| *G05B 15/02* | (2006.01) |
| *G11B 20/10* | (2006.01) |
| *H04N 5/04* | (2006.01) |
| *H04N 9/79* | (2006.01) |
| *H04N 21/43* | (2011.01) |
| *H04N 21/436* | (2011.01) |
| *H04L 29/08* | (2006.01) |
| *G06F 3/16* | (2006.01) |
| *G06F 3/048* | (2013.01) |
| *H04L 29/06* | (2006.01) |
| (Continued) | |

(52) **U.S. Cl.**
CPC ........ *G06F 3/165* (2013.01); *G11B 20/10527* (2013.01); *H04H 20/103* (2013.01); *H04H 20/26* (2013.01); *H04L 65/4076* (2013.01); *H04L 65/60* (2013.01); *H04L 65/80* (2013.01); *H04L 67/1095* (2013.01); *H04L 67/26* (2013.01); *H04L 69/28* (2013.01); *H04N 5/04* (2013.01); *H04N 9/7904* (2013.01); *H04N 21/4307* (2013.01); *H04N 21/43615* (2013.01); *H04R 3/12* (2013.01); *H04R 27/00* (2013.01); *H04W 56/0015* (2013.01); *G11B 2020/10592* (2013.01); *H04H 2201/20* (2013.01); *H04R 2227/003* (2013.01); *H04R 2227/005* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,959, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — David E England

(57) **ABSTRACT**

Examples include a playback device with a network interface and memory with program instructions that, when executed by the processor, cause the playback device to (a) receive, via the network interface from a network device communicatively coupled to the playback device over a LAN, an address identifying a network location of audio information available at an audio information source, where the audio information source is outside of the LAN, (b) obtain, via the network interface from the audio information source, the audio information, (c) transmit, via the network interface to another playback device, the audio information, and (d) play back the audio information.



**US 9,213,357 C1**

Page 2

**Related U.S. Application Data**

continuation of application No. 10/816,217, filed on Apr. 1, 2004, now Pat. No. 8,234,395.

(60) Provisional application No. 60/490,768, filed on Jul. 28, 2003.

(51) **Int. Cl.**

| | |
|---|---|
| *H03G 3/20* | (2006.01) |
| *G06F 17/00* | (2019.01) |
| *H04R 27/00* | (2006.01) |
| *H04J 3/06* | (2006.01) |
| *G06F 1/00* | (2006.01) |
| *H04R 3/12* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *H04W 56/00* | (2009.01) |

US 9,213,357 C1

1

**EX PARTE
REEXAMINATION CERTIFICATE**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **9**, **10**, **11**, **12** and **19** is
confirmed.

Claims **1-8**, **13-18** and **20** were not reexamined.

\*  \*  \*  \*  \*

2

# Exhibit 4

US010541883B2

(12) **United States Patent**
Millington et al.

(10) Patent No.: **US 10,541,883 B2**
(45) Date of Patent: **\*Jan. 21, 2020**

(54) **PLAYBACK DEVICE CONNECTION**

(71) Applicant: **SONOS, INC.**, Santa Barbara, CA (US)

(72) Inventors: **Nicholas A. J. Millington**, Santa Barbara, CA (US); **Paul V. Hainsworth**, Foxboro, MA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/298,515**

(22) Filed: **Mar. 11, 2019**

(65) **Prior Publication Data**

US 2019/0207824 A1    Jul. 4, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/091,113, filed on Apr. 5, 2016, which is a continuation of application (Continued)

(51) **Int. Cl.**
*H04L 12/24* (2006.01)
*H04L 29/06* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *H04L 41/22* (2013.01); *G06F 3/0481* (2013.01); *G06F 3/0482* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... H04L 41/22; H04L 12/28; H04L 12/2803; H04L 12/2807; H04L 12/2809;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,956,591 A    5/1976 Gates, Jr.
4,105,974 A    8/1978 Rogers
(Continued)

FOREIGN PATENT DOCUMENTS

CA    2320451 A1    3/2001
CA    2371747 A1    5/2001
(Continued)

OTHER PUBLICATIONS

Final Office Action dated Jun. 5, 2014, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 12 pages.
(Continued)

*Primary Examiner* — Glenford J Madamba

(57) **ABSTRACT**

An example playback device includes programming to perform functions including detecting a triggering event that causes the playback device to transmit a first message indicating that the playback device is available for setup. The functions also include receiving a response to the first message that facilitates establishing an initial communication path with a computing device operating on a secure wireless local area network (WLAN), where the initial communication path is outside of the secure WLAN. The functions also include receiving, from the computing device via the initial communication path, a second message containing network configuration parameters for the secure WLAN including an identifier of, and a security key for, the secure WLAN. The functions also include using the network configuration parameters to connect to the secure WLAN and transitioning from communicating with the computing device via the initial communication path to communicating with the computing device via the secure WLAN.

**20 Claims, 9 Drawing Sheets**



**US 10,541,883 B2**

Page 2

### Related U.S. Application Data

No. 14/486,667, filed on Sep. 15, 2014, now Pat. No. 9,866,447, which is a continuation of application No. 13/618,829, filed on Sep. 14, 2012, now Pat. No. 8,868,698, which is a continuation of application No. 11/147,116, filed on Jun. 6, 2005, now Pat. No. 8,326,951.

(60) Provisional application No. 60/577,284, filed on Jun. 5, 2004.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 3/0484* | (2013.01) |
| *G06F 3/0482* | (2013.01) |
| *H04L 29/08* | (2006.01) |
| *H04L 12/28* | (2006.01) |
| *H04W 12/08* | (2009.01) |
| *H04W 12/00* | (2009.01) |
| *H04W 12/04* | (2009.01) |
| *G06F 3/0481* | (2013.01) |
| *H04W 84/12* | (2009.01) |

(52) **U.S. Cl.**
CPC ...... *G06F 3/04842* (2013.01); *G06F 3/04847* (2013.01); *H04L 12/28* (2013.01); *H04L 12/2803* (2013.01); *H04L 12/2807* (2013.01); *H04L 12/2809* (2013.01); *H04L 41/0803* (2013.01); *H04L 41/0809* (2013.01); *H04L 63/10* (2013.01); *H04L 63/20* (2013.01); *H04L 65/60* (2013.01); *H04L 67/02* (2013.01); *H04L 67/10* (2013.01); *H04L 67/141* (2013.01); *H04W 12/003* (2019.01); *H04W 12/04* (2013.01); *H04W 12/08* (2013.01); *H04L 41/28* (2013.01); *H04L 63/065* (2013.01); *H04L 63/0823* (2013.01); *H04L 2012/2841* (2013.01); *H04L 2012/2849* (2013.01); *H04W 84/12* (2013.01)

(58) **Field of Classification Search**
CPC ..... H04L 41/0809; H04L 63/10; H04L 65/60; H04L 67/02; H04L 67/10; H04L 67/141; G06F 3/0481; G06F 3/0482; G06F 3/04842; G06F 3/04847; H04W 12/04; H04W 12/08
USPC ....................................................... 709/222
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D260,764 | S | 9/1981 | Castagna et al. |
| 4,296,278 | A | 10/1981 | Cullison et al. |
| 4,306,114 | A | 12/1981 | Callahan |
| 4,509,211 | A | 4/1985 | Robbins |
| D279,779 | S | 7/1985 | Taylor |
| 4,530,091 | A | 7/1985 | Crockett |
| 4,696,037 | A | 9/1987 | Fierens |
| 4,701,629 | A | 10/1987 | Citroen |
| 4,712,105 | A | 12/1987 | Koehler |
| D293,671 | S | 1/1988 | Beaumont |
| 4,731,814 | A | 3/1988 | Becker et al. |
| 4,816,989 | A | 3/1989 | Finn et al. |
| 4,824,059 | A | 4/1989 | Butler |
| D301,037 | S | 5/1989 | Matsuda |
| 4,845,751 | A | 7/1989 | Schwab |
| D304,443 | S | 11/1989 | Grinyer et al. |
| D313,023 | S | 12/1990 | Kolenda et al. |
| D313,398 | S | 1/1991 | Gilchrist |
| D313,600 | S | 1/1991 | Weber |
| 4,994,908 | A | 2/1991 | Kuban et al. |
| D320,598 | S | 10/1991 | Auerbach et al. |
| D322,609 | S | 12/1991 | Patton |
| 5,086,385 | A | 2/1992 | Launey et al. |
| D326,450 | S | 5/1992 | Watanabe |
| D327,060 | S | 6/1992 | Wachob et al. |
| 5,151,922 | A | 9/1992 | Weiss |
| 5,153,579 | A | 10/1992 | Fisch et al. |
| D331,388 | S | 12/1992 | Dahnert et al. |
| 5,182,552 | A | 1/1993 | Paynting |
| D333,135 | S | 2/1993 | Wachob et al. |
| 5,185,680 | A | 2/1993 | Kakubo |
| 5,198,603 | A | 3/1993 | Nishikawa et al. |
| 5,237,327 | A | 8/1993 | Saitoh et al. |
| 5,239,458 | A | 8/1993 | Suzuki |
| 5,272,757 | A | 12/1993 | Scofield et al. |
| 5,299,266 | A | 3/1994 | Lumsden |
| D350,531 | S | 9/1994 | Tsuji |
| D350,962 | S | 9/1994 | Reardon et al. |
| 5,361,381 | A | 11/1994 | Short |
| 5,372,441 | A | 12/1994 | Louis |
| D354,059 | S | 1/1995 | Hendricks |
| D354,751 | S | 1/1995 | Hersh et al. |
| D356,093 | S | 3/1995 | McCauley et al. |
| D356,312 | S | 3/1995 | Althans |
| D357,024 | S | 4/1995 | Tokiyama et al. |
| 5,406,634 | A | 4/1995 | Anderson et al. |
| 5,430,485 | A | 7/1995 | Lankford et al. |
| 5,440,644 | A | 8/1995 | Farinelli et al. |
| D362,446 | S | 9/1995 | Gasiorek et al. |
| 5,457,448 | A | 10/1995 | Totsuka et al. |
| D363,933 | S | 11/1995 | Starck |
| 5,467,342 | A | 11/1995 | Logston et al. |
| D364,877 | S | 12/1995 | Tokiyama et al. |
| D364,878 | S | 12/1995 | Green et al. |
| D365,122 | S | 12/1995 | Gioscia |
| D366,044 | S | 1/1996 | Hara et al. |
| 5,481,251 | A | 1/1996 | Buys et al. |
| 5,491,839 | A | 2/1996 | Schotz |
| 5,515,345 | A | 5/1996 | Barreira et al. |
| 5,533,021 | A | 7/1996 | Branstad et al. |
| D372,716 | S | 8/1996 | Thorne |
| 5,553,147 | A | 9/1996 | Pineau |
| 5,553,222 | A | 9/1996 | Milne et al. |
| 5,553,314 | A | 9/1996 | Grube et al. |
| D377,651 | S | 1/1997 | Biasotti et al. |
| 5,596,696 | A | 1/1997 | Tindell et al. |
| 5,602,992 | A | 2/1997 | Danneels |
| 5,623,483 | A | 4/1997 | Agrawal et al. |
| 5,625,350 | A | 4/1997 | Fukatsu et al. |
| 5,633,871 | A | 5/1997 | Bloks |
| D379,816 | S | 6/1997 | Laituri et al. |
| 5,636,345 | A | 6/1997 | Valdevit |
| 5,640,388 | A | 6/1997 | Woodhead et al. |
| 5,642,171 | A | 6/1997 | Baumgartner et al. |
| D380,752 | S | 7/1997 | Hanson |
| 5,652,749 | A | 7/1997 | Davenport et al. |
| D382,271 | S | 8/1997 | Akwiwu |
| 5,661,665 | A | 8/1997 | Glass et al. |
| 5,661,728 | A | 8/1997 | Finotello et al. |
| 5,668,884 | A | 9/1997 | Clair, Jr. et al. |
| 5,673,323 | A | 9/1997 | Schotz et al. |
| D384,940 | S | 10/1997 | Kono et al. |
| D387,352 | S | 12/1997 | Kaneko et al. |
| 5,696,896 | A | 12/1997 | Badovinatz et al. |
| D388,792 | S | 1/1998 | Nykerk |
| D389,143 | S | 1/1998 | Wicks |
| D392,641 | S | 3/1998 | Fenner |
| 5,726,989 | A | 3/1998 | Dokic |
| 5,732,059 | A | 3/1998 | Katsuyama et al. |
| D393,628 | S | 4/1998 | Ledbetter et al. |
| 5,740,235 | A | 4/1998 | Lester et al. |
| 5,742,623 | A | 4/1998 | Nuber et al. |
| D394,659 | S | 5/1998 | Biasotti et al. |
| 5,751,819 | A | 5/1998 | Dorrough |
| 5,761,320 | A | 6/1998 | Farinelli et al. |
| 5,774,016 | A | 6/1998 | Ketterer |
| D395,889 | S | 7/1998 | Gerba et al. |
| 5,787,249 | A | 7/1998 | Badovinatz et al. |
| 5,790,543 | A | 8/1998 | Cloutier |

**US 10,541,883 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D397,996 | S | 9/1998 | Smith |
| 5,808,662 | A | 9/1998 | Kinney et al. |
| 5,812,201 | A | 9/1998 | Yoo |
| 5,815,689 | A | 9/1998 | Shaw et al. |
| 5,818,948 | A | 10/1998 | Gulick |
| D401,587 | S | 11/1998 | Rudolph |
| 5,832,024 | A | 11/1998 | Schotz et al. |
| 5,838,909 | A | 11/1998 | Roy et al. |
| 5,848,152 | A | 12/1998 | Slipy et al. |
| 5,852,722 | A | 12/1998 | Hamilton |
| D404,741 | S | 1/1999 | Schumaker et al. |
| D405,071 | S | 2/1999 | Gambaro |
| 5,867,691 | A | 2/1999 | Shiraishi |
| 5,875,233 | A | 2/1999 | Cox |
| 5,875,354 | A | 2/1999 | Charlton et al. |
| D406,847 | S | 3/1999 | Gerba et al. |
| D407,071 | S | 3/1999 | Keating |
| 5,887,143 | A | 3/1999 | Saito et al. |
| 5,905,768 | A | 5/1999 | Maturi et al. |
| D410,927 | S | 6/1999 | Yamagishi |
| 5,917,830 | A | 6/1999 | Chen et al. |
| D412,337 | S | 7/1999 | Hamano |
| 5,923,869 | A | 7/1999 | Kashiwagi et al. |
| 5,923,902 | A | 7/1999 | Inagaki |
| 5,946,343 | A | 8/1999 | Schotz et al. |
| 5,956,025 | A | 9/1999 | Goulden et al. |
| 5,956,088 | A | 9/1999 | Shen et al. |
| 5,960,006 | A | 9/1999 | Maturi et al. |
| D415,496 | S | 10/1999 | Gerba et al. |
| D416,021 | S | 11/1999 | Godette et al. |
| 5,984,512 | A | 11/1999 | Jones et al. |
| 5,987,525 | A | 11/1999 | Roberts et al. |
| 5,987,611 | A | 11/1999 | Freund |
| 5,990,884 | A | 11/1999 | Douma et al. |
| 5,991,307 | A | 11/1999 | Komuro et al. |
| 5,999,306 | A | 12/1999 | Mercs et al. |
| 6,006,275 | A | 12/1999 | Picazo et al. |
| 6,009,457 | A | 12/1999 | Moller |
| 6,018,376 | A | 1/2000 | Nakatani |
| D420,006 | S | 2/2000 | Tonino |
| 6,026,150 | A | 2/2000 | Frank et al. |
| 6,029,196 | A | 2/2000 | Lenz |
| 6,031,818 | A | 2/2000 | Lo et al. |
| 6,032,202 | A | 2/2000 | Lea et al. |
| 6,038,614 | A | 3/2000 | Chan et al. |
| 6,046,550 | A | 4/2000 | Ference et al. |
| 6,061,457 | A | 5/2000 | Stockhamer |
| 6,078,725 | A | 6/2000 | Tanaka |
| 6,081,266 | A | 6/2000 | Sciammarella |
| 6,088,063 | A | 7/2000 | Shiba |
| D429,246 | S | 8/2000 | Holma |
| D430,143 | S | 8/2000 | Renk |
| 6,101,195 | A | 8/2000 | Lyons et al. |
| 6,108,485 | A | 8/2000 | Kim |
| 6,108,686 | A | 8/2000 | Williams, Jr. |
| 6,119,239 | A | 9/2000 | Fujii |
| 6,122,668 | A | 9/2000 | Teng et al. |
| 6,122,749 | A | 9/2000 | Gulick |
| D431,552 | S | 10/2000 | Backs et al. |
| D432,525 | S | 10/2000 | Beecroft |
| 6,127,941 | A | 10/2000 | Van Ryzin |
| 6,128,318 | A | 10/2000 | Sato |
| 6,148,205 | A | 11/2000 | Cotton |
| 6,154,772 | A | 11/2000 | Dunn et al. |
| 6,157,957 | A | 12/2000 | Berthaud |
| 6,163,647 | A | 12/2000 | Terashima et al. |
| 6,169,725 | B1 | 1/2001 | Gibbs et al. |
| 6,175,872 | B1 | 1/2001 | Neumann et al. |
| 6,181,383 | B1 | 1/2001 | Fox et al. |
| 6,185,737 | B1 | 2/2001 | Northcutt et al. |
| 6,195,435 | B1 | 2/2001 | Kitamura |
| 6,195,436 | B1 | 2/2001 | Scibora et al. |
| 6,199,169 | B1 | 3/2001 | Voth |
| 6,212,282 | B1 | 4/2001 | Mershon |
| 6,246,701 | B1 | 6/2001 | Slattery |
| 6,253,293 | B1 | 6/2001 | Rao et al. |
| D444,475 | S | 7/2001 | Levey et al. |
| 6,255,961 | B1 | 7/2001 | Van Ryzin et al. |
| 6,256,554 | B1 | 7/2001 | DiLorenzo |
| 6,269,406 | B1 | 7/2001 | Dutcher et al. |
| 6,301,012 | B1 | 10/2001 | White et al. |
| 6,308,207 | B1 | 10/2001 | Tseng et al. |
| 6,310,652 | B1 | 10/2001 | Li et al. |
| 6,313,879 | B1 | 11/2001 | Kubo et al. |
| 6,321,252 | B1 | 11/2001 | Bhola et al. |
| 6,324,586 | B1 | 11/2001 | Johnson |
| D452,520 | S | 12/2001 | Gotham et al. |
| 6,332,147 | B1 | 12/2001 | Moran et al. |
| 6,343,028 | B1 | 1/2002 | Kuwaoka |
| 6,349,285 | B1 | 2/2002 | Liu et al. |
| 6,349,339 | B1 | 2/2002 | Williams |
| 6,349,352 | B1 | 2/2002 | Lea |
| 6,351,821 | B1 | 2/2002 | Voth |
| 6,353,172 | B1 | 3/2002 | Fay et al. |
| 6,356,871 | B1 | 3/2002 | Hemkumar et al. |
| 6,404,811 | B1 | 6/2002 | Cvetko et al. |
| 6,418,150 | B1 | 7/2002 | Staats |
| 6,430,353 | B1 | 8/2002 | Honda et al. |
| 6,442,443 | B1 | 8/2002 | Fujii et al. |
| D462,339 | S | 9/2002 | Allen et al. |
| D462,340 | S | 9/2002 | Allen et al. |
| D462,945 | S | 9/2002 | Skulley |
| 6,446,080 | B1 | 9/2002 | Van Ryzin et al. |
| 6,449,642 | B2 | 9/2002 | Bourke-Dunphy et al. |
| 6,449,653 | B2 | 9/2002 | Klemets et al. |
| 6,456,783 | B1 | 9/2002 | Ando et al. |
| 6,463,474 | B1 | 10/2002 | Fuh et al. |
| 6,466,832 | B1 | 10/2002 | Zuqert et al. |
| 6,469,633 | B1 | 10/2002 | Wachter et al. |
| D466,108 | S | 11/2002 | Glodava et al. |
| 6,487,296 | B1 | 11/2002 | Allen et al. |
| 6,493,832 | B1 | 12/2002 | Itakura et al. |
| D468,297 | S | 1/2003 | Ikeda |
| 6,522,886 | B1 | 2/2003 | Youngs et al. |
| 6,526,325 | B1 | 2/2003 | Sussman et al. |
| 6,526,411 | B1 | 2/2003 | Ward |
| 6,535,121 | B2 | 3/2003 | Mathney et al. |
| D474,763 | S | 5/2003 | Tozaki et al. |
| D475,993 | S | 6/2003 | Meyer et al. |
| D476,643 | S | 7/2003 | Yamagishi |
| D477,310 | S | 7/2003 | Moransais |
| 6,587,127 | B1 | 7/2003 | Leeke et al. |
| 6,598,172 | B1 | 7/2003 | Vandeusen et al. |
| D478,051 | S | 8/2003 | Sagawa |
| D478,069 | S | 8/2003 | Beck et al. |
| D478,896 | S | 8/2003 | Summers |
| 6,611,537 | B1 | 8/2003 | Edens et al. |
| 6,611,813 | B1 | 8/2003 | Bratton |
| D479,520 | S | 9/2003 | De Saulles |
| D481,056 | S | 10/2003 | Kawasaki et al. |
| 6,631,410 | B1 | 10/2003 | Kowalski et al. |
| 6,636,269 | B1 | 10/2003 | Baldwin |
| 6,639,584 | B1 | 10/2003 | Li |
| 6,653,899 | B2 | 11/2003 | Organvidez et al. |
| 6,654,720 | B1 | 11/2003 | Graham et al. |
| 6,654,956 | B1 | 11/2003 | Trinh et al. |
| 6,658,091 | B1 | 12/2003 | Naidoo et al. |
| 6,674,803 | B1 | 1/2004 | Kesselring |
| 6,684,060 | B1 | 1/2004 | Curtin |
| D486,145 | S | 2/2004 | Kaminski et al. |
| 6,686,838 | B1 | 2/2004 | Rezvani et al. |
| 6,687,664 | B1 | 2/2004 | Sussman et al. |
| 6,703,940 | B1 | 3/2004 | Allen et al. |
| 6,704,421 | B1 | 3/2004 | Kitamura |
| 6,741,961 | B2 | 5/2004 | Lim |
| D491,925 | S | 6/2004 | Griesau et al. |
| 6,757,517 | B2 | 6/2004 | Chang et al. |
| D493,148 | S | 7/2004 | Shibata et al. |
| 6,763,274 | B1 | 7/2004 | Gilbert |
| D495,333 | S | 8/2004 | Borsboom |
| 6,778,073 | B2 | 8/2004 | Lutter et al. |
| 6,778,493 | B1 | 8/2004 | Ishii |
| 6,778,869 | B2 | 8/2004 | Champion |
| D496,003 | S | 9/2004 | Spira |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D496,005 | S | 9/2004 | Wang |
| D496,335 | S | 9/2004 | Spira |
| 6,795,852 | B1 | 9/2004 | Kleinrock et al. |
| D497,363 | S | 10/2004 | Olson et al. |
| 6,801,507 | B1 | 10/2004 | Humpleman et al. |
| 6,803,964 | B1 | 10/2004 | Post et al. |
| 6,809,635 | B1 | 10/2004 | Kaaresoja |
| D499,086 | S | 11/2004 | Polito |
| 6,816,510 | B1 | 11/2004 | Banerjee |
| 6,816,818 | B2 | 11/2004 | Wolf et al. |
| 6,823,225 | B1 | 11/2004 | Sass |
| 6,826,283 | B1 | 11/2004 | Wheeler et al. |
| D499,395 | S | 12/2004 | Hsu |
| D499,718 | S | 12/2004 | Chen |
| D500,015 | S | 12/2004 | Gubbe |
| 6,836,788 | B2 | 12/2004 | Kim et al. |
| 6,839,752 | B1 | 1/2005 | Miller et al. |
| D501,477 | S | 2/2005 | Hall |
| 6,859,460 | B1 | 2/2005 | Chen |
| 6,859,538 | B1 | 2/2005 | Voltz |
| 6,873,862 | B2 | 3/2005 | Reshefsky |
| 6,882,335 | B2 | 4/2005 | Saarinen |
| D504,872 | S | 5/2005 | Uehara et al. |
| D504,885 | S | 5/2005 | Zhang et al. |
| 6,898,642 | B2 | 5/2005 | Chafle et al. |
| 6,901,439 | B1 | 5/2005 | Bonasia et al. |
| D506,463 | S | 6/2005 | Daniels |
| 6,907,458 | B2 | 6/2005 | Tomassetti et al. |
| 6,910,078 | B1 | 6/2005 | Raman et al. |
| 6,912,610 | B2 | 6/2005 | Spencer |
| 6,915,347 | B2 | 7/2005 | Hanko et al. |
| 6,917,592 | B1 | 7/2005 | Ramankutty et al. |
| 6,919,771 | B2 | 7/2005 | Nakajima |
| 6,920,373 | B2 | 7/2005 | Xi et al. |
| 6,931,557 | B2 | 8/2005 | Togawa |
| 6,934,766 | B1 | 8/2005 | Russell |
| 6,937,988 | B1 | 8/2005 | Hemkumar et al. |
| 6,970,482 | B2 | 11/2005 | Kim |
| 6,985,694 | B1 | 1/2006 | De Bonet et al. |
| 6,987,767 | B2 | 1/2006 | Saito |
| D515,072 | S | 2/2006 | Lee |
| D515,557 | S | 2/2006 | Okuley |
| 7,006,758 | B1 | 2/2006 | Yamamoto et al. |
| 7,007,106 | B1 | 2/2006 | Flood et al. |
| 7,020,791 | B1 | 3/2006 | Aweya et al. |
| D518,475 | S | 4/2006 | Yang et al. |
| 7,043,477 | B2 | 5/2006 | Mercer et al. |
| 7,043,651 | B2 | 5/2006 | Aweya et al. |
| 7,046,677 | B2 | 5/2006 | Monta et al. |
| 7,047,308 | B2 | 5/2006 | Deshpande |
| 7,054,888 | B2 | 5/2006 | Lachapelle et al. |
| 7,058,719 | B2 | 6/2006 | Motoyama |
| 7,058,889 | B2 | 6/2006 | Trovato et al. |
| 7,068,596 | B1 | 6/2006 | Mou |
| D524,296 | S | 7/2006 | Kita |
| D527,375 | S | 8/2006 | Flora et al. |
| 7,092,528 | B2 | 8/2006 | Patrick et al. |
| 7,092,694 | B2 | 8/2006 | Griep et al. |
| 7,096,169 | B2 | 8/2006 | Crutchfield et al. |
| 7,102,513 | B1 | 9/2006 | Taskin et al. |
| 7,113,999 | B2 | 9/2006 | Pestoni et al. |
| 7,115,017 | B1 | 10/2006 | Laursen et al. |
| 7,120,168 | B2 | 10/2006 | Zimmermann |
| 7,130,316 | B2 | 10/2006 | Kovacevic |
| 7,130,368 | B1 | 10/2006 | Aweya et al. |
| 7,130,608 | B2 | 10/2006 | Hollstrom et al. |
| 7,130,616 | B2 | 10/2006 | Janik |
| 7,136,934 | B2 | 11/2006 | Carter et al. |
| 7,139,981 | B2 | 11/2006 | Mayer et al. |
| 7,143,141 | B1 | 11/2006 | Morgan et al. |
| 7,143,939 | B2 | 12/2006 | Henzerling |
| 7,146,260 | B2 | 12/2006 | Preston et al. |
| 7,158,488 | B2 | 1/2007 | Fujimori |
| 7,161,939 | B2 | 1/2007 | Israel et al. |
| 7,162,315 | B2 | 1/2007 | Gilbert |
| 7,164,694 | B1 | 1/2007 | Nodoushani et al. |
| 7,167,765 | B2 | 1/2007 | Janik |
| 7,185,090 | B2 | 2/2007 | Kowalski et al. |
| 7,187,947 | B1 | 3/2007 | White et al. |
| 7,188,353 | B1 | 3/2007 | Crinon |
| 7,197,148 | B2 | 3/2007 | Nourse et al. |
| 7,206,367 | B1 | 4/2007 | Moore et al. |
| 7,206,618 | B2 | 4/2007 | Latto et al. |
| 7,206,967 | B1 | 4/2007 | Marti et al. |
| 7,209,795 | B2 | 4/2007 | Sullivan et al. |
| 7,218,708 | B2 | 5/2007 | Berezowski et al. |
| 7,218,930 | B2 | 5/2007 | Ko et al. |
| 7,236,739 | B2 | 6/2007 | Chang et al. |
| 7,236,773 | B2 | 6/2007 | Thomas |
| 7,251,533 | B2 | 7/2007 | Yoon et al. |
| 7,257,398 | B1 | 8/2007 | Ukita et al. |
| 7,260,616 | B1 | 8/2007 | Cook |
| 7,263,070 | B1 | 8/2007 | Delker et al. |
| 7,263,110 | B2 | 8/2007 | Fujishiro |
| 7,269,338 | B2 | 9/2007 | Janevski |
| 7,277,547 | B1 | 10/2007 | Delker et al. |
| 7,286,652 | B1 | 10/2007 | Azriel et al. |
| 7,289,631 | B2 | 10/2007 | Ishidoshiro |
| 7,293,060 | B2 | 11/2007 | Komsi |
| 7,295,548 | B2 | 11/2007 | Blank et al. |
| 7,305,694 | B2 | 12/2007 | Commons et al. |
| 7,308,188 | B2 | 12/2007 | Namatame |
| 7,310,334 | B2 | 12/2007 | Fitzgerald et al. |
| 7,312,785 | B2 | 12/2007 | Tsuk et al. |
| 7,313,384 | B2 | 12/2007 | Meenan et al. |
| 7,313,593 | B1 | 12/2007 | Pulito et al. |
| 7,319,764 | B1 | 1/2008 | Reid et al. |
| 7,321,784 | B2 | 1/2008 | Serceki et al. |
| 7,324,857 | B2 | 1/2008 | Goddard |
| 7,330,875 | B1 | 2/2008 | Parasnis et al. |
| 7,333,519 | B2 | 2/2008 | Sullivan et al. |
| 7,356,011 | B1 | 4/2008 | Waters et al. |
| 7,359,006 | B1 | 4/2008 | Xiang et al. |
| 7,366,206 | B2 | 4/2008 | Lockridge et al. |
| 7,372,846 | B2 | 5/2008 | Zwack |
| 7,383,036 | B2 | 6/2008 | Kang et al. |
| 7,391,791 | B2 | 6/2008 | Balassanian et al. |
| 7,392,102 | B2 | 6/2008 | Sullivan et al. |
| 7,392,481 | B2 | 6/2008 | Gewickey et al. |
| 7,394,480 | B2 | 7/2008 | Song |
| 7,400,644 | B2 | 7/2008 | Sakamoto et al. |
| 7,412,499 | B2 | 8/2008 | Chang et al. |
| 7,428,310 | B2 | 9/2008 | Park |
| 7,430,181 | B1 | 9/2008 | Hong |
| 7,433,324 | B2 | 10/2008 | Switzer et al. |
| 7,434,166 | B2 | 10/2008 | Acharya et al. |
| 7,457,948 | B1 | 11/2008 | Bilicksa et al. |
| 7,469,139 | B2 | 12/2008 | Van De Groenendaal |
| 7,472,058 | B2 | 12/2008 | Tseng et al. |
| 7,474,677 | B2 | 1/2009 | Trott |
| 7,483,538 | B2 | 1/2009 | McCarty et al. |
| 7,483,540 | B2 | 1/2009 | Rabinowitz et al. |
| 7,483,958 | B1 | 1/2009 | Elabbady et al. |
| 7,492,912 | B2 | 2/2009 | Chung et al. |
| 7,505,889 | B2 | 3/2009 | Salmonsen et al. |
| 7,509,181 | B2 | 3/2009 | Champion |
| 7,519,667 | B1 | 4/2009 | Capps |
| 7,548,744 | B2 | 6/2009 | Oesterling et al. |
| 7,548,851 | B1 | 6/2009 | Lau et al. |
| 7,558,224 | B1 | 7/2009 | Surazski et al. |
| 7,558,635 | B1 | 7/2009 | Thiel et al. |
| 7,571,014 | B1 | 8/2009 | Lambourne et al. |
| 7,574,274 | B2 | 8/2009 | Holmes |
| 7,599,685 | B2 | 10/2009 | Goldberg et al. |
| 7,606,174 | B2 | 10/2009 | Ochi et al. |
| 7,607,091 | B2 | 10/2009 | Song et al. |
| 7,627,825 | B2 | 12/2009 | Kakuda |
| 7,630,501 | B2 | 12/2009 | Blank et al. |
| 7,631,119 | B2 | 12/2009 | Moore et al. |
| 7,643,894 | B2 | 1/2010 | Braithwaite et al. |
| 7,653,344 | B1 | 1/2010 | Feldman et al. |
| 7,657,224 | B2 | 2/2010 | Goldberg et al. |
| 7,657,644 | B1 | 2/2010 | Zheng |
| 7,657,910 | B1 | 2/2010 | McAulay et al. |

**US 10,541,883 B2**

Page 5

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,665,115 | B2 | 2/2010 | Gallo et al. |
| 7,668,990 | B2 | 2/2010 | Krzyzanowski et al. |
| 7,669,113 | B1 | 2/2010 | Moore et al. |
| 7,669,219 | B2 | 2/2010 | Scott, III |
| 7,672,470 | B2 | 3/2010 | Lee |
| 7,675,943 | B2 | 3/2010 | Mosig et al. |
| 7,676,044 | B2 | 3/2010 | Sasaki et al. |
| 7,676,142 | B1 | 3/2010 | Hung |
| 7,688,306 | B2 | 3/2010 | Wehrenberg et al. |
| 7,689,304 | B2 | 3/2010 | Sasaki |
| 7,689,305 | B2 | 3/2010 | Kreifeldt et al. |
| 7,702,279 | B2 | 4/2010 | Ko et al. |
| 7,702,403 | B1 | 4/2010 | Gladwin et al. |
| 7,710,941 | B2 | 5/2010 | Rietschel et al. |
| 7,711,774 | B1 | 5/2010 | Rothschild |
| 7,720,096 | B2 | 5/2010 | Klemets |
| 7,721,032 | B2 | 5/2010 | Bushell et al. |
| 7,742,740 | B2 | 6/2010 | Goldberg et al. |
| 7,743,009 | B2 | 6/2010 | Hangartner et al. |
| 7,746,906 | B2 | 6/2010 | Jinzaki et al. |
| 7,756,743 | B1 | 7/2010 | Lapcevic |
| 7,761,176 | B2 | 7/2010 | Ben-Yaacov et al. |
| 7,765,315 | B2 | 7/2010 | Batson et al. |
| RE41,608 | E | 8/2010 | Blair et al. |
| 7,793,206 | B2 | 9/2010 | Lim et al. |
| 7,827,259 | B2 | 11/2010 | Heller et al. |
| 7,831,054 | B2 | 11/2010 | Ball et al. |
| 7,835,689 | B2 | 11/2010 | Goldberg et al. |
| 7,853,341 | B2 | 12/2010 | McCarty et al. |
| 7,865,137 | B2 | 1/2011 | Goldberg et al. |
| 7,882,234 | B2 | 2/2011 | Watanabe et al. |
| 7,885,622 | B2 | 2/2011 | Krampf et al. |
| 7,907,819 | B2 | 3/2011 | Ando et al. |
| 7,916,877 | B2 | 3/2011 | Goldberg et al. |
| 7,917,082 | B2 | 3/2011 | Goldberg et al. |
| 7,933,418 | B2 | 4/2011 | Morishima |
| 7,934,239 | B1 | 4/2011 | Dagman |
| 7,945,143 | B2 | 5/2011 | Yahata et al. |
| 7,945,636 | B2 | 5/2011 | Nelson et al. |
| 7,945,708 | B2 | 5/2011 | Ohkita |
| 7,958,441 | B2 | 6/2011 | Heller et al. |
| 7,966,388 | B1 | 6/2011 | Pugaczewski et al. |
| 7,987,294 | B2 | 7/2011 | Bryce et al. |
| 7,995,732 | B2 | 8/2011 | Koch et al. |
| 7,996,566 | B2 | 8/2011 | Sylvain et al. |
| 7,996,588 | B2 | 8/2011 | Subbiah et al. |
| 8,014,423 | B2 | 9/2011 | Thaler et al. |
| 8,015,306 | B2 | 9/2011 | Bowman |
| 8,020,023 | B2 | 9/2011 | Millington et al. |
| 8,023,663 | B2 | 9/2011 | Goldberg |
| 8,028,038 | B2 | 9/2011 | Weel |
| 8,028,323 | B2 | 9/2011 | Weel |
| 8,041,062 | B2 | 10/2011 | Cohen et al. |
| 8,045,721 | B2 | 10/2011 | Burgan et al. |
| 8,045,952 | B2 | 10/2011 | Qureshey et al. |
| 8,050,203 | B2 | 11/2011 | Jacobsen et al. |
| 8,050,652 | B2 | 11/2011 | Qureshey et al. |
| 8,055,364 | B2 | 11/2011 | Champion |
| 8,064,904 | B2 | 11/2011 | Jain et al. |
| 8,074,253 | B1 | 12/2011 | Nathan |
| 8,086,752 | B2 | 12/2011 | Millington et al. |
| 8,090,317 | B2 | 1/2012 | Burge et al. |
| 8,103,009 | B2 | 1/2012 | McCarty et al. |
| 8,111,132 | B2 | 2/2012 | Allen et al. |
| 8,112,032 | B2 | 2/2012 | Ko et al. |
| 8,116,476 | B2 | 2/2012 | Inohara |
| 8,126,172 | B2 | 2/2012 | Horbach et al. |
| 8,131,389 | B1 | 3/2012 | Hardwick et al. |
| 8,131,390 | B2 | 3/2012 | Braithwaite et al. |
| 8,144,883 | B2 | 3/2012 | Pedersen |
| 8,148,622 | B2 | 4/2012 | Rothkopf et al. |
| 8,150,079 | B2 | 4/2012 | Maeda et al. |
| 8,169,938 | B2 | 5/2012 | Duchscher et al. |
| 8,170,222 | B2 | 5/2012 | Dunko |
| 8,170,260 | B2 | 5/2012 | Reining et al. |

| | | | |
|---|---|---|---|
| 8,175,297 | B1 | 5/2012 | Ho et al. |
| 8,185,674 | B2 | 5/2012 | Moore et al. |
| 8,194,874 | B2 | 6/2012 | Starobin et al. |
| 8,204,890 | B1 | 6/2012 | Gogan et al. |
| 8,208,653 | B2 | 6/2012 | Eo et al. |
| 8,214,447 | B2 | 7/2012 | Deslippe et al. |
| 8,214,740 | B2 | 7/2012 | Johnson |
| 8,214,873 | B2 | 7/2012 | Weel |
| 8,218,790 | B2 | 7/2012 | Bull et al. |
| 8,230,099 | B2 | 7/2012 | Weel |
| 8,233,029 | B2 | 7/2012 | Yoshida et al. |
| 8,233,648 | B2 | 7/2012 | Sorek et al. |
| 8,234,395 | B2 | 7/2012 | Millington et al. |
| 8,239,748 | B1 | 8/2012 | Moore et al. |
| 8,279,709 | B2 | 10/2012 | Choisel et al. |
| 8,281,001 | B2 | 10/2012 | Busam et al. |
| 8,285,404 | B1 | 10/2012 | Kekki |
| 8,290,603 | B1 | 10/2012 | Lambourne et al. |
| 8,300,845 | B2 | 10/2012 | Zurek et al. |
| 8,311,226 | B2 | 11/2012 | Lorgeoux et al. |
| 8,315,555 | B2 | 11/2012 | Ko et al. |
| 8,316,147 | B2 | 11/2012 | Batson et al. |
| 8,325,931 | B2 | 12/2012 | Howard et al. |
| 8,326,951 | B1 | 12/2012 | Millington et al. |
| 8,340,330 | B2 | 12/2012 | Yoon et al. |
| 8,345,709 | B2 | 1/2013 | Nitzpon et al. |
| 8,364,295 | B2 | 1/2013 | Beckmann et al. |
| 8,370,678 | B2 | 2/2013 | Millington et al. |
| 8,374,595 | B2 | 2/2013 | Chien et al. |
| 8,407,623 | B2 | 3/2013 | Kerr et al. |
| 8,411,883 | B2 | 4/2013 | Matsumoto |
| 8,423,659 | B2 | 4/2013 | Millington |
| 8,423,893 | B2 | 4/2013 | Ramsay et al. |
| 8,432,851 | B2 | 4/2013 | Xu et al. |
| 8,433,076 | B2 | 4/2013 | Zurek et al. |
| 8,442,239 | B2 | 5/2013 | Bruelle-Drews et al. |
| 8,457,334 | B2 | 6/2013 | Yoon et al. |
| 8,463,184 | B2 | 6/2013 | Dua |
| 8,463,875 | B2 | 6/2013 | Katz et al. |
| 8,473,844 | B2 | 6/2013 | Kreifeldt et al. |
| 8,477,958 | B2 | 7/2013 | Moeller et al. |
| 8,483,853 | B1 | 7/2013 | Lambourne et al. |
| 8,509,211 | B2 | 8/2013 | Trotter et al. |
| 8,520,870 | B2 | 8/2013 | Sato et al. |
| 8,565,455 | B2 | 10/2013 | Worrell et al. |
| 8,577,048 | B2 | 11/2013 | Chaikin et al. |
| 8,588,949 | B2 | 11/2013 | Lambourne et al. |
| 8,600,084 | B2 | 12/2013 | Garrett |
| 8,601,394 | B2 | 12/2013 | Sheehan et al. |
| 8,611,559 | B2 | 12/2013 | Sanders |
| 8,615,091 | B2 | 12/2013 | Terwal |
| 8,639,830 | B2 | 1/2014 | Bowman |
| 8,654,995 | B2 | 2/2014 | Silber et al. |
| 8,672,744 | B2 | 3/2014 | Gronkowski et al. |
| 8,683,009 | B2 | 3/2014 | Ng et al. |
| 8,688,431 | B2 | 4/2014 | Lyons et al. |
| 8,731,206 | B1 | 5/2014 | Park |
| 8,750,282 | B2 | 6/2014 | Gelter et al. |
| 8,751,026 | B2 | 6/2014 | Sato et al. |
| 8,762,565 | B2 | 6/2014 | Togashi et al. |
| 8,775,546 | B2 | 7/2014 | Millington |
| 8,818,538 | B2 | 8/2014 | Sakata |
| 8,819,554 | B2 | 8/2014 | Basso et al. |
| 8,831,761 | B2 | 9/2014 | Kemp et al. |
| 8,843,586 | B2 | 9/2014 | Pantos et al. |
| 8,861,739 | B2 | 10/2014 | Ojanpera |
| 8,868,698 | B2 | 10/2014 | Millington et al. |
| 8,885,851 | B2 | 11/2014 | Westenbroek |
| 8,904,066 | B2 | 12/2014 | Moore et al. |
| 8,917,877 | B2 | 12/2014 | Haaff et al. |
| 8,930,006 | B2 | 1/2015 | Haatainen |
| 8,934,647 | B2 | 1/2015 | Joyce et al. |
| 8,934,655 | B2 | 1/2015 | Breen et al. |
| 8,942,252 | B2 | 1/2015 | Balassanian et al. |
| 8,942,395 | B2 | 1/2015 | Lissaman et al. |
| 8,954,177 | B2 | 2/2015 | Sanders |
| 8,965,544 | B2 | 2/2015 | Ramsay |
| 8,966,394 | B2 | 2/2015 | Gates et al. |
| 9,042,556 | B2 | 5/2015 | Kallai et al. |

## US 10,541,883 B2

Page 6

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,130,770 | B2 | 9/2015 | Millington et al. |
| 9,137,602 | B2 | 9/2015 | Mayman et al. |
| 9,160,965 | B2 | 10/2015 | Redmann et al. |
| 9,195,258 | B2 | 11/2015 | Millington |
| 9,456,243 | B1 | 9/2016 | Hughes et al. |
| 9,507,780 | B2 | 11/2016 | Rothkopf et al. |
| 2001/0001160 | A1 | 5/2001 | Shoff et al. |
| 2001/0009604 | A1 | 7/2001 | Ando et al. |
| 2001/0022823 | A1 | 9/2001 | Renaud |
| 2001/0027498 | A1 | 10/2001 | Van De Meulenhof et al. |
| 2001/0032188 | A1 | 10/2001 | Miyabe et al. |
| 2001/0042107 | A1 | 11/2001 | Palm |
| 2001/0043456 | A1 | 11/2001 | Atkinson |
| 2001/0046235 | A1 | 11/2001 | Trevitt et al. |
| 2001/0047377 | A1 | 11/2001 | Sincaglia et al. |
| 2001/0050991 | A1 | 12/2001 | Eves |
| 2002/0002039 | A1 | 1/2002 | Qureshey et al. |
| 2002/0002562 | A1 | 1/2002 | Moran et al. |
| 2002/0002565 | A1 | 1/2002 | Ohyama |
| 2002/0003548 | A1 | 1/2002 | Krusche et al. |
| 2002/0015003 | A1 | 2/2002 | Kato et al. |
| 2002/0022453 | A1 | 2/2002 | Balog et al. |
| 2002/0026442 | A1 | 2/2002 | Lipscomb et al. |
| 2002/0034374 | A1 | 3/2002 | Barton |
| 2002/0035621 | A1 | 3/2002 | Zintel et al. |
| 2002/0042844 | A1 | 4/2002 | Chiazzese |
| 2002/0049843 | A1 | 4/2002 | Barone et al. |
| 2002/0062406 | A1 | 5/2002 | Chang et al. |
| 2002/0065926 | A1 | 5/2002 | Hackney et al. |
| 2002/0067909 | A1 | 6/2002 | Iivonen |
| 2002/0072816 | A1 | 6/2002 | Shdema et al. |
| 2002/0072817 | A1 | 6/2002 | Champion |
| 2002/0073228 | A1 | 6/2002 | Cognet et al. |
| 2002/0078293 | A1 | 6/2002 | Kou et al. |
| 2002/0080783 | A1 | 6/2002 | Fujimori et al. |
| 2002/0090914 | A1 | 7/2002 | Kang et al. |
| 2002/0093478 | A1 | 7/2002 | Yeh |
| 2002/0095460 | A1 | 7/2002 | Benson |
| 2002/0098878 | A1 | 7/2002 | Mooney et al. |
| 2002/0101357 | A1 | 8/2002 | Gharapetian |
| 2002/0103635 | A1 | 8/2002 | Mesarovic et al. |
| 2002/0109710 | A1 | 8/2002 | Holtz et al. |
| 2002/0112244 | A1 | 8/2002 | Liou et al. |
| 2002/0114354 | A1 | 8/2002 | Sinha et al. |
| 2002/0114359 | A1 | 8/2002 | Ibaraki et al. |
| 2002/0124097 | A1* | 9/2002 | Isely ...................... H04M 60/95 709/231 |
| 2002/0124182 | A1 | 9/2002 | Bacso et al. |
| 2002/0129156 | A1 | 9/2002 | Yoshikawa |
| 2002/0131398 | A1 | 9/2002 | Taylor |
| 2002/0131761 | A1 | 9/2002 | Kawasaki et al. |
| 2002/0136335 | A1 | 9/2002 | Liou et al. |
| 2002/0137505 | A1 | 9/2002 | Eiche et al. |
| 2002/0143998 | A1 | 10/2002 | Rajagopal et al. |
| 2002/0150053 | A1 | 10/2002 | Gray et al. |
| 2002/0159596 | A1 | 10/2002 | Durand et al. |
| 2002/0161865 | A1 | 10/2002 | Nguyen |
| 2002/0163361 | A1 | 11/2002 | Parkin |
| 2002/0165721 | A1 | 11/2002 | Chang et al. |
| 2002/0165921 | A1 | 11/2002 | Sapieyevski |
| 2002/0168938 | A1 | 11/2002 | Chang |
| 2002/0173273 | A1 | 11/2002 | Spurgat et al. |
| 2002/0177411 | A1 | 11/2002 | Yajima et al. |
| 2002/0181355 | A1 | 12/2002 | Shikunami et al. |
| 2002/0184310 | A1 | 12/2002 | Traversat et al. |
| 2002/0188762 | A1 | 12/2002 | Tomassetti et al. |
| 2002/0194260 | A1 | 12/2002 | Headley et al. |
| 2002/0194309 | A1 | 12/2002 | Carter et al. |
| 2003/0002609 | A1 | 1/2003 | Faller et al. |
| 2003/0008616 | A1 | 1/2003 | Anderson |
| 2003/0014486 | A1 | 1/2003 | May |
| 2003/0018797 | A1 | 1/2003 | Dunning et al. |
| 2003/0020763 | A1 | 1/2003 | Mayer et al. |
| 2003/0023741 | A1 | 1/2003 | Tomassetti et al. |
| 2003/0035072 | A1 | 2/2003 | Hagg |
| 2003/0035444 | A1 | 2/2003 | Zwack |
| 2003/0041173 | A1 | 2/2003 | Hoyle |
| 2003/0041174 | A1 | 2/2003 | Wen et al. |
| 2003/0043856 | A1 | 3/2003 | Lakaniemi et al. |
| 2003/0043924 | A1 | 3/2003 | Haddad et al. |
| 2003/0050058 | A1 | 3/2003 | Walsh et al. |
| 2003/0055892 | A1 | 3/2003 | Huitema et al. |
| 2003/0061428 | A1 | 3/2003 | Garney et al. |
| 2003/0063528 | A1 | 4/2003 | Ogikubo |
| 2003/0063755 | A1 | 4/2003 | Nourse et al. |
| 2003/0066094 | A1 | 4/2003 | Van Der Schaar et al. |
| 2003/0067437 | A1 | 4/2003 | McClintock et al. |
| 2003/0073432 | A1 | 4/2003 | Meade |
| 2003/0097478 | A1 | 5/2003 | King |
| 2003/0099212 | A1 | 5/2003 | Anjum et al. |
| 2003/0099221 | A1 | 5/2003 | Rhee |
| 2003/0101253 | A1 | 5/2003 | Saito et al. |
| 2003/0103088 | A1 | 6/2003 | Dresti et al. |
| 2003/0109270 | A1 | 6/2003 | Shorty |
| 2003/0110329 | A1 | 6/2003 | Higaki et al. |
| 2003/0123853 | A1 | 7/2003 | Iwahara et al. |
| 2003/0126211 | A1 | 7/2003 | Anttila et al. |
| 2003/0135822 | A1 | 7/2003 | Evans |
| 2003/0157591 | A1 | 8/2003 | Hasty |
| 2003/0167335 | A1 | 9/2003 | Alexander |
| 2003/0172123 | A1 | 9/2003 | Polan et al. |
| 2003/0179780 | A1 | 9/2003 | Walker et al. |
| 2003/0182254 | A1 | 9/2003 | Plastina et al. |
| 2003/0185400 | A1 | 10/2003 | Yoshizawa et al. |
| 2003/0187657 | A1 | 10/2003 | Erhart et al. |
| 2003/0195964 | A1 | 10/2003 | Mane |
| 2003/0198254 | A1 | 10/2003 | Sullivan et al. |
| 2003/0198255 | A1 | 10/2003 | Sullivan et al. |
| 2003/0198257 | A1 | 10/2003 | Sullivan et al. |
| 2003/0200001 | A1 | 10/2003 | Goddard et al. |
| 2003/0204273 | A1 | 10/2003 | Dinker et al. |
| 2003/0204509 | A1 | 10/2003 | Dinker et al. |
| 2003/0210796 | A1 | 11/2003 | McCarty et al. |
| 2003/0212802 | A1 | 11/2003 | Rector et al. |
| 2003/0219007 | A1 | 11/2003 | Barrack et al. |
| 2003/0227478 | A1 | 12/2003 | Chatfield |
| 2003/0229900 | A1 | 12/2003 | Reisman |
| 2003/0231208 | A1 | 12/2003 | Hanon et al. |
| 2003/0231871 | A1 | 12/2003 | Ushimaru |
| 2003/0235304 | A1 | 12/2003 | Evans et al. |
| 2004/0001106 | A1 | 1/2004 | Deutscher et al. |
| 2004/0001484 | A1 | 1/2004 | Ozguner |
| 2004/0001591 | A1 | 1/2004 | Deguchi |
| 2004/0002938 | A1 | 1/2004 | Deguchi |
| 2004/0008852 | A1 | 1/2004 | Also et al. |
| 2004/0010727 | A1 | 1/2004 | Fujinami |
| 2004/0012620 | A1 | 1/2004 | Buhler et al. |
| 2004/0014426 | A1 | 1/2004 | Moore |
| 2004/0015252 | A1 | 1/2004 | Aiso et al. |
| 2004/0019497 | A1 | 1/2004 | Volk et al. |
| 2004/0019807 | A1 | 1/2004 | Freund et al. |
| 2004/0019911 | A1 | 1/2004 | Gates et al. |
| 2004/0023697 | A1 | 2/2004 | Komura |
| 2004/0024478 | A1 | 2/2004 | Hans et al. |
| 2004/0024925 | A1 | 2/2004 | Cypher et al. |
| 2004/0027166 | A1 | 2/2004 | Mangum et al. |
| 2004/0032348 | A1 | 2/2004 | Lai et al. |
| 2004/0032421 | A1 | 2/2004 | Williamson et al. |
| 2004/0037433 | A1 | 2/2004 | Chen |
| 2004/0041836 | A1 | 3/2004 | Zaner et al. |
| 2004/0042629 | A1 | 3/2004 | Mellone et al. |
| 2004/0044742 | A1 | 3/2004 | Evron et al. |
| 2004/0048569 | A1 | 3/2004 | Kawamura |
| 2004/0059842 | A1 | 3/2004 | Hanson et al. |
| 2004/0059965 | A1 | 3/2004 | Marshall et al. |
| 2004/0066736 | A1 | 4/2004 | Kroeger |
| 2004/0075767 | A1 | 4/2004 | Neuman et al. |
| 2004/0078383 | A1 | 4/2004 | Mercer et al. |
| 2004/0080671 | A1 | 4/2004 | Siemens et al. |
| 2004/0093096 | A1 | 5/2004 | Huang et al. |
| 2004/0098754 | A1 | 5/2004 | Vella et al. |
| 2004/0111473 | A1 | 6/2004 | Lysenko et al. |
| 2004/0117462 | A1 | 6/2004 | Bodin et al. |
| 2004/0117491 | A1 | 6/2004 | Karaoguz et al. |

**US 10,541,883 B2**

Page 7

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2004/0117840 | A1 | 6/2004 | Boudreau et al. |
| 2004/0117858 | A1 | 6/2004 | Boudreau et al. |
| 2004/0128701 | A1 | 7/2004 | Kaneko et al. |
| 2004/0131192 | A1 | 7/2004 | Metcalf |
| 2004/0133689 | A1* | 7/2004 | Vasisht ............. H04L 29/12216 |
| | | | 709/228 |
| 2004/0143368 | A1 | 7/2004 | May et al. |
| 2004/0143852 | A1 | 7/2004 | Meyers |
| 2004/0148237 | A1 | 7/2004 | Bittmann et al. |
| 2004/0168081 | A1* | 8/2004 | Ladas ................. H04L 63/0428 |
| | | | 726/8 |
| 2004/0170383 | A1 | 9/2004 | Mazur |
| 2004/0171346 | A1 | 9/2004 | Lin |
| 2004/0177167 | A1 | 9/2004 | Iwamura et al. |
| 2004/0179554 | A1 | 9/2004 | Tsao |
| 2004/0183827 | A1 | 9/2004 | Putterman et al. |
| 2004/0185773 | A1 | 9/2004 | Gerber et al. |
| 2004/0203378 | A1 | 10/2004 | Powers |
| 2004/0203590 | A1 | 10/2004 | Shteyn |
| 2004/0208158 | A1 | 10/2004 | Fellman et al. |
| 2004/0213230 | A1 | 10/2004 | Douskalis et al. |
| 2004/0223622 | A1 | 11/2004 | Lindemann et al. |
| 2004/0224638 | A1 | 11/2004 | Fadell et al. |
| 2004/0228367 | A1 | 11/2004 | Mosig et al. |
| 2004/0248601 | A1 | 12/2004 | Chang |
| 2004/0249490 | A1 | 12/2004 | Sakai |
| 2004/0249965 | A1 | 12/2004 | Huggins et al. |
| 2004/0249982 | A1 | 12/2004 | Arnold et al. |
| 2004/0252400 | A1 | 12/2004 | Blank et al. |
| 2004/0253969 | A1 | 12/2004 | Nguyen et al. |
| 2005/0010691 | A1 | 1/2005 | Oyadomari et al. |
| 2005/0011388 | A1 | 1/2005 | Kouznetsov |
| 2005/0013394 | A1 | 1/2005 | Rausch et al. |
| 2005/0015551 | A1 | 1/2005 | Eames et al. |
| 2005/0021590 | A1 | 1/2005 | Debique et al. |
| 2005/0027821 | A1 | 2/2005 | Alexander et al. |
| 2005/0047605 | A1 | 3/2005 | Lee et al. |
| 2005/0058149 | A1 | 3/2005 | Howe |
| 2005/0060435 | A1 | 3/2005 | Xue et al. |
| 2005/0062637 | A1 | 3/2005 | El Zabadani et al. |
| 2005/0081213 | A1 | 4/2005 | Suzuoki et al. |
| 2005/0105052 | A1 | 5/2005 | McCormick et al. |
| 2005/0114538 | A1 | 5/2005 | Rose |
| 2005/0120128 | A1 | 6/2005 | Willes et al. |
| 2005/0125222 | A1 | 6/2005 | Brown et al. |
| 2005/0125357 | A1 | 6/2005 | Saadat et al. |
| 2005/0131558 | A1 | 6/2005 | Braithwaite et al. |
| 2005/0154766 | A1 | 7/2005 | Huang et al. |
| 2005/0159833 | A1 | 7/2005 | Giaimo et al. |
| 2005/0160270 | A1 | 7/2005 | Goldberg et al. |
| 2005/0166115 | A1 | 7/2005 | Burke et al. |
| 2005/0168630 | A1 | 8/2005 | Yamada et al. |
| 2005/0170781 | A1 | 8/2005 | Jacobsen et al. |
| 2005/0177643 | A1 | 8/2005 | Xu |
| 2005/0181348 | A1 | 8/2005 | Carey et al. |
| 2005/0195205 | A1 | 9/2005 | Abrams, Jr. |
| 2005/0195823 | A1 | 9/2005 | Chen et al. |
| 2005/0197725 | A1 | 9/2005 | Alexander et al. |
| 2005/0198221 | A1 | 9/2005 | Manchester et al. |
| 2005/0198574 | A1 | 9/2005 | Lamkin et al. |
| 2005/0201549 | A1 | 9/2005 | Dedieu et al. |
| 2005/0215265 | A1 | 9/2005 | Sharma |
| 2005/0216556 | A1 | 9/2005 | Manion et al. |
| 2005/0239445 | A1 | 10/2005 | Karaoguz et al. |
| 2005/0246421 | A1 | 11/2005 | Moore et al. |
| 2005/0262269 | A1 | 11/2005 | Nonaka et al. |
| 2005/0281255 | A1 | 12/2005 | Davies et al. |
| 2005/0283820 | A1 | 12/2005 | Richards et al. |
| 2005/0288805 | A1 | 12/2005 | Moore et al. |
| 2005/0289224 | A1 | 12/2005 | Deslippe et al. |
| 2006/0041639 | A1 | 2/2006 | Lamkin et al. |
| 2006/0072489 | A1 | 4/2006 | Toyoshima |
| 2006/0095516 | A1 | 5/2006 | Wijeratne |
| 2006/0098936 | A1 | 5/2006 | Ikeda et al. |
| 2006/0119497 | A1 | 6/2006 | Miller et al. |
| 2006/0142034 | A1 | 6/2006 | Wentink et al. |
| 2006/0143236 | A1 | 6/2006 | Wu |
| 2006/0155721 | A1 | 7/2006 | Grunwald et al. |
| 2006/0161635 | A1 | 7/2006 | Lamkin et al. |
| 2006/0161742 | A1 | 7/2006 | Sugimoto et al. |
| 2006/0173844 | A1 | 8/2006 | Zhang et al. |
| 2006/0173976 | A1 | 8/2006 | Vincent et al. |
| 2006/0193454 | A1 | 8/2006 | Abou-Chakra et al. |
| 2006/0222186 | A1 | 10/2006 | Paige et al. |
| 2006/0227985 | A1 | 10/2006 | Kawanami |
| 2006/0259649 | A1 | 11/2006 | Hsieh et al. |
| 2006/0270395 | A1 | 11/2006 | Dhawan et al. |
| 2007/0003067 | A1 | 1/2007 | Gierl et al. |
| 2007/0022156 | A1 | 1/2007 | Grubbs |
| 2007/0022207 | A1 | 1/2007 | Millington et al. |
| 2007/0038999 | A1 | 2/2007 | Millington et al. |
| 2007/0043847 | A1 | 2/2007 | Carter et al. |
| 2007/0047712 | A1 | 3/2007 | Gross et al. |
| 2007/0048713 | A1 | 3/2007 | Plastina et al. |
| 2007/0054680 | A1 | 3/2007 | Mo et al. |
| 2007/0087686 | A1 | 4/2007 | Holm et al. |
| 2007/0142022 | A1 | 6/2007 | Madonna et al. |
| 2007/0142944 | A1 | 6/2007 | Goldberg et al. |
| 2007/0143493 | A1 | 6/2007 | Mullig et al. |
| 2007/0169115 | A1 | 7/2007 | Ko et al. |
| 2007/0180137 | A1 | 8/2007 | Rajapakse |
| 2007/0192156 | A1 | 8/2007 | Gauger |
| 2007/0220150 | A1 | 9/2007 | Garg |
| 2007/0249295 | A1 | 10/2007 | Ukita et al. |
| 2007/0265031 | A1 | 11/2007 | Koizumi et al. |
| 2007/0271388 | A1 | 11/2007 | Bowra et al. |
| 2007/0299778 | A1 | 12/2007 | Haveson et al. |
| 2008/0002836 | A1 | 1/2008 | Moeller et al. |
| 2008/0007649 | A1 | 1/2008 | Bennett |
| 2008/0007650 | A1 | 1/2008 | Bennett |
| 2008/0007651 | A1 | 1/2008 | Bennett |
| 2008/0018785 | A1 | 1/2008 | Bennett |
| 2008/0022320 | A1 | 1/2008 | Ver Steeg |
| 2008/0025535 | A1 | 1/2008 | Rajapakse |
| 2008/0072816 | A1 | 3/2008 | Riess et al. |
| 2008/0075295 | A1 | 3/2008 | Mayman et al. |
| 2008/0077261 | A1 | 3/2008 | Gilley et al. |
| 2008/0077620 | A1 | 3/2008 | Gilley et al. |
| 2008/0086318 | A1 | 4/2008 | Gilley et al. |
| 2008/0091771 | A1 | 4/2008 | Allen et al. |
| 2008/0109852 | A1 | 5/2008 | Kretz et al. |
| 2008/0120429 | A1 | 5/2008 | Millington et al. |
| 2008/0126943 | A1 | 5/2008 | Parasnis et al. |
| 2008/0144861 | A1 | 6/2008 | Melanson et al. |
| 2008/0144864 | A1 | 6/2008 | Huon et al. |
| 2008/0146289 | A1 | 6/2008 | Korneluk et al. |
| 2008/0189272 | A1 | 8/2008 | Powers et al. |
| 2008/0205070 | A1 | 8/2008 | Osada |
| 2008/0212786 | A1 | 9/2008 | Park |
| 2008/0215169 | A1 | 9/2008 | Debettencourt et al. |
| 2008/0263010 | A1 | 10/2008 | Roychoudhuri et al. |
| 2008/0303947 | A1 | 12/2008 | Ohnishi et al. |
| 2009/0011798 | A1 | 1/2009 | Yamada |
| 2009/0017868 | A1 | 1/2009 | Ueda et al. |
| 2009/0031336 | A1 | 1/2009 | Chavez et al. |
| 2009/0070434 | A1 | 3/2009 | Himmelstein |
| 2009/0089327 | A1 | 4/2009 | Kalaboukis et al. |
| 2009/0100189 | A1 | 4/2009 | Bahren et al. |
| 2009/0124289 | A1 | 5/2009 | Nishida |
| 2009/0157905 | A1 | 6/2009 | Davis |
| 2009/0164655 | A1 | 6/2009 | Pettersson et al. |
| 2009/0193345 | A1 | 7/2009 | Wensley et al. |
| 2009/0222115 | A1 | 9/2009 | Malcolm et al. |
| 2009/0228919 | A1 | 9/2009 | Zott et al. |
| 2009/0251604 | A1 | 10/2009 | Iyer |
| 2010/0004983 | A1 | 1/2010 | Dickerson et al. |
| 2010/0031366 | A1 | 2/2010 | Knight et al. |
| 2010/0049835 | A1 | 2/2010 | Ko et al. |
| 2010/0087089 | A1 | 4/2010 | Struthers et al. |
| 2010/0228740 | A1 | 9/2010 | Cannistraro et al. |
| 2010/0284380 | A1 | 11/2010 | Ramsay et al. |
| 2010/0299639 | A1 | 11/2010 | Ramsay et al. |
| 2011/0001632 | A1 | 1/2011 | Hohorst |
| 2011/0002487 | A1 | 1/2011 | Panther et al. |

## US 10,541,883 B2
Page 8

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2011/0066943 A1 | 3/2011 | Brillon et al. |
| 2011/0228944 A1 | 9/2011 | Croghan et al. |
| 2011/0316768 A1 | 12/2011 | McRae |
| 2012/0029671 A1 | 2/2012 | Millington et al. |
| 2012/0030366 A1 | 2/2012 | Collart et al. |
| 2012/0051567 A1 | 3/2012 | Castor-Perry |
| 2012/0060046 A1 | 3/2012 | Millington |
| 2012/0129446 A1 | 5/2012 | Ko et al. |
| 2012/0148075 A1 | 6/2012 | Goh et al. |
| 2012/0185771 A1 | 7/2012 | Rothkopf et al. |
| 2012/0192071 A1 | 7/2012 | Millington |
| 2012/0207290 A1 | 8/2012 | Moyers et al. |
| 2012/0237054 A1 | 9/2012 | Eo et al. |
| 2012/0281058 A1 | 11/2012 | Laney et al. |
| 2012/0290621 A1 | 11/2012 | Heitz, III et al. |
| 2013/0013757 A1 | 1/2013 | Millington et al. |
| 2013/0018960 A1 | 1/2013 | Knysz et al. |
| 2013/0031475 A1 | 1/2013 | Maor et al. |
| 2013/0038726 A1 | 2/2013 | Kim |
| 2013/0041954 A1 | 2/2013 | Kim et al. |
| 2013/0047084 A1 | 2/2013 | Sanders et al. |
| 2013/0052940 A1 | 2/2013 | Brillhart et al. |
| 2013/0070093 A1 | 3/2013 | Rivera |
| 2013/0080599 A1 | 3/2013 | Ko et al. |
| 2013/0094670 A1 | 4/2013 | Millington |
| 2013/0121492 A1 | 5/2013 | Vacon et al. |
| 2013/0124664 A1 | 5/2013 | Fonseca, Jr. et al. |
| 2013/0129122 A1 | 5/2013 | Johnson et al. |
| 2013/0132837 A1 | 5/2013 | Mead et al. |
| 2013/0159126 A1 | 6/2013 | Elkady |
| 2013/0167029 A1 | 6/2013 | Friesen et al. |
| 2013/0174100 A1 | 7/2013 | Seymour et al. |
| 2013/0174223 A1 | 7/2013 | Dykeman et al. |
| 2013/0179163 A1 | 7/2013 | Herbig et al. |
| 2013/0191454 A1 | 7/2013 | Oliver et al. |
| 2013/0197682 A1 | 8/2013 | Millington |
| 2013/0208911 A1 | 8/2013 | Millington |
| 2013/0208921 A1 | 8/2013 | Millington |
| 2013/0226323 A1 | 8/2013 | Millington |
| 2013/0230175 A1 | 9/2013 | Bech et al. |
| 2013/0232416 A1 | 9/2013 | Millington |
| 2013/0253934 A1 | 9/2013 | Parekh et al. |
| 2013/0279706 A1 | 10/2013 | Marti et al. |
| 2013/0287186 A1 | 10/2013 | Quady |
| 2013/0290504 A1 | 10/2013 | Quady |
| 2014/0006483 A1 | 1/2014 | Garmark et al. |
| 2014/0037097 A1 | 2/2014 | Labosco |
| 2014/0064501 A1 | 3/2014 | Olsen et al. |
| 2014/0075308 A1 | 3/2014 | Sanders et al. |
| 2014/0075311 A1 | 3/2014 | Boettcher et al. |
| 2014/0079242 A1 | 3/2014 | Nguyen et al. |
| 2014/0108929 A1 | 4/2014 | Garmark et al. |
| 2014/0123005 A1 | 5/2014 | Forstall et al. |
| 2014/0140530 A1 | 5/2014 | Gomes-Casseres et al. |
| 2014/0161265 A1 | 6/2014 | Chaikin et al. |
| 2014/0181815 A1 | 6/2014 | Millington et al. |
| 2014/0233755 A1 | 8/2014 | Kim et al. |
| 2014/0242913 A1 | 8/2014 | Pang |
| 2014/0256260 A1 | 9/2014 | Ueda et al. |
| 2014/0267148 A1 | 9/2014 | Luna et al. |
| 2014/0270202 A1 | 9/2014 | Ivanov et al. |
| 2014/0273859 A1 | 9/2014 | Luna et al. |
| 2014/0279889 A1 | 9/2014 | Luna et al. |
| 2014/0285313 A1 | 9/2014 | Luna et al. |
| 2014/0286496 A1 | 9/2014 | Luna et al. |
| 2014/0298174 A1 | 10/2014 | Ikonomov |
| 2014/0323036 A1 | 10/2014 | Daley et al. |
| 2014/0344689 A1 | 11/2014 | Scott et al. |
| 2014/0378056 A1 | 12/2014 | Liu et al. |
| 2015/0019670 A1 | 1/2015 | Redmann |
| 2015/0026613 A1 | 1/2015 | Kwon et al. |
| 2015/0032844 A1 | 1/2015 | Tarr et al. |
| 2015/0043736 A1 | 2/2015 | Olsen et al. |
| 2015/0049248 A1 | 2/2015 | Wang et al. |
| 2015/0074527 A1 | 3/2015 | Sevigny et al. |

| | | |
|---|---|---|
| 2015/0074528 A1 | 3/2015 | Sakalowsky et al. |
| 2015/0098576 A1 | 4/2015 | Sundaresan et al. |
| 2015/0139210 A1 | 5/2015 | Marin et al. |
| 2015/0256954 A1 | 9/2015 | Carlsson et al. |
| 2015/0304288 A1 | 10/2015 | Balasaygun et al. |
| 2015/0365987 A1 | 12/2015 | Weel |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1598767 A | 3/2005 |
| CN | 101292500 A | 10/2008 |
| EP | 0251584 A2 | 1/1988 |
| EP | 0672985 A1 | 9/1995 |
| EP | 0772374 A2 | 5/1997 |
| EP | 1111527 A2 | 6/2001 |
| EP | 1122931 A2 | 8/2001 |
| EP | 1312188 A1 | 5/2003 |
| EP | 1389853 A1 | 2/2004 |
| EP | 2713281 | 4/2004 |
| EP | 1517464 A2 | 3/2005 |
| EP | 0895427 A3 | 1/2006 |
| EP | 1416687 B1 | 8/2006 |
| EP | 1410686 | 3/2008 |
| EP | 2043381 A2 | 4/2009 |
| EP | 2161950 A2 | 3/2010 |
| EP | 0742674 B1 | 4/2014 |
| EP | 2591617 B1 | 6/2014 |
| GB | 2284327 A | 5/1995 |
| GB | 2338374 | 12/1999 |
| GB | 2379533 A | 3/2003 |
| GB | 2486183 | 6/2012 |
| JP | 63269633 | 11/1988 |
| JP | 07-210129 | 8/1995 |
| JP | 2000149391 A | 5/2000 |
| JP | 2001034951 | 2/2001 |
| JP | 2002111817 | 4/2002 |
| JP | 2002123267 A | 4/2002 |
| JP | 2002358241 A | 12/2002 |
| JP | 2003037585 | 2/2003 |
| JP | 2003506765 A | 2/2003 |
| JP | 2003101958 | 4/2003 |
| JP | 2003169089 A | 6/2003 |
| JP | 2005108427 | 4/2005 |
| JP | 2005136457 | 5/2005 |
| JP | 2007241652 A | 9/2007 |
| JP | 2009506603 A | 2/2009 |
| JP | 2009075540 A | 4/2009 |
| JP | 2009135750 | 6/2009 |
| JP | 2009535708 | 10/2009 |
| JP | 2009538006 A | 10/2009 |
| JP | 2011130496 | 6/2011 |
| TW | 439027 | 6/2001 |
| WO | 199525313 | 9/1995 |
| WO | 9709756 A2 | 3/1997 |
| WO | 1999023560 | 5/1999 |
| WO | 199961985 | 12/1999 |
| WO | 0019803 A1 | 4/2000 |
| WO | 0110125 A1 | 2/2001 |
| WO | 200153994 | 7/2001 |
| WO | 0237217 A2 | 5/2002 |
| WO | 02073851 | 9/2002 |
| WO | 03093950 A2 | 11/2003 |
| WO | 2003093950 A2 | 11/2003 |
| WO | 2005013047 A2 | 2/2005 |
| WO | 2007023120 A1 | 3/2007 |
| WO | 2007127485 | 11/2007 |
| WO | 2007131555 | 11/2007 |
| WO | 2007135581 A2 | 11/2007 |
| WO | 2008082350 A1 | 7/2008 |
| WO | 2008114389 A1 | 9/2008 |
| WO | 2012050927 | 4/2012 |
| WO | 2014004182 | 1/2014 |
| WO | 2014149533 A2 | 9/2014 |

OTHER PUBLICATIONS

Final Office Action dated Jul. 13, 2009, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 16 pages.

## US 10,541,883 B2

Page 9

(56)        **References Cited**

OTHER PUBLICATIONS

Final Office Action dated Sep. 13, 2012, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 17 pages.
Final Office Action dated Nov. 18, 2015, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 56 pages.
Final Office Action dated Oct. 21, 2011, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 19 pages.
Final Office Action dated Mar. 27, 2014, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 29 pages.
Final Office Action dated Jan. 28, 2011, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 21 pages.
Final Office Action dated Jun. 30, 2008, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 30 pages.
Final Office Action dated Jun. 2, 2017, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 32 pages.
Final Office Action dated Aug. 3, 2015, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 13 pages.
Fout, Tom, "Universal Plug and Play (UPnP) Client Support," Microsoft, Aug. 2001, 18 pages.
Fries et al. "The MP3 and Internet Audio Handbook: Your Guide to the Digital Music Revolution." 2000, 320 pages.
Fulton et al., "The Network Audio System: Make Your Application Sing (as Well as Dance)!" The X Resource, 1994, 14 pages.
Gaston et al., "Methods for Sharing Stereo and Multichannel Recordings Among Planetariums," Audio Engineering Society Convention Paper 7474, 2008, 15 pages.
General Event Notification Architecture Base: Client to Arbiter (Apr. 2000) (23 pages).
Hans et al., "Interacting with Audio Streams for Entertainment and Communication," Proceedings of the Eleventh ACM International Conference on Multimedia, ACM, 2003, 7 pages.
Herre et al., "The Reference Model Architecture for MPEG Spatial Audio Coding," Audio Engineering Society Convention Paper (Presented at the 118th Convention), May 28-31, 2005, 13 pages.
Home Networking with Universal Plug and Play, IEEE Communications Magazine, vol. 39 No. 12 (Dec. 2001) (D+M_0402025-40) (16 pages).
"Home Theater Control Systems," Cinema Source, 2002, 19 pages.
Horwitz, Jeremy, "Logic3 i-Station25," retrieved from the internet: http://www.ilounge.com/index.php/reviews/entry/logic3-i-station25/, last visited Dec. 17, 2013, 5 pages.
Huang C.M., et al., "A Synchronization Infrastructure for Multicast Multimedia at the Presentation Layer," IEEE Transactions on Consumer Electronics, 1997, pp. 370-380, vol. 43, No. 3.
IBM Home Director Installation and Service Manual, Copyright1998, 124 pages.
IBM Home Director Owner's Manual, Copyright 1999, 67 pages.
*Implicit, LLC* v. *Sonos, Inc.* (No. 14-1330-RGA), Defendant's Original Complaint (Mar. 3, 2017) (15 pages).
Integra Audio Network Receiver NAC 2.3 Instruction Manual, 68 pages.
Integra Audio Network Server NAS 2.3 Instruction Manual, pp. 1-32.
Integra Service Manual, Audio Network Receiver Model NAC-2.3, Dec. 2002, 44 pages.
Intel Designing a UPnP AV Media Renderer, v. 1.0 ("Intel AV Media Renderer") (May 20, 2003) (SONDM000115117-62) (46 pages).
Intel Media Renderer Device Interface ("Intel Media Renderer") (Sep. 6, 2002) (62 pages).
Intel SDK for UPnP Devices Programming Guide, Version 1.2.1, (Nov. 2002) (30 pages).
International Bureau, International Preliminary Report on Patentability dated Jan. 8, 2015, issued in connection with International Application No. PCT/US2013/046372, filed on Jun. 18, 2013, 6 pages.
International Bureau, International Preliminary Report on Patentability, dated Jan. 8, 2015, issued in connection with International Application No. PCT/US2013/046386, filed on Jun. 18, 2013, 8 pages.

International Bureau, International Preliminary Report on Patentability dated Jan. 30, 2014, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 6 pages.
International Searching Authority, International Search Report dated Aug. 1, 2008, in connection with International Application No. PCT/US2004/023102, 5 pages.
International Searching Authority, International Search Report dated Aug. 26, 2013, issued in connection with International Application No. PCT/US2013/046372, filed on Jun. 18, 2013, 3 pages.
International Searching Authority, International Search Report dated Dec. 26, 2012, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 3 pages.
International Searching Authority, International Search Report dated Sep. 30, 2013, issued in connection with International Application No. PCT/US2013/046386, filed on Jun. 18, 2013, 3 pages.
International Searching Authority, Written Opinion dated Aug. 26, 2013, issued in connection with International Application No. PCT/US2013/046372, filed on Jun. 18, 2013, 4 pages.
International Searching Authority, Written Opinion dated Dec. 26, 2012, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 4 pages.
International Searching Authority, Written Opinion dated Sep. 30, 2013, issued in connection with International Application No. PCT/US2013/046386, filed on Jun. 18, 2013, 6 pages.
Ishibashi et al., "A Comparison of Media Synchronization Quality Among Reactive Control Schemes," IEEE Infocom, 2001, pp. 77-84.
Ishibashi et al., "A Group Synchronization Mechanism for Live Media in Multicast Communications," IEEE Global Telecommunications Conference, 1997, pp. 746-752, vol. 2.
Ishibashi et al., "A Group Synchronization Mechanism for Stored Media in Multicast Communications," IEEE Information Revolution and Communications, 1997, pp. 692-700, vol. 2.
Issues with Mixed IEEE 802.b/802.11g Networks, AVAGO0058, Agere Systems, Feb. 2004, 5 pages.
Japanese Patent Office, Decision of Rejection dated Jul. 8, 2014, issued in connection with Japanese Patent Application No. 2012-178711, 3 pages.
Japanese Patent Office, Final Office Action dated Nov. 8, 2016, issued in connection with Japanese Patent Application No. 2015-520286, 5 pages.
Japanese Patent Office, Notice of Rejection, dated Feb. 3, 2015, issued in connection with Japanese Patent Application No. 2014-521648, 7 pages.
Japanese Patent Office, Notice of Rejection dated Sep. 15, 2015, issued in connection with Japanese Patent Application No. 2014-220704, 7 pages.
Japanese Patent Office, Office Action dated Nov. 22, 2016, issued in connection with Japanese Patent Application No. 2015-520288, 6 pages.
Japanese Patent Office, Office Action dated May 24, 2016, issued in connection with Japanese Patent Application No. 2014-220704, 7 pages.
Japanese Patent Office, Office Action dated Mar. 29, 2016, issued in connection with Japanese Patent Application No. JP2015-520288, 12 pages.
Japanese Patent Office, Office Action dated Nov. 29, 2016, issued in connection with Japanese Patent Application No. 2015-516169, 4 pages.
Japanese Patent Office, Office Action Summary dated Feb. 2, 2016, issued in connection with Japanese Patent Application No. 2015-520286, 6 pages.
Japanese Patent Office, Office Action Summary dated Nov. 19, 2013, issued in connection with Japanese Patent Application No. 2012-178711, 5 pages.
Jo et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, pp. 71-82, vol. 4861.
Jones, Stephen, "Dell Digital Audio Receiver: Digital upgrade for your analog stereo," Analog Stereo, Jun. 24, 2000 retrieved Jun. 18, 2014, 2 pages.
Kou et al., "RenderingControl:1 Service Template Verion 1.01," Contributing Members of the UPnP Forum, Jun. 25, 2002, 63 pages.

# US 10,541,883 B2

Page 10

(56) **References Cited**

OTHER PUBLICATIONS

Lake Processors: Lake® LM Series Digital Audio Processors Operation Manual, 2011, 71 pages.

Levergood et al., "AudioFile: A Network-Transparent System for Distributed Audio Applications," Digital Equipment Corporation, 1993, 109 pages.

LG: RJP-201M Remote Jack Pack Installation and Setup Guide, 2010, 24 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 9: Defendants' Invalidity Contentions for U.S. Pat. No. 9,202,509 filed Apr. 15, 2016, 163 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Preliminary Identification of Prior Art References, provided Jul. 29, 2016, 5 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Brief in Support of their Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Oct. 12, 2016, 24 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Opposition to Sonos's Motion to Strike Defendants' New Amended Answer Submitted with their Reply, provided Oct. 3, 2016, 15 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, provided Oct. 12, 2016, 43 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit B: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, provided Oct. 12, 2016, 27 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Opening Brief in Support of Defendants' Motion for Leave to Amend Their Answer to Add the Defense of Inequitable Conduct, provided Aug. 1, 2016, 11 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Order, provided Oct. 7, 2016, 2 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Plaintiff's Opposition to Defendants' Motion for Leave to Amend Their Answer to Add the Defense of Inequitable Conduct, provided Aug. 26, 2016, 25 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Redlined Exhibit B: Defendants' First Amended Answer to Plaintiffs' Third Amended Complaint, provided Aug. 1, 2016, 27 pages.

*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), DI 206-1, Transcript of 101 Hearing (Nov. 28, 2016) (28 pages).

*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), DI 207, Public Joint Claim Construction Brief (Nov. 30, 2016) (88 pages).

*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), DI 214, D&M Post-Markman Letter (Dec. 22, 2016) (13 pages).

*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), DI 215, Sonos Post-Markman Letter (Dec. 22, 2016) (15 pages).

*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), DI 219, Claim Construction Opinion (Jan. 12, 2017) (24 pages).

*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), DI 221, Claim Construction Order (Jan. 18, 2017) (2 pages).

*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), Markman Hearing Transcript (Dec. 14, 2016) (69 pages).

Sonos System Overview, Version 1.0, Jul. 2011, 12 pages.

Sony: AIR-SA 50R Wireless Speaker, Copyright 2009, 2 pages.

Sony: Altus Quick Setup Guide ALT-SA32PC, Copyright 2009, 2 pages.

Sony: BD/DVD Home Theatre System Operating Instructions for BDV-E300, E301 and E801, Copyright 2009, 115 pages.

Sony: BD/DVD Home Theatre System Operating Instructions for BDV-IT1000/BDV-IS1000, Copyright 2008, 159 pages.

Sony: Blu-ray Disc/DVD Home Theatre System Operating Instructions for BDV-IZ1000W, Copyright 2010, 88 pages.

Sony: DVD Home Theatre System Operating Instructions for DAV-DZ380W/DZ680W/DZ880W, Copyright 2009, 136 pages.

Sony: DVD Home Theatre System Operating Instructions for DAV-DZ870W, Copyright 2008, 128 pages.

Sony Ericsson MS500 User Guide, Copyright 2009, 2 pages.

Sony: Home Theatre System Operating Instructions for HT-IS100, Copyright 2008, 168 pages.

Sony: HT-IS100, 5.1 Channel Audio System, last updated Nov. 2009, 2 pages.

Sony: Multi Channel AV Receiver Operating Instructions, 2007, 80 pages.

Sony: Multi Channel AV Receiver Operating Instructions for STR-DN1000, Copyright 2009, 136 pages.

Sony: STR-DN1000, Audio Video Receiver, last updated Aug. 2009, 2 pages.

Sony: Wireless Surround Kit Operating Instructions for WHAT-SA2, Copyright 2010, 56 pages.

Taylor, Marilou, "Long Island Sound," Audio Video Interiors, Apr. 2000, 8 pages.

TOA Corporation, Digital Processor DP-0206 DACsys2000 Version 2.00 Software Instruction Manual, Copyright 2001, 67 pages.

Understanding Universal Plug and Play, Microsoft White Paper (Jun. 2000) (D+M_0402074-118) (45 pages).

United States Patent and Trademark Office, U.S. Appl. No. 60/490,768, filed Jul. 28, 2003, entitled "Method for synchronizing audio playback between multiple networked devices," 13 pages.

United States Patent and Trademark Office, U.S. Appl. No. 60/825,407, filed Sep. 12, 2006, entitled "Controlling and manipulating groupings in a multi-zone music or media system," 82 pages.

Universal Plug and Play Device Architecture V. 1.0, (Jun. 8, 2000) (54 pages).

Universal Plug and Play in Windows XP, Tom Fout. Microsoft Corporation (Jul. 2001) (D+M_0402041-73) (33 pages).

Universal Plug and Play ("UPnP") AV Architecture:1 for UPnP, Version 1.0, (Jun. 25, 2002) (D+M_0298151-72) (22 pages).

Universal Plug and Play Vendor's Implementation Guide (Jan. 5, 2000) (7 pages).

"UPnP and Sonos Questions," Sonos Community, Dec. 2006, 5 pages.

UPnP AV Architecture:0.83 (Jun. 12, 2002) (SONDM000115483-504) (22 pages).

UPnP Design by Example, A Software Developers Guide to Universal Plug and Play Michael Jeronimo and JackWeast, Intel Press (D+M_0401307-818) (Apr. 2003) (511 pages).

UPnP; "Universal Plug and Play Device Architecture," Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54.

WANCommonInterfaceConfig:1 Service Template Version 1.01 for UPnP, Ver. 1.0 (Nov. 12, 2001) (D+M_0401820-43) (24 pages).

WaveLan High-Speed Multimode Chip Set, AVAGO0003, Agere Systems, Feb. 2003, 4 pages.

WaveLan High-Speed Multimode Chip Set, AVAGO0005, Agere Systems, Feb. 2003, 4 pages.

Final Office Action dated Dec. 3, 2014, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 12 pages.

Final Office Action dated Jul. 3, 2012, issued in connection with U.S. Appl. No. 13/298,090, filed Nov. 16, 2011, 46 pages.

Final Office Action dated Jun. 3, 2016, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 24 pages.

Final Office Action dated Mar. 3, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 13 pages.

Final Office Action dated Mar. 4, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 16 pages.

Final Office Action dated Jul. 5, 2013, issued in connection with U.S. Appl. No. 13/618,829, filed Sep. 14, 2012, 22 pages.

Final Office Action dated Mar. 5, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 13 pages.

Final Office Action dated Jan. 7, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 14 pages.

Final Office Action dated Mar. 8, 2017, issued in connection with U.S. Appl. No. 14/486,667, filed Sep. 15, 2014, 39 pages.

Final Office Action dated Mar. 9, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 14 pages.

Final Office Action dated Apr. 10, 2017, issued in connection with U.S. Appl. No. 15/243,355, filed Aug. 22, 2016, 15 pages.

Fober et al., "Clock Skew Compensation over a High Latency Network," Proceedings of the ICMC, 2002, pp. 548-552.

Final Office Action dated Aug. 10, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 26 pages.

Final Office Action dated Aug. 11, 2015, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 15 pages.

## US 10,541,883 B2

(56)        **References Cited**

OTHER PUBLICATIONS

Final Office Action dated Feb. 11, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 13 pages.
Final Office Action dated Feb. 11, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 17 pages.
Final Office Action dated Jul. 11, 2017, issued in connection with U.S. Appl. No. 15/243,186, filed Aug. 22, 2016, 13 pages.
Final Office Action dated Feb. 12, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 20 pages.
Final Office Action dated Jan. 12, 2017, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 25 pages.
Final Office Action dated Dec. 13, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 41 pages.
Final Office Action dated Oct. 13, 2011, issued in connection with U.S. Appl. No. 12/035,112, filed Feb. 21, 2008, 10 pages.
Final Office Action dated Aug. 14, 2009, issued in connection with U.S. Appl. No. 11/147,116, filed Jun. 6, 2005, 28 pages.
Final Office Action dated Jul. 15, 2015, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 18 pages.
Final Office Action dated Jun. 15, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 25 pages.
Final Office Action dated Jun. 15, 2017, issued in connection with U.S. Appl. No. 15/228,639, filed Aug. 4, 2016, 16 pages.
Final Office Action dated May 15, 2017, issued in connection with U.S. Appl. No. 13/864,252, filed Apr. 17, 2013, 13 pages.
Final Office Action dated Mar. 16, 2011, issued in connection with U.S. Appl. No. 11/147,116, filed Jun. 6, 2005, 40 pages.
Final Office Action dated May 16, 2017, issued in connection with U.S. Appl. No. 13/864,249, filed Apr. 17, 2013, 14 pages.
Final Office Action dated May 16, 2017, issued in connection with U.S. Appl. No. 13/864,250, filed Apr. 17, 2013, 12 pages.
Final Office Action dated Dec. 17, 2014, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 36 pages.
Final Office Action dated Oct. 19, 2016, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 14 pages.
Final Office Action dated Apr. 20, 2017, issued in connection with U.S. Appl. No. 13/864,248, filed Apr. 17, 2013, 14 pages.
Final Office Action dated Jan. 21, 2010, issued in connection with U.S. Appl. No. 11/906,702, filed Oct. 2, 2007, 27 pages.
Final Office Action dated Oct. 22, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 12 pages.
Final Office Action dated Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 23 pages.
Final Office Action dated Dec. 24, 2009, issued in connection with U.S. Appl. No. 11/147,116, filed Jun. 6, 2005, 29 pages.
Final Office Action dated Feb. 24, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 28 pages.
Final Office Action dated May 25, 2016, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 33 pages.
Final Office Action dated Apr. 28, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 20 pages.
Final Office Action dated Jun. 28, 2017, issued in connection with U.S. Appl. No. 14/808,875, filed Jul. 24, 2015, 14 pages.
Final Office Action dated Nov. 30, 2015, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 26 pages.
Final Office Action dated Dec. 31, 2015, issued in connection with U.S. Appl. No. 14/486,667, filed Sep. 15, 2014, 34 pages.
Final Office Action dated Feb. 4, 2019, issued in connection with U.S. Appl. No. 15/091,113, filed Apr. 5, 2016, 23 pages.
Fireball DVD and Music Manager DVDM-100 Installation and User's Guide, Copyright 2003, 185 pages.
Fireball MP-200 User's Manual, Copyright 2006, 93 pages.
Fireball Remote Control Guide WD006-1-1, Copyright 2003, 19 pages.
Fireball SE-D1 User's Manual, Copyright 2005, 90 pages.
First Action Interview Office Action Summary dated Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/505,027, filed Oct. 2, 2014, 6 pages.

First Action Pre-Interview Office Action dated Jun. 22, 2017, issued in connection with U.S. Appl. No. 14/516,883, filed Oct. 17, 2014, 5 pages.
"884+ Automatic Matrix Mixer Control System," Ivie Technologies, Inc., 2000, pp. 1-4.
Advanced Driver Tab User Interface WaveLan GUI Guide, AVAGO0009, Agere Systems, Feb. 2004, 4 pages.
Advisory Action dated Feb. 2, 2016, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 8 pages.
Advisory Action dated Sep. 18, 2008, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 8 pages.
Advisory Action dated Feb. 1, 2016, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 6 pages.
Advisory Action dated Jun. 1, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 11 pages.
Advisory Action dated Nov. 1, 2013, issued in connection with U.S. Appl. No. 13/618,829, filed Sep. 14, 2012, 3 pages.
Advisory Action dated Mar. 2, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 3 pages.
Advisory Action dated Jan. 5, 2012, issued in connection with U.S. Appl. No. 12/035,112, filed Feb. 21, 2008, 3 pages.
Advisory Action dated Sep. 5, 2014, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 3 pages.
Advisory Action dated Jan. 8, 2015, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 4 pages.
Advisory Action dated Mar. 8, 2017, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 22 pages.
Advisory Action dated Jun. 9, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 25, 2013, 3 pages.
Advisory Action dated Aug. 10, 2017, issued in connection with U.S. Appl. No. 13/864,250, filed Apr. 17, 2013, 3 pages.
Advisory Action dated Feb. 10, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 3 pages.
Advisory Action dated Nov. 12, 2014, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 6 pages.
Advisory Action dated Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 9 pages.
Advisory Action dated Apr. 15, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 9 pages.
Advisory Action dated Aug. 16, 2017, issued in connection with U.S. Appl. No. 13/864,248, filed Apr. 17, 2013, 5 pages.
Advisory Action dated Jun. 20, 2017, issued in connection with U.S. Appl. No. 15/243,355, filed Aug. 22, 2016, 5 pages.
Advisory Action dated Aug. 22, 2017, issued in connection with U.S. Appl. No. 13/864,249, filed Apr. 17, 2013, 3 pages.
Advisory Action dated Mar. 25, 2015, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 5 pages.
Advisory Action dated Feb. 26, 2015, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 3 pages.
Advisory Action dated Nov. 26, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 9 pages.
Advisory Action dated Apr. 27, 2016, issued in connection with U.S. Appl. No. 14/486,667, filed Sep. 15, 2014, 7 pages.
Advisory Action dated Dec. 28, 2016, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 4 pages.
Advisory Action dated Jul. 28, 2015, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 7 pages.
Advisory Action dated Sep. 28, 2009, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 4 pages.
Agere Systems' Voice-over-Wireless LAN (VoWLAN) Station Quality of Service, AVAGO0015, Agere Systems, Jan. 2005, 5 pages.
Akyildiz et al., "Multimedia Group Synchronization Protocols for Integrated Services Networks," IEEE Journal on Selected Areas in Communications, 1996 pp. 162-173, vol. 14, No. 1.
Audio Authority: How to Install and Use the Model 1154 Signal Sensing Auto Selector, 2002, 4 pages.
Audio Authority: Model 1154B High Definition AV Auto Selector, 2008, 8 pages.
AudioSource: AMP 100 User Manual, 2003, 4 pages.
AudioTron Quick Start Guide, Version 1.0, Mar. 2001, 24 pages.
AudioTron Reference Manual, Version 3.0, May 2002, 70 pages.
AudioTron Setup Guide, Version 3.0, May 2002, 38 pages.

# US 10,541,883 B2

Page 12

(56)         **References Cited**

OTHER PUBLICATIONS

Automatic Profile Hunting Functional Description, AVAGO0013, Agere Systems, Feb. 2004, 2 pages.
"A/V Surround Receiver AVR-5800," Denon Electronics, 2000, 2 pages.
"A/V System Controleer, Owner's Manual," B&K Compontents, Ltd., 1998, 52 pages.
AVTransport:1 Service Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (66 pages).
Axis Communication: Axis P8221 Network I/O Audio Module, 2009, 41 pages.
Baldwin, Roberto. "How-To: Setup iTunes DJ on Your Max and iPhone", available at http://www.maclife.com/article/howtos/howto_setup_itunes_dj_your_mac_and_iphone, archived on Mar. 17, 2009, 4 pages.
Balfanz et al., "Network-in-a-Box: How to Set Up a Secure Wireless Network in Under a Minute," 13th USENIX Security Symposium—Technical Paper, 2002, 23 pages.
Balfanz et al., "Talking to Strangers: Authentication in Ad-Hoc Wireless Networks," Xerox Palo Alto Research Center, 2002, 13 pages.
Barham et al., "Wide Area Audio Synchronisation," University of Cambridge Computer Laboratory, 1995, 5 pages.
Baudisch et al., "Flat Volume Control: Improving Usability by Hiding the Volume Control Hierarchy in the User Interface," 2004, 8 pages.
Benslimane Abderrahim, "A Multimedia Synchronization Protocol for Multicast Groups," Proceedings of the 26th Euromicro Conference, 2000, pp. 456-463, vol. 1.
Biersack et al., "Intra- and Inter-Stream Synchronization for Stored Multimedia Streams," IEEE International Conference on Multimedia Computing and Systems, 1996, pp. 372-381.
Blakowski G. et al., "A Media Synchronization Survey: Reference Model, Specification, and Case Studies," Jan. 1996, pp. 5-35, vol. 14, No. 1.
Bluetooth. "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity," Core, Version 1.0 A, Jul. 26, 1999, 1068 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions, filed Sep. 14, 2016, 100 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions, filed Apr. 15, 2016, 97 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Preliminary Identification of Indefinite Terms, provided Jul. 29, 2016, 8 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' 35 U.S.C. § 282 Notice filed Nov. 2, 2017, 31 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Amended Answer, Defenses, and Counterclaims for Patent Infringement, filed Nov. 30, 2015, 47 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Answer to Plaintiff's Second Amended Complaint, filed Apr. 30, 2015, 19 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' First Amended Answer to Plaintiffs' Third Amended Complaint, filed Sep. 7, 2016, 23 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Reply in Support of Partial Motion for Judgment on the Pleadings, filed Jun. 10, 2016, 15 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' First Amended Answer to Plaintiffs' Third Amended Complaint, provided Aug. 1, 2016, 26 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, filed Sep. 9, 2016, 43 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, provided Sep. 9, 2016, 88 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, First Amended Complaint for Patent Infringement, filed Dec. 17, 2014, 26 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Joint Claim Construction Chart, vol. 1 of 3 with Exhibits A-O, filed Aug. 17, 2016, 30 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Opening Brief in Support of Defendants' Partial Motion for Judgment on the Pleadings for Lack of Patent-Eligible Subject Matter, filed May 6, 2016, 27 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Plaintiff Sonos, Inc.'s Opening Claim Construction Brief, filed Sep. 9, 2016, 26 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Plaintiff Sonos, Inc.'s Response in Opposition to Defendants' Partial Motion for Judgment on the Pleadings, filed May 27, 2016, 24 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Reply Brief in Support of Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Nov. 10, 2016, 16 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Reply Brief in Support of Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Sep. 9, 2016, 16 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Second Amended Complaint for Patent Infringement, filed Feb. 27, 2015, 49 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Sonos's Motion to Strike Defendants' New Amended Answer Submitted with their Reply Brief, provided Sep. 15, 2016, 10 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Sonos's Opposition to Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Oct. 31, 2016, 26 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Third Amended Complaint for Patent Infringement, Jan. 29, 2016, 47 pages.
*Sonos, Inc.* v. *D&M Holdings Inc.* (No. 14-1330-RGA), Defendants' Final Invalidity Contentions (Jan. 18, 2017) (106 pages).
*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), DI 226, Opinion Denying Inequitable Conduct Defenses, Feb. 6, 2017, updated, 5 pages.
*Sonos, Inc.* v. *D&M Holdings* (No. 14-1330-RGA), DI 242, US District Judge Andrews 101 Opinion, Mar. 13, 2017, 16 pages.
*Sonos, Inc.* v. *D&M Holdings* , Sonos Opening Markman Brief including Exhibits, Mar. 3, 2017, 17 pages.
*Sonos, Inc.* v. *D&M Holdings* , Sonos Supp Reply Markman Brief including Exhibits, Mar. 29, 2017, 36 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Declaration of Steven C. Visser, executed Sep. 9, 2016, 40 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 1: Defendants' Invalidity Contentions for U.S. Pat. No. 7,571,014 filed Sep. 16, 2016, 270 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 10: Defendants' Invalidity Contentions for U.S. Pat. No. 9,219,959 filed Sep. 27, 2016, 236 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 11: Defendants' Invalidity Contentions for Design U.S. Pat. No. D559,197 filed Sep. 27, 2016, 52 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 2: Defendants' Invalidity contentions for U.S. Pat. No. 8,588,949 filed Sep. 27, 2016, 224 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 3: Defendants' Invalidity Contentions for U.S. Pat. No. 8,843,224 filed Sep. 27, 2016, 147 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 4: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,312 filed Sep. 27, 2016, 229 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 5: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,637 filed Sep. 27, 2016, 213 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 6: Defendants' Invalidity Contentions for U.S. Pat. No. 9,042,556 filed Sep. 27, 2016, 162 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 7: Defendants' Invalidity Contentions for U.S. Pat. No. 9,195,258 filed Sep. 27, 2016, 418 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 8: Defendants' Invalidity Contentions for U.S. Pat. No. 9,202,509 filed Sep. 27, 2016, 331 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 9: Defendants' Invalidity Contentions for U.S. Pat. No. 9,213,357 filed Sep. 27, 2016, 251 pages.

# US 10,541,883 B2

Page 13

(56)           **References Cited**

OTHER PUBLICATIONS

*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 1: Defendants' Invalidity Contentions for U.S. Pat. No. 7,571,014 filed Apr. 15, 2016, 161 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 10: Defendants' Invalidity Contentions for U.S. Pat. No. 9,213,357 filed Apr. 15, 2016, 244 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 11: Defendants' Invalidity Contentions for U.S. Pat. No. 9,219,959 filed Apr. 15, 2016, 172 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 12: Defendants' Invalidity Contentions for Design U.S. Pat. No. D559,197 filed Apr. 15, 2016, 36 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 2: Defendants' Invalidity Contentions for U.S. Pat. No. 8,588,949 filed Apr. 15, 2016, 112 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 3: Defendants' Invalidity Contentions for U.S. Pat. No. 8,843,224 filed Apr. 15, 2016, 118 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 4: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,312 filed Apr. 15, 2016, 217 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 5: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,637 filed Apr. 15, 2016, 177 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 6: Defendants' Invalidity Contentions for U.S. Pat. No. 9,042,556 filed Apr. 15, 2016, 86 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 7: Defendants' Invalidity Contentions for U.S. Pat. No. 9,130,771 filed Apr. 15, 2016, 203 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.,* Defendant's Initial Invalidity Contentions Exhibit 8: Defendants' Invalidity contentions for U.S. Pat. No. 9,195,258 filed Apr. 15, 2016, 400 pages.
Non-Final Office Action dated Jun. 1, 2016, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 21 pages.
Non-Final Office Action dated Sep. 1, 2010, issued in connection with U.S. Appl. No. 11/147,116, filed Jun. 6, 2005, 36 pages.
Non-Final Office Action dated Nov. 2, 2016, issued in connection with U.S. Appl. No. 14/486,667, filed Sep. 15, 2014, 37 pages.
Non-Final Office Action dated Feb. 3, 2009, issued in connection with U.S. Appl. No. 11/147,116, filed Jun. 6, 2005, 32 pages.
Non-Final Office Action dated Jan. 3, 2017, issued in connection with U.S. Appl. No. 14/808,875, filed Jul. 24, 2015, 10 pages.
Non-Final Office Action dated Jun. 3, 2015, issued in connection with U.S. Appl. No. 14/564,544, filed Dec. 9, 2014, 7 pages.
Non-Final Office Action dated Nov. 3, 2016, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 17 pages.
Non-Final Office Action dated Oct. 3, 2014, issued in connection with U.S. Appl. No. 13/863,083, filed Apr. 15, 2013, 22 pages.
Non-Final Office Action dated Jun. 4, 2015, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 16 pages.
Non-Final Office Action dated Mar. 4, 2015, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 16 pages.
Non-Final Office Action dated Oct. 4, 2016, issued in connection with U.S. Appl. No. 15/089,758, filed Apr. 4, 2016, 9 pages.
Non-Final Office Action dated Oct. 5, 2016, issued in connection with U.S. Appl. No. 13/864,250, filed Apr. 17, 2013, 10 pages.
Non-Final Office Action dated Oct. 5, 2016, issued in connection with U.S. Appl. No. 13/864,252, filed Apr. 17, 2013, 11 pages.
Non-Final Office Action dated Oct. 6, 2016, issued in connection with U.S. Appl. No. 15/088,678, filed Apr. 1, 2016, 9 pages.
Non-Final Office Action dated Jul. 7, 2015, issued in connection with U.S. Appl. No. 14/486,667, filed Sep. 15, 2014, 22 pages.
Non-Final Office Action dated Nov. 7, 2011, issued in connection with U.S. Appl. No. 11/147,116, filed Jun. 6, 2005, 48 pages.
Non-Final Office Action dated Oct. 7, 2016, issued in connection with U.S. Appl. No. 15/156,392, filed May 17, 2016, 8 pages.

Non-Final Office Action dated Mar. 8, 2016, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 13 pages.
Non-Final Office Action dated Aug. 9, 2016, issued in connection with U.S. Appl. No. 13/871,795, filed Apr. 26, 2013, 31 pages.
Non-Final Office Action dated Apr. 10, 2017, issued in connection with U.S. Appl. No. 13/871,785, filed Apr. 26, 2013, 10 pages.
Non-Final Office Action dated Mar. 10, 2011, issued in connection with U.S. Appl. No. 12/035,112, filed Feb. 21, 2008, 12 pages.
Non-Final Office Action dated May 10, 2016, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 22 pages.
Non-Final Office Action dated Nov. 10, 2016, issued in connection with U.S. Appl. No. 15/243,355, filed Aug. 22, 2016, 11 pages.
Non-Final Office Action dated Jul. 11, 2017, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 10 pages.
Non-Final Office Action dated Jan. 12, 2017, issued in connection with U.S. Appl. No. 13/895,076, filed May 15, 2013, 10 pages.
Non-Final Office Action dated Jun. 12, 2015, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 16 pages.
Non-Final Office Action dated Mar. 12, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 13 pages.
Non-Final Office Action dated Jan. 13, 2016, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 14 pages.
Non-Final Office Action dated Mar. 13, 2015, issued in connection with U.S. Appl. No. 13/705,177, filed Dec. 5, 2012, 15 pages.
Non-Final Office Action dated Aug. 15, 2017, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 11 pages.
Non-Final Office Action dated Jul. 15, 2016, issued in connection with U.S. Appl. No. 14/803,953, filed Jul. 20, 2015, 20 pages.
Non-Final Office Action dated Nov. 16, 2016, issued in connection with U.S. Appl. No. 15/228,639, filed Aug. 4, 2016, 15 pages.
Non-Final Office Action dated Aug. 17, 2017, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 12 pages.
Non-Final Office Action dated Nov. 17, 2014, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 11 pages.
Non-Final Office Action dated Feb. 18, 2009, issued in connection with U.S. Appl. No. 10/861,653, filed Jun. 5, 2004, 18 pages.
Non-Final Office Action dated Jan. 18, 2013, issued in connection with U.S. Appl. No. 13/618,829, filed Sep. 14, 2012, 58 pages.
Non-Final Office Action dated Nov. 18, 2014, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 10 pages.
Non-Final Office Action dated Jun. 19, 2015, issued in connection with U.S. Appl. No. 13/533,105 filed Jun. 26, 2012, 38 pages.
Non-Final Office Action dated Nov. 19, 2014, issued in connection with U.S. Appl. No. 13/848,921, filed Mar. 22, 2013, 9 pages.
Non-Final Office Action dated Apr. 20, 2017, issued in connection with U.S. Appl. No. 90/013,822, filed Dec. 27, 2016, 197 pages.
Non-Final Office Action dated Aug. 20, 2009, issued in connection with U.S. Appl. No. 11/906,702, filed Oct. 2, 2007, 27 pages.
Non-Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 15/080,591, filed Mar. 25, 2016, 9 pages.
Non-Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 15/080,716, filed Mar. 25, 2016, 8 pages.
Non-Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 15/088,283, filed Apr. 1, 2016, 9 pages.
Non-Final Office Action dated Sep. 21, 2016, issued in connection with U.S. Appl. No. 15/088,532, filed Apr. 1, 2016, 9 pages.
Non-Final Office Action dated Sep. 22, 2016, issued in connection with U.S. Appl. No. 15/088,906, filed Apr. 1, 2016, 9 pages.
Non-Final Office Action dated Sep. 22, 2016, issued in connection with U.S. Appl. No. 15/155,149, filed May 16, 2016, 7 pages.
Non-Final Office Action dated Jul. 23, 2018, issued in connection with U.S. Appl. No. 15/091,113, filed Apr. 5, 2016, 19 pages.
Non-Final Office Action dated Jun. 23, 2015, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 30 pages.
Non-Final Office Action dated Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 11 pages.
WaveLAN Wireless Integration Developer Kit (WI-DK) for Access Point Developers, AVAGO0054, Agere Systems, Jul. 2003, 2 pages.
WaveLAN Wireless Integration-Developer Kit (WI-DK) Hardware Control Function (HCF), AVAGO0052, Agere Systems, Jul. 2003, 2 pages.
"Welcome. You're watching Apple TV." Apple TV 1st Generation Setup Guide, Apr. 8, 2008 Retrieved Oct. 14, 2014, 40 pages.

**US 10,541,883 B2**

Page 14

(56)          **References Cited**

OTHER PUBLICATIONS

"Welcome. You're watching Apple TV." Apple TV 2nd Generation Setup Guide, Mar. 10, 2011 Retrieved Oct. 16, 2014, 36 pages.
"Welcome. You're watching Apple TV." Apple TV 3rd Generation Setup Guide, Mar. 16, 2012 Retrieved Oct. 16, 2014, 36 pages.
WI-DK Release 2 WaveLan Embedded Drivers for VxWorks and Linux, AVAGO0056, Agere Systems, Jul. 2003, 2 pages.
WI-DK Release 2 WaveLan END Reference Driver for VxWorks, AVAGO0044, Agere Systems, Jul. 2003, 4 pages.
WI-DK Release 2 WaveLan LKM Reference Drivers for Linux, AVAGO0048, Agere Systems, Jul. 2003, 4 pages.
Windows Media Connect Device Compatibility Specification (Apr. 12, 2004) (16 pages).
WPA Reauthentication Rates, AVAGO0063, Agere Systems, Feb. 2004, 3 pages.
Yamaha DME 32 manual: copyright 2001.
Yamaha DME 64 Owner's Manual; copyright 2004, 80 pages.
Yamaha DME Designer 3.5 setup manual guide; copyright 2004, 16 pages.
Yamaha DME Designer 3.5 User Manual; Copyright 2004, 507 pages.
Yamaha DME Designer software manual: Copyright 2004, 482 pages.
"Symantec pcAnywhere User's Guide," v 10.5.1, 1995-2002, 154 pages.
"Systemline Modular Installation Guide, Multiroom System," Systemline, 2003, pp. 1-22.
"ZR-8630AV MultiZone Audio/Video Receiver, Installation and Operation Guide," Niles Audio Corporation, 2003, 86 pages.
ZX135: Installation Manual,LA Audio, Apr. 2003, 44 pages.
WANPPPConnection:1 Service Template Version 1.01 for UPnP, Version 1.0 (Nov. 12, 2001) (D+M_0401918-2006) (89 pages).
WANIPConnection:1 Service Template Version 1.01 for UPnP Ver. 1.0 (Nov. 12, 2001) (D+M_0401844-917) (74 pages).
Lienhart et al., "On the Importance of Exact Synchronization for Distributed Audio Signal Processing," Session L: Poster Session II—ICASSP'03 Papers, 2002, 1 page.
LinkSys by Cisco, Wireless Home Audio Controller, Wireless-N Touchscreen Remote DMRW1000 Datasheet, Copyright 2008, 2 pages.
LinkSys by Cisco, Wireless Home Audio Controller, Wireless-N Touchscreen Remote DMRW1000 User Guide, Copyright 2008, 64 pages.
LinkSys by Cisco, Wireless Home Audio Player, Wireless-N Music Extender DMP100 Quick Installation Guide, Copyright 2009, 32 pages.
LinkSys by Cisco, Wireless Home Audio Player, Wireless-N Music Extender DMP100 User Guide, Copyright 2008, 65 pages.
Linux SDK for UPnP Devices v. 1.2 (Sep. 6, 2002) (101 pages).
"Linux SDK for UPnP Devices v1.2," Intel Corporation, Jan. 17, 2003, 102 pages.
Liu et al., "A synchronization control scheme for real-time streaming multimedia applications," Packet Video, 2003, 10 pages, vol. 2003.
Liu et al., "Adaptive Delay Concealment for Internet Voice Applications with Packet-Based Time-Scale Modification," Information Technologies 2000, pp. 91-102.
Louderback, Jim, "Affordable Audio Receiver Furnishes Homes With MP3," TechTV Vault. Jun. 28, 2000 retrieved Jul. 10, 2014, 2 pages.
Maniactools, "Identify Duplicate Files by Sound," Sep. 28, 2010, http://www.maniactools.com/soft/music-duplicate-remover/identify-duplicate-files-by-sound.shtml.
MediaRenderer:1 Device Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (12 pages).
MediaServer:1 Device Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (12 pages).
Microsoft, Universal Plug and Play (UPnP) Client Support ("Microsoft UPnP") (Aug. 2001) (D+M_0402007-24) (18 pages).

Microsoft Window's XP Reviewer's Guide (Aug. 2001) (D+M_0402225-85) (61 pages).
"Microsoft Windows XP File and Printer Share with Microsoft Windows" Microsoft Windows XP Technical Article, 2003, 65 pages.
Mills David L., "Network Time Protocol (Version 3) Specification, Implementation and Analysis," Network Working Group, Mar. 1992, 7 pages.
Mills, David L., "Precision Synchronization of Computer Network Clocks," ACM SIGCOMM Computer Communication Review, 1994, pp. 28-43, vol. 24, No. 2.
"Model MRC44 Four Zone—Four Source Audio/Video Controller/ Amplifier System," Xantech Corporation, 2002, 52 pages.
Motorola, "Simplefi, Wireless Digital Audio Receiver, Installation and User Guide," Dec. 31, 2001, 111 pages.
"SMPTE Made Simple: A Time Code Tutor by Timeline," 1996, 46 pages.
Network Time Protocol (NTP), RFC 1305 (Mar. 1992) (D+M_0397417-536) (120 pages).
"NexSys Software v.3 Manual," Crest Audio, Inc., 1997, 76 pages.
Niederst, Jennifer "O'Reilly Web Design in a Nutshell," Second Edition, Sep. 2001, 678 pages.
Nilsson, M., "ID3 Tag Version 2," Mar. 26,1998, 28 pages.
Non-Final Office Action dated May 1, 2014, issued in connection with U.S. Appl. No. 14/184,522, filed Feb. 19, 2014, 31 pages.
Non-Final Office Action dated Dec. 5, 2013, issued in connection with U.S. Appl. No. 13/827,653, filed Mar. 14, 2013, 28 pages.
Non-Final Office Action dated Jan. 5, 2012, issued in connection with U.S. Appl. No. 13/298,090, filed Nov. 16, 2011, 40 pages.
Non-Final Office Action dated May 6, 2014, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 23 pages.
Non-Final Office Action dated Sep. 7, 2016, issued in connection with U.S. Appl. No. 13/864,248, filed Apr. 17, 2013, 12 pages.
Non-final Office Action dated Apr. 10, 2013, issued in connection with U.S. Appl. No. 13/619,237, filed Sep. 14, 2012, 10 pages.
Non-Final Office Action dated May 12, 2014, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 23 pages.
Non-Final Office Action dated May 14, 2014, issued in connection with U.S. Appl. No. 13/848,932, filed Mar. 22, 2013, 14 pages.
Non-Final Office Action dated Feb. 10, 2014, issued in connection with U.S. Appl. No. 14/176,808, filed Feb. 10, 2014, 6 pages.
Non-Final Office Action dated Dec. 18, 2013, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 12 pages.
Non-Final Office Action dated Jan. 18, 2008, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 38 pages.
Non-Final Office Action dated Apr. 19, 2010, issued in connection with U.S. Appl. No. 11/801,468, filed May 9, 2007, 16 pages.
Non-Final Office Action dated Mar. 19, 2013, issued in connection with U.S. Appl. No. 13/724,048, filed Dec. 21, 2012, 9 pages.
Non-Final Office Action dated Jun. 21, 2011, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 13 pages.
Non-Final Office Action dated Jan. 22, 2009, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 18 pages.
Non-Final Office Action dated Jul. 25, 2014, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 9 pages.
Non-Final Office Action dated Jul. 25, 2014, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 11 pages.
Non-Final Office Action dated Jun. 25, 2010, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 17 pages.
Non-Final Office Action dated Nov. 25, 2013, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 19 pages.
Non-Final Office Action dated May 27, 2014, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 13 pages.
Non-Final Office Action dated Feb. 29, 2012, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 10 pages.
Non-Final Office Action dated Nov. 29, 2010, issued in connection with U.S. Appl. No. 11/801,468, filed May 9, 2007, 17 pages.
Non-Final Office Action dated Jul. 30, 2013 issued in connection with U.S. Appl. No. 13/724,048, filed Dec. 21, 2012, 7 pages.
Non-Final Office Action dated Jul. 31, 2014, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 31 pages.
Non-Final Office Action dated Dec. 1, 2014, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 11 pages.

**US 10,541,883 B2**

Page 15

(56)         **References Cited**

OTHER PUBLICATIONS

Notice of Allowance dated Jul. 13, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 22 pages.
Notice of Allowance dated Jul. 13, 2017, issued in connection with U.S. Appl. No. 13/895,076, filed May 15, 2013, 10 pages.
Notice of Allowance dated Nov. 13, 2013, issued in connection with U.S. Appl. No. 13/724,048, filed Dec. 21, 2012, 7 pages.
Notice of Allowance dated Oct. 13, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 7 pages.
Notice of Allowance dated Aug. 14, 2012, issued in connection with U.S. Appl. No. 11/147,116, filed Jun. 6, 2005, 33 pages.
Notice of Allowance dated Dec. 14, 2016, issued in connection with U.S. Appl. No. 15/088,906, filed Apr. 1, 2016, 9 pages.
Notice of Allowance dated Jun. 14, 2012, issued in connection with U.S. Appl. No. 12/035,112, filed Feb. 21, 2008, 9 pages.
Notice of Allowance dated Jul. 15, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 18 pages.
Notice of Allowance dated Mar. 15, 2017, issued in connection with U.S. Appl. No. 15/080,716, filed Mar. 25, 2016, 7 pages.
Notice of Allowance dated Jan. 16, 2009, issued in connection with U.S. Appl. No. 10/861,653, filed Jun. 5, 2004, 11 pages.
Notice of Allowance dated Jul. 17, 2015, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 20 pages.
Notice of Allowance dated May 17, 2018, issued in connection with U.S. Appl. No. 14/805,085, filed Jul. 21, 2015, 18 pages.
Notice of Allowance dated Jul. 18, 2014, issued in connection with U.S. Appl. No. 13/618,829, filed Sep. 14, 2012, 8 pages.
Notice of Allowance dated May 19, 2015, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 7 pages.
Notice of Allowance dated Oct. 19, 2016, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 14 pages.
Notice of Allowance dated Sep. 21, 2015, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 11 pages.
Notice of Allowance dated Dec. 22, 2016, issued in connection with U.S. Appl. No. 15/080,716, filed Mar. 25, 2016, 9 pages.
Notice of Allowance dated Sep. 22, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 7 pages.
Notice of Allowance dated Nov. 23, 2016, issued in connection with U.S. Appl. No. 14/803,953, filed Jul. 20, 2015, 21 pages.
Notice of Allowance dated Sep. 24, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 7 pages.
Notice of Allowance dated Sep. 24, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 7 pages.
Notice of Allowance dated Apr. 25, 2017, issued in connection with U.S. Appl. No. 15/156,392, filed May 17, 2016, 8 pages.
Notice of Allowance dated Sep. 25, 2014, issued in connection with U.S. Appl. No. 14/176,808, filed Feb. 10, 2014, 5 pages.
Notice of Allowance dated Apr. 27, 2015, issued in connection with U.S. Appl. No. 13/932,864, filed Jul. 1, 2013, 20 pages.
Notice of Allowance dated Aug. 27, 2015, issued in connection with U.S. Appl. No. 13/705,177, filed Dec. 5, 2012, 34 pages.
Notice of Allowance dated Aug. 27, 2015, issued in connection with U.S. Appl. No. 14/505,027, filed Oct. 2, 2014, 18 pages.
Notice of Allowance dated Dec. 27, 2011, issued in connection with U.S. Appl. No. 10/816,217, filed Apr. 1, 2004, 15 pages.
Notice of Allowance dated Mar. 27, 2017, issued in connection with U.S. Appl. No. 15/089,758, filed Apr. 4, 2016, 7 pages.
Notice of Allowance dated Mar. 28, 2017, issued in connection with U.S. Appl. No. 15/088,906, filed Apr. 1, 2016, 7 pages.
Notice of Allowance dated Mar. 28, 2017, issued in connection with U.S. Appl. No. 15/155,149, filed May 16, 2016, 7 pages.
Parasound Zpre2 Zone Preamplifier with PTZI Remote Control, 2005, 16 pages.
Notice of Allowance dated Nov. 28, 2017, issued in connection with U.S. Appl. No. 15/091,014, filed Apr. 5, 2016, 8 pages.
Notice of Allowance dated Apr. 29, 2015, issued in connection with U.S. Appl. No. 13/863,083, filed Apr. 15, 2013, 19 pages.
Notice of Allowance dated Jan. 29, 2015, issued in connection with U.S. Appl. No. 13/359,976, filed Jan. 27, 2012, 28 pages.

Notice of Allowance dated Jul. 29, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 9 pages.
Notice of Allowance dated Mar. 29, 2017, issued in connection with U.S. Appl. No. 14/803,953, filed Jul. 20, 2015, 8 pages.
Notice of Allowance dated Apr. 3, 2017, issued in connection with U.S. Appl. No. 15/088,678, filed Apr. 1, 2016, 8 pages.
Notice of Allowance dated Aug. 30, 2016, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 7 pages.
Notice of Allowance dated Jul. 30, 2015, issued in connection with U.S. Appl. No. 13/705,178, filed Dec. 5, 2012, 18 pages.
Notice of Allowance dated Mar. 30, 2017, issued in connection with U.S. Appl. No. 15/088,532, filed Apr. 1, 2016, 7 pages.
Notice of Allowance dated Aug. 5, 2015, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 26 pages.
Notice of Allowance dated Apr. 6, 2017, issued in connection with U.S. Appl. No. 15/088,283, filed Apr. 1, 2016, 7 pages.
Notice of Allowance dated Jul. 6, 2015, issued in connection with U.S. Appl. No. 13/297,000, filed Nov. 15, 2011, 24 pages.
Notice of Incomplete Re-Exam Request dated May 25, 2017, issued in connection with U.S. Appl. No. 90/013,959, filed Apr. 1, 2016, 10 pages.
Notice of Intent to Issue Re-Examination Certificate dated Aug. 3, 2017, issued in connection with U.S. Appl. No. 90/013,882, filed Dec. 27, 2016, 20 pages.
Nutzel et al., "Sharing Systems for Future HiFi Systems," IEEE, 2004, 9 pages.
Office Action in Ex Parte Reexamination dated Oct. 20, 2017, issued in connection with U.S. Appl. No. 90/013,959, filed Jun. 16, 2017, 50 pages.
"Sonos Multi-Room Music System User Guide," Version 090401, Sonos, Inc. Apr. 1, 2009, 256 pages.
Palm, Inc., "Handbook for the Palm VII Handheld," May 2000, 311 pages.
Non-Final Office Action dated Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/864,251, filed Apr. 17, 2013, 11 pages.
Non-Final Office Action dated Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 9 pages.
Non-Final Office Action dated Oct. 23, 2014, issued in connection with U.S. Appl. No. 13/932,864, filed Jul. 1, 2013, 20 pages.
Non-final Office Action dated Oct. 24, 2014, issued in connection with U.S. Appl. No. 13/435,776, filed Mar. 30, 2012, 14 pages.
Non-Final Office Action dated Feb. 26, 2015, issued in connection with U.S. Appl. No. 14/186,850, filed Feb. 21, 2014, 25 pages.
Non-Final Office Action dated Jul. 26, 2017, issued in connection with U.S. Appl. No. 13/705,176, filed Dec. 5, 2012, 14 pages.
Non-Final Office Action dated Mar. 26, 2015, issued in connection with U.S. Appl. No. 14/184,528, filed Feb. 19, 2014, 18 pages.
Non-Final Office Action dated Jun. 27, 2008, issued in connection with U.S. Appl. No. 10/861,653, filed Jun. 5, 2004, 19 pages.
Non-Final Office Action dated Mar. 27, 2015, issued in connection with U.S. Appl. No. 13/705,178, filed Dec. 5, 2012, 14 pages.
Non-Final Office Action dated Dec. 28, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 29 pages.
Non-Final Office Action dated Nov. 29, 2016, issued in connection with U.S. Appl. No. 13/894,179, filed May 14, 2013, 14 pages.
Non-Final Office Action dated Apr. 30, 2012, issued in connection with U.S. Appl. No. 13/204,511, filed Aug. 5, 2011, 16 pages.
Non-Final Office Action dated Jan. 30, 2015, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 29 pages.
Non-Final Office Action dated Jan. 30, 2015, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 13 pages.
Non-Final Office Action dated Nov. 30, 2016, issued in connection with U.S. Appl. No. 15/243,186, filed Aug. 22, 2016, 12 pages.
Non-Final Office Action dated Sep. 30, 2016, issued in connection with U.S. Appl. No. 13/864,249, filed Apr. 17, 2013, 12 pages.
Non-Final Office Action dated Dec. 31, 2013, issued in connection with U.S. Appl. No. 13/618,829, filed Sep. 14, 2012, 26 pages.
North American MPEG-2 Information, "The MPEG-2 Transport Stream," Retrieved from the Internet: URL: http://www.coolstf.com/mpeg/#ts, 2006, pp. 1-5.
Notice of Allowance dated Jan. 31, 2013, issued in connection with U.S. Appl. No. 13/298,090, filed Nov. 16, 2011, 19 pages.

## US 10,541,883 B2

Page 16

(56)         References Cited

OTHER PUBLICATIONS

Notice of Allowance dated Dec. 1, 2016, issued in connection with U.S. Appl. No. 15/088,283, filed Apr. 1, 2016, 9 pages.
Notice of Allowance dated Jun. 1, 2017, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 12 pages.
Notice of Allowance dated Dec. 2, 2016, issued in connection with U.S. Appl. No. 15/088,532, filed Apr. 1, 2016, 9 pages.
Notice of Allowance dated Dec. 2, 2016, issued in connection with U.S. Appl. No. 15/088,678, filed Apr. 1, 2016, 9 pages.
Notice of Allowance dated Dec. 2, 2016, issued in connection with U.S. Appl. No. 15/089,758, filed Apr. 4, 2016, 9 pages.
Notice of Allowance dated Dec. 2, 2016, issued in connection with U.S. Appl. No. 15/155,149, filed May 16, 2016, 9 pages.
Notice of Allowance dated Jul. 2, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 17 pages.
Notice of Allowance dated Jul. 2, 2015, issued in connection with U.S. Appl. No. 13/888,203, filed May 6, 2013, 19 pages.
Notice of Allowance dated Jul. 2, 2015, issued in connection with U.S. Appl. No. 14/184,935, filed Feb. 20, 2014, 23 pages.
Notice of Allowance dated Jun. 2, 2017, issued in connection with U.S. Appl. No. 14/486,667, filed Sep. 15, 2014, 10 pages.
Notice of Allowance dated Sep. 3, 2015, issued in connection with U.S. Appl. No. 13/705,174, filed Dec. 5, 2012, 4 pages.
Notice of Allowance dated Aug. 4, 2015, issued in connection with U.S. Appl. No. 14/516,867, filed Oct. 17, 2014, 13 pages.
Notice of Allowance dated Oct. 4, 2017, issued in connection with U.S. Appl. No. 14/486,667, filed Sep. 15, 2014, 8 pages.
Notice of Allowance dated Oct. 5, 2012, issued in connection with U.S. Appl. No. 13/204,511, filed Aug. 5, 2011, 11 pages.
Notice of Allowance dated Mar. 6, 2014, issued in connection with U.S. Appl. No. 13/827,653, filed Mar. 14, 2013, 17 pages.
Notice of Allowance dated May 6, 2011, issued in connection with U.S. Appl. No. 11/801,468, filed May 9, 2007, 10 pages.
Notice of Allowance dated Sep. 6, 2013, issued in connection with U.S. Appl. No. 13/619,237, filed Sep. 14, 2012, 10 pages.
Notice of Allowance dated Apr. 7, 2016, issued in connection with U.S. Appl. No. 13/533,105, filed Jun. 26, 2012, 40 pages.
Notice of Allowance dated Dec. 7, 2016, issued in connection with U.S. Appl. No. 15/156,392, filed May 17, 2016, 9 pages.
Notice of Allowance dated Oct. 7, 2015, issued in connection with U.S. Appl. No. 14/184,526, filed Feb. 19, 2014, 7 pages.
Notice of Allowance dated Mar. 9, 2017, issued in connection with U.S. Appl. No. 15/080,591, filed Mar. 25, 2016, 7 pages.
Notice of Allowance dated Oct. 9, 2015, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 4 pages.
Notice of Allowance dated Aug. 10, 2015, issued in connection with U.S. Appl. No. 13/848,904, filed Mar. 22, 2013, 9 pages.
Notice of Allowance dated Feb. 10, 2017, issued in connection with U.S. Appl. No. 14/290,493, filed May 29, 2014, 13 pages.
Notice of Allowance dated Nov. 10, 2011, issued in connection with U.S. Appl. No. 11/906,702, filed Oct. 2, 2007, 17 pages.
Notice of Allowance dated Apr. 11, 2016, issued in connection with U.S. Appl. No. 13/864,247, filed Apr. 17, 2013, 21 pages.
Notice of Allowance dated Jan. 11, 2016, issued in connection with U.S. Appl. No. 14/564,544, filed Dec. 9, 2014, 5 pages.
Notice of Allowance dated Aug. 12, 2013, issued in connection with U.S. Appl. No. 13/435,739, filed Mar. 30, 2012, 27 pages.
Notice of Allowance dated Jul. 12, 2017, issued in connection with U.S. Appl. No. 13/894,179, filed May 14, 2013, 10 pages.
Notice of Allowance dated Dec. 13, 2016, issued in connection with U.S. Appl. No. 15/080,591, filed Mar. 25, 2016, 9 pages.
Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy," Core, Version 1.0 B, Dec. 1, 1999, 1076 pages.
Bogen Communications, Inc., ProMatrix Digitally Matrixed Amplifier Model PM3180, Copyright1996, 2 pages.
Brassil et al., "Enhancing Internet Streaming Media with Cueing Protocols," 2000, 9 pages.
Breebaart et al., "Multi-Channel Goes Mobile: MPEG Surround Binaural Rendering," AES 29th International Conference, Sep. 2-4, 2006, pp. 1-13.

Bretl W.E., et al., MPEG2 Tutorial [online], 2000 [retrieved on Jan. 13, 2009] Retrieved from the Internet:(http://www.bretl.com/ mpeghtml/MPEGindex.htm), pp. 1-23.
Canadian Intellectual Property Office, Canadian Office Action dated Apr. 4, 2016, issued in connection with Canadian Patent Application No. 2,842,342, 5 pages.
Canadian Intellectual Property Office, Canadian Office Action dated Sep. 14, 2015, issued in connection with Canadian Patent Application No. 2,842,342, 2 pages.
Cen et al., "A Distributed Real-Time MPEG Video Audio Player," Department of Computer Science and Engineering, Oregon Graduate Institute of Science and Technology, 1995, 12 pages.
Chakrabarti et al., "A Remotely Controlled Bluetooth Enabled Environment," IEEE, 2004, pp. 77-81.
Change Notification: Agere Systems WaveLan Multimode Reference Design (D2 to D3), AVAGO0042, Agere Systems, Nov. 2004, 2 pages.
Chinese Office Action, Office Action dated Dec. 20, 2016, issued in connection with Chinese Application No. 201380044446.8, 16 pages.
Chinese Patent Office, Office Action dated Jul. 5, 2016, issued in connection with Chinese Patent Application No. 201380044380.2, 25 pages.
Chinese Patent Office, Second Office Action dated Feb. 27, 2017, issued in connection with Chinese Patent Application No. 201380044380.2, 22 pages.
Connection Manager: 1 Service Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (25 pages).
ContentDirectory:1 Service Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (89 pages).
Corrected Notice of Allowability dated Dec. 23, 2016, issued in connection with U.S. Appl. No. 14/803,953, filed Jul. 20, 2015, 18 pages.
Corrected Notice of Allowance dated Aug. 19, 2015, issued in connection with U.S. Appl. No. 13/907,666, filed May 31, 2013, 2 pages.
Creative, "Connecting Bluetooth Devices with Creative D200," http://support.creative.com/kb/ShowArticle.aspx?url=http://ask. creative.com:80/SRVS/CGI-BIN/WEBCGI.EXE/,/?St=106,E= 0000000000396859016,K=9377,Sxi=8, VARSET=ws:http://us. creative.com,case=63350>, available on Nov. 28, 2011, 2 pages.
Crown PIP Manual available for sale at least 2004, 68 pages.
Dannenberg et al., "A. System Supporting Flexible Distributed Real-Time Music Processing," Proceedings of the 2001 International Computer Music Conference, 2001, 4 pages.
Dannenberg, Roger B., "Remote Access to Interactive Media," Proceedings of the SPIE 1785, 1993, pp. 230-237.
Day, Rebecca, "Going Elan!" Primedia Inc., 2003, 4 pages.
Deep-Sleep Implementation in WL60011 for IEEE 802.11b Applications, AVAGO0020, Agere Systems, Jul. 2004, 22 pages.
Dell, Inc. "Dell Digital Audio Receiver: Reference Guide," Jun. 2000, 70 pages.
Dell, Inc. "Start Here," Jun. 2000, 2 pages.
"Denon 2003-2004 Product Catalog," Denon, 2003-2004, 44 pages.
Denon AV Surround Receiver AVR-1604/684 User's Manual, 2004, 128 pages.
Denon AV Surround Receiver AVR-5800 Operating Instructions, Copyright 2000, 67 pages.
Designing a UPnP AV MediaServer, Nelson Kidd (2003) (SONDM000115062-116) (55 pages).
Dhir, Amit, "Wireless Home Networks—DECT, Bluetooth, Home RF, and Wirelss LANs," XILINX, wp135 (v1.0), Mar. 21, 2001, 18 pages.
"DP-0206 Digital Signal Processor," TOA Electronics, Inc., 2001, pp. 1-12.
European Patent Office, European Extended Search Report dated Mar. 7, 2016, issued in connection with EP Application No. 13810340.3, 9 pages.
European Patent Office, European Extended Search Report dated Feb. 28, 2014, issued in connection with EP Application No. 13184747.7, 8 pages.

**US 10,541,883 B2**

Page 17

(56)    **References Cited**

OTHER PUBLICATIONS

European Patent Office, European Extended Search Report dated Mar. 31, 2015, issued in connection with EP Application No. 14181454.1, 9 pages.
European Patent Office, Examination Report dated Mar. 22, 2016, issued in connection with European Patent Application No. EP14181454.1, 6 pages.
European Patent Office, Examination Report dated Oct. 24, 2016, issued in connection with European Patent Application No. 13808623.6, 4 pages.
European Patent Office, Office Action dated Nov. 25, 2016, issued in connection with EP Application No. 13810340.3, 5 pages.
Falcone, John, "Sonos BU150 Digital Music System review," CNET, CNET [online] Jul. 27, 2009 [retrieved on Mar. 16, 2016], 11 pages Retrieved from the Internet: URL:http://www.cnet.com/products/sonos-bu150-digital-music-system/.
Faller, Christof, "Coding of Spatial Audio Compatible with Different Playback Formats," Audio Engineering Society Convention Paper (Presented at the 117th Convention), Oct. 28-31, 2004, 12 pages.
File History of Re-Examination U.S. Appl. No. 90/013,423 (Sonos Ref. No. 12-0902-REX).
Park et al., "Group Synchronization in MultiCast Media Communications," Proceedings of the 5th Research on Multicast Technology Workshop, 2003, 5 pages.
Pascoe, Bob, "Salutation Architectures and the newly defined service discovery protocols from Microsoft® and Sun®," Salutation Consortium, White Paper, Jun. 6, 1999, 5 pages.
Pillai et al., "A Method to Improve the Robustness of MPEG Video Applications over Wireless Networks," Kent Ridge Digital Labs, 2000, 15 pages.
Polycom Conference Composer User Guide, copyright 2001, 29 pages.
Pre-Brief Conference Decision dated May 11, 2017, issued in connection with U.S. Appl. No. 14/504,812, filed Oct. 2, 2014, 2 pages.
Pre-Interview First Office Action dated Mar. 10, 2015, issued in connection with U.S. Appl. No. 14/505,027, filed Oct. 2, 2014, 4 pages.
Presentations at WinHEC 2000, May 2000, 138 pages.
PRISMIQ, Inc., "PRISMIQ Media Player User Guide", 2003, 44 pages.
Proficient Audio Systems M6 Quick Start Guide, 2011, 5 pages.
Proficient Audio Systems: Proficient Editor Advanced Programming Guide, 2007, 40 pages.
Programming Interface for WL54040 Dual-Band Wireless Transceiver, AVAGO0066, Agere Systems, May 2004, 16 pages.
Radio Shack, "Auto-Sensing 4-Way Audio/Video Selector Switch," 2004, 1 page.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 1, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 2, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 3, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 4, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 5, 46 pages.
Rangan et al., "Feedback Techniques for Continuity and Synchronization in Multimedia Information Retrieval," ACM Transactions on Information Systems, 1995, pp. 145-176, vol. 13, No. 2.
Real Time Control Protocol (RTCP) and Realtime Transfer Protocol (RTP), RFC 1889 (Jan. 1996) (D+M_0397810-84) (75 pages).
Realtime Streaming Protocol (RTSP), RFC 2326 (Apr. 1998) (D+M_0397945-8036) (92 pages).
Realtime Transport Protocol (RTP), RFC 3550 (Jul. 2003) (D+M_0398235-323) (89 pages).
Re-Exam Final Office Action dated Aug. 5, 2015, issued in connection with U.S. Appl. No. 90/013,423, filed Jan. 5, 2015, 25 pages.
Reexam Non-Final Office Action dated Nov. 9, 2016, issued in connection with U.S. Appl. No. 90/013,774, filed Jun. 29, 2016, 35 pages.

Re-Exam Non-Final Office Action dated Apr. 22, 2015, issued in connection with U.S. Appl. No. 90/013,423, filed Jan. 5, 2015, 16 pages.
Reid, Mark, "Multimedia conferencing over ISDN and IP networks using ITU-T H-series recommendations: architecture, control and coordination," Computer Networks, 1999, pp. 225-235, vol. 31.
RenderingControl:1 Service Template Version 1.01 for UPnP, Version 1.0, (Jun. 25, 2002) (63 pages).
Renewed Request for Ex Parte Re-Examination, U.S. Appl. No. 90/013,959, filed Jun. 16, 2017, 126 pages.
Renkus Heinz Manual; available for sale at least 2004, 6 pages.
Request for Ex Parte Reexamination submitted in U.S. Pat. No. 9,213,357 on May 22, 2017, 85 pages.
"Residential Distributed Audio Wiring Practices," Leviton Network Solutions, 2001, 13 pages.
Ritchie et al., "MediaServer:1 Device Template Version 1.01," Contributing Members of the UPnP Forum, Jun. 25, 2002, 12 pages.
Ritchie et al., "UPnP AV Architecture:1, Version 1.0," Contributing Members of the UPnP Forum, Jun. 25, 2002, 22 pages.
Ritchie, John, "MediaRenderer:1 Device Template Version 1.01," Contributing Members of the UPnP Forum, Jun. 25, 2002, 12 pages.
Roland Corporation, "Roland announces BA-55 Portable PA System," press release, Apr. 6, 2011, 2 pages.
Rothermel et al., "An Adaptive Protocol for Synchronizing Media Streams," Institute of Parallel and Distributed High-Performance Systems (IPVR), 1997, 26 pages.
Rothermel et al., "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995, 13 pages.
Rothermel et al., "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, Apr. 18-21, 1995, 12 pages.
Rothermel et al., "Clock Hierarchies—An Abstraction for Grouping and Controlling Media Streams," University of Stuttgart Institute of Parallel and Distributed High-Performance Systems, Jan. 1996, 23 pages.
Rothermel et al., "Synchronization in Joint-Viewing Environments," University of Stuttgart Institute of Parallel and Distributed High-Performance Systems, 1992, 13 pages.
Rothermel, Kurt, "State-of-the-Art and Future Research in Stream Synchronization," University of Stuttgart, 3 pages.
"RVL-6 Modular Multi-Room Controller, Installation & Operation Guide," Nile Audio Corporations, 1999, 46 pages.
Schmandt et al., "Impromptu: Managing Networked Audio Applications for Mobile Users," 2004, 11 pages.
Schulzrinne et al., "RTP: A Transport Protocol for Real-Time Applications," Network Working Group, Jan. 1996, pp. 1-75.
Schulzrinne H., et al., "RTP: A Transport Protocol for Real-Time Applications, RFC 3550," Network Working Group, 2003, pp. 1-89.
Simple Network Time Protocol (SNTP), RFC 1361 (Aug. 1992) (D+M_0397537-46) (10 pages).
Simple Network Time Protocol (SNTPII), RFC 1769 (Mar. 1995) (D+M_0397637-76) (14 pages).
Simple Service Discovery Protocol/1.0 Operating without an Arbiter (Oct. 28, 1999) (24 pages).
*Sonos, Inc. v D&M Holdings*, D&M Supp Opposition Brief including Exhibits, Mar. 17, 2017, 23 pages.
*Sonos, Inc. v D&M Holdings*, Expert Report of Jay P. Kesan including Appendices A-P, Feb. 20, 2017, 776 pages.
*Sonos, Inc. v D&M Holdings Inc. et al.*, Complaint for Patent Infringement, filed Oct. 21, 2014, 20 pages.
Non-Final Office Action dated May 30, 2019, issued in connection with U.S. Appl. No. 16/298,542, filed Mar. 11, 2019, 22 pages.
Non-Final Office Action dated Sep. 4, 2019, issued in connection with U.S. Appl. No. 15/091,113, filed Apr. 5, 2016, 23 pages.
Notice of Allowance dated Aug. 26, 2019, issued in connection with U.S. Appl. No. 16/298,542, filed Mar. 11, 2019, 8 pages.
*Sonos, Inc. v. Implicit, LLC*: Declaration of Roman Chertov in Support of the Inter Partes Review of U.S. Pat. No. 7,391,791 dated Mar. 9, 2018, 92 pages.
*Sonos, Inc. v. Implicit, LLC*: Declaration of Roman Chertov in Support of the Inter Partes Review of U.S. Pat. No. 8,942,252 dated Mar. 9, 2018, 81 pages.

**US 10,541,883 B2**

Page 18

(56)         **References Cited**

OTHER PUBLICATIONS

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit A, filed Oct. 14, 2019, 3 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit C, filed Oct. 14, 2019, 16 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit D, filed Oct. 14, 2019, 36 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit E, filed Oct. 14, 2019, 21 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint, filed Oct. 14, 2019, 66 pages.

*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' First Amended Answer and Counterclaims to Plaintiff's Complaint, filed Nov. 14, 2019, 66 pages.

* cited by examiner



FIG. 1



*FIG. 2A*



*FIG. 2B*



*FIG. 2C*



*FIG. 3A*



*FIG. 3B*



*FIG. 4A*



FIG. 4B



*FIG. 5*

*(Prior Art)*

US 10,541,883 B2

**1**

**PLAYBACK DEVICE CONNECTION**

CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/091,113, filed on Apr. 5, 2016; U.S. application Ser. No. 14/486,667, filed on Sep. 15, 2014, and issued on Jan. 9, 2018, as U.S. Pat. No. 9,866,447; U.S. application Ser. No. 14/486,667 is a continuation of U.S. application Ser. No. 13/618,829, filed on Sep. 14, 2012, and issued Oct. 21, 2014, as U.S. Pat. No. 8,868,698; U.S. application Ser. No. 13/618,829 is a continuation of U.S. application Ser. No. 11/147,116 filed on Jun. 6, 2005, and issued Dec. 4, 2012, as U.S. Pat. No. 8,326,951; U.S. application Ser. No. 11/147,116 claims priority to provisional application 60/577,284 filed Jun. 5, 2004. The entire contents of U.S. application Ser. Nos. 15/091,113; 14/486,667; 13/618,829; 11/147,116; and 60/577,284 applications are incorporated herein by reference.

BACKGROUND

Field of the Invention

The invention is generally related to the area of multimedia technologies in consumer electronics industry. More particularly, the invention is related to techniques for connecting various devices to a network for secure communications with a minimum of human interaction and technical ability.

The Background of Related Art

Consumer electronics devices that operate using wireless or wired Ethernet standards are often subject to the same complicated set-up process as a wireless computer network. Typically, the person who sets up the wireless network must have at least some knowledge about IP (Internet Protocol) networking and Ethernet (e.g., 802.3, 802.11), such as addressing, security, broadcast, unicast, etc. Such a skill requirement is generally acceptable for computer-to-computer networks, which is typically done by an IT professional. However, it is impractical to require average consumers to have such knowledge to hook up consumer electronic devices, such as home entertainment products that use wireless/wired Ethernet connectivity.

FIG. **5** shows an exemplary setting **500** for connecting a computer to a wireless network. The setting **500** is typically displayed when a user is ready to connect the computer to a wireless network so that the user can enter relevant information in the setting **500**. Although the setting **500** requires very little information to make the computer connected to the network, the information is relatively technical to the average consumers. First, the user has to know what type of network the computer is going to be connected to. There are two choices **502**, Access Point (infrastructure) and Computer-to-computer (Ad Hoc). The distinction between these two types of network is a common knowledge to the IT professionals yet can be a difficult question to the average consumers. Further even if the user knows the difference, there are more questions or options related to the security settings in **504**, which evidently requires some good understanding about the network security over the wireless network.

**2**

For home entertainment products, there is a clear need to create simple methods of setting up and maintaining a secure wireless/wired in-home network with minimum human interventions.

SUMMARY OF THE INVENTION

This section is for the purpose of summarizing some aspects of the present invention and to briefly introduce some preferred embodiments. Simplifications or omissions in this section as well as in the abstract or the title of this description may be made to avoid obscuring the purpose of this section, the abstract and the title. Such simplifications or omissions are not intended to limit the scope of the present invention.

In general, the present invention pertains to techniques for automatically configuring necessary parameters of a device to be coupled to a network. According to one aspect of the present invention, an Ad-hoc (wireless or wired) network is established to facilitate communications among a group of devices. When a new device is added to the network, a rudimentary communication path is initially established between one of the devices in the network ("first device") and the new device ("second device") such that necessary parameters (e.g., SSID, WEP security, channel frequency) can be exchanged for the second device to function properly in the network. To ensure the parameters are exchanged in a secure fashion, an additional public security procedure can be used between the two devices.

According to another aspect of the present invention, a first device that may be or may not be the device in the network broadcasts a message including probing datagrams in compliance with the standard IP broadcast. The rudimentary communication path may be established after the second device responds to the message from the first device. According to yet another aspect of the present invention, such an automatic configuration process is only started when a user is indeed ready to do so. In general, a mechanism is provided and accessible by the user to activate the process. As such, no incident or unwanted configuration process could be initiated without the approval of the user. In one embodiment, the second device is equipped with two buttons that must be pressed simultaneously to activate the automatic configuration process.

The necessary parameters in the second device are subsequently configured in several exchanges of messages with the first device. At least some of the messages are encrypted. As a result, the second device is automatically configured to operate correctly in the network with a minimum of human intervention and technical ability. In an exemplary application of the present invention for an audio system with a controller and multiple zone players, an Ad-hoc network is formed among the controller and the zone players, where the network may be wired or wireless or a mixture of both. In one case, either a handheld controller or a zone player (referred to as an access device) is coupled to an access point of a LAN. An Ad-hoc network can be thus formed based on the access device. The remaining (unconfigured) zone players may be coupled to the network whenever desired, all with minimum human intervention. As a result, any one of the zone players may communicate with each other to share or distribute audio sources available on the Internet and reproduce sounds together or separately.

The present invention may be implemented in many forms including software, hardware or a combination of both as method, process, or system. According to one embodiment of the present invention, the present invention

US 10,541,883 B2

3

is a method for providing a first device and a second device for the network, activating the second device intentionally to automatically configure necessary parameters with the first device, establishing automatically a rudimentary communication path between the first device and the second device by scanning all available transmission channels allocated in accordance with a protocol; and exchanging messages between the first device and the second device over the rudimentary communication path till the second device is fully operating with the first device.

According to another embodiment of the present invention, the present invention is a system for establishing a network for a group of devices, the system comprises at least one of the devices provided to remotely control operations of one or more of the other devices, one of the devices (hereinafter "first device") configured to establish automatically respective rudimentary communication paths for probing communication, each of the rudimentary communication paths being with one of the other devices, wherein an automatic configuration process takes place only in one of the other devices after the user authorizes the one of the other devices to start the automatic configuration process, and wherein the automatic configuration process causes several messages to be exchanged between the first device and one of the other devices, some of the messages carry information pertaining to an appropriate transmission channel, an identifier of the network and a security key for subsequent communication, the some of the messages are encrypted.

According to yet another embodiment of the present invention, the present invention is a system for establishing a network for a group of devices, the system comprises a plurality of zone players, each equipped with a mechanism that is once manually activated by a user, an automatic configuration process starts, wherein one of the zone players is coupled to a local area network as an access device; and at least a controller provided to remotely control operations of one or more of the zone players, wherein the access device establishes automatically respective rudimentary communication paths, each with the controller or one of the remaining zone players, the automatic configuration process takes places in the controller and each of the remaining zone players after the user manually activates the automatic configuration process respectively in the controller and each of the remaining zone players, and wherein the automatic configuration process causes several messages to be exchanged between the access device and any one of the controller and the remaining zone players that have been activated for the automatic configuration process, some of the messages carry information pertaining to a transmission channel, an identifier of the network and a security key for subsequent communication, at least some of the messages are encrypted.

According to still another embodiment of the present invention, the present invention is a software product to be executable in a device for establishing a network for a group of devices, the software product comprises program code for activating a second device, when requested, to automatically configure necessary parameters with a first device, program code for establishing automatically a rudimentary communication path with the first device by scanning all available transmission channels allocated in accordance with a protocol, and program code for exchanging messages between the first device and the second device over the rudimentary communication path till the second device is fully operating with the first device.

4

According to still another embodiment of the present invention, the present invention is a method for establishing a network for a group of devices, the method comprises providing a plurality of zone players, each equipped with a mechanism that once is manually activated by a user, an automatic configuration process starts, wherein at least a controller is provided to remotely control operations of one or more of the zone players; coupling one of the zone players to a local area network as an access device; establishing automatically respective rudimentary communication paths with the access device, each of paths being with the controller or one of the remaining zone players, wherein the automatic configuration process takes place in the controller and each of the remaining zone players after the user manually activates the automatic configuration process respectively in the controller and each of the remaining zone players, and exchanging several messages between the access device and any one of the controller and the remaining zone players that have been activated for the automatic configuration process, wherein some of the messages carry information pertaining to a transmission channel, an identifier of the network and a security key for subsequent communication, and at least some of the messages are encrypted.

One of the objects, features, and advantages of the present invention is to provide techniques that facilitate automatic configuration of devices to be coupled to a network with minimum human intervention.

Other objects, features, and advantages of the present invention will become apparent upon examining the following detailed description of an embodiment thereof, taken in conjunction with the attached drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the present invention will become better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. **1** shows an exemplary configuration in which the present invention may be practiced;

FIG. **2A** shows an exemplary functional block diagram of a player in accordance with the present invention;

FIG. **2B** shows an example of controllers that may be used to remotely control one or more players of FIG. **1**;

FIG. **2C** shows an exemplary internal functional block diagram of a controller in accordance with one embodiment of the present invention;

FIG. **3A** shows three zone players and a controller that form an Ad-Hoc network as an example to facilitate the description of an automatic configuration process contemplated in the present invention;

FIG. **3B** shows an embodiment that involves a process of five exchanges of data;

FIG. **4A** shows a flowchart or process according to one embodiment of the present invention;

FIG. **4B** shows another flowchart or process according to one embodiment of the present invention; and

FIG. **5** shows an exemplary setting for connecting a computer to a wireless network.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention pertains to techniques for automatically configuring necessary parameters of a device to be coupled to a network with minimum human intervention.

US 10,541,883 B2

5

According to one aspect of the present invention, a wired and/or wireless Ad-hoc network is established to facilitate communications among a group of devices. According to one aspect of the present invention, when a new device is added to the network, a rudimentary communication path is initially established between one of the devices ("first device") in the network and the new device ("second device") such that necessary parameters (e.g., SSID, WEP security, channel frequency) can be exchanged for the new device to function properly in the network. To ensure the parameters are exchanged in a secure fashion, an additional public security procedure can be used between the two devices.

The detailed description of the present invention is presented largely in terms of procedures, steps, logic blocks, processing, or other symbolic representations that directly or indirectly resemble the operations of devices or systems that can be used on networks. These descriptions and representations are typically use by those skilled in the art to most effectively convey the substance of their work to others skilled in the art.

Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams or the use of sequence numbers representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

Embodiments of the invention are discussed herein with reference to an audio system with multi-zone capability. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to the audio system is for explanatory purposes as the invention extends beyond these limited embodiments.

Referring now to the drawings, in which like numerals refer to like parts throughout the several views. FIG. 1 shows an exemplary configuration 100 in which the present invention may be practiced. The configuration may represent, but not be limited to, a part of a residential home, a business building or a living complex with multiple zones. There are a number of multimedia players of which three examples 102, 104 and 106 are shown as audio devices. Each of the audio devices may be installed or provided in one particular area or zone and hence referred to as a zone player herein.

As used herein, unless explicitly stated otherwise, a track and an audio source are used interchangeably, an audio source or audio sources are in digital format and can be transported or streamed across a data network. To facilitate the understanding of the present invention, it is assumed that the configuration 100 represents a home. Thus, the zone player 102 and 104 may be located in two of the bedrooms respectively while the zone player 106 may be installed in a living room. All of the zone players 102, 104 and 106 are coupled directly or indirectly to a data network 108. In addition, a computing device 110 is shown to be coupled on the network 108. In reality, any other devices such as a home gateway device, a storage device, or an MP3 player may be coupled to the network 108 as well.

The network 108 may be a wired network, a wireless network or a combination of both. In one example, all devices including the zone players 102, 104 and 106 are

6

coupled to the network 108 by wireless means based on an industry standard such as IEEE 802.11. In yet another example, all devices including the zone players 102, 104 and 106 are part of a local area network that communicates with a wide area network (e.g., the Internet).

All devices on the network 108 may be configured to download and store audio sources or receive streaming audio sources. For example, the computing device 110 can download audio sources from the Internet and store the downloaded sources locally for sharing with other devices on the Internet or the network 108. The zone player 106 can be configured to receive streaming audio source and share the source with other devices. Shown as a stereo system, the device 112 is configured to receive an analog source (e.g., from broadcasting) or retrieve a digital source (e.g., from a compact disk). The analog sources can be converted to digital sources. In accordance with the present invention, all audio sources, regardless of where they are located or how they are received, may be shared among the devices on the network 108.

Any device on the network 108 may be configured to control operations of the zone players 102, 104 and 106. In particular, one or more controlling devices 140 and 142 are used to control zone players 102, 104 and 106 as shown in FIG. 1. The controlling devices 140 and 142 are preferably portable and remotely control the zone players via wireless means (e.g., infrared, radio, wireless standard IEEE 802.11b or 802.11g). In one embodiment, besides controlling an individual zone player, the controlling device 140 or 142 is configured to manage audio sources and other characteristics of all the zone players regardless where the controlling device 140 or 142 is located in a house or a confined living complex.

Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a zone player 200 in accordance with the present invention. The zone player 200 includes a network interface 202, a processor 204, a memory 206, an audio processing circuit 210, a digital signal processing module 212, and an audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player 200.

The network interface 202 may include either one or both of a wireless interface 216 and a wired interface 217. The wireless interface 216, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player 200 to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g). The wired interface 217 provides network interface functions by a wired means (e.g., an Ethernet cable). Depending on implementation, each of the zone players may be equipped with either one or both of the interfaces 216 or 217. In one embodiment, a zone player, referred to as an access zone player, including both of the interfaces 216 and 217 is coupled to an access point of an LAN and communicates with other zone players wirelessly. Thus these other zone

US 10,541,883 B2

7

players may communicate with other devices on a network or retrieve audio sources via the access zone player. The processor 204 is configured to control the operation of other parts in the zone player 200. The memory 206 may be loaded with one or more software modules that can be executed by the processor 204 to achieve desired tasks.

The audio processing circuit 210 resembles most of the circuitry in an audio playback device and includes one or more digital-to-analog converters (DAC), an audio preprocessing part, an audio enhancement part or a digital signal processor and others. In operation, when an audio source (e.g., audio source) is retrieved via the network interface 202, the audio source is processed in the audio processing circuit 210 to produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier 214 for playback on speakers. In addition, the audio processing circuit 210 may include necessary circuitry to process analog signals as inputs to produce digital signals for sharing with other devices on a network.

Depending on an exact implementation, the digital signal processing module 212 may be implemented within the audio processing circuit 210 or as a combination of hardware and software. The audio amplifier 214 is typically an analog circuit that powers the provided analog audio signals to drive one or more speakers.

Referring now to FIG. 28, there is shown an example of a controller 240, which may correspond to the controlling device 140 or 142 of FIG. 1. The controller 240 may be used to facilitate the control of multi-media applications, automation and others in a living complex. In particular, the controller 240 is configured to facilitate a selection of a plurality of audio sources available on the network, controlling operations of one or more zone players (e.g., the zone player 200) through a RF interface corresponding to the wireless interface 216 of FIG. 2A. According to one embodiment, the wireless means is based on an industry standard (e.g., infrared, radio, wireless standard IEEE 802.11 a, 802.11b or 802.11g). When a particular audio source is being played in the zone player 200, a picture, if there is one, associated with the audio source may be transmitted from the zone player 200 to the controller 240 for display. In one embodiment, the controller 240 is used to select an audio source for playback. In another embodiment, the controller 240 is used to manage (e.g., add, delete, move, save, or modify) a playlist.

The user interface for the controller 240 includes a screen 242 (e.g., a LCD screen) and a set of functional buttons as follows: a "zones" button 244, a "back" button 246, a "music" button 248, a scroll wheel 250, "ok" button 252, a set of transport control buttons 254, a mute button 262, a volume up/down button 264, a set of soft buttons 266 corresponding to the labels 268 displayed on the screen 242.

The screen 242 displays various screen menus in response to a selection by a user. In one embodiment, the "zones" button 244 activates a zone management screen or "Zone Menu" to allow a user to group players in a number of desired zones so that the players are synchronized to play an identical playlist or tracks. The "back" button 246 may lead to different actions depending on the current screen. In one embodiment, the "back" button triggers the current screen display to go back to a previous one. In another embodiment, the "back" button negates the user's erroneous selection. The "music" button 248 activates a music menu, which allows the selection of an audio source (e.g., a song track) to be added to a playlist (e.g., a music queue) for playback. The scroll wheel 250 is used for selecting an item within a list, whenever a list is presented on the screen 242. When

8

the items in the list are too many to be accommodated in one screen display, a scroll indicator such as a scroll bar or a scroll arrow is displayed beside the list. When the scroll indicator is displayed, a user may rotate the scroll wheel 250 to either choose a displayed item or display a hidden item in the list. The "ok" button 252 is use to confirm the user selection on the screen 242 or activate a playback of an item.

There are three transport buttons 254, which are used to control the effect of the currently playing track. For example, the functions of the transport buttons may include play/pause and forward/rewind a track, move forward to the next track, or move backward to the previous track. According to one embodiment, pressing one of the volume control buttons such as the mute button 262 or the volume up/down button 264 activates a volume panel. In addition, there are three soft buttons 266 that can be activated in accordance with the labels 268 on the screen 242. It can be understood that, in a multi-zone system, there may be multiple audio sources being played respectively in more than one zone players. The music transport functions described herein shall apply selectively to one of the sources when a corresponding zone player is selected.

FIG. 2C illustrates an internal functional block diagram of an exemplary controller 270, which may correspond to the controller 240 of FIG. 2B. The screen 272 on the controller 270 may be a LCD screen. The screen 272 communicates with and is commanded by a screen driver 274 that is controlled by a microcontroller (e.g., a processor) 276. The memory 282 may be loaded with one or more application modules 284 that can be executed by the microcontroller 276 with or without a user input via the user interface 278 to achieve desired tasks. In one embodiment, an application module is configured to facilitate automatic establishment of a wireless connection with a network or another device. In another embodiment, an application module is configured to facilitate automatically configuring itself after communicating with another configured device. It should be noted that similar application modules may also be included in the memory 206 of FIG. 2A. As a result, either a zone player or a controller may be automatically configured to communicate over a network, provided such an automatic configuration is intended by a user.

The controller 270 includes a network interface 280 referred to as a RF interface 280 that facilitates wireless communication with a zone player via a corresponding wireless interface or RF interface thereof. The controller 270 may control one or more zone players, such as 102, 104 and 106 of FIG. 1. Nevertheless, there may be more than one controllers, each preferably in a zone (e.g., a room) and configured to control any one and all of the zone players.

It should be pointed out that the controller 240 in FIG. 2B is not the only controlling device that may practice the present invention. Other devices that provide the equivalent control functions (e.g., a computing device, a PDA, a hand-held device, and a laptop computer) may also be configured to practice the present invention. In the above description, unless otherwise specifically described, it is clear that keys or buttons are generally referred to as either the physical buttons or soft buttons, enabling a user to enter a command or data.

It is assumed that a user has obtained an audio system that includes a set of zone players and a controller. Although it is possible to connect each of the zone players and the controller to a network, the requirement for extra network cards, cables and a hub/switch/router makes the idea unattractive. The introduction of wireless networking has allowed for an implementation without these requirements.

US 10,541,883 B2

9

FIG. **3**A shows that there are three zone players **302**, **304** and **306** and a controller **308** that form a network branch that is also referred to as an Ad-Hoc network **310**. In one embodiment, the network **310** is pure wireless. In another embodiment, the network **310** is wired or a combination of wired and wireless. In general, an Ad-Hoc (or "spontaneous") network is a local area network or other small network in which there is no one access point for all traffics. With an established Ad-Hoc network, the devices **302**, **304**, **306** and **308** can all communicate with each other in 'peer-to-peer' style of communication. Furthermore, any device may come/go from the network and the network will automatically reconfigure itself without needing the user to reconfigure the network.

By the Ad-Hoc network **310**, the devices **302**, **304**, **306** and **308** may share or exchange one or more audio sources and be grouped to play identical or different audio sources. For example, the devices **302** and **304** are grouped to play back one piece of music, and at the same time, the device **306** plays back another piece of music. In other words, the devices **302**, **304**, **306** and **308** as shown in FIG. **3**A form a HOUSEHOLD that distribute audio and/or reproduce sound. As used herein, the term HOUSEHOLD (always in caps to disambiguate from the user's domicile) is used to represent a collection of networked devices that are cooperating to provide an application or service. An instance of a HOUSEHOLD is identified with a Household ID (or HHID).

In one embodiment, an HHID is a short string or an identifier that is computer-generated to ensure that it is unique. Accordingly, the network **310** may be characterized by a unique HHID and a unique set of configuration variables or parameters, such as Channels (i.e., respective frequency bands), SSID (a sequence of alphanumeric characters as a name of a wireless network), and WEP keys (wired equivalent privacy, or simply security keys). In one embodiment, SSID is simply set to be the same as HHID. One of the aspects of the present invention is to provide a bootstrap procedure that enables automatic and simple establishment of these configuration parameters in each device within a HOUSEHOLD to enable communications among the devices.

In general, each HOUSEHOLD includes two types of network nodes:

Control Point (CP)—it controls the overall network setup process and sequencing, including an automatic generation of required network parameters (e.g., WEP keys). In one embodiment, it also provides the user with a HOUSEHOLD configuration user interface. The CP function is typically provided by a computer running a CP application module, or by a handheld controller (e.g., the controller **308**) also running CP application module.

Zone Player (ZP)—the ZP is any other device on the network that is placed to participate in the automatic configuration process. It should be noted that ZP, as a notation used herein, includes the controller **308** or a computing device.

The configuration of a HOUSEHOLD involves multiple CP's and ZP's that rendezvous and establish a known configuration such that they can use standard networking protocol (e.g., IP over Wired or Wireless Ethernet) for communication. In one embodiment, there are two types of networks/protocols: Ethernet—802.3 and Wireless—802.11g. Interconnections between a CP and a ZP may use either one of the networks/protocols. A device in the system as a member of a HOUSEHOLD may connect to both networks simultaneously. In an environment that has both

10

networks in use, it is assumed that at least one device in a system is connected to both as a bridging device, thus providing bridging services between wired/wireless networks for others. The zone player **306** in FIG. **3**A is shown to be connected to both networks, for example, the connectivity to the network **312** is based on Ethernet while the connectivity to other devices **302**, **304** and **308** is based on Wireless.

Establishing a rudimentary communication path. In reference to FIG. **3**A, a zone player is not yet a member of a HOUSEHOLD. It is assumed that the zone player is to be added to become a member of the HOUSEHOLD by a cable or wireless. When the zone player is initially turned on, it executes an embedded module that is configured to establish a rudimentary communication path with another device (network-enabled). The rudimentary communication path facilitates the automatic configuration of the zone player via the another device. This communication path may operate over wireless and/or Ethernet protocols, as the zone player may be connected to one or both. In operation, the communication path does not cause negative effects on other devices in the vicinity and can reach all other members of the HOUSEHOLD (both CP's and ZP's) if there are any. It should also be noted that the communication path does not have to be direct between two devices and may be bridged by one or more other devices. Because the communication path is only used for initial device configuration, it does not require significant performance or sophisticated functionality. There are at least two elements to establish the communication path: channel selection and packet exchange.

Channel Selection. The selection of an appropriate (RF) transmission channel or simply channel is primarily an exercise in two constraints: finding a channel that is quiet from a protocol (e.g., 802.11) viewpoint, i.e., minimal conflicting wireless traffic, and finding a channel that is quiet from an RF viewpoint, i.e., minimal noise from other signals. Both of these tests may be applied because typically a home environment may have other RF (e.g., 2.4 GHz) traffic or potentially other wireless access points. It is generally desirable to use a channel that is free from other RF interference. In any case, it is always desirable to avoid other wireless traffic.

Channel selection is typically accomplished with a scanning technique, namely the device listens on each channel for a period of time, looking for the presence of wireless beacons and other RF signals. In one embodiment, devices that are configured have a preferred channel for the HOUSEHOLD, devices that are not configured have a pre-defined (default) channel or channels that they rendezvous on. For example, 802.11b/g channel 1 could be pre-configured as the default channel. Alternatively, multiple channels, with a well-known frequency hopping sequence, could be used by the devices (this would require an aperiodic frequency change interval).

Many hardware configurations only support reception/ transmission on a single channel at a given time. Also there are configured and unconfigured devices that may use different channels for the bootstrap configuration and standard network operations (post-configuration communications). According to one embodiment, it is necessary to forcibly put the devices in a "configuration" mode, whereby they use the appropriate channels for communication.

Packet Exchange. To enable communication between devices that are not part of the same HOUSEHOLD, a packet exchange network infrastructure is developed. Probing messages are sent in such a way that they traverse both the Ethernet and wireless networks, reaching any connected

US 10,541,883 B2

11                                                              12

devices. Devices that are already in a HOUSEHOLD constitute a network infrastructure that can be used to exchange unicast and multicast/broadcast network frames between the devices. A device that is not yet in the HOUSEHOLD has a much more limited networking capability and can only receive data from devices to which it is directly wired, and unencrypted messages broadcast to all wireless networks operating in a particular channel of the RF spectrum.

In general, an IP address of a new device is not known to any members of the HOUSEHOLD. If the device is purely wireless, it may not have an IP address at all, or it may have an automatically assigned IP address that is inaccessible to other devices with IP addresses respectively assigned by a DHCP server. To allow devices that are not members of the HOUSEHOLD to join the HOUSEHOLD, a transport may be constructed that can get data one "hop" beyond the HOUSEHOLD network infrastructure.

In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe" datagrams and standard IP broadcast. For example, the 802.11 "probe" datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe" datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen. A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together as described below, the combination of the "probe" datagrams and IP broadcast provides for a broadcast datagram transport that allows even devices that have not had any networking parameters configured to communicate.

In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the normal IP data payload.

Messages relating to the bootstrap procedure may be forwarded beyond the boundaries of an existing HOUSEHOLD network infrastructure (including properly configured wireless devices, and the wired network). Similarly, messages originating outside of the HOUSEHOLD network infrastructure may be forwarded into the infrastructure. This forwarding procedure may be accomplished in a mixed wireless/wired network environment without introducing a broadcast storm. A broadcast storm is a state in which a message that has been broadcast across a network results in more responses than necessary, and each response results in even more responses in a snowball effect, subsequently resulting in a network meltdown. In one embodiment, the network is carefully configured to prevent such a broadcast storm or any illegal broadcast messages. To accomplish this, two flags are included in the message body, for example, "SENT_AS_PROBE" and "SENT_AS_IP_BROADCAST". When a device receives a "probe" message, assumed using "Sonos Netstart" SSID (or the broadcast BSS, as with all probe requests), it forwards the message as an IP broadcast message (after setting the "SENT_AS_

IP_BROADCAST" flag) if the SENT_AS_IP_BROADCAST flag is not already set. Similarly, when it receives an IP broadcast with a UDP payload address to an appropriate port (e.g., port number 6969), it forwards the message as a "probe" datagram (after setting the "SENT_AS_PROBE" flag) if that flag is not already set. This allows messages related to the packet exchange both to enter and to exit the HOUSEHOLD network infrastructure without causing a broadcast storm.

Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices.

Device Discovery. To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new HOUSEHOLD, containing one CP and two ZP's, the activation process may be manually activated on each by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the preinstalled module to start the bootstrap procedure.

For a ZP:

If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command.

If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network.

There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described above.

For the CP:

If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process.

If the device is configured, it will attempt to contact other members of its HOUSEHOLD network.

The CP may also be an orphaned device, in which case it performs similarly to that of the ZP.

In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired. At this point, the configuration process can begin.

Device Configuration. The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user

US 10,541,883 B2

13

or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices. Each device executes this sequence, and then exits the activation mode. FIG. 3B shows an embodiment that involves a process of five exchanges of data.

Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows:

Alive—a message indicating that a named ZP is available for configuration. The message includes at least a zpUU/O which is a globally unique identifier that identifies the ZP sending the message.

QueryNetParams—a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a zpUUID, cpPK (the RSA public key of the CP) and tid (a unique transaction identifier).

RespondNetParams—a response to the QueryNetParams. It includes the ZP's network configuration information (HHID, WEP key and RSA public key). For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a zpUUID, netConfig(the ZP's current network configuration parameters), zpPK, and tid. It is should be noted that a new ZP, set to factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured.

SetNetParams—a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a zpUU/O, netConfig and tid. It should be noted that netConfig includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration.

AckNetParams—a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a zpUUID and a tid.

In operation, after a user activates the configuration process (on both ZP and CP) at 351 in FIG. 38. The CP enters a state where it is willing to accept an Alive message. The CP only remains in this state for a limited (finite) period of time. The ZP enters an activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time. The ZP will periodically transmit an Alive message until it either receives a QueryNetParams message, or exits the activation state.

At 352, the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new tid, and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it sends the QueryNetParams. At 353, if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration. If the ZP is unconfigured (e.g., factory default settings), it will return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP also returns its public key such that the WEP key can be encrypted using the CP's public key.

At 354, upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations:

14

|  | GP already configured | GP not configured |
|---|---|---|
| ZP already configured | The CP sends a SetNetParams message to the ZP containing the GP's current net config. | The CP sets its own config to match theZP config, and the config process is terminated. |
| ZPnot configured | The CP sends a SetNetParams message tothe ZP containing the CP's current net config. | The CP generates new config parameters. The parameters are sent to the ZP in a SetNetParams message. The CP sets its own config to these values as well. |

At 355, when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet.

Accordingly, the GP determines that it generates new configuration parameters in accordance with the following:

HHID—this is provided by the user via the CP user interface or automatically generated by the CP.

SSID—this is automatically generated by the CP (e.g., set to the same value as the HHID).

WEP Key—this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the GP).

Channel—the GP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources).

Subsequent to the activation process, any devices that have been reconfigured will attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored.

If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions). If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence—the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence. Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP).

Security. To ensure that the communication among the members in a HOUSEHOLD by wireless means is secure, there are multiple issues in the auto-configuration that are resolved in the present invention.

1. Typically, the broadcasting messages in packet exchange are unencrypted. However, it is undesirable to transmit sensitive information such as WEP keys over wireless medium without encryption. As described below, public key cryptography is used to ensure that WEP keys are distributed in a secured manner.

2. Because the network configuration process is automated and the data is transmitted over the network, it is desirable to ensure that the process is not started without the approval of the user. Specifically, it must not be possible for a malicious wireless device to surreptitiously program one of the devices. Accord-

US 10,541,883 B2

15

ingly, the auto-configuration process is started manually by a user on all devices.

3. When one of the connected devices is removed from the HOUSEHOLD, it can no longer access to the network. This is accomplished with a mechanism on each device that resets it to factory default configuration (e.g., erases WEP keys and other private information).

4. It must be possible for the user to validate that they have correctly configured the right devices and that no other devices have been joined to the network. In one embodiment, this is accomplished with a validation/status user interface on the Control Point.

Use of Public Key Cryptography. The configuration process uses public key cryptography to exchange WEP keys and other information which must not be visible to any party sniffing the network. In one embodiment, this is accomplished in the following manner:

1. There is a designated (e.g., Sanos) certificate authority (CA), an entity that can issue signed public key certificates.

2. Each CP and ZP is factory configured with a unique certificate, public and private key, in a format that supports the RSA algorithm. The certificate is signed and issued by the designated CA, and includes a hash of the MAC address of a device.

3. CP and ZP exchange public keys and WEP keys are encrypted using the public key. In certain circumstances, the devices compare the MAC in received packets with that in the certificate to add an additional layer of security.

FIG. 4A shows a flowchart or process 400 according to one embodiment of the present invention. The process 400 may be implemented in hardware, software or a combination of both as a method, a system or a process. In one embodiment, the process 400 is implemented for a handheld controller or a computing device. To facilitate the understanding of the process 400, the description herein is based on a handheld controller, such as the controller 308 of FIG. 3A, which shall not be considered as the limitations to the present invention.

Typically, a handheld controller (or HH) is equipped with a mechanism to allow a user to reset itself. In some implementation, the reset is simply done when the controller is powered up. At 402, it is assumed that the controller is powered up. The process 400 goes to 404 to determine whether the controller is configured. By configuration, it means that the controller is ready for communication with other devices (e.g., zone players) that may or may not be on a network, preferably a wireless network. In the context of FIG. 3A, it means that the handheld device 308 is ready to communicate with each or all of the devices 302, 304, and 306 (assuming that the devices 302, 304, and 306 have not been configured yet).

It is assumed that the controller is configured, the process 400 goes to 406 where it determines whether the device is a controller or a computer. As described above, the device may be a controller, a personal computer or other type of device, although it has been assumed to be a controller. Nevertheless, in this embodiment, a step is provided to determine exactly what it is, because a controller and a computer may provide a different display or graphic environment. If the device is indeed a controller, the process 400 goes to 408, wherein the controller shows a proper screen for a user to proceed with the control of the zone players or replay of certain audios via one or more zone players. If the device is a computer, the computer is typically loaded with a module that is now executed to display an environment

16

(e.g., a graphic user interface or GUI) that allows a user to perform many tasks that may be done on the handheld controller in addition to other tasks that may be assisted by a pointing device (e.g., a mouse) or a keyboard.

In any case, it is assumed that the device is a controller. Referring back to 404, it is now assumed that the device is not configured, the process 400 goes to 412 to determine if a user has activated the automatic configuration process. In one embodiment, the controller goes to "sleep" mode after a predefined time should there be no activation of the configuration process. When the user activates the configuration process, the process 400 goes 414 to determine whether the controller itself is coupled to an access point of a network, at least a member of the HOUSEHOLD (e.g., one zone player) is coupled thereto or an Ad-Hoc network. Typically, a GUI is provided for a handheld or a computer. Accordingly, a display with a relevant message is displayed. After it is certain that either the controller itself or a zone player is coupled to a network, a user may press "OK" in the displayed GUI.

At 418, should the user desire to start the automatic configuration process now, the user activates the process manually. In one embodiment, there are two buttons, labeled respectively as "VOL" and "Mute". When these two buttons are pressed at the same time, the automatic configuration process starts. The process 400 goes to 420 to determine whether a valid response is received from a zone player. If not, after a certain time 422, the process 400 goes back to 418 to reactivate the process or 414 via 424 to remind the user to ensure that the required connection is placed.

In one embodiment, a handheld controller is configured to facilitate a new zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the zone player as follows:

1) when a reset or two buttons are pushed on the Zone-Player to 'activate' the household join process, it starts a scan through the available wireless channels, sending the "Alive" datagram for each channel in turn. Sometimes, it cycles through the channels several times;

2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and

3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a successful sequence ending in the configuration of the ZonePlayer (at which point it uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall timeout for the activation process has not expired).

Although the Zone Player performs the channel cycling, the controller may also be configured to perform the channel cycling as well. However, when the controller is, for example, a personal computer, the Zone Player is typically configured to cycle through the available channels.

In any case, when a valid response is received from the zone player, the process 400 determines whether the zone player provides its own network name (e.g., HHID) at 426. If the zone player does not have an HHID, which means that the zone player is to be added into a wireless network named after an HHID provided by the device, the process 400 goes to 428 to instruct the zone player to join the wireless network. If the zone player does have an HHID, which means that the device itself is to be added into the wireless network named after the HHID provided by the zone player, the process 400 goes to 430 to exit.

US 10,541,883 B2

17

The automatic configuration process, as described above, is executed. After it is completed, a message or an indication of completion is displayed. After the user acknowledges at **434**, the user is offered to name the zone player, for example, "Dinning" which means that the zone player is in the dinning room. Subsequently, the process **400** goes to **406**.

For completeness, FIG. **4B** shows a flowchart or process **450** that may be also implemented in hardware, software or a combination of both as a method, a system or a process. In one embodiment, the process **450** is implemented for a zone player. To facilitate the understanding of the process **450**, the description herein is based on a zone player, such as the player **302** of FIG. **3A**, which shall not be considered as the limitations to the present invention.

When a zone player is powered up, the process **450** determines whether the zone player is already registered or configured at **452**. There are situations in which the zone player just obtained by a user is already configured, for example, the zone player is a used one (i.e., previously configured). If it is indeed configured, the process **450** goes to **454** where an indication of "registered" is shown. If the zone player is never configured, the process **450** goes to **456** to indicate such. It is assumed that the zone player works normally at **458** (e.g., through an internal checkup).

At **460**, a user activates the automatic configuration process by, for example, pressing two buttons, labeled respectively as "VOL" and "Mute", at the same time. The automatic configuration process starts by sending out an Alive message at **462** as described above. At **464**, the zone player awaits a response. If no response is received within or beyond a predefined time, the process **450** goes to **466** or **458** to continue waiting for a response or restart the process. It is assumed that there is a response, and the automatic configuration process continues as shown in FIG. **3B** without failure, the process goes to **468** where the zone player is now part of the wireless network named after an HHID received either from a configured device or provided by itself.

There are numerous functions, benefits and advantages in the present invention. One of them is that the present invention provides techniques for automatically configuring parameters of a device to be coupled to an Ad-hoc network, where the Ad-hoc network forming by a group of devices can be wireless, wired or a combination of both. By way of the present invention, a system including a set of zone players and one or more controllers operates correctly and does not interfere with any existing network. Other functions, benefits and advantages can be appreciated from the detailed description provided above.

The present invention has been described in sufficient details with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement and combination of parts may be resorted without departing from the spirit and scope of the invention as claimed. Accordingly, the scope of the present invention is defined by the appended claims rather than the foregoing description of embodiments.

We claim:

**1**. A playback device comprising:

a network interface that is configured to provide an interconnection with at least one data network;

at least one processor;

a non-transitory computer-readable medium; and

program instructions stored on the non-transitory computer-readable medium that, when executed by the at

18

least one processor, cause the playback device to perform functions comprising:

detecting a triggering event that causes the playback device to enter a setup mode in which the playback device transmits at least a first message indicating that the playback device is available for setup;

while in the setup mode, receiving a response to the first message that facilitates establishing an initial communication path with a computing device that is installed with an application for controlling the playback device, wherein the computing device is operating on a secure wireless local area network (WLAN) that is defined by an access point, wherein the initial communication path with the computing device does not traverse the access point;

receiving, from the computing device via the initial communication path, at least a second message containing network configuration parameters for the secure WLAN, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN;

using the network configuration parameters to connect to the secure WLAN that is defined by the access point; and

transitioning from communicating with the computing device via the initial communication path to communicating with the computing device via the secure WLAN that is defined by the access point.

**2**. The playback device of claim **1**, wherein the triggering event comprises one of (a) powering on the playback device or (b) receiving user input via a physical interface of the playback device.

**3**. The playback device of claim **1**, wherein the computing device comprises a controller device of a networked audio system.

**4**. The playback device of claim **1**, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:

after receiving the second message, providing an indication that the playback device has successfully received the network configuration parameters for the secure WLAN.

**5**. The playback device of claim **4**, wherein providing the indication comprises transmitting, to the computing device via the initial communication path, at least a third message indicating that playback device has successfully received the network configuration parameters.

**6**. The playback device of claim **4**, wherein providing the indication comprises providing an indication that the playback device has successfully connected to the secure WLAN using the network configuration parameters.

**7**. The playback device of claim **1**, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:

after connecting to the secure WLAN, establishing a new networked audio system on the secure WLAN.

**8**. The playback device of claim **1**, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:

US 10,541,883 B2

19

after connecting to the secure WLAN, joining an existing
networked audio system operating on the secure
WLAN.

**9.** The playback device of claim **1**, further comprising
program instructions stored on the non-transitory computer-
readable medium that, when executed by the at least one
processor, cause the playback device to perform functions
comprising:

receiving, from the computing device, a command to
assign a name to the playback device.

**10.** The playback device of claim **1**, wherein communi-
cating with the computing device via the secure WLAN
comprises receiving a command related to playback of audio
content.

**11.** The playback device of claim **10**, wherein the com-
mand comprises a command to retrieve audio content for
playback from an audio source that is accessible via a
communication path that includes the secure WLAN, and
wherein the playback device further comprises program
instructions stored on the non-transitory computer-readable
medium that, when executed by the at least one processor,
cause the playback device to perform functions comprising:

in response to receiving the command, retrieving the
audio content from the audio source via the commu-
nication path that includes the secure WLAN.

**12.** The playback device of claim **1**, wherein the second
message comprises a command for the playback device to
adopt the network configuration parameters.

**13.** The computing device of claim **1**, further comprising
program instructions stored on the non-transitory computer-
readable medium that, when executed by the at least one
processor, cause the computing device to perform functions
comprising:

after transitioning to communicating with computing
device via the secure WLAN, receiving, from the
computing device, a command to form a group with at
least a first playback device of a networked audio
system such that the playback device is configured to
play back audio content in synchrony with at least the
first playback device.

**14.** A non-transitory, computer-readable storage medium,
wherein the non-transitory computer-readable storage
medium is provisioned with program instructions that are
executable to cause a playback device to perform functions
comprising:

detecting a triggering event that causes the playback
device to enter a setup mode in which the playback
device transmits at least a first message indicating that
the playback device is available for setup;

while in the setup mode, receiving a response to the first
message that facilitates establishing an initial commu-
nication path with a computing device that is installed
with an application for controlling the playback device,
wherein the computing device is operating on a secure
wireless local area network (WLAN) that is defined by
an access point, wherein the initial communication path
with the computing device does not traverse the access
point;

receiving, from the computing device via the initial com-
munication path, at least a second message containing
network configuration parameters for the secure
WLAN, wherein the network configuration parameters
comprise an identifier of the secure WLAN and a
security key for the secure WLAN;

using the network configuration parameters to connect to
the secure WLAN that is defined by the access point;
and

20

transitioning from communicating with the computing
device via the initial communication path to commu-
nicating with the computing device via the secure
WLAN that is defined by the access point.

**15.** The non-transitory, computer-readable storage
medium of claim **14**, wherein the triggering event comprises
one of (a) powering on the playback device or (b) receiving
user input via a physical interface of the playback device.

**16.** The non-transitory, computer-readable storage
medium of claim **14**, wherein the non-transitory computer-
readable medium is also provisioned with program instruc-
tions that are executable to cause the playback device to
perform functions comprising:

after receiving the second message, providing an indica-
tion that the playback device has successfully received
the network configuration parameters for the secure
WLAN.

**17.** The non-transitory, computer-readable storage
medium of claim **16**, wherein providing the indication
comprises transmitting, to the computing device via the
initial communication path, at least a third message indicat-
ing that the playback device has successfully received the
network configuration parameters.

**18.** The non-transitory, computer-readable storage
medium of claim **16**, wherein providing the indication
comprises providing an indication that the playback device
has successfully connected to the secure WLAN using the
network configuration parameters.

**19.** The non-transitory, computer-readable storage
medium of claim **14**, wherein communicating with the
computing device via the secure WLAN comprises receiv-
ing a command to retrieve audio content for playback from
an audio source that is accessible via a communication path
that includes the secure WLAN, and wherein the non-
transitory computer-readable medium is also provisioned
with program instructions that are executable to cause the
playback device to perform functions comprising:

in response to receiving the command, retrieving the
audio content from the audio source via the commu-
nication path that includes the secure WLAN.

**20.** A method comprising:

detecting a triggering event that causes the playback
device to enter a setup mode in which the playback
device transmits at least a first message indicating that
the playback device is available for setup;

while in the setup mode, receiving a response to the first
message that facilitates establishing an initial commu-
nication path with a computing device that is installed
with an application for controlling the playback device,
wherein the computing device is operating on a secure
wireless local area network (WLAN) that is defined by
an access point, wherein the initial communication path
with the computing device does not traverse the access
point;

receiving, from the computing device via the initial com-
munication path, at least a second message containing
network configuration parameters for the secure
WLAN, wherein the network configuration parameters
comprise an identifier of the secure WLAN and a
security key for the secure WLAN;

using the network configuration parameters to connect to
the secure WLAN that is defined by the access point;
and

transitioning from communicating with the computing
device via the initial communication path to commu-

US 10,541,883 B2

21

22

nicating with the computing device via the secure WLAN that is defined by the access point.

\* \* \* \* \*

# Exhibit 5

US010853023B2

(12) **United States Patent**　　　　　　(10) **Patent No.:**　　**US 10,853,023 B2**
Millington et al.　　　　　　　　　　　　　(45) **Date of Patent:**　　　***Dec. 1, 2020**

(54) **NETWORKED PLAYBACK DEVICE**

(71) Applicant: **Sonos, Inc.**, Santa Barbara, CA (US)

(72) Inventors: **Nicholas A. J. Millington**, Santa Barbara, CA (US); **Tom Cullen**, Santa Barbara, CA (US); **Robert Reimann**, Santa Barbara, CA (US); **Brent Lehman**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/166,518**

(22) Filed: **Oct. 22, 2018**

(65)　　　　**Prior Publication Data**

US 2019/0121604 A1　　Apr. 25, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/583,553, filed on May 1, 2017, now Pat. No. 10,108,393, which is a
(Continued)

(51) **Int. Cl.**
　　***G06F 17/00***　　　　(2019.01)
　　***G06F 3/16***　　　　(2006.01)
　　　　(Continued)

(52) **U.S. Cl.**
　　CPC .............. ***G06F 3/165*** (2013.01); ***G06F 3/162*** (2013.01); ***G11B 27/10*** (2013.01); ***H02B 1/00*** (2013.01);
　　　　(Continued)

(58) **Field of Classification Search**
　　CPC ......... G06F 3/162; G06F 3/165; G11B 27/10; H02B 1/00; H03G 3/10; H03G 3/3026; H04R 3/00; H04R 3/12; H04R 27/00
　　　　(Continued)

(56)　　　　**References Cited**

U.S. PATENT DOCUMENTS

3,956,591 A　　5/1976　Gates, Jr.
4,105,974 A　　8/1978　Rogers
　　　　(Continued)

FOREIGN PATENT DOCUMENTS

CA　　　2320451　A1　　3/2001
CN　　　1598767　A　　3/2005
　　　　(Continued)

OTHER PUBLICATIONS

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 4: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,312 filed Sep. 27, 2016, 229 pages.
(Continued)

*Primary Examiner* — Paul C McCord
(74) *Attorney, Agent, or Firm* — McDonnell Boehnen Hulbert & Berghoff LLP

(57)　　　　**ABSTRACT**

An example playback device includes a first interface for receiving a first audio signal from a first audio source; a second interface for receiving a second audio signal from a second audio source; and a processor configured to: cause the playback device to playback the second audio signal; determine that the first audio signal is present at the first interface; in response to determining that the first audio signal is present at the first interface, (i) cease playback of the second audio signal being played by the playback device and (ii) cause the playback device to playback the first audio signal; receive an instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface; and arm the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal.

**17 Claims, 22 Drawing Sheets**



## US 10,853,023 B2

Page 2

### Related U.S. Application Data

continuation of application No. 14/628,999, filed on Feb. 23, 2015, now Pat. No. 9,686,606, which is a continuation of application No. 14/561,421, filed on Dec. 5, 2014, now Pat. No. 9,681,223, which is a continuation of application No. 13/089,167, filed on Apr. 18, 2011, now Pat. No. 8,938,312.

(51) **Int. Cl.**

| | |
|---|---|
| *H03G 3/10* | (2006.01) |
| *H03G 3/30* | (2006.01) |
| *G11B 27/10* | (2006.01) |
| *H02B 1/00* | (2006.01) |
| *H04R 3/00* | (2006.01) |
| *H04R 3/12* | (2006.01) |
| *H04R 27/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *H03G 3/10* (2013.01); *H03G 3/3026* (2013.01); *H04R 3/00* (2013.01); *H04R 3/12* (2013.01); *H04R 27/00* (2013.01); *H04R 2227/005* (2013.01)

(58) **Field of Classification Search**
USPC ........................................................... 700/94
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D260,764 | S | 9/1981 | Castagna et al. |
| 4,306,114 | A | 12/1981 | Callahan |
| 4,509,211 | A | 4/1985 | Robbins |
| D279,779 | S | 7/1985 | Taylor |
| 4,530,091 | A | 7/1985 | Crockett |
| 4,696,037 | A | 9/1987 | Fierens |
| 4,701,629 | A | 10/1987 | Citroen |
| 4,712,105 | A | 12/1987 | Koehler |
| D293,671 | S | 1/1988 | Beaumont |
| 4,731,814 | A | 3/1988 | Becker et al. |
| 4,824,059 | A | 4/1989 | Butler |
| D301,037 | S | 5/1989 | Matsuda |
| 4,845,751 | A | 7/1989 | Schwab |
| D304,443 | S | 11/1989 | Grinyer et al. |
| D313,023 | S | 12/1990 | Kolenda et al. |
| D313,398 | S | 1/1991 | Gilchrist |
| D313,600 | S | 1/1991 | Weber |
| 4,994,908 | A | 2/1991 | Kuban et al. |
| 4,995,778 | A | 2/1991 | Bruessel |
| D320,598 | S | 10/1991 | Auerbach et al. |
| D322,609 | S | 12/1991 | Patton |
| 5,086,385 | A | 2/1992 | Launey et al. |
| D326,450 | S | 5/1992 | Watanabe |
| D327,060 | S | 6/1992 | Wachob et al. |
| 5,151,922 | A | 9/1992 | Weiss |
| D331,388 | S | 12/1992 | Dahnert et al. |
| 5,182,552 | A | 1/1993 | Paynting |
| D333,135 | S | 2/1993 | Wachob et al. |
| 5,237,327 | A | 8/1993 | Saitoh et al. |
| 5,272,757 | A | 12/1993 | Scofield et al. |
| D350,531 | S | 9/1994 | Tsuji |
| D350,962 | S | 9/1994 | Reardon et al. |
| 5,361,381 | A | 11/1994 | Short |
| 5,372,441 | A | 12/1994 | Louis |
| D354,059 | S | 1/1995 | Hendricks |
| D354,751 | S | 1/1995 | Hersh et al. |
| D356,093 | S | 3/1995 | McCauley et al. |
| D356,312 | S | 3/1995 | Althans |
| D357,024 | S | 4/1995 | Tokiyama et al. |
| 5,406,634 | A | 4/1995 | Anderson et al. |
| 5,430,485 | A | 7/1995 | Lankford et al. |
| 5,440,644 | A | 8/1995 | Farinelli et al. |
| D362,446 | S | 9/1995 | Gasiorek et al. |
| 5,457,448 | A | 10/1995 | Totsuka et al. |
| D363,933 | S | 11/1995 | Starck |
| D364,877 | S | 12/1995 | Tokiyama et al. |
| D364,878 | S | 12/1995 | Green et al. |
| D365,102 | S | 12/1995 | Gioscia |
| D366,044 | S | 1/1996 | Hara et al. |
| 5,481,251 | A | 1/1996 | Buys et al. |
| 5,515,345 | A | 5/1996 | Barreira et al. |
| D372,716 | S | 8/1996 | Thorne |
| 5,553,147 | A | 9/1996 | Pineau |
| 5,553,314 | A | 9/1996 | Grube et al. |
| D377,651 | S | 1/1997 | Biasotti et al. |
| 5,625,350 | A | 4/1997 | Fukatsu et al. |
| D379,816 | S | 6/1997 | Laituri et al. |
| 5,640,388 | A | 6/1997 | Woodhead et al. |
| 5,642,171 | A | 6/1997 | Baumgartner et al. |
| D380,752 | S | 7/1997 | Hanson |
| D382,271 | S | 8/1997 | Akwiwu |
| 5,661,665 | A | 8/1997 | Glass et al. |
| D384,940 | S | 10/1997 | Kono et al. |
| D387,352 | S | 12/1997 | Kaneko et al. |
| D388,792 | S | 1/1998 | Nykerk |
| D389,143 | S | 1/1998 | Wicks |
| D392,641 | S | 3/1998 | Fenner |
| D393,628 | S | 4/1998 | Ledbetter et al. |
| 5,740,235 | A | 4/1998 | Lester et al. |
| 5,742,623 | A | 4/1998 | Nuber et al. |
| D394,659 | S | 5/1998 | Biasotti et al. |
| 5,761,320 | A | 6/1998 | Farinelli et al. |
| 5,774,016 | A | 6/1998 | Ketterer |
| D395,889 | S | 7/1998 | Gerba et al. |
| 5,790,543 | A | 8/1998 | Cloutier |
| D397,996 | S | 9/1998 | Smith |
| 5,812,201 | A | 9/1998 | Yoo |
| 5,818,948 | A | 10/1998 | Gulick |
| D401,587 | S | 11/1998 | Rudolph |
| 5,832,024 | A | 11/1998 | Schotz et al. |
| 5,848,152 | A | 12/1998 | Slipy et al. |
| 5,852,722 | A | 12/1998 | Hamilton |
| D404,741 | S | 1/1999 | Schumaker et al. |
| D405,071 | S | 2/1999 | Gambaro |
| 5,875,233 | A | 2/1999 | Cox |
| D406,847 | S | 3/1999 | Gerba et al. |
| D407,071 | S | 3/1999 | Keating |
| 5,905,768 | A | 5/1999 | Maturi et al. |
| D410,927 | S | 6/1999 | Yamagishi |
| 5,910,991 | A | 6/1999 | Farrar |
| D412,337 | S | 7/1999 | Hamano |
| 5,923,902 | A | 7/1999 | Inagaki |
| 5,946,343 | A | 8/1999 | Schotz et al. |
| 5,956,025 | A | 9/1999 | Goulden et al. |
| 5,960,006 | A | 9/1999 | Maturi et al. |
| D415,496 | S | 10/1999 | Gerba et al. |
| D416,021 | S | 11/1999 | Godette et al. |
| 5,984,512 | A | 11/1999 | Jones et al. |
| 5,987,611 | A | 11/1999 | Freund |
| 5,990,884 | A | 11/1999 | Douma et al. |
| 5,991,307 | A | 11/1999 | Komuro et al. |
| 5,999,906 | A | 12/1999 | Mercs et al. |
| 6,018,376 | A | 1/2000 | Nakatani |
| D420,006 | S | 2/2000 | Tonino |
| 6,029,196 | A | 2/2000 | Lenz |
| 6,032,202 | A | 2/2000 | Lea et al. |
| 6,038,614 | A | 3/2000 | Chan et al. |
| 6,046,550 | A | 4/2000 | Ference et al. |
| 6,061,457 | A | 5/2000 | Stockhamer |
| 6,081,266 | A | 6/2000 | Sciammarella |
| 6,088,063 | A | 7/2000 | Shiba |
| D429,246 | S | 8/2000 | Holma |
| D430,143 | S | 8/2000 | Renk |
| 6,101,195 | A | 8/2000 | Lyons et al. |
| 6,119,239 | A | 9/2000 | Fujii |
| 6,122,749 | A | 9/2000 | Gulick |
| D431,552 | S | 10/2000 | Backs et al. |
| D432,525 | S | 10/2000 | Beecroft |
| 6,127,941 | A | 10/2000 | Van Ryzin |
| 6,148,205 | A | 11/2000 | Cotton |
| 6,169,725 | B1 | 1/2001 | Gibbs et al. |
| 6,181,383 | B1 | 1/2001 | Fox et al. |
| 6,195,435 | B1 | 2/2001 | Kitamura |

**US 10,853,023 B2**

Page 3

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,212,282 | B1 | 4/2001 | Mershon |
| 6,246,701 | B1 | 6/2001 | Slattery |
| D444,475 | S | 7/2001 | Levey et al. |
| 6,256,554 | B1 | 7/2001 | DiLorenzo |
| 6,269,406 | B1 | 7/2001 | Dutcher et al. |
| 6,301,012 | B1 | 10/2001 | White et al. |
| 6,310,652 | B1 | 10/2001 | Li et al. |
| 6,313,879 | B1 | 11/2001 | Kubo et al. |
| 6,321,252 | B1 | 11/2001 | Bhola et al. |
| D452,520 | S | 12/2001 | Gotham et al. |
| 6,353,172 | B1 | 3/2002 | Fay et al. |
| 6,356,871 | B1 | 3/2002 | Hemkumar et al. |
| 6,404,811 | B1 | 6/2002 | Cvetko et al. |
| 6,418,150 | B1 | 7/2002 | Staats |
| 6,442,443 | B1 | 8/2002 | Fujii et al. |
| D462,339 | S | 9/2002 | Allen et al. |
| D462,340 | S | 9/2002 | Allen et al. |
| D462,945 | S | 9/2002 | Skulley |
| 6,449,642 | B2 | 9/2002 | Bourke-Dunphy et al. |
| 6,456,783 | B1 | 9/2002 | Ando et al. |
| 6,463,474 | B1 | 10/2002 | Fuh et al. |
| 6,466,832 | B1 | 10/2002 | Zuqert et al. |
| 6,469,633 | B1 | 10/2002 | Wachter et al. |
| D466,108 | S | 11/2002 | Glodava et al. |
| 6,487,296 | B1 | 11/2002 | Allen et al. |
| 6,493,832 | B1 | 12/2002 | Itakura et al. |
| D468,297 | S | 1/2003 | Ikeda |
| 6,522,886 | B1 | 2/2003 | Youngs et al. |
| 6,535,121 | B2 | 3/2003 | Mathney et al. |
| D474,763 | S | 5/2003 | Tozaki et al. |
| D475,993 | S | 6/2003 | Meyer |
| D476,643 | S | 7/2003 | Yamagishi |
| D477,310 | S | 7/2003 | Moransais |
| D478,051 | S | 8/2003 | Sagawa |
| D478,069 | S | 8/2003 | Beck et al. |
| D478,896 | S | 8/2003 | Summers |
| 6,611,537 | B1 | 8/2003 | Edens et al. |
| D479,520 | S | 9/2003 | De |
| D481,056 | S | 10/2003 | Kawasaki et al. |
| 6,631,410 | B1 | 10/2003 | Kowalski et al. |
| 6,636,269 | B1 | 10/2003 | Baldwin |
| 6,653,899 | B2 | 11/2003 | Organvidez et al. |
| 6,654,720 | B1 | 11/2003 | Graham et al. |
| 6,654,956 | B1 | 11/2003 | Trinh et al. |
| 6,684,060 | B1 | 1/2004 | Curtin |
| D486,145 | S | 2/2004 | Kaminski et al. |
| 6,697,687 | B1 | 2/2004 | Kasahara et al. |
| 6,703,940 | B1 | 3/2004 | Allen et al. |
| 6,704,421 | B1 | 3/2004 | Kitamura |
| 6,741,961 | B2 | 5/2004 | Lim |
| D491,925 | S | 6/2004 | Griesau et al. |
| 6,757,517 | B2 | 6/2004 | Chang et al. |
| D493,148 | S | 7/2004 | Shibata et al. |
| D495,333 | S | 8/2004 | Borsboom |
| 6,778,073 | B2 | 8/2004 | Lutter et al. |
| 6,778,869 | B2 | 8/2004 | Champion |
| D496,003 | S | 9/2004 | Spira |
| D496,005 | S | 9/2004 | Wang |
| D496,335 | S | 9/2004 | Spira |
| D497,363 | S | 10/2004 | Olson et al. |
| 6,809,635 | B1 | 10/2004 | Kaaresoja |
| D499,086 | S | 11/2004 | Polito |
| 6,816,510 | B1 | 11/2004 | Banerjee |
| 6,826,283 | B1 | 11/2004 | Wheeler et al. |
| D499,395 | S | 12/2004 | Hsu |
| D499,718 | S | 12/2004 | Chen |
| D500,015 | S | 12/2004 | Gubbe |
| D501,477 | S | 2/2005 | Hall |
| 6,859,460 | B1 | 2/2005 | Chen |
| D502,538 | S | 2/2005 | Voltz |
| 6,873,862 | B2 | 3/2005 | Reshefsky |
| 6,882,335 | B2 | 4/2005 | Saarinen |
| D504,872 | S | 5/2005 | Uehara et al. |
| D504,885 | S | 5/2005 | Zhang et al. |
| 6,901,439 | B1 | 5/2005 | Bonasia et al. |
| D506,463 | S | 6/2005 | Daniels |
| 6,915,347 | B2 | 7/2005 | Hanko et al. |
| 6,919,771 | B2 | 7/2005 | Nakajima |
| 6,931,557 | B2 | 8/2005 | Togawa |
| 6,937,988 | B1 | 8/2005 | Hemkumar et al. |
| 6,987,767 | B2 | 1/2006 | Saito |
| D515,072 | S | 2/2006 | Lee |
| D515,557 | S | 2/2006 | Okuley |
| 6,999,827 | B1 | 2/2006 | Yong |
| D518,475 | S | 4/2006 | Yang et al. |
| 7,046,677 | B2 | 5/2006 | Monta et al. |
| D524,296 | S | 7/2006 | Kita |
| 7,072,477 | B1 | 7/2006 | Kincaid |
| D527,375 | S | 8/2006 | Flora et al. |
| 7,092,528 | B2 | 8/2006 | Patrick et al. |
| 7,092,694 | B2 | 8/2006 | Griep et al. |
| 7,096,169 | B2 | 8/2006 | Crutchfield et al. |
| 7,120,168 | B2 | 10/2006 | Zimmermann |
| 7,130,316 | B2 | 10/2006 | Kovacevic |
| 7,130,608 | B2 | 10/2006 | Hollstrom et al. |
| 7,130,616 | B2 | 10/2006 | Janik |
| 7,136,934 | B2 | 11/2006 | Carter et al. |
| 7,139,981 | B2 | 11/2006 | Mayer et al. |
| 7,143,939 | B2 | 12/2006 | Henzerling |
| 7,146,260 | B2 | 12/2006 | Preston et al. |
| 7,161,939 | B2 | 1/2007 | Israel et al. |
| 7,197,148 | B2 | 3/2007 | Nourse et al. |
| 7,206,618 | B2 | 4/2007 | Latto et al. |
| 7,218,708 | B2 | 5/2007 | Berezowski et al. |
| 7,236,773 | B2 | 6/2007 | Thomas |
| 7,260,616 | B1 | 8/2007 | Cook |
| 7,263,110 | B2 | 8/2007 | Fujishiro |
| 7,269,338 | B2 | 9/2007 | Janevski |
| 7,277,547 | B1 | 10/2007 | Delker et al. |
| 7,289,631 | B2 | 10/2007 | Ishidoshiro |
| 7,295,548 | B2 | 11/2007 | Blank et al. |
| 7,302,468 | B2 | 11/2007 | Wijeratne |
| 7,305,694 | B2 | 12/2007 | Commons et al. |
| 7,308,188 | B2 | 12/2007 | Namatame |
| 7,313,384 | B1 | 12/2007 | Meenan et al. |
| 7,324,857 | B2 | 1/2008 | Goddard |
| 7,356,011 | B1 | 4/2008 | Waters et al. |
| 7,366,206 | B2 | 4/2008 | Lockridge et al. |
| 7,391,791 | B2 | 6/2008 | Balassanian et al. |
| 7,428,310 | B2 | 9/2008 | Park |
| 7,430,181 | B1 | 9/2008 | Hong |
| 7,457,948 | B1 | 11/2008 | Bilicksa et al. |
| 7,472,058 | B2 | 12/2008 | Tseng et al. |
| 7,483,538 | B2 | 1/2009 | McCarty et al. |
| 7,490,044 | B2 | 2/2009 | Kulkarni |
| 7,492,912 | B2 | 2/2009 | Chung et al. |
| 7,505,889 | B2 | 3/2009 | Salmonsen et al. |
| 7,519,188 | B2 | 4/2009 | Berardi et al. |
| 7,539,551 | B2 | 5/2009 | Komura et al. |
| 7,548,744 | B2 | 6/2009 | Oesterling et al. |
| 7,548,851 | B1 | 6/2009 | Lau et al. |
| 7,558,224 | B1 | 7/2009 | Surazski et al. |
| 7,558,635 | B1 | 7/2009 | Thiel et al. |
| 7,571,014 | B1 * | 8/2009 | Lambourne ............ H04R 27/00 700/94 |
| 7,627,825 | B2 | 12/2009 | Kakuda |
| 7,630,500 | B1 | 12/2009 | Beckman et al. |
| 7,630,501 | B2 | 12/2009 | Blank et al. |
| 7,643,894 | B2 | 1/2010 | Braithwaite et al. |
| 7,653,344 | B1 | 1/2010 | Feldman et al. |
| 7,657,910 | B1 | 2/2010 | McAulay et al. |
| 7,675,943 | B2 | 3/2010 | Mosig et al. |
| 7,676,044 | B2 | 3/2010 | Sasaki et al. |
| 7,676,142 | B1 | 3/2010 | Hung |
| 7,688,306 | B2 | 3/2010 | Wehrenberg et al. |
| 7,710,941 | B2 | 5/2010 | Rietschel et al. |
| 7,721,032 | B2 | 5/2010 | Bushell et al. |
| 7,728,911 | B2 | 6/2010 | Lacy et al. |
| 7,746,906 | B2 | 6/2010 | Jinzaki et al. |
| 7,761,176 | B2 | 7/2010 | Ben-Yaacov et al. |
| 7,831,054 | B2 | 11/2010 | Ball et al. |
| 7,853,341 | B2 | 12/2010 | McCarty et al. |
| 7,882,234 | B2 | 2/2011 | Watanabe et al. |
| 7,908,637 | B2 | 3/2011 | Kwon et al. |

US 10,853,023 B2

Page 4

(56)　　　　　References Cited

U.S. PATENT DOCUMENTS

| 7,930,644 | B2 | 4/2011 | Silva et al. |
| 7,933,418 | B2 | 4/2011 | Morishima |
| 7,945,636 | B2 | 5/2011 | Nelson et al. |
| 7,945,708 | B2 | 5/2011 | Ohkita |
| 7,966,388 | B1 | 6/2011 | Pugaczewski et al. |
| 7,987,294 | B2 | 7/2011 | Bryce et al. |
| 7,995,732 | B2 | 8/2011 | Koch et al. |
| 8,014,423 | B2 | 9/2011 | Thaler et al. |
| 8,041,062 | B2 | 10/2011 | Cohen et al. |
| 8,045,952 | B2 | 10/2011 | Qureshey et al. |
| 8,050,203 | B2 | 11/2011 | Jacobsen et al. |
| 8,054,987 | B2 | 11/2011 | Seydoux |
| 8,055,363 | B2 | 11/2011 | Lee |
| 8,063,698 | B2 | 11/2011 | Howard |
| 8,103,009 | B2 | 1/2012 | McCarty et al. |
| 8,139,774 | B2 | 3/2012 | Berardi et al. |
| 8,150,079 | B2 | 4/2012 | Maeda et al. |
| 8,160,281 | B2 | 4/2012 | Kim et al. |
| 8,170,222 | B2 | 5/2012 | Dunko |
| 8,175,292 | B2 | 5/2012 | Aylward et al. |
| 8,229,125 | B2 | 7/2012 | Short |
| 8,233,029 | B2 | 7/2012 | Yoshida et al. |
| 8,233,632 | B1 | 7/2012 | MacDonald et al. |
| 8,234,395 | B2 | 7/2012 | Millington |
| 8,238,578 | B2 | 8/2012 | Aylward |
| 8,243,961 | B1 | 8/2012 | Morrill |
| 8,265,310 | B2 | 9/2012 | Berardi et al. |
| 8,275,307 | B2 | 9/2012 | Doyle et al. |
| 8,290,185 | B2 | 10/2012 | Kim |
| 8,306,235 | B2 | 11/2012 | Mahowald |
| 8,311,226 | B2 | 11/2012 | Lorgeoux et al. |
| 8,325,935 | B2 | 12/2012 | Rutschman |
| 8,331,585 | B2 | 12/2012 | Hagen et al. |
| 8,345,891 | B2 | 1/2013 | Jakes et al. |
| 8,374,595 | B2 | 2/2013 | Chien et al. |
| 8,391,501 | B2 | 3/2013 | Khawand et al. |
| 8,411,883 | B2 | 4/2013 | Matsumoto |
| 8,423,893 | B2 | 4/2013 | Ramsay et al. |
| 8,442,239 | B2 | 5/2013 | Bruelle-Drews et al. |
| 8,452,020 | B2 | 5/2013 | Gregg et al. |
| 8,472,633 | B2 | 6/2013 | Krantz et al. |
| 8,477,958 | B2 | 7/2013 | Moeller et al. |
| 8,483,853 | B1 | 7/2013 | Lambourne et al. |
| 8,521,316 | B2 | 8/2013 | Louboutin |
| 8,565,455 | B2 | 10/2013 | Worrell et al. |
| 8,577,045 | B2 | 11/2013 | Gibbs |
| 8,600,075 | B2 | 12/2013 | Lim |
| 8,600,084 | B1 | 12/2013 | Garrett |
| 8,601,394 | B2 | 12/2013 | Sheehan et al. |
| 8,620,006 | B2 | 12/2013 | Berardi et al. |
| 8,639,370 | B2 | 1/2014 | Torrini et al. |
| 8,654,995 | B2 | 2/2014 | Silber et al. |
| 8,688,431 | B2 | 4/2014 | Lyons et al. |
| 8,855,319 | B2 | 10/2014 | Liu et al. |
| 8,861,739 | B2 | 10/2014 | Ojanpera |
| 8,879,761 | B2 | 11/2014 | Johnson et al. |
| 8,914,559 | B2 | 12/2014 | Kalayjian et al. |
| 8,934,647 | B2 | 1/2015 | Joyce et al. |
| 8,934,655 | B2 | 1/2015 | Breen et al. |
| 8,938,312 | B2 | 1/2015 | Millington et al. |
| 8,942,252 | B2 | 1/2015 | Balassanian et al. |
| 8,942,395 | B2 | 1/2015 | Lissaman et al. |
| 8,965,546 | B2 | 2/2015 | Visser et al. |
| 8,977,974 | B2 | 3/2015 | Kraut |
| 8,984,442 | B2 | 3/2015 | Pirnack et al. |
| 9,020,153 | B2 | 4/2015 | Britt, Jr. |
| 9,042,556 | B2 | 5/2015 | Kallai et al. |
| 9,195,258 | B2 | 11/2015 | Millington |
| 2001/0042107 | A1 | 11/2001 | Palm |
| 2001/0043456 | A1 | 11/2001 | Atkinson |
| 2001/0050991 | A1 | 12/2001 | Eves |
| 2002/0022453 | A1 | 2/2002 | Balog et al. |
| 2002/0026442 | A1 | 2/2002 | Lipscomb et al. |
| 2002/0072816 | A1 | 6/2002 | Shdema et al. |
| 2002/0072817 | A1 | 6/2002 | Champion |

| 2002/0078293 | A1 | 6/2002 | Kou et al. |
| 2002/0083175 | A1 | 6/2002 | Knowles et al. |
| 2002/0083342 | A1 | 6/2002 | Webb et al. |
| 2002/0098878 | A1 | 7/2002 | Mooney et al. |
| 2002/0101357 | A1 | 8/2002 | Gharapetian |
| 2002/0112084 | A1 | 8/2002 | Deen et al. |
| 2002/0124097 | A1 | 9/2002 | Isely et al. |
| 2002/0131761 | A1 | 9/2002 | Kawasaki et al. |
| 2002/0137505 | A1 | 9/2002 | Eiche et al. |
| 2002/0150053 | A1 | 10/2002 | Gray et al. |
| 2002/0165921 | A1 | 11/2002 | Sapieyevski |
| 2002/0188762 | A1 | 12/2002 | Tomassetti et al. |
| 2003/0014486 | A1 | 1/2003 | May |
| 2003/0023329 | A1 | 1/2003 | Brooks et al. |
| 2003/0023411 | A1 | 1/2003 | Witmer et al. |
| 2003/0043856 | A1 | 3/2003 | Lakaniemi et al. |
| 2003/0046703 | A1 | 3/2003 | Knowles et al. |
| 2003/0063755 | A1 | 4/2003 | Nourse et al. |
| 2003/0073432 | A1 | 4/2003 | Meade |
| 2003/0103088 | A1 | 6/2003 | Dresti et al. |
| 2003/0157951 | A1 | 8/2003 | Hasty |
| 2003/0167335 | A1 | 9/2003 | Alexander |
| 2003/0179780 | A1 | 9/2003 | Walker et al. |
| 2003/0185400 | A1 | 10/2003 | Yoshizawa et al. |
| 2003/0198257 | A1 | 10/2003 | Sullivan et al. |
| 2003/0212802 | A1 | 11/2003 | Rector et al. |
| 2003/0219007 | A1 | 11/2003 | Barrack et al. |
| 2003/0231208 | A1 | 12/2003 | Hanon et al. |
| 2004/0001591 | A1 | 1/2004 | Mani et al. |
| 2004/0014426 | A1 | 1/2004 | Moore |
| 2004/0015252 | A1 | 1/2004 | Aiso et al. |
| 2004/0019807 | A1 | 1/2004 | Freund et al. |
| 2004/0023697 | A1 | 2/2004 | Komura |
| 2004/0024478 | A1 | 2/2004 | Hans et al. |
| 2004/0031853 | A1 | 2/2004 | Peng |
| 2004/0037433 | A1 | 2/2004 | Chen |
| 2004/0042629 | A1 | 3/2004 | Mellone et al. |
| 2004/0059842 | A1 | 3/2004 | Hanson et al. |
| 2004/0081099 | A1 | 4/2004 | Patterson et al. |
| 2004/0117462 | A1 | 6/2004 | Bodin et al. |
| 2004/0136554 | A1 | 7/2004 | Kirkeby |
| 2004/0168081 | A1 | 8/2004 | Ladas et al. |
| 2004/0171346 | A1 | 9/2004 | Lin |
| 2004/0177167 | A1 | 9/2004 | Iwamura et al. |
| 2004/0183827 | A1 | 9/2004 | Putterman et al. |
| 2004/0185773 | A1 | 9/2004 | Gerber et al. |
| 2004/0203590 | A1 | 10/2004 | Shteyn |
| 2004/0223622 | A1 | 11/2004 | Lindemann et al. |
| 2004/0237750 | A1 | 12/2004 | Smith et al. |
| 2004/0239816 | A1* | 12/2004 | Ando ................... H04N 5/4401 |
| | | | 348/705 |
| 2004/0249490 | A1 | 12/2004 | Sakai |
| 2004/0252400 | A1 | 12/2004 | Blank et al. |
| 2004/0253969 | A1 | 12/2004 | Nguyen et al. |
| 2005/0060435 | A1 | 3/2005 | Xue et al. |
| 2005/0100174 | A1 | 5/2005 | Howard et al. |
| 2005/0131558 | A1 | 6/2005 | Braithwaite et al. |
| 2005/0154766 | A1 | 7/2005 | Huang et al. |
| 2005/0160270 | A1 | 7/2005 | Goldberg et al. |
| 2005/0197725 | A1 | 9/2005 | Alexander et al. |
| 2005/0201549 | A1 | 9/2005 | Dedieu et al. |
| 2005/0235334 | A1 | 10/2005 | Togashi et al. |
| 2005/0281138 | A1 | 12/2005 | Shimozawa et al. |
| 2006/0029005 | A1* | 2/2006 | Slemmer .............. H04L 12/2805 |
| | | | 370/270 |
| 2006/0072489 | A1 | 4/2006 | Toyoshima |
| 2006/0083388 | A1 | 4/2006 | Rothschild |
| 2006/0089735 | A1 | 4/2006 | Atkinson |
| 2006/0173844 | A1 | 8/2006 | Zhang et al. |
| 2006/0173972 | A1 | 8/2006 | Jung et al. |
| 2006/0205349 | A1 | 9/2006 | Passier et al. |
| 2006/0222186 | A1 | 10/2006 | Paige et al. |
| 2006/0227985 | A1 | 10/2006 | Kawanami |
| 2006/0229752 | A1 | 10/2006 | Chung |
| 2006/0259649 | A1 | 11/2006 | Hsieh et al. |
| 2006/0270395 | A1 | 11/2006 | Dhawan et al. |
| 2007/0003067 | A1 | 1/2007 | Gierl et al. |
| 2007/0005160 | A1 | 1/2007 | Zaucha et al. |
| 2007/0053514 | A1 | 3/2007 | Imai et al. |

## US 10,853,023 B2
Page 5

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0087686 A1 | 4/2007 | Holm et al. |
| 2007/0142944 A1 | 6/2007 | Goldberg et al. |
| 2007/0220150 A1 | 9/2007 | Garg |
| 2007/0265031 A1 | 11/2007 | Koizumi et al. |
| 2007/0291961 A1 | 12/2007 | Shin |
| 2008/0075295 A1 | 3/2008 | Mayman et al. |
| 2008/0077261 A1 | 3/2008 | Baudino et al. |
| 2008/0092204 A1 | 4/2008 | Bryce et al. |
| 2008/0109852 A1 | 5/2008 | Kretz et al. |
| 2008/0144864 A1 | 6/2008 | Huon |
| 2008/0146289 A1 | 6/2008 | Korneluk et al. |
| 2008/0152165 A1 | 6/2008 | Zacchi |
| 2008/0205070 A1 | 8/2008 | Osada |
| 2008/0215169 A1 | 9/2008 | Debettencourt et al. |
| 2008/0216125 A1 | 9/2008 | Li et al. |
| 2008/0303947 A1 | 12/2008 | Ohnishi et al. |
| 2009/0006968 A1 | 1/2009 | Trask et al. |
| 2009/0011798 A1 | 1/2009 | Yamada |
| 2009/0070434 A1 | 3/2009 | Himmelstein |
| 2009/0124289 A1 | 5/2009 | Nishida |
| 2009/0251604 A1 | 10/2009 | Iyer |
| 2010/0054709 A1 | 3/2010 | Misawa et al. |
| 2010/0087089 A1 | 4/2010 | Struthers et al. |
| 2010/0142735 A1 | 6/2010 | Yoon et al. |
| 2010/0274372 A1 | 10/2010 | Nielsen et al. |
| 2010/0332565 A1 | 12/2010 | Al-Shaykh et al. |
| 2011/0001632 A1 | 1/2011 | Hohorst |
| 2011/0002487 A1 | 1/2011 | Panther et al. |
| 2011/0170710 A1 | 7/2011 | Son |
| 2011/0228944 A1 | 9/2011 | Croghan et al. |
| 2011/0301728 A1 | 12/2011 | Hamilton et al. |
| 2011/0316768 A1 | 12/2011 | McRae |
| 2012/0051558 A1 | 3/2012 | Kim et al. |
| 2012/0051567 A1 | 3/2012 | Castor-Perry |
| 2012/0127831 A1 | 5/2012 | Gicklhorn et al. |
| 2012/0148075 A1 | 6/2012 | Goh et al. |
| 2012/0263325 A1 | 10/2012 | Freeman et al. |
| 2012/0275624 A1 | 11/2012 | Ho et al. |
| 2012/0288126 A1 | 11/2012 | Karkkainen et al. |
| 2012/0304233 A1 | 11/2012 | Roberts et al. |
| 2013/0010970 A1 | 1/2013 | Hegarty et al. |
| 2013/0022221 A1 | 1/2013 | Kallai et al. |
| 2013/0028443 A1 | 1/2013 | Pance et al. |
| 2013/0129122 A1 | 5/2013 | Johnson et al. |
| 2013/0259254 A1 | 10/2013 | Xiang et al. |
| 2014/0016784 A1 | 1/2014 | Sen et al. |
| 2014/0016786 A1 | 1/2014 | Sen |
| 2014/0016802 A1 | 1/2014 | Sen |
| 2014/0023196 A1 | 1/2014 | Xiang et al. |
| 2014/0112481 A1 | 4/2014 | Li et al. |
| 2014/0219456 A1 | 8/2014 | Morrell et al. |
| 2014/0226823 A1 | 8/2014 | Sen et al. |
| 2014/0256260 A1 | 9/2014 | Ueda et al. |
| 2014/0294200 A1 | 10/2014 | Baumgarte et al. |
| 2014/0355768 A1 | 12/2014 | Sen et al. |
| 2014/0355794 A1 | 12/2014 | Morrell et al. |
| 2015/0063610 A1 | 3/2015 | Mossner |
| 2015/0146886 A1 | 5/2015 | Baumgarte |
| 2015/0201274 A1 | 7/2015 | Ellner et al. |
| 2015/0281866 A1 | 10/2015 | Williams et al. |
| 2015/0365987 A1 | 12/2015 | Weel |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1669240 A | 9/2005 |
| CN | 1871838 A | 11/2006 |
| CN | 101053152 A | 10/2007 |
| CN | 101127987 A | 2/2008 |
| CN | 101212827 A | 7/2008 |
| CN | 101320292 A | 12/2008 |
| CN | 101501775 A | 8/2009 |
| CN | 101667414 A | 3/2010 |
| EP | 1124175 A2 | 8/2001 |
| EP | 1133896 B1 | 8/2002 |
| EP | 1312188 A1 | 5/2003 |
| EP | 1389853 A1 | 2/2004 |
| EP | 1517464 A2 | 3/2005 |
| EP | 1416687 B1 | 8/2006 |
| EP | 1410686 | 3/2008 |
| EP | 1825713 B1 | 10/2012 |
| EP | 0742674 B1 | 4/2014 |
| EP | 2860992 A1 | 4/2015 |
| EP | 2978240 A1 | 1/2016 |
| GB | 2379533 A | 3/2003 |
| JP | 63269633 | 11/1988 |
| JP | H08261761 A | 10/1996 |
| JP | 2000149391 A | 5/2000 |
| JP | 2001210019 A | 8/2001 |
| JP | 2002111817 | 4/2002 |
| JP | 2003045166 A | 2/2003 |
| JP | 2005136457 | 5/2005 |
| JP | 2005136457 A | 5/2005 |
| JP | 2006054799 A | 2/2006 |
| JP | 2006217116 | 8/2006 |
| JP | 2007323789 | 12/2007 |
| JP | 2007336517 A | 12/2007 |
| JP | 2009135750 | 6/2009 |
| JP | 2011055043 A | 3/2011 |
| JP | 2011130496 | 6/2011 |
| KR | 2004001853 | 4/2004 |
| TW | 439027 | 6/2001 |
| WO | 9709756 A2 | 3/1997 |
| WO | 1999023560 | 5/1999 |
| WO | 0019693 A1 | 4/2000 |
| WO | 200153994 | 7/2001 |
| WO | 2003093950 A2 | 11/2003 |
| WO | 2007135581 A2 | 11/2007 |
| WO | 2008082350 A1 | 7/2008 |
| WO | 2015024881 | 2/2015 |

OTHER PUBLICATIONS

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 5: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,637 filed Sep. 27, 2016, 213 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 6: Defendants' Invalidity Contentions for U.S. Pat. No. 9,042,556 filed Sep. 27, 2016, 162 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 7: Defendants' Invalidity Contentions for U.S. Pat. No. 9,195,258 filed Sep. 27, 2016, 418 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 8: Defendants' Invalidity Contentions for U.S. Pat. No. 9,202,509 filed Sep. 27, 2016, 331 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 9: Defendants' Invalidity Contentions for U.S. Pat. No. 9,213,357 filed Sep. 27, 2016, 251 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 1: Defendants' Invalidity Contentions for U.S. Pat. No. 7,571,014 filed Apr. 15, 2016, 161 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 10: Defendants' Invalidity Contentions for U.S. Pat. No. 9,213,357 filed Apr. 15, 2016, 244 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 11: Defendants' Invalidity Contentions for U.S. Pat. No. 9,219,959 filed Apr. 15, 2016, 172 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 12: Defendants' Invalidity Contentions for U.S. Pat. No. D. 559,197 filed Apr. 15, 2016, 36 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 2: Defendants' Invalidity contentions for U.S. Pat. No. 8,588,949 filed Apr. 15, 2016, 112 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 3: Defendants' Invalidity Contentions for U.S. Pat. No. 8,843,224 filed Apr. 15, 2016, 118 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 4: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,312 filed Apr. 15, 2016, 217 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 5: Defendants' Invalidity Contentions for U.S. Pat. No. 8,938,637 filed Apr. 15, 2016, 177 pages.

## US 10,853,023 B2

Page 6

(56)            **References Cited**

OTHER PUBLICATIONS

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 6: Defendants' Invalidity Contentions for U.S. Pat. No. 9,042,556 filed Apr. 15, 2016, 86 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 7: Defendants' Invalidity Contentions for U.S. Pat. No. 9,130,771 filed Apr. 15, 2016, 203 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 8: Defendants' Invalidity Contentions for U.S. Pat. No. 9,195,258 filed Apr. 15, 2016, 400 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Initial Invalidity Contentions Exhibit 9: Defendants' Invalidity Contentions for U.S. Pat. No. 9,202,509 filed Apr. 15, 2016, 163 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Preliminary Identification of Prior Art References, provided Jul. 29, 2016, 5 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Brief in Support of their Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Oct. 12, 2016, 24 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendants' Opposition to Sonos's Motion to Strike Defendants' New Amended Answer Submitted with their Reply, provided Oct. 3, 2016, 15 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Complaint, provided Oct. 12, 2016, 43 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Exhibit B: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, provided Oct. 12, 2016, 43 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Opening Brief in Support of Defendants' Motion for Leave to Amend Their Answer to Add the Defense of Inequitable Conduct, provided Aug. 1, 2016, 11 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Order, provided Oct. 7, 2016, 2 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Plaintiff's Opposition to Defendants' Motion for Leave to Amend Their Answer to Add the Defense of Inequitable Conduct, provided Aug. 26, 2016, 25 pages.

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Redlined Exhibit B: Defendants' First Amended Answer to Plaintiffs' Third Amended Complaint, provided Aug. 1, 2016, 27 pages.

*Sonos, Inc.* v. *D&M Holdings*, DI 206-1, Transcript of 101 Hearing (Nov. 28, 2016) (28 pages).

*Sonos, Inc.* v. *D&M Holdings*, DI 207, Public Joint Claim Construction Brief (Nov. 30, 2016) (88 pages).

*Sonos, Inc.* v. *D&M Holdings*, DI 214, D&M Post-Markman Letter (Dec. 22, 2016) (13 pages).

*Sonos, Inc.* v. *D&M Holdings*, DI 215, Sonos Post-Markman Letter (Dec. 22, 2016) (15 pages).

*Sonos, Inc.* v. *D&M Holdings*, DI 219, Claim Construction Opinion (Jan. 12, 2017) (24 pages).

*Sonos, Inc.* v. *D&M Holdings*, DI 221, Claim Construction Order (Jan. 18, 2017) (2 pages).

*Sonos, Inc.* v. *D&M Holdings*, Markman Hearing Transcript (Dec. 14, 2016) (69 pages).

Sony: AIR-SA 50R Wireless Speaker, Copyright 2009, 2 pages.

Sony: Altus Quick Setup Guide ALT-SA32PC, Copyright 2009, 2 pages.

Sony: BD/DVD Home Theatre System Operating Instructions for BDV-E300, E301 and E801, Copyright 2009, 115 pages.

Sony: BD/DVD Home Theatre System Operating Instructions for BDV-IT1000/BDV-IS1000, Copyright 2008, 159 pages.

Sony: Blu-ray Disc/DVD Home Theatre System Operating Instructions for BDV-IZ1000W, Copyright 2010, 88 pages.

Sony: DVD Home Theatre System Operating Instructions for DAV-DZ380W/DZ680W/DZ880W, Copyright 2009, 136 pages.

Sony: DVD Home Theatre System Operating Instructions for DAV-DZ870W, Copyright 2008, 128 pages.

Sony Ericsson MS500 User Guide, Copyright 2009, 2 pages.

Sony: Home Theatre System Operating Instructions for HT-IS100, Copyright 2008, 168 pages.

Sony: HT-IS100, 5.1 Channel Audio System, last updated Nov. 2009, 2 pages.

Sony: Multi Channel AV Receiver Operating Instructions, 2007, 80 pages.

Sony: Multi Channel AV Receiver Operating Instructions for STR-DN1000, Copyright 2009, 136 pages.

Sony: STR-DN1000, Audio Video Receiver, last updated Aug. 2009, 2 pages.

Sony: Wireless Surround Kit Operating Instructions for WHAT-SA2, Copyright 2010, 56 pages.

Taylor, Marilou, "Long Island Sound," Audio Video Interiors, Apr. 2000, 8 pages.

TOA Corporation, Digital Processor DP-0206 DACsys2000 Version 2.00 Software Instruction Manual, Copyright 2001, 67 pages.

"884+ Automatic Matrix Mixer Control System," Ivie Technologies, Inc., 2000, pp. 1-4.

Advanced Driver Tab User Interface WaveLan GUI Guide, AVAGO0009, Agere Systems, Feb. 2004, 4 pages.

Advisory Action dated Aug. 1, 2014, issued in connection with U.S. Appl. No. 13/186,249, filed Jul. 19, 2011, 2 pages.

Agere Systems' Voice-over-Wireless LAN (VoWLAN) Station Quality of Service, AVAGO0015, Agere Systems, Jan. 2005, 5 pages.

Akyildiz et al., "Multimedia Group Synchronization Protocols for Integrated Services Networks," IEEE Journal on Selected Areas in Communications, 1996 pp. 162-173, vol. 14, No. 1.

Audio Authority: How to Install and Use the Model 1154 Signal Sensing Auto Selector, 2002, 4 pages.

Audio Authority: Model 1154B High Definition AV Auto Selector, 2008, 8 pages.

AudioSource: AMP 100 User Manual, 2003, 4 pages.

AudioTron Quick Start Guide, Version 1.0, Mar. 2001, 24 pages.

AudioTron Reference Manual, Version 3.0, May 2002, 70 pages.

AudioTron Setup Guide, Version 3.0, May 2002, 38 pages.

Automatic Profile Hunting Functional Description, AVAGO0013, Agere Systems, Feb. 2004, 2 pages.

"A/V Surround Receiver AVR-5800," Denon Electronics, 2000, 2 pages.

"A/V System Controleer, Owner's Manual," B&K Compontents, Ltd., 1998, 52 pages.

AVTransport:1 Service Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (66 pages).

AXIS Communication: AXIS P8221 Network I/O Audio Module, 2009, 41 pages.

Balfanz et al., "Network-in-a-Box: How to Set Up a Secure Wireless Network in Under a Minute," 13th USENIX Security Symposium—Technical Paper, 2002, 23 pages.

Balfanz et al., "Talking to Strangers: Authentication in Ad-Hoc Wireless Networks," Xerox Palo Alto Research Center, 2002, 13 pages.

Barham et al., "Wide Area Audio Synchronisation," University of Cambridge Computer Laboratory, 1995, 5 pages.

Bluetooth. "Specification of the Bluetooth System: The ad hoc SCATTERNET for affordable and highly functional wireless connectivity," Core, Version 1.0 A, Jul. 26, 1999, 1068 pages.

Bluetooth. "Specification of the Bluetooth System: Wireless connections made easy," Core, Version 1.0 B, Dec. 1, 1999, 1076 pages.

Bogen Communications, Inc., ProMatrix Digitally Matrixed Amplifier Model PM3180, Copyright1996, 2 pages.

Brassil et al., "Enhancing Internet Streaming Media with Cueing Protocols," 2000, 9 pages.

Breebaart et al., "Multi-Channel Goes Mobile: MPEG Surround Binaural Rendering," AES 29th International Conference, Sep. 2-4, 2006, pp. 1-13.

Cen et al., "A Distributed Real-Time MPEG Video Audio Player," Department of Computer Science and Engineering, Oregon Graduate Institute of Science and Technology, 1995, 12 pages.

Change Notification: Agere Systems WaveLan Multimode Reference Design (D2 to D3), AVAGO0042, Agere Systems, Nov. 2004, 2 pages.

**US 10,853,023 B2**

Page 7

(56)                **References Cited**

OTHER PUBLICATIONS

Chinese Patent Office, Chinese Office Action dated May 3, 2016, issued in connection with Chinese Application No. 201280045592.8, 18 pages.

Chinese Patent Office, Second Office Action dated Mar. 31, 2016, issued in connection with Chinese Application No. 201280029979.4, 6 pages.

Chinese Patent Office,First Office Action dated Aug. 5, 2015, issued in connection with Chinese Application No. 201280029979.4, 12 pages.

Connection Manager: 1 Service Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (25 pages).

ContentDirectory:1 Service Template Version 1.01 for UPnP, version 1.0 (Jun. 25, 2002) (89 pages).

Corrected Notice of Allowability dated Nov. 24, 2014, issued in connection with U.S. Appl. No. 13/089,167, filed Apr. 18, 2011, 2 pages.

Dannenberg et al., "A. System Supporting Flexible Distributed Real-Time Music Processing," Proceedings of the 2001 International Computer Music Conference, 2001, 4 pages.

Dannenberg, Roger B., "Remote Access to Interactive Media," Proceedings of the SPIE 1785, 1993, pp. 230-237.

Day, Rebecca, "Going Elan!" Primedia Inc., 2003, 4 pages.

Deep-Sleep Implementation in WL60011 for IEEE 802.11b Applications, AVAGO0020, Agere Systems, Jul. 2004, 22 pages.

Dell, Inc. "Dell Digital Audio Receiver: Reference Guide," Jun. 2000, 70 pages.

Dell, Inc. "Start Here," Jun. 2000, 2 pages.

"Denon 2003-2004 Product Catalog," Denon, 2003-2004, 44 pages.

Denon AV Surround Receiver AVR-1604/684 User's Manual, 2004, 128 pages.

Denon AV Surround Receiver AVR-5800 Operating Instructions, Copyright 2000, 67 pages.

Designing a UPnP AV MediaServer, Nelson Kidd (2003) (SONDM000115062-116) (55 pages).

"DP-0206 Digital Signal Processor," TOA Electronics, Inc., 2001, pp. 1-12.

European Patent Office, European Examination Report dated Dec. 14, 2015, issued in connection with European Application No. 12814263.5, 6 pages.

European Patent Office, European Extended Examination Report dated Jan. 5, 2016, issued in connection with European Application No. 15002531.0, 8 pages.

European Patent Office, European Extended Search Report dated Oct. 17, 2018, issued in connection with European Application No. 18187618.6, 6 pages.

European Patent Office, European Extended Search Report dated Aug. 18, 2017, issued in connection with EP Application No. 17000923.7, 5 pages.

European Patent Office, European Extended Search Report dated Feb. 5, 2019, issued in connection with European Application No. 18209665.1, 5 pages.

European Patent Office, European Office Action dated Nov. 9, 2016, issued in connection with European Application No. 15002531.0-1568, 4 pages.

European Patent Office, European Office Action dated Aug. 21, 2017, issued in connection with European Application No. 17175867.5, 5 pages.

"Residential Distributed Audio Wiring Practices," Leviton Network Solutions, 2001, 13 pages.

"Response to the Written Opinion of the International Searching Authority," issued in connection with European Patent Application No. 12717999.2, dated Jun. 30, 2014, 9 pages.

Roland Corporation, "Roland announces BA-55 Portable PA System," press release, Apr. 6, 2011, 2 pages.

Rothermel et al., "An Adaptive Protocol for Synchronizing Media Streams," Institute of Parallel and Distributed High-Performance Systems (IPVR), 1997, 26 pages.

Rothermel et al., "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, Apr. 18-21, 1995, 12 pages.

Rothermel et al., "Clock Hierarchies—An Abstraction for Grouping and Controlling Media Streams," University of Stuttgart Institute of Parallel and Distributed High-Performance Systems, Jan. 1996, 23 pages.

Rothermel et al., "Synchronization in Joint-Viewing Environments," University of Stuttgart Institute of Parallel and Distributed High-Performance Systems, 1992, 13 pages.

Rothermel, Kurt, "State-of-the-Art and Future Research in Stream Synchronization," University of Stuttgart, 3 pages.

"RVL-6 Modular Multi-Room Controller, Installation & Operation Guide," Nile Audio Corporations, 1999, 46 pages.

Simple Network Time Protocol (SNTPI), RFC 1361 (Aug. 1992) (D+M_0397537-46) (10 pages).

Simple Network Time Protocol (SNTPII), RFC 1769 (Mar. 1995) (D+M_0397663-76) (14 pages).

Service Discovery Protocol/1.0 Operating without an Arbiter (Oct. 28, 1999) (24 pages).

Sonos, Inc. v D&M Holdings, D&M Supp Opposition Brief including Exhibits, Mar. 17, 2017, 23 pages.

Sonos, Inc. v. D&M Holdings, Expert Report of Jay P. Kesan including Appendices A-P, Feb. 20, 2017, 776 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Complaint for Patent Infringement, filed Oct. 21, 2014, 20 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendant's Amended Invalidity Contentions, filed Sep. 14, 2016, 100 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendant's Initial Invalidity Contentions, filed Apr. 15, 2016, 97 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendant's Preliminary Identification of Indefinite Terms, provided Jul. 29, 2016, 8 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendants' 35 U.S.C. § 282 Notice filed Nov. 2, 2017, 31 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendants' Amended Answer, Defenses, and Counterclaims for Patent Infringement, filed Nov. 30, 2015, 47 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendants' Answer to Plaintiff's Second Amended Complaint, filed Apr. 30, 2015, 19 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendants' First Amended Answer to Plaintiffs' Third Amended Complaint, filed Sep. 7, 2016, 23 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendants' Notice of Third-Party Subpoena to Core Brands, LLC, Mar. 18, 20116, 100 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendants' Notice of Third-Party Subpoena to Parasound Products, Inc., Mar. 18, 2016, 67 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Defendants' Reply in Support of Partial Motion for Judgment on the Pleadings, filed Jun. 10, 2016, 15 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Exhibit A: Defendants' First Amended Answer to Plaintiffs' Third Amended Complaint, provided Aug. 1, 2016, 26 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, filed Sep. 9, 2016, 43 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Exhibit A: Defendants' Second Amended Answer to Plaintiffs' Third Amended Complaint, provided Sep. 9, 2016, 88 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., First Amended Complaint for Patent Infringement, filed Dec. 17, 2014, 26 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Joint Claim Construction Chart, vol. 1 of 3 with Exhibits A-O, filed Aug. 17, 2016, 30 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Opening Brief in Support of Defendants' Partial Motion for Judgment on the Pleadings for Lack of Patent-Eligible Subject Matter, filed May 6, 2016, 27 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Plaintiff Sonos, Inc.'s Opening Claim Construction Brief, filed Sep. 9, 2016, 26 pages.

Sonos, Inc. v. D&M Holdings Inc. et al., Plaintiff Sonos, Inc.'s Response in Opposition to Defendants' Partial Motion for Judgment on the Pleadings, filed May 27, 2016, 24 pages.

**US 10,853,023 B2**

Page 8

(56)                **References Cited**

OTHER PUBLICATIONS

*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Reply Brief in Support of Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Nov. 10, 2016, 16 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Reply Brief in Support of Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Sep. 9, 2016, 16 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Second Amended Complaint for Patent Infringement, filed Feb. 27, 2015, 49 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Sonos's Motion to Strike Defendants' New Amended Answer Submitted with their Reply Brief, provided Sep. 15, 2016, 10 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Sonos's Opposition to Defendants' Motion for Leave to Amend their Answer to Add the Defense of Inequitable Conduct, provided Oct. 31, 2016, 26 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Third Amended Complaint for Patent Infringement, filed Jan. 29, 2016, 47 pages.
*Sonos, Inc.* v. *D&M Holdings Inc.*, Defendants' Final Invalidity Contentions (Jan. 18, 2017) (106 pages).
*Sonos, Inc.* v. *D&M Holdings*, DI 226, Opinion Denying Inequitable Conduct Defenses, Feb. 6, 2017 updated, 5 pages.
*Sonos, Inc.* v. *D&M Holdings*, DI 242, US District Judge Andrews 101 Opinion, Mar. 13, 2017, 16 pages.
*Sonos, Inc.* v. *D&M Holdings*, Sonos Supp Opening Markman Brief including Exhibits, Mar. 3, 2017, 17 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Sonos Supp Reply Markman Brief including Exhibits, Mar. 29, 2017, 36 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Declaration of Steven C. Visser, executed Sep. 9, 2016, 40 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 1: Defendants' Invalidity contentions for U.S. Pat. No. 7,571,014 filed Sep. 16, 2016, 270 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 10: Defendants' Invalidity Contentions for U.S. Pat. No. 9,219,959 filed Sep. 27, 2016, 236 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 11: Defendants' Invalidity Contentions for U.S. Pat. No. D. 559,197 filed Sep. 27, 2016, 52 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 2: Defendants' Invalidity Contentions for U.S. Pat. No. 8,588,949 filed Sep. 27, 2016, 224 pages.
*Sonos, Inc.* v. *D&M Holdings Inc. et al.*, Defendant's Amended Invalidity Contentions Exhibit 3: Defendants' Invalidity Contentions for U.S. Pat. No. 8,843,224 filed Sep. 27, 2016, 147 pages.
Understanding Universal Plug and Play, Microsoft White Paper (Jun. 2000) (D+M_0402074-118) (45 pages).
United States Patent and Trademark Office, U.S. Appl. No. 60/490,768, filed Jul. 28, 2003, entitled "Method for synchronizing audio playback between multiple networked devices," 13 pages.
United States Patent and Trademark Office, U.S. Appl. No. 60/825,407, filed Sep. 12, 2006, entitled "Controlling and manipulating groupings in a multi-zone music or media system," 82 pages.
Universal Plug and Play Device Architecture V. 1.0, (Jun. 8, 2000) (54 pages).
Universal Plug and Play in Windows XP, Tom Fout. Microsoft Corporation (Jul. 2001) (D+M_0402041-73) (33 pages).
Universal Plug and Play ("UPnP") AV Architecture:1 for UPnP, Version 1.0, (Jun. 25, 2002) (D+M_0298151-72) (22 pages).
Universal Plug and Play Vendor's Implementation Guide (Jan. 5, 2000) (7 pages).
UPnP AV Architecture:0.83 (Jun. 12, 2002) (SONDM000115483-504) (22 pages).
UPnP Design by Example, A Software Developers Guide to Universal Plug and Play Michael Jeronimo and JackWeast, Intel Press (D+M_0401307-818) (Apr. 2003) (511 pages).
UPnP; "Universal Plug and Play Device Architecture," Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54.
WANCommonInterfaceConfig:1 Service Template Version 1.01 for UPnP, Ver. 1.0 (Nov. 12, 2001) (D +M_0401820-43) (24 pages).

WANIPConnection:1 Service Template Version 1.01 for UPnP Ver. 1.0 (Nov. 12, 2001) (D+M_0401844-917) (74 pages).
WANPPPConnection:1 Service Template Version 1.01 for UPnP, Version 1.0 (Nov. 12, 2001) (D +M_0401918-2006) (89 pages).
WaveLan High-Speed Multimode Chip Set, AVAGO0003, Agere Systems, Feb. 2003, 4 pages.
WaveLan High-Speed Multimode Chip Set, AVAGO0005, Agere Systems, Feb. 2003, 4 pages.
WaveLAN Wireless Integration Developer Kit (WI-DK) for Access Point Developers, AVAGO0054, Agere Systems, Jul. 2003, 2 pages.
WaveLAN Wireless Integration-Developer Kit (WI-DK) Hardware Control Function (HCF), AVAGO0052, Agere Systems, Jul. 2003, 2 pages.
WI-DK Release 2 WaveLan Embedded Drivers for VxWorks and Linux, AVAGO0056, Agere Systems, Jul. 2003, 2 pages.
WI-DK Release 2 WaveLan END Reference Driver for VxWorks, AVAGO0044, Agere Systems, Jul. 2003, 4 pages.
WI-DK Release 2 WaveLan LKM Reference Drivers for Linux, AVAGO0048, Agere Systems, Jul. 2003, 4 pages.
Windows Media Connect Device Compatibility Specification (Apr. 12, 2004) (16 pages).
WPA Reauthentication Rates, AVAGO0063, Agere Systems, Feb. 2004, 3 pages.
Yamaha DME 64 Owner's Manual; copyright 2004, 80 pages.
Yamaha DME Designer 3.5 setup manual guide; copyright 2004, 16 pages.
Yamaha DME Designer 3.5 User Manual; Copyright 2004, 507 pages.
"Symantec pcAnywhere User's Guide," v 10.5.1, 1995-2002, 154 pages.
"Systemline Modular Installation Guide, Multiroom System," Systemline, 2003, pp. 1-22.
"ZR-8630AV MultiZone Audio/Video Receiver, Installation and Operation Guide," Niles Audio Corporation, 2003, 86 pages.
ZX135: Installation Manual,LA Audio, Apr. 2003, 44 pages.
European Patent Office, Extended European Search Report dated Jul. 6, 2016, issued in connection with European Application No. 16159936.0-1568, 8 pages.
European Patent Office, Extended European Search Report dated Jun. 30, 2016, issued in connection with European Application No. 16157894.3-1568, 8 pages.
Faller, Christof, "Coding of Spatial Audio Compatible with Different Playback Formats," Audio Engineering Society Convention Paper (Presented at the 117th Convention), Oct. 28-31, 2004, 12 pages.
Final Office Action dated Apr. 10, 2014, issued in connection with U.S. Appl. No. 13/186,249, filed Jul. 19, 2011, 12 pages.
Fireball DVD and Music Manager DVDM-100 Installation and User's Guide, Copyright 2003, 185 pages.
Fireball MP-200 User's Manual, Copyright 2006, 93 pages.
Fireball Remote Control Guide WD006-1-1, Copyright 2003, 19 pages.
Fireball SE-D1 User's Manual, Copyright 2005, 90 pages.
Fober et al., "Clock Skew Compensation over a High Latency Network," Proceedings of the ICMC, 2002, pp. 548-552.
Fries et al. "The MP3 and Internet Audio Handbook: Your Guide to the Digital Music Revolution." 2000, 320 pages.
Gaston et al., "Methods for Sharing Stereo and Multichannel Recordings Among Planetariums," Audio Engineering Society Convention Paper 7474, 2008, 15 pages.
General Event Notification Architecture Base: Client to Arbiter (Apr. 2000) (23 pages).
Herre et al., "The Reference Model Architecture for MPEG Spatial Audio Coding," Audio Engineering Society Convention Paper (Presented at the 118th Convention), May 28-31, 2005, 13 pages.
Home Networking with Universal Plug and Play, IEEE Communications Magazine, vol. 39 No. 12 (Dec. 2001) (D+M_0402025-40) (16 pages).
"Home Theater Control Systems," Cinema Source, 2002, 19 pages.
Horwitz, Jeremy, "Logic3 i-Station25," retrieved from the internet: http://www.ilounge.com/index.php/reviews/entry/logic3-i-station25/, last visited Dec. 17, 2013, 5 pages.

## US 10,853,023 B2

Page 9

(56)          **References Cited**

OTHER PUBLICATIONS

IBM Home Director Installation and Service Manual, Copyright1998, 124 pages.
IBM Home Director Owner's Manual, Copyright 1999, 67 pages.
*Implicit, LLC* v. *Sonos, Inc.,* Defendants Original Complaint (Mar. 3, 2017) (15 pages).
Integra Audio Network Receiver NAC 2.3 Instruction Manual, 68 pages.
Integra Audio Network Server NAS 2.3 Instruction Manual, pp. 1-32.
Integra Service Manual, Audio Network Receiver Model NAC-2.3, Dec. 2002, 44 pages.
Intel Designing a UPnP AV Media Renderer, v. 1.0 ("Intel AV Media Renderer") (May 20, 2003) (SONDM000115117-62) (46 pages).
Intel Media Renderer Device Interface ("Intel Media Renderer") (Sep. 6, 2002) (62 pages).
Intel SDK for UPnP Devices Programming Guide, Version 1.2.1, (Nov. 2002) (30 pages).
International Bureau, International Preliminary Report on Patentability dated Jan. 30, 2014, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 6 pages.
International Bureau, International Preliminary Report on Patentability, dated Oct. 31, 2013, issued in connection with International Application No. PCT/US2012/033946, filed on Apr. 17, 2012, 8 pages.
International Searching Authority, International Search Report dated Aug. 13, 2012, issued in connection with International Application No. PCT/US2012/033946, filed on Apr. 17, 2012, 3 pages.
International Searching Authority, International Search Report dated Dec. 26, 2012, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 3 pages.
International Searching Authority, Written Opinion dated Aug. 13, 2012, issued in connection with International Application No. PCT/US2012/033946, filed on Apr. 17, 2012, 7 pages.
International Searching Authority, Written Opinion dated Dec. 26, 2012, issued in connection with International Application No. PCT/US2012/045894, filed on Jul. 9, 2012, 4 pages.
Ishibashi et al., "A Comparison of Media Synchronization Quality Among Reactive Control Schemes," IEEE Infocom, 2001, pp. 77-84.
Issues with Mixed IEEE 802.b/802.11g Networks, AVAGO0058, Agere Systems, Feb. 2004, 5 pages.
Japanese Patent Office, Notice of Rejection dated Mar. 7, 2017, issued in connection with Japanese Application No. 2016-028196, 2 pages.
Japanese Patent Office, Notice of Rejection, dated Feb. 3, 2015, issued in connection with Japanese Patent Application No. 2014-521648, 7 pages.
Japanese Patent Office, Office Action dated Oct. 28, 2014, issued in connection with Japanese patent application No. 2014-506484, 5 pages.
Japanese Patent Office, Office Action dated May 8, 2018, issued in connection with Japanese Application No. 2017-111806, 8 pages.
Japanese Patent Office, Translation of Office Action dated May 8, 2018, issued in connection with Japanese Application No. 2017-111806, 4 pages.
Jo et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, pp. 71-82, vol. 4861.
Jones, Stephen, "Dell Digital Audio Receiver: Digital upgrade for your analog stereo," Analog Stereo, Jun. 24, 2000 retrieved Jun. 18, 2014, 2 pages.
Lake Processors: Lake® LM Series Digital Audio Processors Operation Manual, 2011, 71 pages.
LG: RJP-201M Remote Jack Pack Installation and Setup Guide, 2010, 24 pages.
Lienhart et al., "On the Importance of Exact Synchronization for Distributed Audio Signal Processing," Session L: Poster Session II—ICASSP'03 Papers, 2002, 1 page.

LinkSys by Cisco, Wireless Home Audio Controller, Wireless-N Touchscreen Remote DMRW1000 Datasheet, Copyright 2008, 2 pages.
LinkSys by Cisco, Wireless Home Audio Controller, Wireless-N Touchscreen Remote DMRW1000 User Guide, Copyright 2008, 64 pages.
LinkSys by Cisco, Wireless Home Audio Player, Wireless-N Music Extender DMP100 Quick Installation Guide, Copyright 2009, 32 pages.
LinkSys by Cisco, Wireless Home Audio Player, Wireless-N Music Extender DMP100 User Guide, Copyright 2008, 65 pages.
Linux SDK for UPnP Devices v. 1.2 (Sep. 6, 2002) (101 pages).
Liu et al., "A synchronization control scheme for real-time streaming multimedia applications," Packet Video, 2003, 10 pages, vol. 2003.
Liu et al., "Adaptive Delay Concealment for Internet Voice Applications with Packet-Based Time-Scale Modification," Information Technologies 2000, pp. 91-102.
Louderback, Jim, "Affordable Audio Receiver Furnishes Homes With MP3," TechTV Vault. Jun. 28, 2000 retrieved Jul. 10, 2014, 2 pages.
MediaRenderer:1 Device Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (12 pages).
MediaServer:1 Device Template Version 1.01 for UPnP, Version 1.0 (Jun. 25, 2002) (12 pages).
Microsoft, Universal Plug and Play (UPnP) Client Support ("Microsoft UPnP") (Aug. 2001) (D+M_0402007-24) (18 pages).
Microsoft Window's XP Reviewer's Guide (Aug. 2001) (D+M_0402225-85) (61 pages).
"Microsoft Windows XP File and Printer Share with Microsoft Windows" Microsoft Windows XP Technical Article, 2003, 65 pages.
"Model MRC44 Four Zone—Four Source Audio/Video Controller/ Amplifier System," Xantech Corporation, 2002, 52 pages.
"SMPTE Made Simple: A Time Code Tutor by Timeline," 1996, 46 pages.
Network Time Protocol (NTP), RFC 1305 (Mar. 1992) (D+M_0397417-536) (120 pages).
"NexSys Software v.3 Manual," Crest Audio, Inc., 1997, 76 pages.
Niederst, Jennifer "O'Reilly Web Design in a Nutshell," Second Edition, Sep. 2001, 678 pages.
Non-Final Office Action dated Oct. 4, 2016, issued in connection with U.S. Appl. No. 14/684,927, filed Apr. 13, 2015, 10 pages.
Non-Final Office Action dated Oct. 4, 2016, issued in connection with U.S. Appl. No. 14/813,961, filed Jul. 30, 2015, 10 pages.
Non-Final Office Action dated Apr. 7, 2016, issued in connection with U.S. Appl. No. 14/561,421, filed Dec. 5, 2014, 16 pages.
Non-Final Office Action dated Apr. 7, 2016, issued in connection with U.S. Appl. No. 14/628,999, filed Feb. 23, 2015, 13 pages.
Non-Final Office Action dated Sep. 11, 2014, issued in connection with U.S. Appl. No. 13/186,249, filed Jul. 19, 2011, 11 pages.
Non-Final Office Action dated Apr. 24, 2014, issued in connection with U.S. Appl. No. 13/089,167, filed Apr. 18, 2011, 11 pages.
Non-Final Office Action dated Sep. 25, 2013, issued in connection with U.S. Appl. No. 13/186,249, filed Jul. 19, 2011, 12 pages.
Notice of Allowance dated Oct. 1, 2014, issued in connection with U.S. Appl. No. 13/089,167, filed Apr. 18, 2011, 14 pages.
Notice of Allowance dated Apr. 10, 2015, issued in connection with U.S. Appl. No. 13/186,249, filed Jul. 19, 2011, 16 pages.
Notice of Allowance dated Feb. 16, 2017, issued in connection with U.S. Appl. No. 14/628,999, filed Feb. 23, 2015, 7 pages.
Notice of Allowance dated Aug. 18, 2016, issued in connection with U.S. Appl. No. 14/628,999, filed Feb. 23, 2015, 7 pages.
Notice of Allowance dated Mar. 22, 2017, issued in connection with U.S. Appl. No. 14/561,421, filed Dec. 5, 2015, 7 pages.
Notice of Allowance dated Aug. 27, 2018, issued in connection with U.S. Appl. No. 15/583,553, filed May 1, 2017, 7 pages.
Notice of Allowance dated Jun. 28, 2017, issued in connection with U.S. Appl. No. 14/813,961, filed Jul. 30, 2015, 7 pages.
Notice of Allowance dated Sep. 28, 2016, issued in connection with U.S. Appl. No. 14/561,421, filed Dec. 5, 2015, 10 pages.
Notice of Allowance dated Jun. 30, 2017, issued in connection with U.S. Appl. No. 14/684,927, filed Apr. 13, 2015, 8 pages.

**US 10,853,023 B2**

Page 10

(56)                **References Cited**

OTHER PUBLICATIONS

Notice of Allowance dated Nov. 5, 2018, issued in connection with U.S. Appl. No. 15/688,204, filed Aug. 28, 2017, 7 pages.
Notice of Incomplete Re-Exam Request dated May 25, 2017, issued in connection with U.S. Appl. No. 90/013,959, filed Apr. 1, 2016, 10 pages.
Office Action in Ex Parte Reexamination mailed on Oct. 20, 2017, issued in connection with U.S. Appl. No. 90/013,959, filed Jun. 16, 2017, 50 pages.
Palm, Inc., "Handbook for the Palm VII Handheld," May 2000, 311 pages.
Parasound Zpre2 Zone Preamplifier with PTZI Remote Control, 2005, 16 pages.
Pillai et al., "A Method to Improve the Robustness of MPEG Video Applications over Wireless Networks," Kent Ridge Digital Labs, 2000, 15 pages.
Presentations at WinHEC 2000, May 2000, 138 pages.
Proficient Audio Systems M6 Quick Start Guide, 2011, 5 pages.
Proficient Audio Systems: Proficient Editor Advanced Programming Guide, 2007, 40 pages.
Programming Interface for WL54040 Dual-Band Wireless Transceiver, AVAGO0066, Agere Systems, May 2004, 16 pages.
Radio Shack, "Auto-Sensing 4-Way Audio/Video Selector Switch," 2004, 1 page.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 1, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 2, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 3, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 4, 100 pages.
RadioShack, Pro-2053 Scanner, 2002 Catalog, part 5, 46 pages.
Rangan et al., "Feedback Techniques for Continuity and Synchronization in Multimedia Information Retrieval," ACM Transactions on Information Systems, 1995, pp. 145-176, vol. 13, No. 2.
Real Time Control Protocol (RTCP) and Realtime Transfer Protocol (RTP), RFC 1889 (Jan. 1996) (D+M_0397810-84) (75 pages).
Realtime Streaming Protocol (RTSP), RFC 2326 (Apr. 1998) (D+M_0397945-8036) (92 pages).
Realtime Transport Protocol (RTP), RFC 3550 (Jul. 2003) (D+M_0398235-323) (89 pages).
Reid, Mark, "Multimedia conferencing over ISDN and IP networks using ITU-T H-series recommendations: architecture, control and coordination," Computer Networks, 1999, pp. 225-235, vol. 31.
RenderingControl:1 Service Template Version 1.01 for UPnP, Version 1.0, (Jun. 25, 2002) (SONDM000115187-249) (63 pages).
Renewed Request for Ex Parte Re-Examination, U.S. Appl. No. 90/013,959, filed Jun. 16, 2017, 126 pages.
AudioPoint from Home Director. Play Digital Music on Your Conventional Stereo System, 2002, 2 pages.
AudioPoint, Welcome to the coolest way to listen to digital music over your conventional stereo equipment, Home Director HD00B02, 2002, 2 pages.
Barix Download Exstreamer Software. Accessed via WayBack Machine, Apr. 6, 2003. http://www.barix.com/estreamer/software.download.html. 2 pages.
Barix. Exstreamer Datasheet. Accessed via WayBack Machine, Apr. 2, 2003. http://www.barix.com/exstreamer/, 1 page.
Chinese Patent Office, Second Office Action and Translation dated Dec. 13, 2019, issued in connection with Chinese Application No. 201610817558.8, 9 pages.
Crest Audio Pro Series 8001 Power Amplifier. V.2.2 Mar. 25, 1997, 2 pages.
Davies, Chris. Sony Ericsson MS500 Bluetooth Splashproof Speaker. http://www.slashgear.com/sony-ericsson-ms500-bluetooth-splashproof. Mar. 17, 2009, 2 pages.
Denon AVR-3805 A/V Surround Receiver. Datasheet, last modified Mar. 1, 2004, 2 pages.
DP-0206 TOA Digital Signal Processor. TOA Corporation, 2001, 4 pages.
Exstreamer. Network MP3 player for digital audio streaming in a consumer, home installation and commercial applications. Barix Think Further. Sep. 2002, 2 pages.

Exstreamer. The Exstreamer Instruction Manual. Barix Think Further. Version 1.5 , Oct. 2002, 21 pages.
Exstreamer. The Exstreamer Technical Description: Version 1.5. Barix Think Further. Oct. 2002, 36 pages.
FireBall Digital Music Manager E-40 and E-120. Meet FireBall. The Industry's choice for managing your entire music collection. Datasheet. 2003, 2 pages.
Fireball E2 User's Manual. Escient. Gracenote cddb. 2000-2004, 106 pages.
LA Audio ZX135E 6 Zone Expander. Pro Audio Design Pro. Inc. https://www.proaudiodesign.com/products/la-audio-zx135e-6-zone-expander, accessed Mar. 26, 2020, 6 pages.
Model MRC88 Eight Zone—Eight Source Audio/Video Controller/Amplifier System, Xantech Corporation, 2003, 102 pages.
Multi-Zone Control Systems. ZR-8630AV MultiZone Receiver. Niles. http://www.ampersandcom.com/zr8630av.html accessed Mar. 26, 2020, 5 pages.
Non-Final Office Action dated Oct. 16, 2019, issued in connection with U.S. Appl. No. 16/166,518, filed Oct. 22, 2018, 13 pages.
Structured Media Components. Leviton Integrated Networks, last modified Apr. 10, 2006, 28 pages.
TOA Electronics, Inc. DP-0206 Digital Signal Processor. DACsys 2000, 2001, 12 pages.
UPnP AV Architecture:0.83 for UPnP Version 1.0, Jun. 12, 2002, copyright 2000, 22 pages.
UPnP Forum. UPnP Device Architecture 1.0. Oct. 15, 2008, 80 pages.
Wireless Home Audio Director. Wireless N Music Player with Integrated Amplifier DMC250. Datasheet. Linksys by Cisco. Fill Your Home with Music, 2008, 2 pages.
Yahoo Groups. Exstreamer. Barix Exstreamer. Access via Wayback Machine http://groups.yahoo.com/group/exstreamer/ Dec. 22, 2013, 1 page.
Yamaha DME Designer 3.0 Owner's Manual; Copyright 2008, 501 pages.
Chinese Patent Office, First Office Action and Translation dated Mar. 12, 2019, issued in connection with Chinese Application No. 201610817558.8, 17 pages.
Chinese Patent Office, First Office Action dated Feb. 22, 2019, issued in connection with Chinese Application No. 201710076046.5, 15 pages.
Chinese Patent Office, Second Office Action and Translation dated Nov. 4, 2019, issued in connection with Chinese Application No. 201710076046.5, 18 pages.
Japanese Patent Office, Office Action dated Oct. 29, 2019, issued in connection with Japanese Patent Application No. 2019-001932, 6 pages.
*Sonos, Inc.* v. *Implicit, LLC*: Declaration of Roman Chertov in Support of the Inter Partes Review of U.S. Pat. No. 7,391,791 dated Mar. 9, 2018, 92 pages.
*Sonos, Inc.* v. *Implicit, LLC*: Declaration of Roman Chertov in Support of the Inter Partes Review of U.S. Pat. No. 8,942,252 dated Mar. 9, 2018, 81 pages.
*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit A, filed Oct. 14, 2019, 3 pages.
*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit C, filed Oct. 14, 2019, 16 pages.
*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit D, filed Oct. 14, 2019, 36 pages.
*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint—Exhibit E, filed Oct. 14, 2019, 21 pages.
*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' Answer to Plaintiff's Complaint, filed Oct. 14, 2019, 66 pages.
*Sonos, Inc.* v. *Lenbrook Industries Limited et al.*, Defendants' First Amended Answer and Counterclaims to Plaintiff's Complaint, filed Nov. 14, 2019, 66 pages.

* cited by examiner



FIG. 1



*FIG. 2A*



FIG. 2B

U.S. Patent          Dec. 1, 2020          Sheet 4 of 22          US 10,853,023 B2

260



FIG. 2C

270



*FIG. 2D*



**FIG. 3A**



**FIG. 3B**



*FIG. 4*



**FIG. 5A**

**FIG. 5B**

U.S. Patent          Dec. 1, 2020          Sheet 11 of 22          US 10,853,023 B2

510



**FIG. 5C**



**FIG. 6**



*FIG. 7*



FIG. 8



**FIG. 9**



**FIG. 10A**

FIG. 10B



**FIG. 10C**



**FIG. 10D**

1040

**ZonePlayer Stereo pair**    ☒

The ZonePlayer are connected and will appear as "ZPS5-Black" on your Zone Menu.

OK

**FIG. 10E**



**FIG. 10F**



*FIG. 11*

US 10,853,023 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# NETWORKED PLAYBACK DEVICE

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. application Ser. No. 15/583,553 titled "Leaving Group and Smart In-Line Processing," filed on May 1, 2017, and currently pending; U.S. application Ser. No. 15/583,553 is a continuation of U.S. application Ser. No. 14/628,999 titled "Smart Line-in Processing," filed on Feb. 23, 2015, and issued on Jun. 20, 2017, as U.S. Pat. No. 9,686,606; U.S. application Ser. No. 14/628,999 is a continuation of U.S. application Ser. No. 14/561,421 titled "Smart Line-In Processing in a Group" filed on Dec. 5, 2014, and issued on Jun. 13, 2017, as U.S. Pat. No. 9,681,223; U.S. application Ser. No. 14/561,421 is a continuation of U.S. application Ser. No. 13/089,167 titled "Smart Line-In Processing" filed on Apr. 18, 2011, and issued on Jan. 20, 2015, as U.S. Pat. No. 8,938,312. The entire contents of U.S. application Ser. No. 15/583,553; 14/628,999; 14/561,421; and 13/089,167 are incorporated herein by reference.

## BACKGROUND

The presently described technology is directed towards technology for use in the area of consumer electronics. In particular, certain embodiments are directed to smart line-in processing for use in an audio environment.

Music is very much a part of our everyday lives. And thanks to the advancement of technology, music content is now more accessible than ever. The same can be said of other types of media, such as television, movies, and other audio and video content. In fact, now a user can even access the content over the Internet through an online store, an Internet radio station, online music service, online movie service, and the like, in addition to the more traditional means of accessing audio and video content.

The demand for such audio and video content continues to surge. Given the high demand over the years, technology used to access and play such content has likewise improved. Even still, technology used in accessing the content and the play back of such content can be significantly improved or developed in ways that the market or end users may not anticipate.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the presently described technology will become better understood by a person skilled in the art with regard to the following description, appended claims, and accompanying drawings where:

FIG. **1** shows an illustrative configuration in which certain embodiments may be practiced;

FIG. **2A** shows an illustrative functional block diagram of a player in accordance with certain embodiments;

FIG. **2B** shows an example of a controller that may be used to remotely control one or more players of FIG. **2A**;

FIG. **2C** shows an example of a controller that may be used to remotely control one or more players of FIG. **2A**;

FIG. **2D** shows an example internal functional block diagram of a controller in accordance with certain embodiments;

FIG. **3A** provides an illustration of a zone scene configuration;

FIG. **3B** shows that a user defines multiple groups to be gathered at the same time;

FIG. **4** shows an example user interface that may be displayed on a controller or a computer of FIG. **1**;

FIG. **5A** shows an example user interface to allow a user to form a scene;

FIG. **5B** shows another example user interface to allow a user to form a scene;

FIG. **5C** shows an example user interface to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively;

FIG. **6** shows a flowchart or process of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone;

FIG. **7** shows an illustrative configuration in which an audio source is played back on two players in accordance to an embodiment;

FIG. **8** shows an illustrative configuration of a pairing amongst multiple players in accordance to an embodiment;

FIG. **9** shows a flowchart or process of grouping a plurality of audio products to play separated sound tracks in synchronization to simulate a multi-channel listening environment;

FIGS. **10A** to **10F** show example snapshots of a controller used in certain embodiments; and

FIG. **11** shows an illustrative configuration of smart in-line processing, in accordance with certain embodiments.

In addition, the drawings are for the purpose of illustrating certain embodiments, but it is understood that the inventions are not limited to the arrangements and instrumentality shown in the drawings.

## DETAILED DESCRIPTION

### I. Overview

The embodiments described herein relate to smart line-in processing. The embodiments are particularly useful in a networked environment where a playback device is capable of playing audio data from two or more different sources, and at least one of the sources receives its audio data from an audio device via a line-in connection. An advantage of certain embodiments described herein, among many other advantages, is that a listener can control the audio device itself and let the system detect a line-in signal and automatically switch the source of the playback device to play from the audio device. As such, the listener does not have to manually switch the source of the playback device before playing the audio device. Another advantage of certain embodiments described herein is that the system may allow the listener to switch the playback device to a different source even while the line-in signal is still present. Yet another advantage of certain embodiments described herein is that the system is capable of rearming itself such that the system can switch the source back to the audio device, should the system once again detect the line-in signal. The embodiments may also find utility in connection with any environment for which multi-source playback is desired.

In certain embodiments, a playback device is idle and therefore not producing sound or the playback device is configured to receive and play a first audio data stream from a first source. The playback device is further capable to receive and play a second audio data stream from a second source. The second source is coupled to an audio device through a line-in connector on the second source. A listener commands the audio device to play audio. The second source is configured, such that when a signal is detected on

US 10,853,023 B2

3

the line-in connector, the second source automatically switches the playback device to play audio from the audio device via the second audio data stream. The switch to play audio from the audio device may optionally be performed only after the second source detects a signal on the line-in connector for a threshold time. The playing of the second audio data stream may override the playing of the first audio data stream. The playback device and any of the first source and second source may be components of a single apparatus, or the playback device may be separate from any of the first source and second source and communicate with one another, such as over a network.

In certain embodiments, a playback device is configured to receive and play audio from a source, where the source receives the audio from an audio device coupled to the source via a line-in connector. During play of the audio from the audio device, a listener commands the playback device to play a new audio data stream from a different source. Upon receipt of the command, the playback device switches to play the new audio data stream. The playback device subsequently instructs the source to stop sending the audio of the audio device to the playback device. The source stops sending the audio to the playback device and waits until it no longer detects a signal on its line-in connector for an interval of time. When a signal is not detected on the line-in connector for the interval of time, the source is ready to automatically switch the playback device to play audio from the audio device, should the source once again detect a signal on its line-in connector. The playback device and any of the source and the different source may be components of a single apparatus, or the playback device may be separate from any of the source and the different source and communicate with one another, such as over a network.

In certain embodiments, the playback device is configured to output audio data according to a first volume level. When the playback device is automatically switched to play audio from a new source, where the new source receives the audio from an audio device coupled to the new source via a line-in connector, the volume of the playback device is modified to a second volume level. The second volume level is set such that increased dynamic range is given to a volume control of the audio device connected via line-in to the new source. When the playback device switches to play audio from a source that is different from the new source having the line-in connector, the volume of the playback device is returned to a safe volume level such that the audio is not played back to the listener at a high level.

In certain embodiments, a playback device comprises a network interface, a processor, and, optionally, any of: an amplifier and a speaker driver. The network interface may be configured to receive and transmit audio data over a network. The amplifier, if the playback device is so equipped, powers the optional speaker driver. The processor processes audio data to be sent to another device for actual playback, output through the speaker driver if the playback device is so configured, or both. The playback device further comprises a line-in connector for receiving audio from an audio device. The playback device may implement automatic source switching, such that when a signal is detected on the line-in connector, the playback device automatically triggers the audio from the audio device to be played by the playback device itself, to be played by another device in communication with this playback device, or by both. The automatic switch to play audio from the audio device may optionally be performed only after a signal is detected on the line-in connector for a threshold time.

4

In certain embodiments, a playback device comprises a network interface, a processor, an amplifier, and a speaker driver. The network interface may be configured to receive and transmit audio data over a network. The amplifier powers the speaker driver. The processor processes audio data to be output through the speaker driver. The playback device may be automatically switched to play streaming audio data that is received from a source device. The source device includes a line-in connector, through which an audio device is connected. When a signal is detected on the line-in connector of the source device, thereby indicating that a listener wishes to hear audio from the audio device, the playback device receives a command from the source device to automatically play the streaming audio data from the audio device. The automatic switch to play audio from the audio device may optionally be performed only after a signal is detected on the line-in connector for a threshold time.

These embodiments and many additional embodiments are described more below. Further, the detailed description is presented largely in terms of illustrative environments, systems, procedures, steps, logic blocks, processing, and other symbolic representations that directly or indirectly resemble the operations of data processing devices coupled to networks. These process descriptions and representations are typically used by those skilled in the art to most effectively convey the substance of their work to others skilled in the art. Numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it is understood to those skilled in the art that certain embodiments of the present invention may be practiced without certain, specific details. In other instances, well known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the embodiments.

Reference herein to "embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of this phrase in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. The embodiments described herein, explicitly and implicitly understood by one skilled in the art, may be combined with other embodiments.

II. Example Environment

Referring now to the drawings, in which like numerals may refer to like parts throughout the several views. FIG. 1 shows an exemplary configuration 100 in which certain embodiments may be practiced. The configuration 100 may represent, but not be limited to, a part of a residential home, a business building, or a complex with multiple zones. There are a number of multimedia players of which three examples 102, 104 and 106 are shown as audio devices. Each of the audio devices may be installed or provided in one particular area or zone and hence referred to as a zone player herein. It is understood that a zone can comprise more than one zone player.

As used herein, unless explicitly stated otherwise, an audio source or audio sources are generally in digital format and can be transported or streamed over a data network. To facilitate the understanding of the example environment of FIG. 1, it is assumed that the configuration 100 represents a home. Though, it is understood that this technology is not limited to its place of application. Referring back to FIG. 1, the zone players 102 and 104 may be located in one or two

US 10,853,023 B2

5

of the bedrooms while the zone player **106** may be installed or positioned in a living room. All of the zone players **102**, **104**, and **106** are coupled directly or indirectly to a data network **108**. In addition, a computing device **110** is shown to be coupled on the network **108**. In reality, any other device such as a home gateway device, a storage device, or an MP3 player may be coupled to the network **108** as well.

The network **108** may be a wired network, a wireless network or a combination of both. In one example, all devices including the zone players **102**, **104**, and **106** are coupled to the network **108** by wireless means based on an industry standard such as IEEE 802.11. In yet another example, all devices including the zone players **102**, **104**, and **106** are part of a local area network that communicates with a wide area network (e.g., the Internet). In still another example, all devices including the zone players **102**, **104** and **106** and a controller **142** forms an ad-hoc network and may be specifically named, e.g., a household identifier: Smith Family, to be differentiated from a similar neighboring setup with a household identifier, e.g., Kallai Family.

Many devices on the network **108** are configured to download and store audio sources. For example, the computing device **110** can download audio sources, such as music or audio associated with videos, from the Internet (e.g., the "cloud") or some other source and store the downloaded audio sources locally for sharing with other devices on the Internet or the network **108**. The computing device **110** or any of the zone players **102**, **104**, and **106** can also be configured to receive streaming audio. Shown as a stereo system, the device **112** is configured to receive an analog audio source (e.g., from broadcasting) or retrieve a digital audio source (e.g., from a compact disk). The analog audio sources can be converted to digital audio sources. In accordance with certain embodiments, the various audio sources may be shared among the devices on the network **108**.

Two or more zone players (e.g., any two or more of the zone players **102**, **104**, and **106**) may be grouped together to form a new zone group. Any combinations of zone players and an existing zone group may be grouped together. In one instance, a new zone group is formed by adding one zone player to another zone player or an existing zone group.

In certain embodiments, there are two or more zone players in one environment (e.g., a living room in a house). Instead of grouping these two zone players to play back the same audio source in synchrony, these two zone players may be configured to play two separate sounds in left and right channels. In other words, the stereo effects of a sound are reproduced or enhanced through these two zone players, one for the left sound and the other for the right sound. Likewise, for a 3-channel (or 2.1 sound effects) sound, three such zone players may be reconfigured as if there are three speakers: left and right speakers and a subwoofer to form a stereo sound. The details of the reconfiguring the zone players and operating these audio products are described more below. Similar configurations with multiple channels (greater than 3, such as 4, 5, 6, 7, 9 channels and so on) also apply. For example, configurations that use more than two channels may be useful in television and theater type settings, where video content such as in the form of television and movies is played together with audio content that contains more than two channels. Further, certain music might similarly be encoded with more than two channel sound.

In certain embodiments, two or more zone players may be consolidated to form a single, consolidated zone player. The consolidated zone player may further be paired with a single zone player or yet another consolidated zone player. A

6

consolidated zone player may comprise one or more individual playback devices. Each playback device of a consolidated playback device is preferably set in a consolidated mode.

According to certain embodiments, one can continue to do any of: group, consolidate, and pair until a desired configuration is complete. The actions of grouping, consolidation, and pairing are preferably performed through a control interface and not by physically connecting and re-connecting speaker wire, for example, to individual, discrete speakers to create different configurations. As such, certain embodiments described herein provide a more flexible and dynamic platform through which sound reproduction can be offered to the end-user.

According to certain embodiments, a particular zone player (e.g., any of zone players **102**, **104**, and **106**) may be configured to receive a first audio data stream from a first source. The first source might obtain the first audio data stream from any of a downloaded song(s) (e.g., a music file stored on an accessible hard-drive), Internet radio station, online music service, online movie service, and the like, in addition to the more traditional means of accessing audio and video content. The zone player may be further capable to receive and play a second audio data stream from a second source. The second source may be coupled to an audio device through a line-in connector on the second source. In certain embodiments, an audio device might include any of an audio signal source device, such as a record player, radio, cassette player, CD player, DVD player, etc. In certain embodiments, an audio source may include a wireless networking device, such as an AirPort Express, which is an audio device that is commercially offered for sale by Apple, Inc. The AirPort Express may provide streaming audio data to the line-in connection of the second source. Audio data from the AirPort Express device may be controlled via a graphical interface, such as an iTunes music player, which may be separate from a controller of the playback device or the second source. It is understood that the first and second sources may include zone players (e.g., any of zone players **102**, **104**, and **106**).

A listener may command the audio device to play audio (e.g., without having to manually switch sources on the zone player). For example, if the audio device is an AirPort Express, a listener may use an AirPort-enabled computer or smart phone with an iTunes music player, for example, to command the audio device to play. The second source is configured, such that when a signal is detected on the line-in connector, the second source automatically switches the zone player to play audio from the audio device via the second audio data stream. The switch to play audio from the audio device may optionally be performed only after the second source detects a signal on the line-in connector for a threshold time. An example threshold time is 300 milliseconds or less, though any programmed time can work. The play back of the second audio data stream may override the play back of the first audio data stream. The zone player and any of the first source and second source may be components of a single apparatus, or the playback device may be separate from any of the first source and second source and communicate with one another, such as over a network.

At some later point in time, with the audio device connected to the second source via its line-in connector still playing, the listener may decide to play a new audio data stream from a different source and responsively input a command that is communicated to the zone player to play the new audio data stream. The zone player receives the command and switches to the listener's desired source and

US 10,853,023 B2

7

the new audio data stream is played. The zone player subsequently instructs the second source having the line-in connector to stop sending its audio data stream to the zone player. At this point, the second source waits until it no longer detects a signal on its line-in connector for an interval of time. An example interval of time is 13 seconds or less, though any programmed time can work. The second source is now armed (or rearmed) and once again ready to automatically switch the playback on the zone player to the audio data stream from the second source, should the second source once again detect a signal on its line-in connector from the audio device.

An advantage of certain embodiments described above is that the listener can control the audio device itself (e.g., such as by pressing "play" or "stop" on the audio device itself or by pressing "play" or "stop" on a graphical interface associated with the audio device) and let the system detect a line-in signal and automatically switch the source of the zone player, without requiring the listener from having to manually switch the zone player source.

Another advantage of certain embodiments described above is that the system may allow the listener to switch the playback device to a different source even while the line-in signal is still present.

Yet another advantage of certain embodiments described above is that the system is capable of rearming itself such that the system can switch the source back to the audio device, should the system once again detect the line-in signal.

According to some embodiments, a particular zone player (e.g., any of zone players 102, 104, and 106) is configured to output audio data according to a first volume level. When the zone player is automatically switched to play an audio data stream from a new source having a line-in connector, the volume of the zone player is modified to a second volume level. The second volume level is set such that increased dynamic range is given to a volume control of the line-in connected source. An example second volume level is 75 percent of total volume. When the zone player switches once again to play an audio stream from a source that is different from the new source having the line-in connector, the volume of the zone player is returned to a safe volume level such that audio is not played back to the listener at a high level. An example safe volume level is 25 percent of total volume.

It is understood that the technology described herein is not limited to its place of application. For example, it is understood that zones and zone players, and the embodiments described herein, may also be used in vehicles, on water craft, airplanes, amphitheaters, outdoors, along the streets in a village or city, and so on, in addition to homes, offices, gyms, schools, hospitals, hotels, movie theaters, malls, stores, casinos, museum, entertainment parks, or any other place where audio content is played. As such, it will be appreciated that the embodiments described herein may be used in connection with any system or application for which a certain audio system configuration is desired.

III. Example Playback Devices

Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a zone player 200 in accordance with an embodiment. The zone player 200 includes a network interface 202, line-in connection 220, processor 204, memory 206, audio processing circuit 210, module 212, optionally, audio amplifier 214 that may be internal or external, and optionally, speaker unit 218 connected to the

8

audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols used in the Internet is TCP/IP (Transmission Control Protocol/Internet Protocol). In general, a network interface 202 manages the assembling of an audio source or file into smaller packets that are to be transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player 200. Accordingly, in certain embodiments, each of the packets includes an IP-based source address as well as an IP-based destination address.

The network interface 202 may include one or both of a wireless interface 216 and a wired interface 217. The wireless interface 216, also referred to as an RF interface, provides network interface functions by a wireless means for the zone player 200 to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b, 802.11g, 802.11n, or 802.15.1). The wired interface 217 provides network interface functions by a wired means (e.g., an Ethernet cable). In one embodiment, a zone player includes both of the interfaces 216 and 217, and other zone players include only a RF or wired interface. Thus these other zone players communicate with other devices on a network or retrieve audio sources via the zone player. The processor 204 is configured to control the operation of other parts in the zone player 200. The memory 206 may be loaded with one or more software modules that can be executed by the processor 204 to achieve desired tasks. According to one embodiment, a software module implementing an embodiment, such as described herein, is executed, the processor 204 operates in accordance with the software module in reference to a saved zone group configuration characterizing a zone group created by a user, the zone player 200 is caused to retrieve an audio source from another zone player or a device on the network and synchronize the players in the zone group to play back the audio source as desired. According to another embodiment, a software module implementing an embodiment described herein creates a pair between two or more zone players to create a desired multi-channel audio environment.

According to another embodiment, a software module implementing one or more embodiments described herein allows for automated source switching. For example, processor 204 operates in accordance with a software module for determining that an audio signal is present at the line-in connector 220 and responsively switches a source of a zone player or playback device to the audio device. Processor 204, in accordance with a software module, may further receive an instruction to stop the play back of audio data from the audio device even when the audio signal is present at the line-in connector 220. Processor 204, in accordance with a software module, may further determine that the audio signal is no longer present at the line-in connector 220 and responsively rearm, such that a subsequent presence of the audio signal will switch the source to the audio device.

Line-in connection 220 may include a socket for a jack plug or some other audio connector and may be coupled to the audio processing circuit 210. In certain embodiments, the line-in connection 220 includes a socket for any of a 0.25 inch plug, a 3.5 mm plug, and a 2.5 mm plug. An illustrative setup may include connecting an AirPort Express via its 3.5

US 10,853,023 B2

9

mm stereo mini-jack connection to the zone player **200** via its 3.5 mm connection (e.g., line-in connection **220**).

According to one embodiment, the memory **206** is used to save one or more saved zone configuration files that may be retrieved for modification at any time. Typically, a saved zone group configuration file is transmitted to a controller (e.g., the controlling device **140** or **142** of FIG. **1**, a computer, a portable device, or a TV) when a user operates the controlling device. The zone group configuration provides an interactive user interface so that various manipulations or control of the zone players may be performed.

In certain embodiments, the audio processing circuit **210** resembles the circuitry in an audio playback device and includes one or more analog-to-digital converters (ADC), one or more digital-to-analog converters (DAC), an audio preprocessing part, an audio enhancement part or a digital signal processor and others. In operation, when an audio source is retrieved via the network interface **202**, the audio source is processed in the audio processing circuit **210** to produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier **214** for playback on speakers. In addition, the audio processing circuit **210** may include necessary circuitry to process analog signals as inputs to produce digital signals for sharing with other devices on a network.

Depending on an exact implementation, the module **212** may be implemented as a combination of hardware and software. In one embodiment, the module **212** is used to save a scene. The audio amplifier **214** is typically an analog circuit that powers the provided analog audio signals to drive one or more speakers.

It is understood that zone player **200** is an example of a playback device. Examples of playback devices include those zone players that are commercially offered for sale by Sonos, Inc. of Santa Barbara, Calif. They currently include a ZonePlayer **90**, ZonePlayer **120**, and Sonos S5. The ZonePlayer **90** is an example zone player without a built-in amplifier, whereas the ZonePlayer **120** is an example zone player with a built-in amplifier. The S5 is an example zone player with a built-in amplifier and speakers. In particular, the S5 is a five-driver speaker system that includes two tweeters, two mid-range drivers, and one subwoofer. When playing audio content via the S5, the left audio data of a track is sent out of the left tweeter and left mid-range driver, the right audio data of a track is sent out of the right tweeter and the right mid-range driver, and mono bass is sent out of the subwoofer. Further, both mid-range drivers and both tweeters have the same equalization (or substantially the same equalization). That is, they are both sent the same frequencies, just from different channels of audio. While the S5 is an example of a zone player with speakers, it is understood that a zone player with speakers is not limited to one with a certain number of speakers (e.g., five speakers as in the S5), but rather can contain one or more speakers. Further, a zone player may be part of another device, which might even serve a primary purpose different than audio.

### IV. Example Controller

Referring now to FIG. **2B**, there is shown an exemplary controller **240**, which may correspond to the controlling device **140** or **142** of FIG. **1**. The controller **240** may be used to facilitate the control of multi-media applications, automation and others in a complex. In particular, the controller **240** is configured to facilitate a selection of a plurality of audio sources available on the network, controlling operations of one or more zone players (e.g., the zone player **200**)

10

through a RF interface corresponding to the wireless interface **216** of FIG. **2A**. According to one embodiment, the wireless means is based on an industry standard (e.g., infrared, radio, wireless standard IEEE 802.11a, 802.11b 802.11g, 802.11n, or 802.15.1). When a particular audio source is being played in the zone player **200**, a picture, if there is any, associated with the audio source may be transmitted from the zone player **200** to the controller **240** for display. In one embodiment, the controller **240** is used to synchronize audio playback of more than one zone player by grouping the zone players in a group. In another embodiment, the controller **240** is used to control the volume of each of the zone players in a zone group individually or together.

In an embodiment, the controller **240** is used to create a pairing between two or more playback devices to create or enhance a multi-channel listening environment. For example, the controller **240** may be used to select and pair two or more playback devices. In addition, the controller **240** may be used to turn pairing on or off. The controller **240** may also be used to consolidate playback devices, and further to set a particular playback device in consolidated mode. Accordingly, in some embodiments, the controller **240** provides a flexible mechanism for dynamically configuring a multi-channel audio environment. In some instances, the pairing creates a multi-channel listening environment. In some instances, the pairing enhances a multi-channel listening environment by increasing the separation between devices. For example, two individual playback devices, which are positioned at a distance from each other, may provide more channel separation to the listener than the audio coming from only a single device.

The user interface for the controller **240** includes a screen **242** (e.g., a LCD screen) and a set of functional buttons as follows: a "zones" button **244**, a "back" button **246**, a "music" button **248**, a scroll wheel **250**, "ok" button **252**, a set of transport control buttons **254**, a mute button **262**, a volume up/down button **264**, a set of soft buttons **266** corresponding to the labels **268** displayed on the screen **242**.

The screen **242** displays various screen menus in response to a user's selection. In one embodiment, the "zones" button **244** activates a zone management screen or "Zone Menu", which is described in more details below. The "back" button **246** may lead to different actions depending on the current screen. In one embodiment, the "back" button triggers the current screen display to go back to a previous one. In another embodiment, the 'back" button negates the user's erroneous selection. The "music" button **248** activates a music menu, which allows the selection of an audio source (e.g., a song) to be added to a zone player's music queue for playback.

The scroll wheel **250** is used for selecting an item within a list, whenever a list is presented on the screen **242**. When the items in the list are too many to be accommodated in one screen display, a scroll indicator such as a scroll bar or a scroll arrow is displayed beside the list. When the scroll indicator is displayed, a user may rotate the scroll wheel **250** to either choose a displayed item or display a hidden item in the list. The "OK" button **252** is used to confirm the user selection on the screen **242**.

There are three transport buttons **254**, which are used to control the effect of the currently playing song. For example, the functions of the transport buttons may include play/ pause and forward/rewind a song, move forward to a next song track, or move backward to a previous track. According to one embodiment, pressing one of the volume control buttons such as the mute button **262** or the volume up/down

US 10,853,023 B2

**11**

button **264** activates a volume panel. In addition, there are three soft buttons **266** that can be activated in accordance with the labels **268** on the screen **242**. It is understood that, in a multi-zone system, there may be multiple audio sources being played respectively in more than one zone players. The music transport functions described herein shall apply selectively to one of the sources when a corresponding one of the zone players or zone groups is selected.

FIG. 2C shows an exemplary controller **260** which may correspond to the controlling device **140** or **142** of FIG. **1**. The controller **260** is provided with a touch screen that allows a user to interact with the controller, for example, to navigate a playlist of many items, to control operations of one or more players. In one embodiment as it will be further shown in FIGS. **10A** to **10F**, a user may interact with the controller to make a multi-channel audio environment, such as create a stereo pair for example, and may even be used to separate the multi-channel audio environment, such as disengage a stereo pair. It should be noted that other network-enabled portable devices such as an iPhone, iPad or any other smart phone or network-enabled device may be used as a controller to interact or control multiple zone players in an environment (e.g., a networked computer such as a PC or Mac may also be used as a controller). According to one embodiment, an application may be downloaded into a network enabled device. Such an application may implement most of the functions discussed above for the controller **240** using a navigating mechanism or touch screen in the device. Those skilled in the art will appreciate the flexibility of such an application and its ability to be ported to a new type of portable device given the detailed description herein.

FIG. 2D illustrates an internal functional block diagram of an exemplary controller **270**, which may correspond to the controller **240** of FIG. **2B**, a computing device, smart phone, or any other communicative device. The screen **272** on the controller **270** may be an LCD screen. The screen **272** communicates with and is commanded by a screen driver **274** that is controlled by a microcontroller (e.g., a processor) **276**. The memory **282** may be loaded with one or more application modules **284** that can be executed by the microcontroller **276** with or without a user input via the user interface **278** to achieve desired tasks. In one embodiment, an application module is configured to facilitate grouping a number of selected zone players into a zone group and synchronizing the zone players for one audio source. In another embodiment, an application module is configured to control together the audio sounds (e.g., volume) of the zone players in a zone group. In operation, when the microcontroller **276** executes one or more of the application modules **284**, the screen driver **274** generates control signals to drive the screen **272** to display an application specific user interface accordingly, more of which will be described below.

The controller **270** includes a network interface **280** referred to as a RF interface **280** that facilitates wireless communication with a zone player via a corresponding RF interface thereof. In one embodiment, the commands such as volume control and audio playback synchronization are sent via the RF interfaces. In another embodiment, a saved zone group configuration is transmitted between a zone player and a controller via the RF interfaces. The controller **270** may control one or more zone players, such as **102**, **104** and **106** of FIG. **1**. Nevertheless, there may be more than one controller, each preferably in a zone (e.g., a room or rooms nearby each other) and configured to control any one and all of the zone players.

In one embodiment, a user creates a zone group including at least two zone players from the controller **240** that sends

**12**

signals or data to one of the zone players. As all the zone players are coupled on a network, the received signals in one zone player can cause other zone players in the group to be synchronized so that all the zone players in the group play back an identical audio source or a list of identical audio sources in a timely synchronized manner such that no (or substantially no) audible delays or hiccups could be heard. Similarly, when a user increases the audio volume of the group from the controller, the signals or data of increasing the audio volume for the group are sent to one of the zone players and causes other zone players in the group to be increased together in volume and in scale.

According to one implementation, an application module is loaded in memory **282** for zone group management. When a predetermined key (e.g. the "zones" button **244**) is activated on the controller **240**, the application module is executed in the microcontroller **276**. The input interface **278** coupled to and controlled by the microcontroller **276** receives inputs from a user. A "Zone Menu" is then displayed on the screen **272**. The user may start grouping zone players into a zone group by activating a "Link Zones" or "Add Zone" soft button, or de-grouping a zone group by activating an "Unlink Zones" or "Drop Zone" button. The detail of the zone group manipulation will be further discussed below.

As described above, the input interface **278** includes a number of function buttons as well as a screen graphical user interface. It should be pointed out that the controller **240** in FIG. **2B** is not the only controlling device that may practice the embodiments. Other devices that provide the equivalent control functions (e.g., a computing device, a hand-held device) may also be configured to practice the present invention. In the above description, unless otherwise specifically described, it is clear that keys or buttons are generally referred to as either the physical buttons or soft buttons, enabling a user to enter a command or data.

One mechanism for 'joining' zone players together for music playback is to link a number of zone players together to form a group. To link a number of zone players together, a user may manually link each zone player or room one after the other. For example, there is a multi-zone system that includes the following zones:

Bathroom
Bedroom
Den
Dining Room
Family Room
Foyer

If a user wishes to link five of the six zone players using the current mechanism, the user may start with a single zone and then manually link each zone to that zone. This mechanism may be sometimes quite time consuming. According to one embodiment, a set of zones can be dynamically linked together using one command. Using what is referred to herein as a theme or a zone scene, zones can be configured in a particular scene (e.g., morning, afternoon, or garden), where a predefined zone grouping and setting of attributes for the grouping are automatically effectuated.

For instance, a "Morning" zone scene/configuration command would link the Bedroom, Den and Dining Room together in one action. Without this single command, the user would need to manually and individually link each zone. FIG. **3A** provides an illustration of one zone scene, where the left column shows the starting zone grouping—all zones are separate, the column on the right shows the effects of grouping the zones to make a group of 3 zones named after "Morning".

US 10,853,023 B2

13

Expanding this idea further, a Zone Scene can be set to create multiple sets of linked zones. For example, a scene creates 3 separate groups of zones, the downstairs zones would be linked together, the upstairs zones would be linked together in their own group, and the outside zones (in this case the patio) would move into a group of its own.

In one embodiment as shown in FIG. 3B, a user defines multiple groups to be gathered at the same time. For example: an "Evening Scene" is desired to link the following zones:

Group 1
Bedroom
Den
Dining Room
Group 2
Garage
Garden

where Bathroom, Family Room and Foyer should be separated from any group if they were part of a group before the Zone Scene was invoked.

A feature of certain embodiments is that that zones do not need to be separated before a zone scene is invoked. In one embodiment, a command is provided and links all zones in one step, if invoked. The command is in a form of a zone scene. After linking the appropriate zones, a zone scene command could apply the following attributes:

Set volumes levels in each zones (each zone can have a different volume)
Mute/Unmute zones.
Select and play specific music in the zones.
Set the play mode of the music (Shuffle, Repeat, Shuffle-repeat)
Set the music playback equalization of each zone (e.g., bass treble).

A further extension of this embodiment is to trigger a zone scene command as an alarm clock function. For instance the zone scene is set to apply at 8:00 am. It could link appropriate zones automatically, set specific music to play and then stop the music after a defined duration. Although a single zone may be assigned to an alarm, a scene set as an alarm clock provides a synchronized alarm, allowing any zones linked in the scene to play a predefined audio (e.g., a favorable song, a predefined playlist) at a specific time or for a specific duration. If, for any reason, the scheduled music failed to be played (e.g., an empty playlist, no connection to a share, failed UPnP, no Internet connection for an Internet Radio station), a backup buzzer will sound. This buzzer will be a sound file that is stored in a zone player.

FIG. 4 shows an exemplary user interface 400 that may be displayed on a controller 142 or a computer 110 of FIG. 1. The interface 400 shows a list of items that may be set up by a user to cause a scene to function at a specific time. In the embodiment shown in FIG. 4, the list of items includes "Alarm", "Time", "Zone", "Music", "Frequency" and "Alarm length". "Alarm" can be set on or off. When "Alarm" is set on, "Time" is a specific time to set off the alarm. "Zone" shows which zone players are being set to play a specified audio at the specific time. "Music" shows what to be played when the specific time arrives. "Frequency" allows the user to define a frequency of the alarm. "Alarm length" defines how long the audio is to be played. It should be noted that the user interface 400 is provided herein to show some of the functions associated with setting up an alarm. Depending on an exact implementation, other functions, such as time zone, daylight savings, time synchronization, and time/date format for display may also be provided.

14

According to one embodiment, each zone player in a scene may be set up for different alarms. For example, a "Morning" scene includes three zone players, each in a bedroom, a den, and a dining room. After selecting the scene, the user may set up an alarm for the scene as whole. As a result, each of the zone players will be activated at a specific time.

FIG. 5A shows a user interface 500 to allow a user to form a scene. The panel on the left shows the available zones in a household. The panel on the right shows the zones that have been selected and be grouped as part of this scene. Depending on an exact implementation of a user interface, Add/Remove buttons may be provided to move zones between the panels, or zones may be dragged along between panels.

FIG. 5B shows another user interface 520 to allow a user to form a scene. The user interface 520 that may be displayed on a controller or a computing device, lists available zones in a system. A checkbox is provided next to each of the zones so that a user may check in the zones to be associated with the scene.

FIG. 5C shows a user interface 510 to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively. As shown in the user interface 510, the 'Volumes . . .' button (shown as sliders, other forms are possible) allows the user to affect the volumes of the associated zone players when a zone scene is invoked. In one embodiment, the zone players can be set to retain whatever volume that they currently have when the scene is invoked. Additionally the user can decide if the volumes should be unmuted or muted when the scene is invoked.

V. Providing Example Player Themes or Zone Scenes

FIG. 6 shows a flowchart or process 600 of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone. The process 600 is presented in accordance with one embodiment of the present invention and may be implemented in a module to be located in the memory 282 of FIG. 2C.

The process 600 is initiated when a user decides to proceed with a zone scene at 602. The process 600 then moves to 604 where it allows a user to decide which zone players to be associated with the scene. For example, there are ten players in a household, and the scene is named after "Morning". The user may be given an interface to select four of the ten players to be associated with the scene. At 606, the scene is saved. The scene may be saved in any one of the members in the scene. In the example of FIG. 1, the scene is saved in one of the zone players and displayed on the controller 142. In operation, a set of data pertaining to the scene includes a plurality of parameters. In one embodiment, the parameters include, but may not be limited to, identifiers (e.g., IP address) of the associated players and a playlist. The parameters may also include volume/tone settings for the associated players in the scene. The user may go back to 602 to configure another scene if desired.

Given a saved scene, a user may activate the scene at any time or set up a timer to activate the scene at 610. The process 600 can continue when a saved scene is activated at 610. At 612, upon the activation of a saved scene, the process 600 checks the status of the players associated with the scene. The status of the players means that each of the players shall be in condition to react in a synchronized manner. In one embodiment, the interconnections of the players are checked to make sure that the players commu-

US 10,853,023 B2

15

nicate among themselves and/or with a controller if there is such a controller in the scene.

It is assumed that all players associated with the scene are in good condition. At **614**, commands are executed with the parameters (e.g., pertaining to a playlist and volumes). In one embodiment, data including the parameters is transported from a member (e.g., a controller) to other members in the scene so that the players are caused to synchronize an operation configured in the scene. The operation may cause all players to play back a song in identical or different volumes or to play back a pre-stored file.

### VI. Example Multi-Channel Environments

FIG. **7** shows an example configuration in which an audio source is played back on two players **702** and **704**, according to an example embodiment. These two players **702** and **704** may be located in and around one place (e.g., a hall, room, or nearby rooms) and are designated to play two sound tracks respectively. For example, an audio source may have left and right sound channels or tracks (e.g., stereo sound). Instead of grouping the players **702** and **704** to play back the audio source together in synchrony, where each player **702** and **704** plays the same audio content at substantially the same time, the players **702** and **704** can be paired to play different channels of the audio source in synchrony. As a result of pairing, the stereo sound effects can be simulated or enhanced via two players **702** and **704** versus one player or none of the players, for example.

In certain embodiments, each player of players **702** and **704** includes a network interface, one or more speaker drivers (two or more speaker drivers in some instances, such as when the player can play in stereo mode absent pairing), an amplifier, and a processor, such as shown in FIG. **2**A. The network interface receives audio data over a network. One or more amplifiers power the speaker drivers. The processor processes the audio data to be output through the speaker drivers. The processor may further configure a first equalization of the output from the speaker drivers in accordance with a first type of pairing and configuring a second equalization of the output from the speaker drivers in accordance with a second type of pairing.

In an embodiment, the two players **702** and **704** are configured to output a plurality of audio channels independent of each other. For example, each player **702** and **704** may be configured to output audio content in stereo independently from each other. Subsequent to pairing, one playback device (e.g., player **702**) is configured to output a first subset of the plurality of audio channels and the other playback device (e.g., player **704**) is configured to output a second subset of the plurality of audio channels. The first and second subsets are different. In this example, subsequent to pairing players **702** and **704**, player **702** might play the right channel and player **704** might play the left channel. In another example, player **702** might play the right channel plus a center channel (e.g., in television or theater mode) and player **704** might play the left channel plus the center channel. Even in the latter example, the first and second subsets are different in that player **702** is playing channels Right+Center and player **704** is playing channels Left+Center. In yet another embodiment, subsequent to pairing, player **702** might play all channels except certain bass frequencies, which may be played via player **704**, thereby using player **704** as a subwoofer.

In another embodiment, a collection of three or more playback devices (e.g., players **702**, **704**, and one or more additional players) are each configured to output a plurality

16

of audio channels independent of another playback device in the collection. Subsequent to pairing, each of the playback devices is configured to output a generally different audio channel(s) from the collection. This embodiment is particularly useful in a television or movie theater setting where a particular playback device of the multiple playback devices is configured to output in two-channel or stereo mode at one time (e.g., when playing a song), and subsequent to pairing, is configured to output as a front-right channel, a front-center channel, a front-left channel, a rear-right channel, a rear-left channel, and so on (e.g., when watching a movie or television).

In another embodiment, one of the paired playback devices (e.g., player **702** or player **704**) processes the data of the audio item, essentially separating the data into channels, each of the channels representing a single-sound track, for example, and being played back in one of the playback devices, thus creating or enhancing a multi-channel listening environment. In an alternative embodiment, both playback devices (e.g., players **702** and **704**) may receive and process the data of the audio item and each playback device may output only the audio content designated for the respective player. For example, player **702** might receive both left and right channel audio, but only play the left channel, whereas player **704** might also receive both left and right channel audio, but only play the right channel.

In another embodiment, two or more playback devices (e.g., players **702** or **704**) may be grouped into a single or consolidated playback device and the consolidated playback device (e.g., consolidated player **702**+**704**) may be paired with one or more playback devices. For instance, two playback devices maybe grouped into a first consolidated playback device and two additional playback devices maybe grouped into a second consolidated playback device. Then, the first and second consolidated playback devices may be paired to create or enhance a multi-channel listening environment.

In certain embodiments, a playback device (e.g., either player **702** or **704**) that is configured to output an audio channel is paired with one or more additional playback devices, such that the playback device is configured to output a different audio channel than previously configured. For instance, the playback device might be configured to output a right channel in stereo mode, but subsequent to being paired with one or more additional playback devices, might be configured to output a rear, right channel in theater mode. The playback device may be paired to one or more other playback devices.

In certain embodiments, a playback device (e.g., either player **702** or **704**) that is configured to output a plurality of audio channels is paired with one or more additional playback devices, such that the playback device is configured to output a subset of the plurality of audio channels relative to the one or more additional playback devices. For instance, the playback device might be configured to output in two-channel or stereo mode, but subsequent to being paired with one or more playback devices might be configured to output a right or left channel. The playback device may be paired to one or more other playback devices.

According to certain embodiments, the action of pairing two or more playback devices is triggered based on a command from a user via a control interface (e.g., a manual command) or responsive to an event (e.g., an automatic command). For example, using a controller, a user can create a pairing between two or more playback devices or disengage the pairing between two or more playback devices. In another example, pairing may be triggered by the audio

US 10,853,023 B2

17

content itself, a signal received from a source device, or some other predefined event, such that pairing occurs when the event is detected by the controller or playback device, for example. In addition, another device might be programmed to detect the event and provide a pairing signal to the controller and/or playback devices.

Further, it is understood that going from a configuration of no pairing (unpaired or non paired) to a configuration of pairing or from one kind of pairing (e.g., a pairing used in a type of stereo mode or theater mode) to a different kind of pairing (e.g., another pairing used in a type of stereo mode or theater mode) are all various types of "pairing" that can occur according to certain embodiments. In addition, disengaging a pairing between multiple playback devices might go from pairing to no pairing or from pairing of a first kind back to pairing of a previous kind, for example.

In one example, a first type of pairing might include "no pairing" with another playback device and a second type of pairing might include pairing with one or more additional playback devices. In a second example, a first type of pairing might include pairing with a second playback device and a second type of pairing might include pairing with a plurality of playback devices. In a third example, a first type of pairing might include reproducing two channel sound via the speaker drivers and a second type of pairing comprises reproducing no more than one channel of the two channel sound via the speaker drivers. In a fourth example, a first type of pairing might comprise reproducing a first audio channel via the speaker drivers and the second type of pairing might include reproducing a second audio channel via the speaker drivers. In a fifth example, a first type of pairing might include reproducing the audio content via the speaker drivers in stereo mode and a second type of pairing might include reproducing the audio content via the speaker drivers in theater mode. In a sixth example, a first type of pairing might include reproducing the audio content via the speaker drivers and a second type of pairing comprises reproducing the audio content via the speaker drivers when in consolidated mode. It is understood that various variations and modifications may be made to the examples described just above with the attainment of some or all of the advantages of the technology described herein.

According to certain embodiments, the configuration of a playback device may include any of: changing the equalization of the playback device by changing the equalization of one or more specific speaker drivers and optimizing the synchronization between paired devices. Changing the equalization of the playback device might include any of: turning on or off (or effectively muting) one or more specific speaker drivers, changing the channel output of one or more speaker drivers, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, changing the amplifier gain of the playback device as a whole.

In certain embodiments, changing the equalization of a playback device (e.g., changing the equalization of one or more speaker drivers of the playback device) may affect frequency dependent parameters. Examples might include the adjustment of the strength of frequencies within the audio data, a phase adjustment, and time-delay adjustment. In addition, a particular equalization may use a first type of pass filter, such as one that attenuates high, middle, or low frequencies, for example, while allowing other frequencies to pass unfiltered (or substantially unfiltered). Filters might also be different kinds or of a different order (e.g., first order filter, second order filter, third order filter, fourth order filter, and so on). For example, a first equalization of a playback

18

device might include using a first type of pass filter to modify the output based on a first type of pairing and a second equalization of the playback device might include using a second type of pass filter to modify the output based on the second type of pairing. In this example, the first and second type of pass filters have one or different properties and/or behaviors, thus changing the equalization and sonic behavior of the device.

By way of illustration, when two S5 devices are paired to create a stereo pair, for example, one S5 device may be configured as the "left" and the other S5 device may be configured as the "right." In one embodiment, the user may determine which is left or right. In this configuration, for example, the left and right audio data may be sent to both S5 devices, but the left audio data of the track is played out of the S5 device configured as left and the right audio data of a track is played out of the S5 device configured as right. In addition, the equalization of each S5 device is changed in an attempt to reduce or eliminate certain constructive or destructive interference. For example, one tweeter on each S5 device may be turned off or substantially muted. In certain embodiments, the crossover frequency to each driver may even be changed from a previous configuration so that two or more drivers are not necessarily outputting the exact same audio data, otherwise constructive and/or destructive interference may occur. In certain embodiments, the amplifier gain is adjusted for a particular speaker driver and/or for the playback device as a whole.

In operation, according to certain embodiments, a controller 706 (e.g., a controller 142 of FIG. 1 or 240 of FIG. 2B or a portable device) is used to initiate the operation. Through a user interface, the controller 706 causes a player 702 to retrieve the audio source, provided the audio source is on a network 708 (e.g., the Internet or a local area network). Similarly, the controller 706 may also cause a designated device (e.g., another networked device) to establish a communication session with the player 702 to deliver the requested audio source. In any case, either one or both of the players 702 and 704 may have access to the data representing the audio source.

In certain embodiments, a module in the player 702 is activated to process the data. According to one embodiment, the right and left sound tracks are separated. One sound track is retained locally in one player and the other sound track is pushed or uploaded to the other device (e.g., via an ad-hoc network). When the right and left sound tracks are played back simultaneously or substantially simultaneously, the stereo sound effect can be appreciated.

In another embodiment, several tracks are separated, such as in television or theater mode. For example, the tracks may be separated into a center channel, right front channel, left front channel, right rear channel, left rear channel, and so on. Accordingly, one or more sound tracks may be retained locally in one player and the other sound tracks are pushed or uploaded to the other devices.

In yet another embodiment, one player might process the data and retain one or more tracks locally, while the remaining data is sent onto another player. The receiving player may then process the data and retain one or more tracks locally and send any remaining data onto another player. This process, or one like it, may continue until all of the tracks are retained locally by corresponding player devices.

In yet another embodiment, each player might receive and process the data and play only the channel or channels that are designated for that player.

In certain embodiments, it is important to maintain good synchronization, especially when pairing two or more inde-

US 10,853,023 B2

19

pendently clocked playback devices so that the multi-channel audio content is played back as it was originally intended. According to an embodiment, a message may be initiated from one device to another that is also activated to send back an acknowledgement. Upon receiving the acknowledgement, the time delay in transporting data from one device to another can be measured. The time delay will be considered when synchronizing the two players to play back the two separated sound tracks. In certain embodiments, if sending a packet (e.g., a packet in accordance with SNTP protocol) to a playback device and receiving a response takes more than fifteen milliseconds, for example, the timing information contained within that packet, such as clock information, is discarded. If sending and receiving a packet is less than fifteen milliseconds, then the information from the packet is used to adjust playback, if so necessary.

Additional details of synchronizing operations of two or more independently clocked players are provided in commonly assigned U.S. application Ser. No. 10/816,217, filed Apr. 1, 2004, entitled "System and Method For Synchronizing Operations Among A Plurality Of Independently Clocked Digital Data Processing Devices" which is hereby incorporated by reference.

FIG. 8 shows an example configuration of a pairing amongst multiple players 802, 804, 806, 808, 810, and 812 in a theater-like environment, in accordance to an embodiment. Player 802 may operate as a front-left channel, player 804 may operate as a center channel, player 806 may operate as a front-right channel, player 808 may operate as a subwoofer, player 810 may operate as a rear, right channel, and player 812 may operate as a rear, right channel. In this example, the players 802, 804, 806, 808, 810, and 812 are wirelessly coupled over network 816 so as to receive and transmit data over a wireless network, and obtain power from power outlets in the wall or through some other power source (e.g., a battery). Players 802, 804, 806, 808, 810, and 812 may be wired, if so configured in an alternate embodiment. Controller 814 may be a network-enabled device, examples of which include a smart phone, tablet computer, laptop computer, desktop computer, or a television.

In one embodiment, a designated player, such as player 804, receives multi-channel audio content from a source 816. Source 816 might include audio and/or video content downloaded or streamed from the Internet, a DVD or Blu-Ray player, or from some other source of audio and/or video content. Player 804 separates the multi-channel audio and sends respective audio channels to its playback owner. For example, if a particular audio channel is designated for the front, right speaker, then that content is wirelessly directed from player 804 to player 802, and so on. Players 802, 804, 806, 808, 810, and 812 play the audio content synchronously, so as to create a multi-channel listening environment. Moreover, if source 816 provides video content along with audio content, then the audio content is preferably played in synchrony with the video content.

In another embodiment, each player of players 802, 804, 806, 808, 810, and 812 may separate out its own one or more channels for playback. That is, either all audio content, or a portion thereof, is sent to each player (e.g., from source 816 or another playback device) and the player itself obtains its own data for playback.

In addition, players 802, 804, 806, 808, 810, and 812 may be reconfigured to operate in many different configurations, such as described above. For example, players 802 and 806 may be paired to operate in stereo mode, while the other players remain in sleep mode or turned off (player 808 may remain on in any particular configuration, if so desired and

20

configured, because it is operating as a subwoofer). In another example, players 802 and 810 may be consolidated and output left channel audio, while players 806 and 812 may be consolidated and output right channel audio. In yet another example, some of players 802, 804, 806, 808, 810, and 812 are consolidated into a single player and paired with additional playback devices, such as in an adjacent room. In a further example, players 802, 804, 806, 808, 810, and 812 are grouped and not paired, when the audio content is music (versus movie content, for example). These are just some configuration examples. Many other configurations are possible using the teachings described herein.

FIG. 9 shows a flowchart or process 900 of grouping a plurality of audio products to play separated sound tracks in synchronization to simulate a multi-channel listening environment. The process 900 is presented in accordance with certain embodiments and may be implemented in a module to be located in the memory 282 of FIG. 2D. To facilitate the description of process 900, a listening environment of stereo sound with left and right channels is described. Those skilled in the art can appreciate that the description can be equally applied to other forms of multi-channel listening environment (e.g., three, five, seven channel environments).

Typically, there is a plurality of players being controlled by one or more controllers, where these players are disposed in various locations. For example, there are five players in a house; three of them are respectively disposed in three rooms while two players are disposed in a larger room. Accordingly, these two players would be candidates to be paired to simulate a stereo listening environment, instead of just playing synchronized audio from both in a grouped fashion. In another example, there are four players in a large space or adjacent spaces, two pairs of the players may be paired to simulate a stereo listening environment, in which two players in one consolidated pair can be grouped to play back one (left) sound track and the other two in the other consolidated pair can be grouped to play back one (right) sound track.

In any case, two groups of players or two players are decided to be paired at 902. If no players are paired, the process 900 will not be activated. It is assumed that two players from a group of players being controlled by a controller are selected to be paired at 902. The process 900 proceeds.

At 904, a user may decide which player is to play back which sound track. Depending on the location of the user or listener(s) with respect to the selected players, it is assumed that a player or unit A is chosen to play back a left sound track and another player or unit B is chosen to play back a right sound track. In an alternative embodiment, the players themselves (or the controller) may automatically determine which unit is configured to play the right channel and which unit is configured to play the left channel without input from the user.

According to one embodiment, a time delay in transporting data between the two units A and B is measured at 906. This time delay may facilitate sound synchronization between the two units as one of the units will receive a processed sound track from the other. The user may continue to operate on a controller to select a title (e.g., an audio source or an item from a playlist) for playback on the two units at 910.

Once the title is determined at 912, the data for the title is accessed. Depending on where the data is located, the controller may be configured to cause one of the two units to obtain or stream in the data. In one embodiment, the controller or unit A initiates a request to a remotely-net-

US 10,853,023 B2

21                                                22

worked device providing or storing the data. Assuming an authentication procedure, if any, completes successfully, the remote device starts to upload the data to the unit A. Likewise, if the data is locally stored in the unit A, the data can be accessed locally without requesting the same from the network. As the data is being received or accessed in the unit A, a processing module is activated in the unit A to process the data, essentially separating the data into two streams of sound tracks at **914**. In an alternative embodiment, each unit may receive and process the data, essentially separating the data into a stream to be played by the respective unit.

At **916**, one of the streams is uploaded from the unit A to unit B via a local network (e.g., the ad-hoc network formed by all the players being controlled by the controller). As the streams are being distributed, the two units are configured to play back the streams respectively, each reproducing the sound of a single sound track at **918**. Together, in synchrony, the two units create a stereo sound listening environment.

It should be noted that the delay time, if noticeable, may be incorporated into the unit A to delay the consumption of the stream by the delay time to synchronize with the unit B. Alternatively, a non-selected player may be used to process a streaming data of the title and configured to supply two streams to the pair of players, thus equalizing the delay time that would be otherwise experienced by the unit B.

FIGS. **10A-10F** show illustrative screenshots of a controller for creating a stereo pair in accordance with certain embodiments. The screenshots are from a computing device (e.g., a tablet computer, laptop, or desktop) used as a controller. Those skilled in the art can appreciate that FIGS. **10A-10F** may be readily modified to be used in a portable device with network capability, such as, for example, iPhone or iTouch or other smart phone or other network-enabled devices. Additionally, the controller might exist as part of a player itself or directly/indirectly coupled to the player, and therefore such screenshots may be modified accordingly—such a controller need not have network capability as the player will have network connectivity.

FIG. **10A** shows a graphic interface **1000** that may be displayed on a controller when a user desires to create a stereo pair with two players in a system. It is understood that the system may include two or more players. If a stereo pair is desired, such as discussed with respect to the example of FIGS. **10A-10F**, then any two players (one or both of which may be a consolidated player) in the system may be paired. However, if pairing more than two players is desired, such as creating an environment which is capable of playing more than two channel audio data, then the graphic interface **1000** may include an additional option or options. For example, an option might include "Make a Movie Surround Sound Pairing," "Make a Music Surround Sound Pairing," or "Make a Dolby Pro Logic Pairing." Any descriptive language may be used to appropriately indicate to the user the type of pairing that can be created. Upon selecting an option, a setup wizard on the controller may help the user appropriately configure the system such that multi-channel discrete audio may be effectively realized by the system.

Turning back to FIG. **10A**, the interface **1000** allows a user to initiate a stereo pair with a zone player named "ZPS5-Black." In certain embodiments, the system recognizes that ZPS5-Black is part of a particular zone (e.g., kitchen, family room, bedroom, and so on). The system may allow the user to pair ZPS5-Black with another player in the same zone only, or alternatively, the system may allow the user to pair ZPS5-Black with another player in a different zone (such as an adjacent zone). Pairing players in different

zones may be particularly useful when an open space is divided into two or more zones (e.g., an open space might include a kitchen and family room, for example).

Additionally, the system may be programmed such that pairing players from different zones creates another zone to reflect the players in paired mode (e.g., a single kitchen-family room zone during paired operation might originate from a kitchen zone and a family room zone during non-paired operation). In such an embodiment, a user may be able to switch between zones or dynamically create new zones.

In certain embodiments, if another similar player is available to be paired, then the screenshot of FIG. **10B** may be displayed. If the user wishes to continue with creating a pair, then the user may select "OK." If not, then the user may select "Cancel." In another embodiment, a different player (e.g., a player that is not an S5) may be paired instead. That is, different types of players may be paired, if the players are so designed to be paired. To accommodate the differences in player type, the equalization of one or more players may be adjusted accordingly to compensate for things like the number and size of speaker drivers used in one player versus the other player. In yet another embodiment, a list of the players in the system may be displayed (not shown), from which the user selects two or more players to make the stereo pair. The list of players may be automatically determined by the system based on a player's particular location within a home, room, or configuration with other players within a room, for example.

Turning now to FIG. **10C**, in this example, it is assumed that the user may select a zone player named "ZPS5-White" to be paired with "ZPS5-Black" to create a stereo pair. If so desired, the user may select "OK" to proceed with the pairing. Otherwise, the user may select "Cancel." In certain embodiments, ZPS5-White may be in the same zone as ZPS5-Black. In other embodiments, ZPS5-White may be in a different zone as ZPS5-Black.

Upon selecting "OK" in FIG. **10C**, a screenshot like that of FIG. **10D** may be displayed to the user, thereby instructing the user to press the mute button (or some other designated button) on the "LEFT" player of the stereo pair. Further, a light on the players may flash to further indicate that each of the players is a possibility for left channel pairing. Upon selection of the left player, FIG. **10E** may be displayed to inform the user that a pair has been created along with a name for the pair, if so desired. Responsively, the system will play the left channel audio from the user designated player and will automatically play the right channel audio from the other player. FIG. **10F** provides an example screenshot to allow the user to separate the stereo pair if so desired.

In an alternative embodiment, the creation of a stereo pair may be an option for a particular zone or a number of zones (e.g., a household of zones). For example, an option like "Create a Stereo Pair" may exist such that upon selection, a setup wizard may launch asking the user to press a flashing mute button (or some other designated button) on whichever speaker the user wanted to be the left speaker in the zone, a portion of zones, or all of the zones. In one embodiment, flashing would occur for all of the same speaker types. In another embodiment, flashing would occur for all speaker types that are capable of being paired. After choosing the left speaker, the wizard screen would ask the user to do the same for the right speaker. Preferably, only the speakers that are capable of being paired as the right speaker are flashing so as to appropriately narrow the choices for the user.

US 10,853,023 B2

23                                                                        24

Additionally, in one embodiment and as shown in FIG. 3A or 3B, a graphic display is provided to show to the user all the players in a system and how they are grouped or named. A nickname for the stereo pair in the display **1040** may be highlighted and would be further displayed in FIG. 3A if FIG. 3A is modified after the stereo pair is complete

A similar graphic interface may be used to create a pair in an environment having more than two channels. For example, in a home theater environment, the system may list more than two separate players from which the user can create a pairing by selecting which player is to operate as the front right, center, front left, rear right, and rear left. A subwoofer may also be added to the list, so that it can be integrated into the multi-channel pairing by the user.

As an example, similar to what is described in the various embodiments above with respect to creating a stereo pair, the system may flash an indicator light on all relevant players and a setup wizard may ask the user to select the "front-left," then the "front-right," then the "front-center," then the "rear-left," then the "rear-right," and so on until all of the players are appropriately paired. Preferably, only the speakers that are capable of being paired as the next speaker are flashing so as to appropriately narrow the choices for the user.

## VII. Example Smart Line-in Processing

FIG. **11** shows an example configuration of smart line-in processing, in accordance to an embodiment. System **1100** includes a playback device **1102**, a first source **1104**, a second source **1106** having a line-in connector **1108**, and an audio device **1110**. The playback device **1102** and any of the first source **1104** and the second source **1106** may be components of a single apparatus (e.g., a single playback device), or the playback device **1102** may be separate from any of the first source **1104** and second source **1106** and communicate with one another, such as over a wired or wireless network. By way of illustration, the playback device **1102** may be a zone player or playback device such as shown in FIGS. **1**, **2**A, **7**, and **8**. Additionally, it is understood that first source **1104** and second source **1106** may also each be a playback device, such as described herein.

In certain embodiments, the playback device **1102** is idle and therefore not producing sound. Alternatively, the playback device **1102** is configured to receive and play a first audio data stream from the first source **1104**. The playback device **1102** is further capable to receive and play a second audio data stream from the second source **1106**. The second source **1106** is coupled to an audio device **1110** through a line-in connector **1108** on the second source **1106**. Line-in connector **1108** may include a TRS type connector/socket (e.g., a TRS connector may be referred to as an audio jack, jack plug, stereo plug, mini-jack, and mini-stereo). Other types of connectors may also be used depending on the application. Further, a digital audio connection may be made instead of an analog audio connection. Such as described above, an example audio device **1110** may include a wireless networking device, such as an AirPort Express, which is a product that is commercially offered for sale by Apple, Inc.

A listener (e.g., user of **1100**) commands the audio device **1110** to play audio (e.g., via a separate control interface like an iTunes music controller). The second source **1106** is configured, such that when a signal is detected on the line-in connector **1108**, the second source **1106** automatically switches the playback device **1102** to play audio from the audio device **1110** via the second audio data stream. The switch to play audio from the audio device **1110** may optionally be performed only after the second source **1106** detects a signal on the line-in connector **1108** for a threshold time (e.g., 300 milliseconds or less). It is understood that the playing of the second audio data stream may override the playing of the first audio data stream, if the playback device **1102** was receiving and/or playing audio from the first source **1104**. Additionally, when the playback device **1102** is automatically switched to play audio from the second source **1106**, where the second source **1106** receives the audio from the audio device **1110** coupled to the second source **1106** via the line-in connector **1108**, the volume of the playback device **1102** is modified to a second volume level. The second volume level is set such that increased dynamic range is given to a volume control of the audio device **1110** connected via line-in to the second source **1106**.

In another illustration, the playback device **1102** is configured to receive and play audio from the second source **1106**. During play, a listener commands the playback device **1102** via a controller (such as shown in FIG. 2D) to instead play the first audio data stream from the first source **1104**. Upon receipt of the command, the playback device **1102** switches to play the first audio data stream. The playback device **1102** subsequently instructs the second source **1106** to stop sending the audio of the audio device **1110** to the playback device **1102**. The second source **1106** stops sending the audio to the playback device **1102** and waits until it no longer detects a signal on its line-in connector **1108** for an interval of time. When a signal is not detected on the line-in connector **1108** for the interval of time (e.g., 13 seconds or less), the second source **1106** is ready to automatically switch the playback device **1102** to play audio from the audio device **1110**, should the second source **1106** once again detect a signal on its line-in connector **1108**. Additionally, when the playback device **1102** switches to play the first audio data stream, the volume of the playback device **1102** is returned to a safe volume level such that the audio is not played back to the listener at a high level. While a high level may be programmed to taste, an example of a safe volume level is less than 100 db.

## VII. Conclusion

The components, elements, and/or functionality of the systems discussed above may be implemented alone or in combination in various forms in hardware, firmware, and/or as a set of instructions in software, for example. Certain embodiments may be provided as a set of instructions residing on a computer-readable medium, such as a memory, hard disk, CD-ROM, DVD, and/or EPROM, for execution on a processing device, such as a controller and/or playback device.

Various inventions have been described in sufficient detail with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement and combination of parts may be resorted without departing from the spirit and scope of the invention as claimed. While the embodiments discussed herein may appear to include some limitations as to the presentation of the information units, in terms of the format and arrangement, the embodiments have applicability well beyond such embodiment, which can be appreciated by those skilled in the art. Accordingly, the scope of the present invention is defined by the appended claims rather than the forgoing description of embodiments.

US 10,853,023 B2

25

The invention claimed is:

**1**. A playback device comprising:

one or more processors; and

tangible, non-transitory computer readable memory comprising instructions stored therein, wherein the instructions, when executed, cause the playback device to perform a method comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content via a line-in connector;

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

**2**. The playback device of claim **1**, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

**3**. The playback device of claim **1**, wherein playing the second type of media content comprises playing the second type of media content in synchrony with a second playback device.

**4**. The playback device of claim **1**, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

**5**. The playback device of claim **1**, wherein playing the second type of media content comprises transmitting at least a portion of the second type of media content to a third playback device.

**6**. The playback device of claim **1**, wherein playing the first type of media content comprises transmitting at least a portion of the first type of media content to at least one of a second playback device or a third playback device.

**7**. The playback device of claim **1**, wherein the first type of media content comprises media content received from a video device.

**8**. Tangible, non-transitory computer-readable media comprising instructions encoded therein, wherein the instructions, when executed by a playback device, cause the playback device to perform functions comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content via a line-in connector;

26

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

**9**. The tangible, non-transitory computer-readable media of claim **8**, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

**10**. The tangible, non-transitory computer-readable media of claim **8**, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

**11**. The tangible, non-transitory computer-readable media of claim **8**, wherein playing the second type of media content comprises transmitting at least a portion of the second type of media content to a third playback device.

**12**. The tangible, non-transitory computer-readable media of claim **8**, wherein playing the first type of media content comprises transmitting at least a portion of the first type of media content to at least one of a second playback device or a third playback device.

**13**. The tangible, non-transitory computer-readable media of claim **8**, playback device of claim **1**, wherein the first type of media content comprises media content received from a video device.

**14**. A method performed by a playback device, the method comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content; after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content via a line-in connector;

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

**15**. The method of claim **14**, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

**16**. The method of claim **14**, wherein playing the second type of media content comprises playing the second type of media content in synchrony with a second playback device.

**17**. The method of claim **14**, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

\* \* \* \* \*

# Exhibit 6

FIRST LOOKS
Entertainment Technology

# An Audio Hub that Actually Works, Easily

**BY BILL HOWARD**



The **Sonos ZonePlayer ZP100** is the iPod of digital audio hubs. It's a joy to use: well engineered, driven by a scroll wheel, and finished in milky white. This is the first digital audio hub we can recommend without reservation.

Even at the price is reasonable, as long as you understand the audience that Sonos is chasing: Although the ZonePlayer is a *digital audio hub,* meaning that it plays MP3 and WMA files that reside on your PC, the system is really competing with whole-house audio systems based on CD changers and 12-channel audio amplifiers. Those can run to $1,000 a room for dedicated wiring, an in-wall volume-control and remote-control sensor, and a whole-house amplifier. With the ZonePlayer, you buy one remote ($399), and for each room where you want music, you buy one chunky, 10-pound hub ($499 each, or $1,199 for two hubs plus a remote).

Unlike other digital audio hubs, which typically cost $100 to $200 and don't look half as striking, the ZonePlayer integrates a 50-watt-per-channel stereo amplifier. That means you can use traditional audio speakers without the need to hook the system to your existing stereo. While most users will choose to use that built-in amplifier, there is a line-level output to use with powered speakers or an external amp.

And not only does ZonePlayer have an Ethernet jack, it also has a four-port 10/100-Mbps switch, as well as proprietary (not 802.11b) wireless. Only the first ZonePlayer you install has to be wired. A 2.4-GHz peer-to-peer mesh network passes the audio along wirelessly to the others.

Setup is simple. Plug the first Sonos hub into electrical power and wired Ethernet, connect two speakers, run the setup CD on a PC, then point to the music folders you want indexed. Music can be on a PC or a network hard drive. And like only a few other hubs,

updated weekly. The Rhapsody streaming service should be available to Sonos users by the time you read this, although Rhapsody will limit you to three different simultaneous music streams (the same as if you were using it on three different PCs in your home).

the ZonePlayer can see network drives directly, not just as mapped drives of desktop PCs. Song information is stored on each ZonePlayer.

Most users love the idea of multiple independent streams of music: rock in the rec room, classical in the kitchen, and jazz on the patio, all simultaneously. That's something most other hubs can do. But the Zone-Player does the opposite as well: It can play the same music throughout the house, perfectly synchronized. Even though that may seem drop-dead simple, other hubs don't do it. And you can join multiple rooms to play the same music or put something different on in other rooms on the fly.

You can also play Internet radio: The ZonePlayer supplies a sampling of about 70 stations,

**THE ZONEPLAYER ZP100** is as elegant as it is simple to set up. The remote has a large color screen for accessing your music.

As you might expect from a remote control that costs as much as a PDA, this one is a gem. It integrates a 3.5-inch backlit color display and 13 buttons. You move through lists by sliding your finger along a circular scroll wheel, then pressing a Select button in the center. On the LCD, you see album art, the name of the song playing, the artist, the album, the elapsed/total playing time, the next song up, and the remaining songs in the queue for each room (or zone).

If you want to crank up ZZ Top in your downstairs office, it takes just a couple of seconds to tap the Zones button and drop the music link to the living room. Want less volume for background music in the living room than in the kitchen? Press the volume-down button, then slide the

scroll wheel to select each room and set the volume for it. Once you're back to using the master volume control, the volume rises or falls relative to each room's existing setting. These are the brilliant touches that make you forgive the ZonePlayer for costing twice as much as any other digital audio hub.

You also can control the ZonePlayer from your PC if that's easier for you (for instance, when you're setting up a music queue that's not yet part of a playlist). Everything you can do on the remote, you can do on your PC. And on the front of each hub are a volume control and mute button, for when it's easier to reach the hub than the remote or your PC.

Our wish list for the Zone-Player is short. The first item is support for rights-managed Windows Media Audio. This is complicated, because music can be distributed to multiple rooms, which might affect rights discussions. The Zone-Player also lacks support for WMA Lossless, FLAC, and Ogg Vorbis formats but hopes to support them by year-end. Support for AAC tracks purchased from iTunes is lacking, too, but that's Apple's doing.

We'd also like to see a docking cradle for the remote, which would be classier than the supplied transformer. Users with imperfect eyesight might wish for a large-font option on the controller display. And while you can set it up from the Mac, the music player software so far only has a PC version. Most of all, we'd like to see a sibling product that also handles photos and PC-based video.

**Sonos ZonePlayer ZP100**

$499 direct; remote control, $399; two players plus remote, $1,199. Sonos Inc., www.sonos.com. ●●●●○

# Exhibit 7

Tiny $199 Sonos Play:1 speaker fills a room with wireless tunes - NBC News                    6/12/19, 10:17 AM



**BREAKING: TRUMP ASSERTS EXECUTIVE PRIVILEGE OVER CENSUS CITIZENSHIP INFO SUBPOENAED BY HOUSE DEMOCRATS** GET ALERTS ✉

 **NBC NEWS**

SECTIONS ⌄    NIGHTLY NEWS    MSNBC    MEET THE PRESS    DATELINE    📻 TODAY    🔍

advertisement

---

GADGETS

---

OCT 14 2013, 9:35 AM ET

# Tiny $199 Sonos Play:1 speaker fills a room with wireless tunes

by **WILSON ROTHMAN**

SHARE








The Sonos Play:1 is meant to fit in where larger sound systems can't, like in the bathroom or kitchen.

Sonos' new $199 Play:1 speaker may look like other wireless audio products out there, but don't mistake it for the rest of the herd. It's not a Bluetooth speaker, nor does it merely stream music from your phone over Wi-Fi. It's a portal to a whole Internet of audio, one that you manipulate with your favorite phone or tablet. And, for being smaller than a half-gallon milk carton, it sounds pretty awesome.



advertisement

**FROM THE WEB**   Sponsored Links

**How to Pay Off $10,000 Fast**
NerdWallet

**Which 2019 Subcompact Luxury SUV Is Worth Buying?**
Kelley Blue Book

by Taboola

**MORE FROM NBC NEWS**

**Serial killer Bobby Joe Long executed after 30 years in prison**

**Delaware mother says she suffered savage attack while on Caribbean vacation**

Tiny $199 Sonos Play:1 speaker fills a room with wireless tunes - NBC News

6/12/19, 10:17 AM

Not that we didn't see this coming: Sonos first introduced a Play:5 at $399, then a Play:3 at $299, so a Play:1 at $199 was inevitable. (There's also a $699 PlayBar designed to sit under your TV.) That $199 price tag seems to be a magic number, too: The Play:1 is the cheapest way to get started on a Sonos system, not to mention adding additional rooms to a system that you may already have.

The Play:1 is a single speaker, meaning that the music comes out in mono. However, Sonos' system lets you add a second speaker in the same room, and pair them for stereo sound. And while, like all Sonos gear, you control it mainly through a phone or tablet, this has a new play/pause button, that gives you basic control in places like a kitchen or bathroom, where you may not want to be fumbling with an iPhone.

If you're not familiar with Sonos, this company revolutionized the home audio world a decade ago when it launched the first (rather expensive) Sonos kits: wireless nodes that you set up around the house that could play music tracks from a home computer or Internet radio. If you wanted the same song in every room, no problem, the tracks would be perfectly in sync, but you could also play different tracks in different rooms, too.

At the time, this was mind blowing. Never before could you get music in every room without drilling a bunch of holes for wires, and never before was setting up a wireless network so simple. But besides being expensive, the original Sonos set-up was cumbersome, requiring you to hook up speakers, and rely on a remote control of the company's own devising.

The explosion of smartphones and tablets, the advent of all-you-can-eat subscription streaming music services like Spotify and MOG, and improvements in audio and networking technology, have all benefitted Sonos as it has evolved. Now you can get a very sweet set-up for under a grand, and control it with an iPhone, iPad or Android device.



The Sonos speaker lineup includes the large Play:5, the medium Play:3 and the brand new little Play:1, along with the PlayBar soundbar.

by Taboola

advertisement



advertisement

Case 1:24-cv-00131-JNR     Document 120-2     Filed 12/17/24     Page 190 of 467 PageID #: 7320

For a limited time through the holidays, Sonos will selling the Play:1 with a free network bridge. Ordinarily, when you set-up Sonos, you need the first device to be connected by wire to your home network. (This is a good thing, because it enables Sonos to talk to your devices and the Internet, but also set up a completely separate wireless mesh network for the music.) By including the normally $49 bridge, buyers can put their sole Play:1 anywhere in the house.

For the first time in Sonos' history, competition is mounting. Bose and Samsung announced similar systems just this week, in fact. But CEO John MacFarlane doesn't seem phased. In fact, when we met in New York last week, he seemed ready to face the competition, citing a decade of experience and strong retail partnerships. Sonos has a price advantage, too — both the Samsung and the Bose start at $399.

*Wilson Rothman is the Technology & Science editor at NBC News Digital. Catch up with him on Twitter at @wjrothman, and join our conversation on Facebook.* 📺

---

WILSON ROTHMAN

---

**TOPICS** , GADGETS

---

**FIRST PUBLISHED** OCT 14 2013, 9:35 AM ET

---

⬇ **NEXT STORY**

---



**MOST WATCHED**

What is ICE?

---

**More to Explore**                    Sponsored Links by Taboola

**If You Can Qualify for Any Credit Card, These Are the Top 6**

NerdWallet

**10 Best Used Cars Under $5,000**

Kelley Blue Book

**The Five Guys Ordering Secret You Need To Know**

Wikibuy

**Wells Fargo Propel® Card**

Wells Fargo

**How Far Does $1 Million Go in Retirement?**

Fisher Investments

advertisement

**People In Chicago: See What A Stairlift Really Costs**

Acorn Stairlifts

**SPONSORED CONTENT**

Wells Fargo $400 Welcome Bonus Offer. Learn M…
Wells Fargo - Member FDIC

These SUVs Will Take Your Breath Away. Search For 2019 …
Yahoo Search

5 Stocks for Building Wealth After 50 The Motley Fool

The Best Way To Wipe Out $10,000 Of Debt NerdWallet

10 Longest-Range Electric Cars of 2019 Kelley Blue Book

Ashton Kutcher testified he was 'freaking out' when police told him…

Watch Prince William and Kate shear a squirmy sheep

A South Carolina mother confronted her son's bullies. Then she was ar…

Body cam footage shows Ohio 'dancing cop' punching man

Dominican Republic resort claims Delaware woman who says she w…

by Taboola Promoted Links

**MORE FROM NBC NEWS**

ABOUT US    CAREERS    CONTACT    NEW: PRIVACY POLICY    TERMS OF SERVICE    NBCNEWS.COM SITE MAP    ADVERTISE    ADCHOICES

© 2019 NBCNEWS.COM

Exhibit 8

# Wireless speaker shootout: Sonos Play:1 vs. the Bose SoundTouch 20 and Samsung Shape M7
## Can these challengers unseat the reigning Wi-Fi speaker champ?
Published: March 12, 2014 06:00 PM



Sonos Play:1, $200

**Find Ratings**

**Wireless & Bluetooth Speakers** 🔒

For the last decade, audio has often taken a back seat to video. It was overshadowed by TVs with ever-bigger screens, the explosion in streaming movie and TV services, and the emergence of mobile devices, such as smart phones and tablets, that let you watch your content on the go.

But thanks to these mobile devices, there's a booming demand for wireless speakers that let you easily play audio content—everything from music to cell-phone conversations—in almost any room in the house. Bluetooth systems are popular, but they tend to limit you to speakers that are in only one room. Wi-Fi speaker systems, on the other hand, let you stream music to several rooms in the house, and many can work together to work in a multichannel setup.

We recently decided to test the new Play:1 speaker from Sonos—the company that essentially invented the category—against new Wi-Fi speakers from Bose (the SoundTouch 20) and Samsung (Shape M7) to see if they were credible challengers to the Wi-Fi speaker throne. Here's what we found.

### Sonos Play:1, $200
Sonos not only helped to invent the wireless speaker category, the company also set the bar for performance, ease of use, and flexibility. But its speakers tended to be pricey, especially for a multi-room system, or a multichannel system with a subwoofer. With the new Sonos Play:1 speaker, priced at $200, though, Sonos now has a model for the masses. The question is whether it's still able to deliver the sonic goods at that lower price.

The Play:1 speaker is a small, stylish, and solidly constructed mono Wi-Fi speaker, offered in either black or white cabinets with a silver-colored, nonremovable metallic mesh grille. Like the larger Play:3, $300, the Play:1 delivers very good sound, with bass that while not extremely deep is well-balanced and more extended than expected given its small size. Like other Sonos models we've tested, it's also very easy to use.

Also like other Sonos speakers, the Play:1 sounds great on its own—but when you pair it with another Play:1 speaker in a stereo configuration, you get a richer, more detailed sound with a wider soundstage. You can also add a Sonos-powered subwoofer ($700) and the Sonos Playbar ($700) speakers to create a full 5.1-channel multichannel system, or use it with other Sonos speakers to form a wireless multi-room sound system.

---

**Looking for a wireless speaker? Find the right model with our Wi-Fi & Bluetooth Speakers buying guide and Ratings.**

---

One of the benefits of a Sonos system is that it complements your existing Wi-Fi network with its own dedicated mesh network, so you don't get interference from other devices on the network when playing music. Another is that each Sonos component acts as a transmitter, extending the range of the network beyond the range of your router. Like other Sonos speakers, the Play:1 has an Ethernet jack, since at least one component in any Sonos system requires either a wired broadband connection or the use of a Sonos bridge wired to your router.

The Play:1 has direct access to several online music services, including Pandora, Rdio, and Spotify. Sonos speakers no longer come with a remote control; instead there are free Sonos Controller apps for Android and iOS portable devices, or PC and Mac computers. The Play:1 lacks a wired analog (3.5mm) input, a feature found in the other players. Sonos can play iTunes music, but not copyright-protected files purchased before April 2009.

**The verdict:** The top dog in our shootout. Despite being less expensive than its siblings, the Play:1 is another Sonos winner, with satisfying performance and a good number of streaming-music choices. It's a great way for the uninitiated to get into the Sonos world and for current users to expand their systems without spending a lot of money.



Bose SoundTouch 20, $400.

## Bose SoundTouch 20, $400

Sitting smack dab in the middle of a three-model SoundTouch series of wireless speakers that clearly targets the Sonos crowd, the SoundTouch 20 is Bose's first run at the multi-room speaker market. The speaker, which uses a proprietary but AirPlay-compatible Wi-Fi technology, has an Bose-looking upright, rectangular design and a small OLED display housed on a plastic panel that's centered on the front of the unit's dark-gray, cloth-covered grille. The unit's controls—Power, Aux, Volume Up/Down, and six presets—are on the top of the enclosure, which like the side panels is white.

Unlike the Sonos Play:1, the SoundTouch comes with a small infrared remote control, with rubberized buttons for choosing presets or controlling volume, play, and other functions. The speaker has an auxiliary minijack input for connecting portable devices, plus an Ethernet port for a wired connection to your home network. It also has a USB port for setting up the system via your computer.

Despite its larger size and higher price, the SoundTouch 20 doesn't rise to Sonos's level when it comes to sound quality. Overall sound was good; compared to the Play:1, though, bass wasn't as defined and could be a bit boomy, and midrange lacked detail. Still, the speaker will probably be fine for most noncritical listeners looking for the convenience of a wireless speaker system for music and movie/TV soundtracks. It's also easy to set up using the SoundTouch app on a computer, and easy to use.

There were a few limitations. For example, unlike the Play:1 and the new Samsung Shape M7 wireless speakers, you can't combine two of the SoundTouch speakers to form a stereo pair, which, with proper speaker placement, can be used to create a more expansive soundstage. Also, at the time of our testing, the Bose SoundTouch had limited access to streaming music services; it could access only Pandora Internet radio. The company says that more services will be added in the future.

On the other hand, the SoundTouch 20 is compatible with Apple AirPlay, so you can use it with other (current or future) AirPlay speakers in a multi-speaker setup. And you won't need an optional bridge unit to connect

multiple SoundTouch- or AirPlay-compatible speakers in a multi-room configuration, something the Sonos may and the Samsung does require. As mentioned, Bose is the only system of the three to include a simple remote control, though you can also download a much more versatile free Bose SoundTouch app for Android and iOS devices to use a smart phone, tablet, or computer to control the speaker.

**The verdict:** Perhaps in an effort to achieve simplicity, the SoundTouch 20 gives up some flexibility and some features we sometimes find in multi-room speakers. It's also rather pricey. For those who live in Apple's world, the SoundTouch 20 is worth considering, as it can sync to your iTunes library, but Android users would probably be better served by a different speaker system. One feature we liked were the six presets, which let you easily call up favorite music selections without having to fire up another device.



Samsung Shape M7, $350

**Samsung Shape M7, $350**

This distinctive-looking, wedge-shaped Samsung Shape M7—which can be positioned either horizontally or vertically (using an included mounting stand)—is basically the company's answer to Sonos, with a few interesting additions, such as Bluetooth and NFC technology. The attractive speaker comes with a black or white enclosure with complementary-colored, diamond-shaped textured grilles. Hidden behind a plate at the rear of the speaker are several connections, including a 3.5mm audio input, an Ethernet jack, and a USB port that's used only for firmware updates.

The M7 can be used with its proprietary Wi-Fi-based technology and with Bluetooth for connecting to Bluetooth-enabled portable devices or to Samsung TVs that have the SoundShare feature. It also has a 3.mm auxiliary input for wired connections to music players. In general, we found the speaker was very easy to set up and use, especially if you have a WPS-enabled router. There are a few buttons (including Mute and Volume) on the top of the unit, but you can get iOs and Android apps that let you control with smart phones and tablets.

Thanks to its unusual shape and the combination of dual-band Wi-Fi, Bluetooth, and DLNA (AllShare) support, the M7 is among the most versatile speakers we've tested, though it's not without some limitations. One is that there's no option for adding a subwoofer—but while it lacks deep bass, it's hardly bass-shy.

When used as a single stereo speaker, the Shape M7 delivers good overall sound quality—a bit better than the Bose SoundTouch 20, but not quite as clear and detailed as the Sonos Play:1. So it should be a fine choice for most noncritical listeners looking for a wireless stereo speaker for music and movie or TV soundtrack reproduction.

But sound quality bumps up to very good when two M7s are paired to form a two-speaker stereo system, though you've now spent $700 for the speakers and $50 for the hub. When we paired two M7 speakers, bass became more balanced and thus less prominent, midrange lost some of its softness, and treble was a bit more extended.

The M7 speaker streams audio wirelessly from Internet services such as Amazon Cloud Player, TuneIn Radio, Pandora, and Rhapsody—more services than Bose, but not as many as Sonos. It can also stream from network-connected hard drives and computers. It can also stream content directly off your phone or tablet via Bluetooth, which Sonos can't do. You can also use your phone, tablet, or computer to access Internet streaming services the Shape M7 lacks, such as Spotify.



Unlike Sonos, the M7 system doesn't require at least one speaker to be wired directly to your router. But if you want to create a stereo pair or a multi-room system, you'll need the optional hub, which connects to your router via an Ethernet cable. Like Sonos, the M7 doesn't come with a separate remote control. Instead, you use the free Samsung Multiroom app on an Android or iOS device. The app also lets you add speakers and have them work as a stereo pair. There's also a pairing button on the speakers.

**The verdict:** The Samsung Shape M7 is an impressive first step into the world of Wi-Fi speakers, especially when you consider its versatility. Like the Sonos—but not the Bose SoundTouch 20—it can play high-resolution (lossless) audio files. It also features manual or NFC Bluetooth pairing, which the Play:1 lacks. Still, the M7 comes in second place in our three-speaker shootout. But we'll continue to monitor improvements in all these speakers systems to see if any can usurp Sonos' throne.

*—James K. Willcox*



### Find Ratings



**Wireless & Bluetooth Speakers Ratings** 🔒
View and compare all Wireless & Bluetooth Speakers ratings.

Wireless & Bluetooth Speakers

**CR** Consumer Reports

**Member Support**

Contact Us

Account Settings

What is Membership?

Make a Donation

Newsletters

Give a Gift

**About**

About Us

Career Opportunities

Media Room

Advocacy

Wireless Speaker Reviews: Sonos, Bose and Samsung - Consumer Reports News                    9/12/19, 10:25 AM

**Product Reviews**

Appliances

Babies & Kids

Cars

Electronics

Health

Home & Garden

Money

A-Z Index

**Magazine & Books**

Current Issue

Magazine Archive

5 Year Index

Bookstore

**More**

Video

en Español

Canada Extra

Report a Safety Problem

Give a Confidential News Tip

Buy a New Car

Buy a Used Car

Join

Privacy Policy     User Agreement     Ad Choices                                    © 2019 Consumer Reports, Inc.

# Exhibit 9




Advertisement

GEAR

# Brilliant Bluetooth Speakers





8 / 41



by Men's Journal



## Sonos Play:1

Sonos almost singlehandedly established the stand-alone wireless home speaker system category, primarily because the company believed in the future of

Advertisement



## Christian Bale's 7 Most



‹ Previous                    Next ›

streaming music long before Pandora or Spotify existed. The company also believed it was worth building quality powered speakers to spray that digital music around the house. Thank goodness, because its latest and least expensive speaker entry — the Sonos Play:1 — is a blast.

The smallest member of the Sonos speaker family, the Sonos Play:1 stands just a couple of inches taller than an iPhone but packs a solid sonic punch. It uses two drivers in a sealed cabinet, which means there's no port venting, so you can jam it against a wall or between the Cuisinart and the Krups blender on your kitchen counter without diminishing its sound. And its sound is impressive.

From Coltrane to Coldplay, the Play:1 delivers smooth yet crisp audio with plenty of rim-shot clarity. Yet it is rarely overbearing in the high end; something competitors are often guilty of. On the bass end, kick drums are solid without the flabby aspects that some speakers can have in an effort to sound richer and more full-bodied. (If you want neighbor-disturbing bottom-end vibrations, however, only a separate subwoofer will deliver that.)

When used in tandem with a second Play:1, the speakers automatically recognize each other and switch from mono to stereo. Internal digital signal processors even tweak the sonic profile of the speakers to deliver a different sound stage when switching from single to stereo speakers.

The Play:1's rounded corners aren't going to win any design innovation awards, but the overall look is inconspicuous, fitting comfortably into any type of decor. Controls on the top of the speaker allow you to pause a song; a double press will skip to the next track. Of course, like nearly everything these days, you can control the Sonos speakers through an iPhone or Android app, switching between music sources, changing the volume in different rooms, even adjusting the equalization.

The speaker will not stream music directly from a smartphone over Bluetooth or work with Apple's Airplay, but that may be a good thing. It means guests can't hijack your stereo to foist their favorite Adele tracks on you, and the music won't stop playing should you wander too far from the speaker with your phone. The Sonos system relies on its own Internet connection using your home Wi-Fi network to play music from your own digital collection or favorite streaming service.

Just as there are now dozens of streaming music services and sources, there are also countless wireless speakers on the market. What helps Sonos stand out from the crowd is its ability to work with numerous other Sonos speakers, including stereo and home theater setups. Moreover, the Play:1's $199 price is

# AROUND THE WEB



Science Says This Body Type Is the Most Attractive Now
NYPost.com



Inside the Disturbing and Deadly 'Pumping' Trend
NYPost.com



Athletes We've Sadly Lost So Far in 2019
Grunge.com

**Powered By ZergNet**

Advertisement

extremely competitive, coming in at the same level as less powerful, less feature-rich, and less acoustically accurate portable Bluetooth speakers like the $180 Beats Pil or $300 Jawbone Big Jambox.

Of course, the Sonos Play:1 isn't completely wireless; you have to plug it in to power it up. A Sonos Bridge connected to your router is also needed if you want to go wireless (the $49 Bridge is included at no additional charge with the Play:1 for a limited time this fall). So it's more comparable to the newly introduced $399 Samsung Shape M7 and $399 Bose SoundTouch 20. But the Samsung and Bose offerings, while more expensive, only work with a limited number of music services, while Sonos covers everything from Slacker to Songza to Spotify. It is, as they say, definitely a player. [$199; sonos.com]

**BACK TO TOP**



30 / 41

## EcoXBT Speaker

When brought to the shore, many speakers suffer death by saltwater or spilled cooler – the EcoXBT, however, is purpose-built for the beach. Water- and shockproof, the sweet-sounding Bluetooth device boasts a rubberized shell that not only keeps its stereo speakers and six-watt amp safe but also allows it to float, so you can clip it to your kayak and pump tunes as you paddle. [$130; ecoxgear.com]

Available at eBay for $79, Cabela's for $79, and Adorama for $104.



31 / 41

## Sonos play:5

It's a question we get asked all the time: *What is the easiest and best way to set up a wireless home music system?* The answer is Sonos. Thanks to ease of use, streaming service compatibility, and speaker choices (three sizes, plus one TV sound bar), it is basically a no-brainer. And yet, if the question is posed slightly differently — for example: *What is the best wireless system for true room-filling sound?* — the answer becomes less clear. Thanks to the manufacturer's brand new Play:5 speaker, that's no longer the case.

RELATED: The Best Televisions for Any Budget

Play:5 (not to be confused with an older model of the same name) is bookshelf-sized but with six synchronized drivers (three woofers and three tweeters), and the sound is big. And it's very clear — with plenty of bass and nice definition in the mid and high ranges. Placed in a large living room, the soundstage is wide, and there's an impressive sensation of stereo separation. Even better, you can pair two Play:5s (be warned though, they are $499 each) and have a true stereo experience — plus enough volume to open your own dance club. The speakers can be placed either horizontally or vertically (the unit automatically orients itself for optimum output); and unlike earlier Sonos speakers, hard-to-press buttons have been replaced by touch controls that allow you to adjust volume and skip songs with a quick swipe.

RELATED: Best Computer Speakers to Rock Your Home Office

In addition to the Play:5, Sonos introduced a feature that claims to automatically optimize the sound from any of its speakers depending on where it's placed in a room. It's called Trueplay — and, miraculously, it works. Since most speakers in Sonos' lineup are small (the Play:1 is about the size of a jar of tomato sauce), they tend to get tucked

into bookshelves or behind end tables. By sheer nature of their physical placement, sound can be muffled. Trueplay fixes that. The setup involves moving your iPhone around the perimeter of a room for about 30 seconds as the speaker admits a high-pitched sound. The speaker then re-calibrates itself and the sonic improvements are remarkable: much clearer and much punchier. With Trueplay (a free update to the Sonos app) and a juiced Play:5, Sonos buries the already mortally wounded competition.



32 / 41

## Tech: The Speaker of the Future

Though its footprint is just a little larger than a kitchen toaster's, the **Devialet Phantom** is a 750-watt Bluetooth speaker with a sound that makes it capable of replacing your home stereo setup. Most remarkable is its thundering bass: Hermetically sealed drivers vibrate visibly outward from both sides, forcing a low end of 16 hertz. (That's pipe-organ low.) [$1,990; en.devialet.com]



Courtesy UE    33 / 41

## UE Roll

**What It Is:** A portable, sweet-sounding, water-resistant speaker that won't break the bank.

RELATED: 5 Seriously Rugged Speakers to Take Outside

**Why We Like It:** It seems like a new Bluetooth speaker comes out every week, and the truth is we're getting a bit bored of them. But when the company behind our favorite of the bunch, the UE Boom, hits the market with a new release, we take notice. Thankfully, the Roll is more than just a smaller version of the beloved Boom. UE has broken the cylindrical speaker mold with a discus-shaped gadget that is a bit more than 5 inches in diameter. Sitting flat on a table, it seems a bit odd, but the shape makes tons of sense when you use the built-in bungee cord to attach to just about anything — a bike, a lamp, a backpack.

The sound is not quite as spectacular as the Boom, but at half the size (and half the price) you still get a very rich audio with a surprising amount of bass. It has the same solidly built construction and rubberized finish as the Boom, plus it's waterproof and perfect for summer fun around the pool. (While the Roll doesn't float, if you order it from UE's website you get a small donut-shaped floatation device the speaker rests in so it can hang out in the water with you.) Add to that 9 hours of battery life, 65 feet of range, and the ability to daisy chain more than one speaker (including a Roll and a Boom), and

and the ability to daisy chain more than one speaker (including a Roll and a Boom), and UE has hit us with another Bluetooth speaker to get excited about — and just in the knick of time.

**Nitpick:** Tough to find any faults, but we suppose it would be cool if you could throw the Roll into a pool without UE's little floatie.

[$99; ultimateears.com]
Available at eBay for $59.



Courtesy Marshall Headphones                                                34 / 41

## Marshall Acton Speaker

**What It Is:** A compact Bluetooth speaker — though not a portable one, since it's 6.6 pounds, and has to be plugged in at all times — that borrows design elements from Marshall's iconic amplifiers. It comes in black or cream, with a coiled 3.5 mm (headphone jack) cable for connecting directly to audio sources.

RELATED: The Best Audio Systems for Any Home

**Why We Like It:** As convenient as Bluetooth speakers are, putting the Acton in that category is almost an insult. This small-but-substantial speaker isn't something you casually set up poolside, or toss in a bag before heading out to a party. It's serious, old school audio gear — as powerful and balanced as much larger traditional speakers — designed for the smartphone era. There are no options to connect to a receiver or TV. The only port in this little powerhouse (it's the size of two loaves of bread, stacked on

each other) is a 3.5 mm auxiliary input, for hooking up a phone or tablet. You can also pair via Bluetooth, but the included cable is too cool not to use. It's a coiled, guitar-style number that makes you feel like you're plugging in a Les Paul rather than an iPad.

The Acton's simple layout of metallic, analog knobs and buttons are just as irresistible. Why mess with an on-screen equalizer, when you can twist the dedicated bass and treble knobs till the song is perfect? And when you hear how loud this room-filling little monster can get, with unbelievable low end and not a hint of distortion, you need to crank the volume knob. If the neighbors need to call the cops, so be it.

**Nitpick:** Once we heard the Acton in action, we stopped wondering about the high price and lack of portability. For music playback in the home, this speaker is a space-saving bargain, with enough power to rock an entire apartment or floor of a house. Our only gripe is that it doesn't provide the option to hook up to a home theater setup.

[$300; marshallheadphones.com]

Available at eBay for $183, Nordstrom for $249, and Urban Outfitters for $250.

# Want more?

Sign up for our newsletter to get the latest adventures, workouts, destinations, and more.



| ✉ Enter your email address | Sign Up |

How we use your email address

## More News

The Best Salt-Infused Grooming Products for Beachy Hair and Smooth Skin

Alex Honnold and Brad Gobright Complete Daunting Free Climb on Yosemite's El Capitan

Jeep Gladiator: The Pickup Truck That'll Take Your Adventures Virtually Anywhere on Land

The 7 Best Last-Minute Father's Day Gifts

These Are the Trending Gifts for Men for 2019

The Best Performance Briefs to Beat the Heat This Summer

All Stories →

**More Videos**



Hit the Gym in the Best New Training Gear of 2019 (So Far)



Here's the Difference Between Bourbon and Whiskey



Inside the Lab: Crown & Caliber, the Online Luxury Watch Shop

# AROUND THE WEB











The Tragic Life of Mark Ruffalo

Looper.com



The Daredevil That Fell to His
Death From a 62-Story Building

NYPost.com



Proof Chris Pratt Just Isn't a Very
Good Dude

NickiSwift.com



Insane Stunts That Tragically
Took Lives

Grunge.com

Powered by ZergNet



## Jeep Gladiator: The Pickup Truck That'll Take Your Adventures Virtually Anywhere on Land



## The 7 Best Last-Minute Father's Day Gifts



## These Are the Trending Gifts for Men for 2019



## What I Learned From Tearing Apart and Rebuilding My Bike



## Nearly 13,000 Reviewers Love This $30 Portable Bluetooth Speaker



## The Coolest Pieces of Gear We Tested This Week



## The Best Father's Day Gifts for Every Type of Dad



## Gear Review: The Patagonia Yulex 2.0 Wetsuit



## Go Above and Beyond This Father's Day With Vices Reserve

## AROUND THE WEB



**Next-Generation Ford F-150 Spied Testing with New Bodywork**

Autoblog.com



**Enola From 'Waterworld' is 34 Now and Unrecognizably Gorgeous**

NickiSwift.com



**Mil-Spec Hummers Rumble Into Jay Leno's Garage**

Autoblog.com



**The Hound Is Absolutely Gorgeous Out of Character**

NickiSwift.com

**Powered by ZergNet**



## The Best Shoes for Running a Marathon



## Get an Amazon Echo for Only $30 and Ring Video Doorbells for Just $50—Today Only!



## How to Shop for Your First Mountain Bike



## Amazon's Latest Alexa Feature Will Let You Delete Stored Voice Data



## Shoot to Thrill: The Best New Action Cams for Every Adventure



## The Best New Rain Jackets for Any Situation



## The Best New Duffels, Gym Bags, and Luggage for Every Adventure



## Turn Your Home Into a Smart Home for Under $100 With Google



## We Found the Perfect Travel Laptop—and Right Now It's $330 Off

## AROUND THE WEB



What You Should Know Before Ordering White Castle Again

Mashed.com



Justin and Jessica's Marriage Keeps Getting Weirder and Weirder

NickiSwift.com



The Sad Words David Ortiz Told Doctors After Being Shot

NYPost.com



This Baby Talking to His Dad Will Crack You Up

NYPost.com

Powered by ZergNet



## The Best New Mountain Bikes of 2019 Are Killer Climbers



## Deal Alert! Get a Chromebook Laptop On Sale for Just $75—Today Only!

Men's Journal has affiliate partnerships so we may receive compensation for some links to products and services.

American Media Active Lifestyle Group

© American Media, Inc. 2019     Privacy Policy     Accessibility Statement     Your Ad Choices     Data Policy     Terms of Use

Customer Service     Media Kit     Sitemap

Powered by WordPress.com VIP

Exhibit 10



# Top 300 Organizations Granted U.S. Patents in 2017

### Are more patents better?

*IPO does not attempt to answer the question above. IPO publishes patent owner lists as an information service for IPO members.*

*This list of organizations that received the most U.S. utility patents is being published by IPO for the 35th consecutive year. It is based on data obtained from the U.S. Patent and Trademark Office.*

*Patents granted to parent and subsidiary companies are combined in many instances. See the end notes for more information. IPO makes reasonable efforts to avoid errors, but cannot guarantee accuracy.*

*18 June 2018*

# 2017 Patent Owners
## Numerical Listing

Use care in interpreting the "percent change from 2016" column.   The total number of patents granted by the USPTO in 2017 was 318,829, up 5 percent from 2016.   The percent change for an individual organization could be affected by mergers, acquisitions, divestitures, inconsistent treatment of subsidiaries in 2016 and 2017, and many other factors.

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|---|---|---|---|
| 1 | International Business Machines Corp. | 8,996 | 10.8 |
| 2 | Samsung Electronics Co., Ltd. | 5,810 | 5.3 |
| 3 | Intel Corp. | 3,726 | 8.4 |
| 4 | Canon K.K. | 3,664 | -5.5 |
| 5 | Alphabet Inc. | 3,065 | new |
| 6 | General Electric Co. | 2,989 | 14.2 |
| 7 | Qualcomm, Inc. | 2,728 | -14.3 |
| 8 | LG Electronics Inc. | 2,696 | 10.0 |
| 9 | Microsoft Corp. | 2,601 | 1.7 |
| 10 | Taiwan Semiconductor Manufacturing Co., Ltd. | 2,408 | 6.1 |
| 11 | Samsung Display Co., Ltd. | 2,266 | 11.3 |
| 12 | Apple, Inc. | 2,225 | 5.6 |
| 13 | Sony Corp. | 2,116 | -2.5 |
| 14 | Toyota Jidosha K.K. | 2,015 | 23.6 |
| 15 | Amazon Technologies, Inc. | 1,960 | 15.2 |
| 16 | Toshiba Corp. | 1,891 | -1.5 |
| 17 | Ford Global Technologies, LLC | 1,876 | 18.4 |
| 18 | Dell Technologies | 1,681 | 3.2 |
| 19 | Telefonaktiebolaget LM Ericsson | 1,551 | -0.1 |
| 20 | Siemens AG | 1,538 | 3.6 |
| 21 | Fujitsu Ltd. | 1,531 | -2.1 |
| 22 | Huawei Technologies Co., Ltd. | 1,472 | 18.6 |
| 23 | United Technologies Corp. | 1,423 | 23.0 |
| 24 | Medtronic Inc. | 1,414 | -1.9 |
| 25 | Seiko Epson Corp. | 1,404 | -17.1 |
| 26 | Nokia Corp. | 1,381 | new |
| 27 | BOE Technology Group Co., Ltd. | 1,376 | 40.8 |
| 28 | Panasonic Intellectual Property Management Co., Ltd. | 1,338 | -4.6 |
| 29 | Hyundai Motor Co. | 1,295 | 20.3 |
| 30 | AT&T Corp. | 1,263 | -0.2 |
| 31 | Boeing Co. | 1,171 | 10.2 |
| 32 | Robert Bosch GmbH | 1,158 | 3.1 |
| 33 | Johnson & Johnson | 1,147 | 18.7 |
| 34 | Mitsubishi Denki K.K. | 1,142 | 11.5 |
| 35 | Ricoh Co., Ltd. | 1,140 | -23.2 |
| 36 | GM Global Technology Operations LLC | 1,063 | -4.9 |
| 37 | Honeywell International Inc. | 1,036 | 20.8 |
| 38 | Cisco Technology, Inc. | 989 | 0.2 |
| 39 | Koninklijke Philips N.V. | 973 | -14.2 |
| | Semiconductor Energy Laboratory Co., Ltd. | 973 | -8.3 |
| 41 | SK Hynix Inc. | 938 | -18.1 |
| 42 | Texas Instruments, Inc. | 923 | 3.9 |
| 43 | Denso Corp. | 863 | 18.7 |
| 44 | Honda Motor Co., Ltd. | 854 | -1.9 |
| 45 | Western Digital Corp. | 837 | -27.4 |
| 46 | NEC Corp. | 816 | -7.8 |
| 47 | Micron Technology, Inc. | 807 | -9.3 |
| 48 | Globalfoundries Inc. | 782 | -73.9 |
| 49 | The Dow Chemical Co. | 765 | 7.8 |
| 50 | Oracle International Corp. | 753 | 12.1 |
| 51 | Halliburton Energy Services, Inc. | 738 | 25.6 |
| 52 | Verizon | 715 | -5.5 |
| 53 | Shenzhen China Star Optoelectronics Technology Co., Ltd. | 709 | 30.5 |
| 54 | Brother Kogyo K.K. | 705 | -31.3 |
| 55 | Fujifilm Corp. | 691 | -1.2 |
| 56 | Schlumberger Technology Corp. | 680 | -0.7 |
| 57 | Sharp Corp. | 679 | -20.5 |
| 58 | Infineon Technologies AG | 677 | 8.7 |
| 59 | STMicroelectronics, Inc. | 675 | -9.2 |
| 60 | Facebook, Inc. | 660 | 33.0 |
| 61 | LG Chem., Ltd. | 634 | 24.6 |
| 62 | Kyocera Document Solutions Inc. | 632 | -17.1 |
| 63 | HP Inc. | 630 | -4.1 |
| 64 | Olympus Corp. | 613 | 9.5 |
| 65 | LG Display Co., Ltd. | 604 | -5.6 |
| 66 | 3M Innovative Properties Co. | 602 | 11.5 |
| | NXP USA, Inc. | 602 | new |
| 68 | Renesas Electronics Corp. | 601 | 2.0 |
| 69 | Caterpillar Inc. | 595 | 15.5 |
| 70 | Applied Materials, Inc. | 590 | -1.9 |
| 71 | Xerox Corp. | 586 | -30.0 |
| 72 | Electronics and Telecommunications Research Institute | 585 | -12.8 |
| 73 | Fuji Xerox Co., Ltd. | 569 | -1.9 |

**2017 Patent Owners**
**Numerical Listing**

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|------|--------------|--------------|--------------------------|
| 74 | Murata Manufacturing Co., Ltd. | 563 | 16.9 |
| 75 | Japan Display Inc. | 553 | 15.6 |
| 76 | Corning Inc. | 547 | 28.0 |
| 77 | University of California, The Regents of | 524 | 3.6 |
| 78 | SAP AG | 521 | 4.6 |
| 79 | LG Innotek Co., Ltd. | 520 | 11.7 |
| 80 | Kyocera Corp. | 509 | 23.8 |
| 81 | Blackberry Ltd. | 506 | -52.0 |
| 82 | Hewlett Packard Enterprise | 505 | -21.8 |
| 83 | Konica Minolta, Inc. | 495 | 9.9 |
| 84 | Hitachi, Ltd. | 491 | -4.3 |
| 85 | Procter & Gamble Co. | 469 | 15.4 |
| 86 | DuPont | 465 | -10.3 |
| 87 | Commissariat a l'Energie Atomique et aux Energies Alternatives | 458 | 3.5 |
| 88 | Seagate Technology, LLC | 457 | -14.2 |
| 89 | Monsanto Technology, LLC | 434 | -26.0 |
| 90 | Avago Technologies General IP (Singapore) Pte. Ltd. | 431 | 24.8 |
| 91 | Mitsubishi Heavy Industries, Ltd. | 427 | 7.0 |
| 92 | BASF SE | 415 | -1.9 |
| 93 | ZTE Corp. | 407 | -16.0 |
| 94 | Tokyo Electron Ltd. | 403 | 3.7 |
| 95 | Mediatek Inc. | 398 | 29.6 |
| 96 | Becton Dickinson and Co. | 397 | 35.8 |
|  | Samsung SDI Co., Ltd. | 397 | -9.1 |
| 98 | Sprint Corp. | 391 | -30.7 |
| 99 | Nike, Inc. | 372 | -11.6 |
| 100 | Rolls-Royce PLC | 359 | 26.5 |
| 101 | Nissan Motor Co., Ltd. | 357 | 11.2 |
| 102 | Tencent Technology (Shenzhen) Co. Ltd. | 354 | 25.1 |
|  | United States of America, Navy | 354 | 5.1 |
| 104 | United Microelectronics Corp. | 351 | 7.7 |
| 105 | Yazaki Corp. | 349 | -12.9 |
| 106 | Futurewei Technologies, Inc. | 345 | 0.3 |
| 107 | Dolby Laboratories, Inc. | 344 | 32.8 |
| 108 | ExxonMobil Corp. | 339 | -18.0 |
| 109 | Raytheon Co. | 336 | -9.8 |
| 110 | Adobe Systems Inc. | 334 | -5.4 |
| 111 | Deere & Co. | 328 | 27.1 |
| 112 | Roche Holdings, Inc. | 323 | -20.1 |
| 113 | Boston Scientific Scimed, Inc. | 320 | 2.8 |
| 114 | Empire Technology Development LLC | 314 | -8.9 |
|  | Philips Lighting Holding B.V. | 314 | new |

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|------|--------------|--------------|--------------------------|
| 116 | Industrial Technology Research Institute, Taiwan | 312 | -19.9 |
| 117 | Koch Industries | 310 | 50.6 |
| 118 | Massachusetts Institute of Technology | 306 | 9.2 |
| 119 | TE Connectivity | 301 | 8.0 |
| 120 | Fanuc Corp. | 299 | 32.1 |
| 121 | NXP B.V. | 296 | 2.0 |
| 122 | Elwha LLC | 294 | 22.4 |
| 123 | InterDigital Technology Corp. | 291 | 5.8 |
| 124 | Bayer Intellectual Property GmbH | 290 | 52.4 |
| 125 | Bank of America Corp. | 288 | 3.1 |
| 126 | Rohm Co., Ltd. | 286 | 0.7 |
| 127 | Sanofi | 284 | -5.6 |
|  | Whirlpool Corp. | 284 | 22.2 |
| 129 | Samsung Electro-Mechanics Co., Ltd. | 281 | -46.6 |
| 130 | Fuji Electric Co., Ltd. | 279 | 19.4 |
|  | Nvidia Corp. | 279 | -25.4 |
| 132 | CNH Industrial America LLC | 272 | 44.5 |
| 133 | Hon Hai Precision Industry Co., Ltd. | 271 | -57.9 |
|  | Schaeffler Technologies AG & Co. KG | 271 | 29.2 |
| 135 | Commscope Technologies LLC | 270 | 25.6 |
| 136 | Novartis AG | 262 | 5.7 |
| 137 | Juniper Networks, Inc. | 259 | 5.4 |
| 138 | Eaton Corp. | 257 | 16.7 |
| 139 | Sumitomo Electric Industries, Ltd. | 255 | -5.5 |
| 140 | Illinois Tool Works Inc. | 250 | 10.8 |
| 141 | Stryker Corp. | 244 | 21.7 |
| 142 | ABB Ltd. | 243 | -30.5 |
|  | NetApp, Inc. | 243 | -3.3 |
| 144 | Infineon Technologies Austria AG | 242 | 18.2 |
|  | Thomson Licensing S.A. | 242 | -7.4 |
| 146 | Hitachi Automotive Systems, Ltd. | 235 | 16.2 |
|  | Saint-Gobain Corp. | 235 | 10.2 |
|  | Societe Nationale d'Etude et de Construction de Moteurs d'Aviation | 235 | 18.7 |
| 149 | Marvell International Ltd. | 231 | new |
| 150 | Disney Enterprises, Inc. | 227 | 14.1 |
| 151 | ASML Netherlands B.V. | 223 | -0.9 |
|  | Audi AG | 223 | 10.8 |
| 153 | Ebay Inc. | 220 | 20.0 |
| 154 | University of Texas | 219 | 26.0 |
| 155 | Saudi Arabian Oil Co. | 218 | 21.6 |

**2017 Patent Owners**
**Numerical Listing**

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|------|-------------|-------------|--------------------------|
| 156 | Semiconductor Components Industries, LLC | 217 | 6.5 |
| 157 | Symantec Corp. | 214 | 0.9 |
| 158 | Nikon Corp. | 212 | -0.5 |
| 159 | Salesforce.com, Inc. | 211 | -6.2 |
|  | Shin Etsu Chemical Co., Ltd. | 211 | 3.3 |
| 161 | Casio Computer Co. Ltd. | 206 | -7.3 |
|  | Cree, Inc. | 206 | -17.0 |
|  | Merck Patent GmbH | 206 | 18.4 |
|  | Skyworks Solutions, Inc. | 206 | new |
| 165 | CA, Inc. | 204 | 10.3 |
|  | Stanford University | 204 | -19.6 |
|  | Sun Patent Trust | 204 | 42.2 |
|  | Xperi Corp. | 204 | 6.4 |
| 169 | Merck & Co., Inc. | 203 | 3.0 |
| 170 | Paypal. Inc. | 202 | 27.7 |
| 171 | LAM Research Corp. | 201 | 10.9 |
| 172 | Airbus Operations GmbH | 200 | -10.5 |
|  | HTC Corp. | 200 | -7.5 |
| 174 | Nichia Corp. | 196 | 25.5 |
| 175 | ARM Ltd. | 195 | 40.5 |
|  | Avaya Inc. | 195 | 3.1 |
| 177 | TDK Corp. | 194 | 22.2 |
| 178 | Komatsu Ltd. | 193 | 21.2 |
| 179 | KLA-Tencor Corp. | 192 | 13.5 |
|  | NTT Docomo, Inc. | 192 | -12.0 |
|  | Red Hat, Inc. | 192 | -5.2 |
| 182 | Continental Automotive GmbH | 189 | 21.2 |
|  | Sumitomo Chemical Co., Ltd. | 189 | 9.5 |
| 184 | Wistron Corp. | 187 | -69.5 |
| 185 | Cook Medical Technologies LLC | 186 | -11.3 |
| 186 | Hitachi High-Technologies Corp. | 185 | -9.7 |
| 187 | Osram Opto Semiconductors GmbH | 184 | 12.5 |
| 188 | Sumitomo Wiring Systems, Ltd. | 183 | 24.6 |
| 189 | Semiconductor Manufacturing International (Shanghai) Corp. | 182 | 18.7 |
| 190 | Lenovo (Singapore) Pte. Ltd. | 179 | -2.8 |
|  | Rockwell Automation Technologies, Inc. | 179 | 21.2 |
| 192 | Thales | 178 | 12.9 |
| 193 | Aktiebolaget SKF | 177 | 15.8 |
| 194 | Bally Gaming, Inc. | 176 | -19.9 |
|  | Tsinghua University | 176 | -1.7 |
| 196 | Bayerische Motoren Werke AG | 174 | 28.2 |
| 197 | Echostar Technologies LLC | 172 | 14.5 |
|  | Rockwell Collins, Inc. | 172 | 21.5 |
| 199 | Bridgestone Corp. | 171 | -15.2 |

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|------|-------------|-------------|--------------------------|
|  | Lockheed Martin Corp. | 171 | -11.1 |
|  | Panasonic Intellectual Property Corp. of America | 171 | -78.9 |
| 202 | Nitto Denko Corp. | 170 | -17.1 |
| 203 | LSIS Co., Ltd. | 169 | 30.8 |
| 204 | Haier US Appliance Solutions, Inc. | 168 | new |
| 205 | King Fahd University of Petroleum and Minerals | 167 | new |
|  | Mahle International GmbH | 167 | 26.9 |
| 207 | Johns Hopkins University | 164 | -1.8 |
| 208 | Ecolab USA Inc. | 163 | 14.7 |
| 209 | Airbus Operations S.A.S. | 162 | 4.9 |
|  | Comcast Cable Communications, LLC | 162 | new |
|  | Foxconn Interconnect Technology Ltd. | 162 | 9.3 |
|  | Wisconsin Alumni Research Foundation | 162 | -3.7 |
| 213 | Nintendo Co., Ltd. | 161 | -28.6 |
|  | Rambus, Inc. | 161 | -5.6 |
| 215 | Cooper Technologies Co. | 159 | 15.7 |
| 216 | Hitachi Metals Ltd. | 158 | -12.7 |
|  | IGT | 158 | -56.3 |
| 218 | Nippon Steel & Sumitomo Metal Corp. | 157 | 2.5 |
| 219 | AU Optronics Corp. | 156 | -42.3 |
|  | Harvard College, President and Fellows | 156 | new |
| 221 | Daikin Industries Ltd. | 155 | 0.0 |
| 222 | BAE Systems | 154 | -10.4 |
|  | Syngenta Participations AG | 154 | 16.9 |
| 224 | Cardiac Pacemakers, Inc. | 153 | -3.9 |
| 225 | Accenture Global Services Ltd. | 152 | 3.9 |
|  | Northrop Grumman Systems Corp. | 152 | new |
| 227 | Aisin Seiki K.K. | 151 | 2.0 |
|  | Carl Zeiss SMT GmbH | 151 | 15.2 |
|  | Shimadzu Corp. | 151 | 14.6 |
| 230 | California Institute of Technology | 150 | -34.0 |
|  | Chevron USA Inc. | 150 | 14.0 |
|  | Globus Medical, Inc. | 150 | 2.7 |
|  | Marvell World Trade Ltd. | 150 | new |
|  | Nielsen | 150 | -12.7 |
| 235 | L'Oreal S.A. | 149 | 23.5 |
|  | Panasonic Corp. | 149 | 2.7 |
| 237 | Here Global B.V. | 148 | 19.6 |
|  | Omron Corp. | 148 | 10.8 |
|  | Synaptics, Inc. | 148 | new |

**2017 Patent Owners Numerical Listing**

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|---|---|---|---|
| 240 | Macronix International Co., Ltd. | 147 | -59.9 |
| | Shimano Inc. | 147 | -6.1 |
| | ZF Friedrichshafen, AG | 147 | -11.6 |
| 243 | Kobe Steel, Ltd. | 145 | 13.8 |
| 244 | Delta Electronics Inc. | 144 | 8.3 |
| | Jtekt Corp. | 144 | -4.9 |
| 246 | Innolux Corp. | 143 | new |
| 247 | Evonik Degussa GmbH | 142 | new |
| | Toyoda Jidoshokki Seisakusho K.K. | 142 | new |
| | United States of America, Army | 142 | 4.2 |
| 250 | Borgwarner Inc. | 141 | new |
| | Kawasaki Jukogyo K.K. | 141 | -6.4 |
| 252 | Acushnet Co. | 140 | 10.0 |
| | Bose Corp. | 140 | new |
| | Compagnie Generale des Etablissements Michelin | 140 | 19.3 |
| 255 | Nuance Communications, Inc. | 139 | 4.3 |
| 256 | Analog Devices, Inc. | 138 | 2.2 |
| | Xiaomi Inc. | 138 | new |
| 258 | Advanced Micro Devices, Inc. | 137 | -54.7 |
| | Hyundai Mobis, Co., Ltd. | 137 | 13.9 |
| 260 | Nestec, S.A. | 136 | -22.1 |
| | Open Invention Network, LLC | 136 | 11.8 |
| | Toray Industries Inc. | 136 | 5.1 |
| 263 | Boston Scientific Neuromodulation Corp. | 134 | -30.6 |
| | Xilinx, Inc. | 134 | -15.7 |
| 265 | Lenovo (Beijing) Ltd. | 133 | new |
| | Sonos, Inc. | 133 | new |
| 267 | Abbott Cardiovascular Systems, Inc. | 132 | -0.8 |
| | United States of America, Department of Health & Human Services | 132 | -11.4 |
| 269 | Alibaba Group Holding Ltd. | 130 | new |
| | Lenovo Enterprise Solutions (Singapore) Pte. Ltd. | 130 | -56.2 |
| 271 | Bristol-Myers Squibb Co. | 129 | 14.0 |
| | Citrix Systems, Inc. | 129 | -33.3 |
| | Huawei Device Co., Ltd. | 129 | -17.1 |
| | Yamaha Motor Co., Ltd. | 129 | 10.1 |
| 275 | Colgate-Palmolive Co. | 128 | new |
| | Excalibur IP, LLC | 128 | new |
| | Motorola Solutions, Inc. | 128 | -37.5 |
| | Rovi Guides, Inc. | 128 | new |
| | University of Michigan | 128 | -10.9 |
| 280 | Ciena Corp. | 127 | new |
| | NTN Corp. | 127 | 2.4 |

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|---|---|---|---|
| 282 | Centre National de la Recherche Scientifique - CNRS | 126 | -1.6 |
| | Cypress Semiconductor Corp. | 126 | -32.5 |
| | Stanley Black & Decker, Inc. | 126 | 4.0 |
| 285 | Qorvo US, Inc. | 125 | new |
| 286 | Arris Enterprises, LLC | 124 | 8.9 |
| | T-Mobile, USA, Inc. | 124 | new |
| | UOP | 124 | -44.4 |
| 289 | Delphi Technologies, Inc. | 121 | new |
| | HRL Laboratories, LLC | 121 | 4.1 |
| 291 | Broadcom Corp. | 119 | -590.8 |
| | Sumitomo Rubber Industries, Ltd. | 119 | -3.4 |
| 293 | Intuitive Surgical Operations, Inc. | 118 | -6.8 |
| 294 | United States of America, National Aeronautics and Space Administration | 117 | 1.7 |
| 295 | DSM IP Assets B.V. | 116 | -24.1 |
| | NGK Spark Plug Co., Ltd. | 116 | -6.0 |
| | University of South Florida | 116 | 1.7 |
| 298 | Acer Inc. | 115 | 4.3 |
| | General Hospital Corp. | 115 | new |
| | Hitachi Kokusai Electric Inc. | 115 | -18.3 |
| | JFE Steel Corp. | 115 | new |
| | Smith & Nephew, Inc. | 115 | -85.2 |

www.ipo.org

# 2017 Patent Owners
## Alphabetical Listing

Use care in interpreting the "percent change from 2016" column. The total number of utility patents granted by the USPTO in 2017 was 318,829, up 5 percent from 2016. The percent change for an individual organization might be affected by mergers, acquisitions, divestitures, inconsistent treatment of subsidiaries in 2016 and 2017, and other factors.

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|------|--------------|--------------|--------------------------|
| 66 | 3M Innovative Properties Co. | 602 | 11.5 |
| 142 | ABB Ltd. | 243 | -30.5 |
| 267 | Abbott Cardiovascular Systems, Inc. | 132 | -0.8 |
| 225 | Accenture Global Services Ltd. | 152 | 3.9 |
| 298 | Acer Inc. | 115 | 4.3 |
| 252 | Acushnet Co. | 140 | 10.0 |
| 110 | Adobe Systems Inc. | 334 | -5.4 |
| 258 | Advanced Micro Devices, Inc. | 137 | -54.7 |
| 172 | Airbus Operations GmbH | 200 | -10.5 |
| 209 | Airbus Operations S.A.S. | 162 | 4.9 |
| 227 | Aisin Seiki K.K. | 151 | 2.0 |
| 193 | Aktiebolaget SKF | 177 | 15.8 |
| 269 | Alibaba Group Holding Ltd. | 130 | new |
| 5 | Alphabet Inc. | 3,065 | new |
| 15 | Amazon Technologies, Inc. | 1,960 | 15.2 |
| 256 | Analog Devices, Inc. | 138 | 2.2 |
| 12 | Apple, Inc. | 2,225 | 5.6 |
| 70 | Applied Materials, Inc. | 590 | -1.9 |
| 175 | ARM Ltd. | 195 | 40.5 |
| 286 | Arris Enterprises, LLC | 124 | 8.9 |
| 151 | ASML Netherlands B.V. | 223 | -0.9 |
| 30 | AT&T Corp. | 1,263 | -0.2 |
| 219 | AU Optronics Corp. | 156 | -42.3 |
| 151 | Audi AG | 223 | 10.8 |
| 90 | Avago Technologies General IP (Singapore) Pte. Ltd. | 431 | 24.8 |
| 175 | Avaya Inc. | 195 | 3.1 |
| 222 | BAE Systems | 154 | -10.4 |
| 194 | Bally Gaming, Inc. | 176 | -19.9 |
| 125 | Bank of America Corp. | 288 | 3.1 |
| 92 | BASF SE | 415 | -1.9 |
| 124 | Bayer Intellectual Property GmbH | 290 | 52.4 |
| 196 | Bayerische Motoren Werke AG | 174 | 28.2 |
| 96 | Becton Dickinson and Co. | 397 | 35.8 |
| 81 | Blackberry Ltd. | 506 | -52.0 |
| 27 | BOE Technology Group Co., Ltd. | 1,376 | 40.8 |
| 31 | Boeing Co. | 1,171 | 10.2 |
| 250 | Borgwarner Inc. | 141 | new |
| 252 | Bose Corp. | 140 | new |
| 263 | Boston Scientific Neuromodulation Corp. | 134 | -30.6 |
| 113 | Boston Scientific Scimed, Inc. | 320 | 2.8 |
| 199 | Bridgestone Corp. | 171 | -15.2 |
| 271 | Bristol-Myers Squibb Co. | 129 | 14.0 |
| 291 | Broadcom Corp. | 119 | -590.8 |
| 54 | Brother Kogyo K.K. | 705 | -31.3 |
| 165 | CA, Inc. | 204 | 10.3 |
| 230 | California Institute of Technology | 150 | -34.0 |
| 4 | Canon K.K. | 3,664 | -5.5 |
| 224 | Cardiac Pacemakers, Inc. | 153 | -3.9 |
| 227 | Carl Zeiss SMT GmbH | 151 | 15.2 |
| 161 | Casio Computer Co. Ltd. | 206 | -7.3 |
| 69 | Caterpillar Inc. | 595 | 15.5 |
| 282 | Centre National de la Recherche Scientifique - CNRS | 126 | -1.6 |
| 230 | Chevron USA Inc. | 150 | 14.0 |
| 280 | Ciena Corp. | 127 | new |
| 38 | Cisco Technology, Inc. | 989 | 0.2 |
| 271 | Citrix Systems, Inc. | 129 | -33.3 |
| 132 | CNH Industrial America LLC | 272 | 44.5 |
| 275 | Colgate-Palmolive Co. | 128 | new |
| 209 | Comcast Cable Communications, LLC | 162 | new |
| 87 | Commissariat a l'Energie Atomique et aux Energies Alternatives | 458 | 3.5 |
| 135 | Commscope Technologies LLC | 270 | 25.6 |
| 252 | Compagnie Generale des Etablissements Michelin | 140 | 19.3 |
| 182 | Continental Automotive GmbH | 189 | 21.2 |
| 185 | Cook Medical Technologies LLC | 186 | -11.3 |
| 215 | Cooper Technologies Co. | 159 | 15.7 |
| 76 | Corning Inc. | 547 | 28.0 |
| 161 | Cree, Inc. | 206 | -17.0 |
| 282 | Cypress Semiconductor Corp. | 126 | -32.5 |
| 221 | Daikin Industries Ltd. | 155 | 0.0 |
| 111 | Deere & Co. | 328 | 27.1 |
| 18 | Dell Technologies | 1,681 | 3.2 |
| 289 | Delphi Technologies, Inc. | 121 | new |

www.ipo.org

**2017 Patent Owners Alphabetical Listing**

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|---|---|---|---|
| 244 | Delta Electronics Inc. | 144 | 8.3 |
| 43 | Denso Corp. | 863 | 18.7 |
| 150 | Disney Enterprises, Inc. | 227 | 14.1 |
| 107 | Dolby Laboratories, Inc. | 344 | 32.8 |
| 295 | DSM IP Assets B.V. | 116 | -24.1 |
| 86 | DuPont | 465 | -10.3 |
| 138 | Eaton Corp. | 257 | 16.7 |
| 153 | Ebay Inc. | 220 | 20.0 |
| 197 | Echostar Technologies LLC | 172 | 14.5 |
| 208 | Ecolab USA Inc. | 163 | 14.7 |
| 72 | Electronics and Telecommunications Research Institute | 585 | -12.8 |
| 122 | Elwha LLC | 294 | 22.4 |
| 114 | Empire Technology Development LLC | 314 | -8.9 |
| 247 | Evonik Degussa GmbH | 142 | new |
| 275 | Excalibur IP, LLC | 128 | new |
| 108 | ExxonMobil Corp. | 339 | -18.0 |
| 60 | Facebook, Inc. | 660 | 33.0 |
| 120 | Fanuc Corp. | 299 | 32.1 |
| 17 | Ford Global Technologies, LLC | 1,876 | 18.4 |
| 209 | Foxconn Interconnect Technology Ltd. | 162 | 9.3 |
| 130 | Fuji Electric Co., Ltd. | 279 | 19.4 |
| 73 | Fuji Xerox Co., Ltd. | 569 | -1.9 |
| 55 | Fujifilm Corp. | 691 | -1.2 |
| 21 | Fujitsu Ltd. | 1,531 | -2.1 |
| 106 | Futurewei Technologies, Inc. | 345 | 0.3 |
| 6 | General Electric Co. | 2,989 | 14.2 |
| 298 | General Hospital Corp. | 115 | new |
| 48 | Globalfoundries Inc. | 782 | -73.9 |
| 230 | Globus Medical Inc. | 150 | 2.7 |
| 36 | GM Global Technology Operations LLC | 1,063 | -4.9 |
| 204 | Haier US Appliance Solutions, Inc. | 168 | new |
| 51 | Halliburton Energy Services, Inc. | 738 | 25.6 |
| 219 | Harvard College, President and Fellows | 156 | new |
| 237 | Here Global B.V. | 148 | 19.6 |
| 82 | Hewlett Packard Enterprise | 505 | -21.8 |
| 146 | Hitachi Automotive Systems, Ltd. | 235 | 16.2 |
| 186 | Hitachi High-Technologies Corp. | 185 | -9.7 |
| 298 | Hitachi Kokusai Electric Inc. | 115 | -18.3 |
| 216 | Hitachi Metals Ltd. | 158 | -12.7 |
| 84 | Hitachi, Ltd. | 491 | -4.3 |

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|---|---|---|---|
| 133 | Hon Hai Precision Industry Co., Ltd. | 271 | -57.9 |
| 44 | Honda Motor Co., Ltd. | 854 | -1.9 |
| 37 | Honeywell International Inc. | 1,036 | 20.8 |
| 63 | HP Inc. | 630 | -4.1 |
| 289 | HRL Laboratories, LLC | 121 | 4.1 |
| 172 | HTC Corp. | 200 | -7.5 |
| 271 | Huawei Device Co., Ltd. | 129 | -17.1 |
| 22 | Huawei Technologies Co., Ltd. | 1,472 | 18.6 |
| 258 | Hyundai Mobis, Co., Ltd. | 137 | 13.9 |
| 29 | Hyundai Motor Co. | 1,295 | 20.3 |
| 140 | Illinois Tool Works Inc. | 250 | 10.8 |
| 116 | Industrial Technology Research Institute, Taiwan | 312 | -19.9 |
| 58 | Infineon Technologies AG | 677 | 8.7 |
| 144 | Infineon Technologies Austria AG | 242 | 18.2 |
| 246 | Innolux Corp. | 143 | new |
| 3 | Intel Corp. | 3,726 | 8.4 |
| 123 | InterDigital Technology Corp. | 291 | 5.8 |
| 1 | International Business Machines Corp. | 8,996 | 10.8 |
| 216 | IGT | 158 | -56.3 |
| 293 | Intuitive Surgical Operations, Inc. | 118 | -6.8 |
| 75 | Japan Display Inc. | 553 | 15.6 |
| 298 | JFE Steel Corp. | 115 | new |
| 207 | Johns Hopkins University | 164 | -1.8 |
| 33 | Johnson & Johnson | 1,147 | 18.7 |
| 244 | Jtekt Corp. | 144 | -4.9 |
| 137 | Juniper Networks, Inc. | 259 | 5.4 |
| 250 | Kawasaki Jukogyo K.K. | 141 | -6.4 |
| 205 | King Fahd University of Petroleum and Minerals | 167 | new |
| 179 | KLA-Tencor Corp. | 192 | 13.5 |
| 243 | Kobe Steel, Ltd. | 145 | 13.8 |
| 117 | Koch Industries | 310 | 50.6 |
| 178 | Komatsu Ltd. | 193 | 21.2 |
| 83 | Konica Minolta, Inc. | 495 | 9.9 |
| 39 | Koninklijke Philips N.V. | 973 | -14.2 |
| 80 | Kyocera Corp. | 509 | 23.8 |
| 62 | Kyocera Document Solutions Inc. | 632 | -17.1 |
| 171 | LAM Research Corp. | 201 | 10.9 |
| 265 | Lenovo (Beijing) Ltd. | 133 | new |
| 190 | Lenovo (Singapore) Pte. Ltd. | 179 | -2.8 |
| 269 | Lenovo Enterprise Solutions (Singapore) Pte. Ltd. | 130 | -56.2 |
| 61 | LG Chem., Ltd. | 634 | 24.6 |

www.ipo.org

**2017 Patent Owners**
**Alphabetical Listing**

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|---|---|---|---|
| 65 | LG Display Co., Ltd. | 604 | -5.6 |
| 8 | LG Electronics Inc. | 2,696 | 10.0 |
| 79 | LG Innotek Co., Ltd. | 520 | 11.7 |
| 199 | Lockheed Martin Corp. | 171 | -11.1 |
| 235 | L'Oreal S.A. | 149 | 23.5 |
| 203 | LSIS Co., Ltd. | 169 | 30.8 |
| 240 | Macronix International Co., Ltd. | 147 | -59.9 |
| 205 | Mahle International GmbH | 167 | 26.9 |
| 149 | Marvell International Ltd. | 231 | new |
| 230 | Marvell World Trade Ltd. | 150 | new |
| 118 | Massachusetts Institute of Technology | 306 | 9.2 |
| 95 | Mediatek Inc. | 398 | 29.6 |
| 24 | Medtronic Inc. | 1,414 | -1.9 |
| 169 | Merck & Co., Inc. | 203 | 3.0 |
| 161 | Merck Patent GmbH | 206 | 18.4 |
| 47 | Micron Technology, Inc. | 807 | -9.3 |
| 9 | Microsoft Corp. | 2,601 | 1.7 |
| 34 | Mitsubishi Denki K.K. | 1,142 | 11.5 |
| 91 | Mitsubishi Heavy Industries, Ltd. | 427 | 7.0 |
| 89 | Monsanto Technology, LLC | 434 | -26.0 |
| 275 | Motorola Solutions, Inc. | 128 | -37.5 |
| 74 | Murata Manufacturing Co., Ltd. | 563 | 16.9 |
| 46 | NEC Corp. | 816 | -7.8 |
| 260 | Nestec, S.A. | 136 | -22.1 |
| 142 | NetApp, Inc. | 243 | -3.3 |
| 295 | NGK Spark Plug Co., Ltd. | 116 | -6.0 |
| 174 | Nichia Corp. | 196 | 25.5 |
| 230 | Nielsen | 150 | -12.7 |
| 99 | Nike, Inc. | 372 | -11.6 |
| 158 | Nikon Corp. | 212 | -0.5 |
| 213 | Nintendo Co., Ltd. | 161 | -28.6 |
| 218 | Nippon Steel & Sumitomo Metal Corp. | 157 | 2.5 |
| 101 | Nissan Motor Co., Ltd. | 357 | 11.2 |
| 202 | Nitto Denko Corp. | 170 | -17.1 |
| 26 | Nokia Corp. | 1,381 | new |
| 225 | Northrop Grumman Systems Corp. | 152 | new |
| 136 | Novartis AG | 262 | 5.7 |
| 280 | NTN Corp. | 127 | 2.4 |
| 179 | NTT Docomo, Inc. | 192 | -12.0 |
| 255 | Nuance Communications, Inc. | 139 | 4.3 |
| 130 | Nvidia Corp. | 279 | -25.4 |
| 121 | NXP B.V. | 296 | 2.0 |
| 66 | NXP USA, Inc. | 602 | new |
| 64 | Olympus Corp. | 613 | 9.5 |

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|---|---|---|---|
| 237 | Omron Corp. | 148 | 10.8 |
| 260 | Open Invention Network, LLC | 136 | 11.8 |
| 50 | Oracle International Corp. | 753 | 12.1 |
| 187 | Osram Opto Semiconductors GmbH | 184 | 12.5 |
| 235 | Panasonic Corp. | 149 | 2.7 |
| 199 | Panasonic Intellectual Property Corp. of America | 171 | -78.9 |
| 28 | Panasonic Intellectual Property Management Co., Ltd. | 1,338 | -4.6 |
| 170 | Paypal. Inc. | 202 | 27.7 |
| 114 | Philips Lighting Holding B.V. | 314 | new |
| 85 | Procter & Gamble Co. | 469 | 15.4 |
| 285 | Qorvo US, Inc. | 125 | new |
| 7 | Qualcomm, Inc. | 2,728 | -14.3 |
| 213 | Rambus, Inc. | 161 | -5.6 |
| 109 | Raytheon Co. | 336 | -9.8 |
| 179 | Red Hat, Inc. | 192 | -5.2 |
| 68 | Renesas Electronics Corp. | 601 | 2.0 |
| 35 | Ricoh Co., Ltd. | 1,140 | -23.2 |
| 32 | Robert Bosch GmbH | 1,158 | 3.1 |
| 112 | Roche Holdings, Inc. | 323 | -20.1 |
| 190 | Rockwell Automation Technologies, Inc. | 179 | 21.2 |
| 197 | Rockwell Collins, Inc. | 172 | 21.5 |
| 126 | Rohm Co., Ltd. | 286 | 0.7 |
| 100 | Rolls-Royce PLC | 359 | 26.5 |
| 275 | Rovi Guides, Inc. | 128 | new |
| 146 | Saint-Gobain Corp. | 235 | 10.2 |
| 159 | Salesforce.com, Inc. | 211 | -6.2 |
| 11 | Samsung Display Co., Ltd. | 2,266 | 11.3 |
| 129 | Samsung Electro-Mechanics Co., Ltd. | 281 | -46.6 |
| 2 | Samsung Electronics Co., Ltd. | 5,810 | 5.3 |
| 96 | Samsung SDI Co., Ltd. | 397 | -9.1 |
| 127 | Sanofi | 284 | -5.6 |
| 78 | SAP AG | 521 | 4.6 |
| 155 | Saudi Arabian Oil Co. | 218 | 21.6 |
| 133 | Schaeffler Technologies AG & Co. KG | 271 | 29.2 |
| 56 | Schlumberger Technology Corp. | 680 | -0.7 |
| 88 | Seagate Technology, LLC | 457 | -14.2 |
| 25 | Seiko Epson Corp. | 1,404 | -17.1 |
| 156 | Semiconductor Components Industries, LLC | 217 | 6.5 |
| 39 | Semiconductor Energy Laboratory Co., Ltd. | 973 | -8.3 |
| 189 | Semiconductor Manufacturing International (Shanghai) Corp. | 182 | 18.7 |

**www.ipo.org**

**2017 Patent Owners**
**Alphabetical Listing**

| Rank | Organization | 2017 Patents | Percent Change From 2016 |
|---|---|---|---|
| 57 | Sharp Corp. | 679 | -20.5 |
| 53 | Shenzhen China Star Optoelectronics Technology Co., Ltd. | 709 | 30.5 |
| 227 | Shimadzu Corp. | 151 | 14.6 |
| 240 | Shimano Inc. | 147 | -6.1 |
| 159 | Shin Etsu Chemical Co., Ltd. | 211 | 3.3 |
| 20 | Siemens AG | 1,538 | 3.6 |
| 41 | SK Hynix Inc. | 938 | -18.1 |
| 161 | Skyworks Solutions, Inc. | 206 | new |
| 298 | Smith & Nephew, Inc. | 115 | -85.2 |
| 146 | Societe Nationale d'Etude et de Construction de Moteurs d'Aviation | 235 | 18.7 |
| 265 | Sonos, Inc. | 133 | new |
| 13 | Sony Corp. | 2,116 | -2.5 |
| 98 | Sprint Corp. | 391 | -30.7 |
| 165 | Stanford University | 204 | -19.6 |
| 282 | Stanley Black & Decker, Inc. | 126 | 4.0 |
| 59 | STMicroelectronics, Inc. | 675 | -9.2 |
| 141 | Stryker Corp. | 244 | 21.7 |
| 182 | Sumitomo Chemical Co., Ltd. | 189 | 9.5 |
| 139 | Sumitomo Electric Industries, Ltd. | 255 | -5.5 |
| 291 | Sumitomo Rubber Industries, Ltd. | 119 | -3.4 |
| 188 | Sumitomo Wiring Systems, Ltd. | 183 | 24.6 |
| 165 | Sun Patent Trust | 204 | 42.2 |
| 157 | Symantec Corp. | 214 | 0.9 |
| 237 | Synaptics, Inc. | 148 | new |
| 222 | Syngenta Participations AG | 154 | 16.9 |
| 10 | Taiwan Semiconductor Manufacturing Co., Ltd. | 2,408 | 6.1 |
| 177 | TDK Corp. | 194 | 22.2 |
| 119 | TE Connectivity | 301 | 8.0 |
| 19 | Telefonaktiebolaget LM Ericsson | 1,551 | -0.1 |
| 102 | Tencent Technology (Shenzhen) Co. Ltd. | 354 | 25.1 |
| 42 | Texas Instruments, Inc. | 923 | 3.9 |
| 192 | Thales | 178 | 12.9 |
| 49 | The Dow Chemical Co. | 765 | 7.8 |
| 144 | Thomson Licensing S.A. | 242 | -7.4 |
| 286 | T-Mobile, USA, Inc. | 124 | new |
| 94 | Tokyo Electron Ltd. | 403 | 3.7 |
| 260 | Toray Industries Inc. | 136 | 5.1 |
| 16 | Toshiba Corp. | 1,891 | -1.5 |
| 247 | Toyoda Jidoshokki Seisakusho K.K. | 142 | new |
| 14 | Toyota Jidosha K.K. | 2,015 | 23.6 |
| 194 | Tsinghua University | 176 | -1.7 |
| 104 | United Microelectronics Corp. | 351 | 7.7 |
| 247 | United States of America, Army | 142 | 4.2 |
| 267 | United States of America, Department of Health & Human Services | 132 | -11.4 |
| 294 | United States of America, National Aeronautics and Space Administration | 117 | 1.7 |
| 102 | United States of America, Navy | 354 | 5.1 |
| 23 | United Technologies Corp. | 1,423 | 23.0 |
| 77 | University of California, The Regents of | 524 | 3.6 |
| 275 | University of Michigan | 128 | -10.9 |
| 295 | University of South Florida | 116 | 1.7 |
| 154 | University of Texas | 219 | 26.0 |
| 286 | UOP | 124 | -44.4 |
| 52 | Verizon | 715 | -5.5 |
| 45 | Western Digital Corp. | 837 | -27.4 |
| 127 | Whirlpool Corp. | 284 | 22.2 |
| 209 | Wisconsin Alumni Research Foundation | 162 | -3.7 |
| 184 | Wistron Corp. | 187 | -69.5 |
| 71 | Xerox Corp. | 586 | -30.0 |
| 256 | Xiaomi Inc. | 138 | new |
| 263 | Xilinx, Inc. | 134 | -15.7 |
| 165 | Xperi Corp. | 204 | 6.4 |
| 271 | Yamaha Motor Co., Ltd. | 129 | 10.1 |
| 105 | Yazaki Corp. | 349 | -12.9 |
| 240 | ZF Friedrichshafen, AG | 147 | -11.6 |
| 93 | ZTE Corp. | 407 | -16.0 |

**www.ipo.org**

## END NOTES:

1.     "New" in the percent change column indicates that the company was not on the Top 300 list in 2016.

2.     The number of patents granted does not necessarily indicate the value of a company's technology, the effectiveness of its R&D, or whether it will be profitable.  The number of patents per company varies widely from industry to industry and from company to company within an industry.

3.     This report was compiled by IPO from data provided by the U.S. Patent and Trademark Office.  Patents reported are utility patents granted during calendar year 2017 that listed the organization or a subsidiary as the owner on the printed patent document.  Patents in the name of a majority-owned subsidiary are included with patents of the parent organization if the organization asked IPO to include subsidiaries.  Patents that were granted to two or more organizations jointly are attributed to the organization listed first on the patent document.

4.     The number of utility patents granted by the USPTO increased to 318,829 in 2017 from 303,051 in 2016.

5.     IPO has published this report annually since 1984 as a service to its members.  For annual lists, go to www.ipo.org/top-300.

6.     For next year's list, IPO will include patents of majority-owned subsidiaries under the name of the parent if the parent provides the names of such subsidiaries to IPO at info@ipo.org by 1 March 2019.

Exhibit 11

# Interactive: Patent Power 2017

The technology world's most valuable patent portfolios

Below is this year's interactive table combining 18 industry scorecards with the top 20 companies in each sector. To see an individual scorecard, select that industry from the list on the right, or select multiple sectors as you prefer. In the zoomable map below, companies are plotted by the country in which their headquarters is located. Companies are plotted by the country in which each headquarters are located in the zoomable map below.

For an explanation of how the metrics are used to derive the Pipeline Power score—which takes into account the value rather than the raw quantity of patents in a portfolio—read the sidebar, "Constructing the Patent Power Scorecard."



# Exhibit 12





SONOS                          S1

**Sonos Era 100 Stand**          Guides      **Sonos Era 100 Wall Mount**          Guides
                                 Product info                                       Product info

**Sonos Era 300 Stand**          Guides      **Sonos Era 300 Wall Mount**          Guides
                                 Product info                                       Product info

**Sonos One Shelf**              Guides      **Sonos One Stand (Pair)**            Guides
                                 Product info                                       Product info

**Sonos One Wall Mount**         Guides      **Sonos Wall Mount**                  Guides
                                 Product info                                       Product info

**Sonos Beam Wall Mount**        Guides      **Sonos Arc Wall Mount**              Guides
                                 Product info                                       Product info

**Sonos Move Wall Hook**         Guides      **Sonos Roam Wireless Charger**       Guides
                                 Product info                                       Product info

**Sonos Combo Adapter**          Guides      **Sonos Line-In Adapter**             Guides
                                 Product info                                       Product info

Discontinued products

**One**                          Guides      **One SL**                            Guides

**Play:1**                       Guides      **Play:3**                            Guides

**Play:5 (gen1)**                Guides      **Play:5**                            Guides



| | | | | |
|---|---|---|---|---|
| **Beam (Gen 1)** | | Guides | **Playbar** | Guides |
| **Playbase** | | Guides | **Connect:Amp** | Guides |
| **Connect** | | Guides | **Boost** | Guides |
| **Bridge** | | Guides | **Controller 100** | Guides |
| **Dock** | | Guides | **Sonos Controller** | Guides |
| **Zone Player 100** | | Guides | **Sonos Wall Mount** | Guides |

# Our Company
# News
# Blog
# Careers
# Responsibility
# Innovation

Manage Your Account

Order Status

Shipping and Delivery

Returns

Find a Store

Investors

Business Solutions

Works with Sonos

Developer Portal

Contact Us

Corporate Sales

Sonos Trades

Frontline Workers

Sonos App

Sonos Voice Control

Students

Upgrade

🇺🇸 United States ⌃    𝕏  f  ▶  📷    © 2024 Sonos, Inc.    Legal    Privacy statement    Accessibility    Conformity    Site map    Security    Your Privacy Choices

Exhibit 13

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

☐ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended October 1, 2022**
or
☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

#### Commission File Number: 001-38603

# SONOS, INC.
### *(Exact name of Registrant as specified in its charter)*

| | | |
|---|---|---|
| **Delaware** | | **03-0479476** |
| (State or other jurisdiction of incorporation or organization) | | (I.R.S. Employer Identification No.) |
| **614 Chapala Street** | **Santa Barbara**　　　**CA** | **93101** |
| (Address of principal executive offices) | | (Zip code) |

805-965-3001
Registrant's telephone number, including area code

#### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.001 par value** | **SONO** | **The Nasdaq Global Select Market** |

#### Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging Growth Company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the shares of SONO common stock held by non-affiliates of the registrant as of April 1, 2022, the last business day of the registrant's most recently completed second fiscal quarter, was $2,517.8 million based on the closing price of $27.68 as reported by The Nasdaq Global Select Market System.

As of November 7, 2022, the registrant had 126,685,545 shares of common stock outstanding, $0.001 par value per share.

#### DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates by reference certain information from the registrant's definitive proxy statement (the "2023 Proxy Statement") relating to its 2023 Annual Meeting of Stockholders. The 2023 Proxy Statement will be filed with the United States Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

## TABLE OF CONTENTS

Page

**Part I**

Item 1    Business    4

Item 1A    Risk Factors    13

Item 1B    Unresolved Staff Comments    27

Item 2    Properties    27

Item 3    Legal Proceedings    28

Item 4    Mine Safety Disclosures    28

**Part II**

Item 5    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities    29

Item 6    [Reserved]    30

Item 7    Management's Discussion and Analysis of Financial Condition and Results of Operations    31

Item 7A    Quantitative and Qualitative Disclosures About Market Risk    44

Item 8    Financial Statements and Supplementary Data    46

Item 9    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure    79

Item 9A    Controls and Procedures    79

Item 9B    Other Information    79

Item 9C    Disclosure Regarding Foreign Jurisdictions that Prevent Inspections    79

**Part III**

Item 10    Directors, Executive Officers and Corporate Governance    80

Item 11    Executive Compensation    80

Item 12    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters    80

Item 13    Certain Relationships and Related Transactions, and Director Independence    80

Item 14    Principal Accountant Fees and Services    80

**Part IV**

Item 15    Exhibits, Financial Statement Schedules    81

Item 16    Form 10-K Summary    83

Signatures    84

[This page intentionally left blank]

*Forward-Looking Statements*

*This Annual Report on Form 10-K contains forward-looking statements. All statements other than statements of historical fact contained in this Annual Report on Form 10-K, including statements regarding future operations, are forward-looking statements. In some cases, forward-looking statements may be identified by words such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "could," "would," "expect," "objective," "plan," "potential," "seek," "grow," "target," "if," and similar expressions intended to identify forward-looking statements. We have based these forward-looking statements on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives and financial needs. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in the section titled "Risk Factors" set forth in Part I, Item 1A of this Annual Report on Form 10-K and in our other filings with the Securities and Exchange Commission (the "SEC"). Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this Annual Report on Form 10-K may not occur, and actual results may differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward-looking statements contained in this Annual Report on Form 10-K include, but are not limited to, statements about:*

- *our expectations regarding our results of operations, including gross margin, financial condition and cash flows;*
- *our expectations regarding the development and expansion of our business;*
- *anticipated trends, challenges and opportunities in our business and in the markets in which we operate;*
- *competitors and competition in our markets;*
- *our ability to maintain and promote our brand and expand brand awareness;*
- *our ability to successfully develop and introduce new products;*
- *our ability to manage our international operations;*
- *the effects of tariffs, trade barriers and retaliatory trade measures;*
- *our ability to expand our customer base and expand sales to existing customers;*
- *our expectations regarding development of our direct-to-consumer sales channels;*
- *expansion of our partner network;*
- *the macroeconomic environment and our ability to navigate it;*
- *the impact of the COVID-19 pandemic on our business and our response to it;*
- *our ability to retain and hire necessary employees and staff our operations appropriately;*
- *the timing and amount of certain expenses and our ability to achieve operating leverage over time; and*
- *our ability to maintain, protect and enhance our intellectual property.*

*We caution you that the foregoing list may not contain all of the forward-looking statements made in this Annual Report on Form 10-K.*

*You should not rely upon forward-looking statements as predictions of future events. The events and circumstances reflected in the forward-looking statements may not be achieved or occur. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Except as required by law, we do not intend to update any of these forward-looking statements after the date of this Annual Report on Form 10-K or to conform these statements to actual results or revised expectations.*

*You should read this Annual Report on Form 10-K with the understanding that our actual future results, levels of activity, performance and events and circumstances may be materially different from what we expect.*

# PART I

**Item 1: Business**

*Overview*

Sonos is one of the world's leading sound experience brands.

We pioneered multi-room, wireless audio products, debuting the world's first multi-room wireless sound system in 2005. Today, our products include wireless, portable, and home theater speakers, components, and accessories to address consumers' evolving audio needs. We are known for delivering unparalleled sound, thoughtful design aesthetic, simplicity of use, and an open platform. Our platform has attracted a broad range of more than 130 streaming content providers, such as Apple Music, Spotify, Deezer, and Pandora. These partners find value in our independent platform and access to our millions of desirable and engaged customers. We frequently introduce new services and features across our platform, providing our customers with enhanced functionality, improved sound, and an enriched user experience. We are committed to continuous technological innovation as reflected in our growing global patent portfolio. We believe our patents comprise the foundational intellectual property for wireless multi-room and other audio technologies.

Our innovative products, seamless customer experience, and expanding global footprint have driven 17 consecutive years of sustained revenue growth since our first product launch. Our growth is driven by both new customers buying our products as well as existing customers continuing to add products to their Sonos systems. In fiscal 2022, existing customers accounted for approximately 44% of new product registrations. As of October 1, 2022, we had a total of nearly 41.8 million products registered in approximately 14.0 million households globally, including the addition of approximately 1.4 million new households during fiscal 2022. Our customers have typically purchased additional Sonos products over time. As of October 1, 2022, 60% of our 14.0 million households had registered more than one Sonos product. As of October 1, 2022, our households own 3.0 products on average. We also estimate that our customers listened to 12.8 billion hours, excluding Bluetooth listening, of audio content using our products in fiscal 2022, which represents 5.5% growth from fiscal 2021.

*Our Products*

We generate revenue from sales of our Sonos speaker products, including wireless speakers and home theater speakers, from our Sonos system products, which largely comprises our component products, and from partner products and other revenue, including partnerships with IKEA and Sonance, Sonos and third-party accessories, licensing, advertising, and subscription revenue. Our portfolio of products encourages customers to uniquely tailor their Sonos sound systems to best meet their sound and design preferences.

- *Sonos speakers.* Sonos speakers comprises our wireless speakers and home theater products, including:

| Product | Launch Date | Description |
|---------|-------------|-------------|
| **Sub Mini** | October 2022 | Our wireless subwoofer which delivers powerful, balanced bass, rich, clear low end frequencies, in a compact cylindrical design. |
| **Ray** | June 2022 | Our smallest, smart soundbar for TV, music, and more. |
| **Beam (Gen 2)** | October 2021 | Our smart, compact soundbar for TV, music, and more, with support for Dolby Atmos. Originally introduced as Beam (Gen 1) in June 2018. |
| **Roam Colors**<br>**Roam SL**<br>**Roam** | May 2022<br>March 2022<br>April 2021 | Our ultra-portable smart speaker with Bluetooth and WiFi for listening on the go and at home. Originally introduced as Roam in April 2021 |
| **Arc** | June 2020 | Our premium smart soundbar for TV, movies, music, gaming, and more, with support for Dolby Atmos. Replaced Playbar, our first smart soundbar released in April 2013 and Playbase, our powerful sound base for TVs released in 2017. |
| **Five** | June 2020 | Our high fidelity speaker for superior sound. Originally launched as Play:5 (Gen 1) in November 2009 and completely redesigned in November 2015 as Play:5 (Gen 2). |
| **Sub (Gen 3)** | June 2020 | Our wireless subwoofer for deep bass. Originally introduced as Sub (Gen 1) in June 2012. |
| **Move** | September 2019 | Our durable, battery-powered smart speaker for outdoor and indoor listening. |
| **One SL** | September 2019 | Our powerful microphone-free speaker for music and more. Replaced Play:1 which was introduced in October 2013. |
| **One** | October 2017 | Our powerful smart speaker with voice control built in. |

- *Sonos System Products.* Sonos system products comprises our component and other products which allow customers to convert third-party wired systems, stereo systems and home theater set-ups into our easy-to-use, wirelessly controlled streaming music system, including:

| Product | Launch Date | Description |
|---------|-------------|-------------|
| **Port** | September 2019 | Our versatile streaming component for stereos or receivers. Replaced Connect which launched in January 2007. |
| **Amp** | February 2019 | Our versatile amplifier powering all our customers' entertainment. Replaced Connect: Amp which launched in September 2012. |

- *Partner Products and Other Revenue.* Partner products and other revenue categories comprise products sold in connection with our partnerships, accessories, professional services, licensing, and advertising revenue. Products in this category comprise accessories that allow our customers to integrate our products seamlessly into their homes as well as products manufactured by and/or sold by our partners, including:

| Product | Launch Date | Description |
|---|---|---|
| **Audi Partnership** | April 2021 | Our first-ever automotive audio partnership delivering Sonos-tuned premium sound experience for the Q4 e-tron and further models including the A1, Q2, and Q3. |
| **Sonos Radio HD** | November 2020 | Our ad-free, high-definition streaming tier of our streaming radio service, Sonos Radio. |
| **Sonos Radio** | April 2020 | Our free, ad-supported streaming radio experience bringing together more than 60,000 stations from multiple streaming partners alongside original programming from Sonos. |
| **Sonos Architectural by Sonance** | February 2019 | Our collection of installed passive speakers for indoor and outdoor use designed and optimized for Amp in partnership with Sonance, including in-ceiling, in-wall, and outdoor speakers. |
| **IKEA module units** | Various | Hardware and embedded software integrated into final products manufactured and sold by IKEA. Current IKEA products include SYMFONISK picture frame, bookshelf speaker, and speaker lamp. |
| **Accessories** | Various | Our custom-designed stands, mounts, shelves, cables, chargers, and more. |

### Our Software

Our proprietary software is the foundation of the Sonos sound system and further differentiates our products and services from those of our competitors.

In June 2020, we introduced Sonos S2, a powerful new app and operating system to enable a new generation of Sonos products and experiences, which includes new features, usability updates, and more personalization while also enabling higher resolution audio technologies for music and home theater. In June 2022, we introduced Sonos Voice Control, the first voice experience purpose-built for listening to and controlling your music on Sonos speakers. Designed with privacy at its core, Sonos Voice Control is the simplest way to control your music, offering complete command of your Sonos system using only your voice. Sonos Voice Control works on every voice-capable Sonos speaker, processing requests entirely on the Sonos device.

Our software provides the following key benefits:

- *Multi-room experience.* Our system enables our speakers to work individually or together in synchronized playback groups, powered by wireless network and Bluetooth capabilities to route and play audio optimally.

- *Open platform for content partners.* Our platform enables customers to easily search and browse for content from a list of more than 130 content partners from around the world including stations, artists, albums, podcasts, audio books, and more. Content partners can connect to Sonos via our platform and find a new and growing audience for their catalogs.

- *Intuitive and flexible control.* Our customers can control their experiences through the Sonos app, voice control, from Sonos devices directly, or an expanding number of third-party apps and smart devices. As our customers navigate across different controllers, our technology synchronizes the control experience across the Sonos platform to deliver the music and entertainment experience they desire.

- *Smart audio tuning.* Our Trueplay technology uses the microphones on an iOS device to analyze room attributes, speaker placement and other acoustic factors to improve sound quality. We also developed Automatic TruePlay to deliver the same audio tuning experience, directly using the microphones integrated to our speakers and make this available to iOS and Android users.

- *Continuous Improvement.* Our software platform and cloud service enables feature enhancements and delivery of new experiences on an ongoing basis. As a result, the Sonos experience improves for customers over time.

### Our Partner Ecosystem

We have built a platform that attracts partners to enable our customers to play content from their preferred services. Our platform has attracted a broad range of more than 130 streaming content providers and span across content, control, and third-party applications:

- *Content.* We partner with a broad range of content providers, such as streaming music services, internet radio stations, and podcast services, allowing our customers to enjoy their audio content from whichever source they desire.

- *Control.* We provide our customers with multiple options to control their home audio experiences, including voice control and direct control from within selected streaming music service apps. Our platform is the first to offer consumers the ability to buy a single smart speaker with more than one voice assistant choice. Our voice-enabled speaker products have Amazon Alexa and Google Assistant functionality, and in June 2022, we introduced Sonos Voice Control.

- *Third-party partnerships.* We partner with third-party developers to build new applications and services on top of the Sonos platform, increasing customer engagement and creating new experiences for our customers, such as architectural in-ceiling, in-wall and outdoor speakers in partnership with Sonance, picture frame, bookshelf and table lamp speakers in partnership with IKEA, and automotive sound in partnership with Audi.

### Research and Development

Our research and development team develops new hardware products, software and services, while continually improving and enhancing our existing software and hardware products to address customer demands and emerging trends. Our teams have worked on features and enhancements to the Sonos system including developments to the Sonos app, product setup, Trueplay tuning, the ability to use Alexa or Google voice services, and Sonos Voice Control. Our audio team has developed a series of acoustic technologies which enabled us to create speakers that produce high-fidelity sound. In April 2022, we added a talented group of employees to our research and development team through our acquisition of Mayht, a Netherlands-based company, which invented a new approach to audio transducers. We expect that the addition of this team and its strategic technology will help transform and enhance our product portfolio.

Our wireless and radio team established world-class wireless performance that enabled multi-room experience, wireless surround sound, and many other applications. Our industrial design and mechanical engineering teams developed a cohesive, unique family of products across multiple categories and use-cases such as home theater, all-in-one, and portable. These products demonstrate a range of proprietary manufacturing and design details, logo application techniques, and assembly architecture. The products and software we develop require significant technical knowledge and expertise to develop at a competitive pace. We believe our research and development capabilities and our intellectual property differentiates us from our competitors. We intend to continue to significantly invest in research and development to bring new products and software to market and expand our platform and capabilities.

### *Sales and Marketing*

We sell our products primarily through over 10,000 third-party physical retail stores and our products are distributed in more than 60 countries. The majority of our sales are transacted through traditional physical retailers, including on their websites. We also sell through online retailers, to custom installers who bundle our products with services that they sell to their customers, and directly through our website sonos.com.

We invest in customer experience and customer relationship management to drive loyalty, word-of-mouth marketing and sustainable, profitable growth. Our marketing investments are focused on driving profitable growth through advertising, public relations and brand promotion activities, including digital platforms, sponsorships, collaborations, brand activations, and channel marketing. We continue to invest significant resources in our marketing and brand development efforts, including investing in capital expenditures on product displays to support our channel marketing through our retail partners.

### *Manufacturing, Logistics and Fulfillment*

We outsource the manufacturing of our speakers and components to contract manufacturers, who produce our products based on our design specifications. Our products are manufactured by contract manufacturers in China and Malaysia, and in fiscal 2022, we began further diversifying our supply chain into Vietnam. In accordance with our agreements with our contract manufacturers, they will enter into purchase orders with their upstream suppliers for component inventory necessary to manufacture our products, based on our demand forecasts.

The vast majority of our products are shipped to our third-party warehouses which are then shipped to our distributors, retailers, and directly to our customers. Our third-party warehouses are located in the United States in California and Pennsylvania, as well as internationally in Australia, Canada, the Netherlands, China, Japan, and the United Kingdom.

We use a small number of logistics providers for substantially all of our product delivery to both distributors and retailers. This approach generally allows us to reduce order fulfillment time, reduce shipping costs, and improve inventory flexibility.

### *Our Competitive Strengths*

The proliferation of streaming services, the rapid expansion of digital audio content types, and the rise in voice assistants are significantly changing audio consumption habits and increasing demand for easy, premium, integrated audio experiences. As a leading sound system for consumers, content partners and developers, Sonos is capitalizing on the large market opportunity created by these dynamics. We believe the following combination of capabilities and features of our business model distinguish us from our competitors and position us well to capitalize on our opportunities:

- *Leading sound system*. We have developed and refined our sound system over the last 19 years. Our effort has resulted in significant consumer awareness and market share among home audio professionals. For example, a 2022 product study by CE Pro ranked Sonos as the leading brand in the wireless speakers, soundbar, and subwoofer categories. Our 93% share in the wireless speaker category among these industry professionals significantly outpaces our competitors.

- *Proprietary Sonos app and software platform.* We offer our customers a mobile app that controls the Sonos sound system and the entire listening experience. Customers can stream different audio content to speakers in different rooms or the same audio content synchronized throughout the entire home. Additionally, the Sonos app enables universal search, the ability to search for audio content across streaming services and owned content so that customers can easily find, play, or curate music.

- *Platform enables freedom of choice for consumers*. Our broad and growing network of partners provides access to voice control, streaming music, internet radio, podcasts, and audiobook content, enabling consumers with freedom of choice in content and services. Our platform attracts a broad set of content providers, including leading streaming music services and third-party developers.

- *Differentiated consumer experience creates engaged households who often repeat purchases*. We deliver a differentiated customer experience to millions of households every day, cultivating a long-term passionate and engaged customer base. This engagement with our products, and our ability to continuously improve and enhance the functionality of our existing products through software updates, can help drive momentum in our flywheel as customers add products to their Sonos sound systems. We generate significant revenue and profits from existing customers purchasing additional products to expand their Sonos sound systems. In fiscal 2022, existing households represented approximately 44% of new product registrations. We have proven our ability to profitably develop new experiences that drive existing customers to add additional products to their home, while continuing to add new homes. We believe that we have yet to fully realize the lifetime value of our customer base and this aspect of our financial model will continue to contribute to our ability to achieve sustainable, profitable growth over the long term.

- *Commitment to innovation drives continuous improvement*. We have made significant investments in research and development since our inception and believe that we own the foundational intellectual property of wireless multi-room and other audio technologies. Our patent portfolio continues to grow each year. We were included in the Intellectual Property Owners Association "Top 300 Patent Owners" report for calendar year 2021. As of calendar year 2021, we held approximately 1,150 issued patents in the United States versus approximately 15 in 2011.

### Our Growth Strategies

Key elements of our growth strategy include:

- *Continued introduction of innovative products and services and expansion into new categories*. To address our market opportunity, we have developed a long-term roadmap to deliver innovative products, services and software enhancements, and expand into new categories. We intend to continue to introduce products and services across multiple categories designed for enjoyment in all the places and spaces that our customers listen to audio content, including outside of the home, as well as business and enterprise customers. Executing on our roadmap will position us to acquire new customers, increase sales to existing customers, and improve the customer experience.

- *Expansion of direct-to-consumer efforts and building relationships with existing channel partners and prospective customers*. We are focused on reaching and converting prospective customers through third-party retail stores, e-commerce retailers, our website sonos.com, and custom installers of home audio systems. We expect that our direct-to-consumer channel will continue to contribute to our growth. We intend to continue to build direct relationships with current and prospective customers through sonos.com and the Sonos app to drive direct sales. In fiscal 2022, we generated 22.5% of total revenue through our direct-to-consumer channel, primarily sonos.com. While we seek to increase sales through our direct-to-consumer sales channel, we expect that our third-party retailers will continue to be an important part of our ecosystem. We will continue to seek retail partners that can deliver differentiated in-store experiences to support customer demand for product demonstrations. Additionally, we intend to expand and strengthen our partnerships with custom installers who are valuable to our customer base and contribute to our new household growth. For example, a 2022 product survey by CE Pro ranked Sonos as the leading brand in the wireless speakers, soundbar, and subwoofer categories. Our 93% share in the wireless speakers category among these industry professionals significantly outpaces our competitors. In fiscal 2022, we generated 21.2% of total revenue through our installer solutions channel.

- *Expand partner ecosystem to enhance platform*. We intend to deepen our relationships with our current partners and expand our partner ecosystem by providing our customers access to streaming music services, voice assistants, internet radio, podcasts and audiobook content.

- *Increase brand awareness in existing geographic markets*. We intend to increase our household penetration rates in our existing geographic markets by increasing brand awareness, expanding our product offerings and growing our partner ecosystem.

- *Expansion into new geographic markets*. Geographic expansion represents a growth opportunity in currently underserved countries. We intend to expand into new countries over time by employing country-specific marketing campaigns and distribution channels.

**Factors Affecting Performance**

*New Product Introductions*. Since 2005, we have released products in multiple audio categories. We intend to introduce new products that appeal to a broad set of consumers, as well as bring our differentiated listening platform and experience to all the places and spaces where our customers listen to the breadth of audio content available, including inside and outside their homes.

*Seasonality*. Historically, we have typically experienced the highest levels of revenue in the first fiscal quarter of the year coinciding with the holiday shopping season and our promotional activities. Our promotional discounting activity is typically higher in the first fiscal quarter as well, which negatively impacts gross margin during this period. However, our higher sales volume in the holiday shopping season has historically resulted in a higher operating margin in the first fiscal quarter due to positive operating leverage.

*Ability to Sell Additional Products to Existing Customers*. Our existing customers typically increase the number of Sonos products in their homes. In fiscal 2022, existing households represented approximately 44% of new product registrations. As we execute on our product roadmap to address evolving consumer preferences, we believe we can expand the number of products in our customers' homes. Our ability to sell additional products to existing customers is a key part of our business model, as follow-on purchases indicate high customer engagement and satisfaction, decrease the likelihood of competitive substitution, and result in higher customer lifetime value. We will continue to innovate and invest in product development in order to enhance customer experience and drive sales of additional products to existing customers.

*Expansion of Partner Ecosystem*. Expanding and maintaining strong relationships with our partners will remain important to our success. Our ability to develop, manufacture, and sell voice-enabled speakers that deliver differentiated consumer experiences will be a critical driver of our future performance, particularly as we compete in a larger market with an expanding number of competitors. We currently compete with, and will continue to compete with, companies that have greater resources than we do, many of which have brought voice-enabled speakers to market. To date, our agreements with these partners have all been on a royalty-free basis. We believe our partner ecosystem improves customer experience, attracting more customers to Sonos, which in turn attracts more partners to the platform, further enhancing customer experience. We believe partners choose to be part of the Sonos platform because it provides access to a large, engaged customer base on a global scale. We look to partner with a wide variety of streaming music services, voice assistants, connected home integrators, content creators, and podcast providers. We have also partnered with certain companies in the development of our own voice-enabled products, while also bringing to market our own voice assistant focused specifically on the audio experience. Our competitiveness in the voice-enabled speaker market will depend on successful investment in research and development, market acceptance of our products and our ability to maintain and benefit from our technology partnerships.

As competition increases, we believe our ability to give users the freedom to choose across a broad set of streaming services and voice control partners will be an important key differentiating factor.

*Channel Strategy*. We believe growing our own e-commerce channel will continue to be important to supporting our overall growth and profitability as consumers continue the shift from physical to online sales channels. We are investing in our e-commerce capabilities and in-app experience to drive direct sales. In fiscal 2022, sales through our direct-to-consumer channel, primarily through sonos.com, represented 22.5% of our revenue in fiscal 2022, and 24.2% in fiscal 2021. Sales through our direct-to-consumer channel decreased 5.1% in fiscal 2022 and increased 46.5% in fiscal 2021.

While we seek to increase sales through our direct-to-consumer sales channel, we expect that our partnerships with third-party retailers and custom installers will continue to be an important part of our ecosystem. We will continue to seek retail partners that can deliver differentiated in-store experiences to support customer demand for product demonstrations. Additionally, we intend to expand and strengthen our partnerships with custom installers who are valuable to our customer base and contribute to our new household growth. In fiscal 2022, we generated 21.2% of total revenue through our installer solutions channel. Our physical retail distribution relies on third-party retailers and our ability to maintain our diversified manufacturing footprint and base of component suppliers in support of production efficiency and flexibility across our global supply chain.

*International Expansion.* Our products are sold in more than 60 countries, and in fiscal 2022, 45.0% of our revenue was generated outside the United States. Our international growth will depend on our ability to generate sales from the global population of consumers, develop international distribution channels, and diversify our partner ecosystem to appeal to a more global audience. We are committed to strengthening our brand in global markets and our future success will depend in part on our growth in international markets.

*Investing in Product and Software Development.* Our investments in product and software development consist primarily of expenses in the personnel who support our research and development efforts and capital expenditures for new tooling and production line equipment to manufacture and test our products. We believe that our financial performance will significantly depend on the effectiveness of our investments to design and introduce innovative new products and services and enhance existing products and

software. If we fail to innovate and expand our product and software offerings or fail to maintain high standards of quality in our products, our brand, market position and revenue will be adversely affected. Further, if our development efforts are not successful, we will not recover the investments made.

*Investing in Sales and Marketing*. We continue to invest resources in our marketing and brand development efforts. Our marketing investments are focused on increasing brand awareness through advertising, public relations and brand promotion activities. While we maintain a base level of investment throughout the year, significant increases in spending are highly correlated with the holiday shopping season, new product launches, and software introductions. We also invest in capital expenditures on product displays to support our retail channel partners. Sales and marketing investments are typically incurred in advance of any revenue benefits from these activities.

### Competition

We compete against established, audio-focused sellers of speakers and sound systems such as Bose, Samsung (and its subsidiaries Harman International and JBL), Sony, Bang & Olufsen, and Masimo (and its subsidiary Sound United that owns, among others, the Denon, Polk Audio and Bowers and Wilkens brands), and against developers of voice-enabled speakers and other voice-enabled products such as Amazon, Apple, and Google. In some cases, our competitors are also our partners in our product development and resale and distribution channels. Many of our competitors have significant market share, diversified product lines, well-established supply and distribution systems, strong worldwide brand recognition, loyal customer bases and significant financial, marketing, research, development and other resources.

The principal competitive factors in our market include:

- brand awareness and reputation;

- breadth of product offering;

- price;

- sound quality;

- multi-room and wireless capabilities;

- customer support;

- product quality and design;

- ease of setup and use; and

- network of technology and content partners.

We believe we compete favorably with our competitors on the basis of the factors described above.

### Intellectual Property

Intellectual property is an important aspect of our business, and we seek protection for our intellectual property as appropriate. To establish and protect our proprietary rights, we rely upon a combination of patent, copyright, trade secret and trademark laws, and contractual restrictions such as confidentiality agreements, licenses and intellectual property assignment agreements. We maintain a policy requiring our employees, contractors, consultants and other third parties to enter into confidentiality and proprietary rights agreements to control access to our proprietary information. These laws, procedures and restrictions provide only limited protection, and any of our intellectual property rights may be challenged, invalidated, circumvented, infringed or misappropriated. There is no guarantee that we will prevail on any patent infringement claims against third parties. Furthermore, the laws of certain countries do not protect proprietary rights to the same extent as the laws of the United States, and we therefore may be unable to protect our proprietary technology in certain jurisdictions.

Sonos is a leading innovator that holds a comprehensive portfolio of intellectual property rights, including patents, trade secrets, copyrights, trademarks, service marks, trade dress and other forms of intellectual property rights in the U.S. and various other countries. Sonos' patent portfolio, in particular, has been recognized as one of the strongest in consumer electronics. Our patents and patent applications relate to hardware, software, networking, accessories, and services, and include technology for the ability to stream content for playback wirelessly to one or more rooms in the home or business. It also includes technology for enabling a wide range of experiences and audio technologies that are important to the Sonos platform and enjoyed by millions of people every day across the globe. Experiences covered by our patents include simple system setup, seamless integration with other platforms and services, balanced

sound, voice interactions and control, as well as experiences unique to home theater to name a few. We regularly file patent applications in the U.S. and throughout the world to protect our innovations and technology that come from areas such as research, development, and design. Our patents expire at various times and no single patent or other intellectual property right is solely responsible for protecting Sonos' products and services. Sonos continues to invest in protecting its expanding innovation through ongoing development of its patent portfolio. In addition to its own intellectual property, Sonos also enters into licensing agreements with our third-party partners to provide access to a broad range of technology, services, and content for our customers.

In January 2020, the Company filed a complaint with the U.S. International Trade Commission ("ITC") against Alphabet Inc. ("Alphabet") and Google LLC ("Google") and a counterpart lawsuit in the U.S. District Court for the Central District of California against Google alleging infringement of five Sonos patents. In September 2020, the Company filed another lawsuit against Google alleging infringement of an additional four Sonos patents. This lawsuit is currently pending in U.S. District Court for the Northern District of California. In December 2020, the Company filed another lawsuit against Google Germany Gmbh and Google Ireland Ltd. in the regional court of Hamburg, Germany, alleging infringement of a Sonos patent. Starting in 2020, Google has responded by filing patent infringement lawsuits against the Company in the ITC, U.S. District Court for the Northern District of California, Canada, Germany, France, and the Netherlands, and patent infringement lawsuits against the Company's subsidiary, Sonos Europe B.V., in Germany, France, and the Netherlands. See Note 13. Commitments and Contingencies of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for further details.

While we believe that our active patents and patent applications are an important aspect of our business, we also rely heavily on the innovative skills, technical competence and marketing abilities of our personnel.

### Human Capital

Sonos is dedicated to creating the ultimate listening experience for our customers, and our employees are critical to achieving this mission. In order to continue to design innovative experiences and products, and compete and succeed in our highly competitive and rapidly evolving market, it is crucial that we continue to attract and retain experienced employees. As part of these efforts, we strive to offer a competitive compensation and benefits program, foster a community where everyone feels included and empowered to do their best work, and give employees the opportunity to give back to their communities and make a social impact.

As of October 1, 2022, we had 1,844 full-time employees. Of our full-time employees, 1,312 were in the United States and 532 were in our international locations. Other than our employees in France and the Netherlands, none of our employees are represented by a labor union or covered by a collective bargaining agreement.

### Compensation and Benefits Program. 
Our compensation program is designed to attract and reward talented individuals who possess the skills necessary to support our business objectives, assist in the achievement of our strategic goals and create long-term value for our stockholders. We provide employees with compensation packages that include base salary, annual incentive bonuses, and long-term equity awards ("RSUs") tied to the value of our stock price. We believe that a compensation program with both short-term and long-term awards provides fair and competitive compensation and aligns employee and stockholder interests, including by incentivizing business and individual performance (pay for performance), motivating based on long-term company performance and integrating compensation with our business plans. In addition to cash and equity compensation, we also offer employees benefits such as life and health (medical, dental & vision) insurance, paid time off, paid parental leave, and a 401(k) plan.

### Diversity, Equity and Inclusion. 
At Sonos, we believe that music and sound is universal and connects us as people, and we strive to build products that move everyone. To do this, we are committed to building an equitable and inclusive environment where diverse teams build more creative solutions, drive better results, innovate and bring their authentic selves to work each day. We monitor the representation of women and racially or ethnically diverse team members at different levels throughout the company and disclose the composition of our team in our annual Listen Better Report, which is our corporate social responsibility report available on the Investor Relations section of our website.

As an organization, we've committed to annual diversity, equity and inclusion goals to increase representation at all levels and foster greater connection and belonging at Sonos. To accomplish these goals, we're implementing initiatives to help us reach these goals, including:

- holding management directly accountable in creating a more diverse and inclusive environment by designating 10% of the annual cash incentive plan for management for diversity, equity and inclusion goals;

- examining our hiring practices to ensure we source the best talent from the widest available pool;

- intentional listening to our employee resource groups who provide critical insight into the experience of underrepresented groups at Sonos and across our industry;

- frequent review of our policies and practices to ensure an equitable experience for all;

- coupling our hiring goals with a focus on retention, employee engagement, and inclusive leadership;

- implementing mentoring and allyship programs that connect employees to key support systems across Sonos; and

- deepening our organizational acumen around allyship, unconscious bias, and equity.

*Community Involvement*. We aim to enhance the communities where we live and work, and believe that this commitment helps in our efforts to attract and retain employees. We offer employees the opportunity to give back both through our Sonos Soundwaves program, which partners with leading non-profits, and our Sonos Cares program, which offers employees paid volunteer time each year.

### Corporate Information

We incorporated in Delaware in August 2002 as Rincon Audio, Inc. and we changed our name to Sonos, Inc. in May 2004. We completed the initial public offering ("IPO") of our common stock in August 2018 and our common stock is listed on The Nasdaq Global Select Market under the symbol of "SONO." Our principal executive offices are located at 614 Chapala Street, Santa Barbara, California 93101, and our telephone number is (805) 965-3001.

Our website address is www.sonos.com. The information on, or that can be accessed through, our website is not incorporated by reference into this Annual Report on Form 10-K. Investors should not rely on any such information in deciding whether to purchase our common stock.

Sonos, the Sonos logo, Sonos One, Sonos One SL, Sonos Five, Sonos Beam, Play:1, Play:5, Playbase, Playbar, Sonos Arc, Amp, Sub, Sonos Move, Port, Boost, Ray, Sonos Ray, Sonos Roam, Sonos Voice Control, Trueplay, Sub Mini, Sonos Sub Mini, Mayht and our other registered or common law trademarks, tradenames or service marks appearing in this Annual Report on Form 10-K are our property. Solely for convenience, our trademarks, tradenames, and service marks referred to in this Annual Report on Form 10-K appear without the ®, ™ and SM symbols, but those references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights to these trademarks, tradenames and service marks. This Annual Report on Form 10-K contains additional trademarks, tradenames and service marks of other companies that are the property of their respective owners.

### Available Information

We make available, free of charge through our website, our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and amendments to those reports, filed or furnished pursuant to Sections 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, as soon as reasonably practicable after they have been electronically filed with, or furnished to, the SEC.

The SEC maintains an internet site (www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC.

## Item 1A. Risk Factors

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, as well as the other information in this Annual Report on Form 10-K, including our consolidated financial statements and the related notes, and the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," before making an investment decision. The occurrence of any of the events or developments described below could materially and adversely affect our business, financial condition, results of operations and growth prospects. In such an event, the market price of our common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not currently known to us or that we currently believe are not material may also impair our business, financial condition, results of operations and growth prospects.*

### Economic, Industry and Strategic Risk

**Our business has been, and could in the future be, adversely affected by the ongoing COVID-19 pandemic.**

The COVID-19 pandemic and related mitigation measures have adversely affected our business and operating results and may continue to impact us in the future. During the pandemic, consistent with its effects industry-wide, our supply chain has experienced disruptions, including lockdowns, port congestion, component supply-related challenges, and inflationary pressures, which may continue in the future. Supply chain challenges have increased our component and shipping and logistics costs, caused delayed product availability, and impacted our ability to forecast and meet product demand, procure certain components, and effectively manage our inventory levels, all of which has and could in the future, materially and adversely affected our business, results of operations, financial position, and cash flows. Although some pandemic-related impacts on our business have abated, they may emerge or intensify again given the uncertain course of the pandemic and its effects.

COVID-19 has also negatively impacted the global economy to date, including by contributing to significant global economic uncertainty. The duration and severity of the economic impacts of COVID-19 are unknown and may be prolonged and extend beyond the easing of mitigation measures, the widespread availability of vaccines and treatments or any eventual containment of the spread of COVID-19. In particular, any recession, depression, inflationary pressures, or other sustained adverse market event resulting from, among other causes, COVID-19 may result in high levels of unemployment and associated loss of personal income, decreased consumer confidence, and lower discretionary spending, which could materially and adversely affect our business, results of operations, financial position, and cash flows.

The extent of the impact of the COVID-19 pandemic on our business and operating results is uncertain and difficult to predict and will depend on factors outside of our control, including efforts to contain the spread of COVID-19, any resurgence of infections or any variants that may emerge and the impact of the pandemic on the global economy. Moreover, we have experienced increased demand for our products during much of the COVID-19 pandemic and we cannot predict how or whether the easing of COVID-19 mitigation measures will impact demand for our products or shift consumer spending habits in general. During the second half of fiscal 2022, we saw a softening of consumer demand in part as a result of a shift in consumer spending from purchasing goods to purchasing services and it is uncertain whether such shift will continue.

### *The home audio and consumer electronics industries are highly competitive.*

The markets in which we operate are extremely competitive and rapidly evolving, and we expect that competition will intensify in the future. Our competition includes established, well-known sellers of speakers and sound systems such as Bose, Samsung (and its subsidiaries Harman International and JBL), Sony, Bang & Olufsen and Masimo (and its subsidiary Sound United that owns, among others, the Denon, Polk Audio and Bowers and Wilkens brands), and developers of voice-enabled speakers and systems such as Amazon, Apple and Google. We could also face competition from new market entrants, some of whom might be current partners of ours.

In order to deliver products that appeal to changing and increasingly diverse consumer preferences and to overcome the fact that a relatively high percentage of consumers may already own or use products that they perceive to be similar to those that we offer, we must develop superior technology, anticipate increasingly diverse consumer tastes and rapidly develop attractive products with competitive selling prices. In addition, many of our current and potential partners have business objectives that may drive them to sell their speaker products at a significant discount compared to ours. Amazon and Google, for example, both currently offer their speaker products at significantly lower prices than our speaker products. Many of these partners may subsidize these prices and seek to monetize their customers through the sale of additional services rather than the speakers themselves. Even if we are able to efficiently develop and offer innovative products at competitive selling prices, our operating results and financial condition may be adversely impacted if we are unable to effectively anticipate and counter the ongoing price erosion that frequently affects consumer products or if the average selling prices of our products decrease faster than we are able to reduce our manufacturing costs.

Most of our competitors have greater financial, technical and marketing resources available to them than those available to us, and, as a result, they may develop competing products that cause the demand for our products to decline. Our competitors have established, or may establish, cooperative relationships among themselves or with third parties to increase the abilities of their products to address the needs of our prospective customers, and other companies may enter our markets by entering into strategic relationships with our competitors. A failure to effectively anticipate and respond to these established and new competitors may adversely impact our business and operating results.

Further, our current and prospective competitors may consolidate with each other or acquire companies that will allow them to develop products that better compete with our products, which would intensify the competition that we face and may also disrupt or lead to termination of our distribution, technology and content partnerships. For example, if one of our competitors were to acquire one of our content partners, the consolidated company may decide to disable the streaming functionality of its service with our products.

If we are unable to compete with these consolidated companies or if consolidation in the market disrupts our partnerships or reduces the number of companies we partner with, our business would be adversely affected.

***To remain competitive and stimulate consumer demand, we must successfully manage frequent new product introductions and transitions.***

Due to the quickly evolving and highly competitive nature of the home audio and broader consumer electronics industry, we must frequently introduce new products, enhance existing products and effectively stimulate customer demand for new and upgraded products in both mature and developing markets. For example, in June 2022 we introduced Ray, our compact soundbar and in September 2022 we introduced Sub Mini, the smaller of our two wireless subwoofer offerings. The successful introduction of these products and any new products depends on a number of factors, such as the timely completion of development efforts to correspond with limited windows for market introduction. We face significant challenges in managing the risks associated with new product introductions and production ramp-up issues, including accurately forecasting initial consumer demand, effectively managing any third-party strategic alliances or collaborative partnerships related to new product development or commercialization, as well as the risk that new products may have quality or other defects in the early stages of introduction or may not achieve the market acceptance necessary to generate sufficient revenue. New and upgraded products can also affect the sales and profitability of existing products. Accordingly, if we cannot properly manage the introduction of new products, our operating results and financial condition may be adversely impacted, particularly if the cadence of new product introductions increases as we expect.

***Although we have achieved profitability, our business is impacted by a number of factors, including those outside of our control like the global economy, and we may not be able to sustain or increase our profitability and expect to incur increased operating costs in the future.***

Although we achieved profitability starting in the fiscal year ended October 2, 2021, we may not be able to maintain or grow our profitability. We have experienced net losses in the past and may incur net losses in the future. We had an accumulated deficit of $2.5 million as of October 1, 2022.

We expect our operating expenses to increase in the future as we expand our operations and execute on our product roadmap and strategy. We plan to make significant future expenditures related to the expansion of our business and our product offerings, including investments in:

- research and development to continue to introduce innovative new products, enhance existing products and improve our customers' listening experience;

- sales and marketing to expand our global brand awareness, promote new products, increase our customer base and expand sales within our existing customer base; and

- legal, accounting, information technology and other administrative expenses to sustain our operations as a public company.

In order to maintain or grow our profitability, we need to continue to increase our revenue and we cannot assure you that we will be able to do so, particularly during times of global economic, social and political uncertainty. For example, demand for our products was impacted in the second half of fiscal 2022, and in the future may be impacted, by uncertainty in the economic environment including the potential for an extended global recession, continued inflationary pressures, or, in certain markets, foreign currency exchange rate fluctuations, including those resulting from the Russian invasion of Ukraine. Our ability to achieve revenue growth will depend in part on our ability to execute on our product roadmap and our strategy and to determine the market opportunity for new products. New product introductions may adversely impact our gross margin in the near to intermediate term due to the frequency of these product introductions and their anticipated increased share of our overall product volume. The expansion of our business and product offerings also places a continuous and significant strain on our management, operational and financial resources. In the event that we are unable to grow our revenue, or in the event that revenue grows more slowly than we expect, our operating results could be adversely affected, and our stock price could be harmed.

***Our investments in research and development may not yield the results expected.***

Our business operates in intensely competitive markets characterized by changing consumer preferences and rapid technological innovation. Due to advanced technological innovation and the relative ease of technology imitation, new products tend to become standardized more rapidly, leading to more intense competition and ongoing price erosion. In order to strengthen the competitiveness of our products in this environment, we continue to invest heavily in research and development. However, these investments may not yield the innovation or the results expected on a timely basis, or our competitors may surpass us in technological innovation, hindering our ability to timely commercialize new and competitive products that meet the needs and demands of the market, which consequently may adversely impact our operating results as well as our reputation.

***If we are not successful in continuing to expand our direct-to-consumer sales channel by driving consumer traffic and consumer purchases through our website, our business and results of operations could be harmed.***

15

We have invested significant resources in our direct-to-consumer sales channel, primarily through our website, and our future growth relies, in part, on our continued ability to attract consumers to this channel, which has and will continue to require significant expenditures in marketing, software development and infrastructure. If we are unable to continue to drive traffic to, and increase sales through, our website, our business and results of operations could be harmed. The continued success of direct-to-consumer sales through our website is subject to risks associated with e-commerce, many of which are outside of our control. Our inability to adequately respond to these risks and uncertainties or to successfully maintain and expand our direct-to-consumer business via our website may have an adverse impact on our results of operations.

### *If we are unable to accurately anticipate market demand for our products, we may have difficulty managing our production and inventory and our operating results could be harmed.*

We must forecast production and inventory needs in advance with our suppliers and manufacturers; our ability to do so accurately could be affected by many factors, including changes in customer demand and spending patterns, new product introductions, sales promotions, channel inventory levels, uncertainties related to the COVID-19 pandemic, Russia's invasion of Ukraine, and general economic conditions, including inflation and the potential for an extended global recession. If demand does not meet our forecast, excess product inventory could force us to write-down or write-off inventory or to sell the excess inventory at discounted prices, which could cause our gross margin to suffer and impair the strength of our brand. In addition, excess inventory may result in reduced working capital, which could adversely affect our ability to invest in other important areas of our business such as marketing and product development. If our channel partners have excess inventory of our products, they may decrease their purchases of our products in subsequent periods. If demand exceeds our forecast, as it did in parts of fiscal 2022, and we do not have sufficient inventory to meet this demand, we may experience decreased revenue or customer dissatisfaction as a result of any continued inventory shortages or we may have to rapidly increase production which may result in reduced manufacturing quality and customer satisfaction as well as higher supply and manufacturing costs that would lower our gross margin. Any of these scenarios could adversely impact our operating results and financial condition.

### *Our efforts to expand beyond our core product offerings and offer products with wider applications may not succeed and could adversely impact our business.*

We may seek to expand beyond our core sound systems and develop products that have wider applications outside of home sound, such as commercial or office. Developing these products would require us to devote substantial additional resources, and our ability to succeed in developing such products to address such markets is unproven. It is likely that we would need to hire additional personnel, partner with new third parties and incur considerable research and development expenses to pursue such an expansion successfully. We may have less familiarity with consumer preferences for these products and less product or category knowledge, and we could encounter difficulties in attracting new customers due to lower levels of consumer familiarity with our brand. As a result, we may not be successful in future efforts to achieve profitability from new markets, services or new types of products, and our ability to generate revenue from our existing products may suffer. If any such expansion does not enhance our ability to maintain or grow our revenue or recover any associated development costs, our operating results could be adversely affected.

### *We experience seasonal demand for our products, and if our sales in high-demand periods are below our forecasts, our overall financial condition and operating results could be adversely affected.*

Given the seasonal nature of our sales, accurate forecasting is critical to our business. Our fiscal year ends on the Saturday closest to September 30, the holiday shopping season occurs in the first quarter of our fiscal year and the typically slower summer months occur in the fourth quarter of our fiscal year. Historically, our revenue has been significantly higher in our first fiscal quarter due to increased consumer spending patterns during the holiday season. Any shortfalls in expected first fiscal quarter revenue, due to macroeconomic conditions like the potential for an extended global recession, product release patterns, a decline in the effectiveness of our promotional activities, supply chain disruptions, inflationary pressures or for any other reason, could cause our annual operating results to suffer

significantly. In addition, if we fail to accurately forecast customer demand for the holiday season, we may experience excess inventory levels or a shortage of products available for sale, which could further harm our financial condition and operating results.

***The success of our business depends in part on the continued growth of the voice-enabled speaker market and our ability to establish and maintain market share.***

We have increasingly focused our product roadmap on voice-enabled speakers. We introduced our first voice-enabled speaker, Sonos One, in October 2017, our first voice-enabled home theater speaker, Sonos Beam, in July 2018, our first Bluetooth-enabled portable speaker with voice control, Sonos Move, in September 2019, and our voice-enabled premium home theater speaker, Sonos Arc, in June 2020. In April 2021, we introduced Roam, our portable smart speaker. In May 2022, we introduced Sonos Voice Control, our proprietary voice assistant, on all of our voice-enabled speakers. If the voice-enabled speaker markets do not continue to grow or grow in unpredictable ways, our revenue may fall short of expectations and our operating results may be harmed, particularly since we incur substantial costs to introduce new products in advance of anticipated sales. Additionally, even if the market for voice-enabled speakers does continue to grow, we may not be successful in developing and selling speakers that appeal to consumers or gain sufficient market acceptance. To succeed in this market, we will need to design, produce and sell innovative and compelling products and partner with other businesses that enable us to capitalize on new technologies, some of which have developed or may develop and sell voice-enabled speaker products of their own as further described herein.

***If market demand for streaming music does not grow as anticipated or the availability and quality of streaming services does not continue to increase, our business could be adversely affected.***

A large proportion of our customer base uses our products to listen to content via subscription-based streaming music services. Accordingly, we believe our future revenue growth will depend in significant part on the continued expansion of the market for streaming music. The success of the streaming music market depends on the quality, reliability and adoption of streaming technology and on the continued success of streaming music services such as Apple Music, Spotify, Deezer, and Pandora. If the streaming music market in general fails to expand or if the streaming services that we partner with are not successful, demand for our products may suffer and our operating results may be adversely affected.

***If we are unable to protect our intellectual property, the value of our brand and other intangible assets may be diminished, and our business may be adversely affected.***

We rely and expect to continue to rely on a combination of confidentiality and license agreements with our employees, consultants and third parties with whom we have relationships, as well as patent, trademark, copyright and trade secret protection laws, to protect our proprietary rights. In the United States and certain other countries, we have filed various applications for certain aspects of our intellectual property, most notably patents. However, third parties may knowingly or unknowingly infringe our proprietary rights or challenge our proprietary rights, pending and future patent and trademark applications may not be approved, and we may not be able to prevent infringement without incurring substantial expense. Such infringement could have a material adverse effect on our brand, business, financial condition and results of operations. We have initiated legal proceedings to protect our intellectual property rights, and we may file additional actions in the future. For example, in January 2020 we filed a complaint with the ITC against Alphabet and Google and a counterpart lawsuit in the U.S. District Court for the Central District of California against Google alleging infringement of five Sonos patents, and in September 2020 we filed another lawsuit against Google alleging infringement of an additional four Sonos patents. The cost of defending our intellectual property has been and may in the future be substantial, and there is no assurance we will be successful. Our business could be adversely affected as a result of any such actions, or a finding that any patents-in-suit are invalid or unenforceable. These actions have led and may in the future lead to additional counterclaims or actions against us, which are expensive to defend against and for which there can be no assurance of a favorable outcome. For example, Google has responded to our legal proceedings by filing multiple patent infringement lawsuits against us in the U.S. District Court for the Northern District of California, cases against us in the ITC and patent infringement lawsuits against us and our subsidiary Sonos Europe B.V. in various foreign jurisdictions. Further, parties we bring legal action against could retaliate through non-litigious means, which could harm our ability to compete against such parties or to enter new markets.

In addition, the regulations of certain foreign countries do not protect our intellectual property rights to the same extent as the laws of the United States. As our brand grows, we may discover unauthorized products in the marketplace that are counterfeit reproductions of our products. If we are unsuccessful in pursuing producers or sellers of counterfeit products, continued sales of these products could adversely impact our brand, business, financial condition and results of operations.

***We currently are, and may continue to be, subject to intellectual property rights claims and other litigation which are expensive to support, and if resolved adversely, could have a significant impact on us and our stockholders.***

Companies in the consumer electronics industries own large numbers of patents, copyrights, trademarks, domain names and trade secrets, and frequently enter into litigation based on allegations of infringement, misappropriation or other violations of intellectual property or other rights. As we gain an increasingly high profile and face more intense competition in our markets, and as we introduce more products and services, including through acquisitions and through partners, the possibility of intellectual property rights claims against us grows. Our technologies may not be able to withstand any third-party claims or rights against their use, and we may be subject to litigation and disputes. The costs of supporting such litigation and disputes are considerable, and there can be no assurance that a favorable outcome would be obtained. We may be required to settle such litigation and disputes, or we may be subject to an unfavorable judgment in a trial, and the terms of a settlement or judgment against us may be unfavorable and require us to cease some or all our operations, limit our ability to use certain technologies, pay substantial amounts to the other party or issue additional shares of our capital stock to the other party, which would dilute our existing stockholders. Further, if we are found to have engaged in practices that are in violation of a third party's rights, we may have to negotiate a license to continue such practices, which may not be available on reasonable or favorable terms, or may have to develop alternative, non-infringing technology or discontinue the practices altogether. In the event that these practices relate to an acquisition or a partner, we may not be successful in exercising any indemnification rights available to us under our agreements or in recovering damages in the event that we are successful. Each of these efforts could require significant effort and expense and ultimately may not be successful.

***If we are not able to maintain and enhance the value and reputation of our brand, or if our reputation is otherwise harmed, our business and operating results could be adversely affected.***

Our continued success depends on our reputation for providing high-quality products and consumer experiences, and the "Sonos" name is critical to preserving and expanding our business. Our brand and reputation are dependent on a number of factors, including our marketing efforts, product quality, and trademark protection efforts, each of which requires significant expenditures.

The value of our brand could also be severely damaged by isolated incidents, which may be outside of our control. For example, in the United States, we rely on custom installers of home audio systems for a significant portion of our sales but maintain no control over the quality of their work and thus could suffer damage to our brand or business to the extent such installations are unsatisfactory or defective. Any damage to our brand or reputation may adversely affect our business, financial condition and operating results.

***Conflicts with our channel and distribution partners could harm our business and operating results.***

Several of our existing products compete, and products that we may offer in the future could compete, with the product offerings of some of our significant channel and distribution partners who have greater financial and technical resources than we do. To the extent products offered by our partners compete with our products, they may choose to market and promote their own products over ours or could end our partnerships and cease selling or promoting our products entirely. Any reduction in our ability to place and promote our products, or increased competition for available shelf or website placement, especially during peak retail periods, such as the holiday shopping season, would require us to increase our marketing expenditures and to seek other distribution channels to promote our products. If we are unable to effectively sell our products due to conflicts with our distribution partners or the inability to find alternative distribution channels, our business would be harmed.

The expansion of our direct-to-consumer channel could alienate some of our channel partners and cause a reduction in product sales from these partners. Channel partners may perceive themselves to be at a disadvantage based on the direct-to-consumer sales offered through our website. Due to these and other factors, conflicts in our sales channels could arise and cause channel partners to divert resources away from the promotion and sale of our products. Further, to the extent we use our mobile app to increase traffic to our website and increase direct-to-consumer sales, we will rely on application marketplaces such as the Apple App Store and Google Play to drive downloads of our mobile app. Apple and Google, both of which sell products that compete with ours, may choose to use their marketplaces to promote their competing products over our products or may make access to our mobile app more difficult. Any of these situations could adversely impact our business and results of operations.

18

***Competition with our technology partners could harm our business and operating results.***

We are dependent on a number of technology partners for the development of our products, some of which have developed or may develop and sell products that compete with our products. These technology partners may cease doing business with us or disable the technology they provide our products for a variety of reasons, including to promote their products over our own. For example, we are currently manufacturing and developing voice-enabled speaker systems that are enhanced with the technology of our partners, including those who sell competing products. We introduced Sonos One, Sonos Beam, Sonos Move, Sonos Roam, and Sonos Arc, which feature built in voice-enabled speakers powered by Amazon's Alexa or Google's Google Assistant technology. One or more of our partners could disable their integration, terminate or not renew their distribution agreement with us, or begin charging us for their integration with our voice-enabled products. For example, our current agreement with Amazon allows Amazon to disable the Alexa integration in our voice-enabled products with limited notice. We cannot assure you that we will be successful in establishing partnerships with other companies that have developed voice-control enablement technology or in developing such technology on our own.

If one or more of our technology partners do not maintain their integration with our products or seek to charge us for this integration, or if we have not developed alternative partnerships for similar technology or developed such technology on our own, our sales may decline, our reputation may be harmed and our business and operating results may suffer.

***Competition with our content partners could cause these partners to cease to allow their content to be streamed on our products, which could lower product demand.***

Demand for our products depends in large part on the availability of streaming third-party content that appeals to our existing and prospective customers. Compatibility with streaming music services, podcast platforms and other content provided by our content partners is a key feature of our products. To date, all our arrangements have been entered into on a royalty-free basis. Some of these content partners compete with us already, and others may in the future produce and sell speakers along with their streaming services. Additionally, other content partners may form stronger alliances with our competitors in the home audio market. Any of our content partners may cease to allow their content to be streamed on our products for a variety of reasons, including as a result of our offering competing services, to promote other partnerships or their products over our products, or to seek to charge us for this streaming. If this were to happen, demand for our products could decrease, our costs could increase and our operating results could be harmed.

## Operational Risks

***We are dependent on a limited number of contract manufacturers to manufacture our products and our efforts to diversify manufacturers may not be successful.***

We depend on a limited number of contract manufacturers to manufacture our products, with our key manufacturer, Inventec Appliances Corporation, manufacturing a majority of our products. We have also historically manufactured our products in China. In fiscal 2020, we began our efforts to diversify our supply chain through the addition of new contract manufacturers and geographic diversification, starting with Malaysia and extending such efforts into Vietnam in fiscal 2022. Our reliance on a limited number of contract manufacturers increases the risk that, in the event that any or all of such manufacturers experience an interruption in their operations, fail to perform their obligation in a timely manner or terminate agreements with us, we would not be able to maintain our production capacity without incurring material additional costs and substantial delays or we may be fully prevented from selling our products. Any material disruption in our relationship with our manufacturers would harm our ability to compete effectively and satisfy demand for our products and could adversely impact our revenue, gross margin and operating results.

In addition, there is no guarantee that our efforts to diversify manufacturers will be successful. Identifying and onboarding a new manufacturer takes a significant amount of time and resources. If we do not successfully coordinate the timely manufacturing and distribution of our products by such manufacturers, if such manufacturers are unable to successfully and timely process our orders or if we do not receive timely and accurate information from such manufacturers, we may have an insufficient supply of products to meet customer demand, we may lose sales, we may experience a build-up in inventory, we may incur additional costs, and our financial performance and reporting may be adversely affected. By adding manufacturers in other countries, we may experience increased transportation costs, fuel costs, labor unrest, impact of natural disasters and other adverse effects on our ability, timing and cost of delivering products, which may increase our inventory, decrease our margins, adversely affect our relationships with distributors and other customers and otherwise adversely affect our operating results and financial condition. In addition, any partial or full government-mandated shutdown resulting from COVID-19 may impact or delay our efforts to diversify our supply chain or may cause supply chain disruptions notwithstanding any supply chain diversification efforts.

***We depend on a limited number of third-party components suppliers and logistics providers, and many of our components have long lead times, and our business and operating results could be adversely affected by shortages, disruptions and related challenges.***

We are dependent on a limited number of suppliers for various key components used in our products, and we may from time to time have sole source suppliers. The cost, quality and availability of these components are essential to the successful production and sale of our products. We are subject to the risk of industry-wide shortages, price fluctuations and long lead times in the supply of these components and other materials, which risk has been and may continue to be heightened by the impact of COVID-19. If the supply of these components is delayed or constrained, or if one or more of our main suppliers were to go out of business, alternative sources or suppliers may not be available on acceptable terms or at all. In the event that any of our suppliers were to discontinue production of our key product components, developing alternate sources of supply for these components would be time consuming, difficult and costly. In the event we are unable to obtain components in sufficient quantities on a timely basis and on commercially reasonable terms, our ability to sell our products in order to meet market demand would be affected and could materially and adversely affect our brand, image, business prospects and operating results.

In addition, the longer lead time for many of our components presents challenges in our efforts to manage component inventory, as we procure such components based on our then current forecast of demand for our products. During the pandemic, we have also faced the challenge of managing component inventory during periods of fluctuating availability. In particular, many components with longer lead times have experienced shortages during the pandemic and, as a result, during fiscal 2022 we increased our investments in, and purchase commitments for, certain components possible to secure inventory in anticipation of shortages and strong demand, and we may need to do so again in the future. In the event that actual demand for our products differs from our forecast, we may end up with an excess inventory of components, as we saw in the fourth quarter of fiscal 2022, negatively impacting our working capital.

We also use a small number of logistics providers for substantially all our product delivery to both distributors and retailers. If one of these providers were to experience financial difficulties or disruptions in its business, or be subject to closures or other disruptions as a result of COVID-19, our own operations could be adversely affected. Because substantially all of our products are distributed from and into a small number of locations and by a small number of companies, we are susceptible to both isolated and system-wide interruptions caused by events out of our control, including COVID-19 lockdowns. Any disruption to the operations of our distribution facilities could delay product delivery, harm our reputation among our customers and adversely affect our operating results and financial condition.

We have limited control over the third-party suppliers and logistics providers on which our business depends. If any of these parties fails to perform its obligations to us, we may be unable to deliver our products to customers in a timely manner. Further, we do not have long-term contracts with all of these parties, and there can be no assurance that we will be able to renew our contracts with them on favorable terms or at all. We may be unable to replace an existing supplier or logistics provider or supplement a provider in the event we experience significantly increased demand. Accordingly, a loss or interruption in the service of any key party could adversely impact our revenue, gross margin and operating results.

***We sell our products through a limited number of key channel partners, and the loss of any such channel partner would adversely impact our business.***

We are dependent on our channel partners for a vast majority of our product sales. Best Buy, one of our key channel partners, accounted for 15% of our revenue in fiscal 2022. We compete with other consumer products for placement and promotion of our products in the stores of our channel partners, including in some cases products of our channel partners. Our contracts with our channel partners allow them to exercise significant discretion in the placement and promotion of our products, and such contracts do not contain any long-term volume commitments. If one or several of our channel partners do not effectively market and sell our products, discontinue or reduce the inventory of our products, increase the promotions of or choose to promote competing products over ours, the volume of our products sold to customers could decrease, and our business and results of operations would therefore be significantly harmed. Many of our key channel partners temporarily closed or reduced operations in their retail stores at various times during the pandemic and may continue to do so in the future, which has had, and may continue to have, a material effect on our business and results of operations.

Revenue from our channel partners also depends on a number of factors outside our control and may vary from period to period. One or more of our channel partners may experience serious financial difficulty, particularly in light of the impact of the pandemic on the retail sector, may consolidate with other channel partners or may have limited or ceased operations. Our business and results of operations have been, and may continue to be, significantly harmed by retail store closures by many of our key channel partners. Loss of a key channel partner would require us to identify alternative channel partners or increase our reliance on our direct-to-consumer channel, which may be time-consuming and expensive or we may be unsuccessful in our efforts to do so.

***We have and may in the future discontinue support for older versions of our products, resulting in customer dissatisfaction that could negatively affect our business and operating results.***

We have historically maintained, and we believe our customers may expect, extensive backward compatibility for our older products and the software that supports them, allowing older products to continue to benefit from new software updates. We expect that as we continue to improve and enhance our software platform, this backward compatibility will no longer be practical or cost-effective, and we may decrease or discontinue service for our older products. For example, certain of our legacy products continue to work but no longer receive software updates (other than bug fixes and patches). To the extent we no longer provide extensive backward capability for our products, we may damage our relationship with our existing customers, as well as our reputation, brand loyalty and ability to attract new customers.

For these reasons, any decision to decrease or discontinue backward capability may decrease sales, generate legal claims and adversely affect our business, operating results and financial condition.

***Product quality issues and a higher-than-expected number of warranty claims or returns could harm our business and operating results.***

The products that we sell could contain defects in design or manufacture. Defects could also occur in the products or components that are supplied to us. There can be no assurance we will be able to detect and remedy all defects in the hardware and software we sell, which could result in product recalls, product redesign efforts, loss of revenue, reputational damage and significant warranty and other remediation expenses. Similar to other consumer electronics, our products have a risk of overheating and fire in the course of usage or upon malfunction. Any such defect could result in harm to property or in personal injury. If we determine that a product does not meet product quality standards or may contain a defect, the launch of such product could be delayed until we remedy the quality issue or defect. The costs associated with any protracted delay necessary to remedy a quality issue or defect in a new product could be substantial.

We generally provide a one-year warranty on all our products, except in the European Union ("EU") and select other countries where we provide a minimum two-year warranty, depending on the region, on all our products. The occurrence of any material defects in our products could expose us to liability for warranty claims in excess of our current reserves, and we could incur significant costs to correct any defects, warranty claims or other problems. In addition, our failure to comply with past, present and future laws regulating extended warranties and accidental damage coverage could result in reduced sales of our products, reputational damage, penalties and other sanctions, which could harm our business and financial condition.

***Our international operations are subject to increased business and economic risks that could impact our financial results.***

We have operations outside the United States, and we expect to continue to expand our international presence, especially in Asia. In fiscal 2022, 45% of our revenue was generated outside the United States. This subjects us to a variety of risks inherent in doing business internationally, including:

- fluctuations in currency exchange rates and costs of imposing currency exchange controls;

- political, social and/or economic instability, including related to the ongoing COVID-19 pandemic, Russia's invasion of Ukraine and the United Kingdom's withdrawal from the EU, commonly known as "Brexit";

- tariffs, trade barriers and duties;

- protectionist laws and business practices that favor local businesses in some countries;

- higher levels of credit risk and payment fraud and longer payment cycles associated with, and increased difficulty of payment collections from certain international customers;

- burdens and risks of complying with a number and variety of foreign laws and regulations, including the Foreign Corrupt Practices Act;

- laws and regulations may change from time to time unexpectedly and may be unpredictably enforced;

- potential negative consequences from changes in or interpretations of U.S. and foreign tax laws;

- the cost of developing connected products for countries where Wi-Fi technology has been passed over in favor of more advanced cellular data networks;

- reduced protection for intellectual property rights in some countries;

- difficulties and associated costs in managing and staffing multiple international locations; and

- delays from customs brokers or government agencies.

If we are unable to manage the complexity of our global operations successfully, or if the risks above become substantial for us, our financial performance and operating results could suffer. Further, any measures that we may implement to reduce risks of our international operations may not be effective, may increase our expenses and may require significant management time and effort. Entry into new international markets requires considerable management time and financial resources related to market, personnel and facilities development before any significant revenue is generated. As a result, initial operations in a new market may operate at low margins or may be unprofitable.

We have significant operations in China, where many of the risks listed above are particularly acute. China experiences high turnover of direct labor due to the intensely competitive and fluid market for labor, and if our labor turnover rates are higher than we expect in that region, or we otherwise fail to adequately manage our labor needs, then our business and results of operations could be adversely affected.

***We will need to improve our financial and operational systems to manage our growth effectively and support our increasingly complex business arrangements, and an inability to do so could harm our business and results of operations.***

To manage our growth and our increasingly complex business operations, especially as we move into new markets internationally, we will need to upgrade our operational and financial systems and procedures, which requires management time and may result in significant additional expense. In particular, we replaced our legacy ERP system in order to accommodate our expanding operations. We cannot be certain that we will institute, in a timely or efficient manner or at all, the improvements to our managerial, operational and financial systems and procedures necessary to support our anticipated increased levels of operations. Problems associated with, or disruptions resulting from, any improvement or expansion of our operational and financial systems could adversely affect our relationships with our suppliers, manufacturers, resellers and customers, inhibit our ability to expand or take advantage of market opportunities, cause harm to our reputation, result in errors in our financial and other reporting, and affect our ability to maintain an effective internal control environment and meet our external reporting obligations, any of which could harm our business and operating results and affect our stock price.

***A significant disruption in our websites, servers or information technology systems, or those of our third-party partners, could impair our customers' listening experience or otherwise adversely affect our customers, damage our reputation or harm our business.***

As a consumer electronics company, our website and mobile app are important presentations of our business, identity and brand and an important means of interacting with, and providing information to, consumers of our products. We depend on our servers and centralized information technology systems, and those of third parties, for product functionality, to manage operations and to store critical information and intellectual property. Accordingly, we allocate significant resources to maintaining our information technology systems and deploying network security, data encryption, training and other measures to protect against unauthorized access or misuse. Nevertheless, our website and information technology systems, and those of the third parties we rely on, are susceptible to damage, viruses, disruptions or shutdowns due to foreseeable and unforeseeable events. System failures and disruptions could impede the manufacturing and shipping of products, functionality of our products, transactions processing and financial reporting, and result in the loss of intellectual property or data, require substantial repair costs and damage our reputation, competitive position, financial condition and results of operations.

For example, we use Amazon Web Services ("AWS") to maintain the interconnectivity of our mobile app to our servers and those of the streaming services that our customers access to enjoy our products. Because AWS runs its own platform that we access, we are vulnerable to both system-wide and Sonos-specific service outages at AWS. Our access to AWS' infrastructure could be limited by a number of potential causes, including technical failures, natural disasters, fraud or security attacks that we cannot predict or prevent.

Additionally, our products may contain flaws that make them susceptible to unauthorized access or use. For example, we previously discovered a vulnerability in our products that could be exploited when a customer visited a website with malicious content, allowing the customer's local network to be accessed by third parties who could then gain unauthorized access to the customer's playlists and other data and limited control of the customer's devices. While we devote significant resources to address and eliminate flaws and other vulnerabilities in our products, there can be no assurance that our products will not be compromised in the future. Any such flaws or vulnerabilities, whether actual or merely potential, could harm our reputation, competitive position, financial condition and results of operations.

***Any cybersecurity breaches or our actual or perceived failure to comply with such legal obligations by us, or by our third-party service providers or partners, could harm our business.***

We collect, store, process and use our customers' personally identifiable information and other data, and we rely on third parties that are not directly under our control to do so as well. While we take measures intended to protect the security, integrity and confidentiality of the personal information and other sensitive information we collect, store or transmit, we cannot guarantee that inadvertent or unauthorized use or disclosure will not occur, or that third parties will not gain unauthorized access to this information. There have been a number of recent reported incidents where third parties have used software to access the personal data of their partners' customers for marketing and other purposes.

If we or our third-party service providers were to experience a breach, disruption or failure of systems compromising our customers' data, or if one of our third-party service providers or partners were to access our customers' personal data without our authorization, our brand and reputation could be adversely affected, use of our products could decrease and we could be exposed to a risk of loss, litigation and regulatory proceedings. In addition, a breach could require expending significant additional resources related to the security of information systems and disrupt our operations.

The use of data by our business and our business associates is highly regulated in all our operating countries. Privacy and information security laws and regulations change, and compliance with them may result in cost increases due to, among other things, systems changes and the development of new processes. If we or those with whom we share information fail to comply with laws and regulations, such as the General Data Protection Regulation ("GDPR") and California Consumer Privacy Act ("CCPA"), our reputation could be damaged, possibly resulting in lost business, and we could be subjected to additional legal risk or financial losses as a result of non-compliance. Complying with such laws may also require us to modify our data processing practices and policies and incur substantial expenditures.

***Changes in how network operators manage data that travels across their networks or in net neutrality rules could harm our business.***

We rely upon the ability of consumers to access our service through the internet. If network operators block, restrict or otherwise impair access to our service over their networks, our service and business could be negatively affected. To the extent that network operators implement usage-based pricing, including meaningful bandwidth caps, or otherwise try to monetize access to their networks by data providers, we could incur greater operating expenses. Furthermore, to the extent network operators create tiers of internet access service and either charge us for or prohibit us from being available through these tiers, our business could be negatively impacted.

Further, in the past, internet service providers ("ISPs") have attempted to implement usage-based pricing, bandwidth caps and traffic shaping or throttling. To the extent network operators create tiers of internet access service and charge our customers in direct relation to their consumption of audio content, our ability to attract and retain customers could be impaired, which would harm our business. Net neutrality rules, which were designed to ensure that all online content is treated the same by ISPs and other companies that provide broadband services, were repealed by the Federal Communications Commission ("FCC") effective June 2018. Although the FCC has preempted state jurisdiction over net neutrality, some states have taken executive action directed at reinstating aspects of the FCC's 2015 order. Further, while many countries, including across the EU, have implemented net neutrality rules, in others, the laws may be nascent or non-existent. The absence or repeal of the net neutrality rules could force us to incur greater operating expenses, cause our streaming partners to seek to shift costs to us or result in a decrease in the streaming-based usage of our platform by our customers, any of which would harm our results of operations. In addition, given uncertainty around these rules, including changing interpretations, amendments or repeal, coupled with potentially significant political and economic power of local network operators, we could experience discriminatory or anti-competitive practices that could impede our growth, cause us to incur additional expense or otherwise negatively affect our business.

***Our use of open source software could negatively affect our ability to sell our products and subject us to possible litigation.***

We incorporate open source software into our products, and we may continue to incorporate open source software into our products in the future. Open source software is generally licensed by its authors or other third parties under open source licenses. Some of these licenses contain requirements that we make available source code for modifications or derivative works we create based upon the open source software and that we license such modifications or derivative works under the terms of a particular open source license or other license granting third parties certain rights of further use. Additionally, if a third-party software provider has incorporated open source software into software that we license from such provider, we could be required to disclose any of our source code that incorporates or is a modification of our licensed software. If an author or other third party that distributes open source software that we use or license were to allege that we had not complied with the conditions of the applicable license, we could be required to incur significant legal expenses defending against those allegations and could be subject to significant damages, enjoined from offering or selling our products

that contained the open source software and required to comply with the above conditions. Any of the foregoing could disrupt and harm our business and financial condition.

**Legal and Regulatory Risks**

***Changes in international trade policies, including the imposition of tariffs have had, and may continue to have, an adverse effect on our business, financial condition and results of operations.***

Under the previous administration, the U.S. government has imposed significant new tariffs on China related to the importation of certain product categories, including those under the August 2019 Section 301 Tariff Action (List 4A) ("Section 301 tariffs"). These Section 301 tariffs have increased our cost of revenue and adversely impacted our results of operations. We were able to obtain an exemption from the Section 301 tariffs for certain of our products for a period of time during fiscal 2020 and, for our core speaker products, through the first quarter of fiscal 2021. In March 2022, we obtained an additional exclusion exemption for our core speaker products for the period from October 12, 2021 to December 31, 2022. To date, we have been able to obtain certain refunds on tariffs paid during the fiscal 2020 and fiscal 2021 exemption periods and continue to see outstanding refund requests and corresponding refunds processed for such periods.

In the event that future tariffs are imposed on imports of our products, we do not successfully obtain the remaining refunds to which we are currently entitled, we are not successful in any future exemption requests, the amounts of existing tariffs are increased, our efforts to diversify our supply chain outside of China are delayed or otherwise not successful, or China or other countries take retaliatory trade measures in response to existing or future tariffs, our business may be impacted and we may be required to raise prices or make changes to our operations, any of which could materially harm our revenue or operating results. In response to future new tariffs, we may intensify our efforts to diversify outside of China, resulting in significant costs and disruption to our operations as we would need to pursue the time-consuming processes of recreating new supply chains, identifying substitute components and establishing new manufacturing locations.

***We must comply with extensive regulatory requirements, and the cost of such compliance, and any failure to comply, may adversely affect our business, financial condition and results of operations.***

In our current business and as we expand into new markets and product categories, we must comply with a wide variety of laws, regulations, standards and other requirements governing, among other things, electrical safety, wireless emissions, health and safety, e-commerce, consumer protection, export and import requirements, hazardous materials usage, product related energy consumption, packaging, recycling and environmental matters. Compliance with these laws, regulations, standards and other requirements may be onerous and expensive, and they may be inconsistent from jurisdiction to jurisdiction or change from time to time, further increasing the cost of compliance and doing business. Our products may require regulatory approvals or satisfaction of other regulatory concerns in the various jurisdictions in which they are manufactured, sold or both. These requirements create procurement and design challenges that require us to incur additional costs identifying suppliers and manufacturers who can obtain and produce compliant materials, parts and products. Failure to comply with such requirements can subject us to liability, additional costs and reputational harm and, in extreme cases, force us to recall products or prevent us from selling our products in certain jurisdictions.

***We may incur costs in complying with changing tax laws in the United States and abroad, which could adversely impact our cash flow, financial condition and results of operations.***

We are a U.S.-based company subject to taxes in multiple U.S. and foreign tax jurisdictions. Our profits, cash flow and effective tax rate could be adversely affected by changes in the tax rules and regulations in the jurisdictions in which we do business, unanticipated changes in statutory tax rates and changes to our global mix of earnings. As we expand our operations, any changes in the U.S. or foreign taxation of such operations may increase our worldwide effective tax rate.

We are also subject to examination by the Internal Revenue Service ("IRS") and other tax authorities, including state revenue agencies and foreign governments. If any tax authority disagrees with any position we have taken, our tax liabilities and operating results may be adversely affected. While we regularly assess the likelihood of favorable or unfavorable outcomes resulting from examinations by the IRS and other tax authorities to determine the adequacy of our provision for income taxes, there can be no assurance that the actual outcome resulting from these examinations will not materially adversely affect our financial condition and results of operations. In addition, the distribution of our products subjects us to numerous complex and often-changing customs regulations. Failure to comply with these systems and regulations could result in the assessment of additional taxes, duties, interest and penalties. There is no assurance that tax and customs authorities agree with our reporting positions and upon audit may assess us additional taxes, duties, interest and penalties. If this occurs and we cannot successfully defend our position, our profitability will be reduced.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

As of October 1, 2022, we had gross U.S. federal net operating loss carryforwards of $105.8 million, of which $74.7 million have an indefinite life and $31.1 million that expire beginning in 2035, and gross state net operating loss carryforwards of $65.5 million, which expire beginning in 2027, as well as $41.7 million in foreign net operating loss carryforwards with an indefinite life. As of October 1, 2022, we also had U.S. federal research and development tax credit carryforwards of $70.0 million, and state research and development tax credit carryforwards of $48.1 million, which will expire beginning in 2025 and 2024, respectively. Because of the change of ownership provisions of Sections 382 and 383 of the Code, use of a portion of the Company's domestic net operating losses and tax credit carryforwards may be limited in future periods depending upon future changes in ownership. Further, a portion of the carryforwards may expire before being applied to reduce future income tax liabilities if sufficient taxable income is not generated in future periods.

## Risks Related to Ownership of Our Common Stock

***The stock price of our common stock has been and may continue to be volatile or may decline regardless of our operating performance.***

The stock price of our common stock has been and may continue to be volatile. The stock price of our common stock may fluctuate significantly in response to numerous factors in addition to the ones described in the preceding Risk Factors, many of which are beyond our control, including:

- overall performance of the equity markets and the economy as a whole;

- changes in the financial projections we or third parties may provide to the public or our failure to meet these projections;

- actual or anticipated changes in our growth rate relative to that of our competitors;

- announcements of new products, or of acquisitions, strategic partnerships, joint ventures or capital-raising activities or commitments, by us or by our competitors;

- additions or departures of key personnel;

- failure of securities analysts to maintain coverage of us, changes in financial estimates by any securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- rumors and market speculation involving us or other companies in our industry;

- sales of shares of our common stock by us or our stockholders particularly sales by our directors, executive officers and significant stockholders, or the perception that these sales could occur; and

- additional stock issuances that result in significant dilution to shareholders.

In addition, the stock market with respect to companies in the technology industry has experienced significant price and volume fluctuations that have affected and continue to affect the stock prices of these companies. In the past, stockholders have instituted securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business and adversely affect our business.

***We do not intend to pay dividends for the foreseeable future.***

We have never declared or paid any cash dividends on our common stock, and we do not intend to pay any cash dividends in the foreseeable future. We anticipate that we will retain all our future earnings for use in the development of our business and for general corporate purposes. Any determination to pay dividends in the future will be at the discretion of the Board. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investments. In addition, the terms of our credit facilities contain restrictions on our ability to declare and pay cash dividends on our capital stock.

*Certain provisions in our corporate charter documents and under Delaware law may prevent or hinder attempts by our stockholders to change our management or to acquire a controlling interest in us.*

There are provisions in our restated certificate of incorporation and restated bylaws that may make it difficult for a third party to acquire, or attempt to acquire, control of our company, even if a change in control were considered favorable by our stockholders. These anti-takeover provisions include:

- a classified Board so that not all members of the Board are elected at one time;

- the ability of the Board to determine the number of directors and fill any vacancies and newly created directorships;

- a requirement that our directors may only be removed for cause;

- a prohibition on cumulative voting for directors;

- the requirement of a super-majority to amend some provisions in our restated certificate of incorporation and restated bylaws;

- authorization of the issuance of "blank check" preferred stock that the Board could use to implement a stockholder rights plan;

- an inability of our stockholders to call special meetings of stockholders; and

- a prohibition on stockholder actions by written consent, thereby requiring that all stockholder actions be taken at a meeting of our stockholders.

In addition, our restated certificate of incorporation provides that the Delaware Court of Chancery is the exclusive forum for any derivative action or proceeding brought on our behalf; any action asserting a breach of fiduciary duty; any action asserting a claim against us arising pursuant to the Delaware General Corporation Law (the "DGCL"), our restated certificate of incorporation or our restated bylaws; or any action asserting a claim against us that is governed by the internal affairs doctrine. Our restated certificate of incorporation also provides that the federal district courts of the United States will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act of 1933, as amended.

Further, Section 203 of the DGCL may discourage, delay or prevent a change in control of our company. Section 203 imposes certain restrictions on mergers, business combinations, and other transactions between us and holders of 15% or more of our common stock.

## General Risk Factors

*The loss of one or more of our key personnel, or our failure to attract, assimilate and retain other highly qualified personnel in the future, could harm our business.*

We depend on the continued services and performance of our key personnel. The loss of key personnel, including key members of management as well as our product development, marketing, sales and technology personnel, could disrupt our operations and have an adverse effect on our ability to grow our business. In addition, the loss of key personnel in our finance and accounting departments could harm our internal controls, financial reporting capability and capacity to forecast and plan for future growth. Further, the market for highly skilled workers and leaders in our industry is extremely competitive. If we do not succeed in attracting, hiring and integrating high-quality personnel or in retaining or motivating existing personnel, we may be unable to grow effectively, and our financial condition may be harmed.

*Natural disasters, geopolitical unrest, war, terrorism, pandemics, public health issues or other catastrophic events could disrupt the supply, delivery or demand of products, which could negatively affect our operations and performance.*

We are subject to the risk of disruption by earthquakes, floods and other natural disasters, fire, power shortages, geopolitical unrest, war, including Russia's invasion of Ukraine, terrorist attacks and other hostile acts, public health issues, epidemics or pandemics, including COVID-19, and other events beyond our control and the control of the third parties on which we depend. Any of these catastrophic events, whether in the United States or abroad, may have a strong negative impact on the global economy, us, our contract manufacturers, our suppliers or customers, and could decrease demand for our products, create delays and inefficiencies in our supply chain and make it difficult or impossible for us to deliver products to our customers. Further, our headquarters are located in Santa Barbara, California, in a seismically active region that is also prone to forest fires. Any catastrophic event that occurred near our headquarters, or near our manufacturing facilities in China or Malaysia, could impose significant damage to our ability to conduct our

business and could require substantial recovery time, which could have an adverse effect on our business, operating results and financial condition.

### *We may need additional capital, and we cannot be certain that additional financing will be available.*

In October 2021, we entered into a credit agreement with JPMorgan Chase Bank, N.A., Bank of America N.A., Morgan Stanley Senior Funding, Inc., and Goldman Sachs Bank USA, which allows us to borrow up to $100.0 million, with a maturity date of October 2026. We may require additional equity or debt financing to fund our operations and capital expenditures. Our ability to obtain financing will depend, among other things, on our development efforts, business plans, operating performance and the condition of the capital markets at the time we seek financing. We cannot assure you that additional financing will be available to us on favorable terms if and when required, or at all.

### *We have and may in the future acquire other businesses or receive offers to be acquired, which could require significant management attention, disrupt our business, dilute stockholder value and adversely affect our operating results.*

As part of our business strategy, we have and may in the future make investments in complementary businesses, products, services or technologies. These acquisitions and other transactions and arrangements involve significant challenges and risks, including not advancing our business strategy, receiving an unsatisfactory return on our investment, difficulty integrating and retaining new employees, business systems, and technology, or distracting management from our other business initiatives. If an arrangement fails to adequately anticipate changing circumstances and interests of a party, it may result in early termination or renegotiation of the arrangement. The success of these transactions and arrangements will depend in part on our ability to leverage them to enhance our existing products or develop compelling new ones. It may take longer than expected to realize the full benefits from these transactions and arrangements such as increased revenue or enhanced efficiencies, or the benefits may ultimately be smaller than we expected. These events could adversely affect our consolidated financial statements.

### *If we fail to maintain an effective system of internal controls in the future, we may experience a loss of investor confidence and an adverse impact to our stock price.*

Pursuant to the Sarbanes-Oxley Act of 2002, we are required to document and test our internal control procedures and to provide a report by management on internal control over financial reporting, including management's assessment of the effectiveness of such control. We previously reported and remediated material weaknesses in internal control over financial reporting. Completion of remediation does not provide assurance that our remediation or other controls will continue to operate properly. If we are unable to maintain effective internal control over financial reporting or disclosure controls and procedures, our ability to record, process and report financial information accurately, and to prepare consolidated financial statements within required time periods could be adversely affected, which could subject us to litigation or investigations requiring management resources and payment of legal and other expenses, negatively affect investor confidence in our consolidated financial statements and adversely impact our stock price.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

We are a global company with our corporate headquarters located in Santa Barbara, California. We lease office space in Santa Barbara, as well as offices in various locations in the U.S. and around the world. We believe our existing facilities are adequate to meet our current requirements.

**Item 3. Legal Proceedings**

From time to time, we may become involved in legal proceedings or be subject to claims arising in the ordinary course of our business. Other than the matters described in Note 13. Commitments and Contingencies of the notes to our consolidated financial statements included in Part II. Item 8 of this Annual Report, we were not a party to any legal proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition or cash flows. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors.

**Item 4. Mine Safety Disclosures**

None.

## PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities**

### *Market Information for Our Common Stock*

Shares of our common stock trade on The Nasdaq Global Select Market under the symbol "SONO."

### *Holders of Record*

As of November 7, 2022, there were 1,638 holders of record of our common stock. This figure does not include a substantially greater number of beneficial holders of our common stock whose shares are held of record by banks, brokers and other financial institutions.

### *Dividend Policy*

We have never declared or paid any cash dividends on our capital stock, and we do not currently intend to pay any cash dividends for the foreseeable future. We expect to retain future earnings, if any, to fund the development and growth of our business. Any future determination to pay dividends on our common stock will be made at the discretion of the Board and will depend upon, among other factors, our financial condition, operating results, current and anticipated cash needs, plans for expansion and other factors that the Board may deem relevant. In addition, the terms of our credit facilities contain restrictions on our ability to declare and pay cash dividends on our capital stock.

### *Recent Sales of Unregistered Securities*

None.

### *Issuer Purchases of Equity Securities*

The following table presents information with respect to our repurchase of common stock during the quarter ended October 1, 2022.

| Period | Total Number of Shares Purchased (1) | | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs (in thousands) |
|---|---|---|---|---|---|---|
| Jul 3 - Jul 30 | 483,797 | $ | 19.68 | 483,797 | $ | 23,374 |
| Jul 31 - Aug 27 | 1,444,900 | $ | 16.24 | 1,444,900 | $ | — |
| Aug 28 - Oct 1 | — | $ | — | — | $ | — |
| Total | 1,928,697 | | | 1,928,697 | | |

*(1)* In November 2021, the Board of Directors authorized a common stock repurchase program of up to $150.0 million; as of October 1, 2022, we had fully utilized the amount available under this common stock repurchase program. Over the past three fiscal years, we have completed $250.0 million in share repurchases, for 11,760,762 shares, at an average price of $21.26 per share. See Note 8. Stockholders' Equity of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for further information. We also withhold shares of common stock in connection with the vesting of restricted stock unit awards issued to such employees to satisfy applicable tax withholding requirements. Although these withheld shares are not issued or considered common stock repurchases under our stock repurchase program and therefore are not included in the preceding table, they are treated as common stock repurchases in our consolidated financial statements as they reduce the number of shares that would have been issued upon vesting.

*Stock Performance Graph*



Comparison of Cumulative Total Return Since August 2, 2018
Assumes Initial Investment of $100



|  | September 28, 2018 | September 27, 2019 | October 2, 2020 | October 1, 2021 | September 30, 2022 |
|---|---|---|---|---|---|
| Sonos, Inc. | $ 80.56 | $ 67.86 | $ 77.85 | $ 162.03 | $ 69.81 |
| Nasdaq composite index | $ 103.34 | $ 103.11 | $ 141.94 | $ 192.31 | $ 135.54 |
| S&P 500 | $ 103.43 | $ 107.29 | $ 118.44 | $ 163.28 | $ 126.82 |

**Item 6. [Reserved]**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read the following discussion of our financial condition and results of operations in conjunction with the consolidated financial statements and the notes thereto included elsewhere in this Annual Report on Form 10-K. The following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in the section titled "Risk Factors."*

*We operate on a 52-week or 53-week fiscal year ending on the Saturday nearest September 30 each year. Our fiscal year is divided into four quarters of 13 weeks, each beginning on a Sunday and containing two 4-week periods followed by a 5-week period. An additional week is included in the fourth fiscal quarter approximately every five years to realign fiscal quarters with calendar quarters. References to fiscal 2022 are to our 52-week fiscal year ended October 1, 2022, references to fiscal 2021 are to our 52-week fiscal year ended October 2, 2021, references to fiscal 2020 are to our 53-week fiscal year ended October 3, 2020.*

*Overview*

Sonos is one of the world's leading sound experience brands.

We pioneered multi-room, wireless audio products, debuting the world's first multi-room wireless sound system in 2005. Today, our products include wireless, portable, and home theater speakers, components, and accessories to address consumers' evolving audio needs. We are known for delivering unparalleled sound, thoughtful design aesthetic, simplicity of use, and an open platform. Our platform has attracted a broad range of more than 130 streaming content providers, such as Apple Music, Spotify, Deezer, and Pandora. These partners find value in our independent platform and access to our millions of desirable and engaged customers. We frequently introduce new services and features across our platform, providing our customers with enhanced functionality, improved sound, and an enriched user experience. We are committed to continuous technological innovation as reflected in our growing global patent portfolio. We believe our patents comprise the foundational intellectual property for wireless multi-room and other audio technologies.

Our innovative products, seamless customer experience and expanding global footprint have driven 17 consecutive years of sustained revenue growth since our first product launch. We generate revenue from the sale of our Sonos speaker products, including wireless speakers and home theater speakers, from our Sonos system products, which largely comprises our component products, and from partner products and other revenue, including partnerships with IKEA and Sonance, Sonos and third-party accessories, licensing, and advertising revenue.

We have developed a robust product and software roadmap that we believe will help us capture the expanding addressable market for our products. We believe executing on our roadmap will position us to acquire new customers, offer a continuously improving experience to our existing customers, and grow follow-on purchases.

*Recent developments*

The impacts of, and uncertainty related to, the COVID-19 pandemic and its expected duration persist. Developments continue to occur, relating to the emergence of new variants of the virus, outbreaks, and resulting lockdowns globally. COVID-19 has affected our supply chain, consistent with its effect across many industries, including component supply-related challenges, inflationary pressures, port congestion and the continuing impacts of lockdowns in China. We began to see recovery in supply for some of our products, while supply chain constraints resulted in delayed product availability for certain products. As a result of these broader industry-wide supply chain challenges, in fiscal 2022, we experienced increased component costs, and increased shipping and logistics costs, as well as longer lead times.

More recently, macroeconomic trends have led to uncertainty in the economic environment. These include conditions such as the potential for a recession, foreign exchange rate fluctuations - particularly the strengthening of the U.S. dollar relative to the euro and the British pound, high inflation and the related negative impact on the global economy, and the continuing conflict between Russia and Ukraine. Foreign exchange rate fluctuations had an unfavorable impact on revenue for the second half of fiscal 2022, primarily due to the strength of the U.S. dollar relative to the euro and the British pound. These trends, as well as a shift in consumer spending from purchasing goods to purchasing services, led to softening demand in the second half of fiscal 2022. The falloff in demand resulted in an increase in our component supply and inventory as we had previously increased our investments and purchase commitments to secure inventory for long lead-time components during what had been a period of constrained availability and strong demand. We continue to work with our contract manufacturing partners to actively manage the impact of industry-wide supply chain challenges, including fluctuations in component availability and consumer demand. The extent to which our business, or the business of our suppliers or manufacturers, will be impacted in the future is unknown.

For additional information, refer to Part I, Item 1A. Risk factors.

### Key Metrics

In addition to the measures presented in our consolidated financial statements, we use the following key metrics to evaluate our business, measure our performance, identify trends affecting our business and assist us in making strategic decisions. Our key metrics are total revenue, products sold, adjusted EBITDA and adjusted EBITDA margin. The most directly comparable financial measure calculated under U.S. GAAP for adjusted EBITDA is net income (loss). In the fiscal years ended October 1, 2022 and October 2, 2021, we had net income of $67.4 million and $158.6 million, respectively and in the fiscal year ended October 3, 2020, we had a net loss of $20.1 million.

| | Fiscal Year Ended | | |
| | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| **(In thousands, except percentages)** | | | |
| Revenue | $ 1,752,336 | $ 1,716,744 | $ 1,326,328 |
| Products sold | 6,281 | 6,503 | 5,806 |
| Adjusted EBITDA[1] | $ 226,549 | $ 278,585 | $ 108,543 |
| Adjusted EBITDA margin[1] | 12.9% | 16.2% | 8.2% |

[1] For additional information regarding adjusted EBITDA and adjusted EBITDA margin (which are non-GAAP financial measures), including reconciliations of net income (loss), to adjusted EBITDA, see the sections titled "Adjusted EBITDA and Adjusted EBITDA Margin" and "Non-GAAP Financial Measures" below.

### Revenue

We generate substantially all of our revenue from the sale of Sonos speakers and Sonos system products. We also generate a portion of revenue from Partner products and other revenue sources, such as module revenue from our IKEA partnership, architectural speakers from our Sonance partnership, accessories such as speaker stands and wall mounts, professional services, licensing, and advertising revenue.

For a description of our revenue recognition policies, see the section titled "Critical accounting policies and estimates."

### Products Sold

Products sold represents the number of products that are sold during a period, net of returns and includes the sale of products in the Sonos speakers and Sonos system products categories, as well as module units sold through our partnerships with IKEA and Sonance from our Partner products and other revenue category. Growth rates between products sold and revenue are not perfectly correlated because our revenue is affected by other variables, such as the mix of products sold during the period, promotional discount activity, the introduction of new products that may have higher or lower than average selling prices, as well as the impact of recognition of previously deferred revenue.

### Adjusted EBITDA and Adjusted EBITDA Margin

We define adjusted EBITDA as net income (loss) adjusted to exclude the impact of stock-based compensation expense, depreciation, interest, other income (expense), taxes, and other items that we do not consider representative of our underlying operating performance.

We define adjusted EBITDA margin as adjusted EBITDA divided by revenue. See the section titled "Results of Operations — Non-GAAP Financial Measures" for information regarding our use of adjusted EBITDA and adjusted EBITDA margin, and a reconciliation of net income (loss) to adjusted EBITDA.

## Components of Results of Operations

### Revenue

We generate substantially all of our revenue from the sale of Sonos speakers and Sonos system products. We also generate a portion of revenue from Partner products and other revenue sources, such as module revenue from our IKEA partnership, architectural speakers from our Sonance partnership, and accessories such as speaker stands and wall mounts, as well as professional services,

licensing, advertising, and subscription revenue. We attribute revenue from our IKEA partnership to our Asia Pacific ("APAC") region, as our regional revenue is defined by the shipment location. Our revenue is recognized net of allowances for returns, discounts, sales incentives, and any taxes collected from customers. We also defer a portion of our revenue that is allocated to unspecified software upgrades and cloud-based services, as well as for newly launched products sold to resellers not recognized until the date of general availability is reached. Our revenue is subject to fluctuation based on the foreign currency in which our products are sold, principally for sales denominated in the euro and the British pound. The introduction of new products may result in an increase in revenue but may also impact revenue generated from existing products as consumers shift purchases to new products.

For a description of our revenue recognition policies, see the section titled "Critical accounting policies and estimates."

### Cost of Revenue

Cost of revenue consists of product costs, including costs of our contract manufacturers for production, components, shipping and handling, tariffs, duty costs, warranty replacement costs, packaging, fulfillment costs, manufacturing and tooling equipment depreciation, warehousing costs, hosting costs, and excess and obsolete inventory write-downs. It also includes licensing costs, such as royalties to third parties, and attributable amortization of acquired developed technology. In addition, we allocate certain costs related to management and facilities, personnel-related expenses, and supply chain logistic costs. Personnel-related expenses consist of salaries, bonuses, benefits, and stock-based compensation expenses.

### Gross Profit and Gross Margin

Our gross margin has fluctuated and may, in the future, fluctuate from period to period based on a number of factors, including the mix of products we sell, the channel mix through which we sell our products, fluctuations of the impacts of our product and material cost saving initiatives, the foreign currency in which our products are sold, and tariffs and duty costs implemented by governmental authorities.

### Operating Expenses

Operating expenses consist of research and development, sales and marketing, and general and administrative expenses.

*Research and development*. Research and development expenses consist primarily of personnel-related expenses, consulting and contractor expenses, tooling, test equipment, prototype materials, and related overhead costs. To date, software development costs have been expensed as incurred because the period between achieving technological feasibility and the release of the software has been short and development costs qualifying for capitalization have been insignificant.

*Sales and marketing*. Sales and marketing expenses consist primarily of advertising and marketing activity for our products and personnel-related expenses, as well as trade show and event costs, sponsorship costs, consulting and contractor expenses, travel costs, depreciation for product displays, as well as related maintenance and repair expenses, customer experience and technology support tool expenses, revenue related sales fees from our direct-to-consumer business, and overhead costs.

*General and administrative*. General and administrative expenses consist of personnel-related expenses for our finance, legal, human resources and administrative personnel, as well as the costs of professional services, information technology, litigation, patents, related overhead, and other administrative expenses.

### Other Income (Expense), Net

*Interest income.* Interest income consists primarily of interest income earned on our cash and cash equivalents balances.

*Interest expense.* Interest expense consists primarily of interest expense associated with our debt financing arrangements and amortization of debt issuance costs.

*Other income (expense), net.* Other income (expense), net consists primarily of our foreign currency exchange gains and losses relating to transactions and remeasurement of asset and liability balances denominated in currencies other than the U.S. dollar. We expect our foreign currency gains and losses to continue to fluctuate in the future due to changes in foreign currency exchange rates.

### *Provision for (Benefit From) Income Taxes*

We are subject to income taxes in the United States and foreign jurisdictions in which we operate. Foreign jurisdictions have statutory tax rates different from those in the United States. Accordingly, our effective tax rate will vary depending on jurisdictional mix of earnings, and changes in tax laws. In addition, certain U.S. tax regulations subject the earnings of our non-U.S. subsidiaries to current taxation in the United States. Our effective tax rate will be impacted by our ability to claim deductions and foreign tax credits to offset the taxation of foreign earnings in the United States.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A valuation allowance is provided to reduce our deferred tax assets to amounts that are more-likely-than-not to be realized. We have assessed, on a jurisdictional basis, the available means of recovering deferred tax assets, including the ability to carry back net operating losses, the existence of taxable temporary differences, the availability of tax planning strategies and available sources of future taxable income. We have concluded that future taxable income can be considered a source of income to realize a benefit for deferred tax assets in certain foreign jurisdictions. In addition, we have concluded that a valuation allowance on deferred tax assets in the U.S. continues to be appropriate considering cumulative pre-tax losses in recent years and uncertainty with respect to future taxable income.

It is possible that in the foreseeable future there may be sufficient positive evidence to release a portion or all of the remaining valuation allowance. Release of the remaining valuation allowance would result in a benefit to income tax expense for the period the release is recorded, which could have a material impact on net earnings. The timing and amount of the potential valuation allowance release are subject to significant management judgment, as well as prospective earnings in the United States.

### *Results of Operations*

The consolidated statements of operations data for fiscal years 2022, 2021, and 2020, and the consolidated balance sheet data as of October 1, 2022, and October 2, 2021, are derived from our audited consolidated financial statements appearing in Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K. The consolidated statements of operations data for fiscal years 2019, and 2018, and the consolidated balance sheet data as of October 3, 2020, September 28, 2019, and September 29, 2018, are

derived from audited consolidated financial statements not included in this Annual Report on Form 10-K. Our historical results are not necessarily indicative of the results that may be expected in any future period.

| | Fiscal Year Ended | | | | |
| | October 1, 2022 | October 2, 2021 | October 3, 2020 | September 28, 2019 | September 29, 2018[4] |
|---|---|---|---|---|---|
| **(In thousands, except share and per share amounts and percentages)** | | | | | |
| Revenue | $ 1,752,336 | $ 1,716,744 | $ 1,326,328 | $ 1,260,823 | $ 1,137,008 |
| Cost of revenue [1] | 955,969 | 906,750 | 754,372 | 733,480 | 647,700 |
| Gross profit | 796,367 | 809,994 | 571,956 | 527,343 | 489,308 |
| Operating expenses | | | | | |
| Research and development [1] | 256,073 | 230,078 | 214,672 | 171,174 | 142,109 |
| Sales and marketing [1] | 280,333 | 272,124 | 263,539 | 247,599 | 270,869 |
| General and administrative [1] | 170,429 | 152,828 | 120,978 | 102,871 | 85,205 |
| Total operating expenses | 706,835 | 655,030 | 599,189 | 521,644 | 498,183 |
| Operating income (loss) | 89,532 | 154,964 | (27,233) | 5,699 | (8,875) |
| Other income (expense), net | | | | | |
| Interest income | 1,655 | 146 | 1,998 | 4,349 | 731 |
| Interest expense | (552) | (592) | (1,487) | (2,499) | (5,242) |
| Other income (expense), net | (21,905) | 2,407 | 6,639 | (8,625) | (1,162) |
| Total other income (expense), net | (20,802) | 1,961 | 7,150 | (6,775) | (5,673) |
| Income (loss) before provision for (benefit from) income taxes | 68,730 | 156,925 | (20,083) | (1,076) | (14,548) |
| Provision for (benefit from) income taxes | 1,347 | (1,670) | 32 | 3,690 | 1,056 |
| Net income (loss) | $ 67,383 | $ 158,595 | $ (20,115) | $ (4,766) | $ (15,604) |
| Net income (loss) per share attributable to common stockholders:[2] | | | | | |
| Basic | $ 0.53 | $ 1.30 | $ (0.18) | $ (0.05) | $ (0.24) |
| Diluted | $ 0.49 | $ 1.13 | $ (0.18) | $ (0.05) | $ (0.24) |
| Weighted-average shares used in computing net income (loss) per share attributable to common stockholders:[2] | | | | | |
| Basic | 127,691,030 | 122,245,212 | 109,807,154 | 103,783,006 | 65,706,215 |
| Diluted | 137,762,078 | 140,309,152 | 109,807,154 | 103,783,006 | 65,706,215 |
| **Other Data:** | | | | | |
| Products sold[5] | 6,281 | 6,503 | 5,806 | 6,204 | 5,165 |
| Adjusted EBITDA [3] | $ 226,549 | $ 278,585 | $ 108,543 | $ 88,689 | $ 69,128 |
| Adjusted EBITDA margin [3] | 12.9% | 16.2% | 8.2% | 7.0% | 6.1% |

(1)    Stock-based compensation was allocated as follows:

| | Fiscal Year Ended | | | | |
| | October 1, 2022 | October 2, 2021 | October 3, 2020 | September 28, 2019 | September 29, 2018 |
|---|---|---|---|---|---|
| **(In thousands)** | | | | | |
| Cost of revenue | $ 1,620 | $ 988 | $ 1,106 | $ 985 | $ 198 |
| Research and development | 30,724 | 25,075 | 23,439 | 17,643 | 13,960 |
| Sales and marketing | 15,335 | 13,570 | 14,359 | 12,965 | 15,885 |
| General and administrative | 27,961 | 22,494 | 18,706 | 14,982 | 8,602 |
| Total stock-based compensation expense | $ 75,640 | $ 62,127 | $ 57,610 | $ 46,575 | $ 38,645 |

(2)    See Note 11. Net Income (Loss) Per Share Attributable to Common Stockholders of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for an explanation of the calculations of our net income (loss) per share attributable to common stockholders, basic and diluted.

(3)    Adjusted EBITDA and adjusted EBITDA margin are financial measures that are not calculated in accordance with U.S. GAAP. See the section titled "—Non-GAAP Financial Measures" below for information regarding our use of these non-GAAP financial measures and a reconciliation of net income (loss) to adjusted EBITDA.

(4)  Reflects the impact of the adoption of new accounting standard in fiscal year 2018 related to revenue recognition.
(5)  Products sold for the fiscal years 2019 and 2018 have been recast to reflect the change in product revenue categorization.

| | As of | | | | |
| | October 1, 2022 | October 2, 2021 | October 3, 2020 | September 28, 2019 | September 29, 2018 |
|---|---|---|---|---|---|
| **(In thousands)** | | | | | |
| **Consolidated balance sheet data:** | | | | | |
| Cash and cash equivalents | $ 274,855 | $ 640,101 | $ 407,100 | $ 338,641 | $ 220,930 |
| Working capital | 331,752 | 481,384 | 267,362 | 276,635 | 201,243 |
| Total assets | 1,188,388 | 1,138,804 | 816,051 | 761,605 | 587,498 |
| Total long-term debt | — | — | 18,251 | 24,840 | 33,097 |
| Total liabilities | 627,875 | 569,762 | 518,212 | 480,677 | 379,140 |
| Accumulated deficit | (2,514) | (69,897) | (228,492) | (208,377) | (203,611) |
| Total stockholders' equity | 560,513 | 569,042 | 297,839 | 280,928 | 208,358 |

### Non-GAAP Financial Measures

To supplement our consolidated financial statements presented in accordance with U.S. GAAP, we monitor and consider adjusted EBITDA and adjusted EBITDA margin, which are non-GAAP financial measures. These non-GAAP financial measures are not based on any standardized methodology prescribed by U.S. GAAP and are not necessarily comparable to similarly titled measures presented by other companies.

We define adjusted EBITDA as net income (loss) adjusted to exclude the impact of depreciation, stock-based compensation expense, interest income, interest expense, other income (expense), income taxes and other items that we do not consider representative of underlying operating performance. We define adjusted EBITDA margin as adjusted EBITDA divided by revenue.

We use these non-GAAP financial measures to evaluate our operating performance and trends and make planning decisions. We believe that these non-GAAP financial measures help identify underlying trends in our business that could otherwise be masked by the effect of the expenses and other items that we exclude in these non-GAAP financial measures. Accordingly, we believe that these non-GAAP financial measures provide useful information to investors and others in understanding and evaluating our operating results, enhancing the overall understanding of our past performance and future prospects, and allowing for greater transparency with respect to a key financial metric used by our management in its financial and operational decision-making.

Adjusted EBITDA and adjusted EBITDA margin are non-GAAP financial measures, and should not be considered in isolation of, or as an alternative to, measures prepared in accordance with U.S. GAAP. There are a number of limitations related to the use of adjusted EBITDA rather than net income (loss), which is the nearest U.S. GAAP equivalent of adjusted EBITDA, and the use of adjusted EBITDA margin rather than operating margin, which is the nearest U.S. GAAP equivalent of adjusted EBITDA margin. These limitations include that the non-GAAP financial measures:

- exclude depreciation and amortization, and although these are non-cash expenses, the assets being depreciated may be replaced in the future;

- exclude stock-based compensation expense, which has been, and will continue to be, a significant recurring expense for our business and an important part of our compensation strategy;

- do not reflect interest income, primarily resulting from interest income earned on our cash and cash equivalent balances;

- do not reflect interest expense, or the cash requirements necessary to service interest or principal payments on our debt, which reduces cash available to us;

- do not reflect the effect of foreign currency exchange gains or losses, which is included in other income (expense), net;

- do not reflect the provision for or benefit from income tax that may result in payments that reduce cash available to us;

- do not reflect items that are not considered representative of our underlying operating performance which reduce cash available to us; and

- may not be comparable to similar non-GAAP financial measures used by other companies, because the expenses and other items that we exclude in our calculation of these non-GAAP financial measures may differ from the expenses and other items, if any, that other companies may exclude from these non-GAAP financial measures when they report their operating results.

Because of these limitations, these non-GAAP financial measures should be considered along with other operating and financial performance measures presented in accordance with U.S. GAAP.

The following table presents a reconciliation of net income (loss) to adjusted EBITDA:

| (In thousands, except percentages) | Fiscal Year Ended | | | | |
| | October 1, 2022 | October 2, 2021 | October 3, 2020 | September 28, 2019 | September 29, 2018 |
|---|---|---|---|---|---|
| Net income (loss) | $ 67,383 | $ 158,595 | $ (20,115) | $ (4,766) | $ (15,604) |
| Depreciation and amortization | 38,504 | 33,882 | 36,426 | 36,415 | 39,358 |
| Stock-based compensation expense | 75,640 | 62,127 | 57,610 | 46,575 | 38,645 |
| Interest income | (1,655) | (146) | (1,998) | (4,349) | (731) |
| Interest expense | 552 | 592 | 1,487 | 2,499 | 5,242 |
| Other (income) expense, net | 21,905 | (2,407) | (6,639) | 8,625 | 1,162 |
| Provision for (benefit from) income taxes | 1,347 | (1,670) | 32 | 3,690 | 1,056 |
| Restructuring and related expenses | — | (2,446) | 26,285 | — | — |
| Legal and transaction related costs [1] | 22,873 | 30,058 | 15,455 | — | — |
| Adjusted EBITDA | $ 226,549 | $ 278,585 | $ 108,543 | $ 88,689 | $ 69,128 |
| Revenue | 1,752,336 | 1,716,744 | 1,326,328 | 1,260,823 | 1,137,008 |
| Adjusted EBITDA margin | 12.9% | 16.2% | 8.2% | 7.0% | 6.1% |

(1)    Legal and transaction-related costs consist of expenses related to our intellectual property ("IP") litigation against Alphabet and Google as well as legal and transaction costs associated with our acquisition activities, which we do not consider representative of our underlying operating performance.

**Comparison of Fiscal Years 2022 and 2021**

*Revenue*

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
| --- | --- | --- | --- | --- |
| | October 1, 2022 | October 2, 2021 | $ | % |
| Sonos speakers | $ 1,368,916 | $ 1,378,808 | $ (9,892) | (0.7)% |
| Sonos system products | 297,110 | 265,180 | 31,930 | 12.0 |
| Partner products and other revenue | 86,310 | 72,756 | 13,554 | 18.6 |
| Total revenue | $ 1,752,336 | $ 1,716,744 | $ 35,592 | 2.1% |
| **Volume data (products sold in thousands)** | | | **Units** | **%** |
| Total products sold | 6,281 | 6,503 | (222) | (3.4)% |

Total revenue increased 2.1% for fiscal 2022, compared to fiscal 2021. The growth was driven by strong demand for our products in the first half of the fiscal year despite lower promotional activity, somewhat offset by the continuing impact of constrained product availability, as well as the softening demand in the third and fourth fiscal quarters.

Sonos speakers revenue represented 78.1% of total revenue for fiscal 2022. The category decreased 0.7% compared to fiscal 2021, mainly related to decreased sales in Move and One, which resulted primarily from lower promotional activity in the first fiscal quarter due to limited supply. Sonos system products represented 17.0% of total revenue for fiscal 2022, and increased 12.0% compared to the fiscal 2021, supported by demand and availability of supply. Partner products and other revenue represented 4.9% of total revenue for fiscal 2022, and increased 18.6% compared to fiscal 2021. The increase was driven by sales from our partnerships with Sonance and IKEA.

The volume of products sold decreased for fiscal 2022, compared to fiscal 2021, as we sold fewer units in the Sonos speakers category. Revenue increased despite a decrease in volume for fiscal 2022, compared to fiscal 2021, primarily due to the impact of higher selling prices.

Revenue for fiscal 2022, compared to fiscal 2021, increased 6.4% in the Americas, decreased 6.5% in EMEA, and increased 11.0% in APAC.

In constant currency U.S. dollars, total revenue increased 4.9% for the twelve months ended October 1, 2022, compared to the twelve months ended October 2, 2021. We calculate constant currency growth percentages by translating our prior period financial results using the current period average currency exchange rates and comparing these amounts to our current period reported results.

*Cost of Revenue and Gross Profit*

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
| --- | --- | --- | --- | --- |
| | October 1, 2022 | October 2, 2021 | $ | % |
| Cost of revenue | $ 955,969 | $ 906,750 | $ 49,219 | 5.4% |
| Percentage of revenue | 54.6% | 52.8% | | |
| Gross profit | $ 796,367 | $ 809,994 | $ (13,627) | (1.7)% |
| Gross margin | 45.4% | 47.2% | | |

The increase in cost of revenue for fiscal 2022, compared to fiscal 2021, was primarily driven by an increase in air freight shipping in the first quarter of fiscal 2022, higher component costs, and an overall increase in shipping and logistics costs related to industry-wide supply chain dynamics.

Gross margin decreased 180 basis points for fiscal 2022, compared to fiscal 2021. The decrease was primarily due to increased shipping and logistics costs as well as increased component costs, both of which stemmed from broader industry-wide supply chain dynamics. The decrease in gross margin was also related to increased tariff expenses of $6.0 million, net of refunds recognized, compared to fiscal 2021, resulting from the impact of having an exemption from tariffs on core speaker products in the first half of fiscal 2021,

which we did not have in the first half of fiscal 2022. The overall decrease was partially offset by the impact of reduced promotional activity and higher selling prices.

### Research and Development

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
|---|---|---|---|---|
| | October 1, 2022 | October 2, 2021 | $ | % |
| Research and development | $    256,073 | $    230,078 | $    25,995 | 11.3% |
| Percentage of revenue | 14.6% | 13.4% | | |

Research and development expenses increased $26.0 million, or 11.3%, for fiscal 2022 compared to fiscal 2021. The increase was primarily driven by $17.0 million in personnel-related expenses due to increased headcount and stock-based compensation partially offset by lower variable compensation. The increase was also driven by an increase of $12.4 million in product development costs and professional fees, and $2.0 million in information technology, partially offset by a decrease of $10.0 million from a one-time product development investment in the prior year.

### Sales and Marketing

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
|---|---|---|---|---|
| | October 1, 2022 | October 2, 2021 | $ | % |
| Sales and marketing | $    280,333 | $    272,124 | $    8,209 | 3.0% |
| Percentage of revenue | 16.0% | 15.9% | | |

Sales and marketing expenses increased $8.2 million, or 3.0%, in fiscal 2022 compared to fiscal 2021. The increase was primarily due to higher brand and marketing expenses of $5.3 million, additional professional fees of $3.9 million, and an increase of $2.8 million resulting from a gain that was recognized in the prior year related to the restructuring plan initiated in June 2020. The increase was partially offset by $5.7 million in lower personnel-related expenses due to lower variable compensation, partially offset by increased headcount and stock-based compensation.

### General and Administrative

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
|---|---|---|---|---|
| | October 1, 2022 | October 2, 2021 | $ | % |
| General and administrative | $    170,429 | $    152,828 | $    17,601 | 11.5% |
| Percentage of revenue | 9.7% | 8.9% | | |

General and administrative expenses increased $17.6 million, or 11.5%, in fiscal 2022 compared to fiscal 2021. The increase was primarily driven by $11.6 million in personnel-related expenses due to increased headcount and stock-based compensation, offset by lower variable compensation. The increase was also driven by $8.4 million primarily related to our investments in information technology, including replacing our legacy enterprise resource planning system, offset by a $3.6 million decrease in legal fees, including legal fees incurred in connection with our IP litigation.

*Other Income (Expense), Net*

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
| | October 1, 2022 | October 2, 2021 | $ | % |
| --- | --- | --- | --- | --- |
| Interest income | $ 1,655 | $ 146 | $ 1,509 | * |
| Interest expense | $ 552 | $ 592 | $ (40) | (6.8)% |
| Other income (expense), net | $ (21,905) | $ 2,407 | $ (24,312) | * |

\* not meaningful

Interest income increased by $1.5 million, in fiscal 2022 compared to fiscal 2021, due to higher yields earned on our cash and cash equivalents during fiscal 2022. Other income (expense), net decreased from other income of $2.4 million for fiscal 2021 to other expense of $21.9 million for fiscal 2022, due to foreign currency exchange losses.

*Provision for (Benefit From) Income Taxes*

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
| | October 1, 2022 | October 2, 2021 | $ | % |
| --- | --- | --- | --- | --- |
| Provision for (benefit from) income taxes | $ 1,347 | $ (1,670) | $ 3,017 | -180.7% |

The provision for income taxes increased from a benefit from income taxes of $1.7 million for fiscal 2021 to a provision for income taxes of $1.3 million for fiscal 2022. For fiscal 2022, we recorded a $2.3 million provision for non-U.S. entities and a benefit of $1.0 million for the U.S. entity, resulting in a total provision for income tax of $1.3 million. The most significant factors impacting the fiscal 2022 provision include a benefit of $7.3 million for the release of valuation allowances in certain foreign jurisdictions and a provision of $5.2 million for the revaluation of certain foreign deferred tax assets. For fiscal 2021, we recorded a benefit of $2.1 million for non-U.S. entities and a provision of $0.4 million for the U.S. entity, resulting in a total tax benefit of $1.7 million. The benefit from income taxes for the year ended October 2, 2021, includes a benefit of $7.8 million from the release of the valuation allowance in the Netherlands offset by the provision for income taxes recognized on current year earnings.

## Comparison of Fiscal Years 2021 and 2020

For the comparison of fiscal years 2021 and 2020, refer to Part II, Item 7 "Management's discussion and analysis of financial condition and results of operations" on Form 10-K for our fiscal year ended October 2, 2021, filed with the SEC on November 22, 2021, under the subheading "Comparison of fiscal years 2021 and 2020."

## Liquidity and Capital Resources

Our operations are financed primarily through cash flows from operating activities and net proceeds from the sale of our equity securities. As of October 1, 2022, our principal sources of liquidity consisted of cash flows from operating activities, cash and cash equivalents of $274.9 million, including $65.6 million held by our foreign subsidiaries, proceeds from the exercise of stock options and borrowing capacity under the Credit Facility. In accordance with our policy, the undistributed earnings of our non-U.S. subsidiaries remain indefinitely reinvested outside of the United States as of October 1, 2022, as they are required to fund needs outside of the United States. In the event funds from foreign operations are needed to fund operations in the United States and if U.S. tax has not already been previously provided, we may be required to accrue and pay additional U.S. taxes to repatriate these funds.

We believe our existing cash and cash equivalent balances, cash flows from operations and committed credit lines will be sufficient to meet our long-term working capital and capital expenditure needs for at least the next 12 months. In October 2021, we entered into a credit agreement with JPMorgan Chase Bank, N.A., Bank of America N.A., Morgan Stanley Senior Funding, Inc., and Goldman Sachs Bank USA (the "Revolving Credit Agreement"), which allows us to borrow up to $100 million, with a maturity date of October 2026. Our future capital requirements may vary materially from those currently planned and will depend on many factors, including our rate of revenue growth, the timing and extent of spending on research and development efforts and other business initiatives, our planned sales and marketing activities, the timing of new product introductions, our potential merger and acquisition activity, market acceptance of our products, and overall economic conditions. To the extent that current and anticipated sources of liquidity are insufficient to fund our future business activities and requirements, we may be required to seek additional equity or debt financing. The sale of additional equity would result in increased dilution to our stockholders. If we were to incur additional debt financing it would result in increased

debt service obligations and the instruments governing such debt could provide for operating and financing covenants that would restrict our operations.

### Debt Obligations

On October 13, 2021, we entered into the Revolving Credit Agreement, which replaced our prior $80.0 million credit facility with JPMorgan Chase Bank, N.A., which matured in October 2021, in its entirety.

The Revolving Credit Agreement provides for (i) a five-year senior secured revolving credit facility in the amount of up to $100.0 million and (ii) an uncommitted incremental facility subject to certain conditions. Proceeds are to be used for working capital and general corporate purposes. The facility may be drawn as an Alternative Base Rate Loan (at 1.00% plus an applicable margin) or Eurocurrency Loans (at the London interbank offered rate ("LIBOR") plus an applicable margin). We must also pay (i) an unused commitment fee ranging from 0.200% to 0.275% per annum of the average daily unused portion of the aggregate revolving credit commitment under the agreement and (ii) a per annum fee equal to the applicable margin over LIBOR multiplied by the aggregate face amount of outstanding letters of credit. As of October 1, 2022, we did not have any outstanding borrowings and $3.0 million in undrawn letters of credit that reduce the availability under the Revolving Credit Agreement.

Our obligations under the Revolving Credit Agreement are secured by substantially all of our assets. The Revolving Credit Agreement contains customary representations and warranties, customary affirmative and negative covenants, a financial covenant that is tested quarterly and requires us to maintain a certain consolidated leverage ratio, and customary events of default. As of October 1, 2022, we were in compliance with all financial covenants under the Revolving Credit Agreement.

### Cash Flows

#### Fiscal 2022 Changes in Cash Flows

The following table summarizes our cash flows for the periods indicated:

| | | Fiscal Year Ended | | |
| --- | --- | --- | --- | --- |
| | | October 1, 2022 | | October 2, 2021 |
| **(In thousands)** | | | | |
| Net cash provided by (used in): | | | | |
| Operating activities | $ | (28,260) | $ | 253,226 |
| Investing activities | | (172,632) | | (45,531) |
| Financing activities | | (150,260) | | 24,967 |
| Effect of exchange rate changes | | (14,094) | | 148 |
| Net increase in cash, cash equivalents and restricted cash | $ | (365,246) | $ | 232,810 |

#### Cash Flows from Operating Activities

Net cash used in operating activities of $28.3 million for fiscal 2022 consisted of net income of $67.4 million, non-cash adjustments of $134.4 million and a net decrease in cash related to changes in operating assets and liabilities of $230.0 million. Non-cash adjustments primarily consisted of stock-based compensation expense of $75.6 million and depreciation and amortization of $38.5 million. The net decrease in net operating assets and liabilities was primarily due to an increase in inventories of $277.5 million due to the recovery of supply for certain products, as well as higher inventory balances in preparation for the holiday season, a decrease in accrued compensation of $52.9 million due to a decrease in accrued variable compensation, an increase in other assets of $16.6 million related to capitalized costs related to the replacement of our legacy enterprise resource management system, a decrease in other liabilities of $5.5 million, and an increase in accounts receivable of $5.5 million. The decrease in net operating assets and liabilities was partially offset by an increase in accounts payable and accrued expenses of $129.7 million primarily related to an increase in accrued inventory payments.

#### Cash Flows from Investing Activities

Cash used in investing activities for fiscal 2022 of $172.6 million consisted primarily of payments for acquisitions, net of acquired cash of $126.4 million, as well as purchases of property and equipment and intangible assets of $46.2 million, which were primarily related to manufacturing-related tooling and test equipment to support the launch of new products, as well as purchased intangible assets.

*Cash Flows from Financing Activities*

Cash used in financing activities for fiscal 2022 of $150.3 million consisted primarily of payments for repurchases of common stock of $150.1 million, payments for repurchases of common stock related to shares withheld for tax in connection with vesting of RSUs of $39.7 million, as well as payments for debt issuance costs of $0.9 million, offset by proceeds from the exercise of stock options of $40.4 million.

*Fiscal 2021 Changes in Cash Flows*

For the comparison of fiscal 2021 to fiscal 2020, refer to Part II, Item 7 "Management's discussion and analysis of financial condition and results of operations" of our Form 10-K for our fiscal year ended October 2, 2021, filed with the SEC on November 22, 2021, under the subheading "Liquidity and capital resources."

### Contractual obligations

See Note 6. Leases and Note 13. Commitments and Contingencies of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for further details.

## Critical Accounting Policies and Estimates

Our consolidated financial statements are prepared in accordance with U.S. GAAP. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Actual results could differ materially from those estimates.

Our critical accounting policies requiring estimates, assumptions and judgments that we believe have the most significant impact on our consolidated financial statements are described below.

### Revenue Recognition

Revenue is recognized upon transfer of control of promised products or services to customers in an amount that reflects the consideration we expect to receive in exchange for those products or services. We generally enter into contracts that include a combination of products and services. Revenue is allocated to distinct performance obligations and is recognized net of allowances for returns, discounts, sales incentives and any taxes collected from customers, which are subsequently remitted to governmental authorities. Shipping and handling costs associated with outbound freight after control over a product has transferred to a customer are accounted for as a fulfillment cost and are included in cost of revenue. We do not have material assets related to incremental costs to obtain or fulfill customer contracts.

*Nature of Products and Services*

Our product revenue primarily includes sales of Sonos speakers and Sonos system products, which include software that enables our products to operate over a customer's wireless network as well as connect to various third-party services, including music and voice. We also generate a small portion of revenue from partner products and other revenue sources, such as module revenue from our IKEA partnership, architectural speakers from our Sonance partnership, and accessories such as speaker stands and wall mounts, as well as professional services, licensing and advertising revenue. Module revenue comprises hardware and embedded software that is integrated into final products that are manufactured and sold by our partners. Our software primarily consists of firmware embedded in the products and the Sonos app, which is software that can be downloaded to consumer devices at no charge, with or without the purchase of one of our products. Products and related software are accounted for as a single performance obligation and all intended functionality is available to the customer upon purchase. The revenue allocated to the products and related software is the substantial portion of the total sale price. Revenue is recognized at the point in time when control is transferred, which is either upon shipment or upon delivery to the customer, depending on delivery terms.

Our service revenue includes revenue allocated to (i) unspecified software upgrades and (ii) cloud-based services that enable products to access third-party music and voice assistant platforms, which are each distinct performance obligations and are provided to customers at no additional charge. Unspecified software upgrades are provided on a when-and-if-available basis and have historically included updates and enhancements such as bug fixes, feature enhancements and updates to the ability to connect to third-party music or voice assistant platforms. Service revenue is recognized ratably over the estimated service period.

*Significant Judgments*

Our contracts with customers generally contain promises to transfer products and services as described above. Determining whether products and services are considered distinct performance obligations that should be accounted for separately may require significant judgment.

Determining the standalone selling price ("SSP") for each distinct performance obligation requires judgment. We estimate SSP for items that are not sold separately, which include the products and related software, unspecified software upgrades and cloud services, using information that may include competitive pricing information, where available, as well as analysis of the cost of providing the products or services plus a reasonable margin. In developing SSP estimates, we also consider the nature of the products and services and the expected level of future services.

Determining the revenue recognition period for unspecified software upgrades and cloud services requires judgment. We recognize revenue attributable to these performance obligations ratably over the best estimate of the period that the customer is expected to receive the services. In developing the estimated period of providing future services, we consider our past history, our plans to continue to provide services, including plans to continue to support updates and enhancements to prior versions of our products, expected technological developments, obsolescence, competition and other factors. The estimated service period may change in the future in response to competition, technology developments and our business strategy.

Estimating variable consideration such as sales incentives and product returns requires judgment. We offer sales incentives through various programs, consisting primarily of discounts, cooperative advertising and market development fund programs. We record transactions related to cooperative advertising and market development fund programs with customers as a reduction to revenue unless we receive a distinct benefit in exchange for credits claimed by the customer and can reasonably estimate the fair value of the benefit received, in which case we record them as operating expenses. We recognize a liability, or a reduction to accounts receivable, and reduce revenue for sales incentives based on the estimated amount of sales incentives that will be claimed by customers. Estimates for sales incentives are developed using the most likely amount and are included in the transaction price to the extent that a significant reversal of revenue would not result once the uncertainty is resolved. In developing our estimates, we also consider the susceptibility of the incentive to outside influences, the length of time until the uncertainty is resolved, our experience with similar contracts, and the range of possible outcomes. Reductions in revenue related to discounts are allocated to products and services on a relative basis based on their respective SSP. Judgment is required to determine the timing and amount of recognition of marketing funds, which we estimate based on past practice of providing similar funds.

We accept returns from direct customers and from certain resellers. To establish an estimate for returns, we use the expected value method by considering a portfolio of contracts with similar characteristics to calculate the historical returns rate. When determining the expected value of returns, we consider future business initiatives and relevant anticipated future events.

### Inventories

Inventories consist of finished goods and component parts, which are purchased from contract manufacturers and component suppliers. Inventories are stated at the lower of cost and net realizable value. Cost is determined using a standard costing method, which approximates first-in first-out. We assess the valuation of inventory balances including an assessment to determine potential excess and/or obsolete inventory. We may be required to write down the value of inventory if estimates of future demand and market conditions indicate estimated excess and/or obsolete inventory. We may be required to write down the value of inventory if estimates of future demand and market conditions indicate excess and/or obsolete inventory. Inventory write-downs and losses on purchase commitments are recorded as a component of cost of revenue in the consolidated statement of operations and comprehensive income (loss).

### Business Combinations

We use the acquisition method of accounting for business combinations and recognize assets acquired and liabilities assumed measured at their fair values on the date acquired. Goodwill is measured as of the acquisition date as the excess of consideration transferred over the net acquisition date fair value of the assets acquired and the liabilities assumed. These estimates are inherently uncertain and subject to refinement. During the measurement period, which may be up to one year from the acquisition date, adjustments to the fair value of these tangible and intangible assets acquired and liabilities assumed may be recorded, with the corresponding offset to goodwill. Upon the conclusion of the measurement period or final determination of the fair value of assets acquired and liabilities assumed, whichever comes first, any subsequent adjustments are recorded to our consolidated statements of operations and comprehensive income (loss).

### *Product Warranties*

Our products are covered by a warranty to be free from defects in material and workmanship for a period of one year, except for products sold in the EU and select other countries where we provide a minimum two-year warranty, depending on the region, on all our products. At the time of sale, an estimate of future warranty costs is recorded as a component of the cost of revenue. Our estimate of costs to fulfill our warranty obligations is based on historical experience and expectations of future costs to repair or replace.

### *Income Taxes*

Our income tax expense, deferred tax assets and liabilities, and liabilities for unrecognized tax benefits reflect our best estimate of current and future taxes to be paid. Significant judgments and estimates are required in the determination of the consolidated income tax expense.

We prepare and file income tax returns based on our interpretation of each jurisdiction's tax laws and regulations. In preparing our consolidated financial statements, we estimate our income tax liability in each of the jurisdictions in which we operate by estimating our actual current tax expense together with assessing temporary differences resulting from differing treatment of items for tax and financial reporting purposes. These differences result in deferred tax assets and liabilities, which are included in our consolidated balance sheets. Significant management judgment is required in assessing the realizability of our deferred tax assets. In performing this assessment, we consider whether it is "more-likely-than-not" that some portion or all the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. In making this determination, we consider the scheduled reversal of deferred tax liabilities, projected future taxable income and the effects of tax planning strategies. We recorded a valuation allowance against all our U.S. deferred tax assets and certain of our foreign deferred tax assets as of October 1, 2022. We intend to continue maintaining a full valuation allowance on our U.S. and certain foreign deferred tax assets until there is sufficient evidence to support the reversal of all or some portion of these allowances.

We account for uncertain tax positions using a "more-likely-than-not" threshold for recognizing and resolving uncertain tax positions. We evaluate uncertain tax positions on a quarterly basis and consider various factors, that include, but are not limited to, changes in tax law, the measurement of tax positions taken or expected to be taken in tax returns, the effective settlement of matters subject to audit, information obtained during in process audit activities and changes in facts or circumstances related to a tax position. We accrue for potential interest and penalties related to unrecognized tax benefits in income tax expense.

Our policy with respect to the undistributed earnings of our non-U.S. subsidiaries is to maintain an indefinite reinvestment assertion as they are required to fund needs outside of the United States. This assertion is made on a jurisdiction by jurisdiction basis and takes into account the liquidity requirements in both the United States and of our foreign subsidiaries.

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate and foreign currency risks as follows:

### *Interest Rate Risk*

As of October 1, 2022, we had cash and cash equivalents of $274.9 million, which consisted primarily of cash on hand, money market fund investments, and bank deposits. Such interest-earning instruments carry a degree of interest rate risk due to floating interest rates.

To date, we have not been exposed, nor do we anticipate being exposed, to material risks due to changes in interest rates. A hypothetical 10% change in interest rates during any of the periods presented would not have had a material impact on our consolidated financial statements.

*Foreign Currency Risk*

Our inventory purchases are primarily denominated in U.S. dollars. Our international sales are primarily denominated in foreign currencies and any movement in the exchange rate between the U.S. dollar and the currencies in which we conduct sales in foreign countries could have an impact on our revenue, principally for sales denominated in the euro and the British pound. A portion of our operating expenses are incurred outside the United States and are denominated in foreign currencies, which are also subject to foreign currency exchange rate fluctuations. In certain countries where we may invoice customers in the local currency our revenues benefit from a weaker dollar and are adversely affected by a stronger dollar. The opposite impact occurs in countries where we record expenses in local currencies. In those cases, our costs and expenses benefit from a stronger dollar and are adversely affected by a weaker dollar.

We do not currently use foreign exchange contracts or derivatives to hedge any foreign currency exposures. The volatility of exchange rates depends on many factors that we cannot forecast with reliable accuracy. Our continued international expansion increases our exposure to exchange rate fluctuations and, as a result, such fluctuations could have a significant impact on our future results of operations.

We recognized a net loss from foreign currency of $21.9 million in fiscal 2022, and net gains from foreign currency of $2.4 million and $6.6 million in fiscal 2021 and fiscal 2020, respectively. Recently, we have seen a particular strengthening of the U.S. dollar relative to the euro and the British pound. If this trend continues, it will negatively affect the U.S. dollar value of revenue and gross margins we earn on our foreign currency-denominated sales. Based on transactions denominated in currencies other than respective functional currencies as of October 1, 2022, a hypothetical adverse change of 10% would have resulted in an adverse impact on income (loss) before provision for (benefit from) income taxes of approximately $22.5 million for the fiscal year ended 2022.

### Recent Accounting Pronouncements

See Note 2. Summary of Significant Accounting Policies of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for a discussion of recent accounting pronouncements.

**Item 8. Financial Statements and Supplementary Data**

**Index to Consolidated Financial Statements**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 238) | 47 |
| Consolidated Balance Sheets | 50 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) | 51 |
| Consolidated Statements of Stockholders' Equity | 52 |
| Consolidated Statements of Cash Flows | 53 |
| Notes to Consolidated Financial Statements | 54 |

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Sonos, Inc.

*Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of Sonos, Inc. and its subsidiaries (the "Company") as of October 1, 2022 and October 2, 2021, and the related consolidated statements of operations and comprehensive income (loss), of stockholders' equity and of cash flows for each of the three years in the period ended October 1, 2022, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of October 1, 2022, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of October 1, 2022 and October 2, 2021, and the results of its operations and its cash flows for each of the three years in the period ended October 1, 2022 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of October 1, 2022, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

*Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.
Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding

prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matters***

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Revenue Recognition - Estimates of Standalone Selling Price and Service Period for Unspecified Software Upgrades and Cloud-Based Services*

As described in Notes 2 and 5 to the consolidated financial statements, the Company's contracts with customers generally contain promises to transfer products and services which are not sold separately. Service revenue includes revenue allocated to (i) unspecified software upgrades and (ii) cloud-based services, which are each distinct performance obligations, based on relative standalone selling price. Management's estimation of standalone selling price requires judgment. Management has disclosed factors considered in estimating standalone selling price including competitive pricing information, where available, analyses of the cost of providing the products or services plus a reasonable gross margin, the nature of the products and services and the expected level of future services. Determining the revenue recognition period for unspecified software upgrades and cloud-based services also requires judgment. Management recognizes revenue attributable to these performance obligations ratably over the estimated service period. In developing the estimated service period over which to recognize service revenue, management considers past history, plans to continue to provide services, including plans to continue to support updates and enhancements to prior versions of the Company's products, expected technological developments, obsolescence, competition and other factors. Deferred revenue primarily relates to revenue allocated to unspecified software upgrades and cloud-based services and was $73.8 million as of October 1, 2022.

The principal considerations for our determination that performing procedures relating to revenue recognition, specifically estimates of standalone selling price and service period for unspecified software upgrades and cloud-based services, is a critical audit matter are the significant judgment by management in estimating the standalone selling price and the service period, which in turn led to significant auditor judgment, subjectivity, and audit effort in performing procedures and evaluating audit evidence relating to (i) management's estimates of standalone selling price by considering estimates of the cost of providing the services plus a reasonable gross margin, and (ii) management's estimates of service period by considering management's plans to continue to support updates and enhancements to prior versions of the Company's products.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the revenue recognition process, including over the estimation of the standalone selling prices and service period for unspecified software upgrades and cloud-based services. The procedures also included, among others, testing management's process for estimating the standalone selling price and service period. Procedures to test management's process for estimating standalone selling price included (i) evaluating the appropriateness of management's cost plus gross margin method of estimating standalone selling price; (ii) comparing the estimate of standalone selling price to competitive pricing information for comparable services using publicly disclosed information; (iii) evaluating the reasonableness of estimates of the cost of providing the services; and (iv) evaluating the reasonableness of gross margins. Evaluating the reasonableness of estimates of the cost of providing the services involved (i) testing the allocation of engineering costs, which is driven by time spent on software upgrades and cloud-based services and (ii) testing the completeness, accuracy, relevance, and classification of the engineering costs. Evaluating the reasonableness of gross margins involved comparing management's gross margin to the gross margin earned for similar services by third party peer companies within the same industry. Procedures performed to test management's process for estimating the service period for these services included (i) testing the completeness and accuracy of underlying data and (ii) evaluating the reasonableness of management's plans to continue to

support updates and enhancements to prior versions of the Company's products through a look-back analysis performed using historical software updates, as well as considering currently active products receiving software updates.

*Acquisition of Mayht – Valuation of Acquired In-Process Research and Development Intangible Assets*

As described in Notes 5 and 12 to the consolidated financial statements, on April 8, 2022, the Company completed the acquisition of 100% of the equity interests of Mayht for total purchase price consideration of $99.3 million. The Company accounted for this transaction as a business combination and recognized $71.8 million in intangible assets related to in-process research and development activity, which is not subject to amortization in the current period. The estimated fair value of acquired in process research and development intangible assets was determined using an income model valuation approach. Assumptions used in the determination of the fair value of the acquired in process research and development intangible assets include revenue pricing and volume forecasts, revenue growth rates, and the discount rate.

The principal considerations for our determination that performing procedures relating to the acquisition of Mayht, specifically the valuation of acquired in-process research and development intangible assets, is a critical audit matter are (i) a high degree of auditor judgment and subjectivity in performing procedures relating to the fair value of in-process research and development intangible assets acquired due to the significant judgment by management when developing the estimates; (ii) the significant audit effort in evaluating significant assumptions related to revenue pricing and volume forecasts, revenue growth rates, and the discount rate; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls over management's valuation of the acquired in-process research and development intangible assets and controls over the development of management's significant assumptions related to revenue pricing and volume forecasts, revenue growth rates, and the discount rate. These procedures also included, among others (i) reading the purchase agreement and (ii) testing management's process for estimating the fair value of the acquired in-process research and development intangible assets. Testing management's process included evaluating the appropriateness of the valuation method, testing the completeness and accuracy of underlying data provided by management, and evaluating the reasonableness of significant assumptions related to revenue pricing and volume forecasts, revenue growth rates, and the discount rate. Evaluating the reasonableness of the assumptions related to revenue pricing and volume forecasts and revenue growth rates involved reviewing pre-existing contractual arrangements, reviewing third party economic and industry forecasts, as well as considering consistency with evidence obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in the evaluation of the appropriateness of the method used to value the acquired in-process research and development intangible assets and in the evaluation of the reasonableness of the discount rate assumption.

/s/ PricewaterhouseCoopers LLP
Los Angeles, California
November 23, 2022
We have served as the Company's auditor since 2011, which includes periods before the Company became subject to SEC reporting requirements.

**SONOS, INC.**
**Consolidated Balance Sheets**
*(in thousands, except share and par values)*

| | | As of | | |
|---|---|---|---|---|
| | | October 1, 2022 | | October 2, 2021 |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 274,855 | $ | 640,101 |
| Accounts receivable, net of allowances of $26,317 and $20,707 as of October 1, 2022, and October 2, 2021 | | 101,206 | | 100,779 |
| Inventories | | 454,288 | | 185,130 |
| Prepaid and other current assets | | 37,042 | | 31,504 |
| Total current assets | | 867,391 | | 957,514 |
| Property and equipment, net | | 86,168 | | 71,341 |
| Operating lease right-of-use assets | | 28,329 | | 33,841 |
| Goodwill | | 77,300 | | 15,545 |
| Intangible assets, net: | | | | |
| In-process research and development | | 64,680 | | 20,100 |
| Other intangible assets | | 26,384 | | 4,350 |
| Deferred tax assets | | 1,508 | | 10,028 |
| Other noncurrent assets | | 36,628 | | 26,085 |
| Total assets | $ | 1,188,388 | $ | 1,138,804 |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 335,758 | $ | 214,996 |
| Accrued expenses | | 109,290 | | 108,029 |
| Accrued compensation | | 23,624 | | 77,695 |
| Deferred revenue, current | | 27,318 | | 35,866 |
| Other current liabilities | | 39,649 | | 39,544 |
| Total current liabilities | | 535,639 | | 476,130 |
| Operating lease liabilities, noncurrent | | 25,596 | | 33,960 |
| Deferred revenue, noncurrent | | 56,152 | | 53,632 |
| Deferred tax liabilities | | 9,642 | | 2,394 |
| Other noncurrent liabilities | | 846 | | 3,646 |
| Total liabilities | | 627,875 | | 569,762 |
| Commitments and contingencies (Note 13) | | | | |
| Stockholders' equity: | | | | |
| Common stock, $0.001 par value; 1,500,000,000 and 500,000,000 shares authorized, 129,823,663 and 128,857,085 shares issued, 126,668,723 and 126,985,273 shares outstanding as of October 1, 2022, and October 2, 2021, respectively | | 130 | | 129 |
| Treasury stock, 3,154,940 and 1,871,812 shares at cost as of October 1, 2022, and October 2, 2021, respectively | | (50,896) | | (50,276) |
| Additional paid-in capital | | 617,390 | | 690,462 |
| Accumulated deficit | | (2,514) | | (69,897) |
| Accumulated other comprehensive loss | | (3,597) | | (1,376) |
| Total stockholders' equity | | 560,513 | | 569,042 |
| Total liabilities and stockholders' equity | $ | 1,188,388 | $ | 1,138,804 |

The accompanying notes are an integral part of these consolidated financial statements.

**SONOS, INC.**

**Consolidated Statements of Operations and Comprehensive Income (Loss)**

*(in thousands, except share and per share data)*

| | Year Ended | | |
|---|---|---|---|
| | October 1, 2022 | October 2, 2021 | October 3, 2020 |
| Revenue | $ 1,752,336 | $ 1,716,744 | $ 1,326,328 |
| Cost of revenue | 955,969 | 906,750 | 754,372 |
| Gross profit | 796,367 | 809,994 | 571,956 |
| Operating expenses | | | |
| Research and development | 256,073 | 230,078 | 214,672 |
| Sales and marketing | 280,333 | 272,124 | 263,539 |
| General and administrative | 170,429 | 152,828 | 120,978 |
| Total operating expenses | 706,835 | 655,030 | 599,189 |
| Operating income (loss) | 89,532 | 154,964 | (27,233) |
| Other income (expense), net | | | |
| Interest income | 1,655 | 146 | 1,998 |
| Interest expense | (552) | (592) | (1,487) |
| Other income (expense), net | (21,905) | 2,407 | 6,639 |
| Total other income (expense), net | (20,802) | 1,961 | 7,150 |
| Income (loss) before provision for (benefit from) income taxes | 68,730 | 156,925 | (20,083) |
| Provision for (benefit from) income taxes | 1,347 | (1,670) | 32 |
| Net income (loss) | $ 67,383 | $ 158,595 | $ (20,115) |
| Net income (loss) attributable to common stockholders: | | | |
| Basic and diluted | $ 67,383 | $ 158,595 | $ (20,115) |
| | | | |
| Net income (loss) per share attributable to common stockholders: | | | |
| Basic | $ 0.53 | $ 1.30 | $ (0.18) |
| Diluted | $ 0.49 | $ 1.13 | $ (0.18) |
| Weighted-average shares used in computing net income (loss) per share attributable to common stockholders: | | | |
| Basic | 127,691,030 | 122,245,212 | 109,807,154 |
| Diluted | 137,762,078 | 140,309,152 | 109,807,154 |
| Total comprehensive income (loss) | | | |
| Net income (loss) | $ 67,383 | $ 158,595 | $ (20,115) |
| Change in foreign currency translation adjustment | (2,221) | 514 | (1,826) |
| Comprehensive income (loss) | $ 65,162 | $ 159,109 | $ (21,941) |

The accompanying notes are an integral part of these consolidated financial statements.

## SONOS, INC.
### Consolidated Statements of Stockholders' Equity
*(in thousands, except share amounts)*

| | Common Stock Shares | Common Stock Amount | Additional Paid-In Capital | Treasury Stock Shares | Treasury Stock Amount | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| Balance at September 28, 2019 | 109,623,417 | $ 110 | $ 502,757 | (1,020,775) | $ (13,498) | $ (208,377) | $ (64) | $ 280,928 |
| Issuance of common stock pursuant to equity incentive plans | 8,392,371 | 8 | 42,278 | — | — | — | — | 42,286 |
| Retirement of treasury stock | (4,100,555) | (4) | (53,652) | 4,100,555 | 53,656 | — | — | — |
| Repurchase of common stock | — | — | — | (3,787,783) | (50,015) | — | — | (50,015) |
| Repurchase of common stock related to shares withheld for tax in connection with vesting of restricted stock unit awards ("RSUs") | — | — | — | (863,135) | (11,029) | — | — | (11,029) |
| Stock-based compensation expense | — | — | 57,610 | — | — | — | — | 57,610 |
| Net loss | — | — | — | — | — | (20,115) | — | (20,115) |
| Change in foreign currency translation adjustment | — | — | — | — | — | — | (1,826) | (1,826) |
| Balance at October 3, 2020 | 113,915,233 | 114 | 548,993 | (1,571,138) | (20,886) | (228,492) | (1,890) | 297,839 |
| Issuance of common stock pursuant to equity incentive plans | 17,544,060 | 18 | 147,800 | — | — | — | — | 147,818 |
| Retirement of treasury stock | (2,602,208) | (3) | (68,458) | 2,602,208 | 68,461 | — | — | — |
| Repurchase of common stock | — | — | — | (1,394,006) | (50,014) | — | — | (50,014) |
| Repurchase of common stock related to shares withheld for tax in connection with vesting of RSU | — | — | — | (1,508,876) | (47,837) | — | — | (47,837) |
| Stock-based compensation expense | — | — | 62,127 | — | — | — | — | 62,127 |
| Net loss | — | — | — | — | — | 158,595 | — | 158,595 |
| Change in foreign currency translation adjustment | — | — | — | — | — | — | 514 | 514 |
| Balance at October 2, 2021 | 128,857,085 | 129 | 690,462 | (1,871,812) | (50,276) | (69,897) | (1,376) | 569,042 |
| Issuance of common stock pursuant to equity incentive plans | 7,825,793 | 8 | 40,435 | — | — | — | — | 40,443 |
| Retirement of treasury stock | (6,859,215) | (7) | (189,147) | 6,859,215 | 189,154 | — | — | — |
| Repurchase of common stock | — | — | — | (6,578,973) | (150,121) | — | — | (150,121) |
| Repurchase of common stock related to shares withheld for tax in connection with vesting of RSU | — | — | — | (1,563,370) | (39,653) | — | — | (39,653) |
| Stock-based compensation expense | — | — | 75,640 | — | — | — | — | 75,640 |
| Net income | — | — | — | — | — | 67,383 | — | 67,383 |
| Change in foreign currency translation adjustment | — | — | — | — | — | — | (2,221) | (2,221) |
| Balance at October 1, 2022 | 129,823,663 | $ 130 | $ 617,390 | (3,154,940) | $ (50,896) | $ (2,514) | $ (3,597) | $ 560,513 |

The accompanying notes are an integral part of these consolidated financial statements.

**SONOS, INC.**
**Consolidated Statements of Cash Flows**
*(in thousands)*

| | | Year Ended | |
| --- | --- | --- | --- |
| | October 1, 2022 | October 2, 2021 | October 3, 2020 |
| **Cash flows from operating activities** | | | |
| Net income (loss) | $ 67,383 | $ 158,595 | $ (20,115) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 38,504 | 33,882 | 36,426 |
| Impairment and abandonment charges | 62 | 3,552 | 14,174 |
| Stock-based compensation expense | 75,640 | 62,127 | 57,610 |
| Other | 10,919 | 1,951 | 5,710 |
| Deferred income taxes | (1,508) | (8,330) | (567) |
| Foreign currency transaction (gain) loss | 10,775 | (1,108) | (4,143) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable, net | (5,513) | (45,697) | 49,593 |
| Inventories | (277,489) | (7,911) | 38,010 |
| Other assets | (16,604) | (30,009) | (5,749) |
| Accounts payable and accrued expenses | 129,686 | 26,231 | (24,440) |
| Accrued compensation | (52,904) | 33,447 | 1,088 |
| Deferred revenue | (1,667) | 27,587 | 4,754 |
| Other liabilities | (5,544) | (1,091) | 9,635 |
| Net cash provided by (used in) operating activities | (28,260) | 253,226 | 161,986 |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment, intangible and other assets | (46,216) | (45,531) | (33,035) |
| Cash paid for acquisitions, net of acquired cash | (126,416) | — | (36,289) |
| Net cash used in investing activities | (172,632) | (45,531) | (69,324) |
| **Cash flows from financing activities** | | | |
| Payments for debt issuance costs | (929) | — | — |
| Proceeds from exercise of stock options | 40,443 | 147,818 | 42,286 |
| Payments for repurchase of common stock | (150,121) | (50,014) | (50,015) |
| Payments for repurchase of common stock related to shares withheld for tax in connection with vesting of RSUs | (39,653) | (47,837) | (11,029) |
| Repayments of borrowings | — | (25,000) | (8,333) |
| Net cash provided by (used in) financing activities | (150,260) | 24,967 | (27,091) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (14,094) | 148 | 2,900 |
| Net increase in cash, cash equivalents, and restricted cash | (365,246) | 232,810 | 68,471 |
| **Cash, cash equivalents, and restricted cash** | | | |
| Beginning of period | 640,101 | 407,291 | 338,820 |
| End of period | $ 274,855 | $ 640,101 | $ 407,291 |
| **Supplemental disclosure** | | | |
| Cash paid for interest | $ 344 | $ 502 | $ 1,647 |
| Cash paid for taxes, net of refunds | $ 9,306 | $ 4,114 | $ 783 |
| Cash paid for amounts included in the measurement of lease liabilities | $ 14,636 | $ 18,657 | $ 17,194 |
| **Supplemental disclosure of non-cash investing and financing activities** | | | |
| Purchases of property and equipment, accrued but not paid | $ 9,112 | $ 5,653 | $ 3,911 |
| Right-of-use assets obtained in exchange for lease liabilities | $ 5,054 | $ 2,010 | $ 77,416 |

The accompanying notes are an integral part of these consolidated financial statements.

**SONOS, INC.**
**Notes to Consolidated Financial Statements**

## 1. Business Overview

### *Description of Business*

Sonos, Inc. and its wholly owned subsidiaries (collectively, "Sonos," the "Company," "we," "us" or "our") designs, develops, manufactures, and sells audio products and services. The Sonos sound system provides customers with an immersive listening experience created by the design of its speakers and components, a proprietary software platform, and the ability to stream content from a variety of sources over the customer's wireless network or over Bluetooth.

The Company's products are sold through third-party physical retailers, including custom installers of home audio systems, select e-commerce retailers, and its website sonos.com. The Company's products are distributed in over 60 countries through its wholly owned subsidiaries: Sonos Europe B.V. in the Netherlands, Beijing Sonos Technology Co. Ltd. in China, Sonos Japan GK in Japan, and Sonos Australia Pty Ltd. in Australia.

## 2. Summary of Significant Accounting Policies

### *Basis of Presentation and Preparation*

The consolidated financial statements, which include the accounts of Sonos, Inc. and its wholly owned subsidiaries, have been prepared in conformity with accounting principles generally accepted in the United States ("U.S. GAAP"). All intercompany accounts and transactions have been eliminated in consolidation. Certain prior period amounts have been reclassified to conform to the current period presentation.

The Company operates on a 52-week or 53-week fiscal year ending on the Saturday nearest September 30 each year. The Company's fiscal year is divided into four quarters of 13 weeks, each beginning on a Sunday and containing two 4-week periods followed by a 5-week period. An additional week is included in the fourth fiscal quarter approximately every five years to realign fiscal quarters with calendar quarters. This last occurred in the Company's fiscal year ended October 3, 2020, and will reoccur in the fiscal year ending October 3, 2026. As used in the Annual Report on Form 10-K, "fiscal 2022" refers to the 52-week fiscal year ending October 1, 2022, "fiscal 2021" refers to the 52-week fiscal year ending October 2, 2021, "fiscal 2020" refers to the 53-week fiscal year ended October 3, 2020.

### *Use of Estimates and Judgments*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and judgments that affect the amounts reported and disclosed in the consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates. For revenue recognition, examples of estimates and judgments include: determining the nature and timing of satisfaction of performance obligations, determining the standalone selling price ("SSP") of performance obligations and estimating variable consideration such as sales incentives and product returns. Additionally, estimates and judgments are made by management for allowances for credit losses, excess and obsolete inventory, loss on purchase commitments, useful lives associated with property and equipment, incremental borrowing rates associated with leases, the recording of and release of valuation allowances with respect to deferred tax assets and uncertain tax positions, impairment of long-lived assets, impairment of goodwill and indefinite-lived intangible assets, warranty, contingencies and valuation and assumptions underlying stock-based compensation and other equity instruments. On an ongoing basis, the Company evaluates its estimates and judgments compared to historical experience and trends that form the basis for making estimates and judgments about the carrying value of assets and liabilities.

The Company has considered the impacts of the COVID-19 pandemic when developing its estimates and assumptions noted above. The impacts of, and uncertainty related to, the COVID-19 pandemic and its expected duration persist. Actual results and outcomes may differ from management's estimates and assumptions.

### *Comprehensive Income (Loss)*

Comprehensive income (loss) consists of two components: net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) refers to net gains and losses that are recorded as an element of stockholders' equity but are excluded from

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

net income (loss). The Company's other comprehensive income (loss) consists of net unrealized gains and losses on foreign currency translation adjustments from those subsidiaries not using the U.S. dollar as their functional currency.

### Cash and Cash Equivalents

Cash equivalents consist of short-term, highly liquid financial instruments with insignificant interest rate risk that are readily convertible to cash and have maturities of three months or less from the date of purchase. As of October 1, 2022, and October 2, 2021, cash equivalents consisted of money market funds, which are recorded at fair value.

### Accounts Receivable

Accounts receivable are recorded at the invoiced amount less allowances for credit losses and sales incentives, do not require collateral and do not bear interest.

The allowance for credit losses is established through a provision for net bad debt expense which is recorded in general and administrative expense in the consolidated statements of operations and comprehensive income (loss). The Company determines the adequacy of the allowance for credit losses by evaluating the collectability of accounts, including consideration of the age of invoices, each customer's expected ability to pay and collection history, customer-specific information, and current economic conditions that may impact the customer's ability to pay. This estimate is periodically adjusted as a result of the aforementioned process, or when the Company becomes aware of a specific customer's inability to meet its financial obligations.

### Concentration of Credit Risk

Financial instruments that potentially subject the Company to significant concentrations of credit risk consist principally of cash and cash equivalents and accounts receivable. The Company maintains cash and cash equivalents in several high-quality financial institutions. Cash and cash equivalents held at these banks, including those held in foreign branches of global banks, may exceed the amount of insurance provided on such deposits. These deposits may be redeemed upon demand, and management believes that the financial institutions that hold the Company's cash and cash equivalents are financially sound and, accordingly, minimal credit risk exists with respect to cash. The Company has not experienced any losses in such accounts.

As of October 1, 2022, and October 2, 2021, the Company's customers that accounted for 10% or more of total accounts receivable, net, were as follows:

|  | Accounts Receivable, net | |
|---|---|---|
|  | October 1, 2022 | October 2, 2021 |
| Customer A | 34% | 19% |
| Customer B | * | 10% |

\* Accounts receivable was less than 10%.

The Company's customers that accounted for 10% or more of total revenue were as follows:

|  | Revenue | | |
|---|---|---|---|
|  | Year Ended | | |
|  | October 1, 2022 | October 2, 2021 | October 3, 2020 |
| Customer A | 15% | 14% | 12% |

### Inventories

Inventories primarily consist of finished goods and component parts, which are purchased from contract manufacturers and component suppliers. Inventories are stated at lower of cost and net realizable value. Cost is determined using a standard costing method, which approximates first-in first-out. Inventory costs primarily consist of materials, inbound freight, import duties, tariffs, direct labor and manufacturing overhead, logistics, and other handling fees. The Company assesses the valuation of inventory balances including an assessment to determine potential excess and/or obsolete inventory. The Company may be required to write down the value of inventory if estimates of future demand and market conditions indicate excess and/or obsolete inventory. Inventory write-downs and losses on purchase commitments are recorded as a component of cost of revenue in the consolidated statement of operations and comprehensive

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

income (loss). Losses in relation to purchase commitments amounted to $12.0 million for the fiscal year ended October 1, 2022. Ownership of inventory transfers to the Company at the time the goods are shipped from the suppliers. Inventories recorded on the Company's consolidated balance sheets include in transit inventory owned by the Company that have been shipped but have not yet been received at a Company distribution center.

### Property and Equipment, Net

Property and equipment are stated at historical cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the related assets as follows:

| | |
|---|---|
| Computer hardware and software | 1-5 years |
| Furniture and fixtures | 2-5 years |
| Tooling and production line test equipment | 2-4 years |
| Leasehold improvements | 1-15 years |
| Product displays | 1-3 years |

Costs incurred to improve leased office space are capitalized. Leasehold improvements are amortized on a straight-line basis over the shorter of the term of the lease or the estimated useful life of the improvement. Expenditures for major renewals and improvements that extend the useful lives of property and equipment are capitalized. Maintenance, repair costs and gains or losses associated with disposals are charged to expense as incurred.

Product displays are deployed at retail locations. Because the product displays facilitate marketing of the Company's products within the retail stores, depreciation for product displays is recorded in sales and marketing expenses in the consolidated statements of operations and comprehensive income (loss).

### Cloud Computing Arrangements

The Company incurs costs to implement cloud computing arrangements that are hosted by a third-party vendor. Implementation costs incurred during the application development stage are capitalized until the software is ready for its intended use. The costs are then amortized on a straight-line basis over the term of the associated hosting arrangement and are recognized as an operating expense within the consolidated statements of operations and comprehensive income (loss). Beginning in fiscal 2020, and continuing through fiscal 2022, the Company began activities to replace its legacy enterprise resource management system in order to accommodate the Company's expanding operations. In May 2022, the Company went live with its implementation of a new enterprise resource planning ("ERP") system. Capitalized costs, net of accumulated amortization, were $21.7 million and $14.3 million as of October 1, 2022 and October 2, 2021, respectively, and are reported as a component of other noncurrent assets on the Company's consolidated balance sheets. Amortization expenses for implementation costs for cloud-based computing arrangements for the twelve months ended October 1, 2022 were $1.9 million.

### Business Combinations

The Company uses the acquisition method of accounting for business combinations and recognizes assets acquired and liabilities assumed measured at their fair values on the date acquired. Goodwill is measured as of the acquisition date as the excess of consideration transferred over the net acquisition date fair value of the assets acquired and the liabilities assumed. These estimates are inherently uncertain and subject to refinement. During the measurement period, which maybe up to one year from the acquisition date, adjustments to the fair value of these tangible and intangible assets acquired and liabilities assumed may be recorded, with the corresponding offset to goodwill.  Upon the conclusion of the measurement period or final determination of the fair value of assets acquired and liabilities assumed, whichever comes first, any subsequent adjustments are recorded to the Company's consolidated statements of operations and comprehensive income (loss).

### Impairment of Goodwill and Indefinite-lived Intangible Assets

Goodwill and indefinite-lived intangible assets are not amortized and are tested for impairment on an annual basis or between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of the reporting unit or asset below its carrying value.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

In connection with the Company's evaluation of goodwill impairment, the Company performs a qualitative assessment to determine if it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If the qualitative assessment is not conclusive, the Company tests goodwill for impairment, including comparing the fair value of the reporting unit to its carrying value (including attributable goodwill). The Company determines fair value of its reporting unit using an income or market approach incorporating market participant considerations and management's assumptions on revenue growth rates, operating margins, discount rates and expected capital expenditures. Fair value determinations may include both internal and third-party valuations. The Company performs its annual goodwill impairment assessment during the third quarter of each fiscal year and more frequently if circumstances otherwise dictate.

In connection with the Company's evaluation of indefinite-lived intangible asset impairment, the Company performs a qualitative assessment to determine if it is more likely than not that the fair value of the asset is less than its carrying value. If the qualitative assessment is not conclusive, the Company proceeds to test for impairment by comparing the fair value of the asset to the carrying value. Fair value is determined based on estimated discounted future cash flow analyses that include significant management assumptions such as revenue growth rates, weighted-average costs of capital and assumed royalty rates. If the carrying value exceeds fair value, an impairment charge will be recorded to reduce the asset to fair value.

### Impairment of Long-Lived Assets

The Company evaluates the recoverability of its long-lived assets, which primarily comprises property and equipment and operating lease right-of-use assets, for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. The Company performs impairment testing at the level that represents the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. Recoverability is measured by comparing the carrying amounts to the expected future undiscounted cash flows attributable to the assets. If it is determined that an asset may not be recoverable, an impairment loss equal to the excess of the asset's carrying value over its fair value is recorded. Fair value is determined based on estimated discounted future cash flows analyses. There were no impairment charges identified on the Company's long-lived assets for fiscal 2022 or fiscal 2021. For fiscal 2020, there were impairment charges incurred related to the 2020 restructuring plan.

### Product Warranties

The Company's products are covered by warranty to be free from defects in material and workmanship for a period of one year, except in the EU and select other countries where the Company provides a minimum two-year warranty, depending on the region, on all its products. At the time of sale, an estimate of future warranty costs is recorded as a component of cost of revenue and a warranty liability is recorded for estimated costs to satisfy the warranty obligation. The Company's estimate of costs to fulfill its warranty obligations is based on historical experience and expectations of future costs to repair or replace.

### Legal Contingencies

If a potential loss from any claim or legal proceeding is considered probable, and the amount can be reasonably estimated, the Company records a liability for an estimated loss. Legal fees are expensed as incurred and included in general and administrative expenses in the consolidated statements of operations and comprehensive income (loss). See Note 13. Commitments and Contingencies for additional information regarding legal contingencies.

### Treasury Stock

The Company accounts for treasury stock acquisitions using the cost method. The Company accounts for the retirement of treasury stock by deducting its par value from common stock and reflecting any excess of cost over par value as a deduction from additional paid-in capital on the consolidated balance sheets.

### Fair Value Accounting

Assets and liabilities recorded at fair value on the consolidated balance sheets are categorized based upon the level of judgment associated with the inputs used to measure their fair value.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

| Level Input | Input Definition |
|---|---|
| Level 1 | Quoted prices for identical assets or liabilities in active markets at the measurement date. |
| Level 2 | Inputs, other than quoted prices included in Level 1, such as quoted prices for similar assets or liabilities, in active markets or other inputs that are observable or can be corroborated with market data at the measurement date. |
| Level 3 | Unobservable inputs that reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. |

### Foreign Currency

Certain of the Company's wholly owned subsidiaries have non-U.S. dollar functional currencies. The Company translates assets and liabilities of non-U.S. dollar functional currency subsidiaries into U.S. dollars using exchange rates in effect at the end of each period and stockholders' equity at historical rates. Revenue and expenses for these subsidiaries are translated using rates that approximate those in effect during the period. Gains and losses from translation are recognized in foreign currency translation included in accumulated other comprehensive loss.

The Company remeasures monetary assets or liabilities denominated in currencies other than the functional currency using exchange rates prevailing on the balance sheet date, and non-monetary assets and liabilities at historical rates. Foreign currency remeasurement and transaction gains and losses are included in other income (expense), net.

Foreign currency remeasurement and transaction gains (losses) are recorded in other income (expense), net as follows:

| | October 1, 2022 | | October 2, 2021 | | October 3, 2020 |
|---|---|---|---|---|---|
| **(In thousands)** | | | | | |
| Foreign currency remeasurement and transaction gains (losses) | $ (21,877) | $ | 2,353 | $ | 6,594 |

### Revenue Recognition

Revenue is recognized upon transfer of control of promised products or services to customers in an amount that reflects the consideration the Company expects to receive in exchange for those products or services. The Company's contracts generally include a combination of products and services. Revenue is allocated to distinct performance obligations and is recognized net of allowances for returns, discounts, sales incentives and any taxes collected from customers, which are subsequently remitted to governmental authorities. Shipping and handling costs associated with outbound freight after control over a product has transferred to a customer are not considered a separate performance obligation and are accounted for as a fulfillment cost and are included in cost of revenue. As of October 1, 2022, and October 2, 2021, the Company did not have any material assets related to incremental costs to obtain or fulfill customer contracts.

#### Nature of Products and Services

Product revenue primarily includes sales of Sonos speakers and Sonos system products, which include software that enables the Company's products to operate over a customer's wireless network, as well as connect to various third-party services, including music and voice. The Company also generates a small portion of revenue from Partner products and other revenue sources in connection with partnerships, accessories, professional services, licensing, advertising, and subscription revenue. Revenue for module units is related to hardware and embedded software that is integrated into final products that are manufactured and sold by the Company's partners. Software primarily consists of firmware embedded in the products and the Sonos app, which is software that can be downloaded to consumer devices at no charge, with or without the purchase of one of the Company's products. Products and related software are accounted for as a single performance obligation and all intended functionality is available to the customer upon purchase. The revenue allocated to the products and related software is the substantial portion of the total sale price. Product revenue is recognized at the point in time when control is transferred, which is either upon shipment or upon delivery to the customer, depending on delivery terms.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Service revenue includes revenue allocated to (i) unspecified software upgrades and (ii) cloud-based services that enable products to access third-party music and voice assistant platforms, based on relative standalone selling price, which are each distinct performance obligations and are provided to customers at no additional charge. Unspecified software upgrades are provided on a when-and-if-available basis and have historically included updates and enhancements such as bug fixes, feature enhancements and updates to the ability to connect to third-party music or voice assistant platforms. Service revenue is recognized ratably over the estimated service period.

*Significant Judgments*

The Company's contracts with customers generally contain promises to transfer products and services as described above. Determining whether products and services are considered distinct performance obligations that should be accounted for separately requires significant judgment.

Determining the SSP for each distinct performance obligation requires judgment. The Company estimates SSP for items that are not sold separately, which include the products and related software, unspecified software upgrades and cloud-based services, using information that may include competitive pricing information, where available, as well as analyses of the cost of providing the products or services plus a reasonable margin. In developing SSP estimates, the Company also considers the nature of the products and services and the expected level of future services.

Determining the revenue recognition period for unspecified software upgrades and cloud-based services also requires judgment. The Company recognizes revenue attributable to these performance obligations ratably over the best estimate of the period that the customer is expected to receive the services. In developing the estimated period of providing future services, the Company considers past history, plans to continue to provide services, including plans to continue to support updates and enhancements to prior versions of the Company's products, expected technological developments, obsolescence, competition and other factors. The estimated service period may change in the future in response to competition, technology developments and the Company's business strategy.

The Company offers sales incentives through various programs consisting primarily of discounts, cooperative advertising and market development fund programs. The Company records cooperative advertising and market development fund programs with customers as a reduction to revenue unless it receives a distinct benefit in exchange for credits claimed by the customer and can reasonably estimate the fair value of the benefit received, in which case the Company records it as an expense. The Company recognizes a liability or a reduction to accounts receivable, and reduces revenue based on the estimated amount of sales incentives that will be claimed by customers. Estimates for sales incentives are developed using the most likely amount and are included in the transaction price to the extent that a significant reversal of revenue would not result once the uncertainty is resolved. In developing its estimate, the Company also considers the susceptibility of the incentive to outside influences, the length of time until the uncertainty is resolved and the Company's experience with similar contracts. Reductions in revenue related to discounts are allocated to products and services on a relative basis based on their respective SSP. Judgment is required to determine the timing and amount of recognition of marketing funds which the Company estimates based on past practice of providing similar funds.

The Company accepts returns from direct customers and from certain resellers. To establish an estimate for returns, the Company uses the expected value method by considering a portfolio of contracts with similar characteristics to calculate the historical returns rate. When determining the expected value of returns, the Company considers future business initiatives and relevant anticipated future events.

*Supplier Concentration*

The Company relies on third parties for the supply and manufacture of its products, as well as third-party logistics providers for the distribution of its products. In instances where these parties fail to perform their obligations, the Company may be unable to find alternative suppliers or satisfactorily deliver its products to customers on time, if at all. During fiscal 2022, 2021 and 2020, approximately 57%, 59% and 65%, respectively, of the Company's finished goods purchased during each year were from one vendor.

*Deferred Revenue and Payment Terms*

The Company invoices each order upon hardware shipment or delivery and recognizes revenue for each distinct performance obligation when transfer of control has occurred, which in the case of services, may extend over several reporting periods. Amounts invoiced in advance of revenue recognition are recorded as deferred revenue on the consolidated balance sheets. Deferred revenue primarily relates to revenue allocated to unspecified software upgrades and platform services, as well as for newly launched products

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

sold to resellers not recognized until the date of general availability is reached. General availability deferrals are classified as current deferred revenue as the Company starts shipping the product to the reseller within one month prior to the general availability date. The Company classifies deferred revenue as noncurrent if amounts are expected to be recognized as revenue beyond one year from the balance sheet date.

*Payment Terms*

Payment terms and conditions vary among the Company's distribution channels although terms generally include a requirement of payment within 30 days of product shipment. Sales directly to customers from the Company's website are paid at the time of product shipment. Prior to providing payment terms to customers, an evaluation of the customer's credit risk is performed. Contractual allowances are an offset to accounts receivable.

**Research and Development**

Research and development expenses consist primarily of personnel-related expenses, consulting and outside professional service costs, tooling and prototype materials and overhead costs. Substantially all of the Company's research and development expenses are related to developing new products and services and improving existing products and services. To date, software development costs have been expensed as incurred because the period between achieving technological feasibility and the release of the software has been short and development costs qualifying for capitalization have been insignificant.

In-process research and development ("IPRD") assets represent the fair value of incomplete research and development projects obtained as part of a business combination that have not yet reached technological feasibility and are initially not subject to amortization; rather, these assets are subject to impairment considerations of indefinite-lived intangible assets. Upon completion of development, IPRD assets are considered definite-lived intangible assets, transferred to developed technology and are amortized over their useful lives. If a project were to be abandoned, the IPRD would be considered fully impaired and expensed to Research and development.

**Advertising Costs**

Advertising costs are expensed as incurred and included in sales and marketing expenses. Advertising expenses were $66.6 million, $62.3 million and $43.9 million for fiscal 2022, 2021 and 2020, respectively.

**Restructuring and Related Costs**

Costs associated with a restructuring plan generally consist of involuntary employee termination benefits, contract termination costs, and other exit-related costs including costs to close facilities. The Company records a liability for involuntary employee termination benefits when management has committed to a plan that establishes the terms of the arrangement and that plan has been communicated to employees. Costs to terminate a contract before the end of the term are recognized on the termination date, and costs that will continue to be incurred in a contract for the remaining term without economic benefit are recognized as of the cease-use date. Restructuring and related costs may also include the write-down of related assets, including operating lease right-of-use assets, when the sale or abandonment of the asset is a direct result of the plan. Other exit-related costs are recognized as incurred. Restructuring and related costs are recognized as an operating expense within the consolidated statements of operations and comprehensive income (loss) and are classified based on the Company's classification policy for each category of operating expense.

**Stock-Based Compensation**

The Company measures stock-based compensation cost at fair value on the date of grant. Compensation cost for stock options is recognized, on a straight-line basis, as an expense over the period of vesting as the employee performs the related services, net of estimated forfeitures. The Company estimates the fair value of stock option awards using the Black-Scholes option-pricing model and is based on the Company's closing stock price on the trading day immediately prior to the date of grant. The Company estimates forfeitures based on expected future terminations and will revise rates, as necessary, in subsequent periods if actual forfeitures differ from initial estimates. The fair value of RSUs is based on the Company's closing stock price on the trading day immediately preceding the date of grant. The Company estimates the fair value of performance stock units ("PSU") on the grant date and recognizes compensation expense in the period it becomes probable that performance conditions will be achieved. On a quarterly basis, the Company re-evaluates the assumption of the probability that performance conditions will be satisfied and revises its estimates as appropriate as new or updated information becomes available.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Retirement Plans*

The Company has a defined contribution 401(k) plan (the "401(k) Plan") for the Company's U.S.-based employees, as well as various defined contribution plans for its international employees. Eligible U.S. employees may make tax-deferred contributions under the 401(k) plan, but are limited to the maximum annual dollar amount allowable under the Internal Revenue Code of 1986, as amended (the "Code"). The Company matches contributions towards the 401(k) Plan and international defined contribution plans. The Company's matching contributions totaled $8.2 million and $7.6 million for fiscal 2022 and 2021, respectively.

*Income Taxes*

The Company accounts for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the consolidated financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the consolidated financial statements and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income during the period that includes the enactment date.

The Company records a valuation allowance when necessary to reduce its deferred tax assets to amounts that are more likely than not to be realized. In making such a determination, all available positive and negative evidence is considered, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, and results of recent operations. If the Company determines that it would be able to realize its deferred tax assets in the future in excess of their net recorded amount, the Company would make an adjustment to the deferred tax asset valuation allowance, which would result in a benefit to income taxes.

The Company records uncertain tax positions in accordance with a two-step process whereby (i) the Company determines whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position and (ii) for those tax positions that meet the more likely than not recognition threshold, the Company recognizes the largest amount of tax benefit that is more than 50% likely to be realized upon ultimate settlement with the related tax authority.

The Company includes interest and penalties related to unrecognized tax benefits within the provision for income taxes in the consolidated statements of operations and comprehensive income (loss). The Company has not incurred any interest or penalties related to unrecognized tax benefits in any of the periods presented.

The Company's provision for (benefit from) income taxes, deferred tax assets and liabilities and liabilities for unrecognized tax benefits involves the use of estimates, assumptions and judgments. Although the Company believes its estimates, assumptions and judgments to be reasonable, any changes in tax law or its interpretation of tax laws and the resolutions of potential tax audits could significantly impact the amounts provided for income taxes in the Company's consolidated financial statements. Actual future operating results and the underlying amount and type of income could differ materially from the Company's estimates, assumptions and judgments thereby impacting the Company's financial position and results of operations.

*Segment Information*

The Company operates as one operating segment as it only reports aggregate financial information on a consolidated basis, accompanied by disaggregated information about revenue by geographic region and product category to its Chief Executive Officer, who is the Company's chief operating decision maker.

*Leases*

The substantial majority of the Company's leases are for its office spaces and facilities, which are accounted for as operating leases. The Company determines whether an arrangement is a lease at inception if there is an identified asset, and if it has the right to control the identified asset for a period of time. Some of the Company's leases include options to extend the leases for up to 5 years, and some include options to terminate the leases within 1 year. The Company's lease terms are only for periods in which it has enforceable rights and are impacted by options to extend or terminate the lease only when it is reasonably certain that the Company will exercise the option. For leases with terms greater than 12 months, the Company records the related right-of-use asset and lease obligation at the present value of lease payments over the lease terms. Leases with an initial term of 12 months or less are not recorded on the balance sheet. Lease expense is recognized on a straight-line basis over the lease term. Lease agreements will typically exist with lease and non-lease components, which are accounted for separately. The Company's agreements may contain variable lease payments. The

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Company includes variable lease payments that depend on an index or a rate and exclude those which depend on facts or circumstances occurring after the commencement date, other than the passage of time. As most of the Company's leases do not contain an implicit interest rate, the Company uses judgment to determine an incremental borrowing rate to use at lease commencement.

### *Recently Adopted Accounting Pronouncements*

In December 2019, the Financial Accounting Standards Board ("FASB") issued ASU No. 2019-12, Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes. This standard simplifies the accounting for income taxes by removing certain exceptions to the general principles in Accounting Standards Codification Topic 740 ("ASC 740") as well as by improving consistent application of the topic by clarifying and amending existing guidance. The Company adopted this standard in the first quarter of fiscal 2022. The adoption did not have a material impact on the Company's consolidated financial statements.

### *Recent Accounting Pronouncements Pending Adoption*

In October 2021, the FASB issued ASU No. 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers. This update requires that an entity recognize and measure contract assets and contract liabilities acquired in a business combination in accordance with Topic 606. This standard is effective for the Company in the first quarter of fiscal 2024, with early adoption permitted. The Company is currently evaluating timing of adoption of the pronouncement and does not expect it to have a material impact on the Company's consolidated financial statements or disclosures.

In March 2020, the FASB issued ASU No. 2020-04, Reference Rate Reform (Topic 848): Facilitation of Effects of Reference Rate Reform on Financial Reporting, and then issued a subsequent amendment to the initial guidance under ASU No. 2021-01 (collectively Topic 848). Topic 848 provides practical expedients and exceptions for applying U.S. GAAP to contracts, hedging relationships, derivatives, and other transactions affected by reference rate reform if certain criteria are met. The expedients and exceptions provided by the amendments in this update apply only to contracts, hedging relationships, derivatives, and other transactions that reference the London interbank offered rate ("LIBOR") or another reference rate expected to be discontinued as a result of reference rate reform. Topic 848 is currently effective and upon adoption may be applied prospectively to contract modifications and hedging relationships made on or before December 31, 2022. The Company is currently evaluating the pronouncement to determine the impact it may have on the Company's consolidated financial statements.

## 3. Fair Value Measurements

The carrying values of the Company's financial instruments, including accounts receivable and accounts payable, approximate their fair values due to the short period of time to maturity or repayment.

The following table summarizes fair value measurements by level for the assets measured at fair value on a recurring basis as of October 1, 2022, and October 2, 2021:

| | October 1, 2022 | | | |
|---|---|---|---|---|
| (In thousands) | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Money market funds (cash equivalents) | $ 187,170 | $ — | $ — | $ 187,170 |

| | October 2, 2021 | | | |
|---|---|---|---|---|
| (In thousands) | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Money market funds (cash equivalents) | $ 484,482 | $ — | $ — | $ 484,482 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

### 4. Revenue and Geographic Information

*Disaggregation of Revenue*

Revenue by geographical region also includes the applicable service revenue for software upgrades and cloud-based services attributable to each region and is based on ship-to address, is as follows:

| (In thousands) | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| Americas | $ 1,044,113 | $ 980,931 | $ 755,874 |
| Europe, Middle East and Africa ("EMEA") | 578,034 | 618,476 | 470,883 |
| Asia Pacific ("APAC") | 130,189 | 117,337 | 99,571 |
| Total revenue | $ 1,752,336 | $ 1,716,744 | $ 1,326,328 |

Revenue is attributed to individual countries based on ship-to address and also includes the applicable service revenue for software upgrades and cloud-based services attributable to each country. Revenue by significant countries is as follows:

| (In thousands) | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| United States | $ 964,118 | $ 890,837 | $ 697,410 |
| Other countries | 788,218 | 825,907 | 628,918 |
| Total revenue | $ 1,752,336 | $ 1,716,744 | $ 1,326,328 |

Revenue by product category also includes the applicable service revenue for software upgrades and cloud-based services attributable to each product category. Revenue by major product category is as follows:

| (In thousands) | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| Sonos speakers | $ 1,368,916 | $ 1,378,808 | $ 1,034,813 |
| Sonos system products | 297,110 | 265,180 | 218,788 |
| Partner products and other revenue | 86,310 | 72,756 | 72,727 |
| Total revenue | $ 1,752,336 | $ 1,716,744 | $ 1,326,328 |

*Disaggregation of Property and Equipment*

Property and equipment, net by country as of October 1, 2022, and October 2, 2021 were as follows:

| (In thousands) | October 1, 2022 | October 2, 2021 |
|---|---|---|
| China | $ 40,609 | $ 23,460 |
| United States | 30,870 | 40,669 |
| Other countries | 14,689 | 7,212 |
| Property and equipment, net | $ 86,168 | $ 71,341 |

63

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

**5. Balance Sheet Components**

The following tables show the Company's balance sheet component details.

*Accounts Receivable Allowances*

The following table summarizes changes in the allowance for credit losses for fiscal 2022 and 2021, and the allowance for doubtful accounts for fiscal 2020:

| (In thousands) | October 1, 2022 | | October 2, 2021 | | October 3, 2020 | |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 1,547 | $ | 1,307 | $ | 1,255 |
| Increases | | 2,098 | | 1,529 | | 1,127 |
| Write-offs | | (901) | | (1,289) | | (1,075) |
| Ending balance | $ | 2,744 | $ | 1,547 | $ | 1,307 |

The following table summarizes the changes in the allowance for sales incentives for fiscal 2022, 2021 and 2020:

| (In thousands) | October 1, 2022 | | October 2, 2021 | | October 3, 2020 | |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 19,160 | $ | 17,515 | $ | 20,051 |
| Charged to revenue | | 51,225 | | 95,249 | | 108,843 |
| Utilization of sales incentive allowance | | (46,812) | | (93,604) | | (111,379) |
| Ending balance | $ | 23,573 | $ | 19,160 | $ | 17,515 |

*Inventories*

Inventories, net, consist of the following:

| (In thousands) | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|
| Finished goods | $ | 406,657 | $ | 154,608 |
| Components | | 47,631 | | 30,522 |
| Inventories | $ | 454,288 | $ | 185,130 |

The Company writes down inventory as a result of excess and obsolete inventories, or when it believes that the net realizable value of inventories is less than the carrying value. As of October 1, 2022, and October 2, 2021, inventory write-downs were $8.8 million and $4.8 million, respectively.

*Property and Equipment, Net*

Property and equipment, net consist of the following:

| (In thousands) | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|
| Computer hardware and software | $ | 42,000 | $ | 40,098 |
| Furniture and fixtures | | 7,511 | | 7,483 |
| Tooling and production line test equipment | | 100,337 | | 76,210 |
| Leasehold improvements | | 49,656 | | 49,846 |
| Product displays | | 56,885 | | 57,863 |
| Total property and equipment | | 256,389 | | 231,500 |
| Accumulated depreciation and amortization | | (170,221) | | (160,159) |
| Property and equipment, net | $ | 86,168 | $ | 71,341 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Depreciation expense was $33.3 million, $31.8 million and $34.9 million for fiscal 2022, 2021 and 2020, respectively. During fiscal 2022, 2021 and 2020, the Company abandoned and disposed of gross fixed assets of $18.9 million, $32.9 million and $18.5 million, with accumulated depreciation of $18.8 million, $32.2 million and $14.2 million, respectively. Disposals of fixed assets were recorded in operating expenses in the consolidated statements of operations and comprehensive income (loss) and resulted in losses of $0.1 million, $0.7 million and $4.3 million for fiscal 2022, 2021 and 2020, respectively.

### *Goodwill*

The following table presents the changes in carrying amount of goodwill for the fiscal year ended October 1, 2022:

| (In thousands) | |
| --- | --- |
| Balance as of October 2, 2021 | $ 15,545 |
| Goodwill acquired | 66,078 |
| Effect of exchange rate changes on goodwill | (4,323) |
| Balance as of October 1, 2022 | $ 77,300 |

### *Intangible Assets*

As part of the acquisition of Mayht Holding BV ("Mayht"), the Company recognized $71.8 million in intangible assets related to in-process research and development activity, which is not subject to amortization for the current period. The following table reflects the changes in the net carrying amount of the components of intangible assets associated with the Company's acquisition activity:

| | October 1, 2022 | | | | |
| --- | --- | --- | --- | --- | --- |
| (In thousands, except weighted-average remaining life) | Gross Carrying Amount | Accumulated Amortization | Impact of FX | Net Carrying Value | Weighted-Average Remaining Life |
| Tradename | $ 451 | $ (23) | $ (44) | $ 384 | 5.50 |
| Technology-based | 34,032 | (8,032) | 0 | 26,000 | 5.50 |
| Total finite-lived intangible assets | 34,483 | (8,055) | (44) | 26,384 | 5.50 |
| In-process research and development and other intangible assets not subject to amortization | 71,759 | 0 | (7,079) | 64,680 | |
| Total intangible assets | $ 106,242 | $ (8,055) | $ (7,123) | $ 91,064 | |

The following table summarizes the estimated future amortization expense of the Company's intangible assets as October 1, 2022:

| Fiscal years ending (In thousands) | Future Amortization Expense |
| --- | --- |
| 2023 | $ 6,176 |
| 2024 | 5,963 |
| 2025 | 3,363 |
| 2026 | 3,033 |
| 2027 and thereafter | 7,849 |
| Total future amortization expense | $ 26,384 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Accrued Expenses*

Accrued expenses consisted of the following:

| (In thousands) | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|
| Accrued advertising and marketing | $ | 21,292 | $ | 19,989 |
| Accrued taxes | | 7,081 | | 16,941 |
| Accrued inventory and supply chain costs | | 51,011 | | 48,672 |
| Accrued product development | | 8,168 | | 7,101 |
| Accrued general and administrative expenses | | 21,634 | | 14,243 |
| Other accrued payables | | 104 | | 1,083 |
| Total accrued expenses | $ | 109,290 | $ | 108,029 |

*Deferred Revenue*

Amounts invoiced in advance of revenue recognition are recorded as deferred revenue on the consolidated balance sheets. For the fiscal year ended October 1, 2022, deferred revenue included revenue allocated to unspecified software upgrades and cloud-based services of $73.8 million, as well as current deferred revenue related to newly launched products sold to resellers not recognized as revenue until the date of general availability was reached.

The following table presents the changes in the Company's deferred revenue balances for the fiscal years ended October 1, 2022, October 2, 2021, and October 3, 2020:

| (In thousands) | October 1, 2022 | | October 2, 2021 | | October 3, 2020 | |
|---|---|---|---|---|---|---|
| Deferred revenue, beginning of period | $ | 89,498 | $ | 62,389 | $ | 56,449 |
| Recognition of revenue included in beginning of period deferred revenue | | (41,438) | | (19,175) | | (13,052) |
| Revenue deferred, net of revenue recognized on contracts in the respective period | | 35,410 | | 46,284 | | 18,992 |
| Deferred revenue, end of period | $ | 83,470 | $ | 89,498 | $ | 62,389 |

The Company expects the following recognition of deferred revenue as of October 1, 2022:

| | For the fiscal years ending | | | | | |
|---|---|---|---|---|---|---|
| (In thousands) | 2023 | 2024 | 2025 | 2026 | 2027 and Beyond | Total |
| Revenue expected to be recognized | $ 27,318 | $ 15,587 | $ 13,330 | $ 11,029 | $ 16,206 | $ 83,470 |

*Other Current Liabilities*

Other current liabilities consist of the following:

| (In thousands) | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|
| Reserve for returns | $ | 18,263 | $ | 19,266 |
| Short-term operating lease liabilities | | 10,532 | | 10,724 |
| Warranty liability | | 5,771 | | 5,604 |
| Other | | 5,083 | | 3,950 |
| Total other current liabilities | $ | 39,649 | $ | 39,544 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table presents the changes in the Company's warranty liability for the fiscal years ended October 1, 2022, and October 2, 2021:

| (In thousands) | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|
| Warranty liability, beginning of period | $ | 5,604 | $ | 3,628 |
| Provision for warranties issued during the period | | 13,033 | | 15,304 |
| Settlements of warranty claims during the period | | (12,866) | | (13,328) |
| Warranty liability, end of period | $ | 5,771 | $ | 5,604 |

## 6. Leases

The Company entered into various non-cancelable lease agreements for offices and facilities, as well as auto leases. The substantial majority of the Company's leases are for its office spaces and facilities, which are accounted for as operating leases. The Company leases office space in California, as well as offices in various locations in the U.S., with additional sales, operations, and research and development offices around the world. These facilities operate under leases with initial terms from one to ten years and expire at various dates through 2027. The Company determines whether an arrangement is a lease at inception if there is an identified asset, and it has the right to control the identified asset for a period of time. Some of the Company's leases include options to extend the lease for up to 5 years, and some include options to terminate the lease within 1 year. The Company's lease terms are only for periods in which it has enforceable rights and are impacted by options to extend or terminate the lease only when it is reasonably certain that the Company will exercise the option.

For leases with terms greater than 12 months, the Company records the related right-of-use asset and lease obligation at the present value of lease payments over the lease terms. Leases with an initial term of 12 months or less are not recorded on the balance sheet. Lease expense is recognized on a straight-line basis over the lease term. The Company's leases do not include any residual value guarantees, bargain purchase options or asset retirement obligations.

Lease agreements will typically exist with lease and non-lease components, which are accounted for separately. The Company's agreements may contain variable lease payments. The Company includes variable lease payments that depend on an index or a rate and exclude those which depend on facts or circumstances occurring after the commencement date, other than the passage of time.

Most of the Company's leases do not contain an implicit interest rate. Therefore, the Company uses judgment to estimate an incremental borrowing rate, which is defined as the rate of interest the Company would have to pay to borrow an amount that is equal to the lease obligations, on a collateralized basis, and over a similar term. The Company takes into consideration the terms of the Company's Credit Facility (as defined in Note 7. Debt), lease terms, and current interest rates to determine the incremental borrowing rate at lease commencement date. At October 1, 2022, the Company's weighted-average discount rate was 4.26%, while the weighted-average remaining lease term was 3.1 years. As part of the supplemental cash flow disclosure, the right-of-use assets obtained in exchange for new operating lease liabilities does not reflect the impact of prepaid or deferred rent.

The components of lease expense for the fiscal year ended October 1, 2022, was as follows:

| (In thousands) | Year Ended October 1, 2022 | |
|---|---|---|
| Operating lease cost | $ | 11,041 |
| Short-term lease cost | | 258 |
| Variable lease cost | | 4,326 |
| Total lease cost | $ | 15,625 |

For the fiscal years ended October 1, 2022, and October 2, 2021, rent expense, including leases for offices and facilities as well as auto leases, was $11.3 million and $11.8 million, respectively, and common area maintenance expense was $4.3 million and $3.8 million, respectively.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table summarizes the maturity of lease liabilities under operating leases as of October 1, 2022:

| Fiscal years ending<br>(In thousands) | Operating leases |
|---|---|
| 2022 | $ 12,952 |
| 2023 | 13,579 |
| 2024 | 10,206 |
| 2025 | 2,310 |
| 2026 | 789 |
| Thereafter | 225 |
| Total lease payments | 40,061 |
| Less imputed interest | (3,933) |
| Total lease liabilities | $ 36,128 |

## 7. Debt

On October 13, 2021, the Company entered into a Revolving Credit Agreement with JPMorgan Chase Bank, N.A., as the administrative agent, and the lenders party thereto (the "Revolving Credit Agreement"). The Revolving Credit Agreement replaced the Company's prior $80.0 million credit facility with JPMorgan Chase Bank, N.A., which matured in October 2021, in its entirety.

The Revolving Credit Agreement provides for (i) a five-year senior secured revolving credit facility in the amount of up to $100.0 million and (ii) an uncommitted incremental facility subject to certain conditions. Proceeds are to be used for working capital and general corporate purposes. The facility may be drawn as an Alternative Base Rate Loan (at 1.00% plus an applicable margin) or Eurocurrency Loans (at LIBOR plus an applicable margin). The Company must also pay (i) an unused commitment fee ranging from 0.200% to 0.275% per annum of the average daily unused portion of the aggregate revolving credit commitment under the agreement and (ii) a per annum fee equal to the applicable margin over LIBOR multiplied by the aggregate face amount of outstanding letters of credit. As of October 1, 2022, the Company did not have any outstanding borrowings and had $3.0 million in undrawn letters of credit that reduce the availability under the Revolving Credit Agreement.

The Company's obligations under the Revolving Credit Agreement are secured by substantially all of the Company's assets. The Revolving Credit Agreement contains customary representations and warranties, customary affirmative and negative covenants, a financial covenant that is tested quarterly and requires the Company to maintain a certain consolidated leverage ratio, and customary events of default. As of October 1, 2022, the Company was in compliance with all financial covenants under the Revolving Credit Agreement.

## 8. Stockholders' Equity

### Share Repurchase Program

On November 17, 2021, the Board of Directors authorized a common stock repurchase program of up to $150.0 million. During the fiscal year ended October 1, 2022, the Company repurchased 6,578,973 shares for an aggregate purchase price of $150.0 million at an average price of $22.80 per share under the repurchase program. As of October 1, 2022, the Company fully utilized the amount available under this stock repurchase program.

Treasury stock during the fiscal year ended October 1, 2022, included shares withheld to satisfy employees' tax withholding requirements in connection with vesting of RSUs. Additionally, during the fiscal year ended October 1, 2022, the Company retired 6,859,215 shares of treasury stock. The Company accounts for the retirement of treasury stock by deducting its par value from common stock and reflecting any excess of cost over par value as a deduction from additional paid-in-capital on the consolidated balance sheets.

## 9. Stock-Based Compensation

### 2018 Equity Incentive Plan

In July 2018, the Board of Directors (the "Board") adopted the 2018 Equity Incentive Plan (the "2018 Plan"). The 2018 Plan became effective in connection with the Company's initial public offering ("IPO"). The number of shares reserved for issuance under

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

the 2018 Plan increases automatically on January 1 of each year beginning in 2019 and continuing through 2028 by a number of shares of common stock equal to the lesser of (x) 5% of the total outstanding shares of the Company's common stock and common stock equivalents as of the immediately preceding December 31 (rounded to the nearest whole share) and (y) a number of shares determined by the Company's the Board. As of October 1, 2022, there were 38,593,443 shares reserved for future issuance under the 2018 Plan.

### Stock Options

Pursuant to the 2018 Plan, the Company issues stock options to employees and directors. The option price, number of shares and grant date are determined at the discretion of the Board. For so long as the option holder performs services for the Company, the options generally vest over 48 months, on a monthly or quarterly basis, with certain options subject to an initial annual cliff vest, and are exercisable for a period not to exceed ten years from the date of grant.

The summary of the Company's stock option activity is as follows:

| | Number of Options | Weighted- Average Exercise Price | Weighted- Average Remaining Contractual Term (In years) | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|
| **Outstanding at October 2, 2021** | 14,545,239 | $ 12.86 | 5.1 | $ 282,141 |
| Exercised | (3,570,150) | $ 11.32 | | |
| Expired | (340) | $ 2.50 | | |
| Forfeited | (171,867) | $ 12.69 | | |
| **Outstanding at October 1, 2022** | 10,802,882 | $ 13.37 | 4.5 | $ 10,956 |
| **At October 1, 2022** | | | | |
| Options exercisable | 10,340,382 | $ 13.29 | 4.4 | $ 10,886 |
| Options vested and expected to vest | 10,794,122 | $ 13.37 | 4.5 | $ 10,953 |

The Company granted no options in fiscal 2022, 2021 and 2020. Options vested in fiscal 2022, 2021 and 2020, respectively, have a fair value of $6.6 million, $10.8 million, and $27.4 million.

The total intrinsic value of stock options exercised was $58.0 million, $242.7 million and $40.1 million for fiscal 2022, 2021 and 2020, respectively.

As of October 1, 2022, and October 2, 2021, the Company had $0.4 million and $6.2 million, respectively, of unrecognized stock-based compensation cost, which is expected to be recognized over a weighted-average period of 0.2 years and 0.9 years, respectively.

The Company's policy for issuing stock upon stock option exercise is to issue new common stock.

### Restricted Stock Units

Pursuant to the 2018 Plan, the Company issues RSUs to employees and directors. RSUs vest quarterly over the service period, which is generally four years with certain awards subject to an initial annual cliff vest. The summary of the Company's RSU activity is as follows:

| | Number of Units | Weighted- Average Grant Date Fair Value | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|
| **Outstanding at October 2, 2021** | 9,283,525 | $ 12.64 | $ 299,487 |
| Granted | 4,287,612 | $ 27.97 | |
| Released | (4,255,643) | $ 14.00 | |
| Forfeited | (1,007,317) | $ 17.65 | |
| **Outstanding at October 1, 2022** | 8,308,177 | $ 19.25 | $ 115,484 |
| At October 1, 2022 | | | |
| Units expected to vest | 7,168,277 | $ 18.93 | $ 99,639 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

As of October 1, 2022 and October 2, 2021, the Company had $120.6 million and $90.0 million of unrecognized stock-based compensation expense related to RSUs, each of which are expected to be recognized over a weighted-average period of 2.5 years.

### Performance Stock Units

Pursuant to the 2018 Plan, the Company has issued and may issue certain PSUs that vest on the satisfaction of service and performance conditions. PSUs vest upon satisfaction of service and performance conditions. The number of shares vested at the end of the performance period are based on the extent to which the corresponding performance goals have been achieved. The summary of the Company's PSU activity is as follows:

| | Number of Units | | Weighted-Average Grant Date Fair Value | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| | | | | | (In thousands) |
| **Outstanding at October 2, 2021** | 158,521 | $ | 22.81 | $ | 5,114 |
| Granted | 252,296 | $ | 29.71 | | |
| Forfeited | (12,740) | $ | 29.91 | | |
| **Outstanding at October 1, 2022** | 398,077 | $ | 26.96 | $ | 5,533 |

As of October 1, 2022 and October 2, 2021, the Company had $0.4 million and $3.6 million of unrecognized stock-based compensation expense related to PSUs, which is expected to be recognized over a weighted-average period of 0.6 and 1.2 years, respectively.

### Stock-based Compensation

Total stock-based compensation expense by function category was as follows:

| | October 1, 2022 | | October 2, 2021 | | October 3, 2020 | |
|---|---|---|---|---|---|---|
| **(In thousands)** | | | | | | |
| Cost of revenue | $ | 1,620 | $ | 988 | $ | 1,106 |
| Research and development | | 30,724 | | 25,075 | | 23,439 |
| Sales and marketing | | 15,335 | | 13,570 | | 14,359 |
| General and administrative | | 27,961 | | 22,494 | | 18,706 |
| Total stock-based compensation expense | $ | 75,640 | $ | 62,127 | $ | 57,610 |

## 10. Income Taxes

The Company's income (loss) before provision for (benefit from) income taxes for fiscal 2022, 2021 and 2020 were as follows:

| | October 1, 2022 | | October 2, 2021 | | October 3, 2020 | |
|---|---|---|---|---|---|---|
| **(In thousands)** | | | | | | |
| Domestic | $ | 54,609 | $ | 126,810 | $ | (15,194) |
| Foreign | | 14,121 | | 30,115 | | (4,889) |
| Income (loss) before provision for (benefit from) income taxes | $ | 68,730 | $ | 156,925 | $ | (20,083) |

## SONOS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Components of the provision for (benefit from) income taxes consisted of the following:

| (In thousands) | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| Current: | | | |
| U.S. Federal | $ — | $ — | $ (1,388) |
| U.S. State | 483 | 440 | 724 |
| Foreign | 3,401 | 6,216 | 1,220 |
| Total current | 3,884 | 6,656 | 556 |
| Deferred: | | | |
| U.S. Federal | (1,459) | — | — |
| U.S. State | (21) | — | — |
| Foreign | (1,057) | (8,326) | (524) |
| Total deferred | (2,537) | (8,326) | (524) |
| Provision for (benefit from) income taxes | $ 1,347 | $ (1,670) | $ 32 |

The Company is subject to income taxes in the United States and foreign jurisdictions in which it operates. The Company's tax provision is impacted by the jurisdictional mix of earnings as its foreign subsidiaries have statutory tax rates different from those in the United States.

Components of the Company's deferred income tax assets and liabilities are as follows:

| (In thousands) | October 1, 2022 | October 2, 2021 |
|---|---|---|
| Deferred tax assets | | |
| Accrued expenses and reserves | $ 8,872 | $ 18,601 |
| Deferred revenue | 14,170 | 13,915 |
| U.S. net operating loss carryforwards | 26,363 | 25,284 |
| Foreign net operating loss carryforwards | 7,702 | 13,240 |
| Research & development tax credit carryforwards | 92,487 | 77,607 |
| Stock-based compensation | 9,261 | 9,082 |
| Operating lease liability | 7,717 | 9,908 |
| Capitalized research & development | 9,420 | 3,409 |
| Other capitalized costs | 3,799 | 4,622 |
| Depreciation | 2,239 | 1,843 |
| Other | 182 | 428 |
| Total deferred tax assets | 182,212 | 177,939 |
| Valuation allowance | (162,267) | (155,978) |
| Deferred tax assets, net of valuation allowance | 19,945 | 21,961 |
| Deferred tax liabilities | | |
| Tax accounting method change | — | (962) |
| Right-of-use asset | (5,940) | (7,388) |
| Intangibles | (22,125) | (5,833) |
| Other | (14) | (144) |
| Total deferred tax liabilities | (28,079) | (14,327) |
| Net deferred tax assets (liabilities) | $ (8,134) | $ 7,634 |
| | | |
| Reported as | | |
| Deferred tax assets | $ 1,508 | $ 10,028 |
| Deferred tax liabilities | (9,642) | (2,394) |
| Net deferred tax assets (liabilities) | $ (8,134) | $ 7,634 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The Company has assessed, on a jurisdictional basis, the realization of its net deferred tax assets, including the ability to carry back net operating losses, the existence of taxable temporary differences, the availability of tax planning strategies and available sources of future taxable income. The Company has concluded that based on cumulative taxable income and future taxable income that it is able to realize a benefit for net deferred tax assets in certain foreign jurisdictions. In addition, the Company has concluded that a valuation allowance on its net deferred tax assets in the U.S. and certain foreign jurisdictions continues to be appropriate considering cumulative taxable losses in recent years and uncertainty with respect to future taxable income.

During the fiscal year ended October 1, 2022, the Company determined that the net deferred tax assets of certain of our non-U.S. subsidiaries were more-likely-than-not realizable and released valuation allowance totaling $7.3 million as an income tax benefit. The Company determined that the valuation allowance releases were appropriate as sufficient positive evidence, notably fiscal 2022 profits and forecasted future taxable income in each jurisdiction, outweighed the available negative evidence. It is possible that within the next 12 months there may be sufficient positive evidence to release a portion or all of the remaining valuation allowance in the U.S. and certain foreign jurisdictions. Release of the remaining valuation allowance would result in a benefit to income tax expense for the period the release is recorded, which could have a material impact on net earnings. The timing and amount of the potential valuation allowance release are subject to significant management judgment, as well as prospective earnings in the United States and certain other foreign entities and jurisdictions.

As of October 1, 2022, the Company had gross U.S. federal net operating loss carryforwards of $105.8 million, of which $74.7 million have an indefinite life and $31.1 million expire beginning in 2035, gross state net operating loss carryforwards of $65.5 million, which expire beginning in 2027, and gross foreign net operating loss carryforwards of $41.7 million with an indefinite life. As of October 1, 2022, the Company also had gross federal and state research and development tax credit carryforwards of $70.0 million and $48.1 million, respectively. The federal research and development tax credits will begin to expire in 2025, and the state research and development tax credits will begin to expire in 2024.

Because of the change of ownership provisions of Sections 382 and 383 of the Internal Revenue Code, and similar state provisions, use of a portion of the Company's U.S. federal and state net operating loss and research and development tax credit carryforwards may be limited in future periods if there are future changes in ownership. Further, a portion of the carryforwards may expire before being applied to reduce future taxable income and income tax liabilities if sufficient taxable income is not generated in future periods.

The following table summarizes changes in the valuation allowance for fiscal 2022, 2021 and 2020:

| (In thousands) | | October 1, 2022 | | October 2, 2021 | | October 3, 2020 |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 155,978 | $ | 113,939 | $ | 95,088 |
| Increase during the period | | 13,841 | | 49,791 | | 18,851 |
| Decrease during the period | | (7,552) | | (7,752) | | — |
| Ending balance | $ | 162,267 | $ | 155,978 | $ | 113,939 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Reconciliation of U.S. statutory federal income taxes to the Company's provision for (benefit from) income taxes is as follows:

| (In thousands) | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| U.S. federal income taxes at statutory rate | $ 14,433 | $ 32,954 | $ (4,217) |
| U.S. state and local income taxes, net of federal benefit and state credits | (2,594) | (9,473) | (2,798) |
| Foreign income tax rate differential | 970 | 1,430 | (75) |
| Stock-based compensation | (15,532) | (47,496) | 869 |
| Federal research and development tax credits | (8,983) | (21,535) | (8,012) |
| Unrecognized federal tax benefits | (2,482) | 4,041 | 815 |
| Change in tax rate | 5,013 | (2,681) | — |
| Global intangible low taxed income, net of foreign tax credits | 290 | — | — |
| 162(m) executive compensation limitation | 2,574 | — | — |
| Base erosion and anti-abuse tax | — | — | (781) |
| Other | 1,079 | (565) | 598 |
| Change in valuation allowance | 6,579 | 41,655 | 13,633 |
| Provision for income taxes | $ 1,347 | $ (1,670) | $ 32 |

Change in gross unrecognized tax benefits, excluding interest and penalties, as a result of uncertain tax positions are as follows:

| (In thousands) | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| Beginning balance | $ 21,252 | $ 14,721 | $ 12,527 |
| Decrease - tax positions in prior periods | (6,039) | (4) | (768) |
| Increase - tax positions in current periods | 1,808 | 6,535 | 2,962 |
| Ending balance | $ 17,021 | $ 21,252 | $ 14,721 |

The Company does not anticipate changes to its unrecognized benefits within the next 12 months that would result in a material change to the Company's financial position. The unrecognized tax benefits as of October 1, 2022, would have no impact on the effective tax rate if recognized.

The Company conducts business in a number of jurisdictions and, as such, is required to file income tax returns in multiple jurisdictions globally. U.S. federal income tax returns for the 2018 tax year and earlier are no longer subject to examination by the U.S. Internal Revenue Service (the "IRS"). All U.S. federal and state net operating losses as well as research and development tax credits generated to date, including 2018 and earlier, used in open tax years are subject to adjustment by the IRS and state tax authorities.

The Company recognizes interest and penalties, if any, related to uncertain tax positions in income tax expense. There were no accrued interest or penalties as of October 1, 2022, and October 2, 2021.

As of October 1, 2022, the Company continues to assert that the unremitted earnings in our foreign subsidiaries are permanently reinvested and therefore no deferred taxes or withholding taxes have been provided. If, in the future, the Company decides to repatriate its $7.2 million of undistributed earnings from these subsidiaries in the form of dividends or otherwise, the Company could be subject to withholding taxes payable at that time. Outside basis differences in the Company's foreign subsidiaries including unremitted earnings and any related taxes are not material.

**11. Net Income (Loss) Per Share Attributable to Common Stockholders**

Basic net income (loss) per share attributable to common stockholders is calculated by dividing net income (loss) attributable to common stockholders by the weighted-average number of shares of common stock outstanding less shares subject to repurchase. Diluted net income (loss) per share attributable to common stockholders adjusts the basic net income (loss) per share attributable to common stockholders and the weighted-average number of shares of common stock outstanding for the potentially dilutive impact of stock awards, using the treasury stock method.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table sets forth the computation of the Company's basic and diluted net income (loss) per share attributable to common stockholders:

| (In thousands, except share and per share data) | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| **Numerator:** | | | |
| Net income (loss) attributable to common stockholders - basic and diluted | $ 67,383 | $ 158,595 | $ (20,115) |
| **Denominator:** | | | |
| Weighted-average shares of common stock - basic | 127,691,030 | 122,245,212 | 109,807,154 |
| Effect of potentially dilutive stock options | 5,472,807 | 10,120,238 | — |
| Effect of RSUs | 4,385,406 | 7,875,245 | — |
| Effect of PSUs | 212,835 | 68,457 | — |
| Weighted-average shares of common stock—diluted | 137,762,078 | 140,309,152 | 109,807,154 |
| | | | |
| **Net income (loss) per share attributable to common stockholders:** | | | |
| Basic | $ 0.53 | $ 1.30 | $ (0.18) |
| Diluted | $ 0.49 | $ 1.13 | $ (0.18) |

The following potentially dilutive shares as of the end of each period presented were excluded from the computation of diluted net income (loss) per share for the periods presented because including them would have been antidilutive:

| | October 1, 2022 | October 2, 2021 | October 3, 2020 |
|---|---|---|---|
| Stock options to purchase common stock | 6,877,530 | 9,030,004 | 33,503,698 |
| Restricted stock units | 5,041,645 | 3,505,140 | 9,225,127 |
| Performance stock units | 88,672 | 55,586 | — |
| Total | 12,007,847 | 12,590,730 | 42,728,825 |

**12. Business Combinations**

During the first quarter of fiscal 2022, the Company completed two acquisitions for a combined aggregate cash consideration of approximately $27.1 million. The acquisitions brought talented employees and strategic intellectual property ("IP") to enhance the experience of Sonos products. The Company accounted for these transactions as business combinations and allocated the purchase consideration to assets acquired and liabilities assumed. In aggregate, $0.2 million was attributed to net assets acquired, $6.2 million to intangible assets, $1.5 million in deferred tax liabilities, and $22.2 million to goodwill. The goodwill recognized was primarily attributable to the assembled workforce and expected post-acquisition synergies from these acquisitions. Goodwill is not deductible for tax purposes. The transaction costs associated with the acquisitions were not material and were expensed as incurred, as general and administrative expenses in the consolidated statements of operations and comprehensive income (loss). Pro forma results of operations for these acquisitions have not been presented because they are not material to the Company's consolidated financial statements, either individually or in the aggregate.

On April 8, 2022, the Company completed the acquisition of 100% of the equity interests of Mayht, a Netherlands-based company that has invented a new approach to audio transducers. The acquisition brought a talented group of employees and strategic technology that is expected to enable the Company to transform its product portfolio. The total purchase price consideration of the acquisition of Mayht was $99.3 million paid in cash. The Company accounted for this transaction as a business combination and allocated the purchase consideration to assets acquired and liabilities assumed, with $72.2 million in intangible assets, $16.8 million in net liabilities assumed, and $43.9 million in estimated goodwill. The estimated fair value of acquired in process research and development intangible assets was determined using an income model valuation approach. Assumptions used in the determination of the fair value of the acquired in-process research and development intangible assets include revenue pricing and volume forecasts, revenue growth rate, and discount rate. The goodwill recognized was primarily attributable to the assembled workforce and expected post-acquisition synergies from integrating Mayht's technology into the Company's products. The goodwill is not deductible for income tax purposes.

The results of Mayht's operations have been included in, but are not material to, the Company's consolidated results of operations since the date of acquisition. Pro forma results of operations have not been presented because the effect of the acquisition was not

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

material to the Company's consolidated statement of operations and comprehensive income (loss). One-time acquisition-related costs of $1.0 million were expensed as general and administrative expenses as incurred.

Additional information, such as that related to income tax and other contingencies, existing as of the acquisition date but unknown to the Company may become known during the remainder of the measurement period, not to exceed 12 months from the acquisition date, which may result in changes to the amounts and allocations recorded.

### 13. Commitments and Contingencies

*Commitments to suppliers*

The Company utilizes contract manufacturers to build its products. These contract manufacturers acquire components and build products based on demand forecast information the Company supplies, which typically covers the fiscal year. Consistent with industry practice, the Company acquires inventories from such manufacturers through blanket purchase orders against which orders are applied based on projected demand information and availability of goods. Such purchase commitments typically cover the Company's forecasted product and manufacturing requirements for periods that range a number of months. In certain instances, these agreements allow the Company the option to cancel, reschedule, and/or adjust our requirements based on its business needs for a period of time before the order is due to be fulfilled. While the Company's purchase orders are legally cancellable in some situations, there are many which are not cancellable in the event of a demand plan change or other circumstances, such as where the supplier has procured unique, Sonos-specific designs, and/or specific non-cancellable, non-returnable components based on our provided forecasts.

As of October 1, 2022, the Company's commitments to suppliers were estimated to be approximately $360 million, the majority of which is expected to be paid in the next two years, with approximately $185 million to $220 million expected to be paid in the next twelve months. These commitments are related to electrical components that can be specific to Sonos products, and for which the Company typically participates in negotiations directly with the suppliers, and comprised 1) contractual obligations to third-party manufacturers and suppliers, 2) the inventory owned by contract manufacturers procured to manufacture Sonos products, and 3) purchase commitments made by contract manufacturers to their upstream suppliers.

*Legal Proceedings*

From time to time, the Company is involved in legal proceedings in the ordinary course of business, including claims relating to employee relations, business practices, and patent infringement. Litigation can be expensive and disruptive to normal business operations. Moreover, the results of complex legal proceedings are difficult to predict, and the Company's view of these matters may change in the future as the litigation and events related thereto unfold. The Company expenses legal fees as incurred. The Company records a provision for contingent losses when it is both probable that a liability has been incurred and the amount of the loss can be reasonably estimated. An unfavorable outcome to any legal matter, if material, could have an adverse effect on the Company's operations or its financial position, liquidity or results of operations.

*The Company's Lawsuits Against Google:*

On January 7, 2020, the Company filed a complaint with the U.S. International Trade Commission ("ITC") against Alphabet Inc. ("Alphabet") and Google LLC ("Google") and a counterpart lawsuit in the U.S. District Court for the Central District of California against Google. The complaint and lawsuit each allege infringement by Alphabet and Google of certain Sonos patents related to its smart speakers and related technology. The counterpart lawsuit is stayed pending completion of the ITC investigation and appeal thereof. The ITC concluded its investigation in January 2022, finding all five of the Company's asserted patents to be valid and infringed by Google, and further finding that one redesign per patent proposed by Google would avoid infringement. The ITC issued a limited exclusion order and a cease-and-desist order with respect to Google's infringing products. The outcome of the ITC investigation is currently being appealed by the Company and Google.

On September 29, 2020, the Company filed another lawsuit against Google alleging infringement of additional Sonos patents and seeking monetary damages and other non-monetary relief. This suit is pending in U.S. District Court for the Northern District of California. In this lawsuit, Google has countersued the Company alleging breach of contract and conversion against the Company in connection with Google and the Company's collaboration in 2013. The Company disputes the claims and intends to defend these claims during the case. In this lawsuit, the judge has already concluded that Google infringes one asserted patent and that patent is not invalid. The judge has also ruled that another asserted patent is not infringed by Google and is invalid. This lawsuit is expected to conclude with a jury trial in May 2023.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

On December 1, 2020, the Company filed a lawsuit against two Google foreign subsidiaries in the regional court of Hamburg, Germany, alleging infringement of a Sonos patent seeking non-monetary relief. The Company has since withdrawn this action after having received some preliminary relief.

*Google's Lawsuits Against the Company:*

On June 11, 2020, Google filed a lawsuit in the U.S. District Court for the Northern District of California against the Company alleging infringement by the Company of five Google patents and seeking monetary damages and other non-monetary relief. Four of these patents have since been found invalid by the Court or by the U.S. Patent and Trademark Office at the Company's urging, or have been withdrawn from the case by Google. In this lawsuit, one patent remains asserted against the Company. No trial date is set.

On June 12, 2020, Google filed lawsuits in District Court Munich I against Sonos Europe B.V. and Sonos, Inc., alleging infringement of two Google patents seeking monetary damages and an injunction preventing sales of allegedly infringing products. In March 2021, the District Court Munich stayed the case for infringement of one Google patent pending the outcome of a nullity action concerning the validity of that patent. In June 2021, the Munich court issued a decision dismissing Google's complaint regarding the other Google patent for lack of infringement by the Company. Google has appealed the Munich court's ruling, which is pending.

On August 21, 2020, Google filed a lawsuit against the Company in Canada alleging infringement of one Google patent. On July 26, 2022, the Canadian court ruled that the Company does not infringe this patent after a trial on the merits. Google has appealed the Canadian's court's ruling, which is pending.

On August 21, 2020, Google filed a lawsuit against Sonos Europe B.V. and Sonos, Inc. in France, alleging infringement of two Google patents seeking monetary damages and an injunction preventing sales of allegedly infringing products. In February 2021, Google withdrew its infringement allegations regarding one patent in view of prior art brought to the attention of the court by the Company. In March 2022, the French trial court ruled for the Company on Google's other asserted patent. Google has appealed the French trial court's ruling, which is pending.

On August 21, 2020, Google filed a lawsuit against Sonos Europe B.V. and Sonos, Inc. in the Netherlands alleging infringement of a Google patent seeking an injunction preventing sales of allegedly infringing products. In October, 2022, the Netherlands court ruled that the Company does not infringe Google's patent.

In September 2020, Google filed a lawsuit against Sonos Europe B.V. in the Netherlands, alleging infringement of a Google patent seeking an injunction preventing sales of allegedly infringing products. In February 2022, the Court rejected Google's claims concerning this patent. Google has appealed this decision, which is pending.

On August 8, 2022, Google filed two complaints with the ITC against the Company and two counterpart lawsuits in the Northern District of California against the Company, collectively alleging infringement by the Company of seven Google patents generally related to wireless charging, device setup, and voice control, and seeking monetary damages and other non-monetary relief. The ITC investigations are currently pending while the counterpart lawsuits are stayed pending completion of the ITC investigations. The ITC has terminated the investigation as to one Google patent as a result of imminent expiration of that Google patent. One of the two ITC investigations is scheduled for an oral hearing in June 2023 and scheduled for a final decision in January 2024, while the other of the two ITC investigations is scheduled for an oral hearing in July 2023 and scheduled for a final decision in May 2024.

*Implicit*

On March 10, 2017, Implicit, LLC ("Implicit") filed a patent infringement action in the United States District Court, District of Delaware against the Company. Implicit is asserting that the Company infringed on two patents in this case. The Company denies the allegations. There is no assurance of a favorable outcome and the Company's business could be adversely affected as a result of a finding that the Company patents-in-suit are invalid and/or unenforceable. A range of loss, if any, associated with this matter is not probable or reasonably estimable as of October 1, 2022.

The Company is involved in certain other litigation matters not listed above but does not consider these matters to be material either individually or in the aggregate at this time. The Company's view of the matters not listed may change in the future as the litigation and events related thereto unfold.

*Tariff refunds*

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

On May 13, 2020, the Company was granted a temporary exclusion from the August 2019 Section 301 Tariff Action (List 4A) ("Section 301 tariffs"), eliminating the tariffs on the Company's component products imported from China until August 31, 2020. The exclusion for the Company's component products was not extended past August 31, 2020, with the Section 301 tariffs for our component products automatically reinstated on September 1, 2020. On July 23, 2020, the Company was granted a temporary exclusion from Section 301 tariffs, eliminating the tariffs on the Company's core speaker products imported from China until August 31, 2020. These exemptions entitled the Company to refunds for tariffs paid from September 2019 through December 2020. On August 28, 2020, the United States Trade Representative granted an extension through December 31, 2020 of the exclusion for the Company's core speaker products, with the Section 301 tariffs for our core speaker products automatically reinstated on January 1, 2021. On March 23, 2022, the Company was granted an exclusion extension from the Section 301 tariffs, eliminating tariffs on the Company's core speaker products, including certain new product introductions, imported from China from April 13, 2022 through December 31, 2022. This exemption entitled the Company to refunds for tariffs paid from October 12, 2021 through April 12, 2022.

For fiscal 2022 and 2021, the Company recognized $15.8 million and $18.3 million, respectively, in refunds based upon acceptance of the Company's refund request, recognized as a reduction to cost of revenue. As of October 1, 2022, the remaining refunds the Company expected to recover totaled approximately $10.1 million, for tariffs paid from September 2019 through December 2020, and from October 12, 2021 through April 12, 2022. The Company did not record these potential refunds due to uncertainty of the timing of acceptance of approval, but such refunds will be recognized as a reduction to cost of revenue if and when acceptance occurs.

*Guarantees and Indemnifications*

In the normal course of business, the Company enters into agreements that contain a variety of representations and warranties and provide for general indemnification. The Company's exposure under these agreements is unknown because it involves claims that may be made against the Company in the future, but have not yet been made. To date, the Company has not incurred material costs to defend lawsuits or settle claims related to these indemnification provisions. The Company has also entered into indemnification agreements with its directors and officers that may require the Company to indemnify its directors and officers against liabilities that may arise by reason of their status or service as directors or officers to the fullest extent permitted by the Delaware General Corporation Law. The Company also currently has directors' and officers' insurance. No amount has been accrued in the consolidated financial statements with respect to these indemnification guarantees.

**14. Quarterly Financial Data (Unaudited)**

The following table summarizes the Company's unaudited quarterly financial information for each of the four quarters of 2022 and 2021 (the sum of quarterly periods may not equal full-year amounts due to rounding):

| | Three Months Ended | | | |
| | October 1, 2022 | July 2, 2022 | April 2, 2022 | January 1, 2022 |
|---|---|---|---|---|
| **(In thousands, except per share amounts)** | | | | |
| Revenue | $ 316,290 | $ 371,783 | $ 399,781 | $ 664,481 |
| Gross profit | 124,099 | 175,848 | 179,034 | 317,385 |
| Net income (loss) | (64,067) | (597) | 8,566 | 123,481 |
| Net income (loss) per share - basic | $ (0.50) | $ 0.00 | $ 0.07 | $ 0.97 |
| Net income (loss) per share - diluted | $ (0.50) | $ 0.00 | $ 0.06 | $ 0.87 |

| | Three Months Ended | | | |
| | October 2, 2021 | July 3, 2021 | April 3, 2021 | January 2, 2021 |
|---|---|---|---|---|
| **(In thousands, except per share amounts)** | | | | |
| Revenue | $ 359,539 | $ 378,672 | $ 332,949 | $ 645,584 |
| Gross profit | 166,931 | 177,861 | 165,776 | 299,425 |
| Net income (loss) | (8,744) | 17,826 | 17,221 | 132,292 |
| Net income (loss) per share - basic | $ (0.07) | $ 0.14 | $ 0.14 | $ 1.14 |
| Net income (loss) per share - diluted | $ (0.07) | $ 0.12 | $ 0.12 | $ 1.01 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

**15. Subsequent Event**

On November 16, 2022, the Company announced that its Board of Directors has authorized a common stock repurchase program of up to $100.0 million.

**SONOS, INC.**
**Notes to Consolidated Financial Statements**

### Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

### Item 9A. Controls and Procedures

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as required under Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended ("Exchange Act") as of October 1, 2022. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective as of October 1, 2022.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Exchange Act Rule 13a-15(f).

Our Chief Executive Officer and Chief Financial Officer, with assistance from other members of management, assessed the effectiveness of our internal control over financial reporting as of October 1, 2022, based on the framework and criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, our management concluded that our internal control over financial reporting was effective as of October 1, 2022.

The effectiveness of our internal control over financial reporting as of October 1, 2022, has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears in Item 15(a) of this Annual Report on Form 10-K.

**Changes in Internal Control Over Financial Reporting**

During the third quarter of fiscal 2022, we transitioned to our new ERP system as our system of record for financial reporting, which included changes to certain financial processes impacting key controls related to our internal controls over financial reporting. We believe we have maintained appropriate internal control over financial reporting during the implementation and believe this new system will strengthen our internal control environment. However, there are inherent risks in implementing any new system, and we will continue to evaluate these control changes as part of our assessment of internal control over financial reporting. There were no other changes in our internal control over financial reporting in management's evaluation pursuant to Rule 13a-15(f) during the quarter ended October 1, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B. Other Information

None.

### Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections

Not applicable.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is included under the captions "Board of Directors and Corporate Governance," "Proposal One: Election of Directors," "Executive Officers" and "Delinquent Section 16(a) Reports" included in our definitive Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended October 1, 2022, and is incorporated herein by reference.

**Item 11. Executive Compensation**

The information required by this item is included under the captions "Board of Directors and Corporate Governance" and "Executive Compensation" in our definitive Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended October 1, 2022, and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is included under the captions "Equity Compensation Plan Information" and "Security Ownership of Certain Beneficial Owners and Management" in our definitive Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended October 1, 2022, and is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this item is included under the captions "Board of Directors and Corporate Governance" and "Certain Relationships and Related Party Transactions" in our definitive Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended October 1, 2022, and is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

The information required by this item is included under the caption "Proposal Two: Ratification of Appointment of Independent Registered Public Accounting Firm" in our definitive Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended October 1, 2022, and is incorporated herein by reference.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**PART IV**

**Item 15. Exhibits, Financial Statement Schedules**

*(a)(1) Financial Statements*

The information concerning Sonos' consolidated financial statements and the Report of Independent Registered Public Accounting Firm required by this Item 15(a)(1) is incorporated by reference herein to the section of this Annual Report on Form 10-K in Part II, Item 8, titled "Financial Statements and Supplementary Data."

*(a)(2) Financial Statement Schedules*

All financial statement schedules have been omitted as the information is not required under the related instructions or is not applicable or because the information required is already included in the consolidated financial statements or the notes to those consolidated financial statements.

*(a)(3) Exhibits*

We have filed, or incorporated into this Annual Report on Form 10-K by reference, the exhibits listed on the accompanying Exhibit Index immediately preceding the signature page of this Annual Report on Form 10-K.

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Title | Incorporated By Reference | | | | Filed or Furnished Herewith |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | File No. | Exhibit | Filing Date | |
| 3.1 | Restated Certificate of Incorporation | 10-Q | 001-38603 | 3.1 | 9/11/2018 | |
| 3.2 | Restated Bylaws | 10-Q | 001-38603 | 3.2 | 9/11/2018 | |
| 4.1 | Form of Common Stock Certificate | S-1 | 333-226076 | 4.01 | 7/6/2018 | |
| 4.2 | Amended and Restated Investor Rights Agreement, dated as of July 18, 2012, by and among the Registrant and certain investors of the Registrant | S-1 | 333-226076 | 4.02 | 7/6/2018 | |
| 4.3 | Description of Securities | 10-K | 001-38603 | 4.3 | 11/26/19 | |
| 10.1+ | Form of Indemnification Agreement entered into between Sonos, Inc. and each of its directors and executive officers | S-1 | 333-226076 | 10.01 | 7/6/2018 | |
| 10.2+ | 2003 Stock Plan, as amended, and forms of agreement thereunder | S-1 | 333-226076 | 10.02 | 7/6/2018 | |
| 10.3+ | 2018 Equity Incentive Plan and forms of agreement thereunder | 10-Q | 001-38603 | 10.1 | 8/12/2021 | |
| 10.4+ | 2018 Employee Stock Purchase Plan and form of subscription agreement | S-1 | 333-226076 | 10.04 | 7/6/2018 | |
| 10.5+ | Offer Letter between Patrick Spence and the Registrant, dated May 25, 2012 | S-1 | 333-226076 | 10.05 | 7/6/2018 | |
| 10.6+ | Offer Letter between Brittany Bagley and the Registrant, dated March 29, 2019 | 10-Q | 001-38603 | 10.1 | 5/10/2019 | |
| 10.7† | Manufacturing Agreement between Inventec Appliances Corporation and the Registrant, dated September 4, 2014, as amended | S-1 | 333-226076 | 10.08 | 7/6/2018 | |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

| | | | | | | |
|---|---|---|---|---|---|---|
| 10.8+ | Offer Letter between Nicholas Millington and the Registrant, dated February 27, 2003 | 10-K | 001-38603 | 10.9 | 11/28/2018 | |
| 10.9+ | Offer Letter between Matthew Siegel and the Registrant, dated August 15, 2017 | 10-K | 001-38603 | 10.10 | 11/28/2018 | |
| 10.10+ | Executive Incentive Plan | 10-Q | 001-38603 | 10.1 | 2/7/2019 | |
| 10.11+ | Performance Share Award Agreement between Patrick Spence and the Registrant, dated May 28, 2020 | 10-Q | 001-38603 | 10.1 | 8/6/2020 | |
| 10.12+ | Offer Letter between Edward Lazarus and the Registrant, dated December 5, 2018 | 10-Q | 001-38603 | 10.1 | 2/6/2020 | |
| 10.13+ | Form of Performance Share Award Agreement under 2018 Equity Incentive Plan | 10-Q | 001-38603 | 10.1 | 2/11/2021 | |
| 10.14+ | Letter Agreement between Anna Fraser and the Registrant, dated September 5, 2022 | | | | | X |
| 21.1 | List of subsidiaries of the Registrant | S-1 | 333-226076 | 21.01 | 7/6/2018 | |
| 23.1 | Consent of Independent Registered Public Accounting Firm | | | | | X |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) | | | | | X |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and Rule 15d-14(a) of the Exchange Act | | | | | X |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and Rule 15d-14(a) of the Exchange Act | | | | | X |
| 32.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(b) of the Exchange Act and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 32.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(b) of the Exchange Act and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 101.INS | XBRL Instance Document | | | | | X |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | | | | X |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | | | | X |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | | | | X |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | | | | X |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | | | | X |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in the Exhibit 101 attachments) | | | | | X |

\* Furnished and not filed.
+ Indicates a management contract or compensatory plan or arrangement.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

† Confidential treatment has been granted with respect to portions of this exhibit.

**Item 16. Form 10-K Summary**

None.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned thereunto duly authorized.

**Sonos, Inc.**

| | | |
|---|---|---|
| Date: November 23, 2022 | By: | /s/ Patrick Spence |
| | | Patrick Spence |
| | | Chief Executive Officer and Director |
| | | *(Principal Executive Officer)* |
| Date: November 23, 2022 | By: | /s/ Eddie Lazarus |
| | | Eddie Lazarus |
| | | Chief Financial Officer and Chief Legal Officer |
| | | *(Principal Financial Officer)* |
| Date: November 23, 2022 | By: | /s/ Chris Mason |
| | | Chris Mason |
| | | SVP, Finance and Chief Accounting Officer |
| | | *(Principal Accounting Officer)* |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each individual whose signature appears below constitutes and appoints Patrick Spence, Eddie Lazarus, Chris Mason, and each of them, such individual's true and lawful attorneys-in-fact and agents with full power of substitution, for such individual and in such individual's name, place and stead, in any and all capacities, to sign any amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as such individual might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them or their substitute or substitutes, may lawfully do or cause to be done or by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Patrick Spence<br>Patrick Spence | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | November 23, 2022 |
| /s/ Eddie Lazarus<br>Eddie Lazarus | Chief Financial Officer and Chief Legal Officer<br>*(Principal Financial Officer)* | November 23, 2022 |
| /s/ Chris Mason<br>Chris Mason | SVP, Finance and Chief Accounting Officer<br>*(Principal Accounting Officer)* | November 23, 2022 |
| /s/ Karen Boone<br>Karen Boone | Director | November 23, 2022 |
| /s/ Joanna Coles<br>Joanna Coles | Director | November 23, 2022 |
| /s/ Thomas Conrad<br>Thomas Conrad | Director | November 23, 2022 |
| /s/ Deirdre Findlay<br>Deirdre Findlay | Director | November 23, 2022 |
| /s/ Julius Genachowski<br>Julius Genachowski | Director | November 23, 2022 |
| /s/ Panos Panay<br>Panos Panay | Director | November 23, 2022 |
| /s/ Michelangelo Volpi<br>Michelangelo Volpi | Director and Chairperson of the Board of Directors | November 23, 2022 |

BR83570H-0123-10K

# Exhibit 14

Table of contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

☒         **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended September 30, 2023**
or

☐         **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 001-38603**

# SONOS, INC.
### *(Exact name of Registrant as specified in its charter)*

| **Delaware** | | | **03-0479476** |
|---|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | | (I.R.S. Employer Identification No.) |

| **614 Chapala Street** | **Santa Barbara** | **CA** | **93101** |
|---|---|---|---|
| (Address of principal executive offices) | | | (Zip code) |

805-965-3001
Registrant's telephone number, including area code

### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.001 par value** | **SONO** | **The Nasdaq Global Select Market** |

### Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act (Check one):

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging Growth Company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the shares of SONO common stock held by non-affiliates of the registrant as of March 31, 2023, the last business day of the registrant's most recently completed second fiscal quarter, was $1,546.1 million based on the closing price of $19.62 as reported by The Nasdaq Global Select Market System.

As of November 7, 2023, the registrant had 125,150,415 shares of common stock outstanding, $0.001 par value per share.

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III incorporates by reference certain information from the registrant's definitive proxy statement (the "2024 Proxy Statement") relating to its 2024 Annual Meeting of Stockholders. The 2024 Proxy Statement will be filed with the United States Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

Table of contents

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Part I** | | |
| Item 1 | Business | 4 |
| Item 1A | Risk Factors | 13 |
| Item 1B | Unresolved Staff Comments | 26 |
| Item 1C | Cybersecurity | 26 |
| Item 2 | Properties | 26 |
| Item 3 | Legal Proceedings | 26 |
| Item 4 | Mine Safety Disclosures | 26 |
| | | |
| **Part II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 27 |
| Item 6 | [Reserved] | 28 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 43 |
| Item 8 | Financial Statements and Supplementary Data | 44 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 76 |
| Item 9A | Controls and Procedures | 76 |
| Item 9B | Other Information | 76 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 76 |
| | | |
| **Part III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 77 |
| Item 11 | Executive Compensation | 77 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 77 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 77 |
| Item 14 | Principal Accountant Fees and Services | 77 |
| | | |
| **Part IV** | | |
| Item 15 | Exhibits, Financial Statement Schedules | 78 |
| Item 16 | Form 10-K Summary | 80 |
| Signatures | | 81 |

Table of contents

*Forward-Looking Statements*

This Annual Report on Form 10-K contains forward-looking statements. All statements other than statements of historical fact contained in this Annual Report on Form 10-K, including statements regarding future operations, are forward-looking statements. In some cases, forward-looking statements may be identified by words such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "could," "would," "expect," "objective," "plan," "potential," "seek," "grow," "target," "if," and similar expressions intended to identify forward-looking statements. We have based these forward-looking statements on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations, objectives, restructuring efforts, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in the section titled "Risk Factors" set forth in Part I, Item 1A of this Annual Report on Form 10-K and in our other filings with the Securities and Exchange Commission (the "SEC"). Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this Annual Report on Form 10-K may not occur, and actual results may differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward-looking statements contained in this Annual Report on Form 10-K include, but are not limited to, statements about:

- our expectations regarding our results of operations, including gross margin, financial condition and cash flows;

- our expectations regarding the development and expansion of our business;

- anticipated trends, challenges and opportunities in our business and in the markets in which we operate;

- competitors and competition in our markets;

- our ability to maintain and promote our brand and expand brand awareness;

- our ability to successfully develop and introduce new products;

- our ability to manage our international operations;

- the effects of tariffs, trade barriers and retaliatory trade measures;

- our ability to expand our customer base and expand sales to existing customers;

- our expectations regarding development of our direct-to-consumer sales channels;

- expansion of our partner network;

- the macroeconomic environment and our ability to navigate it;

- our ability to retain and hire necessary employees and staff our operations appropriately;

- the timing and amount of certain expenses and our ability to achieve operating leverage over time; and

- our ability to maintain, protect and enhance our intellectual property.

We caution you that the foregoing list may not contain all of the forward-looking statements made in this Annual Report on Form 10-K.

You should not rely upon forward-looking statements as predictions of future events. The events and circumstances reflected in the forward-looking statements may not be achieved or occur. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. Except as required by law, we do not intend to update any of these forward-looking statements after the date of this Annual Report on Form 10-K or to conform these statements to actual results or revised expectations.

You should read this Annual Report on Form 10-K with the understanding that our actual future results, levels of activity, performance and events and circumstances may be materially different from what we expect.

Table of contents

PART I

**Item 1: Business**

*Overview*

Sonos is one of the world's leading sound experience brands.

We pioneered multi-room, wireless audio products, debuting the world's first multi-room wireless sound system in 2005. Today, our products include wireless, portable and home theater speakers, components, and accessories to address consumers' evolving audio needs. We are known for delivering unparalleled sound, thoughtful design aesthetic, simplicity of use, and an open platform. Our platform has attracted a broad range of more than 130 streaming content providers, such as Apple Music, Spotify, Deezer, and Pandora. These partners find value in our independent platform and access to our millions of desirable and engaged customers. We frequently introduce new services and features across our platform, providing our customers with enhanced functionality, improved sound, and an enriched user experience. We are committed to continuous technological innovation as reflected in our growing global patent portfolio. We believe our patents comprise the foundational intellectual property for wireless multi-room and other audio technologies.

Since we launched our first product 18 years ago, we have grown our install base by launching innovative new products, delivering a seamless customer experience, and expanding our global footprint. In fiscal 2023, existing customers accounted for approximately 44% of new product registrations. As of September 30, 2023, we had a total of nearly 46.6 million products registered in approximately 15.3 million households globally, including the addition of approximately 1.3 million new households during fiscal 2023. Our customers have typically purchased additional Sonos products over time. As of September 30, 2023, 60% of our 15.3 million households had registered more than one Sonos product. As of September 30, 2023, our households own 3.0 products on average.

*Our Products*

We generate revenue from sales of our Sonos speaker products, including wireless speakers and home theater speakers, from our Sonos system products, which largely comprises our component products, and from partner products and other revenue, including partnerships with IKEA and Sonance, Sonos and third-party accessories, licensing, advertising, and subscription revenue, including

4

Table of contents

Sonos Radio HD, and Sonos Pro. Our portfolio of products encourages customers to uniquely tailor their Sonos sound systems to best meet their sound and design preferences.

- *Sonos speakers.* Sonos speakers comprises our wireless speakers and home theater products, including:

| Product | Launch Date | Description |
|---|---|---|
| **Era 100** | March 2023 | Our powerful smart speaker with improved acoustics and design that delivers detailed stereo sound and deep bass. Originally launched as One in October 2017 and completely redesigned in March 2023 as Era 100. |
| **Era 300** | March 2023 | Our bold, revolutionary speaker that offers the best out-loud listening experience for your favorite spatial audio content with Dolby Atmos. |
| **Sub Mini** | October 2022 | Our wireless subwoofer which delivers powerful, balanced bass, rich, clear low end frequencies, in a compact cylindrical design. |
| **Ray** | June 2022 | Our smallest, smart soundbar for TV, music, and more. |
| **Beam (Gen 2)** | October 2021 | Our smart, compact soundbar for TV, music, and more, with support for Dolby Atmos. Originally introduced as Beam (Gen 1) in June 2018. |
| **Roam Colors** **Roam SL** **Roam** | May 2022 March 2022 April 2021 | Our ultra-portable smart speaker with Bluetooth and WiFi for listening on the go and at home. Originally introduced as Roam in April 2021 |
| **Arc** | June 2020 | Our premium smart soundbar for TV, movies, music, gaming, and more, with support for Dolby Atmos. Replaced Playbar, our first smart soundbar released in April 2013 and Playbase, our powerful sound base for TVs released in 2017. |
| **Five** | June 2020 | Our high fidelity speaker for superior sound. Originally launched as Play:5 (Gen 1) in November 2009 and completely redesigned in November 2015 as Play:5 (Gen 2). |
| **Sub (Gen 3)** | June 2020 | Our wireless subwoofer for deep bass. Originally introduced as Sub (Gen 1) in June 2012. |
| **Move 2** | September 2023 | Our portable, battery-powered smart speaker that delivers spacious stereo sound, with ultra-durable water resistant design for outdoor and indoor listening. Originally introduced as Move in September 2019. |

- *Sonos System Products.* Sonos system products comprises our component and other products which allow customers to convert third-party wired systems, stereo systems and home theater set-ups into our easy-to-use, wirelessly controlled streaming music system, including:

| Product | Launch Date | Description |
|---|---|---|
| **Port** | September 2019 | Our versatile streaming component for stereos or receivers. Replaced Connect which launched in January 2007. |
| **Amp** | February 2019 | Our versatile amplifier powering all our customers' entertainment. Replaced Connect: Amp which launched in September 2012. |

Table of contents

- *Partner Products and Other Revenue.* Partner products and other revenue categories comprise products sold in connection with our partnerships, accessories, professional services, licensing, and advertising revenue. Products in this category comprise accessories that allow our customers to integrate our products seamlessly into their homes as well as products manufactured by and/or sold by our partners, including:

| Product | Launch Date | Description |
|---------|-------------|-------------|
| **Sonos Pro** | April 2023 | Our software-as-a-service subscription offering for commercial audiences. |
| **Audi Partnership** | April 2021 | Our first-ever automotive audio partnership delivering Sonos-tuned premium sound experience for the Q4 e-tron and further models including the A1, Q2, and Q3. |
| **Sonos Radio HD** | November 2020 | Our subscription service of ad-free, high-definition streaming tier of our streaming radio, Sonos Radio. |
| **Sonos Radio** | April 2020 | Our free, ad-supported streaming radio experience bringing together more than 60,000 stations from multiple streaming partners alongside original programming from Sonos. |
| **Sonos Architectural by Sonance** | February 2019 | Our collection of installed passive speakers for indoor and outdoor use designed and optimized for Amp in partnership with Sonance, including in-ceiling, in-wall, and outdoor speakers. |
| **IKEA module units** | Various | Hardware and embedded software integrated into final products manufactured and sold by IKEA. Current IKEA products include SYMFONISK picture frame, bookshelf speaker, and speaker lamp. |
| **Accessories** | Various | Our custom-designed stands, mounts, shelves, cables, chargers, and more. |

Table of contents

### Our Software

Our proprietary software is the foundation of the Sonos sound system and further differentiates our products and services from those of our competitors.

In June 2020, we introduced Sonos S2, a powerful new app and operating system to enable a new generation of Sonos products and experiences, which includes new features, usability updates, and more personalization while also enabling higher resolution audio technologies for music and home theater. In June 2022, we introduced Sonos Voice Control, the first voice experience purpose-built for listening to and controlling your music on Sonos speakers. Designed with privacy at its core, Sonos Voice Control is the simplest way to control your music, offering complete command of your Sonos system using only your voice. Sonos Voice Control works on every voice-capable Sonos speaker, processing requests entirely on the Sonos device.

Our software provides the following key benefits:

- *Multi-room, multi-service experience.* Our system enables our speakers to work individually or together in synchronized playback groups, powered by wireless network and Bluetooth capabilities to route and play audio optimally from all the different content services that our customers enjoy.

- *Open platform for content partners.* Our platform enables customers to easily search and browse for content from a list of more than 130 content partners from around the world including stations, artists, albums, podcasts, audio books, and more. Content partners can connect to Sonos via our platform and find a new and growing audience for their catalogs.

- *Intuitive and flexible control.* Our customers can control their experiences through the Sonos app, voice control, from Sonos devices directly, or an expanding number of third-party apps and smart devices. As our customers navigate across different controllers, our technology synchronizes the control experience across the Sonos platform to deliver the music and entertainment experience they desire.

- *Smart audio tuning.* Our Trueplay technology uses the microphones on an iOS device to analyze room attributes, speaker placement and other acoustic factors to improve sound quality. We also developed Automatic TruePlay to deliver the same audio tuning experience, directly using the microphones integrated to our speakers and make this available to iOS and Android users.

- *Continuous Improvement.* Our software platform and cloud service enables feature enhancements and delivery of new experiences on an ongoing basis. As a result, the Sonos experience improves for customers over time.

### Our Partner Ecosystem

We have built a platform that attracts partners to enable our customers to play content from their preferred services. Our platform has attracted a broad range of more than 130 streaming content providers and spans across content, control, and third-party applications:

- *Content.* We partner with a broad range of content providers, such as streaming music services, internet radio stations, and podcast services, allowing our customers to enjoy their audio content from whichever source they desire.

- *Control.* We provide our customers with multiple options to control their home audio experiences, including voice control and direct control from within selected streaming music service apps. Our platform is the first to offer consumers the ability to buy a single smart speaker with more than one voice assistant choice. Our voice-enabled speaker products have Amazon Alexa and Google Assistant functionality, and in June 2022, we introduced Sonos Voice Control.

- *Third-party partnerships.* We partner with third-party developers to build new applications and services on top of the Sonos platform, increasing customer engagement and creating new experiences for our customers, such as architectural in-ceiling, in-wall and outdoor speakers in partnership with Sonance, picture frame, bookshelf and table lamp speakers in partnership with IKEA, and automotive sound in partnership with Audi.

### Research and Development

Our research and development team develops new hardware products, software and services, while continually improving and enhancing our existing software and hardware products to address customer demands and emerging trends. Our teams have worked on features and enhancements to the Sonos system including developments to the Sonos app, product setup, Trueplay tuning, the ability to use Alexa or Google voice services, and Sonos Voice Control. Our audio team has developed a series of acoustic technologies which enabled us to create speakers that produce high-fidelity sound. In April 2022, we added a talented group of employees to our research and development team through our acquisition of Mayht, a Netherlands-based company, which invented a new approach to audio transducers. The addition of this team and its strategic technology is helping transform and enhance our product portfolio. Our wireless

Table of contents

and radio team established world-class wireless performance that enabled multi-room experience, wireless surround sound, and many other applications. Our industrial design and mechanical engineering teams developed a cohesive, unique family of products across multiple categories and use-cases such as home theater, all-in-one, and portable. These products demonstrate a range of proprietary manufacturing and design details, logo application techniques, and assembly architecture. The products and software we develop require significant technical knowledge and expertise to develop at a competitive pace. We believe our research and development capabilities and our intellectual property differentiates us from our competitors. We intend to continue to significantly invest in research and development to bring new products and software to market and expand our platform and capabilities.

### Sales and Marketing

We sell our products primarily through over 10,000 third-party physical retail stores and our products are distributed in more than 60 countries. The majority of our sales are transacted through traditional physical retailers, including on their websites. We also sell through online retailers, to custom installers who bundle our products with services that they sell to their customers, and directly through our website sonos.com.

We invest in customer experience and customer relationship management to drive loyalty, word-of-mouth marketing and sustainable, profitable growth. Our marketing investments are focused on driving profitable growth through advertising, public relations and brand promotion activities, including digital platforms, sponsorships, collaborations, brand activations, and channel marketing. We continue to invest in our marketing and brand development efforts, including investing in capital expenditures on product displays to support our channel marketing through our retail partners.

### Manufacturing, Logistics and Fulfillment

We outsource the manufacturing of our speakers and components to contract manufacturers, who produce our products based on our design specifications. Our products are manufactured by contract manufacturers in China and Malaysia, and Vietnam. In fiscal 2023, we began the process of exiting certain partnerships with two of our contract manufacturers and we expect to complete these exits with minimal disruption by the first quarter of fiscal 2024. Additionally, we continued to diversify and add to our contract manufacturing partnerships and shifted more of our production into our locations in Malaysia and Vietnam, resulting in savings including tariff avoidance. In accordance with our agreements with our contract manufacturers, they will enter into purchase orders with their upstream suppliers for component inventory necessary to manufacture our products, based on our demand forecasts.

The vast majority of our products are shipped to our third-party warehouses which are then shipped to our distributors, retailers, and directly to our customers. Our third-party warehouses are located in the United States in California and Pennsylvania, as well as internationally in Australia, Canada, the Netherlands, China, Japan, and the United Kingdom.

We use a small number of logistics providers for substantially all of our product delivery to both distributors and retailers. This approach generally allows us to reduce order fulfillment time, reduce shipping costs, and improve inventory flexibility.

### Our Competitive Strengths

The proliferation of streaming services, the rapid expansion of digital audio content types, and the rise in voice assistants are significantly changing audio consumption habits and increasing demand for easy, premium, integrated audio experiences. As a leading sound system for consumers, content partners and developers, Sonos is capitalizing on the large market opportunity created by these dynamics. We believe the following combination of capabilities and features of our business model distinguish us from our competitors and position us well to capitalize on our opportunities:

- *Leading sound system.* We have developed and refined our sound system over the last 20 years. Our effort has resulted in significant consumer awareness and market share among home audio professionals. For example, a 2023 product study by CE Pro ranked Sonos as the leading brand in the wireless speakers, soundbar, and subwoofer categories. Our 91% share in the wireless speaker category among custom installation industry professionals significantly outpaces our competitors.

- *Proprietary Sonos app and software platform.* We offer our customers a mobile app that controls the Sonos sound system and the entire listening experience. Customers can stream different audio content to speakers in different rooms or the same audio content synchronized throughout the entire home. Additionally, the Sonos app enables universal search, the ability to search for audio content across streaming services and owned content so that customers can easily find, play, or curate music.

- *Platform enables freedom of choice for consumers.* Our broad and growing network of partners provides access to voice control, streaming music, internet radio, podcasts, and audiobook content, enabling consumers with freedom of choice in

content and services. Our platform attracts a broad set of content providers, including leading streaming music services and third-party developers.

- *Differentiated consumer experience creates engaged households who often repeat purchases.* We deliver a differentiated customer experience to millions of households every day, cultivating a long-term passionate and engaged customer base. This engagement with our products, and our ability to continuously improve and enhance the functionality of our existing products through software updates, drives momentum in our flywheel as customers add products to their Sonos sound systems. We generate significant revenue and profits from existing customers purchasing additional products to expand their Sonos sound systems. In fiscal 2023, existing households represented approximately 44% of new product registrations. We have proven our ability to profitably develop new experiences that drive existing customers to add additional products to their home, while continuing to add new homes. We believe that we have yet to fully realize the lifetime value of our customer base and this aspect of our financial model will continue to contribute to our ability to achieve sustainable, profitable growth over the long term.

- *Commitment to innovation drives continuous improvement.* We have made significant investments in research and development since our inception and believe that we own the foundational intellectual property of wireless multi-room and other audio technologies. Our patent portfolio continues to grow each year. We were included in the Intellectual Property Owners Association "Top 300 Patent Owners" report for calendar year 2022, which was our sixth consecutive year. As of calendar year 2022, we have obtained a total of approximately 1,320 issued patents in the United States versus approximately 15 in 2011.  We obtained 168 US patents in calendar year 2022 alone and are on pace to exceed 200 US patents in calendar year 2023.

### Our Growth Strategies

Key elements of our growth strategy include:

- *Continued introduction of innovative products and services and expansion into new categories.* To address our market opportunity, we have developed a long-term roadmap to deliver innovative products, services and software enhancements, and expand into new categories. We intend to continue to introduce products and services across multiple categories designed for enjoyment in all the places and spaces that our customers listen to audio content, including outside of the home, as well as business and enterprise customers. Executing on our roadmap will position us to acquire new customers, increase sales to existing customers, and improve the customer experience.

- *Expansion of direct-to-consumer efforts and building relationships with existing channel partners and prospective customers.* We are focused on reaching and converting prospective customers through third-party retail stores, e-commerce retailers, our website sonos.com, and custom installers of home audio systems. We expect that our direct-to-consumer channel will continue to contribute to our growth. We intend to continue to build direct relationships with current and prospective customers through sonos.com and the Sonos app to drive direct sales. In fiscal 2023, we generated 23.8% of total revenue through our direct-to-consumer channel, primarily sonos.com. While we seek to increase sales through our direct-to-consumer sales channel, we expect that our third-party retailers will continue to be an important part of our ecosystem. We will continue to seek retail partners that can deliver differentiated in-store experiences to support customer demand for product demonstrations. Additionally, we intend to expand and strengthen our partnerships with custom installers who are valuable to our customer base and contribute to our new household growth. For example, a 2023 product survey by CE Pro ranked Sonos as the leading brand in the wireless speakers, soundbar, and subwoofer categories. Our 91% share in the wireless speakers category among  custom installation industry professionals significantly outpaces our competitors. In fiscal 2023, we generated 20.7% of total revenue through our installer solutions channel.

- *Expand partner ecosystem to enhance platform.* We intend to deepen our relationships with our current partners and expand our partner ecosystem by providing our customers access to streaming music services, voice assistants, internet radio, podcasts and audiobook content.

- *Increase brand awareness in existing geographic markets.* We intend to increase our household penetration rates in our existing geographic markets by increasing brand awareness, expanding our product offerings and growing our partner ecosystem.

- *Expansion into new geographic markets.* Geographic expansion represents a growth opportunity in currently underserved countries. We intend to expand into new countries over time by employing country-specific marketing campaigns and distribution channels.

Table of contents

**Factors Affecting Performance**

*New Product Introductions*. Since 2005, we have released products in multiple audio categories. We intend to introduce new products and services that appeal to a broad set of consumers, as well as bring our differentiated listening platform and experience to all the places and spaces where our customers listen to the breadth of audio content available, including inside and outside their homes, as well as commercial spaces.

*Seasonality*. Historically, we have typically experienced the highest levels of revenue in the first fiscal quarter of the year coinciding with the holiday shopping season and our promotional activities. Our promotional discounting activity is typically higher in the first fiscal quarter as well, which negatively impacts gross margin during this period. However, our higher sales volume in the holiday shopping season has historically resulted in a higher operating margin in the first fiscal quarter due to positive operating leverage.

*Ability to Sell Additional Products to Existing Customers*. Our existing customers typically increase the number of Sonos products in their homes. In fiscal 2023, existing households represented approximately 44% of new product registrations. As we execute on our product roadmap to address evolving consumer preferences, we believe we can expand the number of products in our customers' homes. Our ability to sell additional products to existing customers is a key part of our business model, as follow-on purchases indicate high customer engagement and satisfaction, decrease the likelihood of competitive substitution, and result in higher customer lifetime value. We will continue to innovate and invest in product development in order to enhance customer experience and drive sales of additional products to existing customers.

*Expansion of Partner Ecosystem*. Expanding and maintaining strong relationships with our partners will remain important to our success. Our ability to develop, manufacture, and sell voice-enabled speakers that deliver differentiated consumer experiences will be a critical driver of our future performance, particularly as we compete in a larger market with an expanding number of competitors. We currently compete with, and will continue to compete with, companies that have greater resources than we do, many of which have brought voice-enabled speakers to market. To date, our agreements with these partners have all been on a royalty-free basis. We believe our partner ecosystem improves customer experience, attracting more customers to Sonos, which in turn attracts more partners to the platform, further enhancing customer experience. We believe partners choose to be part of the Sonos platform because it provides access to a large, engaged customer base on a global scale. We look to partner with a wide variety of streaming music services, voice assistants, connected home integrators, content creators, podcast and audiobook providers. We have also partnered with certain companies in the development of our own voice-enabled products, while also bringing to market our own voice assistant focused specifically on the audio experience. Our competitiveness in the voice-enabled speaker market will depend on successful investment in research and development, market acceptance of our products and our ability to maintain and benefit from our technology partnerships.

As competition increases, we believe our ability to give users the freedom to choose across a broad set of streaming services and voice control partners will be an important key differentiating factor.

*Channel Strategy*. We believe growing our own e-commerce channel will continue to be important to supporting our overall growth and profitability as consumers continue the shift from physical to online sales channels. We are investing in our e-commerce capabilities and in-app experience to drive direct sales. In fiscal 2023 and 2022, sales through our direct-to-consumer channel, primarily through sonos.com, represented 23.8% and 22.5% of our total revenue, respectively.

While we seek to increase sales through our direct-to-consumer sales channel, we expect that our partnerships with third-party retailers and custom installers will continue to be an important part of our ecosystem. We will continue to seek retail partners that can deliver differentiated in-store experiences to support customer demand for product demonstrations. Additionally, we intend to expand and strengthen our partnerships with custom installers who are valuable to our customer base and contribute to our new household growth. In fiscal 2023, sales through our installer solutions channel represented  20.7% of total revenue, and 21.2% in fiscal 2022. Our physical retail distribution relies on third-party retailers and our ability to maintain our diversified manufacturing footprint and base of component suppliers in support of production efficiency and flexibility across our global supply chain.

*International Expansion.* Our products are sold in more than 60 countries, and in fiscal 2023, 41.3% of our revenue was generated outside the United States. Our international growth will depend on our ability to generate sales from the global population of consumers, develop international distribution channels, and diversify our partner ecosystem to appeal to a more global audience. We are committed to strengthening our brand in global markets and our future success will depend in part on our growth in international markets.

*Investing in Product and Software Development.* Our investments in product and software development consist primarily of expenses in the personnel who support our research and development efforts and capital expenditures for new tooling and production line equipment to manufacture and test our products. We believe that our financial performance will significantly depend on the effectiveness of our investments to design and introduce innovative new products and services and enhance existing products and

10

software. If we fail to innovate and expand our product and software offerings or fail to maintain high standards of quality in our products, our brand, market position and revenue will be adversely affected. Further, if our development efforts are not successful, we will not recover the investments made.

*Investing in Sales and Marketing*. Our marketing investments are focused on increasing brand awareness through advertising, public relations and brand promotion activities. While we maintain a base level of investment throughout the year, significant increases in spending are highly correlated with the holiday shopping season, new product launches, and software introductions. We also invest in capital expenditures on product displays to support our retail channel partners. Sales and marketing investments are typically incurred in advance of any revenue benefits from these activities.

### Competition

We compete against established, audio-focused sellers of speakers and sound systems such as Bose, Samsung (and its subsidiaries Harman International and JBL), Sony, Bang & Olufsen, and Masimo (and its subsidiary Sound United that owns, among others, the Denon, Polk Audio and Bowers and Wilkens brands), and against developers of voice-enabled speakers and other voice-enabled products such as Amazon, Apple, and Google. In some cases, our competitors are also our partners in our product development and resale and distribution channels. Many of our competitors have significant market share, diversified product lines, well-established supply and distribution systems, strong worldwide brand recognition, loyal customer bases and significant financial, marketing, research, development and other resources.

The principal competitive factors in our market include:

- brand awareness and reputation;
- breadth of product offering;
- price;
- sound quality;
- multi-room and wireless capabilities;
- customer support;
- product quality and design;
- ease of setup and use; and
- network of technology and content partners.

We believe we compete favorably with our competitors on the basis of the factors described above.

### Intellectual Property

Intellectual property is an important aspect of our business, and we seek protection for our intellectual property as appropriate. To establish and protect our proprietary rights, we rely upon a combination of patent, copyright, trade secret and trademark laws, and contractual restrictions such as confidentiality agreements, licenses and intellectual property assignment agreements. We maintain a policy requiring our employees, contractors, consultants and other third parties to enter into confidentiality and proprietary rights agreements to control access to our proprietary information. These laws, procedures and restrictions provide only limited protection, and any of our intellectual property rights may be challenged, invalidated, circumvented, infringed or misappropriated. There is no guarantee that we will prevail on any patent infringement claims against third parties. Furthermore, the laws of certain countries do not protect proprietary rights to the same extent as the laws of the United States, and we therefore may be unable to protect our proprietary technology in certain jurisdictions.

Sonos is a leading innovator that holds a comprehensive portfolio of intellectual property rights, including patents, trade secrets, copyrights, trademarks, service marks, trade dress and other forms of intellectual property rights in the U.S. and various other countries. Sonos' patent portfolio, in particular, has been recognized as one of the strongest in consumer electronics. Our patents and patent applications relate to hardware, software, networking, accessories, and services, and include technology for the ability to stream content for playback wirelessly to one or more rooms in the home or business. It also includes technology for enabling a wide range of experiences and audio technologies that are important to the Sonos platform and enjoyed by millions of people every day across the globe. Experiences covered by our patents include simple system setup, seamless integration with other platforms and services, balanced sound, voice interactions and control, as well as experiences unique to home theater to name a few. We regularly file patent applications in the U.S. and throughout the world to protect our innovations and technology that come from areas such as research, development,

11

and design. Our patents expire at various times and no single patent or other intellectual property right is solely responsible for protecting Sonos' products and services. Sonos continues to invest in protecting its expanding innovation through ongoing development of its patent portfolio. In addition to its own intellectual property, Sonos also enters into licensing agreements with our third-party partners to provide access to a broad range of technology, services, and content for our customers.

In January 2020, the Company filed a complaint with the U.S. International Trade Commission ("ITC") against Alphabet Inc. ("Alphabet") and Google LLC ("Google") and a counterpart lawsuit in the U.S. District Court for the Central District of California against Google alleging infringement of five Sonos patents. In September 2020, the Company filed another lawsuit against Google alleging infringement of an additional four Sonos patents. In December 2020, the Company filed another lawsuit against Google Germany Gmbh and Google Ireland Ltd. in the regional court of Hamburg, Germany, alleging infringement of a Sonos patent. The ITC case has concluded with a finding of all five Sonos patents infringed by Google and not invalid. The California case has concluded with a jury verdict against Google but the court holding the Sonos patents unenforceable and invalid. Both cases are awaiting appeal. The Company has since withdrawn the German case. Starting in 2020, Google has responded by filing patent infringement lawsuits against the Company in the ITC, U.S. District Court for the Northern District of California, Canada, Germany, France, and the Netherlands, and patent infringement lawsuits against the Company's subsidiary, Sonos Europe B.V., in Germany, France, and the Netherlands. The ITC cases have concluded with a finding of no violation by the Company and are now awaiting appeal. The cases in Canada, Germany, France, and the Netherlands have been decided against Google. In the California case, all but one of Google's patent claims have been dismissed, with no trial date set. See Note 12. Commitments and Contingencies of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for further details.

While we believe that our active patents and patent applications are an important aspect of our business, we also rely heavily on the innovative skills, technical competence and marketing abilities of our personnel.

### Human Capital

Sonos is dedicated to creating the ultimate listening experience for our customers, and our employees are critical to achieving this mission. In order to continue to design innovative experiences and products, and compete and succeed in our highly competitive and rapidly evolving market, it is crucial that we continue to attract and retain experienced employees. As part of these efforts, we strive to offer a competitive compensation and benefits program, foster a community where everyone feels included and empowered to do their best work, and give employees the opportunity to give back to their communities and make a social impact.

As of September 30, 2023, we had 1,867 full-time employees. Of our full-time employees, 1,332 were in the United States and 535 were in our international locations. Except for our employees in France and the Netherlands, none of our employees are represented by a labor union or covered by a collective bargaining agreement.

### Compensation and Benefits Program. Our compensation program is designed to attract and reward talented individuals who possess the skills necessary to support our business objectives, assist in the achievement of our strategic goals and create long-term value for our stockholders. We provide employees with compensation packages that include base salary, annual incentive bonuses, and long-term equity awards ("RSUs") tied to the value of our stock price. We believe that a compensation program with both short-term and long-term awards provides fair and competitive compensation and aligns employee and stockholder interests, including by incentivizing business and individual performance (pay for performance), motivating based on long-term company performance and integrating compensation with our business plans. In addition to cash and equity compensation, we also offer employees benefits such as life and health (medical, dental & vision) insurance, paid time off, paid parental leave, and a 401(k) plan.

### Diversity, Equity and Inclusion. At Sonos, we believe that music and sound is universal and connects us as people, and we strive to build products that move everyone. To do this, we are committed to building an equitable and inclusive environment where diverse teams build more creative solutions, drive better results, innovate and bring their authentic selves to work each day. We monitor the representation of women and racially or ethnically diverse team members at different levels throughout the company and disclose the composition of our team in our annual Listen Better Report, which is our corporate social responsibility report available on the Investor Relations section of our website.

As an organization, we've committed to annual diversity, equity and inclusion goals to increase representation at all levels and foster greater connection and belonging at Sonos. To accomplish these goals, we're implementing initiatives to help us reach these goals, including:

• holding management directly accountable in creating a more diverse and inclusive environment by designating 10% of the annual cash incentive plan for management for diversity, equity and inclusion goals;

• examining our hiring practices to ensure we source the best talent from the widest available pool;

Table of contents

- intentional listening to our employee resource groups who provide critical insight into the experience of underrepresented groups at Sonos and across our industry;

- frequent review of our policies and practices to ensure an equitable experience for all;

- coupling our hiring goals with a focus on retention, employee engagement, and inclusive leadership;

- implementing mentoring and allyship programs that connect employees to key support systems across Sonos; and

- deepening our organizational acumen around allyship, unconscious bias, and equity.

*Community Involvement*. We aim to enhance the communities where we live and work, and believe that this commitment helps in our efforts to attract and retain employees. We offer employees the opportunity to give back both through our Sonos Soundwaves program, which partners with leading non-profits, and our Sonos Cares program, which offers employees paid volunteer time each year.

### Corporate Information

We incorporated in Delaware in August 2002 as Rincon Audio, Inc. and we changed our name to Sonos, Inc. in May 2004. We completed the initial public offering ("IPO") of our common stock in August 2018 and our common stock is listed on The Nasdaq Global Select Market under the symbol of "SONO." Our principal executive offices are located at 614 Chapala Street, Santa Barbara, California 93101, and our telephone number is (805) 965-3001.

Our website address is www.sonos.com. The information on, or that can be accessed through, our website is not incorporated by reference into this Annual Report on Form 10-K. Investors should not rely on any such information in deciding whether to purchase our common stock.

Sonos, the Sonos logo, Sonos One, Sonos One SL, Sonos Five, Sonos Beam, Play:1, Play:5, Playbase, Playbar, Sonos Arc, Amp, Sub, Sonos Move, Port, Boost, Ray, Sonos Ray, Sonos Roam, Sonos Voice Control, Trueplay, Sub Mini, Sonos Sub Mini, Mayht, Era 100, Era 300, and our other registered or common law trademarks, tradenames or service marks appearing in this Annual Report on Form 10-K are our property. Solely for convenience, our trademarks, tradenames, and service marks referred to in this Annual Report on Form 10-K appear without the ®, ™ and SM symbols, but those references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights to these trademarks, tradenames and service marks. This Annual Report on Form 10-K contains additional trademarks, tradenames and service marks of other companies that are the property of their respective owners.

### Available Information

We make available, free of charge through our website, our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and amendments to those reports, filed or furnished pursuant to Sections 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, as soon as reasonably practicable after they have been electronically filed with, or furnished to, the SEC.

The SEC maintains an internet site (www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC.

## Item 1A. Risk Factors

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, as well as the other information in this Annual Report on Form 10-K, including our consolidated financial statements and the related notes, and the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," before making an investment decision. The occurrence of any of the events or developments described below could materially and adversely affect our business, financial condition, results of operations and growth prospects. In such an event, the market price of our common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not currently known to us or that we currently believe are not material may also impair our business, financial condition, results of operations and growth prospects.*

Table of contents

**Economic, Industry and Strategic Risk**

*To remain competitive and stimulate consumer demand, we must successfully manage frequent new product introductions and transitions.*

Due to the quickly evolving and highly competitive nature of the home audio and broader consumer electronics industry, we must frequently introduce new products, enhance existing products and effectively stimulate customer demand for new and upgraded products in both mature and developing markets. For example, in March 2023, we introduced Sonos Era 100 and Sonos Era 300, our next generation of smart speakers, in September 2023, we introduced Move 2, our next generation of our Move speaker, and in April 2023, we introduced Sonos Pro, our new audio subscription service for businesses. The successful introduction of these products and any new products depends on a number of factors, such as the timely completion of development efforts to correspond with limited windows for market introduction. We face significant challenges in managing the risks associated with new product introductions and production ramp-up issues, including accurately forecasting initial consumer demand, effectively managing any third-party strategic alliances or collaborative partnerships related to new product development or commercialization, as well as the risk that new products may have quality or other defects in the early stages of introduction or may not achieve the market acceptance necessary to generate sufficient revenue. New and upgraded products can also affect the sales and profitability of existing products. Accordingly, if we cannot properly manage the introduction of new products, our operating results and financial condition may be adversely impacted, particularly if the cadence of new product introductions increases as we expect.

*Although we have achieved profitability in the past, we are not currently profitable, and we may not be able to regain profitability or consistent revenue growth and expect to incur increased operating costs in the future.*

Although we achieved profitability in the fiscal year ended October 2, 2021, and were profitable in fiscal 2022, we had a net loss of $10.3 million in fiscal 2023. As of September 30, 2023, we had an accumulated deficit of $12.8 million.

We expect our operating expenses to increase in the future as we expand our operations and execute on our product roadmap and strategy. We plan to make future expenditures related to the expansion of our business and our product offerings, including investments in:

- research and development to continue to introduce innovative new products, enhance existing products and improve our customers' listening experience;

- sales and marketing to expand our global brand awareness, promote new products, increase our customer base and expand sales within our existing customer base; and

- legal, accounting, information technology and other administrative expenses to sustain our operations as a public company.

In order to regain or grow our profitability, we need to increase our revenue and we cannot assure you that we will be able to do so, particularly during times of global economic, social and political uncertainty. Our ability to achieve revenue growth will depend in part on our ability to execute on our product roadmap and strategy and to determine the market opportunity for new products. New product introductions may adversely impact our gross margin in the near to intermediate term due to the frequency of these product introductions and their anticipated increased share of our overall product volume. The expansion of our business and product offerings also places a continuous and significant strain on our management, operational and financial resources. In the event that we are unable to grow our revenue, or in the event that revenue grows more slowly than we expect, our operating results could be adversely affected, and our stock price could decrease.

*If we are unable to accurately anticipate market demand for our products, we may have difficulty managing our production and inventory and our operating results could be harmed.*

We must forecast production and inventory needs in advance with our suppliers and manufacturers, and our ability to do so accurately could be affected by many factors, including changes in customer demand and spending patterns, new product introductions, sales promotions, channel inventory levels, and general economic and political conditions. If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale, either of which could adversely impact our operating results and financial condition.

Following an increase in demand during the COVID-19 pandemic, we have recently seen a softening of consumer demand. As a result, we have had to, and may continue to, write-down or write-off inventory or sell the excess inventory at discounted prices, which has, and could in the future, cause our gross margin to suffer. In addition, excess inventory has, and may in the future, result in reduced working capital, which could adversely affect our ability to invest in other important areas of our business such as marketing and product development. If our channel partners have excess inventory of our products, they may decrease their purchases of our products in subsequent periods. In addition, in the event of excess inventory including excess component inventory, we may be unable to renegotiate our agreements with existing suppliers on mutually acceptable terms. Although in certain instances our agreements with certain suppliers allow us the option to cancel, reschedule, and adjust our requirements based on our business needs, our loss contingencies may include

14

Table of contents

liabilities for contracts that we cannot cancel, reschedule or adjust with suppliers or partners.  We may also deem it necessary or advisable to renegotiate agreements with our supply partners in order to scale our inventory with demand.

***A resurgence of the COVID-19 pandemic could adversely impact our business and it remains uncertain how the post-COVID environment will impact demand for our products.***

During the pandemic, consistent with its effects industry-wide, we experienced supply chain disruptions and challenges that increased costs and impacted our ability to meet demand and manage inventory levels.  The pandemic has also contributed to ongoing global economic uncertainty.  Any resurgence of the pandemic could have similar impacts on our business, operating results and financial condition.

In addition, we experienced increased demand for our products during the COVID-19 pandemic and have recently seen a softening of consumer demand and a shift in consumer spending from purchasing goods to purchasing services and travel.  It remains uncertain the extent to which the post-pandemic environment will impact demand for our products and services or shift consumer spending habits generally over the longer term.

***Global economic conditions and any associated impact on consumer discretionary spending could have a material adverse effect on our business, results of operations and financial condition.***

Continued global economic uncertainty and reductions in consumer discretionary spending and consumer confidence may impact the sales of our products and services. Factors affecting the level of consumer spending for our products and services include general economic conditions, including the potential for an extended global recession, continued inflationary pressures, rising interest rates and, in certain markets, foreign currency exchange rate fluctuations.  As global economic conditions continue to be volatile or economic uncertainty remains, trends in consumer discretionary spending also remain unpredictable. Unfavorable economic conditions may lead consumers to delay or reduce purchases of our products and services and consumer demand for our products and services may not grow as we expect.  Any reduction in sales of our products and services resulting from reductions in consumer discretionary spending could have an adverse effect on our business, financial condition, and operating results.

***The home audio and consumer electronics industries are highly competitive.***

The markets in which we operate are extremely competitive and rapidly evolving, and we expect that competition will intensify in the future. Our competition includes established, well-known sellers of speakers and sound systems such as Bose, Samsung (and its subsidiaries Harman International and JBL), Sony, Bang & Olufsen, and Masimo (and its subsidiary Sound United that owns, among others, the Denon, Polk Audio and Bowers and Wilkens brands), and developers of voice-enabled speakers and systems such as Amazon, Apple and Google. We could also face competition from new market entrants, some of whom might be current partners of ours.

In order to deliver products that appeal to changing and increasingly diverse consumer preferences and to overcome the fact that a relatively high percentage of consumers may already own or use products that they perceive to be similar to those that we offer, we must develop superior technology, anticipate increasingly diverse consumer tastes and rapidly develop attractive products with competitive selling prices. In addition, many of our current and potential partners have business objectives that may drive them to sell their speaker products at a significant discount compared to ours. Amazon and Google, for example, both currently offer their speaker products at significantly lower prices than our speaker products. Many of these partners may subsidize these prices and seek to monetize their customers through the sale of additional services rather than the speakers themselves. Even if we are able to efficiently develop and offer innovative products at competitive selling prices, our operating results and financial condition may be adversely impacted if we are unable to effectively anticipate and counter the ongoing price erosion that frequently affects consumer products or if the average selling prices of our products decrease faster than we are able to reduce our manufacturing costs.

Many of our competitors have greater financial, technical and marketing resources available to them than those available to us, and, as a result, they may develop competing products that cause the demand for our products to decline. Our competitors have established, or may establish, cooperative relationships among themselves or with third parties to increase the abilities of their products to address the needs of our prospective customers, and other companies may enter our markets by entering into strategic relationships with our competitors. A failure to effectively anticipate and respond to these established and new competitors may adversely impact our business and operating results.

Further, our current and prospective competitors may consolidate with each other or acquire companies that will allow them to develop products that better compete with our products, which would intensify the competition that we face and may also disrupt or lead to termination of our distribution, technology and content partnerships. For example, if one of our competitors were to acquire one of our content partners, the consolidated company may decide to disable the streaming functionality of its service with our products.

If we are unable to compete with these consolidated companies or if consolidation in the market disrupts our partnerships or reduces the number of companies we partner with, our business would be adversely affected.

***Our investments in research and development may not yield the results expected.***

15

Table of contents

Our business operates in intensely competitive markets characterized by changing consumer preferences and rapid technological innovation. Due to advanced technological innovation and the relative ease of technology imitation, new products tend to become standardized more rapidly, leading to more intense competition and ongoing price erosion. In order to strengthen the competitiveness of our products in this environment, we continue to invest heavily in research and development. However, these investments may not yield the innovation or the results expected on a timely basis, or our competitors may surpass us in technological innovation, hindering our ability to timely commercialize new and competitive products that meet the needs and demands of the market, which consequently may adversely impact our operating results as well as our reputation.

*If we are not successful in continuing to expand our direct-to-consumer sales channel by driving consumer traffic and consumer purchases through our website, our business and results of operations could be harmed.*

We have invested significant resources in our direct-to-consumer sales channel, primarily through our website, and our future growth relies, in part, on our continued ability to attract consumers to this channel, which has and will continue to require significant expenditures in marketing, software development and infrastructure. If we are unable to continue to drive traffic to, and increase sales through, our website, our business and results of operations could be harmed. The continued success of direct-to-consumer sales through our website is subject to risks associated with e-commerce, many of which are outside of our control. Our inability to adequately respond to these risks and uncertainties or to successfully maintain and expand our direct-to-consumer business via our website may have an adverse impact on our results of operations.

*Our efforts to expand beyond our core product offerings and offer products with wider applications may not succeed and could adversely impact our business*

We have, and may in the future continue to, seek to expand beyond our core sound systems and develop products that have wider applications outside of home sound, such as commercial or office. For example, in April 2023, we introduced Sonos Pro, our new audio subscription service for businesses. Developing these products would require us to devote substantial additional resources, and our ability to succeed in developing such products to address such markets is unproven. It is likely that we would need to hire additional personnel, partner with new third parties and incur considerable research and development expenses to pursue such an expansion successfully. We may have less familiarity with consumer preferences for these products and less product or category knowledge, and we could encounter difficulties in attracting new customers due to lower levels of consumer familiarity with our brand. As a result, we may not be successful in future efforts to achieve profitability from new markets, services or new types of products, and our ability to generate revenue from our existing products may suffer. If any such expansion does not enhance our ability to maintain or grow our revenue or recover any associated development costs, our operating results could be adversely affected.

*We experience seasonal demand for our products, and if our sales in high-demand periods are below our forecasts, our overall financial condition and operating results could be adversely affected.*

Given the seasonal nature of our sales, accurate forecasting is critical to our business. Our fiscal year ends on the Saturday closest to September 30; the holiday shopping season occurs in the first quarter of our fiscal year, and the typically slower summer months occur in the fourth quarter of our fiscal year. Historically, our revenue has been significantly higher in our first fiscal quarter due to increased consumer spending patterns during the holiday season. Any shortfalls in expected first fiscal quarter revenue, due to macroeconomic conditions like the potential for an extended global recession, product release patterns, a decline in the effectiveness of our promotional activities, supply chain disruptions, inflationary pressures or for any other reason, could cause our annual operating results to suffer significantly. In addition, if we fail to accurately forecast customer demand for the holiday season, we may experience excess inventory levels or a shortage of products available for sale, which could further harm our financial condition and operating results.

*The success of our business depends in part on the continued growth of the voice-enabled speaker market and our ability to establish and maintain market share.*

We have increasingly focused our product roadmap on voice-enabled speakers. We introduced our first voice-enabled speaker in 2017 and since then have introduced a total of eight voice-enabled speakers, as well as Sonos Voice Control, our proprietary voice assistant. If the voice-enabled speaker markets do not continue to grow or grow in unpredictable ways, our revenue may fall short of expectations and our operating results may be harmed, particularly since we incur substantial costs to introduce new products in advance of anticipated sales. Additionally, even if the market for voice-enabled speakers does continue to grow, we may not be successful in developing and selling speakers that appeal to consumers or gain sufficient market acceptance. To succeed in this market, we will need to design, produce and sell innovative and compelling products and partner with other businesses that enable us to capitalize on new

Table of contents

technologies, some of which have developed or may develop and sell voice-enabled speaker products of their own as further described herein.

***If market demand for streaming music does not grow as anticipated or the availability and quality of streaming services does not continue to increase, our business could be adversely affected.***

A large proportion of our customer base uses our products to listen to content via subscription-based streaming music services. Accordingly, we believe our future revenue growth will depend in significant part on the continued expansion of the market for streaming music. The success of the streaming music market depends on the quality, reliability and adoption of streaming technology and on the continued success of streaming music services such as Apple Music, Spotify, Deezer, and Pandora. If the streaming music market in general fails to expand or if the streaming services that we partner with are not successful, demand for our products may suffer and our operating results may be adversely affected.

***If we are unable to protect our intellectual property, the value of our brand and other intangible assets may be diminished, and our business may be adversely affected.***

We rely and expect to continue to rely on a combination of confidentiality and license agreements with our employees, consultants and third parties with whom we have relationships, as well as patent, trademark, copyright and trade secret protection laws, to protect our proprietary rights. In the United States and certain other countries, we have filed various applications for certain aspects of our intellectual property, most notably patents. However, third parties may knowingly or unknowingly infringe our proprietary rights or challenge our proprietary rights, pending and future patent and trademark applications may not be approved, and we may not be able to prevent infringement without incurring substantial expense. Such infringement could have a material adverse effect on our brand, business, financial condition and results of operations. We have initiated legal proceedings to protect our intellectual property rights, and we may file additional actions in the future. For example, in January 2020 we filed a complaint with the ITC against Alphabet and Google and a counterpart lawsuit in the U.S. District Court for the Central District of California against Google alleging infringement of five Sonos patents, and in September 2020 we filed another lawsuit against Google alleging infringement of an additional four Sonos patents.  See Note 12. Commitments and Contingencies of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for further details. The cost of defending our intellectual property has been and may in the future be substantial, and there is no assurance we will be successful. Our business could be adversely affected as a result of any such actions, or a finding that any patents-in-suit are invalid or unenforceable. These actions have led and may in the future lead to additional counterclaims or actions against us, which are expensive to defend against and for which there can be no assurance of a favorable outcome. For example, Google has responded to our legal proceedings by filing multiple patent infringement lawsuits against us in the U.S. District Court for the Northern District of California, cases against us in the ITC, and patent infringement lawsuits against us and our subsidiary Sonos Europe B.V. in various foreign jurisdictions. See Note 12. Commitments and Contingencies of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for further details.  Further, parties we bring legal action against could retaliate through non-litigious means, which could harm our ability to compete against such parties or to enter new markets.

In addition, the regulations of certain foreign countries do not protect our intellectual property rights to the same extent as the laws of the United States. As our brand grows, we may discover unauthorized products in the marketplace that are counterfeit reproductions of our products. If we are unsuccessful in pursuing producers or sellers of counterfeit products, continued sales of these products could adversely impact our brand, business, financial condition and results of operations.

***We currently are, and may continue to be, subject to intellectual property rights claims and other litigation which are expensive to support, and if resolved adversely, could have a significant impact on us and our stockholders.***

Companies in the consumer electronics industries own large numbers of patents, copyrights, trademarks, domain names and trade secrets, and frequently enter into litigation based on allegations of infringement, misappropriation or other violations of intellectual property or other rights. As we gain an increasingly high profile and face more intense competition in our markets, and as we introduce more products and services, including through acquisitions and through partners, the possibility of intellectual property rights claims against us grows. Our technologies may not be able to withstand any third-party claims or rights against their use, and we may be subject to litigation and disputes. The costs of supporting such litigation and disputes are considerable, and there can be no assurance that a favorable outcome would be obtained. We may be required to settle such litigation and disputes, or we may be subject to an unfavorable judgment in a trial, and the terms of a settlement or judgment against us may be unfavorable and require us to cease some or all our operations, limit our ability to use certain technologies, pay substantial amounts to the other party or issue additional shares of our capital stock to the other party, which would dilute our existing stockholders. Further, if we are found to have engaged in practices that are in violation of a third party's rights, we may have to negotiate a license to continue such practices, which may not be available on reasonable or favorable terms, or may have to develop alternative, non-infringing technology or discontinue the practices altogether. In the event that these practices relate to an acquisition or a partner, we may not be successful in exercising any indemnification rights available to us under our agreements or in recovering damages in the event that we are successful. Each of these efforts could require significant effort and expense and ultimately may not be successful.

17

Table of contents

***If we are not able to maintain and enhance the value and reputation of our brand, or if our reputation is otherwise harmed, our business and operating results could be adversely affected.***

Our continued success depends on our reputation for providing high-quality products and consumer experiences, and the "Sonos" name is critical to preserving and expanding our business. Our brand and reputation are dependent on a number of factors, including our marketing efforts, product quality, and trademark protection efforts, each of which requires significant expenditures.

The value of our brand could also be severely damaged by isolated incidents, which may be outside of our control. For example, in the United States, we rely on custom installers of home audio systems for a significant portion of our sales but maintain no control over the quality of their work and thus could suffer damage to our brand or business to the extent such installations are unsatisfactory or defective. Any damage to our brand or reputation may adversely affect our business, financial condition and operating results.

***Conflicts with our channel and distribution partners could harm our business and operating results.***

Several of our existing products compete, and products that we may offer in the future could compete, with the product offerings of some of our significant channel and distribution partners who have greater financial and technical resources than we do. To the extent products offered by our partners compete with our products, they may choose to market and promote their own products over ours or could end our partnerships and cease selling or promoting our products entirely. Any reduction in our ability to place and promote our products, or increased competition for available shelf or website placement, especially during peak retail periods, such as the holiday shopping season, would require us to increase our marketing expenditures and to seek other distribution channels to promote our products. If we are unable to effectively sell our products due to conflicts with our distribution partners or the inability to find alternative distribution channels, our business would be harmed.

The expansion of our direct-to-consumer channel could alienate some of our channel partners and cause a reduction in product sales from these partners. Channel partners may perceive themselves to be at a disadvantage based on the direct-to-consumer sales offered through our website. Due to these and other factors, conflicts in our sales channels could arise and cause channel partners to divert resources away from the promotion and sale of our products. Further, to the extent we use our mobile app to increase traffic to our website and increase direct-to-consumer sales, we will rely on application marketplaces such as the Apple App Store and Google Play to drive downloads of our mobile app. Apple and Google, both of which sell products that compete with ours, may choose to use their marketplaces to promote their competing products over our products or may make access to our mobile app more difficult. Any of these situations could adversely impact our business and results of operations.

***Competition with our technology partners could harm our business and operating results.***

We are dependent on a number of technology partners for the development of our products, some of which have developed or may develop and sell products that compete with our products. These technology partners may cease doing business with us or disable the technology they provide our products for a variety of reasons, including to promote their products over our own. For example, we are currently manufacturing and developing voice-enabled speaker systems that are enhanced with the technology of our partners, including those who sell competing products. Our existing voice-enabled speakers are powered by Amazon's Alexa or Google's Google Assistant technology. One or more of our partners could disable their integration on one or all of our voice-enabled products, terminate or not renew their distribution agreement with us, or begin charging us for their integration with our voice-enabled products. For example, our current agreement with Amazon allows Amazon to disable the Alexa integration in our voice-enabled products with limited notice. We cannot assure you that we will be successful in establishing partnerships with other companies that have developed voice-control enablement technology or in developing such technology on our own.

If one or more of our technology partners do not maintain their integration with our products or seek to charge us for this integration, or if we have not developed alternative partnerships for similar technology or developed such technology on our own, our sales may decline, our reputation may be harmed and our business and operating results may suffer.

***Competition with our content partners could cause these partners to cease to allow their content to be streamed on our products, which could lower product demand.***

Demand for our products depends in large part on the availability of streaming third-party content that appeals to our existing and prospective customers. Compatibility with streaming music services, podcast platforms and other content provided by our content partners is a key feature of our products. To date, all our arrangements have been entered into on a royalty-free basis. Some of these content partners compete with us already, and others may in the future produce and sell speakers along with their streaming services. Additionally, other content partners may form stronger alliances with our competitors in the home audio market. Any of our content partners may cease to allow their content to be streamed on our products for a variety of reasons, including as a result of our offering competing services, to promote other partnerships or their products over our products, or to seek to charge us for this streaming. If this were to happen, demand for our products could decrease, our costs could increase and our operating results could be harmed.

## Operational Risks

***We are dependent on a limited number of contract manufacturers to manufacture our products and our efforts to diversify manufacturers may not be successful.***

We depend on a limited number of contract manufacturers to manufacture our products, with our key manufacturer, Inventec Appliances Corporation, manufacturing a majority of our products. We have also historically manufactured our products in China. In fiscal 2020, we began our efforts to diversify our supply chain through the addition of new contract manufacturers and geographic diversification, starting with Malaysia and extending such efforts into Vietnam in fiscal 2022. During fiscal 2023, we began the process of exiting certain partnerships with two of our contract manufacturers, including our second-largest contract manufacturer, and may exit other partnerships with contract manufacturers from time to time. Our reliance on a limited number of contract manufacturers increases the risk that, in the event that any or all of such manufacturers experience an interruption in their operations, fail to perform their obligation in a timely manner or terminate agreements with us, we would not be able to maintain our production capacity without incurring material additional costs and substantial delays or we may be fully prevented from selling our products. Any material disruption in our relationship with our manufacturers would harm our ability to compete effectively and satisfy demand for our products and could adversely impact our revenue, gross margin and operating results.

In addition, there is no guarantee that our efforts to diversify manufacturers will be successful. Identifying and onboarding a new manufacturer takes a significant amount of time and resources. If we do not successfully coordinate the timely manufacturing and distribution of our products by such manufacturers, if such manufacturers are unable to successfully and timely process our orders or if we do not receive timely and accurate information from such manufacturers, we may have an insufficient supply of products to meet customer demand, we may lose sales, we may experience a build-up in inventory, we may incur additional costs, and our financial performance and reporting may be adversely affected. By adding manufacturers in other countries, we may experience increased transportation costs, fuel costs, labor unrest, impact of natural disasters and other adverse effects on our ability, timing and cost of delivering products, which may increase our inventory, decrease our margins, adversely affect our relationships with distributors and other customers and otherwise adversely affect our operating results and financial condition.

***We depend on a limited number of third-party components suppliers and logistics providers, and many of our components have long lead times, and our business and operating results could be adversely affected by shortages, disruptions and related challenges.***

We are dependent on a limited number of suppliers for various key components used in our products, and we may from time to time have sole source suppliers. The cost, quality and availability of these components are essential to the successful production and sale of our products. We are subject to the risk of industry-wide shortages, price fluctuations and long lead times in the supply of these components and other materials. If the supply of these components is delayed or constrained, or if one or more of our main suppliers were to go out of business, alternative sources or suppliers may not be available on acceptable terms or at all. In the event that any of our suppliers were to discontinue production of our key product components, developing alternate sources of supply for these components would be time consuming, difficult and costly. In the event we are unable to obtain components in sufficient quantities on a timely basis and on commercially reasonable terms, our ability to sell our products in order to meet market demand would be affected and could materially and adversely affect our brand, image, business prospects and operating results.

In addition, the longer lead time for many of our components presents challenges in our efforts to manage component inventory, as we procure such components based on our then current forecast of demand for our products. For example, during the pandemic we increased our investments in, and purchase commitments for, components with longer lead times where possible to secure inventory in anticipation of shortages and strong demand, and we may need to do so again in the future. In the event that actual demand for our products differs from our forecast, we may end up with an excess inventory of components, as we saw in fiscal 2023, negatively impacting our working capital.

We also use a small number of logistics providers for substantially all our product delivery to both distributors and retailers. If one of these providers were to experience financial difficulties or disruptions in its business, or be subject to closures or other disruptions, our own operations could be adversely affected. Because substantially all of our products are distributed from and into a small number of locations and by a small number of companies, we are susceptible to both isolated and system-wide interruptions caused by events out of our control. Any disruption to the operations of our distribution facilities could delay product delivery, harm our reputation among our customers and adversely affect our operating results and financial condition.

We have limited control over the third-party suppliers and logistics providers on which our business depends. If any of these parties fails to perform its obligations to us, we may be unable to deliver our products to customers in a timely manner. Further, we do not have long-term contracts with all of these parties, and there can be no assurance that we will be able to renew our contracts with them on favorable terms or at all. We may be unable to replace an existing supplier or logistics provider or supplement a provider in the event we experience significantly increased demand. Accordingly, a loss or interruption in the service of any key party could adversely impact our revenue, gross margin and operating results.

Table of contents

***We sell our products through a limited number of key channel partners, and the loss of any such channel partner would adversely impact our business.***

We are dependent on our channel partners for a vast majority of our product sales. Best Buy, one of our key channel partners, accounted for 17% of our revenue in fiscal 2023. We compete with other consumer products for placement and promotion of our products in the stores of our channel partners, including in some cases products of our channel partners. Our contracts with our channel partners allow them to exercise significant discretion in the placement and promotion of our products, and such contracts do not contain any long-term volume commitments. If one or several of our channel partners do not effectively market and sell our products, discontinue or reduce the inventory of our products, increase the promotions of or choose to promote competing products over ours, the volume of our products sold to customers could decrease, and our business and results of operations would therefore be significantly harmed. Many of our key channel partners temporarily closed or reduced operations in their retail stores at various times during the pandemic and may continue to do so in the future, which has had, and may continue to have, a material effect on our business and results of operations.

Revenue from our channel partners also depends on a number of factors outside our control and may vary from period to period. One or more of our channel partners may experience serious financial difficulty, particularly in light of the impact of the pandemic on the retail sector, may consolidate with other channel partners or may have limited or ceased operations. Our business and results of operations have been, and may continue to be, significantly harmed by retail store closures by many of our key channel partners. Loss of a key channel partner would require us to identify alternative channel partners or increase our reliance on our direct-to-consumer channel, which may be time-consuming and expensive or we may be unsuccessful in our efforts to do so.

***We have and may in the future discontinue support for older versions of our products, resulting in customer dissatisfaction that could negatively affect our business and operating results.***

We have historically maintained, and we believe our customers may expect, extensive backward compatibility for our older products and the software that supports them, allowing older products to continue to benefit from new software updates. We expect that as we continue to improve and enhance our software platform, this backward compatibility will no longer be practical or cost-effective, and we may decrease or discontinue service for our older products. For example, certain of our legacy products continue to work but no longer receive software updates (other than bug fixes and patches). To the extent we no longer provide extensive backward capability for our products, we may damage our relationship with our existing customers, as well as our reputation, brand loyalty and ability to attract new customers.

For these reasons, any decision to decrease or discontinue backward capability may decrease sales, generate legal claims and adversely affect our business, operating results and financial condition.

***Product quality issues and a higher-than-expected number of warranty claims or returns could harm our business and operating results.***

The products that we sell could contain defects in design or manufacture. Defects could also occur in the products or components that are supplied to us. There can be no assurance we will be able to detect and remedy all defects in the hardware and software we sell, which could result in product recalls, product redesign efforts, loss of revenue, reputational damage and significant warranty and other remediation expenses. Similar to other consumer electronics, our products have a risk of overheating and fire in the course of usage or upon malfunction. Any such defect could result in harm to property or in personal injury. If we determine that a product does not meet product quality standards or may contain a defect, the launch of such product could be delayed until we remedy the quality issue or defect. The costs associated with any protracted delay necessary to remedy a quality issue or defect in a new product could be substantial.

We generally provide a one-year warranty on all our products, except in the European Union ("EU") and select other countries where we provide a minimum two-year warranty, depending on the region, on all our products. The occurrence of any material defects in our products could expose us to liability for warranty claims in excess of our current reserves, and we could incur significant costs to correct any defects, warranty claims or other problems. In addition, our failure to comply with past, present and future laws regulating extended warranties and accidental damage coverage could result in reduced sales of our products, reputational damage, penalties and other sanctions, which could harm our business and financial condition.

***Our international operations are subject to increased business and economic risks that could impact our financial results.***

We have operations outside the United States, and we expect to continue to expand our international presence, especially in Asia. In fiscal 2023, 41.3% of our revenue was generated outside the United States. This subjects us to a variety of risks inherent in doing business internationally, including:

- fluctuations in currency exchange rates and costs of imposing currency exchange controls;

- political, social and/or economic instability;

- tariffs, trade barriers and duties;

- protectionist laws and business practices that favor local businesses in some countries;

Table of contents

- higher levels of credit risk and payment fraud and longer payment cycles associated with, and increased difficulty of payment collections from certain international customers;

- burdens and risks of complying with a number and variety of foreign laws and regulations, including the Foreign Corrupt Practices Act;

- laws and regulations may change from time to time unexpectedly and may be unpredictably enforced;

- potential negative consequences from changes in or interpretations of U.S. and foreign tax laws;

- the cost of developing connected products for countries where Wi-Fi technology has been passed over in favor of more advanced cellular data networks;

- reduced protection for intellectual property rights in some countries;

- difficulties and associated costs in managing and staffing multiple international locations; and

- delays from customs brokers or government agencies.

If we are unable to manage the complexity of our global operations successfully, or if the risks above become substantial for us, our financial performance and operating results could suffer. Further, any measures that we may implement to reduce risks of our international operations may not be effective, may increase our expenses and may require significant management time and effort. Entry into new international markets requires considerable management time and financial resources related to market, personnel and facilities development before any significant revenue is generated. As a result, initial operations in a new market may operate at low margins or may be unprofitable.

We have significant operations in China, where many of the risks listed above are particularly acute. China experiences high turnover of direct labor due to the intensely competitive and fluid market for labor, and if our labor turnover rates are higher than we expect in that region, or we otherwise fail to adequately manage our labor needs, then our business and results of operations could be adversely affected.

***We will need to improve our financial and operational systems to manage our growth effectively and support our increasingly complex business arrangements, and an inability to do so could harm our business and results of operations.***

To manage our growth and our increasingly complex business operations, especially as we move into new markets internationally, we will need to upgrade our operational and financial systems and procedures, which requires management time and may result in significant additional expense. For example, we replaced our legacy enterprise resource planning ("ERP") system in fiscal 2022 in order to accommodate our expanding operations. We cannot be certain that we will institute, in a timely or efficient manner or at all, the improvements to our managerial, operational and financial systems and procedures necessary to support our anticipated increased levels of operations. Problems associated with, or disruptions resulting from, any improvement or expansion of our operational and financial systems could adversely affect our relationships with our suppliers, manufacturers, resellers and customers, inhibit our ability to expand or take advantage of market opportunities, cause harm to our reputation, result in errors in our financial and other reporting, and affect our ability to maintain an effective internal control environment and meet our external reporting obligations, any of which could harm our business and operating results and affect our stock price.

***A significant disruption in our websites, servers or information technology systems, or those of our third-party partners, could impair our customers' listening experience or otherwise adversely affect our customers, damage our reputation or harm our business.***

As a consumer electronics company, our website and mobile app are important presentations of our business, identity and brand and an important means of interacting with, and providing information to, consumers of our products. We depend on our servers and centralized information technology systems, and those of third parties, for product functionality, to manage operations and to store critical information and intellectual property. Accordingly, we allocate significant resources to maintaining our information technology systems and deploying network security, data encryption, training and other measures to protect against unauthorized access or misuse. Nevertheless, our website and information technology systems, and those of the third parties we rely on, are susceptible to damage, viruses, disruptions or shutdowns due to foreseeable and unforeseeable events. System failures and disruptions could impede the manufacturing and shipping of products, functionality of our products, transactions processing and financial reporting, and result in the loss of intellectual property or data, require substantial repair costs and damage our reputation, competitive position, financial condition and results of operations.

For example, we use Amazon Web Services ("AWS") to maintain the interconnectivity of our mobile app to our servers and those of the streaming services that our customers access to enjoy our products. Because AWS runs its own platform that we access, we are vulnerable to both system-wide and Sonos-specific service outages at AWS. Our access to AWS' infrastructure could be limited by a number of potential causes, including technical failures, natural disasters, fraud or security attacks that we cannot predict or prevent.

Additionally, our products may contain flaws that make them susceptible to unauthorized access or use. For example, we previously discovered a vulnerability in our products that could be exploited when a customer visited a website with malicious content, allowing the customer's local network to be accessed by third parties who could then gain unauthorized access to their playlists and other data and limited control of the customer's devices. While we devote significant resources to address and eliminate flaws and other vulnerabilities in our products, there can be no assurance that our products will not be compromised in the future. Any such flaws or vulnerabilities, whether actual or merely potential, could harm our reputation, competitive position, financial condition and results of operations.

***Any cybersecurity breaches or our actual or perceived failure to comply with such legal obligations by us, or by our third-party service providers or partners, could harm our business.***

We collect, store, process and use our customers' personally identifiable information and other data, and we rely on third parties that are not directly under our control to do so as well. While we take measures intended to protect the security, integrity and confidentiality of the personal information and other sensitive information we collect, store or transmit, we cannot guarantee that inadvertent or unauthorized use or disclosure will not occur, or that third parties will not gain unauthorized access to this information. There have been a number of recent reported incidents where third parties have used software to access the personal data of their partners' customers for marketing and other purposes.

If we or our third-party service providers were to experience a breach, disruption or failure of systems compromising our customers' data, or if one of our third-party service providers or partners were to access our customers' personal data without our authorization, our brand and reputation could be adversely affected, use of our products could decrease and we could be exposed to a risk of loss, litigation and regulatory proceedings. In addition, a breach could require expending significant additional resources related to the security of information systems and disrupt our operations.

The use of data by our business and our business associates is highly regulated in all our operating countries. Privacy and information security laws and regulations change, and compliance with them may result in cost increases due to, among other things, systems changes and the development of new processes. If we or those with whom we share information fail to comply with laws and regulations, such as the General Data Protection Regulation ("GDPR") and California Consumer Privacy Act ("CCPA"), our reputation could be damaged, possibly resulting in lost business, and we could be subjected to additional legal risk or financial losses as a result of non-compliance. Complying with such laws may also require us to modify our data processing practices and policies and incur substantial expenditures.

***Changes in how network operators manage data that travels across their networks or in net neutrality rules could harm our business.***

We rely upon the ability of consumers to access our service through the internet. If network operators block, restrict or otherwise impair access to our service over their networks, our service and business could be negatively affected. To the extent that network operators implement usage-based pricing, including meaningful bandwidth caps, or otherwise try to monetize access to their networks by data providers, we could incur greater operating expenses. Furthermore, to the extent network operators create tiers of internet access service and either charge us for or prohibit us from being available through these tiers, our business could be negatively impacted.

Further, in the past, internet service providers ("ISPs") have attempted to implement usage-based pricing, bandwidth caps and traffic shaping or throttling. To the extent network operators create tiers of internet access service and charge our customers in direct relation to their consumption of audio content, our ability to attract and retain customers could be impaired, which would harm our business. Net neutrality rules, which were designed to ensure that all online content is treated the same by ISPs and other companies that provide broadband services, were repealed by the Federal Communications Commission ("FCC") effective June 2018. Although the FCC has preempted state jurisdiction over net neutrality, some states have taken executive action directed at reinstating aspects of the FCC's 2015 order. Further, while many countries, including across the EU, have implemented net neutrality rules, in others, the laws may be nascent or non-existent. The absence or repeal of the net neutrality rules could force us to incur greater operating expenses, cause our streaming partners to seek to shift costs to us or result in a decrease in the streaming-based usage of our platform by our customers, any of which would harm our results of operations. In addition, given uncertainty around these rules, including changing interpretations, amendments or repeal, coupled with potentially significant political and economic power of local network operators, we could experience discriminatory or anti-competitive practices that could impede our growth, cause us to incur additional expense or otherwise negatively affect our business.

***Our use of open source software could negatively affect our ability to sell our products and subject us to possible litigation.***

We incorporate open source software into our products, and we may continue to incorporate open source software into our products in the future. Open source software is generally licensed by its authors or other third parties under open source licenses. Some of these licenses contain requirements that we make available source code for modifications or derivative works we create based upon the open source software and that we license such modifications or derivative works under the terms of a particular open source license or other license granting third parties certain rights of further use. Additionally, if a third-party software provider has incorporated open source software into software that we license from such provider, we could be required to disclose any of our source code that incorporates or

22

Table of contents

is a modification of our licensed software. If an author or other third party that distributes open source software that we use or license were to allege that we had not complied with the conditions of the applicable license, we could be required to incur significant legal expenses defending against those allegations and could be subject to significant damages, enjoined from offering or selling our products that contained the open source software and required to comply with the above conditions. Any of the foregoing could disrupt and harm our business and financial condition.

## Legal and Regulatory Risks

***Changes in international trade policies, including the imposition of tariffs have had, and may continue to have, an adverse effect on our business, financial condition and results of operations.***

Under the previous administration, the U.S. government has imposed significant new tariffs on China related to the importation of certain product categories, including those under the August 2019 Section 301 Tariff Action (List 4A) ("Section 301 tariffs"). These Section 301 tariffs have increased our cost of revenue and adversely impacted our results of operations. We were able to obtain an exemption from the Section 301 tariffs for certain of our products, including our core speaker products, for certain periods since fiscal 2020. In particular, on December 16, 2022, the USTR granted an extension through September 30, 2023, of the exclusion for our core speaker products. To date, we have been able to obtain certain refunds on tariffs paid through the fiscal 2022 exemption periods and are in the process of obtaining the minimal remaining refunds processed for such periods.

In the event that future tariffs are imposed on imports of our products, we are not successful in any future exemption requests, the amounts of existing tariffs are increased, our efforts to diversify our supply chain outside of China are delayed or otherwise not successful, or China or other countries take retaliatory trade measures in response to existing or future tariffs, our business may be impacted and we may be required to raise prices or make changes to our operations, any of which could materially harm our revenue or operating results. In response to future new tariffs, we may intensify our efforts to diversify outside of China, resulting in significant costs and disruption to our operations as we would need to pursue the time-consuming processes of recreating new supply chains, identifying substitute components and establishing new manufacturing locations.

***We must comply with extensive regulatory requirements, and the cost of such compliance, and any failure to comply, may adversely affect our business, financial condition and results of operations.***

In our current business and as we expand into new markets and product categories, we must comply with a wide variety of laws, regulations, standards and other requirements governing, among other things, electrical safety, wireless emissions, health and safety, e-commerce, consumer protection, export and import requirements, hazardous materials usage, product related energy consumption, packaging, recycling and environmental matters. Compliance with these laws, regulations, standards and other requirements may be onerous and expensive, and they may be inconsistent from jurisdiction to jurisdiction or change from time to time, further increasing the cost of compliance and doing business. Our products may require regulatory approvals or satisfaction of other regulatory concerns in the various jurisdictions in which they are manufactured, sold or both. These requirements create procurement and design challenges that require us to incur additional costs identifying suppliers and manufacturers who can obtain and produce compliant materials, parts and products. Failure to comply with such requirements can subject us to liability, additional costs and reputational harm and, in extreme cases, force us to recall products or prevent us from selling our products in certain jurisdictions.

***We may incur costs in complying with changing tax laws in the United States and abroad, which could adversely impact our cash flow, financial condition and results of operations.***

We are a U.S.-based company subject to taxes in multiple U.S. and foreign tax jurisdictions. Our profits, cash flow and effective tax rate could be adversely affected by changes in the tax rules and regulations in the jurisdictions in which we do business, unanticipated changes in statutory tax rates and changes to our global mix of earnings. As we expand our operations, any changes in the U.S. or foreign taxation of such operations may increase our worldwide effective tax rate.

We are also subject to examination by the Internal Revenue Service ("IRS") and other tax authorities, including state revenue agencies and foreign governments. If any tax authority disagrees with any position we have taken, our tax liabilities and operating results may be adversely affected. While we regularly assess the likelihood of favorable or unfavorable outcomes resulting from examinations by the IRS and other tax authorities to determine the adequacy of our provision for income taxes, there can be no assurance that the actual outcome resulting from these examinations will not materially adversely affect our financial condition and results of operations. In addition, the distribution of our products subjects us to numerous complex and often-changing customs regulations. Failure to comply with these systems and regulations could result in the assessment of additional taxes, duties, interest and penalties. There is no assurance that tax and customs authorities agree with our reporting positions and upon audit may assess us additional taxes, duties, interest and penalties. If this occurs and we cannot successfully defend our position, our profitability will be reduced.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

For the year ended September 30, 2023, we utilized $84.9 million U.S. federal net operating loss and have no U.S. federal net operating loss carryforwards remaining. As of September 30, 2023, we had gross state net operating loss carryforwards of $25.4 million, which expire beginning in 2032, as well as $46.9 million in foreign net operating loss carryforwards with an indefinite life. As of

Table of contents

September 30, 2023, we also had U.S. federal research and development tax credit carryforwards as filed of $54.4 million, and state research and development tax credit carryforwards as filed of $47.0 million, which will expire beginning in 2038 and 2025, respectively. Because of the change of ownership provisions of Sections 382 and 383 of the Code, use of a portion of the Company's domestic net operating losses and tax credit carryforwards may be limited in future periods depending upon future changes in ownership. Further, a portion of the carryforwards may expire before being applied to reduce future income tax liabilities if sufficient taxable income is not generated in future periods.

**Risks Related to Ownership of Our Common Stock**

***The stock price of our common stock has been and may continue to be volatile or may decline regardless of our operating performance.***

The stock price of our common stock has been and may continue to be volatile. The stock price of our common stock may fluctuate significantly in response to numerous factors in addition to the ones described in the preceding Risk Factors, many of which are beyond our control, including:

- overall performance of the equity markets and the economy as a whole;

- changes in the financial projections we or third parties may provide to the public or our failure to meet these projections;

- actual or anticipated changes in our growth rate relative to that of our competitors;

- announcements of new products, or of acquisitions, strategic partnerships, joint ventures or capital-raising activities or commitments, by us or by our competitors;

- additions or departures of key personnel;

- failure of securities analysts to maintain coverage of us, changes in financial estimates by any securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- rumors and market speculation involving us or other companies in our industry;

- sales of shares of our common stock by us or our stockholders particularly sales by our directors, executive officers and significant stockholders, or the perception that these sales could occur; and

- additional stock issuances that result in significant dilution to shareholders.

In addition, the stock market with respect to companies in the technology industry has experienced significant price and volume fluctuations that have affected and continue to affect the stock prices of these companies. In the past, stockholders have instituted securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business and adversely affect our business.

***We do not intend to pay dividends for the foreseeable future.***

We have never declared or paid any cash dividends on our common stock, and we do not intend to pay any cash dividends in the foreseeable future. We anticipate that we will retain all our future earnings for use in the development of our business and for general corporate purposes. Any determination to pay dividends in the future will be at the discretion of the Board. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investments. In addition, the terms of our credit facilities contain restrictions on our ability to declare and pay cash dividends on our capital stock.

***Certain provisions in our corporate charter documents and under Delaware law may prevent or hinder attempts by our stockholders to change our management or to acquire a controlling interest in us.***

There are provisions in our restated certificate of incorporation and restated bylaws that may make it difficult for a third party to acquire, or attempt to acquire, control of our company, even if a change in control were considered favorable by our stockholders. These anti-takeover provisions include:

- a classified Board so that not all members of the Board are elected at one time;

- the ability of the Board to determine the number of directors and fill any vacancies and newly created directorships;

- a requirement that our directors may only be removed for cause;

- a prohibition on cumulative voting for directors;

Table of contents

- the requirement of a super-majority to amend some provisions in our restated certificate of incorporation and restated bylaws;

- authorization of the issuance of "blank check" preferred stock that the Board could use to implement a stockholder rights plan;

- an inability of our stockholders to call special meetings of stockholders; and

- a prohibition on stockholder actions by written consent, thereby requiring that all stockholder actions be taken at a meeting of our stockholders.

In addition, our restated certificate of incorporation provides that the Delaware Court of Chancery is the exclusive forum for any derivative action or proceeding brought on our behalf; any action asserting a breach of fiduciary duty; any action asserting a claim against us arising pursuant to the Delaware General Corporation Law (the "DGCL"), our restated certificate of incorporation or our restated bylaws; or any action asserting a claim against us that is governed by the internal affairs doctrine. Our restated certificate of incorporation also provides that the federal district courts of the United States will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act of 1933, as amended.

Further, Section 203 of the DGCL may discourage, delay or prevent a change in control of our company. Section 203 imposes certain restrictions on mergers, business combinations, and other transactions between us and holders of 15% or more of our common stock.

## General Risk Factors

***The loss of one or more of our key personnel, or our failure to attract, assimilate and retain other highly qualified personnel in the future, could harm our business.***

We depend on the continued services and performance of our key personnel. The loss of key personnel, including key members of management as well as our product development, marketing, sales and technology personnel, could disrupt our operations and have an adverse effect on our ability to grow our business. In addition, the loss of key personnel in our finance and accounting departments could harm our internal controls, financial reporting capability and capacity to forecast and plan for future growth. Further, the market for highly skilled workers and leaders in our industry is extremely competitive. If we do not succeed in attracting, hiring and then integrating high-quality personnel or in retaining and motivating existing personnel, we may be unable to grow effectively, and our financial condition may be harmed.

***Natural disasters, geopolitical unrest, war, terrorism, pandemics, public health issues or other catastrophic events could disrupt the supply, delivery or demand of products, which could negatively affect our operations and performance.***

We are subject to the risk of disruption by earthquakes, floods and other natural disasters, fire, power shortages, geopolitical unrest, war, terrorist attacks and other hostile acts, public health issues, epidemics or pandemics, including COVID-19, and other events beyond our control and the control of the third parties on which we depend. Any of these catastrophic events, whether in the United States or abroad, may have a strong negative impact on the global economy, us, our contract manufacturers, our suppliers or customers, and could decrease demand for our products, create delays and inefficiencies in our supply chain and make it difficult or impossible for us to deliver products to our customers. Further, our headquarters are located in Santa Barbara County, California, in a seismically active region that is also prone to forest fires. Any catastrophic event that occurred near our headquarters, or near our manufacturing facilities in China, Malaysia or Vietnam, could impose significant damage to our ability to conduct our business and could require substantial recovery time, which could have an adverse effect on our business, operating results and financial condition.

***We may need additional capital, and we cannot be certain that additional financing will be available.***

In October 2021, we entered into a credit agreement with JPMorgan Chase Bank, N.A., Bank of America N.A., Morgan Stanley Senior Funding, Inc., and Goldman Sachs Bank USA, which allows us to borrow up to $100.0 million, with a maturity date of October 2026. We may require additional equity or debt financing to fund our operations and capital expenditures. Our ability to obtain financing will depend, among other things, on our development efforts, business plans, operating performance and the condition of the capital markets at the time we seek financing. We cannot assure you that additional financing will be available to us on favorable terms if and when required, or at all.

***We have and may in the future acquire other businesses or receive offers to be acquired, which could require significant management attention, disrupt our business, dilute stockholder value and adversely affect our operating results.***

As part of our business strategy, we have and may in the future make investments in complementary businesses, products, services or technologies. These acquisitions and other transactions and arrangements involve significant challenges and risks, including not advancing our business strategy, receiving an unsatisfactory return on our investment, difficulty integrating and retaining new employees, business systems, and technology, or distracting management from our other business initiatives. If an arrangement fails to adequately anticipate changing circumstances and interests of a party, it may result in early termination or renegotiation of the

25

Table of contents

arrangement. The success of these transactions and arrangements will depend in part on our ability to leverage them to enhance our existing products or develop compelling new ones. It may take longer than expected to realize the full benefits from these transactions and arrangements such as increased revenue or enhanced efficiencies, or the benefits may ultimately be smaller than we expected. These events could adversely affect our consolidated financial statements.

***If we fail to maintain an effective system of internal controls in the future, we may experience a loss of investor confidence and an adverse impact to our stock price.***

Pursuant to the Sarbanes-Oxley Act of 2002, we are required to document and test our internal control procedures and to provide a report by management on internal control over financial reporting, including management's assessment of the effectiveness of such control. We previously reported and remediated material weaknesses in internal control over financial reporting. Completion of remediation does not provide assurance that our remediation or other controls will continue to operate properly. If we are unable to maintain effective internal control over financial reporting or disclosure controls and procedures, our ability to record, process and report financial information accurately, and to prepare consolidated financial statements within required time periods could be adversely affected, which could subject us to litigation or investigations requiring management resources and payment of legal and other expenses, negatively affect investor confidence in our consolidated financial statements and adversely impact our stock price.

## Item 1B. Unresolved Staff Comments

None.

## Item 1C. Cybersecurity

Not applicable.

## Item 2. Properties

We are a global company with our corporate headquarters located in Santa Barbara, California. In July 2023, we entered into a lease agreement for office space for a new headquarters location in Goleta, California. We intend to relocate our headquarters to this space in fiscal 2024. With this addition, we lease office space in Goleta, California, as well as offices in various locations in the U.S. and around the world. We believe our existing facilities are adequate to meet our current requirements.

## Item 3. Legal Proceedings

From time to time, we may become involved in legal proceedings or be subject to claims arising in the ordinary course of our business. Other than the matters described in Note 12. Commitments and Contingencies of the notes to our consolidated financial statements included in Part II. Item 8 of this Annual Report, we were not a party to any legal proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition or cash flows. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors.

## Item 4. Mine Safety Disclosures

None.

PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities**

*Market Information for Our Common Stock*

Shares of our common stock trade on The Nasdaq Global Select Market under the symbol "SONO."

*Holders of Record*

As of November 3, 2023, there were 4 holders of record of our common stock. This figure does not include a substantially greater number of beneficial holders of our common stock whose shares are held of record by banks, brokers and other financial institutions.

*Dividend Policy*

We have never declared or paid any cash dividends on our capital stock, and we do not currently intend to pay any cash dividends for the foreseeable future. We expect to retain future earnings, if any, to fund the development and growth of our business. Any future determination to pay dividends on our common stock will be made at the discretion of the Board and will depend upon, among other factors, our financial condition, operating results, current and anticipated cash needs, plans for expansion and other factors that the Board may deem relevant. In addition, the terms of our credit facilities contain restrictions on our ability to declare and pay cash dividends on our capital stock.

*Recent Sales of Unregistered Securities*

None.

*Issuer Purchases of Equity Securities*

The following table presents information with respect to our repurchase of common stock during the quarter ended September 30, 2023.

| Period | Total Number of Shares Purchased (1) | | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs [1] (in thousands) |
|---|---|---|---|---|---|---|
| Jul 2  - Jul 29 | — | $ | — | — | $ | 54,974 |
| Jul 30 - Aug 26 | 1,762,624 | $ | 13.92 | 1,762,624 | $ | 30,440 |
| Aug 27  -Sep 30 | 2,244,894 | $ | 13.54 | 2,244,894 | $ | 34 |
| Total | 4,007,518 | | | 4,007,518 | | |

[1] Approximate dollar value of shares that may yet be purchased under the plans or programs does not include the impact of direct costs incurred to acquire shares.

(1)     In November 2022, the Board of Directors authorized a common stock repurchase program of up to $100.0 million. During the twelve months ended September 30, 2023, the Company repurchased 6,555,702 shares for an aggregate purchase price of $100.0 million at an average price of $15.25 per share under the repurchase program. See Note 8. Stockholders' Equity of the Company's consolidated financial statements for further information. Over the past three fiscal years, we have completed $300.0 million in share repurchases, for 14,528,681 shares, at an average price of $20.65 per share. We also withhold shares of common stock in connection with the vesting of restricted stock unit awards issued to such employees to satisfy applicable tax withholding requirements. Although these withheld shares are not issued or considered common stock repurchases under our stock repurchase program and therefore are not included in the preceding table, they are treated as common stock repurchases in our consolidated financial statements as they reduce the number of shares that would have been issued upon vesting.

27

Table of contents

*Stock Performance Graph*



In fiscal 2023, we elected to replace the Nasdaq Composite Index with the Nasdaq Computer Index because we believe it is more aligned with our peer group and will provide a meaningful comparison of our stock performance going forward.

**Item 6. [Reserved]**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read the following discussion of our financial condition and results of operations in conjunction with the consolidated financial statements and the notes thereto included elsewhere in this Annual Report on Form 10-K. The following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this Annual Report on Form 10-K, particularly in the section titled "Risk Factors."*

*We operate on a 52-week or 53-week fiscal year ending on the Saturday nearest September 30 each year. Our fiscal year is divided into four quarters of 13 weeks, each beginning on a Sunday and containing two 4-week periods followed by a 5-week period. An additional week is included in the fourth fiscal quarter approximately every five years to realign fiscal quarters with calendar quarters. References to fiscal 2023 are to our 52-week fiscal year ended September 30, 2023, references to fiscal 2022 are to our 52-week fiscal year ended October 1, 2022, references to fiscal 2021 are to our 52-week fiscal year ended October 2, 2021 and references to fiscal 2020 are to our 53-week fiscal year ended October 3, 2020.*

*Overview*

Sonos is one of the world's leading sound experience brands.

We pioneered multi-room, wireless audio products, debuting the world's first multi-room wireless sound system in 2005. Today, our products include wireless, portable, and home theater speakers, components, and accessories to address consumers' evolving audio needs. We are known for delivering unparalleled sound, thoughtful design aesthetic, simplicity of use, and an open platform. Our platform has attracted a broad range of more than 130 streaming content providers, such as Apple Music, Spotify, Deezer, and Pandora. These partners find value in our independent platform and access to our millions of desirable and engaged customers. We frequently introduce new services and features across our platform, providing our customers with enhanced functionality, improved sound, and an enriched user experience. We are committed to continuous technological innovation as reflected in our growing global patent portfolio. We believe our patents comprise the foundational intellectual property for wireless multi-room and other audio technologies.

We generate revenue from the sale of our Sonos speaker products, including wireless speakers and home theater speakers, from our Sonos system products, which largely comprises our component products, and from partner products and other revenue, including partnerships with IKEA and Sonance, Sonos and third-party accessories, licensing, advertising, and subscription revenue.

We have developed a robust product and software roadmap that we believe will help us capture the expanding addressable market for our products. We believe executing on our roadmap will position us to acquire new customers, offer a continuously improving experience to our existing customers, and grow follow-on purchases.

*Recent developments*

In March 2023, we executed the successful launch of two new products simultaneously - Era 100 and Era 300, our next generation of smart speakers. We also entered our new category with the introduction of Sonos Pro, our new audio subscription service for businesses. In September 2023, we launched Move 2, our new and improved premium portable all-in-one speaker, which we are confident is the best on the market. Notwithstanding the success of these products, our fiscal 2023 results were impacted by the near term industry-wide macroeconomic pressures we have flagged throughout fiscal 2023, and our fiscal 2023 results were adversely affected by a tightening of inventory in our installer solutions channel and by our retail partners, as well as demand softening in the later part of the year.

During fiscal 2023, we saw improvements in our supply chain, including recovery of supply for our products, decreased spot market component costs, and decreased shipping and logistics costs compared to the prior year. This improvement was partially offset by inventory write-downs for component inventory for purchases we committed to in response to industry-wide supply constraints resulting from the impact of the COVID-19 pandemic. In fiscal 2023, we began the process of exiting certain partnerships with two of our contract manufacturers and we expect to complete these exits with minimal disruption by the first quarter of fiscal 2024. We also added to our diversified contract manufacturing partnerships and shifted more of our production into our new contract manufacturing locations in Malaysia and Vietnam, resulting in savings from tariff avoidance.

In June 2023, in response to the softening of underlying demand trends we observed in the prior quarter resulting from industry-wide macroeconomic pressures, we initiated a restructuring plan to reduce our cost base (the "2023 restructuring plan"). The 2023 restructuring plan included a reduction in force involving approximately 7% of our employees, a further reduction of our real estate footprint, and a re-evaluation of certain program spend. Restructuring and abandonment costs under the 2023 restructuring plan were $11.4 million, substantially all of which were incurred in the third quarter of fiscal 2023. Additionally, in March 2023, in support of

29

Table of contents
Case 1:24-cv-00131-JNR    Document 120-2    Filed 12/17/24    Page 352 of 467 PageID
#: 7482

operational efficiencies, we abandoned portions of our office spaces for the remainder of their respective lease terms resulting in non-recurring abandonment charges of $4.8 million.

We have considered the impacts of these recent developments based on information currently available when developing our estimates and assumptions. Actual results and outcomes may differ from our estimates and assumptions. For additional information of risks related to our business, refer to Part II, Item 1A. Risk factors.

### Key Metrics

In addition to the measures presented in our consolidated financial statements, we use the following key metrics to evaluate our business, measure our performance, identify trends affecting our business and assist us in making strategic decisions. Our key metrics are total revenue, products sold, adjusted EBITDA and adjusted EBITDA margin. The most directly comparable financial measure calculated under U.S. GAAP for adjusted EBITDA and adjusted EBITDA margin are net income (loss) and net income (loss) margin, respectively.

| | Fiscal Year Ended | | |
| | September 30, 2023 | October 1, 2022 | October 2, 2021 |
|---|---|---|---|
| (In thousands, except percentages) | | | |
| Revenue | $ 1,655,255 | $ 1,752,336 | $ 1,716,744 |
| Products sold | 5,725 | 6,281 | 6,503 |
| Net income (loss) | (10,274) | 67,383 | 158,595 |
| Net income (loss) margin[1] | (0.6)% | 3.8% | 9.2% |
| Adjusted EBITDA[2] | $ 153,878 | $ 226,549 | $ 278,585 |
| Adjusted EBITDA margin[2] | 9.3% | 12.9% | 16.2% |

[1] Net income (loss) margin is calculated by dividing net income (loss) by revenue.

[2] For additional information regarding adjusted EBITDA and adjusted EBITDA margin (which are non-GAAP financial measures), including reconciliations of net income (loss), to adjusted EBITDA, see the sections titled "Adjusted EBITDA and Adjusted EBITDA Margin" and "Non-GAAP Financial Measures" below.

### Revenue

We generate substantially all of our revenue from the sale of Sonos speakers and Sonos system products. We also generate a portion of revenue from Partner products and other revenue sources, such as module revenue from our IKEA partnership, architectural speakers from our Sonance partnership, accessories such as speaker stands and wall mounts, professional services, licensing, and advertising revenue.

For a description of our revenue recognition policies, see the section titled "Critical accounting policies and estimates."

### Products Sold

Products sold represents the number of products that are sold during a period, net of returns and includes the sale of products in the Sonos speakers and Sonos system products categories, as well as module units sold through our partnerships with IKEA and Sonance from our Partner products and other revenue category. Growth rates between products sold and revenue are not perfectly correlated because our revenue is affected by other variables, such as the mix of products sold during the period, promotional discount activity, the introduction of new products that may have higher or lower than average selling prices, as well as the impact of recognition of previously deferred revenue.

### Adjusted EBITDA and Adjusted EBITDA Margin

We define adjusted EBITDA as net income (loss) adjusted to exclude the impact of stock-based compensation expense, depreciation, interest, other income (expense), taxes, and other items that we do not consider representative of our underlying operating performance.

We define adjusted EBITDA margin as adjusted EBITDA divided by revenue. See the section titled "Results of Operations —Non-GAAP Financial Measures" for information regarding our use of adjusted EBITDA and adjusted EBITDA margin, and a reconciliation of net income (loss) to adjusted EBITDA and net income (loss) margin to adjusted EBITDA margin.

**Components of Results of Operations**

### Revenue

We generate substantially all of our revenue from the sale of Sonos speakers and Sonos system products. We also generate a portion of revenue from Partner products and other revenue sources, such as module revenue from our IKEA partnership, architectural speakers from our Sonance partnership, and accessories such as speaker stands and wall mounts, as well as professional services, licensing, advertising, and subscription revenue. We attribute revenue from our IKEA partnership to our Asia Pacific ("APAC") region, as our regional revenue is defined by the shipment location. Our revenue is recognized net of allowances for returns, discounts, sales incentives, and any taxes collected from customers. We also defer a portion of our revenue that is allocated to unspecified software upgrades and cloud-based services, as well as for newly launched products sold to resellers not recognized until the date of general availability is reached. Our revenue is subject to fluctuation based on the foreign currency in which our products are sold, principally for sales denominated in the euro and the British pound. The introduction of new products may result in an increase in revenue but may also impact revenue generated from existing products as consumers shift purchases to new products.

For a description of our revenue recognition policies, see the section titled "Critical accounting policies and estimates."

### Cost of Revenue

Cost of revenue consists of product costs, including costs of our contract manufacturers for production, components, shipping and handling, tariffs, duty costs, warranty replacement costs, packaging, fulfillment costs, manufacturing and tooling equipment depreciation, warehousing costs, hosting costs, and excess and obsolete inventory write-downs. It also includes licensing costs, such as royalties to third parties, and attributable amortization of acquired developed technology. In addition, we allocate certain costs related to management and facilities, personnel-related expenses, and supply chain logistic costs. Personnel-related expenses consist of salaries, bonuses, benefits, and stock-based compensation expenses.

### Gross Profit and Gross Margin

Our gross margin has fluctuated and may, in the future, fluctuate from period to period based on a number of factors, including the mix of products we sell, the channel mix through which we sell our products, fluctuations of the impacts of our product and material cost saving initiatives, the foreign currency in which our products are sold, and tariffs and duty costs implemented by governmental authorities.

### Operating Expenses

Operating expenses consist of research and development, sales and marketing, and general and administrative expenses.

*Research and development.* Research and development expenses consist primarily of personnel-related expenses, consulting and contractor expenses, tooling, test equipment, prototype materials, and related overhead costs. To date, software development costs have been expensed as incurred because the period between achieving technological feasibility and the release of the software has been short and development costs qualifying for capitalization have been insignificant.

*Sales and marketing.* Sales and marketing expenses consist primarily of advertising and marketing activity for our products and personnel-related expenses, as well as trade show and event costs, sponsorship costs, consulting and contractor expenses, travel costs, depreciation for product displays, as well as related maintenance and repair expenses, customer experience and technology support tool expenses, revenue related sales fees from our direct-to-consumer business, and overhead costs.

*General and administrative.* General and administrative expenses consist of personnel-related expenses for our finance, legal, human resources and administrative personnel, as well as the costs of professional services, information technology, litigation, patents, related overhead, and other administrative expenses.

### Other Income (Expense), Net

*Interest income.* Interest income consists primarily of interest income earned on our cash and cash equivalents balances.

*Interest expense.* Interest expense consists primarily of interest expense associated with our debt financing arrangements and amortization of debt issuance costs.

Table of contents

*Other income (expense), net.* Other income (expense), net consists primarily of our foreign currency exchange gains and losses relating to transactions and remeasurement of asset and liability balances denominated in currencies other than the U.S. dollar. We expect our foreign currency gains and losses to continue to fluctuate in the future due to changes in foreign currency exchange rates.

### Provision for (Benefit From) Income Taxes

We are subject to income taxes in the United States and foreign jurisdictions in which we operate. Foreign jurisdictions have statutory tax rates different from those in the United States. Accordingly, our effective tax rate will vary depending on jurisdictional mix of earnings, and changes in tax laws. In addition, certain U.S. tax regulations subject the earnings of our non-U.S. subsidiaries to current taxation in the United States. Our effective tax rate will be impacted by our ability to claim deductions and foreign tax credits to offset the taxation of foreign earnings in the United States.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A valuation allowance is provided to reduce our deferred tax assets to amounts that are more-likely-than-not to be realized. We have assessed, on a jurisdictional basis, the available means of recovering deferred tax assets, including the ability to carry back net operating losses, the existence of taxable temporary differences, the availability of tax planning strategies and available sources of future taxable income. We have concluded that future taxable income can be considered a source of income to realize a benefit for deferred tax assets in certain foreign jurisdictions. In addition, we have concluded that a valuation allowance on deferred tax assets in the U.S. continues to be appropriate considering cumulative pre-tax losses in recent years and uncertainty with respect to future taxable income.

It is possible that in the foreseeable future there may be sufficient positive evidence to release a portion or all of the remaining valuation allowance. Release of the remaining valuation allowance would result in a benefit to income tax expense for the period the release is recorded, which could have a material impact on net earnings. The timing and amount of the potential valuation allowance release are subject to significant management judgment, as well as prospective earnings in the United States.

### Results of Operations

The consolidated statements of operations data for fiscal years 2023, 2022, and 2021, and the consolidated balance sheet data as of September 30, 2023, and October 1, 2022, are derived from our audited consolidated financial statements appearing in Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K. The consolidated statements of operations data for fiscal years 2020, and 2019, and the consolidated balance sheet data as of October 2, 2021, October 3, 2020, and September 28,

Table of contents

2019, are derived from audited consolidated financial statements not included in this Annual Report on Form 10-K. Our historical results are not necessarily indicative of the results that may be expected in any future period.

| (In thousands, except share and per share amounts and percentages) | Fiscal Year Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | September 30, 2023 | October 1, 2022 | October 2, 2021 | October 3, 2020 | September 28, 2019 |
| Revenue | $ 1,655,255 | $ 1,752,336 | $ 1,716,744 | $ 1,326,328 | $ 1,260,823 |
| Cost of revenue [1] | 938,765 | 955,969 | 906,750 | 754,372 | 733,480 |
| Gross profit | 716,490 | 796,367 | 809,994 | 571,956 | 527,343 |
| Operating expenses | | | | | |
| Research and development [1] | 301,001 | 256,073 | 230,078 | 214,672 | 171,174 |
| Sales and marketing [1] | 267,518 | 280,333 | 272,124 | 263,539 | 247,599 |
| General and administrative [1] | 168,518 | 170,429 | 152,828 | 120,978 | 102,871 |
| Total operating expenses | 737,037 | 706,835 | 655,030 | 599,189 | 521,644 |
| Operating income (loss) | (20,547) | 89,532 | 154,964 | (27,233) | 5,699 |
| Other income (expense), net | | | | | |
| Interest income | 10,201 | 1,655 | 146 | 1,998 | 4,349 |
| Interest expense | (733) | (552) | (592) | (1,487) | (2,499) |
| Other income (expense), net | 15,473 | (21,905) | 2,407 | 6,639 | (8,625) |
| Total other income (expense), net | 24,941 | (20,802) | 1,961 | 7,150 | (6,775) |
| Income (loss) before provision for (benefit from) income taxes | 4,394 | 68,730 | 156,925 | (20,083) | (1,076) |
| Provision for (benefit from) income taxes | 14,668 | 1,347 | (1,670) | 32 | 3,690 |
| Net income (loss) | $ (10,274) | $ 67,383 | $ 158,595 | $ (20,115) | $ (4,766) |
| Net income (loss) per share attributable to common stockholders:[2] | | | | | |
| Basic | $ (0.08) | $ 0.53 | $ 1.30 | $ (0.18) | $ (0.05) |
| Diluted | $ (0.08) | $ 0.49 | $ 1.13 | $ (0.18) | $ (0.05) |
| Weighted-average shares used in computing net income (loss) per share attributable to common stockholders:[2] | | | | | |
| Basic | 127,702,885 | 127,691,030 | 122,245,212 | 109,807,154 | 103,783,006 |
| Diluted | 127,702,885 | 137,762,078 | 140,309,152 | 109,807,154 | 103,783,006 |
| Other Data: | | | | | |
| Products sold [4] | 5,725 | 6,281 | 6,503 | 5,806 | 6,204 |
| Adjusted EBITDA [3] | $ 153,878 | $ 226,549 | $ 278,585 | $ 108,543 | $ 88,689 |
| Net income (loss) margin | (0.6)% | 3.8% | 9.2% | (1.5)% | (0.4)% |
| Adjusted EBITDA margin [3] | 9.3% | 12.9% | 16.2% | 8.2% | 7.0% |

(1)     Stock-based compensation was allocated as follows:

| (In thousands) | Fiscal Year Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | September 30, 2023 | October 1, 2022 | October 2, 2021 | October 3, 2020 | September 28, 2019 |
| Cost of revenue | $ 2,038 | $ 1,620 | $ 988 | $ 1,106 | $ 985 |
| Research and development | 35,530 | 30,724 | 25,075 | 23,439 | 17,643 |
| Sales and marketing | 15,677 | 15,335 | 13,570 | 14,359 | 12,965 |
| General and administrative | 23,612 | 27,961 | 22,494 | 18,706 | 14,982 |
| Total stock-based compensation expense | $ 76,857 | $ 75,640 | $ 62,127 | $ 57,610 | $ 46,575 |

(2)     See Note 11. Net Income (Loss) Per Share Attributable to Common Stockholders of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for an explanation of the calculations of our net income (loss) per share attributable to common stockholders, basic and diluted.

(3)     Adjusted EBITDA and adjusted EBITDA margin are financial measures that are not calculated in accordance with U.S. GAAP. See the section titled "—Non-GAAP Financial Measures" below for information regarding our use of these non-GAAP financial measures and a reconciliation of net income (loss) to adjusted EBITDA.

Table of contents

(4)    Products sold for the fiscal 2019 has been recast to reflect the change in product revenue categorization.

| | As of | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | | October 3, 2020 | | September 28, 2019 |
| **(In thousands)** | | | | | | | | | |
| **Consolidated balance sheet data:** | | | | | | | | | |
| Cash and cash equivalents | $ | 220,231 | $ | 274,855 | $ | 640,101 | $ | 407,100 | $ | 338,641 |
| Working capital | | 305,413 | | 331,752 | | 481,384 | | 267,362 | | 276,635 |
| Total assets | | 1,002,241 | | 1,188,388 | | 1,138,804 | | 816,051 | | 761,605 |
| Total long-term debt | | — | | — | | — | | 18,251 | | 24,840 |
| Total liabilities | | 483,584 | | 627,875 | | 569,762 | | 518,212 | | 480,677 |
| Accumulated deficit | | (12,788 ) | | (2,514 ) | | (69,897 ) | | (228,492 ) | | (208,377 ) |
| Total stockholders' equity | | 518,657 | | 560,513 | | 569,042 | | 297,839 | | 280,928 |

### Non-GAAP Financial Measures

To supplement our consolidated financial statements presented in accordance with U.S. GAAP, we monitor and consider adjusted EBITDA and adjusted EBITDA margin, which are non-GAAP financial measures. These non-GAAP financial measures are not based on any standardized methodology prescribed by U.S. GAAP and are not necessarily comparable to similarly titled measures presented by other companies.

We define adjusted EBITDA as net income (loss) adjusted to exclude the impact of depreciation and amortization, stock-based compensation expense, interest income, interest expense, other income (expense), income taxes, and other items that we do not consider representative of underlying operating performance. We define adjusted EBITDA margin as adjusted EBITDA divided by revenue.

We use these non-GAAP financial measures to evaluate our operating performance and trends and make planning decisions. We believe that these non-GAAP financial measures help identify underlying trends in our business that could otherwise be masked by the effect of the expenses and other items that we exclude in these non-GAAP financial measures. Accordingly, we believe that these non-GAAP financial measures provide useful information to investors and others in understanding and evaluating our operating results, enhancing the overall understanding of our past performance and future prospects, and allowing for greater transparency with respect to a key financial metric used by our management in its financial and operational decision-making.

Adjusted EBITDA and adjusted EBITDA margin are non-GAAP financial measures, and should not be considered in isolation of, or as an alternative to, measures prepared in accordance with U.S. GAAP. There are a number of limitations related to the use of adjusted EBITDA rather than net income (loss), which is the nearest U.S. GAAP equivalent of adjusted EBITDA, and the use of adjusted EBITDA margin rather than net income (loss) margin, which is the nearest U.S. GAAP equivalent of adjusted EBITDA margin. These limitations include that the non-GAAP financial measures:

- exclude depreciation and amortization, and although these are non-cash expenses, the assets being depreciated may be replaced in the future;

- exclude stock-based compensation expense, which has been, and will continue to be, a significant recurring expense for our business and an important part of our compensation strategy;

- do not reflect interest income, primarily resulting from interest income earned on our cash and cash equivalent balances;

- do not reflect interest expense, or the cash requirements necessary to service interest or principal payments on our debt, which reduces cash available to us;

- do not reflect the effect of foreign currency exchange gains or losses, which is included in other income (expense), net;

- do not reflect the provision for or benefit from income tax that may result in payments that reduce cash available to us;

- do not reflect items that are not considered representative of our underlying operating performance which reduce cash available to us; and

- may not be comparable to similar non-GAAP financial measures used by other companies, because the expenses and other items that we exclude in our calculation of these non-GAAP financial measures may differ from the expenses and other items, if any, that other companies may exclude from these non-GAAP financial measures when they report their operating results.

Because of these limitations, these non-GAAP financial measures should be considered along with other operating and financial performance measures presented in accordance with U.S. GAAP.

The following table presents a reconciliation of net income (loss) to adjusted EBITDA:

| | Fiscal Year Ended | | | | |
| | September 30, 2023 | October 1, 2022 | October 2, 2021 | October 3, 2020 | September 28, 2019 |
|---|---|---|---|---|---|
| (In thousands, except percentages) | | | | | |
| Net income (loss) | $ (10,274) | $ 67,383 | $ 158,595 | $ (20,115) | $ (4,766) |
| Add (deduct): | | | | | |
| Depreciation and amortization | 48,969 | 38,504 | 33,882 | 36,426 | 36,415 |
| Stock-based compensation expense | 76,857 | 75,640 | 62,127 | 57,610 | 46,575 |
| Interest income | (10,201) | (1,655) | (146) | (1,998) | (4,349) |
| Interest expense | 733 | 552 | 592 | 1,487 | 2,499 |
| Other (income) expense, net | (15,473) | 21,905 | (2,407) | (6,639) | 8,625 |
| Provision for (benefit from) income taxes | 14,668 | 1,347 | (1,670) | 32 | 3,690 |
| Legal and transaction related costs [1] | 32,950 | 22,873 | 30,058 | 15,455 | — |
| Restructuring, abandonment, and related expenses[2] | 15,649 | — | (2,446) | 26,285 | — |
| Adjusted EBITDA | $ 153,878 | $ 226,549 | $ 278,585 | $ 108,543 | $ 88,689 |
| Revenue | 1,655,255 | 1,752,336 | 1,716,744 | 1,326,328 | 1,260,823 |
| Net income (loss) margin | (0.6)% | 3.8% | 9.2% | (1.5)% | (0.4)% |
| Adjusted EBITDA margin | 9.3% | 12.9% | 16.2% | 8.2% | 7.0% |

(1)  Legal and transaction-related costs consist of expenses related to our intellectual property ("IP") litigation against Alphabet and Google as well as legal and transaction costs associated with our acquisition activities, which we do not consider representative of our underlying operating performance.

(2)  Restructuring, abandonment, and related expenses for fiscal 2023 include $4.8 million of non-recurring lease abandonment charges that were incurred in March 2023, when we abandoned portions of our office spaces for the remainder of their respective lease terms in support of operational efficiencies. See Note 14. Restructuring Plan of the notes to our consolidated financial statement for further discussion related to our 2023 restructuring plan.

## Comparison of Fiscal Years 2023 and 2022

### Revenue

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
|---|---|---|---|---|
| | September 30, 2023 | October 1, 2022 | $ | % |
| Sonos speakers | $ 1,293,440 | $ 1,368,916 | $ (75,476) | (5.5)% |
| Sonos system products | 285,064 | 297,110 | (12,046) | (4.1) |
| Partner products and other revenue | 76,751 | 86,310 | (9,559) | (11.1) |
| Total revenue | $ 1,655,255 | $ 1,752,336 | $ (97,081) | (5.5)% |
| **Volume data (products sold in thousands)** | | | **Units** | **%** |
| Total products sold | 5,725 | 6,281 | (556) | (8.9)% |

Total revenue decreased $97.1 million, or 5.5%, for fiscal 2023, compared to fiscal 2022. The decrease was mainly driven by reduced orders from retail and installer solutions partners as they tightened channel inventory positions, as well as demand softening in the later part of the year and the unfavorable impact of foreign exchange rates. These impacts were further exacerbated by an unfavorable comparison to fiscal 2022, during which we experienced significant fulfillment of backorders as supply began to improve following a long period of supply constraints. The overall decrease was partially offset by the strong performance of our new product introductions.

Sonos speakers revenue represented 78.1% of total revenue for fiscal 2023. The category decreased 5.5% compared to fiscal 2022, driven by expected declines in sales of Sonos One as we introduced the next generation of this product (Era 100), as well as Roam demand softness, partially offset by the strong performance of Sub Mini which was introduced in October 2022, and Era 300 and Era 100 which were introduced in March 2023. Sonos system products represented 17.2% of total revenue for fiscal 2023, and decreased 4.1% compared to the fiscal 2022, primarily due to our installer solutions channel partners tightening inventory of products in this category during the first half of the year, partially offset by the favorability due to the impact of the severely supply-constrained prior year. Partner products and other revenue represented 4.6% of total revenue for fiscal 2023, and decreased 11.1% compared to fiscal 2022. The decline was driven by a decrease in orders of our partner products.

The volume of products sold decreased 8.9% for fiscal 2023, compared to fiscal 2022, driven by unit decreases across all categories. The rate of decrease of volume of products sold was larger than the rate of decrease of revenue for fiscal 2023, compared to fiscal 2022, primarily due to large decreases in products with lower selling prices which contributed a smaller corresponding decrease in revenue.

### Revenue by Region

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | | Constant Currency Change |
|---|---|---|---|---|---|
| | September 30, 2023 | October 1, 2022 | $ | % | |
| Americas | $ 1,048,245 | $ 1,044,113 | $ 4,132 | 0.4% | 1.5% |
| EMEA | 518,179 | 578,034 | (59,855) | (10.4) | (6.8) |
| APAC | 88,831 | 130,189 | (41,358) | (31.8) | (25.8) |
| Total revenue | $ 1,655,255 | $ 1,752,336 | $ (97,081) | (5.5)% | (3.3)% |

In constant currency U.S. dollars, total revenue decreased 3.3% for the twelve months ended September 30, 2023, compared to the twelve months ended October 1, 2022. We calculate constant currency growth percentages by translating our current period financial results using the prior period average currency exchange rates and comparing these amounts to our prior period reported results.

Table of contents

*Cost of Revenue and Gross Profit*

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
|---|---|---|---|---|
| | September 30, 2023 | October 1, 2022 | $ | % |
| Cost of revenue | $ 938,765 | $ 955,969 | $ (17,204) | (1.8)% |
| Percentage of revenue | 56.7% | 54.6% | | |
| Gross profit | $ 716,490 | $ 796,367 | $ (79,877) | (10.0)% |
| Gross margin | 43.3% | 45.4% | | |

Cost of revenue decreased $17.2 million, or 1.8%, for fiscal 2023, compared to fiscal 2022, primarily due to decreased volume of products sold, lower shipping and logistics costs related to the improvement in industry-wide supply chain dynamics compared to the prior year, and decreased spot market component costs due to the normalization of the supply chain. The decrease was partially offset by the impact of product mix related to selling more products with higher costs per unit, higher general component costs, and higher inventory-related write-downs.

Gross margin decreased 216 basis points for fiscal 2023, compared to fiscal 2022. The decrease was primarily due to higher promotional activity, higher general component costs, the unfavorable impact of foreign exchange rates, and higher inventory-related write-downs. The overall decrease was partially offset by lower shipping and logistics costs, the impact of planned selling price increases and decreased spot market component costs due to the normalization of the supply chain.

*Research and Development*

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
|---|---|---|---|---|
| | September 30, 2023 | October 1, 2022 | $ | % |
| Research and development | $ 294,445 | $ 256,073 | $ 38,372 | 15.0% |
| Restructuring and abandonment costs | 6,556 | — | 6,556 | * |
| Total research and development | $ 301,001 | $ 256,073 | $ 44,928 | 17.5% |
| Percentage of revenue | 18.2% | 14.6% | | |
| * not meaningful | | | | |

Research and development expenses increased $44.9 million, or 17.5%, for fiscal 2023, compared to fiscal 2022. This increase was primarily driven by $40.4 million of higher personnel-related expenses, stock-based compensation and overhead driven by increased headcount related to our continued execution on our product roadmap and category expansion, and the impact of $6.6 million of restructuring and abandonment costs resulting from the 2023 restructuring plan.

*Sales and Marketing*

| (Dollars in thousands) | Fiscal Year Ended | | Change from Prior Fiscal Year | |
|---|---|---|---|---|
| | September 30, 2023 | October 1, 2022 | $ | % |
| Sales and marketing | $ 261,883 | $ 280,333 | $ (18,450) | (6.6)% |
| Restructuring and abandonment costs | 5,635 | — | 5,635 | * |
| Total sales and marketing | $ 267,518 | $ 280,333 | $ (12,815) | (4.6)% |
| Percentage of revenue | 16.2% | 16.0% | | |
| * not meaningful | | | | |

Sales and marketing expenses decreased $12.8 million, or 4.6%, for fiscal 2023, compared to fiscal 2022. This decrease was primarily driven by lower marketing expenses of $28.0 million partially offset by an increase of $6.3 million in personnel-related expenses, stock-based compensation and overhead due to increased headcount, as well as $5.6 million of restructuring and abandonment costs resulting from the 2023 restructuring plan.

37

*General and Administrative*

| (Dollars in thousands) | Fiscal Year Ended | | | | Change from Prior Fiscal Year | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2023 | | October 1, 2022 | | $ | | % | |
| General and administrative | $ | 165,060 | $ | 170,429 | $ | (5,369) | | (3.2)% |
| Restructuring and abandonment costs | | 3,458 | | — | | 3,458 | | * |
| Total general and administrative | $ | 168,518 | $ | 170,429 | $ | (1,911) | | (1.1)% |
| Percentage of revenue | | 10.2% | | 9.7% | | | | |
| * not meaningful | | | | | | | | |

General and administrative expenses decreased $1.9 million, or 1.1%, for fiscal 2023, compared to fiscal 2022. The decrease was mainly due to $14.9 million of decreased stock-based compensation expense and lower overhead costs, partially offset by $11.6 million legal fees incurred in connection with our IP litigation, and the impact of $3.5 million of restructuring and abandonment costs resulting from the 2023 restructuring plan.

*Other Income (Expense), Net*

| (Dollars in thousands) | Fiscal Year Ended | | | | Change from Prior Fiscal Year | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2023 | | October 1, 2022 | | $ | | % | |
| Interest income | $ | 10,201 | $ | 1,655 | $ | 8,546 | | * |
| Interest expense | | (733) | | (552) | | (181) | | 32.80% |
| Other income (expense), net | | 15,473 | | (21,905) | | 37,378 | | * |
| Total other income (expense), net | $ | 24,941 | $ | (20,802) | $ | 45,743 | | * |
| * not meaningful | | | | | | | | |

Interest income for fiscal 2023, compared to fiscal 2022, increased due to higher yields on our cash and cash equivalents. Interest expense for fiscal 2023, compared to fiscal 2022, increased primarily due to expenses associated with amending our Revolving Credit Agreement. The increase in other income (expense), net for fiscal 2023, compared to fiscal 2022, was primarily due to foreign currency exchange gains. These gains stem from the remeasurement of monetary assets and liabilities denominated in non-functional currencies, and were driven notably by the strengthening of the euro.

*Provision for Income Taxes*

| (Dollars in thousands) | Fiscal Year Ended | | | | Change from Prior Fiscal Year | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2023 | | October 1, 2022 | | $ | | % | |
| Provision for income taxes | $ | 14,668 | $ | 1,347 | $ | 13,321 | | * |
| * not meaningful | | | | | | | | |

For the fiscal year ended September 30, 2023, our U.S. tax expense was adversely impacted by the requirement to capitalize and amortize research and development expenses under Section 174 of the U.S. Internal Revenue Code ("Section 174") as we recorded a U.S. current tax expense with no corresponding deferred tax benefit due to the valuation allowance maintained against our U.S. deferred tax assets.

**Comparison of Fiscal Years 2022 and 2021**

For the comparison of fiscal years 2022 and 2021, refer to Part II, Item 7 "Management's discussion and analysis of financial condition and results of operations" on Form 10-K for our fiscal year ended October 1, 2022, filed with the SEC on November 23, 2022, under the subheading "Comparison of fiscal years 2022 and 2021."

Table of contents

**Liquidity and Capital Resources**

Our operations are financed primarily through cash flows from operating activities and net proceeds from the sale of our equity securities. As of September 30, 2023, our principal sources of liquidity consisted of cash flows from operating activities, cash and cash equivalents of $220.2 million, including $44.5 million held by our foreign subsidiaries, proceeds from the exercise of stock options and borrowing capacity under the Credit Facility. In accordance with our policy, the undistributed earnings of our non-U.S. subsidiaries remain indefinitely reinvested outside of the United States as of September 30, 2023, as they are required to fund needs outside of the United States. In the event funds from foreign operations are needed to fund operations in the United States and if U.S. tax has not already been previously provided, we may be required to accrue and pay additional U.S. taxes to repatriate these funds.

We believe our existing cash and cash equivalent balances, cash flows from operations and committed credit lines will be sufficient to meet our long-term working capital and capital expenditure needs for at least the next 12 months. We hold our cash with a diverse group of major financial institutions and have processes and safeguards in place to manage our cash balances and mitigate the risk of loss. In October 2021, we entered into a credit agreement with JPMorgan Chase Bank, N.A., Bank of America N.A., Morgan Stanley Senior Funding, Inc., and Goldman Sachs Bank USA (the "Revolving Credit Agreement"), which allows us to borrow up to $100 million, with a maturity date of October 2026. Our future capital requirements may vary materially from those currently planned and will depend on many factors, including our rate of revenue growth, the timing and extent of spending on research and development efforts and other business initiatives, our planned sales and marketing activities, the timing of new product introductions, our potential merger and acquisition activity, market acceptance of our products, and overall economic conditions. To the extent that current and anticipated sources of liquidity are insufficient to fund our future business activities and requirements, we may be required to seek additional equity or debt financing. The sale of additional equity would result in increased dilution to our stockholders. If we were to incur additional debt financing it would result in increased debt service obligations and the instruments governing such debt could provide for operating and financing covenants that would restrict our operations.

*Debt Obligations*

On October 13, 2021, we entered into the Revolving Credit Agreement. The Revolving Credit Agreement provides for (i) a five-year senior secured revolving credit facility in the amount of up to $100.0 million and (ii) an uncommitted incremental facility subject to certain conditions. Proceeds are to be used for working capital and general corporate purposes. In June 2023, we amended our Revolving Credit Agreement to change the reference rate from LIBOR to the Secured Overnight Financing Rate ("SOFR"), effective July 1, 2023. The facility may be drawn as an Alternative Base Rate Loan (at 1.00% plus an applicable margin) or Term Benchmark Loan (SOFR plus an applicable margin). We must also pay (i) an unused commitment fee ranging from 0.200% to 0.275% per annum of the average daily unused portion of the aggregate revolving credit commitment under the agreement and (ii) a per annum fee equal to the applicable margin over SOFR multiplied by the aggregate face amount of outstanding letters of credit. As of September 30, 2023, we did not have any outstanding borrowings and $1.8 million in undrawn letters of credit that reduce the availability under the Revolving Credit Agreement.

Our obligations under the Revolving Credit Agreement are secured by substantially all of our assets. The Revolving Credit Agreement contains customary representations and warranties, customary affirmative and negative covenants, a financial covenant that is tested quarterly and requires us to maintain a certain consolidated leverage ratio, and customary events of default. As of September 30, 2023, we were in compliance with all financial covenants under the Revolving Credit Agreement.

*Cash Flows*

*Fiscal 2023 Changes in Cash Flows*

The following table summarizes our cash flows for the periods indicated:

| | | Fiscal Year Ended | | | |
| --- | --- | --- | --- | --- | --- |
| | | September 30, 2023 | | October 1, 2022 | |
| **(In thousands)** | | | | | |
| Net cash provided by (used in): | | | | | |
| Operating activities | $ | 100,406 | $ | (28,260 | ) |
| Investing activities | | (50,286 | ) | (172,632 | ) |
| Financing activities | | (108,592 | ) | (150,260 | ) |
| Effect of exchange rate changes | | 3,848 | | (14,094 | ) |
| Net decrease in cash, cash equivalents and restricted cash | $ | (54,624 | ) $ | (365,246 | ) |

*Cash Flows from Operating Activities*

Net cash provided by operating activities of $100.4 million for fiscal 2023 consisted of net loss of $10.3 million, non-cash adjustments of $149.6 million and a net decrease in cash related to changes in operating assets and liabilities of $38.9 million. Non-cash adjustments primarily consisted of stock-based compensation expense of $76.9 million, depreciation and amortization of $49.0 million, provision for inventory obsolescence of $20.6 million, restructuring and abandonment charges of $5.5 million, and other adjustments of $5.5 million, partially offset by foreign currency transaction gains of $7.3 million. The net decrease in net operating assets and liabilities was primarily due to a decreases in accounts payable and accrued expenses of $162.3 million due to lower inventory purchases, a decrease in deferred revenue of $4.6 million, and a decrease in accrued compensation of $2.2 million due to lower accrued variable compensation. The net decrease in cash from the change in operating assets and liabilities was partially offset by lower inventory balances of $87.0 million as a result of improved inventory management, a decrease in accounts receivable of $32.1 million, and a decrease in other assets of $10.5 million driven by a decrease in prepaid expenses.

*Cash Flows from Investing Activities*

Cash used in investing activities for fiscal 2023 of $50.3 million consisted primarily of purchases of property and equipment mainly related to point-of-sale product displays and manufacturing-related tooling and test equipment to support the launch of new products.

*Cash Flows from Financing Activities*

Cash used in financing activities for fiscal 2023 of $108.6 million consisted primarily of payments for repurchase of common stock of $100.1 million, payments for repurchase of common stock related to shares withheld for tax in connection with vesting of RSUs of $29.9 million, partially offset by proceeds from exercise of common stock options of $21.3 million.

*Fiscal 2022 Changes in Cash Flows*

For the comparison of fiscal 2022 to fiscal 2021, refer to Part II, Item 7 "Management's discussion and analysis of financial condition and results of operations" of our Form 10-K for our fiscal year ended October 1, 2022, filed with the SEC on November 23, 2022, under the subheading "Liquidity and capital resources."

**Contractual obligations**

See Note 6. Leases and Note 12. Commitments and Contingencies of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for further details.

## Critical Accounting Policies and Estimates

Our consolidated financial statements are prepared in accordance with U.S. GAAP. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Actual results could differ materially from those estimates.

Our critical accounting policies requiring estimates, assumptions and judgments that we believe have the most significant impact on our consolidated financial statements are described below.

**Revenue**

*Nature of Products and Services*

We generate substantially all of our revenue from the sale of Sonos speakers and Sonos system products. We also generate a portion of revenue from partner products and other revenue sources, such as module revenue from our IKEA partnership, architectural speakers from our Sonance partnership, and accessories such as speaker stands and wall mounts, as well as professional services, advertising revenue, licensing and subscription revenue such as Sonos Radio HD and Sonos Pro (software-as-a-service).

Our contracts generally include a combination of products and related software, and services. Products and related software primarily constitute Sonos speakers and Sonos system products and include software that enables our products to operate over a customer's wireless network as well as connect to various third-party services, including music and voice. Additionally, module revenue includes hardware and embedded software that is integrated into final products that are manufactured and sold by our partners. Service revenue includes revenue allocated to (i) unspecified software upgrades and (ii) cloud-based services that enable products to access third-party music and voice assistant platforms. Unspecified software upgrades have historically included updates and enhancements such as bug fixes, feature enhancements and updates to the ability to connect to third-party music or voice assistant platforms.

*Performance Obligations*

Determining whether products and services are considered distinct performance obligations that should be accounted for separately requires significant judgment. We have determined that products and related software represent a single performance obligation. The basis of our determination is these products are highly dependent on, and interrelated with, the embedded software and cannot function as they are intended without the software.

We determined that unspecified software upgrades represent a separate performance obligation as they occur subsequent to the time of purchase, fulfillment of these promises can be made separately, there are no resulting significant modification or customization to our products, and these services are provided to customers at no additional charge. We have also determined cloud-based services to be a separate performance obligation based as they are additive to our products rather than transformative.

*Transaction price*

Revenue is recognized at transaction price which is the amount that we expect to receive in exchange for our products and services. Transaction price is calculated as the stated consideration net of variable consideration such as allowances for returns, discounts, sales incentives, and any tax collected from customers. The transaction price is allocated to the separate performance obligations in the contract based on relative standalone selling prices ("SSPs").

We estimate SSP for items that are not sold separately, which include the products and related software, unspecified software upgrades and cloud services, using information that may include competitive pricing information, where available, as well as analysis of the cost of providing the products or services plus a reasonable margin. In developing SSP estimates, we also consider the nature of the products and services and the expected level of future services.

We offer sales incentives through various programs, consisting primarily of discounts, cooperative advertising and market development fund programs. Reductions in revenue related to discounts are allocated to products and services on a relative basis based on their respective SSP. Estimates for sales incentives are developed using the most likely amount based on our past experience with similar contracts and are included in the transaction price to the extent that a significant reversal of revenue would not result once the uncertainty is resolved.

We accept returns from direct customers and from certain resellers. To establish an estimate for returns, we use the expected value method by considering a portfolio of contracts with similar characteristics to calculate the historical returns rate.

A change in contract, future business initiatives, or customer behavior due to macroeconomic conditions could require us to change the above estimates, or if actual results differ significantly from the estimates, we would be required to increase or reduce revenue to reflect the impact.

*Revenue Recognition*

Revenue is allocated to products and related software, and to unspecified software upgrades and cloud-based services. Revenue allocated to the products and related software is the substantial portion of the total sale price. Revenue for products and related software is recognized at the point in time when control is transferred to the customer, which is either upon shipment or upon delivery to the customer, depending on delivery terms.

Revenue allocated to unspecified software upgrades and cloud-based services is deferred and recognized ratably over our best estimate of the period that the customer is expected to receive the services. Determining the revenue recognition period for unspecified software upgrades and cloud services requires judgment. In developing the estimated period of providing future services, we consider our past history, our plans to continue to provide services, including plans to continue to support updates and enhancements to prior versions of our products, expected technological developments, obsolescence, competition and other factors. The estimated service period may change in the future in response to competition, technology developments and our business strategy.

41

Table of contents

For fiscal 2023, there has not been any event that would require us to materially change the underlying assumptions of revenue estimates. A hypothetical 10% change to our SSP estimates and/or the estimated recognition period for unspecified software upgrades and cloud-based services, would not result in a material change to our fiscal 2023 revenue.

*Inventories*

Inventory consists of finished goods and component parts, which we purchase from contract manufacturers and component suppliers. We record and value our inventory at the lower-of-cost and net realizable value. We determine cost using a standard costing method, which approximates first-in first-out. On a quarterly basis, we assess the value of our inventory on hand and non-cancelable purchase commitments for potential excess and/or obsolete inventory and will periodically write down the value to account for estimated excess and/or obsolete inventory. We determine excess or obsolete inventory based on market conditions, age/condition of inventory, an estimate of the future demand for our products within a specified time horizon, generally the shorter of 24 months or remaining life of the product, and product life cycle status. Inventory write-downs and losses on purchase commitments are recorded as a component of cost of revenue in our consolidated statement of operations and comprehensive income (loss). If actual demand is lower than our forecasted demand, we could be required to write down the value of additional inventory, which would have a negative effect on our gross profit. A hypothetical 10% change to our inventory reserves percentages would not result in a material change to our fiscal 2023 cost of revenue.

*Income Taxes*

Our income tax expense, deferred tax assets and liabilities, and liabilities for unrecognized tax benefits reflect our best estimate of current and future taxes to be paid. Significant judgments and estimates are required in the determination of the consolidated income tax expense.

We prepare and file income tax returns based on our interpretation of each jurisdiction's tax laws and regulations. In preparing our consolidated financial statements, we estimate our income tax liability in each of the jurisdictions in which we operate by estimating our actual current tax expense together with assessing temporary differences resulting from differing treatment of items for tax and financial reporting purposes. These differences result in deferred tax assets and liabilities, which are included in our consolidated balance sheets. Significant management judgment is required in assessing the realizability of our deferred tax assets. In performing this assessment, we consider whether it is "more-likely-than-not" that some portion or all the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. In making this determination, we consider the scheduled reversal of deferred tax liabilities, projected future taxable income and the effects of tax planning strategies. We recorded a valuation allowance against all our U.S. deferred tax assets and certain of our foreign deferred tax assets as of  September 30, 2023. We intend to continue maintaining a full valuation allowance on our U.S. and certain foreign deferred tax assets until there is sufficient evidence to support the reversal of all or some portion of these allowances.

We account for uncertain tax positions using a "more-likely-than-not" threshold for recognizing and resolving uncertain tax positions. We evaluate uncertain tax positions on a quarterly basis and consider various factors, that include, but are not limited to, changes in tax law, the measurement of tax positions taken or expected to be taken in tax returns, the effective settlement of matters subject to audit, information obtained during in process audit activities and changes in facts or circumstances related to a tax position. We accrue for potential interest and penalties related to unrecognized tax benefits in income tax expense. Changes in the recognition or measurement of uncertain tax positions could result in material increases or decreases in our income tax expense in the period in which we make the change, which could have a material impact on our effective tax rate and operating results.

Our policy with respect to the undistributed earnings of our non-U.S. subsidiaries is to maintain an indefinite reinvestment assertion as they are required to fund needs outside of the United States. This assertion is made on a jurisdiction by jurisdiction basis and takes into account the liquidity requirements in both the United States and of our foreign subsidiaries.

Table of contents

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate and foreign currency risks as follows:

*Interest Rate Risk*

As of September 30, 2023, we had cash and cash equivalents of $220.2 million, which consisted primarily of cash on hand, money market fund investments, and bank deposits. Such interest-earning instruments carry a degree of interest rate risk due to floating interest rates.

To date, we have not been exposed, nor do we anticipate being exposed, to material risks due to changes in interest rates. A hypothetical 10% change in interest rates during any of the periods presented would not have had a material impact on our consolidated financial statements.

*Foreign Currency Risk*

Our inventory purchases are primarily denominated in U.S. dollars. Our international sales are primarily denominated in foreign currencies and any movement in the exchange rate between the U.S. dollar and the currencies in which we conduct sales in foreign countries could have an impact on our revenue, principally for sales denominated in the euro and the British pound. A portion of our operating expenses are incurred outside the United States and are denominated in foreign currencies, which are also subject to foreign currency exchange rate fluctuations. In certain countries where we may invoice customers in the local currency our revenues benefit from a weaker dollar and are adversely affected by a stronger dollar. The opposite impact occurs in countries where we record expenses in local currencies. In those cases, our costs and expenses benefit from a stronger dollar and are adversely affected by a weaker dollar.

We do not currently use foreign exchange contracts or derivatives to hedge any foreign currency exposures. The volatility of exchange rates depends on many factors that we cannot forecast with reliable accuracy. Our continued international expansion increases our exposure to exchange rate fluctuations and, as a result, such fluctuations could have a significant impact on our future results of operations.

We recognized a net gain from foreign currency of $13.7 million in fiscal 2023, a net loss from foreign currency of $21.9 million in fiscal 2022 and a net gain from foreign currency of $2.4 million in fiscal 2021. Recently, we have seen a particular strengthening of the U.S. dollar relative to the euro and the British pound. If this trend continues, it will negatively affect the U.S. dollar value of revenue and gross margins we earn on our foreign currency-denominated sales. Based on transactions denominated in currencies other than respective functional currencies as of September 30, 2023, a hypothetical adverse change of 10% would have resulted in an adverse impact on income (loss) before provision for (benefit from) income taxes of approximately $21.5 million for the fiscal year ended 2023.

**Recent Accounting Pronouncements**

See Note 2. Summary of Significant Accounting Policies of the notes to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K for a discussion of recent accounting pronouncements.

Table of contents

**Item 8. Financial Statements and Supplementary Data**

**Index to Consolidated Financial Statements**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 238) | 45 |
| Consolidated Balance Sheets | 47 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) | 48 |
| Consolidated Statements of Stockholders' Equity | 49 |
| Consolidated Statements of Cash Flows | 50 |
| Notes to Consolidated Financial Statements | 51 |

Table of contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Sonos, Inc.

*Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of Sonos, Inc. and its subsidiaries (the "Company") as of September 30, 2023 and October 1, 2022, and the related consolidated statements of operations and comprehensive income (loss), of stockholders' equity and of cash flows for each of the three years in the period ended September 30, 2023, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of September 30, 2023, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of September 30, 2023 and October 1, 2022, and the results of its operations and its cash flows for each of the three years in the period ended September 30, 2023 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of September 30, 2023, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

*Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control Over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Table of contents

*Critical Audit Matters*

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Revenue Recognition - Estimates of Standalone Selling Price and Service Period for Unspecified Software Upgrades and Cloud-Based Services*

As described in Notes 2 and 5 to the consolidated financial statements, the Company's contracts with customers generally contain promises to transfer products and services which are not sold separately. Service revenue includes revenue allocated to (i) unspecified software upgrades and (ii) cloud-based services, which are each distinct performance obligations, based on relative standalone selling price. Management's estimation of standalone selling price requires judgment. Management has disclosed factors considered in estimating standalone selling price including competitive pricing information, where available, analyses of the cost of providing the products or services plus a reasonable gross margin, the nature of the products and services and the expected level of future services. Determining the revenue recognition period for unspecified software upgrades and cloud-based services also requires judgment. Management recognizes revenue attributable to these performance obligations ratably over the estimated service period. In developing the estimated service period over which to recognize service revenue, management considers past history, plans to continue to provide services, including plans to continue to support updates and enhancements to prior versions of the Company's products, expected technological developments, obsolescence, competition and other factors. Deferred revenue primarily relates to revenue allocated to unspecified software upgrades and cloud-based services and was $80 million as of September 30, 2023.

The principal considerations for our determination that performing procedures relating to revenue recognition, specifically estimates of standalone selling price and service period for unspecified software upgrades and cloud-based services, is a critical audit matter are the significant judgment by management in estimating the standalone selling price and the service period, which in turn led to significant auditor judgment, subjectivity, and audit effort in performing procedures and evaluating audit evidence relating to (i) management's estimates of standalone selling price by considering estimates of the cost of providing the services plus a reasonable gross margin, and (ii) management's estimates of service period by considering management's plans to continue to support updates and enhancements to prior versions of the Company's products.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the revenue recognition process, including over the estimation of the standalone selling prices and service period for unspecified software upgrades and cloud-based services. The procedures also included, among others, testing management's process for estimating the standalone selling price and service period. Procedures to test management's process for estimating standalone selling price included (i) evaluating the appropriateness of management's cost plus gross margin method of estimating standalone selling price; (ii) comparing the estimate of standalone selling price to competitive pricing information for comparable services using publicly disclosed information; (iii) evaluating the reasonableness of estimates of the cost of providing the services; and (iv) evaluating the reasonableness of gross margins. Evaluating the reasonableness of estimates of the cost of providing the services involved (i) testing the allocation of engineering costs, which is driven by time spent on software upgrades and cloud-based services and (ii) testing the completeness, accuracy, relevance, and classification of the engineering costs. Evaluating the reasonableness of gross margins involved comparing management's gross margin to the gross margin earned for similar services by third party peer companies within the same industry. Procedures performed to test management's process for estimating the service period for these services included (i) testing the completeness and accuracy of underlying data and (ii) evaluating the reasonableness of management's plans to continue to support updates and enhancements to prior versions of the Company's products through a look-back analysis performed using historical software updates, as well as considering currently active products receiving software updates.

/s/ PricewaterhouseCoopers LLP
Los Angeles, California
November 20, 2023
We have served as the Company's auditor since 2011, which includes periods before the Company became subject to SEC reporting requirements.

Table of contents

**SONOS, INC.**
**Consolidated Balance Sheets**
*(in thousands, except share and par values)*

| | As of | | | |
| --- | --- | --- | --- | --- |
| | September 30, 2023 | | October 1, 2022 | |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 220,231 | $ | 274,855 |
| Accounts receivable, net of allowances of $31,786 and $26,317 as of September 30, 2023, and October 1, 2022, respectively | | 67,583 | | 101,206 |
| Inventories | | 346,521 | | 454,288 |
| Prepaid and other current assets | | 25,296 | | 37,042 |
| Total current assets | | 659,631 | | 867,391 |
| Property and equipment, net | | 87,075 | | 86,168 |
| Operating lease right-of-use assets | | 48,918 | | 28,329 |
| Goodwill | | 80,420 | | 77,300 |
| Intangible assets, net: | | | | |
| In-process research and development | | 69,791 | | 64,680 |
| Other intangible assets | | 20,218 | | 26,384 |
| Deferred tax assets | | 1,659 | | 1,508 |
| Other noncurrent assets | | 34,529 | | 36,628 |
| Total assets | $ | 1,002,241 | $ | 1,188,388 |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 187,981 | $ | 335,758 |
| Accrued expenses | | 89,717 | | 109,290 |
| Accrued compensation | | 22,079 | | 23,624 |
| Deferred revenue, current | | 20,188 | | 27,318 |
| Other current liabilities | | 34,253 | | 39,649 |
| Total current liabilities | | 354,218 | | 535,639 |
| Operating lease liabilities, noncurrent | | 54,956 | | 25,596 |
| Deferred revenue, noncurrent | | 60,650 | | 56,152 |
| Deferred tax liabilities | | 9,846 | | 9,642 |
| Other noncurrent liabilities | | 3,914 | | 846 |
| Total liabilities | | 483,584 | | 627,875 |
| Commitments and contingencies (Note 12) | | | | |
| Stockholders' equity: | | | | |
| Common stock, $0.001 par value; 500,000,000 shares authorized, 130,399,940 and 129,823,663 shares issued, 125,113,916 and 126,668,723 shares outstanding as of September 30, 2023, and October 1, 2022, respectively | | 130 | | 130 |
| Treasury stock, 5,286,024 and 3,154,940 shares at cost as of September 30, 2023 and October 1, 2022, respectively | | (72,586) | | (50,896) |
| Additional paid-in capital | | 607,345 | | 617,390 |
| Accumulated deficit | | (12,788) | | (2,514) |
| Accumulated other comprehensive loss | | (3,444) | | (3,597) |
| Total stockholders' equity | | 518,657 | | 560,513 |
| Total liabilities and stockholders' equity | $ | 1,002,241 | $ | 1,188,388 |

The accompanying notes are an integral part of these consolidated financial statements.

47

Table of contents

**SONOS, INC.**
**Consolidated Statements of Operations and Comprehensive Income (Loss)**
*(in thousands, except share and per share data)*

| | Year Ended | | |
|---|---|---|---|
| | September 30, 2023 | October 1, 2022 | October 2, 2021 |
| Revenue | $ 1,655,255 | $ 1,752,336 | $ 1,716,744 |
| Cost of revenue | 938,765 | 955,969 | 906,750 |
| Gross profit | 716,490 | 796,367 | 809,994 |
| Operating expenses | | | |
| Research and development | 301,001 | 256,073 | 230,078 |
| Sales and marketing | 267,518 | 280,333 | 272,124 |
| General and administrative | 168,518 | 170,429 | 152,828 |
| Total operating expenses | 737,037 | 706,835 | 655,030 |
| Operating income (loss) | (20,547) | 89,532 | 154,964 |
| Other income (expense), net | | | |
| Interest income | 10,201 | 1,655 | 146 |
| Interest expense | (733) | (552) | (592) |
| Other income (expense), net | 15,473 | (21,905) | 2,407 |
| Total other income (expense), net | 24,941 | (20,802) | 1,961 |
| Income before provision for (benefit from) income taxes | 4,394 | 68,730 | 156,925 |
| Provision for (benefit from) income taxes | 14,668 | 1,347 | (1,670) |
| Net income (loss) | $ (10,274) | $ 67,383 | $ 158,595 |
| Net income (loss) attributable to common stockholders: | | | |
| Basic and diluted | $ (10,274) | $ 67,383 | $ 158,595 |
| Net income (loss) per share attributable to common stockholders: | | | |
| Basic | $ (0.08) | $ 0.53 | $ 1.30 |
| Diluted | $ (0.08) | $ 0.49 | $ 1.13 |
| Weighted-average shares used in computing net income (loss) per share attributable to common stockholders: | | | |
| Basic | 127,702,885 | 127,691,030 | 122,245,212 |
| Diluted | 127,702,885 | 137,762,078 | 140,309,152 |
| Total comprehensive income (loss) | | | |
| Net income (loss) | $ (10,274) | $ 67,383 | $ 158,595 |
| Change in foreign currency translation adjustment | 153 | (2,221) | 514 |
| Comprehensive income (loss) | $ (10,121) | $ 65,162 | $ 159,109 |

The accompanying notes are an integral part of these consolidated financial statements.

48

Table of contents

**SONOS, INC.**
**Consolidated Statements of Stockholders' Equity**
*(in thousands, except share amounts)*

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | Shares | Amount | | | |
| **Balance at October 3, 2020** | 113,915,233 | $ 114 | $ 548,993 | (1,571,138) | $ (20,886) | $ (228,492) | $ (1,890) | $ 297,839 |
| Issuance of common stock pursuant to equity incentive plans | 17,544,060 | 18 | 147,800 | — | — | — | — | 147,818 |
| Retirement of treasury stock | (2,602,208) | (3) | (68,458) | 2,602,208 | 68,461 | — | — | — |
| Repurchase of common stock | — | — | — | (1,394,006) | (50,014) | — | — | (50,014) |
| Repurchase of common stock related to shares withheld for tax in connection with vesting of restricted stock unit awards ("RSUs") | — | — | — | (1,508,876) | (47,837) | — | — | (47,837) |
| Stock-based compensation expense | — | — | 62,127 | — | — | — | — | 62,127 |
| Net income | — | — | — | — | — | 158,595 | — | 158,595 |
| Change in foreign currency translation adjustment | — | — | — | — | — | — | 514 | 514 |
| **Balance at October 2, 2021** | 128,857,085 | 129 | 690,462 | (1,871,812) | (50,276) | (69,897) | (1,376) | 569,042 |
| Issuance of common stock pursuant to equity incentive plans | 7,825,793 | 8 | 40,435 | — | — | — | — | 40,443 |
| Retirement of treasury stock | (6,859,215) | (7) | (189,147) | 6,859,215 | 189,154 | — | — | — |
| Repurchase of common stock | — | — | — | (6,578,973) | (150,121) | — | — | (150,121) |
| Repurchase of common stock related to shares withheld for tax in connection with vesting of RSUs | — | — | — | (1,563,370) | (39,653) | — | — | (39,653) |
| Stock-based compensation expense | — | — | 75,640 | — | — | — | — | 75,640 |
| Net income | — | — | — | — | — | 67,383 | — | 67,383 |
| Change in foreign currency translation adjustment | — | — | — | — | — | — | (2,221) | (2,221) |
| **Balance at October 1, 2022** | 129,823,663 | 130 | 617,390 | (3,154,940) | (50,896) | (2,514) | (3,597) | 560,513 |
| Issuance of common stock pursuant to equity incentive plans | 6,714,406 | 6 | 21,340 | — | — | — | — | 21,346 |
| Retirement of treasury stock | (6,138,129) | (6) | (108,242) | 6,138,129 | 108,248 | — | — | — |
| Repurchase of common stock | — | — | — | (6,555,702) | (100,064) | — | — | (100,064) |
| Repurchase of common stock related to shares withheld for tax in connection with vesting of RSUs | — | — | — | (1,713,511) | (29,874) | — | — | (29,874) |
| Stock-based compensation expense | — | — | 76,857 | — | — | — | — | 76,857 |
| Net loss | — | — | — | — | — | (10,274) | — | (10,274) |
| Change in foreign currency translation adjustment | — | — | — | — | — | — | 153 | 153 |
| **Balance at September 30, 2023** | 130,399,940 | $ 130 | $ 607,345 | (5,286,024) | $ (72,586) | $ (12,788) | $ (3,444) | $ 518,657 |

The accompanying notes are an integral part of these consolidated financial statements.

49

Table of contents

**SONOS, INC.**
**Consolidated Statements of Cash Flows**
*(in thousands)*

| | | Year Ended | | | |
|---|---|---|---|---|---|
| | September 30, 2023 | | October 1, 2022 | | October 2, 2021 |
| **Cash flows from operating activities** | | | | | |
| Net income (loss) | $ (10,274) | $ | 67,383 | $ | 158,595 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 48,969 | | 38,504 | | 33,882 |
| Restructuring and abandonment charges | 5,533 | | — | | — |
| Stock-based compensation expense | 76,857 | | 75,640 | | 62,127 |
| Provision for inventory obsolescence | 20,640 | | 6,276 | | 2,790 |
| Other | 5,535 | | 4,705 | | 2,713 |
| Deferred income taxes | (583) | | (1,508) | | (8,330) |
| Foreign currency transaction (gain) loss | (7,335) | | 10,775 | | (1,108) |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable, net | 32,120 | | (5,513) | | (45,697) |
| Inventories | 87,004 | | (277,489) | | (7,911) |
| Other assets | 10,470 | | (16,604) | | (30,009) |
| Accounts payable and accrued expenses | (162,345) | | 129,686 | | 26,231 |
| Accrued compensation | (2,185) | | (52,904) | | 33,447 |
| Deferred revenue | (4,576) | | (1,667) | | 27,587 |
| Other liabilities | 576 | | (5,544) | | (1,091) |
| Net cash provided by (used in) operating activities | 100,406 | | (28,260) | | 253,226 |
| **Cash flows from investing activities** | | | | | |
| Purchases of property and equipment, intangible and other assets | (50,286) | | (46,216) | | (45,531) |
| Cash paid for acquisitions, net of acquired cash | — | | (126,416) | | — |
| Net cash used in investing activities | (50,286) | | (172,632) | | (45,531) |
| **Cash flows from financing activities** | | | | | |
| Payments for debt issuance costs | — | | (929) | | — |
| Proceeds from exercise of stock options | 21,346 | | 40,443 | | 147,818 |
| Payments for repurchase of common stock | (100,064) | | (150,121) | | (50,014) |
| Payments for repurchase of common stock related to shares withheld for tax in connection with vesting of RSUs | (29,874) | | (39,653) | | (47,837) |
| Repayments of borrowings | — | | — | | (25,000) |
| Net cash provided by (used in) financing activities | (108,592) | | (150,260) | | 24,967 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | 3,848 | | (14,094) | | 148 |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | (54,624) | | (365,246) | | 232,810 |
| **Cash, cash equivalents, and restricted cash** | | | | | |
| Beginning of period | 274,855 | | 640,101 | | 407,291 |
| End of period | $ 220,231 | $ | 274,855 | $ | 640,101 |
| **Supplemental disclosure** | | | | | |
| Cash paid for interest | $ 1,330 | $ | 344 | $ | 502 |
| Cash paid for taxes, net of refunds | $ 9,522 | $ | 9,306 | $ | 4,114 |
| Cash paid for amounts included in the measurement of lease liabilities | $ 14,218 | $ | 14,636 | $ | 18,657 |
| **Supplemental disclosure of non-cash investing and financing activities** | | | | | |
| Purchases of property and equipment, accrued but not paid | $ 2,784 | $ | 9,112 | $ | 5,653 |
| Right-of-use assets obtained in exchange for lease liabilities | $ 31,692 | $ | 5,054 | $ | 2,010 |
| Change in estimate of asset retirement obligations | $ 2,290 | $ | — | $ | — |

The accompanying notes are an integral part of these consolidated financial statements.

50

Table of contents

**SONOS, INC.**
**Notes to Consolidated Financial Statements**

## 1. Business Overview

### Description of Business

Sonos, Inc. and its wholly owned subsidiaries (collectively, "Sonos," the "Company," "we," "us" or "our") designs, develops, manufactures, and sells audio products and services. The Sonos sound system provides customers with an immersive listening experience created by the design of its speakers and components, a proprietary software platform, and the ability to stream content from a variety of sources over the customer's wireless network or over Bluetooth.

The Company's products are sold through third-party physical retailers, including custom installers of home audio systems, select e-commerce retailers, and its website sonos.com. The Company's products are distributed in over 60 countries through its wholly owned subsidiaries: Sonos Europe B.V. in the Netherlands, Beijing Sonos Technology Co. Ltd. in China, Sonos Japan GK in Japan, and Sonos Australia Pty Ltd. in Australia.

## 2. Summary of Significant Accounting Policies

### Basis of Presentation and Preparation

The consolidated financial statements, which include the accounts of Sonos, Inc. and its wholly owned subsidiaries, have been prepared in conformity with accounting principles generally accepted in the United States ("U.S. GAAP"). All intercompany accounts and transactions have been eliminated in consolidation. Certain prior period amounts have been reclassified to conform to the current period presentation.

The Company operates on a 52-week or 53-week fiscal year ending on the Saturday nearest September 30 each year. The Company's fiscal year is divided into four quarters of 13 weeks, each beginning on a Sunday and containing two 4-week periods followed by a 5-week period. An additional week is included in the fourth fiscal quarter approximately every five years to realign fiscal quarters with calendar quarters. This last occurred in the Company's fiscal year ended October 3, 2020, and will reoccur in the fiscal year ending October 3, 2026. As used in the Annual Report on Form 10-K, "fiscal 2023" refers to the 52-week fiscal year ending September 30, 2023, "fiscal 2022" refers to the 52-week fiscal year ending October 1, 2022, and "fiscal 2021" refers to the 52-week fiscal year ending October 2, 2021.

### Use of Estimates and Judgments

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and judgments that affect the amounts reported and disclosed in the consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates. For revenue recognition, examples of estimates and judgments include: determining the nature and timing of satisfaction of performance obligations, determining the standalone selling price ("SSP") of performance obligations and estimating variable consideration such as sales incentives and product returns. Additionally, estimates and judgments are made by management for allowances for credit losses, excess and obsolete inventory, loss on purchase commitments, useful lives associated with property and equipment, incremental borrowing rates associated with leases, the recording of and release of valuation allowances with respect to deferred tax assets and uncertain tax positions, impairment of long-lived assets, impairment of goodwill and indefinite-lived intangible assets, warranty, contingencies and valuation and assumptions underlying stock-based compensation and other equity instruments. On an ongoing basis, the Company evaluates its estimates and judgments compared to historical experience and trends that form the basis for making estimates and judgments about the carrying value of assets and liabilities.

### Comprehensive Income (Loss)

Comprehensive income (loss) consists of two components: net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) refers to net gains and losses that are recorded as an element of stockholders' equity but are excluded from net income (loss). The Company's other comprehensive income (loss) consists of net unrealized gains and losses on foreign currency translation adjustments from those subsidiaries not using the U.S. dollar as their functional currency.

51

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Cash and Cash Equivalents*

Cash equivalents consist of short-term, highly liquid financial instruments with insignificant interest rate risk that are readily convertible to cash and have maturities of three months or less from the date of purchase. As of September 30, 2023, and October 1, 2022, cash equivalents consisted of money market funds, which are recorded at fair value.

*Accounts Receivable*

Accounts receivable are recorded at the invoiced amount less allowances for credit losses and sales incentives, do not require collateral and do not bear interest.

The allowance for credit losses is established through a provision for net bad debt expense which is recorded in general and administrative expense in the consolidated statements of operations and comprehensive income (loss). The Company determines the adequacy of the allowance for credit losses by evaluating the collectability of accounts, including consideration of the age of invoices, each customer's expected ability to pay and collection history, customer-specific information, and current economic conditions that may impact the customer's ability to pay. This estimate is periodically adjusted as a result of the aforementioned process, or when the Company becomes aware of a specific customer's inability to meet its financial obligations.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to significant concentrations of credit risk consist principally of cash and cash equivalents and accounts receivable. The Company maintains cash and cash equivalents in several high-quality financial institutions. Cash and cash equivalents held at these banks, including those held in foreign branches of global banks, may exceed the amount of insurance provided on such deposits. These deposits may be redeemed upon demand, and management believes that the financial institutions that hold the Company's cash and cash equivalents are financially sound and, accordingly, minimal credit risk exists with respect to cash. The Company has not experienced any losses in such accounts.

As of September 30, 2023, and October 1, 2022, the Company's customer that accounted for 10% or more of total accounts receivable, net, were as follows:

|  | September 30, 2023 | October 1, 2022 |
|---|---|---|
| Customer A | 32 % | 34 % |

The Company's customer that accounted for 10% or more of total revenue were as follows:

|  | Year Ended | | |
|---|---|---|---|
|  | September 30, 2023 | October 1, 2022 | October 2, 2021 |
| Customer A | 17 % | 15 % | 14 % |

*Inventories*

Inventories primarily consist of finished goods and component parts, which are purchased from contract manufacturers and component suppliers. Inventories are stated at lower of cost and net realizable value. Cost is determined using a standard costing method, which approximates first-in first-out. Inventory costs primarily consist of materials, inbound freight, import duties, tariffs, direct labor and manufacturing overhead, logistics, and other handling fees. The Company assesses the valuation of inventory balances including an assessment to determine potential excess and/or obsolete inventory. The Company may be required to write down the value of inventory if estimates of future demand and market conditions indicate excess and/or obsolete inventory. Inventory write-downs and losses on purchase commitments are recorded as a component of cost of revenue in the consolidated statement of operations and comprehensive income (loss). For the fiscal years ended September 30, 2023, and October 1, 2022, losses related to purchase commitments were $14.7 million and $12.0 million, respectively. Ownership of inventory transfers to the Company based on contractual terms with its contract manufacturers.

Table of contents

SONOS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

*Property and Equipment, Net*

Property and equipment are stated at historical cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the related assets as follows:

| | |
|---|---|
| Computer hardware and software | 1-5 years |
| Furniture and fixtures | 2-5 years |
| Tooling and production line test equipment | 2-4 years |
| Leasehold improvements | 2-15 years |
| Product displays | 1-4 years |

Costs incurred to improve leased office space are capitalized. Leasehold improvements are amortized on a straight-line basis over the shorter of the term of the lease or the estimated useful life of the improvement. Expenditures for major renewals and improvements that extend the useful lives of property and equipment are capitalized. Maintenance, repair costs and gains or losses associated with disposals are charged to expense as incurred.

Product displays are deployed at retail locations. Because the product displays facilitate marketing of the Company's products within the retail stores, depreciation for product displays is recorded in sales and marketing expenses in the consolidated statements of operations and comprehensive income (loss).

*Cloud Computing Arrangements*

The Company incurs costs to implement cloud computing arrangements that are hosted by a third-party vendor. Implementation costs incurred during the application development stage are capitalized until the software is ready for its intended use. The costs are then amortized on a straight-line basis over the term of the associated hosting arrangement and are recognized as an operating expense within the consolidated statements of operations and comprehensive income (loss). Beginning in fiscal 2020, the Company conducted activities to replace its legacy enterprise resource planning ("ERP") system in order to accommodate the Company's expanding operations and went live with the new ERP in May 2022. Capitalized costs related to cloud computing arrangements, net of accumulated amortization, were $18.0 million and $21.7 million as of September 30, 2023 and October 1, 2022, respectively, and are reported as a component of other noncurrent assets on the Company's consolidated balance sheets. Amortization expenses for implementation costs for cloud-based computing arrangements for the twelve months ended September 30, 2023, and  October 1, 2022, were $3.7 million and $1.9 million, respectively. Accumulated amortization for cloud-based computing arrangements was $6.2 million and $2.5 million as of September 30, 2023, and October 1, 2022, respectively.

*Impairment of Goodwill and Indefinite-lived Intangible Assets*

Goodwill and indefinite-lived intangible assets are not amortized and are tested for impairment on an annual basis during the third quarter of each fiscal year or between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of the reporting unit or asset below its carrying value.

In connection with the Company's evaluation of goodwill impairment, the Company performs a qualitative assessment to determine if it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If the qualitative assessment is not conclusive, the Company tests goodwill for impairment, including comparing the fair value of the reporting unit to its carrying value (including attributable goodwill). The Company determines fair value of its reporting unit using an income or market approach incorporating market participant considerations and management's assumptions on revenue growth rates, operating margins, discount rates and expected capital expenditures. Fair value determinations may include both internal and third-party valuations.

In connection with the Company's evaluation of indefinite-lived intangible asset impairment, the Company performs a qualitative assessment to determine if it is more likely than not that the fair value of the asset is less than its carrying amount. If the qualitative assessment is not conclusive, the Company proceeds to test for impairment by comparing the fair value of the asset to the carrying value. Fair value is determined based on estimated discounted future cash flow analyses that include significant management assumptions such as revenue growth rates, weighted-average costs of capital and assumed royalty rates. If the carrying value exceeds fair value, an impairment charge will be recorded to reduce the asset to fair value. For fiscal years 2023, 2022, and 2021, the Company's qualitative assessments identified no factors indicating it was more likely than not that the fair value of the Company's reporting unit and indefinite-lived intangible assets were less than their respective carrying amounts. Therefore, the Company incurred no impairment charges.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

### Impairment of Long-Lived Assets

The Company evaluates the recoverability of its long-lived assets, which primarily comprises property and equipment and operating lease right-of-use assets, for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. The Company performs impairment testing at the level that represents the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. Recoverability is measured by comparing the carrying amounts to the expected future undiscounted cash flows attributable to the assets. If it is determined that an asset may not be recoverable, an impairment loss equal to the excess of the asset's carrying value over its fair value is recorded. Fair value is determined based on estimated discounted future cash flows analyses. There were no impairment charges identified on the Company's long-lived assets during fiscal 2023, 2022, and 2021.

### Product Warranties

The Company's products are covered by warranty to be free from defects in material and workmanship for a period of one year, except in the EU and select other countries where the Company provides a minimum two-year warranty, depending on the region, on all its products. At the time of sale, an estimate of future warranty costs is recorded as a component of cost of revenue and a warranty liability is recorded for estimated costs to satisfy the warranty obligation. The Company's estimate of costs to fulfill its warranty obligations is based on historical experience and expectations of future costs to repair or replace.

### Legal Contingencies

If a potential loss from any claim or legal proceeding is considered probable, and the amount can be reasonably estimated, the Company records a liability for an estimated loss. Legal fees are expensed as incurred and included in general and administrative expenses in the consolidated statements of operations and comprehensive income (loss). See Note 12. Commitments and Contingencies for additional information regarding legal contingencies.

### Treasury Stock

The Company accounts for treasury stock acquisitions using the cost method. The Company accounts for the retirement of treasury stock by deducting its par value from common stock and reflecting any excess of cost over par value as a deduction from additional paid-in capital on the consolidated balance sheets.

### Fair Value Accounting

Assets and liabilities recorded at fair value on the consolidated balance sheets are categorized based upon the level of judgment associated with the inputs used to measure their fair value.

Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

| Level Input | Input Definition |
| --- | --- |
| Level 1 | Quoted prices for identical assets or liabilities in active markets at the measurement date. |
| Level 2 | Inputs, other than quoted prices included in Level 1, such as quoted prices for similar assets or liabilities, in active markets or other inputs that are observable or can be corroborated with market data at the measurement date. |
| Level 3 | Unobservable inputs that reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. |

### Foreign Currency

Certain of the Company's wholly owned subsidiaries have non-U.S. dollar functional currencies. The Company translates assets and liabilities of non-U.S. dollar functional currency subsidiaries into U.S. dollars using exchange rates in effect at the end of each

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

period and stockholders' equity at historical rates. Revenue and expenses for these subsidiaries are translated using rates that approximate those in effect during the period. Gains and losses from translation are recognized in foreign currency translation included in accumulated other comprehensive loss.

The Company remeasures monetary assets or liabilities denominated in currencies other than the functional currency using exchange rates prevailing on the balance sheet date, and non-monetary assets and liabilities at historical rates. Foreign currency remeasurement and transaction gains and losses are included in other income (expense), net.

Foreign currency remeasurement and transaction gains (losses) are recorded in other income (expense), net as follows:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Foreign currency remeasurement and transaction gains (losses) | $ | 13,674 | $ | (21,877 ) | $ | 2,353 |

### Revenue Recognition

Revenue is recognized upon transfer of control of promised products or services to customers in an amount that reflects the consideration the Company expects to receive in exchange for those products or services. The Company's contracts generally include a combination of products and services. Revenue is allocated to distinct performance obligations and is recognized net of allowances for returns, discounts, sales incentives and any taxes collected from customers, which are subsequently remitted to governmental authorities. Shipping and handling costs associated with outbound freight after control over a product has transferred to a customer are not considered a separate performance obligation and are accounted for as a fulfillment cost and are included in cost of revenue.

#### Nature of Products and Services

Product revenue primarily includes sales of Sonos speakers and Sonos system products, which include software that enables the Company's products to operate over a customer's wireless network, as well as connect to various third-party services, including music and voice. The Company also generates a small portion of revenue from Partner products and other revenue sources in connection with partnerships, accessories, professional services, licensing, advertising, and subscription revenue. Revenue for module units is related to hardware and embedded software that is integrated into final products that are manufactured and sold by the Company's partners. Software primarily consists of firmware embedded in the products and the Sonos app, which is software that can be downloaded to consumer devices at no charge, with or without the purchase of one of the Company's products. Products and related software are accounted for as a single performance obligation and all intended functionality is available to the customer upon purchase. The revenue allocated to the products and related software is the substantial portion of the total sale price. Product revenue is recognized at the point in time when control is transferred, which is either upon shipment or upon delivery to the customer, depending on delivery terms.

Service revenue includes revenue allocated to (i) unspecified software upgrades and (ii) cloud-based services that enable products to access third-party music and voice assistant platforms, based on relative standalone selling price, which are each distinct performance obligations and are provided to customers at no additional charge. Unspecified software upgrades are provided on a when-and-if-available basis and have historically included updates and enhancements such as bug fixes, feature enhancements and updates to the ability to connect to third-party music or voice assistant platforms. Service revenue is recognized ratably over the estimated service period.

#### Significant Judgments

The Company's contracts with customers generally contain promises to transfer products and services as described above. Determining whether products and services are considered distinct performance obligations that should be accounted for separately requires significant judgment.

Determining the SSP for each distinct performance obligation requires judgment. The Company estimates SSP for items that are not sold separately, which include the products and related software, unspecified software upgrades and cloud-based services, using information that may include competitive pricing information, where available, as well as analyses of the cost of providing the products or services plus a reasonable margin. In developing SSP estimates, the Company also considers the nature of the products and services and the expected level of future services.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Determining the revenue recognition period for unspecified software upgrades and cloud-based services also requires judgment. The Company recognizes revenue attributable to these performance obligations ratably over the best estimate of the period that the customer is expected to receive the services. In developing the estimated period of providing future services, the Company considers past history, plans to continue to provide services, including plans to continue to support updates and enhancements to prior versions of the Company's products, expected technological developments, obsolescence, competition and other factors. The estimated service period may change in the future in response to competition, technology developments and the Company's business strategy.

The Company offers sales incentives through various programs consisting primarily of discounts, cooperative advertising and market development fund programs. The Company records cooperative advertising and market development fund programs with customers as a reduction to revenue unless it receives a distinct benefit in exchange for credits claimed by the customer and can reasonably estimate the fair value of the benefit received, in which case the Company records it as an expense. The Company recognizes a liability or a reduction to accounts receivable, and reduces revenue based on the estimated amount of sales incentives that will be claimed by customers. Estimates for sales incentives are developed using the most likely amount and are included in the transaction price to the extent that a significant reversal of revenue would not result once the uncertainty is resolved. In developing its estimate, the Company also considers the susceptibility of the incentive to outside influences, the length of time until the uncertainty is resolved and the Company's experience with similar contracts. Reductions in revenue related to discounts are allocated to products and services on a relative basis based on their respective SSP. Judgment is required to determine the timing and amount of recognition of marketing funds which the Company estimates based on past practice of providing similar funds.

The Company accepts returns from direct customers and from certain resellers. To establish an estimate for returns, the Company uses the expected value method by considering a portfolio of contracts with similar characteristics to calculate the historical returns rate. When determining the expected value of returns, the Company considers future business initiatives and relevant anticipated future events.

### Supplier Concentration

The Company relies on third parties for the supply and manufacture of its products, as well as third-party logistics providers for the distribution of its products. In instances where these parties fail to perform their obligations, the Company may be unable to find alternative suppliers or satisfactorily deliver its products to customers on time, if at all. During fiscal 2023, 2022 and 2021, approximately 58%, 57% and 59%, respectively, of the Company's finished goods purchased during each year were from one vendor.

### Deferred Revenue and Payment Terms

The Company invoices each order upon hardware shipment or delivery and recognizes revenue for each distinct performance obligation when transfer of control has occurred, which in the case of services, may extend over several reporting periods. Amounts invoiced in advance of revenue recognition are recorded as deferred revenue on the consolidated balance sheets. Deferred revenue primarily relates to revenue allocated to unspecified software upgrades and platform services, as well as for newly launched products sold to resellers not recognized until the date of general availability is reached. General availability deferrals are classified as current deferred revenue as the Company starts shipping the product to the reseller within one month prior to the general availability date. The Company classifies deferred revenue as noncurrent if amounts are expected to be recognized as revenue beyond one year from the balance sheet date.

*Payment Terms*

Payment terms and conditions vary among the Company's distribution channels although terms generally include a requirement of payment within 30 days of product shipment. Sales directly to customers from the Company's website are paid at the time of product shipment. Prior to providing payment terms to customers, an evaluation of the customer's credit risk is performed. Contractual allowances are an offset to accounts receivable.

### Research and Development

Research and development expenses consist primarily of personnel-related expenses, consulting and outside professional service costs, tooling and prototype materials and overhead costs. Substantially all of the Company's research and development expenses are related to developing new products and services and improving existing products and services. To date, software development costs have been expensed as incurred because the period between achieving technological feasibility and the release of the software has been short and development costs qualifying for capitalization have been insignificant.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

In-process research and development ("IPRD") assets represent the fair value of incomplete research and development projects obtained as part of a business combination that have not yet reached technological feasibility and are initially not subject to amortization; rather, these assets are subject to impairment considerations of indefinite-lived intangible assets. Upon completion of development, IPRD assets are considered definite-lived intangible assets, transferred to developed technology and are amortized over their useful lives. If a project were to be abandoned, the IPRD would be considered fully impaired and expensed to research and development.

### Advertising Costs

Advertising costs are expensed as incurred and included in sales and marketing expenses. Advertising expenses were $43.9 million, $66.6 million and $62.3 million for fiscal 2023, 2022 and 2021, respectively.

### Restructuring and Related Costs

Costs associated with a restructuring plan generally consist of involuntary employee termination benefits, contract termination costs, and other exit-related costs including costs to close facilities. The Company records a liability for involuntary employee termination benefits when management has committed to a plan that establishes the terms of the arrangement and that plan has been communicated to employees. Costs to terminate a contract before the end of the term are recognized on the termination date, and costs that will continue to be incurred in a contract for the remaining term without economic benefit are recognized as of the cease-use date. Restructuring and related costs may also include the write-down of related assets, including operating lease right-of-use assets, when the sale or abandonment of the asset is a direct result of the plan. Other exit-related costs are recognized as incurred. Restructuring and related costs are recognized as an operating expense within the consolidated statements of operations and comprehensive income (loss) and are classified based on the Company's classification policy for each category of operating expense.

### Stock-Based Compensation

The Company measures stock-based compensation cost at fair value on the date of grant. Compensation cost for stock options is recognized, on a straight-line basis, as an expense over the period of vesting as the employee performs the related services, net of estimated forfeitures. The Company estimates the fair value of stock option awards using the Black-Scholes option-pricing model and is based on the Company's closing stock price on the trading day immediately prior to the date of grant. The Company estimates forfeitures based on expected future terminations and will revise rates, as necessary, in subsequent periods if actual forfeitures differ from initial estimates. The fair value of RSUs is based on the Company's closing stock price on the trading day immediately preceding the date of grant. The Company estimates the fair value of performance stock units ("PSU") on the grant date and recognizes compensation expense in the period it becomes probable that performance conditions will be achieved. On a quarterly basis, the Company re-evaluates the assumption of the probability that performance conditions will be satisfied and revises its estimates as appropriate as new or updated information becomes available.

### Retirement Plans

The Company has a defined contribution 401(k) plan (the "401(k) Plan") for the Company's U.S.-based employees, as well as various defined contribution plans for its international employees. Eligible U.S. employees may make tax-deferred contributions under the 401(k) plan, but are limited to the maximum annual dollar amount allowable under the Internal Revenue Code of 1986, as amended (the "Code"). The Company matches contributions towards the 401(k) Plan and international defined contribution plans. The Company's matching contributions totaled $9.5 million, $8.2 million, and $7.6 million for fiscal 2023, 2022, and 2021, respectively.

### Income Taxes

The Company accounts for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the consolidated financial statements. Under this method, deferred tax assets and liabilities are determined based on the differences between the consolidated financial statements and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income during the period that includes the enactment date.

The Company records a valuation allowance when necessary to reduce its deferred tax assets to amounts that are more likely than not to be realized. In making such a determination, all available positive and negative evidence is considered, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, and results of recent operations. If

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

the Company determines that it would be able to realize its deferred tax assets in the future in excess of their net recorded amount, the Company would make an adjustment to the deferred tax asset valuation allowance, which would result in a benefit to income taxes.

The Company records uncertain tax positions in accordance with a two-step process whereby (i) the Company determines whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position and (ii) for those tax positions that meet the more likely than not recognition threshold, the Company recognizes the largest amount of tax benefit that is more than 50% likely to be realized upon ultimate settlement with the related tax authority.

The Company includes interest and penalties related to unrecognized tax benefits within the provision for income taxes in the consolidated statements of operations and comprehensive income (loss). The Company has not incurred any interest or penalties related to unrecognized tax benefits in any of the periods presented.

The Company's provision for (benefit from) income taxes, deferred tax assets and liabilities, and liabilities for unrecognized tax benefits involves the use of estimates, assumptions and judgments. Although the Company believes its estimates, assumptions and judgments to be reasonable, any changes in tax law or its interpretation of tax laws and the resolutions of potential tax audits could significantly impact the amounts provided for income taxes in the Company's consolidated financial statements. Actual future operating results and the underlying amount and type of income could differ materially from the Company's estimates, assumptions and judgments thereby impacting the Company's financial position and results of operations.

### Segment Information

The Company operates as one operating segment as it only reports aggregate financial information on a consolidated basis, accompanied by disaggregated information about revenue by geographic region and product category to its Chief Executive Officer, who is the Company's chief operating decision maker.

### Leases

The substantial majority of the Company's leases are for its office spaces and facilities, which are accounted for as operating leases. The Company determines whether an arrangement is a lease at inception if there is an identified asset, and if it has the right to control the identified asset for a period of time. Some of the Company's leases include options to extend the leases for up to 5 years, and some include options to terminate the leases within 1 year. The Company's lease terms are only for periods in which it has enforceable rights and are impacted by options to extend or terminate the lease only when it is reasonably certain that the Company will exercise the option. For leases with terms greater than 12 months, the Company records the related right-of-use asset and lease obligation at the present value of lease payments over the lease terms. Leases with an initial term of 12 months or less are not recorded on the balance sheet. Lease expense is recognized on a straight-line basis over the lease term. Lease agreements will typically exist with lease and non-lease components, which are accounted for separately. The Company's agreements may contain variable lease payments. The Company includes variable lease payments that depend on an index or a rate and exclude those which depend on facts or circumstances occurring after the commencement date, other than the passage of time. As most of the Company's leases do not contain an implicit interest rate, the Company uses judgment to determine an incremental borrowing rate to use at lease commencement.

### Recently Adopted Accounting Pronouncements

In March 2020, the FASB issued ASU No. 2020-04, Reference Rate Reform (Topic 848): Facilitation of Effects of Reference Rate Reform on Financial Reporting, and then issued subsequent amendments to the initial guidance under ASU No. 2021-01 and ASU No. 2022-06 (collectively Topic 848). Topic 848 provides practical expedients and exceptions for applying U.S. GAAP to contracts, hedging relationships, derivatives, and other transactions affected by reference rate reform if certain criteria are met. The expedients and exceptions provided by the amendments in this update apply only to contracts, hedging relationships, derivatives, and other transactions that reference the London Interbank Offered Rate ("LIBOR") or another reference rate expected to be discontinued as a result of reference rate reform. Topic 848 is currently effective and upon adoption may be applied prospectively to contract modifications and hedging relationships made on or before December 31, 2024. In June 2023, the Company amended its Revolving Credit Agreement (as defined below) to change the reference rate from LIBOR to the Secured Overnight Financing Rate ("SOFR"), effective July 1, 2023. The Company applied the practical expedients provided in Topic 848 to account for the modification as a continuation of the existing contract. The modification had no significant impact on the Company's consolidated financial statements. Refer to Note 7. *Debt* for further information.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

In October 2021, the FASB issued ASU No. 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers. This update requires that an entity recognize and measure contract assets and contract liabilities acquired in a business combination in accordance with Topic 606. The Company adopted this standard in the fourth quarter of fiscal 2023. The adoption did not have a material impact on the Company's consolidated financial statements.

### 3. Fair Value Measurements

The carrying values of the Company's financial instruments, including accounts receivable and accounts payable, approximate their fair values due to the short period of time to maturity or repayment.

The following table summarizes fair value measurements by level for the assets measured at fair value on a recurring basis as of September 30, 2023, and October 1, 2022:

| | September 30, 2023 | | | | | | | |
| | Level 1 | | Level 2 | | Level 3 | | Total | |
| **(In thousands)** | | | | | | | | |
| **Assets:** | | | | | | | | |
| Money market funds (cash equivalents) | $ | 51,522 | $ | — | $ | — | $ | 51,522 |

| | October 1, 2022 | | | | | | | |
| | Level 1 | | Level 2 | | Level 3 | | Total | |
| **(In thousands)** | | | | | | | | |
| **Assets:** | | | | | | | | |
| Money market funds (cash equivalents) | $ | 187,170 | $ | — | $ | — | $ | 187,170 |

### 4. Revenue and Geographic Information

*Disaggregation of Revenue*

Revenue by geographical region also includes the applicable service revenue for software upgrades and cloud-based services attributable to each region and is based on ship-to address, is as follows:

| | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
| --- | --- | --- | --- | --- | --- | --- |
| **(In thousands)** | | | | | | |
| Americas | $ | 1,048,245 | $ | 1,044,113 | $ | 980,931 |
| Europe, Middle East and Africa ("EMEA") | | 518,179 | | 578,034 | | 618,476 |
| Asia Pacific ("APAC") | | 88,831 | | 130,189 | | 117,337 |
| Total revenue | $ | 1,655,255 | $ | 1,752,336 | $ | 1,716,744 |

Revenue is attributed to individual countries based on ship-to address and also includes the applicable service revenue for software upgrades and cloud-based services attributable to each country. Revenue by significant countries is as follows:

| | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
| --- | --- | --- | --- | --- | --- |
| **(In thousands)** | | | | | | |
| United States | $ | 971,151 | $ | 964,118 | $ | 890,837 |
| Other countries | | 684,104 | | 788,218 | | 825,907 |
| Total revenue | $ | 1,655,255 | $ | 1,752,336 | $ | 1,716,744 |

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Revenue by product category also includes the applicable service revenue for software upgrades and cloud-based services attributable to each product category. Revenue by major product category is as follows:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Sonos speakers | $ | 1,293,440 | $ | 1,368,916 | $ | 1,378,808 |
| Sonos system products | | 285,064 | | 297,110 | | 265,180 |
| Partner products and other revenue | | 76,751 | | 86,310 | | 72,756 |
| Total revenue | $ | 1,655,255 | $ | 1,752,336 | $ | 1,716,744 |

*Disaggregation of Property and Equipment*

Property and equipment, net by country as of September 30, 2023, and October 1, 2022 were as follows:

| (In thousands) | September 30, 2023 | | October 1, 2022 | |
|---|---|---|---|---|
| China | $ | 32,045 | $ | 40,609 |
| United States | | 30,430 | | 30,870 |
| Other countries | | 24,600 | | 14,689 |
| Property and equipment, net | $ | 87,075 | $ | 86,168 |

**5. Balance Sheet Components**

The following tables show the Company's balance sheet component details.

*Accounts Receivable Allowances*

The following table summarizes changes in the allowance for credit losses for fiscal 2023, 2022 and 2021:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 2,744 | $ | 1,547 | $ | 1,307 |
| Increases | | 1,561 | | 2,098 | | 1,529 |
| Write-offs | | (1,594) | | (901) | | (1,289) |
| Ending balance | $ | 2,711 | $ | 2,744 | $ | 1,547 |

The following table summarizes the changes in the allowance for sales incentives for fiscal 2023, 2022 and 2021:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 23,573 | $ | 19,160 | $ | 17,515 |
| Charged to revenue | | 139,657 | | 51,225 | | 95,249 |
| Utilization of sales incentive allowance | | (134,155) | | (46,812) | | (93,604) |
| Ending balance | $ | 29,075 | $ | 23,573 | $ | 19,160 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Inventories*

Inventories, net, consist of the following:

| (In thousands) | September 30, 2023 | | October 1, 2022 | |
|---|---|---|---|---|
| Finished goods | $ | 281,571 | $ | 406,657 |
| Components | | 64,950 | | 47,631 |
| Inventories | $ | 346,521 | $ | 454,288 |

The Company writes down inventory as a result of excess and obsolete inventories, or when it believes that the net realizable value of inventories is less than the carrying value. As of September 30, 2023, and October 1, 2022, inventory write-downs were $29.7 million and $8.8 million, respectively.

*Property and Equipment, Net*

Property and equipment, net consist of the following:

| (In thousands) | September 30, 2023 | | October 1, 2022 | |
|---|---|---|---|---|
| Computer hardware and software | $ | 41,679 | $ | 42,000 |
| Furniture and fixtures | | 6,971 | | 7,511 |
| Tooling and production line test equipment | | 108,693 | | 100,337 |
| Leasehold improvements | | 53,648 | | 49,656 |
| Product displays | | 68,771 | | 56,885 |
| Total property and equipment | | 279,762 | | 256,389 |
| Accumulated depreciation and amortization | | (192,687) | | (170,221) |
| Property and equipment, net | $ | 87,075 | $ | 86,168 |

Depreciation expense was $42.7 million, $33.3 million and $31.8 million for fiscal 2023, 2022 and 2021, respectively. During fiscal 2023, 2022 and 2021, the Company abandoned and disposed of gross fixed assets of $21.3 million, $18.9 million and $32.9 million, with accumulated depreciation of $21.1 million, $18.8 million and $32.2 million, respectively. Disposals of fixed assets were recorded in operating expenses in the consolidated statements of operations and comprehensive income (loss) and resulted in immaterial losses for fiscal 2023, 2022 and 2021.

*Goodwill*

The following table presents the changes in carrying amount of goodwill for the fiscal year ended September 30, 2023:

| (In thousands) | | |
|---|---|---|
| Balance as of October 1, 2022 | $ | 77,300 |
| Effect of exchange rate changes on goodwill | | 3,120 |
| Balance as of September 30, 2023 | $ | 80,420 |

*Intangible Assets*

As part of the acquisition of Mayht Holding BV ("Mayht") in fiscal 2022, the Company recognized $71.8 million in intangible assets related to in-process research and development activity, which is not subject to amortization for the current period. The following

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

table reflects the changes in the net carrying amount of the components of intangible assets associated with the Company's acquisition activity:

| (In thousands, except weighted-average remaining life) | Gross Carrying Amount | | Accumulated Amortization | | Foreign Currency Translation | | Net Carrying Value | | Weighted-Average Remaining Life |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | September 30, 2023 | | | | |
| Tradename | $ | 451 | $ | (113 ) | $ | (12 ) | $ | 326 | 4.50 |
| Technology-based | | 31,480 | | (11,588 ) | | - | | 19,892 | 4.89 |
| Total finite-lived intangible assets | | 31,931 | | (11,701 ) | | (12 ) | | 20,218 | 4.88 |
| In-process research and development and other intangible assets not subject to amortization | | 71,759 | | - | | (1,968 ) | | 69,791 | |
| Total intangible assets | $ | 103,690 | $ | (11,701 ) | $ | (1,980 ) | $ | 90,009 | |

The following table summarizes the estimated future amortization expense of the Company's intangible assets as September 30, 2023:

| Fiscal years ending (In thousands) | Future Amortization Expense | |
|---|---|---|
| 2024 | $ | 5,969 |
| 2025 | | 3,367 |
| 2026 | | 3,038 |
| 2027 | | 3,022 |
| 2028 and thereafter | | 4,822 |
| Total future amortization expense | $ | 20,218 |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Accrued Expenses*

Accrued expenses consisted of the following:

| (In thousands) | | September 30, 2023 | | October 1, 2022 |
|---|---|---|---|---|
| Accrued inventory and supply chain costs | $ | 48,384 | $ | 51,011 |
| Accrued advertising and marketing | | 13,029 | | 21,292 |
| Accrued taxes | | 11,410 | | 7,081 |
| Accrued general and administrative expenses | | 9,924 | | 21,634 |
| Accrued product development | | 4,298 | | 8,168 |
| Other accrued payables | | 2,672 | | 104 |
| Total accrued expenses | $ | 89,717 | $ | 109,290 |

*Deferred Revenue*

Amounts invoiced in advance of revenue recognition are recorded as deferred revenue on the consolidated balance sheets. For the fiscal year ended September 30, 2023, deferred revenue included revenue allocated to unspecified software upgrades and cloud-based services of $80.0 million. For the fiscal year ended October 1, 2022, deferred revenue included revenue allocated to unspecified software upgrades and cloud-based services of $73.8 million, as well as current deferred revenue related to newly launched products sold to resellers not recognized as revenue until the date of general availability was reached.

The following table presents the changes in the Company's deferred revenue balances for the fiscal years ended September 30, 2023, October 1, 2022, and October 2, 2021:

| (In thousands) | | September 30, 2023 | | October 1, 2022 | | October 2, 2021 |
|---|---|---|---|---|---|---|
| Deferred revenue, beginning of period | $ | 83,470 | $ | 89,498 | $ | 62,389 |
| Recognition of revenue included in beginning of period deferred revenue | | (27,057) | | (41,438) | | (19,175) |
| Revenue deferred, net of revenue recognized on contracts in the respective period | | 24,425 | | 35,410 | | 46,284 |
| Deferred revenue, end of period | $ | 80,838 | $ | 83,470 | $ | 89,498 |

The Company expects the following recognition of deferred revenue as of September 30, 2023:

| | For the fiscal years ending | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (In thousands) | | 2024 | | 2025 | | 2026 | | 2027 | | 2028 and Beyond | | Total |
| Revenue expected to be recognized | $ | 20,188 | $ | 17,086 | $ | 14,718 | $ | 12,088 | $ | 16,758 | $ | 80,838 |

*Other Current Liabilities*

Other current liabilities consist of the following:

| (In thousands) | | September 30, 2023 | | October 1, 2022 |
|---|---|---|---|---|
| Reserve for returns | $ | 21,462 | $ | 18,263 |
| Short-term operating lease liabilities | | 1,153 | | 10,532 |
| Warranty liability | | 7,466 | | 5,771 |
| Other | | 4,172 | | 5,083 |
| Total other current liabilities | $ | 34,253 | $ | 39,649 |

63

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table presents the changes in the Company's warranty liability for the fiscal years ended September 30, 2023, and October 1, 2022:

| (In thousands) | September 30, 2023 | October 1, 2022 |
|---|---|---|
| Warranty liability, beginning of period | $ 5,771 | $ 5,604 |
| Provision for warranties issued during the period | 12,517 | 13,033 |
| Settlements of warranty claims during the period | (10,822 ) | (12,866 ) |
| Warranty liability, end of period | $ 7,466 | $ 5,771 |

## 6. Leases

The Company entered into various non-cancelable lease agreements for offices and facilities, as well as auto leases. The substantial majority of the Company's leases are for its office spaces and facilities, which are accounted for as operating leases. The Company leases office space in California, as well as offices in various locations in the U.S., with additional sales, operations, and research and development offices around the world. The Company determines whether an arrangement is a lease at inception if there is an identified asset, and it has the right to control the identified asset for a period of time. Some of the Company's leases include options to extend the lease for up to 5 years, and some include options to terminate the lease within 1 year. The Company's lease terms are only for periods in which it has enforceable rights and are impacted by options to extend or terminate the lease only when it is reasonably certain that the Company will exercise the option.

For leases with terms greater than 12 months, the Company records the related right-of-use asset and lease obligation at the present value of lease payments over the lease terms. Leases with an initial term of 12 months or less are not recorded on the balance sheet. Lease expense is recognized on a straight-line basis over the lease term. The Company's leases do not include any residual value guarantees or bargain purchase options.

Lease agreements will typically exist with lease and non-lease components, which are accounted for separately. The Company's agreements may contain variable lease payments. The Company includes variable lease payments that depend on an index or a rate and exclude those which depend on facts or circumstances occurring after the commencement date, other than the passage of time.

Most of the Company's leases do not contain an implicit interest rate. Therefore, the Company uses judgment to estimate an incremental borrowing rate, which is defined as the rate of interest the Company would have to pay to borrow an amount that is equal to the lease obligations, on a collateralized basis, and over a similar term. The Company takes into consideration the terms of the Company's Credit Facility (as defined in Note 7. Debt), lease terms, and current interest rates to determine the incremental borrowing rate at lease commencement date. At September 30, 2023, the Company's weighted-average discount rate was 5.14%, while the weighted-average remaining lease term was 9.1 years. As part of the supplemental cash flow disclosure, the right-of-use assets obtained in exchange for new operating lease liabilities does not reflect the impact of prepaid or deferred rent.

On May 11, 2023, the Company amended its existing operating lease at the Lafayette City Center in Boston, Massachusetts. The effect of the modification was a partial reduction in the square footage of the lease and an extension of the lease term through July 2035. The modification resulted in the Company continuing to classify the lease as an operating lease, with an increase in right-of-use assets and lease liabilities totaling $31.6 million and $30.4 million, respectively.

On July 13, 2023, as part of the Company's ongoing evaluation of real estate needs and overall lease consolidation initiatives, the Company entered into a lease agreement for a new headquarters location for approximately 50,000 square feet of office space located in Goleta, California. The lease expires in May 2031, with no option to extend. The Company anticipates taking possession of the leased premises in October 2023 and intends to relocate its headquarters to this space in fiscal 2024.

Refer to Note 14. Restructuring Plan for discussion of the impact of lease abandonment charges.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The components of lease expense for the fiscal year ended September 30, 2023, was as follows:

| (In thousands) | Year Ended September 30, 2023 |
|---|---|
| Operating lease cost | $ 12,324 |
| Short-term lease cost | 340 |
| Variable lease cost | 5,480 |
| Total lease cost | $ 18,144 |

For the fiscal years ended September 30, 2023, and October 1, 2022, rent expense, including leases for offices and facilities as well as auto leases, was $12.7 million and $11.3 million, respectively, and common area maintenance expense was $5.5 million and $4.3 million, respectively.

The following table summarizes the maturity of lease liabilities under operating leases as of September 30, 2023:

| Fiscal years ending (In thousands) | Operating leases |
|---|---|
| 2024 | $ 4,415 |
| 2025 | 9,579 |
| 2026 | 7,888 |
| 2027 | 6,395 |
| 2028 | 5,841 |
| Thereafter | 41,040 |
| Total lease payments | 75,158 |
| Less imputed interest | (19,049) |
| Total lease liabilities | $ 56,109 |

**7. Debt**

On October 13, 2021, the Company entered into a Revolving Credit Agreement with JPMorgan Chase Bank, N.A., as the administrative agent, and the lenders party thereto (the "Revolving Credit Agreement").

The Revolving Credit Agreement provides for (i) a five-year senior secured revolving credit facility in the amount of up to $100.0 million and (ii) an uncommitted incremental facility subject to certain conditions. Proceeds are to be used for working capital and general corporate purposes. In June 2023, the Company amended the Revolving Credit Agreement, replacing prior references to LIBOR with references to SOFR a result of the discontinuation of LIBOR. The facility may be drawn as an Alternative Base Rate Loan (at 1.00% plus an applicable margin) or Term Benchmark Loan (at the Term SOFR Rate, plus the applicable Term SOFR Adjustment ranging from 0.11% to 0.43%, plus an applicable margin (in total, "Adjusted Term SOFR")). The Company must also pay (i) an unused commitment fee ranging from 0.200% to 0.275% per annum of the average daily unused portion of the aggregate revolving credit commitment under the agreement and (ii) a per annum fee equal to the applicable margin over Adjusted Term SOFR multiplied by the aggregate face amount of outstanding letters of credit. As of September 30, 2023, the Company did not have any outstanding borrowings and had $1.8 million in undrawn letters of credit that reduce the availability under the Revolving Credit Agreement.

The Company's obligations under the Revolving Credit Agreement are secured by substantially all of the Company's assets. The Revolving Credit Agreement contains customary representations and warranties, customary affirmative and negative covenants, a financial covenant that is tested quarterly and requires the Company to maintain a certain consolidated leverage ratio, and customary

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

events of default. As of September 30, 2023, the Company was in compliance with all financial covenants under the Revolving Credit Agreement.

## 8. Stockholders' Equity

### Share Repurchase Program

On November 16, 2022, the Board of Directors authorized a common stock repurchase program of up to $100.0 million. During the fiscal year ended September 30, 2023, the Company repurchased 6,555,702 shares for an aggregate purchase price of $100.0 million at an average price of $15.25 per share under the repurchase program. As of September 30, 2023, the Company fully utilized the amount available under this stock repurchase program.

Treasury stock during the fiscal year ended September 30, 2023, included shares withheld to satisfy employees' tax withholding requirements in connection with vesting of RSUs. Additionally, during the fiscal year ended September 30, 2023, the Company retired 6,138,129 shares of treasury stock. The Company accounts for the retirement of treasury stock by deducting its par value from common stock and reflecting any excess of cost over par value as a deduction from additional paid-in-capital on the consolidated balance sheets.

## 9. Stock-Based Compensation

### 2018 Equity Incentive Plan

In July 2018, the Board of Directors (the "Board") adopted the 2018 Equity Incentive Plan (the "2018 Plan"). The 2018 Plan became effective in connection with the Company's initial public offering ("IPO"). The number of shares reserved for issuance under the 2018 Plan increases automatically on January 1 of each year beginning in 2019 and continuing through 2028 by a number of shares of common stock equal to the lesser of (x) 5% of the total outstanding shares of the Company's common stock and common stock equivalents as of the immediately preceding December 31 (rounded to the nearest whole share) and (y) a number of shares determined by the Company's the Board. As of September 30, 2023, there were 42,317,925 shares reserved for future issuance under the 2018 Plan.

### Stock Options

Pursuant to the 2018 Plan, the Company issues stock options to employees and directors. The option price, number of shares and grant date are determined at the discretion of the Board. For so long as the option holder performs services for the Company, the options generally vest over 48 months, on a monthly or quarterly basis, with certain options subject to an initial annual cliff vest, and are exercisable for a period not to exceed ten years from the date of grant. The Company's policy for issuing stock upon stock option exercise is to issue new common stock.

The summary of the Company's stock option activity is as follows:

| | Number of Options | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (In years) | | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|---|---|
| **Outstanding at October 1, 2022** | 10,802,882 | $ | 13.37 | 4.5 | $ | 10,956 |
| Exercised | (2,005,776) | $ | 10.64 | | | |
| Forfeited | (247,149) | $ | 14.20 | | | |
| **Outstanding at September 30, 2023** | 8,549,957 | $ | 13.99 | 3.6 | $ | 1,689 |
| **At September 30, 2023** | | | | | | |
| Options exercisable | 8,549,957 | $ | 13.99 | 3.6 | $ | 1,689 |
| Options vested and expected to vest | 8,549,957 | $ | 13.99 | 3.6 | $ | 1,689 |

The Company granted no options in fiscal 2023, 2022, and 2021. Options vested in fiscal 2023, 2022 and 2021, respectively, have a fair value of $2.6 million, $6.6 million, and $10.8 million. As of September 30, 2023, all outstanding stock options have vested and the Company had no unrecognized stock-based compensation expense related to stock options. As of October 1, 2022, the Company had $0.4 million of unrecognized stock-based compensation expense related to stock options, which were expected to be recognized

Case 1:24-cv-00131-JNR     Document 120-2     Filed 12/17/24     Page 389 of 467 PageID
#: 7519
Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

over a weighted-average period of 0.2 years. The total intrinsic value of stock options exercised was $15.3 million, $58.0 million and $242.7 million for fiscal 2023, 2022 and 2021, respectively.

*Restricted Stock Units*

Pursuant to the 2018 Plan, the Company issues RSUs to employees and directors. RSUs vest quarterly over the service period, which is generally four years with certain awards subject to an initial annual cliff vest. The summary of the Company's RSU activity is as follows:

| | Number of Units | | Weighted-Average Grant Date Fair Value | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| | | | | | (In thousands) |
| **Outstanding at October 1, 2022** | 8,308,177 | $ | 19.25 | $ | 115,484 |
| Granted | 5,272,828 | $ | 17.33 | | |
| Released | (4,458,367) | $ | 16.66 | | |
| Forfeited | (1,460,603) | $ | 19.34 | | |
| **Outstanding at September 30, 2023** | 7,662,035 | $ | 19.42 | $ | 98,917 |
| At September 30, 2023 | | | | | |
| Units expected to vest | 6,618,791 | $ | 19.39 | $ | 85,449 |

As of September 30, 2023 and October 1, 2022, the Company had $111.6 million and $120.6 million of unrecognized stock-based compensation expense related to RSUs, each of which are expected to be recognized over a weighted-average period of 2.4 and 2.5 years, respectively.

*Performance Stock Units*

Pursuant to the 2018 Plan, the Company has issued and may issue certain PSUs that vest on the satisfaction of service and performance conditions. The number of shares vested at the end of the performance period are based on the extent to which the corresponding performance goals have been achieved. The number of shares vested during the twelve months ended September 30, 2023, includes performance achievement adjustments of a net reduction of 12,895 units. The summary of the Company's PSU activity is as follows:

| | Number of Units | | Weighted-Average Grant Date Fair Value | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| | | | | | (In thousands) |
| **Outstanding at October 1, 2022** | 398,077 | $ | 26.96 | $ | 5,533 |
| Granted | 249,370 | $ | 17.54 | | |
| Released | (263,158) | $ | 26.26 | | |
| Forfeited | (119,098) | $ | 21.45 | | |
| **Outstanding at September 30, 2023** | 265,191 | $ | 21.27 | $ | 3,424 |

As of September 30, 2023 and October 1, 2022, the Company had $0.3 million and $0.4 million of unrecognized stock-based compensation expense related to PSUs, which is expected to be recognized over a weighted-average period of 1.2 and 0.6 years, respectively.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Stock-based Compensation*

Total stock-based compensation expense by function category was as follows:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Cost of revenue | $ | 2,038 | $ | 1,620 | $ | 988 |
| Research and development | | 35,530 | | 30,724 | | 25,075 |
| Sales and marketing | | 15,677 | | 15,335 | | 13,570 |
| General and administrative | | 23,612 | | 27,961 | | 22,494 |
| Total stock-based compensation expense | $ | 76,857 | $ | 75,640 | $ | 62,127 |

## 10. Income Taxes

The Company's income before provision for (benefit from) income taxes for fiscal 2023, 2022 and 2021 were as follows:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Domestic | $ | (9,904) | $ | 54,609 | $ | 126,810 |
| Foreign | | 14,298 | | 14,121 | | 30,115 |
| Income before provision for (benefit from) income taxes | $ | 4,394 | $ | 68,730 | $ | 156,925 |

Components of the provision for (benefit from) income taxes consisted of the following:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Current: | | | | | | |
| U.S. Federal | $ | 7,507 | $ | — | $ | — |
| U.S. State | | 4,947 | | 483 | | 440 |
| Foreign | | 2,810 | | 3,401 | | 6,216 |
| Total current | | 15,264 | | 3,884 | | 6,656 |
| Deferred: | | | | | | |
| U.S. Federal | | — | | (1,459) | | — |
| U.S. State | | — | | (21) | | — |
| Foreign | | (596) | | (1,057) | | (8,326) |
| Total deferred | | (596) | | (2,537) | | (8,326) |
| Provision for (benefit from) income taxes | $ | 14,668 | $ | 1,347 | $ | (1,670) |

The Company is subject to income taxes in the United States and foreign jurisdictions in which it operates. The Company's tax provision is impacted by the jurisdictional mix of earnings as its foreign subsidiaries have statutory tax rates different from those in the United States. For the year ended September 30, 2023 the Company's U.S. tax expense was adversely impacted by the requirement to capitalize and amortize research and development expenses under Section 174 as the Company recorded a current U.S. tax expense with no corresponding deferred tax benefit due to the valuation allowance maintained against its U.S. deferred tax assets.

68

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Components of the Company's deferred income tax assets and liabilities are as follows:

| (In thousands) | | September 30, 2023 | | October 1, 2022 |
|---|---|---|---|---|
| **Deferred tax assets** | | | | |
| Research & development tax credit carryforwards | $ | 75,593 | $ | 92,487 |
| Capitalized research & development | | 63,395 | | 9,420 |
| Accrued expenses and reserves | | 17,837 | | 8,872 |
| Deferred revenue | | 15,855 | | 14,170 |
| Operating lease liability | | 13,097 | | 7,717 |
| Stock-based compensation | | 7,727 | | 9,261 |
| Foreign net operating loss carryforwards | | 7,606 | | 7,702 |
| Other capitalized costs | | 5,364 | | 3,799 |
| Depreciation | | 2,700 | | 2,239 |
| U.S. net operating loss carryforwards | | 1,852 | | 26,363 |
| Other | | 494 | | 182 |
| Total deferred tax assets | | 211,520 | | 182,212 |
| Valuation allowance | | (185,840) | | (162,267) |
| Deferred tax assets, net of valuation allowance | | 25,680 | | 19,945 |
| **Deferred tax liabilities** | | | | |
| Intangibles | | (22,475) | | (22,125) |
| Right-of-use asset | | (11,392) | | (5,940) |
| Other | | — | | (14) |
| Total deferred tax liabilities | | (33,867) | | (28,079) |
| Net deferred tax assets (liabilities) | $ | (8,187) | $ | (8,134) |
| | | | | |
| **Reported as** | | | | |
| Deferred tax assets | $ | 1,659 | $ | 1,508 |
| Deferred tax liabilities | | (9,846) | | (9,642) |
| Net deferred tax assets (liabilities) | $ | (8,187) | $ | (8,134) |

The Company has assessed, on a jurisdictional basis, the realization of its net deferred tax assets, including the ability to carry back net operating losses, the existence of taxable temporary differences, the availability of tax planning strategies and available sources of future taxable income. The Company has concluded that based on cumulative taxable income and future taxable income that it is able to realize a benefit for net deferred tax assets in certain foreign jurisdictions. In addition, the Company has concluded that a valuation allowance on its net deferred tax assets in the U.S. and certain foreign jurisdictions continues to be appropriate considering cumulative taxable losses in recent years and uncertainty with respect to future taxable income. It is possible that within the next 12 months there may be sufficient positive evidence to release a portion or all of the remaining valuation allowance in the U.S. and certain foreign jurisdictions. Release of the remaining valuation allowance would result in a benefit to income tax expense for the period the release is recorded, which could have a material impact on net earnings. The timing and amount of the potential valuation allowance release are subject to significant management judgment, as well as prospective earnings in the United States and certain other foreign entities and jurisdictions.

For the year ended September 30, 2023, we utilized $84.9 million U.S. federal net operating loss and have no U.S. federal net operating loss carryforwards remaining. As of September 30, 2023, we had gross state net operating loss carryforwards of $25.4 million, which expire beginning in 2032, as well as $46.9 million in foreign net operating loss carryforwards with an indefinite life. As of September 30, 2023, we also had U.S. federal research and development tax credit carryforwards as filed of $54.4 million, and state research and development tax credit carryforwards as filed of $47.0 million, which will expire beginning in 2038 and 2025, respectively. The federal and state research and development tax credits are shown net of uncertain tax positions and net of federal benefit, as applicable, in the components of the Company's deferred income tax assets and liabilities. For the year ended September 30, 2023, the increase in capitalized research and development relates to the requirement to capitalize research and development expenses under Section 174.

Because of the change of ownership provisions of Sections 382 and 383 of the Internal Revenue Code, and similar state provisions, use of a portion of the Company's U.S. federal and state net operating loss and research and development tax credit carryforwards may be limited in future periods if there are future changes in ownership. Further, a portion of the carryforwards may expire before being applied to reduce future taxable income and income tax liabilities if sufficient taxable income is not generated in future periods.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

The following table summarizes changes in the valuation allowance for fiscal 2023, 2022 and 2021:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 162,267 | $ | 155,978 | $ | 113,939 |
| Increase during the period | | 23,628 | | 13,841 | | 49,791 |
| Decrease during the period | | (55) | | (7,552) | | (7,752) |
| Ending balance | $ | 185,840 | $ | 162,267 | $ | 155,978 |

Reconciliation of U.S. statutory federal income taxes to the Company's provision for (benefit from) income taxes is as follows:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| U.S. federal income taxes at statutory rate | $ | 923 | $ | 14,433 | $ | 32,954 |
| U.S. state and local income taxes, net of federal benefit and state credits | | (841) | | (2,594) | | (9,473) |
| Foreign income tax rate differential | | 734 | | 970 | | 1,430 |
| Stock-based compensation | | 104 | | (15,532) | | (47,496) |
| Federal research and development tax credits | | (7,591) | | (8,983) | | (21,535) |
| Unrecognized federal tax benefits | | 184 | | (2,482) | | 4,041 |
| Change in tax rate | | — | | 5,013 | | (2,681) |
| Global intangible low taxed income, net of foreign tax credits | | 1,234 | | 290 | | — |
| Foreign -derived intangible income (FDII) deduction | | (6,863) | | — | | — |
| Subpart F income | | 1,374 | | — | | — |
| 162(m) executive compensation limitation | | 2,513 | | 2,574 | | — |
| Other | | (695) | | 1,079 | | (565) |
| Change in valuation allowance | | 23,592 | | 6,579 | | 41,655 |
| Provision for income taxes | $ | 14,668 | $ | 1,347 | $ | (1,670) |

Change in gross unrecognized tax benefits, excluding interest and penalties, as a result of uncertain tax positions are as follows:

| (In thousands) | September 30, 2023 | | October 1, 2022 | | October 2, 2021 | |
|---|---|---|---|---|---|---|
| Beginning balance | $ | 17,021 | $ | 21,252 | $ | 14,721 |
| Decrease - tax positions in prior periods | | (566) | | (6,039) | | (4) |
| Increase - tax positions in current periods | | 1,164 | | 1,808 | | 6,535 |
| Ending balance | $ | 17,619 | $ | 17,021 | $ | 21,252 |

The Company does not anticipate changes to its unrecognized benefits within the next 12 months that would result in a material change to the Company's financial position. The unrecognized tax benefits as of September 30, 2023, would have no impact on the effective tax rate if recognized

The Company conducts business in a number of jurisdictions and, as such, is required to file income tax returns in multiple jurisdictions globally. U.S. federal income tax returns for the 2019 tax year and earlier are no longer subject to examination by the U.S. Internal Revenue Service (the "IRS"). All U.S. federal and state net operating losses as well as research and development tax credits generated to date, including 2019 and earlier, used in open tax years are subject to adjustment by the IRS and state tax authorities.

The Company recognizes interest and penalties, if any, related to uncertain tax positions in income tax expense. There were no accrued interest or penalties as of September 30, 2023, and October 1, 2022.

As of September 30, 2023, the Company continues to assert that the unremitted earnings in our foreign subsidiaries are permanently reinvested and therefore no deferred taxes or withholding taxes have been provided. If, in the future, the Company decides to repatriate its $6.4 million of undistributed earnings from these subsidiaries in the form of dividends or otherwise, the Company could

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

be subject to withholding taxes payable at that time. Outside basis differences in the Company's foreign subsidiaries including unremitted earnings and any related taxes are not material.

### 11. Net Income (Loss) Per Share Attributable to Common Stockholders

Basic net income (loss) per share attributable to common stockholders is calculated by dividing net income (loss) attributable to common stockholders by the weighted-average number of shares of common stock outstanding less shares subject to repurchase. Diluted net income (loss) per share attributable to common stockholders adjusts the basic net income (loss) per share attributable to common stockholders and the weighted-average number of shares of common stock outstanding for the potentially dilutive impact of stock awards, using the treasury stock method.

The following table sets forth the computation of the Company's basic and diluted net income (loss) per share attributable to common stockholders:

| (In thousands, except share and per share data) | September 30, 2023 | October 1, 2022 | October 2, 2021 |
|---|---|---|---|
| **Numerator:** | | | |
| Net income (loss) attributable to common stockholders - basic and diluted | $ (10,274) | $ 67,383 | $ 158,595 |
| **Denominator:** | | | |
| Weighted-average shares of common stock - basic | 127,702,885 | 127,691,030 | 122,245,212 |
| Effect of potentially dilutive stock options | — | 5,472,807 | 10,120,238 |
| Effect of RSUs | — | 4,385,406 | 7,875,245 |
| Effect of PSUs | — | 212,835 | 68,457 |
| Weighted-average shares of common stock—diluted | 127,702,885 | 137,762,078 | 140,309,152 |
| | | | |
| **Net income (loss) per share attributable to common stockholders:** | | | |
| Basic | $ (0.08) | $ 0.53 | $ 1.30 |
| Diluted | $ (0.08) | $ 0.49 | $ 1.13 |

The following potentially dilutive shares as of the end of each period presented were excluded from the computation of diluted net income (loss) per share for the periods presented because including them would have been antidilutive:

| | September 30, 2023 | October 1, 2022 | October 2, 2021 |
|---|---|---|---|
| Stock options to purchase common stock | 9,449,904 | 6,877,530 | 9,030,004 |
| Restricted stock units | 9,742,444 | 5,041,645 | 3,505,140 |
| Performance stock units | 149,991 | 88,672 | 55,586 |
| Total | 19,342,339 | 12,007,847 | 12,590,730 |

### 12. Commitments and Contingencies

*Commitments to suppliers*

The Company utilizes contract manufacturers to build its products. These contract manufacturers acquire components and build products based on demand forecast information the Company supplies, which typically covers the fiscal year. Consistent with industry practice, the Company acquires inventories from such manufacturers through blanket purchase orders against which orders are applied based on projected demand information and availability of goods. Such purchase commitments typically cover the Company's forecasted product and manufacturing requirements for periods that range a number of months. In certain instances, these agreements allow the Company the option to cancel, reschedule, and/or adjust our requirements based on its business needs for a period of time before the order is due to be fulfilled. The Company's purchase orders typically are not cancellable in the event of a demand plan change or other circumstances, such as where the supplier has procured unique, Sonos-specific designs, and/or specific non-cancellable, non-returnable components based on our provided forecasts.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

As of September 30, 2023, the Company's open purchase orders to contract manufacturers for finished goods were approximately $70 million, the majority of which are expected to be paid in the next six months. As of September 30, 2023, the Company's expected commitments to suppliers for components were in the range of $226 million to $256 million, the majority of which is expected to be paid and/or utilized by our contract manufacturers in building finished goods within the next two years. The expected commitments are subject to change as a result of fluctuations in the demand forecast, as well as ongoing negotiations with contract manufacturers and suppliers. These commitments are related to components that can be specific to Sonos products and comprised 1) indirect obligations to third-party manufacturers and suppliers, 2) the inventory owned by contract manufacturers procured to manufacture Sonos products, and 3) purchase commitments made by contract manufacturers to their upstream suppliers.

*Legal Proceedings*

From time to time, the Company is involved in legal proceedings in the ordinary course of business, including claims relating to employee relations, business practices, and patent infringement. Litigation can be expensive and disruptive to normal business operations. Moreover, the results of complex legal proceedings are difficult to predict, and the Company's view of these matters may change in the future as the litigation and events related thereto unfold. The Company expenses legal fees as incurred. The Company records a provision for contingent losses when it is both probable that a liability has been incurred and the amount of the loss can be reasonably estimated. An unfavorable outcome to any legal matter, if material, could have an adverse effect on the Company's operations or its financial position, liquidity or results of operations.

*The Company's Lawsuits Against Google:*

On January 7, 2020, the Company filed a complaint with the U.S. International Trade Commission ("ITC") against Alphabet Inc. ("Alphabet") and Google LLC ("Google") and a counterpart lawsuit in the U.S. District Court for the Central District of California against Google. The complaint and lawsuit each allege infringement by Alphabet and Google of certain Sonos patents related to its smart speakers and related technology. The counterpart lawsuit is stayed pending completion of the ITC investigation and appeal thereof.  The ITC concluded its investigation in January 2022, finding all five of the Company's asserted patents to be valid and infringed by Google, and further finding that one redesign per patent proposed by Google would avoid infringement.  The ITC issued a limited exclusion order and a cease-and-desist order with respect to Google's infringing products.  The outcome of the ITC investigation is currently being appealed by the Company and Google.

On September 29, 2020, the Company filed another lawsuit against Google alleging infringement of additional Sonos patents and seeking monetary damages and other non-monetary relief.  A jury trial was held in May 2023, which found one Sonos patent to be infringed and another Sonos patent not infringed, and returned an award of $32.5 million based on a royalty rate of $2.30 per infringing unit. After trial, the court held Sonos' patents unenforceable under the doctrine of prosecution laches and invalid as a result of amendments made during prosecution. The Company is appealing the ruling.

On December 1, 2020, the Company filed a lawsuit against two Google foreign subsidiaries in the regional court of Hamburg, Germany, alleging infringement of a Sonos patent seeking non-monetary relief.  The Company has since withdrawn this action after having received some preliminary relief.

*Google's Lawsuits Against the Company:*

On June 11, 2020, Google filed a lawsuit in the U.S. District Court for the Northern District of California against the Company alleging infringement by the Company of five Google patents and seeking monetary damages and other non-monetary relief. Four of these patents have since been found invalid by the Court or by the U.S. Patent and Trademark Office, or have been withdrawn from the case by Google.  In this lawsuit, one patent remains asserted against the Company. No trial date is set.

On June 12, 2020, Google filed lawsuits in District Court Munich I against Sonos Europe B.V. and Sonos, Inc., alleging infringement of two Google patents seeking monetary damages and an injunction preventing sales of allegedly infringing products. In March 2021, the District Court Munich stayed the case for infringement of one Google patent pending the outcome of a nullity action concerning the validity of that patent. In June 2021, the Munich court issued a decision dismissing Google's complaint regarding the other Google patent for lack of infringement by the Company.  Google has appealed the Munich court's ruling, which is pending.

On August 21, 2020, Google filed a lawsuit against the Company in Canada alleging infringement of one Google patent. On July 26, 2022, the Canadian court ruled that the Company does not infringe this patent after a trial on the merits. Google has appealed the Canadian's court's ruling, which is pending.

Table of contents

SONOS, INC.
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

On August 21, 2020, Google filed a lawsuit against Sonos Europe B.V. and Sonos, Inc. in France, alleging infringement of two Google patents seeking monetary damages and an injunction preventing sales of allegedly infringing products. In February 2021, Google withdrew its infringement allegations regarding one patent in view of prior art brought to the attention of the court by the Company. In March 2022, the French trial court ruled for the Company on one of Google's asserted patents. The French trial court found the other Google patent invalid in November 2023. Google has appealed the French trial court's March 2022 ruling, which is pending.

On August 21, 2020, Google filed a lawsuit against Sonos Europe B.V. and Sonos, Inc. in the Netherlands alleging infringement of a Google patent seeking an injunction preventing sales of allegedly infringing products. In October, 2022, the Netherlands court ruled that the Company does not infringe Google's patent.

In September 2020, Google filed a lawsuit against Sonos Europe B.V. in the Netherlands, alleging infringement of a Google patent and seeking an injunction preventing sales of allegedly infringing products. In February 2022, the Court rejected Google's claims concerning this patent. Google has appealed this decision, which is pending.

On August 8, 2022, Google filed two complaints with the ITC against the Company and two counterpart lawsuits in the Northern District of California against the Company, collectively alleging infringement by the Company of seven Google patents generally related to wireless charging, device setup, and voice control, and seeking monetary damages and other non-monetary relief. The counterpart lawsuits are stayed pending completion of the ITC investigations. The ITC has terminated the investigation as to one Google patent as a result of imminent expiration of that Google patent. An oral hearing in the first ITC investigation took place in June 2023, with the administrative law judge issuing an initial determination of no violation by the Company. Google is seeking internal Commission review of the initial determination with a final decision by the Commission scheduled for January 2024. The oral hearing in the second ITC investigation has been postponed after the administrative law judge has indicated that she will be invalidating both Google patents at issue.

*Implicit*

On March 10, 2017, Implicit, LLC ("Implicit") filed a patent infringement action in the United States District Court, District of Delaware against the Company. Implicit is asserting that the Company has infringed on certain claims of two patents in this case. The Company denies the allegations. The claims at issue have been held unpatentable by the USPTO. Implicit has appealed this ruling, which will be heard by the appeals court in 2024. There is no assurance of a favorable outcome and the Company's business could be adversely affected as a result of a finding that the Company patents-in-suit are invalid and/or unenforceable. A range of loss, if any, associated with this matter is not probable or reasonably estimable as of September 30, 2023.

The Company is involved in certain other litigation matters not listed above but does not consider these matters to be material either individually or in the aggregate at this time. The Company's view of the matters not listed may change in the future as the litigation and events related thereto unfold.

*Tariff refunds*

On May 13, 2020, the Company was granted a temporary exclusion from the August 2019 Section 301 Tariff Action (List 4A) ("Section 301 tariffs"), eliminating the tariffs on the Company's component products imported from China until August 31, 2020. The exclusion for the Company's component products was not extended past August 31, 2020, with the Section 301 tariffs for our component products automatically reinstated on September 1, 2020. On July 23, 2020, the Company was granted a temporary exclusion from Section 301 tariffs, eliminating the tariffs on the Company's core speaker products imported from China until August 31, 2020. These exemptions entitled the Company to refunds for tariffs paid from September 2019 through December 2020. On August 28, 2020, the United States Trade Representative granted an extension through December 31, 2020 of the exclusion for the Company's core speaker products, with the Section 301 tariffs for our core speaker products automatically reinstated on January 1, 2021. On March 23, 2022, the Company was granted an exclusion extension from the Section 301 tariffs, eliminating tariffs on the Company's core speaker products, including certain new product introductions, imported from China from April 13, 2022 through December 31, 2022. This exemption entitled the Company to refunds for tariffs paid from October 12, 2021 through April 12, 2022.

For fiscal 2023 and 2022, the Company recognized $10.4 million and $15.8 million, respectively, in refunds based upon acceptance of the Company's refund request, recognized as a reduction to cost of revenue. As of September 30, 2023, the remaining refunds the Company expected to recover were minimal for tariffs paid from September 2019 through December 2020, and from October 12, 2021 through April 12, 2022. The Company did not record these potential refunds due to uncertainty of the timing of acceptance of approval, but such refunds will be recognized as a reduction to cost of revenue if and when acceptance occurs.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

*Guarantees and Indemnifications*

In the normal course of business, the Company enters into agreements that contain a variety of representations and warranties and provide for general indemnification. The Company's exposure under these agreements is unknown because it involves claims that may be made against the Company in the future, but have not yet been made. To date, the Company has not incurred material costs to defend lawsuits or settle claims related to these indemnification provisions. The Company has also entered into indemnification agreements with its directors and officers that may require the Company to indemnify its directors and officers against liabilities that may arise by reason of their status or service as directors or officers to the fullest extent permitted by the Delaware General Corporation Law. The Company also currently has directors' and officers' insurance. No amount has been accrued in the consolidated financial statements with respect to these indemnification guarantees.

**13. Quarterly Financial Data (Unaudited)**

The following table summarizes the Company's unaudited quarterly financial information for each of the four quarters of 2023 and 2022 (the sum of quarterly periods may not equal full-year amounts due to rounding):

| | | Three Months Ended | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | September 30, 2023 | | July 1, 2023 | | April 1, 2023 | | December 31, 2022 |
| (In thousands, except per share amounts) | | | | | | | | |
| Revenue | $ | 305,147 | $ | 373,356 | $ | 304,173 | $ | 672,579 |
| Gross profit | | 128,054 | | 171,762 | | 131,618 | | 285,057 |
| Net income (loss) | | (31,239) | | (23,571) | | (30,652) | | 75,188 |
| Net income (loss) per share - basic | $ | (0.25) | $ | (0.18) | $ | (0.24) | $ | 0.59 |
| Net income (loss) per share - diluted | $ | (0.25) | $ | (0.18) | $ | (0.24) | $ | 0.57 |

| | | Three Months Ended | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | October 1, 2022 | | July 2, 2022 | | April 2, 2022 | | January 1, 2022 |
| (In thousands, except per share amounts) | | | | | | | | |
| Revenue | $ | 316,290 | $ | 371,783 | $ | 399,781 | $ | 664,481 |
| Gross profit | | 124,099 | | 175,848 | | 179,034 | | 317,385 |
| Net income (loss) | | (64,067) | | (597) | | 8,566 | | 123,481 |
| Net income (loss) per share - basic | $ | (0.50) | $ | 0.00 | $ | 0.07 | $ | 0.97 |
| Net income (loss) per share - diluted | $ | (0.50) | $ | 0.00 | $ | 0.06 | $ | 0.87 |

**14. Restructuring Plan**

On June 14, 2023, the Company initiated a restructuring plan to reduce its cost base (the "2023 restructuring plan"). The 2023 restructuring plan included a reduction in force involving approximately 7% of the Company's employees, further reducing the Company's real estate footprint, and re-evaluation of certain program spend. Total pre-tax restructuring and abandonment costs under the 2023 restructuring plan were $11.4 million, substantially all of which were incurred in the third quarter of fiscal 2023, with nominal amounts to be incurred through the first quarter of fiscal 2024. Additionally, in March 2023, in support of operational efficiencies, the Company abandoned portions of its office spaces for the remainder of their respective lease terms resulting in non-recurring abandonment charges of $4.8 million.

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

Restructuring and abandonment costs by major cost-type incurred were as follows:

| (in thousands) | Twelve Months Ended September 30, 2023 |
|---|---|
| Employee-related costs | $ 9,083 |
| Lease abandonment charges[1] | 5,600 |
| Other restructuring costs | 966 |
| Total restructuring and abandonment costs | $ 15,649 |

[1] Restructuring and abandonment costs for fiscal 2023, include $4.8 million of non-recurring lease abandonment charges that were incurred in March 2023, when the Company abandoned portions of its office spaces for the remainder of their respective lease terms in support of operational efficiencies.

Restructuring and abandonment costs are recorded in the Company's consolidated statements of operations and comprehensive income (loss) as follows:

| (in thousands) | Twelve Months Ended September 30, 2023 |
|---|---|
| Research and development[1] | $ 6,556 |
| Sales and marketing[1] | 5,635 |
| General and administrative[1] | 3,458 |
| Total restructuring and abandonment costs | $ 15,649 |

[1] Restructuring and abandonment costs for twelve months ended September 30, 2023, include accelerated depreciation for leasehold improvements and non-recurring write-offs for operating lease right-of-use assets that were incurred in March 2023, when the Company abandoned portions of its office spaces for the remainders of their respective lease terms in support of operational efficiencies.

The following table summarizes the Company's restructuring activities recorded in accrued expenses and accrued compensation within the consolidated balance sheets:

| (in thousands) | Employee Related Costs | Lease Abandonment and Other Restructuring Costs | Total |
|---|---|---|---|
| Balance as of October 1, 2022 | $ - | $ - | $ - |
| Restructuring charges | 9,083 | 1,022 | 10,105 |
| Cash paid | (7,015) | (966) | (7,981) |
| Balance as of September 30, 2023 | $ 2,068 | $ 56 | $ 2,124 |

## 15. Subsequent Event

On November 15, 2023, the Company announced that its Board of Directors authorized a common stock repurchase program of up to $200.0 million.

Table of contents

**SONOS, INC.**
**Notes to Consolidated Financial Statements**

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as required under Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended ("Exchange Act") as of September 30, 2023. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective as of September 30, 2023.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Exchange Act Rule 13a-15(f).

Our Chief Executive Officer and Chief Financial Officer, with assistance from other members of management, assessed the effectiveness of our internal control over financial reporting as of September 30, 2023, based on the framework and criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, our management concluded that our internal control over financial reporting was effective as of September 30, 2023.

The effectiveness of our internal control over financial reporting as of September 30, 2023, has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears in Item 15(a) of this Annual Report on Form 10-K.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting in management's evaluation pursuant to Rule 13a-15(f) during the quarter ended September 30, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

On September 7, 2023, Julius Genachowski, Chairperson and a member of our Board of Directors, adopted a trading plan intended to satisfy the requirements of Rule 10b5-1(c).  The plan provides that Mr. Genachowski may sell up to 46,434 shares of common stock subject to options granted under our equity incentive plan. The plan terminates on the earlier of the date all shares under the plan are sold or 1) March 10, 2025, with respect to 6,724 shares of common stock subject to options granted in March 2015 and 2) March 14, 2025, with respect to 39,710 shares of common stock subject to options granted in November 2016.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

76

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is included under the captions "Board of Directors and Corporate Governance," "Proposal One: Election of Directors," "Executive Officers" and "Delinquent Section 16(a) Reports" included in our definitive Proxy Statement for the 2024 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended September 30, 2023, and is incorporated herein by reference.

**Item 11. Executive Compensation**

The information required by this item is included under the captions "Board of Directors and Corporate Governance" and "Executive Compensation" in our definitive Proxy Statement for the 2024 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended September 30, 2023, and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is included under the captions "Equity Compensation Plan Information" and "Security Ownership of Certain Beneficial Owners and Management" in our definitive Proxy Statement for the 2024 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended September 30, 2023, and is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this item is included under the captions "Board of Directors and Corporate Governance" and "Certain Relationships and Related Party Transactions" in our definitive Proxy Statement for the 2024 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended September 30, 2023, and is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

The information required by this item is included under the caption "Proposal Two: Ratification of Appointment of Independent Registered Public Accounting Firm" in our definitive Proxy Statement for the 2024 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of our year ended September 30, 2023, and is incorporated herein by reference.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**PART IV**

**Item 15. Exhibits, Financial Statement Schedules**

*(a)(1) Financial Statements*

The information concerning Sonos' consolidated financial statements and the Report of Independent Registered Public Accounting Firm required by this Item 15(a)(1) is incorporated by reference herein to the section of this Annual Report on Form 10-K in Part II, Item 8, titled "Financial Statements and Supplementary Data."

*(a)(2) Financial Statement Schedules*

All financial statement schedules have been omitted as the information is not required under the related instructions or is not applicable or because the information required is already included in the consolidated financial statements or the notes to those consolidated financial statements.

*(a)(3) Exhibits*

We have filed, or incorporated into this Annual Report on Form 10-K by reference, the exhibits listed on the accompanying Exhibit Index immediately preceding the signature page of this Annual Report on Form 10-K.

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Title | Incorporated By Reference | | | | Filed or Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 3.1 | Restated Certificate of Incorporation | 10-Q | 001-38603 | 3.1 | 9/11/2018 | |
| 3.2 | Restated Bylaws | 10-Q | 001-38603 | 3.2 | 9/11/2018 | |
| 4.1 | Form of Common Stock Certificate | S-1 | 333-226076 | 4.01 | 7/6/2018 | |
| 4.2 | Amended and Restated Investor Rights Agreement, dated as of July 18, 2012, by and among the Registrant and certain investors of the Registrant | S-1 | 333-226076 | 4.02 | 7/6/2018 | |
| 4.3 | Description of Securities | 10-K | 001-38603 | 4.3 | 11/26/19 | |
| 10.1+ | Form of Indemnification Agreement entered into between Sonos, Inc. and each of its directors and executive officers | S-1 | 333-226076 | 10.01 | 7/6/2018 | |
| 10.2+ | 2003 Stock Plan, as amended, and forms of agreement thereunder | S-1 | 333-226076 | 10.02 | 7/6/2018 | |
| 10.3+ | 2018 Equity Incentive Plan and forms of agreement thereunder | 10-Q | 001-38603 | 10.1 | 8/12/2021 | |
| 10.4+ | 2018 Employee Stock Purchase Plan and form of subscription agreement | S-1 | 333-226076 | 10.04 | 7/6/2018 | |
| 10.5+ | Offer Letter between Patrick Spence and the Registrant, dated May 25, 2012 | S-1 | 333-226076 | 10.05 | 7/6/2018 | |
| 10.6† | Manufacturing Agreement between Inventec Appliances Corporation and the Registrant, dated September 4, 2014, as amended | S-1 | 333-226076 | 10.08 | 7/6/2018 | |

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

| | | | | | | |
|---|---|---|---|---|---|---|
| 10.7+ | Offer Letter between Nicholas Millington and the Registrant, dated February 27, 2003 | 10-K | 001-38603 | 10.9 | 11/28/2018 | |
| 10.8+ | Offer Letter between Maxime Bouvat-Merlin and the Registrant dated June 23, 2016 | | | | | X |
| 10.9+ | Executive Incentive Plan | 10-Q | 001-38603 | 10.1 | 2/7/2019 | |
| 10.10+ | Performance Share Award Agreement between Patrick Spence and the Registrant, dated May 28, 2020 | 10-Q | 001-38603 | 10.1 | 8/6/2020 | |
| 10.11+ | Offer Letter between Edward Lazarus and the Registrant, dated December 5, 2018 | 10-Q | 001-38603 | 10.1 | 2/6/2020 | |
| 10.12+ | Form of Performance Share Award Agreement under 2018 Equity Incentive Plan | 10-Q | 001-38603 | 10.1 | 2/11/2021 | |
| 10.13+ | Offer Letter between Shamayne Braman and the Registrant dated August 20, 2021. | | | | | X |
| 21.1 | List of subsidiaries of the Registrant | S-1 | 333-226076 | 21.01 | 7/6/2018 | |
| 23.1 | Consent of Independent Registered Public Accounting Firm | | | | | X |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) | | | | | X |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and Rule 15d-14(a) of the Exchange Act | | | | | X |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and Rule 15d-14(a) of the Exchange Act | | | | | X |
| 32.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(b) of the Exchange Act and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 32.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(b) of the Exchange Act and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 97+ | Sonos, Inc. Clawback Policy | | | | | X |
| 101.INS | XBRL Instance Document | | | | | X |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | | | | X |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | | | | X |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | | | | X |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | | | | X |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | | | | X |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in the Exhibit 101 attachments) | | | | | X |

\* Furnished and not filed.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**

+ Indicates a management contract or compensatory plan or arrangement.
† Confidential treatment has been granted with respect to portions of this exhibit.

**Item 16. Form 10-K Summary**

None.

Table of contents

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned thereunto duly authorized.

**Sonos, Inc.**

| | | |
|---|---|---|
| Date: November 20, 2023 | By: | /s/ Patrick Spence |
| | | Patrick Spence |
| | | Chief Executive Officer and Director |
| | | *(Principal Executive Officer)* |
| Date: November 20, 2023 | By: | /s/ Eddie Lazarus |
| | | Eddie Lazarus |
| | | Chief Financial Officer and Chief Legal Officer |
| | | *(Principal Financial Officer)* |
| Date: November 20, 2023 | By: | /s/ Chris Mason |
| | | Chris Mason |
| | | SVP, Finance and Chief Accounting Officer |
| | | *(Principal Accounting Officer)* |

81

**SONOS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)**
**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each individual whose signature appears below constitutes and appoints Patrick Spence, Eddie Lazarus, Chris Mason, and each of them, such individual's true and lawful attorneys-in-fact and agents with full power of substitution, for such individual and in such individual's name, place and stead, in any and all capacities, to sign any amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as such individual might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Patrick Spence<br>Patrick Spence | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | November 20, 2023 |
| /s/ Eddie Lazarus<br>Eddie Lazarus | Chief Financial Officer and Chief Legal Officer<br>*(Principal Financial Officer)* | November 20, 2023 |
| /s/ Chris Mason<br>Chris Mason | SVP, Finance and Chief Accounting Officer<br>*(Principal Accounting Officer)* | November 20, 2023 |
| /s/ Karen Boone<br>Karen Boone | Director | November 20, 2023 |
| /s/ Joanna Coles<br>Joanna Coles | Director | November 20, 2023 |
| /s/ Thomas Conrad<br>Thomas Conrad | Director | November 20, 2023 |
| /s/ Julius Genachowski<br>Julius Genachowski | Director and Chairperson of the Board of Directors | November 20, 2023 |
| /s/ Michelangelo Volpi<br>Michelangelo Volpi | Director | November 20, 2023 |

82

Exhibit 10.8

# SONOS

June 23, 2016

Dear Max:

We're thrilled to offer you a position with Sonos!

In the exempt position of VP Hardware, you'll be based in our Santa Barbara office reporting to Nicholas Millington.

This letter outlines information related to your compensation and benefits. Attached to this letter is an Appendix, which describes additional material terms and conditions of your employment. You should read the letter and the Appendix carefully.

**<ins>Base Salary</ins>**

If you decide to join Sonos, you will be paid an initial annual base salary of $ 250 ,000 (your "Base Salary"), which will be paid semi-monthly in accordance with the Company's normal payroll practices as established or modified from time to time. Your Base Salary shall be subject to all of the required and elected taxes and withholdings.

**<ins>Bonus Eligibility</ins>**

You will be eligible to participate in the Sonos Bonus Plan, subject to the terms and condition of the Sonos Discretionary Bonus Plan (the "Bonus Plan"). Currently, the target discretionary bonus award for non-sales positions is 15% of annual base salary. Please note that the discretionary bonus is not guaranteed. In addition, you must commence employment prior to June 30 to be eligible to receive a pro-rated bonus for the current fiscal year (which runs from October 1-September 30 ). Please see the Bonus Plan, which governs your eligibility for a discretionary bonus.

**<ins>Equity Award</ins>**

We have agreed that should you join Sonos, in addition to the cash compensation outlined above, you will receive an equity award (in the form of a stock option grant) with a projected value of $ 4,500 ,000 USD (referred to as your "New Hire Win Value"). The New Hire Win Value is not a promise of a specified return, and the actual value of the option grant, if any, will depend on many different factors.

The New Hire Win Value will be translated into an option grant with the right to purchase a specific number of shares based on the fair market value ("FMV") of Sonos common stock as of the date at time of grant. The option grant will be approved, and the strike price established, by the Sonos Board of Directors at their first meeting following your employment start date. 25% of the shares subject to the option grant will vest 12 months after the date your vesting begins, subject to your continuing employment with Sonos. The remaining shares will vest monthly over the next 36 months in equal monthly amounts, subject to your continuing employment with Sonos. The option grant will be subject to the terms and conditions of Sonos' Stock Option Plan and Stock Option Agreement.

**<ins>Sign On Bonus</ins>**

In addition, we are pleased to offer you a one-time sign on bonus of $ 25,000 to be paid out concurrent with your first paycheck or direct deposit, subject to your execution of the Company's Sign On Bonus Repayment Agreement and the terms and conditions outlined therein.

**<ins>Relocation</ins>**

We will reimburse your reasonable and approved out-of-pocket moving expenses, such as moving costs, temporary housing, etc., up to a total maximum of $ 15,000 , subject to your execution of the Relocation Agreement, the terms and conditions outlined therein, the Company's Relocation Policy, and applicable IRS rules.

**<ins>Benefits</ins>**

Regular full-time employees working 30 or more hours per week will be eligible to receive benefits that are provided to U.S. employees. These presently include benefits such as life and health (medical, dental and vision) insurance, paid time off, a 401(k) plan, and tuition reimbursement. For a more detailed understanding of the benefits and the eligibility requirements, please consult the summary plan descriptions for the programs and Sonos' Employee Handbook, which will be made available to you during your new hire orientation. Sonos reserves the right to discontinue, suspend, or to modify such plans, programs and practices.

**<ins>Important Terms and Conditions of Employment</ins>**

There are several important terms and conditions of employment at Sonos of which you should be aware. These terms, which are explained in the attached Appendix, generally apply to all U.S. employees of Sonos in the same manner as they will apply to you. This offer of at-will employment is expressly conditioned upon the terms outlined in the Appendix, including, among other things, a satisfactory background check and your execution of the Employee Agreement and the Arbitration Agreement.

**Please accept t his of f er (including all terms out lined in t he Appendix) by signing and dating below no later than June 24 , 2016.** If you accept our offer, we anticipate that your first day of employment would be July 18, 2016. In accepting this offer of employment, you represent and warrant that you are not relying upon any representation or statement except those terms set forth in this letter. You acknowledge that this letter supersedes all prior representations regarding the terms and condition of your employment.

We look forward to having you join us as we lead the music-listening revolution.

Sincerely,
/s/ John MacFarlane

John MacFarlane
Chief Executive Officer

**Please countersign:**

I have read, understand and accept this offer of at will employment, including the attached Appendix, which I understand is the Company's entire offer to me.

Signature: /s/ Max Bouvat-Merlin

Date: June 23, 2016
Enclosures:
Sign On Bonus Repayment Agreement Relocation
Agreement & Policy

Appendix of Important Terms And Conditions of Employment

### At -Will Employment

Your employment shall be on an at-will basis. As an at-will employee, either you or the Company can terminate your employment at any time and for any reason or no reason, with or without prior notice. As a result, nothing in this offer letter is a promise or guarantee of employment for any specific period of time or continued employment. Any contrary representations, which may have been made to you, are superseded by this letter. The Company also retains the right to make all other decisions concerning your employment (e.g., changes to your position, title, level, responsibilities, compensation, job duties, reporting structure, work location, work schedule, goals or any other managerial decisions) at any time, with or without cause or advance notice, as it deems appropriate in its sole discretion. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company.

### Employee Agreement And Arbitration Agreement

As a condition of your employment, you will need to sign and comply with the enclosed At Will Employment, Confidential Information, and Invention Assignment Agreement (the "Employee Agreement") and Arbitration Agreement. The Employee Agreement requires, among other provisions, the assignment of intellectual property rights to Sonos and non disclosure of
Company proprietary information. The Arbitration Agreement includes an arbitration provision and specifies the procedures to be followed in the event of any dispute or claim relating to or arising out of our employment relationship. Please return a signed copy of the Employee Agreement and the Arbitration Agreement (which are enclosed) to me with your signed acceptance of this offer. You acknowledge and agree that the Employee Agreement and the Arbitration Agreement shall remain in full force and effect regardless of any change in your position, compensation or any other term and conditions of your employment with the Company in accordance with the terms contained therein.

### No Conflicting Agreement

By accepting your offer of employment, you represent and warrant that your employment with Sonos and the performance by you of your duties as a Sonos employee do not and will not breach or contravene: (i) any agreement or contract (including, without limitation, any employment or consulting agreement, any agreement not to compete or any confidentiality or nondisclosure agreement) to which you are a party; or (ii) any obligation you may otherwise have under applicable law to any former employer or to any person to whom you have provided consulting services. You further represent and warrant that you have delivered or disclosed, as the case may be, to Sonos all agreements, contracts and obligations relevant to clauses (i) and (ii) above. You agree not to bring any third party confidential information to Sonos, including that of your former employer, and that in performing your duties for Sonos you will not in any way utilize any such information.

### Background Check

Sonos reserves the right to conduct background investigations and/or reference checks on all of its potential employees prior to hire and during employment. This offer of employment may be rescinded at any time in the event of unsatisfactory background investigation and/or reference check results. If required by law, you will receive a disclosure regarding the nature and scope of the background check Sonos plans to conduct on you and a consent form to authorize Sonos to conduct such background check under separate cover.

### Compliance with Company Standards; Cooperation

As a Company employee, you will be expected to abide by Sonos' policies, rules and standards of conduct, as well as your
Employee Agreement. To this end, Sonos expects you to comply at all times with the Company's standards of professionalism, loyalty, integrity, honesty, reliability and respect for others. To ensure ongoing compliance, after receipt, you will sign and deliver to Sonos acknowledgement of receipt forms for any policy statements provided to you, as well as periodic forms to certify your continuing full compliance with the Company's policies. You also will comply at all times with all laws and regulations applicable to the Company's business and performance of your duties for the Company.
You also agree that, during the term of your employment with the Company and at all times thereafter, upon reasonable request, you will fully cooperate with the Company and/or its representatives, without additional compensation, concerning any business matters or disputes of any kind about which you have, or may have, any relevant information.

**Sonos, Inc.**

**Sign On Bonus Repayment Agreement**

This Sign On Bonus Repayment Agreement (the "Agreement") is entered into on June 23, 2016 by and between Max Bouvat- Merlin (the "Employee") and Sonos, Inc. (the "Company").

WHEREAS, the Company seeks to employ the Employee as per the terms of the offer letter presented in conjunction with this Agreement (the "Offer Letter");

WHEREAS, the Company seeks to provide the Employee with additional financial incentive in the form of a sign on bonus as set forth in the Offer Letter to join the Company and to remain employed with the Company for at least twelve months; and

WHEREAS, the Employee acknowledges and agrees that the Sign On Bonus (as defined below) is not earned by him/her until he/she has been employed by the Company for at least twelve months and acknowledges and agrees that he/she will repay the Sign On Bonus advanced to him/her under this Agreement in the event that his/her employment with the Company is terminated:
(i) by the Employee for any reason or (ii) by the Company for "Cause" (as defined below), within the twelve-month period following the commencement of his/her employment with the Company, as further described herein.

NOW THEREFORE, for good and valuable consideration, the Employee and the Company agree as follows:

1. <u>Sign On Bonus</u>. Subject to the terms and conditions set forth in Section 2 below, the Company agrees to advance to the Employee a sign on bonus in the amount outlined in the offer letter (the "Sign On Bonus"), which shall be paid on the first payday following the commencement of the Employee's employment with the Company. The Employee acknowledges and agrees that the Sign On Bonus will not be due and payable to him/her until he/she has been employed by the Company for at least twelve
months. This Sign On Bonus shall be subject to all applicable taxes and withholdings.

2. <u>Repayment Obligation Upon Termination by Employee For Any Reason or Termination by Company for "Cause."</u> The Employee acknowledges and agrees that, in the event that his/her employment with the Company is terminated by Employee for any reason or by the Company for "Cause" within the twelve-month period following the commencement of his/her employment, he/she will immediately repay the Sign On Bonus advanced by the Company. The Employee agrees that he/she shall pay all of the payments owed under this Section in cash or by certified check on or before the date of termination from employment. If the Employee remains employed with the Company for more than twelve months and/or if the Company terminates Employee's employment for any reason other than Cause, then the Employee will not be obligated to repay the Sign On Bonus advanced by the company upon the Employee's termination from employment. For purposes of this Agreement, termination shall be considered for "Cause" if Employee's employment is terminated for one or more of the following reasons: (i) failure to perform the duties and/or responsibilities on behalf of the Company, which continues uncured for the period of ten calendar days following his/her receipt of written notice from the Company; (ii) commission of or indictment for, or plea of no contest to, a felony or crime of moral turpitude; (iii) misconduct or disloyalty, deliberate dishonesty or breach of fiduciary duty to the Company; (iv) commission of an act of embezzlement, fraud or deliberate disregard of the rules or policies of the Company; (v) unauthorized disclosure,misappropriation or use of any trade secret or confidential information of the Company; (vi) the commission of an act which constitutes material unfair competition with the Company; (vii) breach of any written agreement between you and the Company, including the At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement.

1. <u>Authorization To Deduct From Wages</u>. The Employee further agrees that, if the Employee fails to pay the Company the full amount of the Sign On Bonus on or before his/her termination date in accordance his/her obligations under Section 2, the Company is hereby authorized, to the extent permitted by local law, to deduct all amounts owed to the Company under this
Agreement from any and all payments due to him/her by the Company at the time of termination, including without limitation, any unreimbursed business expenses, accrued but unused vacation pay, his/her final wages, earned commissions, and bonus
payments. To this end, Employee agrees to execute a form, to be prepared by the Company, authorizing the Company to withhold the specific amount that is due.

2. <u>At-Will Employment</u>. The Employee understands that this Agreement does not create an obligation on the Company to continue his/her employment. The Employee understands that his/her employment with the Company is and will continue to be at-will,
meaning that either the Employee or the Company may terminate his/her employment at any time and for any or no reason. Accordingly, nothing in this Agreement should be construed to be a guarantee of continued employment for twelve months.

3. <u>Modifications.</u> Any amendment to or modification of this Agreement, or any waiver of any provision hereof, shall be in writing and signed by the Company. Any waiver by the Company of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach hereof.

4. <u>Legal Fees</u>. Should the Company prevail in any action against the Employee to enforce the terms of this Agreement, the Employee acknowledges and agrees that he/she shall be responsible for the payment of the Company's legal fees and costs, including reasonable attorney's fees.

5. <u>**Consent.**</u> **The Employee represent s t hat he/she has read t he foregoing agreement , t hat he/she fully understands the terms and conditions of the Agreement and is voluntarily executing the same.**

IN WITNESS WHEREOF, the undersigned has executed this Agreement as a sealed instrument as of the date written below.

**ACCEPTED AND AGREED**:

Employee: Max Bouvat-Merlin

/s/ Max Bouvat-Merlin

Date: June 23, 2016

**Sonos, Inc.**

/s/ John MacFarlane

John MacFarlane
Chief Executive Officer

**Sonos Relocation Policy**

## Our Philosophy

We want to make your move as easy as possible. Understanding that every move is unique, we offer a relocation allowance tailored towards your specific needs. Our goal is to ensure you use this allowance in the most meaningful and valuable way to cover your reasonable out-of- pocket moving expenses.

## Eligibility

All employees who accept an offer or transfer offer to work at a Sonos location greater than 50 miles away from their current residence are eligible to receive a relocation allowance. We anticipate employees can complete their move within 12 calendar months of their official transfer or hire date. We understand that exceptions may apply and we can review situations that do not meet these guidelines and request relocation exceptions as needed. Refer to the IRS Moving Expenses Guide for more information and specific rules on reimbursement eligibility.

## What We Offer

We offer a relocation reimbursement allowance to cover reasonable out-of-pocket moving expenses, some of which are taxable and may be grossed up in accordance with IRS regulations. Please see below for types of expenses that may qualify for reimbursement.

### House Hunting Trip

Includes transportation, lodging, area tour and realtor consultation. We expect you will only need one trip, the duration of which is to be discussed between you, your manager, and your HR Partner. We understand that exceptions may apply and can review those situations as needed. Note, these payments may be considered a taxable expense if this trip is separate from your one travel trip to your new home.

### Relocation of Household Goods

Includes reimbursement of storage fees, shipment of personal goods, vehicles, movers and related insurance coverage. Miscellaneous Expenses
Includes assistance for costs incurred during the move, including temporary housing, lease cancelations, utility costs for service hookups and related service charges.

## Execution of Relocation Agreement /Repayment Terms

To qualify for relocation expense reimbursement, an employee must execute a Relocation Agreement and return a signed copy of the Agreement to HR. Under the Relocation Agreement, the employee agrees that if he/she terminates his/her employment for any reason or if the Company terminates Employee's employment for "Cause" (as defined in the Agreement) at any time on or prior to the one-year anniversary of the date Employee commences his/her employment at the office to which he/she was assigned/transferred, he/she will immediately repay the Relocation Expenses paid by the Company. The employee also agrees that if he/she fails to repay this amount prior to the termination date, the Company may deduct any unpaid amount from the employee's final wages, expense reimbursement, unpaid bonuses, etc., to the extent permitted by law.

## Types of Expenses

The IRS recognizes two types of relocation Expenses; Deductible and Non-deductible. Any relocation expense that could be considered a deductible expense is not taxed and is reimbursed via Sonos payroll. This amount is deducted from your relocation allowance. Any relocation expense that would be considered a non-deductible expense is grossed up to reflect the appropriate taxes, Sonos then pays any applicable taxes and the net amount is reimbursed via Sonos payroll. The net amount is what is deducted from your relocation allowance. (These are subject to the most updated IRS Moving Expenses Guide.)

### Nontaxable

- Move of personal goods, including the cost to ship your car and your household pets to your new home
- Utility costs for service hookups & related service charges
- Temporary housing (first month)
- Storage expenses (first month)
- One travel trip to your new home (1 trip per employee & 1 trip per employee's dependents)
- Use of personal vehicle at the rate .19 per mile

### Taxable

- Expenses of buying or selling a home (including closing costs, mortgage fees, and points)
- Return trips to your former residence
- Lease cancellations Furniture
- Driver's license
- Temporary housing and storage expenses (after 1st month)

- Meals
- Personal Services

**How to Submit Expenses**

 Submit a completed expense report with all original receipts to hr@sonos.com. If you have a company credit card, please do not charge any relocation expenses to that card as these expenses must be reimbursed via Payroll. We are here to help and ensure your move is as easy as possible. Reach out to your HR Business Partner for any questions.

**409A Notice**

 It is intended that any expense reimbursement made per this Policy shall be exempt from Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A").

Notwithstanding the foregoing, if any expense reimbursement made under this policy shall be determined to be "deferred compensation"

within the meaning of Section 409A, then (i) the amount of the indemnification payment or expense reimbursement during one taxable year shall not affect the amount of the expense reimbursement during any other taxable year, (ii) the expense
reimbursement shall be made on or before the last day of your taxable year following the year in which the expense was incurred and (iii) the right to expense reimbursement hereunder shall not be subject to liquidation or exchange for another benefit.

**Signature**: /s/ Max Bouvat-Merlin

Exhibit 10.13

# SONOS

08/20/2021

Dear Shamayne,

We're thrilled to offer you a position with Sonos!

In the exempt position  of Chief Diversity, Equity and Inclusion Officer you'll be based in our Remote- US Minnesota office reporting to Patrick Spence.

This letter outlines information related to your compensation and benefits. Attached to this letter is an Addendum A which contains the "**Employee Agreement**". The Employee Agreement describes additional material terms and conditions of your employment. You should read this offer letter and the attached Employee Agreement carefully.

## Base Salary
If you decide to join Sonos, you will be paid an initial annual salary of $300,000.00(your "**Base Salary**"), which will be paid bi-weekly in accordance with Sonos' normal payroll practices as established or modified from time to time. Your Base Salary shall be subject to all of the required and elected deductions, taxes and withholdings.

## Bonus Eligibility
You will also be eligible for a discretionary target 35% bonus of your annual base salary, which is based solely on the company's performance against its annual target for revenue growth and operating profit.In addition, you must commence employment prior to August 31 to be eligible to receive a pro-rated discretionary bonus for the current fiscal year which runs October to September and, in any case, you must remain employed by Sonos through the actual payment date to be eligible to receive any bonus payment. Sonos reserves the right to change its discretionary bonus criteria from time to time in Sonos' sole discretion.

## Equity Award
If you decide to join Sonos, it will be recommended that the Compensation Committee (the "**Committee**") of Sonos' Board of Directors grant you restricted stock units ("**RSUs**") settleable in shares of Sonos' Common Stock. Subject to approval by the Committee, the grant of RSUs will give you the right to receive shares of Common Stock in an aggregate value of up to $650,000.00, as determined by the Committee on the date of grant.

The Company currently intends that the number of RSUs will be determined by dividing $650,000.00 by the average closing price of Sonos' Common Stock over all trading days over the 30 calendar days immediately preceding the grant date.

The RSUs will vest as follows: 25% of the RSUs will vest 12 months after your grant date, subject to your continuing employment with Sonos on such vesting date. The remaining RSUs will vest quarterly over the next three years in equal quarterly installments, in each case, however, subject to your continuing employment with Sonos on each such vesting date.

The RSU grant will be subject to the terms and conditions of Sonos' 2018 Equity Incentive Plan and Sonos' standard forms of award agreements thereunder.

## Benefits

Regular full-time employees working 20 or more hours per week will be eligible to receive benefits that are provided to U.S. employees. These presently include benefits such as life and health (medical, dental & vision) insurance, paid time off, and a 401(k) plan. For a more detailed understanding of the benefits and the eligibility requirements, please consult the summary plan descriptions for the programs and Sonos' Employee Handbook, which will be made available to you during your new hire orientation. Sonos reserves the right to discontinue, suspend, or to modify such plans, programs and practices at any time in Sonos' sole discretion.

## Important Terms and Conditions of Employment
There are several important terms and conditions of employment at Sonos of which you should be aware. These terms, which are explained in the attached Employee Agreement, generally apply to all U.S. employees of Sonos in the same manner as they will apply to you. This offer of at-will employment is expressly conditioned upon a satisfactory background check, and your acceptance and execution of both the Employee Agreement and Arbitration Agreement (respectively attached as Addendum A and B).

**Please accept this offer by signing and dating below no later than** [8/27/2021]. If you accept our offer, we anticipate that your first day of employment would be 10/04/2021. In accepting this offer of employment, you represent and warrant that you are not relying upon any representation or statement except those terms set forth in this letter. You acknowledge that this letter supersedes all prior representations regarding the terms and condition of your employment.

We look forward to having you join us as we lead the music-listening revolution.

Signature: /s/ Shamayne Braman

Date: August 21, 2021

Sonos, Inc.

/s/ Patrick Spence

Patrick Spence
Chief Executive Officer

**Addendum A**

**Employee Agreement**
(At Will Employment, Confidential Information, and Invention Assignment Agreement)

As a condition of your employment with Sonos, Inc., its subsidiaries, affiliates, successors or assigns (collectively, "**Sonos**"), and in consideration of your employment with Sonos and your receipt of the compensation now and hereafter paid to you by Sonos,you agree to the following terms and conditions outlined in this At Will Employment, Confidential Information, and Invention Assignment Agreement ("**Employee Agreement**"). This Employee Agreement shall be effective as of the date you sign below. Terms not defined herein shall have the meaning set forth in the accompanying offer letter.

**1.    Specifics of Employment.**

A.    *At Will Employment.* Your employment shall be on an at-will basis. As an at-will employee, either you or Sonos can terminate your employment at any time and for any reason or no reason, with or without prior notice. As a result, nothing in the offer letter (including the Addendum(s) ) is a promise or guarantee of employment for any specific period of time or continued employment. Any contrary representations, which may have been made to you, are superseded by this Employee Agreement. Sonos also retains the right to make all other decisions concerning your employment (e.g., changes to your position, title, level, responsibilities, compensation, job duties, reporting structure, work location, work schedule, goals or any other managerial decisions) at any time, with or without cause or advance notice, as it deems appropriate in its sole discretion. Although your job duties, title, compensation and benefits, as well as Sonos' personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of Sonos.

By signing this employment agreement, you understand and acknowledge that your employment with Sonos is for an unspecified duration and constitutes "at-will" employment. You also understand that any representation to the contrary is unauthorized and not valid unless obtained in writing and signed by the chief executive officer of Sonos. You acknowledge that this employment relationship may be terminated at any time,with or without good cause or for any or no cause, at the option either of Sonos or yourself, with or without notice.

B.    *Compliance with Sonos Standards; Cooperation.* As a Sonos employee, you will be expected to abide by Sonos' policies, rules and standards of conduct outlined in the Employee Handbook, as well as this Employee Agreement. To this end, Sonos expects you to comply at all times with Sonos' policies, including without limitation standards of professionalism, respect for others, data security policy, facilities and IT systems policies, and Sonos Purchasing Policy.All relevant policies shall be provided to you following your start date. You may be required to acknowledge receipt of and intended compliance with any such policy statements provided to you.

You additionally represent and warrant that you shall observe and comply with all applicable laws, ordinances, codes and regulations of governmental agencies, including federal, provincial, state, municipal and local governing bodies, in performing your employment duties hereunder. You also agree that,during the term of your employment with Sonos and at all times thereafter, upon reasonable request,you will fully cooperate with Sonos and/or its representatives, without additional compensation, concerning any business matters or disputes of any kind about which you have, or may have, any relevant information.

C.    *Background Check.* Sonos reserves the right to conduct background investigations and/or reference checks on all of its potential employees prior to hire and during employment. The offer of employment may be rescinded at any time in the event of unsatisfactory background investigation and/or reference check results. If required by law, you will receive a disclosure regarding the nature and scope of the background check Sonos plans to conduct on you and a consent form to authorize Sonos to conduct such background check under separate cover.

**2.    Confidential Information.**

A.    *Sonos Confidential Information.* You agree at all times during your employment and thereafter, to hold in strictest confidence, and not to use (except for the benefit of Sonos), and not to disclose to any person, firm or corporation without written authorization of the Board of Directors of Sonos, any Confidential Information of Sonos, except under a non- disclosure agreement with a third party duly authorized and executed by Sonos. you understand that "**Confidential Information**" shall mean any and all confidential and/or proprietary knowledge, data or information of Sonos, its affiliates, parents and subsidiaries, whether having existed, now existing, or to be developed during your employment. By way of

illustration but not limitation, "Confidential Information" includes: (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology and all patents, copyrights and/or other proprietary rights therein; (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Sonos business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Sonos, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Sonos, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Sonos and other non-public information relating to customers and potential customers; (d) information regarding any of Sonos' business partners and their services, including names; representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Sonos, and other non-public information relating to business partners; (e) information regarding personnel, contractors, employee lists, compensation, and employee and contractor skills; and (f) any other non-public information which a competitor of Sonos could use to the competitive disadvantage of Sonos. "Confidential Information" shall not include information that: (1) is or becomes a matter of public knowledge through no fault of yours or without violation of any duty of confidentiality by you; or (2) is rightfully received by you from a third party without a duty of confidentiality. Further, nothing in this Employee Agreement shall prohibit you from discussing the terms and conditions of my employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act.

B.    *Former Employer Information*. You agree that you will not, during your employment with Sonos, improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity and that you will not bring onto the premises of Sonos any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

C.    *Third Party Information*. You recognize that Sonos has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on Sonos' part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out your work for Sonos consistent with Sonos' agreement with such third party.

**3.    Inventions.**

A.    *Inventions Retained and Licensed*. Upon signing the Employee Agreement, you will be prompted to review a separate attachment titled "List of Prior Inventions" where you will list all inventions, original works of authorship, developments, improvements, and trade secrets which were made by you prior to your employment with Sonos, which belong to (or are otherwise controlled by) you (collectively referred to as "**Prior Inventions**"), and which you do not wish to be assigned to Sonos hereunder; or, if no such list is outlined, you represent that there are no such Prior Inventions. Upon signing the Employee Agreement, the List of Prior Inventions will be provided electronically as a separate attachment. If, during your employment with Sonos, you incorporate into a Sonos product, process or service a Prior Invention, you hereby grant to Sonos a nonexclusive, royalty-free, fully paid- up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

B.    *Assignment of Inventions*. You agree that you will promptly make full written disclosure to Sonos, and will hold in trust for the sole right and benefit of Sonos, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, algorithms, databases, computer programs, formulae, techniques, graphics or images, audio or visual works, trademarks or trade secrets, in each case whether or not patentable or registrable under copyright or similar laws, which you may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time you are in the employ of Sonos (collectively referred to as "**Inventions**"), except as provided in **Section 3.E** below. You further acknowledge that all Inventions which are made by you (solely or jointly with others) within the scope of and during the period of your employment with Sonos and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act and other intellectual property laws, and you hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to Sonos and its successors and assigns, without further compensation, all of your right, title and interest in all such Inventions, and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions (collectively, "**Intellectual Property Rights**"). You understand and agree that the decision whether or not to commercialize or market any invention

developed by you solely or jointly with others is within Sonos' sole discretion and for Sonos' sole benefit and that no royalty will be due to you as a result of Sonos' efforts to commercialize or market any such Invention. Further, you hereby waive all claims to any moral rights or other special rights which you may have or accrue in any Inventions or Intellectual Property Rights.

C.    *Maintenance of Records.* You agree to keep and maintain adequate and current written records of and documentation underlying all Inventions made by you (solely or jointly with others) during the term of your employment with Sonos. The records will be in the form of notes,sketches, drawings, and any other format that may be specified by Sonos. The records will be available to and remain the sole property of Sonos at all times.

D.    *Patent and Copyright Registrations.* You agree to assist Sonos, or its designee, at Sonos' expense, in every proper way to secure Sonos' rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to Sonos of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which Sonos shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to Sonos, its successors, assigns,and nominees the sole and exclusive rights, title and interest in and to such Inventions or Intellectual Property Rights relating thereto. You further agree that your obligation to execute or cause to be executed, when it is in your power to do so, any such instrument or papers shall continue after the termination of this Employee Agreement and/or your employment with Sonos. If Sonos is unable because of your mental or physical incapacity or for any other reason to secure your signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions assigned to Sonos as above, then you hereby irrevocably designate and appoint Sonos and its duly authorized officers and agents as your agent and attorney in fact, to act for and in your behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by you.

E.    *Exception to Assignments.* You understand that the provisions of this Employee Agreement requiring assignment of Inventions to Sonos do not apply to any invention that you developed entirely on my own time without using Sonos' equipment, supplies, facilities, or trade secrets, except for those inventions that either (i) relate to Sonos actual or anticipated business, research or development, or (ii) result from or are connected with work performed by you for Sonos.Specifically, you understand that my agreement to assign Inventions does not apply to any invention which qualifies fully for protection from assignment to Sonos under the provisions of California Labor Code Section 2870 or Washington state law as set forth in the Revised Code of Washington 49.44.140 (the text of which are attached hereto as <u>Exhibit A</u>) or any other similar applicable federal or state law related to the assignment of employee inventions (collectively, the "**Excluded Inventions Laws**"). You will advise Sonos promptly in writing of any inventions that You believe are excluded from assignment by virtue of meeting the criteria in California Labor Code Section 2870, the Revised Code of Washington 49.44.140 or any other applicable Excluded Inventions Law and are not otherwise disclosed on the List of Inventions.

F.    *Obligation to Keep Sonos Informed About Post-Employment Inventions/Intellectual Property Rights.* For the six-month period following the termination of my employment from Sonos, you agree that you will promptly disclose to Sonos fully and in writing all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, algorithms, databases, computer programs, formulae, techniques, graphics or images, audio or visual works, inventions authored, conceived or reduced to practice by me, either alone or jointly with others (the **"Post-Employment Inventions"**) and/or all United States or foreign patent, copyright or other intellectual property right(s) filed by you (solely or with others) and/or on my behalf (the "**Post- Employment Intellectual Property Rights**") if such intellectual property or Intellectual Property Rights related to products or projects on which you worked or to which you had access during your Sonos employment. You agree that Sonos will have the right to request information from you related to the Post-Employment Inventions or Post-Employment Intellectual Property Rights (including, information related to the date of conception and/or implementation) for purposes of determining whether the Post-Employment Invention at issue uses, is derived from, and/or otherwise misappropriates Sonos' trade secrets and/or Confidential Information and/or was developed during your Sonos employment and/or using Sonos' property. Nothing herein limits Sonos' right to pursue all remedies to protect its intellectual property. Sonos will keep in confidence and will not use for any purpose or disclose to third parties without your consent any confidential information disclosed in writing to Sonos pursuant to this subparagraph.

G.    *Use of Image of Likeness.* You authorize Sonos to use your name, picture, voice, image and/or likeness during your employment by Sonos and at any time thereafter. Further, you waive all claims you may now have or may ever have against Sonos and its officers, directors, employees and agents arising out of Sonos' use, adaptation, reproduction, modification, distribution, exhibition or other commercial exploitation of your name, picture, signature, voice, image and/or likeness, including, but not limited to right of privacy, right of publicity and celebrity, use of voice, name or likeness and copyright infringement.

**4.    Conflicts.**

A.  *Conflicting Employment.* You agree that,during the term of your employment with Sonos, you will not engage in any other employment, occupation or consulting directly related to the business in which Sonos is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to Sonos.

B.  *Conflicting Obligations.* By accepting your offer of employment, you represent and warrant that your employment with Sonos and the performance by you of your duties as a Sonos employee do not and will not breach or contravene: (i) any agreement or contract (including, without limitation, any employment or consulting agreement, any agreement not to compete, or any confidentiality or nondisclosure agreement) to which you are a party; or (ii) any obligation you may otherwise have under applicable law to any former employer or to any person to whom you have provided consulting services. You further represent and warrant that you have disclosed to Sonos the details of all agreements, contracts and/or obligations relevant to clauses (i) and (ii) above.

**5.  Returning Company Documents.** You agree that, at the time of leaving the employ of Sonos (or earlier, if requested), You will deliver to Sonos (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, emails, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items (including electronic copies) developed by you pursuant to you employment with Sonos or otherwise belonging to Sonos, its successors or assigns, including, without limitation, those records maintained pursuant to **paragraph 3.C**.

**6.  Notification of New Employer.** If you leave the employ of Sonos, you hereby grant consent to notification by Sonos to your new employer about your obligations under this Employee Agreement. If you were offered employment or the opportunity to enter into any business venture as owner, partner, consultant or other capacity, you agree to inform your potential employer, partner, co-owner and/or others involved managing the business with which you have an opportunity to be associated of your obligations under this Employee Agreement and also agree to provide such person or persons with a copy of this Employee Agreement (if so requested).

**7.  No Expectation of Privacy.** You acknowledge and agree that you do not have any privacy interest in any items or material stored on Sonos' premises or property, including without limitation any files or data stored on Sonos' computers, network and/or phones (including cell phones), such as email, pictures or documents, whether in an active state, or obtained from restored backups, and regardless of whether such files or data had previously been deleted by me. Without limiting the foregoing, you further acknowledge that the full contents of you email and stored data may be made known to or disclosed to other Sonos employees as required in the normal course of Sonos'operations, both during and after your employment with Sonos. You authorize Sonos to monitor communications made by you using Sonos' property, facilities and resources, and the right to search and enter all areas of Sonos' premises, including any locked desks or drawers. You also authorize Sonos to search any of your personal computers, personal cell phones or other electronic or storage devices to the extent such devices are used by you: (i) to store or transmit Confidential Information; or (ii) to discharge your duties or conduct business on behalf of Sonos.

**8.  Remedies.**

A.  *Equitable Relief.* You understand that if You violate the terms of this Employee Agreement while You are employed by Sonos, you will be subject to disciplinary action up to and including discharge from your employment. You further agree and acknowledge that the non-disclosure and assignment of Invention covenants and undertakings in Sections 2 and 3 of this Employee Agreement relate to matters that are of a special, unique and extraordinary character and that a violation or breach of any of the restrictive covenants or assignment clauses in this Employee Agreement will cause irreparable harm to Sonos, the full amount of which will be impossible to estimate or determine and which cannot be adequately compensated. For that reason, you agree that if you breach any of your confidentiality or assignment obligations under this Employee Agreement, monetary compensation shall be inadequate to compensate Sonos for such breach.You therefore agree that, in the event of a breach or threatened breach of the confidentiality and/or assignment of Invention obligations by you, Sonos is entitled, in addition to any of the other rights, remedies or damages available to Sonos, to a temporary restraining order, a preliminary injunction and a permanent injunction in order to prevent or to restrain any breach or threatened breach by you or any of your partners, co-venturers, employers, employees, agents, representatives or any other persons directly or indirectly acting for you. Sonos may apply for such injunctive relief in any court of competent jurisdiction without the necessity of posting any bond or other security.

B.    *Reimbursement*. You agree to reimburse Sonos for any costs resulting from or related to any claims, liabilities and damages arising from any claim brought against Sonos by a former employer(s) alleging that you are in breach of any legal obligations that you owe to any former employer(s). If such a claim is started against Sonos then Sonos shall have the option, exercisable in its sole discretion, to terminate your employment immediately, consistent with the at-will nature of our relationship.

C.    *Attorneys' Fees*. If you breach this Employee Agreement, you agree that Sonos, if the prevailing party, shall be entitled to recover its reasonable attorneys' fees and costs, to the extent such recovery is not prohibited by law. This remedy shall be in addition to, and not as an alternative to, any other remedies at law or in equity available to Sonos.

**9.    General Provisions.**

A.    *Governing Law*. This Employee Agreement shall be governed by and construed and interpreted in accordance with the laws of the state in which you are employed by Sonos, without regard to its conflict of laws.

B.    *Arbitration Agreement/Venue/Jury Waiver*. You acknowledge that you have executed an Arbitration Agreement contemporaneously with this Employee Agreement and agree that the Arbitration Agreement shall govern whether a particular dispute must be submitted to arbitration or may proceed in the courts. As set forth in the Arbitration Agreement and as reaffirmed herein, Sonos and you agree that any claims for equitable relief or declaratory judgment by either Sonos or you arising out of the non-disclosure or assignment of Inventions provisions set forth in Sections 2 and 3 of this Employee Agreement are expressly excluded from the agreement to arbitrate certain claims as provided in the Arbitration Agreement. Sonos and you further agree that any such causes of action shall be commenced and maintained in any state or federal court located within the state in which you are employed by Sonos and you hereby submit to the personal jurisdiction of such court. Each party hereto hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this employee agreement or the transactions contemplated hereby.

C.    *Entire Agreement*. This Employee Agreement sets forth the entire agreement and understanding between Sonos and you relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during your interview(s) or offer negotiations, whether written or oral, except for the Arbitration Agreement. No modification of or amendment to this Employee Agreement, nor any waiver of any rights under this Employee Agreement, will be effective unless in writing signed by an authorized representative of Sonos and you.

D.    *Severability/Modification*. If any of the provisions of this Employee Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable the remainder of this Employee Agreement, but rather the remainder of this Employee Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions, and the rights and obligations of the parties shall be enforced accordingly. Moreover, if one or more of the provisions contained in this Employee Agreement shall for any reason be held to be excessively broad as to scope, activity,subject or otherwise so as to be unenforceable at law, such provision or provisions shall be construed by the appropriate judicial body or arbitrator by limiting, revising or reducing it or them, so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear. The parties hereby agree that the language of all parts of this Employee Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly for or against any of the parties.

E.    *Successors and Assigns*. This Employee Agreement will be binding upon your heirs, executors, administrators and other legal representatives. Sonos shall have the right to assign this Employee Agreement to its successors and assigns without consent by you, and all covenants and agreements hereunder shall ensure to the benefit of and are enforceable by said successors and assigns. You do not have the right to assign this Agreement.

F.    *No Abandonment Regardless of Material Change*. You agree that Sonos may modify or change your position, duties, compensation, benefits, responsibilities, and/or any other terms and conditions of employment as it deems appropriate in its sole discretion. Any such changes to the terms and conditions of my employment (whether material or immaterial) shall not alter or modify your obligations as set forth herein and shall not be construed as an intent or agreement to abandon this agreement, to create a new employment relationship, and/ or to relieve you of your obligations hereunder (unless such agreement or intent is expressly and specifically set forth in writing by Sonos). You acknowledge and agree that this Employment Agreement shall remain in full force and effect regardless of any change in the terms and conditions of my employment (whether material or immaterial).

G.    *Waiver*. Sonos may waive any breach by you of any provision of this Employment Agreement expressly in writing in its sole discretion. Any waiver by Sonos of a breach of any provision of this Employment Agreement shall not operate or be construed as a waiver of any subsequent breach of such provision or any other provision hereof.

H.    *Survival*. You understand and agree that your obligations under this Employment Agreement shall survive the termination of this Employment Agreement and/or your employment regardless of the manner of such termination and shall be binding upon your heirs, executors, administrators and legal representatives.

**10.    Acknowledgment/Independent Legal Advice.**

You acknowledge that you have carefully read and considered the provisions of this Employment Agreement. You further acknowledge that you have had the opportunity to seek legal advice, and have either obtained such advice with regard to this Employee Agreement or have chosen not to do so. You agree that the restrictions and covenants set forth in this Employee Agreement are fair and reasonable and are necessary for the protection of the interests of Sonos and its business, officers, directors and employees.

Signature: /s/ Shamayne Braman

Date: August 21, 2021

Sonos, Inc.

/s/ Patrick Spence

Patrick Spence
Chief Executive Officer

Addendum B

**Arbitration Agreement**

This Arbitration Agreement ("**Arbitration Agreement**") is entered into by and between Sonos, Inc. and its affiliates and successors (referred to herein as the "**Sonos**") and Shamayne Braman (referred to herein as "**You**").

**1.**   Agreement to Arbitrate.

a.   Mutual Agreement to Arbitrate Certain Claims/Issues. In consideration of Sonos' offer of employment and/or continued employment to You and your acceptance of the same, You and Sonos agree that any and all existing or future disputes or claims related to your employment with Sonos (including, but not limited to, the termination of your employment with Sonos), except those claims and disputes identified below in subparagraph (b) of this Section, will be resolved by final and binding arbitration and that no other forum for dispute resolution will be available to either party. Except as set forth in Section 1(b) or otherwise prohibited by applicable law, claims subject to arbitration include, but are not limited to:

i.    Claims related to your employment, change in employment status, and/or termination of employment with Sonos;

ii.   Claims under any California, Massachusetts, New York, Washington, or any other state, federal and/or municipal statute, regulation, ordinance, law and/or executive order (as amended) relating to employment, discrimination (including discrimination on the basis of race, color, religion, creed, sex, sex harassment, sexual orientation, age, gender identity, marital status, familial status, pregnancy, national origin, ancestry, alien age, handicap,disability, present or past history of mental disorders or physical disability, veteran's status, candidacy for or activity in a general assembly or other public office, or constitutionally protected acts of speech), fair employment practices, or other terms and conditions of employment, including, but not limited to, the Age Discrimination in Employment Act and Older Workers Benefit Protection Act (*29 U.S.C. § 621 et seq.*), the Civil Rights Acts of 1866 and 1871, Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991 (*42 U.S.C.§ 2000e et seq.*), the Equal Pay Act (*29 U.S.C. § 201 et seq.*), the Americans With Disabilities Act (*42 U.S.C. § 12101 et seq.*), the Immigration Reform and Control Act (*8 U.S.C. § 1101 et seq.*), the Uniformed Services Employment and Reemployment Rights Act (*"USERRA"*); the California Fair Employment and Housing Act, the Massachusetts Fair Employment Practices Statute (*M.G.L. c. 151B § 1 et seq.*), the Massachusetts Equal Rights Act (*M.G.L. c. 93 §102*), the Massachusetts Civil Rights Act (*M.G.L. c. 12 §§ 11H & 11I*), the Massachusetts Privacy Statute (*M.G.L. c. 214 § 1B*), the Massachusetts Sexual Harassment Statute (*M.G.L. c. 214 § 1C*), the Massachusetts law against retaliation (*M.G.L. c. 19C, §11*), the New York State Human Rights Law *(N.Y. Exec. Law § 290 et seq)*; the New York City Human Rights Law *(N.Y.C. Admin. Code § 8–101 et seq)*; the New York Equal Rights Law *(N.Y. Civ. Rights Law §§ 40 to 45)*;the Washington Law Against Discrimination *(RCW Chapter 49.60)*; and the Seattle Fair Employment Practices Ordinance *(Seattle Municipal Code 14.04)*;

iii.  Claims under any California, Massachusetts, New York, Washington, or any other state, federal and/or municipal statute, regulation, ordinance, law and/or executive order (as amended) relating to leaves of absence, layoffs or reductions-in-force, wages, hours, or other terms and conditions of employment, including, but not limited to, the National Labor Relations Act (*29 U.S.C. § 151 et seq.*), the Family and Medical Leave Act (*29 U.S.C. § 2601 et seq.*), the Employee Retirement Income Security Act of 1974 (*29 U.S.C. § 1000 et seq.*), COBRA (*29 U.S.C. § 1161 et seq.*), the Fair Labor Standards Act (*29 U.S.C. § 201 et seq.*), the Occupational Safety and Health Act (*29 U.S.C. § 651 et seq.*), the Worker Adjustment and Retraining Notification Act (*29 U.S.C. § 2101 et seq.*), the California Family Rights Act (*Cal. Gov. Code §§ 12945.1- 12945.2*), the California Pregnancy Disability Leave Act (*Cal. Gov. Code § 12945*), the California School Activities Act (*Cal. Labor Code § 230.8*), the California Healthy Workplace Health Family Act (*Cal. Labor Code §§ 245-249*), the Cal-WARN Act (*Cal. Labor Code §§ 1400-1408*), the California wage payment laws (Cal. Labor Code §§ 200 through 244); the California Overtime Law (*Cal. Labor Code §§ 500-552*), the California Minimum Wage Law (*Cal. Labor Code § 1182.12*), the Massachusetts Small Necessities Leave Act (*M.G.L. c. 149, §52D*), the Massachusetts Parental Leave Law (*M.G.L. c. 149, §105D*), the Massachusetts Wage Act (*M.G.L. c. 149 § 148 et. seq.)*, the Massachusetts Minimum Fair Wages Act (*M.G.L. c. 151 § 1 et. seq.*), the Massachusetts Equal Pay Act (*M.G.L. c. 149 § 105A*), the Massachusetts Paid Sick Leave law (*M.G.L. c. 149, §§ 148C; 148D*); Article 6 of the New York Labor Law *(N.Y. Lab. Law §§ 190- 199-A)*, including the New York Wage Payment Act *(N.Y. Lab. Law § 190, et seq.)*; the New York State Minimum Wage Law; all New York Labor Standards; all New York Wage and Hour Laws; the Washington Payment of Wages Law *(RCW 49.48.010 and 49.52.050)*; the Washington Overtime Law *(RCW 49.46.130)*; the Seattle Minimum Wage Ordinance; the Washington State Family Care Act *(RCW 49.12.265 et seq)*; and the Washington Family Leave Act *(RCW 49.78)*;

iv.   Claims under any California, Massachusetts, New York, Washington, or any other state, federal and/or any other common law theory, including, without limitation, wrongful discharge, breach of express or implied contract,

promissory estoppel, unjust enrichment, breach of a covenant of good faith and fair dealing,violation of public policy, defamation, interference with contractual relations, intentional or negligent infliction of emotional distress, invasion of privacy, misrepresentation, deceit, fraud, negligence, or any claim to attorneys' fees under any applicable statute or common law theory of recovery;

v.    Claims under any California, Massachusetts, New York, Washington, or any other state, federal and/or municipal statute, regulation, ordinance, law or executive order (as amended) relating to whistleblower protections, violation of public policy, or any other form of retaliation or wrongful termination, including but not limited to the Sarbanes-Oxley Act of 2002;the New York Whistleblower &Retaliation Laws *(N.Y. Lab. Law §§ 740, 741, and 215)*; the New York Nondiscrimination for Legal Actions Laws;

vi.    Claims under any Sonos' compensation, benefit,stock option, incentive compensation, bonus, restricted stock, and/or equity plan, program, policy, practice or agreement, or any other type of employment-related agreement, contract or policy; and/or

vii.    Any other claim arising under other state,federal, municipal or other local law not specifically itemized herein.

The parties also agree that the arbitrator shall have the power and authority to interpret this Agreement and to decide whether a certain dispute or claim is subject to arbitration under this Agreement. This power and authority to determine arbitrability is hereby expressly delegated to the appointed arbitrator and not to any judge or court. The parties agree that this agreement to arbitrate also covers claims brought by You against Sonos' agents, officers or other employees for actions they may have taken in connection with your employment.

**b.    Claims Excluded from Agreement to Arbitrate/Choice of Venue for Such Claims**:

The agreement to arbitrate in Section 1(a) does not apply to claims for benefits under state unemployment insurance or workers compensation programs. In addition, this Agreement does not prohibit You from filing a claim or participating in an investigation, hearing or proceeding with a local, state or federal administrative agency, including the EEOC, the Department of Labor, the National Labor Relations Board, the Massachusetts Commission Against Discrimination, the California Department of Fair Employment and Housing, the New York City Commission on Human Rights,the New York State Division of Human Rights,the Washington State Human Rights Commission and/or any other federal or state administrative agency. (However, this Agreement does preclude You from pursuing any such claim in court).

In addition, this agreement to arbitrate expressly excludes and does not apply to claims for equitable relief or declaratory judgment by either You or Sonos arising out of: (i) the non- disclosure or assignment of inventions provisions set forth in Sections 2 and 3 of the At Will Employment, Confidential Information, and Invention Assignment Agreement (the "**Employee Agreement**"); (ii) state or federal trade secret laws; and/or (iii) state or federal intellectual property laws. You understand and agree that violations of the non-disclosure or assignment of inventions provisions of the Employee Agreement, state or federal trade secret laws and/or state or federal intellectual property laws could cause irreparable and unique injury and that money damages would not provide an adequate remedy for such injury. Accordingly, You and Sonos agree that the parties could not effectively pursue all available rights and remedies (including equitable relief) for such claims in an arbitration proceeding and that such claims must therefore be excluded from the agreement to arbitrate. All claims excluded from arbitration under this Section shall be commenced and maintained in any state or federal court located within the state in which You are employed by Sonos.

**2.    No Class Actions or Arbitrations.** You and Sonos agree that the arbitrator may only hear the parties' individual claims and will not have the authority: (i) to consolidate the claims of other employees; (ii) to fashion a proceeding as a class or collective action; and/or (iii) to award relief to a group or class of employees in one arbitration proceeding. **In other words, You must pursue all claims subject to arbitration as an individual and may not pursue such claims as part of a class.**You represent, agree,and acknowledge that You will be able to effectively pursue your rights and any and all claims against Sonos in an individual arbitration according to the terms of this Arbitration Agreement.

**3.    Procedure, Deadline for Filing Of Claims Subject to Agreement to Arbitrate, Rules of Arbitration,  Confidentiality.**You and Sonos agree that arbitration proceedings shall be conducted by the American Arbitration Association ("**AAA**") pursuant to the Federal Arbitration Act, and in accordance with the Employment Arbitration Rules and Mediation Procedures, (available on-line at www.adr.org), which are incorporated herein by reference.

The parties agree that any and all claims subject to arbitration under this Agreement must be initiated with the AAA within the statute of limitations period prescribed for such claims under applicable law. As set forth in Rule 4 of the Employment Arbitration Rules and Mediation Procedures, a party may initiate arbitration by filing a Demand for Arbitration in writing with the AAA. If You file such a Demand, please also send a copy of to Sonos' Legal Department, Attention: General Counsel. Alternatively, the parties may submit a joint request for arbitration in writing. No demand for arbitration may be

made after the date when the institution of legal or equitable proceedings based on such claim or dispute would be barred by the applicable statute of limitation.

The parties agree that a neutral arbitrator will be selected in accordance with the Employment Arbitration Rules and Mediation Procedures and further agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment or motions to dismiss prior to any arbitration hearing. The parties also agree that the arbitrator shall have the power to award any remedies, including attorney's fees and costs, available under applicable law. The parties agree that any decision of the arbitrator must be in writing. The arbitrator's decision shall be final and binding on both You and Sonos and shall be enforceable by any court having proper jurisdiction. The arbitrator shall maintain the confidentiality of the arbitration and shall have the authority to make appropriate rulings to safeguard that confidentiality unless the parties agree otherwise or the law provides to the contrary.

**4.**    **Governing Law/Location of Arbitration.** This Agreement shall be governed by and construed and interpreted in accordance with the Federal Arbitration Act, 9 U.S.C. §§ 1-16. You and Sonos agree that any and all arbitrations between the parties compelled and contemplated by this Agreement shall be held within the state in which You are employed by Sonos.

**5.**    **Cost of Arbitration.** The parties agree that Sonos shall pay for any administrative or hearing fees and/or costs charged by the arbitrator or the AAA.

**6.**    **Attorney's Fees.** You and Sonos each shall bear your own attorneys' fees incurred in connection with the arbitration, and the arbitrator will not have the authority to order attorneys' fees unless an agreement between You and Sonos or a statute or law at issue in the dispute authorizes the award of attorneys' fees to the prevailing party, in which case the arbitrator shall have the authority to make an award of attorneys' fees as permitted under the applicable law or agreement.

**7.**    **Jury Waiver.** YOU AND SONOSHEREBY IRREVOCABLY WAIVEANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING IN ANY WAY TO YOUR EMPLOYMENT.

**8.**    **Consideration to Support Agreement.** You and Sonos agree that there is sufficient and adequate consideration to support your mutual obligations under this Agreement. Specifically, You acknowledge that You are offered employment or continued employment in consideration of your promise to arbitrate certain claims related to your employment as set forth in this Agreement. In addition, the mutual promises of Sonos and You to resolve certain claims by arbitration in accordance with the provisions of this Arbitration Agreement, rather than through the courts, provide consideration for this Agreement.

**9.**    **Acknowledgment of Waiver of Rights.** You understand and acknowledge that by signing this agreement, you are waiving the following rights:(i) your right to pursue class or collective action against Sonos in any forum, whether through the courts or through arbitration; (ii) your right to a trial or hearing before a court of any and all present or future claims against Sonos subject to arbitration under this arbitration agreement; and (iii) any right to trial by jury for any and all present or future claims related to your employment.

**10.**    **Voluntary Agreement.** You represent that You have read the terms of the foregoing agreement, that You fully understand its terms, and are voluntarily executing the same. You acknowledge that You have been advised to consult with an attorney before signing this agreement and that You have had a sufficient opportunity to do so.

**11.**    **Complete Agreement.** This Arbitration Agreement contains the complete agreement between Sonos and You regarding the subject of arbitration and dispute resolution and supersedes any and all prior written, oral or other types of representations and agreements between Sonos and You, if any, related to the subject of dispute resolution of any kind, except for the Employee Agreement.

**12.**    **Severability.** If any provision of this Agreement, or part thereof, is held invalid, void or voidable as against public policy or otherwise, the invalidity shall not affect other provisions, or parts thereof, which may be given effect without the invalid provision or part. To this extent, the provisions, and parts thereof, of this Arbitration Agreement are declared to be severable. Moreover, if one or more of the provisions contained in this Arbitration Agreement shall for any reason be held to be unenforceable at law, such provision or provisions shall be construed by the appropriate judicial body by limiting, revising or reducing it or them, so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear. The parties hereby agree that the language of all parts of this Arbitration Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly for or against any of the parties.

**13.**    **Modification.** This Arbitration Agreement may be modified only in a writing, which expressly refers to this Agreement and You by full name and which is signed by You and an authorized representative of Sonos.

**14.**    **Successors and Assigns.** This Arbitration Agreement will be binding upon Your heirs, executors, administrators and other legal representatives. Sonos shall have the right to assign this Arbitration Agreement to its successors and assigns without consent by You, and all covenants and agreements hereunder shall ensure to the benefit of and are enforceable by said successors and assigns. You do not have the right to assign this Arbitration Agreement.

**You represent that you have read the foregoing Arbitration Agreement, fully understand its terms and conditions, and are voluntarily executing the same.In entering into this Arbitration Agreement, you did not rely on any representation, promise or inducement made by Sonos with the exception of the terms and conditions set forth in this document.**

Signature: /s/ Shamayne Braman

Date: August 21, 2021

Sonos, Inc.

/s/ Patrick Spence

Patrick Spence
Chief Executive Officer

**CALIFORNIA LABOR CODE SECTION 2870 INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT**

a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

  1.    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

  2.    Result from any work performed by the employee for the employer.

b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

Signature: /s/ Shamayne Braman

Date: August 21, 2021

Sonos, Inc.

/s/ Patrick Spence

Patrick Spence
Chief Executive Officer

Exhibit 23.1

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-226516, 333-229558, 333-236296, 333-256052, 333-262611, and 333-269648) of Sonos, Inc. of our report dated November 20, 2023 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.


/s/ PricewaterhouseCoopers LLP


Los Angeles, California
November 20, 2023

1

Exhibit 31.1

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Patrick Spence, certify that:

1. I have reviewed this annual report on Form 10-K of Sonos, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 20, 2023

/s/ Patrick Spence

Patrick Spence

Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**

**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Eddie Lazarus, certify that:

1. I have reviewed this annual report on Form 10-K of Sonos, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e))  and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 20, 2023

/s/ Eddie Lazarus

Eddie Lazarus
Chief Financial Officer and Chief Legal Officer
(Principal Financial Officer)

Exhibit 32.1

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Patrick Spence, Chief Executive Officer of Sonos, Inc. (the "Company"), hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge, this annual report on Form 10-K of the Company for the fiscal year ended September 30, 2023 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and that the information contained in such annual report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 20, 2023                          By:    /s/ Patrick Spence
                                                        Patrick Spence
                                                        Chief Executive Officer
                                                        (Principal Executive Officer)

Exhibit 32.2

**CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Eddie Lazarus, Chief Financial Officer and Chief Legal Officer of Sonos, Inc. (the "Company"), hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge, this annual report on Form 10-K of the Company for the fiscal year ended September 30, 2023 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and that the information contained in such annual report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 20, 2023                    By:    /s/ Eddie Lazarus

                                                  Eddie Lazarus

                                                  Chief Financial Officer and Chief Legal Officer
                                                  (Principal Financial Officer)

Exhibit 97

**SONOS, INC.**
**POLICY FOR RECOUPMENT OF INCENTIVE COMPENSATION**

### 1.  Introduction

In accordance with Section 10D of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the regulations thereunder, the Board of Directors (the "Board") of Sonos, Inc. (the "Company") has adopted a policy (the "Policy") providing for the Company's recoupment of certain incentive-based compensation received by Covered Executives (as defined below) in the event that the Company is required to prepare an accounting restatement due to its material noncompliance with any financial reporting requirement under the securities laws.  This Policy is designed to comply with, and shall be construed and interpreted to be consistent with, Section 10D of the Exchange Act, Rule 10D-1 promulgated under the Exchange Act and Listing Rule 5608 of the corporate governance rules of The Nasdaq Stock Market.

### 2.  Administration

Administration and enforcement of this Policy is delegated to the Compensation, People and Diversity & Inclusion Committee of the Board (as constituted from time to time, and including any successor committee, the "Committee"). The Committee shall make all determinations under this Policy in its sole discretion. Determinations of the Committee under this Policy need not be uniform with respect to any or all Covered Executives and will be final and binding.

### 3.  Effective Date

This Policy shall be effective as of October 2, 2023 (the "Effective Date") and shall apply only to Covered Compensation (as defined below) that is received by Covered Executives on or after the Effective Date.

### 4.  Covered Executives

This Policy covers each current or former officer of the Company subject to Section 16 of the Exchange Act (each, a "Covered Executive").

### 5.  Covered Compensation

This Policy applies to any cash-based and equity-based incentive compensation, bonuses, and awards that are received by a Covered Executive and that were based, wholly or in part, upon the attainment of any financial reporting measure ("Covered Compensation").  For the avoidance of doubt, none of the following shall be deemed to be Covered Compensation: base salary, a bonus that is paid solely at the discretion of the Committee or Board and not paid from a bonus pool determined by satisfying a financial reporting measure performance goal, and cash or equity-based awards that are earned solely upon satisfaction of one or more subjective or strategic standards.

This Policy shall apply to any Covered Compensation received by an employee who served as a Covered Executive at any time during the performance period for that Covered Compensation.

### 6. Financial Restatements; Recoupment

In the event that the Company is required to prepare an accounting restatement due to the material noncompliance of the Company with any financial reporting requirement under the securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements, or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period (such an accounting restatement, a "Restatement"), the Committee shall review the Covered Compensation received by a Covered Executive during the three-year period preceding the Required Financial Restatement Date as well as any transition period that results from a change in the Company's fiscal year within or immediately following those three completed fiscal years. Regardless of whether the Company filed the restated financial statements, the Committee shall, to the full extent permitted by governing law, seek recoupment of any Covered Compensation, whether in the form of cash or equity, received by a Covered Executive (computed without regard to any taxes paid), if and to the extent:

    a.    the amount of the Covered Compensation was calculated based upon the achievement of certain financial results that were subsequently the subject of a Restatement; and

    b.    the amount of the Covered Compensation that would have been received by the Covered Executive had the financial results been properly reported would have been lower than the amount actually awarded (any such amount, "Erroneously-Awarded Compensation").

To the extent Covered Compensation was based on the achievement of a financial reporting measure, but the amount of such Covered Compensation was not awarded or paid on a formulaic basis, the Committee shall determine the amount, if any, of such Covered Compensation that is deemed to be Erroneously-Awarded Compensation.

For purposes of this Policy, the "Required Financial Restatement Date" is the earlier to occur of:

    a.    the date the Board, a committee of the Board, or any officer or officers authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare a Restatement; or

    b.    the date a court, regulator, or other legally authorized body directs the Company to prepare a Restatement.

For the avoidance of doubt, a Covered Executive will be deemed to have received Covered Compensation in the Company's fiscal period during which the financial reporting measure specified in the award is attained, even if the Covered Executive remains subject to additional payment conditions with respect to such award.

**7.** <u>**Method of Recoupment**</u>

The Committee will determine, in its sole discretion, the method for recouping Erroneously-Awarded Compensation, which may include, without limitation:

    a.   requiring reimbursement of cash incentive compensation previously paid;

    b.   canceling or rescinding some or all outstanding vested or unvested equity (and/or equity-based) awards;

    c.   adjusting or withholding from unpaid compensation or other set-off to the extent permitted by applicable law; and/or

    d.   reducing or eliminating future salary increases, cash-based or equity-based incentive compensation, bonuses, awards or severance.

**8.** <u>**Impracticability Exceptions**</u>

The Committee shall not seek recoupment of any Erroneously-Awarded Compensation to the extent it determines that:

    a.   the direct expense paid to a third party to assist in enforcing this Policy would exceed the amount of Erroneously-Awarded Compensation to be recovered;

    b.   recovery would violate home country law where that law was adopted prior to November 28, 2022; and/or

    c.   recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to Company employees, to fail to meet the requirements of Sections 401(a)(13) and 411(a) of the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

**9.** <u>**No Indemnification**</u>

For the avoidance of doubt, the Company shall not indemnify any Covered Executive against the loss of any Erroneously-Awarded Compensation or any Covered Compensation that is recouped pursuant to the terms of this Policy, or any claims relating to the Company's enforcement of its rights under this Policy.

**10.** <u>**Severability**</u>

If any provision of this Policy or the application of any such provision to any Covered Executive shall be adjudicated to be invalid, illegal or unenforceable in any respect, such

invalidity, illegality or unenforceability shall not affect any other provisions of this Policy, and the invalid, illegal or unenforceable provisions shall be deemed amended to the minimum extent necessary to render any such provision or application enforceable.

## 11.  <u>Amendments</u>

The Committee may amend, modify or terminate this Policy in whole or in part at any time and may adopt such rules and procedures that it deems necessary or appropriate to implement this Policy or to comply with applicable laws and regulations.

## 12.  <u>No Impairment of Other Remedies</u>

The remedies under this Policy are in addition to, and not in lieu of, any legal and equitable claims the Company may have, the Company's ability to enforce, without duplication, the recoupment provisions set forth in any separate Company policy or in any Company plan, program or agreement (each, a "Separate Recoupment Policy" and collectively, the "Separate Recoupment Policies"), or any actions that may be imposed by law enforcement agencies, regulators or other authorities.  Notwithstanding the foregoing, in the event that there is a conflict between the application of this Policy to a Covered Executive in the event of a Restatement and any additional recoupment provisions set forth in a Separate Recoupment Policy to which a Covered Executive is subject, the provisions of this Policy shall control.  The Company may also adopt additional Separate Recoupment Policies in the future or amend existing requirements as required by law or regulation.

Exhibit 15



NEXT GENERATION SIERRA
STEP UP LIKE A PRO
GMC    EXPLORE SIERRA

DIGITAL **TRENDS**   Product Reviews +   News +   Videos +   Features +   Best Products +   How To   More +



SHARE

Simon Cohen
🐦 @ActuallySimon

POSTED ON
03.1.18 - 9:20AM PST

HOME THEATER

# Sonos vs. Bluesound: A Hi-fi, Wi-Fi Speaker System Shootout

Sonos is the king of multiroom audio, but this Canadian upstart plans a coup



📷 Left: Sonos Play:1, Right: Bluesound Pulse Flex (Image credit: Simon Cohen/Digital Trends)

For years, Sonos has managed to hold on to the top spot in the wireless home audio space — a category it single-handedly created 16 years ago. During that time, there has been no shortage of competitors. From audio behemoths like Denon, Bose, and Yamaha the surprising contributions from Amazon, Google, and Apple, many have imitated, but few have duplicated Sonos' achievements. That may be about to change, though, and you can blame Canada.

ADVERTISEMENT


Here to help
OMG crashes
go right.
StateFarm

RELATED ON DT


**Mobile**
American Airlines expands its fast in-flight Wi-Fi, but it still costs


**Deals**
Amazon slashes the price on this TP-Link Whole Home Mesh Wi-Fi System


ELECTRIC DRIVING.
IT'S JUST DRIVING.
PLUGINTOTHEPRESENT.COM


NEXT GENERATION SIERRA
WITH AVAILABLE PROGRADE TRAILERING SYSTEM
GMC    EXPLORE SIERRA

## There has been no shortage of Sonos competitors.

While few outside the audiophile world were paying attention, a small electronics distribution company based out of Ontario called Lenbrook International, has been acquiring some of the most respected


ELECTRIC DRIVING.
IT'S JUST DRIVING.
PLUGINTOTHEPRESENT.COM

brands in the business, namely NAD, and PSB
Speakers. Using components from both of these groups, Lenbrook created
Bluesound, a whole-home audio product aimed squarely at audio fans who like the
Sonos model, but want audiophile-grade performance.



To see if Bluesound has managed to upstage Sonos, we spent a week with the two
systems, side-by-side, subjecting them to a full spate of usage scenarios: Listening to
a private music collection, streaming from subscriptions services like Tidal and Google
Music, running a multi-speaker home theater set-up, and multiroom operations. All
the while, we took careful notes on how each system sounded, and how easy it was to
use. Here's what we found.

## Imitation or iteration?

Like Denon's HEOS system, Bluesound has gone out of its way to mimic Sonos's
product line up. It's been clever about it, however, and so far has avoided the legal
entanglements that Denon's, um, flattery of Sonos has earned. Though pricing and
features make it hard to match up products perfectly, this chart shows how
Bluesound and Sonos compare in terms of models:

| Sonos ($USD) | Bluesound ($USD) |
|---|---|
| Play:1 ($150) | Pulse Flex ($300) |
| Play:3 ($250) | Pulse Mini ($500) |
| Play:5 ($500) | Pulse 2 ($700) |
| PlayBar ($700) | Pulse Soundbar ($800) |
| SUB ($700) | Pulse Sub ($600) |
| Connect ($350) | Node 2 ($500) |
| Connect:AMP ($500) | PowerNode 2 ($800) |

This isn't a complete list — both companies make other products — but these are the
models that come closest to a direct comparison. The first thing that jumps out at you
is the price difference. Bluesound components are — with the sole exception of the
Pulse Sub — $100 to $200 more than a roughly equivalent Sonos product. To justify
this, Bluesound has loaded its products with extra features not found on any Sonos
unit. On the back of every Bluesound speaker, you'll find an Ethernet port, USB port,
headphone jack, and a combo optical/analog input jack. There's also support for aptX
Bluetooth alongside Wi-Fi, and the ability to play high-resolution audio files like
lossless FLAC, MQA, WAV, and AIFF. This feature set is nearly identical to that of
Denon's HEOS line.



📷 Left: Bluesound Pulse Soundbar ; Right: Sonos Playbar (Simon Cohen/Digital Trends+

But Bluesound's product team will tell you there's even more reason to feel good

But Bluesound's product team will tell you they have every reason to feel good about the extra cash: The amplification is provided by NAD, and the speakers' drivers are made by PSB, which is their way of saying you're buying a product with the kind of decades-old audiophile street cred an upstart like Sonos can't match. One Bluesound rep even went so far as to say, "Sonos is fine for background music." Ouch.

For our test, we matched up a pair of Play:1s, a Play:5, a Play:3, and a PlayBar, against a pair of Pulse Flexs, a Pulse 2, a Pulse Mini, and a Pulse Soundbar.

ADVERTISEMENT



### Getting a handle on design

Looking at Sonos's product line leaves the impression that the company is still refining its design language. Some products have metal speaker grilles with fine perforations, and others — like the PlayBar — use a fabric covering. Some use physical buttons, while the newer products, like the Sonos One smart speaker and the Play:5 have touch and gesture sensitive controls. Most use matte-finished black or white plastic for the main body, except the SUB, which favors high-gloss finishes. Bluesound is more consistent with the look and feel of its products, though it also has some variation, especially with the controls: Depending on the product, you may get physical buttons (Pulse Flex), touch controls (Pulse Mini and Pulse 2) or, in the case of the Pulse Soundbar, no controls at all.

**Bluesound speakers can be programmed to work with any IR remote.**

Speaking of control, we were surprised to discover that all of the Bluesound products, except the Pulse Flex, can be controlled with an infrared remote. The company doesn't include a remote in the box, because the speakers can be programmed to work with any IR remote, thanks to learning functionality. Play, pause, volume up & down, previous/next track, and presets can all be triggered. We suspect most people will only use this feature with the Pulse Soundbar, but it's great to have the option. Sonos offers this on its PlayBar and PlayBase exclusively, and only for volume control.

Both companies have integrated power supplies into their speakers, something which very few manufacturers do these days, and we love it. It can be hard enough to hide a power cord, but add a bulky AC adapter, or wall-wart, and things can get downright ugly. Sonos has done a better job of hiding the power inputs on its speakers, but we appreciate that Bluesound has designed its power cords with 90-degree angles on some models, to help minimize how much they protrude. It's also worth noting that the Pulse Flex can be equipped with an optional battery pack for outdoor use.



📷 Simon Cohen/Digital Trends

We also think Bluesound deserves credit for including integrated handles on the Pulse
2, Pulse Mini, and the Pulse Soundbar. Handles may seem unimportant in the big
scheme, but given that Bluesound speakers have an array of direct-connection
options, like Bluetooth and line-in, it just makes sense that you should be able to tote
them around as easily as possible. Sonos speakers only work when connected to a
home Wi-Fi network, so we understand why they felt handles to be superfluous.

ADVERTISEMENT



### Set-up's a cinch

Each system is controlled via a companion app for iOS/Android for mobile device, and
both offer apps for Windows/Mac. Sonos calls its app simply "Sonos" while Bluesound
calls its app "BluOS." Using the mobile app to set them up is equally easy, but with
slightly different approaches. With Sonos, you need to physically press two buttons on
a speaker to sync it to the system, whereas Bluesound asks you to flip to your phone's
Wi-Fi device list, and find the new speaker before finishing the setup back in the
BluOS app. We prefer Sonos's modestly simpler technique because switching out and
in from an app always feels clunky, but both ways were equally quick.

### Got smarts?

Smart home control, especially when done using your voice via Amazon's Alexa,
Google's Assistant, or Apple's Siri, is a massive trend right now. Sonos was one of the
first audio companies to launch compatibility with Alexa, both through its new Sonos
One smart speaker, or via any of Amazon's Echo products. It intends to offer Google
Assistant later this year. Bluesound tells us it plans to integrate voice control but is
still looking at which technology will provide the best user experience. For now,
advantage Sonos.

### Group love

One of the best parts of investing in a whole-home audio system is being able to
control the music for every room in the house from the palm of your hand. From the
get-go, Sonos has set the benchmark for making this an easy, intuitive experience,
and we've seen a lot of competitors fail to live up to that high bar. Bluesound
manages to exceed it.

**Sonos set the benchmark
for managing speaker
groups. Bluesound
manages to exceed it.**

In both mobile and desktop versions of its app,
grouping and ungrouping speakers is effortless,
thanks to little plus-sign buttons next to each speaker
in the speaker list. Tap the speaker you want to group,
then tap the plus buttons next to each speaker you
want to join it. That's it. Removing speakers is a two-
tap process, but killing the group itself only takes one
tap. Engaging all of your speakers to play the same music is just as easy. Not that it's
hard to do this with Sonos products, but with Sonos, you do it through an
intermediary dialog window. Bluesound has also added a unique feature to multi-
speaker control: If at any time you want to switch the music you're listening to from
one speaker to another, there's an arrow button you can tap, which brings up the list

of speakers so you can pick where the music should go. You can do this on Sonos too, but only via the grouping function, which is a little less convenient.

ADVERTISEMENT

### Why-Fi

One thing we noticed with Bluesound gear is that it's a lot fussier than Sonos when it comes to Wi-Fi. In order to maximize performance, and ensure that there are no problems with dropouts, the speakers need a really strong connection to your Wi-Fi (assuming you're using wireless networking). Unlike Sonos products, which can run their own mesh network when one of them is connected to Ethernet, Bluesound components must each maintain their own connection to your router. We encountered a few glitches along the way, including a strange problem with some of the speakers associating themselves to a mesh Wi-Fi node that had a weaker signal than the one closest to them. Power cycling them fixed this, but we found Sonos to be a more stable system overall.



📷 Simon Cohen/Digital Trends

### More music

When it comes to streaming music services, no one beats Sonos for choice. With built-in support for over 60 subscription services including all of the majors, like Apple Music, Spotify, and Pandora, Sonos remains the streaming music king. Bluesound currently has support for 16 services — a far cry from Sonos — but includes Spotify, Amazon Music, Deezer, and Tidal. Company reps tell us they're actively working on adding the missing biggies like Apple Music, and Google Play, but customers who buy Bluesound for its support of high resolution music may not mind the wait: It already supports Tidal, and Qobuz, which are the two main providers of lossless streaming music at the moment.

**When it comes to streaming music services, no one beats Sonos for choice.**

You can, of course, stream any music service you have on your phone or tablet to a Bluesound speaker via Bluetooth, but this isn't a true replacement for native support. For one thing, audio quality takes a hit compared to Wi-Fi, especially if your phone isn't aptX compatible (all iPhones), and you'll need to shuttle back and forth between the BluOS app and your music

services app.

ADVERTISEMENT

## Many inputs, one speaker

Despite Bluesound's plethora of inputs, none of these are able to act as sources for other Bluesound speakers. Connecting to a Pulse 2 via Bluetooth, for instance, means you can only listen on the Pulse 2 — speakers grouped with the Pulse 2 will sit idle as long as you've chosen Bluetooth as the source. Same goes for USB, and line-in. Bluesound's team is aware that this puts them behind folks like Denon, and Yamaha, which can both distribute inputs from one speaker to many, and says they're going to make this happen in a future update. If and when they do, it will be a convenient way to invite guests to play music from their devices, something which Sonos is still unable to provide.

## The search begins

Got lots of music on your computer, some more on your phone, and millions of more tracks available via streaming services? That's a lot to wade through especially when you're looking for a very specific song or album. The solution is a comprehensive search feature, and ever since Sonos introduced its universal search, it's been the one to beat. With one field to search across genres, types, and mediums, no one does search as well as Sonos, but Bluesound comes closer than most. While there's no universal search, there is a very good — and fast — search function for each music source, be it your music library, or a streaming service. Unfortunately you can't filter a search. Instead, search results are organized by type, so a search for "Dire Straits," will return a list that begins with artists, moves to albums, then finishes with songs (if any). Depending on the search term, that could be a lot of scrolling.

## Sounds personal

So which one sounds better? This is always the hardest part of any review. It's harder still when you introduce elements like high-resolution audio, or get into the weeds on attributes like EQ: Which is better, a flat, unadulterated EQ that stays true to the source, or one that has been massaged by digital signal processing (DSP)?



For our comparison, we set up each speaker according to the step-by-step guidance
the apps gave us. If the app encouraged us to do special tuning, as Sonos' Trueplay
system does, we did it. If not, we left things alone, working with the system's default
settings. Both Sonos and Bluesound give users the ability to modify bass and treble,
but neither gives you a full-featured equalizer.

For the majority of our test, we ran identical Tidal tracks through each system. When
the highest available quality for a given track was 16-bit FLAC (CD quality) we'd play
that version on both. When a high-res, or MQA version was available, we'd play that
through the Bluesound system too, to see if we could detect the improvements of
high resolution. We also listened to radio stations via TuneIn, local MP3, AAC, and
FLAC files ripped from CD, or downloaded from iTunes, and used a variety of source
devices, e.g. an iPhone 6, a Pixel XL, and a NAS drive.

**Bluesound's approach
creates sound that, while
powerful, clean, and
precise, lacks warmth,
fullness, and range.**

Finally, because both systems are designed to work as
home theatre speakers when the sound bars are
paired with two rear channel speakers, we used them
with 2-channel, 5.1 Dolby, and Dolby Atmos sources
via an optical cable from an LG OLED TV.

The verdict: Even though the Bluesound speakers
delivered better definition (especially with high-res
tracks), achieved significantly higher volume levels than their Sonos equivalents, and
could reproduce high frequency sounds like Adele's soaring vocals with ear-piercing
precision, we think most people will still prefer Sonos.

How can that be? We think the answer lies in the different approach each company
takes to sound reproduction. With its roots in audiophile-grade equipment, and under
the heavy influence of PSB's Paul Barton — who may hold the unofficial record for
most hours spent in an anechoic chamber – Bluesound believes in a flat frequency
response curve. In other words, its DSP (digital signal processing) shouldn't play any
role in modifying the EQ of the source material. Sonos takes a decidedly different
approach, using its DSP to tweak the frequencies, and going a step further with its
Trueplay tuning to ensure that this tweaking is a reflection of the listening
environment.

Bluesound's approach creates sound that, while powerful, clean, and precise, lacks
warmth, fullness, and range. Sonos, by contrast, doesn't deliver the same precision,
and can't get as loud, but its EQ acrobatics let you experience more of the low and
midrange — that "warmth" we're referring to — while simultaneously shaping the way
the music fills the room. We auditioned the systems for friends and family, without
telling them any of this, and simply asked which system sounded better. Without
exception, they preferred Sonos. That's not at all scientific, and it's quite possible that
if we had brought in a dedicated group of audiophiles to listen, they would have said
the opposite. The takeaway here is that, while a flat frequency response may indeed
be the most authentic way to reproduce a song, many ears may prefer something
else.



6/17/2019 Sonos vs. Bluesound: Which wireless hi-fi sound system...

Case 1:24-cv-00131-JNR    Document 120-2    Filed 12/17/24    Page 443 of 467 PageID #: 7573

📷 Bluesound

Before testing the two systems, we thought Bluesound's touted high-resolution playback would be the obvious point in its favor, but that didn't materialize as much as we expected. Yes, we certainly heard a difference, but it was subtle. Not only was there virtually no improvement on the small Pulse Flex, we had to really crank up the volume on the Pulse 2 and Pulse Soundbar to hear the extra detail. It was there, no doubt about it, but, to put a number on it, we'd say it only improved things by about 10 percent.

On the home theater front, the difference between the two systems becomes acute. Bluesound can decode Dolby 5.1, but it can't use it to create a surround sound experience through just the Pulse Soundbar. The PlayBar, on the other hand, is dazzling, with an uncanny ability to trick your ears into thinking there's not only a set of surrounds, but a subwoofer too. If Bluesound has an edge here, it's with dialogue. The high-end precision of its tweeters, combined with its lack of sound shaping, means all voices are that much easier to hear.

ADVERTISEMENT

BETTER STARTS HERE.    SEE WHY    hulu

## Who won?

Sonos continues to be the best choice for most people thanks to its combination of price, performance, ease of use, and compatibility with nearly every music source on the planet. Tack on its leadership position in the smart home space, and you get a nearly perfect whole-home audio experience.

But there's always room for competition, and Bluesound has proven itself a strong contender. With an unparalleled number of inputs, IR remote compatibility, high-resolution playback, and superb accuracy, Bluesound speakers deftly fill in gaps in the Sonos story. As much as we agree that Bluesound can justify some of its price premium based on these features, ultimately they need to sound better to seal the deal. We think most people will prefer how Sonos sounds, and so for now, the company that started the wireless hi-fi category remains the king.

*Updated March 1, 2018: New pricing info on the Bluesound Pulse Soundbar.*

### Editors' Recommendations

- Sonos Beam vs. Sonos Playbar: Which home theater soundbar should you buy?
- Ikea's budget-minded Symfonisk Wi-Fi speakers hide Sonos audio in plain sight
- The best Wi-Fi extenders for 2019
- The best Wi-Fi 6 routers
- Amazon will reportedly launch a hi-fi version of Amazon Music Unlimited



DON'T MISS

‹ The best movies on Amazon Prime Video right now (June 2019)

UP NEXT

Cringe along as we turn ourselves into Samsung AR Emojis ›



**MOVIES & TV**

## 10 great sci-fi books to read before they become TV shows

You can get ahead of the next crop of science-fiction television series by picking up the books that inspired them. We've compiled a list of books you can add to your reading list now to get a glimpse of the future.

Posted 6 days ago — By Rick Marshall



DEAL



**American Airlines expands its fast in-flight Wi-Fi, but it still costs**

American Airlines has completed the installation of satellite-based in-flight Wi-Fi for the whole of its mainline narrowbody fleet comprising more than 700 planes, mainly on its domestic routes. But the service still costs.

8 hours ago — By Trevor Mogg



**Amazon slashes the price on this TP-Link Whole Home Mesh Wi-Fi System**

We've found a great deal on the latest-generation TP-Link Deco Whole Home Mesh Wi-Fi System on Amazon right now that lets you do just that. Everyone can save up to $20 thanks to a coupon, but Amazon Prime Card holders can save even more.

3 days ago — By Ed Oswald



**Can the 3900X beat the 9900K to become the best gaming CPU in the world?**

One of the most important head to head hardware battles in 2019 is the Core i9-9900K vs. Ryzen 9 3900X. Whichever wins will be the best gaming processor the world has ever seen. Here's why we think the winner deserves the crown.

4 days ago — By Jon Martindale



700 planes, mainly on its domestic routes. But the service still costs.

8 hours ago — By Trevor Mogg

DEAL



Everyone can save up to $20 thanks to a coupon, but Amazon Prime Card holders can save even more.

3 days ago — By Ed Oswald



processor the world has ever seen. Here's why we think the winner deserves the crown.

4 days ago — By Jon Martindale



**Will Smith's best movies ranked, from**

DEAL



**The best 4K smart TV deals for June**



**The best shows on Netflix right now**

Will Smith's Best Movies ranked, from
Bad Boys to Ali to Hitch

A ranking of Hollywood actor Will Smith's best
movies to date. From his early roles during the
Fresh Prince days to his Oscar-baiting dramas,
Smith has played all kinds of characters in a wide
array of beloved films.

2 days ago — By Christine Persaud

The best 4K smart TVs of June
2019: Samsung, LG, and Vizio

A good 4K smart TV is the only way to enjoy all your
favorite shows, movies, and games in glorious Ultra
HD. If you're looking to take your home
entertainment to the next level, then we've got the
best 4K TV deals right here.

2 days ago — By Lucas Coll

The best shows on Netflix right now
(June 2019)

Looking for a new show to binge? Lucky for you,
we've curated a list of the best shows on Netflix,
whether you're a fan of outlandish anime, dramatic
period pieces, or shows that leave you questioning
what lies beyond.

2 days ago — By Will Nicol



ADVERTISEMENT

HOME THEATER

## What is Dolby Atmos Music, and how can you experience it?

Dolby Atmos is a surround sound format that creates
immersive, 3D soundtracks to make movies come alive. But
the same technology is also being adopted for music
creation, and it's a game-changer. Here's everything you
need to know.

Posted 2 days ago — By Simon Cohen





**Who needs sunshine? Stay inside and watch the best movies on Netflix instead**

Save yourself from hours wasted scrolling through
Netflix's massive library by checking out our picks
for the streamer's best movies available right now,
whether you're into explosive action, witty humor,
or anything else.

2 days ago — By Will Nicol

DEAL



**Amazon drops prices on Bose and Plantronics wireless noise-canceling headphones**

Earlier this week, Dell dropped the price of Bose's
QuietComfort 35 II noise-canceling wireless
headphones. Amazon has now matched Dell's
price, dropping the price of its stock down to $299.

2 days ago — By Ed Oswald



**Get your pulse racing with some of the best action movies currently on Netflix**

In need of a movie that will really get your
adrenaline pumping? Netflix offers a ton of films
that fit the bill, along with a few you might want to
avoid. Here, we rounded up the best action movies
currently streaming on Netflix.

2 days ago — By Will Nicol



**Snuggle up with the best romance films currently streaming on Netflix**

Looking for a story about love and lust? We've
rounded up the most romantic films currently on
Netflix, whether you're looking for a story about



**The best movies streaming on Hulu right now (June 2019)**

From dramas to blockbusters, Hulu offers some
great films to its subscribers. Check out the best
movies on Hulu, whether you're into charming



**Awesome Tech You Can't Buy Yet: Plant-based shoes and a ukulele learning aid**

Check out our roundup of the best new
crowdfunding projects and product
announcements that hit the web this week. You

young love or a man who falls in love with artificial intelligence.

adventure tales or ghost stories.

may not be able to buy this stuff yet, but it sure is fun to gawk!

2 days ago — By Will Nicol, Brie Barbee, Kailia Coomes     1 day ago — by Will Nicol     1 day ago — By Will Nicol

Show More

# Exhibit 16

# WHAT HI★FI?

THE WORLD'S #1 TECH BUYER'S GUIDE

🇺🇸 ▾

## Only Minutes from Portland. Welcome to Tualatin Valley.

| TRENDING | Prime Day 2019 | B&W Formation Duo | Technics SL-1000R | Samsung Q90 | Best speakers | Sonos Beam |
|----------|----------------|-------------------|-------------------|-------------|---------------|------------|

Review

## Sonos multi-room system review

There's a reason Sonos is so dominant in this sector

★★★★★ By What Hi-Fi? Posted a month ago

   



### OUR VERDICT



It's facing more competition than ever, but no multi-room offering is as complete or as pleasurable to live with as Sonos

### ➕ FOR

Still the best user experience

Good service support

Consistent, engaging sound

Regular updates

### ➖ AGAINST

Individual speakers can be trumped for sound

No hi-res support

For years, Sonos has been synonymous with the concept of multi-room audio, so it's hard to know which came first. At the very least, Sonos spotted a trend long before its competitors – at most, it's responsible for making the market what it is today.

Sonos as a system has two big advantages – breadth of choice and simplicity of use. In the time its rivals have been playing catch-up, Sonos has launched a whole family of products and got onside with a long list of streaming services, not to mention nailing the usability aspect of multi-room.

**MORE:** Multi-room audio: everything you need to know

### Sonos multi-room system

| | | | | | |
|---|---|---|---|---|---|
| | Sonos One | amazon | $141.14 | VIEW | |
| | | | | See all prices | |
| | Sonos Play:1 | Walmart Marketplace | $127.97 | VIEW | |
| | | | | See all prices | |
| | Sonos Play:3 | SONOS | $249 | VIEW | |
| | | | | See all prices | |
| | Sonos Play:5 | amazon | $409.99 | VIEW | |
| | | | | See all prices | |
| | Sonos Beam | Walmart Marketplace | $348.97 | VIEW | |
| | | | | See all prices | |
| | Sonos Playbase | amazon | $699 | VIEW | |
| | | | | See all prices | |



| | Sonos Sub | blinq | $539.69 | VIEW |
| | | | | See all prices |
| | Sonos Connect | BEST BUY | $307.99 | VIEW |
| | | | | See all prices |
| | Sonos Connect: Amp | amazon | $529.99 | VIEW |
| | | | | See all prices |
| | Sonos Amp | WORLD WIDE STEREO | $599 | VIEW |
| | | | | See all prices |

We check over 130 million products every day for the best prices

**VIEW ALL DEALS**

## Speakers



Sonos One

The current star of Sonos's range of wireless speakers is undoubtedly the One (above). Matching the five-star performance of the Play:1 pretty much step for step, it builds on the latter's feature list with built-in Alexa Voice Assistant (and, soon, Google Assistant) to become the company's inaugural smart speaker offering.

ADVERTISING

Case 1:24-cv-00131-JNR    Document 120-2    Filed 12/17/24    Page 451 of 467 PageID #: 7581

**RECOMMENDED VIDEOS FOR YOU...**    **WHAT HI·FI?**

Things have changed on the top plate, where the three buttons of the Play:1 have been replaced by a touch-sensitive panel decorated with a circle of tiny, white LEDs and symbols.

These represent play/pause, the microphone and Sonos' now-familiar context-sensitive actions, while the white LEDs illustrate when Alexa is switched on. Unlike the Play:1, the One also gets a dedicated Pairing button, just above the ethernet socket.

If you want to voice-control music in other rooms, specify where (eg. "Alexa, play Bowie in the lounge") and the One will send music to the Sonos kit you've ascribed to that 'zone' – even a non-Alexa-enabled Sonos speaker, such as a PlayBar or Play:5 (below). "Alexa, play Bowie everywhere" sets all your Sonos speakers to synchronised Ziggy Stardust mode.

A combination of noise-cancelling, something called "smart voice capture" and a custom-designed six-microphone array also ensures that she can always hear you.

**MORE:** Sonos deals: The cheapest price on every Sonos speaker



Sonos Play:5

Of course, you can also use Alexa on the One exactly as you do an Amazon Echo or Echo Dot, so as well as playing music you can set timers and alarms, check the weather, add items to your shopping list – small features, but useful nonetheless.

The One produces a weighty, full-bodied and spacious sound that's capable of going loud for a speaker this small. Voices are clearly projected, bass is solid, and treble is crisp and clean. It's a surprisingly sophisticated sound, and one that's natural and authentic.

Should you want the same sonic performance without the voice control, you can currently pick up the Play:1 for £60 less than the One.

That general sonic character also carries over to the far larger Play:5, but it's able to produce a far bigger and bolder sound, thanks to its larger chassis and extra drivers: three 10cm mid-woofers sit below a trio of tweeters, one front-firing and two horned outwards for greater dispersion, and are powered by six matching Class D amplifiers.

This is a weighty performance that can easily fill a room without sacrificing the clarity or openness of the mid-range. It's effortlessly listenable, with no hard or sharp edges to cause distraction.

MORE: Sonos: everything you need to know

Case 1:24-cv-00131-JNR    Document 120-2    Filed 12/17/24    Page 453 of 467 PageID #: 7583



The 'Sonos Architectural by Sonance' Outdoor Speaker

It loses some of its sheen when compared to the superb sound and extraordinary value of the Audio Pro C10, as do most speakers entering the Scandinavian brand's territory, but still represents a fine-sounding option for those joining the Sonos family.

Sonos encourages you to calibrate each speaker using the app's built-in TruePlay feature, which measures pulses fired out from the drivers. It generally results in better performance, so it's a shame that, due to inconsistencies in Android devices' microphones, only iOS devices can get in on the action.

There's also a Loudness switch for each speaker, which is worth experimenting with. Turning it off can result in greater clarity and tighter bass, particularly if the speaker is placed in a corner, but it also reduces weight and scale.

Sonos has also partnered with Sonance to create the Sonos Architectural by Sonance range of speakers, which includes an in-wall speaker, in-ceiling speaker and an outdoor speaker (above). These are not Sonos speakers in the usual sense, but passive speakers designed to complement Sonos products in terms of finish and sonic character.

The selling point is that if you connect the Sonos Amp to a pair of Sonance speakers, you can use the Trueplay feature to tune the sound to your room. With other speakers this isn't possible.

**MORE:** IKEA's Symfonisk Sonos speakers to go on sale in August





| | | $249.99 | |
| REDUCED PRICE | Walmart | $149 | VIEW |
| REDUCED PRICE | amazon | $149 | VIEW |

SHOW MORE DEALS ▼

We check over 130 million products every day for the best prices

## Hi-fi components



Sonos Amp

We've long enjoyed the Connect as Sonos's means of connecting existing hi-fi systems to its multi-room network, while until recently the Connect:Amp has been the company's go-to powered version of the streamer.

But the recent arrival of the Sonos Amp (above) has given customers a new,

tantalising option. Even by Sonos's standards, it's an understated device. It's only available in black and with three touch-sensitive 'buttons' on the front: one for play/pause and two that change use with context but are mainly for the volume.

The insides of the new Amp are densely packed, with no dead space. That, of course, creates a cooling problem, but the Amp is designed to bring in air from underneath and expel it from the top, all without the use of a fan.

**MORE:** 32 Sonos tips, tricks and features



Sonos Amp

In terms of character, the Amp paints very much with the same bold strokes as the rest of its family, revelling in forward-sounding presentations and dealing them with gusto and a more-than-respectable level of detail.

That's not to say the Amp is overly energetic – it doesn't attempt to force the issue with subtler tracks as some enthusiastically forward-sounding components can tend to do – but it doesn't need asking twice to really throw the music at you.

What restricts it from being a class leader, regardless of the competition from Bluesound's Award-winning Powernode 2i, is a relatively pedestrian sense of timing and dynamics.

Organisation is wavering only when an arrangement tests the Amp at its limits, and rhythmically it is far from inept, but there isn't quite the musicality to offer tracks their due expression or drive beats with obvious impetus on leading notes.

As part of a Sonos network, it is an admirable performer, not least for its versatility; it just falls short in terms of hi-fi separates, which its rival from Bluesound does not.

**MORE:** Best music streaming services 2019

Today's best sonos amp deals    ⓘ



| | | $589.99 | VIEW |
| | WORLD WIDE STEREO | $599 | VIEW |
| | Walmart Marketplace | $599 | VIEW |
| | ADORAMA | $599 | VIEW |

SHOW MORE DEALS ▼

We check over 130 million products every day for the best prices

## Home cinema



Sonos Beam

Sonos's suite of home cinema components all share the character of the rest of the family. Further testament to their talents, is their consistently high ratings in our stand-alone tests: the Playbase and Sub were both awarded four stars, with the Playbar achieving five.

The star, however, is the Award-winning Beam (above). Inside are four full-range drivers, one tweeter and three passive radiators, plus five class-D amplifiers. As on the Playbar and Playbase, the drivers and radiators are positioned along the front and the far edges of the bar, helping to drive sound around your room for a more immersive, room-filling sound.

Voice control is taken care of by five far-field microphones, which ensure the Beam can hear you wherever you are in the room, even when the speaker is

blaring music out.

**MORE:** <span style="color:red">9 Sonos Beam tips, tricks and features</span>



This isn't simply a soundbar: it's also a wireless, multi-room speaker that can play music from almost any source, pretty much like any other Sonos speaker.

And it sounds exceptionally good, particularly for its size. Sonos has managed to overcome two of the usual limitations of compact speakers: scale and weight. Dialogue is also clear and direct, and never drowned out by the rest of the action.

In fact, you might be blown away by the transformation from your TV's in-built speakers. Suddenly you're getting scale, dynamics, detail and punch and as close to the intended performance as you could expect from a £400 speaker.

It isn't perfect – there's a little treble brightness and sibilance is present, particularly at higher volumes or with poorly recorded audio – but it's far less a problem than we encountered with the Playbase, for example.

And while the Beam is almost unbelievably spacious for its size, it doesn't quite fool you into thinking you're listening to a proper surround sound system. Effects stretch right across the front of the room, well beyond the dimensions of the screen.

They don't, however, stretch up the sides. It's a deep, spacious, atmospheric delivery, with echoes and reverb and three-dimensionality, but it's not surround sound.

The Beam is, though, about as musical as a dispersive soundbar can be. You sacrifice some directness due to the angling of the drivers but for a device designed first and foremost as an AV product, the Beam makes for a solid music system, with good tonal balance, bass weight, rhythm and punch.

**MORE:** <span style="color:red">Best home cinema and AV deals</span>

**Today's best Sonos Beam, Sonos Playbar, Sonos Playbase and Sonos Sub deals** 

★★★★☆ <span style="color:red">340 Amazon customer reviews</span>



| | | $348.97 | VIEW |
|---|---|---|---|
| | | $399 | VIEW |
| | | $399 | VIEW |
| | | $399.99 | VIEW |

SHOW MORE DEALS ▼

We check over 130 million products every day for the best prices

## Multi-room performance



The Sonos app

The Sonos app is a large part of the system's charm. As well as walking you through set-up, it's where control of your system takes place, enabling you to see what music is playing where and to group speakers together.

It also offers the widest choice of streaming service compatibility of any multi-room system, giving you access to all of your music in one place. Even Spotify is properly integrated into the app, where most rivals force you to use Spotify Connect. On Sonos though, that's merely an option.

Having everything in one place is one of Sonos's greatest strengths, largely because it enables genuine universal search. Search for an artist, album or track and Sonos will browse through all music services and local sources connected over a home network, such as iTunes libraries and NAS drives.

It's a nice touch, especially when most competitors only search one source at a time. You're also able to build playlists and on-the-fly queues directly within Sonos, and again from multiple sources.

Case 1:24-cv-00131-JNR    Document 120-2    Filed 12/17/24    Page 459 of 467 PageID #: 7589

One big gap in Sonos's offering is its lack of support for hi-res audio, and with the likes of Bluesound offering it, it's a shame Sonos hasn't followed suit. If you try to play anything hi-res you'll get an error message, so it won't even downsample it. It's truly out of bounds.

**MORE:** 3 of the best 21st century turntable systems



The Sonos app

There's a question mark over how important hi-res audio is in the context of a multi-room system consisting of compact wireless speakers, but the option would be nice.

Otherwise, Sonos supports all the main file formats, including MP3, WMA, FLAC (up to 16bit/44.1kHz), WAV, AAC and AIFF, recommending FLAC format for lossless files to ensure the most accurate indexing.

Sonos has also recently added Alexa voice control, either through the addition of Amazon Echo devices or the Sonos One or Beam, and Google Assistant is coming to both devices in July. Buying one of Sonos's own smart speakers gives you the best, most seamlessly integrated experience, but adding the cheaper Echo Dot to an existing Sonos system gives you the option to control the music across your house using your voice.

The constant updating of its app is testament to Sonos's dedication to endlessly improving, upgrading and evolving its offering, and it makes investment in a Sonos system feel like a safe bet.

**MORE:** Every *What Hi-Fi?* Sonos review

## Verdict

While we still hope that Sonos has a change of heart and adds hi-res support in the near future, we don't believe its absence is a deal-breaker.

But if you do, you should look at what Bluesound offers. Those looking for a simpler, cheaper and better-sounding alternative to Sonos now have the Audio Pro option, too.

But for combining a broad range of accomplished products with comfortably

the most substantial selection of streaming services and the most pleasant and complete user-experience, Sonos remains one of the best multi-room performers.

Taboola Feed

**Best stereo amplifiers 2019: budget and premium**
If you want great sound from a separates hi-fi system, you need to choose a top quality stereo amplifier.
What Hi-Fi

**World's First Surviving Octuplets Are All Grown Up. Look At Them 9 Years Later**
DirectExpose | Sponsored

**Meet the US Navy's new $13 billion aircraft**
CNET | Sponsored

**Dad Invites This Unexpected Guest To Daughter's Wedding**
creativetimez.com | Sponsored

**Check Out The New 2019 Acura RLX Sedan**
Kelley Blue Book | Sponsored

**Inside Mark Zuckerberg's $59 Million Lake Tahoe Compound**
Lonny | Sponsored

**If You See Square Waves In The Ocean Get Out Of The Water Immediately**
Science101 | Sponsored

**Best speakers 2019: standmount, floorstander, desktop, active**
What Hi-Fi

**The new issue of What Hi-Fi? is on sale now!**
What Hi-Fi

**Man's Wife Reads Out Her Husband's Affair Texts Instead Of Vows**
scienceglory.com | Sponsored

**The 43 Greatest Guitarists Of All Time, Ranked**
History101 | Sponsored

Case 1:24-cv-00131-JNR    Document 120-2    Filed 12/17/24    Page 461 of 467 PageID #: 7591

### Best budget hi-fi speakers 2019

Excellent sound quality doesn't have to cost a fortune. The best budget hi-fi speakers will add the finishing touches to a fledgling hi-fi system.

What Hi-Fi

### Gruesome Civil War Photos Released From Government Vault

**BlitzLift** | Sponsored

### Play this for 1 min and see why everyone is addicted!

**Vikings: Free Online Game** | Sponsored

### The best hi-fi and audio deals - June 2019

What Hi-Fi

### Best stereo speakers 2018

What Hi-Fi

### 31 Tourist Attractions That Most People Wouldn't Visit

**Boredom Therapy** | Sponsored

### Man Buys Russian Tank Off eBay. Then He Looks Inside

**DirectExpose** | Sponsored

Advertisement



Advertisement



Case 1:24-cv-00131-JNR    Document 120-2    Filed 12/17/24    Page 463 of 467 PageID #: 7593



| 1 | **Best computer speakers 2019** |
|---|---|
| 2 | **Spotify combines music and news in Your Daily Drive in-car playlist** |
| 3 | **10 of the best film scores to test your system** |
| 4 | **Sony KD-65AG9 review** |
| 5 | **JLab Epic Air Sport true wireless earbuds boast 70-hour battery life** |

Advertisement

Case 1:24-cv-00131-JNR   Document 120-2   Filed 12/17/24   Page 464 of 467 PageID #: 7594



Sponsored

Sponsored By Los Angeles Tourism

## LA <3 Keeping It 100

Welcome to Los Angeles, where self-expression is a way of life —embrace your uniqueness.

**See More**

### About our deals

We sort through thousands of deals to offer the be... ...ilers. You can support us by clicking these independently selected links, as we may earn a co... ...no extra cost to you.

Contact us if you have any questions or have foun...

Do you find our price comparison useful?

Yes 👍    No 👎



WHAT HI-FI?    CLOSE ✖

Choosing the RightTV

🔇   01:29

What Hi-Fi? is part of Future US Inc, an internatio...    Visit ...

Terms and conditions   |   Privacy policy   |   Cookies policy   |   About us   |   Contact us   |   Brands

© Future US, Inc. 11 West 42nd Street, 15th Floor, New York, NY 10036.

# Exhibit 17



AS SEEN ON

**"Best Music Streamer for Existing Systems"**

CNET

## Smart Audio



**WiiM Amp**
Stream Elegance, Amplify Brilliance

- Compact all-in-one streaming amplifier delivering 60W per channel at 8 ohm, ensuring superior sound quality.
- Boasts HDMI ARC and Sub Out features for an effortless home theater experience upgrade.
- Housed in a sleek aluminum casing, the WiiM Amp is crafted with premium components, innovative circuitry, and a custom-designed heatsink for optimal thermal performance.

Learn more »





**WiiM Pro Plus**
Music Streamer Redefined

- All-in-one streamer with superior sound quality, eliminating the need for an external DAC.
- Advanced ADC integration, ideal for vinyl lovers seeking top-notch analog input.
- Seamless multiroom streaming via AirPlay 2, Chromecast, Alexa or other WiiM devices.

Learn more »





**WiiM Pro**
Stream Like a Pro

- Wired and wireless network connection & rich audio interfaces.
- Supports 192x/24-bit Hi-Res audio, AirPlay 2, Chromecast Audio, Spotify Connect, Tidal Connect, and more.
- Voice control with Alexa, Google, and Siri Voice Assistants.

Learn more »





**WiiM Mini**
Make Your Audio Smart

- Make Your Audio Smart.
- Supports wireless multi-room audio, AirPlay 2, Spotify Connect, Tidal Connect, and more.
- Supports Hi-Res audio and voice control with Siri and Alexa Voice Assistants.

Learn more »





**WiiM Remote**
Upgrade your Listening Experience

- Open the WiiM Home App and easily pair it with WiiM Mini or WiiM Pro.
- Use Alexa to control music playback and other connected devices.
- Use the remote to control music playback, volume, mute audio, and launch your presets with one button.

Learn more »



## Smart Home



**WiiM Wake-up Light**
**Your Perfect Bedside Companion**

- All-in-one sunrise alarm clock, bedside reading light, and sound machine with Alexa built-in.
- Ultimate sound machine with an unlimited selection of sounds.
- A sunrise alarm clock with music alarms, personalized sleep routines, and lighting options.

Learn more ›

amazon

# Product Vision

We're committed to offering you high-quality, feature-rich, and affordable audio and smart home products.
With our innovative voice user interface, audio streaming technology, a wide selection of music services,
patented smart home solutions, feature updates, and more, we hope to bring you products that will enhance your life.



**Help**
Support

**About us**
Linkplay
Mission
Contact us
Privacy Policy
Security

**Follow us**
Facebook
Instagram
Twitter

**App download**
App Store
Google Play

© 2024 Linkplay Technology Inc.