Exhibit 13

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,959 | 06/16/2017 | 9213357 | 04-0401-REEXAM (14-1800-R | 9548 |

107361        7590        08/09/2017
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| ENGLAND, DAVID E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/09/2017 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MR. CHRISTOPHER JOHN ROURK

JACKSON WALKER LLP

2323 ROSS AVENUE

SUITE 600

DALLAS, TX 75201

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/013,959*.

PATENT NO. *9213357*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

David E. England

Primary Examiner

Art Unit: 3992

Application/Control Number: 90/013,959                                            Page 2
Art Unit: 3992

## DECISION GRANTING EX PARTE REEXAMINATION

A substantial new question, hereinafter "SNQ", of patentability affecting claims 9, 10, 11, and 19 of United States Patent Number 9,213,357 to Millington, (hereafter "the '357 Patent"), is presented by the request for *ex parte* reexamination submitted on 05/22/2017.

The present application is being examined under the pre-AIA first to invent provisions.

## Prosecution History

The '357 Patent, entitled "Obtaining Content From Remote Source For Playback" was issued on December 15th, 2015 from application 14/516,867, hereinafter "the '867 Application", filed on October 17th, 2014 which is a continuation of application No. US 13/297,000, filed on November 15, 2011, which is a continuation of application No. US 10/816,217, filed on April 1, 2004, now Patent No. 8,234,395, which claims priority to provisional application No. US 60/490,768, filed on July 28, 2003.

The prosecution history of the '357 Patent starts with the filing of the '867 Application on 10/17/2014, which includes a preliminary amendment that canceled claims 1 – 20 and added claims 21 – 40. A Non-Final Office Action, dated 12/01/2014, rejected claims 21, 22, 30 – 34 and 40 over Goldberg 2007/0142944 in view of Alexander 2005/0027821 and claims 23-29 and 35-39 over Goldberg and Alexander in further view of Meade 20030073432. The Applicant and Examiner then conducted an Interview, dated 12/18/2014, discussing proposed claim amendments regarding claim 21. It was agreed that the reference of Alexander fails to disclose

Application/Control Number: 90/013,959                                    Page 3
Art Unit: 3992

control information pertaining to a second playback device. Applicant responded with an

amendment on 01/19/2015. The Examiner responded by rejecting claims 21-40 over Goldberg

and Meade in a Final Rejection dated 03/09/2015. Applicant responded with an After Final

Consideration Pilot Program 2.0 with more amendments to the claims dated 05/11/2015. An

Interview was conducted 05/27/2015 discussing the new amendments and interpretation of the

claims. Accompanied with this Interview was an Advisory Action that did **not** enter the newly

amended claims and maintaining the rejection. The Applicant responded with an RCE dated

07/07/2015, amending the claims with similar limitations as proposed in the After Final

Consideration Pilot Program 2.0 with other added amendments. Applicant stated in their remarks

that Goldberg, Meade, and Sinha (the "cited references"), do not teach at least

　　　　"play[ing] back the audio information in synchrony with the second playback

　　device by using the playback timing information associated with the audio information

　　and the clock information of the first playback device to play back the audio information,

　　wherein the first and second playback devices remain independently clocked during

　　synchronous playback of the audio information" in combination with the other elements

　　recited in independent claims 21, 33, and 40.

　　　　Applicant has amended independent claims 21, 33, and 40 to recite "play[ing]

　　back the audio information in synchrony with the second playback device by using the

　　playback timing information associated with the audio information and the clock

　　information of the first playback device to play back the audio information," based on the

　　Examiner Interview of May 27, 2015. Applicant has also amended independent claims

　　21, 33, and 40 to recite "wherein the first and second playback devices remain

Application/Control Number: 90/013,959                                      Page 4
Art Unit: 3992

independently clocked during synchronous playback of the audio information" as yet a

further distinction over the cited references.

The Examiner subsequently sent out a Notice of Allowance with Examiner's

amendments, dated 08/04/2015, and an Interview Summary. In the Interview Summary, the

Examiner explained that 35 U.S.C. 112 second paragraph issues were the only thing preventing a

Notice of allowance and an Examiner's amendment would remedy this. Applicant's Attorney

agreed to the Examiner's amendment. In the Examiner's Amendment, the Examiner stated that,

on pp. 2 & 3, "Applicants argue at page 10 of Remarks as filed that none of Goldberg, Meade,

and Sinha teaches the newly added subject matter. Examiner generally agrees." The Examiner

then goes into depth as to what specifically is the Reasons for Allowance.

### Reasons for Allowance

The following is an examiner's statement of reasons for allowance:
none of the qualifying prior art references of record, taken alone or in
combination, disclose or reasonably suggest: a combination of elements as claimed in
independent claim 33, wherein after receiving the control information (i) obtaining, by
the first playback device from the audio information source outside of the LAN, the
audio information; (ii) transmitting, by the first playback device to a second playback
device, the audio information, playback timing information associated with the audio
information, and device clock time information of the first playback device; and (iii)
playing back, by the first playback device, the audio information in synchrony with the
second playback device by using the timing information associated with the audio
information and the device clock time information of the first playback device to play
back the audio information, wherein the first and second playback devices remain
independently clocked during synchronous playback of the audio information.
Independent claims 21 and 40 contain similar limitations.

, see the '867 Application, Notice of Allowance, p. 5.

Application/Control Number: 90/013,959                                    Page 5
Art Unit: 3992

Therefore, since the Examiner elaborated on what specifically was the reasons for

allowance, those reasons cited above, from page 5 of the Notice of Allowance, are the basis for

the SNQ.


**Analysis of Substantial New Question of Patentability**

A SNQ of patentability is raised by a cited patent or printed publication when there is a

substantial likelihood that a reasonable examiner would consider the prior art patent or printed

publication important in deciding whether or not the claim is patentable.  A SNQ of patentability

is not raised by prior art presented in a reexamination request if the Office has previously

considered (in an earlier examination of the patent) the same question of patentability as to a

patent claim favorable to the patent owner based on the same prior art patents or printed

publications. In re Recreative Technologies, 83 F.3d 1394, 38 USPQ2d 1776 (Fed. Cir. 1996).

The substantial new question of patentability may be based on art previously considered by the

Office if the reference is presented in a new light or a different way that escaped review during

earlier examination. MPEP §2216.

It is not sufficient that a request for reexamination merely proposes one or more

rejections of a patent claim or claims as a basis for reexamination. It must first be demonstrated

that a patent or printed publication that is relied upon in a proposed rejection presents a new,

non-cumulative technological teaching that was not previously considered and discussed on the

record during the prosecution of the application that resulted in the patent for which

reexamination is requested, and during the prosecution of any other prior proceeding involving

the patent for which reexamination is requested. MPEP §2216.

Application/Control Number: 90/013,959                                          Page 6
Art Unit: 3992

**Basis of SNQ**

The '357 Patent was issued on December 15th, 2015, allowing claims 21 - 40, which are now renumbered as 1 – 20, from the '867 Application, filed on October 17th, 2014. The '867 Application's Reasons for Allowance, dated August 4th, 2015, was necessitated by the Applicant's Amendments, as stated above. Third Party Requester, hereinafter "3PR", proposes a SNQ with regards to claims 9, 10, 12, and 19 of the '357 Patent, with claim 9 being the only independent claim brought into question. As seen in the amendment made by the Applicant, which lead to the subsequent Notice of Allowance, as stated above:

> "wherein after receiving the control information (i) obtaining, by the first playback device from the audio information source outside of the LAN, the audio information; (ii) transmitting, by the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock time information of the first playback device; and (iii) playing back, by the first playback device, the audio information in synchrony with the second playback device by using the timing information associated with the audio information and the device clock time information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information."

Therefore, the basis for SNQ will be the limitation stated above.

Application/Control Number: 90/013,959                                                      Page 7
Art Unit: 3992

## Proposed Substantial New Question of Patentability

3PR identifies the following printed publications as forming the basis for the SNQ in the

Request or supporting the main references in the proposed rejections, see the Request pp. 18-19.

a)   U.S. 9,195,258 to Nicholas A. J. Millington, filed February 20, 2014,
issued November 24, 2015 ("the '258 Patent");

b)   * U.S. 6,611,537 to Edens et al., filed May 15, 1998, issued August 26,
2003 ("Edens");

c)   * U.S. 2004/0252400 to Blank et al., filed June 13, 2003, published December
16, 2004 ("Blank");

d)   U.S. 2002/015003 to Gray et al., filed April 17, 2001, published October 17, 2002
("Gray");

e)   "File and Printer Sharing with Microsoft Windows," Microsoft Corporation,
published November 2003 ("Microsoft File Sharing");

f)   "Symantec pcAnywhere User's Guide," copyright 1995-2002, Symantec Corporation
("pcAnywhere")

g)   RFC 1305, Network Time Protocol (Version 3) Specification, Implementation
and Analysis, March, 1992 ("RFC 1305")

h)   SMPTE Made Simple, TimeLine Vista, Inc., 1996 ("SMPTE Made Easy");

i)   The MP3 and Internet Audio Handbook, Bruce Fries and Marty Fries, TeamCom
Books (2000) (the "Handbook");

j)   Admitted Prior Art (APA) in the '357 Patent and other related Sonos patents
(the Sonos APA ),

k)   * U.S. Patent application publication 2007/0142944 to Goldberg et al. ("Goldberg");

l)   * U.S. Patent application publication 2003/0073432 to Meade ("Meade");

m)   "Web Design in a Nutshell," O'Reilly & Associates, Inc. (2001) ("Nutshell");

n)   RFC 2326, Real Time Streaming Protocol (RTSP) (April 1998) ("RTSP")

Application/Control Number: 90/013,959                                    Page 8
Art Unit: 3992

    o)   RFC 1889, RTP: A Transport Protocol for Real-Time Applications (January 1996) ("RTP")

*=cited during prosecution.

    3PR has alleged a SNQ of patentability with regards to claims 9, 10, 12, and 19 in light of the prior art utilized in these proposed rejections which are stated below and in the corresponding tables of the Request for Reexamination:

    1.   Claims 9, 10, 12 and 19 are invalid under the judicially-created doctrine of obviousness-type double patenting over the '258 Patent (Table 1);

    2.   Claims 9, 10, 12 and 19 are invalid under 35 U.S.C. 102(b) over Edens (Table 2);

    3.   Claims 9, 10, 12 and 19 are invalid under 35 U.S.C. 102(e)(1) over Blank (Table 4);

    4.   Claims 9, 10, 12 and 19 are invalid under 35 U.S.C. 103(a) over Edens, the Handbook and the Sonos APA (Table 3);

    5.   Claims 9, 10, 12 and 19 are invalid under 35 U.S.C. 103(a) over Blank, Gray, SMPTE, RFC 1305, Microsoft File Sharing, pcAnywhere, the Handbook and the Sonos APA (Table 5);

    6.   Claims 9, 10, 12 and 19 are invalid under 35 U.S.C. 103(a) over Meade, Goldberg and the Sonos APA (Table 6); and

    7.   Claims 9, 10, 12 and 19 are invalid under 35 U.S.C. 103(a) over Meade, Goldberg, Blank, Gray, Edens, SMPTE, RFC 1305, Microsoft File Sharing, pcAnywhere, the Handbook, the Sonos APA, Nutshell, RTSP and RIP (Table 7).

Application/Control Number: 90/013,959                                        Page 9
Art Unit: 3992

**Claim interpretation**

It is noted that the 3PR makes specific mention of two specific limitations, within the

limitation which is the basis of the SNQ, which require attention in determining what their BRI

encompasses, pp. 24 - 28 of the Request, limitations "independently clocked" and "playback

timing information".

**"independently clocked"**

The 3PR has pointed out that the limitation of "independently clocked" could have

multiple meanings, and because of the PO's concurrent litigation, could also encompass

syncronized clocks, see p. 26 of the Request. When reviewing the IDS for this information one

sees "Potter Aderson & Corroon LLP, Suplemental opening Breif on Claims Construction,

3/3/2017". When looking for this document, it is not found within the submission of the IDS and

therefore can not be specifically considered. However, under further envestegation, the Examiner

has come across how the Courts have construe the limitation as found in the Litigation Search

acompanied with this action. The courts have stated that the limitation "independently clocked",

under BRI, is interpreted as "operating in accordance with their own respective clocks during

synchronous playback.", see page 9-10. Therefore, this interpretation will be utilized in

determining the SNQ and in examination.


**"playback timing information"**

As pointed out by the 3PR, there appear to be two specific contructions for this

limitation. It is said that Sonos proposed a contructions for "playback timing information" of

"information indicating when the audio information [content] is to be played back", (construction

Application/Control Number: 90/013,959                                        Page 10
Art Unit: 3992

1). D&M in the Concurrent Litigation was said to construe the claims under BRI to mean "a

series of time values, associated with an audio work divided into blocks of information, each

indicating when one of the clocks of audio information should be played by the device",

(construction 2). It would appear that "construction 1" is the broadest of the two specifically

stated. It is said that Figures 2- 4 depict playback timing information. Though these figures

depict more than what is claimed, it is seen multiple times thoughtout the specification that the

device "provide audio and playback timing information for the synchrony group to enable a

master device and slave devices to play the audio program synchronously", (e.g., Col. 8, lines

61-66). As stated in column 11, lines 15 et seq., "FIG. 4, the audio and playback timing

information is in the form of a series of frames, **with each frame having a time stamp**."

Therefore, the BRI of "playback timing information" is merely a type of time stamp.


**Alleged SNQ based upon Obviousness-type Double patenting over the '285 Patent**

The '285 Patent was not previously considered or even cited in the prosecution of the

'867 Application, later the '357 Patent. As pointed out by 3PR, in Table 1 of the Request, it

would appear that similar limitations and teachings are claimed which are the basis for the SNQ.

The '285 Patent teaches technological features that a reasonable Examiner would consider

important in deciding whether or not the subject claims are patentable.

Application/Control Number: 90/013,959                                          Page 11
Art Unit: 3992

     Accordingly, these teachings would be important to a reasonable examiner in deciding

patentability as to at least independent claim 9 the '357 Patent. Further, The '285 Patent

teachings are new and non-cumulative.  Accordingly, The '285 Patent <u>raises</u> a substantial new

question of patentability as to at least independent claim 9 of the '357 Patent that have not been

decided in a previous examination. Claims 10, 12, and 19 are brought in at least due to their

dependency on independent claim 9.


     **Alleged SNQ based upon Edens alone or in combination with Handbook and/or**

**Sonos APA**

     Edens is presented to determine if a SNQ of patentability regarding claims 9, 10, 12, and

19 of the '357 Patent is raised. Edens was present as prior art in prior prosecutions of the

application which became the '357 Patent **but** was not used in rejecting the claims and not

discussed in the prosecution. Edens teaches technological features that a reasonable Examiner

would consider important in deciding whether or not the subject claims are patentable.

Edens discloses a protocol and architecture for the synchronous logical ring network that

synchronizes all network devices to a single reference clock of a network clock device, which

can be any of the networked audio devices on the network of Edens, and which provides for

fixed frames of information propagating around the network at consistent time intervals. The

synchronous data can include digital stereo audio having left channel and right channel data,

which can be routed to one or more of the audio devices on the network. See Edens at; 24:57-

25:2 ("As noted above, and as will be explained in greater detail below, network devices on a

logical ring network of the present invention are synchronized to one another. . . As will

Application/Control Number: 90/013,959                                Page 12
Art Unit: 3992

be explained below, this **low level** device **synchronization** greatly **facilitates** the **synchronization** of audio and video sources, audio sources received by multiple speakers, and many other media synchronization requirements."); 31:22-36, 52:66-53:10 ("As each frame propagates around the default network path (or alternate path) of the logic ring networks, the CD player would overwrite nibbles 10-15 and 74-79 with the respective (left and right channel) source digital audio streams. Edens appears to not disclose the limitation of "wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information". Edens discloses a "network clock" which all devices that are "clock-Capable" network devices, could be selected to become the "network clock", See 48:66 et seq. As seen in different areas of Edens, once a device becomes the "network clock" all other devices synchronize to that clock, e.g., 66:37 et seq., Abstract, and 10:8 – 22, "An arbitration process occurs automatically upon network **initialization, and one of the competing devices** is elected the **network clock device to which all other devices are then synchronized**. By **synchronizing all network devices to a single reference clock**, and providing fixed frames of information propagating around the network at consistent time intervals (44.1 kHz "frame rates" in one  embodiment, to enable device synchronization to the CD audio sample rate), the  logical ring network ensures that information always will propagate from one  device to another at consistent time intervals.  In other words, information will propagate consistently around the logical ring network at the frame rate; and the time required for information to propagate between any two particular devices will remain fixed." It appears that the network clock is in reference to the devices specific clock. If not, then there is no mention of the devices having a clock for playback and processing, which would be interpreted as "their own respective clocks".

Application/Control Number: 90/013,959                                      Page 13
Art Unit: 3992

3PR attempts to equat the section of 48:66-49:12 has "independent clocking" yet this section

discussed the process of finding a device to be the "network clock" when each device has an

"independent clock". This process is not done while the devices are playingback audio

information.

Edens does not disclose "wherein the first and second playback devices remain

independently clocked during synchronous playback of the audio information".

When reviewing the SNQs presented by the 3PR, one sees that Edens is combine with the

Handbook and Sonos APA. Therefore, one must review if an SNQ is raised alone and in

combination with these references. When reviewing the proposed rejection, one sees Sonos APA

is relied upon to disclose the some of the limitations which are the basis of the SNQ and more

specifically the limitation of, "wherein the first and second playback devices remain

independently clocked during synchronous playback of the audio information", which is lacking

in Edens. The whole section which 3PR relies upon is reads,

> "Another problem arises from the following.  When an audio playback device
>
> converts the digital audio information from digital to analog form, it does so using a
>
> clock that provides timing information.  Generally, the audio playback devices that are
>
> being developed have independent clocks, and, if they are not clocking at precisely the
>
> same rate, the audio playback provided by the various devices can get out of
>
> synchronization.", 2:21-27.

As clearly seen, the clocks are independent but are not playing back the audio in

synchronization. This would mean that the combination of Sonos APA with Edens would raise a

SNQ.

Application/Control Number: 90/013,959                                    Page 14
Art Unit: 3992

Accordingly, these teachings would be important to a reasonable examiner in deciding

patentability as to at least independent claim 9 the '357 Patent. Further, Edens' teachings are new

and non-cumulative.  Accordingly, Edens in combination with Sonos APA <u>raises</u> a substantial

new question of patentability as to at least independent claim 9 of the '357 Patent that have not

been decided in a previous examination. Claims 10, 12, and 19are brought in at least due to their

dependency on independent claim 9.


**Alleged SNQ based upon Blank alone or in combination with Gray, SMPTE, RFC**

**1305, Microsoft file sharing, pcAnywhere, the Handbook and Sonos APA**

Blank is presented to determine if a SNQ of patentability regarding claims 9, 10, 12, and

19 of the '357 Patent is raised. Blank was present as prior art in prior prosecutions of the

application which became the '357 Patent but was submitted in a very large IDS and was not

specifically mentioned in a rejection nor Reasons for Allowance. Blank teaches technological

features that a reasonable Examiner would consider important in deciding whether or not the

subject claims are patentable.

As seen in the proposed rejection, that Blank and Gray are more heavily discussed in the

limitations which are the basis of the SNQ, with the other for mentioned prior art used as further

explanation of the prior art to support or define what is well known. Therefore, Blanks and Gray

will be reviewed in light of the other prior art to determine if an SNQ has been raised.

Application/Control Number: 90/013,959                                          Page 15
Art Unit: 3992

Blank discloses a system for synchronous playback between media synch players 110,

which use a time server 120 to coordinate synchronous playback between the media synch

players (1) through (N), See Blank at [0029] ("In operation, the media synch players 110 each

generate a content stream such as video or audiovisual data in synchrony at the behest of the live

playback system control console 125. Synchronism is derived from the time server 120,

facilitating orchestration of the content provided by the media synch players 110. The system

control console 125 and the media synch players 110 are slaved to the time server 120. As such,

the system control console 125 can transmit a start time t+d for the media synch players 110 to

start providing content from media files 210 (FIG. 2), and the media synch players 110 are

synchronized with respect to this start time " Blank discloses in Figure 1 the media synch players

110 form a synchrony group for the playback of audio information that is provided over a

network.

Blank incorporates U.S. patent application No. 09/836,834 (Published Application No.

2002/0150053 to Gray et a., hereinafter "Gray") by reference at [0042] and [0045], Gray

discloses communication of multimedia packets 304 from a multimedia source 301 to a

multimedia sink 302 over heterogeneous networks 303, which inherently requires an address

identifying a network location of audio information outside of a LAN for a multimedia sink 302

on a local area network 313. A person having skill in the art would recognize that all network

communications between networked audio devices require the use of network addresses. Figure

3 of Gray is shown below and demonstrates that the multimedia source 301 is accessible through

a network connection and is outside of the local area network of the multimedia sink 302.

Application/Control Number: 90/013,959                                    Page 16
Art Unit: 3992

Gray also discloses that this time stamping procedure can be implemented at the application

layer, and that "the application layer itself may maintain the common time reckoning across the

devices, calculate the appropriate time stamp, and/or include the time stamp in the multimedia

packet. Which of these tasks the application layer performs may depend on the capabilities of the

link layer that the application layer uses to forward multimedia packets through the gateway."

[0069]. In combination, the time stamped packets of Gray allow synchronized playback at a

plurality of media synch players 110 of the system of Blank, for content that is provided from

a source outside of the LAN on which the media synch players 110 of Blank are operating.

Furthermore, while Blank discloses that time server 120 can be separate from the media synch

players 110, a person having ordinary skill in the art would recognize that it could also be

included in one of media synch players 110, so as to reduce the number of devices required for

synchronized playback.

When reviewing the proposed rejection, one sees Sonos APA is relied upon to disclose

the some of the limitations which are the basis of the SNQ and more specifically the limitation

of, "wherein the first and second playback devices remain independently clocked during

synchronous playback of the audio information", which is lacking in Blank and Gray. The whole

section which 3PR relies upon is reads,

> "Another problem arises from the following. When an audio playback device
>
> converts the digital audio information from digital to analog form, it does so using a
>
> clock that provides timing information. Generally, the audio playback devices that are
>
> being developed have independent clocks, and, if they are not clocking at precisely the

same rate, the audio playback provided by the various devices can get out of

synchronization.", 2:21-27.

As clearly seen, the clocks are independent but are not playing back the audio in

synchronization. This would mean that the combination of Sonos APA with Blank and Gray

would raise a SNQ.

Accordingly, these teachings would be important to a reasonable examiner in deciding

patentability as to at least independent claim 9 the '357 Patent. Further, Blank and Gray

teachings are new and non-cumulative.  Accordingly, Blank and Gray in combination with at

least Sonos APA raises a substantial new question of patentability as to at least independent

claim 9 of the '357 Patent that have not been decided in a previous examination. Claims 10, 12,

and 19 are brought in at least due to their dependency on independent claim 9.


**Alleged SNQ based upon Meade, Goldberg and Sonos APA and/or Edens,
Blank, SMPTE, NTP, Nutshell, RTF and RTSP**

Meade and Goldberg are presented to determine if a SNQ of patentability regarding

claims 9, 10, 12, and 19 of the '357 Patent is raised. Meade and Goldberg were present as prior

art in prior prosecutions and utilized in rejecting claims of the application which became the '357

Patent. Meade and Goldberg teach technological features that a reasonable Examiner would

consider important in deciding whether or not the subject claims are patentable.

As seen in the history of the prosecution, Meade and Goldberg were previously used in

the rejection of the claims and specifically overcome by the amendments to the claims. Further,

the Examiner stated that Meade and Goldberg did not teach those claim limitations which are the

Application/Control Number: 90/013,959                                                    Page 18
Art Unit: 3992

basis for the SNQ. In this case, for old prior art that was previously considered to be

reconsidered, the art must be presented in a new light by the 3PR. When reviewing the proposed

rejection and explanation of the prior art, Meade and Goldberg are utilized in a similar manner as

previously stated in the rejection which was overcome by amendments, i.e., 3PR cites the same

paragraphs as was cited in the previously rejections.

      Therefore, **Meade and Goldberg** are <u>not</u> presented in a new light and since the

previous Examiner agreed that the application's claims were allowable over **Meade and**

**Goldberg**, **Meade and Goldberg** do **not** raise a substantial **new** question (SNQ) regarding claims

9, 10, 12, and 19 of the '357 Patent alone or in combination with the other prior art listed.


### *Conclusion*

A Request for *ex parte* reexamination of United States Patent Number 9,213,357 is <u>Ordered</u>.


      A substantial new question of patentability affecting at least claim 9 of United States

Patent Number 9,213,357 is raised by the Request for *ex parte* reexamination based on the '258

Patent, the Edens in combination with at least Sonos APA, and Blank in combination with at

least Gray and Sonos APA cited areas supplied by the Requester.

      <u>Therefore, claims 9, 10, 12, and 19 will be reexamined</u>.


      Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

Application/Control Number: 90/013,959                                          Page 19
Art Unit: 3992

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).


### Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.985 to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the

'357 Patent throughout the course of this reexamination proceeding. The third party requester is

also reminded of the ability to similarly apprise the Office of any such activity or proceeding

throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.


### CORRESPONDENCE


**All** correspondence relating to this ex parte reexamination proceeding should be directed:


By EFS:        Registered users may submit via the electronic filing system EFS-Web, at
               https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html.

By Mail to:    Mail Stop *Ex Parte* Reexam
               Central Reexamination Unit
               Commissioner for Patents
               United States Patent & Trademark Office
               P.O. Box 1450
               Alexandria, VA 22313-1450

By FAX to:     (571) 273-9900
               Central Reexamination Unit

By hand:       Customer Service Window
               Randolph Building
               401 Dulany Street
               Alexandria, VA 22314

Application/Control Number: 90/013,959                                         Page 20
Art Unit: 3992

For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence (except

for a request for reexamination and a corrected or replacement request for reexamination) will be

considered timely filed if (a) it is transmitted via the Office's electronic filing system in

accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission for each piece of

correspondence stating the date of transmission, which is prior to the expiration of the set period

of time in the Office action.

Any inquiry concerning this communication or earlier communications from the Examiner, or as

to the status of this proceeding, should be directed to the Central Reexamination Unit at

telephone number (571) 272-7705.

Signed:

/David E. England/
Primary Examiner, Art Unit 3992

Conferees:  /Roland Foster/, Primary Examiner, CRU 3992

/MICHAEL FUELLING/

Supervisory Patent Examiner, Art Unit 3992

| *Order Granting Request For Ex Parte Reexamination* | Control No.<br>90/013,959 | Patent Under Reexamination<br>9213357 |
|---|---|---|
| | Examiner<br>DAVID ENGLAND | Art Unit<br>3992 |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>16 June 2017</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐  PTO-892,        b)☐  PTO/SB/08,        c)☒  Other: <u>*PTO/SB/42*</u>

1. ☒    The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

| /DAVID ENGLAND/<br>Primary Examiner, Art Unit 3992 | | |
|---|---|---|

cc:Requester ( if third party requester )

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,959 | 06/16/2017 | 9213357 | 04-0401-REEXAM (14-1800-R | 9548 |

107361        7590        10/20/2017
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| ENGLAND, DAVID E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/20/2017 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MR. CHRISTOPHER JOHN ROURK

JACKSON WALKER LLP

2323 ROSS AVENUE

SUITE 600

DALLAS, TX  75201

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/013,959*.

PATENT NO. *9213357*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

David E. England

Primary Examiner

Art Unit: 3992

| *Office Action in Ex Parte Reexamination* | Control No.<br>90/013,959 | | Patent Under Reexamination<br>9213357 | |
|---|---|---|---|---|
| | Examiner<br>DAVID ENGLAND | | Art Unit<br>3992 | AIA (First Inventor to File) Status<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a. ☒ Responsive to the communication(s) filed on *06/16/2017* .

☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

b. ☐ This action is made FINAL.

c. ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.     3. ☐ Interview Summary, PTO-474.

2. ☒ Information Disclosure Statement, PTO/SB/08.     4. ☐ _____.

Part II    SUMMARY OF ACTION

1a. ☒ Claims *9-12 and 19* are subject to reexamination.

1b. ☒ Claims *1-8,13-18 and 20* are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☐ Claims _____ are patentable and/or confirmed.

4. ☒ Claims *9-12,19* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a) ☐ approved (7b) ☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some*  c) ☐ None     of the certified copies have

    1 ☐ been received.

    2 ☐ not been received.

    3 ☐ been filed in Application No. _____ .

    4 ☐ been filed in reexamination Control No. _____.

    5 ☐ been received by the International Bureau in PCT application No. _____.

    * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

Application/Control Number: 90/013,959                                     Page 2
Art Unit: 3992

## DETAILED EX PARTE REEXAMINATION NON-FINAL OFFICE ACTION

## I. INTRODUCTION

This is a Non-Final Office Action on the merits in the *Ex Parte* Reexamination of claims 9, 10, 11, 12, and 19 of US Patent No. US 9,213,357 to Millington, hereinafter "the '357 Patent".

The present application is being examined under the pre-AIA first to invent provisions.

### A. References Cited in this Office Action

1.      The prior art patents and/or printed publications, hereinafter "the references", which have been submitted 08/22/2014, have been considered and are relied upon in this Office Action are relisted as follows.

    a.      U.S. 9,195,258 to Nicholas A. J. Millington, filed February 20, 2014, issued November 24, 2015 (hereinafter "the '258 Patent");

    b.       The MP3 and Internet Audio Handbook, Brace Fries and Marty Fries, TeamCom Books (2000) (hereinafter the "Handbook");

    c.      U.S. 6,611,537 to Edens et al., filed May 15, 1998, issued August 26, 2003 (hereinafter "Edens");

    d.      U.S. 2004/0252400 to Blank et al., filed June 13, 2003, published December 16, 2004 (hereinafter "Blank");

    e.      U.S. 2002/015003 to Gray et al., filed April 17, 2001, published October 17, 2002 (hereinafter "Gray");

    f.      Admitted Prior Art (APA) in the '357 Patent and other related Sonos patents (hereinafter the "SONOS APA").

Application/Control Number: 90/013,959                                    Page 3
Art Unit: 3992

## II. CLAIM INTERPRETATION

2.      During examination, claims are given the broadest reasonable interpretation consistent

with the specification and limitations in the specification are not read into the claims. See MPEP

§2111, MPEP §2111.01 and *In re Yamamoto et al.*, 222 USPQ 934 (Fed. Cir. 1984).  Under a

broadest reasonable interpretation, words of the claim must be given their plain meaning, unless

such meaning is inconsistent with the specification. See MPEP 2111.01(I).  It is further noted it

is improper to import claim limitations from the specification, i.e., a particular embodiment

appearing in the written description may not be read into a claim when the claim language is

broader than the embodiment. See MPEP 2111.01(II).  Therefore, unless one of the exceptions

applies below, Examiners will interpret the limitations of the claims using the broadest

reasonable interpretation.

3.      As noted in the Order of this current application, the 3PR makes specific mention of two

specific limitations, within the limitation which is the basis of the SNQ, which require attention

in determining what their BRI encompasses, pp. 24 - 28 of the Request, limitations

"independently clocked" and "playback timing information".


### "independently clocked"

4.      The 3PR has pointed out that the limitation of "independently clocked" could have

multiple meanings, and because of the PO's concurrent litigation, could also encompass

syncronized clocks, see p. 26 of the Request. When reviewing the IDS for this information one

sees "Potter Aderson & Corroon LLP, Suplemental opening Breif on Claims Construction,

Application/Control Number: 90/013,959                                    Page 4
Art Unit: 3992

3/3/2017". When looking for this document, it is not found within the submission of the IDS and

therefore can not be specifically considered. However, under further envestegation, the Examiner

has come across how the Courts have construe the limitation as found in the Litigation Search

acompanied with this action. The courts have stated that the limitation "independently clocked",

under BRI, is interpreted as "operating in accordance with their own respective clocks during

synchronous playback.", see page 9-10. Furthermore, as closely interpreted by the Examiner

under BRI, the interpretation of "independently clocked" could also be that the clocks of each

device is run under the devices own power, (i.e., the master device does not run the other

device's clocks, the master device merely sets a sync point).


        **"playback timing information"**

5.      As pointed out by the 3PR, there appear to be two specific contructions for this

limitation. It is said that Sonos proposed a contructions for "playback timing information" of

"information indicating when the audio information [content] is to be played back", (construction

1). D&M in the Concurrent Litigation was said to construe the claims under BRI to mean "a

series of time values, associated with an audio work divided into blocks of information, each

indicating when one of the clocks of audio information should be played by the device",

(construction 2). It would appear that "construction 1" is the broadest of the two specifically

stated. It is said that Figures 2- 4 depict playback timing information. Though these figures

depict more than what is claimed, it is seen multiple times thoughtout the specification that the

device "provide audio and playback timing information for the synchrony group to enable a

master device and slave devices to play the audio program synchronously", (e.g., Col. 8, lines

Application/Control Number: 90/013,959                                               Page 5
Art Unit: 3992

61-66). As stated in column 11, lines 15 et seq., "FIG. 4, the audio and playback timing

information is in the form of a series of frames, **with each frame having a time stamp**."

Therefore, the BRI of "playback timing information" could merely be a type of time stamp.

## III. REJECTIONS

### A. Relevant Statutes – Claim Rejections

In the event the determination of the status of the application as subject to AIA 35 U.S.C.

102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the

statutory basis for the rejection will not be considered a new ground of rejection if the prior art

relied upon, and the rationale supporting the rejection, would be the same under either status.

### 1.    *Claim Rejections - Nonstatutory Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the

unjustified or improper timewise extension of the "right to exclude" granted by a patent

and to prevent possible harassment by multiple assignees.  A nonstatutory double

patenting rejection is appropriate where the claims at issue are not identical, but at least

one examined application claim is not patentably distinct from the reference claim(s)

because the examined application claim is either anticipated by, or would have been

obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d

1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993);

*In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d

Application/Control Number: 90/013,959                                    Page 6
Art Unit: 3992

937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA

1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or

1.321(d) may be used to overcome an actual or provisional rejection based on a

nonstatutory double patenting ground provided the reference application or patent either

is shown to be commonly owned with this application, or claims an invention made as a

result of activities undertaken within the scope of a joint research agreement. A terminal

disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO internet Web site contains terminal disclaimer forms which may be

used.  Please visit http://www.uspto.gov/forms/.  The filing date of the application will

determine what form should be used.  A web-based eTerminal Disclaimer may be filled

out completely online using web-screens. An eTerminal Disclaimer that meets all

requirements is auto-processed and approved immediately upon submission.  For more

information about eTerminal Disclaimers, refer to

http://www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.


2.    ***Claim Rejections - 35 USC § 103***

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all
obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set
forth in section 102 of this title, if the differences between the subject matter sought to be patented and
the prior art are such that the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which the invention was made.

Application/Control Number: 90/013,959                                  Page 7
Art Unit: 3992

**B. Detailed Analysis of the Rejection**

The Examiner will use the shorthand notation of "1:1-5" for Column 1, lines 1-5.


*DOUBLE PATENTING REJECTOIN*


      Claim 9 of **US Patent 9,213,357, under reexamination, hereinafter "the '357 Patent",** is rejected on the ground of nonstatutory double patenting as being unpatentable over claim 11 of the '258 Patent in view of the Handbook.

      Although the claims at issue are not identical, they are not patentably distinct from each other for the reasoning in the claim chart below.

      The '258 Patent shares the same, single inventor as requested '357 Patent and was neither cited, nor applied. The '357 Patent is part of a very large family of patents with multiple continuity chains all related to a provisional application, 60/490,768, filed July 28th, 2003.

| '357 Patent (Patent under reexamination) | '258 Patent |
|---|---|
| Claim 9. A first playback device comprising: | Claim 11. A system comprising: |
| one or more processors; a network interface; and | a plurality of zone players that are communicatively coupled via at least a local area network (LAN) with a plurality of controllers, wherein: |
| tangible, non-transitory computer-readable memory comprising program instructions that, when executed by the one or more processors, cause the first playback device to: | each of the plurality of controllers is configured to provide control information to any one of the plurality of zone players via the LAN;  and each of the plurality of zone players is configured to |
| receive, via the network interface from a network device configured to control the first | (a) receive control information from any one of the plurality of controllers via the LAN, wherein |

Application/Control Number: 90/013,959                                                          Page 8

Art Unit: 3992

| | |
|---|---|
| playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a network location of audio information available at an audio information source, wherein the audio information source is outside of the LAN;  and after receiving the control information,<br><br>(i) obtain, via the network interface from the audio information source outside of the LAN, the audio information; | the received control information comprises a direction for the zone player to enter into a synchrony group with at least one other zone player of the plurality of zone players,<br><br>**HANDBOOK**<br><br>**(It is seen that the claim does not specifically state the control information having identical data within it. However, it is well known, and common practice, to have a device download or stream an audio file, i.e., music file, to a device from a server on the internet, i.e., another LAN with music files connected to the internet that a user can download music from. This would mean the device would have to have the address to the server to retrieve the music file and then download or "obtain" the music file. Furthermore, it is seen in the specification that the "control information" could have enabled the audio information channel device 23 to provide audio and playback timing information to the group, e.g., 8:19 et seq. Though not specifically claimed as such, it does shed light that it could have been obvious to one skilled in the art at the time the invention was made to have other audio information separate or with the control information. Furthermore, the Handbook discloses such a step, (e.g., pp. 17 – 22 et seq.).** |
| (ii) transmit, via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device;  and<br><br>(iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the | (b) in response to the direction, enter into the synchrony group with the at least one other zone player of the plurality of zone players,<br><br>wherein in the synchrony group, the zone player and the at least one other zone player are configured to play back audio in synchrony based at least in part on (b-i) audio content, (b-ii) playback timing information associated with the audio content, wherein the playback timing information is generated by and transmitted from |

Application/Control Number: 90/013,959                                           Page 9
Art Unit: 3992

| | |
|---|---|
| device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information. | one of the zone player or the at least one other zone player to the other of the zone player or the at least one other zone player and (b-iii) clock time information for the one of the zone player or the at least one other zone player, <br><br>wherein the clock time information is generated by and transmitted from the one of the zone player or the at least one other zone player to the other of the zone player or the at least one other zone player, wherein the zone players in the synchrony group remain independently clocked while playing back audio in synchrony, and <br><br>(c) transmit status information to at least one of the plurality of controllers via the LAN, wherein the status information comprises an indication of a status of the synchrony group. |

*REJECTION UNDER 35 U.S.C. 103(a)*

1.      Claims **9, 10, 11, 12, and 19 are** rejected under **pre-AIA 35 U.S.C. 103(a)** as being
unpatentable over U.S. **Edens in view of the Handbook and in further view of Sonos APA**.

*RE: Claim 9*

**A first playback device comprising: one or more processors; a network interface;**

**and tangible, non-transitory computer-readable memory comprising program**

**instructions that, when executed by the one or more processors, cause the**

**first playback device to:**

Edens discloses a multimedia PC 170, which can be "used to control devices on logical

ring network 120, as well as to transmit and receive digital media to/from other network

Application/Control Number: 90/013,959                                          Page 10
Art Unit: 3992

devices." Edens at 14:41-43. The other network devices can include other multimedia PCs that

are playing back audio in synchrony. In addition, surround sound amplifiers/speakers 153-158

are networked audio devices that could be implemented with PC functionality similar to

multimedia PC 170, see Edens at 14:64-67 ("by adding devices of greater complexity,

particularly CPU-based devices controlled by software or firmware, the possibilities are virtually

endless" for controlling devices in the system of Edens.). Edens also discloses a multimedia/data

viewer (MDV) 5100, which is a portable interface and display device that can act as a remote

control or interface for network devices or as a multimedia/data playback device. In particular,

MDV 5100 includes CPU 5102, 10 Base-T Ethernet connection 5176, and a high quality audio

subsystem that includes stereo A/D 5122 and D/A 5124 (using Crystal Semiconductor 5331 and

4331 components, respectively), which supports a 44.1 kHz sample rate with 18-bit audiophile

sampling. 108:62-110:4. Edens discloses tangible, non-transitory computer-readable memory

comprising program instructions that, when executed by the one or more processors, cause the

first playback to perform functions, such as in multimedia PC 170, a CPU-based speaker device

controlled by software or firmware, or MDV 5100, (e.g., 14:64 – 67 & 109:30-32 "*64MB

KM64000 flash memory 5106 stores the operating system and applications software for

multimedia/ data viewer 5100.*").

> **receive, via the network interface from a network device configured to control the**
>
> **first playback device and communicatively coupled to the first playback device over**
>
> **a local area network (LAN), control information comprising an address identifying**
>
> **a network location of audio information available at an audio information source,**
>
> **wherein the audio information source is outside of the LAN; and after receiving the**

Application/Control Number: 90/013,959                                   Page 11
Art Unit: 3992

**control information, (i) obtain, via the network interface from the audio information**

**source outside of the LAN, the audio information;**

Edens discloses multiple ways for the playback devices of Edens (PC 170, a CPU-based
speaker device or MDV 5100) to receive control information via the network interface from a
network device configured to control the first playback device and communicatively coupled to
the first playback device over the LAN. In one embodiment, the playback devices of Edens
"could be controlled by respective remote control/interface/monitor devices 190 and 195 (which
could range from simple remote controls to complex controllers with large LCD screens capable
of viewing computer graphics images, MPEG2 video, etc.)," (e.g., 14:19-23). In another
embodiment, "multimedia PC 170 could be used to control devices on logical ring network 120,
as well as to transmit and receive digital media to/from other network devices", (e.g., 14:42-44).
Edens discloses accessing a URL over the Internet for information required by a playback device
of Eden for operational purposes, (e.g., 46:56-60, "*Other interested devices can read this
information for subsequent use in communicating directly with a particular device and/or
obtaining additional information about a device from an external resource (e.g., the Internet via
a URL pointer*"), and 47:47-54, "*As will be apparent to one reasonably skilled in the art, many
different data structures (e.g., a linked list of objects) and combinations of RAM/ROM/registers
can be employed to accommodate the various types of data contained within the configuration
and code control block, as well as any other information stored in a network device's local
memory and I/O address space, including 'pointers' to external information.*". A person having
ordinary skill in the art would recognize that URL pointers could be used to obtain audio data, as
it was widely known by the Critical Date of the '357 Patent to obtain audio data from a remote

Application/Control Number: 90/013,959                                    Page 12
Art Unit: 3992

source over the Internet. As such, it is seen specifically that the Handbook specifically teaches

accessing audio data from different websites to have either downloaded or streamed to a

requesting computer and have forwarded to other devices in a smaller network, (e.g., pp.17 – 22

et seq.). It is obvious that once a user knowns the location of the audio content they wish to listen

to, they have the ability to download it in the multiple ways discussed above and in the prior art.

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention

was made to combine the teachings of the Handbook with Eden for similar reasons stated above,

herein and in the double patenting rejection.

> **(ii) transmit, via the network interface of the first playback device to a second**
> **playback device, the audio information, playback timing information associated**
> **with the audio information, and device clock information of the first playback**
> **device; and**

Edens discloses at 10:9-18 that "*one of the competing devices is elected the network clock*

*device to which all other devices are then synchronized. By synchronizing all network devices to*

*a single reference clock, and providing fixed frames of information propagating around the*

*network at consistent time intervals (44.1 kHz "frame rates" in one embodiment, to enable*

*device synchronization to the CD audio sample rate), the logical ring network ensures that*

*information always will propagate from one device to another at consistent time intervals*".

Edens uses frames of data that include the "frame header," which is <u>playback timing information</u>

that is used to synchronize digital media streams such as CD audio or MPEG <u>(audio</u>

<u>information)</u>, (e.g., Eden  27:1-5 et seq., "One of these special markers, the 'frame header'

(which actually comprises 2 symbols), is used to synchronize all other devices to the network

Application/Control Number: 90/013,959                                      Page 13
Art Unit: 3992

clock device at a rate useful for synchronizing digital media streams, such as CD audio or

MPEG video,"). Edens transmits <u>device clock **information** of the first playback device</u> (acting

as network clock device) using a TIME MARK system command with "time of day" specified in

the timestamp field, (e.g., Edens at 51:38-56, "*In one embodiment, the network clock device*

*transmits this 'time of day' reference by first* <u>*broadcasting a TIME MARK system command with*</u>

<u>*the 'time of day'*</u> *specified in the Timestamp field, which indicates to interested network devices*

*that such 'time of day' will occur upon receipt of the next 'WK' frame header. At the appropriate*

*time, the network clock device then substitutes the Time Sync ('WK') frame header (in lieu of the*

*far more common Clock Sync ('JK') frame header) to 'mark' the previously specified time of*

*day. It should be noted that this "time of day" is a very accurate relative time marker. Although*

*it is received at slightly different times by network devices due to propagation delays along the*

*logical ring network, these relative time differences remain constant due to the synchronous*

*nature of the logical ring network, Moreover, in one embodiment, the delay does not exceed one*

*(44.1 kHz audio sample) frame time. The 'sub-frame' field of the Timestamp therefore is set to*

*zero in this embodiment,"*).

Also, see Edens at 10:58-66 ("*In addition to 'frame header' markers that synchronize devices to*

*a master clock, these frames contain two independent streams—a 'data stream' for the*

*distribution of real-time continuous digital media streams, as well as asynchronous data, and a*

*'system command stream' for the distribution of 'system commands,' which are used primarily*

*for network initialization and auto-configuration of network devices, as well as basic switching*

*of digital media streams*"). Any one of the playback devices of Edens can serve as the network

clock device. See Edens at 26:33-46 ("*In one embodiment, at least one device on a logical ring*

Application/Control Number: 90/013,959                                   Page 14
Art Unit: 3992

*network must be capable of acting as the network clock device, typically in addition to*

*performing its 'normal' function (e.g., CD player). During network initialization, a clock*

*arbitration process determines which device (among those capable of acting as the network*

*clock device) will be deemed the network clock device. In other embodiments, the network clock*

*device could be predetermined— e.g., via a user-settable switch. Once the network clock device*

*has been selected, all other devices are synchronized to the network clock device. The precise*

*details of the network initialization process, and the manner in which devices are synchronized*

*to the network clock device, are discussed in greater detail below*.").

> **(iii) play back the audio information in synchrony with the second playback device
> by using the playback timing information associated with the audio information and
> the device clock information of the first playback device to play back the audio
> information,**

The synchronous data can include digital stereo audio having left channel and right

channel data, which can be routed to one or more of the audio devices on the network. See

Edens at; 24:57-25:2 ("*As noted above, and as will be explained in greater detail below, network*

*devices on a logical ring network of the present invention are synchronized to one another. . . As*

*will be explained below, this low level device synchronization greatly facilitates the*

*synchronization of audio and video sources, audio sources received by multiple speakers, and*

*many other media synchronization requirements.*"); 31:22-36, 52:66-53:10 ("*As each frame*

*propagates around the default network path (or alternate path) of the logic ring networks, the*

*CD player would overwrite nibbles 10-15 and 74-79 with the respective (left and right channel)*

*source digital audio streams.*") As seen in different areas of Edens, once a device becomes the

Application/Control Number: 90/013,959                                              Page 15
Art Unit: 3992

"network clock" all other devices synchronize to that clock, e.g., 66:37 et seq., Abstract, and 10:8

– 22, "An arbitration process occurs automatically upon network **initialization, and one of the**

**competing devices** is elected the **network clock device to which all other devices are then**

**synchronized**.  By **synchronizing all network devices to a single reference clock**, and

providing fixed frames of information propagating  around the network at consistent time

intervals (44.1 kHz "frame rates" in one  embodiment, to enable device synchronization to the

CD audio sample rate), the logical ring network ensures that information always will propagate

from one device to another at consistent time intervals, also see Edens 26:32 – et seq.

Additionally, the Timestamp field "time of day" mechanism can also be used to determine when

to play back the audio information in synchrony. See Edens at 56:9-14 ("*In addition, the*

*controller may use the "Timestamp" field to cause all network devices receiving a*

*STOP STREAMS system command to stop transmitting their streams simultaneously, at the time*

*specified by the Timestamp field, using the "time of day" mechanism discussed above.*"), 10:4-

7 ("*Information can propagate around this logical ring, reaching every device on each*

*revolution around the network. Network devices are full-duplex, transmitting and receiving*

*information simultaneously.*") It is noted that this limitation does not require the second playback

device to playback the audio information by using the playback timing information associated

with the audio information and the device clock information of the first playback device to play

back the audio information. That limitation only applies to the first playback device, and as long

as the second playback device is playing back the audio information in synchrony with the first

playback device while the first playback device uses the playback timing information associated

Application/Control Number: 90/013,959                                        Page 16
Art Unit: 3992

with the audio information and the device clock information of the first playback device to play

back the audio information, then the claim limitation is satisfied.

As such, a person of ordinary skill would have understood that any one of multimedia PC

170, surround sound amplifiers/speakers 153-158 and MDCV 5100 are intelligent playback

devices that could playback the audio information, playback timing information associated with

the audio information, and device clock information of the first playback device, because

Edens discloses that these playback devices could be used to play back audio in synchrony.

In addition, to the extent that Edens is considered not to teach this limitation, the Sonos APA at

1:47 to 2:28 acknowledges that it was known to play back audio information in synchrony with

first and second playback devices by using the device clock information of the first playback

device to play back the audio information, which inherently requires playback timing

information associated with the audio information. It would be obvious to a person having

ordinary skill in the art to use the Sonos APA with the system of Edens, because both Edens and

the Sonos APA are directed to networked audio devices that play back audio in synchrony,

and the Sonos APA would allow Edens to utilize other communications media than the

synchronous logical ring network, because it teaches that the timing functionality can be

provided by a network that is compliant with RFC 1305 or SNTP.

**wherein the first and second playback devices remain independently clocked during
synchronous playback of the audio information.**

Edens discloses that these network devices can each be capable of acting as a "clock"

device and can arbitrate for election as the "network clock" device. Edens at 24:56-63 ("*As noted*

*above, and as will be explained in greater detail below, network devices on a logical ring*

Application/Control Number: 90/013,959                                    Page 17
Art Unit: 3992

*network of the present invention are synchronized to one another. This synchronization occurs upon initialization of the logical ring network, during which each device capable of acting as a "clock" device arbitrates for election as the "network clock" device.")*. Independent clocking is also disclosed by virtue of the network clock selection process between independently clocked devices, only one of which is selected as the network clock. See Edens at 48:66-49:12 ("*To initiate the network clock device arbitration process, each 'clock-capable' network device immediately broadcasts repeated CLOCK ID system commands (with its own Device ID in the source address field) 1004. Because the logical ring network is not yet synchronized to a network clock device, each such device ignores all received information other than CLOCK ID system commands (i.e., resynchronizing to each received frame header). Upon receiving a CLOCK ID system command, it compares the received 'source' Device ID with its own Device ID 1006. The 'clock-capable' network device having the highest Device ID will win the arbitration. As will become apparent, this arbitration process will be decided very quickly— i.e., in a single 'revolution' of a system command around the default network path of the logical ring network.")* As such, a person of ordinary skill would have understood that anyone of multimedia PC 170, surround sound amplifiers/speakers 153-158 and MDCV 5100 are intelligent playback devices that remain independently clocked during synchronous playback of the audio information, because they would have multiple clocks, and would operate in accordance with their own respective clocks during synchronous playback.

In addition, the Sonos APA discloses that playback devices can remain independently clocked during synchronous playback of audio information, see '357 Patent at 2:21-27 ("*When an audio playback device converts the digital audio information from digital to analog form, it*

Application/Control Number: 90/013,959                                    Page 18
Art Unit: 3992

*does so using a clock that provides timing information. Generally, the audio playback devices*

*that are being developed have independent clocks, and, if they are not clocking at precisely the*

*same rate, the audio playback provided by the various devices can get out of synchronization*,").

Thus, if the independent clocks of the audio playback devices are clocking at precisely the same

rate by design, or if they are synchronized, then the audio playback provided by the various

devices remains in synchronization. Furthermore, as closely interpreted by the Examiner under

BRI, the interpretation of "independently clocked" could also be that the clocks of each device is

run under the devices own power, (i.e., the master device does not run the other device's clocks,

the master device merely sets a sync point). Therefore, Edens would start the synchronization

process and the devices in the network would run the clock from the sync point as received from

the master clock. Thus it would have been obvious to one of ordinary skill in the art to combine

Sonos APA with Edens because Edens merely lacked the explanation of the well-known and

understood notion of devices running their clocks independent of each other as stated by Sonos

APA. Furthermore, the problem of synchronization of the independently clocked devices of

Sonos APA is seen to be remedied by Edens' ability to synchronize the devices on its network

much like the '357 Patent.


*RE: Claim 10*

      **The first play back device of claim 9, wherein the program instructions, when**

**executed by the one or more processors, further cause the first playback device to:**

**generate the playback timing information associated with the audio information;**

**and**

Application/Control Number: 90/013,959                                          Page 19
Art Unit: 3992

The program instructions of the first playback device of Edens (PC 170, a CPU-based speaker device or MDV 5100) cause the first playback device to generate the playback timing information associated with the audio information, such as by generating the frame header. See Edens at 27:1-5 (*"One of these special markers, the 'frame header' (which actually comprises 2 symbols), is used to synchronize all other devices to the network clock device at a rate useful for synchronizing digital media streams, such as CD audio or MPEG video."*). A person of ordinary skill would have understood that this disclosure from Edens was the claimed program instructions that, when executed by the one or more processors, further caused the first playback device to generate the playback timing information associated with the audio information, because the generation of the frame header could have been accomplished in a device such as multimedia PC 170 or other playback devices of Edens, such as when that playback device was the network clock device and also the device that was obtaining audio data from outside of the network and providing it to other playback devices of Edens.

**generate the device clock information of the first playback device.**

The program instructions of the playback devices of Edens (PC 170, a CPU-based speaker device or MDV 5100) cause the associated playback device to generate the device clock information of the first playback device, such as by generating the TIME MARK system command with "time of day" specified in the timestamp field. See Edens at 51:38~56 (*"In one embodiment, the network clock device transmits this 'time of day' reference by first broadcasting a TIME MARK system command with the 'time of day' specified in the Timestamp field, which indicates to interested network devices that such 'time of day' will occur upon receipt of the next 'WK' frame header. At the appropriate time, the network clock device then substitutes the Time*

Application/Control Number: 90/013,959                                                Page 20
Art Unit: 3992

*Sync ('WK') frame header (in lieu of the far more common Clock Sync ('JK') frame header) to*

*'mark' the previously specified time of day. It should be noted that this "time of day" is a very*

*accurate relative time marker. Although it is received at slightly different times by network*

*devices due to propagation delays along the logical ring network, these relative time differences*

*remain constant due to the synchronous nature of the logical ring network. Moreover, in*

*one embodiment, the delay does not exceed one (44.1 kHz audio sample) frame time. The 'sub-*

*frame' field of the Timestamp therefore is set to zero in this embodiment*.").

A person of ordinary skill would have understood that this disclosure from Edens was the

claimed program instructions that, when executed by the one or more processors, further caused

the first playback device to generate the device clock information of the first playback device,

because the generation of the time of day, time sync and clock sync data could have been

accomplished in a device such as multimedia PC 170 or other playback devices of Edens, such as

when that playback device was the network clock device and also the device that was obtaining

audio data from outside of the network and providing it to other playback devices of Edens.


*RE: Claim 11*

**The first playback device of claim 9, wherein the control information further**

**comprises one or more instructions for the first playback device and the second**

**playback device to playback audio information.**

Edens discloses that the control information further comprises one or more instructions

for the first playback device and the second playback device to playback audio information. No

limitations are provided in regards to the format, substance or type of instructions, such that any

Application/Control Number: 90/013,959                                    Page 21
Art Unit: 3992

instruction for the first playback device and the second playback device to playback audio

information meets this limitation under the broadest reasonable interpretation.

Edens discloses that network devices such as the playback devices can send commands to one

another, pursuant to virtually any protocol, which would include simple playback protocols such

as a "play" command. See Edens at 11:26-30 ("*Network devices also can utilize channels of the*

*data stream to send custom commands to one another, including control information, pursuant*

*to virtually any protocol known to such devices*").

Edens discloses that audio data can be played by surround sound amplifier/speaker devices 153-

158, which can be controlled by-control devices 190 and 195, which inherently requires

instructions for the first playback device and the second playback device (e.g. two or more of

surround sound amplifiers/speaker devices 153-158 (which can be CPU-based devices

augmented with hardware and software as disclosed at 14:64-67) to playback audio information.

See Edens at 14:11-23 ("*The audio extracted by MPEG2 decoder 161 could be transmitted back*

*onto logical ring network 120 and played by left 167 and right 168 amplifier/speakers. The audio*

*extracted by MPEG2 decoder 151 could be transmitted back onto logical ring network 120,*

*processed by DSP (e.g., AC-3 surround sound decoder) 152, and then transmitted back onto*

*logical ring network 120 and played by surround sound amplifier/speakers 153, 154, 156, 157*

*and 158. The systems in rooms 106 and 102 could be controlled by respective remote*

*control/interface/monitor devices 190 and 195 (which could range from simple remote controls*

*to complex controllers with large LCD screens capable of viewing computer graphics images,*

*MPEG2 video, etc.*").

Application/Control Number: 90/013,959                                    Page 22
Art Unit: 3992

A controller of Edens can also send a START STREAMS command to networked audio devices to start playback. See Edens at 56:25-41 ("*Finally, having assigned all reallocated network nibble streams to the relevant network devices, the controller could restart, those streams simultaneously by sending the START STREAMS system command to such devices. The START STREAMS system command is identical to the STOP STREAMS system command discussed above, except that devices start (rather than stop) transmitting/receiving data at the time indicated by the Timestamp field. Thus, a controller can accommodate virtually any programming change a user makes (typically via some form of remote control device) with respect to the source (e.g., DSS satellite receiver, DVD player, CD player, etc.) or destination (e.g., particular speakers, televisions/monitors, etc.) of an audio or video program, or other form of data.*"). The start/stop streams commands applies to each device that is receiving the information and then further transmitting it on to another device. 10:4-7 ("*Information can propagate around this logical ring, reaching every device on each revolution around the network. Network devices are full-duplex, transmitting and receiving information simultaneously*").

A person of ordinary- skill would have understood that this disclosure from Edens was the claimed control information further comprises one or more instructions for the first playback device and the second playback device to playback audio information, because the START STREAMS command was an instruction for playing back the audio content that could have been generated by a controlling multimedia PC, MDV 5100 or other control device of Edens, and would have been received and retransmitted by each playback device of Edens that was playing back the audio in synchrony.

Application/Control Number: 90/013,959                                    Page 23
Art Unit: 3992

*RE: Claim 12*

**The first device of claim 11, wherein the first and second playback devices are members of a synchrony group, and wherein the program instructions, when executed by the one or more processors, further cause the first playback device to:**

Edens discloses that, the first and second playback devices are members of a synchrony group, which is any two devices that are synchronized in some manner under the broadest reasonable construction of the term "synchrony group." For example, Edens explicitly discloses synchronized playback between stereo speaker devices, and also **between** multiple sets of stereo speakers. 52:66-53:10 ("*As each frame propagates around the default network path (or alternate path) of the logic ring networks, the CD player would overwrite nibbles 10-15 and 74-79 with the respective (left and right channel) source digital audio streams. Other network devices would merely pass those nibbles of each frame along to the next network device on the logical ring network. **One or more** "left" speaker network devices (e.g., in different rooms of a house) would extract nibbles 10-15 of each frame and play that left channel digital audio stream. Similarly, **one or more** "right" speaker network devices would extract nibbles 74-79 said play that right channel digital audio stream.*").

A person of ordinary skill would have understood that this disclosure from Edens demonstrated that multiple playback devices of Edens could play back the audio in synchrony, which would make them members of a "synchrony group" under the **BRI**. See also Edens at 10:4-7; 11:13-18; 14:24-40; 27:1-5; 32:28-52; 56:9-14 and 104:7-15.

**transmit, to the network device, status information that comprises a status of the synchrony group.**

Application/Control Number: 90/013,959                                      Page 24
Art Unit: 3992

Edens discloses transmit status information to the network device that comprises a status of the synchrony group. The broadest reasonable interpretation of the term "status information" includes any kind of status information associated with the synchrony group, including any device that is capable of communicating with other devices, such as by responding to a MASTER RESET, CLOCK. ID, SCAN RESET, SCAN REQUEST, SCAN REPLY and SCAN INITIATE system command, which are used to reset and initialize network devices, by communicating with other network devices and read/write one another's device-specific information via the MESSAGE, READ, WRITE, SET and GET system commands, or by responding to a data stream channel reallocation and control via the TALK ASSIGN, TALK QUERY, LISTEN ASSIGN, LISTEN QUERY, START STREAMS, STOP STREAMS, and QUERY STREAMS system commands. See Table V, 40:45 to 45:20.

Edens further discloses, in column 35 et seq., the system command stream is used primarily for initialization of configuration of devices on a logical ring network. Part of the message format specifically states a "status" byte, (e.g., 36:25 - 53, *The next to last byte of a system command is the "status" byte. Network devices set the LSB or "acknowledge" bit of this byte in a received system command to acknowledge receipt of the system command. Because system commands propagate back to the network device that initiated them before being removed, the initiating network device can inspect the acknowledge bit and know whether the target device received the system command. The "next-to-LSB" (i.e., bit 1) of the status byte is undefined in this embodiment. As will be discussed below, most system commands that are addressed directly to a network device (i.e., not broadcast) require an acknowledgement. The 6 MSBs of the status byte*

Application/Control Number: 90/013,959                                    Page 25
Art Unit: 3992

*can be used by a network device as a "sequence number" to track system commands it*

*initiates…").*

A person of ordinary skill would have understood that this disclosure from Edens was the

claimed transmission of status information that, comprises a status of the synchrony group to

the network, device, because device-specific information obtained via the MESSAGE, READ,

WRITE, SET and GET system commands, or from a response to a data stream channel

reallocation and control via the TALK ASSIGN, TALK QUERY, LISTEN ASSIGN, LISTEN

QUERY, START STREAMS, STOP STREAMS, and QUERY STREAMS provided status

information from a member of a synchrony group, which meets the claim limitation under the

BRI.

*RE: Claim 19*

> **The first playback device of claim 9, wherein the audio information source outside**
>
> **of the LAN is an Internet-accessible audio information source, and wherein**
>
> **obtaining, from the audio information source outside of the LAN, the**
>
> **audio information, comprises obtaining the audio information from the Internet-**
>
> **accessible audio information source.**

Edens discloses multiple ways for the playback devices of Edens (PC 170, a CPU-based

speaker device or MDV 5100) to receive control information via the network interface from a

network device configured to control the first playback device and communicatively coupled to

the first playback device over the LAN. In one embodiment, the playback devices of Edens

"could be controlled by respective remote control/interface/monitor devices 190 and 195 (which

Application/Control Number: 90/013,959                                          Page 26
Art Unit: 3992

could range from simple remote controls to complex controllers with large LCD screens capable

of viewing computer graphics images, MPEG2 video, etc.)," (e.g., 14:19-23). In another

embodiment, "multimedia PC 170 could be used to control devices on logical ring network 120,

as well as to transmit and receive digital media to/from other network devices", (e.g., 14:42-44).

Edens discloses accessing a URL over the Internet for information required by a playback device

of Eden for operational purposes, (e.g., 46:56-60, "*Other interested devices can read this*

*information for subsequent use in communicating directly with a particular device and/or*

*obtaining additional information about a device from an external resource (e.g., the Internet via*

*a URL pointer"*), and 47:47-54, "*As will be apparent to one reasonably skilled in the art, many*

*different data structures (e.g., a linked list of objects) and combinations of RAM/ROM/registers*

*can be employed to accommodate the various types of data contained within the configuration*

*and code control block, as well as any other information stored in a network device's local*

*memory and I/O address space, including 'pointers' to external information.*". A person having

ordinary skill in the art would recognize that URL pointers could be used to obtain audio data, as

it was widely known by the Critical Date of the '357 Patent to obtain audio data from a remote

source over the Internet. As such, it is seen specifically that the Handbook specifically teaches

accessing audio data from different websites to have either downloaded or streamed to a

requesting computer and have forwarded to other devices in a smaller network, (e.g., pp.17 – 22

et seq.). Furthermore, the Handbook discloses in multiple other areas that PCs could be used as

playback devices and included the ability to obtain audio information from a source outside the

LAN. See the Handbook, pages see pages, 28-34, 66-84, 109-116, 123-154, 243-261. It is

obvious that once a user knowns the location of the audio content they wish to listen to, they

Application/Control Number: 90/013,959                                    Page 27
Art Unit: 3992

have the ability to download it in the multiple ways discussed above and in the prior art.

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention

was made to combine the teachings of the Handbook with Eden for similar reasons stated above,

herein and in the double patenting rejection.


2.        Claims **9, 10, 11, 12, and 19 are** rejected under **pre-AIA 35 U.S.C. 103(a)** as being

unpatentable over U.S. **Blank in view of the Gray and in further view of Sonos APA**.


*RE: Claim 9*

**A first playback device comprising: one or more processors; a network interface;
and tangible, non-transitory computer-readable memory comprising program
instructions that, when executed by the one or more processors, cause the
first playback device to:**

Blank discloses a media synch player 110 that is a playback device, (e.g., ¶ 0029, "*In

operation, the media synch players 110 each generate a content stream such as video or

audiovisual data in synchrony at the behest of the live playback system control console 125.

Synchronism is derived from the time server 120, facilitating orchestration of the content

provided by the media synch players 110. The system control console 125 and the media synch

players 110 are slaved to the time server 120. As such, the system control console 125 can

transmit a start time t+d for the media synch players 110 to start providing content from media

files 210 (FIG. 2), and the media synch players 110 are synchronized with respect to this start*

Application/Control Number: 90/013,959                                            Page 28
Art Unit: 3992

*time.*" See also [0026], [0034], [0036]-[0041], [0044]-[0047], [0052]-[0059], [0065]-[0071],

[0077]-[0093].

Gray discloses a management system 212 at [0036]-[Q037] that can receive audio data

over the Internet for use with audio system 216, and that management system can be a playback

device that is integral with audio system 216. A person of ordinary skill in the art would

understand that management system 212 can be implemented as part of one or more media synch

player 110.

A person of ordinary skill in the art. would consider the media synch players 110 of

Blank or the management system 212 of Gray to be playback devices that could be implemented

as PCs or in conjunction with PCs, and would understand that they could be implemented in

conjunction with commonplace PC functionality disclosed in the Handbook.

**receive, via the network interface from a network device configured to control the**

**first playback device and communicatively coupled to the first playback device over**

**a local area network (LAN), control information comprising an address identifying**

**a network location of audio information available at an audio information source,**

**wherein the audio information source is outside of the LAN; and after receiving the**

**control information, (i) obtain, via the network interface from the audio information**

**source outside of the LAN, the audio information;**

Blank discloses that recorded media that are distributed over a wide geographic area can

be used for a multimedia presentation that requires synchronization of multiple displays at, (e.g.,

¶ 0008). Blank discloses that live playback system control console 125 at ¶ 0054 that provides

control signals to interface 220 of media synch players 110, and that these control signals can

Application/Control Number: 90/013,959                                      Page 29
Art Unit: 3992

include commands to "play" and "get file." Thus, at least live playback system control console

125 is a "*network device configured to control the first playback device and communicatively*

*coupled to the first playback device over a local area network (LAN).*", (e.g., ¶ 0054, "*In the*

*block 405, control signals from the control console 125 are received by the interface 220. In one*

*embodiment, the control signals may comprise, for example, one of: play, pause, stop, seek to*

*time, get file and show images.*"). Blank discloses that media files 210 can be stored at a media

storage location for each media synch player 110, or that is shared by two or more media synch

players 110 at ¶ 0037. Blank discloses that the disclosed system elements can be connected over

a WAN or the Internet at [0023], Blank incorporates U.S. patent application Ser. No. 09/836,834

(Published Application No. 2002/0150053 to Gray et a., hereinafter "Gray") by reference at

[0042] and [0045], Gray discloses communication of multimedia packets 304 from a multimedia

source 301 to a multimedia sink 302 over heterogeneous networks 303, which inherently requires

an address identifying a network location of audio information outside of a LAN for a

multimedia sink 302 on a local area network 313. See, Gray at Fig. 1, ¶¶ 0053, **0059**, 0061).

Gray discloses at ¶¶ 0036 – 0037 that management system 212 can receive audio data

over the Internet for use with audio system 216, and that management system can be a playback

device that is integral with audio system 216. A person of ordinary skill in the art would

understand that management system 212 can be implemented as part of one or more media synch

player 110.

A person of ordinary skill in the art would recognize that streaming audio content from a

source outside of the LAN could be accomplished using software programs such as the Windows

Media Player, as disclosed at [0037] of Blank. A person having ordinary skill in the art would

Application/Control Number: 90/013,959                                    Page 30
Art Unit: 3992

thus understand that live playback system control console 125 can provide control information to a media synch player that comprises an address identifying a network location of audio information available at an audio information source, wherein the audio information source is outside of the LAN, as disclosed in Gray. As such, a person having ordinary skill in the art would understand that audio data that is received over the Internet by the system of Gray can be stored as a media file 210 of a media synch player 110 of Blank. It was common as of the critical date of the '357 Patent (April 1, 2003) for users to obtain content over the Internet from sources outside of a user's LAN and to store that content on a personal computer or other playback device. Also See, e.g., the Handbook.

> **(ii) transmit, via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device;  and**

Blank discloses clock module 212 of a media synch player 110 that can be slaved to another clocking system at ¶ 0038, Blank also discloses the use of a time server 120 at ¶ 0029 and ¶¶ 0044-0051. A person of ordinary skill in the art would recognize that the time server 120 could be located on a first media synch player 110, and could provide the master clock that is used to provide the playback timing information, (e.g., MPEP 2144.04 V.B. "Making Integral" *In re Larson,* 340 F.2d 965, 968, 144 USPQ 347, 349 (CCPA 1965), i.e., the courts found that making one means integral with another means, among other reasons, "that the use of a one piece construction instead of the structure disclosed in [the prior art] would be merely a matter of obvious engineering choice."). In this instance, taking to computers and housing them in "one

Application/Control Number: 90/013,959                                          Page 31
Art Unit: 3992

box" would be an "obvious engineering choice".  Thusly, the time server 120 would then

transmit clock information to a second media synch players 110, to allow it to acquire lock with

a clock contained in time server 120. See ¶ 0048 of Blank.

     As discussed below, the first media synch player 110 can obtain the audio information

and provide it to the second media synch player 110 using Windows file sharing, and can then

provide playback timing information by either 1) hosting live playback system control console

125 and transmitting a play command to the second media synch player 110, for "playback

timing information" construction 1, or 2) add time stamps to the media data packets at the

application layer that are used to control playback timing in accordance with the teachings of

Gray, for "playback timing information" construction 2, Time information can also be

transmitted from time server 120 to other media synch players 110 to cause them to "speed up or

slow" down rendering of clocks 212 in the individual media synch players 110." See [0045] of

Blank. Time information that causes other media synch players 110 to speed up or slow down

meets the broadest reasonable interpretation of "playback timing information," because it is used

to control playback timing.

     A person having skill in the art would recognize that live playback system control

console 125 can also be implemented on a media synch player 110 with time server 120, and can

be used to provide playback timing information to other media synch players 110 as disclosed at

[0044] as a time stamp "t" and an indication of a delay "d" that is used to coordinate playback,

which satisfies the broadest reasonable interpretation of "playback timing information,"

because it is used to control playback timing. Therefore, it would have been obvious to combine

the devices stated in Blank because of similar reasons stated above and in MPEP 2144.04. Blank

Application/Control Number: 90/013,959                                        Page 32
Art Unit: 3992

discloses the playback timing information associated with the audio information under

construction 1, such as when a start time t+d is generated by a first playback device that is also

used to implement system control console 125. See ¶ 0029.

Gray discloses the use of time stamps in multimedia packets at [0062] that are used to

control the time that a multimedia packet is to be rendered at, and further discloses at [0069] that

the application layer can "maintain the common time reckoning across the devices, calculate the

appropriate time stamp, and/or include the time stamp in the multimedia packet." A person of

ordinary skill in the art would recognize from this teaching that the application layer on the

media synch player 110 that includes a time server 120 could include the time stamp into the

multimedia packets of the audio data from media file 210 (that has been obtained from outside

the LAN and stored in media file 210) and which is then provided to other media synch players

110 as "playback timing data" for synchronized playback, because that would allow the system

of Blank to be implemented on as few as two different devices, and would eliminate the need for

a separate time server 120. Gray discloses the playback timing information associated with the

audio information under construction 2, such as when the application layer of a media synch

player 110 inserts timestamps into frames of audio data, See ¶¶ 0016, 0087, 0089.

A person of ordinary skill in the art would consider the media synch players 110 of Blank

or the management system 212 of Gray to be playback devices that could be implemented as PCs

or in conjunction with PCs, and which can transmit audio information, playback timing

information and clock information to another playback device for synchronous playback.

Application/Control Number: 90/013,959                                    Page 33
Art Unit: 3992

To the extent that it is considered that Blank or Gray do not disclose this limitation, the Sonos APA discloses that it was known to transmit audio information and playback timing information associated with the audio information (for synchronous playback) and device clock information of the first playback device (using RFC 1305 or SNTP), via the network interface of the first playback device to a second playback device. See '357 Patent at 1:47 to 2:28 and the '768 Provisional at pages 1-2. It would be obvious to use the Sonos APA with the system of Blank, because both Blank and the Sonos APA are directed to networked audio devices that playback audio in synchrony, and the Sonos APA would eliminate the need for an additional device for time server 120, because it teaches that the timing functionality can be provided by a playback device.

**(iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information,**

Blank discloses that media synch players 110 play back the audio information in synchrony with each other by using the playback timing information associated with the audio information that is generated by live playback system control consoled 125 and the device clock information of the first playback device (which is used to generate the NTP timing information) to play back the audio information. See ¶¶ [0009], [0010], [0022], [0024], [0025], [0029], [0041], [0043]-[0045], Each media synch player 110 uses the audio information and its own clock information and the playback timing information (the start time of Blank t+d under construction 1, or frame-specific time stamps of Gray under construction 2), but even if the

Application/Control Number: 90/013,959                                    Page 34
Art Unit: 3992

claims are amended to positively recite the second playback device and to require the second

playback device to use the playback timing information associated with the audio information

and the device clock information of the first playback device to play back the audio information.

Blank or Blank and Gray disclose that also.

The management systems 212 of Gray can play back the audio information in synchrony with a

second management system 212 by using the playback timing information associated with each

frame of the audio information and the device clock information of the first playback device to

play back the audio information, such as using an application synchronization process in

conjunction with the management systems 212. See ¶¶ [0016], [0087], [0089].

     A person of ordinary skill in the art would consider the media synch players 110 of Blank

or the management system 212 of Gray to be playback devices that could be implemented as PCs

or in conjunction with PCs, and which can play back audio in synchrony with each other using

the playback timing information and clock time information of the first playback device, as

discussed above.

     It is noted that this limitation does not require the second playback device to playback the

audio information by using the playback timing information associated with the audio

information and the device clock information of the first playback device to play back the audio

information. That limitation only applies to the first playback device, and as long as the second

playback device is playing back the audio information in synchrony with the first playback

device while the first playback device uses the playback timing information associated with the

audio information and the device clock information of the first playback device to play back the

audio information, then the claim limitation is satisfied. It is further noted that the only real

Application/Control Number: 90/013,959                                      Page 35
Art Unit: 3992

information that is used to play the audio is the audio information and the playback timing

information. The "device clock information" is not specifically utilized since all that is needed it

that the synchrony uses the playback timing information **associated** with the audio information

and the device clock information, i.e., "associated" is not the same as saying "using" the device

clock information in actual playing of audio information.

      To the extent that it is considered that Blank or Gray do not disclose this limitation, the

Sonos APA discloses that it was known to transmit audio information and playback timing

information associated with the audio information (for synchronous playback) and device clock

information of the first playback device (using RFC 1305 or SNTP), via the network interface of

the first playback device to a second playback device. See '357 Patent at 1:47 to 2:28 and the

'768 Provisional at pages 1-2. It would be obvious to use the Sonos APA with the system of

Blank, because both Blank and the Sonos APA are directed to networked audio devices that

playback audio in synchrony, and the Sonos APA would allow Blank to provide the timing

functionality on one of the media synch players 110 instead of a dedicated time server 120, thus

reducing the need for an additional device.

      **wherein the first and second playback devices remain independently clocked during**

**synchronous playback of the audio information.**

      The prior art of Blank and Gray do not explicitly disclose this limitation.

      A person of ordinary skill in the art would consider the media synch players 110 of Blank

or the management system 212 of Gray to be playback devices that could be implemented as PCs

or in conjunction with PCs, and which can remain independently clocked during synchronous

playback, at least because PCs contain multiple clocks that can be independent.

Application/Control Number: 90/013,959                                     Page 36
Art Unit: 3992

To the extent that it is considered that Blank or Gray do not disclose this limitation, the

Sonos APA discloses that playback devices can remain independently clocked during

synchronous playback of audio information, see '357 Patent at 2:21-27 ("*When an audio*

*playback device converts the digital audio information from digital to analog form, it does so*

*using a clock that provides timing information. Generally, the audio playback devices that are*

*being developed have independent clocks, and, if they are not clocking at precisely the same*

*rate, the audio playback provided by the various devices can get out of synchronization.*"). Thus,

if the independent clocks of the audio playback devices are clocking at precisely the same rate by

design, or if they are synchronized, then the audio playback provided by the various devices

remains in synchronization. Furthermore, as closely interpreted by the Examiner under BRI, the

interpretation of "independently clocked" could also be that the clocks of each device is run

under the devices own power, (i.e., the master device does not run the other device's clocks, the

master device merely sets a sync point). Therefore, Blank or Gray would start the

synchronization process and the devices in the network would run the clock from the sync point

as received from the master clock. Thus it would have been obvious to one of ordinary skill in

the art to combine Sonos APA with Blank or Gray because Blank and Gray merely lacked the

explanation of the well-known and understood notion of devices running their clocks

independent of each other as stated by Sonos APA. Furthermore, the problem of synchronization

of the independently clocked devices of Sonos APA is seen to be remedied by Blank and Gray's

ability to synchronize the devices on its network much like the '357 Patent.

Application/Control Number: 90/013,959                                    Page 37
Art Unit: 3992

*RE: Claim 10*

**The first play back device of claim 9, wherein the program instructions, when executed by the one or more processors, further cause the first playback device to: generate the playback timing information associated with the audio information; and**

Blank discloses that the software generates the playback timing information associated with the audio information under construction 1, such as when a start time t+d is generated by a first playback device that is also used to implement system control console 125. See ¶ [0029] Gray discloses that the software generates the playback timing information associated with the audio information under construction 2, such as when the application layer of a media synch player 110 inserts timestamps into frames of audio data. See ¶¶ [0016], [0087], [0089]. A person of ordinary skill in the art would consider the media synch players 110 of Blank or the management system 212 of Gray to be playback devices that could be implemented as PCs or in conjunction with PCs that use SMPTE or RFC 1305 to generate playback timing information associated with the audio information, under either construction 1 in the form of a "play" command or under construction 2 in the form of frame-specific playback timing information.

**generate the device clock information of the first playback device.**

Blank discloses that the media synch player 110 software causes the media synch player 110 to generate device clock information of the first playback device, such as by activating the Network Time Protocol module 15. See [0038], [0046]-[0048]. Blank discloses clock module 212 of a media synch player 110 that can be slaved to another clocking system at ¶ 0038, Blank also discloses the use of a time server 120 at ¶ 0029 and ¶¶ 0044-0051. Thusly, the time server

Application/Control Number: 90/013,959                                    Page 38
Art Unit: 3992

120 would then transmit clock information to a second media synch players 110, to allow it

to acquire lock with a clock contained in time server 120. See ¶ 0048 of Blank. Also see rejection

of claim 9 above.


*RE: Claim 11*

**The first playback device of claim 9, wherein the control information further**

**comprises one or more instructions for the first playback device and the second**

**playback device to playback audio information.**

Blank discloses at [0029] that the "*media synch players 110 each generate a content*

*stream such as video or audiovisual data in synchrony at the behest of the live playback system*

*control console 125. Synchronism is derived from the time server 120, facilitating orchestration*

*of the content provided by the media synch players 110. The system control console 125 and the*

*media synch players 110 are slaved to the time server 120. As such, the system control console*

*125 can transmit a start time t+d for the media synch players 110 to start providing content from*

*media files 210 (FIG. 2), and the media synch players 110 are synchronized with respect to this*

*start time*." The start time is control information that includes one or more instructions for the

first playback device and the second playback device to playback audio information.

See also Blank at [0044] ("*In operation, a time stamp "t" is obtained by each device from the*

*controller 125, which is synchronized with the time server 120. Also included with the time*

*stamp t is a delay indication "d". In combination, these time related components instruct the*

*media synch players 110 on when to render content, available from the media files 210.*

*Essentially, each media synch player 110 will wait to render content until a particular time*

*t+d, derived from the time stamp from the controller 125. As such, content from all of the media*

*synch players 110 will be synchronized to the same moment in time—t+d —regardless of when*

*the time synchronization was initiated* ”), [0056] (“*In a block 410, the media synch players 110*

*respond to the control signals and provide appropriate output signals via the signal paths 112 to*

*the displays 105. Such may comprise start of synchronized operation of the media synch players*

*110 and associated displays 105, switching from one media file 210 to another (e.g., get file*

*followed by start), cease operation (e.g., stop), which may include initiation of a predetermined*

*state such as a blank or black display 105, and the like*”).

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the

management system 212 of Gray to be playback devices that could be implemented as PCs or

in conjunction with PCs, and which can play back audio in synchrony with each other in

response to a suitable playback command.


*RE: Claim 12*

> **The first device of claim 11, wherein the first and second playback devices are**
>
> **members of a synchrony group, and wherein the program instructions, when**
>
> **executed by the one or more processors, further cause the first playback device to:**

Blank discloses that media synch players 110 are members of a synchrony group that

play back the audio information in synchrony with each other by using the playback timing

information associated with the audio information that is generated by live playback system

control consoled 125 and the device clock information of the first playback device (which is used

Application/Control Number: 90/013,959                                    Page 40
Art Unit: 3992

to generate the NTP timing information) to play back the audio information. See ¶¶ [0009],
[0010], [0022], [0024], [0025], [0029], [0041], [0043] - [0045].

The management systems 212 of Gray can play back the audio information in synchrony
with a second management system 212 in a synchrony group by using the playback timing
information associated with each frame of the audio information and the device clock
information of the first playback device to play back the audio information, such as using an
application synchronization process in conjunction with the management systems 212. See ¶¶
[0016], [0087], [0089].

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the
management system 212 of Gray to be playback devices that could be implemented as PCs or
in conjunction with PCs, and which can play back audio in synchrony with each other, which
would make then members of a synchrony group.

**transmit, to the network device, status information that comprises a status of the
synchrony group.**

Blank discloses that status information that comprises a status of the synchrony group can
be displayed in Figures 6 & 7, which shows the status of players **Al, B1** and **Cl,** which are each
playing the same audio source ("Fgn_Affair"). See ¶¶ [0064]-[0065].

Application/Control Number: 90/013,959                                         Page 41

Art Unit: 3992



*Fig. 6*

*Fig. 7*

Blank discloses that status information can be displayed using a player status mode [0070], and that the status information can include a status such as "playing" [0071], See Fig. 9, "player status," which is a "status of the synchrony group" because it is a status of a member of the synchrony group under the broadest reasonable construction of the term:

Application/Control Number: 90/013,959                                          Page 42
Art Unit: 3992



Fig. 9

To the extent that it is considered that Blank does not disclose this limitation, the Sonos APA discloses the existence of discovery protocols that can be used to learn about other components on the network and to establish communication with them, such as the Universal Plug and Play (UPnP) architecture, which defines discovery as the first step in UPnP networking. This allows devices to discover other devices and to exchange information about themselves and/or their services. See U.S. Provisional Application 60/490,768, filed July 28, 2003 (the '768 Provisional), A person of ordinary skill in the art would understand that such discovery protocols would result in the transmission of status information for each device in the synchrony group to a controller device, which could be implemented in conjunction with live playback system control console 125 or other suitable control devices.

Application/Control Number: 90/013,959                                    Page 43
Art Unit: 3992

*RE: Claim 19*

> **The first playback device of claim 9, wherein the audio information source outside of the LAN is an Internet-accessible audio information source, and wherein obtaining, from the audio information source outside of the LAN, the audio information, comprises obtaining the audio information from the Internet-accessible audio information source.**

Blank discloses that the system elements can be connected by LANs, WANs or the Internet. See ¶ [0023].

Gray discloses that audio content can be obtained from a remote source over the Internet. See ¶¶ [0035]-[0037], [0041], [0046]-[0048].

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the management system 212 of Gray to be playback devices that could be implemented as PCs or in conjunction with PCs that can obtain audio information from an Internet-accessible source, as disclosed Blank, Gray, Sonos APA, or what is well known and ordinary in the art.

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to combine the teachings of the Handbook with for similar reasons stated above, herein and in the double patenting rejection.

Application/Control Number: 90/013,959                                    Page 44
Art Unit: 3992

## IV. CONCLUSION

### A. Submissions

1.       Information Disclosure Statement (IDS)

        The multiple IDS submissions on 08/31/2017, and the IDS submitted 10/09/2017 was

considered as of 10/17/2017. It is to be noted, however, that where patents, publications, and

other such items of information are submitted by a party (patent owner or requester) in

compliance with the requirements of the rules, the requisite degree of consideration to be given

to such information will be limited by the degree to which the party filing the information

citation has explained the content and relevance of the information. In instances, where no

explanation of citations (items of information) is required and none is provided for an

information citation, only a cursory review of that information is required. The examiner need

only perform a cursory evaluation of each unexplained item of information, to the extent that

he/she needs in order to determine whether he/she will evaluate the item further. If the cursory

evaluation reveals the item not to be useful, the examiner may simply stop looking at it. This

review may often take the form of considering the documents in the same manner as other

documents in Office search files are considered by the Examiner while conducting a search of

the prior art in a proper field of search. The initials of the Examiner, in this proceeding, placed

adjacent to the citations on the PTO/SB/08A or its equivalent, without an indication in the record

to the contrary in the record, do not signify that the information has been considered by the

Examiner any further than to the extent noted above. The same degree of consideration was

provided for the references merely cited with the request but for which no explanation regarding

the content and relevance of the information was provided. See MPEP 609, Chapter 0600, pages

Application/Control Number: 90/013,959                                              Page 45
Art Unit: 3992

192-193 of pages 1-197 - MPEP Eighth Edition, Revision 8 (July 2010). The examiner notes that

due to the unusually large number of references cited, and the absence of any description of the

relevance of the references, it should be assumed that only the most cursory review of the cited

documents consistent with these guidelines has been performed. If applicant is aware of any

information that might be of particular relevance, it should be pointed out in order to insure a

higher degree consideration.

2.      In order to ensure full consideration of any amendments, affidavits or declarations, or

other documents as evidence of patentability, such documents must be submitted in response to

this Office action. Submissions after the next Office action, which is intended to be a final

action, will be governed by the requirements of 37 CFR 1.116, after final rejection and 37 CFR

41.33 after appeal, which will be strictly enforced.


**B. Extension of time**

        Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings

"will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in ex parte

reexamination proceedings are provided for in 37 CFR 1.550(c). See MPEP § 2265.


**C. Litigation Reminder**

        The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving in

Application/Control Number: 90/013,959                                      Page 46
Art Unit: 3992

the '357 Patent throughout the course of this reexamination proceeding. See MPEP §§ 2207,

2282 and 2286.


**D. Amendment in Reexamination Proceedings**

Patent owner is notified that any proposed amendment to the specification and/or

claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be

formally presented pursuant to 37 CFR 1.530(d) - (j), and must contain any fees required by 37

CFR 1.20(c). See MPEP § 2234 and 2250(IV) for examples to assist in the preparation of proper

proposed amendments in reexamination proceedings.


**E. Service of Papers**

All correspondence related to this ExParte reexamination proceeding should be directed:

By EFS:          Registered users may submit via the electronic filing system EFS-Web, at

                 https://efs.uspto.gov/efile/myportal/efs-registered

By Mail to:      Mail Stop Ex Parte Reexam

                 Central Reexamination Unit

                 Commissioner for Patents

                 United States Patent & Trademark Office

                 P.O. Box 1450

                 Alexandria, VA 22313-1450

Application/Control Number: 90/013,959                                    Page 47
Art Unit: 3992

By FAX to:      (571) 273-9900

                Central Reexamination Unit


By hand:        Customer Service Window

                Randolph Building

                401 Dulany Street

                Alexandria, VA 22314


Telephone numbers for reexamination inquiries:

Reexamination and Amendment practice: (571) 272-7703

Central Reexamination Unit (CRU): (571) 272-7705

Any inquiry concerning this communication or earlier communications from the examiner, or as

to the status of this proceeding, should be directed to the Central Reexamination Unit at

telephone number (571) 272-7705.


/David E. England/
Primary Examiner, Art Unit 3992

Conferees: /Roland Foster/, Primary Examiner, Art Unit 3992

/MICHAEL FUELLING/
Supervisory Patent Examiner, Art Unit 3992

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,959 | 06/16/2017 | 9213357 | 04-0401-REEXAM (14-1800-R | 9548 |

107361          7590          11/22/2017

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| ENGLAND, DAVID E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/22/2017 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| *Reexamination* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 90013959 | 9213357 |
| | Certificate Date | Certificate Number |

| Requester Correspondence Address: | ☐ Patent Owner | ☒ Third Party |
|---|---|---|

MR. CHRISTOPHER JOHN ROURK
JACKSON WALKER LLP
2323 ROSS AVENUE
SUITE 600
DALLAS, TX 75201

| LITIGATION REVIEW ☐ | /DE/ (examiner initials) | 11/17/2017 (date) |
|---|---|---|
| Case Name | | Director Initials |
| Sonos Inc. v. D&MHoldings, Inc., United States District Court | | |
| | | |
| | | |
| | | |
| | | |

### COPENDING OFFICE PROCEEDINGS

| TYPE OF PROCEEDING | NUMBER |
|---|---|
| | |
| | |
| | |
| | |

| | /DAVID ENGLAND/ |
|---|---|
| | Primary Examiner.Art Unit 3992 |

DOC. CODE **RXFILJKT**

| *Ex Parte Reexamination Interview Summary* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/013,959 | 9213357 |
| | Examiner | Art Unit |
| | DAVID ENGLAND | 3992 |

All participants (USPTO personnel, patent owner, patent owner's representative):

(1) _DAVID ENGLAND_

(2) _Michael Fuelling, SPR_

(3) _Roland Foster, Primary Re-examiner_

(4) _Jeffrey Armstrong 54967, Christopher Butts 67558_

Date of Interview: _16 November 2017_

Type: a)☐ Telephonic   b)☒ Video Conference
c)☒ Personal (copy given to: 1)☐ patent owner   2)☐ patent owner's representative)

Exhibit shown or demonstration conducted:   d)☒ Yes   e)☐ No.
   If Yes, brief description: _The Attorneys demonstrated how claim 9 works with their devices. Mainly how the connection process works and the devices playback music in synchronicity. The Attorneys of record will also submit a complete detailed description of how the demonstration was conducted._

Agreement with respect to the claims f)☐ was reached.   g)☐ was not reached.   h)☒ N/A.
Any other agreement(s) are set forth below under "Description of the general nature of what was agreed to…"

Claim(s) discussed: _9_.

Identification of prior art discussed: _Edens, the Handbook, APA, Blank, and Gray_.

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:
_See Continuation Sheet._

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims patentable, if available, must be attached.  Also, where no copy of the amendments that would render the claims patentable is available, a summary thereof must be attached.)

A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION MUST INCLUDE PATENT OWNER'S STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  (See MPEP § 2281). IF A RESPONSE TO THE LAST OFFICE ACTION HAS ALREADY BEEN FILED, THEN PATENT OWNER IS GIVEN **ONE MONTH** FROM THIS INTERVIEW DATE TO PROVIDE THE MANDATORY STATEMENT OF THE SUBSTANCE OF THE INTERVIEW (37 CFR 1.560(b)). THE REQUIREMENT FOR PATENT OWNER'S STATEMENT CAN NOT BE WAIVED. **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

| /DAVID ENGLAND/ Primary Examiner, Art Unit 3992 | | |
|---|---|---|

cc: Requester (if third party requester)

**Continuation Sheet (PTOL-474)**                                    **Reexam Control No.  90/013,959**

 Continuation of Description of the general nature of what was agreed to if an agreement was reached, or any other comments:  In the attached interview agenda, the Attorneys of record discussed to main points, see sections 'A' and 'B' of the interview agenda. As to discussion point 'A', the Examiner stated that if the network topology was a pivotal point in overcoming the rejection to submit a very detailed explanation of what was submitted in the agenda and possibly a declaration from an expert explaining why the art would not read on the claims as discussed in point 'A'. As to discussion point 'B', the Examiner stated that if the Attorneys felt the court cases that are cited would aid in furthering their discussion point, to submit examples from the court decisions along with a more detailed explanation as to why the combination of Blank, Gray, and the APA would not be combinable. Examiner further stated that the term "independently clocked" is still broad and could be interpreted in many different ways since it is not explicitly defined in the specification. The Attorneys of record stated they will submit further explanation on the term that was already discussed in a court proceeding along with other explanation as to how the term is to be interpreted under BRI. The Examiner awaits the Applicant's official response .



**McDonnell Boehnen Hulbert & Berghoff**
Law Offices

300 South Wacker Drive     312-913-0001 phone
Chicago, Illinois 60606-6709    312-913-0002 fax
www.mbhb.com

November 15, 2017

Via email: david.england@uspto.gov

Examiner David E. England
U.S. Patent & Trademark Office
P.O. Box 1450
Arlington, VA 22313-1450

**RE:  Interview Agenda for 90/013,959 (Sonos 04-0401-REEXAM; 14-1800-REX)**

Examiner England:

Thank you for agreeing to interview the above-referenced application on Thursday, November 16, 2017, at 11:45am ET.  An agenda of topics is outlined below:

**Agenda for the Examiner Interview**

- A demonstration of a commercial embodiment of the features recited in the claims
- Independent Claim 9
- The broadest reasonable interpretation of "independently clocked"
- The 35 U.S.C. § 103 rejections in the Office Action
- The technical references cited in the Office Action
  1. U.S. Pat. 6,611,537 (Edens)
  2. *The MP3 and Internet Audio Handbook* (Handbook)
  3. alleged Sonos admitted prior art (APA)
  4. U.S. Pub. 2004/0252400 (Blank)
  5. U.S. Pub. 2002/0150053 (Gray)

**Independent Claim 9**

9.      (Original)  A first playback device comprising:

one or more processors;

a network interface; and

tangible, non-transitory computer-readable memory comprising program instructions that, when executed by the one or more processors, cause the first playback device to:

1

receive, via the network interface from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a network location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information, (i) obtain, via the network interface from the audio information source outside of the LAN, the audio information; (ii) transmit, via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

**The § 103 Rejections**

Patentee submits that the claims are patentable over the cited references and requests that the Office withdraw the § 103 rejections.

### A. Claims 9-12 and 19 are Patentable over Edens, Handbook, and the alleged APA

Claims 9-12 and 19 are patentable over Edens, Handbook, and the alleged APA for at least the reason that Edens, Handbook, and the alleged APA, individually or in combination, fail to teach or suggest at least "play[ing] back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information," in combination with the other elements recited in the claims.

#### i. Edens fails to teach or suggest that at least that the playback devices remain independently clocked during synchronous playback

Edens solves the problem of synchronous playback among multiple playback devices in an entirely different manner than that recited by claim 9 of Millington '357.

In contrast to claim 9, Edens discloses a system where playback devices are never independently clocked, and thus, they do not "remain independently clocked" during synchronous playback. Instead, Edens discloses playback devices configured in "a synchronous logical ring network." Edens, 9:58. In Edens's synchronous logical ring network, "fixed frames of information propogat[e] around the network at consistent time intervals (44.1kHz 'frame rates' in one embodiment, to enable device synchronization to the CD audio sample rate)." Edens, 10:12-15.

"[T]he logical ring network ensures that information always will propagate from one device to another at consistent time intervals" so that "the time required for information to propagate between any two particular devices will remain fixed." Edens, 10:15-21.

Because of the network architecture and configuration of Edens's synchronous logical ring network, the playback devices in the synchronous logical network are inherently not independently clocked while in operation, much less during synchronous playback of media content. Thus, Edens fails to teach or suggest at least "play[ing] back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information," in combination with the other elements recited in the claims.

### ii. The addition of Handbook fails to overcome the deficiencies of Edens

The Office Action does not cite Handbook for teaching "play[ing] back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information." Office Action, pp. 14-18. Further, Patentee's review of Handbook found no teaching or suggestion of this aspect of the claims.

### iii. The addition of alleged APA fails to overcome the deficiencies of Edens and Handbook

Contrary to the assertions in the Office Action, it would not have been obvious to modify the "synchronous logical ring network" of Edens with the teachings of the alleged APA so that the playback devices in Edens "remain independently clocked" during synchronous playback because Edens teaches away from solutions where playback devices are independently clocked.

A reference teaches away from a claimed invention "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013).

Here, Edens says, "[a]pplying local area network technology (e.g., Ethernet and TCP/IP network protocols) to consumer electronics devices *raises a number of problems*" and that "[a]lthough it appears advantageous to connect consumer electronics devices as generic nodes on a network, *existing network protocols are far from optimized for real-time streams of digital audio* and video." Edens, 4:47-53 (emphasis added).

Edens further explains that "Ethernet…is not optimized to carry real-time continuous digital media streams" because "[i]t is an asynchronous, packet-based protocol that would add significant overhead to digital audio and video samples, which require consistent and timely delivery, as opposed to the ability to 'burst' packets of information at high speeds on demand." Edens, 5:4-10. Edens teaches that playback devices that use asynchronous transmission protocols to distribute real-time media would be too "complex and expensive devices, due to the memory, buffers, counters and associated circuitry required" to perform synchronous playback of real-time media distributed via asynchronous networks. Edens, 6:38-52.

By distinguishing the "synchronous logical ring network" from asynchronous alternatives and explicitly disparaging alternatives that "cannot guarantee consistent delivery of data such as

3

real-time continuous digital media streams," Edens, 9:12-14, Edens teaches away from solutions where playback devices in a network are independently clocked.

Because Edens teaches away from networks of independently clocked playback devices, persons of skill in the art at the time of the invention would not have been motivated to modify Edens such that the playback devices "remain independently clocked" during synchronous playback.

### B.  Claims 9-12 and 19 are Patentable over Blank, Gray, and the alleged APA

Blank, Gray, and the alleged APA do not disclose a network of playback devices where one playback device "(i) obtain[s], via the network interface from the audio information source outside of the LAN, the audio information; (ii) transmit[s], via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) play[s] back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information," as recited in the claims.  Indeed, the Office Action acknowledges that Blank, Gray, and the alleged APA fail to disclose the specific combination of elements recited in the claims.

Instead, the Office Action contends that various components of Blank and Gray could be modified and combined to arrive at the claimed invention, and proposes that:

(i) "the time server 120 [in Blank] *__could__* be located on a first media synch player 110 [in Blank], and *__could__* provide the master clock that is used to provide the playback timing information," Office Action, pp. 30-31 (emphasis added);

(ii) "the media synch players 110 of Blank or the management system 212 of Gray…*__could__* be implemented as PCs or in conjunction with PCS, and which *__can__* transmit audio information, playback timing information and clock information to another playback device for synchronous playback," Office Action, p. 32 (emphasis added); and

(ii) "the media synch players 110 of Blank or the management system 212 of Gray…*__could__* be implemented as PCs or in conjunction with PCs, and which *__can__* remain independently clocked during synchronous playback, at least because PCs contain multiple clocks that *__can__* be independent."  Office Action, p. 35 (emphasis added).

Patentee disagrees that Blank and/or Gray could be modified in the manner proposed in the Office Action.  Nevertheless, the fact that the prior art *__could__* be modified is not sufficient to support the conclusion that a person of skill in the art *__would__* have been motivated to do so.  *InTouch Technologies v. VGO Communications*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) (reversing a finding of obviousness that was based on "conclusory references to [the expert's] belief that one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so.") (emphasis original).

Patentee acknowledges that "[a]ny judgment on obviousness is in a sense necessarily a reconstruction based on hindsight reasoning."  MPEP 2145(X)(A) (quoting *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).  But a proper obviousness analysis under § 103 "takes into account only knowledge which was within the level of ordinary skill in the art at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure." *Id*.

Here, nothing in Blank, Gray, or the alleged APA teaches or suggests that the disparate components of Blank and Gray could be combined as proposed and further modified in view of the teachings of the alleged APA to function in the manner recited in the claims.

In the absence of any rational motivation to combine and then further modify the components and features of Blank and Gray as proposed in the Office Action, Applicant's own claim language is the only apparent basis in the record for the proposed combinations and further modifications. When the only roadmap in the record to the claimed invention is based on Applicant's own disclosure, the § 103 rejection is an exercise in impermissible hindsight and should be withdrawn. *Ex Parte Hongwei Kong*, Appeal 2013-0092361 (PTAB, Oct. 22, 2015) (reversing § 103 rejection where "the Examiner has pieced together individual elements from the prior art using only Appellant's disclosure and claim as a roadmap, an exercise in impermissible hindsight").

If you have questions, or if you would like additional information to prepare for the interview, please feel free to call me.

Best regards,

Jeff Armstrong
312-913-2104 (office)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No.: 04-0401-REEXAM)
(MBHB No. 14-1800-REX)

| | | |
|---|---|---|
| In the *Ex Part*e Reexamination of: | ) | |
| | ) | |
| U.S. Pat. 9,213,357 | ) | Art Unit: 3992 |
| | ) | |
| Serial No.: 90/013,959 | ) | Examiner: David E. England |
| | ) | |
| Filed: June 16, 2016 | ) | Confirmation No. 9548 |
| | ) | |
| For: Obtaining Content from Remote Source | ) | |
| For Playback | ) | |

U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## RESPONSE TO THE NON-FINAL OFFICE ACTION
## MAILED OCTOBER 20, 2017

Please consider the following Remarks submitted in response to the Non-Final Office

Action mailed on October 20, 2017, in the above-captioned reexamination.

A listing of the **PENDING CLAIMS** begin on page 2.

**REMARKS** begin on page 7.

Patentee authorizes the Office to charge any underpayment or credit any overpayment of

fees in connection with the above-captioned reexamination to Deposit Account 13-2490.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

1

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

# CLAIMS

1.    (Original)  A method comprising:

receiving, by a first playback device from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information (i) obtaining, by the first playback device from the audio information source outside of the LAN, the audio information; (ii) transmitting, by the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) playing back, by the first playback device, the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

2.    (Original)  The method of claim 1, further comprising:

after receiving the control information, additionally (i) generating, by the first playback device, the playback timing information associated with the audio information; and (ii) generating, by the first playback device, the device clock information of the first playback device.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

2

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

3.    (Original)   The method of claim 1, wherein the control information further comprises one or more instructions for the first playback device and the second playback device to playback audio information.

4.    (Original)  The method of claim 3, wherein the first and second playback devices are members of a synchrony group, and wherein the method further comprises:

transmitting, by the first playback device to the network device, status information that comprises a status of the synchrony group.

5.    (Original)   The method of claim 4, wherein the status information further comprises an identification of each playback device in the synchrony group.

6.    (Original)   The method of claim 5, wherein the status information further comprises an identification of a master playback device of the synchrony group.

7.    (Original)  The method of claim 6, wherein the first playback device is the master playback device of the synchrony group.

8.    (Original)   A tangible non-transitory computer-readable medium having instructions stored thereon that, when executed, cause a first playback device to:

receive, from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information, (i) obtain, from the audio information source outside of the LAN, the audio information; (ii) transmit, to a second playback device, the audio

information, playback timing information associated with the audio information, and clock time information for the first playback device; and (iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the clock time information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

9.      (Original)  A first playback device comprising:

one or more processors;

a network interface; and

tangible, non-transitory computer-readable memory comprising program instructions that, when executed by the one or more processors, cause the first playback device to:

receive, via the network interface from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a network location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information, (i) obtain, via the network interface from the audio information source outside of the LAN, the audio information; (ii) transmit, via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

4

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

10.    (Original)  The first playback device of claim 9, wherein the program instructions, when executed by the one or more processors, further cause the first playback device to:

generate the playback timing information associated with the audio information; and generate the device clock information of the first playback device.

11.    (Original)  The first playback device of claim 9, wherein the control information further comprises one or more instructions for the first playback device and the second playback device to playback audio information.

12.    (Original)  The first playback device of claim 11, wherein the first and second playback devices are members of a synchrony group, and wherein the program instructions, when executed by the one or more processors, further cause the first playback device to:

transmit, to the network device, status information that comprises a status of the synchrony group.

13.    (Original)  The first playback device of claim 12, wherein the status information further comprises an identification of each playback device in the synchrony group.

14.    (Original)  The first playback device of claim 12, wherein the status information further comprises an identification of a master playback device of the synchrony group.

15.    (Original)  The first playback device of claim 14, wherein the first playback device is the master playback device of the synchrony group.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

5

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

16.    (Original)  The first playback device of claim 12, wherein the status information further comprises an identification of one or more slave playback devices in the synchrony group, and wherein the second playback device is one of the one or more slave playback devices in the synchrony group.

17.    (Original)  The first playback device of claim 16, wherein the instructions, when executed by the one or more processors, further cause the first playback device to:

generate a plurality of frames, wherein an individual frame comprises at least a portion of the audio information and the playback timing information associated with the audio information, and wherein the first playback device transmitting to the second playback device the audio information, playback timing information, and device clock information of the first playback device comprises transmitting the plurality of frames to the second playback device.

18.    (Original)  The first playback device of claim 9, wherein the audio information comprises one of audio files or packetized streaming audio information.

19.    (Original)  The first playback device of claim 9, wherein the audio information source outside of the LAN is an Internet-accessible audio information source, and wherein obtaining, from the audio information source outside of the LAN, the audio information, comprises obtaining the audio information from the Internet-accessible audio information source.

20.    (Original)  The first playback device of claim 9, wherein obtaining, from the audio information source outside of the LAN, the audio information, comprises sending, to the audio information source, a request for the audio information.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

6

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

# REMARKS

## I.      Status of the Claims

Claims 9-12 and 19 of U.S. Pat. 9,213,357 (Millington '357) are subject to reexamination, of which claim 9 is independent.  Claims 1-8, 13-18, and 20 are not subject to reexamination. Patentee has not amended the claims.

## II.      Summary of the Non-Final Office Action

In the Non-Final Office Action, the Office: (i) rejected claim 9 on the ground of nonstatutory double patenting based on claim 11 of U.S. Pat. 9,195,258 (Millington '258), *The MP3 and Internet Audio Handbook* (Handbook), and alleged Sonos admitted prior art (APA); (ii) rejected claims 9-12, and 19 under 35 U.S.C. § 103 based on U.S. Pat. 6,611,537 (Edens) and Handbook; (iii) rejected claims 9-12 and 19 under 35 U.S.C. § 103 based on U.S. Pub. 2004/0252400 (Blank), U.S. Pub. 2002/0150053 (Gray), and alleged APA.

## III.      Summary of the Claimed Features

The subject matter of Millington '357 was invented during the development of Sonos's revolutionary multi-zone home audio system when the inventor, Nicholas Millington, recognized that it is "desirable to maintain synchrony of operations among a plurality of independently-clocked digital data processing devices in relation to, for example, information that is provided thereto by a common source."  Millington '357, 1:48-51.  For example, in systems where audio information relating to the same audio program is provided to two or more independently-clocked audio playback devices (also referred to as "zone players") that are distributed in different rooms of a residence, an office, or the like, it is desirable for the audio playback devices to play back the same audio in synchrony.  Millington '357, 1:51-2:11; Wolfe Dec., ¶ 22.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

7

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

However, Millington recognized that playing back the same audio on multiple independently-clocked audio playback devices in synchrony presents several challenges.

One challenge is that "[s]mall differences in the audio playback devices' start times and/or playback speeds can be perceived by a listener as an echo effect, and larger differences can be very annoying." Millington '357, 2:12-14. Millington recognized that these "[d]ifferences can arise because [of] a number of reasons, including delays in the transfer of audio information over the network," and further, that "[s]uch delays can differ as among the various audio playback devices for a variety of reasons, including where they are connected into the network, message traffic and other reasons." Millington '357, 2:15-19. Thus, there is a level of precision required for playing back audio in synchrony that may not be required for other types of operations.

Another challenge is that "[w]hen an audio playback device converts the digital audio information from digital to analog form, it does so using a clock that provides timing information," and "[g]enerally, the audio playback devices that are being developed have independent clocks." Millington '357, 2:21-28. In operation, such independently-clocked playback devices cannot be expected to "clock[] at precisely the same rate." Millington '357, 2:25-26; Wolfe Dec., ¶ 26. And as a result, such independently-clocked playback devices could not play back audio in synchrony. Millington '357, 2:26-28; Wolfe Dec. ¶ 26.

To overcome these challenges, Millington developed "a new and improved system and method for synchronizing operations among a number of digital data processing devices that are regulated by independent clocking devices," such as "audio playback devices that receive digital audio information that is to be played back in synchrony." Millington '357, 2:32-40. For instance, Millington's invention is directed to a "network audio system" in which a first playback

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

8

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

device is programmed with the capability to, *inter alia*, "(i) obtain…audio information; (ii) transmit…the audio information, playback timing information associated with the audio information, and device clock information of the first playback device [to a second playback device]; and (iii) play back…the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information."  Millington '357, 38:27-43. This invention thus enables the playback devices in the networked audio system to "reproduce audio information synchronously, notwithstanding the fact that packets, which may contain digital audio information, transmitted over the network to the various [playback devices] connected thereto may have differing delays and the [playback devices] operate with independent clocks."  Millington '357, 31:30-36.

IV.    **Response to the Double Patenting Rejections**

Patentee disagrees that claims 9-12 and 19 are unpatentable over claim 11 of Millington '258.    Nevertheless, without conceding the merits of the rejection, and solely to advance prosecution, Patentee has submitted a terminal disclaimer relative to Millington '258, and Patentee requests that the Office withdraw the double patenting rejections in view of the terminal disclaimer.

V.    **Response to the § 103 Rejections**

Patentee submits that the claims are patentable over the cited references and requests that the Office withdraw the § 103 rejections.

McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

9

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

### A.  Claims 9-12 and 19 are Patentable over Edens, Handbook, and the alleged APA

In contrast to the claims, Edens discloses playback devices configured in "a synchronous logical ring network." Edens, 9:58. Because Edens relies on its synchronous network architecture to ensure synchronous playback of audio content among multiple playback devices, Edens solves the problem of synchronous playback among multiple playback devices in an entirely different manner than claim 9 of Millington '357. Wolfe Dec., ¶ 27. And because Edens solves the problem of synchronous playback among multiple playback devices using a synchronous logical ring network architecture that is different from the solution recited in claim 9, Edens fails to teach or suggest all the elements recited in claim 9, and indeed, Edens teaches away from solutions that do not implement synchronous transmission schemes. Wolfe Dec., ¶¶ 27-28 and 36-37. Further, the addition of Handbook and the alleged APA fails to overcome the deficiencies of Edens.  Wolfe Dec., ¶¶ 23-26.

More particularly, and as explained below, claims 9-12 and 19 are patentable over Edens, Handbook, and the alleged APA for at least the reason that Edens, Handbook, and the alleged APA, individually or in combination, fail to teach or suggest a first playback device configured to (i) "transmit, via the network interface of the first playback device to a second playback device...playback timing information associated with the audio information..."; (ii) "play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information"; and (iii) "wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information," in combination with the other elements recited in the claims.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

10

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

   i.   **Edens, Handbook, and the alleged APA fail to teach or suggest a first playback device configured to "transmit, via the network interface of the first playback device to a second playback device…playback timing information associated with the audio information"**

At a minimum, Edens does not teach or suggest a first playback device configured to "transmit, via the network interface of the first playback device to a second playback device…playback timing information associated with the audio information," in combination with the other elements recited in the claims. Further, the addition of Handbook and the alleged APA fails to overcome this deficiency of Edens.

In Edens's synchronous logical ring network, "*__fixed frames__* of information propagat[e] around the network at *__consistent time intervals__* (44.1kHz 'frame rates' in one embodiment, to enable device synchronization to the CD audio sample rate)." Edens, 10:12-15 (emphasis added). Because of the strictly-enforced frame size and frame transmission rate of Edens's synchronous ring network, "information is *__guaranteed__* to propagate from any device to any other device within one CD audio sample time." Edens, 27:40-45 (emphasis added). "In other words, information will propagate consistently around the logical ring network at the frame rate; and the time required for information to propagate between any two particular devices will remain fixed." Edens, 10:18-21. Importantly, "all network devices are guaranteed to receive any given 44.1kHz audio sample *__before any network device receives the next such sample__*." Edens, 31:11-13 (emphasis added).

Because Edens guarantees that every playback device receives the same sample at the same sample time, and because for an ordered series of audio samples, all the playback devices are guaranteed to receive a current sample before any playback device receives a next sample in the ordered series, Edens does not need to have one playback device "transmit[]…*__playback timing information__* associated with the audio information…" to other playback devices in the

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

11

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

system.  Wolfe, Dec., ¶¶ 27-28.  Instead, each playback device in Edens simply plays each received audio sample immediately upon receipt because the synchronous ring network architecture "*ensur[es]* phase coherency among devices" so that "left and right speakers are *guaranteed* to be 'synchronized' to the same audio sample time while playing stereo audio generated by a CD player."  Edens, 27:40-45 (emphasis added); Edens, 31:42-44 ("each speaker still would play its audio [] stream '*immediately*' upon receiving it via the logical ring network") (emphasis added); Wolfe Dec., ¶ 28.

The Office Action contends, "Edens uses frames of data that include the 'frame header,' which is playback timing information that is used to synchronize digital media streams such as CD audio or MPEG (audio information)."  Office Action, pp. 12-13 (emphasis original).  But the frame header in Edens does not amount to "playback timing information" under either (1) the District Court's construction of "information indicating when the audio information [content] is to be played back" or (2) the Office's broader proposed construction of "merely a type of time stamp."  Wolfe Dec., ¶¶ 29-32. This is because the "frame header" neither indicates *when* audio information *is to be played back* as required under the District Court's construction nor includes any type of time information as required under the Office's proposed construction.[1] Wolfe Dec., ¶¶ 29-32.

Instead, Edens explains that "the 'frame header' (which actually comprises 2 symbols), is used to synchronize all other devices to the network clock device" at the frame rate.  Edens, 27:1-14.  In operation, "the frame header occupies the first two nibbles (0 and 1) of the 128 nibbles in each frame."  Edens, 30:19-21.  Importantly, the frame header in Edens is not a time

---

[1] Patentee disagrees with the Office's construction of "playback timing information" to the extent that it permits for *any* type of time stamp.  The term "playback timing information" itself makes clear that such information must be used to schedule *playback* of the "associated…audio information".  Allowing "playback timing information" to read on *any* type of time stamp would read the word "playback" and the phrase "associated with the audio information" out of this claim term, which is improper.

McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

12

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

stamp, it is not "associated with" any particular "audio information," and it certainly does not indicate **when** audio information **is to be played back**. Wolfe Dec., ¶¶ 29-32. Instead, each frame header is one of two alternative patterns, neither of which encodes **any** timing information – let alone "playback timing information" as that term is used in the claims of the '357 Patent. Wolfe Dec., ¶ 32; Edens, 68:60-63 ("Frame header detection logic 2500 recognizes the unique pattern of the two possible frame header symbol pairs, JK ('1100010001') and WK ('0100010001'), transmitted at a 44.1 kHz rate...").

Moreover, to the extent the Office contends that "playback timing information" in the claims "could merely be a type of time stamp," Office Action, p. 5, Edens **teaches away** from asynchronous solutions that require the generation and use of timestamps when transmitting audio data between playback devices. Wolfe Dec., ¶¶ 33-34; MPEP 2141.02 (VI) (prior art must be considered in its entirety, including disclosures that teach away from the claims). For example, Edens explains that, when "data packets are transmitted asynchronously, devices must be able to buffer incoming packets and generate timing information internally (i.e., 'timestamps' associated with the data packets), which must be communicated to other devices." Edens, 6:40-45; Wolfe Dec. ¶¶ 33-34. Edens expressly disparages the use of timestamps in connection with transmitting media between playback devices, because such implementations require "almost double the audio data…due to this buffering/timestamping process, resulting in a significant loss of bandwidth." Edens, 6:45-47; Wolfe Dec. ¶¶ 33-34. Edens further discourages the use of timestamps in this context because such an approach requires "expensive devices, due to the memory, buffers, counters and associated circuitry" for generating and processing those timestamps. Edens, 6:47-49; Wolfe Dec. ¶¶ 33-34. Thus, not only does Edens fail to disclose the use of "playback timing information" to achieve synchronous playback, Edens also teaches

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

13

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

away from using timestamps when asynchronously transmitting audio data between playback devices.  Wolfe Dec. ¶¶ 33-34.

Because the "frame header" in Edens is merely a bit pattern and neither encodes time data associated with audio information (i.e., it is not a time stamp) nor indicates when audio information is to be played back, the "frame header" in Edens does not amount to "playback timing information associated with the audio information" as proposed in the Office Action. Wolfe Dec., ¶¶ 27-32. Thus, Edens does not teach or suggest a first playback device configured to "transmit, via the network interface of the first playback device to a second playback device…playback timing information associated with the audio information," as recited in the claims. Indeed, Edens has no reason to transmit the recited "playback timing information associated with the audio content" and even teaches away from using "playback timing information associated with the audio content" for synchronous playback, because the synchronous ring network architecture guarantees that each playback device receives the same audio sample at the same sample time, thereby enabling each playback device to play a received audio sample immediately upon receipt without reference to "playback timing information associated with the audio content."  Wolfe Dec., ¶¶ 27-34.

The addition of Handbook and the alleged APA does not overcome this deficiency of Edens because, like Edens, Handbook and the alleged APA also fail to teach or suggest a first playback device configured to "transmit, via the network interface of the first playback device to a second playback device…playback timing information associated with the audio information." Indeed, the Office Action does not cite Handbook or the alleged APA for teaching this aspect of the claims.  Office Action, pp. 12-14.  Further, Patentee's review of Handbook and the alleged

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

14

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

APA found no teaching or suggestion of this claim element in combination with the other elements recited in the claims.

Accordingly, the combination of Edens, Handbook, and the alleged APA fails to teach or suggest a first playback device that is configured to "transmit, via the network interface of the first playback device to a second playback device…playback timing information associated with the audio information," in combination with the other elements recited in the claims. Therefore, claims 9-12 and 19 are patentable over Edens, Handbook, and the alleged APA for at least this independent reason.

>    **ii.  Edens, Handbook, and the alleged APA fail to teach or suggest a first playback device configured to "play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information."**

Edens fails to teach or suggest a first playback device configured to "play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information" for at least the reason that Edens, Handbook, and the alleged APA fail to teach or suggest "playback timing information associated with the audio information" in the first instance, as described above.

Because Edens, Handbook, and the alleged APA fail to teach or suggest "playback timing information associated with the audio information" in the first instance, Edens, Handbook, and the alleged APA cannot possibly teach or suggest a first playback device configured to "play back the audio information in synchrony with the second playback device by using the playback

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

15

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

timing information associated with the audio information…," in combination with the other elements recited in the claims.  Therefore, claims 9-12 and 19 are patentable over Edens, Handbook, and the alleged APA for at least this additional independent reason.

### iii. Edens, Handbook, and the alleged APA fail to teach or suggest "wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information."

On November 30, 2017, and contrary to 37 CFR 1.550 and MPEP 2254, the third-party requester filed an Information Disclosure Statement enclosing a letter the third-party requester sent to the District Court in the related litigation accusing Sonos of advocating for a different meaning of the term "independently clocked" during the present *ex parte* reexamination than the position that Sonos took during the related litigation.  Because under 37 CFR 1.550, "active participation of the ex parte reexamination requester ends with the reply pursuant to § 1.535, and no further submissions on behalf of the reexamination requester will be acknowledged or considered," Patentee is uncertain as to how the Office will treat the third party requester's improper submission.  Therefore, Patentee has submitted herewith an Information Disclosure Statement that includes the materials submitted in the third party requester's improperly-filed submission to ensure that the record is complete.

Contrary to the accusation in the third-party requester's misleading letter to the District Court, Sonos has not taken conflicting positions on the meaning of the "independently clocked" claim term.[2]  As explained during the November 16, 2017, interview and confirmed again here,

---

[2] Indeed, as Sonos explained to the District Court, the architecture disclosed in Edens is completely different from the independently-clocked HEOS players accused of infringement in the related litigation. Specifically, as explained during the interview and herein, Edens is directed to playback devices in a specialized "***synchronous*** logical ring network." On the other hand, the accused HEOS players are interconnected via an ***asynchronous*** network and each operate in accordance with their own respective clocks.  While the third-party requester has tried to equate the functionality of having one independently-clocked HEOS player in the asynchronous network attempt to mirror the frequency of another independently-clocked HEOS player in the asynchronous network with Edens's "synchronous

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

16

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

Patentee agrees with the construction of the "independently clocked" term adopted by the District Court in the related litigation. But as explained during the interview, regardless of whether the District Court's construction or the Office's proposed broadest reasonable interpretation applies, the claims are still patentable over Edens, Handbook, and the alleged APA for the independent reasons explained above.

Nevertheless, and further to the technical distinctions set forth above, the playback devices in Edens do not "remain independently clocked during synchronous playback" in combination with the other elements recited in the claim in same way as the playback devices disclosed and described in Millington '357 for at least the reason that the playback devices in Edens are configured to use synchronous transmission protocols to transmit information in "a synchronous logical ring network" architecture. Edens, 9:58-61; Wolfe Dec., ¶ 35. Because of the underlying network architecture of Edens's synchronous logical ring network, the playback devices in the synchronous logical ring network are very different from the playback devices in Millington '357, and thus, the playback devices in Edens do not remain independently clocked during synchronous playback of media content like the playback devices recited in the claims. Wolfe Dec., ¶ 35. Thus, Edens fails to teach or suggest a first playback device configured to "play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the

---

logical ring network," these are distinctly different types of systems that achieve different results, as the District Court recognized in denying the third-party requester's request to reopen claim construction. Thus, the Patentee's argument here that the playback devices in Edens's "synchronous logical ring network" are not "independently clocked" has no relevance to the Patentee's argument in the related litigation that the accused HEOS Players "remain independently clocked during synchronous playback," which has been adopted both by the District Court and also the jury in the related litigation.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

17

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

audio information," in combination with the other elements recited in the claims for at least this additional reason.

The addition of Handbook and the alleged APA does not overcome this deficiency of Edens. Indeed, contrary to the assertions in the Office Action, it would not have been obvious to modify the "synchronous logical ring network" of Edens with the teachings of the alleged APA so that the playback devices in Edens "remain independently clocked" during synchronous playback for at least the reasons that (i) the alleged APA nowhere states that independently clocked playback devices could play content in synchrony and (ii) Edens teaches away from network devices configured for operation on asynchronous networks like the recited playback devices.

First, the alleged APA states, "[t]iming information can be distributed to various network connected devices using network time protocols such as Network Time Protocol (NTP) and Simple Network Time Protocol" but that "these protocols, however, only provide a distribution mechanism for timing information; they do not provide the algorithms to synchronize playback using such timing information." Prov. App. 60/490,768, ¶ 4; Wolfe Dec., ¶ 23. The alleged APA further explains that "[g]enerally, the audio playback devices that are being developed have independent clocks, and, if they are not clocking at precisely the same rate, the audio playback provided by the various devices can get out of synchronization." Millington '357, 2:24-28. Contrary to the suggestion in the Office Action, independently-clocked playback devices did not reliably clock at precisely the same rate. Wolfe Dec., ¶ 26. And as a result, independently-clocked playback devices could not be expected to play back audio in synchrony. Wolfe Dec., ¶ 26. So even if the "synchronous logical ring network" of Edens were modified with the teachings of the alleged APA as suggested in the Office Action, the proposed combination still

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

18

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

would not teach or suggest a first playback device configured to "play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information," in combination with the other claim elements.  Wolfe Dec., ¶¶ 23-26.

Second, Edens teaches away from network devices that do not use synchronous transmission protocols.  Wolfe Dec., ¶ 36.  A reference teaches away from a claimed invention "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013); MPEP 2141.02(VI).

Here, Edens says, "[a]pplying local area network technology (e.g., Ethernet and TCP/IP network protocols) to consumer electronics devices ***raises a number of problems***" and that "[a]lthough it appears advantageous to connect consumer electronics devices as generic nodes on a network, ***existing network protocols are far from optimized for real-time streams of digital audio and video***."  Edens, 4:47-53 (emphasis added); Wolfe Dec., ¶ 36.  Edens further explains that "Ethernet…is not optimized to carry real-time continuous digital media streams" because "[i]t is an asynchronous, packet-based protocol that would add significant overhead to digital audio and video samples, which require consistent and timely delivery, as opposed to the ability to 'burst' packets of information at high speeds on demand."  Edens, 5:4-10; Wolfe Dec., ¶ 36. Edens teaches that playback devices that use Ethernet and/or other asynchronous transmission protocols rather than synchronous transmission protocols to distribute real-time media would be

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

19

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

undesirably "complex and expensive devices, due to the memory, buffers, counters and associated circuitry required" for real-time digital media. Edens, 6:38-52; Wolfe Dec., ¶ 36.

By distinguishing the "synchronous logical ring network" from alternatives that do not rely upon synchronous transmission and explicitly disparaging alternatives that "cannot guarantee consistent delivery of data such as real-time continuous digital media streams," Edens, 9:12-14, Edens teaches away from playback devices like those recited in the claims that do not rely on synchronous transmission protocols, but rather solve the problem of synchronizing audio playback between independently-clocked playback devices in a local area network by having one playback device transmit "playback timing information associated with the audio information" and "device clock information" to another playback device. Wolfe Dec., ¶ 37.

Because Edens expressly disparages solutions that do not implement a synchronous logical ring network, persons of skill in the art at the time of the invention would not have been motivated to modify the synchronous logical ring network nodes in Edens to perform the playback device functions recited in the claims. MPEP 2141.02(VI).

### B.  Claims 9-12 and 19 are Patentable over Blank, Gray, and the alleged APA

The § 103 rejections of claims 9-12 and 19 based on Blank, Gray, and the alleged APA should be withdrawn for at least the reasons that (i) the combination of Blank, Gray, and the alleged APA does not teach or suggest all the elements recited in the claims; (ii) the proposed modification and combination of Blank and Gray is based on improper hindsight reasoning that uses Patentee's claims as a roadmap; and (iii) a person of skill in the art at the time of the invention would not have been motivated to modify and combine the disparate devices in Blank and Gray and then configure those devices to perform the functions recited in the claims as proposed in the Office Action.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

20

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

i.  **Blank, Gray, and the alleged APA fail to teach or suggest all the elements recited in the claims**

At a minimum, the combination of Blank, Gray, and the alleged APA fails to teach or suggest a first playback device configured to "play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information," in combination with the other elements recited in the claims.

The Office Action contends that the proposed combination of Blank and Gray teaches "playing back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information" because (i) "[e]ach media synch player 110 uses the audio information and its own clock information and the playback timing information (the start time of Blank t+d)" or (ii) each media synch player 110 uses the audio information and its own clock information and the "frame-specific time stamps of Gray."  Office Action, p. 33.

Contrary to the first assertion in the Office Action, Blank does not disclose a scenario where a first media synch player plays media content (in synchrony or otherwise) based on playback timing information that the first media synch player also sends to another media synch player.  Wolfe Dec., ¶ 40.  Even assuming for the sake of argument that a person of skill in the art at the time of the invention could have combined Blank's media synch player 110 and control console 125 as proposed in the Office Action, there is no teaching or suggestion in Blank as to how such a combined device would (or even could) use the t+d information that the proposed

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

21

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

combined device would send to a second media synch player 110 for synchronous playback with the second media synch player 110. Wolfe Dec., ¶ 41.

Further, contrary to the second assertion in the Office Action, neither Blank nor Gray disclose a scenario where a first media synch player plays media content (in synchrony or otherwise) based on a "frame-specific time stamp" that the first media synch player also sends to another media synch player. Wolfe Dec., ¶¶ 42, 47. And even assuming for the sake of argument that a person of skill in the art at the time of the invention could have modified Blank's media synch player 110 to use Gray's "frame-specific time stamps," neither Gray nor Blank suggest using time stamps for synchronous playback between multiple playback devices. Wolfe Dec., ¶¶ 43, 48.

The addition of the alleged APA does not overcome the deficiencies of Blank and Gray because the alleged APA also does not teach or suggest synchronous playback. The Office Action contends that Blank and Gray could be modified to use RFC 1305 (NTP) and SNTP based on the alleged APA's disclosure of those protocols. Office Action, p. 33. But neither RFC 1305 (NTP) nor SNTP relate to playing back media content, much less playing back media content in synchrony among multiple playback devices. Wolfe Dec., ¶ 24. Instead, both NTP and SNTP merely address *clock synchronization* between computing devices rather than *synchronous playback of media content* among multiple playback devices. Wolfe Dec., ¶ 24. These are different concepts, and clock synchronization alone is not sufficient to achieve synchronous playback of media content in a networked audio system. Wolfe Dec., ¶ 25. Indeed, the alleged APA expressly states, "[t]iming information can be distributed to various network connected devices using network time protocols such as Network Time Protocol (NTP) and Simple Network Time Protocol" but that "these protocols, however, only provide a distribution

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

22

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

mechanism for timing information; they do not provide the algorithms to synchronize playback using such timing information."  Prov. App. 60/490,768, ¶ 4; Wolfe Dec., ¶ 23.

In view of the foregoing, Blank, Gray, and the alleged APA fail to teach or suggest a first playback device configured to "play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information," in combination with the other elements recited in the claims."  Therefore, claims 9-12 and 19 are patentable over Blank, Gray, and the alleged APA for at least this independent reason.

### ii.  The proposed modification and combination of Blank and Gray is based on hindsight reasoning that uses Patentee's claims as a roadmap

The Office Action contends that a person of skill in the art could have modified and then combined various devices in Blank and Gray to practice the claimed invention, and that it would have been obvious for a person of skill in the art to do so.  Office Action, pp. 30-35.  Patentee respectfully disagrees.

As an initial matter, Patentee disagrees that Blank and/or Gray could be modified in the manner proposed in the Office Action or that Blank and Gray teach or suggest the claim elements for which they are cited.  Nevertheless, the fact that the prior art **_could_** be modified is not sufficient to support the legal conclusion that a person of skill in the art **_would_** in fact have been motivated to do so.  *InTouch Technologies v. VGO Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) (reversing a finding of obviousness that was based on "conclusory references to [the expert's] belief that one of ordinary skill in the art **_could_** combine these references, not that they **_would_** have been motivated to do so.") (emphasis original); *ActiveVideo*

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

23

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

*Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012); *Ex Parte Hongwei Kong*, PTAB, 2013-009261 (Decided Oct. 22, 2015), p. 3 (reversing Examiner's § 103 rejection and "conclud[ing] the Examiner [had] pieced together individual elements from the prior art using only [applicant's] disclosure and claim as a roadmap, an exercise in impermissible hindsight."). "A reason for combining disparate prior art references is a critical component of an obviousness analysis" and "should be made explicit." *InTouch*, 751 F.3d at 1351 (quotations omitted).

For example, the Federal Circuit in *InTouch* reversed a district court's judgment of obviousness because, even assuming the prior art disclosed all the claim elements, "there [was] insufficient evidence…of a reason or motivation…to combine [the prior art references]" to arrive at the claimed invention. 751 F.3d at 1351. The patent challenger's expert (i) cited a first reference describing "what happens when you have multiple robots and you want to control them from different stations" and a second reference showing "doing things over the Internet," (ii) reasoned that "robots are going over the Internet too; so that applies to them as well," and (iii) opined that "one of ordinary skill in the art could combine these references." *Id*. at 1351. Because the expert's "testimony primarily consisted of conclusory references to her belief that one of ordinary skill in art ***could*** combine these references, not they ***would*** have been motivated to do so," the Federal Circuit concluded that, absent any evidence that a person of skill in the art would have been motivated to combine the references, "[i]t appears that [the expert] relied on the [challenged patent] itself as a roadmap" for her obviousness opinion, and thus, the patent challenger's expert "succumbed to hindsight bias in her obviousness analysis." *Id*. at 1351-52 (emphasis original).

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

24

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

Similarly, the Federal Circuit in *ActiveVideo* affirmed a district court's judgement of nonobviousness even though the prior art disclosed all the claim limitations because there was no motivation to combine the elements of the prior art in the manner recited in the claims. 694 F.3d at 1327-29. The patent challenger's expert explained that, (i) in the prior art, "[t]hese are all components that are modular, and when I add one, it doesn't change the way the other one works," (ii) modifying and combining the prior art "would yield a predictable result," and (iii) "[t]he motivation to combine would be because you wanted to build something better,…more efficient, cheaper, or you wanted a system that had more features, makes it more attractive to your customers, because by combining [features of the prior art] you could do something new…." *Id.* at 1328. Nevertheless, the Federal Circuit affirmed the district court's judgment of nonobviousness in part because the "expert testimony regarding the motivation to combine references…fail[ed] to explain why a person of ordinary skill in the art ***would*** have combined elements from specific references in the way the claimed invention does" and thus, the expert's proffered motivation to modify and combine the teachings of the prior art was "fraught with hindsight bias." *Id.* at 1328-29 (emphasis added) (citing *KSR v. Teleflex*, 550 U.S. 398, 418 (2007)).

The Federal Circuit's reasoning in *InTouch* and *ActiveVideo* is equally applicable here where, similar to the expert opinions in *InTouch* and *ActiveVideo* that the Federal Circuit found insufficient to support the legal conclusion of obviousness, the Office Action contends only that numerous modifications ***could*** be made. Indeed, the Office Action contends that no less than ***six*** proposed modifications to the teachings of the cited references ***could*** theoretically be made— without providing any explanation as to why those modifications ***would*** have been made— including specifically:

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

25

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

1. "the time server 120 [in Blank] ***could*** be located on a first media synch player 110 [in Blank], and ***could*** provide the master clock that is used to provide the playback timing information," Office Action, pp. 30-31 (emphasis added);

2. Blank's "control console 125 ***can*** also be implemented on [Blank's] media synch player 110 with [Blank's] time server 120, and ***can*** be used to provide playback timing information to other media synch players 110," Office Action, p. 31;

3. assuming Blank's media synch player 110 was modified to distribute audio content and timing to other media synch players as suggested above, a "media synch player 110 [in Blank] that includes a time server 120 [in Blank] ***could*** include the time stamp [taught in Gray] into the multimedia packets of the audio data from media file 210," Office Action, pp. 31-32 (emphasis added);

4. "the media synch players 110 of Blank or the management system 212 of Gray…***could*** be implemented as PCs or in conjunction with PCs, and which ***can*** transmit audio information, playback timing information and clock information to another playback device for synchronous playback," Office Action, p. 32 (emphasis added);

5. "the first media synch player 110 ***can*** obtain the audio information and provide it to the second media synch player 110 using Windows file sharing, and ***can*** then provide playback timing information by either 1)…transmitting a play command… or 2) add time stamps to the media data packets…in accordance with the teachings of Gray," Office Action, p. 31 (emphasis added); and

6. "the media synch players 110 of Blank or the management system 212 [component of home entertainment system 210] of Gray…***could*** be implemented

McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

26

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

as PCs or in conjunction with PCs, and which __*can*__ remain independently clocked during synchronous playback, at least because PCs contain multiple clocks that __*can*__ be independent." Office Action, p. 35 (emphasis added).

As in *InTouch* and *ActiveVideo*, even if Blank and Gray __*could*__ be modified and combined in the complex manner proposed in the Office Action to create a hypothetical consolidated device that performs all the features recited in the claims, that alone is not sufficient to support the conclusion that a person of skill in the art __*would*__ have been motivated to do so. Here, at best, the Office Action "has alleged that some of the elements were in the prior art and some of the other elements, while not present in the prior art, could have been performed by prior art devices if they were used in a way that was not described by the prior art references," and thus, "[i]t strains credulity to suggest that a person of skill in the art would have read [the prior art references] and arrived at the claimed feature without impermissibly using the claims as a roadmap." *Ex Parte Hongwei Kong*, PTAB, 2013-009261 at 3 (reversing Examiner's § 103 rejection and "conclud[ing] the Examiner [had] pieced together individual elements from the prior art using only [applicant's] disclosure and claim as a roadmap, an exercise in impermissible hindsight."). Like the expert testimony in *InTouch* and *ActiveVideo*, the Office Action fails to explain why a person of ordinary skill in the art __*would*__ have combined and modified the disparate elements of Blank and Gray to create a hypothetical consolidated device to practice the claimed invention. And similar to *InTouch, ActiveVideo*, and *Ex Parte Hongwei Kong*, absent any evidence that a person of skill in the art at the time of the invention would have been motivated to modify and combine Blank and Gray to create the hypothetical consolidated device proposed in the Office Action, Applicant's own claim language is the only apparent basis in the record for the proposed combinations and modifications, and thus, the § 103 rejection is an exercise in

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

27

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

hindsight bias and should be withdrawn. *InTouch*, 751 F.3d at 1351-52; *Active Video*, 694 F.3d at 1327-29; *Ex Parte Hongwei Kong*, PTAB, 2013-009261 at 3.

### iii. A person of skill in the art would not have any reason to modify and combine the disparate devices in Blank and Gray and then configure those devices to perform the functions recited in the claims as proposed in the Office Action.

As described above, the Office Action contends that a person of skill in the art at the time of the invention could have created a hypothetical consolidated device by, *inter alia*, (i) combining the functions of Blank's media synch player 110, Blank's time server 120, Blank's control console 125, Gray's multimedia source 301, Gray's multimedia sink 302, and Gray's network gateway 331 into a single, consolidated device, (ii) using Gray's "frame-specific time stamps" for synchronizing playback among the proposed consolidated devices in the manner recited in the claims, and/or (iii) using a network of PCs to implement all the capabilities recited in the claims. Office Action, pp. 30-35. But contrary to the assertions in the Office Action, a person of ordinary skill in the art at the time of the invention would not have been motivated to combine the functions of the components in Blank and Gray and then further configure those modified devices in the proposed hypothetical consolidated device to perform the functions recited in the claims.

Blank is a local area network solution comprising a system for synchronizing playback of audio and video content (A/V content) via multiple displays 105 (each connected to a media synch player 100) over a bus 115 or other local network where "there is a need to maintain synchronization" between "multiple audio-visual displays…to provide a large audience with access to a particular presentation" and where un-synchronized playback among the multiple displays 105 would cause "perceptual discordance of the presentation" that would "undesirably detract from intelligibility and audience appreciation of the content being presented." Blank, ¶ 6,

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

28

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

Fig. 1; Wolfe Dec., ¶ 38.  Although Blank mentions that "other types of interconnections are also possible, including fiber optic communications, LANs, WANs or the Internet or any other data network," Blank, ¶ 23, a person of skill in the art would not have been motivated to synchronize playback of A/V content among two displays connected by a wide area network (WAN) in the context of the system disclosed in Blank, because if two displays were sufficiently far enough apart to warrant connection via a WAN, then no viewer could see the first and second displays at the same time and thus, no viewer would experience "perceptual discordance of the presentation" solved by Blank's disclosed system if the second display did not play the A/V content in synchrony with the first display. Wolfe Dec., ¶ 39.

Blank's system includes (i) multiple "media synch players 110," where each media synch player stores the A/V content in local storage 210 for playback via a display 105; (ii) a "time server 120" to which each device in Blank's system is synchronized; and (iii) a system controller 125 that instructs the media synch players 110 when to start/stop playback of the A/V content to its display 105 from its local storage 210 by sending a time stamp "t" (synced with the time server 120) and a delay "d" to each media synch player 110.  Blank, Figs. 1, 2, ¶¶ 10, 22, 29, 37, 43-44.

In contrast to Blank, Gray is a WAN solution comprising a system for transmitting "real-time" AV content from a media source 301 (e.g., an Internet media content provider) to a media sink 302 (e.g., home entertainment system 210) over a path that traverses multiple heterogeneous networks comprising two or more of a (i) constant delay network 311, (ii) variable delay network 312 with a common time base 322, and/or (iii) a variable delay network without a common time base 313.  Gray, Figs. 2-3, ¶¶ 13, 53-57; Wolfe Dec., ¶ 44.

To deliver the "real-time" AV content from the media source 301 to the media sink 302 over multiple networks within "the minimal jitter tolerances required to support real-time presentation of the multimedia data" at the media sink 302 (i.e., to avoid "choppy" or "stuttering" playback), Gray deploys gateways 331 "between each network in the heterogeneous networks" to emulate a constant delay network over the multiple heterogeneous networks.  Gray, ¶¶ 6, 59, Fig. 6; Wolfe Dec., ¶ 45.

In operation, each gateway interprets (and when appropriate, modifies) time stamps in each multimedia packet, and then forwards each multimedia packet to the next heterogeneous network based on the time stamps to "provide for the delivery of multimedia packets regardless of the heterogenic nature of the networks that intervene between the multimedia source and the multimedia sink" so that "streaming multimedia data may be available regardless of the location of the user," thereby "represent[ing] a significant improvement over the state of the art."  Gray, ¶¶ 63-70; Wolfe Dec., ¶ 46.

### a.  There is no motivation to combine the functions of Blank's media synch player, time server, and control console into the hypothetical consolidated device as proposed in the Office Action.

Nothing in Blank suggests that combining Blank's media synch player, control console, and time server into a single, hypothetical consolidated device would be at all desirable.  Wolfe Dec., ¶ 49-50.  On the other hand, there are technical, economic, and operational reasons ***not*** to combine the functionalities of the media synch player, control console, and time server into a single, hypothetical consolidated device as proposed in the Office Action. Wolfe Dec., ¶¶ 51-56.

For example, each such hypothetical consolidated device would be both more complex to design and more expensive to manufacture than a media synch player alone because of the additional components and programming required for the hypothetical consolidated device to

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

30

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

perform the time server and control console functions. Wolfe Dec., ¶ 52. Further, because each display requires a media synch player function, the additional system cost of using the hypothetical consolidated devices at each display compared to media synch players would increase linearly as the number of displays in the system increased. Wolfe Dec., ¶ 53. And from an operational standpoint, incorporating the control console functionality in each hypothetical consolidated device as proposed would require the system operator controlling the system to either (i) use a dedicated hypothetical consolidated device for controlling the system, but only use the control console functionality, which would be inefficient, or (ii) control the system from one of the hypothetical consolidated devices that is also playing content via a display, which would be cumbersome. Wolfe Dec., ¶¶ 54-55. Additionally, if every hypothetical consolidated device had the ability to transmit and receive audio content, playback timing information, and device clock information to/from any other hypothetical consolidated device, then configuration and operation of a network of such hypothetical consolidated devices would be far more complex than Blank's disclosed solution where each of the media synch player 110, control console 125, and time server 120 devices performs its own specialized role in the network. Wolfe Dec., ¶ 56.

In view of the technical, economic, and operational drawbacks, a person of ordinary skill in the art at the time of the invention would not have been motivated to combine Blank's media synch player, control console, and time server into the hypothetical consolidated device proposed in the Office Action.

### b.  There is no motivation to modify the system in Blank to use the time stamps in Gray for synchronous media playback as proposed in the Office Action.

Further, a person of skill in the art at the time of the invention would not have been motivated to modify the system in Blank to use the time stamps in Gray for synchronizing

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

31

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

playback among multiple playback devices as proposed in the Office Action because Blank *already solves* the problem of synchronous playback among multiple playback devices, albeit in a different way than what is recited in the claims.  Wolfe Dec., ¶ 57.

"[A] person of ordinary skill in the art having common sense at the time of the invention would not have reasonably looked to [a second reference] to solve a problem already solved by [a first reference].")  *In re Rinkevich*, BPAI, 2007-1317 (Decided May 29, 2007), p. 9.

In *Rinkevich*, an examiner rejected claims under § 103 based on two cited references and argued that "an artisan would have been motivated to modify [the first reference] with the teachings of [the second reference]" because "[the second reference] resolves the problem presented by [the first reference], i.e., how to avoid the need to log off an existing user account prior to logging on to a new user account."  BPAI, 2007-1317, p. 5.  However, when analyzing the two cited references, the Board observed that the first reference taught "a Microsoft Windows super-user (SU) utility that allows a system administrator to temporarily start applications running in the security context on a different account without having to first close all open applications and log off."  *Id.* at 9.  Therefore, the Board reasoned, "the problem proffered by the Examiner is already solved by [the first reference]."  *Id.* at 9.  As a result, the Board concluded that "a person of ordinary skill in the art having common sense at the time of the invention would not have reasonably looked to [the second reference] to solve a problem already solved by [the first reference]."  *Id.* at 9.  And absent any evidence that a person of skill in art would have been motivated to combine the first and second references as proposed by the Examiner, the Board further concluded, "the Examiner [had] impermissibly used the instant claims as a guide or roadmap in formulating the rejection."  *Id.* at 9.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

32

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

Here, consistent with the Board's reasoning in *Rinkevich*, a person of skill in the art at the time of the invention would not have been motivated to modify the system in Blank to use the time stamps in Gray for synchronizing playback among multiple playback devices as proposed in the Office Action because Blank already solves the problem of synchronous playback among multiple playback devices. In particular, Blank discloses a solution for coordinating synchronous playback among multiple media synch players 110, where the control console 125 sends a time stamp "t" synced with the time server 120 and a delay "d" to each media synch player 110 so that "all of the media synch players 110 will be synchronized to the same moment in time -- t+d -- regardless of when the time synchronization was initiated." Blank, ¶ 44; Wolfe Dec., ¶ 84. Even though Blank's disclosed solution for synchronizing media playback among devices is different than the solution recited in the claims, Blank nevertheless has a solution for coordinating synchronous playback among multiple media synch players, and thus, "a person of ordinary skill in the art having common sense at the time of the invention would not have reasonably looked to [Gray] to solve a problem already solved by [Blank]." *Rinkevich*, BPAI, 2007-1317 at 9.

Moreover, nothing in Blank or Gray suggests that the time stamps in Gray's WAN solution for emulating a constant delay network over multiple heterogeneous networks could be used in Blank's LAN solution to facilitate synchronous playback among multiple devices as proposed in the Office Action. Gray, ¶¶ 6, 59, Fig. 6; Wolfe Dec., ¶ 58. Indeed, nothing in either Blank or Gray suggests that Gray's time stamps for emulating a constant delay network over multiple heterogeneous networks in a WAN context would be useful for coordinating synchronous playback among multiple devices in a LAN context, much less how a person of skill in the art could go about using Gray's time stamps as "playback timing information

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

33

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

associated with...audio information" in combination with "audio information" and "device clock information" to facilitate synchronous playback among multiple playback devices in the manner recited in the claims. Wolfe Dec., ¶¶ 58-59.

Because a person of ordinary skill in the art having common sense at the time of the invention would not have reasonably looked to Gray to solve a problem already solved by Blank, a person of skill in the art at the time of the invention would not have been motivated to combine the teachings of Blank and Gray as proposed in the Office Action. *Rinkevich*, BPAI, 2007-1317 at 9.

## VI.    Conclusions

In view of the foregoing, and without conceding the merits of any of the assertions in the Request for *Ex Parte* Reexamination or Office Action not explicitly addressed herein, Patentee respectfully submits that the claims are in condition for confirmation, and Patentee respectfully requests that the Office issue a reexamination certificate confirming the patentability of all the claims. If further dialog would advance prosecution, the Office is invited to telephone the undersigned at 312-913-0001.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date:   December 20, 2017          By:   /Jeffrey P. Armstrong/
Jeffrey P. Armstrong
Reg. No. 54,967

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

34

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No.: 04-0401-REEXAM)
(MBHB No. 14-1800-REX)

| | | |
|---|---|---|
| In the *Ex Parte* Reexamination of: | ) | |
| | ) | |
| U.S. Pat. 9,213,357 | ) | Art Unit: 3992 |
| | ) | |
| Serial No.: 90/013,959 | ) | Examiner: David E. England |
| | ) | |
| Filed: June 16, 2016 | ) | Confirmation No. 9548 |
| | ) | |
| For: Obtaining Content from Remote Source | ) | |
| For Playback | ) | |

U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## DECLARATION OF ANDREW WOLFE, PH.D.

1.      I have been asked by the Patentee, Sonos, Inc., in the above-captioned *Ex Parte* Reexamination to opine on certain aspects of the technical references cited in the Non-Final Office Action mailed on October 20, 2017.

2.      I have more than 30 years of experience as a computer architect, computer system designer, personal computer graphics designer, educator, and executive in the electronics industry.  As detailed record of my professional qualifications is attached as Exhibit 1 to this Report and summarized below.

3.      In 1985, I earned a B.S.E.E. degree in Electrical Engineering and Computer Science from The Johns Hopkins University.  In 1987, I received an M.S. degree in Electrical and Computer Engineering from Carnegie Mellon University.  In 1992, I received a Ph.D. in Computer Engineering from Carnegie Mellon University.  My doctoral dissertation proposed a new approach for the architecture of a computer processor.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

1

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

4.      In 1983, I began designing touch sensors, microprocessor-based computer systems, and I/O (input/output) cards for personal computers as a senior design engineer for Touch Technology, Inc.  During the course of my design projects with Touch Technology, I designed I/O cards for PC-compatible computer systems, including the IBM PC-AT, to interface with interactive touch-based computer terminals that I designed for use in public information systems.  I continued designing and developing related technology as a consultant to the Carroll Touch division of AMP, Inc., where in 1986 I designed one of the first custom touchscreen integrated circuits.

5.      From 1986 through 1987, I designed and built a high-performance computer system as a student at Carnegie Mellon University.  From 1986 through early 1988, I also developed the curriculum, and supervised the teaching laboratory, for processor design courses.

6.      In the latter part of 1989, I worked as a senior design engineer for ESL-TRW Advanced Technology Division. While at ESL-TRW, I designed and built a bus interface and memory controller for a workstation-based computer system, and also worked on the design of a multiprocessor system.

7.      At the end of 1989, I (along with some partners) reacquired the rights to the technology I had developed at Touch Technology and at AMP, and founded The Graphics Technology Company.  Over the next seven years, as an officer and a consultant for The Graphics Technology Company, I managed the company's engineering development activities and personally developed dozens of touch screen sensors, controllers, and interactive touch-based computer systems.

8.      I have consulted, formally and informally, for a number of fabless semiconductor companies.  In particular, I have served on the technical advisory boards for two processor

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

2

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

design companies: BOPS, Inc., where I chaired the board, and Siroyan Ltd., where I served in a

similar role for three networking chip companies—Intellon, Inc., Comsilica, Inc, and Entridia,

Inc.—and one 3D game accelerator company, Ageia, Inc.

9.      I have also served as a technology advisor to Motorola and to several venture

capital funds in the U.S. and Europe.  Currently, I am a director of Turtle Beach Corporation,

providing guidance in its development of premium audio peripheral devices for a variety of

commercial electronic products, including speakers.

10.     From 1991 through 1997, I served on the Faculty of Princeton University as an

Assistant Professor of Electrical Engineering.   At Princeton, I taught undergraduate and

graduate-level courses in Computer Architecture, Advanced Computer Architecture, Display

Technology, and Microprocessor Systems, and conducted sponsored research in the area of

computer systems and related topics.  I was also a principal investigator for DOD research in

video technology and a principal investigator for the New Jersey Center for Multimedia

Research.   From 1999 through 2002, I taught the Computer Architecture course to both

undergraduate and graduate students at Stanford University multiple times as a Consulting

Professor.  At Princeton, I received several teaching awards, both from students and from the

School of Engineering.  I have also taught advanced microprocessor architecture to industry

professionals in IEEE and ACM sponsored seminars.  I am currently a lecturer at Santa Clara

University teaching courses on Computer Organization and Architecture and Mechatronics.

11.     From 1997 through 2002, I held a variety of executive positions at a publicly-held

fabless semiconductor company originally called S3, Inc. and later called Sonicblue Inc.  I held

the positions of Chief Technology Officer, Vice President of Systems Integration Products,

Senior Vice President of Business Development, and Director of Technology, among others.  At

McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

3

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

the time I joined S3, the company supplied graphics accelerators for more than 50% of the PCs sold in the United States.

12.     Beginning in 1998, I began to work closely with S3's largest customer, Diamond Multimedia, to explore possible opportunities for a merger.   My investigation included evaluating the technology, market, and business model related to the "Diamond Rio PMP300," the first commercially-viable flash-memory MP3 player.  In 1999, I led the merger negotiations between the two companies, managed significant parts of company integration, and, after the merger was complete, worked on new product development.   Soon after the merger with Diamond Multimedia, I helped introduce the "Diamond Rio PMP500," a portable music player that included USB capability and also the ability to play downloaded files purchased from the Audible.com website.  I also helped develop relationships with MP3 music vendors, including eMusic and MP3.com.

13.     While at Diamond Multimedia, I also helped develop the Rio 600 and 800 MP3 players, which included support for digital rights management ("DRM") protected music, using protocols from Microsoft.  I also helped to develop the Rio Receiver (also sold by Dell), the first successful digital music streaming client device.  I also helped develop the Rio Audio Center, a digital music server and receiver.  During the development of the PMP500 and the Rio 600, I also helped develop a music delivery platform and webstore backend service for selling DRM-protected music.  In 1999, this business segment was spun out as a separate company called RioPort.com.  I served on the RioPort.com board of directors and became involved in their product and technology strategy.  For example, I was involved in RioPort.com becoming the provider of the backend services for what was known at the time as the BestBuy.com music store and the MTV.com music store.  I also worked with Microsoft and various music studios in

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

4

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

developing strategies, business models, and technologies for DRM-protected music delivery. Further, I worked with a company established by Sony Music Entertainment and Universal Music Group, initially called "Duet," that was created to deliver online music subscriptions to users.  While working on Duet, we developed a technology and business model using Microsoft's DRM solution that allowed monthly subscribers to download as much music as they wanted to a Rio 600 and play the downloaded music offline.  This subscription download service launched as the "Pressplay" music service and was later renamed "Napster."  I also managed engineering and marketing for the Rio product line for a period of time as an interim general manager.  I was also an investor in Rioport.com.

14.    I served as a board member and technical advisor at KBGear Inc. from 1999-2001. KBGear Inc. designed and produced digital cameras and music players.

15.    I have published more than 50 peer-reviewed papers in computer architecture and computer systems and IC design.

16.    I also have chaired IEEE and ACM conferences in microarchitecture and integrated circuit design and served as an associate editor for IEEE and ACM journals.

17.    I am a named inventor on at least 53 U.S. patents and 30 foreign patents including patents on networked digital media.

18.    In 2002, I was the invited keynote speaker at the ACM/IEEE International Symposium on Microarchitecture and at the International Conference on Multimedia.  From 1990 through 2005, I have also been an invited speaker on various aspects of technology and the PC industry at numerous industry events including the Intel Developer's Forum, Microsoft Windows Hardware Engineering Conference, Microprocessor Forum, Embedded Systems Conference, Comdex, and Consumer Electronics Show, as well as at the Harvard Business

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

5

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

School and the University of Illinois Law School. I have been interviewed on subjects related to computer graphics and video technology and the electronics industry by publications such as the Wall Street Journal, New York Times, Los Angeles Times, Time, Newsweek, Forbes, and Fortune as well as CNN, NPR, and the BBC. I have also spoken at dozens of universities including MIT, Stanford, University of Texas, Carnegie Mellon, UCLA, University of Michigan, Rice, and Duke.

19.    I have reviewed and considered the specification, claims, and prosecution history of the U.S. Pat. 9,213,357 (Millington '357) under reexamination.

20.    I have reviewed and considered the Office Action mailed on October 20, 2017.

21.    I have also reviewed and considered the following references cited in the Non-Final Office Action mailed on October 20, 2017:

    a.    *The MP3 and Internet Audio Handbook* (Handbook);

    b.    The alleged Sonos admitted prior art (APA);

    c.    U.S. Pat. 6,611,537 (Edens);

    d.    U.S. Pub. 2004/0252400 (Blank); and

    e.    U.S. Pub. 2002/0150053 (Gray).

**The Millington '357 Patent**

22.    In systems where audio information relating to the same audio program is provided to two or more independently-clocked audio playback devices (also referred to as "zone players") that are distributed in different rooms of a residence, an office, or the like, there are circumstances when it is desirable for the audio playback devices to play back the same audio in synchrony. Millington '357, 1:51-2:11.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

6

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

23.     When Sonos was developing synchronous playback technology in 2004, "[t]iming information [could] be distributed to various network connected devices using network time protocols such as Network Time Protocol (NTP) and Simple Network Time Protocol" (SNTP), but "these protocols, however, only provide[d] a distribution mechanism for timing information; they [did] not provide the algorithms to synchronize playback using such timing information." Prov. App. 60/490,768, ¶ 4.

24.     NTP and SNTP merely address clock synchronization between computing devices rather than synchronous playback of media content among multiple playback devices; they do not relate to playing back media content, much less playing back media content in synchrony among multiple playback devices.

25.     Clock synchronization is different from synchronous playback of media among multiple playback devices; clock synchronization alone is not sufficient to achieve synchronous playback of media content in a networked audio system.

26.     When Sonos developed its synchronous playback technology in 2004, independently-clocked playback devices did not reliably clock at precisely the same rate, and as a result, independently-clocked playback devices could not be expected to play back audio in synchrony.

**Edens**

27.     Edens solves the problem of synchronous playback among multiple playback devices in an entirely different manner than claim 9 of Millington '357.  In particular, Edens relies on the tightly-controlled synchronous transmission protocol in the synchronous logical ring network architecture to facilitate synchronous playback of audio content among multiple

McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

7

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

playback devices configured to transmit and receive data according to Edens's synchronous transmission protocol.

28.     Edens does not need to have one playback device "transmit[]...playback timing information associated with the audio information..." to other playback devices in the synchronous logical ring network because (i) the synchronous transmission protocol guarantees that every playback device receives the same sample at the same sample time, and (ii) for an ordered series of audio samples, the synchronous transmission protocol guarantees that all the playback devices in the synchronous logical ring network receive a current sample before any playback device in the synchronous logical ring network receives a next sample in the ordered series. See, e.g., Edens, 10:12-15; 10:18-21; 27:40-45; 31:11-13; and 31:42-44.

29.     The frame header in Edens is not "associated with" any particular "audio information."

30.     The frame header in Edens does not indicate when audio information is to be played back.

31.     The frame header in Edens does not include any type of time information, let alone time information that is used for synchronous playback.

32.     Instead, each frame header is one of two alternative patterns, neither of which encodes *any* timing information – let alone "playback timing information" as that term is used in the claims of the '357 Patent.

33.     Edens teaches away from using time stamps in connection with transmitting media content between playback devices by explaining that:

            a.  when "data packets are transmitted asynchronously, devices must be able to buffer incoming packets and generate timing information

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

8

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

internally (i.e., 'timestamps' associated with the data packets), which must be communicated to other devices," Edens, Edens, 6:40-45;

b.  networks that use time stamps for transmitting media content between devices require "almost double the audio data…due to this buffering/timestamping process, resulting in a significant loss of bandwidth" as compared to networks that implement synchronous transmission protocols, Edens, 6:45-47; and

c.  using time stamps for media playback requires "expensive devices, due to the memory, buffers, counters and associated circuitry" for generating and processing time stamps as compared to networks that implement synchronous transmission protocols, Edens, 6:47-49.

34.    Because Edens teaches away from using time stamps for transmitting media content between playback devices, Edens teaches away from using time stamps for transmitting media content in a system where playback devices are configured for synchronous playback of media transmitted between playback devices.

35.    The playback devices in Edens do not "remain independently clocked during synchronous playback" in combination with the other elements recited in the claims in the same way as the playback devices disclosed and described in Millington '357 because the playback devices in Edens are configured to use synchronous transmission protocols to transmit information in "a synchronous logical ring network" architecture.  Edens, 9:58-61.

36.    Edens teaches away from network devices that do not use synchronous transmission protocols by explaining that:

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

9

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

a. "[a]pplying local area network technology (e.g., Ethernet and TCP/IP network protocols) to consumer electronics devices raises a number of problems" and that "[a]lthough it appears advantageous to connect consumer electronics devices as generic nodes on a network, existing network protocols are far from optimized for real-time streams of digital audio and video," Edens, 4:47-53;

b. "Ethernet…is not optimized to carry real-time continuous digital media streams" because "[i]t is an asynchronous, packet-based protocol that would add significant overhead to digital audio and video samples, which require consistent and timely delivery, as opposed to the ability to 'burst' packets of information at high speeds on demand," Edens, 5:4-10; and

c. Ethernet and/or other asynchronous transmission protocols rather than synchronous transmission protocols to distribute real-time media would be too "complex and expensive devices, due to the memory, buffers, counters and associated circuitry required" to perform synchronous playback of real-time media distributed via asynchronous networks, Edens, 6:38-52.

37. By distinguishing the "synchronous logical ring network" from alternatives that do not rely upon synchronous transmission and explicitly disparaging alternatives that "cannot guarantee consistent delivery of data such as real-time continuous digital media streams," Edens, 9:12-14, Edens teaches away from playback devices like those recited in the claims that do not rely on synchronous transmission protocols, but rather solve the problem of synchronizing audio

McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

10

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

playback between independently-clocked playback devices by having one playback device transmit "playback timing information associated with the audio information" and "device clock information" to another playback device.

**Blank**

38.    Blank is a local area network solution comprising a system for synchronizing playback of audio and video content (A/V content) via multiple displays 105 (each connected to a media synch player 100) over a bus 115 or other local network where "there is a need to maintain synchronization" between "multiple audio-visual displays...to provide a large audience with access to a particular presentation" and where un-synchronized playback among the multiple displays 105 would cause "perceptual discordance of the presentation" that would "undesirably detract from intelligibility and audience appreciation of the content being presented." Blank, ¶ 6, Fig. 1.

39.    Blank mentions that "other types of interconnections are also possible, including fiber optic communications, LANs, WANs or the Internet or any other data network," Blank, ¶ 23, but there is no need to synchronize playback of A/V content among two displays connected by a wide area network (WAN) in the context of the system disclosed in Blank, because if two displays are sufficiently far enough apart to warrant connection via a WAN, then no viewer could see the first and second displays at the same time and thus, no viewer would experience "perceptual discordance of the presentation" solved by Blank's disclosed system if the second display did not play the A/V content in synchrony with the first displayed.

40.    Blank does not disclose a scenario where a first media synch player plays media content (in synchrony or otherwise) based on playback timing information that the first media synch player also sends to another media synch player.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

11

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

41.    There is no teaching or suggestion in Blank as to how such a combined device like the one proposed in the Office Action would (or even could) use the t+d information that the proposed combined device would send to a second media synch player 110 for synchronous playback with the second media synch player 110.

42.    Blank does not disclose a scenario where a first media synch player plays media content (in synchrony or otherwise) based on a "frame-specific time stamp" that the first media synch player also sends to another media synch player.

43.    Blank does not disclose using a "frame-specific time stamp" for synchronizing playback among multiple playback devices.

**Gray**

44.    Gray is a WAN solution comprising a system for transmitting "real-time" AV content from a media source 301 (e.g., an Internet media content provider) to a media sink 302 (e.g., home entertainment system 210) over a path that traverses multiple heterogeneous networks comprising two or more of a (i) constant delay network 311, (ii) variable delay network 312 with a common time base 322, and/or (iii) a variable delay network without a common time base 313.  Gray, Figs. 2-3, ¶¶ 13, 53-57.

45.    To deliver the "real-time" AV content from the media source 301 to the media sink 302 over multiple networks within "the minimal jitter tolerances required to support real-time presentation of the multimedia data" at the media sink 302 (i.e., to avoid "choppy" or "stuttering" playback), Gray deploys gateways 331 "between each network in the heterogeneous networks" to emulate a constant delay network over the multiple heterogeneous networks.  Gray, ¶¶ 6, 59, Fig. 6.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

12

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

46.    In Gray, each gateway interprets (and when appropriate, modifies) time stamps in each multimedia packet, and then forwards each multimedia packet to the next heterogeneous network based on the time stamps to "provide for the delivery of multimedia packets regardless of the heterogenic nature of the networks that intervene between the multimedia source and the multimedia sink" so that "streaming multimedia data may be available regardless of the location of the user," thereby "represent[ing] a significant improvement over the state of the art." Gray, ¶¶ 63-70.

47.    Gray does not disclose a scenario where a first media synch player plays media content (in synchrony or otherwise) based on a "frame-specific time stamp" that the first media synch player also sends to another media synch player.

48.    Gray does not disclose using a "frame-specific time stamp" for synchronizing playback among multiple playback devices.

**Combining and Modifying Blank and Gray**

49.    A person of ordinary skill in the art at the time of the invention would not have been motivated to combine the components of Blank and Gray into the hypothetical consolidated device proposed in the Office Action, and then further configure such a hypothetical consolidated device to perform the functions recited in the claims of Millington '357, as further proposed in the Office Action.

50.    Blank nowhere suggests that it would be desirable to combine the media synch player, control console, and time server components in Blank into the hypothetical consolidated device proposed in the Office Action.

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

13

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

51.     There are technical, economic, and operational reasons not to combine the functionalities of the media synch player, control console, and time server into the proposed hypothetical consolidated device.

52.     It would be more expensive to design and manufacture the hypothetical consolidated device than to design and manufacture the media synch player disclosed in Blank because additional components and programming required to perform the time server and control console functions would need to be added to the media synch player device to create the hypothetical consolidated device.

53.     It would be more expensive to deploy a network of hypothetical consolidated devices than a network that included separate media synch players, a control console, and a time server because each display in Blank requires a media synch player, and the additional cost of using the hypothetical consolidated device at each display versus a media synch player would increase linearly with the number of displays deployed in the network.

54.     It would be inefficient for a system operator to use a hypothetical consolidated device to control Blank's network because the system operator would be using only the control console feature of the hypothetical consolidated device to control Blank's network.

55.     It would be cumbersome for a system operator to manage Blank's network via a hypothetical consolidated device that was also rendering content on a display.

56.     If every hypothetical consolidated device had the ability to transmit and receive audio content, playback timing information, and device clock information to/from any other hypothetical consolidated device, then configuration and operation of a network of hypothetical consolidated devices would be more complex than Blank's disclosed network where each of the media synch player 110, control console 125, and time server 120 devices performs its own

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

14

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

specialized role in the network because it would be more time-consuming to configure individual hypothetical consolidated devices to perform their specific functions in the network than it would be to configure a single time server 120, control console 125, and media synch players 110 to each perform its own specialized role.

57.    A person of skill in the art at the time of the invention would not have been motivated modify the system in Blank to use the time stamps in Gray for synchronizing playback among multiple playback devices as proposed in the Office Action because Blank already solves the problem of synchronous playback among multiple playback devices, albeit in a different way than recited in the claims.

58.    Neither Blank nor Gray suggests that the time stamps in Gray's WAN solution for emulating a constant delay network over multiple heterogeneous networks could be used in Blank's LAN solution to facilitate synchronous playback among multiple devices.  Gray, ¶¶ 6, 59, Fig. 6.

59.    Neither Blank nor Gray suggest to a person of skill in the art how Gray's time stamps could be used as "playback timing information associated with…audio information" in combination with "audio information" and "device clock information" to facilitate synchronous playback among multiple devices.

60.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:  December 20, 2017          By:  _____

                                           Andrew Wolfe, Ph.D.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

15

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

EXHIBIT 1

# Andrew Wolfe Ph.D.

20 S. Santa Cruz Ave. Suite 101
Los Gatos, CA 95030
(408) 402-5872 (office)  (408) 394-1096 (mobile)
Email:  awolfe@awolfe.org

**Education:**
Ph.D. in Computer Engineering, Carnegie Mellon University, 1992
Visiting Graduate Student, Center for Reliable Computing, Stanford University, 1988-1989
M.S. in Electrical and Computer Engineering, Carnegie Mellon University, 1987
B.S.E.E. in Electrical Engineering and Computer Science, The Johns Hopkins University, 1985

**Recent Employment:**

Consultant, [October 2002-present]
**Wolfe Consulting**

Consultant on processor technology, computer systems, consumer electronics, software, design tools, and intellectual property issues.  Testifying and consulting expert for IP and other technology-related litigation matters.

Sample clients include:

| | | |
|---|---|---|
| AMD | Nvidia | Samsung |
| IBM | Motorola | HTC |
| SMIC | AMKOR | Huawei |
| Dell | Honeywell | Western Digital |
| Nintendo | Kingston | Sonos |
| Moneygram | Arraycomm | Insilica |
| Synaptics | Activision | Sawstop |
| Mysticom | P.A.R.C. | Quester Ventures |

Lecturer, [September 2013-present]
**Santa Clara University**

Teaching graduate and undergraduate courses on computer architecture, electronics and embedded computing, and mechatronics.

Chief Technical Officer, [1999-2002]; Sr. VP of Business Development, [2001-2002]; VP, Systems Integration, S3 Fellow , [1998 – 1999]; Director of Technology, S3 Fellow , [1997 - 1998]
**SONIC|blue, Inc**, Santa Clara, CA  (formerly S3 Inc.)

**Strategic Business Development:**
Developed and implemented strategy to reposition S3 from PC graphics into the leading networked consumer electronics company.
- Acquired Diamond Multimedia and coordinated integration of communications, Rio digital music, and workstation graphics divisions into S3.
- Identified and negotiated acquisitions to grow digital media businesses including Empeg, ReplayTV, and Sensory Science.
- Identified and negotiated strategic investments including Comsilica, Intellon, KBGear Interactive, Entridia, DataPlay and others.
- Developed strategy for integrated graphics/core-logic products and established a joint venture with Via Technologies to design and market these products.
- Negotiated divestiture of graphics chip business to Via and the workstation graphics division to ATI.

**Product Planning and Development:**
- Drove roadmap development within SONICblue product divisions.
- Managed Business Development for all product lines.
- Led New Product Development and Corporate Vision processes.
- Acting co-General Manager of Rio digital music business in 2nd half of 2001. Responsible for all areas of product development, business development, and cost management.
- Managed development of the Savage/MX and Savage/IX mobile 3D graphics accelerators and Savage/NB system logic products.

**Public Relations, Public Policy and Investor Relations:**
- Present company products and strategy at industry events such as CES, Comdex, and Microprocessor Forum.
- Discuss new products and initiatives with the press.
- Promote issues of interest to SONICblue to industry groups and in Washington.
- Brief analysts, and investors on company progress. Participate in quarterly conference calls.

**IP Management and Licensing:**
- Negotiated and managed partnership agreements including a critical cross-licensing agreement with Intel.
- Renegotiated technology-licensing agreements with IBM for workstation graphics products.
- Evaluated outside technology opportunities, managed video research and development, and managed corporate IP strategy with legal staff including patent filings, cross licensing, and litigation.

Consulting Professor , [1999-2002]
**Stanford University**, Stanford, CA

Teaching computer architecture and microprocessor design.

Assistant Professor [1991 - 1997]
**Princeton University**, Princeton, NJ

Teaching and research in the Electrical Engineering department. Research in embedded computing systems, multimedia, video signal processors, compiler optimization, and high performance computer architecture. Principal investigator or project manager for ~$6M in funded research.

Visiting Assistant Professor , [1992]
**Carnegie Mellon University**, Pittsburgh, PA

Research and preparation of teaching materials on advanced microprocessor designs including new superscalar and superpipelined processor architectures.

Founder and Vice President and Consultant, [1989 - 1995]
**The Graphics Technology Company, Inc.**, Austin, TX

Founded company to develop touch-sensitive components and systems for the first generation of PDA devices and interactive public systems. Obtained financing from Gunze Corp., Osaka, Japan. Company is now part of 3M.

Senior Electrical Engineer, [1989]
**ESL - TRW, Advanced Technology Division**, Sunnyvale, CA

Designed the architecture for an Intel i860-based multiple-processor digital signal processing system for advanced military applications. Designed several FPGA interface chips for VME-bus systems.

Design Consultant, [1986 -1987]
**Carroll Touch Division, AMP Inc.**, Round Rock, TX

Developed several new technologies for touch-screen systems. Designed the first ASIC produced for AMP, a mixed-signal interface chip for controlling touch-screen sensors. Developed the system electronics, system firmware, and customer utility software for numerous products including those based on the new ASIC.

Senior Design Engineer, [1983 -1985]
**Touch Technology Inc.**, Annapolis, MD

**Advisory Boards:**

Director, Turtle Beach Corporation (NASDAQ:HEAR) (formerly Parametric Sound Corporation), KBGear Interactive, Inc., Comsilica, Inc., Rioport.com, various S3 subsidiaries.

Technical Advisory Boards, Ageia, Inc., Intellon, Inc., Comsilica, Inc., Entridia, Inc., Siroyan, Ltd., BOPS, Inc, Quester Venture Funds

Carnegie Mellon University Silicon Valley Advisory Board; Johns Hopkins University Tech Transfer Advisory Board

**Awards:**

Micro Test-of-Time Award (in recognition of one of the ten most influential papers of the first 25 years of the symposium), 2014
Business 2.0 "20 Young Executives You Need to Know", 2002
Walter C. Johnson Prize for Teaching Excellence, 1997.
Princeton University Engineering Council Excellence in Teaching Award, Spring 1996
AT&T/Lucent Foundation Research Award, 1996.
Walter C. Johnson Prize for Teaching Excellence, 1995
IEEE Certificate of Appreciation, 1995, 2001.
AT&T Foundation Research Award, 1993.
Semiconductor Research Corporation Fellow, 1986 - 1991.
Burroughs Corporation Fellowship in Engineering, 1985 - 1986.

**Professional Activities:**

Program Chair:  Micro-24, 1991, Hot Chips 13, 2001.

General Chair:  Micro-26, 1993, Micro-33, 2000.

Associate Editor:  IEEE Computer Architecture Letters; ACM Transactions in Embedded Computing Systems

Speaker at CES, WinHec, Comdex, Intel Dev. Forum, Digital Media Summit, Microprocessor Forum, etc.

Keynote speaker at Micro-34, ICME 2002

IEEE B. Ramakrishna Rau Award committee – 2012-2016

IEEE Computer Society Awards Committee – 2015

CES Awards Judge - 2016

**Over 50 refereed publications.**

**Publications since January 2006:**

Wolfe, A., "Retrospective on Code Compression and a Fresh Approach to Embedded Systems", IEEE MICRO, July/Aug. 2016, Invited paper.

**Patents:**

| | | |
|---|---|---|
| U.S. Pat. 5,041,701 | – | *Edge Linearization Device for a Contact Input System*, Aug. 20, 1991. |
| U.S. Pat. 5,438,168 | – | *Touch Panel*, Aug. 1, 1995. |
| U.S. Pat. 5,736,688 | – | *Curvilinear Linearization Device for Touch Systems*, Apr. 7, 1998. |
| U.S. Pat. 6,037,930 | – | *Multimodal touch sensitive peripheral device*, March 14, 2000. |
| U.S. Pat. 6,408,421 | – | *High-speed asynchronous decoder circuit for variable-length coded data*, June 18, 2002. |
| U.S. Pat. 6,865,668 | – | *Variable-length, high-speed, asynchronous decoder circuit*, March 8, 2005 |
| U.S. Pat. 7,079,133 | – | *Superscalar 3D Graphics Engine*, July 18, 2006 |
| EP 1 661 131 B1 | – | *PORTABLE ENTERTAINMENT APPARATUS*, Jan. 21, 2009 |
| U.S. Pat. 7,555,006 | – | *Method and system for adaptive transcoding and transrating in a video network*, June 30, 2009 |
| U.S. Pat. 7,996,595 | – | *Interrupt Arbitration for Multiprocessors*, Aug. 9, 2011 |
| EP 2 241 979 B1 | – | *Interrupt Arbitration for Multiprocessors*, Oct. 10, 2011 |
| GB201121568D0 | – | *Mapping Of Computer Threads onto Heterogeneous Resources*, Jan. 25, 2012 |
| U.S. Pat. 8,131,970 | – | *Compiler Based Cache Allocation*, March 6, 2012 |
| U.S. Pat. 8,180,963 | – | *Hierarchical read-combining local memories*, May 15, 2012 |
| U.S. Pat. 8,193,941 | – | *Snoring Treatment*, June 5, 2012 |
| U.S. Pat. 8,203,541 | – | *OLED display and sensor*, June 19, 2012 |
| U.S. Pat. 8,243,045 | – | *Touch-sensitive display device and method*, August 14, 2012 |
| U.S. Pat. 8,244,982 | – | *Allocating processor cores with cache memory associativity*, August 14, 2012 |
| U.S. Pat. 8,260,996 | – | *Interrupt Optimization for Multiprocessors*, Sept. 4, 2012 |
| 101185761 (KR) | – | *Noise Cancellation for Phone Conversation*, Sept. 19, 2012 |
| 101200740 (KR) | – | *OLED display and sensor*, November 7, 2012 |
| 101200741 (KR) | – | *Touch-sensitive display device and method*, November 7, 2012 |
| U.S. Pat. 8,321,614 | – | *Dynamic scheduling interrupt controller for multiprocessors*, Nov. 27, 2012 |
| U.S. Pat. 8,352,679 | – | *Selectively securing data and/or erasing secure data caches responsive to security compromising conditions*, Jan. 8, 2013 |
| U.S. Pat. 8,355,541 | – | *Texture Sensing*, Jan. 15, 2013 |
| U.S. Pat. 8,370,307 | – | *Cloud Data Backup Storage Manager*, Feb. 5, 2013 |
| U.S. Pat. 8,398,451 | – | *Tactile Input Interaction*, March 19, 2013 |
| JP 5241032 B2 | – | *Routing Across Multicore Network Using Real World or Modeled Data*, April 13, 2013 |
| ZL201010124820.3 | – | *Interrupt Optimization for Multiprocessors*, April 17, 2013 |
| U.S. Pat. 8,428,438 | – | *Apparatus for Viewing Television with Pause Capability*, April 23, 2013 |
| JP 5266197 B2 | – | *Data Centers Task Mapping*, May 10, 2013 |
| U.S. Pat. 8,508,498 | – | *Direction and Force Sensing Input Device*, August 13, 2013 |
| U.S. Pat. 8,547,457 | – | *Camera Flash Mitigation*, October 1, 2013 |
| U.S. Pat. 8,549,339 | – | *Processor core communication in multi-core processor*, October 1, 2013 |
| 101319048 (KR) | – | *Camera Flash Mitigation*, October 10, 2013 |
| U.S. Pat. 8,628,478 | – | *Microphone for remote health sensing*, January 14, 2014 |
| 101362017 (KR) | – | *Thread Shift: Allocating Threads to Cores*, Feb. 5, 2014 |
| 101361928 (KR) | – | *Cache Prefill on Thread Migration*, Feb. 5, 2014 |
| 101361945 (KR) | – | *Mapping Of Computer Threads onto Heterogeneous Resources*, Feb. 5, 2014 |
| JP 5484580 B2 | – | *Task Scheduling Based on Financial Impact*, Feb. 28, 2014 |
| JP 5487306 B2 | – | *Cache Prefill on Thread Migration*, Feb. 28, 2014 |
| 101372623 (KR) | – | *Power Management for Processor*, March 4, 2014 |
| 101373925 (KR) | – | *Allocating Processor Cores with Cache Memory Associativity*, March 6, 2014 |
| U.S. Pat. 8,676,668 | – | *Method for the determination of a time, location, and quantity of goods to be made available based on mapped population activity*, March 18, 2014 |
| U.S. Pat. 8,687,533 | – | *Energy Reservation in Power Limited Networks*, April 1, 2014 |
| 101388735 (KR) | – | *Routing Across Multicore Networks Using Real World or Modeled Data*, April 17, 2014 |
| JP 5487307 B2 | – | *Mapping Of Computer Threads onto Heterogeneous Resources*, May. 7, 2014 |
| U.S. Pat. 8,725,697 | – | *Cloud Data Backup Storage*, May 13, 2014 |
| U.S. Pat. 8,726,043 | – | *Securing Backing Storage Data Passed Through a Network*, May 13, 2014 |
| ZL201010124826.0 | – | *Dynamic scheduling interrupt controller for multiprocessors*, May 14, 2014 |
| JP 5547820 B2 | – | *Processor core communication in multi-core processor*, May 23, 2014 |

U.S. Pat. 8,738,949   – *Power Management for Processor*, May 27, 2014
U.S. Pat. 8,751,854   – *Processor Core Clock Rate Selection*, June 10, 2014
JP 5559891 B2      – *Thermal Management in Multi-Core Processor*, June 13, 2014
101414033 (KR)     – *Dynamic Computation Allocation*, June 25, 2014
JP 5571184 B2      – *Dynamic Computation Allocation*, July 4, 2014
101426341 (KR)     – *Processor core communication in multi-core processor*, May 23, 2014
U.S. Pat. 8,799,671   – *Techniques for Detecting Encrypted Data*, Aug 5, 2014
101433485 (KR)     – *Task Scheduling Based on Financial Impact*, Aug. 18, 2014
U.S. Pat. 8,824,666   – *Noise Cancellation for Phone Conversation*, Sept. 2, 2014
U.S. Pat. 8,836,516   – *Snoring Treatment*, Sept. 16, 2014
U.S. Pat. 8,838,370   – *Traffic flow model to provide traffic flow information*, Sept. 16, 2014
U.S. Pat. 8,838,797   – *Dynamic Computation Allocation*, Sept. 16, 2014
U.S. Pat. 8,854,379   – *Routing Across Multicore Networks Using Real World or Modeled Data*, Oct. 7, 2014
JP 5615361 B2      – *Thread Shift: Allocating Threads to Cores*, Oct. 15, 2014
U.S. Pat. 8,866,621   – *Sudden infant death prevention clothing*, Oct. 21, 2014
U.S. Pat. 8,881,157   – *Allocating threads to cores based on threads falling behind threads*, Nov. 4, 2014
U.S. Pat. 8,882,677   – *Microphone for remote health sensing*, Nov. 11, 2014
U.S. Pat. 8,924,743   – *Securing Data Cache through Encryption*, December 30, 2014
U.S. Pat. 8,994,857   – *Camera Flash Mitigation*, March 31, 2015
JP 5699140 B2      – *Camera Flash Mitigation*, April 8, 2015
U.S. Pat. 9,143,814   – *Method and system for adaptive transcoding and transrating in a video network*, Sept 22, 2015
CN102483703B      – *Mapping Of Computer Threads onto Heterogeneous Resources*, Oct. 14, 2015
U.S. Pat. 9,178,694   – *Securing Backing Storage Data Passed Through a Network*, November 3, 2015
U.S. Pat. 9,189,282   – *Thread-to-core mapping based on thread deadline, thread demand, and hardware characteristics data collected by a performance counter*, November 17, 2015
U.S. Pat. 9,189,448   – *Routing image data across on-chip networks*, November 17, 2015
U.S. Pat. 9,208,093   – *Allocation of memory space to individual processor cores*, December 8, 2015
U.S. Pat. 9,239,994   – *Data Centers Task Mapping*, January 19, 2016
EP2228779 B1      – *Traffic flow model to provide traffic flow information*, Jan. 27, 2016
U.S. Pat. 9,262,628   – *Operating System Sandbox*, February 16, 2016
U.S. Pat. 9,330,137   – *Cloud Data Backup Storage Manager*, May. 3, 2016
U.S. Pat. 9,519,305   – *Processor Core Clock Rate Selection*, December 13, 2016
U.S. Pat. 9,569,270   – *Mapping thread phases onto heterogeneous cores based on execution characteristics and cache line eviction count*, February 14, 2017

**Testimony by deposition or at trial – September 20, 2012 - -present**

| Case | Venue | Case Number |
|---|---|---|
| ACER, INC., ACER AMERICA CORPORATION and GATEWAY, INC v TECHNOLOGY PROPERTIES LIMITED, PATRIOT SCIENTIFIC CORPORATION, and ALLIACENSE LIMITED | Northern District of California | 5:08-cv-00877 IF |
| TVI v SONY CORPORATION et. al | Northern District of California | 5:10-cv-00475-JF/HRL |
| Walker Digital, LLC v. Ayre Acoustics, Inc. et al | ITC | 337 -TA-824 |
| ENOVA TECHNOLOGY CORPORATION v INITIO CORPORATION, INITIO CORPORATION (California), WESTERN DIGITAL CORPORATION, BUFFALO INC., and BUFFALO TECHNOLOGY (USA), INC. | District of Delaware | C.A. 10-040LPS |
| In the Matter of Certain Consumer Electronics and Display Devices and Products Containing Same (GPH v HTC) | ITC | 337-TA-836 |
| In the Matter of Computers and Computer Peripheral Devices and Components Thereof and Products Containing the Same (TPL v Kingston et. al) | ITC | 337-TA-841 |
| In the Matter of Certain Electronic Imaging Devices (Flashpoint) | ITC | 337-TA-850 |
| Pacing Technologies LLC v. Garmin International and Garmin USA, Inc. | Southern Dist. of California | CV 12-1067 BEN |
| ProconGPS, Inc. v. Star Sensor, LLC et al. | Northern District of California | 3:12-cv-01903-SI |
| Spireon, Inc. v. CallPass Tech, LLC et al | Northern District of California | 3:12-cv-01903-SI |
| PQ Labs, Inc v Yang Qi, Zaagtech Inc, Jinpeng Li, Haipeng Li. | Northern District of California | 12--00450-CW |
| In the Matter of Certain Consumer Electronics with Display and Processing Capabilities (GPH v Vizio) | ITC | 337-TA-884 |
| Florida Atlantic University Research Corporation, et al. v. TPV Technology Limited, et al | S.D. Fla. | 09-12-CV-80701 09-12-CV-80694 09-12-CV-80697 |
| Inter Partes Review of: U.S. Patent No.: 8,294,677 and U.S. Patent No.: 8,330,738 (TPK v Wintek) | PTO | IPR2013-00433 IPR2013-00436 |
| Inter Partes Review of: U.S. Patent No.: 8,176,267 (SMI v Phison) | PTO | IPR2013-00473 |
| Immersion Technologies v HTC CORPORATION et al. | District of Delaware | 1:12-cv-00259-UNA |
| Smartflash v. Samsung et al. | E. D. Texas | 6:13-CV-448 |
| Black Hills Media LLC v Sonos LLC | C.D. California | 2:14-cv-00486 |
| Kangaroo Media, Inc. et al. v. YinzCam, Inc. | District of Western Pennsylvania | 2:12-cv-00382-JFC |
| Inter Partes Review of: U.S. Patent No. 8,176,267 (CATR v Kingston) | PTO | IPR2015-00149 |
| Inter Partes Review of: U.S. Patent No. 6,890,188 (Imation v Kingston) | PTO | IPR2015-00066 |
| INTELLECTUAL VENTURES II LLC v JP MORGAN CHASE & CO., et al., | Southern District of NY | 13 Civ. 3777 |
| Samsung Electronics Co., Ltd. and Samsung Electronics America Inc. vs. NVIDIA Corporation, Old Micro, Inc. f/k/a Velocity Micro, Inc., and Velocity Holdings, LLC | E. D. Virginia | 3:14-cv-00757-REP |

| | | |
|---|---|---|
| Certain Touchscreen Controllers and Products Containing Same (Synaptics v Shenzhen Huiding Technology Co., Ltd) | ITC | 337-TA-957 |
| Inter Partes Review of: U.S. Patent No. 7,742,053 (LG v ATI) (also 6,897,871 and 7,327,369) | PTO | IPR2015-00325 IPR2015-00326 IPR2015-00330 |
| Ericsson Inc., et al. v TCL Communication Technology Holdings, LTD, et al. | E. D. Texas | 2:15-cv-11 |
| Certain Table Saws Incorporating Active Injury Mitigation Technology and Components Thereof (Sawstop v Bosch) | ITC | 337-TA-965 |
| INTER PARTES REVIEW OF U.S. PATENT NO. RE43,931 (TCL v Ericsson) | PTO | IPR2015-01602 IPR2015-01637 IPR2015-01641 IPR2015-01646 IPR2015-01674 IPR2015-01676 IPR2015-01761 IPR2015-01806 |
| T-Mobile, USA, Inc. v. Huawei Device USA, Inc. and Huawei Technologies Co., Ltd. | W. D. Washington | 14-cv-1351 |
| AVM Technologies, LLC v. Intel Corporation and Related Matters | District of Delaware | 15-33-RGA |
| TCL v. Ericsson, et al. | C.D. California | 8:14-cv-341 |
| Sonos Inc. v D&M Holdings Inc. d/b/a the D&M Group; D&M Holdings U.S. Inc. and Denon Electronics (USA) LLC. | District of Delaware | 14-1330-RGA |

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,959 | 06/16/2017 | 9213357 | 04-0401-REEXAM (14-1800-R | 9548 |

107361          7590          03/16/2018

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| ENGLAND, DAVID E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/16/2018 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

U̲n̲i̲t̲e̲d̲ S̲t̲a̲t̲e̲s̲ P̲a̲t̲e̲n̲t̲ a̲n̲d̲ T̲r̲a̲d̲e̲m̲a̲r̲k̲ O̲f̲f̲i̲c̲e̲

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MR. CHRISTOPHER JOHN ROURK
JACKSON WALKER LLP
2323 ROSS AVENUE
SUITE 600
DALLAS, TX 75201

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. _90/013,959_.

PATENT NO. _._

ART UNIT _3992_.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

David E. England

Primary Examiner

PTOL-465 (Rev.07-04)

Art Unit: 3992

Application/Control Number: 90/013,959                                    Page 2

Art Unit: 3992

## DETAILED EX PARTE REEXAMINATION FINAL OFFICE ACTION

The present application is being examined under the pre-AIA first to invent provisions.


## I. INTRODUCTION

This is a Final Office Action on the merits in the *Ex Parte* Reexamination of claims 9 –

12 and 19 of US Patent No. US 9,213,357 to Millington, hereinafter "the '357 Patent". This Final

Office Action is in response to Patent Owner's, hereinafter "the PO", Response to Office Action

dated 12/20/2017, hereinafter "PO's Response", which is in response to a Non-Final Office

Action mailed 10/20/2017 of the *Ex Parte* Reexamination of claims 9 – 12 and 19 of the '357

Patent.

The PO's Response dated 12/20/2017 has been entered. The current status of the claims

of the '357 Patent are as follows:

- Claims 9 – 12 and 19 stood rejected as of the Non-Final Office Action dated
  10/20/2017.


### A. References Cited in this Office Action

1.      The prior art patents and/or printed publications, hereinafter "the references",

which have been submitted 08/22/2014, have been considered and are relied upon in this

Office Action are relisted as follows.


        a.      U.S. 9,195,258 to Nicholas A. J. Millington, filed February 20, 2014,
        issued November 24, 2015 (hereinafter "the '258 Patent");

Application/Control Number: 90/013,959                                          Page 3
Art Unit: 3992

        b.     The MP3 and Internet Audio Handbook, Brace Fries and Marty Fries, TeamCom Books (2000) (hereinafter the "Handbook");

        c.     U.S. 6,611,537 to Edens et al., filed May 15, 1998, issued August 26, 2003 (hereinafter "Edens");

        d.     U.S. 2004/0252400 to Blank et al., filed June 13, 2003, published December 16, 2004 (hereinafter "Blank");

        e.     U.S. 2002/015003 to Gray et al., filed April 17, 2001, published October 17, 2002 (hereinafter "Gray");

        f.     Admitted Prior Art (APA) in the '357 Patent and other related Sonos patents (hereinafter the "SONOS APA").

## B. Reexam Prosecution Summary

1.     In the Ex Parte Reexamination Request filed on 05/22/2017, by the Requester, the references were relied upon for providing a new technical teaching that would raise a Substantial New Question, "SNQ", of patentability.

2.     A Notice of Incomplete Ex Parte Reexam Request was filed 05/25/2017, see notice.

3.     A Receipt of Corrected Original Ex Parte Request was received 06/16/2017, correcting the error and submitting the actual Substantial New Question, "SNQ", of patentability against claims 9 – 12, and 19, See The Request, dated 06/16/2017.

4.     An Order Granting Ex Parte Reexamination was filed 08/09/2017. In the Order, it was agreed that the teachings of,

        a.     Edens in combination with at least Sonos APA, and Blank in combination with at least Gray and Sonos APA raised a SNQ of patentability as to

Application/Control Number: 90/013,959                                                Page 4
Art Unit: 3992

at least claim 9, of the '357 Patent, and a Double Patenting rejection in view of

9,195,258, See The Order.

5.      A Non-Final Office Action was filed on 10/20/2017 rejecting claims 9 – 12 and

19 under 35 U.S.C. 103(a) and a Double Patenting rejection.

6.      An Interview was conducted 11/16/2017 with Attorneys of record to discuss

multiple points of the claimed invention.

7.      A Response to the Non-Final Office Action was filed 12/20/2017 elaborating the

arguments made in the interview. A Declaration Pursuant to 37 C.F.R. § 1.132 and a

Terminal Disclaimer was filed with the Response.


**II. RESPONSE TO ARGUMENTS**

    Patent Owner's remarks/arguments, pages 9 – 34, have been considered, entered, and will

now be discussed below. The Examiner acknowledges the Declaration Pursuant to 37 C.F.R. §

1.132 filed 12/20/2017. The Terminal Disclaimer filed 12/20/2017 has been approved.


    Response to Filing of Terminal Disclaimer.

    PO as filed a Terminal Disclaimer to overcome the Double Patenting rejection. The

Terminal Disclaimer was approved on 12/21/2017. The Double Patenting rejection has been

overcome and is withdrawn.

Application/Control Number: 90/013,959                                      Page 5
Art Unit: 3992

     <u>Response to the Edens, Handbook, and the APA rejection</u>.

     PO argues the rejection made in view of the above mentioned prior art, see PO Response,
pp. 10 – 20. More specifically, the PO argues that the prior art of Edens does not teach "transmit,
via the network interface of the first playback device to a second playback device… playback
timing information associated with the audio information". PO states that since the network
topology of Edens generates frames at a consistent rate, 44.1kHz, there is no need for playback
timing information since when the information is sent it is automatically played and therefore no
playback timing information associated with the audio information is actually sent.

     **Upon further** review of the prior art, the Examiner finds the PO's arguments persuasive.
The prior art of Edens utilized the frame size to synchronize all other devices to the network
clock and play the audio information instantly. As the claim is interpreted, the "playback timing
information associated with the audio information" is actual data put into the frame or packet and
transferred to other devices. The data size of Edens' frames could not be interpreted as the actual
information in the frame/packet. Therefore playback timing information associated with the
audio information is not needed in Edens because of the network topology and use of Edens'
frame, i.e., Edens teaches away from needing playback timing information associated with the
audio information sent in a frame since the size of the frame dictates the playback time, not the
information in the frame, see PO Response, pp. 10 – 20. Wolfe's Declaration also highlights this
finding, see Wolfe Dec. ¶¶ 28 – 34, and 37. Therefore, the rejection in view of Edens, Handbook,
and the APA is withdrawn.

Application/Control Number: 90/013,959                                      Page 6
Art Unit: 3992

      <u>Response to the Blank, Gray and the APA rejection</u>.

      PO argues the rejection made in view of the above mentioned prior art, see PO Response, pp. 20 – 34. The PO's arguments are broken down into sections and will be addressed in the same manner.

      **PO argues that** Blank, Gray, and the APA, fail to teach or suggest a first playback device configured to "play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information", See section 'i.' of the PO's Response pp. 21 - 23. PO argues that Blank does not disclose a scenario where a first media synch player plays media content (in synchrony or otherwise) based on playback timing information that the first media synch player also sends to another media synch player. PO specifically states that no teaching in Blank suggests the Office's combination of Blank's media synch player 110 and control console 125. PO further argues that the combination of Blank and Gray does not disclose a scenario where a first media synch player plays media content (in synchrony or otherwise) based on a "frame-specific time stamp" that the first media synch player also sends to another media synch player. PO also relies on the Wolfe Dec., ¶¶ 40-43, 47, and 48 to support their arguments.

      **As to the Blank argument**, it is clearly seen in the rejection the obviousness rejection and use of KSR in the rejection quoting sections of the MPEP and known court cases relied upon to support the rational of the rejection, i.e., combination of the two devices would have yielded a predictable results to one of ordinary skill in the art at the time of the invention. In this case, two

Application/Control Number: 90/013,959                                      Page 7
Art Unit: 3992

devices housed in the same "box". The devices would not perform any other unexpected

function other than what they are programed to do and do not require undue experimentation to

determine other different results. This type of computer combination is performed all the time.

For Example, a system could have an email server, printer server, web server, or other types of

servers as separate machines scattered around in a network or combine these servers into one

server or "box" and the functions of those separate server would not be any different, the only

difference would be the location of the servers.

As to the Gray argument, it is seen that the time stamp that is used in Gray in

construction 2 of the rejection is used to render the information received by the receiver

application, (see Gray ¶¶ 0069, 0076 - 0078 and 0089 - 0090). The time stamp specifically state

in paragraph 0069 of Gray is further elaborated on in paragraphs 0076 – 0078. More specifically

the time stamp represents the relative time that the information in the multimedia packet should

be rendered by the receiver application, (i.e., when to play the multimedia information). As noted

before, the claim limitation "playback timing information <u>associated with the audio information</u>",

emphasis added, does not give clear indication as to <u>how</u> the playback timing information is

"associated" with the audio information. The BRI could be as broad as if the playback timing

information is in the same packet as the audio information and therefore they are "associated"

with each other. The teachings of Blank or Blank in view of Gray teaches play back the audio

information in synchrony with the second playback device by using the playback timing

information associated with the audio information and device clock information of the first

playback device to play back the audio information.

Application/Control Number: 90/013,959                                          Page 8
Art Unit: 3992

<u>Response to the Blank, Gray and the APA argument (ii).</u>

PO argues that the proposed modification and combination of Blank and Gray is based on hindsight reasoning that uses Patentee's claims as a roadmap, (See PO arguments pp. 23 – 28). In these arguments, PO cites multiple court cases stating that the prior art does not suggest any such combination of the references let alone the Examiner's combination of Blank's devices into one device that teaches the claimed invention.

**As to these arguments,** the combination of devices to create one device is not new to the art of computer networking let alone the computer art. As stated above in the previous response to PO's arguments, it is well known in the art that one can combine different servers to be housed in one box and would not change the function of each server, i.e., the email server would still sent and receive email and a printer server would still send and receive print requests. The integration of the devices stated in the rejection would have yielded a predictable result of the devices performing their programed functions. In the case of Blank, the values of time 't' and delay indication 'd' would be in reference to the combined devices as one devices, (Blank ¶0044). The integration of the devices stated in the rejection would not make an overly complicated devices as suggested by the PO since it would still be the same two devices connected by an interface of some type and housed in the same "box". Examples of such modification are shown below.

Application/Control Number: 90/013,959                                    Page 9
Art Unit: 3992



As seen the bus used to communicate to the multiple Media Synch Players (n) would still be connected to the same bus and still go to "all the devices" that are housed in one box, also see rejection.

As stated in the rejection, to make these separate components of Blank integral would only take one of skill in the art to combine and would not require undue experimentation and would yield the predictable result of the devices still perform their programed functions, only in a different location. The integration of devices would not be overly complicated as suggested by the PO and Wolfe's Dec. since there is no difference in how the components interact with one another. Such an integration is not beyond the ability or knowledge of one of ordinary skill in the art since making devices integral is not only well known in the art, See MPEP 2144.04(V)B., but would have led to a reasonable expectation of success as also set forth in view of KSR, (i.e., not only have servers been combine to make one device but also the multiple technologies have been added into cell phones).

Application/Control Number: 90/013,959                                    Page 10
Art Unit: 3992

      <u>Response to the Blank, Gray and the APA argument (iii)</u>.

      PO argues that a person of skill in the art would not have any reason to modify and combine the disparate devices in Blank and Gray and then configure those devices to perform the functions recited in the claims as proposed in the office Action, (See PO arguments pp. 28 – 30).

      **As to this argument**, it is seen in Blank, ¶ 0045, that Gray is "assigned to the assignee of the present application and which is <u>hereby incorporated herein by reference</u>." PO argues that Gray is a WAN solution and Blank mentions that "other types of interconnections are also possible, including fiber optic communication, LANs, WANs or the Internet or any other data network", but they could not work together. It is seen in Gray ¶ 0090 that the network may be implemented in an IEC 802.11 wireless network, i.e., wireless LAN. Blank, as stated by the PO, teaches LANs and "any other data network", which under BRI is an IEC 802.11 wireless LAN.

      <u>Response to arguments (a) and (b)</u>.

      PO argues that (a) "there is no motivation to combine the functions of Blank's media synch player, time server, and control console into the hypothetical consolidated device as proposed in the Office Action", and (b) "There is no motivation to modify the system in Blank to use the time stamps in Gray for synchronous media playback as proposed in the Office Action", (See PO arguments pp. 30 – 34).

      **As to argument (a)**, this argument has been similarly covered in the response to arguments above. Firstly, it is seen in Blank, ¶ 0045, that Gray is "assigned to the assignee of the present application and which is <u>hereby incorporated herein by reference</u>." PO seems to only argue Gray's synchronization of display and audio information, which would make the

Application/Control Number: 90/013,959                                    Page 11
Art Unit: 3992

combination of Blank's and Gray's devices extremely complicated and costly. As stated above,

this combination would still be the devices as stated, merely in one box. There is clear overlap of

technology and applying such would merely take one of skill in the art to program such.

Furthermore, Gray clearly teaches their system being used with audio systems, see Gray ¶ 0037,

"**Audio** system 216 may be a speaker, a stereo system, or any device capable of emitting sound

data, and similarly may be integrally positioned with **or separate from display device** 214." It is

further clear that Blank discloses audio and video content, See Blank ¶ 0020, "The following

disclosure describes methods and apparatus for providing synchronized **displays** from two or

more digital data sources.  The **displays** typically include both **audio and video** content."


     **As to argument (b)**, the Examiner has given reasons for combining the reference as in

different manners, see rejection. To further rebut PO arguments, as previously stated Blank as

incorporated by reference Gray. In Blank paragraph 0045, as previously cited, it states:

     "[0045] Time information is also present in the individual clocks of the media synch

     **players** 110.  This time information may be transmitted in a non-isosynchronous manner

     back to the time server 120 and combined with time information derived from the time

     server to speed up or slow down rendering of the clocks 212 in the individual media

     synch **players** 110.  A more detailed description of the use of common time to **convert** a

     non-isosynchronous network to an isosynchronous network can be found in U.S.  patent

     application Ser.  No. 09/863,834, filed on Apr.  17, 2001 (Published Application No.

     20020150053 A1, published on Oct.  17, 2002), entitled "Methods And Systems For

     Distributing Multimedia Data Over Heterogeneous Networks", listing Donald M. Gray et

Application/Control Number: 90/013,959                                              Page 12
Art Unit: 3992

> al. as inventor(s), which is assigned to the assignee of the present application and which
>
> is hereby incorporated herein by reference."

Therefore, not only would one of skill in the art be motivated as stated in the rejection but one

would also be motivated to combine Gray to Blank in the case where one may need to convert

information from a non-isosynchronous network to an isosynchronous network. This would also

lead to the combination of Blank and Gray having the ability to adapt to different network

systems to reach a larger group of consumers.


## III. REJECTIONS


### CLAIM INTERPRETATION

During examination, claims are given the broadest reasonable interpretation consistent

with the specification and limitations in the specification are not read into the claims. See MPEP

§2111, MPEP §2111.01 and *In re Yamamoto et al.*, 222 USPQ 934 (Fed. Cir. 1984).  Under a

broadest reasonable interpretation, words of the claim must be given their plain meaning, unless

such meaning is inconsistent with the specification. See MPEP 2111.01(I).  It is further noted it

is improper to import claim limitations from the specification, i.e., a particular embodiment

appearing in the written description may not be read into a claim when the claim language is

broader than the embodiment. See MPEP 2111.01(II).  Therefore, unless one of the exceptions

applies below, Examiners will interpret the limitations of the claims using the broadest

reasonable interpretation.

Application/Control Number: 90/013,959                                              Page 13
Art Unit: 3992

As noted in the Order of this current application, the 3PR makes specific mention of two specific limitations, within the limitation which is the basis of the SNQ, which require attention in determining what their BRI encompasses, pp. 24 - 28 of the Request, limitations "independently clocked" and "playback timing information".


### **"independently clocked"**

The 3PR has pointed out that the limitation of "independently clocked" could have multiple meanings, and because of the PO's concurrent litigation, could also encompass syncronized clocks, see p. 26 of the Request. When reviewing the IDS for this information one sees "Potter Aderson & Corroon LLP, Suplemental opening Breif on Claims Construction, 3/3/2017". When looking for this document, it is not found within the submission of the IDS and therefore can not be specifically considered. However, under further envestegation, the Examiner has come across how the Courts have construe the limitation as found in the Litigation Search acompanied with this action. The courts have stated that the limitation "independently clocked", under BRI, is interpreted as "operating in accordance with their own respective clocks during synchronous playback.", see page 9-10. Furthermore, as closely interpreted by the Examiner under BRI, the interpretation of "independently clocked" could also be that the clocks of each device is run under the devices own power, (i.e., the master device does not run the other device's clocks, the master device merely sets a sync point).

Application/Control Number: 90/013,959                                      Page 14
Art Unit: 3992

**"playback timing information"**

As pointed out by the 3PR, there appear to be two specific contructions for this limitation. It is said that Sonos proposed a contructions for "playback timing information" of "information indicating when the audio information [content] is to be played back", (construction 1). D&M in the Concurrent Litigation was said to construe the claims under BRI to mean "a series of time values, associated with an audio work divided into blocks of information, each indicating when one of the clocks of audio information should be played by the device", (construction 2). It would appear that "construction 1" is the broadest of the two specifically stated. It is said that Figures 2- 4 depict playback timing information. Though these figures depict more than what is claimed, it is seen multiple times thoughtout the specification that the device "provide audio and playback timing information for the synchrony group to enable a master device and slave devices to play the audio program synchronously", (e.g., Col. 8, lines 61-66). As stated in column 11, lines 15 et seq., "FIG. 4, the audio and playback timing information is in the form of a series of frames, **with each frame having a time stamp**." Therefore, the BRI of "playback timing information" could merely be a type of time stamp.

**A. Relevant Statutes – Claim Rejections**

In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

Application/Control Number: 90/013,959                                   Page 15
Art Unit: 3992

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

## B. Detailed Analysis of the Rejection

The Examiner will use the same shorthand notation as the Requester of "1:1-5" for Column 1,

lines 1-5.

1.        Claims **9, 10, 11, 12, and 19 are** rejected under **pre-AIA 35 U.S.C. 103(a)** as being

unpatentable over U.S. **Blank in view of the Gray and in further view of Sonos APA**.

### *RE: Claim 9*

**A first playback device comprising: one or more processors; a network interface;**

**and tangible, non-transitory computer-readable memory comprising program**

**instructions that, when executed by the one or more processors, cause the**

**first playback device to:**

Blank discloses a media synch player 110 that is a playback device, (e.g., ¶ 0029, "*In*

*operation, the media synch players 110 each generate a content stream such as video or*

*audiovisual data in synchrony at the behest of the live playback system control console 125.*

*Synchronism is derived from the time server 120, facilitating orchestration of the content*

Application/Control Number: 90/013,959                                      Page 16
Art Unit: 3992

*provided by the media synch players 110. The system control console 125 and the media synch*

*players 110 are slaved to the time server 120. As such, the system control console 125 can*

*transmit a start time t+d for the media synch players 110 to start providing content from media*

*files 210 (FIG. 2), and the media synch players 110 are synchronized with respect to this start*

*time.*" See also [0026], [0034], [0036]-[0041], [0044]-[0047], [0052]-[0059], [0065]-[0071],

[0077]-[0093].

Gray discloses a management system 212 at [0036]-[Q037] that can receive audio data

over the Internet for use with audio system 216, and that management system can be a playback

device that is integral with audio system 216. A person of ordinary skill in the art would

understand that management system 212 can be implemented as part of one or more media synch

player 110.

A person of ordinary skill in the art. would consider the media synch players 110 of

Blank or the management system 212 of Gray to be playback devices that could be implemented

as PCs or in conjunction with PCs, and would understand that they could be implemented in

conjunction with commonplace PC functionality disclosed in the Handbook.

**receive, via the network interface from a network device configured to control the**

**first playback device and communicatively coupled to the first playback device over**

**a local area network (LAN), control information comprising an address identifying**

**a network location of audio information available at an audio information source,**

**wherein the audio information source is outside of the LAN; and after receiving the**

**control information, (i) obtain, via the network interface from the audio information**

**source outside of the LAN, the audio information;**

Application/Control Number: 90/013,959                                      Page 17
Art Unit: 3992

Blank discloses that recorded media that are distributed over a wide geographic area can be used for a multimedia presentation that requires synchronization of multiple displays at, (e.g., ¶ 0008). Blank discloses that live playback system control console 125 at ¶ 0054 that provides control signals to interface 220 of media synch players 110, and that these control signals can include commands to "play" and "get file." Thus, at least live playback system control console 125 is a "*network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN).*", (e.g., ¶ 0054, "*In the block 405, control signals from the control console 125 are received by the interface 220. In one embodiment, the control signals may comprise, for example, one of: play, pause, stop, seek to time, get file and show images.*"). Blank discloses that media files 210 can be stored at a media storage location for each media synch player 110, or that is shared by two or more media synch players 110 at ¶ 0037. Blank discloses that the disclosed system elements can be connected over a WAN or the Internet at [0023], Blank incorporates U.S. patent application Ser. No. 09/836,834 (Published Application No. 2002/0150053 to Gray et a., hereinafter "Gray") by reference at [0042] and [0045], Gray discloses communication of multimedia packets 304 from a multimedia source 301 to a multimedia sink 302 over heterogeneous networks 303, which inherently requires an address identifying a network location of audio information outside of a LAN for a multimedia sink 302 on a local area network 313. See, Gray at Fig. 1, ¶¶ 0053, **0059**, 0061).

Gray discloses at ¶¶ 0036 – 0037 that management system 212 can receive audio data over the Internet for use with audio system 216, and that management system can be a playback device that is integral with audio system 216. A person of ordinary skill in the art would

Application/Control Number: 90/013,959                                        Page 18
Art Unit: 3992

understand that management system 212 can be implemented as part of one or more media synch

player 110.

A person of ordinary skill in the art would recognize that streaming audio content from a

source outside of the LAN could be accomplished using software programs such as the Windows

Media Player, as disclosed at [0037] of Blank. A person having ordinary skill in the art would

thus understand that live playback system control console 125 can provide control information to

a media synch player that comprises an address identifying a network location of audio

information available at an audio information source, wherein the audio information source is

outside of the LAN, as disclosed in Gray. As such, a person having ordinary skill in the art

would understand that audio data that is received over the Internet by the system of Gray can be

stored as a media file 210 of a media synch player 110 of Blank. It was common as of the critical

date of the '357 Patent (April 1, 2003) for users to obtain content over the Internet from sources

outside of a user's LAN and to store that content on a personal computer or other playback

device. Also See, e.g., the Handbook.

**(ii) transmit, via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and**

Blank discloses clock module 212 of a media synch player 110 that can be slaved to

another clocking system at ¶ 0038, Blank also discloses the use of a time server 120 at ¶ 0029

and ¶¶ 0044-0051. A person of ordinary skill in the art would recognize that the time server 120

could be located on a first media synch player 110, and could provide the master clock that is

Application/Control Number: 90/013,959                                    Page 19
Art Unit: 3992

used to provide the playback timing information, (e.g., MPEP 2144.04 V.B. "Making Integral" *In re Larson,* 340 F.2d 965, 968, 144 USPQ 347, 349 (CCPA 1965), i.e., the courts found that making one means integral with another means, among other reasons, "that the use of a one piece construction instead of the structure disclosed in [the prior art] would be merely a matter of obvious engineering choice."). In this instance, taking to computers and housing them in "one box" would be an "obvious engineering choice". Thusly, the time server 120 would then transmit clock information to a second media synch players 110, to allow it to acquire lock with a clock contained in time server 120. See ¶ 0048 of Blank.

As discussed below, the first media synch player 110 can obtain the audio information and provide it to the second media synch player 110 using Windows file sharing, and can then provide playback timing information by either 1) hosting live playback system control console 125 and transmitting a play command to the second media synch player 110, for "playback timing information" construction 1, or 2) add time stamps to the media data packets at the application layer that are used to control playback timing in accordance with the teachings of Gray, for "playback timing information" construction 2, Time information can also be transmitted from time server 120 to other media synch players 110 to cause them to "speed up or slow" down rendering of clocks 212 in the individual media synch players 110." See [0045] of Blank. Time information that causes other media synch players 110 to speed up or slow down meets the broadest reasonable interpretation of "playback timing information," because it is used to control playback timing.

A person having skill in the art would recognize that live playback system control console 125 can also be implemented on a media synch player 110 with time server 120, and can

Application/Control Number: 90/013,959                                    Page 20
Art Unit: 3992

be used to provide playback timing information to other media synch players 110 as disclosed at

[0044] as a time stamp "t" and an indication of a delay "d" that is used to coordinate playback,

which satisfies the broadest reasonable interpretation of "playback timing information,"

because it is used to control playback timing. Therefore, it would have been obvious to combine

the devices stated in Blank because of similar reasons stated above and in MPEP 2144.04. Blank

discloses the playback timing information associated with the audio information under

construction 1, such as when a start time t+d is generated by a first playback device that is also

used to implement system control console 125. See ¶ 0029.

Gray discloses the use of time stamps in multimedia packets at [0062] that are used to

control the time that a multimedia packet is to be rendered at, and further discloses at [0069] that

the application layer can "maintain the common time reckoning across the devices, calculate the

appropriate time stamp, and/or include the time stamp in the multimedia packet." A person of

ordinary skill in the art would recognize from this teaching that the application layer on the

media synch player 110 that includes a time server 120 could include the time stamp into the

multimedia packets of the audio data from media file 210 (that has been obtained from outside

the LAN and stored in media file 210) and which is then provided to other media synch players

110 as "playback timing data" for synchronized playback, because that would allow the system

of Blank to be implemented on as few as two different devices, and would eliminate the need for

a separate time server 120. Gray discloses the playback timing information associated with the

audio information under construction 2, such as when the application layer of a media synch

player 110 inserts timestamps into frames of audio data, See ¶¶ 0016, 0087, 0089.

Application/Control Number: 90/013,959                                              Page 21
Art Unit: 3992

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the management system 212 of Gray to be playback devices that could be implemented as PCs or in conjunction with PCs, and which can transmit audio information, playback timing information and clock information to another playback device for synchronous playback.

To the extent that it is considered that Blank or Gray do not disclose this limitation, the Sonos APA discloses that it was known to transmit audio information and playback timing information associated with the audio information (for synchronous playback) and device clock information of the first playback device (using RFC 1305 or SNTP), via the network interface of the first playback device to a second playback device. See '357 Patent at 1:47 to 2:28 and the '768 Provisional at pages 1-2. It would be obvious to use the Sonos APA with the system of Blank, because both Blank and the Sonos APA are directed to networked audio devices that playback audio in synchrony, and the Sonos APA would eliminate the need for an additional device for time server 120, because it teaches that the timing functionality can be provided by a playback device.

**(iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information,**

Blank discloses that media synch players 110 play back the audio information in synchrony with each other by using the playback timing information associated with the audio information that is generated by live playback system control consoled 125 and the device clock

Application/Control Number: 90/013,959                                                    Page 22
Art Unit: 3992

information of the first playback device (which is used to generate the NTP timing information) to play back the audio information. See ¶¶ [0009], [0010], [0022], [0024], [0025], [0029], [0041], [0043]-[0045], Each media synch player 110 uses the audio information and its own clock information and the playback timing information (the start time of Blank t+d under construction 1, or frame-specific time stamps of Gray under construction 2), but even if the claims are amended to positively recite the second playback device and to require the second playback device to use the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information. Blank or Blank and Gray disclose that also.

The management systems 212 of Gray can play back the audio information in synchrony with a second management system 212 by using the playback timing information associated with each frame of the audio information and the device clock information of the first playback device to play back the audio information, such as using an application synchronization process in conjunction with the management systems 212. See ¶¶ [0016], [0087], [0089].

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the management system 212 of Gray to be playback devices that could be implemented as PCs or in conjunction with PCs, and which can play back audio in synchrony with each other using the playback timing information and clock time information of the first playback device, as discussed above.

It is noted that this limitation does not require the second playback device to playback the audio information by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio

Application/Control Number: 90/013,959                                              Page 23
Art Unit: 3992

information. That limitation only applies to the first playback device, and as long as the second playback device is playing back the audio information in synchrony with the first playback device while the first playback device uses the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, then the claim limitation is satisfied. It is further noted that the only real information that is used to play the audio is the audio information and the playback timing information. The "device clock information" is not specifically utilized since all that is needed it that the synchrony uses the playback timing information **associated** with the audio information and the device clock information, i.e., "associated" is not the same as saying "using" the device clock information in actual playing of audio information.

   To the extent that it is considered that Blank or Gray do not disclose this limitation, the Sonos APA discloses that it was known to transmit audio information and playback timing information associated with the audio information (for synchronous playback) and device clock information of the first playback device (using RFC 1305 or SNTP), via the network interface of the first playback device to a second playback device. See '357 Patent at 1:47 to 2:28 and the '768 Provisional at pages 1-2. It would be obvious to use the Sonos APA with the system of Blank, because both Blank and the Sonos APA are directed to networked audio devices that playback audio in synchrony, and the Sonos APA would allow Blank to provide the timing functionality on one of the media synch players 110 instead of a dedicated time server 120, thus reducing the need for an additional device.

   **wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.**

Application/Control Number: 90/013,959                                        Page 24
Art Unit: 3992

The prior art of Blank and Gray do not explicitly disclose this limitation.

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the management system 212 of Gray to be playback devices that could be implemented as PCs or in conjunction with PCs, and which can remain independently clocked during synchronous playback, at least because PCs contain multiple clocks that can be independent.

To the extent that it is considered that Blank or Gray do not disclose this limitation, the Sonos APA discloses that playback devices can remain independently clocked during synchronous playback of audio information, see '357 Patent at 2:21-27 ("*When an audio playback device converts the digital audio information from digital to analog form, it does so using a clock that provides timing information. Generally, the audio playback devices that are being developed have independent clocks, and, if they are not clocking at precisely the same rate, the audio playback provided by the various devices can get out of synchronization.*"). Thus, if the independent clocks of the audio playback devices are clocking at precisely the same rate by design, or if they are synchronized, then the audio playback provided by the various devices remains in synchronization. Furthermore, as closely interpreted by the Examiner under BRI, the interpretation of "independently clocked" could also be that the clocks of each device is run under the devices own power, (i.e., the master device does not run the other device's clocks, the master device merely sets a sync point). Therefore, Blank or Gray would start the synchronization process and the devices in the network would run the clock from the sync point as received from the master clock. Thus it would have been obvious to one of ordinary skill in the art to combine Sonos APA with Blank or Gray because Blank and Gray merely lacked the explanation of the well-known and understood notion of devices running their clocks

Application/Control Number: 90/013,959                                   Page 25
Art Unit: 3992

independent of each other as stated by Sonos APA. Furthermore, the problem of synchronization

of the independently clocked devices of Sonos APA is seen to be remedied by Blank and Gray's

ability to synchronize the devices on its network much like the '357 Patent.


_RE: Claim 10_

**The first play back device of claim 9, wherein the program instructions, when**

**executed by the one or more processors, further cause the first playback device to:**

**generate the playback timing information associated with the audio information;**

**and**

Blank discloses that the software generates the playback timing information associated

with the audio information under construction 1, such as when a start time t+d is generated by a

first playback device that is also used to implement system control console 125. See ¶ [0029]

Gray discloses that the software generates the playback timing information associated with the

audio information under construction 2, such as when the application layer of a media

synch player 110 inserts timestamps into frames of audio data. See ¶¶ [0016], [0087], [0089].

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the

management system 212 of Gray to be playback devices that could be implemented as PCs or

in conjunction with PCs that use SMPTE or RFC 1305 to generate playback timing information

associated with the audio information, under either construction 1 in the form of a "play"

command or under construction 2 in the form of frame-specific playback timing information.

**generate the device clock information of the first playback device.**

Application/Control Number: 90/013,959                                           Page 26
Art Unit: 3992

Blank discloses that the media synch player 110 software causes the media synch player
110 to generate device clock information of the first playback device, such as by activating the
Network Time Protocol module 15. See [0038], [0046]-[0048]. Blank discloses clock module
212 of a media synch player 110 that can be slaved to another clocking system at ¶ 0038, Blank
also discloses the use of a time server 120 at ¶ 0029 and ¶¶ 0044-0051. Thusly, the time server
120 would then transmit clock information to a second media synch players 110, to allow it
to acquire lock with a clock contained in time server 120. See ¶ 0048 of Blank. Also see rejection
of claim 9 above.

<u>RE: Claim 11</u>

**The first playback device of claim 9, wherein the control information further
comprises one or more instructions for the first playback device and the second
playback device to playback audio information.**

Blank discloses at [0029] that the "*media synch players 110 each generate a content
stream such as video or audiovisual data in synchrony at the behest of the live playback system
control console 125. Synchronism is derived from the time server 120, facilitating orchestration
of the content provided by the media synch players 110. The system control console 125 and the
media synch players 110 are slaved to the time server 120. As such, the system control console
125 can transmit a start time t+d for the media synch players 110 to start providing content from
media files 210 (FIG. 2), and the media synch players 110 are synchronized with respect to this
start time*." The start time is control information that includes one or more instructions for the
first playback device and the second playback device to playback audio information.

Application/Control Number: 90/013,959                                    Page 27
Art Unit: 3992

See also Blank at [0044] ("*In operation, a time stamp "t" is obtained by each device from the controller 125, which is synchronized with the time server 120. Also included with the time stamp t is a delay indication "d". In combination, these time related components instruct the media synch players 110 on when to render content, available from the media files 210. Essentially, each media synch player 110 will wait to render content until a particular time t+d, derived from the time stamp from the controller 125. As such, content from all of the media synch players 110 will be synchronized to the same moment in time—t+d—regardless of when the time synchronization was initiated*"), [0056] ("*In a block 410, the media synch players 110 respond to the control signals and provide appropriate output signals via the signal paths 112 to the displays 105. Such may comprise start of synchronized operation of the media synch players 110 and associated displays 105, switching from one media file 210 to another (e.g., get file followed by start), cease operation (e.g., stop), which may include initiation of a predetermined state such as a blank or black display 105, and the like*").

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the management system 212 of Gray to be playback devices that could be implemented as PCs or in conjunction with PCs, and which can play back audio in synchrony with each other in response to a suitable playback command.

<u>RE: Claim 12</u>

**The first device of claim 11, wherein the first and second playback devices are members of a synchrony group, and wherein the program instructions, when executed by the one or more processors, further cause the first playback device to:**

Application/Control Number: 90/013,959                                    Page 28
Art Unit: 3992

Blank discloses that media synch players 110 are members of a synchrony group that play back the audio information in synchrony with each other by using the playback timing information associated with the audio information that is generated by live playback system control consoled 125 and the device clock information of the first playback device (which is used to generate the NTP timing information) to play back the audio information. See ¶¶ [0009], [0010], [0022], [0024], [0025], [0029], [0041], [0043] - [0045].

The management systems 212 of Gray can play back the audio information in synchrony with a second management system 212 in a synchrony group by using the playback timing information associated with each frame of the audio information and the device clock information of the first playback device to play back the audio information, such as using an application synchronization process in conjunction with the management systems 212. See ¶¶ [0016], [0087], [0089].

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the management system 212 of Gray to be playback devices that could be implemented as PCs or in conjunction with PCs, and which can play back audio in synchrony with each other, which would make then members of a synchrony group.

**transmit, to the network device, status information that comprises a status of the synchrony group.**

Blank discloses that status information that comprises a status of the synchrony group can be displayed in Figures 6 & 7, which shows the status of players **Al, B1** and **Cl,** which are each playing the same audio source ("Fgn_Affair"). See ¶¶ [0064]-[0065].

Application/Control Number: 90/013,959      Page 29

Art Unit: 3992



| | Player | File Name | | Start | File Duration | TRT | Bg Image | Bg Color | Freeze |
|---|---|---|---|---|---|---|---|---|---|
| 1 | A1 | Fgn_Affair | ☑ | 00:00 | 00:05:00 | 05:00 | ☑ | | ☐☐ |
| 2 | B1 | Fgn_Affair | ☑ | 00:00 | 00:05:00 | 05:00 | ☑ | Black | ☐☐ |
| 3 | C1 | Fgn_Affair | ☑ | 00:00 | 00:05:00 | 05:00 | ☑ | Black | ☐☐ |

*Fig. 6*



| ID | IP Address | Machine | Friendly Name | Backup ID | X | Y | Width | Height |
|---|---|---|---|---|---|---|---|---|
| 1 | 172.31.161.138 | A1 | A1 | 4 | 0 | 0 | 1024 | 768 |
| 2 | 172.31.161.10 | B1 | B1 | 5 | 0 | 0 | 1024 | 768 |
| 3 | 172.31.161.132 | C1 | C1 | 6 | 0 | 0 | 1024 | 768 |
| 4 | 172.31.161.131 | A2 | A2 | | 0 | 0 | 1024 | 768 |
| 5 | 172.31.161.135 | B2 | B2 | | 0 | 0 | 1024 | 768 |
| 6 | 172.31.161.136 | C2 | C2 | | 0 | 0 | 1024 | 768 |

*Fig. 7*

Blank discloses that status information can be displayed using a player status mode [0070], and that the status information can include a status such as "playing" [0071], See Fig. 9, "player status," which is a "status of the synchrony group" because it is a status of a member of the synchrony group under the broadest reasonable construction of the term:

Application/Control Number: 90/013,959                                        Page 30
Art Unit: 3992



Fig. 9

To the extent that it is considered that Blank does not disclose this limitation, the Sonos APA discloses the existence of discovery protocols that can be used to learn about other components on the network and to establish communication with them, such as the Universal Plug and Play (UPnP) architecture, which defines discovery as the first step in UPnP networking. This allows devices to discover other devices and to exchange information about themselves and/or their services. See U.S. Provisional Application 60/490,768, filed July 28, 2003 (the '768 Provisional). A person of ordinary skill in the art would understand that such discovery protocols would result in the transmission of status information for each device in the synchrony group to a controller device, which could be implemented in conjunction with live playback system control console 125 or other suitable control devices.

Application/Control Number: 90/013,959                                      Page 31

Art Unit: 3992

*RE: Claim 19*

**The first playback device of claim 9, wherein the audio information source outside of the LAN is an Internet-accessible audio information source, and wherein obtaining, from the audio information source outside of the LAN, the audio information, comprises obtaining the audio information from the Internet-accessible audio information source.**

Blank discloses that the system elements can be connected by LANs, WANs or the Internet. See ¶ [0023].

Gray discloses that audio content can be obtained from a remote source over the Internet. See ¶¶ [0035]-[0037], [0041], [0046]-[0048].

A person of ordinary skill in the art would consider the media synch players 110 of Blank or the management system 212 of Gray to be playback devices that could be implemented as PCs or in conjunction with PCs that can obtain audio information from an Internet-accessible source, as disclosed Blank, Gray, Sonos APA, or what is well known and ordinary in the art.

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to combine the teachings of the Handbook with for similar reasons stated above, herein and in the double patenting rejection.

Application/Control Number: 90/013,959                                     Page 32
Art Unit: 3992

## IV. CONCLUSION

### A. Submissions

1.    Information Disclosure Statement (IDS)

        The IDS submissions on 12/20/2017 has been considered. It is to be noted, however, that

where patents, publications, and other such items of information are submitted by a party (patent

owner or requester) in compliance with the requirements of the rules, the requisite degree of

consideration to be given to such information will be limited by the degree to which the party

filing the information citation has explained the content and relevance of the information. In

instances, where no explanation of citations (items of information) is required and none is

provided for an information citation, only a cursory review of that information is required. The

examiner need only perform a cursory evaluation of each unexplained item of information, to the

extent that he/she needs in order to determine whether he/she will evaluate the item further. If the

cursory evaluation reveals the item not to be useful, the examiner may simply stop looking at it.

This review may often take the form of considering the documents in the same manner as other

documents in Office search files are considered by the Examiner while conducting a search of

the prior art in a proper field of search. The initials of the Examiner, in this proceeding, placed

adjacent to the citations on the PTO/SB/08A or its equivalent, without an indication in the record

to the contrary in the record, do not signify that the information has been considered by the

Examiner any further than to the extent noted above. The same degree of consideration was

provided for the references merely cited with the request but for which no explanation regarding

the content and relevance of the information was provided. See MPEP 609, Chapter 0600, pages

192-193 of pages 1-197 - MPEP Eighth Edition, Revision 8 (July 2010). The examiner notes that

Application/Control Number: 90/013,959                                            Page 33
Art Unit: 3992

due to the unusually large number of references cited, and the absence of any description of the

relevance of the references, it should be assumed that only the most cursory review of the cited

documents consistent with these guidelines has been performed. If applicant is aware of any

information that might be of particular relevance, it should be pointed out in order to insure a

higher degree consideration.

The responsibility of compliance with 37 CFR 1.555 rests on all such individuals. Any fraud

practiced or attempted on the Office or any violation of the duty of disclosure through bad faith

or intentional misconduct by any such individual results in noncompliance 37 CFR 1.555(a).

This duty of disclosure is consistent with the duty placed on patent applicants by 37 CFR 1.56.

Any such issues raised by the patent owner or the third party requester during a reexamination

proceeding will merely be noted as unresolved questions under 37 CFR 1.552(c).

All such individuals who fail to comply with 37 CFR 1.555(a) do so at the risk of diminishing

the quality and reliability of the reexamination certificate issuing from the proceeding.

See MPEP § 2282 (*ex parte* reexamination) and MPEP § 2686 (*inter partes* reexamination) for

the patent owner's duty to disclose prior or concurrent proceedings in which the patent is or was

involved. Patent Owner is advised to supply a copy of the pertinent areas of these references so

they may be considered by the Examiner.


**B. Extension of time**

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings

Application/Control Number: 90/013,959                                    Page 34
Art Unit: 3992

"will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in ex parte

reexamination proceedings are provided for in 37 CFR 1.550(c). See MPEP § 2265.


**C. Litigation Reminder**

        The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 9,213,357 throughout the course of this reexamination proceeding.  The third party

requester is also reminded of the ability to similarly apprise the Office of any such activity or

proceeding throughout the course of this reexamination proceeding.  See MPEP §§ 2207, 2282

and 2286.


**D. Amendment in Reexamination Proceedings**

        Patent owner is notified that any proposed amendment to the specification and/or

claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be

formally presented pursuant to 37 CFR 1.530(d) - (j), and must contain any fees required by 37

CFR 1.20(c). See MPEP § 2234 and 2250(IV) for examples to assist in the preparation of proper

proposed amendments in reexamination proceedings.

Application/Control Number: 90/013,959                                    Page 35
Art Unit: 3992

## E. Service of Papers

All correspondence related to this ExParte reexamination proceeding should be directed:

By EFS:        Registered users may submit via the electronic filing system EFS-Web, at

https://efs.uspto.gov/efile/myportal/efs-registered

By Mail to:    Mail Stop Ex Parte Reexam

Central Reexamination Unit

Commissioner for Patents

United States Patent & Trademark Office

P.O. Box 1450

Alexandria, VA 22313-1450


By FAX to:     (571) 273-9900

Central Reexamination Unit


By hand:       Customer Service Window

Randolph Building

401 Dulany Street

Alexandria, VA 22314


Telephone numbers for reexamination inquiries:

Reexamination and Amendment practice: (571) 272-7703

Application/Control Number: 90/013,959                                    Page 36
Art Unit: 3992

Central Reexamination Unit (CRU): (571) 272-7705


Any inquiry concerning this communication or earlier communications from the examiner, or as

to the status of this proceeding, should be directed to the Central Reexamination Unit at

telephone number (571) 272-7705.


/David E. England/
Primary Examiner, Art Unit 3992


Conferees:

/Roland Foster/
Primary Examiner, Art Unit 3992

/MICHAEL FUELLING/
Supervisory Patent Examiner, Art Unit 3992

| **Office Action in Ex Parte Reexamination** | **Control No.**<br>90/013,959 | **Patent Under Reexamination**<br>9213357 |
| --- | --- | --- |
| | **Examiner**<br>DAVID ENGLAND | **Art Unit**<br>3992 | **AIA (First Inventor to File) Status**<br>No |

*Note: the above table has 4 columns in the bottom row.*

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a.☒ Responsive to the communication(s) filed on *12/20/2017* .

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

b.☒ This action is made FINAL.

c.☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1.  ☐ Notice of References Cited by Examiner, PTO-892.      3.  ☐ Interview Summary, PTO-474.

2.  ☒ Information Disclosure Statement, PTO/SB/08.      4.  ☐ _____.

Part II    SUMMARY OF ACTION

1a.  ☒ Claims *9-12 and 19* are subject to reexamination.

1b.  ☒ Claims *1-8,13-18 and 20* are not subject to reexamination.

2.  ☐ Claims _____ have been canceled in the present reexamination proceeding.

3.  ☐ Claims _____ are patentable and/or confirmed.

4.  ☒ Claims *9-12,19* are rejected.

5.  ☐ Claims _____ are objected to.

6.  ☐ The drawings, filed on _____ are acceptable.

7.  ☐ The proposed drawing correction, filed on _____ has been (7a) ☐ approved (7b)☐ disapproved.

8.  ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some*  c)☐ None    of the certified copies have

    1 ☐ been received.

    2 ☐ not been received.

    3 ☐ been filed in Application No. _____ .

    4 ☐ been filed in reexamination Control No. _____.

    5 ☐ been received by the International Bureau in PCT application No. _____.

    * See the attached detailed Office action for a list of the certified copies not received.

9.  ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10.  ☐ Other: _____

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,959 | 06/16/2017 | 9213357 | 04-0401-REEXAM (14-1800-R | 9548 |

107361        7590        05/16/2018
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| ENGLAND, DAVID E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/16/2018 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| ***Applicant-Initiated Interview Summary*** | Application No.<br>90/013,959 | Applicant(s)<br>9213357 | |
|---|---|---|---|
| | Examiner<br>DAVID ENGLAND | Art Unit<br>3992 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *DAVID ENGLAND*.                              (3)*Roland Foster(Primary)*.

(2) *Michael Fuelling (SPRS)*.                     (4)*Jeffrey Armstrong, Chris Butts(Attorneys)*.

    Date of Interview: *09 May 2018*.

    Type:   ☐ Telephonic   ☒ Video Conference<br>              ☐ Personal [copy given to: ☐ applicant   ☐ applicant's representative]

Exhibit shown or demonstration conducted:  ☒ Yes    ☐ No.<br>    If Yes, brief description: *Exhibits from court case involving this patent. Also other*.

Issues Discussed  ☐101  ☐112  ☐102  ☒103  ☒Others<br>(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: *9*.

  Identification of prior art discussed: *Blank & Gray*.

Substance of Interview<br>(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

*See Continuation Sheet*.

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions**: Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☒ Attachment

| /DAVID ENGLAND/<br>Primary Examiner, Art Unit 3992 | /MF/ |
|---|---|

# Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**

A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**

Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2 Business to be transacted in writing.

All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

_____

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
(The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

## Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

Continuation of Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments:

Attorney Armstrong discussed the elements of the agenda that was submitted by the Patent Owner (PO). Firstly, Attorney Armstrong discussed the obviousness combination of Blank and Gray. Attorney Armstrong stated that the timing data from Blank is not the same as the timing information as Gray and therefore are not combinable. Examiner England stated that the different functions of the two combine references would use their time element to their specific function, i.e., when it comes to the specific function of synchronization, the reference that teaches that function would use their time information to perform the claimed function. Examiner England further stated that this argument could be expanded on by the PO and submitted since it would appear to be their best argument with regards to the prior art, i.e., if PO's argument could go into depth about the time element and find any evidence that both time elements from each reference would not make the references combinable in a way that has not been discussed before. Attorney Armstrong further went into the commercial success of the Patent and stated that this would result in the combination of references not being foreseen and difficult to achieve. SPRS Fuelling stated this information should have been provided in the last response since this information seemed to be available and it would be difficult to have a 1.116 showing as to why this evidence was not presented sooner. Lastly, Attorney Armstrong discussed the evidence that was not available in time, from the copending litigation, to the PO and now available to the PO and public. The evidence from the court case allegedly show how some party attempted to copy the patent. Attorney Armstrong further stated that there are court cases that show how copying the engineering of a patent is pertinent to the case and proves that it is not obvious since they were unsuccessful. Examiner England stated that this argument and evidence would have to be clarified and discussed in depth with the other court cases showing how "copying" a competitor would overcome the rejection.

Importantly, an in-depth time line as to when / why this information was unavailable / important to this case, would have to be submitted in the above-mentioned 1.116 showing, including but not limited to, an explanation as to why PO apparently declined to formally submit, via a proper after final submission, the attached, twenty-nine (29) exhibits, with a computer file size of ~47 MB, during the last half-year, namely, from around Nov. or Dec., 2017, until now.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No.: 04-0401-REEXAM)
(MBHB No. 14-1800-REX)

| | | |
|---|---|---|
| In the *Ex Parte* Reexamination of: | ) | |
| | ) | |
| U.S. Pat. 9,213,357 | ) | Art Unit:  3992 |
| | ) | |
| Serial No.:     90/013,959 | ) | Examiner:  David E. England |
| | ) | |
| Filed:  June 16, 2016 | ) | Confirmation No.  9548 |
| | ) | |
| For:    Obtaining Content from Remote Source | ) | |
| For Playback | ) | |

U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## RESPONSE TO THE FINAL OFFICE ACTION
## MAILED MARCH 16, 2018

Please consider the following Remarks submitted in response to the Final Office Action

mailed on March 16, 2018 in the above-captioned reexamination.

A listing of the **PENDING CLAIMS** begin on page 2.

**REMARKS** begin on page 7.

Patentee authorizes the Office to charge any underpayment or credit any overpayment of

fees in connection with the above-captioned reexamination to Deposit Account 13-2490.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

1

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

## CLAIMS

1.      (Original)  A method comprising:

receiving, by a first playback device from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information (i) obtaining, by the first playback device from the audio information source outside of the LAN, the audio information; (ii) transmitting, by the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) playing back, by the first playback device, the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

2.      (Original)  The method of claim 1, further comprising:

after receiving the control information, additionally (i) generating, by the first playback device, the playback timing information associated with the audio information; and (ii) generating, by the first playback device, the device clock information of the first playback device.

McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

2

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

3.      (Original)   The method of claim 1, wherein the control information further comprises one or more instructions for the first playback device and the second playback device to playback audio information.

4.      (Original)  The method of claim 3, wherein the first and second playback devices are members of a synchrony group, and wherein the method further comprises:

transmitting, by the first playback device to the network device, status information that comprises a status of the synchrony group.

5.      (Original)   The method of claim 4, wherein the status information further comprises an identification of each playback device in the synchrony group.

6.      (Original)   The method of claim 5, wherein the status information further comprises an identification of a master playback device of the synchrony group.

7.      (Original)  The method of claim 6, wherein the first playback device is the master playback device of the synchrony group.

8.      (Original)   A  tangible  non-transitory  computer-readable  medium  having instructions stored thereon that, when executed, cause a first playback device to:

receive, from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information, (i) obtain, from the audio information source outside of the LAN, the audio information; (ii) transmit, to a second playback device, the audio

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001                                3                                Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

information, playback timing information associated with the audio information, and clock time information for the first playback device; and (iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the clock time information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

9.      (Original)  A first playback device comprising:

one or more processors;

a network interface; and

tangible, non-transitory computer-readable memory comprising program instructions that, when executed by the one or more processors, cause the first playback device to:

receive, via the network interface from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a network location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and

after receiving the control information, (i) obtain, via the network interface from the audio information source outside of the LAN, the audio information; (ii) transmit, via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

4

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information.

10.     (Original)  The first playback device of claim 9, wherein the program instructions, when executed by the one or more processors, further cause the first playback device to:

generate the playback timing information associated with the audio information; and

generate the device clock information of the first playback device.

11.     (Original)  The first playback device of claim 9, wherein the control information further comprises one or more instructions for the first playback device and the second playback device to playback audio information.

12.     (Original)  The first playback device of claim 11, wherein the first and second playback devices are members of a synchrony group, and wherein the program instructions, when executed by the one or more processors, further cause the first playback device to:

transmit, to the network device, status information that comprises a status of the synchrony group.

13.     (Original)  The first playback device of claim 12, wherein the status information further comprises an identification of each playback device in the synchrony group.

14.     (Original)  The first playback device of claim 12, wherein the status information further comprises an identification of a master playback device of the synchrony group.

15.     (Original)   The first playback device of claim 14, wherein the first playback device is the master playback device of the synchrony group.

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

5

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

16.     (Original)  The first playback device of claim 12, wherein the status information further comprises an identification of one or more slave playback devices in the synchrony group, and wherein the second playback device is one of the one or more slave playback devices in the synchrony group.

17.     (Original)  The first playback device of claim 16, wherein the instructions, when executed by the one or more processors, further cause the first playback device to:

generate a plurality of frames, wherein an individual frame comprises at least a portion of the audio information and the playback timing information associated with the audio information, and wherein the first playback device transmitting to the second playback device the audio information, playback timing information, and device clock information of the first playback device comprises transmitting the plurality of frames to the second playback device.

18.     (Original)  The first playback device of claim 9, wherein the audio information comprises one of audio files or packetized streaming audio information.

19.     (Original)  The first playback device of claim 9, wherein the audio information source outside of the LAN is an Internet-accessible audio information source, and wherein obtaining, from the audio information source outside of the LAN, the audio information, comprises obtaining the audio information from the Internet-accessible audio information source.

20.     (Original)  The first playback device of claim 9, wherein obtaining, from the audio information source outside of the LAN, the audio information, comprises sending, to the audio information source, a request for the audio information.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

6

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

## REMARKS

### I.        Status of the Claims

Claims 9-12 and 19 of U.S. Pat. 9,213,357 (Millington '357) are subject to reexamination, of which claim 9 is independent.  Claims 1-8, 13-18, and 20 are not subject to reexamination. Patentee has not amended the claims.

### II.        Summary of the Final Office Action

In the Final Office Action, the Office: (i) withdrew the double patenting rejections based on U.S. Pat. 9,195,258, *The MP3 and Internet Audio Handbook* (Handbook), and alleged Sonos admitted prior art (APA); (ii) withdrew the 35 U.S.C. § 103 rejections based on U.S. Pat. 6,611,537 (Edens) and Handbook; and (iii) maintained the 35 U.S.C. § 103 rejections of claims 9-12 and 19 based on U.S. Pub. 2004/0252400 (Blank), U.S. Pub. 2002/0150053 (Gray), and the alleged APA.

### III.        Response to the § 103 Rejections

Further to the reasons set forth in Patentee's December 20, 2017, Response, and in response to the "RESPONSE TO ARGUMENTS" section in the Final Office Action, Patentee respectfully requests that the Office withdraw the § 103 rejections of claims 9-12 and 19 based on Blank, Gray, and the alleged APA for at least the reasons that: (A) the proposed combination of Blank and Gray requires changing the functions of the components in Gray, and thus, the rationale of MPEP 2143(I)(A) cannot be used to support the conclusion of obviousness; (B) the purported motivation to combine the teachings of Blank and Gray lacks a rational basis to support the legal conclusion of obviousness; (C) the components of Blank could not have been modified and combined (or modified and combined with the elements of Gray) to perform the

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

7

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

claimed invention with a reasonable expectation of success without undue experimentation; (D) it would not have been obvious to make the separable components of Blank and Gray integral as proposed because the inventor's insight to eliminate the need for perpetual synchronization to a dedicated master clock was contrary to the understanding and expectations of Blank and Gray, and (E) the strong objective evidence of non-obviousness weighs in favor of the patentability of the challenged claims, including competitor praise of the patented synchronous playback feature, competitor copying of products embodying the patented synchronous playback feature, and the struggles and failures of competitors to implement synchronous playback functionality.

A.    **The proposed combination of Blank and Gray requires changing the functions of the components in Gray, and thus, the rationale of MPEP 2143(I)(A) cannot be used to support the conclusion of obviousness**

In the "RESPONSE TO ARGUMENTS" section of the Final Office Action, the Office contends that a person of skill in the art could make the proposed combinations and modifications because the proposed combinations and modifications "would yield predictable results," "could be achieved with a reasonable expectation of success," "would not require undue experimentation," "would not be overly complicated," and that Blank incorporates Gray by reference. Final Office Action, pp. 6-12. Thus, the Final Office Action essentially contends that the claims are obvious in view of Blank and Gray because "all the claimed elements were known in the prior art and one skilled in the art could have combined the elements as claimed by known methods ***with no change in their respective functions***, and the combination yield[s] nothing more than predictable results to one of ordinary skill in the art." Final Office Action, pp. 6-12; MPEP 2143(I)(A) (emphasis added) (quoting *KSR v. Teleflex*, 550 U.S. 398, 416 (2007)). But as the MPEP makes clear, "[i]f ***any*** of these findings cannot be made, then this rationale cannot be

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

8

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art."  MPEP 2143(I)(A) (emphasis added).

Here, and contrary to the assertion in the Final Office Action, the proposed combination of Blank and Gray ***requires a change to the respective functions*** of the components in Gray, and thus, the rationale of MPEP 2143(I)(A) cannot be used to support the conclusion that the claims are obvious in view of Blank and Gray.  In particular, the Final Office Action contends that a "media synch player 110 [of Blank] that includes a time server 120 [of Blank] could include the time stamp [of Gray] into the multimedia packets of the audio data from media file 210 [of Blank]…***which is then provided to other media synch players 110 [of Blank] as 'playback timing data' for synchronized playback***."  Final Office Action, p. 20 (emphasis added). However, Blank teaches using Gray's timestamping feature for synchronizing the internal clock a media synch player 110 to a time server 120 -- ***not as playback timing information for synchronizing playback of media*** by multiple media synch players.

Synchronizing two clocks across a network is different than synchronizing playback of media by two (or more) devices.  Clock synchronization alone is not sufficient to achieve synchronous playback of media content in a networked audio system.  December 20, 2017, Response, pp. 22-23; Wolfe Dec. ¶ 25.  Blank recognizes the technical distinction between these two separate concepts.  Compare Blank ¶¶ 42-51 (describing "Time Synchronization" of the media synch players 110, control console 125, and time server 120) with Blank ¶¶ 52-59 (describing "Media Synch Player Operation Control" including "coordination of each of the media synch players 110 in providing content…in a predetermined sequence.").  And importantly, Blank teaches using Gray in the context of synchronizing a media synch player's

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

9

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

internal clock with the time server 120 -- not in the context of synchronizing playback of media by the media synch players 110.

In particular, Blank explains that each media synch player 110 and the controller 125 "synchronize their internal clocks to the time server" 120. Blank, ¶ 44. In connection with synchronizing a media synch player's 110 internal clock to the time server 120, Blank describes a clock synchronization feedback loop between the media synch players 110 and the dedicated time server 120, where a media synch player 110 transmits timing information from its internal clock "*in a non-isosynchronous manner* back to the time server 120" (i.e., via a variable delay network) where the timing information from the media synch player 110's internal clock is "combined with the time information derived from the time server to speed up or slow down rendering of the clock[] 212 in the individual media synch player[] 110." Blank, ¶ 45 (emphasis added).

Blank recognized that "IP networks do not guarantee the timely delivery of any information" and that "[t]his uncertainty of IP networks is attributable to delays, latency, jitters and other inherent network characteristics." Blank, ¶ 43. So, to provide more consistent delivery of timing information for the clock synchronization feedback loop, Blank instructs persons of skill in the art to read Gray for "[a] more detailed description of the *use of common time to convert a non-isosynchronous network to an isosynchronous network*." Blank, ¶ 44 (emphasis added). Figures 9-10 and ¶¶ 87-90 of Gray best illustrate and describe a scenario where Gray's method of emulating a constant delay network (isosynchronous) over a variable delay network (non-isosynchronous) could be used to provide more consistent delivery of timing information for Blank's clock synchronization feedback loop as suggested by Blank.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

10

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

"Figure 9 illustrates a network configuration 900 in which a transmitter application 901 controls the time base across a variable delay network 903." Gray, ¶ 87. "Figure 10 illustrates a method 1000 for emulating a constant delay network over the variable delay network…described with respect to FIG. 9." Gray, ¶ 88. "An example of a variable delay network in which the method 1000 of FIG. 10 may be implemented is an IEC 802.11 wireless network." Gray, ¶ 90.

In the context of Blank's clock synchronization feedback loop, "[t]he transmitter link layer controller [of Blank's media synch player 110] periodically transmits the transmitter application time base to…the receiver link layer controller 904 [of Blank's time server 120] over the variable delay network 903 (act 1002)." Gray, ¶ 89; Blank, ¶ 45. "[T]he clock registers at the transmitter [of Blank's media synch player 110] and receiver [of Blank's time server 120] link layer controller (i.e., the time base 913 and the time base 914) may be kept synchronized." Gray, ¶ 89; Blank ¶ 44 ("All of the elements synchronize their internal clocks to the time server."). "The transmitter link layer controller 902 [of Blank's media synch player 110] includes the transmitter application time base in each packet [i.e., the packet has a timestamp with the media synch player's current time, which is synchronized with the time server 120] … and then [the media synch player 110] dispatches the packet over the network (act 1004)." Gray, ¶ 90; Blank, ¶ 45. Blank's time server 120 then combines Blank's media synch player's 110 timing information contained in Gray's time stamp "with the time information derived from the time server to speed up or slow down rendering of the clock[] 212 in the individual media synch player[] 110," to synchronize the media synch player's 110 internal clock to the time server 120. Blank, ¶ 45.

Thus, Blank teaches using Gray's timestamping feature for synchronizing the internal clock of a media synch player 110 with a time server 120 -- ***not as playback timing for***

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

11

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

*synchronizing playback of media* by multiple media synch players as proposed in the Final

Office Action. Because the proposed combination of Blank and Gray requires that Gray's

timestamping feature be used to perform a ***different function*** than taught by Blank, the Final

Office Action's assertions that the proposed combinations and modifications "would yield

predictable results," "could be achieved with a reasonable expectation of success," "would not

require undue experimentation," "would not be overly complicated," and that Blank incorporates

Gray by reference are not sufficient to support the legal conclusion that the claims are obvious in

view of Blank and Gray. MPEP 2143(I)(A).

### B.     The purported motivation to combine the teachings of Blank and Gray lacks a rational basis to support the legal conclusion of obviousness

In addition to the generic bases of MPEP 2143(I)(A), the "RESPONSE TO

ARGUMENTS" section of the Final Office Action also contends, "one would also be motivated

to combine Gray with Blank in the case where one may need to convert information from a non-

isosynchronous network to an isosynchronous network," and that "[t]his would also lead to the

combination of Blank and Gray having the ability to adapt to different network systems to reach

a larger group of consumers." Final Office Action, pp. 11-12.

However, the purported motivation lacks a rational basis to support the legal conclusion

of obviousness because Blank discloses a scheme for synchronizing playback among multiple

playback devices, albeit in a different way than what is recited in the claims. Wolfe Dec., ¶ 57.

Because Blank teaches a scheme for synchronous playback, using Gray's timestamping feature

for synchronous playback in the manner proposed in the Final Office would be a solution for a

problem that does not exist in Blank's system. *In re Rinkevich*, BPAI, 2007-1317 (Decided May

29, 2007), p. 9 ("[A] person of ordinary skill in the art having common sense at the time of the

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

12

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

invention would not have reasonably looked to [a second reference] to solve a problem already solved by [a first reference]."); December 20, 2017, Response, pp. 31-34.

Furthermore, if a person of skill in art did combine Blank with Gray for the reason suggested in the Final Office Action (i.e., "to convert information from a non-isosynchronous network to an isosynchronous network"), the resulting system still would not perform the synchronous playback functions recited in the claims because converting information from a non-isosynchronous (variable delay) network to an isosynchronous (constant delay) network as taught by Blank and Gray involves synchronizing internal clocks of network devices to a dedicated master clock for the network -- *not synchronizing playback of media* by two or more media playback devices over the network. Section III(A), *infra*; December 20, 2017, Response, pp. 33-34 ("nothing in Blank or Gray suggests that the time stamps in Gray's WAN solution for emulating a constant delay network over multiple heterogeneous networks could be used in Blank's LAN solution to facilitate synchronous playback among multiple devices as proposed in the Office Action") (citing Wolfe Dec. ¶¶ 58-59).

### C. The components of Blank could not have been modified and combined (or modified and combined with the elements of Gray) to perform the claimed invention with a reasonable expectation of success without undue experimentation

The "RESPONSE TO ARGUMENTS" section of the Final Office Action asserts that combining and modifying the components of Blank or alternatively, combining and modifying the components of Blank and Gray, to practice the claimed invention "would not require undue experimentation" and "would not be overly complicated as suggested by the PO and Wolfe's Dec." Final Office Action, p. 9. But in contrast to the assertion in the Final Office Action, documents produced by the third-party requestor D&M – who was found by the jury in the

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

13

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

concurrent litigation to have willfully infringed Sonos's patents – show that building a device to perform the claimed synchronous playback functions required a great deal of experimentation and was quite a complex and complicated engineering undertaking.

For example, in a 2011 internal D&M technical report reviewing Sonos patent filings, Yuuji Kaneko (a D&M engineer) stated, "***Sonos has excellent synchronous playback feature***." Ex. 1: PTX 270, p. 2 (emphasis added).  But despite having Sonos patent filings as a roadmap, D&M estimated in a January 19, 2012, email that it would need to spend $5.33M and invest 439 man-months (70,240 man-hours, assuming a 40-hour work week) over 20 months to copy Sonos's media playback system embodying the claimed invention.  Ex. 2: PTX 198 at D+M_0161242 ("Engineering also developed an ADS product plan for ***reproducing the Sonos functionality***. The ADS feature set details and resulting project plan are attached. The summary of the plan is 20 months, ***439 man-months***, and $5.33M.") (emphasis added).  In the engineering project plan, D&M allocated ***128 man-months (20,480 hours)*** of the total development effort just to implement a copy of Sonos's patented synchronous playback feature.  Ex. 3: PTX 200 at D+M_0161268.

Indeed, even with the benefit of having Sonos products to copy and Sonos patent filings to follow, D&M's engineers still could not figure out how to implement the synchronous playback function.  In an internal D&M email from January 27, 2012, discussing Sonos's synchronous playback capabilities, Achim Schulz (a D&M engineer) asked, "***Do we have any idea how they can synchronize so perfectly?*** This is related to their mesh network or they have other technical advanced strategy?" Ex. 4: PTX 146 at D+M0072389 (emphasis added).  In response, Hiroyuki Yazawa (another D&M engineer) stated, "As of now ***we do not have any concrete idea***, but we believe some driver level implementation is used in both of network driver

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

and audio driver, where network drivers exchanges precise system timer (clock) information (like what defined in IEEE1588) and audio driver does some precise buffer control, though ***it's only a guess***." Ex. 4: PTX 146 at D+M0072389 (emphasis added).

D&M's engineers are unquestionably persons of ordinary skill in the art, and many arguably rise to the level of an expert in the field in view of their long history of successfully developing and bringing audio products to market. However, even though Sonos patent filings gave D&M a detailed blueprint to follow, copying Sonos products took D&M's engineers a great deal of effort and experimentation as late as 2012-2014 -- nearly a decade after the 2004 date of invention. And if using Sonos patent filings as a guide to copy Sonos products was that complicated and challenging for a team of experienced engineers at a leading audio company nearly a decade after the time of the invention, then consistent with Patentee's December 20, 2017, Response and the Wolfe Declaration, implementing the proposed modifications and combinations of Blank and Gray without the benefit of a tangible product to copy and detailed instructions in a patent specification certainly would not be a trivial task as suggested in the Final Office Action. This is especially true where, as here, the proposed combination of Blank and Gray requires a change to the respective functions of the components in Gray. See Section III(A), *infra*; December 20, 2017 Response, pp. 33-34; Wolfe Dec., ¶¶ 58-59.

Because the evidence shows that persons of skill in the art were unsure of how to implement a system to perform the patented synchronous playback feature and unable to implement a system to practice the patented synchronous playback feature without substantial engineering effort, Patentee submits that the proposed combinations and modifications of Blank and Gray could not have been achieved "with a reasonable expectation of success" and "without undue experimentation" as required to support the conclusion of obviousness.

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 SOUTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
TELEPHONE (312) 913-0001

15

DOCKET NO.: 04-0401-REEXAM
MBHB DOCKET NO. 14-1800-REX
APPLICATION SERIAL NUMBER: 90/013,959
FILING DATE: JUNE 16, 2017

**D. The inventor's insight to eliminate the need for perpetual synchronization to a dedicated master clock was contrary to the understanding and expectations of Blank and Gray, and thus the claims are patentable over Blank individually or in combination with Gray**

The "RESPONSE TO ARGUMENTS" section of the Final Office Action further contends that "the combination of devices to create one device is not new to the art of computer networking." Final Office Action, pp. 7-8.

Patentee acknowledges that making separable components integral, without more, is unlikely to be non-obvious. MPEP 2144.04(V)(B). However, it would not be obvious to combine previously-known separate components into a single integrated device when the resulting single integrated device functions in a manner contrary to the understandings and expectations of the prior art. MPEP 2144.04(V)(B) (citing *Schenck v. Nortron Corp.*, 713 F.2d 782 (Fed. Cir. 1983)).

The challenged claims in *Schneck* were directed to "a vibratory testing machine, comprising a rigidly fixed base structure 13…, a vibratory workpiece-holding structure 14…, [and] supporting means 15" where "said vibratory holding structure 14 and said base structure 13 as well as said supporting means 15 form[ed] jointly a single integral and gaplessly continuous piece." 713 F.2d at 784. The patent challenger argued that the claims were merely "making integral what had earlier been made in four bolted pieces." *Schneck*, 713 F.2d at 784. Observing that the challenged claims "include[d] the inventor's elimination of the need for damping," the Federal Circuit rejected the patent challenger's "making separable components integral" argument and upheld the validity of the challenged claims because the inventor's insight to remove the need for damping "was contrary to the understanding and expectations of the art,"

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

and thus, the claimed integrated structure embodying the inventor's insight would not have been obvious. *Schneck*, 713 F.2d at 785-86.

Here, it would not have been obvious to combine Blank's media synch player 110, time server 120, and system controller 125, nor would it have been obvious to use Gray's modified time stamp functionality with a combination of Blank's media synch player 110, time server 120, and system controller 125, as proposed in the Final Office Action. Like the challenged claims in *Schneck*, the inventor's insight to remove the need to synchronize the internal clock of every playback device in the system to a dedicated and perpetual master clock (e.g., Blank's time server 120) while still achieving synchronized media playback was contrary to the understandings and expectations of the teachings of Blank and Gray. For example, Blank explains that "*[a]ll of the elements* synchronize their internal clocks to the time server" so that "content from all of the media synch players 110 will be synchronized to the same moment in time." Blank, ¶ 44 (emphasis added). And Gray explains that "the invention permits for communication over a variable delay network that does not inherently have a time base" by "periodically transmit[ting] a current time to various receiver devices on the network in order to synchronize the devices on the network." Gray, ¶ 16.

Thus, both Blank and Grey expect and require network devices to be synchronized on a perpetual basis to some form of dedicated master clock for the network, e.g., Blank's time server 120 and/or Gray's common time base 322. In contrast to Blank and Gray, the patented invention enables the inventor's insight to remove the requirement that all playback devices be perpetually synchronized to a dedicated master clock as taught by Blank and Gray, by reciting that playback devices "play[] back audio information in synchrony" using information transmitted between the

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

17

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

two playback devices that includes, "audio information, "playback timing information," as well

as the ***"device clock information of the first playback device."***

To illustrate the "making separable components integral" argument, the "RESPONSE TO

ARGUMENTS" section of the Final Office Action further states, "it is well known in the art that

one can combine different servers to be housed in one box and would not change the function of

each server, i.e., the email server would still send and receive email and a printer server would

still send and receive print requests."  Final Office Action, pp. 7-8.   However, the example of

combining an email server and print server "in one box" greatly oversimplifies the complexities

that logically follow from combining the separate components of Blank "in one box."   When

combining an email server and print server "in one box," the two components do not need to

interact with each other to perform their individual functions, and each component can perform

its own function without causing any conflict with the other component.  But combining Blank's

media synch player 110, time server 120, and control console 125 into a single box introduces

complex inter-component and inter-device interactions and conflicts that do not exist when the

components are separate.  December 20, 2017, Response, pp. 30-31; Wolfe Dec., ¶ 49-56.

For example, Blank does not consider whether the media synch player component of a

first consolidated device should synchronize its clock to (i) the clock of its internal time server

component, or (ii) the clock of a different time server component of a different (and if so, which

one) consolidated device.   Similarly, Blank does not consider whether the control console

component of the first consolidated device should synchronize its clock to (i) the clock of its

internal time server component, or (ii) the clock of a different time server component of a

different (and if so, which one) consolidated device.  Further, Blank does not consider whether

the media synch player component of the first consolidated device should be controlled via (i)

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001                        18                        Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

playback commands issued by its internal control console component, or (ii) playback commands issued by a different control console component of a different (and if so, which one) consolidated device. Additionally, Blank does not consider how to address synchronization conflicts arising when a first media synch player component of a first consolidated device plays media content in synchrony with a second media synch player component of a second consolidated device and (i) the clocks of the first and second media synch player components are synchronized to different time server components, (ii) the first and second media synch player components are controlled by different control console components, and/or (iii) one or both of the first and second media synch player components' clocks are synchronized to a different time server component than the control console component issuing playback commands to the first and/or second media synch player components.

These complex inter-component and inter-device interactions and conflicts flow directly from Blank's and Gray's requirements that all devices be synchronized to a dedicated master clock, e.g., Blank's time server 120 and/or Gray's common time base 322. But removing the requirement that all devices be perpetually synchronized to a dedicated master clock as taught in Blank and Gray greatly streamlines the operation of the system by removing the complexity-causing technical constraints imposed by Blank and Gray.

Because the inventor's insight to eliminate the need for perpetual synchronization to a dedicated master clock "was contrary to the understanding and expectations of the art," the playback devices implementing the patented synchronous playback feature recited in the claims would not have been obvious in view of Blank individually or in combination with Gray. *Schneck*, 713 F.2d at 785-86.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

19

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

### E. The strong objective evidence of non-obviousness weigh in favor of the patentability of the challenged claims

"Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of non-obviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill in the art." *Varian Medical v. William Beaumont Hospital*, IPR 2016-00162, p. 31, 64 (May 4, 2017) (affirming the patentability of challenged claims in view of objective evidence of non-obviousness *even though the prior art disclosed all of the claim elements and persons of skill in the art would have been motivated to combine the teachings of the prior art with a reasonable expectation of success to arrive at the claimed invention*); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1326-1337 (Fed. Cir. 2016) (affirming the patentability of challenged claims because *even though the prior art disclosed all the claim elements*, very strong objective evidence of non-obviousness outweighed evidence that persons of skill in the art would have been motivated to combine the teachings of the prior art with a reasonable expectation of success to arrive at the claimed invention).

"The objective indicia of non-obviousness play an important role as a guard against the statutorily proscribed hindsight reasoning in the obviousness analysis. Indeed, we have held that evidence of secondary considerations may often be the most probative and cogent evidence in the record." *WBIP*, 829 F.3d at 1328 (Fed. Cir. 2016) (citations omitted). To be afforded weight in the obviousness analysis, objective evidence of non-obviousness must have a nexus to the claimed invention. However, there is a presumption of nexus for objective evidence when the patentee shows the objective evidence is tied to a specific product that embodies the claimed invention. *WBIP*, 829 F.3d at 1317 (citations omitted).

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

20

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

Here, as outlined below, there is substantial objective evidence of non-obviousness, including evidence presented at trial in the concurrent litigation of (1) competitor praise of the patented synchronous playback feature, (2) competitor copying of products embodying the patented synchronous playback feature, and (3) competitor struggles and failures to implement synchronous playback functionality.  Further, the evidence outlined below is tied to one or both of (i) the patented synchronous playback feature and/or (ii) the Patentee's products embodying the patented synchronous playback feature.  Thus, all the objective evidence of non-obviousness has a nexus with the claimed invention.  Patentee respectfully requests that the Office consider the objective evidence of non-obviousness outlined herein pursuant to 37 C.F.R. § 1.116(e) for at least the reasons set forth in Patentee's Request to Consider Objective Evidence of Non-Obviousness submitted herewith on a separate paper.

### 1.  Competitor praise for the patented synchronous playback feature

"Evidence that the industry praised a claimed invention or a product which embodies the patent claims weighs against an assertion that the same claim would have been obvious. ***Industry participants, especially competitors, are not likely to praise an obvious advance over the known art***. Thus, if there is evidence of industry praise in the record, it weighs in favor of the nonobviousness of the claimed invention." *WBIP*, 829 F.3d at 1334 (emphasis added).

Here, the Patentee's competitor, D&M – the third-party requestor and adjudged willful infringer from the concurrent litigation – expressed praise for the patented synchronous playback feature.  For example:

- In an internal D&M technical report from 2011 reviewing Sonos patent filings, Yuuji Kaneko (a D&M engineer) stated, "***Sonos has excellent synchronous playback feature***." Ex. 1: PTX 270, p. 2 (emphasis added).
    - This praise has a nexus to the patented synchronous playback feature because the praise is referring to the synchronous playback feature disclosed and

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

21

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

described in the Patentee's patents and published patent applications in the family of related applications that includes the application that issued as the current patent under reexamination.

- In an internal D&M email from 2012 discussing Sonos's synchronous playback capabilities, Hiroyuki Yazawa (a D&M engineer) stated, "…*it's amazing accuracy over [an] IP network*." Ex. 4: PTX 146 at D+M0072389 (emphasis added).
  - This praise has a nexus to the patented synchronous playback feature because the praise is referring to the synchronous playback capability of actual Sonos products that practice the patented synchronous playback feature.

- In a 2012 internal D&M email, Marty Wachter (a D&M engineer) stated, "I have had Sonos in my home since 2005. I think *their synchronization is the best I've ever heard*." Ex. 5: PTX 193 at D+M_0158702 (emphasis added).
  - This praise has a nexus to the patented synchronous playback feature because the praise is referring to the synchronous playback capability of actual Sonos products that practice the patented synchronous playback feature.

- An internal D&M presentation from 2010 given by D&M's Chief Technical Officer summarizes the features of the Sonos system, stating, "Each zone can *play the same music* or different music and music playback in all 32 zones can be *perfectly synchronized*," and states, "every Sonos Zone can act like bridge, a switch, a wireless repeater, *a synchronized source and a synchronized player*. As long as one Sonos device is connected to the home network via Ethernet, *it is virtually impossible to hook to it up 'wrong'.*" Ex. 6: PTX 275 at D+M_0408322-30 (emphasis added).
  - This praise has a nexus to the patented synchronous playback feature because the praise is referring to the synchronous playback capability of actual Sonos products that practice the patented synchronous playback feature.

Because "competitors[] are not likely to praise an obvious advance over the known art," D&M's praise of the patented synchronous playback feature weighs in favor of the non-obviousness of the claimed invention. *WBIP*, 829 F. 3d at 1134.

### 2. Competitor copying of products embodying the patented synchronous playback feature

"Copying may indeed be another form of flattering praise for inventive features, and thus evidence of copying tends to show nonobviousness." *WBIP*, 829 F.3d at 1336 (internal quotes omitted). "*The fact that a competitor copied technology suggests it would not have been obvious.*" *WBIP,* 829 F.3d at 1336 (emphasis added).  In the context of non-obviousness,

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

22

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

"copying requires the _**replication of a specific product**_," which "may be demonstrated either through internal documents" and/or by manufacture of a product having "substantial similarity to, the patented product (as opposed to the patent)." _Tokai Corp. v. Easton Enterprises, Inc._, 632 F.3d 1358, 1370 (Fed. Cir. 2011) (Copying "requires evidence of efforts to replicate a _**specific product**_.") (emphasis added).

Here, the evidence shows, _inter alia_, that the Patentee's competitor, D&M (the third-party requestor and adjudged willful infringer from the concurrent litigation) was aware of, had access to, and copied Sonos products that embody the claimed synchronous playback feature. For example:

- An internal D&M presentation from 2013 containing "R&D Strategy and Requirement[s]" identifies "Step 1" of "How to Win" is to "_**Make Sonos-copy products**_…" Ex. 7: PTX 180 at D+M_0129410 (emphasis added).
  - This evidence of copying has a nexus to the patented synchronous playback feature because all Sonos playback devices practice the patented synchronous playback feature, and thus, the evidence shows at least an intent to copy a specific product that embodies the patented synchronous playback feature.

- In an internal D&M email from 2012 outlining the third-party requestor's plan to copy Sonos products embodying the patented synchronous playback feature, Chris Commons (D&M Vice President), states, "[W]e recently completed a _**detailed analysis of the Sonos product line and features**_. Ichikawa-san sent you the summary presentation of the _**Sonos teardown**_. Engineering also developed an ADS product plan for _**reproducing the Sonos functionality**_. The ADS feature set details and resulting project plan are attached. _**The summary of the plan is 20 months, 439 man-months, and $5.33M**_." Ex. 2: PTX 198 at D+M_0161242 (emphasis added).
  - This evidence of copying has a nexus to the patented synchronous playback feature because all Sonos playback devices practice the patented synchronous playback feature, and thus, the evidence shows access to a specific product that embodies the patented synchronous playback feature and a clearly-defined plan for copying a specific product that embodies the patented synchronous playback feature.

- D&M's internal engineering plan shows that it allocated 128 man-months (20,480 hours) of the total development effort to implementing a copy of Sonos's patented synchronous playback feature. Ex. 3: PTX 200 at D+M_0161268.
  - This evidence of copying has a nexus to the patented synchronous playback feature because all Sonos playback devices practice the patented synchronous

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

23

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

playback feature, and thus, the evidence shows access to a specific product
that embodies the patented synchronous playback feature and a clearly-
defined plan for copying a specific product that embodies the patented
synchronous playback feature.

- The jury verdict from the concurrent litigation found D&M liable for willful
  infringement of Sonos patents.  Ex. 9: Jury Verdict, Case No. 1:14-cv-01330-WCB
  (D. Del., Dec. 15, 2017) at pp. 1-4.
  - The jury's finding of willful infringement has a nexus to the patented
    synchronous playback feature because (i) the Jury's verdict of willful
    infringement was based on the evidence presented at trial showing that D&M
    copied Sonos playback devices, and (ii) all Sonos playback devices practice
    the patented synchronous playback feature.  Ex. 10: Court's Final Jury
    Instructions, Case No. 1:14-cv-01330-WCB (D. Del., Dec. 15, 2017) at pp.
    10-11.

Accordingly, these documents showing that the Patentee's competitor, D&M (the third

party requestor and the adjudged willful infringer in the concurrent litigation) was aware of, had

access to, tore down, and copied Sonos products embodying the patented synchronous playback

feature weigh heavily in favor of the non-obviousness of the claimed invention.  *WBIP*, 829 F.3d

at 1336-37 (confirming a finding of copying based on evidence "that [the accused infringer's]

engineers were aware of and had access to [the patentee's product embodying the patented

feature] and shortly thereafter with express reference to [the patentee's product] adopted the

same features in developing [the infringing product]").

### 3. Competitor struggles and failures to implement synchronous playback functionality

Failure of others to achieve the results of the claimed invention is evidence of non-

obviousness.  See, e.g., *WBIP*, 829 F.3d at 1332 (citing *Iron Grip Barbell Co. v. USA Sports, Inc.*,

392 F.3d 1317, 1325 (Fed. Cir. 2004)).

Here, Sonos's competitors -- including D&M and other sophisticated companies with

long histories of researching, developing, and successfully bringing audio products to market --

tried and failed on their own to develop media playback devices that could play back content in synchrony together.  For example:

- In an internal D&M email from 2012 discussing Sonos's synchronous playback capabilities, Achim Schulz (a D&M engineer) asked, "***Do we have any idea how they can synchronize so perfectly***?  This is related to their mesh network or they have other technical advanced strategy?"  In response, Hiroyuki Yazawa (a D&M engineer) stated, "As of now *we do not have any concrete idea*, but we believe some driver level implementation is used in both of network driver and audio driver, where network drivers exchanges precise system timer (clock) information (like what defined in IEEE1588) and audio driver does some precise buffer control, though ***it's only a guess***."  Ex. 4: PTX 146 at D+M0072389 (emphasis added).
  - This evidence of failure has a nexus to the patented synchronous playback feature because it describes an industry leader's struggles with failure to understand how to implement the patented synchronous playback feature.

- An internal D&M presentation from 2010 given by D&M's Chief Technology Officer states, "Sonos has been ***the only successful multi-zone home audio*** solution marketed to consumers (as opposed to custom installation). ***Offerings from Logitech, Cisco and Yamaha have failed***."  Ex. 6: PTX 275 at D+M 0408332 (emphasis added).
  - This evidence of failure has a nexus to the patented synchronous playback feature because it shows how multiple sophisticated companies failed to deliver a "multi-zone home audio system" and synchronous playback is a defining feature of a multi-zone home audio system.

- An internal D&M competitive research presentation from 2013 on the PURE Jongo Wireless Audio System described the system as having "***poor audio synchronization***."  PTX 179 at D+M_0128194 (emphasis added).  "To the average person it will sound synchronized but ***it made me dizzy***. I wonder if the engineering team has actually calculated the phase differential? ***It sounds to me like it is drifting continuously back and forth***."  Ex. 8: PTX 179 at D+M0128159 (emphasis added).
  - This evidence of failure has a nexus to the patented synchronous playback feature because it describes another competitor's failure to successfully implement synchronous playback functionality.

Because the D&M and other leading companies struggled and failed to deliver multi-room audio systems with synchronous playback capability, this evidence weighs in favor of the non-obviousness of the claimed invention.  *WBIP*, 829 F.3d at 1332.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

25

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017

## VI.    Conclusions

In view of the foregoing, and without conceding the merits of any of the assertions in the Request for *Ex Parte* Reexamination, the Non-Final Office Action, and the Final Office Action not explicitly addressed herein, Patentee respectfully submits that the claims are in condition for confirmation, and Patentee respectfully requests that the Office issue a reexamination certificate confirming the patentability of all the claims.  If further dialog would advance prosecution, the Office is invited to telephone the undersigned at 312-913-0001.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date:  May 16, 2018              By:   /Jeffrey P. Armstrong/
                                 Jeffrey P. Armstrong
                                 Reg. No. 54,967

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

26

Docket No.: 04-0401-REEXAM
MBHB Docket No. 14-1800-REX
Application Serial Number: 90/013,959
Filing Date: June 16, 2017



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,959 | 06/16/2017 | 9213357 | 04-0401-REEXAM (14-1800-R | 9548 |

107361    7590    03/25/2019
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| ENGLAND, DAVID E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/25/2019 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

JACKSON WALKER, LLP

Attn:  Christopher J. Rourk

2323 Ross Avenue, Suite 600

Dallas, TX  75201

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/013959*.

PATENT NO. *9213357*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(e)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(e)).



United States Patent and Trademark Office

**Under Secretary of Commerce for Intellectual Property and**
**Director of the United States Patent and Trademark Office**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**www.uspto.gov**

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP          Appeal No:   2019-003250
300 SOUTH WACKER DRIVE, 32ND FLOOR                *Ex Parte* Reexamination Control No:   90/013,959
CHICAGO, IL 60606                                  Appellant:  Sonos, Inc., (Patent Owner)


# Patent Trial and Appeal Board Docketing Notice


*Ex Parte* Reexamination Control No. 90/013,959 was received from the Technology Center at
the Board on March 19, 2019 and has been assigned Appeal No: 2019-003250.

In all future communications regarding this appeal, please include both the *Ex Parte*
Reexamination Control Number and the appeal number.


The mailing address for the Board is:

**PATENT TRIAL and APPEAL BOARD**
**UNITED STATES PATENT AND TRADEMARK OFFICE**
**P.O. BOX 1450**
**ALEXANDRIA, VIRGINIA 22313-1450**

Telephone inquiries can be made by calling 571-272-9797 and referencing the appeal number
listed above.

By order of the Patent Trial and Appeal Board.


MAT

cc: Third Party Requester

JACKSON WALKER, LLP
Attn:  Christopher J. Rourk
2323 Ross Avenue
Suite 600
Dallas, TX   75201

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No.: 04-0401-REEXAM)
(MBHB No. 14-1800-REX)

| | | |
|---|---|---|
| In the *Ex Parte* Reexamination of: | ) | |
| | ) | |
| U.S. Pat. 9,213,357 | ) | Art Unit:  3992 |
| | ) | |
| Serial No.:   90/013,959 | ) | Examiner:  David E. England |
| | ) | |
| Filed: June 16, 2016 | ) | Confirmation No. 9548 |
| | ) | |
| For:   Obtaining Content from Remote | ) | |
| Source For Playback | ) | |

## REPLY BRIEF

Jeffrey P. Armstrong
McDONNELL BOEHNEN
HULBERT & BERGHOFF LLP
300 South Wacker Drive
Chicago, Illinois 60606
(312) 913-0001

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No.: 04-0401-REEXAM)
(MBHB No. 14-1800-REX)

| | | |
|---|---|---|
| In the *Ex Part*e Reexamination of: | ) | |
| | ) | |
| U.S. Pat. 9,213,357 | ) | Art Unit:  3992 |
| | ) | |
| Serial No.:   90/013,959 | ) | Examiner:  David E. England |
| | ) | |
| Filed: June 16, 2016 | ) | Confirmation No. 9548 |
| | ) | |
| For:   Obtaining Content from Remote | ) | |
| Source For Playback | ) | |

Mail Stop Appeal Brief - Patents
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

## REPLY BRIEF

This Reply Brief is submitted pursuant 37 C.F.R. § 41.41, within two months from the Examiner's Answering Brief mailed on November 5, 2018. The Office is authorized to charge any underpayment or credit any overpayment in this matter to Deposit Account No. 13-2490.

# TABLE OF CONTENTS

I.    Status of the Claims ...................................................................................1

II.   Argument .....................................................................................................1

   A.   The Examiner's Answer still does not explain *why* a POSITA
        would have been motivated to combine Blank's media synch
        player, time server, and control console into a single device.............2

   B.   The clarification in the Examiner's Answer of *how* the
        proposed combination would work confirms that the rejection
        is based on hindsight reasoning that uses the claim language
        as a blueprint .....................................................................................6

   C.   The conclusory contentions regarding reasonable expectation
        of success in the Examiner's Answer contradict evidence
        showing that implementing the claimed invention was a
        complex engineering project fraught with uncertainty.......................8

   D.   The proffered reasons in the Examiner's Answer for
        modifying the proposed combination of Blank's devices to
        use Gray's "frame-specific time stamps" as playback timing
        for synchronous playback lacks a rational basis in the record .........13

   E.   The contentions in the Examiner's Answer regarding the APA
        fail to overcome the deficiencies of Blank, Gray, and the
        proffered reasons for combining and modifying Blank and
        Gray ..................................................................................................16

   F.   The Examiner's Answer confirms that the Examiner has
        improperly disregarded objective evidence of non-
        obviousness with a clear nexus to the claimed invention.................17

III.  Conclusion ................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Cardiac Pacemakers v. St. Jude Medical*,
    381 F.3d 1371, 1377 (Fed. Cir. 2004) ......................................................... 17

*In re Allen*,
    324 F.2d 993, 997 (CCPA 1963) ................................................................. 20

*In re Larson*,
    340 F.2d 965 (CCPA 1965) ........................................................................... 3

*In re Nuvasive*,
    842 F.3d 1376, 1382 (Fed. Cir. 2016) .................................................... 14, 16

*In re Rinkevich*,
    BPAI, 2007-1317 at 9 (Decided May 29, 2007) .......................................... 15

*Personal Web Technologies v. Apple*,
    848 F.3d 987, 991 (Fed. Cir. 2017) ........................................................... 3, 7

*Phil-Insul v. Airlite Plastics*,
    854 F.3d 1344, 1359 (Fed. Cir. 2017) ......................................................... 7

*Rexnord v. Laitram*,
    274 F.3d 1336, 1342 (Fed. Cir. 2001) ......................................................... 7

*Smith & Nephew v. Convatec*,
    IPR 2013-00097 (LMG), Paper 27, p. 7 (PTAB, Aug. 21, 2013) ............... 20

*WBIP v. Kohler*,
    829 F.3d 1317, 1328 (Fed. Cir. 2016) ................................................... 18, 20

## Statutes

35 U.S.C. § 103 ............................................................................... passim

## I.    Status of the Claims

Claims 9-12 and 19 of U.S. Pat. 9,213,357 (the '357 Patent) are rejected under § 103 based on U.S. 2004/0252400 ("Blank"), U.S. 2002/0150053 ("Gray"), and alleged Admitted Prior Art ("APA"); claims 9-12 and 19 are under appeal.

## II.    Argument

The Examiner's rebuttals, clarifications, and arguments in the Answering Brief ("Answer") do not remedy the multiple points of clear error in the § 103 rejection explained in Patentee's Appeal Brief.

First, the additional contentions and arguments in the Answer do not remedy the Examiner's failure to establish a *prima facie* case of obviousness. The Examiner's further arguments for ***why*** a Person of Ordinary Skill in the Art (POSITA) would have been motivated to combine Blank's media synch player, time server, and control console into a single device are conclusory and lack support in the record. Answer, pp. 3-5. And the Examiner's further clarification of ***how*** the proposed combination would work confirms that the § 103 rejection is based on impermissible hindsight reasoning that uses the claim language as a blueprint for the proposed combination. *Id.* at 5-7. Additionally, the Examiner's continued reiteration of conclusory assertions that a POSITA could have made the claimed invention with a reasonable expectation of success, combined with the Examiner's continued refusal to consider actual evidence showing that making the claimed invention was a complex engineering project fraught with uncertainty for a POSITA, confirms that

the Examiner has improperly ignored facts that contradict the Examiner's apparently predetermined conclusion of obviousness. *Id.* at 7-8. And the Examiner's attempts to explain why a POSITA would have further modified the proposed combination of Blank's devices with the teachings of Gray and/or the APA lack support in the record and Federal Circuit case law. *Id.* at 8-10. Because the additional contentions and arguments in the Answer do not remedy the Examiner's failure to establish a *prima facie* case of obviousness, the Board should reverse the § 103 rejection.

Additionally, the Answer confirms that the Examiner has not considered objective evidence of non-obviousness having a nexus to the claimed invention, including extensive evidence of copying showing that D&M[1] used technical details from the '357 Patent and teardowns of Patentee's products to build a device that practiced the synchronous playback feature recited in claim 9 of the '357 Patent. *Id.* at pp. 11-13. The Examiner's continued refusal to consider the objective evidence of non-obvious is an additional clear error that warrants reversal.

**A.    The Examiner's Answer still does not explain *why* a POSITA would have been motivated to combine Blank's media synch player, time server, and control console into a single device**

To support the legal conclusion of obviousness, the Examiner must provide, *inter alia*, a rational reason for ***why*** a POSITA at the time of the invention would have modified or combined the prior art components to arrive at the claimed

---

[1] D&M is the third-party requestor and adjudged willful infringer in the related litigation giving rise to the present *ex parte* reexamination.

invention. *Personal Web Technologies v. Apple*, 848 F.3d 987, 991 (Fed. Cir. 2017). The Examiner failed to meet this burden. Appeal Brief, pp. 8-15. Attempting to remedy this deficiency, the Examiner responded, "one of the motivations to combine the devices of Blank in one 'box'…is found in MPEP 2144.04 V.B. 'Making Integral' *In re Larson*, 340 F.2d 965 (CCPA 1965), i.e.,…making one means integral with another means… would be merely a matter of obvious engineering choice.')." Answer, pp. 3-4. The Examiner's reliance on *Larson* is misplaced and does not justify the conclusion of obviousness here.

In *Larson*, "[t]he essential difference between the [prior art] construction and [the claim] [was] the manner of connecting the brake disc or drum to the wheel hub." The CCPA reasoned that "the brake disc and clamp of [the prior art] comprise several parts [that] are rigidly secured together as a single unit," such that "[t]he constituent parts…constitute a unitary whole," and thus, using "a one piece construction [as claimed] instead of the [prior art] structure [was an] obvious engineering choice." 340 F2d at 967-68. Importantly, the prior art taught the same ***combination*** of components recited in the claim – the only difference was that the prior art combination was clamped together whereas the claimed combination was formed from a single piece of metal. *Id.* Thus, in *Larson*, the motivation to form the combination of components from one piece of metal flowed from a straightforward assumed benefit of making a prior art combination more rigid and stable.

The CCPA's reasoning in *Larson* does not extend to this case for multiple

- 3 -

reasons. First, unlike *Larson*, Blank does not teach the same ***combination*** of components recited in claim 9. Second, it is unreasonable to presume that a POSITA at the time of the invention would have been motivated to combine Blank's components into a single device in view of Blank's suggestion that combining the components would be undesirable in some instances. Blank, ¶ 95. Finally, combining Blank's components is a far more sophisticated task than simply forming a known combination of separate prior art components from one piece of metal.

In the rejection, the Examiner ignores the technical complexities and potential drawbacks that logically flow from the proposed combination. Appeal Brief, pp. 15-19; Sec. B, *infra*. And the Examiner cites no evidence for the conclusory contention that "this type of engineering choice would replicate what is seen in the market as a 'master or controller' or audio visual stereo receiver." Answer, p. 4. There is no evidence in the record about "master controllers" or "audio visual stereo receivers" performing the functions of claim 9 (apart from the devices in the '357 Patent), or evidence of a market for such devices as of the '357 Patent's 2003 priority date.

The Examiner's additional contentions that "combining these into 'one box' would shorten the distance and therefore time with the commands made between these devices, making latency very minimal and only require (sic) a user to purchase one device instead of several," Answer, p. 5, are post hoc motivations that lack a rational basis in the technical teachings of Blank. A POSITA would not have been motivated to combine Blank's devices into a single box to reduce command latency,

because command latency is not a problem for Blank's system. Blank acknowledges IP networks suffer from "delays, latency, jitters and other inherent network characteristics," but explains that Blank's system uses "'tight time' synchronization" to play A/V streams "in a synchronized manner ***despite the characteristics of typical IP networks***." Blank, ¶ 43 (emphasis added). Even if latency caused multiple media synch players to receive a command at slightly different times, the media synch players would still implement the received command at exactly the same time ("t+d") because "all of the media synch players 110 [are] synchronized to the same moment in time - t+d." Blank, ¶ 44.

Finally, there is no evidence in the record that a POSITA would have viewed "one device instead of several" as desirable in the context of Blank's system. Answer, p. 5. To the contrary, Blank suggests to a POSITA that separate components "avoid[] investment in large amounts of hardware…via provision of redundant elements of very expensive hardware for backup capability." Blank, ¶ 95. Combining Blank's components as the Examiner proposes would create "redundant elements of very expensive hardware" that Blank seeks to avoid. Indeed, replacing a single media synch player, time server, or control console would be less costly than replacing the Examiner's proposed device (i.e., a combination of a media synch player, time server, and control console). Ex.[2] A: Wolfe Dec., ¶¶ 50-56.

---

[2] The exhibits cited herein are the exhibits to Patentee's Appeal Brief.

Here, the Examiner has concocted a hindsight rationale to justify the combination in 2017-18 rather than articulating a reason why a POSITA in 2003 would have been motivated to make the proposed combination. Because the Examiner's arguments in the Answer do not remedy the Examiner's failure to provide a rational reason **_why_** a POSITA would have been motivated to combine Blank's components into a single "playback device," the Examiner has failed to establish a *prima facie* case of obviousness for at least this first independent reason.

**B.    The clarification in the Examiner's Answer of _how_ the proposed combination would work confirms that the rejection is based on hindsight reasoning that uses the claim language as a blueprint**

Patentee explained how the proposed combination of Blank's media synch player, time server, and control console introduces multiple technical complexities that are not contemplated by Blank or explained by the Examiner. Appeal Brief, pp. 15-19. In an attempt to wish away these complexities, the Examiner responded that "media sync player 1 is the only device in the system that has the additional components" while "Media Sync Player (N), which would be all other synch players, do not have the same configuration as…media synch player 1." Answer, pp. 5-6. The Examiner's reasoning suffers from multiple flaws.

First, claim 9 recites a "first playback device" and a "second playback device," so the Examiner's contention that the "first playback device" is a fundamentally different device than the "second playback device" is contrary to Federal Circuit precedent that "a claim term should be construed consistently with its appearance in

other places in the same claim." *Rexnord v. Laitram*, 274 F.3d 1336, 1342 (Fed. Cir.

2001). Second, the Examiner has provided no rational reason why a POSITA would

have combined Blank's components to create two different types of playback

devices and nothing in the record suggests that a POSITA would have been

motivated to create a network of two different types of playback devices as the

Examiner has proposed. To the contrary, the record shows that deploying a single

type of playback device was advantageous. Ex. H: PTX 275 at D+M_0408322-30

("every Sonos [player] can act like bridge, a switch, a wireless repeater, a

synchronized source and a synchronized player" and "it is virtually impossible to

hook to it up 'wrong'.").

"[A] clear, evidence-supported account of the contemplated workings of the

combination is a prerequisite to adequately explaining and supporting a conclusion

that a [POSITA] would have been motivated to make the combination." *Personal

Web*, 848 F.3d at 994. The Examiner has failed to provide such an explanation.

Instead, the Examiner's attempt to wish away the complexities that logically flow

from the proposed combination with the contention that a POSITA would have

combined Blank's components to create two different types of playback devices

further confirms that the § 103 rejection is based on improper hindsight reasoning

concocted to justify the proposed combination. Because the further clarifications and

contentions in the Answer do not remedy the Examiner's failure to explain ***how*** the

proposed combination would work, the Examiner has failed to establish a *prima*

*facie* case of obviousness for at least this second independent reason.

### C. The conclusory contentions regarding reasonable expectation of success in the Examiner's Answer contradict evidence showing that implementing the claimed invention was a complex engineering project fraught with uncertainty

The Examiner contends, "all the case information given by the PO does not, in any way, connect the case mention[ed] with those patented claims to the actual claim language in this Re-exam," "[t]here is no evidence shown by the PO that connects the case to the claims and if the actual claim language is what was difficult to duplicate," and "[t]he description of the evidence and the evidence itself does not teach the limitations that are rejected or how D&M attempted to use the specific claim language to copy a Sonos product." Answer, pp. 7-8.[3] But the Examiner's contentions directly contradict facts in the record showing (i) D&M was aware of, had access to, and copied Sonos products embodying the patented synchronous playback feature, (ii) D&M used the technical details of the patented synchronous playback feature described in the '357 Patent specification in connection with its copying efforts, as confirmed by the verdict in the related litigation, and (iii) D&M struggled to copy Sonos's products despite having Sonos commercial products and Sonos patent filings as a roadmap. Appeal Brief, pp. 19-21, 23-29.

In January 2012, D&M outlined its goal to copy Sonos products. Ex. B: PTX

---

[3] The Examiner's other comments regarding "commercial success" are irrelevant because the Patentee has not cited evidence of commercial success.

198. D&M prepared a detailed engineering plan that tasked a large team of engineers with copying Sonos products; that team included Yuuji Kaneko.; Ex. C: PTX 200 at D+M_0161270. In November 2011, Kaneko prepared a report ("the Kaneko Report") that summarized an analysis of Sonos patent documents including U.S. App. 10/816,217. Ex. D: PTX 270, p. 1. The '357 Patent under reexamination is a continuation of U.S. App. 10/816,217; the '357 Patent and U.S. App. 10/816,217 share the same specification. And as described below, the synchronous playback feature recited in claim 9 of the '357 Patent is the same synchronous playback feature described in U.S. App. 10/816,217 and analyzed in the Kaneko Report. FIG. 1 maps the synchronous playback features of claim 9 to the Kaneko Report.



**FIG. 1: Annotated Excerpt of the Kaneko Report (Ex. D: PTX 270, p. 3)**

The Overview" section of the Kaneko Report states, "Sonos has excellent synchronous playback feature." Ex. D: PTX 270, p. 2. The technical details in the "Summary" section of the Kaneko Report confirm that the "synchronous playback feature" praised in the Kaneko Report is the ***same*** synchronous playback feature recited in claim 9 of the '357 Patent. Ex. D: PTX 270, p. 3. In FIG. 1, the Kaneko Report shows a "first playback device" **[1]** transmit[ing]…to a second playback device **[2]**, the audio information **[3]**, playback timing information associated with the audio information **[4]**, and device clock information of the first playback device **[5]**." The Kaneko Report also describes the how the "first playback device" **[1]** performs the claimed function of "play[ing] back the audio information **[3]** in synchrony with the second playback device **[2]** by using the playback timing information associated with the audio information **[4]** and the device clock information of the first playback device **[5]** to play back the audio information **[3]**," as shown in box **[6]** of FIG. 1. Finally, the Kaneko Report confirms that "the first and second playback devices remain independently clocked during synchronous playback of the audio information," showing that the master and slave each continue to output audio according to its "own clock" **[7]**. Ex. D: PTX 270, p. 3. The Kaneko Report's synchronous playback description matches the synchronous playback embodiments described in the '357 Patent. '357 Patent, 24:16-25:25.

D&M allocated substantial engineering resources to copying Sonos's synchronous playback feature. A 2012 D&M email summarizing D&M's plans

states, "for reproducing the Sonos functionality," the project would require "20 months, 439 man-months, and $5.33M," or 70,240 hours based on a 40-hour work week. Ex. B: PTX 198 at D+M_0161242. D&M's plan allocated 128 man-months (20,480 hours) just to copying Sonos's synchronous playback feature. Ex. C: PTX 200 at D+M_0161268. Importantly, D&M's engineering estimates are from January 2012, **_after_** D&M had the benefit of the technical analysis in the Kaneko Report prepared in November 2011. D&M's engineers are unquestionably persons of ordinary skill in the art, and many are arguably experts in the field, and they knew that copying Sonos's synchronous playback feature would be no easy task. The level of technical analysis and detail in the Kaneko Report and D&M's engineering plan shows the degree of actual effort that a POSITA had to undertake to arrive at the claimed invention – it was not a simple matter of combining and modifying Blank's components with a mere hand wave as the Examiner contends.

During D&M's copying efforts, Kaneko's teammates (e.g., Hongo and Takasu listed at Ex. C: PTX 200 at D+M_0161270) participated in discussions about the challenges and uncertainties encountered while copying Sonos's synchronous playback feature. Ex. E: PTX 146 at D+M0072389 ("Do we have any idea how they can synchronize so perfectly?"; "As of now we do not have any concrete idea, but we believe some driver level implementation is used in both of network driver and audio driver…, though it's only a guess.").

After years of engineering effort, millions of dollars, and tens of thousands of

man hours, D&M finally produced a device replicating Sonos's synchronous

playback feature. And a jury concluded D&M's device infringed claim 17 of U.S.

Pat. 9,195,258 (the '258 Patent). Ex. F: Verdict at p. 2. Claim 17 of the '258 Patent

is reproduced in the Jury Instructions. Ex. J: Jury Instructions, p. 23. Importantly,

the synchronous playback feature in claim 17 of the '258 Patent is the **_same_**

synchronous playback feature described in the Kaneko Report and recited in claim

9 of the '357 Patent. Figure 2 shows a comparison of a relevant excerpt of claim 17

of the '258 Patent and a relevant excerpt of claim 9 of the '357 Patent.

| Claim 9 of the '357 Patent (relevant excerpt) | Claim 17 of the '258 Patent (relevant excerpt) |
|---|---|
| "…cause the first playback device to:…" | "…the first and second zone players are configured to…" |
| "(ii) transmit, via the network interface of the first playback device to a second playback device,…playback timing information associated with the audio information, and device clock information of the first playback device" | "wherein the generated playback timing information and the clock time information are transmitted from the one of the first or second zone players to the other of the first or second zone players" |
| "(iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information" | "playback audio in synchrony based at least in part on (i) audio content, (ii) playback timing information associated with the audio content…, and (iii) clock time information for the one of the first or second zone players," |
| "wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information" | "wherein the first and second zone players remain independently clocked while playing back audio in synchrony" |

**FIG 2: Comparison of Claimed Synchronous Playback Features**

Thus, the evidence shows that D&M used Sonos patent documents in furtherance of its copying efforts, struggled with uncertainties while copying the synchronous playback feature, and after great effort, ultimately created a device that infringed the synchronous playback feature recited in claim 9 of the '357 Patent. The Examiner's contention that "the evidence itself does not teach the limitations that are rejected or how D&M attempted to use the specific claim language to copy a Sonos product" simply ignores inconvenient facts that contradict the Examiner's predetermined conclusion of obviousness. Moreover, the evidence contradicts the Examiner's conclusory assertions that the proposed combination "would not require undue experimentation, "would not make an overly complicated device," and "making devices integral is not only well known in the art…but would have lead to a reasonable expectation of success." FOA, pp. 7-9.

Because the Examiner's contentions in the Answer do not remedy the Examiner's failure to show that a POSITA at the time of invention could have created the claimed invention with a reasonable expectation of success, particularly in view of record evidence to the contrary, the Examiner has failed to establish a *prima facie* case of obviousness for at least this third independent reason.

**D.    The proffered reasons in the Examiner's Answer for modifying the proposed combination of Blank's devices to use Gray's "frame-specific time stamps" as playback timing for synchronous playback lacks a rational basis in the record**

The Examiner states, "there are THREE versions, i.e. Construction 1,

Construction 2, and APA interpretation, of the rejection when it comes to the interpretation of [the] 'playback timing' element." Answer, p. 8.

First, regarding "Construction 1," the Examiner contends, "the PO has stated on the record that Blank teaches this limitation and therefore agrees with the Examiner in the first version of the rejection." Answer, p. 9. That is not true. To the contrary, Patentee explained that "Blank already discloses a satisfactory playback timing solution for synchronous playback, albeit a ***different*** solution than what is recited in the claims." Appeal Brief, p. 12 (emphasis added).

Regarding "Construction 2," the Examiner contends it would have been obvious to modify the combination of Blank's devices to use Gray's "frame-specific time stamps" as playback timing for synchronous playback as recited in claim 9. Answer, p. 9. The Federal Circuit has explained that an obviousness rejection must "***articulate a reason why***" a PHOSITA would combine the prior art references" with "a satisfactory explanation" having "a rational connection between the facts found and the choice made" in combining the prior art in the manner proposed in the rejection to arrive at the claimed invention. *In re Nuvasive*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (emphasis original). The Examiner's proffered motivation falls far short of this standard because the motivation lacks any "rational connection between the facts found and the choice made" for at least two reasons.

First, Blank already discloses a satisfactory playback timing solution for synchronous playback, albeit a different solution than what is recited in claim 9. Ex.

A: Wolfe Dec., ¶ 57. Even though Blank's playback timing solution differs from the claimed invention, Blank nevertheless has a viable playback timing solution for synchronous playback, and thus, "a [POSITA] having common sense at the time of the invention would not have reasonably looked to [Gray] to solve a problem already solved by [Blank]." *In re Rinkevich*, BPAI, 2007-1317 at 9 (Decided May 29, 2007).

Second, while Blank incorporates Gray by reference, this alone does not explain why a POSITA would have been motivated to use Gray's "frame-specific time stamps" for playback timing in a system constructed from a combination of Blank's devices. The Examiner states, "Blank teaches in a non-isosynchronous network whereas Gray teaches using their time to convert a non-isosynchronous network to an isosynchronous network," and concludes "it would be obvious…to combine Blank and Gray because the user would be able to use their system in two different types of networks thereby expanding the range of users and system (sic) that may not have been able to stream data in this manner." Answer, p. 9. But the Examiner's reasoning fails to explain why a POSITA would have been motivated to use Gray's "frame-specific time stamps" for playback timing in a system constructed from a combination of Blank's devices. Indeed, converting information from a non-isosynchronous (variable delay) network to an isosynchronous (constant delay) network as taught by Blank and Gray involves synchronizing internal clocks of network devices to a dedicated master clock -- ***not synchronizing playback of media*** by two or more media playback devices. May 16, 2018, Response, pp. 9-13 ("the

proposed combination of Blank and Gray requires that Gray's timestamping feature be used to perform a different function than taught by Blank"); December 20, 2017, Response, pp. 33-34 (same).

The Examiner has failed to "***articulate a reason why*** a PHOSITA would" use Gray's "frame-specific time stamps" for playback timing in a system constructed from a combination of Blank's devices with "a satisfactory explanation" that has "a rational connection between the facts found and the choice made." *In re Nuvasive*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (emphasis original). Because the Examiner's contentions in the Answer do not remedy the Examiner's failure to articulate a reason why a POSITA would have modified Blank with Gray in the manner proposed to arrive at the claimed invention, the Examiner has failed to establish a *prima facie* case of obviousness based on the combination of Blank and Gray.

### E. The contentions in the Examiner's Answer regarding the APA fail to overcome the deficiencies of Blank, Gray, and the proffered reasons for combining and modifying Blank and Gray

The Examiner contends the APA "show[s] that the existence of playback timing is not new or inventive." Answer, p. 9. That is not true. The alleged APA never mentions playback timing, much less using playback timing for synchronous playback in the manner recited in claim 9.

The Examiner further contends the APA shows "devices in the prior art are independently clocked" based on the Examiner's interpretation of the "independently clocked" claim term. Answer, pp. 9-10. But even if devices in the

prior art may have been "independently clocked" under the Examiner's construction, that alone does not show or suggest that "the first and second playback devices remain independently clocked *during synchronous playback of the audio information*," as recited in claim 9. The alleged APA teaches that prior art independently-clocked playback devices could <u>not</u> play audio in synchrony because they did not reliably clock at precisely the same rate. Ex. A: Wolfe Dec., ¶ 26. The inventor's recognition that independently clocked playback devices could not play audio in synchrony with each other does not render obvious the claimed solution that enables multiple playback devices to "remain independently clocked during synchronous playback." *Cardiac Pacemakers v. St. Jude Medical*, 381 F.3d 1371, 1377 (Fed. Cir. 2004) ("Recognition of a need does not render obvious the achievement that meets that need.").

Because the APA does not show or suggest "playback timing" and that multiple playback devices could "remain independently clocked during synchronous playback" as recited in claim 9, the Examiner's contentions in the Answer do not remedy the Examiner's failure to show that further modifying Blank (or Blank and Gray) with the teachings of the APA would render the claims *prima facie* obvious.

### F.   The Examiner's Answer confirms that the Examiner has improperly disregarded objective evidence of non-obviousness with a clear nexus to the claimed invention

Contrary to the Examiner's assertions, the evidence of competitor praise,

- 17 -

copying, and failure of others does have a nexus with the claimed invention.[4] And the Examiner's failure to consider[5] the objective evidence of non-obviousness is yet another clear error. *WBIP v. Kohler*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) ("A determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors, and it is error to reach a conclusion of obviousness until all those factors are considered.)

First, regarding competitor praise, the statement that "Sonos has excellent synchronous playback feature" in the Kaneko Report at Ex. D: PTX 270, p. 2, has a nexus with the claimed invention because it is referring to the same synchronous playback feature recited in claim 9 of the '357 Patent. Sec. C, *supra*. The following statements all have a nexus with the claimed invention because they each refer to the Sonos synchronous playback feature that D&M ultimately copied into D&M products that were found to infringe claim 17 of the '258 Patent, which recites the same synchronous playback feature recited in claim 9 of the '357 Patent, Sec. C, *supra*: (i) Sonos's synchronous playback feature has "amazing accuracy over [an] IP network," Ex. E: PTX 146 at D+M0072389; (ii) "their synchronization is the best

---

[4] Patentee has not addressed the Examiner's comments regarding "commercial success" because Patentee has not cited evidence of commercial success.

[5] The Examiner complains that "the evidence was no[t] presented to the Examiner in a timely manner," Answer, p. 7, but this is incorrect. Patentee explained the reasons for the timing of the submission of the evidence in the 37 C.F.R. § 1.116 Request filed on May 16, 2018, and the Office entered the evidence into the record as shown in the Advisory Action mailed on June 11, 2018.

I've ever heard," Ex. G: PTX 193 at D+M_0158702; and (iii) "[e]ach zone can play the same music…and music playback in all 32 zones can be perfectly synchronized," "every Sonos Zone can act like bridge, a switch, a wireless repeater, a synchronized source and a synchronized player" and "it is virtually impossible to hook to it up 'wrong'," Ex. H: PTX 275 at D+M_0408322-30.

Second, the evidence of competitor copying has a nexus with the claimed invention because the evidence shows D&M was aware of, had access to, and copied Sonos products embodying the claimed synchronous playback feature described in the Kaneko Report. In particular, the evidence of copying in Ex. D: PTX 270 (the Kaneko Report), Ex. I: PTX 180 at D+M_0129410 ("Make Sonos-copy products"), and Ex. B: PTX 198 (D&M's detailed engineering plan to copy Sonos products) has a nexus with the claimed invention because the Kaneko Report shows D&M studied Sonos patent filings describing the synchronous playback feature, and D&M's engineering plan shows D&M reverse engineered actual Sonos products embodying the synchronous playback feature. Further, D&M's copying efforts resulted in a device that was found to infringe claim 17 of the '258 Patent, which recites the same synchronous playback feature recited in claim 9 of the '357 Patent. Ex. F: Verdict at p. 2; Ex. J: Jury Instructions, p. 23; Sec. C, *supra*.

Third, the evidence showing failure of others amounts to evidence of nonobviousness when it is shown that widespread efforts of skilled workers having knowledge of the prior art had failed to find a solution to the problem. *Smith &*

*Nephew v. Convatec*, IPR 2013-00097 (LMG), Paper 27, p. 7 (PTAB, Aug. 21, 2013) (citing *In re Allen*, 324 F.2d 993, 997 (CCPA 1963)). Here, the evidence of failure of others has a nexus with the claimed invention because the evidence shows widespread efforts by persons of ordinary skill in the art failed to develop acceptable synchronous playback solutions. Ex. H: PTX 275 at D+M 0408332 ("Sonos has been the only successful multi-zone home audio solution…Offerings from Logitech, Cisco and Yamaha have failed."); Ex. K: PTX 179 at D+M_0128194 (the PURE Jongo Wireless Audio System had "poor audio synchronization."); Ex. K: PTX 179 at D+M0128159 (The synchronous playback "made me dizzy. I wonder if the engineering team has actually calculated the phase differential? It sounds to me like it is drifting continuously back and forth.").

Because the objective evidence of non-obviousness has a nexus with the claimed invention, the Examiner's continued failure to consider the objective evidence of non-obviousness is a clear error. *WBIP*, 829 F.3d at 1328.

## III.    Conclusion

For the foregoing reasons, Patentee submits that the § 103 rejections should be reversed and patentability of the claims confirmed.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date: January 7, 2019    By: /Jeffrey P. Armstrong/
Jeffrey P. Armstrong
Reg. No. 54,967

- 20 -

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,959 | 06/16/2017 | 9213357 | 04-0401-REEXAM (14-1800-R | 9548 |

130085          7590          05/31/2019
Lee Sullivan Shea & Smith LLP
656 W. Randolph St.
Floor 5W
Chicago, IL 60661

| EXAMINER |
|---|
| ENGLAND, DAVID E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/31/2019 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* CHRISTOPHER J. ROURK

_____

Appeal 2019-003250
Reexamination Control 90/013,861[1]
Patent No. US 9,213,357 B2
Technology Center 3900

_____

Before JOHN A. JEFFERY, MARC S. HOFF, and ERIC B. CHEN,
*Administrative Patent Judges*.

HOFF, *Administrative Patent Judge*.


DECISION ON APPEAL

STATEMENT OF THE CASE

Appellant appeals under 35 U.S.C. § 134 from the rejection of claims
9–12 and 19.  We have jurisdiction under 35 U.S.C. §§ 134(b) and 306.

We reverse.

The '357 patent issued to Millington on December 15, 2015.  The
'700 patent is a system and method for synchronizing operations among a
number of digital data processing devices that are regulated by independent
clocking devices, particularly a plurality of audio playback devices that
receive digital audio information to be played back.  A task distribution

---

[1] Appellant states that the real party in interest is Sonos, Inc. App. Br. 1.

Appeal 2019-003250
Reexamination Control 90/013,861
Patent No. 9,213,357 B2

device distributes tasks (e.g., audio information to be played back) to the
devices.  Each task is associated with a time stamp indicating a time at
which the devices are to play back the audio in synchrony.  Each respective
device obtains the current time from the task distribution device and
determines a time differential between that clock and the respective device's
clock, so as to determine precisely when to execute the task in synchrony.
'357 Patent col. 2:32–66.

Claim 9 is exemplary of the claims on appeal:

9.      A first playback device comprising:

one or more processors;

a network interface; and

tangible, non-transitory computer-readable memory comprising
program instructions that, when executed by the one or more processors,
cause the first playback device to:

receive, via the network interface from a network device configured to
control the first playback device and communicatively coupled to the first
playback device over a local area network (LAN), control information
comprising an address identifying a network location of audio information
available at an audio information source, wherein the audio information
source is outside of the LAN;

and

after receiving the control information, (i) obtain, via the network
interface from the audio information source outside of the LAN, the audio
information; (ii)transmit, via the network interface of the first playback
device to a second playback device, the audio information, playback timing

Appeal 2019-003250
Reexamination Control 90/013,861
Patent No. 9,213,357 B2

information associated with the audio information, and device clock
information of the first playback device; and (iii) play back the audio
information in synchrony with the second playback device by using the
playback timing information associated with the audio information and the
device clock information of the first playback device to playback the audio
information, wherein the first and second playback devices remain
independently clocked during synchronous playback of the audio
information.

The Examiner relies upon the following prior art in rejecting the
claims on appeal:

| Millington | US 9,195,258 B2 | Nov. 24, 2015 |
| Edens | US 6,611,537 B1 | Aug. 26, 2003 |
| Blank | US 2004/0252400 | Dec. 16, 2004 |
| Gray, III | US 2002/0150053 A1 | Oct. 17, 2002 |

Fries et al., *The MP3 and Internet Audio Handbook*, TeamCom Books
(2000).

 Throughout this decision, we make reference to Appellant's Brief
("App. Br.," filed Sept. 17, 2018), the Reply Brief ("Reply Br.," filed Jan. 7,
2019) and the Examiner's Answer ("Ans.," filed Nov. 5, 2018) for their
respective details.

## REJECTIONS

Claims 9-12 and 19 stand rejected under 35 U.S.C. § 103(a) as being
unpatentable over Blank, Gray, and APA.

Appeal 2019-003250
Reexamination Control 90/013,861
Patent No. 9,213,357 B2

## ISSUE

Appellant's arguments present us with the following issue:

Has Appellant adduced objective evidence that leads to a conclusion
that the claims under reexamination would not have been obvious to the
person having ordinary skill in the art?

### PRINCIPLES OF LAW

"There is a presumption of nexus for objective considerations when
the patentee shows that the asserted objective evidence is tied to a specific
product and that product 'is the invention disclosed and claimed in the
patent.'" *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016);
*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir.
1997). "A patent challenger may respond by presenting evidence that shows
the proffered objective evidence was 'due to extraneous factors other than
the patented invention.'" *Id.*; *Demaco Corp. v. F. Von Langsdorff Licensing
Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988). "However, a patent challenger
cannot successfully rebut the presumption with argument alone – it must
present evidence. *Id.*

## ANALYSIS

Independent claim 9 recites, inter alia, transmitting playback timing
information associated with audio information, via a network interface;
playing back the audio information in synchrony by using the playback
timing information associated with the audio information and the device
clock information of the first playback device; wherein the first and second

Appeal 2019-003250
Reexamination Control 90/013,861
Patent No. 9,213,357 B2

playback devices remain independently clocked during synchronous
playback.

Appellant argues that the Examiner erred in failing to give appropriate
weight to its objective evidence of non-obviousness. App. Br. 24–25.
Appellant has presented evidence that D&M engineers praised their product,
characterizing it as "excellent synchronous playback," "amazing accuracy
over IP network," and "the best [synchronization] I've ever heard." App.
Br. 27. Appellant has presented evidence that D&M set out to copy their
product. Appellant's evidence showed that "D&M was aware of, had access
to, and copied Sonos products embodying the claimed synchronous
playback." App. Br. 28. Appellants' evidence showed that even after
allocating "70,240 hours" of employee time and "$5.33M," D&M had
difficulty implementing Appellant's synchronous playback functionality.
App. Br. 29.

Appellant has presented evidence that D&M set out to achieve the
patented synchronous playback product, only to fail for years while
expending thousands of man-hours and millions of dollars. App. Br. 29.
Appellants' evidence showed that D&M engineers had no "concrete idea"
how Sonos "can synchronize so perfectly." *Id.*

The Examiner did not rebut Appellant's evidence. The Examiner's
response was confined to concluding that Appellants' argument was not
persuasive, because Appellant's evidence failed to establish a nexus between
the objective evidence presented and the limitations of the claimed
invention. Ans. 12–13.

Appeal 2019-003250
Reexamination Control 90/013,861
Patent No. 9,213,357 B2

There is a presumption of nexus for such objective considerations as praise by competitors, copying, and failure of others, when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP*, 829 F.3d at 1329.

We agree with Appellant's contention that the Examiner erred in holding Appellants' objective evidence to be unpersuasive. First, the Examiner's response to arguments, in the Answer, finds that Appellants did not state "what specific claimed feature from the litigation in the D&M case was considered novel enough for praise," and "what specific feature in the claim that accomplishes the Synchronous playback that sets Sonos above the competition." Ans. 11. We find that Appellant did, however, argue in the Brief, and again in the Reply Brief, that the D&M litigation concerned the synchronous playback features recited in Millington '258, which are substantially identical to the synchronous playback limitations recited in the '357 patent under reexamination. D&M was found to have willfully infringed the '258 Patent based upon the evidence of copying referenced by Appellant in the Brief. Reply Br. 12, 18. We agree that Appellant has tied their objective evidence to a specific product, which is the invention disclosed and claimed in the '258 Patent and the '357 Patent, which includes the synchronous playback feature that Appellant's competitor praised and sought to copy.

Second, in the Answer, the Examiner continues to insist that Appellant has not satisfied the legal requirements for establishing commercial success. Ans. 12. The Examiner's statements of the law

6

Appeal 2019-003250
Reexamination Control 90/013,861
Patent No. 9,213,357 B2

regarding commercial success are not relevant to the disposition of this appeal, because Appellants *have not presented evidence concerning the commercial success of the invention*. Rather, Appellant has presented unrebutted objective evidence concerning praise by a competitor, copying by a competitor, and failure of others.

The Examiner's finding that the '258 Patent claims multiple other features not found in the claims under reexamination is not persuasive to rebut Appellant's evidence that Appellant's synchronous playback feature was praised, was copied, and was the subject of long-felt need and failure of others. *See* Ans. 13. The Examiner merely suggests that some other feature or features gave rise to this praise, copying, etc. *Id.* The Examiner, however, points to no factual evidence tending to support a theory that any particular other feature or features, rather than the synchronous audio playback asserted by Appellant, motivated Appellant's competitor.

We conclude that Appellant's arguments concerning objective evidence of nonobviousness are persuasive to show Examiner error in asserting the prima facie obviousness of claims 9–12 and 19 over Blank, Gray, and APA. We need not reach Appellant's arguments concerning the prima facie obviousness of the claims over the cited references, because we conclude that the totality of Appellant's evidence of nonobviousness leads to the conclusion that the claims under reexamination would not have been obvious. We do not sustain the Examiner's § 103(a) rejection of claims 9–12 and 19.

Appeal 2019-003250
Reexamination Control 90/013,861
Patent No. 9,213,357 B2

## CONCLUSION

Appellant has adduced objective evidence that leads to a conclusion that the claims under reexamination would not have been obvious to the person having ordinary skill in the art.

## ORDER

The Examiner's decision to reject claims 9–12 and 19 is reversed.

## <u>REVERSED</u>

Exhibit 14

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 15536243 |
| **Application Number:** | 13864250 |
| **International Application Number:** | |
| **Confirmation Number:** | 2371 |
| **Title of Invention:** | SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES |
| **First Named Inventor/Applicant Name:** | Nicholas A.J. Millington |
| **Customer Number:** | 109473 |
| **Filer:** | Robert Johnson Irvine |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | 71301.US.12 / 13-0403 |
| **Receipt Date:** | 17-APR-2013 |
| **Filing Date:** | |
| **Time Stamp:** | 02:06:55 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $1600 |
| RAM confirmation Number | 7000 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

| 1 | Application Data Sheet | ADS-71301_US_12.pdf | 1064871<br><br>accfa71b0aa95900e885befb8ef5a6a66360eab4 | no | 6 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | | 71301_US-Specification.pdf | 3285365<br><br>f36f9701ab8cd3989b81f8a21d1704052bc7bca | yes | 67 |
|---|---|---|---|---|---|

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Specification | 1 | 58 |
| Claims | 59 | 61 |
| Abstract | 62 | 62 |
| Drawings-only black and white line drawings | 63 | 67 |

**Warnings:**

**Information:**

| 3 | Oath or Declaration filed | 13297000-Dec.pdf | 52966<br><br>b421f9358bd38188761d3667976f972dcfdfa526 | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 4 | | 71301US12_PA.pdf | 92462<br><br>4d147ca2dd47420e0c562d9dcbfd310e9f2ec06b | yes | 8 |
|---|---|---|---|---|---|

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Preliminary Amendment | 1 | 1 |
| Specification | 2 | 2 |
| Abstract | 3 | 3 |
| Claims | 4 | 7 |
| Applicant Arguments/Remarks Made in an Amendment | 8 | 8 |

**Warnings:**

**Information:**

| 5 | Fee Worksheet (SB06) | fee-info.pdf | 33250<br><br>76e794566741366a392709ca82dbc07d9d824c43 | no | 2 |

**Warnings:**

**Information:**

| Total Files Size (in bytes): | 4528914 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Atty. Dkt. No. SNS-71301.US.12

## *IN THE UNITED STATES PATENT AND TRADEMARK OFFICE*

Applicant:      Nicholas A.J. Millington

Title:           SYSTEM AND METHOD FOR
                    SYNCHRONIZING OPERATIONS
                    AMONG A PLURALITY OF
                    INDEPENDENTLY CLOCKED DIGITAL
                    DATA PROCESSING DEVICES

Appl. No.:      TBD

Filing Date:    04/16/2013

Examiner:     TBD

Art Unit:      TBD

Confirmation
Number:

## PRELIMINARY AMENDMENT

Sir:

      Please enter the following amendments prior to examination of the application.

      **Amendments to the Specification** are presented on page 2;

      **Amendments to the Abstract** are presented on page 3;

      **Amendments to the Claims** are reflected in the listing of claims that begins on page 4 of this document.

      **Remarks/Arguments** begin on page 8 of this document.

Atty. Dkt. No. SNS-71301.US.12

**Amendments to the Specification:**

On page 1 of the specification, please replace the first paragraph after the section heading "Incorporation By Reference" with the new paragraph as follows:

This application claims priority under 35 USC §120 of US Application No. 13/297,000, filed November 15, 2011, entitled "System And Method For Synchronizing Operations Among A Plurality Of Independently Clocked Digital Data Processing Devices", which is a continuation of Patent Application Serial No. 10/816,217, now US Patent 8,234,395, filed on April 1, 2004, entitled "System and Method for Synchronizing Channel Handoff as Among a Plurality of Independently Clocked Digital Devices", which is a non-provisional application claiming priority under 35 USC §119 to Provisional Patent Application Serial No. 60/490,768, filed on July 28, 2003, entitled "Method for Synchronizing Audio Playback Between Multiple Networked Devices," now expired, all of which are assigned to the assignee of the present application and are incorporated herein by reference.

Atty. Dkt. No. SNS-71301.US.12

Please amend the application as follows:

**Amendments to the Abstract:**

Please replace the Abstract with the new abstract as follows:

In a network comprising a first zone player, wherein the first zone player is a member of a first synchrony group, a method comprising: playing, at the first zone player, audio information associated with the first synchrony group; receiving, at the first zone player, control information from a user interface module, wherein the control information directs the first zone player to disengage from the first synchrony group and to join a second synchrony group; disengaging, by the first zone player based on the received control information, the first zone player from the first synchrony group; joining, by the first zone player based on the received control information, the first zone player to the second synchrony group; and playing, by the first zone player, audio information associated with the second synchrony group.

Atty. Dkt. No. SNS-71301.US.12

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

1-20    (cancelled)

21.    (new) In a network comprising a first zone player, wherein the first zone player is a member of a first synchrony group, a method comprising:

playing, at the first zone player, audio information associated with the first synchrony group;

receiving, at the first zone player, control information from a user interface module, wherein the control information directs the first zone player to disengage from the first synchrony group and to join a second synchrony group;

disengaging, by the first zone player based on the received control information, the first zone player from the first synchrony group;

joining, by the first zone player based on the received control information, the first zone player to the second synchrony group; and

playing, by the first zone player, audio information associated with the second synchrony group.


22.    (new) The method of claim 21, wherein disengaging, by the first zone player based on the received control information, the first zone player from the first synchrony group comprises:

transmitting, by the first zone player, a notification to a second zone player, the transmission indicating that the first zone player is disengaging from the first synchrony group.


23.    (new) The method of claim 22, wherein the second zone player is a master device of the first synchrony group.


24.    (new) The method of claim 21, wherein prior to disengaging the first zone player is a master device of the first synchrony group, and wherein disengaging, by the first zone player

Atty. Dkt. No. SNS-71301.US.12

based on the received control information, the first zone player from the first synchrony group comprises:

transmitting, by the first zone player, a notification to a second zone player, the transmission indicating that the second zone player is to become a master device of the first synchrony group.

25.    (new) The method of claim 21, wherein joining, by the first zone player based on the received control information, the first zone player to the second synchrony group comprises:

transmitting, by the first zone player, a notification to a third zone player, wherein the third zone player is a master device of the second synchrony group, and wherein the notification indicates that the first zone player is joining the second synchrony group.

26.    (new) The method of claim 25, further comprising:

receiving, by the first zone player, audio information associated with the second synchrony group.

27.    (new) The method of claim 26, further comprising:

receiving, by the first zone player, playback timing information associated with the second synchrony group.

28.    (new) A tangible computer-readable memory having instructions stored thereon that when executed cause a first zone player to:

play audio information associated with the first synchrony group;

receive control information from a user interface module, wherein the control information directs the first zone player to disengage from the first synchrony group and to join a second synchrony group;

disengage from the first synchrony group based on the received control information;

join the second synchrony group; and

play audio information associated with the second synchrony group.

Atty. Dkt. No. SNS-71301.US.12

29.    (new) The computer-readable memory of claim 28, wherein the instructions that cause the first zone player to disengage from the first synchrony group further comprise instructions that cause the first zone player to:

transmit a notification to a second zone player, the notification indicating that the first zone player is disengaging from the first synchrony group.

30.    (new) The computer-readable memory of claim 29, wherein the second zone player is a master device of the first synchrony group.

31.    (new) The computer-readable memory of claim 28, further comprising instructions that when executed cause the first zone player to:

transmit a notification to a second zone player, the transmission indicating that the second zone player is to become a master device of the first synchrony group, wherein the first zone player transmits the notification when it is currently the master device of the first synchrony group.

32.    (new) The computer-readable memory of claim 28, wherein the instructions that cause the first zone player to join the second synchrony group further comprise instructions that cause the first zone player to:

transmit a notification to a third zone player, wherein the third zone player is a master device of the second synchrony group, and wherein the notification indicates that the first zone player is joining the second synchrony group.

33.    (new) The computer-readable medium of claim 32, further comprising instructions that when executed cause the first zone player to:

receive audio information associated with the second synchrony group.

34.    (new) The computer-readable medium of claim 33, further comprising instructions that when executed cause the first zone player to:

receive playback timing information associated with the second synchrony group.

Atty. Dkt. No. SNS-71301.US.12

35.    (new) A zone player comprising:

a network interface configured to receive control information from a user interface module;

an audio reproduction device configured to playback audio information;

a control module configured to, based on the control information received from the network interface, cause the zone player to (i) disengage from a first synchrony group of which the zone player is a member, (ii) join a second synchrony group, and (iii) playback audio information at the audio reproduction device, wherein the audio information is associated with the second synchrony group.

36.    (new) The zone player of claim 35, wherein the control module is further configured to transmit, via the network interface, a notification to a second zone player, the notification indicating that the zone player is disengaging from the first synchrony group.

37.    (new) The zone player of claim 36, wherein the second zone player is a master device of the first synchrony group.

38.    (new) The zone player of claim 35, wherein the control module is further configured to transmit, when the zone player is a master device of the first synchrony group, a notification to a second zone player, the notification indicating that the second zone player is to become a master device of the first synchrony group.

39.    (new) The system of claim 35, wherein the control module is further configured to transmit, via the network interface, a notification to a third zone player, wherein the third zone player is a master device of the second synchrony group, and wherein the notification indicates that the zone player is joining the second synchrony group.

40.    (new) The system of claim 35, wherein the audio reproduction device is configured to playback audio information received via the network interface.

Atty. Dkt. No. SNS-71301.US.12

**<u>REMARKS</u>**

      Applicants request that the above-presented amendments are entered prior to examination. The Examiner is invited to contact the undersigned if it would be helpful to advance the prosecution of the application.

                    Respectfully submitted,

Date: <u>April 16, 2013</u>            By:    <u>/Robert J. Irvine III/</u>

TechLaw LLP                       Robert J. Irvine III
Telephone:    (312) 834-4334       Attorney for Applicant
                                        Registration No. 41,865

ATTORNEY'S DOCKET NO. 11-0901

PATENTS

UNITED STATES PATENT APPLICATION

OF

NICHOLAS A. J. MILLINGTON

FOR

SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A PLURALITY OF
INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES

## INCORPORATION BY REFERENCE

This application claims the benefit of Provisional Patent Application Serial No. 60/490,768, filed on July 28, 2003, entitled "Method for Synchronizing Audio Playback Between Multiple Networked Devices," and Non-provisional Patent Application Serial No. 10/816,217, filed on April 1, 2004, entitled "System and Method for Synchronizing Channel Handoff as Among a Plurality of Independently Clocked Digital Devices," both of which are assigned to the assignee of the present application and are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates generally to the field of digital data processing devices, and more particularly to systems and methods for synchronizing operations among a plurality of independently-clocked digital data processing devices. The invention is embodied in a system for synchronizing operations among a plurality of devices, in relation to information that is provided by a common source. One embodiment of the invention enables synchronizing of audio playback as among two or more audio playback devices that receive audio information from a common information source, or channel.

More generally, the invention relates to the field of arrangements that synchronize output generated by a number of output generators, including audio output, video output, combinations of audio and video, as well as other types of output as will be appreciated by those skilled in the art, provided by a common channel. Generally, the invention will find utility in connection with any type of information for which synchrony among independently-clocked devices is desired.

## BACKGROUND OF THE INVENTION

There are a number of circumstances under which it is desirable to maintain synchrony of operations among a plurality of independently-clocked digital data processing devices in relation to, for example, information that is provided thereto by a common source. For example, systems are

1    being developed in which one audio information source can distribute audio information in digital

2    form to a number of audio playback devices for playback. The audio playback devices receive the

3    digital information and convert it to analog form for playback. The audio playback devices may be

4    located in the same room or they may be distributed in different rooms in a residence such as a house

5    or an apartment, in different offices in an office building, or the like. For example, in a system

6    installed in a residence, one audio playback device may be located in a living room, while another

7    audio playback device is be located in a kitchen, and yet other audio playback devices may be

8    located in various bedrooms of a house. In such an arrangement, the audio information that is

9    distributed to various audio playback devices may relate to the same audio program, or the

10   information may relate to different audio programs. If the audio information source provides audio

11   information relating to the same audio program to two or more audio playback devices at the same

12   time, the audio playback devices will generally contemporaneously play the same program. For

13   example, if the audio information source provides audio information to audio playback devices

14   located in the living room and kitchen in a house at the same time, they will generally

15   contemporaneously play the same program.

16   One problem that can arise is to ensure that, if two or more audio playback devices are

17   contemporaneously attempting to play back the same audio program, they do so simultaneously.

18   Small differences in the audio playback devices' start times and/or playback speeds can be perceived

19   by a listener as an echo effect, and larger differences can be very annoying. Differences can arise

20   because for a number of reasons, including delays in the transfer of audio information over the

21   network. Such delays can differ as among the various audio playback devices for a variety of

22   reasons, including where they are connected into the network, message traffic and other reasons as

23   will be apparent to those skilled in the art.

24   Another problem arises from the following. When an audio playback device converts the

25   digital audio information from digital to analog form, it does so using a clock that provides timing

26   information. Generally, the audio playback devices that are being developed have independent

27   clocks, and, if they are not clocking at precisely the same rate, the audio playback provided by the

28   various devices can get out of synchronization.

-2-

1                                    SUMMARY OF THE INVENTION

2              The invention provides a new and improved system and method for synchronizing operations

3      among a number of digital data processing devices that are regulated by independent clocking

4      devices.  Generally, the invention will find utility in connection with any type of information for

5      which synchrony among devices connected to a network is desired.  The invention is described in

6      connection with a plurality of audio playback devices that receive digital audio information that is

7      to be played back in synchrony, but it will be appreciated that the invention can find usefulness in

8      connection with any kind of information for which coordination among devices that have

9      independent clocking devices would find utility.

10             In brief summary, the invention provides, in one aspect, a system for maintaining synchrony

11     of operations among a plurality of devices that have independent clocking arrangements.  The system

12     includes a task distribution device that distributes tasks to a synchrony group comprising a plurality

13     of devices that are to perform the tasks distributed by the task distribution device in synchrony.  The

14     task distribution device distributes each task to the members of the synchrony group over a network.

15     Each task is associated with a time stamp that indicates a time, relative to a clock maintained by the

16     task distribution device, at which the members of the synchrony group are to execute the task.  Each

17     member of the synchrony group periodically obtains from the task distribution device an indication

18     of the current time indicated by its clock, determines a time differential between the task distribution

19     device's clock and its respective clock and determines therefrom a time at which, according to its

20     respective clock, the time stamp indicates that it is to execute the task.

21             In one embodiment, the tasks that are distributed include audio information for an audio track

22     that is to be played by all of the devices comprising the synchrony group synchronously.  The audio

23     track is divided into a series of frames, each of which is associated with a time stamp indicating the

24     time, relative to the clock maintained by an audio information channel device, which, in that

25     embodiment, serves as the task distribution device, at which the members of the synchrony group

26     are to play the respective frame.  Each member of the synchrony group, using a very accurate

-3-

1     protocol, periodically obtains the time indicated by the audio information channel device, and

2     determines a differential between the time as indicated by its local clock and the audio information

3     channel device's clock. The member uses the differential and the time as indicated by the time stamp

4     to determine the time, relative to its local clock, at which it is to play the respective frame. The

5     members of the synchrony group do this for all of the frames, and accordingly are able to play the

6     frames in synchrony.

7                                 **BRIEF DESCRIPTION OF THE DRAWINGS**

8               This invention is pointed out with particularity in the appended claims. The above and

9     further advantages of this invention may be better understood by referring to the following

10    description taken in conjunction with the accompanying drawings, in which:

11              FIG. 1 schematically depicts an illustrative networked audio system, constructed in

12    accordance with the invention;

13              FIG. 2 schematically depicts a functional block diagram of a synchrony group utilizing a

14    plurality of zone players formed within the networked audio system depicted in FIG. 1;

15              FIG. 2A schematically depicts two synchrony groups, illustrating how a member of one

16    synchrony group can provide audio information to the members of another synchrony group;

17              FIG. 3 depicts an functional block diagram of a zone player for use in the networked audio

18    system depicted in FIG. 1; and

19              FIG. 4 is useful in understanding an digital audio information framing methodology useful

20    in the network audio system depicted in FIG. 1.

-4-

1              **DETAILED DESCRIPTION OF AN ILLUSTRATIVE EMBODIMENT**

2         FIG. 1 depicts an illustrative network audio system 10 constructed in accordance with the

3 invention. With reference to FIG. 1, the network audio system 10 includes a plurality of zone

4 players 11(1) through 11(N) (generally identified by reference numeral 11(n)) interconnected by a

5 local network 12, all of which operate under control of one or more user interface modules generally

6 identified by reference numeral 13. One or more of the zone players 11(n) may also be connected

7 to one or more audio information sources, which will generally be identified herein by reference

8 numeral 14(n)(s), and/or one or more audio reproduction devices, which will generally be identified

9 by reference numeral 15(n)(r). In the reference numeral 14(n)(s), index "n" refers to the index "n"

10 of the zone player 11(n) to which the audio information source is connected, and the index "s"

11 $(s=1,...,S_n)$ refers to the "s-th" audio information source connected to that "n-th" zone player 11(n).

12 Thus, if, for example, a zone player 11(n) is connected to four audio information sources 14(n)(1)

13 through 14(n)(4), the audio information sources may be generally identified by reference numeral

14 14(n)(s), with $S_n$=4. It will be appreciated that the number of audio information sources $S_n$ may vary

15 as among the various zone players 11(n), and some zone players may not have any audio information

16 sources connected thereto. Similarly, in the reference numeral 15(n)(r), index "n" refers to the index

17 "n" of the zone player 11(n) to which the audio reproduction device is connected, and the index "r"

18 $(r=1,...,R_n)$ refers to the "r-th" audio information source connected to that "n-th" zone player 11(n).

19 In addition to the audio information sources 14(n)(s), the network audio system 10 may include one

20 or more audio information sources 16(1) through 16(M) connected through appropriate network

21 interface devices (not separately shown) to the local network 12. Furthermore, the local network

22 may include one or more network interface devices (also not separately shown) that are configured

23 to connect the local network 12 to other networks, including a wide area network such as the

24 Internet, the public switched telephony network (PSTN) or other networks as will be apparent to

25 those skilled in the art, over which connections to audio information sources may be established.

1    The zone players 11(n) associated with system 10 may be distributed throughout an
2    establishment such as residence, an office complex, a hotel, a conference hall, an amphitheater or
3    auditorium, or other types of establishments as will be apparent to those skilled in the art or the like.
4    For example, if the zone players 11(n) and their associated audio information source(s) and/or audio
5    reproduction device(s) are distributed throughout a residence, one, such as zone player 11(1) and its
6    associated audio information source(s) and audio reproduction device(s) may be located in a living
7    room, another may be located in a kitchen, another may be located in a dining room, and yet others
8    may be located in respective bedrooms, to selectively provide entertainment in those rooms.  On the
9    other hand, if the zone players 11(n) and their associated audio information source(s) and/or audio
10   reproduction device(s) are distributed throughout an office complex, one may, for example, be
11   provided in each office to selectively provide entertainment to the employees in the respective
12   offices. Similarly, if the zone players 11(n) and associated audio information source(s) and/or audio
13   reproduction device(s) are used in a hotel, they may be distributed throughout the rooms to provide
14   entertainment to the guests.  Similar arrangements may be used with zone players 11(n) and
15   associated audio information source(s) and/or audio reproduction device(s) used in an amphitheater
16   or auditorium.  Other arrangements in other types of environments will be apparent to those skilled
17   in the art. In each case, the zone players 11(n) can be used to selectively provide entertainment in
18   the respective locations, as will be described below.

19   The audio information sources 14(n)(s) and 16(m) may be any of a number of types of
20   conventional sources of audio information, including, for example, compact disc ("CD") players,
21   AM and/or FM radio receivers, analog or digital tape cassette players, analog record turntables and
22   the like. In addition, the audio information sources 14(n)(s) and 16(m) may comprise digital audio
23   files stored locally on, for example, personal computers (PCs), personal digital assistants (PDAs),
24   or similar devices capable of storing digital information in volatile or non-volatile form.  As noted
25   above, the local network 12 may also have an interface (not shown) to a wide area network, over
26   which the network audio system 10 can obtain audio information.  Moreover, one or more of the
27   audio information sources 14(n)(s) may also comprise an interface to a wide area network such as
28   the Internet, the public switched telephony network (PSTN) or any other source of audio

-6-

1    information.  In addition, one or more of the audio information sources 14(n)(s) and 16(m) may
2    comprise interfaces to radio services delivered over, for example, satellite.  Audio information
3    obtained over the wide area network may comprise, for example, streaming digital audio information
4    such as Internet radio, digital audio files stored on servers, and other types of audio information and
5    sources as will be appreciated by those skilled in the art.  Other arrangements and other types of
6    audio information sources will be apparent to those skilled in the art.

7         Generally, the audio information sources 14(n)(s) and 16(m) provide audio information
8    associated with audio programs to the zone players for playback.  A zone player that receives audio
9    information from an audio information source 14(n)(s) that is connected thereto can provide
10   playback and/or forward the audio information, along with playback timing information, over the
11   local network 12 to other zone players for playback.   Similarly, each audio information source
12   16(m) that is not directly connected to a zone player can transmit audio information over the network
13   12 to any zone player 11(n) for playback.  In addition, as will be explained in detail below, the
14   respective zone player 11(n) can transmit the audio information that it receives either from an audio
15   information source 14(n)(s) connected thereto, or from an audio information source 16(m), to
16   selected ones of the other zone players 11(n'), 11(n"),... (n not equal to n', n",...) for playback by
17   those other zone players.  The other zone players 11(n'), 11(n"),... to which the zone player 11(n)
18   transmits the audio information for playback may be selected by a user using the user interface
19   module 13.  In that operation, the zone player 11(n) will transmit the audio information to the
20   selected zone players 11(n'), 11(n"),... over the network 12.  As will be described below in greater
21   detail, the zone players 11(n), 11(n'), 11(n"),... operate such that the zone players 11(n'), 11(n"),...
22   synchronize their playback of the audio program with the playback by the zone player 11(n), so that
23   the zone players 11(n), 11(n'), 11(n") provide the same audio program at the same time.

24        Users, using user interface module 13, may also enable different groupings or sets of zone
25   players to provide audio playback of different audio programs synchronously. For example, a user,
26   using a user interface module 13, may enable zone players 11(1) and 11(2) to play one audio
27   program, audio information for which may be provided by, for example, one audio information
28   source 14(1)(1).  The same or a different user may, using the same or a different user interface

-7-

1    module 13, enable zone players 11(4) and 11(5) to contemporaneously play another audio program,

2    audio information for which may be provided by a second audio information source, such as audio

3    information source 14(5)(2). Further, a user may enable zone player 11(3) to contemporaneously

4    play yet another audio program, audio information for which may be provided by yet another audio

5    information source, such as audio information source 16(1). As yet another possibility, a user may

6    contemporaneously enable zone player 11(1) to provide audio information from an audio

7    information source connected thereto, such as audio information source 14(1)(2), to another zone

8    player, such as zone player 11(6) for playback.

9          In the following, the term "synchrony group" will be used to refer to a set of one or more

10    zone players that are to play the same audio program synchronously. Thus, in the above example,

11    zone players 11(1) and 11(2) comprise one synchrony group, zone player 11(3) comprises a second

12    synchrony group, zone players 11(4) and 11(5) comprise a third synchrony group, and zone player

13    11(6) comprises yet a fourth synchrony group. Thus, while zone players 11(1) and 11(2) are playing

14    the same audio program, they will play the audio program synchronously. Similarly, while zone

15    players 11(4) and 11(5) are playing the same audio program, they will play the audio program

16    synchronously. On the other hand, zone players that are playing different audio programs may do

17    so with unrelated timings. That is, for example, the timing with which zone players 11(1) and 11(2)

18    play their audio program may have no relationship to the timing with which zone player 11(3), zone

19    players 11(4) and 11(5), and zone player 11(6) play their audio programs. It will be appreciated that,

20    since "synchrony group" is used to refer to sets of zone players that are playing the same audio

21    program synchronously, zone player 11(1) will not be part of zone player 11(6)'s synchrony group,

22    even though zone player 11(1) is providing the audio information for the audio program to zone

23    player 11(6).

24          In the network audio system 10, the synchrony groups are not fixed. Users can enable them

25    to be established and modified dynamically. Continuing with the above example, a user may enable

26    the zone player 11(1) to begin providing playback of the audio program provided thereto by audio

27    information source 14(1)(1), and subsequently enable zone player 11(2) to join the synchrony group.

28    Similarly, a user may enable the zone player 11(5) to begin providing playback of the audio program

1   provided thereto by audio information source 14(5)(2), and subsequently enable zone player 11(4)

2   to join that synchrony group.  In addition, a user may enable a zone player to leave a synchrony

3   group and possibly join another synchrony group.  For example, a user may enable the zone player

4   11(2) to leave the synchrony group with zone player 11(1), and join the synchrony group with zone

5   player 11(6).  As another possibility, the user may enable the zone player 11(1) to leave the

6   synchrony group with zone player 11(2) and join the synchrony group with zone player 11(6).  In

7   connection with the last possibility, the zone player 11(1) can continue providing audio information

8   from the audio information source 14(1)(1) to the zone player 11(2) for playback thereby.

9          A user, using the user interface module 13, can enable a zone player 11(n) that is currently

10  not a member of a synchrony group to join a synchrony group, after which it will be enabled to play

11  the audio program that is currently being played by that synchrony group.  Similarly, a user, also

12  using the user interface module 13, can enable a zone player 11(n) that is currently a member of one

13  synchrony group, to disengage from that synchrony group and join another synchrony group, after

14  which that zone player will be playing the audio program associated with the other synchrony group.

15  For example, if a zone player 11(6) is currently not a member of any synchrony group, it, under

16  control of the user interface module 13, can become a member of a synchrony group, after which it

17  will play the audio program being played by the other members of the synchrony group, in

18  synchrony with the other members of the synchrony group.  In becoming a member of the synchrony

19  group, zone player 11(6) can notify the zone player that is the master device for the synchrony group

20  that it wishes to become a member of its synchrony group, after which that zone player will also

21  transmit audio information associated with the audio program, as well as timing information, to the

22  zone player 11(6).  As the zone player 11(6) receives the audio information and the timing

23  information from the master device, it will play the audio information with the timing indicated by

24  the timing information, which will enable the zone player 11(6) to play the audio program in

25  synchrony with the other zone player(s) in the synchrony group.

26         Similarly, if a user, using the user interface module 13, enables a zone player 11(n)

27  associated with a synchrony group to disengage from that synchrony group, and if the zone player

28  11(n) is not the master device of the synchrony group, the zone player 11(n) can notify the master

-9-

1    device, after which the master device can terminate transmission of the audio information and timing

2    information to the zone player 11(n). If the user also enables the zone player 11(n) to begin playing

3    another audio program using audio information from an audio information source 14(n)(s) connected

4    thereto, it will acquire the audio information from the audio information source 14(n)(s) and initiate

5    playback thereof. If the user enables another zone player 11(n') to join the synchrony group

6    associated with zone player 11(n), operations in connection therewith can proceed as described

7    immediately above.

8           As yet another possibility, if a user, using the user interface module 13, enables a zone player

9    11(n) associated with a synchrony group to disengage from that synchrony group and join another

10   synchrony group, and if the zone player is not the master device of the synchrony group from which

11   it is disengaging, the zone player 11(n) can notify the master device of the synchrony group from

12   which it is disengaging, after which that zone player will terminate transmission of audio

13   information and timing information to the zone player 11(n) that is disengaging.

14   Contemporaneously, the zone player 11(n) can notify the master device of the synchrony group that

15   it (that is, zone player 11(n)) is joining, after which the master device can begin transmission of

16   audio information and timing information to that zone player 11(n). The zone player 11(n) can

17   thereafter begin playback of the audio program defined by the audio information, in accordance with

18   the timing information so that the zone player 11(n) will play the audio program in synchrony with

19   the master device.

20          As yet another possibility, a user, using the user interface module 13,  may enable a zone

21   player 11(n) that is not associated with a synchrony group, to begin playing an audio program using

22   audio information provided to it by an audio information source 14(n)(s) connected thereto. In that

23   case, the user, also using the user interface module 13 or a user interface device that is specific to

24   the audio information source 14(n)(s), can enable the audio information source 14(n)(s) to provide

25   audio information to the zone player 11(n). After the zone player 11(n) has begun playback, or

26   contemporaneously therewith, the user, using the user interface module 13, can enable other zone

27   players 11(n'), 11(n''),... to join zone player 11(n)'s synchrony group and enable that zone player

1    11(n) to transmit audio information and timing information thereto as described above, to facilitate

2    synchronous playback of the audio program by the other zone players 11(n'), 11(n")....

3          A user can use the user interface module 13 to control other aspects of the network audio

4    system 10, including but not limited to the selection of the audio information source 14(n)(s) that

5    a particular zone player 11(n) is to utilize, the volume of the audio playback, and so forth.  In

6    addition, a user may use the user interface module 13 to turn audio information source(s) 14(n)(s)

7    on and off and to enable them to provide audio information to the respective zone players 11(n).

8          Operations performed by the various devices associated with a synchrony group will be

9    described in connection with FIG. 2, which schematically depicts a functional block diagram of a

10   synchrony group in the network audio system 10 described above in connection with FIG. 1.  With

11   reference to FIG. 2, a synchrony group 20 includes a master device 21 and zero or more slave

12   devices 22(1) through 22 (G) (generally identified by reference numeral 22(g)), all of which

13   synchronously play an audio program provided by an audio information channel device 23.  Each

14   of the master device 21, slave devices 22(g) and audio information channel device 23 utilizes a zone

15   player 11(n) depicted in FIG. 1, although it will be clear from the description below that a zone

16   player may be utilized both for the audio information channel device for the synchrony group 20,

17   and the master device 21 or a slave device 22(g) of the synchrony group 20.  As will be described

18   below in more detail, the audio information channel device 23 obtains the audio information for the

19   audio program from an audio information source, adds playback timing information, and transmits

20   the combined audio and playback timing information to the master device 21 and slave devices 22(g)

21   over the network 12 for playback.  The playback timing information that is provided with the audio

22   information, together with clock timing information provided by the audio information channel

23   device 23 to the various devices 21 and 22(g) as will be described below, enables the master device

24   21 and slave devices 22(g) of the synchrony group 20 to play the audio information simultaneously.

25         The master device 21 and the slave devices 22(g) receive the audio and playback timing

26   information, as well as the clock timing information, that are provided by the audio information

27   channel device 23, and play back the audio program defined by the audio information.  The master

Case 1:24-cv-00131-JNR    Document 188-3    Filed 06/05/25    Page 271 of 608 PageID
#: 11564 .

11-0901

1    device 21 is also the member of the synchrony group 20 that communicates with the user interface

2    module 13 and that controls the operations of the slave devices 22(g) in the synchrony group 20.

3    In addition, the master device 21 controls the operations of the audio information channel device 23

4    that provides the audio and playback timing information for the synchrony group 20. Generally, the

5    initial master device 21 for the synchrony group will be the first zone player 11(n) that a user wishes

6    to play an audio program. However, as will be described below, the zone player 11(n) that operates

7    as the master device 21 can be migrated from one zone player 11(n) to another zone player 11(n'),

8    which preferably will be a zone player that is currently operating as a slave device 22(g) in the

9    synchrony group.

10        In addition, under certain circumstances, as will be described below, the zone player 11(n)

11    that operates as the audio information channel device 23 can be migrated from one zone player to

12    another zone player, which also will preferably will be a zone player that is currently operating as

13    a member of the synchrony group 20. It will be appreciated that the zone player that operates as the

14    master device 21 can be migrated to another zone player independently of the migration of the audio

15    information channel device 23. For example, if one zone player 11(n) is operating as both the master

16    device 21 and the audio information channel device 23 for a synchrony group 20, the master device

17    21 can be migrated to another zone player 11(n') while the zone player 11(n) is still operating as the

18    audio information channel device 23. Similarly, if one zone player 11(n) is operating as both the

19    master device 21 and the audio information channel device 23 for a synchrony group 20, the audio

20    information channel device 23 can be migrated to another zone player 11(n') while the zone player

21    11(n) is still operating as the master device 21. In addition, if one zone player 11(n) is operating as

22    both the master device 21 and the audio information channel device 23 for a synchrony group 20,

23    the master device 21 can be migrated to another zone player 11(n') and the audio information

24    channel device can be migrated to a third zone player 11(n").

25        The master device 21 receives control information from the user interface module 13 for

26    controlling the synchrony group 20 and provides status information indicating the operational status

27    of the synchrony group to the user interface module 13. Generally, the control information from the

28    user interface module 13 enables the master device 21 to, in turn, enable the audio information

-12-

1  channel device 23 to provide audio and playback timing information to the synchrony group to
2  enable the devices 21 and 22(g) that are members of the synchrony group 20 to play the audio
3  program synchronously.  In addition, the control information from the user interface module 13
4  enables the master device 21 to, in turn, enable other zone players to join the synchrony group as
5  slave devices 22(g) and to enable slave devices 22(g) to disengage from the synchrony group.
6  Control information from the user interface module 13 can also enable the zone player 11(n) that is
7  currently operating as the master device 21 to disengage from the synchrony group, but prior to
8  doing so that zone player will enable the master device 21 to transfer from that zone player 11(n) to
9  another zone player 11(n'), preferably to a zone player 11(n') that is currently a slave device 22(g) in
10  the synchrony group 20.  The control information from the user interface module 13 can also enable
11  the master device 21 to adjust its playback volume and to enable individual ones of the various slave
12  devices 22(g) to adjust their playback volumes.  In addition, the control information from the user
13  interface module 13 can enable the synchrony group 20 to terminate playing of a current track of the
14  audio program and skip to the next track, and to re-order tracks in a play list of tracks defining the
15  audio program that is to be played by the synchrony group 20.

16      The status information that the master device 21 may provide to the user interface module
17  13 can include such information as a name or other identifier for the track of the audio work that is
18  currently being played, the names or other identifiers for upcoming tracks, the identifier of the zone
19  player 11(n) that is currently operating as the master device 21, and identifiers of the zone players
20  that are currently operating as slave devices 22(g).  In one embodiment, the user interface module
21  13 includes a display (not separately shown) that can display the status information to the user.

22      It will be appreciated that the zone player 11(n) that is operating as the audio information
23  channel device 23 for one synchrony group may also comprise the master device 21 or any of the
24  slave devices 22(g) in another synchrony group.  This may occur if, for example, the audio
25  information source that is to provide the audio information that is to be played by the one synchrony
26  group is connected to a zone player also being utilized as the master device or a slave device for the
27  other synchrony group.  This will be schematically illustrated below in connection with FIG. 2A.
28  Since, as noted above, the zone player 11(n) that is operating as the audio information channel

-13-

1    device 23 for the synchrony group 20 may also be operating as a master device 21 or slave device
2    22(g) for another synchrony group, it can also be connected to one or more audio reproduction
3    devices 15(n)(r), although that is not depicted in FIG. 2.  Since the master device 21 and slave
4    devices 22(g) are all to provide playback of the audio program, they will be connected to respective
5    audio reproduction devices 15(n)(r).   Furthermore, it will be appreciated that one or more of the
6    zone players 11(n) that operate as the master device 21 and slave devices 22(g) in synchrony group
7    20 may also operate as an audio information channel device for that synchrony group or for another
8    synchrony group and so they may be connected to one or more audio information sources 14(n)(s),
9    although that is also not depicted in FIG. 2.  In addition, it will be appreciated that a zone player
10   11(n) can also operate as a audio information channel device 23 for multiple synchrony groups.

11          If the audio information channel device 23 does not utilize the same zone player as the master
12   device 21, the master device 21 controls the audio information channel device by exchanging control
13   information over the network 12 with the audio information channel device 23.   The control
14   information is represented in FIG. 2 by the arrow labeled CHAN_DEV_CTRL_INFO.  The control
15   information that the master device 21 provides to the audio information channel device 23 will
16   generally depend on the nature of the audio information source that is to provide the audio
17   information for the audio program that is to be played and the operation to be enabled by the control
18   information.  If, for example, the audio information source is a conventional compact disc, tape, or
19   record player, broadcast radio receiver, or the like, which is connected to a zone player 11(n), the
20   master device 21 may merely enable the zone player serving as the audio information channel device
21   23 to receive the audio information for the program from the audio information source.  It will be
22   appreciated that, if the audio information is not in digital form, the audio information channel device
23   23 will convert it to digital form and provide the digitized audio information, along with the
24   playback timing information, to the master device 21 and slave devices 22(g).

25          On the other hand, if the audio information source is, for example, a digital data storage
26   device, such as may be on a personal computer or similar device, the master device 21 can provide
27   a play list to the audio information channel device 23 that identifies one or more files containing the
28   audio information for the audio program.  In that case, the audio information channel device 23 can

-14-

1    retrieve the files from the digital data storage device and provide them, along with the playback
2    timing information, to the master device 21 and the slave devices 22(g).  It will be appreciated that,
3    in this case, the audio information source may be directly connected to the audio information channel
4    device 23, as, for example, an audio information source 14(n)(s), or it may comprise an audio
5    information source 16(m) connected to the network 12.  As a further alternative, if the audio
6    information source is a source available over the wide area network, the master device 21 can
7    provide a play list comprising a list of web addresses identifying the files containing the audio
8    information for the audio program that is to be played, and in that connection the audio information
9    channel device 23 can initiate a retrieval of the files over the wide area network.  As yet another
10   alternative, if the audio information source is a source of streaming audio received over the wide area
11   network, the master device 21 can provide a network address from which the streaming audio can
12   be received.  Other arrangements by which the master device 21 can control the audio information
13   channel device 23 will be apparent to those skilled in the art.

14          The master device 21 can also provide control information to the synchrony group's audio
15   information channel device 23 to enable a migration from one zone player 11(n) to another zone
16   player 11(n').  This may occur if, for example, the audio information source is one of audio
17   information sources 16 or a source accessible over the wide area network via the network 12.  The
18   master device 21 can enable migration of the audio information channel device 23 for several
19   reasons, including, for example, to reduce the loading of the zone player 11(n), to improve latency
20   of message transmission in the network 12, and other reasons as will be appreciated by those skilled
21   in the art.

22          As noted above, the audio information channel device 23 provides audio and playback timing
23   information for the synchrony group to enable the master device 21 and slave devices 22(g) to play
24   the audio program synchronously.  Details of the audio and playback timing information will be
25   described in detail below in connection with FIGS. 3 and 4, but, in brief, the audio information
26   channel device 23 transmits the audio and playback timing information in messages over the network
27   12 using a multi-cast message transmission methodology.  In that methodology, the audio
28   information channel device 23 will transmit the audio and playback timing information in a series

-15-

1     of messages, with each message being received by all of the zone players 11(n) comprising the

2     synchrony group 20, that is, by the master device 21 and the slave devices 22(g). Each of the

3     messages includes a multi-cast address, which the master device 21 and slave devices 22(g) will

4     monitor and, when they detect a message with that address, they will receive and use the contents

5     of the message. The audio and playback timing information is represented in FIG. 2 by the arrow

6     labeled "AUD+PBTIME_INF0," which has a single tail, representing a source for the information

7     at the audio information channel device 23, and multiple arrowheads representing the destinations

8     of the information, with one arrowhead extending to the master device 21 and other arrowheads

9     extending to each of the slave devices 22(g) in the synchrony group 20. The audio information

10    channel device 23 may make use of any convenient multi-cast message transmission methodology

11    in transmitting the audio and playback timing information to the synchrony group 20. As will be

12    described in detail in connection with FIG. 4, the audio and playback timing information is in the

13    form of a series of frames, with each frame having a time stamp. The time stamp indicates a time,

14    relative to the time indicated by a clock maintained by the audio information channel device 23, at

15    which the frame is to be played. Depending on the size or sizes of the messages used in the selected

16    multi-cast message transmission methodology and the size or sizes of the frames, a message may

17    contain one frame, or multiple frames, or, alternatively, a frame may extend across several messages.

18         The audio information channel device 23 also provides clock time information to the master

19    device 21 and each of the slave devices 22(g) individually over network 12 using a highly accurate

20    clock time information transmission methodology. The distribution of the clock time information

21    is represented in FIG. 2 by the arrows labeled "AICD_CLK_INF (M)" (in the case of the clock time

22    information provided to the master device 21) and "AICD_CLK_INF $(S_1)$" through

23    "AICD_CLK_INF $(S_G)$" (in the case of audio information channel device clock information provided

24    to the slave devices 22(g)). In one embodiment, the master device 21 and slave devices 22(g) make

25    use of the well-known SNTP (Simple Network Time Protocol) to obtain current clock time

26    information from the audio information channel device 23. The SNTP makes use of a unicast

27    message transfer methodology, in which one device, such as the audio information channel device

28    23, provides clock time information to a specific other device, such as the master device 21 or a

1    slave device 22(g), using the other device's network, or unicast, address. Each of the master device
2    21 and slave devices 22(g) will periodically initiate SNTP transactions with the audio information
3    channel device 23 to obtain the clock time information from the audio information channel device
4    23. As will be described below in more detail, the master device 21 and each slave device 22(g)
5    make use of the clock time information to determine the time differential between the time indicated
6    by the audio information channel device's clock and the time indicated by its respective clock, and
7    use that time differential value, along with the playback time information associated with the audio
8    information and the respective device's local time as indicated by its clock to determine when the
9    various frames are to be played. This enables the master device 21 and the slave devices 22(g) in
10   the synchrony group 20 to play the respective frames simultaneously.

11         As noted above, the control information provided by the user to the master device 21 through
12   the user interface module 13 can also enable the master device 21 to, in turn, enable another zone
13   player 11(n') to join the synchrony group as a new slave device 22(g). In that operation, the user
14   interface module 13 will provide control information, including the identification of the zone player
15   11(n') that is to join the synchrony group to the master device 21. After it receives the identification
16   of the zone player 11(n') that is to join the synchrony group, the master device 21 will exchange
17   control information, which is represented in FIG. 2 by the arrows labeled SLV_DEV_CTRL_INF
18   ($S_1$) through SLV_DEV_CTRL_INF ($S_G$) group slave control information, over the network 12 with
19   the zone player 11(n') that is identified in the control information from the user interface module 13.
20   The control information that the master device 21 provides to the new zone player 11(n') includes
21   the network address of the zone player 11(n) that is operating as the audio information channel
22   device 23 for the synchrony group, as well as the multi-cast address that the audio information
23   channel device 23 is using to broadcast the audio and playback timing information over the network.
24   The zone player that is to operate as the new slave device 22(g') uses the multi-cast address to begin
25   receiving the multi-cast messages that contain the audio information for the audio program being
26   played by the synchrony group.

27         It will be appreciated that, if the zone player 11(n) that is operating as the master device 21
28   for the synchrony group 20 is also operating the audio information channel device 23, and if there

-17-

1    are no slave devices 22(g) in the synchrony group 20, the audio information channel device 23 may

2    not be transmitting audio and playback timing information over the network.  In that case, if the new

3    slave device 22(g') is the first slave device in the synchrony group, the zone player 11(n) that is

4    operating as both the master device 21 and audio information channel device 23, can begin

5    transmitting the audio and playback timing information over the network 12 when the slave device

6    22(g') is added to the synchrony group 20.  The zone player 11(n) can maintain a count of the

7    number of slave devices 22(g) in the synchrony group 20 as they join and disengage, and, if the

8    number drops to zero, it can stop transmitting the audio and playback timing information over the

9    network 12 to reduce the message traffic over the network 12.

10           The new slave device 22(g') added to the synchrony group 20 uses the network address of

11    the audio information channel device 23 for several purposes.  In particular, the new slave device

12    22(g') will, like the master device 21 (assuming the zone player 11(n) operating as the master device

13    21 is not also the audio information channel device 23), engage in SNTP transactions with the audio

14    information channel device 23 to obtain the clock timing information from the audio information

15    channel device 23. In addition, the new slave device 22(g') can notify the audio information channel

16    device 23 that it is a new slave device 22(g') for the synchrony group 20 and provide the audio

17    information channel device 23 with its network address.  As will be described below, in one

18    embodiment, particularly in connection with audio information obtained from a source, such as a

19    digital data storage device, which can provide audio information at a rate that is faster than the rate

20    at which it will be played, the audio information channel device 23 will buffer audio and timing

21    information and broadcast it over the network 12 to the synchrony group 20 generally at a rate at

22    which it is provided by the source.  Accordingly, when a new slave device 22(g') joins the synchrony

23    group 20, the playback timing information may indicate that the audio information that is currently

24    being broadcast by the audio information channel device 23 using the multi-cast methodology is to

25    be played back some time in the future.  To reduce the delay with which the new slave device 22(g')

26    will begin playback, the audio information channel device 23 can also retransmit previously

27    transmitted audio and timing information that it had buffered to the new slave device 22(g') using

28    the unicast network address of the slave device 22(g').

-18-

1        The master device 21 can also use the slave device control information exchanged with the

2    slave devices 22(g) for other purposes. For example, the master device 21 can use the slave device

3    control information to initiate a migration of the master from its zone player 11(n) to another zone

4    player 11(n'). This may occur for any of a number of reasons, including, for example, that the master

5    device 21 is terminating playback by it of the audio program and is leaving the synchrony group 20,

6    but one or more of the other devices in the synchrony group is to continue playing the audio

7    program. The master device 21 may also want to initiate a migration if it is overloaded, which can

8    occur if, for example, the zone player 11(n) that is the master device 21 for its synchrony group is

9    also operating as an audio information channel device 23 for another synchrony group.

10        The user can also use the user interface module 13 to adjust playback volume by the

11    individual zone players 11(n) comprising the synchrony group. In that operation, the user interface

12    module 13 provides information identifying the particular device whose volume is to be adjusted,

13    and the level at which the volume is to be set to the master device 21. If the device whose volume

14    is to be adjusted is the master device 21, the master device 21 can adjust its volume according to the

15    information that it receives from the user interface module 13. On the other hand, if the device

16    whose volume is to be adjusted is a slave device 22(g), the master device 21 can provide group slave

17    control information to the respective slave device 22(g), to enable it to adjust its volume.

18        The user can also use the user interface module 13 to enable a synchrony group 20 to cancel

19    playing of the track in an audio program that is currently being played, and to proceed immediately

20    to the next track. This may occur, for example, if the tracks for the program is in the form of a series

21    of digital audio information files, and the user wishes to cancel playback of the track that is defined

22    by one of the files. In that case, when the master device 21 receives the command to cancel playback

23    of the current track, it will provide channel device control information to the audio information

24    channel device 23 so indicating. In response, the audio information channel device 23 inserts control

25    information into the audio and playback timing information, which will be referred to as a

26    "resynchronize" command. In addition, the audio information channel device 23 will begin

27    transmitting audio information for the next track, with timing information to enable it to be played

-19-

1    immediately. The resynchronize command can also enable playback of a track to be cancelled

2    before it has been played. Details of these operations will be described below.

3         As noted above, there may be multiple synchrony groups in the network audio system 10,

4    and further that, for example, a zone player 11(n) may operate both as a master device 21 or a slave

5    device 22(g) in one synchrony group, and as the audio information channel device 23 providing

6    audio and playback timing information and clock timing information for another synchrony group.

7    An illustrative arrangement of this will be described in connection with FIG. 2A. With reference

8    to FIG. 2A, that FIG. depicts elements of two synchrony groups, identified by reference numerals

9    20(1) and 20(2), respectively. For clarity, FIG. 2A does not show a number of elements, the

10   presence of which would be evident from FIGS. 1 and 2 as described above. For example, FIG. 2A

11   does not depict the audio information sources from which audio information is obtained for the

12   synchrony groups or the audio  reproduction devices that are used to produce sound for the master

13   and slave devices, which are depicted in both FIGS. 1 and 2. In addition, FIG. 2A does not depict

14   arrows that represent control information provided by the respective master devices to the slave

15   devices in the respective synchrony groups, or to the audio information channel devices that provide

16   audio and timing information for the respective synchrony groups, which are depicted in FIG. 2. In

17   addition, FIG. 2A does not depict the arrows that represent the clock timing information provided

18   by the audio information channel devices to the respective members of the respective synchrony

19   groups, which are also depicted in FIG. 2. As will be noted below, however, FIG. 2A does depict

20   arrows representing the audio and playback timing information provided by the respective audio

21   information channel devices for the respective synchrony groups 20(1), 20(2), to the master and

22   slave devices comprising the respective synchrony groups 20(1), 20(2).

23        Each synchrony group 20(1), 20(2) comprises elements of a number of zone players. A

24   functional block diagram of a zone player will be described below in connection with FIG. 3.

25   Synchrony group 20(1) includes a master device 21(1) and "K" slave devices 22(1)(1) through

26   22(K)(1) (the index "1" in reference numeral 21(1) and the last index in reference numeral 22(1)(1)

27   through 21(K)(1) corresponds to the index of the synchrony group 20(1) to which they belong)

28   utilize zone players 11(1) and 11(K+1) respectively. Similarly,  synchrony group 20(2) includes a

-20-

1    master device 21(2) and "L" slave devices 22(1)(2) through 22(L)(2) that utilize zone players
2    11(K+2) through 11(K+L+2).  In the illustrative arrangement depicted in FIG. 2A, both synchrony
3    groups 20(1) and 20(2) are controlled by the user interface module 13, which can provide control
4    information to, and receive status information from, the master devices 21(1) and 21(2)
5    independently.  It will be appreciated that separate user interface modules may be provided to
6    provide control information to, and receive status information from, the respective master devices
7    21(1), 21(2).

8         As noted above, the slave device 22(1)(2) in synchrony group 20(2) utilizes zone player
9    11(K+3).  In the illustrative arrangement depicted in FIG. 2A, the audio information channel device
10   23(1) that provides audio and playback timing information to the master and slave devices 21(1),
11   22(1)(1),..., 22(K)(1) of synchrony group 20(1) also utilizes zone player 11(K+3).  As noted above,
12   this may occur if, for example, the audio information source that is to provide audio information to
13   be played by the synchrony group 20(1) is connected to the zone player 11(K+3).  Thus, when the
14   master device 21(1) of synchrony group 20(1) exchanges channel device control information with
15   the audio information channel device 23(1), it is effectively exchanging channel device control
16   information with the zone player 11(K+3).  Similarly, when the master and slave devices 21(1),
17   22(1)(1),..., 22(K)(1) of synchrony group 20(1) receive audio and playback timing information, as
18   well as clock timing information, from the audio information channel device 23(1), they are
19   effectively receiving the information from the zone player 11(K+3).  FIG. 2A depicts a multi-headed
20   arrow representing audio and playback timing information transmitted by the zone player 11(K+3),
21   as audio information channel device 23(1), to the master and slave devices 21(1),
22   22(1)(1),...,11(K)(1) comprising synchrony group 20(1).

23        On the other hand, in the illustrative arrangement depicted in FIG. 2A, the synchrony group
24   20(2) utilizes a zone player 11(K+L+3) as its audio information channel device 23(2).  As with
25   synchrony group 20(1), when the master device 21(2) of synchrony group 20(2) exchanges channel
26   device control information with the audio information channel device 23(2), it is effectively
27   exchanging channel device control information with the zone player 11(K+L+3).  Similarly, when
28   the master and slave devices 21(2), 22(1)(2),..., 22(L)(2) of synchrony group 20(2) receive audio and

-21-

1    playback timing information, as well as clock timing information, from the audio information

2    channel device 23(2), they are effectively receiving the information from the zone player

3    11(K+L+3). FIG. 2A depicts a multi-headed arrow representing audio and playback timing

4    information transmitted by the zone player 11(K+3) as audio information channel device 23(2) to

5    the master and slave devices 21(2), 22(1)(2),...,22(L)(2) comprising synchrony group 20(2).

6           In the illustrative arrangement depicted in FIG. 2A, zone player 11(K+L+3), which is the

7    audio information channel device 23(2) for synchrony group 20(2), is not shown as being either a

8    master or a slave device in another synchrony group. However, it will be appreciated that zone

9    player 11(K+L+3) could also be utilized as the master device or a slave device for another synchrony

10   group. Indeed, it will be appreciated that the zone player that is utilized as the audio information

11   channel device for synchrony group 20(2) may also be a zone player that is utilized as the master

12   device 21(1) or a slave device 22(1)(1),..., 22(K)(1) in the synchrony group 20(1).

13          A zone player 11(n) that is utilized as a member of one synchrony group may also be utilized

14   as the audio information channel device for another synchrony group if the audio information source

15   that is to supply the audio information that is to be played by the other synchrony group is connected

16   to that zone player 11(n). A zone player 11(n) may also be utilized as the audio information channel

17   device for the other synchrony group if, for example, the audio information source is an audio

18   information source 16(m) (FIG. 1) that is connected to the network 12 or an audio information

19   source that is available over a wide area network such as the Internet. The latter may occur if, for

20   example, the zone player 11(n) has sufficient processing power to operate as the audio information

21   channel device and it is in an optimal location in the network 12, relative to the zone players

22   comprising the other synchrony group (that is the synchrony group for which it is operating as audio

23   information channel device) for providing the audio and playback timing information to the

24   members of the other synchrony group. Other circumstances under which the zone player 11(n) that

25   is utilized as a member of one synchrony group may also be utilized as the audio information

26   channel device for another synchrony group will be apparent to those skilled in the art.

1    As was noted above, the master device 21 for a synchrony group 20 may be migrated from
2    one zone player 11(n) to another zone player 11(n').   As was further noted above, the audio
3    information channel device 23 for a synchrony group 20 may be migrated from one zone player
4    11(n) to another zone player 11(n').   It will be appreciated that the latter may occur if, for example,
5    the audio information source that provides the audio program for the synchrony group is not
6    connected to the zone player 11(n) that is operating as the audio information channel device 23, but
7    instead is one of the audio information sources 16(m) connected to the network 12 or a source
8    available over a wide area network such as the Internet.  Operations performed during a migration
9    of an audio information channel device 23 from one zone player 11(n) to another zone player 11(n')
10   will generally depend on the nature of the audio information that is being channeled by the audio
11   information channel device 23.  For example, if the audio information source provides streaming
12   audio, the zone player 11(n) that is currently operating as the audio information channel device 23
13   for the synchrony group 20, can provide the following information to the other zone player 11(n')
14   that is to become the audio information channel device 23 for the synchrony group 20:

15       (a) the identification of the source of the streaming audio information,

16       (b) the time stamp associated with the frame that the zone player 11(n) is currently forming,
17   and

18       (c) the identifications of the zone players that are operating as the master device 21 and slave
19   devices 22(g) comprising the synchrony group 20.

20   After the zone player 11(n') receives the information from the zone player 11(n), it will begin
21   receiving the streaming audio from the streaming audio information source identified by the zone
22   player 11(n), assemble the streaming audio information into frames, associate each frame with a time
23   stamp, and transmit the resulting audio and playback timing information over the network 12.  The
24   zone player 11(n') will perform these operations in the same manner as described above, except that,
25   instead of using the time indicated by its digital to analog converter clock 34 directly in generating
26   the time stamps for the frames, the initial time stamp will be related to the value of the time stamp
27   that is provided by the zone player 11(n) (reference item (b) above), with the rate at which the time

-23-

1    stamps are incremented corresponding to the rate at which its (that is, the zone player 11(n')'s) clock

2    increments. In addition, the zone player 11(n') will notify the zone players that are operating as the

3    master device 21 and slave devices 22(g) of the synchrony group 20 that it is the new audio

4    information channel device 23 for the synchrony group 20, and provide the multi-cast address that

5    it will be using to multi-cast the audio and playback timing information, as well as its unicast

6    network address. After the members of the synchrony group 20 receive the notification from the

7    zone player 11(n') indicating that it is the new audio information channel device 23 for the synchrony

8    group 20, they will receive the audio and playback timing information from the zone player 11(n')

9    instead of the zone player 11(n), using the multi-cast address provided by the zone player 11(n').

10    In addition, they can utilize the zone player 11(n')'s unicast network address to obtain current time

11    information therefrom. It will be appreciated that the zone player 11(n') will determine its current

12    time in relation to the time stamp that is provided by the zone player 11(n) (reference item (b) above)

13    or the current time information that it received from the zone player 11(n) using the SNTP protocol

14    as described above.

15            Generally similar operations can be performed in connection with migrating the audio

16    information channel device from one zone player 11(n) to another zone player 11(n') if the audio

17    information is from one or more audio information files, such as may be the case if the audio

18    information comprises MP3 or WAV files that are available from sources such as sources 16(m)

19    connected to the network 12 or over from sources available over a wide area network such as the

20    Internet, except for differences to accommodate the fact that the audio information is in files. In that

21    case, the zone player 11(n) that is currently operating as the audio information channel device 23 for

22    the synchrony group 20 can provide the following information to the zone player 11(n') that is to

23    become the audio information channel device 23 for the synchrony group 20:

24            (d) a list of the audio information files containing the audio information that is to be played;

25            (e) the identification of the file for which the zone player 11(n) is currently providing audio

26    and playback timing information, along with the offset into the file for which the current item of

-24-

1    audio and playback timing information is being generated and the time stamp that the zone player

2    11(n) is associating with that frame, and

3        (f) the identifications of the zone players that comprise the master device 21 and slave

4    devices 22(g) comprising the synchrony group 20.

5    After the zone player 11(n') receives the information from the zone player 11(n), it will begin

6    retrieving audio information from the file identified in item (e), starting at the identified offset.  In

7    addition, the zone player 11(n') can assemble the retrieved audio information into frames, associate

8    each frame with a time stamp and transmit the resulting audio and playback timing information over

9    the network 12.  The zone player 11(n') will perform these operations in the same manner as

10   described above, except that, instead of using the time indicated by its digital to analog converter

11   clock 34 directly in generating the time stamps for the frames, the value of the initial time stamp will

12   be related to the time stamp that is provided by the zone player 11(n) (reference item (e) above), with

13   the rate at which the time stamps are incremented corresponding to the rate at which its (that is, the

14   zone player 11(n')'s) clock increments.  In addition, the zone player 11(n') will notify the zone

15   players that are operating as the master device 21 and slave devices 22(g) of the synchrony group

16   20 that it is the new audio information channel device 23 for the synchrony group 20, and provide

17   the multi-cast address that it will be using to multi-cast the audio and playback timing information,

18   as well as its unicast network address.  After the members of the synchrony group 20 receive the

19   notification from the zone player 11(n') indicating that it is the new audio information channel device

20   23 for the synchrony group 20, they will receive the audio and playback timing information from

21   the zone player 11(n') instead of the zone player 11(n), using the multi-cast address provided by the

22   zone player 11(n').  In addition, they can utilize the zone player 11(n')'s unicast network address to

23   obtain current time information therefrom.  It will be appreciated that the zone player 11(n') will

24   determine its current time in relation to the time stamp that is provided by the zone player 11(n)

25   (reference item (b) above) or the current time information that it received from the zone player 11(n)

26   using the SNTP protocol as described above.  The zone player 11(n') will process successive audio

27   information files in the list that it receives from the zone player 11(n) (reference item (d)).

1    Operations performed by the zone players 11(n) and 11(n') in connection with migration of
2    the audio information channel device 23 for other types of audio information will be apparent to
3    those skilled in the art.  In any case, preferably, the zone player 11(n) will continue operating as an
4    audio information channel device 23 for the synchrony group 20 for at least a brief time after it
5    notifies the zone player 11(n') that it is to become audio information channel device for the
6    synchrony group, so that the zone player 11(n') will have time to notify the zone players in the
7    synchrony group 20 that it is the new audio information channel device 23 for the synchrony group.

8    Before proceeding further in describing operations performed by the network audio system
9    10, it would be helpful to provide a detailed description of a zone player 11(n) constructed in
10    accordance with the invention.  FIG. 3 depicts a functional block diagram of a zone player 11(n)
11    constructed in accordance with the invention.  All of the zone players in the network audio system
12    10 may have similar construction.  With reference to FIG. 3, the zone player 11(n) includes an audio
13    information source interface 30, an audio information buffer 31, a playback scheduler 32, a digital
14    to analog converter 33, an audio amplifier 35, an audio reproduction device interface 36, a network
15    communications manager 40, and a network interface 41, all of which operate under the control of
16    a control module 42.  The zone player 11(n) also has a device clock 43 that provides timing signals
17    that control the general operations of the zone player 11(n).  In addition, the zone player 11(n)
18    includes a user interface module interface 44 that can receive control signals from the user interface
19    module 13 (FIGS. 1 and 2) for controlling operations of the zone player 11(n), and provide status
20    information to the user interface module 13.

21    Generally, the audio information buffer 31 buffers audio information, in digital form, along
22    with playback timing information.  If the zone player 11(n) is operating as the audio information
23    channel device 23 (FIG. 2) for a synchrony group 20, the information that is buffered in the audio
24    information buffer 31 will include the audio and playback timing information that will be provided
25    to the devices 21 and 22(g) in the synchrony group 20.  If the zone player 11(n) is operating as the
26    master device 21 or a slave device 22(g) for a synchrony group, the information that is buffered in
27    the audio information buffer 31 will include the audio and playback timing information that the zone
28    player 11(n) is to play.

-26-

1    The audio information buffer 31 can receive audio and playback timing information from two

2    sources, namely, the audio information source interface 30 and the network communications

3    manager 40. In particular, if the zone player 11(n) is operating as the audio information channel

4    device 23 for a synchrony group 20, and if the audio information source is a source 14(n)(s)

5    connected to the zone player 11(n), the audio information buffer 31 will receive and buffer audio and

6    playback timing information from the audio information source interface 30. On the other hand, if

7    the zone player 11(n) is operating as the audio information channel device 23 for a synchrony group

8    20, and if the audio information source is a source 16(m) connected to the network 12, or a source

9    available over the wide area network, the audio information buffer 31 will receive and buffer audio

10   and playback timing information from the network communications manager 40. It will be

11   appreciated that, if the zone player 11(n) is not a member of the synchrony group, the zone player

12   11(n) will not play this buffered audio and playback timing information.

13   On yet another hand, if the zone player 11(n) is operating as the master device 21 or a slave

14   device 22(g) in a synchrony group, and if the zone player 11(n) is not also the audio information

15   channel device 23 providing audio and playback timing information for the synchrony group 20, the

16   audio information buffer 31 will receive and buffer audio and playback timing information from the

17   network communications manager 40.

18   The audio information source interface 30 connects to the audio information source(s)

19   14(n)(s) associated with the zone player 11(n). While the zone player 11(n) is operating as audio

20   information channel device 23 for a synchrony group 20, and if the audio information is to be

21   provided by a source 14(n)(s) connected to the zone player 11(n), the audio information source

22   interface 30 will selectively receive audio information from one of the audio information source(s)

23   14(n)(s) to which the zone player is connected and store the audio information in the audio

24   information buffer 21. If the audio information from the selected audio information source 14(n)(s)

25   is in analog form, the audio information source interface 30 will convert it to digital form. The

26   selection of the audio information source 14(n)(s) from which the audio information source interface

27   30 receives audio information is under control of the control module 42, which, in turn, receives

28   control information from the user interface module through the user interface module interface 44.

-27-

1    The audio information source interface 30 adds playback timing information to the digital audio
2    information and buffers the combined audio and playback timing information in the audio
3    information buffer 21.

4        More specifically, as noted above, the audio information source interface 30 receives audio
5    information from an audio information source 14(n)(s), converts it to digital form if necessary, and
6    buffers it along with playback timing information in the audio information buffer 21.  In addition,
7    the audio information source interface 30 will also provide formatting and scheduling information
8    for the digital audio information, whether as received from the selected audio information source
9    14(n)(s) or as converted from an analog audio information source.  As will be made clear below, the
10   formatting and scheduling information will control not only playback by the zone player 11(n) itself,
11   but will also enable other zone players 11(n'), 11(n"),... that may be in a synchrony group for which
12   the zone player 11(n) is the master device, to play the audio program associated with the audio
13   information in synchrony with the zone player 11(n).

14       In one particular embodiment, the audio information source interface 30 divides the audio
15   information associated with an audio work into a series of frames, with each frame comprising
16   digital audio information for a predetermined period of time.  As used herein, an audio track may
17   comprise any unit of audio information that is to be played without interruption.  On the other hand,
18   an audio program may comprise a series of one or more audio tracks that are to be played in
19   succession.  It will be appreciated that the tracks comprising the audio program may also be played
20   without interruption, or alternatively playback between tracks may be interrupted by a selected time
21   interval. FIG. 4 schematically depicts an illustrative framing strategy used in connection with one
22   embodiment of the invention for a digital audio stream comprising an audio work.   More
23   specifically, FIG. 4 depicts a framed digital audio stream 50 comprising a sequence of frames 51(1)
24   through 51(F) (generally identified by reference numeral 51(f)). Each frame 51(f), in turn, comprises
25   a series of audio samples 52(f)(1) through 52(f)(S) (generally identified by reference numeral
26   52(f)(s)) of the audio track.  Preferably all of the frames will have the same number "S" of audio
27   samples, although it will be appreciated from the following that that is primarily for convenience.
28   On the other hand, it will be appreciated that, the number of audio samples may differ from "S"; this

-28-

1    may particularly be the case if the frame 51(f) contains the last audio samples for the digital audio

2    stream for a particular audio work. In that case, the last frame 51(F) will preferably contain samples

3    52(F)(1) through 52(F)(x), where "x" is less than "S." Generally, it is desirable that the number of

4    samples be consistent among all frames 51(f), and in that case padding, which will not be played,

5    can be added to the last frame 51(F).

6        Associated with each frame 51(f) is a header 55(f) that includes a number of fields for storing

7    other information that is useful in controlling playback of the audio samples in the respective frame

8    51(f). In particular, the header 55(f) associated with a frame 51(f) includes a frame sequence number

9    field 56, an encoding type field 57, a sampling rate information field 58, a time stamp field 60, an

10   end of track flag 61, and a length flag field 62. The header 55(f) may also include fields (not shown)

11   for storing other information that is useful in controlling playback. Generally, the frame sequence

12   number field 56 receives a sequence number "f" that identifies the relative position of the frame 51(f)

13   in the sequence of frames 51(1)..51(f)...51(F) containing the digital audio stream 50. The encoding

14   type field 57 receives a value that identifies the type of encoding and/or compression that has been

15   used in generating the digital audio stream. Conventional encoding or compression schemes include,

16   for example, the well-known MP3 and WAV encoding and/or compression schemes, although it will

17   be appreciated that other schemes may be provided for as well. The sampling rate information field

18   58 receives sampling rate information that indicates the sampling rate for the audio samples 52(f)(s).

19   As will be apparent to those skilled in the art, the sampling rate determines the rate at which the zone

20   player 11(n) is to play the audio samples 52(f)(s) in the frame, and, as will be described below,

21   determines the period of the digital to analog converter clock 34.

22        The condition of the end of work flag 61 indicates whether the frame 51(f) contains the last

23   digital audio samples for the audio track associated with the framed digital audio work 50. If the

24   frame 51(f) does not contain the audio samples that are associated with the end of the digital audio

25   stream 50 for a respective audio work, the end of work flag will be clear. On the other hand, if the

26   frame 51(f) does contain the audio samples that are associated with the end of the digital audio

27   stream 50 for a respective audio work, the end of work flag 61 will be set. In addition, since the

28   number of valid audio samples 52(F)(s) in the frame 51(F), that is, the samples that are not padding,

-29-

1    may be less than "S," the default number of audio samples in a frame 51(f), the length flag field 62

2    will contain a value that identifies the number of audio samples in 52(F)(s) in the last frame  51(F)

3    of the audio work 50.  If, as noted above, the frames have a consistent number "S" of samples, the

4    samples 52(F)(x+1) through 52(F)(S) will contain padding, which will not be played.

5         The time stamp field 60 stores a time stamp that identifies the time at which the zone player

6    11(n) is to play the respective frame.  More specifically, for each frame of a framed digital audio

7    stream 50 that is buffered in the audio information buffer 21, the audio information source interface

8    30, using timing information from the digital to analog converter clock 34, will determine a time at

9    which the zone player 11(n) is to play the respective frame, and stores a time stamp identifying the

10   playback time in the time stamp field 60.  The time stamp associated with each frame will later be

11   used by the playback scheduler 32 to determine when the portion of the digital audio stream stored

12   in the frame is to be coupled to the digital to analog converter 33 to initiate play back.  It will be

13   appreciated that the time stamps that are associated with frames in sequential frames 51(1),

14   51(2),...,51(F), will be such that they will be played back in order, and without an interruption

15   between the sequential frames comprising the digital audio stream 50.  It will further be appreciated

16   that, after a time stamp has been determined for the first frame, stored in frame  51(1), of a digital

17   audio stream 50, the audio information source interface 30 can determine time stamps for the

18   subsequent frame 51(2), 51(3),....,51(F) in relation to the number of samples "S" in the respective

19   frames and the sample rate.  The time stamps will also preferably be such that frames will be played

20   back after some slight time delay after they have been buffered in the audio information buffer 21;

21   the purpose for the time delay will be made clear below.

22         Returning to FIG. 3, in addition to dividing the digital audio information into frames, the

23   audio information source interface 30 also aggregates and/or divides the frames 51(f) as necessary

24   into packets, each of which will be of a length that would fit into a message for transmission over

25   the network, and associates each packet with a packet sequence number.  For example, if a packet

26   will accommodate multiple frames 51(f), 51(f+1),... 51(f+y-1), it will aggregate them into a packet

27   and associate them with a packet number, for example p(x).  If the entire frames 51(f) and 51(f+y-1)

28   was accommodated in packet p(x), where "x" is the sequence number, which will occur if the size

-30-

1   of a packet is an exact multiple of the frame size, the next packet, p(x+1) will begin with frame

2   51(f+y) and will include frames 51(f+y),..., 51(f+2y-1).  Subsequent packets p(x+2),.... will be

3   formed in a similar manner.  On the other hand, if the packet length will not accommodate an exact

4   multiple of the frame size, the last frame in the packet will be continued at the beginning of the next

5   packet.

6        If the audio information source interface 30 is aware of track boundaries, which may be the

7   case if the tracks are divided into files, the packets will reflect the track boundaries, that is, the

8   packets will not contain frames from two tracks.  Thus, if the last frames associated with a track are

9   insufficient to fill a packet, the packet will contain padding from the last frame associated with the

10  track to the end of the packet, and the next packet will begin with the first frames associated with

11  the next track.

12       In one embodiment, the audio information source interface 30 stores the packets in the audio

13  information buffer 31 in a ring buffer.  As is conventional, a ring buffer includes a series of storage

14  locations in the buffer.  Each entry will be sufficient to store one packet.  Four pointers are used in

15  connection with the ring buffer, a first pointer pointing to the beginning of the ring buffer, a second

16  pointer pointing to the end of the ring buffer, an third "write" pointer pointing to the entry into which

17  a packet will be written and a fourth "read" pointer pointing to the entry from which packet will be

18  read for use in playback.  When a packet is read from the ring buffer for playback, it will be read

19  from the entry pointed to by the read pointer.  After the packet has been read, the read pointer will

20  be advanced.  If the read pointer points beyond the end of the ring buffer, as indicated by the end

21  pointer, it will be reset to point to the entry pointed to by the beginning pointer, and the operations

22  can be repeated.

23       On the other hand, when the audio information source interface 30 stores a packet in the ring

24  buffer, first determine whether the entry pointed to by the write pointer points to the same entry as

25  the entry pointed to by the read pointer.  If the write pointer points to the same entry as the entry

26  pointed to by the read pointer, the entry contains at least a portion of a packet that has not yet been

27  read for playback, and the audio information source interface 30 will delay storage of the packet until

-31-

1   the entire packet has been read and the read pointer advanced.  After the read pointer has been

2   advanced, the audio information source interface 30 can store the packet in the entry pointed to by

3   the write pointer.  After the packet has been stored, the audio information source interface 30 will

4   advance the write pointer.  If the write pointer points beyond the end of the ring buffer, as indicated

5   by the end pointer, it will be reset to point to the entry pointed to by the beginning pointer, and the

6   operations can be repeated.

7           As noted above, the zone player 11(n) can operate both as an audio information channel

8   device 23 and a member of the synchrony group 20 of which it is a member.  In that case, the audio

9   information buffer 31 can contain one ring buffer.  On the other hand, the zone player 11(n) can

10  operate as an audio information channel device 23 for one synchrony group 20(1) (FIG. 2A) and a

11  member of another synchrony group 20(2).  In that case, the audio information buffer 31 would

12  maintain two ring buffers, one for the audio and timing information associated with synchrony group

13  20(1), and the other for the audio and timing information associated with synchrony group 20(2).

14  It will be appreciated that, in the latter case, the zone player 11(n) will only use the audio and timing

15  information that is associated with synchrony group 20(2) for playback.

16          The playback scheduler 32 schedules playback of the audio information that is buffered in

17  the audio information buffer 31 that is to be played by the zone player 11(n).  Accordingly, under

18  control of the playback scheduler 32, the digital audio information that is buffered in the audio

19  information buffer 21 that is to be played by the zone player 11(n) is transferred to the digital to

20  analog converter 33 for playback. As noted above, if the zone player 11(n) is operating as an audio

21  information channel device 23 for a synchrony group 20 for which it is not a member, the playback

22  scheduler 32 will not schedule the digital audio information that is to be played by that synchrony

23  group 20 for playback.  The playback scheduler 32 only schedules the digital audio information, if

24  any, that is buffered in the audio information buffer 31 that is associated with a synchrony group for

25  which the zone player 11(n) is a member, whether as master device 21 or a slave device 22(g).

26          Essentially, the playback scheduler 32 makes use of the read pointer associated with the

27  circular buffer that contains the audio and playback timing information that is to be played by the

-32-

1    zone player 11(n). The playback scheduler 32 retrieves the packet information from the entry of the

2    ring buffer pointed to by the read pointer, and then advances the ring pointer as described above. The

3    playback scheduler 32 determines the boundaries of the frames in the packet and uses the time

4    stamps in the time stamp fields 60 associated with the respective frame 51(f), along with timing

5    information provided by the zone player 11(n)'s digital to analog converter clock 34, to determine

6    when the respective frame is to be transferred to the digital to analog converter 33. Generally, when

7    the time stamp associated with a buffered digital audio information frame corresponds to the current

8    time as indicated by the digital to analog converter clock 34, the playback scheduler 32 will enable

9    the respective frame to be transferred to the digital to analog converter 33.

10    The digital to analog converter 33, also under control of the digital to analog converter clock

11    34, converts the buffered digital audio information to analog form, and provides the analog audio

12    information to the audio amplifier 35 for amplification. The amplified analog information, in turn,

13    is provided to the audio reproduction devices 15(n)(r) through the audio reproduction device

14    interface 36. The audio reproduction devices 15(n)(r) transform the analog audio information signal

15    to sound thereby to provide the audio program to a listener. The amount by which the audio

16    amplifier 35 amplifies the analog signal is controlled by the control module 42, in response to

17    volume control information provided by the user through the user interface module 13.

18    The network communications manager 40 controls network communications over the

19    network 12, and the network interface 41 transmits and receives message packets over the network

20    12. The network communications manager 40 generates and receives messages to facilitate the

21    transfer of the various types of information described above in connection with FIG. 2, including the

22    channel device control information, slave device control information, audio and playback timing

23    information and the audio information channel device's clock timing information. In connection

24    with the channel device control information and the slave device control information, the network

25    communications manager 40 will generate messages for transfer over the network 12 in response to

26    control information from the control module 42. Similarly, when the network communications

27    manager 40 receives messages containing channel device control information and slave device

1    control information, the network communications manager will provide the information to the

2    control module 42 for processing.

3            With regards to the audio information channel device's clock timing information, as noted

4    above, the master device 21 and slave devices 22(g) of the synchrony group 20 obtain the clock

5    timing information from the audio information channel device 23 using the well-known SNTP. If

6    the zone player 11(n) is operating as the audio information channel device 23 for a synchrony group,

7    during the SNTP operation, it will provide its current time, particularly a current time as indicated

8    by its digital to analog converter clock 34. On the other hand, if the zone player 11(n) is operating

9    as the master device 21 or slave device 22(g) of a synchrony group 20, it will receive the clock

10   timing information from the audio information channel device 23. After the respective device 21,

11   22(g) has obtained the audio information channel device's clock timing information, it will generate

12   a differential time value ΔT representing the difference between the time T indicated by its digital

13   to analog converter clock 34 and the current time information from the audio information channel

14   device 23. The differential time value will be used to update the time stamps for the frames of the

15   digital audio stream 50 (FIG. 4) that are received from the audio information channel device.

16           With regards to the audio and playback timing information, operations performed by the

17   network communications manager 40 will depend on whether

18           (i) the audio and playback timing information has been buffered in the audio information

19   buffer 31 for transmission, as audio information channel device 23, over the network 12 to the

20   master device 21 and/or slave devices 22(g) of a synchrony group, or

21           (ii) the audio and playback timing information has been received from the network 12 to be

22   played by the zone player 11(n) as either the master device 21 for a synchrony group or a slave

23   device in a synchrony group.

24   It will be appreciated that the network communications manager 40 may be engaged in both (i) and

25   (ii) contemporaneously, since the zone player 11(n) may operate both as the audio information

26   channel device 23(1) for a synchrony group 20(1) (reference FIG. 2A) of which it is not a member,

-34-

1    and a member of another synchrony group 20(2) for which another zone player 11(n') is the audio

2    information channel device 23(2). With reference to item (i) above, after a packet that is to be

3    transmitted has been buffered in the respective ring buffer, the network communications manager

4    40 retrieves the packet, packages it into a message and enables the network interface 41 to transmit

5    the message over the network 12. If the control module 42 receives control information from the

6    user interface module 13 (if the master device 21 is also the audio information channel device 23 for

7    the synchrony group 20) or from the master device (if the master device 21 is not the audio

8    information channel device 23 for the synchrony group 20) that would require the transmission of

9    a "resynchronize" command as described above, the control module 42 of the audio information

10    channel device 23 enables the network communications manager 40 to insert the command into a

11    message containing the audio and playback timing information. Details of the operations performed

12    in connection with the "resynchronize" command will be described below. As noted above, the

13    "resynchronize" command is used if the user enables a synchrony group to terminate the playback

14    of a track that is currently being played, or cancel playback of a track whose playback has not begun.

15        On the other hand, with reference to item (ii) above, if network interface 41 receives a

16    message containing a packet containing frames of audio and playback timing information that the

17    zone player 11(n) is to play either as a master device 21 or a slave device for a synchrony group 20,

18    the network interface 41 provides the audio and playback timing information to the network

19    communications manager 40. The network communications manager 40 will determine whether the

20    packet contains a resynchronize command and, if so, notify the control module 42, which will enable

21    operations to be performed as described below. In any case, the network communications manager

22    40 will normally buffer the various frames comprising the audio and playback timing information

23    in the audio information buffer 31, and in that operation will generally operate as described above

24    in connection with the audio information source interface 30. Before buffering them, however, the

25    network communications manager 40 will update their time stamps using the time differential value

26    described above. It will be appreciated that the network communications manager 40 will perform

27    similar operations whether the messages that contain the packets were multi-cast messages or unicast

28    messages as described above

-35-

1    The updating of the time stamps by the master device 21 and the slave devices 22(g) in the
2    synchrony group 20 will ensure that they all play the audio information synchronously. In particular,
3    after the network communications manager 40 has received a frame 51(f) from the network interface
4    41, it will also obtain, from the digital to analog converter clock 34, the zone player 11(n)'s current
5    time as indicated by its digital to analog converter clock 34. The network communications manager
6    40 will determine a time differential value that is the difference between the slave device's current
7    clock time, as indicated by its digital to analog converter 34, and the audio information channel
8    device's time as indicated by the audio information channel device's clock timing information.
9    Accordingly, if the master or slave device's current time has a value $T_S$ and the audio information
10   channel device's current time, as indicated by the clock timing information, has a value $T_C$, the time
11   differential value $\Delta T = T_S - T_C$. If the current time of the master or slave device in the synchrony group
12   20, as indicated by its digital to analog converter clock 34, is ahead of the audio information channel
13   device's clock time as indicated by the clock timing information received during the SNTP operation,
14   the time differential value will have a positive value. On the other hand, if the master or slave
15   device's current time is behind the audio information channel device's clock time, the time
16   differential value $\Delta T$ will have a negative value. If the zone player 11(n) obtains clock timing
17   information from the audio information channel device 23 periodically while it is a member of the
18   synchrony group 20, the network communications manager 40 can generate an updated value for the
19   time differential value $\Delta T$ when it receives the clock timing information from the audio information
20   channel device 23, and will subsequently use the updated time differential value.

21   The network communications manager 40 uses the time differential value $\Delta T$ that it generates
22   from the audio information channel device timing information and zone player 11(n)'s current time
23   to update the time stamps that will be associated with the digital audio information frames that the
24   zone player 11(n) receives from the audio information channel device. For each digital audio
25   information frame that is received from the audio information channel device, instead of storing the
26   time stamp that is associated with the frame as received in the message in the audio information
27   buffer 21, the network communications manager 40 will store the updated time stamp with the
28   digital audio information frame. The updated time stamp is generated in a manner so that, when the

-36-

1      zone player 11(n), as a member of the synchrony group plays back the digital audio information

2      frame, it will do so in synchrony with other devices in the synchrony group.

3          More specifically, after the zone player 11(n)'s network interface 41 receives a message

4      containing a packet that, in turn, contains one or more frames 51(f), it will provide the packet to the

5      network communications manager 40. For each frame 51(f) in the packet that the network

6      communications manager 40 receives from the network interface 41, the network communications

7      manager 40 will add the time differential value $\Delta T$ to the frame's time stamp, to generate the updated

8      time stamp for the frame 51(f), and store the frame 51(f), along with the header 55(f) with the

9      updated time stamp in the audio information buffer 31. Thus, for example, if a frame's time stamp

10      has a time value $T_F$, the network communications manager 40 will generate an updated time stamp

11      $T^U_F$ having a time value $T^U_F = T_F + \Delta T$. Since time value $T^U_F$ according to the slave device's digital

12      to analog converter clock 34 is simultaneous to the time value $T_F$ according to the audio information

13      channel device's digital to analog converter clock 34, the zone player 11(n) device will play the

14      digital audio information frame at the time determined by the audio information channel device 23.

15      Since all of the members of the synchrony group 20 will perform the same operations, generating

16      the updated time stamps $T^U_F$ for the various frames 51(f) in relation to their respective differential

17      time values, all of the zone players 11(n) in the synchrony group 20 will play them synchronously.

18      The network communications manager 40 will generate updated time stamps $T^U_F$ for all of the time

19      stamps 60 in the packet, and then store the packet in the audio information buffer 31.

20          It will be appreciated that, before storing a packet in the audio information buffer 21, the

21      network communications manager 40 can compare the updated time stamps $T^U_F$ associated with the

22      frames in the packet to the slave device's current time as indicated by its digital to analog converter

23      clock 34. If the network communications manager 40 determines the time indicated by the updated

24      time stamps of frames 51(f) in the packet are earlier than the zone player's current time, it can discard

25      the packet instead of storing it in the audio information buffer 21, since the zone player 11(n) will

26      not play them. That is, if the updated time stamp has a time value $T^U_F$ that identifies a time that is

27      earlier than the zone player's current time $T_S$ as indicated by the zone player's digital to analog

28      converter clock 34, the network communications manager 40 can discard the packet.

1        If the zone player 11(n) is operating as the master device 21 of a synchrony group 20, when

2    the user, through the user interface module 13, notifies the zone player 11(n) that another zone player

3    11(n') is to join the synchrony group 20 as a slave device 22(g), the control module 42 of the zone

4    player 11(n) enables the network communications manager 40 to engage in an exchange of

5    messages, described above in connection with FIG. 2, to enable the other zone player 11(n') to join

6    the synchrony group 20 as a slave device.  As noted above, during the message exchange, the

7    messages generated by the network communications manager 40 of the zone player 11(n) will

8    provide the network communications manager of the zone player 11(n') that is to join the synchrony

9    group 20 with information such as the multi-cast address being used by the audio information

10    channel device 23 that is providing the audio program to the synchrony group 20, as well as a unicast

11    network address for the audio information channel device 23.  After receiving that information, the

12    network communications manager and network interface of the zone player 11(n') that is to join the

13    synchrony group 20 can begin receiving the multi-cast messages containing the audio program for

14    the synchrony group, engage in SNTP transactions with the audio information channel device 23 to

15    obtain the latter's current time, and also enable the audio information channel device 23 to send the

16    zone player 11(n') frames 51(f) that it had previously broadcast using the unicast message

17    transmission methodology as described above.

18        On the other hand, if the network communications manager 40 and network interface 41 of

19    the zone player 11(n) receive a message over the network 12 indicating that it is to become a slave

20    device 22(g) of a synchrony group for which another zone player 11(n') is the master device, the

21    network communications manager 40 for zone player 11(n) will provide a notification to the control

22    module 42 of zone player 11(n).  Thereafter, the control module 42 of zone player 11(n) can enable

23    the network communications manager 40 of zone player 11(n) to perform the operations described

24    above to enable it to join the synchrony group 20.

25        As noted above, the user, using user interface module 13, can enable the synchrony group

26    to terminate playback of a track of an audio program that is currently being played.  After playback

27    of a track that is currently being played has been terminated, playback will continue in a

28    conventional manner with the next track that has been buffered in the audio information buffer 31.

-38-

1    It will be appreciated that that could be the next track that is on the original play list, or a previous

2    track. In addition, the user can enable the synchrony group 20 to cancel playback of a track that it

3    has not yet begun to play, but for which buffering of packets has begun in the synchrony group 20.

4    Both of these operations make use of the "resynchronize" command that the master device 21 of the

5    synchrony group 20 can enable the audio information channel device 23 to include in the multi-cast

6    message stream that it transmits to the synchrony group 20. Generally, in response to receipt of the

7    resynchronize command, the members of the synchrony group 20 flush the ring buffer containing

8    the packets that they are to play in the future. In addition, if the members of the synchrony group

9    provide separate buffers for their respective digital to analog converters 33, the members will also

10   flush those buffers as well. After the audio information channel device transmits a packet containing

11   the resynchronize command:

12          (i) in the case of the use of the resynchronize command to terminate playing of a track that

13   is currently being played, the audio information channel device 23 will begin multi-casting packets

14   for the next track, to begin play immediately, and will continue through the play list in the manner

15   described above; and

16          (ii) in the case of the use of the resynchronize command to cancel play of a track for which

17   buffering has begun, but which is to be played in the future, the audio information channel device

18   23 will begin multi-casting packets for the track after the track that has been cancelled, to be played

19   beginning at the time the cancelled track was to begin play, and will also continue through the play

20   list in the manner described above.

21   It will be appreciated that,

22          (a) in the first case (item (i) directly above), the resynchronize command can enable the read

23   pointer to be set to point to the entry in the circular buffer into which the first packet for the next

24   track will be written, which will correspond to the entry to which the write pointer points, but

-39-

1       (b) in the second case (item (ii) directly above), the resynchronize command can enable the

2       write pointer for the circular buffer to be set to point to the entry that contains the first packet for the

3       track whose play is being cancelled.

4       It will further be appreciated that, if a track is cancelled for which buffering has not begun, the

5       resynchronize command will generally not be necessary, since the audio information channel device

6       23 for the synchrony group 20 need only delete that track from the play list.

7       Operations performed in connection with use of the resynchronize command to cancel

8       playback of a track that is currently being played will be described in connection with Packet

9       Sequence A below, and operations performed in connection with the use of the resynchronize

10      command to cancel playback of a track that is has not yet begun to play, but for which buffering of

11      packets has begun, will be described in connection with Packet Sequence B below.

12      Packet Sequence A

13      (A1.0) [packet 57]

14      (A1.1       [continuation of frame 99]

15      (A1.2)     [frame 100, time = 0:00:01, type = mp3 audio]

16      (A1.3)     [frame 101, time = 0:00:02, type = mp3 audio]

17      (A1.4)     [frame 102, time = 0:00:03, type = mp3 audio]

18

19      (A2.0) [packet 58]

20      (A2.1)     [continuation of frame 102]

21      (A2.2)     [frame 103, time = 0:00:04, type = mp3 audio]

22      (A2.3)     [frame 104, time = 0:00:05, type = mp3 audio]

23      (A2.4)     [frame 105, time = 0:00:06, type = mp3 audio]

24

25      (A3.0) [packet 59]

26      (A3.1)     [continuation of frame 105]

27      (A3.2)     [frame 106, time = 0:00:07, type = mp3 audio]

-40-

| | | |
|---|---|---|
| 1 | (A3.3) | [frame 107, time = 0:00:08, type = mp3 audio] |
| 2 | (A3.4) | [frame 108, time = 0:00:09, type = mp3 audio] |
| 3 | | |
| 4 | (A4.0) [packet 60] | |
| 5 | (A4.1) | [continuation of frame 108] |
| 6 | (A4.2) | [frame 109, time = 0:00:10, type = mp3 audio] |
| 7 | (A4.3) | [Resynchronize command] |
| 8 | (A4.4) | [Padding, if necessary] |
| 9 | | |
| 10 | (A5.0) [packet 61] | |
| 11 | (A5.1) | [frame 1, time = 0:00:07, type = mp3 audio] |
| 12 | (A5.2) | [frame 2, time = 0:00:08, type = mp3 audio] |
| 13 | (A5.3) | [frame 3, time = 0:00:09, type = mp3 audio] |
| 14 | (A5.4) | [frame 4, time = 0.00.10, type = mp3 audio] |
| 15 | | |
| 16 | (A6.0) [packet 62] | |
| 17 | (A6.1) | [continuation of frame 4] |
| 18 | (A6.2) | [frame 5, time = 0:00:11, type = mp3 audio] |
| 19 | (A6.3) | [frame 6, time = 0:00:12, type = mp3 audio] |
| 20 | (A6.4) | [frame 7, time = 0:00:13, type = mp3 audio] |

21    Packet Sequence A comprises a sequence of six packets, identified by packet 57 through
22    packet 62, that the audio information channel device 23 multi-casts in respective messages to the
23    members of a synchrony group 20. It will be appreciated that the series of messages that the audio
24    information channel device 23 may multi-cast to the synchrony group 20 may include a messages
25    prior to the packet 57, and may also include messages after packet 62. Each packet comprises a
26    packet header, which is symbolized by lines (A1.0), (A2.0),...(A6.0) in Packet Sequence A, and will
27    generally also include information associated with at least a portion of a frame. In the packets
28    represented in Packet Sequence A, each packet includes information associated with a plurality of

-41-

1    frames. Depending on the lengths of the packets, each packet may contain information associated

2    with a portion of a frame, an entire frame, or multiple frames. In the illustration represented by

3    Packet Sequence A, it is assumed that each packet may contain information associated with multiple

4    frames. In addition, it is assumed that a packet does not necessarily contain information associated

5    with an integral number of frames; in that case, a packet may contain information associated with

6    a portion of a frame, and the next packet will contain the information associated with the rest of a

7    frame.

8        The frames and associated header playback timing information contained in the various

9    packets are symbolized by lines (A1.1), (A1.2),...,(A1.4), (A2.1),....(A6.4) of Packet Sequence A.

10   Thus, for example, line (A1.2) of packet 57 represents the one-hundredth frame, that is, frame

11   51(100) (reference FIG. 4), of the track whose audio information is being transmitted in the sequence

12   of packets that includes packet 57. The frame 51(100) is to be played at an illustrative time,

13   according to the audio information channel device's digital to analog converter clock, of

14   "time = 0:00:01," and the frame is encoded and/or compressed using the well-known MP3 encoding

15   and compression methodology. In that case, the legend "time = 0:00:01" represents the time stamp

16   that would be included in field 60 (FIG. 4) of the header associated with the frame 50(100) as multi-

17   cast by the audio information channel device for the synchrony group. It will be appreciated that the

18   playback time and encoding/compression methodology will be referred in the header 55(100) that

19   is associated with the frame 51(100). It will also be appreciated that the header may also contain

20   additional information as described above.

21       Similarly, line (A1.3) of packet 57 represents the one-hundred and first frame, that is, frame

22   51(101), of the track whose audio information is being transmitted in the sequence of packets that

23   includes packet 57. The frame 51(101) is to be played at an illustrative time, according to the audio

24   information channel device's digital to analog converter clock, of "0:00:02," and the frame is also

25   encoded and/or compressed using the MP3 encoding and compression methodology. Line (A1.4)

26   of packet 57 represents similar information, although it will be appreciated that, depending on the

27   length of packet 57, the line may not represent the information for an entire frame 51(102) and/or

28   its associated header. If the length of packet 57 is not sufficient to accommodate the information for

-42-

1    the entire frame 51(102) and/or associated header, the information will continue in packet 58, as
2    represented by line (A2.1) in Packet Sequence A.  Similarly, if the length of packet 56 was not
3    sufficient to contain the information for an entire frame 51(99) preceding frame 51(100), packet 57
4    (lines (A1.0) through 1.4) may contain any information from frame 51(99) that packet 56 was unable
5    to accommodate.

6        As noted above, when the master device 21 or a slave device 22(g) in the synchrony group
7    20 receives the packet 57, its respective network communications manager 40 will update the time
8    stamps associated with the various frames 51(f) as described above before buffering the respective
9    frames in the respective audio information buffer 31.

10       Packets 58 and 59 contain information that is organized along the lines described above in
11   connection with packet 57.

12       Packet 60 also contains, as represented by lines (A4.1) and (A4.2), information that is
13   organized along the lines of the information represented by lines (Ax.1) and (Ax.2) ("x" equals an
14   integer) described above in connection with packets 57 through 59.  On the other hand, packet 60
15   contains a resynchronize command, as represented by line (A4.3).  Packet 60 also may contain
16   padding, as represented by line 4.4, following the resynchronize command.  As noted above, the
17   master device 21 of a synchrony group 20 will enable the audio information channel device 23 that
18 · is providing audio information to the synchrony group 20 to multi-cast a message containing the
19   resynchronize command when it receives notification from the user interface module 13 that the user
20   wishes to cancel playback of a track that is currently being played.  In the example depicted in
21   Packet Sequence A, as will be described below, the audio information channel device 23 receives
22   notification from the master device 21 that the user wishes to cancel playback of a track at a time
23   corresponding to "time = 0:00:07" according to its digital to analog converter clock 34, and, in line
24   (A4.3) of packet 60 it will provide the resynchronize command, followed by padding, if necessary.

25       As will be apparent from examining lines (A3.1) through (A3.4) of packet 59 and lines
26   (A4.1) and (A4.2) of packet 60, although the audio information channel device 23 has received the
27   notification from the synchrony group's master device 21 to multi-cast the resynchronize command

-43-

1    at a time corresponding to "time = 0:00:07" according to the clock time indicated by its digital to

2    analog converter clock 34, it (that is, the audio information channel device 23) has already multi-cast

3    messages containing frames that are to be played at that time and subsequently.  That is, the audio

4    information channel device 23 has, multi-cast in packet 59, frames 51(106) through 51(108) that

5    contain time stamps "time = 0:00:07," "time = 0:00:08" and "time = 0:00:09," respectively, and, in

6    packet 60, in addition to the continuation of frame 51(108), frame 51(109) that contains time stamp

7    "time = 0:00:10."  (It will be appreciated that the times indicated by the illustrative time stamps are

8    for illustration purposes only, and that in an actual embodiment the time stamps may have different

9    values and differentials.)

10    As noted above, the audio information channel device 23 multi-casts a message containing

11    a packet that, in turn, contains the resynchronize command when it receives the notification from

12    the master device 21 to do so.  In the example depicted in Packet Sequence A, the packet will be

13    multi-cast when the audio information channel device's digital to analog converter clock time

14    corresponds to "0:00:07."  Subsequently, two things happen.  In one, aspect, when the master device

15    21 and slave devices 22(g) receive the packet that contains the resynchronize command, they will

16    stop playing the audio program that they are playing.

17    In addition, the audio information channel device 23 will begin transmitting frames

18    containing audio information for the next track, including therewith time stamps immediately

19    following the digital to analog converter clock time at which the packet including the resynchronize

20    command was transmitted.  Accordingly, and with further reference to Packet Sequence A, the audio

21    information channel device 23 will multi-cast a message containing packet 61.  As indicated above,

22    packet 61 contains, as represented in lines (A5.1) through (A5.3), frames 51(1) through 51(3), which

23    are the first three frames of the next track of the audio program that is to be played.  It is also

24    compressed and encoded using the MP3 encoding and compression scheme, and it is accompanied

25    by time stamps "time = 0:00:07," "time = 0:00:08" and "time = 0:00:10."  As noted above, the time

26    stamp "time = 0:00:07" corresponds to the clock time at which the audio information channel device

27    23 multi-casts the resynchronize command, and, when the master device 21 and slave devices 22(g)

28    receive these frames, they would be expected to begin playing them very shortly, if not immediately

-44-

1    after the audio information channel device 23 multi-casts the message containing the packet that, in

2    turn, contains the resynchronize command.  Packet 61 also includes at least a portion of the next

3    frame, that is, frame 51(4), for that track.  In addition, Packet Sequence A depicted above further

4    includes a subsequent packet, namely, packet 62, that contains any necessary continuation of frame

5    51(4), as well as three subsequent frames.  If any additional packets are required for the track, as well

6.    as for subsequent tracks, they can be multi-cast in a similar manner.

7         As further noted above, the resynchronize command can also be used to cancel playing of

8    one or more tracks for which playback has begun.  This will be illustrated in connection with Packet

9    Sequence B:

10        Packet Sequence B

11    (B1.0) [packet 157]

12    (B1.1)            [continuation of frame 99]

13    (B1.2)            [frame 100, time = 0:00:01, type = mp3 audio]

14    (B1.3)            [frame 101, time = 0:00:02, type = mp3 audio]

15    (B1.4)            [frame 102, time = 0:00:03, type = mp3 audio]

16

17    (B2.0) [packet 158]

18    (B2.1)            [continuation of frame 102]

19    (B2.2)            [frame 103, time = 0:00:04, type = mp3 audio]

20    (B2.3)            [frame 104, time = 0:00:05, type = mp3 audio]

21    (B2.4)            [frame 105, time = 0:00:06, type = mp3 audio]

22

23    (B3.0) [packet 159]

24    (B3.1)            [continuation of frame 105]

25    (B3.2)            [frame 106, time = 0:00:07, type = mp3 audio]

26    (B3.3)            [track boundary notification]

27    (B3.4)            [Padding, if necessary]

-45-

1

2  (B4.0) [packet 160]

3  (B4.1)        [frame 1, time = 0:00:08, type = mp3 audio]

4  (B4.2)        [frame 2, time = 0:00:09, type = mp3 audio]

5  (B4.3)        [frame 3, time = 0:00:10, type = mp3 audio]

6

7  (B5.0) [packet 161]

8  (B5.1)        [continuation of frame 3]

9  (B5.2)        [frame 4, time = 0:00:11, type = mp3 audio]

10  (B5.3)        [Resynchronize, after packet 159]

11  (B5.4)        [Padding, if necessary]

12

13  (B6.0) [packet 162]

14  (B6.1)        [frame 1, time = 0:00:08, type = mp3 audio]

15  (B6.2)        [frame 2, time = 0:00:09, type = mp3 audio]

16  (B6.3)        [frame 3, time = 0:00:10, type = mp3 audio]

17  (B6.4)        [frame 4, time = 0:00:11, type = mp3 audio]

18

19  (B7.0) [packet 163]

20  (B7.1)        [continuation of frame 4]

21  (B7.2)        [frame 5, time = 0:00:12, type = mp3 audio]

22  (B7.3)        [frame 6, time = 0:00:13, type = mp3 audio]

23  (B7.4)        [frame 7, time = 0:00:14, type = mp3 audio]

24        Packet Sequence B comprises a series of seven packets, identified by packet 157 through 163

25  , that the audio information channel device 23 multi-casts to the members of a synchrony group 20.

26  As with Packet Sequence A, it will be appreciated that the series of packets that the audio

27  information channel device 23 may multi-cast to the synchrony group 20 may include packets prior

28  to the packet 157, and may also include packets after packet 162.  Each packet comprises a packet

-46-

1    header, which is symbolized by lines (B1.0), (B2.0),...(B7.0) in Packet Sequence B.  As in Packet

2    Sequence A, each packet will also generally include information associated with at least a portion

3    of a frame 51(f)along with its associated frame 55(f).  As in the packets represented in Packet

4    Sequence A, each packet includes information associated with a plurality of frames.  Depending on

5    the lengths of the packets, each packet may contain information associated with a portion of a frame,

6    an entire frame, or multiple frames.  Further, as with Packet Sequence A, it is assumed that each

7    packet may contain information associated with multiple frames.  In addition, it is assumed that a

8    packet does not necessarily contain information associated with an integral number of frames; in that

9    case, a packet may contain information associated with a portion of a frame, and the next packet will

10   contain the information associated with the rest of a frame.

11          The structures of the packets represented by Packet Sequence B are similar to those described

12   above in connection with Packet Sequence A, and will not be repeated here.  Generally, Packet

13   Sequence B illustratively contains a sequence of packets that represent at least portions of three

14   tracks that may have been selected from, for example, a play list.  In particular, packets 157 through

15   159 represent frames from a portion of one track, packets 160 and 161 represent frames from a

16   second track and packets 162 and 163 represent frames from a third track.  The play list indicated

17   that the first, second and third tracks were to be played in that order.  With particular reference to

18   Packet Sequence B, it should be noted that line (B3.3) indicates that packet 159 includes an

19   indication that that packet contains the last frame for the track, and line (B3.4) provides for padding

20   to the end of the packet.  The first frame of the next track begins in packet 160.

21          In connection with the use of the resynchronize command to cancel playback of a track, at

22   least a portion of which the audio information channel device 23 has multi-cast to the members of

23   the synchrony group, packet 161, in line (B5.3) represents a resynchronize command that indicates

24   that resynchronization is to occur after packet 159, that is, immediately after the packet that contains

25   the last frame of the first of the three tracks represented by the packets in Packet Sequence B.  It

26   should be noted that the resynchronize command is in the packet 161, while the resynchronization

27   is to occur at packet 160, that is, the synchrony group is to not play the track starting with packet

28   160, but instead is to begin playing the track frames for which begin with the next packet, that is,

-47-

1    packet 162. As with Packet Sequence A, in Packet Sequence B the audio information channel device
2    23, in packet 162 and 163, multi-casts frames whose time stamps indicate that they are to be played
3    when the frames that were multi-cast in packets 160 and 161 were to be played.  By use of the
4    resynchronize command and specifying a packet in this manner, the audio information channel
5    device can cancel playback of a track for which playback has not yet begun.

6         It will be appreciated that the resynchronize command is generally not necessary for
7    cancelling play back of a track that the audio information channel device 23 has not started multi-
8    casting to the synchrony group 20, since the audio information channel device 23 itself can re-order
9    the play list to accommodate the cancellation.

10        The invention provides a number of advantages.  In particular, the invention provides a
11   network audio system in which a number of devices share information can reproduce audio
12   information synchronously, notwithstanding the fact that packets, which may contain digital audio
13   information, transmitted over the network to the various zone players connected thereto may have
14   differing delays and the zone players operate with independent clocks.  Moreover, although the
15   invention has been described in connection with audio information, it will be appreciated that the
16   invention will find utility in connection with any type of isochronous information for which
17   synchrony among devices is desired.  The system is such that synchrony groups are created and
18   destroyed dynamically, and in such a manner as to avoid requiring a dedicated device as the master
19   device.

20        It will be appreciated that a number of changes and modifications may be made to the
21   network audio system 10 as described above.  For example, although the invention has been
22   described as providing that the audio information channel device 23 provides digital audio
23   information to the members synchrony group 20 that has been encoded using particular types of
24   encoding and compression methodologies, it will be appreciated that the audio information channel
25   device 23 can provide digital audio information to various members of the synchrony group 20 that
26   have been encoded and compressed using different types of encoding and compression
27   methodologies, and, moreover, for which different sampling rates have been used. For example, the

-48-

1   audio information channel device 23 may provide digital audio information to the master device 21

2   and slave devices 22(1) through 22($g_1$) using the MP3 methodology at a specified sampling rate, the

3   digital audio information for the same program to slave devices 22($g_1$+1) through 22($g_2$) using the

4   WAV methodology at one specified sampling rate, and to slave devices 22($g_2$+1) through 22(G)

5   using the WAV methodology at another specified sampling rate. In that case, the audio information

6   channel device 23 can specify the particular encoding and compression methodology that has been

7   used in the encoding type field 57 associated with each frame and the sampling rate in the sampling

8   rate field 58. Moreover, since the encoding and compression type and sampling rate are specified

9   for each frame, the encoding and compression type and sampling rate can be changed from frame

10  to frame. The audio information channel device 23 may use different multi-cast addresses for the

11  different encoding and compression types and sampling rates, but it will be appreciated that that

12  would not be required.

13      It will be appreciated that two advantages of providing that the encoding and compression

14  methodology and the sampling rate is provided on a frame-by-frame basis, instead of on, for

15  example, a track-by-track basis, is that that would facilitate a slave device joining the synchrony

16  group 20 at a frame mid-track, without requiring, for example, the master device 21 or the audio

17  information channel device 23 to notify it of the encoding and compression methodology or the

18  sampling rate.

19      Another modification is that, instead of the network communications manager 40 of a

20  member of a synchrony group 20 generating the updated time stamp $T^u_F$ for a digital audio

21  information frame by adding the time differential value $\Delta T$ to the time stamp $T_F$ associated with a

22  frame, the network communications manager 40 may instead generate the updated time stamp $T^U_F$

23  by subtracting the differential time value $\Delta T$ from the member's current time $T_S$ as indicated by the

24  member's digital to analog converter clock 34 at the time at which the digital audio information is

25  received. It will be appreciated, however, that there may be variable time delays in processing of

26  messages by the slave device's network communications manager 40, and so it may be preferable

27  to generate the time differential value $\Delta T$ using the time stamp $T_F$ provided by the audio information

28  channel device 23.

-49-

1        In addition, instead of the network communications manager 40 of a member of a synchrony

2    group generating an updated time stamp to reflect the difference between the times indicated by the

3    member's digital to analog converter clock and the audio information channel device's digital to

4    analog converter clock, the network communications manager 40 can generate the time differential

5    value $\Delta T$ and provide it to the member's playback scheduler 32. In that case, the member's network

6    communications manager 40 can store each digital audio information frame along with the time

7    stamp $T_F$ as received from the master device in the audio information buffer 21. The playback

8    scheduler 32 can utilize the time differential value $\Delta T$, and the time stamps $T_F$ associated with the

9    digital audio information frames, to determine when the respective digital audio information frames

10    are to be played. In determining when a digital audio information frame is to be played, the

11    playback scheduler can add the time differential value to the time stamp $T_F$ associated with the

12    digital audio frame, and enable the digital audio frame to be coupled to the digital to analog

13    converter 33 when the time indicated by the sum corresponds to the current time as indicated by the

14    slave device's digital to analog converter clock 34. Alternatively, when the member's digital to

15    analog converter clock 34 updates its current time $T_S$ the playback scheduler can generate an updated

16    current time $T'_S$ by subtracting the differential time value $\Delta T$ from the current time $T_S$, and using the

17    updated current time $T'_S$ to determine when to play a digital audio information frame.

18        As described above, the members of a synchrony group 20 periodically obtain the audio

19    information channel device's current time value and uses the current time value that it receives from

20    the audio information channel device to periodically update the time differential value $\Delta T$ that it uses

21    in updating the time stamps associated with the various frames. It will be appreciated that, if the

22    digital to analog converter clock(s) associated with the member(s) of a synchrony group 20 are

23    ensured to have the same rate as the digital to analog converter clock, a member need only obtain

24    the current time value from the audio information channel device once, at the beginning of playback.

25        As another alternative, if the zone players are provided with digital to analog converter clock

26    34 whose time and rate can be set by an element such as the network communications manager 40,

27    when a zone player 11(n) is operating as a member of a synchrony group 20, its network

28    communications manager 40 can use the various types of timing information that it receives from

1    the audio information channel device 23, including the current time information and the playback

2    timing information indicated by the time stamps that are associated with the various frames 51(f)

3    comprising the audio and playback timing information that it receives, to adjust the synchrony group

4    member's digital to analog converter clock's time value and/or the clock rate that it uses for playback.

5    If the clock's time value is to be adjusted, when the synchrony group member's network

6    communications manager 40 initially receives the current time information from the audio

7    information channel device 23 for the synchrony group 20, the network communications manager

8    40 can set the synchrony group member's digital to analog converter clock 34 to the current time

9    value as indicated by the audio information channel device's current time information. The network

10   communications manager 40 can set the clock 34 to the current time value indicated by the audio

11   information channel device's current time information once, or periodically as it receives the current

12   time information.

13        Alternatively or in addition, the synchrony group member's network communications

14   manager 40 can use one or both of the current time information and/or the playback timing

15   information in the time stamps associated with the respective frames 51(f) to adjust the clock rate

16   of the clock 34 that it uses for playback. For example, when the synchrony group member's network

17   communications manager 40 receives a frame 51($f_x$) having a time stamp having a time value $T_{f_x}$,

18   it can generate the updated time value $T^U{}_{f_x} = T_{f_x} + \Delta T$ as described above, and store the frame

19   with the time stamp with the updated time value in the audio information buffer 30. In addition,

20   since both the number of samples in a frame and the sampling rate, which determines the rate at

21   which the frame is to be played, are known to the network communications manager 40, it can use

22   that information, along with the updated time value $T^U{}_{F_x}$ that is to be used for frame 51($f_x$) to

23   generate an expected updated time value $T^E{}_{f_{x+1}}$ that is expected for the updated time stamp of the

24   next frame 51($f_{x+1}$). After the synchrony group member's network communications manager 40

25   receives the next frame 51($f_{x+1}$), it can generate the updated time value $T^U{}_{f_{x+1}}$ and compare that

-51-

1    value to the expected updated time value $T^E{}_{f_{x+1}}$. If the two time values do not correspond, or if

2    the difference between them is above a selected threshold level, the clock that is used by the audio

3    information channel device 23 to generate the time stamps is advancing at a different rate than the

4    synchrony group member's digital to analog converter clock 34, and so the network communications

5    manager 40 can adjust the rate of the digital to analog converter clock 34 to approach that of the

6    clock used by the audio information channel device 23 so that the differential time value $\Delta T$ is

7    constant. On the other hand, if the two time values do correspond, then the time differential value

8    $\Delta T$ is constant, or the difference is below a threshold level, and the network communications

9    manager 40 need not change the clock rate of the digital to analog converter clock 34. It will be

10   appreciated that, if the clock rate is to be adjusted, the rate adjustment can be fixed, or it can vary

11   based on, for example, the difference between the updated time value $T^U{}_{f_{x+1}}$ and the expected

12   updated time value $T^E{}_{f_{x+1}}$.

13        It will also be appreciated that, if no rate adjustment is performed for one frame $51(f_{x+1})$, the

14   synchrony group member's network communications manager 40 can generate an expected updated

15   time value $T^E{}_{f_{x+2}}$ that is expected for the updated time stamp of the next frame $51(f_{x+2})$ using the

16   updated time value $T^U{}_{F_x}$ determined for frame $51(f_x)$, along with the number of samples in a frame

17   and the sampling rate, and compare the expected updated time value $T^E{}_{f_{x+2}}$ to the updated time

18   value $T^U{}_{f_{x+2}}$ that it generates when it receives frame $51(f_{x+2})$. At that point, if the network

19   communications manager 41 determines that two time values do not correspond, or if the difference

20   between them is above a selected threshold level, it can adjust the rate of the digital to analog

21   converter clock 34. Similar operations can be performed if no rate adjustment is performed for

22   several successive frames $51(f_{x+1})$, $51(f_{x+2})$,.... This will accommodate the possibility that the rate

23   differential between the clock 34 and the clock used by the audio information channel device 23 in

-52-

1   generating the time stamps have rates that differ by an amount sufficiently small that it cannot be

2   detected using time stamps of two or more successive frames.

3           Instead or in addition to adjusting the clock rate as described above, the synchrony group

4   member's network communications manager 40 can perform similar operations in connection with

5   adjusting the clock rate in connection with the current time information that it receives from the

6   audio information channel device 23.

7           Furthermore, although the network audio system 10 has been described such that the master

8   device 21 of a synchrony group 20 can, in response to control information provided thereto by a user

9   through the user interface module 13, provide a notification to a zone player 11(n) that it is to

10  become a member of its synchrony group 20 as a slave device 22(g), it will be appreciated that the

11  user interface module  13 can provide the notification directly to the zone player 11(n) that is to

12  become a member of the synchrony group 20.  In that case, the zone player 11(n) can notify the

13  master device 21 that it is to become a slave device 22(g) in the synchrony group 20, after which the

14  master device 21 can provide information regarding the synchrony group 20, including the multi-cast

15  and unicast addresses of the audio information channel device and other information as described

16  above.

17          Similarly, although the network audio system 10 has been described such that the master

18  device 21 of a synchrony group 20 can, in response to control information provided thereto by a user

19  through the user interface module 13, provide a command to a slave device 22(g) to enable the slave

20  device 22(g) to adjust its volume, it will be appreciated that the user interface module 13 can provide

21  control information directly to the slave device 22(g) to enable the slave device 22(g) to adjust its

22  volume.

23          In addition, although the network audio system 10 has been described such that each frames

24  51(f) is associated with a frame sequence number (reference field 56, FIG. 4), it will be appreciated

25  that, if the packets described above in connection with Packet Sequence A and Packet Sequence B

26  are provided with packet sequence numbers, the frame sequence numbers need not be provided,

27  since the packet sequence numbers can suffice for defining the frame sequencing.

1        Furthermore, although the network audio system 10 has been described such that the zone

2     players 11(n) are provided with an audio amplifier 35 for amplifying the analog signal provided by

3     the respective digital to analog converters 33, it will be appreciated that a zone player may be

4     provided that does not itself include an audio amplifier.  In that case, the analog signal may be

5     coupled to an external amplifier for amplification as necessary before being provided to the audio

6     reproduction device(s) 15(n)(r).  It will be appreciated that a single zone player 11(n) may be

7     provided with multiple audio amplifiers and audio reproduction device interfaces, and, if necessary,

8     multiple digital to analog converters 33, to provide audio programs for corresponding numbers of

9     synchrony groups.

10        Similarly, although the zone players 11(n) have been described such that they may be

11    connected to one or more audio information sources, it will be appreciated that an audio information

12    source may form part of and be integrated into a zone player 11(n).  For example, a zone player may

13    include a compact disk player, cassette tape player, broadcast radio receiver, or the like, that has been

14    integrated into it.  In addition, as noted above, an individual zone player 11(n) may be connected to

15    multiple audio information sources and may contemporaneously operate as the audio information

16    channel device 23 for multiple synchrony groups .

17        In addition, although FIG. 1 shows the network audio system 10 as including one user

18    interface module 13, it will be appreciated that the system 10 may include a plurality of user

19    interface modules.  Each user interface module be useful for controlling all of the zone players as

20    described above, or alternatively one or more of the user interface modules may be useful for

21    controlling selected subsets of the zone players.

22        Moreover, it will be appreciated that, although the invention has been described in connection

23    with audio information, it will be appreciated that the invention will find utility in connection with

24    any type of information for which synchrony among devices connected to a network is desired.

25        As noted above, while a zone player 11(n) is operating as audio information channel device

26    23 for a synchrony group 20, when the zone player 11(n)'s audio information source interface 30 or

27    network communications manager 40 stores digital audio information frames based on audio

1    information from an audio information source 14(n)(s) in the audio information buffer 31, it will

2    provide time stamps for the respective frames to schedule them for playback after some time delay

3    after they have been buffered in the audio information buffer 31. The delay is provided so that, for

4    other zone players 11(n'), 11(n''),... that are operating as members of a synchrony group, there will

5    be sufficient time for the audio and playback timing information to be transferred over the network

6    12 to those other zone players 11(n'), 11(n''),... so that it can be processed and played by them at the

7    appropriate time as described above. The time period that is selected for the time delay may be fixed

8    or variable, and in either case may be based on a number of factors. If the time period selected for

9    the time delay is fixed, it may be based on, for example, factors such as an estimate of the maximum

10    latency in the network 12, the estimated maximum loading of the various components comprising

11    the zone players 11(n), and other estimates as will be appreciated by those skilled in the art.

12        The time delay may be the same for audio information from all types of audio information

13    sources, and may be constant over the entire period that the synchrony group 20 is playing an audio

14    work. Alternatively, different time delays may be utilized based on various criteria. For example,

15    if the audio information is to be played independently of information associated with other types of

16    media, the time delay may be selected to be relatively long, on the order of a significant fraction of

17    a second, or longer. On the other hand, if the audio information is to be played contemporaneously

18    with, for example, video information, which may be supplied by, for example, a video disk, video

19    tape cassette, over cable, satellite, or broadcast television, which may not be buffered or which may

20    be displayed independently of the network audio system 10, it may be undesirable to provide for

21    such a lengthy delay, since the time delay of the audio playback, in relation to the video display, may

22    be noticeable. In that case, the zone player 11(n) may provide for a much shorter time delay. In one

23    embodiment, the time delay provided for audio information to be played concurrently with video

24    information is selected to be generally on the order of fifty milliseconds, which would barely, if at

25    all, be perceptible to someone viewing the video. Other desirable time delays for information from

26    other types of sources will be apparent to those skilled in the art.

27        As yet a further possibility, the zone player 11(n), when operating as an audio information

28    channel device 23 for a synchrony group 20, can dynamically determine the time delay based on a

-55-

1    number of conditions in the network audio system 10, including, for example, the message transfer

2    latency in network 12, the loading of microprocessors or other components that are used in the

3    various zone players 11(n'), 11(n"),... that may comprise a synchrony group 20, as well as other

4    factors. For example, if the audio information channel device 23 determines that the latency in the

5    network 12 has increased beyond a selected threshold, the audio information channel device 23 can

6    adjust the delay to increase the likelihood that the members of the synchrony group 20 will be able

7    to receive the packets and process the frames so that they will be able to play them at the appropriate

8    times. Similarly, if the audio information channel device 23 is notified that a member of the

9    synchrony group 20 to which it provides audio information requires additional time to receive and

10   process the frames that it transmits, the audio information channel device 23 can adjust the delay

11   accordingly. It will be appreciated that, to reduce or minimize possible discontinuities in the audio

12   playback by the members of the synchrony group, the audio information channel device 23 can,

13   instead of adjusting the time delay during a particular audio track, adjust the time delay between

14   tracks, during silent periods of a track or otherwise as will be appreciated by those skilled in the art.

15   In addition, the audio information channel device 23 can use conventional audio compression

16   methodologies to facilitate a speeding up and/or slowing down of playback of an audio track while

17   it is in the process of providing additional time delay. Generally, the members of the synchrony

18   group 20 can provide notifications to the audio information channel device 23 if they determine that

19   they will need an additional time delay, and the audio information channel device 23 can adjust the

20   time delay in accordance with the notifications from the members of the synchrony group 20.

21       It will be appreciated that a system in accordance with the invention can be constructed in

22   whole or in part from special purpose hardware or a general purpose computer system, or any

23   combination thereof, any portion of which may be controlled by a suitable program. Any program

24   may in whole or in part comprise part of or be stored on the system in a conventional manner, or it

25   may in whole or in part be provided in to the system over a network or other mechanism for

26   transferring information in a conventional manner. In addition, it will be appreciated that the system

27   may be operated and/or otherwise controlled by means of information provided by an operator using

28   operator input elements (not shown) which may be connected directly to the system or which may

-56-

1    transfer the information to the system over a network or other mechanism for transferring

2    information in a conventional manner.

3          The foregoing description has been limited to a specific embodiment of this invention. It will

4    be apparent, however, that various variations and modifications may be made to the invention, with

5    the attainment of some or all of the advantages of the invention.  It is the object of the appended

6    claims to cover these and such other variations and modifications as come within the true spirit and

7    scope of the invention.

8          What is claimed as new and desired to be secured by Letters Patent of the United States is:

1. A method for providing synchronized audio play back amongst a plurality of audio devices, the method comprising:

retrieving, by a computing device, audio information from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service;

transmitting a plurality of frames to a plurality of audio devices over a local network from the computing device, each frame of the plurality of frames to include the retrieved audio information and timing information inserted at the computing device, wherein the timing information is to be used to play the audio information by the plurality of audio devices in synchrony.

2. The method of claim 1, wherein the computing device comprises a personal computer.

3. The method of claim 2, further comprising transmitting the plurality of frames to the plurality of audio devices responsive to receiving a user command via a user interface of the personal computer.

4. The method of claim 1, wherein the computing device comprises a mobile computing device.

5. The method of claim 4, further comprising transmitting the plurality of frames to the plurality of audio devices responsive to receiving a user command via a user interface of the mobile computing device.

6. The method of claim 1, wherein the computing device is configured to play the audio information in synchrony with the plurality of audio devices.

7. The method of claim 1, wherein the computing device is configured to play different audio information than the plurality of audio devices and at the same time as the plurality of audio devices play the audio information.

8. The method of claim 1, wherein the locally stored digital audio file is stored on a personal computer or a mobile computing device configured to store digital information.

9. The method of claim 1, further comprising wirelessly transmitting the plurality of frames to the plurality of audio devices.

10. The method of claim 1, wherein the computing device comprises a user interface to receive a user command to transmit the plurality of frames.

11. The method of claim 10, wherein the user interface is to enable a user to at least one of select an audio track, display status information, and display an upcoming audio playback selection.

12. The method of claim 10, wherein the user interface is to enable a user to select one or more of the plurality of audio devices for audio playback.

13. A non-transitory computer readable medium having stored therein instructions executable by a processor to perform a method comprising:

retrieving, by a computing device, audio information from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service;

transmitting a plurality of frames to a plurality of audio devices over a local network from the computing device, each frame of the plurality of frames to include the retrieved audio information and timing information inserted at the computing device, wherein the timing information is to be used to play the audio information by the plurality of audio devices in synchrony.

14. A method for providing synchronized audio amongst a plurality of audio devices, the method comprising:

receiving, by an audio device, a plurality of frames over a local network from a computing device, each frame of the plurality of frames to include audio information and timing information, wherein the timing information is to be used to play the audio information by the audio device in synchrony with another receiving audio device; and

converting, by the audio device, the audio information from a digital form into an analog signal to be output based on the timing information via an amplifier and a speaker driver.

15. The method of claim 15, wherein the computing device comprises a mobile computing device.

16. The method of claim 15, wherein the computing device comprises a personal computer.

17. The method of claim 15, wherein the audio information is from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service.

18. The method of claim 15, wherein the local network comprises a wired network.

19. The method of claim 15, wherein the local network comprises a wireless network.

20. A non-transitory computer readable medium having stored therein instructions executable by a processor to perform a method comprising:

receiving, by an audio device, a plurality of frames over a local network from a computing device, each frame of the plurality of frames to include audio information and timing information, wherein the timing information is to be used to play the audio information by the audio device in synchrony with another receiving audio device; and

converting, by the audio device, the audio information from a digital form into an analog signal to be output based on the timing information via an amplifier and a speaker driver.

1                           ABSTRACT OF THE DISCLOSURE

2            A system is described for maintaining synchrony of operations among a plurality of devices

3      that have independent clocking arrangements.  The system includes a task distribution device that

4      distributes tasks to a synchrony group comprising a plurality of devices that are to perform the tasks

5      distributed by the task distribution device in synchrony.  The task distribution device distributes each

6      task to the members of the synchrony group over a network.  Each task is associated with a time

7      stamp that indicates a time, relative to a clock maintained by the task distribution device, at which

8      the members of the synchrony group are to execute the task.  Each member of the synchrony group

9      periodically obtains  from the task distribution device an indication of the current time indicated by

10     its clock, determines a time differential between the task distribution device's clock and its respective

11     clock and determines therefrom a time at which, according to its respective clock, the time stamp

12     indicates that it is to execute the task.

Hanley, Flight & Zimmerman, LLC
Title: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A
PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES
Inventor(s): Nicholas A. J. Millington
Attorney Docket No.: 20218/11-0901
Page 1 of 5



*FIG.1*

Hanley, Flight & Zimmerman, LLC
Title: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A
PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES
Inventor(s): Nicholas A. J. Millington
Attorney Docket No.: 20218/11-0901
Page 2 of 5



*F I G. 2*

Hanley, Flight & Zimmerman, LLC
Title: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A
PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES
Inventor(s): Nicholas A. J. Millington
Attorney Docket No.: 20218/11-0901
Page 3 of 5



*FIG. 2A*

Hanley, Flight & Zimmerman, LLC
Title: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A
PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES
Inventor(s): Nicholas A. J. Millington
Attorney Docket No.: 20218/11-0901
Page 4 of 5



*F I G. 3*

Hanley, Flight & Zimmerman, LLC
Title: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A
PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES
Inventor(s): Nicholas A. J. Millington
Attorney Docket No.: 20218/11-0901
Page 5 of 5



*F I G. 4*

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519-CON) | 2371 |

| 107361        7590        10/05/2016 |
|---|
| McDonnell Boehnen Hulbert & Berghoff LLP |
| Sonos, Inc. |
| 300 South Wacker Drive |
| Chicago, IL 60606 |

| EXAMINER |
|---|
| SURVILLO, OLEG |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/05/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| **Office Action Summary** | Application No.<br>13/864,250 | Applicant(s)<br>MILLINGTON, NICHOLAS A. J. |
|---|---|---|
| | Examiner<br>OLEG SURVILLO | Art Unit<br>2442 | AIA (First Inventor to File)<br>Status<br>No |

*(Art Unit and AIA columns shown within the table above)*

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on *See Continuation Sheet*.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) *21-40* is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) *21-40* is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on *April 17, 2013* is/are:  a)☒ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

**Certified copies:**

  a)☐ All  b)☐ Some**  c)☐ None of the:
  1.☐ Certified copies of the priority documents have been received.
  2.☐ Certified copies of the priority documents have been received in Application No. _____.
  3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date *See Continuation Sheet*.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____ .

**Continuation Sheet (PTOL-326)**                                                        **Application No.  13/864,250**

Continuation of Status 1).Responsive to communication(s) filed on:  April 17, 2013; August 22, 2013; and November 1, 2013.

 Continuation of Attachment(s) 2). Information Disclosure Statement(s) (PTO/SB/08), Paper No(s)/Mail Date :05/08/2013; 03/04/2014; 04/15/2014; 05/23/2014; 07/07/2014; 08/14/2014; 12/10/2014; 01/28/2015; 03/23/2015; 04/23/2015; 05/31/2015; 07/10/2015; 08/22/2015; 10/09/2015; 11/23/2015; 12/29/2015; 02/11/2016; 03/18/2016; 05/20/2016; 07/07/2016.

Application/Control Number: 13/864,250                                             Page 2
Art Unit: 2442

The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

### *Response to Preliminary Amendment*

1.      Claims 21-40 are pending in the application. No claims are currently amended.

Claims 1-20 have been canceled. Claims 21-40 are new.


### *Response to Arguments*

2.      With regard to Applicant's remarks dated April 17, 2013:

Preliminary amendment has been fully considered and is entered.

Amendment to the specification, abstract, and claims has been fully considered

and is entered.


3.      With regard to Applicant's remarks dated August 22, 2013:

Preliminary amendment has been fully considered and is entered.

Amendment to the title of the invention has been fully considered and is entered.


4.      With regard to Applicant's remarks dated November 1, 2013:

Preliminary amendment has been fully considered and is entered.

Amendment to the specification has been fully considered and is entered.


### *Claim Rejections - 35 USC § 102*

Application/Control Number: 13/864,250                                          Page 3
Art Unit: 2442

The following is a quotation of the appropriate paragraphs of pre-AIA 35 U.S.C.

102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(e) the invention was described in (1) an application for patent, published under section
122(b), by another filed in the United States before the invention by the applicant for patent or
(2) a patent granted on an application for patent by another filed in the United States before
the invention by the applicant for patent, except that an international application filed under
the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an
application filed in the United States only if the international application designated the United
States and was published under Article 21(2) of such treaty in the English language.

5.      Claims 21-40 are rejected under pre-AIA 35 U.S.C. 102(e) as being anticipated

by Goldberg et al. (US 2007/0142944 A1).

As to claim 21, Goldberg teaches in a network comprising a first zone player [one

of the units 100] (Fig. 1), wherein the first zone player is a member of a first synchrony

group [cluster 700] (Fig. 6, 9A, 9B), a method comprising:

playing, at the first zone player, audio information associated with the first

synchrony group (par. [0188]);

receiving, at the first zone player, control information from a user interface

module [GUI of unit 100] (par. [0103]), wherein the control information [user interacting

with a unit 100 results in transmission of a signal to the unit] (par. [0267]) directs the first

zone player to disengage from the first synchrony group and to join a second synchrony

group (par. [0187], [0211], [0267]);

disengaging, by the first zone player based on the received control information,

the first zone player from the first synchrony group [members of the group can come

and go. Also, broadcast unit may send out a signal transferring control] (par. [0187],

[0267]);

Application/Control Number: 13/864,250                                    Page 4
Art Unit: 2442

joining, by the first zone player based on the received control information, the first

zone player to the second synchrony group [detecting and joining a different cluster

700] (par. [0209]-[0211]); and

playing, by the first zone player, audio information associated with the second

synchrony group (par. [0185]).


As to claim 22, Goldberg teaches transmitting, by the first zone player, a

notification to a second zone player, the transmission indicating that the first zone player

is disengaging from the first synchrony group [original broadcast unit 710 transmits to

the other cluster members the addresses of the sockets on the receive unit 730 that is

now the new broadcast unit, and terminates its own multicast] (par. [0272], Fig. 16).


As to claim 23, Goldberg teaches that the second zone player is a master of the

first synchrony group [receive unit 730 becomes a new master of the first synchrony

group once the broadcast unit disengages] (par. [0271]).


As to claim 24, Goldberg teaches that prior to disengaging the first zone player is

a master device of the first synchrony group (par. [0267]), and wherein disengaging, by

the first zone player based on the received control information, the first zone player from

the first synchrony group comprises transmitting, by the first zone player, a notification

to a second zone player, the transmission indicating that the second zone player is to

become a master device of the first synchrony group (par. [0267]-[0271]).

Application/Control Number: 13/864,250                                    Page 5
Art Unit: 2442

As to claim 25, Goldberg teaches transmitting, by the first zone player, a
notification to a third zone player, wherein the third zone player is a master device of the
second synchrony group, and wherein the notification indicates that the first zone player
is joining the second synchrony group (par. [0209]-[0212]).

As to claim 26, Goldberg teaches receiving, by the first zone player, audio
information associated with the second synchrony group (par. [0185]).

As to claim 27, Goldberg teaches receiving, by the first zone player, playback
timing information associated with the second synchrony group (par. [0201]-[0202]).

As to claim 28, Goldberg teaches a tangible computer-readable memory having
instructions stored thereon [invention of Goldberg is computer-implemented thus
inherently requires program instructions to operate] that when executed cause a first
zone player to perform the method steps as discussed per claim 21 above.

As to claims 29-34, Goldberg teaches all the elements as discussed per claims
22-27 above.

As to claim 35, Goldberg teaches a zone player comprising:

Application/Control Number: 13/864,250                                                    Page 6
Art Unit: 2442

a network interface [inter-unit tx/rx 110] configured to receive control information from a user interface [gui] (par. [0096], [0103]);

an audio reproduction device configured to playback audio information [audio player 130] (par. [0104]);

a control module [unit controller 101] configured to perform the functionality as discussed per claim 21 above.


As to claims 36-40, Goldberg teaches all the elements as discussed per claims 22-27 above.


### Conclusion

Any inquiry concerning this communication or earlier communications from the examiner should be directed to OLEG SURVILLO whose telephone number is (571)272-9691.  The examiner can normally be reached on Mon-Thu 10:00am - 7:30pm; Fri 10:00am - 6:30pm EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Glenton B. Burgess can be reached on 571-272-3949.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 13/864,250                                      Page 7
Art Unit: 2442

      Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/OLEG SURVILLO/
Primary Examiner, Art Unit 2442

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519-CON) | 2371 |

| | | |
|---|---|---|
| 107361          7590          12/28/2016 | | |

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| SURVILLO, OLEG |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/28/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) |
| | 13/864,250 | MILLINGTON, NICHOLAS A. J. |
| | **Examiner** | **Art Unit** | |
| | OLEG SURVILLO | 2442 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Oleg Survillo, Primary Examiner AU 2442.*          (3) *Christopher Butts, Reg. No.: 67,558.*

(2) *Jeffrey P. Armstrong, Reg. No.: 54,967.*          (4) *John Tolomei, Reg. No. 57,846.*

Date of Interview: *22 December 2016.*

Type:    ☒ Telephonic    ☐ Video Conference
         ☐ Personal [copy given to: ☐ applicant    ☐ applicant's representative]

Exhibit shown or demonstration conducted:    ☐ Yes    ☒ No.
   If Yes, brief description: _____.

Issues Discussed    ☐101   ☐112   ☒102   ☐103   ☒Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: *21.*

Identification of prior art discussed: *Goldberg.*

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

   *Discussed proposed amendments in light of the prior art references used in the rejection. Agreed that proposed changes overcome the teachings of Goldberg. Discussed making additional changes to establish that first synchrony group contains more than one zone player. No agreement on exact language has been made. It was agreed that further action will be taken based on Applicant's response to the outstanding Office action.*

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☒ Attachment

| /OLEG SURVILLO/ Primary Examiner, Art Unit 2442 | |

**Summary of Record of Interview Requirements**

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant.  An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2  Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing.  The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary.  The action of the Patent and Trademark Office will be based exclusively on the written record in the Office.  No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

_____

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so.  It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks.  Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below.  Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper.  In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview.  In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable).  Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
(The identification of arguments need not be lengthy or elaborate.  A verbatim or highly detailed description of the arguments is not required.  The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file.  Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview.  If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

**Examiner to Check for Accuracy**

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her.  If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.



McDonnell Boehnen Hulbert & Berghoff
Law Offices

300 South Wacker Drive          312-913-0001 phone
Chicago, Illinois 60606-6709     312-913-0002 fax
www.mbhb.com

December 21, 2016

Via email: oleg.survillo@uspto.gov

Examiner Oleg Survillo
U.S. Patent & Trademark Office
P.O. Box 1450
Arlington, VA 22313-1450

**RE:  Interview Agenda for App. 13/864,250 (Sonos 13-0403; MBHB 15-519-CON)**

Examiner Survillo:

Thank you for agreeing to interview the above-referenced application on Thursday, December 22, 2016, at 2pm ET / 1pm CT.  An agenda of topics is outlined below:

**Agenda for the Examiner Interview:**
- Proposed amendments to claim 21
- Section 102 rejection of claim 21
  - U.S. Pub. 2007/0142944 ("Goldberg")

**Example Pending Claim:**

     21.    (Proposed)  ~~In a network comprising a first zone player, wherein the first zone player is a member of~~ A zone player comprising at least one processor and tangible, non-transitory computer-readable memory comprising instructions that, when executed, cause the zone player to perform operations ~~a first synchrony group, a method~~ comprising:

     playing~~, at the first zone player,~~ audio information associated with ~~the~~ a first synchrony group of which the zone player is a member; ~~and~~

     receiving~~, at the first zone player,~~ control information from a ~~user interface module~~ controller device communicatively coupled to the zone player over a data network, wherein the control information includes an identification of another zone player, and wherein the control information directs the ~~first~~ zone player to (a) disengage from the first synchrony group, and to (b) join a second synchrony group with the identified zone player, and (c) receive audio information for playback in synchrony with playback of the audio information by the identified zone player;

1

disengaging, ~~by the first zone player based on the received control information,~~ the ~~first~~ zone player from the first synchrony group;

joining, ~~by the first zone player based on the received control information,~~ the ~~first~~ zone player to the second synchrony group; and

playing, ~~by the first zone player,~~ the audio information <u>in synchrony with the playback of the audio information by the identified zone player</u> ~~associated with the second synchrony group~~.


**I.    Section 102 Rejection of claim 21**

Goldberg fails to disclose or suggest "receiving control information from a controller device communicatively coupled to the zone player over a data network, wherein the control information includes an identification of another zone player."

Goldberg discloses a system having a "broadcast unit" and a "receiver unit" that establish a direct connection 1104 between the two units for exchanging TCP messages involving audio multicasting. *See* Goldberg, paragraphs [0182]-[0185] and Fig. 14, reproduced below. Such a direction connection is contrary to a zone player communicating with a separate controller device over a data network in the manner required by claim 21.



Figure 14B of Goldberg

Additionally, Goldberg fails to disclose or suggest the features of ""receiving control information from a user interface module of a controller device communicatively coupled to the zone player

over a data network, wherein the control information includes an identification of another zone player" in combination with the other features of claim 21 as proposed above, such as the "disengaging," "joining," and "playing [] audio information" in the manner required by claim 21.

If you have questions, or if you would like additional information to prepare for the interview, please feel free to call me.

Best regards,

Jeff Armstrong
312-913-2104 (office)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

### (Docket No. 13-0403 (MBHB 15-519-CON))

| | |
|---|---|
| In the Application of: ) | |
| Nicholas A. J. Millington ) | Examiner: SURVILLO, Oleg |
| ) | |
| Application No.: 13/864,250 ) | Group Art Unit: 2442 |
| ) | |
| Filed: April 17, 2013 ) | Confirmation No. 2371 |
| ) | |
| Title: System and Method for Synchronizing ) | |
| Operations Among a Plurality of ) | |
| Independently Clocked Digital Data ) | |
| Processing Devices ) | |

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO THE OFFICE ACTION MAILED OCTOBER 5, 2016

The present communication responds to the Office Action dated October 5, 2016, in the above application. Amendments to the specification begin on page 2. Amendments to the claims are reflected in the listing of claims beginning on page 3. Remarks begin on page 9.

The Office is hereby authorized to charge any underpayment of fees or credit any overpayment of fees in connection with the prosecution of the above-captioned application to Deposit Account 13-2490.

Application No.:  13/864,250                                    Docket No. 13-0403
Resp. to OA of Oct. 5, 2016

<u>**AMENDMENTS TO THE SPECIFICATION**</u>

Please amend the title of the application as follows:

~~System and Method for Synchronizing Operations Among a Plurality of Independently Clocked Digital Data Processing Devices~~<u>Disengaging and Engaging Zone Players</u>

2

Application No.: 13/864,250                                            Docket No. 13-0403
Resp. to OA of Oct. 5, 2016

## AMENDMENTS TO THE CLAIMS

Please amend claims 21-40.   Following is a complete listing of the claims, as amended.

21.    (Currently Amended) ~~In a network comprising a first zone player, wherein the first zone player is a member of a first synchrony group, a method comprising~~A first zone player comprising at least one processor and tangible, non-transitory computer-readable memory comprising instructions that, when executed, cause the first zone player to perform operations comprising:

playing~~, at the first zone player,~~ first audio information associated with [[the]] a first synchrony group comprising a first zone player and a second zone player;

receiving~~, at the first zone player,~~ control information from a ~~user interface module~~controller device communicatively coupled to the first zone player over a data network, wherein the control information includes an identification of a third zone player, and wherein the control information directs the first zone player to (a) disengage from the first synchrony group, ~~and to~~ (b) join a second synchrony group with the identified third zone player, and (c) receive second audio information for playback in synchrony with playback of the second audio information by the identified third zone player;

disengaging~~, by the first zone player based on the received control information,~~ the first zone player from the first synchrony group in response to receiving the control information;

joining~~, by the first zone player based on the received control information,~~ the first zone player to the second synchrony group; and

playing~~, by the first zone player,~~ the second audio information in synchrony with the playback of the second audio information by the identified third zone player~~associated with the second synchrony group~~.

22.    (Currently Amended) The ~~method of claim 21,~~first zone player of claim 21 wherein the disengaging~~, by the first zone player based on the received control information, the first zone player from the first synchrony group~~ comprises[[:]] transmitting~~, by the first zone player,~~ a notification to [[a]]the second zone player, the ~~transmission~~ notification indicating that the first zone player is disengaging from the first synchrony group.

3

Application No.: 13/864,250                                          Docket No. 13-0403
Resp. to OA of Oct. 5, 2016

23.    (Currently Amended) The ~~method of claim 22,~~first zone player of claim 21 wherein the
operations further comprise prior to the disengaging:

       receiving the first audio information for playback from an audio information source; and

       transmitting the first audio information ~~second zone player is a master device of the first~~
~~synchrony group~~to the second zone player while contemporaneously playing the first audio
information.

24.    (Currently Amended) The first zone player of claim 23, ~~method of claim 21,~~wherein the
control information directs the first zone player to cease the transmitting of the first audio
information, and wherein the operations further comprise ceasing the transmission of the first
audio information~~prior to disengaging the first zone player is a master device of the first~~
~~synchrony group, and wherein disengaging, by the first zone player based on the received control~~
~~information, the first zone player from the first synchrony group comprises: transmitting, by the~~
~~first zone player, a notification to a second zone player, the transmission indicating that the~~
~~second zone player is to become a master device of the first synchrony group.~~

25.    (Currently Amended) The ~~method of claim 21,~~ first zone player of claim 23 wherein the
control information directs the first zone player to receive the second audio information from the
identified third zone player, and wherein the operations further comprise receiving the second
audio information from the identified third zone player~~joining, by the first zone player based on~~
~~the received control information, the first zone player to the second synchrony group comprises:~~
~~transmitting, by the first zone player, a notification to a third zone player, wherein the third zone~~
~~player is a master device of the second synchrony group, and wherein the notification indicates~~
~~that the first zone player is joining the second synchrony group.~~

26.    (Currently Amended) The ~~method of claim 25,~~ first zone player of claim 21 wherein the
control information directs the first zone player to receive the second audio information for
playback from an audio information source, and wherein the operations further comprise
receiving the second audio information from the audio information source.

Application No.: 13/864,250
Resp. to OA of Oct. 5, 2016

Docket No. 13-0403

27. (Currently Amended) The ~~method of claim 26~~first zone player of claim 21 wherein the first audio information is different than the second audio information~~, further comprising: receiving, by the first zone player, playback timing information associated with the second synchrony group~~.

28. (Currently Amended) A tangible non-transitory computer-readable memory having instructions stored thereon that when executed cause a first zone player to:

play first audio information associated with [[the]] a first synchrony group, the first synchrony group including the first zone player and a second zone player;

receive control information from ~~a user interface module~~a controller device communicatively coupled to the first zone player over a data network, wherein the control information includes an identification of a third zone player, and wherein the control information directs the first zone player to (a) disengage from the first synchrony group, (b) ~~and to~~join a second synchrony group with the identified third zone player, and (c) receive second audio information for playback in synchrony with playback of the second audio information by the identified third zone player;

disengage the first zone player from the first synchrony group in response to receiving the ~~based on the received~~ control information;

join the first zone player to the second synchrony group; and

play the second audio information ~~associated~~in synchrony with the playback of the second audio information by the identified third zone player~~the second synchrony group~~.

29. (Currently Amended)    The computer-readable memory of claim 28, ~~wherein the instructions that cause the first zone player to disengage from the first synchrony group further comprise~~ further comprising instructions that when executed cause the first zone player to[[:]] transmit a notification to [[a]]the second zone player, the notification indicating that the first zone player is disengaging from the first synchrony group.

30. (Currently Amended)    The computer-readable memory of claim 28 ~~29, wherein the second zone player is a master device of the first synchrony group~~further comprising instructions that when executed cause the first zone player to:

5

Application No.: 13/864,250                                                    Docket No. 13-0403
Resp. to OA of Oct. 5, 2016

> receive the first audio information for playback from an audio information source; and
>
> transmit the first audio information to the second zone player while contemporaneously
>
> playing the first audio information.

31.    (Currently Amended)  The computer-readable memory of claim 30~~28, further comprising~~ wherein the control information directs the first zone player to cease the transmitting of the first audio information, and wherein the computer-readable memory further comprises instructions that when executed cause the first zone player to cease the transmission of the first audio information~~: transmit a notification to a second zone player, the transmission indicating that the second zone player is to become a master device of the first synchrony group, wherein the first zone player transmits the notification when it is currently the master device of the first synchrony group~~.

32.    (Currently Amended)   The computer-readable memory of claim 30 ~~28, wherein the instructions that cause the first zone player to join the second synchrony group further comprise instructions that cause the first zone player to: transmit a notification to a third zone player, wherein the third zone player is a master device of the second synchrony group, and wherein the notification indicates that the first zone player is joining the second synchrony group~~ wherein the control information directs the first zone player to receive the second audio information from the identified third zone player, and wherein the computer-readable memory further comprises instructions that when executed cause the first zone player to receive the second audio information from the identified third zone player.

33.    (Currently Amended)  The computer-readable ~~medium~~ memory of claim 28 ~~32, further comprising instructions that when executed cause the first zone player to: receive audio information associated with the second synchrony group~~ wherein the control information directs the first zone player to receive the second audio information for playback from an audio information source, and wherein the computer-readable memory further comprises instructions that when executed cause the first zone player to receive the second audio information from the audio information source.

6

Application No.:  13/864,250                                          Docket No. 13-0403
Resp. to OA of Oct. 5, 2016

34.      (Currently Amended)  The computer-readable ~~medium~~ memory of claim 28~~33, further
comprising instructions that when executed cause the first zone player to: receive playback
timing information associated with the second synchrony group~~ wherein the first audio
information is different than the second audio information~~.

35.      (Currently Amended)  ~~A zone player comprising:~~

~~a network interface configured to receive control information from a user interface
module;~~

~~an audio reproduction device configured to playback audio information;~~

~~a control module configured to, based on the control information received from the
network interface, cause the zone player to (i) disengage from a first synchrony group of which
the zone player is a member, (ii) join a second synchrony group, and (iii) playback audio
information at the audio reproduction device, wherein the audio information is associated with
the second synchrony group.~~

A system comprising a first synchrony group, the first synchrony group comprising a first
zone player and a second zone player, the first zone player comprising:
a network interface configured to connect the first zone player to a data network;

at least one processor; and
tangible, non-transitory computer-readable memory comprising instructions that, when executed
by the first zone player, cause the zone player to perform functions comprising:

playing first audio information associated with the first synchrony group;
receiving control information over the data network, the control information including an
identification of a third zone player;

in response to receiving the control information, (a) disengaging from the first synchrony
group, (b) joining a second synchrony group with the third zone player, (c) receiving second
audio information, and (d) playing the second audio information in synchrony with playback of
the second audio by the third zone player.

36.      (Currently Amended)  ~~The zone player of claim 35, wherein the control module is further
configured to transmit, via the network interface, a notification to a second zone player, the
notification indicating that the zone player is disengaging from the first synchrony group.~~

Case 1:24-cv-00131-JNR    Document 188-3    Filed 06/05/25    Page 348 of 608 PageID #: 11641

Application No.: 13/864,250                                      Docket No. 13-0403
Resp. to OA of Oct. 5, 2016

The system of claim 35, wherein the functions further comprise the first zone player transmitting a notification to the second zone player via the network interface, the notification indicating that the first zone player is disengaging from the first synchrony group.

37.    (Currently Amended) ~~The zone player of claim 36, wherein the second zone player is a master device of the first synchrony group.~~

The system of claim 35, wherein the functions further comprise the first zone player transmitting the first audio information to the second zone player while contemporaneously playing the first audio information.

38.    (Currently Amended) ~~The zone player of claim 35, wherein the control module is further configured to transmit, when the zone player is a master device of the first synchrony group, a notification to a second zone player, the notification indicating that the second zone player is to become a master device of the first synchrony group.~~

The system of claim 37, wherein the functions performed in response to receiving the control information further comprise the first zone player ceasing transmitting the first audio information to the second zone player while contemporaneously playing the first audio information.

39.    (Currently Amended) ~~The system of claim 35, wherein the control module is further configured to transmit, via the network interface, a notification to a third zone player, wherein the third zone player is a master device of the second synchrony group, and wherein the notification indicates that the zone player is joining the second synchrony group.~~

The system of claim 36, wherein the functions further comprise first zone player receiving the first audio information from the third zone player.

40.    (Currently Amended) ~~The system of claim 35, wherein the audio reproduction device is configured to playback audio information received via the network interface.~~

The system of claim 35, where receiving second audio information comprises receiving the second audio information from an audio information source that is separate from the third zone player.

Application No.: 13/864,250                                    Docket No. 13-0403
Resp. to OA of Oct. 5, 2016

## REMARKS

Claims 21-40 were pending when the present Office Action was mailed.  Claims 21-40 have been amended to expedite prosecution, and without conceding the merits of the rejections raised in the Office Action.  In view of the above, claims 21-40 are currently pending.

In the Office Action dated October 5, 2016, claims 21-40 were rejected under 35 U.S.C. § 102 over US 2007/0142944 (Goldberg).  As a preliminary matter, the undersigned attorney thanks the Examiner for engaging in a telephone conference with the undersigned and his colleagues, Chris Butts and John Tolomei, on December 22, 2016, to discuss the present Office Action, the Section 102 rejection, the Goldberg reference, and independent claim 21.  The following remarks reflect that Applicant understands that the Examiner agreed that Goldberg fails to disclose or suggest all the features of independent claim 21, as amended.  Applicant requests that this paper constitute the Applicant's Interview Summary.  If the Examiner notices any deficiencies with this paper in this regard, he is encouraged to contact the undersigned attorney to correct such deficiencies.

As acknowledged by the Examiner during the December 22 telephone interview, Goldberg fails to disclose or suggest all the features of amended independent claim 21.  For example, claim 21 is directed to a first zone player that performs operations comprising, *inter alia,* "receiving control information from a controller device communicatively coupled to the first zone player over a data network."  The control information "directs the first zone player to (a) disengage from the first synchrony group, (b) join a second synchrony group with . . . a third zone player [identified by the control information], and (c) receive second audio information for playback in synchrony with playback of the second audio information by the identified third zone player."  The operations further include "disengaging the first zone player from the first synchrony group in response to receiving the control information," "joining the first zone player to the second synchrony group," and "playing the second audio information in synchrony with the playback of the second audio information by the identified third zone player."

Goldberg discloses a system having a broadcast unit and a receiver unit.  *See* paras. [0182]-[0185] and Fig. 14.  The broadcast unit communicates to the members of a cluster.  *See* para. [0263].  In establishing a cluster, the broadcast and receiver units exchange TCP messages for forming a direct connection 1104.  *See* paras. [0182]-[0185] and Fig. 14.  The direct

Application No.: 13/864,250                                      Docket No. 13-0403
Resp. to OA of Oct. 5, 2016

connection 1104 requires the broadcast and receiver unit to mutually accept one another for audio multicasting. *Id.* Rather than "mutually accept" messages for multicasting as required by Goldberg, the zone player of claim 21 is directed by a controller device over a data network. Specifically, the controller device directs the first zone player, via control information, to perform each of "disengage[ing] from [a] first synchrony group," "join[ing] a second synchrony group" and "receiv[ing] [] audio information for playback in synchrony with playback of the [] audio information by [a] third zone player." Accordingly, Applicant requests that the rejection to claim 21 and the claims depending therefrom (claims 22-27) be withdrawn for at least the foregoing reasons, and for the additional features of these claims.

Independent claims 28 and 35 have been amended to include a combination of features generally similar to features of independent claim 21, claims 29-34 depend from base claim 28, and claims 36-40 depend from base claim 35. Therefore, Applicant requests that the rejections of claims 28-40 be withdrawn for at least the reasons discussed above with reference to claim 21, and for the additional features of these claims.

Conclusion

For at least the foregoing reasons, Applicant submits that the claims are in condition for allowance. Applicant thus respectfully requests favorable reconsideration and allowance of the claims. Applicant does not acquiesce in any assertion by the Examiner that is not expressly addressed by these remarks. The Examiner is encouraged to call the undersigned at (312) 913-0001 with any questions or comments for discussion.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date:  January 5, 2017      By:   /Jeffrey P. Armstrong/
                                 Jeffrey P. Armstrong
                                 Reg. No. 54,967

10

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519-CON) | 2371 |

107361          7590          05/16/2017

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| SURVILLO, OLEG |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/16/2017 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| **Office Action Summary** | Application No. 13/864,250 | Applicant(s) MILLINGTON, NICHOLAS  A. J. |
|---|---|---|
| | Examiner OLEG SURVILLO | Art Unit 2442 | AIA (First Inventor to File) Status No |

*Note: the table above has a 4-cell layout in the original:*

| | Application No. 13/864,250 | Applicant(s) MILLINGTON, NICHOLAS  A. J. |
|---|---|---|
| **Office Action Summary** | Examiner OLEG SURVILLO | **Art Unit** 2442 / **AIA (First Inventor to File) Status** No |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>January 5, 2017</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☒ This action is **FINAL**.    2b)☐ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) <u>21-40</u> is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☒ Claim(s) <u>21-40</u> is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a)☐ All  b)☐ Some**  c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1) ☒ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date <u>See Continuation Sheet</u>.
3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____.

**Continuation Sheet (PTOL-326)**                                    **Application No.  13/864,250**

 Continuation of Attachment(s) 2). Information Disclosure Statement(s) (PTO/SB/08), Paper No(s)/Mail Date :10/13/16; 10/13/16; 10/13/16; 10/13/16; 10/13/16; 11/22/16; 02/14/17; 02/14/17; 02/14/17; 04/14/17.

Application/Control Number: 13/864,250                                    Page 2
Art Unit: 2442

The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

### Response to Amendment

1.      Claims 21-40 are pending in the application. Claims 21-40 are currently

amended. Claims 1-20 have been canceled. No new claims are currently added.


### Response to Arguments

2.      With regard to Applicant's remarks dated January 5, 2017:

Regarding amendment to the title of the invention, Applicant's amendment has

been fully considered and is entered.

Regarding the rejection of claims 21-40 under pre-AIA 35 U.S.C. 102(e),

Applicant's amendment and arguments have been fully considered. Applicants argue

that Goldberg fails to teach a controller device that would direct the zone player over a

data network. Examiner agrees. Therefore, the rejection has been withdrawn. However,

new grounds of rejection are made in view of the newly discovered references.

As to any arguments not specifically addressed, they are the same as those

discussed above.


### Claim Rejections - 35 USC § 103

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

Application/Control Number: 13/864,250                                              Page 3
Art Unit: 2442

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

3.      Claims 21-40 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Isely et al. (US 2002/0124097 A1) in view of Goldberg et al. (US 2007/0142944 A1).

As to claim 21, Isely teaches a first zone player comprising at least one processor and tangible, non-transitory computer-readable memory [network attached audio device 105, 205] (Fig. 2) comprising instructions that, when executed, cause the first zone player to perform operations comprising:

playing first audio information associated with a first synchrony group comprising a first zone player and a second zone player [playing the same song in multiple rooms by multiple audio devices] (par. [0056]);

receiving control information from a controller device [controller 125] (Fig. 1) over a data network [local network 120] (Fig. 1), wherein the control information includes an identification of a third zone player [each audio device is individually addressable] (par. [0039], [0047]), wherein the control information directs the first zone player to receive second audio information for playback in synchrony with playback of the second audio information by the identified third zone player [controller controls volume and song selection for each group of aggregated devices in different rooms] (par. [0056], [0060]); and

Application/Control Number: 13/864,250                                    Page 4
Art Unit: 2442

playing the second audio information in synchrony with the playback of the

second audio information by the identified third zone player [steps 530, 535, 630 in Figs.

5 and 6] (par. [0060], [0063]).

Isely also teaches dynamically updating relationship that results in updated

grouping of devices (par. [0063]).

However, Isely does not expressly teach that the first zone player disengages

from the first synchrony group in response to receiving the control information and joins

the second synchrony group as a result of the control input change command that is

distributed to the plurality of audio device in par. [0063] of Isely.

Goldberg teaches a network comprising a first, second, and third zone players

[units 100] (Figs. 1 and 6), wherein the first zone player is a member of a first synchrony

group [cluster 700] (Fig. 6, 9A, 9B), wherein the first zone player is playing a first audio

information associated with the first synchrony group (par. [0188]);

receiving, at the first zone player, control information from a user interface

module [GUI of unit 100] (par. [0103]), wherein the control information [user interacting

with a unit 100 results in transmission of a signal to the unit] (par. [0267]) directs the first

zone player to disengage from the first synchrony group and to join a second synchrony

group (par. [0187], [0211], [0267]);

disengaging the first zone player from the first synchrony group in response to a

control command [user interacting with a unit 100 results in transmission of a signal to

the unit] (par. [0267]) directs the first zone player to disengage from the first synchrony

group and to join a second synchrony group (par. [0187], [0211], [0267]);

Application/Control Number: 13/864,250                                              Page 5
Art Unit: 2442

joining the first zone player to the second synchrony group [detecting and joining a different cluster 700] (par. [0209]-[0211]); and

playing the second audio information in synchrony with the playback of the second audio information by the identified third zone player (par. [0185]).

It would have been obvious to one of ordinary skill in the art at the time of the invention to modify the method, system, and instructions of Isely by directing the first audio device of Isely via the controller to disengage from the first group and join the second group in response to update to the control input specifying the characteristics received from a remote user in order to property distribute audio signal to a plurality of audio devices base on the update of the defined relationships between devices (par. [0063] in Isely; par. [0267] in Goldberg).


As to claim 22, Isely in view of Goldberg teaches transmitting a notification to the second zone player, the notification indicating that the first zone player is disengaging from the first synchrony group [original broadcast unit 710 transmits to the other cluster members the addresses of the sockets on the receive unit 730 that is now the new broadcast unit, and terminates its own multicast] (par. [0272], Fig. 16 in Goldberg).


As to claim 23, Isely in view of Goldberg teaches receiving the first audio information for playback from an audio information source [step 630] (par. [0063] in Isely); and

Application/Control Number: 13/864,250                                    Page 6
Art Unit: 2442

transmitting the first audio information to the second zone player while contemporaneously playing the first audio information (par. [0134]-[0135] in Goldberg).

It would have been obvious to one of ordinary skill in the art at the time of the invention to modify the method, system, and instructions of Isely by having the first audio information transmitted to the second zone player via the first zone player in order to provide alternative peer-to-peer way of sharing the media to an audio device in case the controller is unable to deliver the media directly.

As to claim 24, Isely in view of Goldberg teaches that the control information directs the first zone player to cease the transmitting of the first audio information, and wherein the operations further comprise ceasing the transmission of the first audio information (par. [0187], [0211], [0267] in Goldberg).

As to claim 25, Isely in view of Goldberg teaches that the control information directs the first zone player to receive the second audio information from the identified third zone player, and wherein the operations further comprise receiving the second audio information from the identified third zone player (par. [0209]-[0212] in Goldberg).

As to claim 26, Isely teaches that the control information directs the first zone player to receive the second audio information for playback from an audio information source, and wherein the operations further comprise receiving the second audio information from the audio information source [step 630] (par. [0063]).

Application/Control Number: 13/864,250                                        Page 7
Art Unit: 2442

As to claim 27, Isely teaches that the first audio information is different than the

second audio information (par. [0056]).

As to claim 28, Isely in view of Goldberg teaches a tangible non-transitory

computer-readable memory having instructions stored thereon [inventions of Isely and

Goldberg are computer-implemented thus inherently require program instructions to

operate] that when executed cause a first zone player to perform the method steps as

discussed per claim 21 above.

As to claims 29-34, Isely in view of Goldberg teaches all the elements as

discussed per claims 22-27 above.

As to claim 35, Isely in view of Goldberg teaches a system comprising a first

synchrony group, the first synchrony group comprising a first zone player and a second

zone player (Fig. 1 in Isely), the first zone player comprising a network interface

configured to connect the first zone player to a data network (Fig. 2 in Isely); at least

one processor and a tangible, non-transitory computer-readable memory comprising

instructions that, when executed by the first zone player (Fig. 2 in Isely) cause the first

zone player to perform the functionality as discussed per claim 21 above.

Application/Control Number: 13/864,250                                             Page 8
Art Unit: 2442

As to claims 36-40, Isely in view of Goldberg teaches all the elements as

discussed per claims 22-27 above.


### Conclusion

Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to OLEG SURVILLO whose telephone number is

(571)272-9691.  The examiner can normally be reached on Mon-Thu 10:00am -

7:30pm; Fri 10:00am - 6:30pm EST.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

Application/Control Number: 13/864,250                                     Page 9
Art Unit: 2442

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

      If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Glenton B. Burgess can be reached on 571-272-3949.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

      Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/OLEG SURVILLO/
Primary Examiner, Art Unit 2442

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519-CON) | 2371 |

107361        7590        06/19/2017

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| SURVILLO, OLEG |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/19/2017 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) | | |
|---|---|---|---|---|
| | 13/864,250 | MILLINGTON, NICHOLAS A. J. | | |
| | Examiner | Art Unit | AIA (First Inventor to File) Status | Page |
| | OLEG SURVILLO | 2442 | No | 1 of 1 |

All participants (applicant, applicant's representative, PTO personnel):

1.  OLEG SURVILLO (Primary Examiner); In-Person     2.  Christopher Butts, Reg. No.: 67,558 (Attorney); In-Person

3.  Jeffrey Armstrong, Reg. No.: 54,967 (Attorney); In-Person

**Date of Interview:** 13 June 2017

**Claim(s) discussed:** claim 21

**Identification of prior art discussed:** Isely and Goldberg

**Amendment Proposed:** moved certain claim features for better clarity

## Issues Discussed:

**Item(s) under 35 U.S.C. 103:**
Discussed the rejection over Isely in view of Goldberg. Discussed whether Goldberg teached the claimed "control information". Examiner stated that since the claims did not identify what is included as part of the "control information", the control information is interpreted broadly as a mere trigger that, upon receipt, activates certain preprogrammed functions of the first zone player. Therefore, control information can contain implicit command to perform desired function. Examiner maintained that Goldberg teaches the claimed functionality of the first zone player. No agreement has been reached.

**Attachment(s):** Agenda, Proposed Amendments, Proposed Arguments

| /OLEG SURVILLO/ Primary Examiner, Art Unit 2442 | |
|---|---|

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable time limit of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicant's responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**

Please further see:

**MPEP 713.04**
**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)**
**37 CFR § 1.2 Business to be transacted in writing**



**McDonnell Boehnen Hulbert & Berghoff**
Law Offices

300 South Wacker Drive
Chicago, Illinois 60606-6709
www.mbhb.com

312-913-0001 phone
312-913-0002 fax

June 12, 2017

Via email: oleg.survillo@uspto.gov

Examiner Oleg Survillo
U.S. Patent & Trademark Office
P.O. Box 1450
Arlington, VA 22313-1450

**RE:  Interview Agenda for App. 13/864,250 (Sonos 13-0403; MBHB 15-519-CON)**

Examiner Survillo:

Thank you for agreeing to interview the above-referenced application.  An agenda of topics is outlined below:

**Agenda for the Examiner Interview:**
- Proposed amendments to claim 21
- Section 103 rejection of claim 21
    - U.S. Pub. 2007/0142944 ("Goldberg")
    - U.S. Pub. 2002/0124097 ("Isely")

**Proposed Amendment:**
        Without conceding the merits of the rejections, and solely to advance prosecution, Applicant submits the following amendments to further clarify the claim language.

        21.        (Proposed Amendments) A first zone player comprising at least one processor and tangible, non-transitory computer-readable memory comprising instructions that, when executed, cause the first zone player to perform operations comprising:

        playing first audio information associated with a first synchrony group comprising a first zone player and a second zone player;

        receiving control information from a controller device communicatively coupled to the first zone player over a data network, wherein the control information includes an identification of a third zone player, and wherein the control information directs the first zone player to (a) disengage from the first synchrony group, (b) join a second synchrony group with the identified third zone player,

and (c) receive second audio information for playback in synchrony with playback of the second
audio information by the identified third zone player; <u>and</u>

      <u>in response to receiving the control information (a)</u> disengaging the first zone player from
the first synchrony group<u>,</u> ~~in response to receiving the control information;~~ <u>(b)</u> joining the first zone
player to the second synchrony group[[;]]<u>,</u> and <u>(c)</u> playing the second audio information in
synchrony with the playback of the second audio information by the identified third zone player.

**Comments:**

      The combination of Goldberg and Isely fails to teach or suggest all the elements recited in
the claims.  With reference to claim 21, for example, the combination of Goldberg and Isely fails to
teach or suggest at least "in response to receiving the control information (a) disengaging the first
zone player from the first synchrony group, (b) joining the first zone player to the second synchrony
group, and (c) playing the second audio information in synchrony with the playback of the second
audio information by the identified third zone player," in combination with the other elements recited
in the claims.

**A.**      **Isely fails to teach or suggest all the recited claim elements**

      The Office Action acknowledges, and Applicant agrees, that "Isely does not expressly
teach that the first zone player disengages from the first synchrony group in response to receiving
the control information and joins the second synchrony group as a result of the control input
change command that is distributed to the plurality of audio device[s]."  Office Action, p. 4.

      Therefore, Isely cannot possibly teach or suggest the more detailed feature of "in response
to receiving the control information (a) disengaging the first zone player from the first synchrony
group, (b) joining the first zone player to the second synchrony group, and (c) playing the second
audio information in synchrony with the playback of the second audio information by the identified
third zone player," in combination with the other elements recited in the claims.

**B.**      **The addition of Goldberg does not overcome the deficiencies of Isely**

      The addition of Goldberg does not overcome the deficiencies of Isely for at least the
reason that Goldberg also fails teach or suggest at least "in response to receiving the control
information (a) disengaging the first zone player from the first synchrony group, (b) joining the first
zone player to the second synchrony group, and (c) playing the second audio information in
synchrony with the playback of the second audio information by the identified third zone player," in
combination with the other elements recited in the claims.

      The Office Action cites ¶¶ 185, 187, 209-211, and 267 of Goldberg for teaching the
features of (a) "disengaging from the first synchrony group in response to a control command
[that]...directs the first zone player to disengage from the first synchrony group and to join a
second synchrony group," (b) "joining the first zone player to the second group", and (c) "playing
the second audio information in synchrony with the playback of the second audio information by
the identified third zone player." Office Action, pp. 4-5.

At ¶¶ 185 and 187, Goldberg explains that "Members of the cluster may come and go, especially since members will frequently move physically outside of the transmission range of the broadcast unit 710," and describes how "the broadcast unit 710 and the receiver unit 730 do mutually accept a multicasting relationship." And ¶¶ 209-211 of Goldberg describe the creation and maintenance of clusters.

However, the high level disclosure of creating and maintaining clusters or units generally moving from one cluster to another cluster does not teach or suggest the specific feature of "in response to receiving the control information (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, and (c) playing the second audio information in synchrony with the playback of the second audio information by the identified third zone player," in combination with the other elements recited in the claims.

If you have questions, or if you would like additional information to prepare for the interview, please feel free to call me.

Best regards,

Jeff Armstrong
312-913-2104 (office)

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
Sonos No. 13-0403
(MBHB No. 15-519-CON)

| | | |
|---|---|---|
| In the Application of: | ) | |
| Nicholas A. J. Millington | ) | Examiner: SURVILLO, Oleg |
| | ) | |
| Application No.: 13/864,250 | ) | Group Art Unit: 2442 |
| | ) | |
| Filed: April 17, 2013 | ) | Confirmation No. 2371 |
| | ) | |
| Title: System and Method for Synchronizing | ) | |
| Operations Among a Plurality of | ) | |
| Independently Clocked Digital Data | ) | |
| Processing Devices | ) | |

Mail Stop After Final
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**RESPONSE TO THE FINAL OFFICE ACTION**
**MAILED MAY 16, 2017**

Pursuant to 37 C.F.R. § 1.116 and the After Final Consideration Pilot Program 2.0, please consider the following **AMENDMENTS** and **REMARKS** submitted with in response to the Final Office Action dated May 16, 2017, in the above application.

**AMENDMENTS TO THE CLAIMS** begin on page 2.

**REMARKS** begin on page 8.

Please charge any underpayment or credit any overpayment of fees in connection with the prosecution of the above-captioned application to Deposit Account 13-2490.

Application No.:  13/864,250                                    Docket No. 13-0403

## AMENDMENTS TO THE CLAIMS

1-20.   (Canceled)

21.     (Currently Amended) A first zone player comprising at least one processor and tangible, non-transitory computer-readable memory comprising instructions that, when executed, cause the first zone player to perform operations comprising:

playing first audio information associated with a first synchrony group comprising a first zone player and a second zone player;

receiving control information from a controller device <u>configured to control the first zone player, the second zone player, and a third zone player</u> <s>communicatively coupled to the first zone player</s> over a data network, wherein the control information includes an identification of [[a]] <u>the</u> third zone player, and wherein the control information directs the first zone player to (a) disengage from the first synchrony group, (b) join a second synchrony group with the <s>identified</s> third zone player, and (c) receive second audio information <u>from the third zone player</u> for playback in synchrony with playback of the second audio information by the <s>identified</s> third zone player<u>; and</u>

<u>in response to receiving the control information, (a)</u> disengaging the first zone player from the first synchrony group<u>,</u> <s>in response to receiving the control information;</s> <u>(b)</u> joining the first zone player to the second synchrony group[[;]], <u>(c) receiving the second audio information from the third zone player,</u> and <u>(d)</u> playing the second audio information in synchrony with the playback of the second audio information by the <s>identified</s> third zone player.

Application No.: 13/864,250                                      Docket No. 13-0403

22.    (Currently Amended) The first zone player of claim 21, wherein the disengaging comprises transmitting a notification to the second zone player, the notification indicating that the first zone player is disengaging from the first synchrony group.

23.    (Currently Amended) The first zone player of claim 21, wherein the operations further comprise prior to the disengaging:

receiving the first audio information for playback from an audio information source; and

transmitting the first audio information to the second zone player while contemporaneously playing the first audio information.

24.    (Previously Presented) The first zone player of claim 23, wherein the control information directs the first zone player to cease the transmitting of the first audio information, and wherein the operations further comprise ceasing the transmission of the first audio information.

25-26. (Canceled)

27.    (Currently Amended) The first zone player of claim 21, wherein the first audio information is different than the second audio information.

28.    (Currently Amended) A tangible non-transitory computer-readable memory having instructions stored thereon that when executed cause a first zone player to:

play first audio information associated with a first synchrony group, the first synchrony group including the first zone player and a second zone player;

receive control information from a controller device <u>configured to control the first zone player, the second zone player, and a third zone player</u> ~~communicatively coupled to the first zone~~

3

Application No.:  13/864,250                                    Docket No. 13-0403

~~player~~ over a data network, wherein the control information includes an identification of [[a]] the third zone player, and wherein the control information directs the first zone player to (a) disengage from the first synchrony group, (b) join a second synchrony group with the ~~identified~~ third zone player, and (c) receive second audio information from the third zone player for playback in synchrony with playback of the second audio information by the ~~identified~~ third zone player; and

in response to receiving the control information from the controller device configured to control the first zone player, the second zone player, and a third zone player, (a) disengage the first zone player from the first synchrony group, ~~in response to receiving the control information;~~ (b) join the first zone player to the second synchrony group[[;]], (c) receive the second audio information from the third zone player, and (d) play the second audio information in synchrony with the playback of the second audio information by the ~~identified~~ third zone player.

29.    (Currently Amended)  The tangible, non-transitory computer-readable memory of claim 28, further comprising instructions that when executed cause the first zone player to transmit a notification to the second zone player, the notification indicating that the first zone player is disengaging from the first synchrony group.

30.    (Currently Amended)  The tangible, non-transitory computer-readable memory of claim 28, further comprising instructions that when executed cause the first zone player to:

receive the first audio information for playback from an audio information source; and

transmit the first audio information to the second zone player while contemporaneously playing the first audio information.

4

Application No.: 13/864,250                                    Docket No. 13-0403

31.    (Currently Amended)  The <u>tangible, non-transitory</u> computer-readable memory of claim 30<u>,</u> wherein the control information directs the first zone player to cease the transmitting of the first audio information, and wherein the <u>tangible, non-transitory</u> computer-readable memory further comprises instructions that when executed cause the first zone player to cease the transmission of the first audio information.

32-33.  (Canceled)

34.    (Currently Amended)  The <u>tangible, non-transitory</u> computer-readable memory of claim 28<u>,</u> wherein the first audio information is different than the second audio information.

35.    (Currently Amended)  A system comprising a first synchrony group, the first synchrony group comprising a first zone player and a second zone player, the first zone player comprising:

a network interface configured to connect the first zone player to a data network;

at least one processor; and

tangible, non-transitory computer-readable memory comprising instructions that, when executed by the first zone player, cause the <u>first</u> zone player to perform functions comprising:

playing first audio information associated with the first synchrony group;

receiving <u>first</u> control information <u>from a controller device configured to control the first zone player, the second zone player, and a third zone player</u> over the data network, the <u>first</u> control information including an identification of a third zone player;

in response to receiving the <u>first</u> control information <u>from the controller device</u>, (a) disengaging from the first synchrony group, (b) joining a second synchrony group with the third zone player, (c) receiving second audio information <u>from the third zone player</u>, and (d) playing

5

Application No.:  13/864,250                                     Docket No. 13-0403

the second audio information in synchrony with playback of the second audio by the third zone
player.

36.    (Previously Presented)  The system of claim 35, wherein the functions further
comprise the first zone player transmitting a notification to the second zone player via the
network interface, the notification indicating that the first zone player is disengaging from the
first synchrony group.

37.    (Previously Presented)  The system of claim 35, wherein the functions further
comprise the first zone player transmitting the first audio information to the second zone player
while contemporaneously playing the first audio information.

38.    (Previously Presented)  The system of claim 37, wherein the functions performed
in response to receiving the <u>first</u> control information further comprise the first zone player
ceasing transmitting the first audio information to the second zone player while
contemporaneously playing the first audio information.

39-40.  (Canceled)

41.    (New)  The system of claim 35, wherein the second zone player comprises:
a network interface configured to connect the second zone player to the data network;
at least one processor; and
tangible, non-transitory computer-readable memory comprising instructions that, when
executed by the second zone player, cause the second zone player to perform functions
comprising:
transmitting the first audio information to the first zone player;

6

Application No.:  13/864,250                                     Docket No. 13-0403

playing the first audio information in synchrony with the playback of the first audio information by the first zone player;

receiving second control information from the controller device; and

in response to receiving the second control information from the controller device, ceasing transmission of the second audio information to the first zone player.

42.    (New)  The system of claim 41, wherein in response to receiving the second control information from the controller device, the second zone player additionally continues to play the first audio information.

43.    (New)  The system of claim 35, wherein the third zone player comprises:

a network interface configured to connect the third zone player to the data network;

at least one processor; and

tangible, non-transitory computer-readable memory comprising instructions that, when executed by the third zone player, cause the third zone player to perform functions comprising:

playing the second audio information associated with the second synchrony group;

receiving control information from the controller device configured to control the first zone player, the second zone player, and the third zone player over the data network, the control information including an identification of the first zone player; and

in response to receiving the control information from the controller device configured to control the first zone player, the second zone player, and the third zone player, (a) transmitting the second audio information to the first zone player, and (b) playing the second audio information in synchrony with the playback of the second audio information by the first zone player.

Application No.:  13/864,250                                                     Docket No. 13-0403

## REMARKS

### I.        Status of the Claims

Claims 21-24, 27-31, 34-38, and 41-43 are pending; claims 21, 28, and 35 are independent.  Without conceding the merits of the rejections, and solely to advance prosecution, Applicant has (i) amended claims 21-23, 27-31, 34, and 35 to further clarify the claim language and to generally put the claims in better condition for allowance and issue; (ii) canceled claims 25-26, 32-33, and 39-40; and (iii) added claims 41-43.  No new matter has been added. Applicant reserves the right to pursue the originally-filed and/or previously-pending subject matter in one or more continuation applications.

### II.        Summary of the Final Office Action mailed May 16, 2017

In the Final Office Action mailed on May 16, 2017, the Examiner: (i) withdrew the previous rejections based on U.S. Pub. 2007/0142944 ("Goldberg"); and (ii) rejected claims 21-40 under 35 U.S.C. § 103(a) as allegedly unpatentable in view of U.S. Pub. 2002/0124097 ("Isely") and Goldberg.

### III.        Summary of the Examiner Interview on June 14, 2017

An in-person interview took place on June 13, 2017, at the U.S. Patent Office. Participants included Examiner Oleg Survillo and Applicant's Representatives, Chris Butts and Jeff Armstrong.  During the interview, the participants discussed proposed amendments to claim 21 and the Isely and Goldberg references.  No exhibits were shown and no demonstrations were conducted. No agreement on the claims was reached.  Applicant agreed to file a response with amendments for further review and consideration.

Application No.:  13/864,250                                              Docket No. 13-0403

## IV.    Response to the § 103 Rejections

Applicant requests that the claims are patentable over the combination of Isely and Goldberg for at least the reasons that (A) Isely and Goldberg, individually or in combination, fail to teach or suggest all the elements recited in the claims; (B) modifying Isely's audio system to perform the claimed functions would change the principle of operation of Isely's audio system; and (C) modifying Goldberg's audio players to perform the claimed functions would render Goldberg's audio players unsatisfactory for their intended purpose.

### A.    Isely and Goldberg fail to teach or suggest all the recited claim elements

As an initial matter, Isely and Goldberg fail to teach or suggest all the elements recited in the claims.  With reference to claim 21, for example, Isely and Goldberg fail to teach or suggest at least "in response to receiving the control information [from a controller device configured to control the first zone player, the second zone player, and a third zone player], (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the playback of the second audio information by the third zone player," in combination with the other recited claim elements.

The Office Action acknowledges, and Applicant agrees, that "Isely does not expressly teach that the first zone player disengages from the first synchrony group in response to receiving the control information and joins the second synchrony group as a result of the control input change command that is distributed to the plurality of audio device[s]."  Office Action, p. 4.  Therefore, Isely cannot possibly teach or suggest the more detailed feature of "in response to receiving the control information [from a controller device configured to control the first zone player, the second zone player, and a third zone player], (a) disengaging the first zone player

from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the playback of the second audio information by the third zone player," in combination with the other recited claim elements.

The addition of Goldberg does not overcome the deficiencies of Isely for at least the reason that Goldberg also fails teach or suggest "in response to receiving the control information [from a controller device configured to control the first zone player, the second zone player, and a third zone player], (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the playback of the second audio information by the third zone player."

The Office Action cites ¶¶ 185, 187, 209-211, and 267 of Goldberg for teaching the features of (a) "disengaging from the first synchrony group in response to a control command [that]…directs the first zone player to disengage from the first synchrony group and to join a second synchrony group," (b) "joining the first zone player to the second group", and (c) "playing the second audio information in synchrony with the playback of the second audio information by the identified third zone player." Office Action, pp. 4-5. At ¶¶ 185 and 187, Goldberg explains that "Members of the cluster may come and go, especially since members will frequently move physically outside of the transmission range of the broadcast unit 710," and describes how "the broadcast unit 710 and the receiver unit 730 do mutually accept a multicasting relationship." And ¶¶ 209-211 of Goldberg describe the creation and maintenance of clusters. However, the high level disclosure of creating and maintaining clusters or units generally moving from one cluster to another cluster does not teach or suggest that Goldberg's

Application No.:  13/864,250                                      Docket No. 13-0403

audio players can be controlled over a network, much less perform the specific function of "in response to receiving the control information [from a controller device configured to control the first zone player, the second zone player, and a third zone player], (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the playback of the second audio information by the third zone player," as recited in the claims.

### B.    Modifying Isely's networked audio devices to perform the claimed functions would change the principle of operation of Isely's networked audio devices

"If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the reference are not sufficient to render the claims *prima facie* obvious."  MPEP 2143.01(VI) (citing *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959) (reversing a § 103 rejection because the "suggested combination of references would require a substantial reconstruction and redesign of the elements shown in [the primary reference] as well as a change in the basic principle under which the [primary reference] was designed to operate")).  Here, like in *In re Ratti*, modifying one of Isely's networked audio devices to transmit/receive audio content to/from another networked device would require a substantial reconstruction and redesign of Isley's networked audio device and change the basic principle of operation of Isely's networked audio device from a device that merely receives and plays audio content to a device that must receive audio content, transmit the received audio content to another device, and also playback the audio being transmitted to the other device in synchrony with the other device playing back that audio content.

11

Application No.: 13/864,250                                    Docket No. 13-0403

Isely discloses a system of networked audio devices, where every networked audio device receives content from a centralized network interface. In operation, the "network interface 100 receives digital audio streams and outputs the digital audio streams on the local network 120 using an address based protocol with each of the digital audio streams having a different associated identifier" and a "controller 125 operates to designate the associated identifiers to be received by respective ones of the plurality of network attached audio devices 105. Isely, ¶¶ 38-39. "[T]he controller 125 essentially tells the network audio devices 105 the 'channel' to which they should tune." Isely, ¶ 39. In operation, every networked audio device receives audio content for playback from the centralized "network interface 100" via a channel selected by the "controller 125." Isely never describes or suggests a scenario where one networked audio device receives content from another networked audio device.

Modifying Isely's networked audio device to perform the feature of "in response to receiving the control information [from a controller device configured to control the first zone player, the second zone player, and a third zone player], (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the playback of the second audio information by the third zone player," would require a substantial reconstruction and redesign of Isely's networked audio device, including adding hardware components and software for performing the additional functions not contemplated by the centralized system architecture described in Isely. Substantially reconstructing and redesigning Isely's networked audio device in this manner would change its principle of operation from a networked audio device that merely receives and plays back audio from a centralized network interface to a networked audio device that receives

Application No.: 13/864,250                                     Docket No. 13-0403

audio content from multiple networked audio devices, distributes audio content to other networked audio devices, and coordinates synchronous playback of that audio content by itself and other networked audio devices.

Because modifying Isely's networked audio devices to perform the function of "in response to receiving the control information [from a controller device configured to control the first zone player, the second zone player, and a third zone player], (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the playback of the second audio information by the third zone player," would require a substantial reconstruction and redesign of Isely's networked audio devices and would also change the principle of operation of Isely's networked audio devices, then the teachings of Isely (alone or in combination with Goldberg) are not sufficient to render the claims *prima facie* obvious. MPEP 2143.01(VI).

## C.    Modifying Goldberg's audio players to perform the claimed functions would render Goldberg's audio players unsatisfactory for their intended purpose

"If [the] proposed modification would render the prior art invention being modified unsatisfactory for its intended purpose, then there is no suggestion or motivation to make the proposed modification." MPEP 2143.04(V) (citing *In re Gordon*, 733 F.2d 900, 221 USPQ 1125 (Fed. Cir. 1984)). Here, modifying one of Goldberg's audio players to be commanded and controlled by a controller device over the network that is configured to control multiple audio players would render Goldberg's audio player unsatisfactory for its intended purpose because the modified audio player, under the command and control of a "controller device," would deny the

13

Application No.: 13/864,250                                      Docket No. 13-0403

user the capability of choosing with whom to listen to music and even force the user to listen to music that the user does not wish to listen to.

Goldberg explains that "an object of the present invention [is] to provide users a means of ***choosing*** with whom to listen to music." Goldberg, ¶ 12 (emphasis added). Goldberg also recognizes that "a social imposition" would otherwise occur if devices did not provide users with direct control over which music their audio players should play. Goldberg, ¶ 3. For example, in the context of setting up a cluster of two or more audio players, Goldberg explains, "[o]nce it is established that the broadcast unit 710 and the receiver unit 730 are ***mutually desirous of providing and receiving an audio broadcast, respectively***, sockets optimized for broadcast audio are created both on the broadcast unit 710 and the receiver unit 730." Goldberg, ¶ 182 (emphasis added). Goldberg further explains, "the broadcast unit 710 and the receiver unit 730 exchange TCP messages…***to establish the mutual interest in audio broadcasting and reception.***" Goldberg, ¶ 182 (emphasis added). In operation, "***[s]hould there not be mutual acceptance***, then the system returns to the original state in which the broadcast unit 710 is transmitting the broadcast annunciation in the step 1100, and the receive unit 730 searches for broadcasts in the step 1102," but "***[i]f the broadcast unit 710 and the receiver unit 730 do mutually accept a multicasting relationship***, the broadcast unit 710 creates the multicast out UDP socket 1080 in a step 1112 and the receiver unit 730 creates the multicast in UDP socket 1090 in the step 1114, and multicast audio transmission and reception is initiated in a step 1116." Goldberg, ¶¶ 184-185 (emphasis added).

Here, and to the extent the Office contends that Goldberg's audio players amount to the claimed "zone players," modifying one of Goldberg's audio players to be controlled by "a controller device configured to control the first zone player, the second zone player, and a third

14

Application No.: 13/864,250                                    Docket No. 13-0403

zone player," especially where, as here, the "controller device" unilaterally commands the audio player to change from "playing first audio information" with a second audio player to "playing second audio information" with a third audio player, would be contrary to Goldberg's requirement for mutual acceptance by both users of two separate audio players before those two audio players can play back music together. Thus, modifying Goldberg's audio players to perform the step of "in response to receiving the control information [from a controller device configured to control the first zone player, the second zone player, and a third zone player], (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the playback of the second audio information by the third zone player" would render Goldberg's audio players unsatisfactory for their intended purpose of enabling individual users to choose with whom to listen to music and would instead force the user to listen to music that the user may not wish to listen to.

Because modifying Goldberg's audio players to perform the functions recited in the claims would render Goldberg's audio players unsatisfactory for their intended purpose, there is no suggestion or motivation to modify Goldberg's audio players to perform the function of "in response to receiving the control information [from a controller device configured to control the first zone player, the second zone player, and a third zone player], (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the playback of the second audio information by the third zone player," in combination with the other claim elements. MPEP 2143.04(V).

Application No.:  13/864,250                                          Docket No. 13-0403

**D.      The claims are patentable over Isely and Goldberg**

In view of the foregoing, claim 21 is patentable over Isely and Goldberg for at least the

reasons that (A) Isely and Goldberg, individually or in combination, fail to teach or suggest all

the elements recited in the claims; (B) modifying Isely's audio system to perform the claimed

functions would change the principle of operation of Isely's audio system; and (C) modifying

Goldberg's audio players to perform the claimed functions would render Goldberg's audio

players unsatisfactory for their intended purpose.  And because claims 28 and 35 recite elements

similar to claim 21, claims 28 and 35 are likewise patentable over Isely and Goldberg for reasons

similar to those articulated for claim 21.  Further, and without conceding the merits of the other

assertions in the Office Action, the pending dependent claims are patentable over Isely and

Goldberg for at least the reason that they depend from patentable independent claims.

**V.      Conclusions**

Applicant submits that the claims are allowable over the cited references, and Applicant

requests a Notice of Allowance. If further dialog would advance prosecution, Applicant invites

the Office to telephone the undersigned at 312-913-0001.

> Respectfully submitted,
> McDonnell Boehnen Hulbert & Berghoff LLP

Date:  July 17, 2017               By:   /Jeffrey P. Armstrong/
> Jeffrey P. Armstrong
> Reg. No. 54,967

U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519-CON) | 2371 |

| | | |
|---|---|---|
| 107361        7590        01/09/2018 | EXAMINER | |
| McDonnell Boehnen Hulbert & Berghoff LLP<br>Sonos, Inc.<br>300 South Wacker Drive<br>Chicago, IL 60606 | SURVILLO, OLEG | |
| | ART UNIT | PAPER NUMBER |
| | 2442 | |
| | MAIL DATE | DELIVERY MODE |
| | 01/09/2018 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| **Office Action Summary** | Application No.<br>13/864,250 | Applicant(s)<br>MILLINGTON, NICHOLAS A. J. |
|---|---|---|
| | Examiner<br>OLEG SURVILLO | Art Unit<br>2442 | AIA (First Inventor to File)<br>Status<br>No |

*Note: the Examiner/Art Unit/AIA row spans below the Application No./Applicant columns.*

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *July 17 and November 24, 2017*.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☒ Claim(s) *21-24,27-31,34-38 and 41-49* is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) *21-24,27-31,34-38 and 41-49* is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a)☐ All  b)☐ Some**  c)☐ None of the:
   1.☐ Certified copies of the priority documents have been received.
   2.☐ Certified copies of the priority documents have been received in Application No. _____.
   3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date *12/05/17; 12/05/17*.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

Application/Control Number: 13/864,250                                      Page 2
Art Unit: 2442

     The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

### *Continued Examination Under 37 CFR 1.114*

     A request for continued examination under 37 CFR 1.114, including the fee set

forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this

application is eligible for continued examination under 37 CFR 1.114, and the fee set

forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action

has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submissions filed on July

17, 2017 and November 24, 2017 have been entered.


### *Response to Amendment*

1.     Claims 21-24, 27-31, 34-38, and 41-49 are pending in the application. Claims 21-

24, 28-31, 34-38, and 41-43 are currently amended. Claims 1-20, 25, 26, 32, 33, 39,

and 40 have been canceled. Claims 41-49 are new.


### *Response to Arguments*

2.     With regard to Applicant's remarks dated July 17 and November 24, 2017:

     Applicant's arguments have already been addressed in the Advisory action dated

August 10, 2017.

     As to any arguments not specifically addressed, they are the same as those

discussed above.

Application/Control Number: 13/864,250                                    Page 3
Art Unit: 2442

### *Claim Rejections - 35 USC § 112*

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

3.      Claims 45, 47, and 49 are rejected under 35 U.S.C. 112 (pre-AIA), second

paragraph, as being indefinite for failing to particularly point out and distinctly claim the

subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards

as the invention.

As to claims 45, 47, and 49, it is unclear why the first zone player would provide

the first device timing information and the second playback timing information to the

second synchrony group where the first zone player is not a master zone player, but

rather is the third zone player that provides the second audio information for playback.

Appropriate correction or explanation is required.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

4.      Claims 21-24, 27-31, 34-38, and 41-49 are rejected under pre-AIA 35 U.S.C.

103(a) as being unpatentable over Isely et al. (US 2002/0124097 A1) in view of

Application/Control Number: 13/864,250                                    Page 4
Art Unit: 2442

Goldberg et al. (US 2007/0142944 A1) and in further view of Edens et al. (US Patent
6,611,537 B1).

    As to claim 21, Isely teaches a system comprising:

    a controller device [controller 125] (Fig. 1) configured to control one or more zone
players; and

    a first zone player comprising at least one processor and tangible, non-transitory
computer-readable memory [network attached audio device 105, 205] (Fig. 2)
comprising instructions that, when executed, cause the first zone player to perform
operations comprising:

    playing first audio information in synchrony with a second zone player while the
first zone player is in a first synchrony group comprising the first zone player and the
second zone player, wherein all zone players in the first synchrony group playback the
first audio information [playing the same song in multiple rooms by multiple audio
devices] (par. [0056]);

    receiving control information from the controller device over one or more data
networks [local network 120] (Fig. 1), wherein the control information includes an
identification of a third zone player [each audio device is individually addressable] (par.
[0039], [0047]), and wherein the control information directs the first zone player to
receive second audio information for playback in synchrony with the third zone player
[controller controls volume and song selection for each group of aggregated devices in
different rooms] (par. [0056], [0060]); and

Application/Control Number: 13/864,250                                      Page 5
Art Unit: 2442

after receiving the control information from the controller device, playing the

second audio information in synchrony with the third zone player [steps 530, 535, 630 in

Figs. 5 and 6] (par. [0060], [0063]).

Isely also teaches dynamically updating relationship that results in updated

grouping of devices (par. [0063]).

However, Isely does not expressly teach that the first zone player disengages

from the first synchrony group in response to receiving the control information and joins

the second synchrony group as a result of the control input change command that is

distributed to the plurality of audio device in par. [0063] of Isely. Isely also does not

teach that playback of the first audio information by zone players in the first synchrony

group is based on first device timing information that the first zone player provides to the

first synchrony group.

Goldberg teaches a network comprising a first, second, and third zone players

[units 100] (Figs. 1 and 6), wherein the first zone player is a member of a first synchrony

group [cluster 700] (Fig. 6, 9A, 9B), wherein the first zone player is playing a first audio

information in synchrony with a second zone player while the first zone player is in the

first synchrony group (par. [0188]);

receiving, at the first zone player, control information from a user interface

module [GUI of unit 100] (par. [0103]), wherein the control information [user interacting

with a unit 100 results in transmission of a signal to the unit] (par. [0267]) directs the first

zone player to disengage from the first synchrony group and to join a second synchrony

group (par. [0187], [0211], [0267]);

Application/Control Number: 13/864,250                                          Page 6
Art Unit: 2442

disengaging the first zone player from the first synchrony group in response to a

control command [user interacting with a unit 100 results in transmission of a signal to

the unit] (par. [0267]) directs the first zone player to disengage from the first synchrony

group and to join a second synchrony group (par. [0187], [0211], [0267]);

joining the first zone player to the second synchrony group [detecting and joining

a different cluster 700] (par. [0209]-[0211]); and

playing the second audio information in synchrony with the playback of the

second audio information by the identified third zone player (par. [0185]).

Goldberg also teaches playback of the first audio information by zone players in

the first synchrony group is based on first timing information [synchronization signals]

that the first zone player provides to the first synchrony group (par. [0200]-[0202]).

It would have been obvious to one of ordinary skill in the art at the time of the

invention to modify the method, system, and instructions of Isely by directing the first

audio device of Isely via the controller to disengage from the first group and join the

second group in response to update to the control input specifying the characteristics

received from a remote user in order to property distribute audio signal to a plurality of

audio devices base on the update of the defined relationships between devices (par.

[0063] in Isely; par. [0267] in Goldberg).

It would have been obvious to one of ordinary skill in the art at the time of the

invention to modify the method, system, and instructions of Isely by having playback of

the first audio information by zone players in the first synchrony group being based on

Application/Control Number: 13/864,250                                    Page 7
Art Unit: 2442

first timing information that the first zone player provides to the first synchrony group in order to ensure simultaneous playback (par. [0201] in Goldberg).

Edens is directed to synchronizing network devices for playback of audio (abstract). In particular, Edens teaches that all zone players in the first synchrony group playback the first audio information based on first device timing information [device clock] provided by the first zone player [elected network clock device] (col. 10 lines 9-18). It is noted that the claim is overly broad by reciting "based on" and does not specify how the device timing information and playback timing information is incorporated into synchronous playback of the audio information. Therefore, demonstrating mere existence of this information in prior art in connection with synchronous playback of audio is sufficient to meet the claimed recitation "based on".

It would have been obvious to one of ordinary skill in the art at the time of the invention to modify the method and system of Isely in view of Goldberg by having playback of the first audio information by all zone players in the synchrony group somehow based on an additional device timing information in order to ensure that information always will propagate from one device to another at consistent time intervals, which is an improvement to Goldberg's synchronization approach (col. 10 lines 9-18).

As to claim 22, Isely in view of Goldberg teaches the first zone player transmitting a notification to the second zone player, wherein the notification indicates that the first zone player is disengaging from the first synchrony group [original broadcast unit 710

Application/Control Number: 13/864,250                                    Page 8
Art Unit: 2442

transmits to the other cluster members the addresses of the sockets on the receive unit

730 that is now the new broadcast unit, and terminates its own multicast] (par. [0272],

Fig. 16 in Goldberg).


As to claim 23, Isely in view of Goldberg teaches receiving the first audio

information for playback from an audio information source [step 630] (par. [0063] in

Isely); and

transmitting the first device timing information and the first audio information to at

least the second zone player while contemporaneously playing the first audio

information based on the first device timing information (par. [0134]-[0135], [0200]-

[0202] in Goldberg).

It would have been obvious to one of ordinary skill in the art at the time of the

invention to modify the method, system, and instructions of Isely by having the first

audio information transmitted to the second zone player via the first zone player in order

to provide alternative peer-to-peer way of sharing the media to an audio device in case

the controller is unable to deliver the media directly.


As to claim 24, Isely in view of Goldberg teaches that the control information

directs the first zone player to cease transmitting the first audio information and the first

device timing information, and wherein the operations further cause the first zone player

to cease the transmitting of the first audio information and the first device timing

information to the first synchrony group (par. [0187], [0211], [0267] in Goldberg).

Application/Control Number: 13/864,250                                    Page 9
Art Unit: 2442

As to claim 27, Isely teaches that the first audio information is different than the second audio information (par. [0056]).

As to claims 44-49, Isely in view of Goldberg and Edens teaches all the elements as discussed per claim 21 above. It is noted that selection of which zone player would provide device timing information and playback timing information is dependent on which device is designated as master device [broadcaster in Goldberg] (par. [0254] in Goldberg).

As to claim 28, Isely in view of Goldberg teaches a system comprising first tangible non-transitory computer-readable media having instructions stored thereon [inventions of Isely, Goldberg, and Edens are computer-implemented thus inherently require program instructions to operate] that when executed by a first set of one or more processors, cause a controller device to perform the functionality as discussed per claim 21 above; and

second tangible non-transitory computer-readable media having instructions stored thereon [inventions of Isely, Goldberg, and Edens are computer-implemented thus inherently require program instructions to operate] that when executed by a second set of one or more processors, cause a first zone player to perform the method steps as discussed per claim 21 above.

Application/Control Number: 13/864,250                                    Page 10
Art Unit: 2442

As to claims 29-31 and 34, Isely in view of Goldberg and Edens teaches all the

elements as discussed per claims 22-24 and 27 above.


As to claim 35, Isely in view of Goldberg teaches a system comprising a

controller device configured to control one or more zone players [controller 125] (Fig. 1);

and

a first zone player [networked audio device] (Fig. 1 in Isely) comprising a network

interface configured to connect the first zone player to a data network (Fig. 2 in Isely); at

least one processor and a tangible, non-transitory computer-readable memory

comprising instructions that, when executed by the first zone player (Fig. 2 in Isely)

cause the first zone player to perform the functionality as discussed per claim 21 above.


As to claims 36-38, Isely in view of Goldberg teaches all the elements as

discussed per claims 22-24 and 27 above.


As to claims 41-43, these claims describe the second and the third zone players

and their respective functionalities. However, the system of claim 35, from which claims

41-43 depend, comprises a controller and a first zone player. Therefore, the system of

claim 35 does not expressly include the second and third zone players as part of the

system, thus, further describing the functionality performed by the second and third

zone players does not necessarily limit the system of claim 35. Claims 41-43 are not

further limiting. Additionally, Examiner maintains that combination of Isely in view of

Application/Control Number: 13/864,250                                      Page 11
Art Unit: 2442

Goldberg and Edens teaches the subject matter of claims 41-43 for the same reasons as those discussed per claims 21-24, 27, 44, and 45 above.

### Conclusion

Any inquiry concerning this communication or earlier communications from the examiner should be directed to OLEG SURVILLO whose telephone number is (571)272-9691.  The examiner can normally be reached on Mon-Thu 10:00am - 7:30pm; Fri 10:00am - 6:30pm EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Glenton B. Burgess can be reached on 571-272-3949.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 13/864,250                                              Page 12
Art Unit: 2442

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/OLEG SURVILLO/
Primary Examiner, Art Unit 2442

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519-CON) | 2371 |

107361        7590        03/29/2018
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| SURVILLO, OLEG |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/29/2018 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) | | |
|---|---|---|---|---|
| | 13/864,250 | MILLINGTON, NICHOLAS A. J. | | |
| | Examiner | Art Unit | AIA (First Inventor to File) Status | Page |
| | OLEG SURVILLO | 2442 | No | 1 of 1 |

All participants (applicant, applicant's representative, PTO personnel):

1.  OLEG SURVILLO (Primary Examiner); In-Person    2.  Jeffrey Armstrong (Attorney); In-Person

3.  John Tolomei (Attorney); In-Person

**Date of Interview:** 12 March 2018

**Claim(s) discussed:** claim 21

**Identification of prior art discussed:** Isely, Goldberg, and Edens

**Amendment Proposed:** proposed amendment is attached

## Issues Discussed:

**Proposed Amendments:**
Discussed claimed invention and cited prior art. In particular, discussed Edens where all devices are synchronized to a master clock. Applicant's Attorney pointed out that Edens teaches synchronous network and thus teaches away from the claimed invention. Examiner agreed.  Discussed whether "asynchronous network" recitation would be sufficient to render claims allowable. Examiner stated that he needs additional time to consider this limitation. It was further discussed whether this term is sufficiently defined in the specification and in the art such as to establish which networks would no fall under "asynchronous network" under broadest reasonable interpretation. No agreement has been reached as further consideration is necessary.

**Attachment(s):** Agenda, Proposed Amendments, Proposed Arguments

| /OLEG SURVILLO/<br>Primary Examiner, Art Unit 2442 | |
|---|---|

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable time limit of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicant's responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided.  See MPEP 713.04**

Please further see:

**MPEP 713.04**
**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)**
**37 CFR § 1.2 Business to be transacted in writing**



**McDonnell Boehnen Hulbert & Berghoff**
Law Offices

300 South Wacker Drive      312-913-0001 phone
Chicago, Illinois 60606-6709    312-913-0002 fax
www.mbhb.com

March 8, 2018

Via email: oleg.survillo@uspto.gov

Examiner Oleg Survillo
U.S. Patent & Trademark Office
P.O. Box 1450
Arlington, VA 22313-1450

**RE: Agenda for App. 13/864,250 (Sonos 13-0403; MBHB 15-519-CON)**

Examiner Survillo:

Thank you for agreeing to interview the above-referenced application on March 12, 2018.  An agenda of topics is outlined below:

**Agenda for the Examiner Interview:**
- The Non-Final Office mailed 09-Jan-2018
  - the § 112 rejections
  - the § 103 rejections
- Claim 21
- Cited references:
  - U.S. Pub. 2002/0124097 ("Isely")
  - U.S. Pub. 2007/0142944 ("Goldberg")
  - U.S. Pat. 6,611,537 ("Edens")

**Proposed Amendments:**
Without conceding the merits of the rejection, and solely to advance prosecution, Applicant submits the following amendments for consideration.

21.      (Proposed Amendment) A system comprising:

a controller device configured to control one or more zone players; and

a first zone player comprising at least one processor and tangible, non-transitory computer-readable memory comprising instructions that, when executed, cause the first zone player to perform operations comprising:

providing first device timing information to a second zone player over an asynchronous network while the first zone player is in a first synchrony group comprising the first zone player and the second zone player;

playing first audio information in synchrony with [[a]] the second zone player while the first zone player is in [[a]] the first synchrony group comprising the first zone player and the second zone player, wherein all zone players in the first synchrony group playback the first audio information based on the first device timing information that the first zone player provides to the first synchrony group over the asynchronous network;

receiving control information from the controller device over one or more data networks, wherein the control information includes an identification of a third zone player, and wherein the control information directs the first zone player to (a) disengage from the first synchrony group, (b) join a second synchrony group with the third zone player, and (c) receive second audio information from the third zone player for playback in synchrony with the third zone player; and

after receiving the control information from the controller device, (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the third zone player.

**Arguments for Consideration:**
- Isely, Goldberg, and Edens fail to teach or suggest at least "a first zone player…playing first audio information in synchrony with the second zone player…based on the first device timing information that the first zone player provides over the asynchronous network"

**Isely fails to teach or suggest all the claim elements**
- The Office Action acknowledges Isely does not teach, among other features, "playback of the first audio information by zone players in the first synchrony group is based on first device timing information that the first zone player provides to the first synchrony group." Office Action, p. 5.
- Therefore, Isely fails to teach or suggest "a first zone player…playing first audio information in synchrony with the second zone player…based on the first device timing information that the first zone player provides over the asynchronous network," in combination with the other elements recited in the claims.

**The addition of Goldberg fails to overcome the deficiencies of Isely**
- Goldberg discloses a broadcast unit transmitting a "music file" and "synchronization signals" to receive units. Goldberg, ¶¶ 201-203. Goldberg does not disclose "device timing information," and indeed, the Office Action does not contend that Goldberg discloses this aspect of the claims. Office Action, p. 6.

- Therefore, like Isely, Goldberg also fails to teach or suggest "a first zone player…playing first audio information in synchrony with the second zone player…based on the first device timing information that the first zone player provides over the asynchronous network," in combination with the other claim elements.

**The addition of Edens fails to overcome the deficiencies of Isely and Goldberg**

- The Office Action contends, "Edens teaches that all zone players in the first synchrony group playback the first audio information based on first device timing information [device clock] provided by the first zone player [elected network clock device]." Office Action, p. 7 (citing Edens, 10:9-18.).

- Contrary to the assertion in the Office Action, Edens does not disclose "a first zone player…playing first audio information in synchrony with the second zone player…based on the first device timing information that the first zone player provides over the asynchronous network" for two reasons.

  o First, Edens discloses using device clock information for synchronizing the clocks of nodes in a synchronous logical ring network rather than using that device clock information to play back audio in synchrony. Edens, 10:9-18.

    ▪ In operation, "one of the competing devices [in the ring network] is elected the network clock device to which all other devices are then synchronized." Edens, 10:9-11. "The network clock device sends a synchronization marker at constant intervals along the default network path to which all other devices synchronize." Edens, 24: 63-65. Edens explains that "this low-level device synchronization greatly facilitates the synchronization of audio and video sources." Edens, 24:66-67.

    ▪ However, even if the Office contends Edens's "synchronization marker" amounts to "device timing information," transmitting a synchronization marker to synchronize clocks in a synchronous network does not amount to "playing first audio information in synchrony with the second zone player…based on the first device timing information that the first zone player provides over the asynchronous network."

    ▪ Thus, Edens does not teach or suggest "a first zone player…playing first audio information in synchrony with the second zone player…based on the first device timing information that the first zone player provides over the asynchronous network" for at least this first, independent reason.

  o Second, Edens discloses playback devices configured in "a synchronous logical ring network," Edens, 9:58, where "information propagates around the ring at a consistent rate (e.g., synchronously, based upon a master clock)," Edens, 8:54-56, rather than an asynchronous network as recited in the claims.

    ▪ Even if the Office contends that transmitting a synchronization marker to synchronize devices in a synchronous network amounts to "playing first audio information in synchrony with the second zone player…based on the first device timing information that the first zone player provides," Edens transmits the synchronization markers over the "synchronous logical ring network" rather than an "asynchronous network" as recited in the claims.

- Accordingly, Edens does not teach or suggest "a first zone player…playing first audio information in synchrony with the second zone player…based on the first device timing

information that the first zone player provides over the asynchronous network" for at least this additional independent reason.

**Edens teaches away from the claimed invention**

- The Office Action contends that "[i]t would have been obvious…to modify the method and system of Isely in view Goldberg by having playback of the first audio information by all zone players in the synchrony group somehow based on an additional device timing information [as disclosed in Edens] in order to ensure that information always will propagate from one device to another at consistent time intervals, which is an improvement to Goldberg's synchronization approach." Office Action, p. 7, (citing Edens 10:9-18).

- Contrary to the assertion in the Office Action, a person of ordinary skill in the art at the time of the invention would not have been motivated to modify the asynchronous systems and methods of Goldberg and Isely with the synchronous transmission systems and methods disclosed in Edens because Edens teaches away from network devices that do not use synchronous transmission protocols.

- A reference teaches away from a claimed invention "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013); MPEP 2141.02(VI).

  o Here, Edens says, "[a]pplying local area network technology (e.g., Ethernet and TCP/IP network protocols) to consumer electronics devices *raises a number of problems*" and that "[a]lthough it appears advantageous to connect consumer electronics devices as generic nodes on a network, *existing network protocols are far from optimized for real-time streams of digital audio and video*." Edens, 4:47-53 (emphasis added).

  o Edens further explains that "Ethernet…is not optimized to carry real-time continuous digital media streams" because "[i]t is an asynchronous, packet-based protocol that would add significant overhead to digital audio and video samples, which require consistent and timely delivery, as opposed to the ability to 'burst' packets of information at high speeds on demand." Edens, 5:4-10.

  o Edens teaches that devices using Ethernet and/or other asynchronous transmission protocols rather than synchronous transmission protocols to distribute real-time media would be undesirably "*complex and expensive devices*, due to the memory, buffers, counters and associated circuitry required" for real-time digital media. Edens, 6:38-52 (emphasis added).

- By distinguishing the "synchronous logical ring network" from alternatives that do not rely upon synchronous transmission and explicitly disparaging alternatives that "*cannot guarantee consistent delivery of data such as real-time continuous digital media streams*," Edens, 9:12-14, Edens teaches away from devices like the zone players recited in the claims that do not rely on synchronous transmission protocols, but rather solve the problem of synchronizing audio playback between zone players by having one zone player transmit its "device clock information" to other zone players over an "asynchronous network."

- Because Edens expressly disparages solutions that do not implement a synchronous logical ring network, persons of skill in the art at the time of the invention would not have

been motivated to modify Isely or Goldberg with the synchronous logical ring network systems and methods in Edens to perform the functions recited in the claims. MPEP 2141.02(VI).

If you have questions, or if you would like additional information to prepare for the interview, please feel free to call me.

Best regards,

Jeff Armstrong
312-913-2104 (office)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
Sonos No. 13-0403
(MBHB No. 15-519-CON)

| | |
|---|---|
| In the Application of: ) | |
|     Nicholas A. J. Millington ) | Examiner: SURVILLO, Oleg |
| ) | |
| Application No.: 13/864,250 ) | Group Art Unit: 2442 |
| ) | |
| Filed: April 17, 2013 ) | Confirmation No. 2371 |
| ) | |
| Title: System and Method for Synchronizing ) | |
|     Operations Among a Plurality of ) | |
|     Independently Clocked Digital Data ) | |
|     Processing Devices ) | |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO THE NON-FINAL OFFICE ACTION
### MAILED JANUARY 9, 2018

Please enter the following **AMENDMENTS** and consider the following **REMARKS** in response to the Non-Final Office Action mailed on January 9, 2018, in the above-captioned application.

**AMENDMENTS TO THE CLAIMS** begin on page 2.

**REMARKS** begin on page 13.

Please charge any underpayment or credit any overpayment of fees in connection with the prosecution of the above-captioned application to Deposit Account 13-2490.

13/864,250                                                                13-0403 (15-519-CON)

## AMENDMENTS TO THE CLAIMS

1-20.   (Canceled)

21.    (Currently Amended) A system comprising:

a controller device configured to control one or more zone players; and

a first zone player comprising at least one processor and tangible, non-transitory computer-readable memory comprising instructions that, when executed, cause the first zone player to perform operations comprising:

joining a first synchrony group comprising the first zone player and a second zone player;

providing first device clock timing to the second zone player over an asynchronous network while the first zone player is in the first synchrony group;

playing first audio information in synchrony with [[a]] the second zone player while the first zone player is in [[a]] the first synchrony group comprising the first zone player and the second zone player, wherein all zone players in the first synchrony group playback the first audio information based on using the first device clock timing information that the first zone player provides to the first synchrony group over the asynchronous network;

receiving control information from the controller device over one or more data via the asynchronous network[[s]], wherein the control information includes an identification of a third zone player, and wherein the control information directs the first zone player to (a) disengage from the first synchrony group, (b) join a second synchrony group with the third zone player, and (c) receive second audio information from the third zone player for playback in synchrony with the third zone player; and

2

13/864,250                                                          13-0403 (15-519-CON)

after receiving the control information from the controller device, (a) disengaging the
first zone player from the first synchrony group, (b) joining the first zone player to the second
synchrony group, (c) receiving the second audio information from the third zone player, and (d)
playing the second audio information in synchrony with the third zone player.

22.    (Previously Presented) The  system of claim 21, wherein disengaging from the
first synchrony group comprises the first zone player transmitting a notification to the second
zone player, wherein the notification  indicates that the first zone player is disengaging from the
first synchrony group.

23.    (Currently Amended) The  system of claim 21, wherein the operations performed
by the first zone player further comprise, prior to disengaging from the first synchrony group:

      receiving the first audio information for playback from an audio information source; and

      transmitting the first device <u>clock</u> timing information and the first audio information to at
least the second zone player while contemporaneously playing the first audio information ~~based
on~~ <u>using</u> the first device <u>clock</u> timing information.

24.    (Currently Amended) The system of claim 23, wherein the control information
directs the first zone player to cease transmitting the first audio information and the first device
<u>clock</u> timing information, and wherein the operations further cause the first zone player to cease
transmitting the first audio information and the first device <u>clock</u> timing information to the first
synchrony group.

25-26.  (Canceled)

3

13/864,250                                                                13-0403 (15-519-CON)

27.    (Previously Presented) The first zone player of claim 21, wherein the first audio information is different than the second audio information.

28.    (Currently Amended) A system comprising:

first tangible non-transitory computer-readable media having instructions stored thereon, wherein the instructions, when executed by a first set of one or more processors, cause a controller device to control a plurality of zone players in a media playback system; and

second tangible non-transitory computer-readable media having instructions stored thereon, wherein the instructions, when executed by a second set of one or more processors, cause a first zone player to perform functions comprising:

joining a first synchrony group comprising the first zone player and a second zone player;

providing first device clock timing to the second zone player over an asynchronous network while the first zone player is in the first synchrony group;

playing first audio information in synchrony with [[a]] the second zone player while the first zone player is ~~engaged~~ in [[a]] the first synchrony group, ~~the first synchrony group comprising the first zone player and the second zone player,~~ wherein all zone players in the first synchrony group playback the first audio information ~~based on~~ using the first device clock timing information that the first zone player provides to the first synchrony group over the asynchronous network;

receiving control information from the controller device ~~over one or more data~~ via the asynchronous network[[s]], wherein the control information includes an identification of a third zone player, and wherein the control information directs the first zone player to (a) disengage from the first synchrony group, (b) join a second synchrony group with the third zone player, and

4

(c) receive second audio information from the third zone player for playback in synchrony with the third zone player; and

after receiving the control information from the controller device (a) disengaging the first zone player from the first synchrony group, (b) joining the first zone player to the second synchrony group, (c) receiving the second audio information from the third zone player, and (d) playing the second audio information in synchrony with the third zone player.

29.    (Previously Presented)  The system of claim 28, wherein the second tangible, non-transitory computer-readable media further comprises additional instructions that, when executed, cause the first zone player to transmit a notification to the second zone player, wherein the notification  indicates that the first zone player is disengaging from the first synchrony group.

30.    (Currently Amended)  The system of claim 28, wherein the second tangible, non-transitory computer-readable media further comprises additional instructions that, when executed, cause the first zone player to:

receive the first audio information for playback from an audio information source; and

transmit the first device <u>clock</u> timing information and the first audio information to at least the second zone player while contemporaneously playing the first audio information <s>based on</s> <u>using</u> the first device <u>clock</u> timing information.

31.    (Currently Amended)  The  system of claim 30, wherein the control information received by the first zone player from the controller device directs the first zone player to cease transmitting the first audio information and the first device <u>clock</u> timing information to the first synchrony group, and wherein the second tangible, non-transitory computer-readable memory further comprises additional instructions that, when executed, cause the first zone player to cease

13/864,250                                                                13-0403 (15-519-CON)

transmitting the first audio information and the first device <u>clock</u> timing information to the first

synchrony group.

32-33.  (Canceled)

34.     (Previously Presented)    The system of claim 28, wherein the first audio

information is different than the second audio information.

35.     (Currently Amended)   A system comprising:

a controller device configured to control one or more zone players;

a first zone player comprising:

a network interface configured to connect the first zone player to ~~a data~~ <u>an asynchronous</u>

network;

at least one processor; and

tangible, non-transitory computer-readable memory comprising instructions that, when

executed by the first zone player, cause the first zone player to perform a first set of functions

comprising:

<u>joining a first synchrony group comprising the first zone player and a second zone player;</u>

<u>providing first device clock timing to the second zone player over the asynchronous</u>

<u>network while the first zone player is in the first synchrony group;</u>

playing first audio information in synchrony with [[a]] <u>the</u> second zone player while the

first zone player is ~~engaged~~ in [[a]] <u>the</u> first synchrony group ~~comprising the first zone player~~

~~and the second zone player~~, wherein all zone players in the first synchrony group playback the

first audio information ~~based on~~ <u>using the</u> first device <u>clock</u> timing information that the first zone

player provides to the first synchrony group <u>over the asynchronous network;</u>

6

13/864,250                                                          13-0403 (15-519-CON)

receiving first control information from the controller device over the ~~data~~ <u>asynchronous</u>

network, wherein the first control information includes an identification of a third zone player,

and wherein the first control information directs the first zone player to (a) disengage from the

first synchrony group, (b) join a second synchrony group with the third zone player, and (c)

receive second audio information from the third zone player for playback in synchrony with the

third zone player; <u>and</u>

after receiving the first control information from the controller device, (a) disengaging

from the first synchrony group, (b) joining the first zone player to a second synchrony group

with the third zone player, (c) receiving second audio information from the third zone player, and

(d) playing the second audio information in synchrony with playback of the second audio by the

third zone player.

36.     (Previously Presented)  The system of claim 35, wherein the first set of functions

further comprise the first zone player transmitting a notification to the second zone player via the

network interface, wherein the notification  indicates that the first zone player is disengaging

from the first synchrony group.

37.     (Currently Amended)  The system of claim 35, wherein the first set of functions

further comprise the first zone player transmitting the first device <u>clock</u> timing information and

the first audio information to at least the second zone player while contemporaneously playing

the first audio information ~~based on~~ <u>using</u> the first device <u>clock</u> timing information.

38.     (Currently Amended)  The system of claim 37, wherein the first set of functions

performed in response to receiving the first control information further comprise the first zone

player ceasing transmitting the first device <u>clock</u> timing information and the first audio

7

information to at least the second zone player while contemporaneously playing the first audio

information ~~according to~~ <u>using</u> the first device <u>clock</u> timing information.

39-40.  (Canceled)

41.     (Currently Amended)  The system of claim 35, wherein the second zone player

comprises:

a network interface configured to connect the second zone player to the ~~data~~

<u>asynchronous</u> network;

at least one processor; and

tangible, non-transitory computer-readable memory comprising instructions that, when

executed by the second zone player, cause the second zone player to perform a second set of

functions comprising:

while engaged in the first synchrony group with the first zone player, (a) transmitting the

first audio information to the first zone player, (b) receiving the first device <u>clock</u> timing

information from the first zone player, and (c) playing the first audio information in synchrony

with the playback of the first audio information by the first zone player based on the first device

<u>clock</u> timing information received from the first zone player;

receiving second control information from the controller device; and

after receiving the second control information from the controller device, ceasing playing

the first audio information in synchrony with the playback of the first audio information by the

first zone player based on the first device <u>clock</u> timing information received from the first zone

player.

42.    (Previously Presented) The system of claim 41, wherein after receiving the second control information from the controller device, the second zone player continues to play the first audio information as a standalone zone player.

43.    (Currently Amended)  The system of claim 35, wherein the third zone player comprises:

a network interface configured to connect the third zone player to the ~~data~~ asynchronous network;

at least one processor; and

tangible, non-transitory computer-readable memory comprising instructions that, when executed by the third zone player, cause the third zone player to perform a third set of functions comprising:

playing the second audio information associated with the second synchrony group;

receiving control information from the controller device over the ~~data~~ asynchronous network, the control information including an identification of the first zone player, and wherein the control information directs the third zone player to form the second synchrony group with the first zone player; and

in response to receiving the control information from the controller device, (a) transmitting the second audio information to the first zone player, (b) transmitting second device clock timing information to the first zone player, and (c) playing the second audio information in synchrony with the first zone player based on the second device clock timing information.

44.    (Currently Amended)  The system of claim 21, wherein all zone players in the first synchrony group playback the first audio information based on the first device clock timing

information that the first zone player provides to the first synchrony group during synchronous playback and first playback timing information that the first zone player provides to the first synchrony group during synchronous playback, and wherein after joining the first zone player to the second synchrony group, all zone players in the second synchrony group playback the second audio information based on second device <u>clock</u> timing information that the third zone player provides to the second synchrony group during synchronous playback and second playback timing information that the third zone player provides to the second synchrony group during synchronous playback.

45.    (Currently Amended)  The system of claim 21, wherein all zone players in the first synchrony group playback the first audio information based on the first device <u>clock</u> timing information that the first zone player provides to the first synchrony group during synchronous playback and first playback timing information that the first zone player provides to the first synchrony group during synchronous playback, and wherein after joining the first zone player to the second synchrony group, all zone players in the second synchrony group playback the second audio information based on the first device <u>clock</u> timing information that the first zone player provides to the second synchrony group during synchronous playback and second playback timing information that the first zone player provides to the second synchrony group during synchronous playback.

46.    (Currently Amended)  The system of claim 28, wherein all zone players in the first synchrony group playback the first audio information based on the first device <u>clock</u> timing information that the first zone player provides to the first synchrony group and first playback timing information that the first zone player provides to the first synchrony group, and wherein

all zone players in the second synchrony group playback the second audio information based on second device <u>clock</u> timing information that the third zone player provides to the second synchrony group and second playback timing information that the third zone player provides to the second synchrony group.

47.    (Currently Amended)  The system of claim 28, wherein all zone players in the first synchrony group playback the first audio information based on the first device <u>clock</u> timing information that the first zone player provides to the first synchrony group during synchronous playback and first playback timing information that the first zone player provides to the first synchrony group during synchronous playback, and wherein after joining the first zone player to the second synchrony group, all zone players in the second synchrony group playback the second audio information based on the first device <u>clock</u> timing information that the first zone player provides to the second synchrony group during synchronous playback and second playback timing information that the first zone player provides to the second synchrony group during synchronous playback.

48.    (Currently Amended)  The system of claim 35, wherein all zone players in the first synchrony group playback the first audio information based on the first device <u>clock</u> timing information that the first zone player provides to the first synchrony group during synchronous playback and first playback timing information that the first zone player provides to the first synchrony group during synchronous playback, and wherein all zone players in the second synchrony group playback the second audio information based on second device <u>clock</u> timing information that the third zone player provides to the second synchrony group during

synchronous playback and second playback timing information that the third zone player provides to the second synchrony group during synchronous playback.

49.    (Currently Amended)  The system of claim 35, wherein all zone players in the first synchrony group playback the first audio information based on the first device <u>clock</u> timing information that the first zone player provides to the first synchrony group during synchronous playback and first playback timing information that the first zone player provides to the first synchrony group during synchronous playback, and wherein after joining the first zone player to the second synchrony group, all zone players in the second synchrony group playback the second audio information based on the first device <u>clock</u> timing information that the first zone player provides to the second synchrony group during synchronous playback and second playback timing information that the first zone player provides to the second synchrony group during synchronous playback.

13/864,250                                                                    13-0403 (15-519-CON)

# REMARKS

## I.    Summary of the Claims

Claims 21–24, 27–31, 34–38, and 41–49 are pending; claims 21, 28, and 35 are independent. Without conceding the merits of the rejections, and solely to advance prosecution, Applicant has amended claims 21, 23-24, 28, 30-31, 35, 37-38, 41, and 43-49 to clarify the claim language and to generally put the claims in better condition for allowance. No new matter has been added.

## II.    Summary of the Office Action mailed January 9, 2018

In the Office Action, the Examiner rejected (i) claims 45, 47, and 49 under 35 U.S.C. § 112, ¶ 2, for alleged indefiniteness; and (ii) claims 21-24, 27-31, 34-38, and 41-49 under 35 U.S.C. § 103 based on U.S. Pub. 2002/0124097 ("Isely"), U.S. Pub. 2007/0142944 ("Goldberg"), and U.S. Pat. 6,611,537 ("Edens").

## III.    Summary of the Examiner Interview on March 12, 2018

An in-person Examiner Interview took place on March 12, 2018, at the Patent Office. Participants included Examiner Oleg Survillo and Applicant's representatives, John Tolomei and Jeff Armstrong. During the interview, the participants discussed claim 21 and the Isely, Goldberg, and Edens references. No demonstrations were conducted and no exhibits were shown. No agreement on the claims was reached. Applicant agreed to file a response with amendments and arguments for further review and consideration.

## IV.    Response to the § 112 Rejections

The Office Action states, "[a]s to claims 45, 47, and 49, it is unclear why the first zone player would provide the first device timing information and the second playback timing

13

information to the second synchrony group where the first zone player is not a master zone player, but rather is the third zone player that provides the second audio information for playback." Office Action, p. 3. The specification describes many embodiments where zone players perform different roles for multiple synchrony groups, including embodiments where a zone player contemporaneously functions as both (i) an audio information channel device that provides audio, playback timing, and clock timing for a synchrony group and (ii) a master or slave of another synchrony group. See, e.g., U.S. Pub. 2013/0232415, ¶¶ 45, 49.

## V.      Response to § 103 Rejections

The claims are patentable over Isely, Goldberg, and Edens for at least the reason that Isely, Goldberg, and Edens, individually or in combination, fail to teach or suggest at least "a first zone player…playing first audio information in synchrony with the second zone player while the first zone player is in the first synchrony group, wherein all zone players in the first synchrony group playback the first audio information using the first device clock timing information that the first zone player provides over the asynchronous network," in combination with the other elements recited in the claims.

### A.      Isely fails to teach or suggest all the claim elements

The Office Action acknowledges Isely does not teach, among other features, "playback of the first audio information by zone players in the first synchrony group is based on first device timing information that the first zone player provides to the first synchrony group." Office Action, p. 5. Therefore, Isely fails to teach or suggest "a first zone player…playing first audio information in synchrony with the second zone player while the first zone player is in the first synchrony group, wherein all zone players in the first synchrony group playback the first audio

information using the first device clock timing information that the first zone player provides
over the asynchronous network," in combination with the other elements recited in the claims.

**B.      The addition of Goldberg fails to overcome the deficiencies of Isely**

Goldberg discloses a broadcast unit transmitting a "music file" and "synchronization
signals" to receive units.   Goldberg, ¶¶ 201-203.   Goldberg does not disclose "device clock
timing information," and indeed, the Office Action does not contend that Goldberg discloses this
aspect of the claims.   Office Action, p. 6.   Therefore, like Isely, Goldberg also fails to teach or
suggest "a first zone player…playing first audio information in synchrony with the second zone
player while the first zone player is in the first synchrony group, wherein all zone players in the
first synchrony group playback the first audio information using the first device clock timing
information that the first zone player provides over the asynchronous network," in combination
with the other claim elements.

**C.      The addition of Edens fails to overcome the deficiencies of Isely and
Goldberg**

The Office Action contends, "Edens teaches that all zone players in the first synchrony
group playback the first audio information based on first device timing information [device
clock] provided by the first zone player [elected network clock device]."   Office Action, p. 7
(citing Edens, 10:9-18.).   However, Edens does not disclose "a first zone player…playing first
audio information in synchrony with the second zone player while the first zone player is in the
first synchrony group, wherein all zone players in the first synchrony group playback the first
audio information using the first device clock timing information that the first zone player
provides over the asynchronous network" for at least two reasons.

First, Edens discloses using device clock information for synchronizing the clocks of nodes in a synchronous logical ring network rather than using that device clock information to play back audio in synchrony. Edens, 10:9-18. In operation, "one of the competing devices [in the ring network] is elected the network clock device to which all other devices are then synchronized." Edens, 10:9-11. "The network clock device sends a synchronization marker at constant intervals along the default network path to which all other devices synchronize." Edens, 24: 63-65. Edens explains that "this low-level device synchronization greatly facilitates the synchronization of audio and video sources." Edens, 24:66-67. Even if the Office contends Edens's "synchronization marker" amounts to "device timing information," transmitting a synchronization marker to synchronize clocks in a synchronous network does not amount to "providing first device clock timing to the second zone player over an asynchronous network while the first zone player is in the first synchrony group," as recited in the claims, which occurs before the step of "playing first audio information in synchrony with the second zone player while the first zone player is in the first synchrony group, wherein all zone players in the first synchrony group playback the first audio information using the first device clock timing information that the first zone player provides over the asynchronous network."

Second, Edens discloses playback devices configured in "a synchronous logical ring network," Edens, 9:58, where "information propagates around the ring at a consistent rate (e.g., synchronously, based upon a master clock)," Edens, 8:54-56, rather than an asynchronous network as recited in the claims. So even if the Office contends that transmitting a synchronization marker to synchronize devices in a synchronous network amounts to "playing first audio information in synchrony with the second zone player…based on the first device timing information that the first zone player provides," Edens transmits the synchronization

markers over the "synchronous logical ring network" rather than an "asynchronous network" as recited in the claims.

Thus, Edens does not teach or suggest "a first zone player…playing first audio information in synchrony with the second zone player while the first zone player is in the first synchrony group, wherein all zone players in the first synchrony group playback the first audio information using the first device clock timing information that the first zone player provides over the asynchronous network" for at least these two independent reasons.

### D.    Edens teaches away from the claimed invention

The Office Action contends that "[i]t would have been obvious…to modify the method and system of Isely in view Goldberg by having playback of the first audio information by all zone players in the synchrony group somehow based on an additional device timing information [as disclosed in Edens] in order to ensure that information always will propagate from one device to another at consistent time intervals, which is an improvement to Goldberg's synchronization approach." Office Action, p. 7, (citing Edens 10:9-18).  But contrary to the assertion in the Office Action, a person of ordinary skill in the art at the time of the invention would not have been motivated to modify the asynchronous systems and methods of Goldberg and Isely with the synchronous transmission systems and methods disclosed in Edens because Edens teaches away from network devices that do not use synchronous transmission protocols.

A reference teaches away from a claimed invention "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013); MPEP 2141.02(VI).

13/864,250                                                                13-0403 (15-519-CON)

Here, Edens says, "[a]pplying local area network technology (e.g., Ethernet and TCP/IP network protocols) to consumer electronics devices ***raises a number of problems***" and that "[a]lthough it appears advantageous to connect consumer electronics devices as generic nodes on a network, ***existing network protocols are far from optimized for real-time streams of digital audio and video***." Edens, 4:47-53 (emphasis added). Edens further explains that "Ethernet…is not optimized to carry real-time continuous digital media streams" because "[i]t is an asynchronous, packet-based protocol that would add significant overhead to digital audio and video samples, which require consistent and timely delivery, as opposed to the ability to 'burst' packets of information at high speeds on demand." Edens, 5:4-10. Edens teaches that devices using Ethernet and/or other asynchronous transmission protocols rather than synchronous transmission protocols to distribute real-time media would be undesirably "***complex and expensive devices***, due to the memory, buffers, counters and associated circuitry required" for real-time digital media. Edens, 6:38-52 (emphasis added).

By distinguishing the "synchronous logical ring network" from alternatives that do not rely upon synchronous transmission and explicitly disparaging alternatives that "***cannot guarantee consistent delivery of data such as real-time continuous digital media streams***," Edens, 9:12-14, Edens teaches away from devices like the zone players recited in the claims that do not rely on synchronous transmission protocols, but rather solve the problem of synchronizing audio playback between zone players by having one zone player transmit its "device clock information" to other zone players over an "asynchronous network." Because Edens expressly disparages solutions that do not implement a synchronous logical ring network, persons of skill in the art at the time of the invention would not have been motivated to modify Isely or Goldberg

18

13/864,250                                                          13-0403 (15-519-CON)

with the synchronous logical ring network systems and methods in Edens to perform the functions recited in the claims. MPEP 2141.02(VI).

## VI.    Conclusion

Applicant submits that the claims are allowable over the cited references, and Applicant requests a Notice of Allowance. If further dialog would advance prosecution, Applicant invites the Office to telephone the undersigned at 312-913-0001.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date:  May 9, 2018            By:    /Jeffrey P. Armstrong/
                                     Jeffrey P. Armstrong
                                     Reg. No. 54,967

19

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

107361        7590        09/12/2018

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
| --- |
| SURVILLO, OLEG |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2442 | |

DATE MAILED: 09/12/2018

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519-CON) | 2371 |

TITLE OF INVENTION: DISENGAGING AND ENGAGING ZONE PLAYERS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 12/12/2018 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>  **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
or <u>Fax</u> **(571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

<table>
<tr><td>107361</td><td>7590</td><td>09/12/2018</td></tr>
</table>

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519-CON) | 2371 |

TITLE OF INVENTION: DISENGAGING AND ENGAGING ZONE PLAYERS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 12/12/2018 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SURVILLO, OLEG | 2442 | 709-219000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                     (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

**4a. The following fee(s) are submitted:**

☐ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s):  (Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____     Date _____

Typed or printed name _____     Registration No. _____

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.     OMB 0651-0033     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/864,250 | 04/17/2013 | Nicholas A. J. Millington | 13-0403 (MBHB 15-519 CON) | 2371 |

| | | |
|---|---|---|
| 107361          7590          09/12/2018 | | EXAMINER |
| McDonnell Boehnen Hulbert & Berghoff LLP | | SURVILLO, OLEG |
| Sonos, Inc. | | |
| 300 South Wacker Drive | ART UNIT | PAPER NUMBER |
| Chicago, IL 60606 | 2442 | |

DATE MAILED: 09/12/2018

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 13/864,250 | Applicant(s) Millington, Nicholas A. J. | |
|---|---|---|---|
| | Examiner OLEG SURVILLO | Art Unit 2442 | AIA Status No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>amendment after Non-Final rejection, response dated 05/09/2018</u>.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>21-24,27-31,34-38 and 41-49</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All    b) ☐ Some    *c) ☐ None of the:
       1. ☐ Certified copies of the priority documents have been received.
       2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
       * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>05/24/2018</u>.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☑ Examiner's Amendment/Comment
6. ☐ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

/OLEG SURVILLO/
Primary Examiner, Art Unit 2442

Application/Control Number: 13/864,250                                      Page 2
Art Unit: 2442

## EXAMINER'S COMMENT

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Response to Arguments*

With regard to the Applicants' Remarks dated May 9, 2018:

Regarding the rejection of claims 45, 47, and 49 under 35 U.S.C. 112, second paragraph, Applicant's argument has been fully considered and is persuasive. Therefore, the rejection has been withdrawn.

Regarding the rejection of claims 21-24, 27-31, 34-38, and 41-49 under 35 U.S.C. 103(a), Applicants amendment and arguments have been fully considered. Applicants argue that *"Edens does not disclose "a first zone player…playing first audio information in synchrony with the second zone player while the first zone player is in the first synchrony group, wherein all zone players in the first synchrony group playback the first audio information using the first device clock timing information that the first zone player provides over the asynchronous network"*. In particular, Applicants argue that *"Edens discloses using device clock information for synchronizing the clocks of nodes in a synchronous logical ring network rather than using that device clock information to play back audio in synchrony"*. Examiner agrees. Applicants also argue that *"Edens transmits the synchronization markers over the "synchronous logical ring network" rather than an "asynchronous network"* as recited in the claims. Examiner agrees that combination of Isely, Goldberg, and Edens fails to teach all the features of claims 21,

Application/Control Number: 13/864,250                                                Page 3
Art Unit: 2442

28, and 35, as amended. Therefore, the rejection has been withdrawn. Upon further

search and consideration, no new grounds of rejection are made.

    As to any arguments not specifically addressed, they are the same as those

discussed above.


### *Allowed Claims*

    Claims 21-24, 27-31, 34-38, and 41-49 are allowed.


### *Conclusion*

    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to OLEG SURVILLO whose telephone number is

(571)272-9691.  The examiner can normally be reached on 9:00am - 5:00pm.

    Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Glenton Burgess can be reached on 571-272-3949.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

Application/Control Number: 13/864,250                                    Page 4
Art Unit: 2442

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/OLEG SURVILLO/
Primary Examiner, Art Unit 2442

Exhibit 15

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 35379235 |
| **Application Number:** | 16298515 |
| **International Application Number:** | |
| **Confirmation Number:** | 7686 |
| **Title of Invention:** | Playback Device Connection |
| **First Named Inventor/Applicant Name:** | Nicholas A.J. Millington |
| **Customer Number:** | 135176 |
| **Filer:** | Brandon Jacob Kennedy |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | 05-0601-CON0319A |
| **Receipt Date:** | 11-MAR-2019 |
| **Filing Date:** | |
| **Time Stamp:** | 16:26:52 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | CARD |
| Payment was successfully received in RAM | $5860 |
| RAM confirmation Number | 031219INTEFSW16284000 |
| Deposit Account | 506632 |
| Authorized User | Brandon Kennedy |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
| 37 CFR 1.16 (National application filing, search, and examination fees) | |
| 37 CFR 1.17 (Patent application and reexamination processing fees) | |

37 CFR 1.19 (Document supply fees)

37 CFR 1.20 (Post Issuance fees)

37 CFR 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Oath or Declaration filed | 05-0601-CON0316B_Declaration.pdf | 178147<br>542cd5fc880ec0550cad5c2f073c0e43792e9abd | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Power of Attorney | 05-0601-CON0319A_POA.pdf | 240203<br>082b88770a1c340d1c1416de6a7595dc966d240f | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Authorization for Extension of Time all replies | 05-0601-CON0319A_General_Authorization.pdf | 73766<br>e941fc1f5483e72bec2c609aa1e31c88206fa81a | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Application Data Sheet | 05-0601-CON0319A_ADS.pdf | 1256438<br>e7f6c79aa8f9275557e6968e23f4dffafd0dc52c | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Drawings-only black and white line drawings | 05-0601-CON0316A_Figures.pdf | 179689<br>ac9aaf796356c42aa74ea55e7684bbd57839280e | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 6 | TrackOne Request | 05-0601-CON0319A_Track1Request.pdf | 130236<br>d6f90bf7f437185b1c6d87c3a6c736b7daebc452 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |

| 7 | | 05-0601-CON0319A_Specification.pdf | 296296 57c60b3d06f2a3625e3b3f8ae7ada7112b1919f5 | yes | 41 |

| **Multipart Description/PDF files in .zip description** | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Abstract | 41 | 41 |
| Claims | 35 | 40 |
| Specification | 1 | 34 |

**Warnings:**

**Information:**

| 8 | Fee Worksheet (SB06) | fee-info.pdf | 38782 9463baa2f740c0654da604368c5cb0f5a6da8708 | no | 2 |

**Warnings:**

**Information:**

| **Total Files Size (in bytes):** | 2393557 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

<u>New Applications Under 35 U.S.C. 111</u>
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

<u>National Stage of an International Application under 35 U.S.C. 371</u>
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

<u>New International Application Filed with the USPTO as a Receiving Office</u>
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

PATENT
Attorney Docket No. 05-0601-CON0319A

**Application for a United States Patent United States Patent and Trademark Office**

Title:        Playback Device Connection

Inventor(s):  Nicholas A.J. Millington
                Paul V. Hainsworth

Assignee:    Sonos, Inc.
            614 Chapala St.
            Santa Barbara, CA 93101

PATENT
Attorney Docket No. 05-0601-CON0319A

## CROSS REFERENCE TO RELATED APPLICATIONS

[0000]      This application is a continuation of U.S. App. 15/091,113, filed on Apr. 5, 2016; U.S. App. 14/486,667, filed on Sep. 15, 2014, and issued on Jan. 9, 2018, as U.S. Pat. 9,866,447; U.S. App. 14/486,667 is a continuation of U.S. App. 13/618,829, filed on Sep. 14, 2012, and issued Oct. 21, 2014, as U.S. Pat. 8,868,698; U.S. App. 13/618,829 is a continuation of U.S. App. 11/147,116 filed on Jun. 6, 2005, and issued Dec. 4, 2012, as U.S. Pat. 8,326,951; U.S. App. 11/147,116 claims priority to provisional application 60/577,284 filed Jun. 5, 2004, and which is now expired. The entire contents of the 15/091,113; 14/486,667; 13/618,829; 11/147,116; and 60/577,284 applications are incorporated herein by reference.

## BACKGROUND

### Field of the Invention

[0001]      The invention is generally related to the area of multimedia technologies in consumer electronics industry. More particularly, the invention is related to techniques for connecting various devices to a network for secure communications with a minimum of human interaction and technical ability.

### The Background of Related Art

[0002]      Consumer electronics devices that operate using wireless or wired Ethernet standards are often subject to the same complicated set-up process as a wireless computer network. Typically, the person who sets up the wireless network must have at least some knowledge about IP (Internet Protocol) networking and Ethernet (e.g., 802.3, 802.11), such as addressing, security, broadcast, unicast, etc. Such a skill requirement is generally acceptable for computer-to-computer networks, which is typically done by an IT professional. However, it is impractical to require average consumers to have such knowledge to hook up consumer electronic devices, such as home entertainment products that use wireless/wired Ethernet connectivity.

2

PATENT
Attorney Docket No. 05-0601-CON0319A

[0003]        FIG. 5 shows an exemplary setting **500** for connecting a computer to a wireless network. The setting **500** is typically displayed when a user is ready to connect the computer to a wireless network so that the user can enter relevant information in the setting **500**. Although the setting **500** requires very little information to make the computer connected to the network, the information is relatively technical to the average consumers. First, the user has to know what type of network the computer is going to be connected to. There are two choices **502,** Access Point (infrastructure) and Computer-to-computer (Ad Hoc). The distinction between these two types of network is a common knowledge to the IT professionals yet can be a difficult question to the average consumers. Further even if the user knows the difference, there are more questions or options related to the security settings in **504,** which evidently requires some good understanding about the network security over the wireless network.

[0004]        For home entertainment products, there is a clear need to create simple methods of setting up and maintaining a secure wireless/wired in-home network with minimum human interventions.

## SUMMARY OF THE INVENTION

[0005]        This section is for the purpose of summarizing some aspects of the present invention and to briefly introduce some preferred embodiments. Simplifications or omissions in this section as well as in the abstract or the title of this description may be made to avoid obscuring the purpose of this section, the abstract and the title. Such simplifications or omissions are not intended to limit the scope of the present invention.

[0006]        In general, the present invention pertains to techniques for automatically configuring necessary parameters of a device to be coupled to a network. According to one aspect of the present invention, an Ad-hoc (wireless or wired) network is established to facilitate communications among a group of devices. When a new device

3

PATENT
Attorney Docket No. 05-0601-CON0319A

is added to the network, a rudimentary communication path is initially established between one of the devices in the network ("first device") and the new device ("second device") such that necessary parameters (e.g., SSID, WEP security, channel frequency) can be exchanged for the second device to function properly in the network. To ensure the parameters are exchanged in a secure fashion, an additional public security procedure can be used between the two devices.

[0007]     According to another aspect of the present invention, a first device that may be or may not be the device in the network broadcasts a message including probing datagrams in compliance with the standard IP broadcast. The rudimentary communication path may be established after the second device responds to the message from the first device. According to yet another aspect of the present invention, such an automatic configuration process is only started when a user is indeed ready to do so. In general, a mechanism is provided and accessible by the user to activate the process. As such, no incident or unwanted configuration process could be initiated without the approval of the user. In one embodiment, the second device is equipped with two buttons that must be pressed simultaneously to activate the automatic configuration process.

[0008]     The necessary parameters in the second device are subsequently configured in several exchanges of messages with the first device. At least some of the messages are encrypted. As a result, the second device is automatically configured to operate correctly in the network with a minimum of human intervention and technical ability. In an exemplary application of the present invention for an audio system with a controller and multiple zone players, an Ad-hoc network is formed among the controller and the zone players, where the network may be wired or wireless or a mixture of both. In one case, either a handheld controller or a zone player (referred to as an access device) is coupled to an access point of a LAN. An Ad-hoc network can be thus formed based on the access device. The remaining (unconfigured) zone players may be coupled to the network whenever desired, all with minimum human intervention. As a

PATENT
Attorney Docket No. 05-0601-CON0319A

result, any one of the zone players may communicate with each other to share or distribute audio sources available on the Internet and reproduce sounds together or separately.

[0009]    The present invention may be implemented in many forms including software, hardware or a combination of both as method, process, or system. According to one embodiment of the present invention, the present invention is a method for providing a first device and a second device for the network,  activating  the second device intentionally to automatically configure necessary  parameters  with the first device, establishing automatically a rudimentary communication path between the first device and the second device by scanning all available transmission channels allocated in accordance with a protocol; and exchanging messages between the first device and the second device over the rudimentary communication  path till the second  device is fully operating with the first device.

[0010]    According to another embodiment of the present invention, the present invention is a system for establishing a network for a group of devices, the system comprises at least one of the devices provided to remotely control operations of one or more of the other devices, one of the devices (hereinafter "first device") configured to establish automatically respective rudimentary communication paths for probing communication, each of the rudimentary communication paths being with one of the other devices, wherein an automatic configuration process takes place only in one of the other devices after the user authorizes the one of the other devices to start the automatic configuration process, and wherein the automatic configuration process causes several messages to be exchanged between the first device and one of the other devices, some of the messages carry information pertaining to an appropriate

PATENT
Attorney Docket No. 05-0601-CON0319A

transmission channel, an identifier of the network and a security key for subsequent
communication, the some of the messages are encrypted.

[0011]    According to yet another embodiment of the present invention, the present
invention is a system for establishing a network for a group of devices, the system
comprises a plurality of zone players, each equipped with a mechanism that is once
manually activated by a user, an automatic configuration process starts, wherein one of
the zone players is coupled to a local area network as an access device; and at least a
controller provided to remotely control operations of one or more of the zone players,
wherein the access device establishes automatically respective rudimentary
communication paths, each with the controller or one of the remaining zone players, the
automatic configuration process takes places in the controller and each of the remaining
zone players after the user manually activates the automatic configuration process
respectively in the controller and each of the remaining z ne players, and wherein the
automatic configuration process causes several messages  to be  exchanged  between
the access device and any one of the controller  and the remaining zone players  that
have been activated for the automatic configuration  process,  some of the messages
carry information pertaining to a transmission channel, an identifier of the network and a
security key for subsequent  communication, at least some of the messages are
encrypted.

[0012]    According to still another embodiment of the present invention, the present
invention is a software product  to be executable  in a device for establishing  a network
for a group of devices, the software product comprises program code for activating a
second device, when requested, to automatically  configure  necessary  parameters  with
a first device, program code for establishing automatically a rudimentary communication
path with the first device by scanning all available transmission channels allocated in
accordance with a protocol, and program code for exchanging messages between the

PATENT
Attorney Docket No. 05-0601-CON0319A

first device and the second device over the rudimentary communication path till the second device is fully operating with the first device.

[0013]    According to still another embodiment of the present invention, the present invention is a method for establishing a network for a group of devices, the method comprises providing a plurality of zone players, each equipped with a mechanism that once is manually activated by a user, an automatic configuration process starts, wherein at least a controller is provided to remotely control operations of one or more of the zone players; coupling one of the zone players to a local area network as an access device; establishing automatically respective rudimentary communication paths with the access device, each of paths being with the controller or one of the remaining zone players, wherein the automatic configuration process takes place in the controller and each of the remaining zone players after the user manually activates the automatic configuration process respectively in the controller and each of the remaining zone players, and exchanging several messages between the access device and any one of the controller and the remaining zone players that have been activated for the automatic configuration process, wherein some of the messages carry information pertaining to a transmission channel, an identifier of the network and a security key for subsequent communication, and at least some of the messages are encrypted.

[0014]    One of the objects, features, and advantages of the present invention is to provide techniques that facilitate automatic configuration of devices to be coupled to a network with minimum human intervention.

[0015]    Other objects, features, and advantages of the present invention will become apparent upon examining the following detailed description of an embodiment thereof, taken in conjunction with the attached drawings.

PATENT
Attorney Docket No. 05-0601-CON0319A

## BRIEF DESCRIPTION OF THE DRAWINGS

[0016]     These and other features, aspects, and advantages of the present invention will become better understood with regard to the following description, appended claims, and accompanying drawings where:

[0017]     FIG. 1 shows an exemplary configuration in which the present invention may be practiced;

[0018]     FIG. 2A shows an exemplary functional block diagram of a player in accordance with the present invention;

[0019]     FIG. 2B shows an example of controllers that may be used to remotely control one of more players of FIG. 1;

[0020]     FIG. 2C shows an exemplary internal functional block diagram of a controller in accordance with one embodiment of the present invention;

[0021]     FIG. 3A shows three zone players and a controller that form an Ad-Hoc network as an example to facilitate the description of an automatic configuration process contemplated in the present invention;

[0022]     FIG. 3B shows an embodiment that involves a process of five exchanges of data;

[0023]     FIG. 4A shows a flowchart or process according to one embodiment of the present invention;

[0024]     FIG. 4B shows another flowchart or process according to one embodiment of the present invention; and

8

PATENT
Attorney Docket No. 05-0601-CON0319A

[0025]        FIG. 5 shows an exemplary setting for connecting a computer to a wireless network.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0026]        The present invention pertains to techniques for automatically configuring necessary parameters of a device to be coupled to a network with minimum human intervention. According to one aspect of the present invention, a wired and/or wireless Ad-hoc network is established to facilitate communications among a group of devices. According to one aspect of the present invention, when a new device is added to the network, a rudimentary communication path is initially established between one of the devices ("first device") in the network and the new device ("second device") such that necessary parameters (e.g., SSID, WEP security, channel frequency) can be exchanged for the new device to function properly in the network. To ensure the parameters are exchanged in a secure fashion, an additional public security procedure can be used between the two devices.

[0027]        The detailed description of the present invention is presented largely in terms of procedures, steps, logic blocks, processing, or other symbolic representations that directly or indirectly resemble the operations of devices or systems that can be used on networks. These descriptions and representations are typically use by those skilled in the art to most effectively convey the substance of their work to others skilled in the art.

[0028]        Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification

9

PATENT
Attorney Docket No. 05-0601-CON0319A

are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams or the use of sequence numbers representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

[0029]    Embodiments of the invention are discussed herein with reference to an audio system with multi-zone capability. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to the audio system is for explanatory purposes as the invention extends beyond these limited embodiments.

[0030]    Referring now to the drawings, in which like numerals refer to like parts throughout the several views. FIG. 1 shows an exemplary configuration **100** in which the present invention may be practiced. The configuration may represent, but not be limited to, a part of a residential home, a business building or a living complex with multiple zones. There are a number of multimedia players of which three examples **102, 104** and **106** are shown as audio devices. Each of the audio devices may be installed or provided in one particular area or zone and hence referred to as a zone player herein.

[0031]    As used herein, unless explicitly stated otherwise, a track and an audio source are used interchangeably, an audio source or audio sources are in digital format and can be transported or streamed across a data network. To facilitate the understanding of the present invention, it is assumed that the configuration **100** represents a home. Thus, the zone player **102** and **104** may be located in two of the bedrooms respectively while the zone player **106** may be installed in a living room. All of the zone players **102, 104** and **106** are coupled directly or indirectly to a data network **108**. In addition, a computing device **110** is shown to be coupled on the network **108**. In

10

PATENT
Attorney Docket No. 05-0601-CON0319A

reality, any other devices such as a home gateway device, a storage device, or an MP3 player may be coupled to the network **108** as well.

[0032]     The network **108** may be a wired network, a wireless network or a combination of both. In one example, all devices including the zone players **102, 104** and **106** are coupled to the network **108** by wireless means based on an industry standard such as IEEE 802.11. In yet another example, all devices including the zone players **102, 104** and **106** are part of a local area network that communicates with a wide area network (e.g., the Internet).

[0033]     All devices on the network **108** may be configured to download and store audio sources or receive streaming audio sources. For example, the computing device **110** can download audio sources from the Internet and store the downloaded sources locally for sharing with other devices on the Internet or the network **108**. The zone player **106** can be configured to receive streaming audio source and share the source with other devices. Shown as a stereo system, the device **112** is configured to receive an analog source (e.g., from broadcasting) or retrieve a digital source (e.g., from a compact disk). The analog sources can be converted to digital sources. In accordance with the present invention, all audio sources, regardless of where they are located or how they are received, may be shared among the devices on the network **108**.

[0034]     Any device on the network **108** may be configured to control operations of the zone players **102, 104** and **106**. In particular, one or more controlling devices **140** and **142** are used to control zone players **102, 104** and **106** as shown in FIG. 1. The controlling devices **140** and **142** are preferably portable and remotely control the zone players via wireless means (e.g., infrared, radio, wireless standard IEEE 802.11b or 802.11g). In one embodiment, besides controlling an individual zone player, the controlling device **140 or 142** is configured to manage audio sources and other

11

PATENT
Attorney Docket No. 05-0601-CON0319A

characteristics of all the zone players regardless where the controlling device **140** or **142** is located in a house or a confined living complex.

[0035]     Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a zone player **200** in accordance with the present invention. The zone player **200** includes a network interface **202,** a processor **204,** a memory **206,** an audio processing circuit **210,** a digital signal processing module **212,** and an audio amplifier **214.**  The network interface **202** facilitates a data flow between a data network (i.e., the data network **108** of FIG. 1) and the zone player **200** and typically executes a special set of rules (i.e., a protocol) to send data back and forth.  One of the common protocols is TCP/IP (Transmission Control Protocol/Internet Protocol) commonly used in the Internet. In general, a network interface manages the conversion of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface **202** handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player **200.**

[0036]     The network interface **202** may include either one or both of a wireless interface **216** and a wired interface **217.** The wireless interface **216,** also referred to as a RF interface, provides network interface functions by a wireless means for the zone player **200** to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.119). The wired interface **217** provides network interface functions by a wired means (e.g., an Ethernet cable). Depending on implementation, each of the zone players may be equipped with either one or both of the interfaces **216 or 217.** In one embodiment, a zone player, referred to as an access zone player, including both of the interfaces **216** and **217** is coupled to an access point of an LAN and communicates with other zone players wirelessly. Thus these other zone players may communicate with other devices on a

12

PATENT
Attorney Docket No. 05-0601-CON0319A

network or retrieve audio sources via the access zone player. The processor **204** is configured to control the operation of other parts in the zone player **200.** The memory **206** may be loaded with one or more software modules that can be executed by the processor **204** to achieve desired tasks.

[0037]    The audio processing circuit **210** resembles most of the circuitry in an audio playback device and includes one or more digital-to-analog converters (DAC), an audio preprocessing part, an audio enhancement part or a digital signal processor and others. In operation, when an audio source (e.g., audio source) is retrieved via the network interface **202,** the audio source is processed in the audio processing circuit **210** to produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier **214** for playback on speakers. In addition, the audio processing circuit **210** may include necessary circuitry to process analog signals as inputs to produce digital signals for sharing with other devices on a network.

[0038]    Depending on an exact implementation, the digital signal processing module **212** may be implemented within the audio processing circuit **210** or as a combination of hardware and software. The audio amplifier **214** is typically an analog circuit that powers the provided analog audio signals to drive one or more speakers.

[0039]    Referring now to FIG. 28, there is shown an example of a controller **240,** which may correspond to the controlling device **140 or 142** of FIG. 1. The controller **240** may be used to facilitate the control of multi-media applications, automation and others in a living complex. In particular, the controller **240** is configured to facilitate a selection of a plurality of audio sources available on the network, controlling operations of one or more zone players (e.g., the zone player **200)** through a RF interface corresponding to the wireless interface **216** of FIG. 2A. According to one embodiment, the wireless means is based on an industry standard (e.g., infrared, radio, wireless standard IEEE

PATENT
Attorney Docket No. 05-0601-CON0319A

802.11 a, 802.11b or 802.11g). When a particular audio source is being played in the zone player **200**, a picture, if there is one, associated with the audio source may be transmitted from the zone player **200** to the controller **240** for display. In one embodiment, the controller **240** is used to select an audio source for playback. In another embodiment, the controller **240** is used to manage (e.g., add, delete, move, save, or modify) a playlist.

[0040]      The user interface for the controller **240** includes a screen **242** (e.g., a LCD screen) and a set of functional buttons as follows: a "zones" button **244**, a "back" button **246**, a "music" button **248**, a scroll wheel **250**, "ok" button **252**, a set of transport control buttons **254**, a mute button **262**, a volume up/down button **264**, a set of soft buttons **266** corresponding to the labels **268** displayed on the screen **242**.

[0041]      The screen **242** displays various screen menus in response to a selection by a user.  In one embodiment, the "zones" button **244** activates a zone management screen or "Zone Menu" to allow a user to group players in a number of desired zones so that the players are synchronized to play an identical playlist or tracks.  The "back" button **246** may lead to different actions depending on the current screen. In one embodiment, the "back" button triggers the current screen display to go back to a previous one. In another embodiment, the 'back' button negates the user's erroneous selection. The "music" button **248** activates a music menu, which allows the selection of an audio source (e.g., a song track) to be added to a playlist (e.g., a music queue) for playback.

[0042]      The scroll wheel **250** is used for selecting an item within a list, whenever a list is presented on the screen **242**. When the items in the list are too many to be accommodated in one screen display, a scroll indicator such as a scroll bar or a scroll arrow is displayed beside the list. When the scroll indicator is displayed, a user may

PATENT
Attorney Docket No. 05-0601-CON0319A

rotate the scroll wheel **250** to either choose a displayed item or display a hidden item in the list. The "ok" button **252** is use to confirm the user selection on the screen **242** or activate a playback of an item.

**[0043]**     There are three transport buttons **254,** which are used to control the effect of the currently playing track. For example, the functions of the transport buttons may include play/pause and forward/rewind a track, move forward to the next track, or move backward to the previous track. According to one embodiment, pressing one of the volume control buttons such as the mute button **262** or the volume up/down button **264** activates a volume panel. In addition, there are three soft buttons **266** that can be activated in accordance with the labels **268** on the screen **242**. It can be understood that, in a multi-zone system, there may be multiple audio sources being played respectively in more than one zone players. The music transport functions described herein shall apply selectively to one of the sources when a corresponding zone player is selected.

**[0044]**     FIG. 2C illustrates an internal functional block diagram of an exemplary controller **270,** which may correspond to the controller **240** of FIG. 2B. The screen **272** on the controller **270** may be a LCD screen. The screen **272** communicates with and is commanded by a screen driver **274** that is controlled by a microcontroller (e.g., a processor) **276**. The memory **282** may be loaded with one or more application modules **284** that can be executed by the microcontroller **276** with or without a user input via the user interface **278** to achieve desired tasks.  In one embodiment, an application module is configured to facilitate automatic establishment of a wireless connection with a network or another device. In another embodiment, an application module is configured to facilitate automatically configuring itself after communicating with another configured device. It should be noted that similar application modules may also be included in the memory 206 of FIG. 2A. As a result, either a zone player or a controller may be

15

PATENT
Attorney Docket No. 05-0601-CON0319A

automatically configured to communicate over a network, provided such an automatic configuration is intended by a user.

[0045]    The controller **270** includes a network interface **280** referred to as a RF interface **280** that facilitates wireless communication with a zone player via a corresponding wireless interface or RF interface thereof. The controller **270** may control one or more zone players, such as **102, 104** and **106** of FIG. 1. Nevertheless, there may be more than one controllers, each preferably in a zone (e.g., a room) and configured to control any one and all of the zone players.

[0046]    It should be pointed out that the controller **240** in FIG. 2B is not the only controlling device that may practice the present invention. Other devices that provide the equivalent control functions (e.g., a computing device, a PDA, a hand-held device, and a laptop computer) may also be configured to practice the present invention. In the above description, unless otherwise specifically described, it is clear that keys or buttons are generally referred to as either the physical buttons or soft buttons, enabling a user to enter a command or data.

[0047]    It is assumed that a user has obtained an audio system that includes a set of zone players and a controller. Although it is possible to connect each of the zone players and the controller to a network, the requirement for extra network cards, cables and a hub/switch/router makes the idea unattractive. The introduction of wireless networking has allowed for an implementation without these requirements. FIG. 3A shows that there are three zone players **302, 304** and **306** and a controller **308** that form a network branch that is also referred to as an Ad-Hoc network **310**. In one embodiment, the network **310** is pure wireless. In another embodiment, the network **310** is wired or a combination of wired and wireless. In general, an Ad-Hoc (or "spontaneous") network is a <u>local area network</u> or other small network in which there is

PATENT
Attorney Docket No. 05-0601-CON0319A

no one access point for all traffics. With an established Ad-Hoc network, the devices **302, 304, 306** and **308** can all communicate with each other in 'peer-to-peer' style of communication. Furthermore, any device may come/go from the network and the network will automatically reconfigure itself without needing the user to reconfigure the network.

[0048]    By the Ad-Hoc network **310,** the devices  **302,  304,  306** and **308**  may share or exchange one or more audio sources  and be grouped to play identical or different audio sources. For  example,  the devices  **302**  and **304** are grouped to play back one piece of music, and at the same  time,  the device  **306** plays back  another piece of music. In other words, the devices **302, 304, 306** and **308** as shown in FIG. 3A form a HOUSEHOLD that distribute audio and/or reproduce sound. As used herein, the term HOUSEHOLD (always in caps to disambiguate from the user's domicile) is used to represent a collection of networked devices that are cooperating  to provide  an application or service. An instance of a HOUSEHOLD  is identified with a Household ID (or HHID).

[0049]    In one embodiment, an HHID is a short string or an identifier that is computer-generated to ensure that it is unique. Accordingly, the network **310** may be characterized by a unique HHID and a unique set of configuration variables or parameters, such as Channels (i.e., respective frequency bands), SSID (a sequence of alphanumeric characters as a name of a wireless network), and WEP keys (wired equivalent privacy, or simply security keys). In one embodiment, SSID is simply set to be the same as HHID. One of the aspects of the present invention is to provide a bootstrap procedure that enables automatic and simple establishment of these configuration parameters in each device within a HOUSEHOLD to enable communications among the devices.

17

PATENT
Attorney Docket No. 05-0601-CON0319A

[0050]        In general, each HOUSEHOLD includes two types of network nodes:

• Control Point (CP) - it controls the overall network setup process and sequencing, including an automatic generation of required network parameters (e.g., WEP keys). In one embodiment, it also provides the user with a HOUSEHOLD configuration user interface. The CP function is typically provided by a computer running a CP application module, or by a handheld controller (e.g., the controller **308)** also running CP application module.

• Zone Player (ZP) - the ZP is any other device on the network that is placed to participate in the automatic configuration process. It should be noted that ZP, as a notation used herein, includes the controller **308** or a computing device.

[0051]        The configuration of a HOUSEHOLD involves multiple CP's and ZP's that rendezvous and establish a known configuration such that they can use standard networking protocol (e.g., IP over Wired or Wireless Ethernet) for communication. In one embodiment, there are two types of networks/protocols: Ethernet - 802.3 and Wireless - 802.11g. Interconnections between a CP and a ZP may use either one of the networks/protocols. A device in the system as a member of a HOUSEHOLD may• connect to both networks simultaneously. In an environment that has both networks in use, it is assumed that at least one device in a system is connected to both as a bridging device, thus providing bridging services between wired/wireless networks for others. The zone player **306** in FIG. 3A is shown to be connected to both networks, for example, the connectivity to the network **312** is based on Ethernet while the connectivity to other devices **302, 304** and **308** is based on Wireless.

[0052]        *Establishing a rudimentary communication path.* In reference to FIG. 3A, a zone player is not yet a member of a HOUSEHOLD. It is assumed that the zone player is to be added to become a member of the HOUSEHOLD by a cable or wireless. When the zone player is initially turned on, it executes an embedded module that is configured

18

PATENT
Attorney Docket No. 05-0601-CON0319A

to establish a rudimentary communication path with another device (network-enabled).
The rudimentary communication path facilitates the automatic configuration of the zone
player via the another device. This communication path may operate over wireless
and/or Ethernet protocols, as the zone player may be connected to one or both. In
operation, the communication path does not cause negative effects on other devices in
the vicinity and can reach all other members of the HOUSEHOLD (both CP's and ZP's)
if there are any. It should also be noted that the communication path does not have to
be direct between two devices and may be bridged by one or more other devices.
Because the communication path is only used for initial device configuration, it does not
require significant performance or sophisticated functionality. There are at least two
elements to establish the communication path: channel selection and packet exchange.

**[0053]** *Channel Selection.* The selection of an appropriate (RF) transmission
channel or simply channel is primarily an exercise in two constraints: finding a channel
that is quiet from a protocol (e.g., 802.11) viewpoint, i.e., minimal conflicting wireless
traffic, and finding a channel that is quiet from an RF viewpoint, i.e., minimal noise from
other signals. Both of these tests may be applied because typically a home environment
may have other RF (e.g., 2.4GHz) traffic or potentially other wireless access points.  It is
generally desirable to use a channel that is free from other RF interference. In any case,
it is always desirable to avoid other wireless traffic.

**[0054]** Channel selection is typically accomplished with a scanning technique,
namely the device listens on each channel for a period of time, looking for the presence
of wireless beacons and other RF signals. In one embodiment, devices that are
configured have a preferred channel for the HOUSEHOLD, devices that are not
configured have a pre-defined (default) channel or channels that they rendezvous on.
For example, 802.11b/g channel 1 could be pre-configured as the default channel.

PATENT
Attorney Docket No. 05-0601-CON0319A

Alternatively, multiple channels, with a well-known frequency hopping sequence, could be used by the devices (this would require an aperiodic frequency change interval).

[0055]    Many hardware configurations only support reception/transmission on a single channel at a given time. Also there are configured and unconfigured devices that may use different channels for the bootstrap configuration and standard network operations (post-configuration communications). According to one embodiment, it is necessary to forcibly put the devices in a "configuration" mode, whereby they use the appropriate channels for communication.

[0056]    *Packet Exchange.* To enable communication between devices that are not part of the same HOUSEHOLD, a packet exchange network infrastructure is developed. Probing messages are sent in such a way that they traverse both the Ethernet and wireless networks, reaching any connected devices. Devices that are already in a HOUSEHOLD constitute a network infrastructure that can be used to exchange unicast and multicast/broadcast network frames between the devices. A device that is not yet in the HOUSEHOLD has a much more limited networking capability and can only receive data from devices to which it is directly wired, and unencrypted messages broadcast to all wireless networks operating in a particular channel of the RF spectrum.

[0057]    In general, an IP address of a new device is not known to any members of the HOUSEHOLD.  If the device is purely wireless, it may not have an IP address at all, or it may have an automatically assigned IP address that is inaccessible to other devices with IP addresses respectively assigned by a DHCP server. To allow devices that are not members of the HOUSEHOLD to join the HOUSEHOLD, a transport may be constructed that can get data one "hop" beyond the HOUSEHOLD network infrastructure.

20

PATENT
Attorney Docket No. 05-0601-CON0319A

[0058]    In one embodiment, packets of data are broadcasted among the members of the HOUSEHOLD. The packets of data comprise a mixture of "probe" datagrams and standard IP broadcast. For example, the 802.11 "probe" datagrams are used for the inherent ability to cross wireless network boundaries. In other words, the "probe" datagrams can be received by all listeners (i.e., other devices) on the channel, even those that are not configured with an SSID, because they are sent to the broadcast BSS (e.g., FF:FF:FF:FF:FF:FF) to which all devices may be configured to listen.  A standard IP broadcast is used on the wired network segments and the HOUSEHOLD network infrastructure to enable a PC-based controller to participate while running with standard user privileges (which allow access only to IP-based network services). Used together as described below, the combination of the "probe" datagrams and IP broadcast provides for a broadcast datagram transport that allows even devices that have not had any networking parameters configured to communicate.

[0059]    In general, the probe datagrams comprise a number of elements to facilitate the configuration of other devices to join the HOUSEHOLD. In one embodiment, each of the elements carries up to 255 bytes of data. An element contains data payload for each message used by the bootstrap procedure to invite others to join the HOUSEHOLD. This element is repeated as many times as necessary to carry the complete message. In one embodiment, the IP broadcast datagrams contain the same data payload as the normal IP data payload.

[0060]    Messages relating to the bootstrap procedure may be forwarded beyond the boundaries of an existing HOUSEHOLD network infrastructure (including properly configured wireless devices, and the wired network). Similarly, messages originating outside of the HOUSEHOLD network infrastructure may be forwarded into the infrastructure. This forwarding procedure may be accomplished in a mixed wireless/wired network environment without introducing a broadcast storm. A broadcast

PATENT
Attorney Docket No. 05-0601-CON0319A

storm is a state in which a message that has been broadcast across a network results in more responses than necessary, and each response results in even more responses in a snowball effect, subsequently resulting in a network meltdown. In one embodiment, the network is carefully configured to prevent such a broadcast storm or any illegal broadcast messages. To accomplish this, two flags are included in the message body, for example, "SENT_AS_PROBE" and "SENT_AS_IP_BROADCAST". When a device receives a "probe" message, assumed using "Sonos Netstart" SSID (or the broadcast BSS, as with all probe requests), it forwards the message as an IP broadcast message (after setting the "SENT_AS_IP_BROADCAST" flag) if the SENT_AS_IP_BROADCAST flag is not already set. Similarly, when it receives an IP broadcast with a UDP payload address to an appropriate port (e.g., port number 6969), it forwards the message as a "probe" datagram (after setting the "SENT_AS_PROBE" flag) if that flag is not already set. This allows messages related to the packet exchange both to enter and to exit the HOUSEHOLD network infrastructure without causing a broadcast storm.

[0061]    Using this method of broadcast communication, packets can be sent between any member of the HOUSEHOLD and a device to join the HOUSEHOLD on both Ethernet and wireless networks. The device to join the HOUSEHOLD may be brand new and previously configured with a different network (e.g., a device with a stale configuration in a different household). In addition, if used sparingly, these broadcast messages do not interfere with the normal operation of the network or attached devices. As a result, a communication path on an agreed channel has been established between two devices.

[0062]    *Device Discovery.* To minimize impact on existing networks and to improve configuration security, the system requires a user to manually activate the auto-configuration process. This is accomplished by a specific action on each device that is being added to the network. For example, if the user is installing a brand new

PATENT
Attorney Docket No. 05-0601-CON0319A

HOUSEHOLD, containing one CP and two ZP's, the activation process may be manually activated on each by, for example, powering off and on, pushing a reset button or pushing two or more specific buttons simultaneously. In one embodiment, the CP or ZP is simply powered up by the user, which activates the pre-installed module to start the bootstrap procedure.

**[0063]**    For a ZP:

- If the device is unconfigured (e.g., factory default settings), it will immediately go into a "sleep" mode where it is awaiting an activation command.
- If the device has been previously configured, it will attempt to contact other members of its HOUSEHOLD network.

There are situations in which a ZP is orphaned, namely it is previously configured (e.g., perhaps, with another Ad-hoc network) and now is to be added to the HOUSEHOLD (e.g., the ZP is obtained from a previous owner). In the case of an orphan scenario, the ZP may patiently attempt to contact its original network. It can be perceived that this operation will be unsuccessful but otherwise harmless. Even in this configured state, the device can participate in the rudimentary broadcast communication processes described above.

**[0064]**    For the CP:

- If the device is unconfigured (e.g., factory default settings), it will present the user with a description of how to start the configuration process.
- If the device is configured, it will attempt to contact other members of its HOUSEHOLD network.

The CP may also be an orphaned device, in which case it performs similarly to that of the ZP.

PATENT
Attorney Docket No. 05-0601-CON0319A

**[0065]**      In both cases, correctly configured devices will establish network communications and make themselves available for normal operation. All devices, including those previously configured, will enter an "activation state" when the user indicates that this is desired.  At this point, the configuration process can begin.

**[0066]**      *Device Configuration.* The configuration is carried out by exchanging data between two devices that are not necessarily directly connected. This procedure is carried over a rudimentary communication path as described previously. The sequence of exchanging the data is initiated by the user or some other process, for example, activating a reset button, to trigger the "activation" or configuration mode on the involved devices.  Each device executes this sequence, and then exits the activation mode. FIG. 3B shows an embodiment that involves a process of five exchanges of data.

**[0067]**      Each of the data exchanges is referred to as a type of message: Alive, QueryNetParams, RespondNetParams, SetNetParams, and AckNetParams, each is explained as follows:

Alive -  a message indicating that a named ZP is available for configuration. The message includes at least a *zpUU/O* which is a globally unique identifier that identifies the ZP sending the message.

QueryNetParams -  a request from the CP to the ZP to respond with the ZP's current network configuration information. The request includes at least a *zpUUID, cpPK* (the RSA public key of the CP) and *tid* (a unique transaction identifier).

RespondNetParams -  a response to the QueryNetParams. It includes the ZP's network configuration information (HHID, WEP key and RSA public key).  For security reasons, the WEP key is encrypted using the CP's public key that is only readable by the CP. The response includes at least a *zpUUID, netConfig(the* ZP's current network configuration parameters), *zpPK, and tid.* It is should be noted that a new ZP, set to

PATENT
Attorney Docket No. 05-0601-CON0319A

factory defaults, shall have well-known parameter values, allowing the CP to determine that it is unconfigured.

SetNetParams - a command message from the CP to the ZP indicating that the ZP should reconfigure its network parameters. The WEP key is encrypted using the ZP's public key, and therefore only readable by the ZP. The command includes at least a *zpUU/O, netConfig* and *tid.* It should be noted that *netConfig* includes the new configuration parameters for the ZP, as determined by the CP. The ZP should save this value in its network configuration, in some cases, these parameters may match the ZP's existing configuration.

AckNetParams - a response to the SetNetParams messaging. The response indicates that the SetNetParams message was received and that the network configuration contained therein has been successfully applied. The response includes at least a *zpUUID* and a *tid.*

[0068]    In operation, after a user activates the configuration process (on both ZP and CP) at 351 in FIG. 38. The CP enters a state where it is willing to accept an Alive message.  The CP only remains in this state for a limited (finite) period of time. The ZP enters an activation state where it attempts rendezvous with a CP. The ZP only remains in this state for a limited (finite) period of time.  The ZP will periodically transmit an Alive message until it either receives a QueryNetParams message, or exits the activation state.

[0069]    At **352,** the CP receives an Alive message. If the CP is in the configuration mode, it will generate a new *tid,* and send a QueryNetParams message and send to the ZP. It should be noted that the CP may or may not have been configured at this point. In either case, it sends the QueryNetParams. At **353,** if it is already in the activation state, the ZP responds to a QueryNetParams with its current network configuration.  If the ZP is unconfigured (e.g., factory default settings), it will

PATENT
Attorney Docket No. 05-0601-CON0319A

return an empty HHID and WEP key. If the ZP is previously configured, it will return its current configuration. The ZP also returns its public key such that the WEP key can be encrypted using the CP's public key.

[0070]    At **354,** upon receiving the ZP's current configuration information, the CP decides on a course of action. Most, but not all, of these options result in a SetNetParams message being sent to the ZP. The matrix of possible situations:

|  | *GP already configured* | *GP not configured* |
|---|---|---|
| ***ZP*** *already configured* | The CP sends a SetNetParams message to the ZP containing the GP's current net config. | The CP sets its own config to match the ZP config, and the config process is terminated. |
| *ZP not configured* | The CP sends a SetNetParams message to the ZP containing the CP's current net config. | The CP generates new config parameters. The parameters are sent to the ZP in a SetNetParams message. The CP sets its own config to these values as well. |

[0071]    At **355,** when the ZP receives a SetNetParams message, it reconfigures its own HHID and WEP key to match those contained in the network packet.

Accordingly, the GP determines that it generates new configuration parameters in accordance with the following:

• HHID - this is provided by the user via the CP user interface or automatically generated by the CP.

26

PATENT
Attorney Docket No. 05-0601-CON0319A

- SSID - this is automatically generated by the CP (e.g., set to the same value as the HHID).

- WEP Key- this is automatically generated (e.g., using a pseudo-random number generator, seeded with entropy collected by the GP).

- Channel - the GP probes the network looking for an acceptable channel (based on a variety of criteria, which may include traffic and interference from other sources).

**[0072]**    Subsequent to the activation process, any devices that have been reconfigured will attempt to establish normal network communications using their new network configuration parameters. In all of the above steps, if the CP or ZP is not already in the activation state, receipt of any messages is ignored.

**[0073]**    If there are multiple ZP's activated simultaneously, all of the devices could execute this same sequence, independently of each other (the CP is capable of multiple independent sessions).  If multiple CP's are activated, each will respond to a ZP's Alive message and will execute the sequence - the first one to deliver the SetNetParams to the ZP will configure it. It should be noted that in this case, the second CP will never get an AckNetParams message (because the ZP has exited the activate state). This will cause a transaction timeout in the second CP, at which point it will typically inform the user of the error, or retry the entire sequence.  Should it retry the entire sequence, it will not reprogram the ZP (as described above that the effect of an unconfigured CP talking to a configured ZP).

**[0074]**    *Security*. To ensure that the communication among the members in a HOUSEHOLD by wireless means is secure, there are multiple issues in the auto-configuration that are resolved in the present invention.

27

PATENT
Attorney Docket No. 05-0601-CON0319A

1. Typically, the broadcasting messages in packet exchange are unencrypted. However, it is undesirable to transmit sensitive information such as WEP keys over wireless medium without encryption. As described below, public key cryptography is used to ensure that WEP keys are distributed in a secured manner.

2. Because the network configuration process is automated and the data is transmitted over the network, it is desirable to ensure that the process is not started without the approval of the user. Specifically, it must not be possible for a malicious wireless device to surreptitiously program one of the devices. Accordingly, the auto-configuration process is started manually by a user on all devices.

3. When one of the connected devices is removed from the HOUSEHOLD, it can no longer access to the network. This is accomplished with a mechanism on each device that resets it to factory default configuration (e.g., erases WEP keys and other private information).

4. It must be possible for the user to validate that they have correctly configured the right devices and that no other devices have been joined to the network. In one embodiment, this is accomplished with a validation/status user interface on the Control Point.

[0075]     *Use of Public Key Cryptography.* The configuration process uses public key cryptography to exchange WEP keys and other information which must not be visible to any party sniffing the network. In one embodiment, this is accomplished in the following manner:

1. There is a designated (e.g., Sanos) certificate authority (CA), an entity that can issue signed public key certificates.

PATENT
Attorney Docket No. 05-0601-CON0319A

2. Each CP and ZP is factory configured with a unique certificate, public and private key, in a format that supports the RSA algorithm. The certificate is signed and issued by the designated CA, and includes a hash of the MAC address of a device.

3. CP and ZP exchange public keys and WEP keys are encrypted using the public key. In certain circumstances, the devices compare the MAC in received packets with that in the certificate to add an additional layer of security.

[0076]      FIG. 4A shows a flowchart or process **400** according to one embodiment of the present invention. The process **400** may be implemented in hardware, software or a combination of both as a method, a system or a process. In one embodiment, the process **400** is implemented for a handheld controller or a computing device. To facilitate the understanding of the process **400,** the description herein is based on a handheld controller, such as the controller **308** of FIG. 3A, which shall not be considered as the limitations to the present invention.

[0077]      Typically, a handheld controller (or HH) is equipped with a mechanism to allow a user to reset itself. In some implementation, the reset is simply done when the controller is powered up. At **402,** it is assumed that the controller is powered up. The process **400** goes to **404** to determine whether the controller is configured. By configuration, it means that the controller is ready for communication with other devices (e.g., zone players) that may or may not be on a network, preferably a wireless network. In the context of FIG. 3A, it means that the handheld device  **308** is ready  to communicate with each or all of the devices **302, 304,** and **306** (assuming that the devices **302, 304,** and **306** have not been configured  yet).

PATENT
Attorney Docket No. 05-0601-CON0319A

**[0078]**      It is assumed that the controller is configured, the process **400** goes to **406** where it determines whether the device is a controller or a computer. As described above, the device may be a controller, a personal computer or other type of device, although it has been assumed to be a controller. Nevertheless, in this embodiment, a step is provided to determine exactly what it is, because a controller and a computer may provide a different display or graphic environment. If the device is indeed a controller, the process **400** goes to **408,** wherein the controller shows a proper screen for a user to proceed with the control of the zone players or replay of certain audios via one or more zone players. If the device is a computer, the computer is typically loaded with a module that is now executed to display an environment (e.g., a graphic user interface or GUI) that allows a user to perform many tasks that may be done on the handheld controller in addition to other tasks that may be assisted by a pointing device (e.g., a mouse) or a keyboard.

**[0079]**      In any case, it is assumed that the device is a controller. Referring back to **404,** it is now assumed that the device is not configured, the process **400** goes to **412** to determine if a user has activated the automatic configuration process.  In one embodiment, the controller goes to "sleep" mode after a predefined time should there be no activation of the configuration process. When the user activates the configuration process, the process  **400** goes **414** to determine  whether  the controller itself is coupled to an access point of a network, at least a member of the HOUSEHOLD (e.g., one zone player) is coupled thereto or an Ad-Hoc network. Typically, a GUI is provided for a handheld or a computer. Accordingly, a display with a relevant message is displayed. After it is certain that either the controller  itself or a zone player is coupled to a network, a user may press "OK" in the displayed GUI.

**[0080]**      At **418,** should the user desire to start the automatic configuration process now, the user activates the process manually. In one embodiment,  there are two

PATENT
Attorney Docket No. 05-0601-CON0319A

buttons, labeled respectively as "VOL" and "Mute". When these two buttons are pressed at the same time, the automatic configuration process starts. The process **400** goes to **420** to determine whether a valid response is received from a zone player. If not, after a certain time **422,** the process **400** goes back to **418** to reactivate the process or **414** via **424** to remind the user to ensure that the required connection is placed.

[0081]    In one embodiment, a handheld controller is configured to facilitate a new zone player to execute a household join process to join the HOUSEHOLD upon an appropriate channel. The channel may be agreed upon between the controller and the zone player as follows:

> 1) when a reset or two buttons are pushed on the ZonePlayer to 'activate' the household join process, it starts a scan through the available wireless channels, sending the "Alive" datagram for each channel in turn. Sometimes, it cycles through the channels several times;
>
> 2) as soon as the ZonePlayer receives a QueryNetParams request address to itself, it stops the channel cycling; and
>
> 3) The ZonePlayer remains locked on whatever channel it has stopped cycling until a successful sequence ending in the configuration of the ZonePlayer (at which point it uses the specified channel), or a timeout expires (at which point it returns to its original channel or resumes cycling through channels and sending alive messages if the overall timeout for the activation process has not expired).

[0082]    Although the Zone Player performs the channel cycling, the controller may also be configured to perform the channel cycling as well. However, when the controller is, for example, a personal computer, the Zone Player is typically configured to cycle through the available channels.

**[0083]**    In any case, when a valid response is received from the zone player, the process **400** determines whether the zone player provides its own network name (e.g., HHID) at **426**. If the zone player does not have an HHID, which means that the zone player is to be added into a wireless network named after an HHID provided by the device, the process **400** goes to **428** to instruct the zone player to join the wireless network. If the zone player does have an HHID, which means that the device itself is to be added into the wireless network named after the HHID provided by the zone player, the process **400** goes to **430** to exit.

**[0084]**    The automatic configuration process, as described above, is executed. After it is completed, a message or an indication of completion is displayed. After the user acknowledges at **434,** the user is offered to name the zone player, for example, "Dinning" which means that the zone player is in the dinning room. Subsequently, the process **400** goes to **406.**

**[0085]**    For completeness, FIG. 4B shows a flowchart or process **450** that may be also implemented in hardware, software or a combination of both as a method, a system or a process. In one embodiment, the process **450** is implemented for a zone player. To facilitate the understanding of the process **450,** the description herein is based on a zone player, such as the player **302** of FIG. 3A, which shall not be considered as the limitations to the present invention.

**[0086]**    When a zone player is powered up, the process **450** determines whether the zone player is already registered or configured at **452.** There are situations in which the zone player just obtained by a user is already configured, for example, the zone player is a used one (i.e., previously configured). If it is indeed configured, the process **450** goes to **454** where an indication of "registered" is shown. If the zone player is never

PATENT
Attorney Docket No. 05-0601-CON0319A

configured, the process **450** goes to **456** to indicate such. It is assumed that the zone player works normally at **458** (e.g., through an internal checkup).

**[0087]**      At **460,** a user activates the automatic configuration process by, for example, pressing two buttons, labeled respectively as "VOL" and "Mute", at the same time. The automatic configuration process starts by sending out an Alive message at 462 as described above. At **464,** the zone player awaits a response. If no response is received within or beyond a predefined time, the process **450** goes to **466 or 458** to continue waiting for a response or restart the process. It is assumed that there is a response, and the automatic configuration process continues as shown in FIG. 3B without failure, the process goes to **468** where the zone player is now part of the wireless network named after an HHID received either from a configured device or provided by itself.

**[0088]**      There are numerous functions, benefits and advantages in the present invention. One of them is that the present invention provides  techniques  for automatically configuring parameters of a device to be coupled to an Ad-hoc network, where the Ad-hoc network forming by a group of devices can be wireless, wired or a combination of both. By way of the present invention, a system including a set of zone players and one or more controllers operates correctly and does not interfere with any existing network. Other functions, benefits and advantages can be appreciated from the detailed description provided  above.

**[0089]**      The present invention has been described in sufficient  details  with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement  and combination  of parts may be resorted without departing from the spirit and scope of the invention as claimed. Accordingly,

PATENT
Attorney Docket No. 05-0601-CON0319A

the scope of the present invention is defined by the appended claims rather than the foregoing description of embodiments.

PATENT
Attorney Docket No. 05-0601-CON0319A

## CLAIMS

We Claim:

1.      A playback device comprising:

a network interface that is configured to provide an interconnection with at least one data network;

at least one processor;

a non-transitory computer-readable medium; and

program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:

detecting a triggering event that causes the playback device to enter a setup mode in which the playback device transmits at least a first message indicating that the playback device is available for setup;

while in the setup mode, receiving a response to the first message that facilitates establishing an initial communication path with a computing device operating on a secure wireless local area network (WLAN), wherein the initial communication path is outside of the secure WLAN;

receiving, from the computing device via the initial communication path, at least a second message containing network configuration parameters for the secure WLAN, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN;

using the network configuration parameters to connect to the secure WLAN; and

transitioning from communicating with the computing device via the initial communication path to communicating with the computing device via the secure WLAN.

PATENT
Attorney Docket No. 05-0601-CON0319A

2.      The playback device of claim 1, wherein the triggering event comprises one of (a) powering on the playback device or (b) receiving user input via a physical interface of the playback device.

3.      The playback device of claim 1, wherein the computing device comprises a controller device of a networked audio system.

4.      The playback device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:

        after receiving the second message, providing an indication that the playback device has successfully received the network configuration parameters for the secure WLAN.

5.      The playback device of claim 4, wherein providing the indication comprises transmitting, to the computing device via the initial communication path, at least a third message indicating that the playback device has successfully received the network configuration parameters;

6.      The playback device of claim 4, wherein providing the indication comprises providing an indication that the playback device has successfully connected to the secure WLAN using the network configuration parameters.

7.      The playback device of claim 1, further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:

        after connecting to the secure WLAN, establishing a new networked audio system on the secure WLAN.

8.      The playback device of claim 1, further comprising program instructions stored on the non-

PATENT
Attorney Docket No. 05-0601-CON0319A

transitory computer-readable medium that, when executed by the at least one processor, cause

the playback device to perform functions comprising:

after connecting to the secure WLAN, joining an existing networked audio system operating

on the secure WLAN.

9.      The playback device of claim 1, further comprising program instructions stored on the non-

transitory computer-readable medium that, when executed by the at least one processor, cause

the playback device to perform functions comprising:

receiving, from the computing device, a command to assign a name to the playback

device.

10.     The playback device of claim 1, wherein communicating with the computing device via the

secure WLAN comprises receiving a command related to playback of audio content.

11.     The playback device of claim 10, wherein the command comprises a command to retrieve

audio content for playback from an audio source that is accessible via a communication path that

includes the secure WLAN, and wherein the playback device further comprises program

instructions stored on the non-transitory computer-readable medium that, when executed by the at

least one processor, cause the playback device to perform functions comprising:

in response to receiving the command, retrieving the audio content from the audio source

via the communication path that includes the secure WLAN.

12.     The playback device of claim 1, wherein the second message comprises a command for

the playback device to adopt the network configuration parameters.

13.     The computing device of claim 1, further comprising program instructions stored on the

non-transitory computer-readable medium that, when executed by the at least one processor,

PATENT
Attorney Docket No. 05-0601-CON0319A

cause the computing device to perform functions comprising:

after transitioning to communicating with computing device via the secure WLAN,

receiving, from the computing device, a command to form a group with at least a first playback

device of a networked audio system such that the playback device is configured to play back audio

content in synchrony with at least the first playback device.


14.    A non-transitory, computer-readable storage medium, wherein the non-transitory computer-

readable storage medium is provisioned with program instructions that are executable to cause a

playback device to perform functions comprising:

detecting a triggering event that causes the playback device to enter a setup mode in

which the playback device transmits at least a first message indicating that the playback device is

available for setup;

while in the setup mode, receiving a response to the first message that facilitates

establishing an initial communication path with a computing device operating on a secure wireless

local area network (WLAN), wherein the initial communication path is outside of the secure WLAN;

receiving, from the computing device via the initial communication path, at least a second

message containing network configuration parameters for the secure WLAN, wherein the network

configuration parameters comprise an identifier of the secure WLAN and a security key for the

secure WLAN;

using the network configuration parameters to connect to the secure WLAN; and

transitioning from communicating with the computing device via the initial communication

path to communicating with the computing device via the secure WLAN.


15.    The non-transitory, computer-readable storage medium of claim 14, wherein the triggering

event comprises one of (a) powering on the playback device or (b) receiving user input via a

physical interface of the playback device.

PATENT
Attorney Docket No. 05-0601-CON0319A

16.     The non-transitory, computer-readable storage medium of claim 14, wherein the non-transitory computer-readable medium is also provisioned with program instructions that are executable to cause the playback device to perform functions comprising:

after receiving the second message, providing an indication that the playback device has successfully received the network configuration parameters for the secure WLAN.

17.     The non-transitory, computer-readable storage medium of claim 16, wherein providing the indication comprises transmitting, to the computing device via the initial communication path, at least a third message indicating that the playback device has successfully received the network configuration parameters;

18.     The non-transitory, computer-readable storage medium of claim 16, wherein providing the indication comprises providing an indication that the playback device has successfully connected to the secure WLAN using the network configuration parameters.

19.     The non-transitory, computer-readable storage medium of claim 14, wherein communicating with the computing device via the secure WLAN comprises receiving a command to retrieve audio content for playback from an audio source that is accessible via a communication path that includes the secure WLAN, and wherein the non-transitory computer-readable medium is also provisioned with program instructions that are executable to cause the playback device to perform functions comprising:

in response to receiving the command, retrieving the audio content from the audio source via the communication path that includes the secure WLAN.

20.     A method comprising:

detecting, by a playback device, a triggering event that causes the playback device to enter a setup mode in which the playback device transmits at least a first message indicating that the

PATENT
Attorney Docket No. 05-0601-CON0319A

playback device is available for setup;

while in the setup mode, receiving a response to the first message that facilitates establishing an initial communication path with a computing device operating on a secure wireless local area network (WLAN), wherein the initial communication path is outside of the secure WLAN;

receiving, from the computing device via the initial communication path, at least a second message containing network configuration parameters for the secure WLAN, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN;

using the network configuration parameters to connect to the secure WLAN; and

transitioning from communicating with the computing device via the initial communication path to communicating with the computing device via the secure WLAN.

PATENT
Attorney Docket No. 05-0601-CON0319A

# ABSTRACT

An example playback device includes programming to perform functions including detecting a triggering event that causes the playback device to transmit a first message indicating that the playback device is available for setup. The functions also include receiving a response to the first message that facilitates establishing an initial communication path with a computing device operating on a secure wireless local area network (WLAN), where the initial communication path is outside of the secure WLAN. The functions also include receiving, from the computing device via the initial communication path, a second message containing network configuration parameters for the secure WLAN including an identifier of, and a security key for, the secure WLAN. The functions also include using the network configuration parameters to connect to the secure WLAN and transitioning from communicating with the computing device via the initial communication path to communicating with the computing device via the secure WLAN.



*FIG. 1*



**200**

202 — Network Interface
216 — Wireless
217 — Wired
204 — Processor
206 — Memory
210 — Audio Processing Circuit
212 — Digital Signal Processing Module
214 — Audio Amplifier

*FIG. 2A*



240

Scroll
Wheel
250

252

254

248

246

244

242

Rincon

Now Playing

image

268

266

262

264

*FIG. 2B*



270

282
284

Memory

Application Module

Screen

272

Screen Driver

274

Micro Controller

276

Input Interface

278

RF Interface (Network Interface)

280

**FIG. 2C**



*FIG. 3A*



**FIG. 3B**



FIG. 4A



*FIG. 4B*



FIG. 5

(Prior Art)

# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/298,515 | 03/11/2019 | Nicholas A.J. Millington | 05-0601-CON0319A | 7686 |

135176    7590    05/30/2019
LS3 Sonos
Lee Sullivan Shea & Smith LLP
656 W. Randolph St.
Floor 5W
Chicago, IL 60661

| EXAMINER |
|---|
| MADAMBA, GLENFORD J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2451 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/30/2019 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

ls3_docketing@cardinal-ip.com
york@ls3ip.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 16/298,515 | Applicant(s) Millington et al. |
|---|---|---|
| | Examiner GLENFORD J MADAMBA | Art Unit 2451 | AIA (FITF) Status No |

*Note: the above is a 2x3 table — Art Unit 2451 and AIA (FITF) Status No are separate cells in the second data row.*

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>11 March 2019</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL.**   2b)☑ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☑ Claim(s) <u>1-20</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☑ Claim(s) <u>1-20</u> is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☐ Claim(s) _____ are subject to restriction and/or election requirement
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.
11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
     a)☐ All   b)☐ Some**   c)☐ None of the:
     1.☐ Certified copies of the priority documents have been received.
     2.☐ Certified copies of the priority documents have been received in Application No. _____.
     3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☑ Notice of References Cited (PTO-892)
2)☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date _____.
4)☐ Other: _____.

Application/Control Number: 16/298,515                                    Page 2
Art Unit: 2451

# DETAILED ACTION

## *Double Patenting*

1.      The non-statutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the

unjustified or improper timewise extension of the "right to exclude" granted by a patent

and to prevent possible harassment by multiple assignees.  See *In re Goodman*, 11F.3d

1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645

(Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re

Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and, *In re Thorington,* 418

F.2d 528, 163 USPQ 644 (CCPA 1969).

        A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) may be

used to overcome an actual or provisional rejection based on a non-statutory double

patenting ground provided the conflicting application or patent is shown to be commonly

owned with this application.  See 37 CFR 1.130(b).

        Effective January 1, 1994, a registered attorney or agent of record may sign a

terminal disclaimer.  A terminal disclaimer signed by the assignee must fully comply with

37 CFR 3.73(b).

2.      Claims 1-20 of the instant application {hereinafter Millington '515} are rejected on

the ground of non-statutory obviousness-type double patenting as being unpatentable

Application/Control Number: 16/298,515                                                    Page 3
Art Unit: 2451

over claims 1-20 of co-pending application to Millington et al, U.S. Patent Application

16/298,542 {hereinafter Millington '542}. Although the conflicting claims are not

identical, they are not patentably distinct from each other.


The subject matter claimed in the instant application is technically disclosed in

the co-pending application since the instant application and the co-pending application

are claiming common and/or overlapping subject matter. Claims 1, 14, 20 of the instant

application and independent claims 1, 13 and 20 of the co-pending application both

recite, in part, a playback device performing functions comprising "detecting a triggering

event that causes the playback device to enter a setup mode in which the playback device

transmits at least a first message indicating that the playback device is available for setup;

while in the setup mode, receiving a response to the first message that facilitates

establishing an initial communication path with a computing device operating on a

secure wireless local area network (WLAN), wherein the initial communication path is

outside of the secure WLAN; receiving, from the computing device via the initial

communication path, at least a second message containing network configuration

parameters for the secure WLAN, wherein the network configuration parameters

comprise an identifier of the secure WLAN and a security key for the secure WLAN;

using the network configuration parameters to connect to the secure WLAN; and

transitioning from communicating with the computing device via the

initial communication path to communicating with the computing device via the secure

WLAN".

Claims 1-20 of the instant application are drawn to the same invention as that

recited by co-pending application to Millington '542; however, claims 1, 13 and 20 of the

Application/Control Number: 16/298,515                                        Page 4
Art Unit: 2451

co-pending application {Millington '542} recites the added feature(s) of "**while operating on a secure wireless local area network (WLAN), (a) receiving user input indicating that a user wishes to set up a playback device to operate on the secure WLAN and (b) receiving a first message indicating that a given playback device is available for setup**". Claims 1-20 of the co-pending application accordingly anticipates all of the limitations and features recited by claims 1-20 of the instant application {Millington '515}.

In removing these limitations {in the co-pending application}, the scope of the claim(s) is merely broadened by eliminating elements and their functions. It has been held that omission of an element and its function is an obvious expedient if the remaining elements perform the same function as before. In re Karlson, 136 USPQ 184 (CCPA). Also note Ex parte Rainu, 168 USPQ 365 (Bd. App. 1969) (omission of a reference element whose function is not needed would be obvious to one skilled in the art).

## *Claim Rejections - 35 USC § 102*

1. The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

**1.** Claims **1, 2, 4, 5, 6, 12, 14, 15, 16, 17, 18, 20** are rejected under pre-AIA 35

U.S.C. 102(e) as being anticipated by **Ladas** et al (hereinafter Ladas), U.S. Patent

Publication 2004/0168081 A1.


As per claim(s) **1, 14, 20,** Ladas discloses particular features of the invention, such as a

**playback device comprising:**

      **a network interface that is configured to provide an interconnection with at**

**least one data network** (Ladas: e.g., *Network Interface* 53) [0028] [Fig. 1]**;**

      **at least one processor** (Ladas: e.g., *Processing Unit* 21) [0026] [Fig. 1]**;**

      **a non-transitory computer-readable medium** (Ladas: e.g., 'computer-readable

media', such as ROM 24, RAM 25, etc.) [0025] [Fig. 1]**; and**

      **program instructions stored on the non-transitory computer-readable**

**medium that, when executed by the at least one processor, cause the playback**

**device to perform functions** (Ladas: e.g., *Program Data* 38) [0025] [Fig.

1] **comprising:**

         **detecting a triggering event that causes the playback device to enter**

**a setup mode** (Ladas: e.g., expressly teaches / illustrates in one aspect a <u>**User**</u>

<u>**'pressing a BIND button'** 124 **on wireless network interface device** 120 **of the**</u>

<u>**computing device**</u> to be joined to the 'secure wireless network' ...") [0038] (step 202)

[Fig. 5] **in which the playback device transmits at least a first message indicating**

**that the playback device is available for setup** (e.g., <u>**a 'bind signal'** 206 **is**</u>

<u>**transmitted to the access point"**</u> in response to the bind control being activated on

the computing device that the user wants to join to the secure wireless network) [0039] [Figs. 2 & 5];

       **while in the setup mode, receiving a response to the first message that facilitates establishing an initial communication path with a computing device operating on a secure wireless local area network (WLAN)** (Ladas: e.g., expressly teaches in one aspect that "Accordingly, **the access point transmits a '_bind signal_' 212 back to the computing device** that is to join the secure wireless network....") [0039] [Fig. 5], **wherein the initial communication path is outside of the secure WLAN** (Ladas: e.g., expressly teaches / illustrates in one aspect that "Either a user of the computing device, or a person authorized to control access to the secure network can initiate a bind step to enable the computing device to join the network, and a '**temporary alternate network**' is then created between an access point of the network and the computing device network interface card (NIC)...") [Abstract] (e.g., additionally / expressly teaches that in response to the user pressing the BIND button, "a 'new _**temporary alternate network**_ used only while joining the computing device to the secure wireless network is created** in a step 404; this '**alternate network'** is used only by the access device and the computing device when joining the computing device to the 'normal secure network'**...") [0041] [Figs. 5 & 6] (e.g., '_**Join Temp Network'**_ 410) [0043] [Fig. 4];

       **receiving, from the computing device via the initial communication path, at least a second message containing network configuration parameters for the secure WLAN, wherein the network configuration parameters comprise an identifier of the secure WLAN and a security key for the secure WLAN** (Ladas: e.g.,

expressly teaches in one aspect that "next, a step 214 carries out a 'key exchange' to initiate a secure transmission from the access point to the computing device. The 'key exchange' produces an encryption key <u>enabling the access point to transmit an</u> **'encrypted message'** that conveys the **'SSID'** and **'WEP key'** to the computing device <u>in a step 216</u>...") [0039] (e.g., **'Key Exchange'_214 / 'WEP Key'_216** messages) [Fig. 5];

using the network configuration parameters to connect to the secure WLAN (Ladas: e.g., expressly discloses that <u>in step 218, the computing device decrypts the received SSID and WEP key messages and</u> **'acknowledges'** <u>receipt of these parameters</u>) [0039] (e.g., **'ACK'_218**) [Fig. 5] (e.g., expressly discloses / illustrates wherein **the computing device receives the transmitted {secure} 'network credentials' {s420}, 'Decodes Correct Network Credentials {SSID / WEP Key} & Attempts to Join the {Secure} Network' {s422}**) [Fig. 7] [0044]; and

and transitioning from communicating with the computing device via the initial communication path to communicating with the computing device via the secure WLAN (Ladas: e.g., expressly discloses that "<u>In step 430, the computing device is joined to the secure wireless network. Accordingly, the access point responds to the acknowledgement from step 428, and in step 432 'restarts the secure wireless network' with the correct network credentials (e.g., SSID and WEP key, or the WPA key) that were previously provided to the computing device.</u> **Thereafter, the computing device begins normal operation in a step 434, being now able to communicate with each of the other computing devices that are on the 'secure wireless network**...") [0044] (e.g., **'Join Completed Network'_218 / 'Restart**

***Network with Correct Network Credentials'_432*** ➔ ***'Begin Normal***

***Operations'_434***) [Fig. 7].

Claim(s) **14, 20** recite(s) substantially the same limitations as claim 1, is/are

distinguishable only by its/their statutory category (computer-readable media, method),

and accordingly rejected on the same basis.


As per claim(s) **2, 15,** Ladas discloses the device **wherein the triggering event**

**comprises one of (a) powering on the playback device or (b) receiving user input**

**via a physical interface of the playback device** (Ladas: e.g., expressly teaches /

illustrates in one aspect <u>a User 'pressing a BIND button' 124 on wireless network</u>

<u>interface device 120 of the computing device</u> to be joined to the 'secure wireless

network' ...") [0038] (step 202) [Fig. 5].

Claim(s) **15** recite(s) substantially the same limitations as claim 2, is/are

distinguishable only by its/their statutory category (computer-readable media, method),

and accordingly rejected on the same basis.


As per claim(s) **4, 16,** Ladas discloses the device **further comprising program**

**instructions stored on the non-transitory computer-readable medium that, when**

**executed by the at least one processor, cause the playback device to perform**

**functions comprising:**

**after receiving the second message, providing an indication that the**

**playback device has successfully received the network configuration parameters**

**for the secure WLAN** (Ladas: e.g., expressly discloses that <u>in step 218, the computing</u>

Application/Control Number: 16/298,515                                          Page 9
Art Unit: 2451

device decrypts the received SSID and WEP key messages and 'acknowledges' receipt of these parameters) [0039] (e.g., 'ACK'_218) [Fig. 5].

Claim(s) **16** recite(s) substantially the same limitations as claim 4, is/are distinguishable only by its/their statutory category (computer-readable media, method), and accordingly rejected on the same basis.

As per claim(s) **5, 17,** Ladas discloses the device **wherein providing the indication comprises transmitting, to the computing device via the initial communication path, at least a third message indicating that the playback device has successfully received the network configuration parameters** (Ladas: e.g., expressly discloses that in step 218, the computing device decrypts the received SSID and WEP key messages and **'acknowledges'** receipt of these parameters) [0039] (e.g., '**ACK'_218**) [Fig. 5].

Claim(s) **17** recite(s) substantially the same limitations as claim 5, is/are distinguishable only by its/their statutory category (computer-readable media, method), and accordingly rejected on the same basis.

As per claim(s) **6, 18,** Ladas discloses the device **wherein providing the indication comprises providing an indication that the playback device has successfully connected to the secure WLAN using the network configuration parameters** (Ladas: e.g., expressly discloses that "the computing device transmits an 'acknowledgement' to the access point in step 426, and in response, the access point transmits an acknowledgement back to the computing device in step 428.

**In step 430, the computing device is 'joined' to the secure network** Accordingly, the access point responds to the acknowledgement from step 428, and in step 432 'restarts the secure wireless network' with the correct network credentials (e.g., SSID and WEP key, or the WPA key) that were previously provided to the computing device. **Thereafter, the computing device begins 'normal operation' in a step 434, being now able to communicate with each of the other computing devices that are on the 'secure wireless network'** ...") [0044] (e.g., **ACK'_426 ➔ ACK 428 ➔ 'Join Completed Network'_218 / 'Restart Network with Correct Network Credentials'_432 ➔ 'Begin Normal Operations'_434**) [Fig. 7].

Claim(s) **18** recite(s) substantially the same limitations as claim 6, is/are distinguishable only by its/their statutory category (computer-readable media, method), and accordingly rejected on the same basis.


As per claim(s) **12,** Ladas discloses the device **wherein the second message comprises a command for the playback device to adopt the network configuration parameters** (Ladas: e.g., expressly discloses / illustrates in one aspect wherein the Access Point performs a **'Key Exchange' {s214}** with the computing device attempting to join the secure network and further transmits an '**encrypted message**' including a **WEP Key / SSID** {secure network credentials} **{s216}** for the computing device to 'decode / apply' in joining the secure network) [0039] [Fig. 5] (e.g., expressly discloses / illustrates wherein the computing device receives the transmitted {secure} 'network credentials' {s420}, '**Decodes Correct Network Credentials** {SSID / WEP Key} **& Attempts to Join the** {Secure} **Network' {s422}**) [Fig. 7] [0044].

Application/Control Number: 16/298,515                                                    Page 11
Art Unit: 2451

## *Claim Rejections - 35 USC § 103*

1.  The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

**2.**  Claims **3, 7, 8, 10, 11, 13, 19** are rejected under 35 U.S.C. 103(a) as being

unpatentable over **Ladas** in view of **Isley** et al (hereinafter Isley), US Patent Publication

2002/0124097 A1

As per claim(s) **3,** while Ladas discloses features of the invention as above, he does not

explicitly disclose the additional recited feature{s} of the computing device **wherein the**

**computing device comprises a *controller device* of a networked audio system**.

Nonetheless, the said feature(s) is/are expressly disclosed by Isley in a related

endeavor.

Isley discloses as his invention a system and method for dynamic distribution of

'audio signals' at a 'site' {i.e., local network, such as a '**home audio system**'} based on

defined zones with the site [Isley: Abstract] [0011] [Fig. 1]. In particular, Isley discloses

disclose the additional recited feature{s} of the computing device **wherein the**

**computing device comprises a *controller device* of a networked audio system**

(Isley: e.g., **'*Controller*'_125**) [Fig. 1] (e.g., expressly teaches in one aspect that "**user**

**device 130 in combination with the Controller 125, provides a user interface**

**configured to receive a user designation of aggregations of the audio equipment**

**145, 150**…") [0039] (e.g., additionally / expressly teaches that "a *Zone manager*

*315* 'defines' a plurality of zones for the site. The 'zones' may include 'one' {or a

plurality} of the individual addressable audio devices included in the illustrated block

of *network audio devices 305*….") [0047] [Fig. 3] (e.g., 'The Zone manager defines a

relationship between a reference audio device and for the addressable radio devices in

the zones…") [Abstract] Fig. 4] [0055].

It would thus be obvious to one of ordinary skill in the art at the time of the

invention to modify and/or combine Ladas's invention with the above said additional

feature, as disclosed by Isley, for the motivation of providing a system and method for

dynamic distribution of 'audio signals' at a 'site' {i.e., a **home audio system'**} based on

defined zones with the site [Isley: Abstract] [0011].


As per claim(s) **7,** while Ladas discloses features of the invention as above, he does not

explicitly disclose the additional recited feature{s} of the computing device performing

functions further comprising program instructions stored on the non-transitory computer-

readable medium that, when executed by the at least one processor, cause the

playback device to perform functions comprising: **after connecting to the secure**

**WLAN, establishing a new networked audio system on the secure WLAN**.

Application/Control Number: 16/298,515                                                    Page 13
Art Unit: 2451

Nonetheless, the said feature(s) is/are expressly disclosed by Isley in a related

endeavor.

Isley discloses as his invention a system and method for dynamic distribution of

'audio signals' at a 'site' {i.e., local network, such as a **home audio system'**} based on

defined zones with the site [Isley: Abstract] [0011] [Fig. 1]. In particular, Isley discloses

disclose the additional recited feature{s} of the computing device performing functions

further comprising program instructions stored on the non-transitory computer-readable

medium that, when executed by the at least one processor, cause the playback device

to perform functions comprising: **after connecting to the secure WLAN, establishing

a new networked audio system on the secure WLAN** (Isley: e.g., _Networked Audio_

_Device_105 / 205_ of a **'Home Audio System'**, which may be a '**MP3 player'**, for

example) [0004] [0008] [Fig. 2] (e.g., expressly teaches i one aspect that "_a Zone_

_manager 315_ 'defines' a plurality of zones for the site. The 'zones' may include '**one'**

{or a plurality} **of the individual addressable audio devices** included in the illustrated

block of _network audio devices 305_....") [0047] [Fig. 3] (e.g., **Channel 1'** _Network_

_Audio Device_405_) [Fig. 4] [0055].

It would thus be obvious to one of ordinary skill in the art at the time of the

invention to modify and/or combine Ladas's invention with the above said additional

feature, as disclosed by Isley, for the motivation of providing a system and method for

dynamic distribution of 'audio signals' at a 'site' {i.e., a **home audio system'**} based on

defined zones with the site [Isley: Abstract] [0011].

As per claim(s) **8,** Ladas in view of Isley discloses substantial features of the invention as above. In particular, Isley discloses the additional recited feature(s) of the computing device performing function further comprising **after connecting to the secure WLAN, joining an existing networked audio system operating on the secure WLAN** (Isley: e.g., expressly teaches that in dynamically defining aggregate {audio} 'zones'**, the system can 'add'** {or remove} *Audio devices  105 to* {or from} **groups of virtual zones**…") [0040] [Fig. 1] (e.g., additionally / expressly discloses in one aspect that "Channels can be added or removed from the virtual zone in some embodiments of the present invention by dynamically configuring '**additional** *audio devices*' to belong to the same network group…") [0057] [Fig. 4] (e.g., '**Channels 2-4'** *Network Audio Devices  405*) [Fig. 4].

It would thus be obvious to one of ordinary skill in the art at the time of the invention to modify and/or combine Ladas's invention with the above said additional feature, as disclosed by Isley, for the motivation of providing a system and method for dynamic distribution of 'audio signals' at a 'site' {i.e., a '**home audio system'**} based on defined zones with the site [Isley: Abstract] [0011].

As per claim(s) **10,** Ladas in view of Isley discloses substantial features of the invention as above. In particular, Isley discloses the additional recited feature(s) of the computing device **wherein communicating  with the computing  device via the secure WLAN comprises receiving a command  related to playback  of audio content** (Isley: e.g., expressly teaches that "the network interface 100 or audio interface 320 may, thus, dynamically designate respective ones of the addressable audio devices for inclusion in

Application/Control Number: 16/298,515                                    Page 15
Art Unit: 2451

an aggregation of groups of audio equipment (block 525). Furthermore, one of the **'identifiers' associated with a digital audio stream** to be received by the respective addressable audio devices in the group **may be provided** (block 525). **The 'selection' of a digital audio stream to which each audio device in a group will "tune" may be provided to the OSGi 350 as part of a received 'user designation'** {command} at block 520. ...") [0060] [Fig. 5].

It would thus be obvious to one of ordinary skill in the art at the time of the invention to modify and/or combine Ladas's invention with the above said additional feature, as disclosed by Isley, for the motivation of providing a system and method for dynamic distribution of 'audio signals' at a 'site' {i.e., a '**home audio system'**} based on defined zones with the site [Isley: Abstract] [0011].

As per claim(s) **11, 19,** Ladas in view of Isley discloses substantial features of the invention as above.  In particular, Isley discloses the additional recited feature(s) of the computing device **wherein the command comprises a command to retrieve audio content for playback from an audio source that is accessible via a communication path that includes the secure WLAN** (Isley: e.g., '***Audio Source(s)'_110, 330***) [Figs. 1 & 3] (e.g., additionally / expressly teaches that "the network interface 100 or audio interface 320 may dynamically designate respective ones of the addressable audio devices for inclusion in an aggregation of 'groups' of audio equipment (block 525). Furthermore, one of the ***'identifiers'* associated with a digital audio stream** to be received by the respective addressable audio devices in the group **may be provided** (block 525).  **The 'selection' of a digital audio stream to which each audio device in

a group will "tune" may be provided to the OSGi 350 as part of a received 'user designation' {command} at block 520 …") [0060] [Figs. 1, 3 & 4-5], and **wherein the playback device further comprises program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the playback device to perform functions comprising:**

**in response to receiving the command, retrieving the audio content from the audio source via the communication path that includes the secure WLAN** (Isley: e.g., expressly illustrates in one aspect '*Room 1 Audio Equipment*' outputting audio content from 'Channel 1' audio source, '*Room 2 Audio Equipment*' outputting audio content from 'Channel 2', '*Room 3 Audio Equipment*' outputting audio content from 'Channel 3', etc.) [Fig. 4] (e.g., "Each of the Network Addressable Audio Devices_405 'defines a channel' which operates to drive associated Audio Equipment 450, such as 'speakers' located in respective 'rooms' of a residence…") [0055] (e.g., '*Designate Audio Devices_525 → Receive Audio Stream over Local Network_530 → Output Audio_535*') [Fig. 5].

It would thus be obvious to one of ordinary skill in the art at the time of the invention to modify and/or combine Ladas's invention with the above said additional feature, as disclosed by Isley, for the motivation of providing a system and method for dynamic distribution of 'audio signals' at a 'site' {i.e., a '**home audio system**'} based on defined zones with the site [Isley: Abstract] [0011].

Claim(s) **19** recite(s) substantially the same limitations as claim 11, is/are distinguishable only by its/their statutory category (computer-readable media, method), and accordingly rejected on the same basis.

Application/Control Number: 16/298,515                                                Page 17
Art Unit: 2451

As per claim(s) **13,** Ladas in view of Isley discloses substantial features of the invention as above. In particular, Isley discloses the additional recited feature(s) of the computing device further comprising program instructions stored on the non-transitory computer-readable medium that, when executed by the at least one processor, cause the computing device to perform functions comprising **after transitioning to communicating with computing device via the secure WLAN, receiving, from the computing device, a command to form a group with at least a first playback device of a networked audio system such that the playback device is configured to play back audio content in synchrony with at least the first playback device** (Isley: e.g., expressly teaches in one aspect that "the _**User Interface device 130**_, in combination with the _**Controller 125,**_ provides a 'user interface' configured to receive a **user designation of 'aggregations'** {groupings} **of the audio equipment 145**, 150 located at the site so as to provide '**dynamic zone aggregation**'. _**Controller 125**_ operates to _designate_ the 'associated identifiers' to be received by respective ones of the plurality of network attached audio devices 105. **In other words,** the _**Controller 125**_ **essentially 'tells' the** _**network audio devices 105**_ **the "channel" to which they should tune. The** _controller 125_ **makes this 'designation'** _based on_ the '**user designation'** from the _**user device 130**_ to provide 'dynamic zone aggregation'. Thus, '**individual ones' of the network attached audio devices may be '**_grouped_**' together and '**_instructed_**' to listen to the '**_same_ channel' to provide '**_common_ audio signals' to multiple rooms in a house, while 'other groupings' of** the _**network attached audio devices 105**_ **may be 'assigned a different channel' to**

Application/Control Number: 16/298,515                                                      Page 18
Art Unit: 2451

<u>provide a 'different audio signal source' in another set of rooms within the</u>

<u>residence</u> ...") [0039] [Fig. 1].

It would thus be obvious to one of ordinary skill in the art at the time of the

invention to modify and/or combine Ladas's invention with the above said additional

feature, as disclosed by Isley, for the motivation of providing a system and method for

dynamic distribution of 'audio signals' at a 'site' {i.e., a '**home audio system**'} based on

defined zones with the site [Isley: Abstract] [0011].


**3.**     Claim **9** is rejected under 35 U.S.C. 103(a) as being unpatentable over **Ladas** in

view of **Vasisht** et al (hereinafter Vasisht), US Patent Publication 2004/0133689 A1


As per claim(s) **9,** while Ladas discloses features of the invention as above, he does not

explicitly disclose the additional recited feature{s} of the computing device further

comprising program instructions stored on the non-transitory computer-readable

medium that, when executed by the at least one processor, cause the computing device

to perform functions comprising **receiving, from the computing device, a command**

**to *assign a name* to the playback device**. Nonetheless, the said feature(s) is/are

expressly disclosed by Vasisht in a related endeavor.

Vasisht discloses as his invention a system and method for automatically

configuring a communications network for a user, including the instantiation of a

communications network and automatically generating a plurality of unique network

configurations settings for one or more network devices of the communications network

[Vasisht: Abstract] [0024-0025] [Figs. 2 & 4]. In particular, Vasisht discloses the

additional recited feature{s} of the computing device further comprising program

instructions stored on the non-transitory computer-readable medium that, when

executed by the at least one processor, cause the computing device to perform

functions comprising **receiving, from the computing device, a command to** *assign a*

*name* **to the playback device** (Vasisht: e.g., expressly teaches in one aspect

'Entering a *Unique Node Name* for the Node device' _s424) [0092].

It would thus be obvious to one of ordinary skill in the art at the time of the

invention to modify and/or combine Ladas's invention with the above said additional

feature, as disclosed by Vasisht, for the motivation of providing a system and method

for automatically installing and configuring a communications network for a user, such

as a 'home network', Small Office and Home Office {SOHO} networks, and the like

[Vasisht: Abstract] [0003] [0024].

Claim(s) **17** recite(s) substantially the same limitations as claim 8, is/are

distinguishable only by its/their statutory category (computer-readable media, method),

and accordingly rejected on the same basis.

## *Conclusion*

1.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to GLENFORD J MADAMBA whose telephone number is

(571)272-7989.  The examiner can normally be reached on Monday through Friday

9am-5pm.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Christopher Parry can be reached on 571-272-8328. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/GLENFORD J MADAMBA/

Primary Examiner, Art Unit 2451

Exhibit 16

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
Sonos No. 11-0403-CON1018
(MBHB 15-1433-US-CON4)

| | | |
|---|---|---|
| In the Application of: | ) | |
| | ) | |
| Millington | ) | Examiner:  to be assigned |
| | ) | |
| Application No.:  16/166,518 | ) | Art Unit: 2688 |
| | ) | |
| Filed:  October 22, 2018 | ) | Confirmation No. 7844 |
| | ) | |
| Title:   Networked Playback Device | ) | |
| | ) | |

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**PRELIMINARY AMENDMENT**

Please enter the present preliminary amendment prior to examination of the above-captioned application.

**AMENDMENTS TO THE CLAIMS** begin on page 2.

**REMARKS** begin on page 8.

Applicant believes no fees are required.  Nevertheless, Applicant authorizes and requests the Office to charge any fee due or credit any overpayment to Deposit Account 13-2490.

16/166,518                                                11-0403-CON1018 (15-1433-US-CON4)

## AMENDMENTS TO THE CLAIMS

1.    (New)  A playback device comprising:

one or more processors; and

tangible, non-transitory computer readable memory comprising instructions stored

therein, wherein the instructions, when executed, cause the playback device to perform a method

comprising:

arming the playback device so that receipt of a first type of media content preempts

playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is

receiving the first type of media content;

in response to determining that playback device is receiving the first type of media

content, ceasing playback of the second type of media content and playing the first type of media

content;

determining that the playback device is no longer receiving the first type of media

content; and

in response to determining that the playback device is no longer receiving the first type of

media content, ceasing playback of the first type of media content and rearming the playback

device so that subsequent receipt of the first type of media content preempts playback of the

second type of media content.

16/166,518                                          11-0403-CON1018 (15-1433-US-CON4)

2.      (New) The playback device of claim 1, wherein determining that the playback device is receiving the first type of media content comprises determining that the playback device is receiving the first type of media content via a line-in connector.

3.      (New) The playback device of claim 1, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

4.      (New) The playback device of claim 1, wherein playing the second type of media content comprises playing the second type of media content in synchrony with a second playback device.

5.      (New) The playback device of claim 1, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

6.      (New) The playback device of claim 1, wherein playing the second type of media content comprises transmitting at least a portion of the second type of media content to a third playback device.

7.      (New) The playback device of claim 1, wherein playing the first type of media content comprises transmitting at least a portion of the first type of media content to at least one of a second playback device or a third playback device.

3

16/166,518                                              11-0403-CON1018 (15-1433-US-CON4)

8.      (New) The playback device of claim 1, wherein the first type of media content comprises media content received from a video device.

9.      (New) Tangible, non-transitory computer-readable media comprising instructions encoded therein, wherein the instructions, when executed by a playback device, cause the playback device to perform functions comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content;

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

10.     (New) The tangible, non-transitory computer-readable media of claim 9, wherein determining that the playback device is receiving the first type of media content comprises

4

determining that the playback device is receiving the first type of media content via a line-in connector.

11.     (New) The tangible, non-transitory computer-readable media of claim 9, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

12.     (New) The tangible, non-transitory computer-readable media of claim 9, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

13.     (New) The tangible, non-transitory computer-readable media of claim 9, wherein playing the second type of media content comprises transmitting at least a portion of the second type of media content to a third playback device.

14.     (New) The tangible, non-transitory computer-readable media of claim 9, wherein playing the first type of media content comprises transmitting at least a portion of the first type of media content to at least one of a second playback device or a third playback device.

15.     (New) The tangible, non-transitory computer-readable media of claim 9, playback device of claim 1, wherein the first type of media content comprises media content received from a video device.

5

16/166,518                                                11-0403-CON1018 (15-1433-US-CON4)

16.    (New)  A method performed by a playback device, the method comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content;

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

17.    (New) The method of claim 16, wherein determining that the playback device is receiving the first type of media content comprises determining that the playback device is receiving the first type of media content via a line-in connector.

18.    (New) The method of claim 16, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

16/166,518                                                                11-0403-CON1018 (15-1433-US-CON4)

19.    (New) The method of claim 16, wherein playing the second type of media content comprises playing the second type of media content in synchrony with a second playback device.

20.    (New) The method of claim 16, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

16/166,518                                          11-0403-CON1018 (15-1433-US-CON4)

## REMARKS

Applicant has added new claims 1-20.  The subject matter of the amendments can be found generally throughout Applicant's originally-filed specification, including but not limited to FIG. 11 and paragraphs 133-136.  No new matter has been added.

If further discussion would advance the application to allowance and issue, the Examiner is invited to telephone the undersigned at 312-913-3381.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date:  January 14, 2019          By:    /Margot M. Wilson/
                                 Margot M. Wilson
                                 Reg. No. 77,094

8

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/166,518 | 10/22/2018 | Nicholas A.J. Millington | 11-0403-CON1018 (15-1433) | 7844 |

107361          7590          10/16/2019

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| MCCORD, PAUL C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2656 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/16/2019 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 16/166,518 | Applicant(s) Millington et al. | |
|---|---|---|---|
| | Examiner PAUL C MCCORD | Art Unit 2656 | AIA (FITF) Status No |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☑ Responsive to communication(s) filed on <u>1/14/19</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**     2b) ☑ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims\***

5) ☑ Claim(s) <u>1-20</u> is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>1-20</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement
\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☑ The drawing(s) filed on <u>10/22/18</u> is/are:  a) ☑  accepted or  b) ☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a) ☐ All   b) ☐ Some\*\*   c) ☐ None of the:
    1. ☐  Certified copies of the priority documents have been received.
    2. ☐  Certified copies of the priority documents have been received in Application No. _____.
    3. ☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
\*\* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
  Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413)
  Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

*Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.


**DETAILED ACTION**


*Double Patenting*

A rejection based on double patenting of the "same invention" type finds its support in the language of 35 U.S.C. 101 which states that "whoever invents or discovers any new and useful process... may obtain a patent therefor..." (Emphasis added). Thus, the term "same invention," in this context, means an invention drawn to identical subject matter. See *Miller v. Eagle Mfg. Co.*, 151 U.S. 186 (1894); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Ockert*, 245 U.S. 467, 114 USPQ 330 (CCPA 1957).

A statutory type (35 U.S.C. 101) double patenting rejection can be overcome by canceling or amending the claims that are directed to the same invention so they are no longer coextensive in scope. The filing of a terminal disclaimer cannot overcome a double patenting rejection based upon 35 U.S.C. 101.

Claims 1,9,16 is/are rejected under 35 U.S.C. 101 as claiming the same invention as that of claim 1 of prior U.S. Patent No. 8938312. This is a statutory double patenting rejection. Particularly the claims of the instant application and the '312 patent are substantially similar as shown:

| 16166518 | 8938312 |
|---|---|
| A system, method, etc. for: arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content; | A system, method, etc. operable in response to determining that the first audio signal is no longer present at the line-in connector, arm the playback device such |

| | |
|---|---|
| | that a subsequent presence of the first audio signal at the line-in connector causes the playback device to play the first audio signal. |
| after arming the playback device, playing the second type of media content; | i) cease playback of a second audio signal being played by the playback device, wherein the second audio signal is not present at the line-in connector, and (ii) cause the playback device to play the first audio signal; |
| while playing the second type of media content, determining that the playback device is receiving the first type of media content; in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content; | determine whether the first audio signal is present at the line-in connector; in response to determining that the first audio signal is present at the line-in connector, (i) cease playback of a second audio signal being played by the playback device, and (ii) cause the playback device to play the first audio signal; |
| determining that the playback device is no longer receiving the first type of media content; and in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent | in response to determining that the first audio signal is no longer present at the line-in connector, arm the playback device such that a subsequent presence of the first audio signal at the line-in connector causes the playback device to play the first audio signal. |

| receipt of the first type of media content preempts playback of the second type of media content. | |
|---|---|

### *Claim Rejections - 35 USC § 103*

In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under pre-AIA 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims at issue.

3. Resolving the level of ordinary skill in the pertinent art.

4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

This application currently names joint inventors. In considering patentability of the claims under pre-AIA 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary.  Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of pre-AIA 35 U.S.C. 103(c) and potential pre-AIA 35 U.S.C. 102(e), (f) or (g) prior art under pre-AIA 35 U.S.C. 103(a).

1.      Claims 1-20 rejected under 35 U.S.C. 103(a) as being unpatentable over Ando: 20040239816 further in view of Lambourne: 7571014 hereinafter Lam and further in view of Slemmer: 20060029005.

2.      Regarding claim 1, 9, 16

        Ando teaches:

        A playback device comprising: one or more processors; and tangible, non-transitory computer readable memory comprising instructions stored therein, wherein the instructions, when executed, cause the playback device to perform a method (Ando: ¶ 25-30: Fig 1, 3: processor 11 functional to determine presence of a signal and selectively switch an input based upon presence of an input or user preference of a plurality of sensed input) comprising:

        arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content after arming the playback device, playing the second type of media content; while playing the second type of media content, determining that the playback device is receiving the first type of media content  (Ando: ¶ 25-30: Fig 1, 3: processor 11 functional to determine presence of a signal and selectively switch an input based upon presence of an input or user preference of a plurality of sensed input; system plays media

present at a particular input until a media playback is present/detected at a particular sensed

device or upon a particular input);

in response to determining that playback device is receiving the first type of media

content, ceasing playback of the second type of media content and playing the first type of

media content (Ando: Fig 3: ST5 stops playback from a particular sensed device based upon user

explicit instructions or set preferences effectively preempting the playback of a particular media

upon a determined presence of an additional media); determining that the playback device is no

longer receiving the first type of media content (Ando: Fig 3: ST5 stops playback from a

particular sensed device based upon user explicit instructions or set preferences); and in

response to determining that the playback device is no longer receiving the first type of media

content, ceasing playback of the first type of media content and rearming the playback device so

that subsequent receipt of the first type of media content preempts playback of the second type

of media content  (Ando: ¶ 25-30: Fig 1, 3: processor 11 functional to determine presence of a

signal and selectively switch an input based upon presence of an input or user preference

effectively preempting the playback of a particular media upon a determined presence of an

additional media).

Ando discusses input detection among plural AV apparatus but does not explicitly

discuss the type of plural input connections necessary to the detection and re-sensing of a signal

which operates to output media, reconfigure input sensing and thereby configure and/or

reconfigure a plurality of playback devices in response to determining the Ando determinations

of presence or absence of signals at an input.

In a related field of endeavor Lam teaches:

A digital audio network comprising an audio management system consisting of plural

inputs including playback devices comprising analog inputs (Lam: Col 6:5-7:23; Fig 1, 2A, 2C) and

digital inputs (Lam: Col 6:5-7:23; Fig 1, 2A, 2C) wherein the system functions to select a

particular input and communicate the audio therefrom to a plurality of networked speakers

dispersed over plural selectively grouped zones of playback devices (Lam: Col 6:5-7:23; Fig 1, 2A,

2C) in a manner operable to output multiple channels of input audio from a plurality of

networked speakers  (Lam: Col 6:5-7:23; Fig 1, 2A, 2C, 5). It would have been obvious to one of

ordinary skill in the art at the time of the invention to operate the networked speaker system of

Lam in concert with input detection functional to select input audio as taught or suggested by

Ando. The average skilled practitioner would have been motivated to do so for the purpose of

automatically configuring a digital audio network based on presence of an input, said sensed at

a particular input and would have expected predictable results therefrom.

Ando in view of Lam teaches input detection within a configurable playback system

functional to detect the absence of a signal to re-sense or otherwise reconfigure input sensing

but does not explicitly teach configuring a plurality of playback devices in response to

determining the presence or absence of signals at an input and reconfiguring or re-arming of the

system to respond again to a signal at the line input after an instruction is received to stop

playback and in response to the determination that a signal is no longer present at the line

input.

In a related field of endeavor Slemmer teaches:

A system method and medium bearing coded instructions for aggregating device

interaction among a plurality of playback devices (Slemmer: Abstract: Fig 1, 2, 3) wherein a state

change such as an active signal input at a first device (Slemmer: ¶ 52) functions to consult a set

of configuration rules associating particular second, third etc. device states with the state

change of the first device (Slemmer: ¶ 65-71; Fig 8, 9) A second state change at a first device

functions to rearm or reconfigure the system under direction of the state change . It would have

been obvious to one of ordinary skill in the art at the time of the invention to iterate among

system configurations based upon state changes as taught or suggested by Slemmer in concert

with the input detection and response taught or suggested by Ando in view of Lam. The average

skilled practitioner would have been motivated to do so for the purpose of aggregating rules

directing state changes within a plurality of playback devices in an audio environment and would

have expected predictable results therefrom.

3.      Regarding claim 2, 10, 17

        Ando in view of Lam in view of Slemmer teaches or suggests:

        A playback device, method and coded instructions therefor, wherein determining that

the playback device is receiving the first type of media content comprises determining that the

playback device is receiving the first type of media content via a line-in connector  (Ando: ¶ 25-

30: Fig 1, 3); (Lam: Col 6:5-7:23; Fig 1, 2A, 2C).

4.      Regarding claim 3, 11, 18

        Ando in view of Lam in view of Slemmer teaches or suggests:

        A playback device, method and coded instructions therefor, wherein playing the second

type of media content comprises receiving the second type of media content via at least one of

a wireless or a wired network interface (Ando: ¶ 25-30: Fig 1, 3: wired input); (Lam: Col 6:5-7:23;

Fig 1, 2A, 2C: media provided to output devices via wired or wireless interfaces).

5.      Regarding claim 4, 19

        Ando in view of Lam in view of Slemmer teaches or suggests:

        A playback device, method and coded instructions therefor, wherein playing the second

type of media content comprises playing the second type of media content in synchrony with a

second playback device (Lam: Abstract: Col 6:5-7:23; Fig 1, 2A, 2C: system operates to provide

synchronous audio output from a constellation of playback devices).

6.      Regarding claim 5, 12, 20

        Ando in view of Lam in view of Slemmer teaches or suggests:

        A playback device, method and coded instructions therefor, wherein playing the second

type of media content comprises receiving the second type of media content from an Internet-

accessible media source (Lam: Abstract: Col 5:1-7:23; Fig 1, 2A, 2C: system operates to receive

audio from a wired or wireless network including internet accessible audio provides, routes, etc.

said audio to a constellation of playback devices for synchronous audio output).

7.      Regarding claim 6, 13

        Ando in view of Lam in view of Slemmer teaches or suggests:

        A playback device, method and coded instructions therefor, wherein playing the second

type of media content comprises transmitting at least a portion of the second type of media

content to a third playback device (Lam: Abstract: Col 5:1-7:23; Fig 1, 2A, 2C: system operates to

receive audio from a wired or wireless network including internet accessible audio and analog

audio input to a particular analog input device wherein said particular device provides, routes,

etc. said input analog audio to an additional device among a constellation of playback devices

for synchronous audio output).

8.      Regarding claim 7, 14

        Ando in view of Lam in view of Slemmer teaches or suggests:

        A playback device, method and coded instructions therefor, wherein playing the first

type of media content comprises transmitting at least a portion of the first type of media

content to at least one of a second playback device or a third playback device (Lam: Abstract:

Col 5:1-7:23; Fig 1, 2A, 2C: system operates to receive audio from a wired or wireless network

including internet accessible audio and analog audio input to a particular analog input device

Application/Control Number: 16/166,518                                              Page 10
Art Unit: 2656

wherein said particular device provides, routes, etc. said input analog audio to an additional

device among a selected groupings of playback devices for synchronous audio output)..

9.      Regarding claim 8, 15

        Ando in view of Lam in view of Slemmer teaches or suggests:

        A playback device, method and coded instructions therefor, wherein the first type of

media content comprises media content received from a video device (Ando: HDMI signal input

from a plurality of input devices including video and audio input in concert with HDMI standards

(And: ¶ 15-20, 32-34; Fig 1).


                                            *Conclusion*

        Any inquiry concerning this communication or earlier communications from the examiner

should be directed to PAUL C MCCORD whose telephone number is (571)270-3701.  The examiner can

normally be reached on 730-630 M-F.

        Examiner interviews are available via telephone, in-person, and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use

the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor,

Curtis Kuntz can be reached on (571) 272-7499.  The fax phone number for the organization where this

application or proceeding is assigned is 571-273-8300.

        Information regarding the status of an application may be obtained from the Patent Application

Information Retrieval (PAIR) system.  Status information for published applications may be obtained

from either Private PAIR or Public PAIR.  Status information for unpublished applications is available

through Private PAIR only.  For more information about the PAIR system, see http://pair-

direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic

Application/Control Number: 16/166,518                                          Page 11
Art Unit: 2656

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer

Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR

CANADA) or 571-272-1000.


/PAUL C MCCORD/
Primary Examiner, Art Unit 2656

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
Sonos No.: 11-0403-CON1018
(MBHB No. 15-1433-US-CON4)

| | | |
|---|---|---|
| In the Application of: | ) | |
| | ) | |
|     Millington | ) | Art Unit:  2656 |
| | ) | |
| Serial No.:  16/166,518 | ) | Examiner:  McCord |
| | ) | |
| Filed:  October 22, 2018 | ) | Confirmation No.  7844 |
| | ) | |
| For:  Networked Playback Device | ) | |
| | ) | |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**RESPONSE TO NON-FINAL OFFICE ACTION
MAILED OCTOBER 16, 2019**

Please consider the following Amendments and Remarks in response to the Non-Final

Office Action mailed on October 16, 2019 in the above-captioned application.

A listing of **PENDING CLAIMS** begins on page 2.

**REMARKS** begin on page 7.

Please charge any underpayment of fees or credit any overpayment of fees in connection

with the prosecution of the above-captioned application to Deposit Account 13-2490.

## PENDING CLAIMS

1.      (Original)  A playback device comprising:

one or more processors; and

tangible, non-transitory computer readable memory comprising instructions stored therein, wherein the instructions, when executed, cause the playback device to perform a method comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content;

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

2.      (Original)  The playback device of claim 1, wherein determining that the playback device is receiving the first type of media content comprises determining that the playback device is receiving the first type of media content via a line-in connector.

3.    (Original)  The playback device of claim 1, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

4.    (Original)  The playback device of claim 1, wherein playing the second type of media content comprises playing the second type of media content in synchrony with a second playback device.

5.    (Original)  The playback device of claim 1, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

6.    (Original)   The playback device of claim 1, wherein playing the second type of media content comprises transmitting at least a portion of the second type of media content to a third playback device.

7.    (Original)   The playback device of claim 1, wherein playing the first type of media content comprises transmitting at least a portion of the first type of media content to at least one of a second playback device or a third playback device.

8.    (Original)   The playback device of claim 1, wherein the first type of media content comprises media content received from a video device.

9.    (Original)    Tangible, non-transitory computer-readable media comprising instructions encoded therein, wherein the instructions, when executed by a playback device, cause the playback device to perform functions comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content;

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content; determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

10.    (Original)   The tangible, non-transitory computer-readable media of claim 9, wherein determining that the playback device is receiving the first type of media content comprises determining that the playback device is receiving the first type of media content via a line-in connector.

11.    (Original)   The tangible, non-transitory computer-readable media of claim 9, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

12.    (Original)   The tangible, non-transitory computer-readable media of claim 9, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

13.    (Original)   The tangible, non-transitory computer-readable media of claim 9, wherein playing the second type of media content comprises transmitting at least a portion of the second type of media content to a third playback device.

14.    (Original)   The tangible, non-transitory computer-readable media of claim 9, wherein playing the first type of media content comprises transmitting at least a portion of the first type of media content to at least one of a second playback device or a third playback device.

15.    (Original)   The tangible, non-transitory computer-readable media of claim 9, playback device of claim 1, wherein the first type of media content comprises media content received from a video device.

16.    (Original)  A method performed by a playback device, the method comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content; after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content;

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

17.    (Original)  The method of claim 16, wherein determining that the playback device is receiving the first type of media content comprises determining that the playback device is receiving the first type of media content via a line-in connector.

18.    (Original)  The method of claim 16, wherein playing the second type of media content comprises receiving the second type of media content via at least one of a wireless or a wired network interface.

19.    (Original)  The method of claim 16, wherein playing the second type of media content comprises playing the second type of media content in synchrony with a second playback device.

20.    (Original)  The method of claim 16, wherein playing the second type of media content comprises receiving the second type of media content from an Internet-accessible media source.

## REMARKS

### I.    Summary of the Claims

Claims 1-20 are pending; claims 1, 9, and 16 are independent.   Applicant has not amended the claims in the present Response.

### II.    Summary of the Office Action

In the Office Action, the Office: (i) rejected claims 1, 9, and 16 under 35 U.S.C. § 101 for statutory double patenting based on claim 1 of U.S. Pat. 8,938,312; and (ii) rejected claims 1-20 under 35 U.S.C. § 103 based on U.S. Pub. 2004/0239816 (Ando), U.S. Pat. 7,571,014 (Lambourne), and U.S. Pub. 2006/0029005 (Slemmer).

### III.    Response to the Double Patenting Rejections

Applicant requests that the double patenting rejections be held in abeyance until the present claims are deemed allowable.

### IV.    Response to the § 103 Rejections

The claims are patentable over the combination of Ando, Lambourne, and Slemmer for at least the reason that the combination of Ando, Lambourne, and Slemmer fails to teach or suggest all the elements recited in the claims.  For example, with reference to independent claim 1, the combination of Ando, Lambourne, and Slemmer fails to teach or suggest at least "in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content" in combination with the other elements recited in the claims.

The Office Action states the combination of Ando and Lambourne "does not explicitly teach configuring a plurality of playback devices in response to determining the presence or absence of signals at an input and reconfiguring or re-arming of the system to respond again to a signal at the line input after an instruction is received to stop playback and in response to the determination that a signal is no longer present at the line input."  Office Action, p. 7.  The Office Action cites Slemmer to overcome the stated deficiencies of Ando and Lambourne. Office Action, p. 7 (citing Slemmer, Figs. 8-9, ¶¶ 65-71).

However, the cited portions of Slemmer describe "particular methods of learning," including "logical operations where [a] device whose state changes later in time learns [an] interaction rule" and a "method of learning where the first device to have a change of state learns the interaction rule."  Slemmer, ¶¶ 64-71; Figs 8-9.  Slemmer's disclosed learning methods do not amount to the specific feature of "in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content," as recited in claim 1.

In view of the foregoing, independent claim 1 is patentable over Ando, Lambourne, and Slemmer for at least the reason that the Ando-Lambourne-Slemmer combination fails to teach or suggest at least "in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content" in combination with the other elements recited in the claims. And because independent claims 9 and 16 recite similar elements, independent claims 9 and 16 are also patentable over Ando, Lambourne, and Slemmer for reasons similar to those articulated

for independent claim 1. Further, and without conceding the merits of the other assertions in the Office Action, the pending dependent claims are patentable over Ando, Lambourne, and Slemmer for at least the reason that they depend from patentable independent claims.

## V. Conclusions

Applicant submits that the claims are patentable over the cited references and Applicant requests a Notice of Allowance. If further dialog would advance prosecution, Applicant invites the Office to telephone the undersigned at 312-913-0001.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date: __April 16, 2020__         By: __/Jeffrey P. Armstrong/__
                                           Jeffrey P. Armstrong
                                           Reg. No. 54,967

**Doc Code: DIST.E.FILE**
**Document Description: Electronic Terminal Disclaimer - Filed**

PTO/SB/26

U.S. Patent and Trademark Office
Department of Commerce

| Electronic Petition Request | **TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT** |
|---|---|
| Application Number | 16166518 |
| Filing Date | 22-Oct-2018 |
| First Named Inventor | Nicholas Millington |
| Attorney Docket Number | 11-0403-CON1018 (15-1433) |
| Title of Invention | Networked Playback Device |

☒ Filing of terminal disclaimer does not obviate requirement for response under 37 CFR 1.111 to outstanding Office Action

☒ This electronic Terminal Disclaimer is not being used for a Joint Research Agreement.

| Owner | Percent Interest |
|---|---|
| Sonos, Inc. | 100% |

The owner(s) with percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of prior patent number(s)

8938312

as the term of said prior patent is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the prior patent, "as the term of said prior patent is presently shortened by any terminal disclaimer," in the event that said prior patent later:
- expires for failure to pay a maintenance fee;
- is held unenforceable;
- is found invalid by a court of competent jurisdiction;
- is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
- has all claims canceled by a reexamination certificate;
- is reissued; or
- is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

◉ Terminal disclaimer fee under 37 CFR 1.20(d) is included with Electronic Terminal Disclaimer request.

○  I certify, in accordance with 37 CFR 1.4(d)(4), that the terminal disclaimer fee under 37 CFR 1.20(d) required for this terminal disclaimer has already been paid in the above-identified application.

Applicant claims the following fee status:

○  Small Entity

○  Micro Entity

◉  Regular Undiscounted

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

THIS PORTION MUST BE COMPLETED BY THE SIGNATORY OR SIGNATORIES

I certify, in accordance with 37 CFR 1.4(d)(4) that I am:

◉  An attorney or agent registered to practice before the Patent and Trademark Office who is of record in this application

    Registration Number  54967

○  A sole inventor

○  A joint inventor; I certify that I am authorized to sign this submission on behalf of all of the inventors as evidenced by the power of attorney in the application

○  A joint inventor; all of whom are signing this request

| Signature | /Jeffrey P. Armstrong/ |
|-----------|------------------------|
| Name | Jeffrey P. Armstrong |

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MPEP § 324.

Doc Code: DISQ.E.FILE
Document Description: Electronic Terminal Disclaimer – Approved

Application No.:  16166518

Filing Date:        22-Oct-2018

Applicant/Patent under Reexamination:      Millington

Electronic Terminal Disclaimer filed on      July 17, 2020

☒    APPROVED

**This patent is subject to a terminal disclaimer**

☐    DISAPPROVED

Approved/Disapproved by:  Electronic Terminal Disclaimer automatically approved by EFS-Web

U.S. Patent and Trademark Office

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

107361      7590      07/23/2020
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| MCCORD, PAUL C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2654 | |

DATE MAILED: 07/23/2020

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/166,518 | 10/22/2018 | Nicholas A.J. Millington | 11-0403-CON1018 (15-1433) | 7844 |

TITLE OF INVENTION: Networked Playback Device

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 10/23/2020 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE | By fax, send to: | (571)-273-2885 |
| --- | --- | --- | --- |
| | Commissioner for Patents | | |
| | P.O. Box 1450 | | |
| | Alexandria, Virginia 22313-1450 | | |

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

107361      7590      07/23/2020

**McDonnell Boehnen Hulbert & Berghoff LLP**
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

| | |
| --- | --- |
| | (Typed or printed name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 16/166,518 | 10/22/2018 | Nicholas A.J. Millington | 11-0403-CON1018 (15-1433) | 7844 |

TITLE OF INVENTION: Networked Playback Device

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 10/23/2020 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
| --- | --- | --- |
| MCCORD, PAUL C | 2654 | 700-094000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐Issue Fee ☐Publication Fee (if required) ☐Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web    ☐ Enclosed check    ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

| Authorized Signature _____ | Date _____ |
| --- | --- |
| Typed or printed name _____ | Registration No. _____ |

PTOL-85 Part B (08-18) Approved for use through 01/31/2020      OMB 0651-0033      U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/166,518 | 10/22/2018 | Nicholas A.J. Millington | 11-0403-CON1018 (15-1433) | 7844 |

107361        7590        07/23/2020

McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| MCCORD, PAUL C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2654 | |

DATE MAILED: 07/23/2020

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No.<br>16/166,518 | Applicant(s)<br>Millington et al. | |
|---|---|---|---|
| | Examiner<br>PAUL C MCCORD | Art Unit<br>2654 | AIA (FITF) Status<br>No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>Claims 4/16/20; Interview: 7/17/20</u>.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____ .

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>See Continuation Sheet</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

      a) ☐ All    b) ☐ Some    *c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

      * Certified copies not received: _____ .

    Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____ .

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .

4. ☑ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☑ Examiner's Amendment/Comment

6. ☑ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____ .

/PAUL C MCCORD/
Primary Examiner, Art Unit 2654

**Continuation Sheet (PTOL-37)**                                                                                    **Application No. 16/166,518**

Continuation of 3. The allowed claim(s) is/are: 1,3-9,11-16 and 18-20

Application/Control Number: 16/166,518                                        Page 2
Art Unit: 2654

*Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

**EXAMINER'S AMENDMENT**

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in an interview with Jeff Armstrong on 7/12/20.

The application has been amended as follows:

**EXAMINER'S AMENDMENT**

1.    (Amended)  A playback device comprising:

one or more processors; and

tangible, non-transitory computer readable memory comprising instructions stored therein, wherein the instructions, when executed, cause the playback device to perform a method comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content <u>via a line-in connector</u>;

Application/Control Number: 16/166,518                                        Page 3
Art Unit: 2654

in response to determining that playback device is receiving the first type of media content,

ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content;

and

in response to determining that the playback device is no longer receiving the first type of

media content, ceasing playback of the first type of media content and rearming the playback

device so that subsequent receipt of the first type of media content preempts playback of the second

type of media content.

2.      (Canceled)  ~~The playback device of claim 1, wherein determining that the playback~~
~~device is receiving the first type of media content comprises determining that the playback device~~
~~is receiving the first type of media content via a line-in connector.~~

9.      (Amended)  Tangible,  non-transitory  computer-readable  media  comprising

instructions encoded therein, wherein the instructions, when executed by a playback device, cause

the playback device to perform functions comprising:

arming  the  playback  device  so  that  receipt  of  a  first  type  of  media  content  preempts

playback of a second type of media content;

after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is

receiving the first type of media content <u>via a line-in connector</u>;

in response to determining that playback device is receiving the first type of media content,

ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

10.    (Canceled)  ~~The tangible, non-transitory computer readable media of claim 9, wherein determining that the playback device is receiving the first type of media content comprises determining that the playback device is receiving the first type of media content via a line-in connector.~~

16.    (Amended)  A method performed by a playback device, the method comprising:

arming the playback device so that receipt of a first type of media content preempts playback of a second type of media content; after arming the playback device, playing the second type of media content;

while playing the second type of media content, determining that the playback device is receiving the first type of media content <u>via a line-in connector</u>;

in response to determining that playback device is receiving the first type of media content, ceasing playback of the second type of media content and playing the first type of media content;

determining that the playback device is no longer receiving the first type of media content; and

in response to determining that the playback device is no longer receiving the first type of media content, ceasing playback of the first type of media content and rearming the playback device so that subsequent receipt of the first type of media content preempts playback of the second type of media content.

Application/Control Number: 16/166,518                                                      Page 5
Art Unit: 2654

17.    (Canceled)  ~~The method of claim 16, wherein determining that the playback device~~
~~is receiving the first type of media content comprises determining that the playback device is~~
~~receiving the first type of media content via a line-in connector.~~

### *Reasons for Allowance*

The following is an examiner's statement of reasons for allowance:

The prior art does not reasonably teach the broadest reasonable interpretation of the claim

based on the specification comprising a system composed of a networked audio player(s); said

player(s) operable to form and participate in a playback zone of synchronized networked audio

players, said player(s) comprising a loudspeaker(s), and further comprising at least a processor,

memory, etc. and a line input (such as in that of figure 2A); the system functional to invoke

playback by configuration of a player or players among constellation of networked player(s) (such

as in instant figure 1) wherein execution of network borne commands to instantiate playback by

configuration of the networked player(s) or synchronous sets thereof are driven by determination

of the presence of an audio signal upon a smart line input interface such as that of instant figure

11 and wherein presence of a first signal upon the line input preempts playback of an second extant

media signal and delivers the first media present on the line input using the player(s) and wherein

a subsequent absence of a determined duration of the second signal extant upon the line input

returns playback to the first signal and instructs the playback device to await a subsequent presence

of first signal audio upon the line input. To be certain, there exist myriad telephone type devices

suitable to detect voice activity input into a microphone (Lee: 20110208520); or to detect and

prioritize a particular received media type using particular media type rules (Yew: 20110185048;

Hamilton: 20110301728; Garg: 20070220150); furthermore such telephone and portable computer

type embodiments may comprise a microphone input wherein said microphone input is well known

to double as a line input (Reid: 20110250785); however the prior art does not teach or suggest the

instant networked audio player(s) comprising a dedicated line in connector integral to the audio

player(s) wherein the signal upon the line input of the networked audio player(s) instantiates

playback, reproduction, etc. of the line input signal upon loudspeakers of the audio player(s)

and/or synchronous sets thereof based upon determination of the presence of an audio signal upon

a smart line input interface which further operates to reset the networked playback device(s) and/or

synchronous sets thereof in the absence of the sensed media on the line in connector of the audio

player(s).

Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

***Conclusion***

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to PAUL C MCCORD whose telephone number is (571)270-3701.  The examiner can

normally be reached on 730-630 M-F.

Examiner interviews are available via telephone, in-person, and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use

the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor,

VIVIAN CHIN can be reached on 5712727848.  The fax phone number for the organization where this

application or proceeding is assigned is 571-273-8300.

Application/Control Number: 16/166,518                                                          Page 7
Art Unit: 2654

      Information regarding the status of an application may be obtained from the Patent Application

Information Retrieval (PAIR) system.  Status information for published applications may be obtained

from either Private PAIR or Public PAIR.  Status information for unpublished applications is available

through Private PAIR only.  For more information about the PAIR system, see https://ppair-

my.uspto.gov/pair/PrivatePair. Should you have questions on access to the Private PAIR system, contact

the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information system, call 800-786-

9199 (IN USA OR CANADA) or 571-272-1000.

/PAUL C MCCORD/
Primary Examiner, Art Unit 2654

| *Examiner-Initiated Interview Summary* | Application No.<br>16/166,518 | Applicant(s)<br>Millington et al. | |
|---|---|---|---|
| | Examiner<br>PAUL C MCCORD | Art Unit<br>2654 | AIA (FITF) Status<br>No |

All participants (applicant, applicant's representative, PTO personnel):

(1) <u>PAUL C. MCCORD</u>.          (3) _____.

(2) <u>JEFFREY ARMSTRONG</u>.          (4) _____.

Date of Interview: <u>17 July 2020</u>.

Type:    ☑ Telephonic    ☐ Video Conference
         ☐ Personal [copy given to: ☐ applicant ☐ applicant's representative]

Exhibit shown or demonstration conducted:    ☐ Yes    ☑ No.
If Yes, brief description: _____.

Issues Discussed    ☐ 101    ☐ 112    ☐ 102    ☑ 103    ☑ Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: <u>1</u>.

Identification of prior art discussed: <u>n/a</u>.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

<u>Examiner called to discuss claim amendments and terminal disclaimer to which Applicant agreed</u>.

**Applicant recordation instructions:** It is not necessary for applicant to provide a separate record of the substance of interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /PAUL C MCCORD/<br>Primary Examiner, Art Unit 2654 | |
|---|---|

Exhibit 17

US008234395B2

(12) **United States Patent**   (10) **Patent No.:**     **US 8,234,395 B2**
Millington                                                (45) **Date of Patent:**         **Jul. 31, 2012**

(54) **SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES**

(75) Inventor:  **Nicholas A. J. Millington**, Santa Barbara, CA (US)

(73) Assignee:  **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 703 days.

(21) Appl. No.:  **10/816,217**

(22) Filed:  **Apr. 1, 2004**

(65)            **Prior Publication Data**

US 2007/0038999 A1      Feb. 15, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/490,768, filed on Jul. 28, 2003.

(51) **Int. Cl.**
**G06F 15/16**          (2006.01)
(52) **U.S. Cl.** .......................... 709/231; 709/248; 709/205
(58) **Field of Classification Search** ................. 709/205, 709/248, 231; 718/100, 102
See application file for complete search history.

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,816,989 A | 3/1989 | Finn | |
| 5,491,839 A | 2/1996 | Schotz | |
| 5,668,884 A | 9/1997 | Clair, Jr. et al. | |
| 5,673,323 A | 9/1997 | Schotz et al. | |
| 5,815,689 A * | 9/1998 | Shaw et al. | .................. 713/400 |
| 5,867,691 A | 2/1999 | Shiraishi | |
| 5,875,354 A | 2/1999 | Charlton et al. | |
| 5,887,143 A | 3/1999 | Saito | |
| 5,946,343 A | 8/1999 | Schotz et al. | |
| 6,009,457 A * | 12/1999 | Moller | .......................... 709/203 |
| 6,031,818 A * | 2/2000 | Lo et al. | ................. 370/216 |
| 6,128,318 A * | 10/2000 | Sato | ................. 370/503 |
| 6,157,957 A | 12/2000 | Berthaud | |
| 6,175,872 B1 | 1/2001 | Neumann et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP          0 251 584 A2      1/1988
(Continued)

OTHER PUBLICATIONS

Jo et al, "Synchronized one-to-many media streaming with adaptive playout control", Dec. 10, 2002, SPIE 4861, pp. 71-82.*

(Continued)

*Primary Examiner* — Jeffrey Nickerson
(74) *Attorney, Agent, or Firm* — Hanley, Flight & Zimmerman, LLC

(57)            **ABSTRACT**

A system maintains synchrony of operations among devices that have independent clocking arrangements. The system includes a task distribution device that distributes tasks to a synchrony group of devices that perform the tasks distributed by the task distribution device in synchrony. The task distribution device distributes each task to the members of the synchrony group over a network. Each task is associated with a time stamp that indicates a time, relative to a clock maintained by the task distribution device, at which the members of the synchrony group are to execute the task. Each member of the synchrony group periodically obtains an indication of the current time indicated by its clock, determines a time differential between the task distribution device's clock and its respective clock and determines a time at which, according to its respective clock, the time stamp indicates that it is to execute the task.

20 Claims, 5 Drawing Sheets



**US 8,234,395 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,185,737 | B1 | 2/2001 | Northcutt et al. |
| 6,199,169 | B1 * | 3/2001 | Voth .......................... 713/400 |
| 6,324,586 | B1 | 11/2001 | Johnson .................... 709/248 |
| 6,332,147 | B1 | 12/2001 | Moran et al. |
| 6,351,821 | B1 * | 2/2002 | Voth .......................... 713/600 |
| 6,487,296 | B1 | 11/2002 | Allen et al. |
| 6,526,325 | B1 | 2/2003 | Sussman et al. |
| 6,598,172 | B1 | 7/2003 | VanDeusen et al. |
| 6,611,537 | B1 * | 8/2003 | Edens et al. ............... 370/503 |
| 6,631,410 | B1 * | 10/2003 | Kowalski et al. .......... 709/224 |
| 6,757,517 | B2 | 6/2004 | Chang |
| 6,778,869 | B2 | 8/2004 | Champion |
| 6,836,788 | B2 * | 12/2004 | Kim et al. .................. 709/204 |
| 6,898,642 | B2 | 5/2005 | Chafle et al. |
| 6,912,610 | B2 | 6/2005 | Spencer |
| 6,920,373 | B2 | 7/2005 | Xi et al. |
| 6,934,766 | B1 * | 8/2005 | Russell ...................... 709/246 |
| 7,007,106 | B1 | 2/2006 | Flood et al. |
| 7,047,308 | B2 | 5/2006 | Deshpande |
| 7,115,017 | B1 | 10/2006 | Laursen et al. |
| 7,185,090 | B2 | 2/2007 | Kowalski et al. |
| 7,206,367 | B1 * | 4/2007 | Moore ........................ 375/354 |
| 7,209,795 | B2 * | 4/2007 | Sullivan et al. ............. 700/94 |
| 7,312,785 | B2 * | 12/2007 | Tsuk et al. .................. 345/156 |
| 7,324,857 | B2 * | 1/2008 | Goddard ..................... 700/94 |
| 7,333,519 | B2 * | 2/2008 | Sullivan et al. ............ 370/517 |
| 7,372,846 | B2 * | 5/2008 | Zwack ........................ 370/352 |
| 7,392,102 | B2 * | 6/2008 | Sullivan et al. ............. 700/94 |
| 7,742,740 | B2 | 6/2010 | Goldberg et al. |
| 2001/0032188 | A1 * | 10/2001 | Miyabe et al. .............. 705/57 |
| 2002/0002562 | A1 | 1/2002 | Moran et al. |
| 2002/0034374 | A1 | 3/2002 | Barton |
| 2002/0073228 | A1 | 6/2002 | Cognet et al. |
| 2002/0090914 | A1 * | 7/2002 | Kang et al. .................. 455/41 |
| 2002/0112244 | A1 * | 8/2002 | Liou et al. ................... 725/93 |
| 2002/0143098 | A1 | 10/2002 | Rajagopal et al. |
| 2002/0163361 | A1 | 11/2002 | Parkin |
| 2002/0165921 | A1 | 11/2002 | Sapieyevski |
| 2003/0035444 | A1 | 2/2003 | Zwack |
| 2003/0041173 | A1 | 2/2003 | Hoyle |
| 2003/0066094 | A1 * | 4/2003 | van der Schaar et al. ...... 725/151 |
| 2003/0099212 | A1 * | 5/2003 | Anjum et al. ............... 370/328 |
| 2003/0126211 | A1 * | 7/2003 | Anttila et al. .............. 709/205 |
| 2003/0195964 | A1 * | 10/2003 | Mane .......................... 709/227 |
| 2003/0198257 | A1 * | 10/2003 | Sullivan et al. ............ 370/516 |
| 2003/0210796 | A1 | 11/2003 | McCarty et al. |
| 2003/0231871 | A1 * | 12/2003 | Ushimaru ................... 386/96 |
| 2004/0001591 | A1 * | 1/2004 | Mani et al. ................. 380/210 |
| 2004/0024925 | A1 | 2/2004 | Cypher et al. |
| 2004/0027166 | A1 | 2/2004 | Mangum et al. |
| 2004/0203378 | A1 * | 10/2004 | Powers ..................... 455/41.2 |
| 2004/0249982 | A1 | 12/2004 | Arnold et al. |
| 2004/0252400 | A1 * | 12/2004 | Blank et al. ................ 360/70 |
| 2005/0010691 | A1 | 1/2005 | Oyadomari et al. |
| 2005/0058149 | A1 | 3/2005 | Howe |
| 2005/0081213 | A1 | 4/2005 | Suzuoki et al. |
| 2007/0142944 | A1 * | 6/2007 | Goldberg et al. ............ 700/94 |
| 2009/0157905 | A1 * | 6/2009 | Davis ......................... 709/248 |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 672 985 A1 | 9/1995 |
| EP | 1 111 527 B1 | 6/2001 |
| WO | 9525313 A1 | 9/1995 |
| WO | 9961985 A1 | 12/1999 |

## OTHER PUBLICATIONS

Ishibashi et al, "A Group Synchronization Mechanism for Live Media in Multicast Communications", Nov. 1997, IEEE GLOBECOM, pp. 746-752.*

Ishibashi et al, "A Group Synchronization Mechanism for Stored Media in Multicast Communications", 1997, IEEE INFOCOM, pp. 692-700.*

Huang et al, "A synchronization infrastructure for multicast multimedia at the presentation layer", Aug. 1997, IEEE Transactions on Consumer Electronics, vol. 43, No. 3, pp. 370-380.*

Benslimane, Abderrahim; "A Multimedia Synchronization Protocol for Multicast Groups"; 2000; IEEE; Proceedings of the 26th Euromicro Conference, 2000; vol. 1; pp. 456-463.*

Mills, David; "Precision Synchronization of Computer Network Clocks"; 1994; ACM Computer Communication Review; vol. 24; pp. 28-43.*

Bretl et al; "MPEG2 Tutorial"; 2000; www.bretl.com; retrieved http://www.bretl.com/mpeghtml/MPEGindex.htm on Jan. 13, 2009; pp. 1-23.*

Akyildiz et al; "Multimedia Group Synchronization Protocols for Integrated Services Networks"; Jan. 1996; IEEE; IEEE Journal on Selected Areas in Communications; vol. 14, No. 1; pp. 162-173.*

Schulzrinne et al; "RTP: A Transport Protocol for Real-Time Applications"; Jul. 2003; IETF Network Working Group; RFC 3550; pp. 1-89.*

Biersack, E. et al., "Intra-and Inter- Stream Synchronization for Stored Multimedia Streams," IEEE International Conference on Multimedia Computing & Systems, Jun. 1996, Hiroshima, Japan.

Mills, D. L., "Network Time Protocol (Version 3) Specification, Implementation and Analysis," Network Working Group, Mar. 1992, located at http://toi.iriti.cnr.it/rfc/rfc1305.txt.

Park, S. et al, "Group Synchronization in MultiCast Media Communications," Proc. The 5th Research on Multicast Technology Workshop, Nov. 2003, Daejeon, Korea.

Rothermel, K. et al, "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, Apr. 1995, Durham, New Hampshire, USA.

International Search Report for Patent Cooperation Treaty application No. PCT/US04/23102 dated Aug. 1, 2008.

Huang et al., "A Synchronization Infrastructure for Multicast Multimedia at the Presentation Layer," In: IEEE Transactions on Consumr Electronics, vol. 43, No. 3, Aug. 1997, pp. 370-380.

Ishibashi et al., "A Group Synchronization Mechanism for Live Media in Multicast Communications," In: IEEE GLOBECOM, Nov. 1997, pp. 746-752.

Jo et al., "Synchronized One-to-Many Media Streaming with Adaptive Playout Control," In: Proceedings of SPIE, vol. 4861, Edited by Tescher et al., Dec. 2002, pp. 71-82.

* cited by examiner

**U.S. Patent**        Jul. 31, 2012        Sheet 1 of 5        US 8,234,395 B2



*FIG. 1*



*FIG. 2*



*FIG. 2A*



*FIG. 3*



*F I G. 4*

US 8,234,395 B2

1

# SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES

### INCORPORATION BY REFERENCE

This application claims the benefit of Provisional Patent Application Ser. No. 60/490,768, filed on Jul. 28, 2003, entitled "Method for Synchronizing Audio Playback Between Multiple Networked Devices," assigned to the assignee of the present application, incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention relates generally to the field of digital data processing devices, and more particularly to systems and methods for synchronizing operations among a plurality of independently-clocked digital data processing devices. The invention is embodied in a system for synchronizing operations among a plurality of devices, in relation to information that is provided by a common source. One embodiment of the invention enables synchronizing of audio playback as among two or more audio playback devices that receive audio information from a common information source, or channel.

More generally, the invention relates to the field of arrangements that synchronize output generated by a number of output generators, including audio output, video output, combinations of audio and video, as well as other types of output as will be appreciated by those skilled in the art, provided by a common channel. Generally, the invention will find utility in connection with any type of information for which synchrony among independently-clocked devices is desired.

### BACKGROUND OF THE INVENTION

There are a number of problems associated with operating more than one digital data processing device that receives information from a common information source. One problem that can arise is to ensure that, if two or more audio playback devices are contemporaneously attempting to play back the same audio program, they do so simultaneously. Small differences in the audio playback devices' start times and/or playback speeds can be perceived by a listener as an echo effect, and larger differences can be very annoying. Differences can arise for a number of reasons, including delays in the transfer of audio information over the network. Such delays can differ as among the various audio playback devices for a variety of reasons, including where they are connected into the network, message traffic and other reasons as will be apparent to those skilled in the art.

Another problem arises from the following. When an audio playback device converts the digital audio information from digital to analog form, it does so using a clock that provides timing information. Generally, the audio playback devices that are being developed have independent clocks, and, if they are not clocking at precisely the same rate, the audio playback provided by the various devices can get out of synchronization.

### SUMMARY OF THE INVENTION

The invention provides a new and improved system and method for synchronizing operations among a number of

2

digital data processing devices that are regulated by independent clocking devices. Generally, the invention will find utility in connection with any type of information for which synchrony among devices connected to a network is desired. The invention is described in connection with a plurality of audio playback devices that receive digital audio information that is to be played back in synchrony, but it will be appreciated that the invention can find usefulness in connection with any kind of information for which coordination among devices that have independent clocking devices would find utility.

In brief summary, the invention provides, in one aspect, a system for maintaining synchrony of operations among a plurality of devices that have independent clocking arrangements. The system includes a task distribution device that distributes tasks to a synchrony group comprising a plurality of devices that are to perform the tasks distributed by the task distribution device in synchrony. The task distribution device distributes each task to the members of the synchrony group over a network. Each task is associated with a time stamp that indicates a time, relative to a clock maintained by the task distribution device, at which the members of the synchrony group are to execute the task. Each member of the synchrony group periodically obtains from the task distribution device an indication of the current time indicated by its clock, determines a time differential between the task distribution device's clock and its respective clock and determines therefrom a time at which, according to its respective clock, the time stamp indicates that it is to execute the task.

In one embodiment, the tasks that are distributed include audio information for an audio track that is to be played by all of the devices comprising the synchrony group synchronously. The audio track is divided into a series of frames, each of which is associated with a time stamp indicating the time, relative to the clock maintained by an audio information channel device, which, in that embodiment, serves as the task distribution device, at which the members of the synchrony group are to play the respective frame. Each member of the synchrony group, using a very accurate protocol, periodically obtains the time indicated by the audio information channel device, and determines a differential between the time as indicated by its local clock and the audio information channel device's clock. The member uses the differential and the time as indicated by the time stamp to determine the time, relative to its local clock, at which it is to play the respective frame. The members of the synchrony group do this for all of the frames, and accordingly are able to play the frames in synchrony.

### BRIEF DESCRIPTION OF THE DRAWINGS

This invention is pointed out with particularity in the appended claims. The above and further advantages of this invention may be better understood by referring to the following description taken in conjunction with the accompanying drawings, in which:

FIG. 1 schematically depicts an illustrative networked audio system, constructed in accordance with the invention;

FIG. 2 schematically depicts a functional block diagram of a synchrony group utilizing a plurality of zone players formed within the networked audio system depicted in FIG. 1;

FIG. 2A schematically depicts two synchrony groups, illustrating how a member of one synchrony group can provide audio information to the members of another synchrony group;

FIG. 3 depicts a functional block diagram of a zone player for use in the networked audio system depicted in FIG. 1; and

US 8,234,395 B2

3

FIG. **4** is useful in understanding an digital audio information framing methodology useful in the network audio system depicted in FIG. **1**.

DETAILED DESCRIPTION OF AN
ILLUSTRATIVE EMBODIMENT

FIG. **1** depicts an illustrative network audio system **10** constructed in accordance with the invention. With reference to FIG. **1**, the network audio system **10** includes a plurality of zone players **11**(1) through **11**(N) (generally identified by reference numeral **11**(n)) interconnected by a local network **12**, all of which operate under control of one or more user interface modules generally identified by reference numeral **13**. One or more of the zone players **11**(n) may also be connected to one or more audio information sources, which will generally be identified herein by reference numeral **14**(n)(s), and/or one or more audio reproduction devices, which will generally be identified by reference numeral **15**(n) (r). In the reference numeral **14**(n)(s), index "n" refers to the index "n" of the zone player **11**(n) to which the audio information source is connected, and the index "s" (s=1, . . . , $S_n$) refers to the "s-th" audio information source connected to that "n-th" zone player **11**(n). Thus, if, for example, a zone player **11**(n) is connected to four audio information sources **14**(n)(1) through **14**(n)(4), the audio information sources may be generally identified by reference numeral **14**(n)(s), with $S_n$=4. It will be appreciated that the number of audio information sources Sn may vary as among the various zone players **11**(n), and some zone players may not have any audio information sources connected thereto. Similarly, in the reference numeral **15**(n)(r), index "n" refers to the index "n" of the zone player **11**(n) to which the audio reproduction device is connected, and the index "r" (r=1, . . . , $R_n$) refers to the "r-th" audio information source connected to that "n-th" zone player **11**(n). In addition to the audio information sources **14**(n)(s), the network audio system **10** may include one or more audio information sources **16**(1) through **16**(M) connected through appropriate network interface devices (not separately shown) to the local network **12**. Furthermore, the local network may include one or more network interface devices (also not separately shown) that are configured to connect the local network **12** to other networks, including a wide area network such as the Internet, the public switched telephony network (PSTN) or other networks as will be apparent to those skilled in the art, over which connections to audio information sources may be established.

The zone players **11**(n) associated with system **10** may be distributed throughout an establishment such as residence, an office complex, a hotel, a conference hall, an amphitheater or auditorium, or other types of establishments as will be apparent to those skilled in the art or the like. For example, if the zone players **11**(n) and their associated audio information source(s) and/or audio reproduction device(s) are distributed throughout a residence, one, such as zone player **11**(1) and its associated audio information source(s) and audio reproduction device(s) may be located in a living room, another may be located in a kitchen, another may be located in a dining room, and yet others may be located in respective bedrooms, to selectively provide entertainment in those rooms. On the other hand, if the zone players **11**(n) and their associated audio information source(s) and/or audio reproduction device(s) are distributed throughout an office complex, one may, for example, be provided in each office to selectively provide entertainment to the employees in the respective offices. Similarly, if the zone players **11**(n) and associated audio information source(s) and/or audio reproduction

4

device(s) are used in a hotel, they may be distributed throughout the rooms to provide entertainment to the guests. Similar arrangements may be used with zone players **11**(n) and associated audio information source(s) and/or audio reproduction device(s) used in an amphitheater or auditorium. Other arrangements in other types of environments ill be apparent to those skilled in the art. In each case, the zone players **11**(n) can be used to selectively provide entertainment in the respective locations, as will be described below.

The audio information sources **14**(n)(s) and **16**(m) may be any of a number of types of conventional sources of audio information, including, for example, compact disc ("CD") players, AM and/or FM radio receivers, analog or digital tape cassette players, analog record turntables and the like. In addition, the audio information sources **14**(n)(s) and **16**(m) may comprise digital audio files stored locally on, for example, personal computers (PCs), personal digital assistants (PDAs), or similar devices capable of storing digital information in volatile or non-volatile form. As noted above, the local network **12** may also have an interface (not shown) to a wide area network, over which the network audio system **10** can obtain audio information. Moreover, one or more of the audio information sources **14**(n)(s) may also comprise an interface to a wide area network such as the Internet, the public switched telephony network (PSTN) or any other source of audio information. In addition, one or more of the audio information sources **14**(n)(s) and **16**(m) may comprise interfaces to radio services delivered over, for example, satellite. Audio information obtained over the wide area network may comprise, for example, streaming digital audio information such as Internet radio, digital audio files stored on servers, and other types of audio information and sources as will be appreciated by those skilled in the art. Other arrangements and other types of audio information sources will be apparent to those skilled in the art.

Generally, the audio information sources **14**(n)(s) and **16**(m) provide audio information associated with audio programs to the zone players for playback. A zone player that receives audio information from an audio information source **14**(n)(s) that is connected thereto can provide playback and/or forward the audio information, along with playback timing information, over the local network **12** to other zone players for playback. Similarly, each audio information source **16**(m) that is not directly connected to a zone player can transmit audio information over the network **12** to any zone player **11**(n) for playback. In addition, as will be explained in detail below, the respective zone player **11**(n) can transmit the audio information that it receives either from an audio information source **14**(n)(s) connected thereto, or from an audio information source **16**(m), to selected ones of the other zone players **11**(n'), **11**(n''), . . . (n not equal to n', n'', . . . ) for playback by those other zone players. The other zone players **11**(n'), **11**(n''), . . . to which the zone player **11**(n) transmits the audio information for playback may be selected by a user using the user interface module **13**. In that operation, the zone player **11**(n) will transmit the audio information to the selected zone players **11**(n'), **11**(n''), . . . . over the network **12**. As will be described below in greater detail, the zone players **11**(n), **11**(n'), **11**(n''), . . . . operate such that the zone players **11**(n'), **11**(n''), . . . . synchronize their playback of the audio program with the playback by the zone player **11**(n), so that the zone players **11**(n), **11**(n'), **11**(n'') provide the same audio program at the same time.

Users, using user interface module **13**, may also enable different groupings or sets of zone players to provide audio playback of different audio programs synchronously. For example, a user, using a user interface module **13**, may enable

US 8,234,395 B2

5

zone players **11(1)** and **11(2)** to play one audio program, audio information for which may be provided by, for example, one audio information source **14(1)(1)**. The same or a different user may, using the same or a different user interface module **13**, enable zone players **11(4)** and **11(5)** to contemporaneously play another audio program, audio information for which may be provided by a second audio information source, such as audio information source **14(5)** (**2**). Further, a user may enable zone player **11(3)** to contemporaneously play yet another audio program, audio information for which may be provided by yet another audio information source, such as audio information source **16(1)**. As yet another possibility, a user may contemporaneously enable zone player **11(1)** to provide audio information from an audio information source connected thereto, such as audio information source **14(1)(2)**, to another zone player, such as zone player **11(6)** for playback.

In the following, the term "synchrony group" will be used to refer to a set of one or more zone players that are to play the same audio program synchronously. Thus, in the above example, zone players **11(1)** and **11(2)** comprise one synchrony group, zone player **11(3)** comprises a second synchrony group, zone players **11(4)** and **11(5)** comprise a third synchrony group, and zone player **11(6)** comprises yet a fourth synchrony group. Thus, while zone players **11(1)** and **11(2)** are playing the same audio program, they will play the audio program synchronously. Similarly, while zone players **11(4)** and **11(5)** are playing the same audio program, they will play the audio program synchronously. On the other hand, zone players that are playing different audio programs may do so with unrelated timings. That is, for example, the timing with which zone players **11(1)** and **11(2)** play their audio program may have no relationship to the timing with which zone player **11(3)**, zone players **11(4)** and **11(5)**, and zone player **11(6)** play their audio programs. It will be appreciated that, since "synchrony group" is used to refer to sets of zone players that are playing the same audio program synchronously, zone player **11(1)** will not be part of zone player **11(6)**'s synchrony group, even though zone player **11(1)** is providing the audio information for the audio program to zone player **11(6)**.

In the network audio system **10**, the synchrony groups are not fixed. Users can enable them to be established and modified dynamically. Continuing with the above example, a user may enable the zone player **11(1)** to begin providing playback of the audio program provided thereto by audio information source **14(1)(1)**, and subsequently enable zone player **11(2)** to join the synchrony group. Similarly, a user may enable the zone player **11(5)** to begin providing playback of the audio program provided thereto by audio information source **14(5)** (**2**), and subsequently enable zone player **11(4)** to join that synchrony group. In addition, a user may enable a zone player to leave a synchrony group and possibly join another synchrony group. For example, a user may enable the zone player **11(2)** to leave the synchrony group with zone player **11(1)**, and join the synchrony group with zone player **11(6)**. As another possibility, the user may enable the zone player **11(1)** to leave the synchrony group with zone player **11(2)** and join the synchrony group with zone player **11(6)**. In connection with the last possibility, the zone player **11(1)** can continue providing audio information from the audio information source **14(1)(1)** to the zone player **11(2)** for playback thereby.

A user, using the user interface module **13**, can enable a zone player **11(n)** that is currently not a member of a synchrony group to join a synchrony group, after which it will be enabled to play the audio program that is currently being played by that synchrony group. Similarly, a user, also using

6

the user interface module **13**, can enable a zone player **11(n)** that is currently a member of one synchrony group, to disengage from that synchrony group and join another synchrony group, after which that zone player will be playing the audio program associated with the other synchrony group. For example, if a zone player **11(6)** is currently not a member of any synchrony group, it, under control of the user interface module **13**, can become a member of a synchrony group, after which it will play the audio program being played by the other members of the synchrony group, in synchrony with the other members of the synchrony group. In becoming a member of the synchrony group, zone player **11(6)** can notify the zone player that is the master device for the synchrony group that it wishes to become a member of its synchrony group, after which that zone player will also transmit audio information associated with the audio program, as well as timing information, to the zone player **11(6)**. As the zone player **11(6)** receives the audio information and the timing information from the master device, it will play the audio information with the timing indicated by the timing information, which will enable the zone player **11(6)** to play the audio program in synchrony with the other zone player(s) in the synchrony group.

Similarly, if a user, using the user interface module **13**, enables a zone player **11(n)** associated with a synchrony group to disengage from that synchrony group, and if the zone player **11(n)** is not the master device of the synchrony group, the zone player **11(n)** can notify the master device, after which the master device can terminate transmission of the audio information and timing information to the zone player **11(n)**. If the user also enables the zone player **11(n)** to begin playing another audio program using audio information from an audio information source **14(n)(s)** connected thereto, it will acquire the audio information from the audio information source **14(n)(s)** and initiate playback thereof. If the user enables another zone player **11(n')** to join the synchrony group associated with zone player **11(n)**, operations in connection therewith can proceed as described immediately above.

As yet another possibility, if a user, using the user interface module **13**, enables a zone player **11(n)** associated with a synchrony group to disengage from that synchrony group and join another synchrony group, and if the zone player is not the master device of the synchrony group from which it is disengaging, the zone player **11(n)** can notify the master device of the synchrony group from which it is disengaging, after which that zone player will terminate transmission of audio information and timing information to the zone player **11(n)** that is disengaging. Contemporaneously, the zone player **11(n)** can notify the master device of the synchrony group that it (that is, zone player **11(n)**) is joining, after which the master device can begin transmission of audio information and timing information to that zone player **11(n)**. The zone player **11(n)** can thereafter begin playback of the audio program defined by the audio information, in accordance with the timing information so that the zone player **11(n)** will play the audio program in synchrony with the master device.

As yet another possibility, a user, using the user interface module **13**, may enable a zone player **11(n)** that is not associated with a synchrony group, to begin playing an audio program using audio information provided to it by an audio information source **14(n)(s)** connected thereto. In that case, the user, also using the user interface module **13** or a user interface device that is specific to the audio information source **14(n)(s)**, can enable the audio information source **14(n)(s)** to provide audio information to the zone player **11(n)**. After the zone player **11(n)** has begun playback, or

Case 1:24-cv-00131-JNR   Document 188-3   Filed 06/05/25   Page 562 of 608 PageID #: 11855

US 8,234,395 B2

7

contemporaneously therewith, the user, using the user interface module **13**, can enable other zone players **11**(*n'*), **11**(*n''*), . . . to join zone player **11**(*n*)'s synchrony group and enable that zone player **11**(*n*) to transmit audio information and timing information thereto as described above, to facilitate synchronous playback of the audio program by the other zone players **11**(*n'*), **11**(*n''*) . . . .

A user can use the user interface module **13** to control other aspects of the network audio system **10**, including but not limited to the selection of the audio information source **14**(*n*)(*s*) that a particular zone player **11**(*n*) is to utilize, the volume of the audio playback, and so forth. In addition, a user may use the user interface module **13** to turn audio information source(s) **14**(*n*)(*s*) on and off and to enable them to provide audio information to the respective zone players **11**(*n*).

Operations performed by the various devices associated with a synchrony group will be described in connection with FIG. **2**, which schematically depicts a functional block diagram of an exemplary synchrony group in the network audio system **10** described above in connection with the exemplary embodiment shown in FIG. **1**. With reference to FIG. **2**, an exemplary synchrony group **20** includes a master device **21** and zero or more slave devices **22**(**1**) through **22**(G) (generally identified by reference—numeral **22**(*g*)), all of which synchronously play an audio program provided by an information channel device, such as audio information channel device **23**. Information channel devices may comprise other task sources and task source devices of information. Each of the master device **21**, slave devices **22**(*g*) and audio information channel device **23** may utilize a zone player such as the illustrative zone player **11**(*n*) depicted in the exemplary embodiment shown in FIG. **1**, although it will be clear from the description below that a zone player may be utilized for the audio information channel device for the synchrony group **20**, and the master device **21** or a slave device **22**(*g*) of the synchrony group **20**. As will be described below in more detail in connection with an exemplary embodiment, the audio information channel device **23** obtains the audio information for the audio program from an audio information source, adds playback timing information, and transmits the combined audio and playback timing information to the master device **21** and slave devices **22**(*g*) over the network **12** for playback. The playback timing information that is provided with the audio information, together with clock timing information provided by the audio information channel device **23** to the various devices **21** and **22**(*g*) as will be described below, enables the master device **21** and slave devices **22**(*g*) of the synchrony group **20** to play the audio information simultaneously.

The master device **21** and the slave devices **22**(*g*) receive the audio and playback timing information, as well as the clock timing information, that are provided by the audio information channel device **23**, and play back the audio program defined by the audio information. The master device **21** is also the member of the synchrony group **20** that communicates with the user interface module **13** and that controls the operations of the slave devices **22**(*g*) in the synchrony group **20**. In addition, the master device **21** controls the operations of the audio information channel device **23** that provides the audio and playback timing information for the synchrony group **20**. Generally, the initial master device **21** for the synchrony group will be the first zone player **11**(*n*) that a user wishes to play an audio program. However, as will be described below, the zone player **11**(*n*) that operates as the master device **21** can be migrated from one zone player **11**(*n*)

8

to another zone player **11**(*n'*), which preferably will be a zone player that is currently operating as a slave device **22**(*g*) in the synchrony group.

In addition, under certain circumstances, as will be described below, the zone player **11**(*n*) that operates as the audio information channel device **23** can be migrated from one zone player to another zone player, which also will preferably will be a zone player that is currently operating as a member of the synchrony group **20**. It will be appreciated that the zone player that operates as the master device **21** can be migrated to another zone player independently of the migration of the audio information channel device **23**. For example, if one zone player **11**(*n*) is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the master device **21** can be migrated to another zone player **11**(*n'*) while the zone player **11**(*n*) is still operating as the audio information channel device **23**. Similarly, if one zone player **11**(*n*) is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the audio information channel device **23** can be migrated to another zone player **11**(*n'*) while the zone player **11**(*n*) is still operating as the master device **21**. In addition, if one zone player **11**(*n*) is operating as both the master device **21** and the audio information channel device **23** for a synchrony group **20**, the master device **21** can be migrated to another zone player **11**(*n'*) and the audio information channel device can be migrated to a third zone player **11**(*n''*).

The master device **21** receives control information from the user interface module **13** for controlling the synchrony group **20** and provides status information indicating the operational status of the synchrony group to the user interface module **13**. Generally, the control information from the user interface module **13** enables the master device **21** to, in turn, enable the audio information channel device **23** to provide audio and playback timing information to the synchrony group to enable the devices **21** and **22**(*g*) that are members of the synchrony group **20** to play the audio program synchronously. In addition, the control information from the user interface module **13** enables the master device **21** to, in turn, enable other zone players to join the synchrony group as slave devices **22**(*g*) and to enable slave devices **22**(*g*) to disengage from the synchrony group. Control information from the user interface module **13** can also enable the zone player **11**(*n*) that is currently operating as the master device **21** to disengage from the synchrony group, but prior to doing so that zone player will enable the master device **21** to transfer from that zone player **11**(*n*) to another zone player **11**(*n'*), preferably to a zone player **11**(*n'*) that is currently active a slave device **22**(*g*) in the synchrony group **20**. The control information from the user interface module **13** can also enable the master device **21** to adjust its playback volume and to enable individual ones of the various slave devices **22**(*g*) to adjust their playback volumes. In addition, the control information from the user interface module **13** can enable the synchrony group **20** to terminate playing of a current track of the audio program and skip to the next track, and to re-order tracks in a play list of tracks defining the audio program that is to be played by the synchrony group **20**.

The status information that the master device **21** may provide to the user interface module **13** can include such information as a name or other identifier for the track of the audio work that is currently being played, the names or other identifiers for upcoming tracks, the identifier of the zone player **11**(*n*) that is currently operating as the master device **21**, and identifiers of the zone players that are currently operating as slave devices **22**(*g*). In one embodiment, the user interface

US 8,234,395 B2

9                                                                                        10

module **13** includes a display (not separately shown) that can display the status information to the user.

It will be appreciated that the zone player **11**(*n*) that is operating as the audio information channel device **23** for one synchrony group may also comprise the master device **21** or any of the slave devices **22**(*g*) in another synchrony group. This may occur if, for example, the audio information source that is to provide the audio information that is to be played by the one synchrony group is connected to a zone player also being utilized as the master device or a slave device for the other synchrony group. This will be schematically illustrated below in connection with FIG. **2**A. Since, as noted above, the zone player **11**(*n*) that is operating as the audio information channel device **23** for the synchrony group **20** may also be operating as a master device **21** or slave device **22**(*g*) for another synchrony group, it can also be connected to one or more audio reproduction devices **15**(*n*)(*r*), although that is not depicted in FIG. **2**. Since the master device **21** and slave devices **22**(*g*) are all to provide playback of the audio program, they will be connected to respective audio reproduction devices **15**(*n*)(*r*). Furthermore, it will be appreciated that one or more of the zone players **11**(*n*) that operate as the master device **21** and slave devices **22**(*g*) in synchrony group **20** may also operate as an audio information channel device for that synchrony group or for another synchrony group and so they may be connected to one or more audio information sources **14**(*n*)(*s*), although that is also not depicted in FIG. **2**. In addition, it will be appreciated that a zone player **11**(*n*) can also operate as a audio information channel device **23** for multiple synchrony groups.

If the audio information channel device **23** does not utilize the same zone player as the master device **21**, the master device **21** controls the audio information channel device by exchanging control information over the network **12** with the audio information channel device **23**. The control information is represented in FIG. **2** by the arrow labeled CHAN_DEV_CTRL_INFO. The control information that the master device **21** provides to the audio information channel device **23** will generally depend on the nature of the audio information source that is to provide the audio information for the audio program that is to be played and the operation to be enabled by the control information. If, for example, the audio information source is a conventional compact disc, tape, or record player, broadcast radio receiver, or the like, which is connected to a zone player **11**(*n*), the master device **21** may merely enable the zone player serving as the audio information channel device **23** to receive the audio information for the program from the audio information source. It will be appreciated that, if the audio information is not in digital form, the audio information channel device **23** will convert it to digital form and provide the digitized audio information, along with the playback timing information, to the master device **21** and slave devices **22**(*g*).

On the other hand, if the audio information source is, for example, a digital data storage device, such as may be on a personal computer or similar device, the master device **21** can provide a play list to the audio information channel device **23** that identifies one or more files containing the audio information for the audio program. In that case, the audio information channel device **23** can retrieve the files from the digital data storage device and provide them, along with the playback timing information, to the master device **21** and the slave devices **22**(*g*). It will be appreciated that, in this case, the audio information source may be directly connected to the audio information channel device **23**, as, for example, an audio information source **14**(*n*)(*s*), or it may comprise an audio information source **16**(*m*) connected to the network **12**.

As a further alternative, if the audio information source is a source available over the wide area network, the master device **21** can provide a play list comprising a list of web addresses identifying the files containing the audio information for the audio program that is to be played, and in that connection the audio information channel device **23** can initiate a retrieval of the files over the wide area network. As yet another alternative, if the audio information source is a source of streaming audio received over the wide area network, the master device **21** can provide a network address from which the streaming audio can be received. Other arrangements by which the master device **21** can control the audio information channel device **23** will be apparent to those skilled in the art.

The master device **21** can also provide control information to the synchrony group's audio information channel device **23** to enable a migration from one zone player **11**(*n*) to another zone player **11**(*n*'). This may occur if, for example, the audio information source is one of audio information sources **16** or a source accessible over the wide area network via the network **12**. The master device **21** can enable migration of the audio information channel device **23** for several reasons, including, for example, to reduce the loading of the zone player **11**(*n*), to improve latency of message transmission in the network **12**, and other reasons as will be appreciated by those skilled in the art.

As noted above, the audio information channel device **23** provides audio and playback timing information for the synchrony group to enable the master device **21** and slave devices **22**(*g*) to play the audio program synchronously. Details of the audio and playback timing information will be described in detail below in connection with FIGS. **3** and **4**, but, in brief, the audio information channel device **23** transmits the audio and playback timing information in messages over the network **12** using a multi-cast message transmission methodology. In that methodology, the audio information channel device **23** will transmit the audio and playback timing information in a series of messages, with each message being received by all of the zone players **11**(*n*) comprising the synchrony group **20**, that is, by the master device **21** and the slave devices **22**(*g*). Each of the messages includes a multi-cast address, which the master device **21** and slave devices **22**(*g*) will monitor and, when they detect a message with that address, they will receive and use the contents of the message. The audio and playback timing information is represented in FIG. **2** by the arrow labeled "AUD+PBTIME_INFO," which has a single tail, representing a source for the information at the audio information channel device **23**, and multiple arrowheads representing the destinations of the information, with one arrowhead extending to the master device **21** and other arrowheads extending to each of the slave devices **22**(*g*) in the synchrony group **20**. The audio information channel device **23** may make use of any convenient multi-cast message transmission methodology in transmitting the audio and playback timing information to the synchrony group **20**. As will be described in detail in connection with FIG. **4**, the audio and playback timing information is in the form of a series of frames, with each frame having a time stamp. The time stamp indicates a time, relative to the time indicated by a clock maintained by the audio information channel device **23**, at which the frame is to be played. Depending on the size or sizes of the messages used in the selected multi-cast message transmission methodology and the size or sizes of the frames, a message may contain one frame, or multiple frames, or, alternatively, a frame may extend across several messages.

The audio information channel device **23** also provides clock time information to the master device **21** and each of the slave devices **22**(*g*) individually over network **12** using a

US 8,234,395 B2

11                                                    12

highly accurate clock time information transmission methodology. The distribution of the clock time information is represented in FIG. 2 by the arrows labeled "AICD_CLK_INF (M)" (in the case of the clock time information provided to the master device 21) and "AICD_CLK_INF (M)" through "AICD_CLK_INF (S_G)" (in the case of audio information channel device clock information provided to the slave devices 22(g)). In one embodiment, the master device 21 and slave devices 22(g) make use of the well-known SNTP (Simple Network Time Protocol) to obtain current clock time information from the audio information channel device 23. The SNTP makes use of a unicast message transfer methodology, in which one device, such as the audio information channel device 23, provides clock time information to a specific other device, such as the master device 21 or a slave device 22(g), using the other device's network, or unicast, address. Each of the master device 21 and slave devices 22(g) will periodically initiate SNTP transactions with the audio information channel device 23 to obtain the clock time information from the audio information channel device 23. As will be described below in more detail, the master device 21 and each slave device 22(g) make use of the clock time information to determine the time differential between the time indicated by the audio information channel device's clock and the time indicated by its respective clock, and use that time differential value, along with the playback time information associated with the audio information and the respective device's local time as indicated by its clock to determine when the various frames are to be played. This enables the master device 21 and the slave devices 22(g) in the synchrony group 20 to play the respective frames simultaneously.

As noted above, the control information provided by the user to the master device 21 through the user interface module 13 can also enable the master device 21 to, in turn, enable another zone player 11(n') to join the synchrony group as a new slave device 22(g). In that operation, the user interface module 13 will provide control information, including the identification of the zone player 11(n') that is to join the synchrony group to the master device 21. After it receives the identification of the zone player 11(n') that is to join the synchrony group, the master device 21 will exchange control information, which is represented in FIG. 2 by the arrows labeled SLV_DEV_CTRL_INF (S_1) through SLV_DEV_CTRL_INF (S_G) group slave control information, over the network 12 with the zone player 11(n') that is identified in the control information from the user interface module 13. The control information that the master device 21 provides to the new zone player 11(n') includes the network address of the zone player 11(n) that is operating as the audio information channel device 23 for the synchrony group, as well as the multi-cast address that the audio information channel device 23 is using to broadcast the audio and playback timing information over the network. The zone player that is to operate as the new slave device 22(g') uses the multi-cast address to begin receiving the multi-cast messages that contain the audio information for the audio program being played by the synchrony group.

It will be appreciated that, if the zone player 11(n) that is operating as the master device 21 for the synchrony group 20 is also operating the audio information channel device 23, and if there are no slave devices 22(g) in the synchrony group 20, the audio information channel device 23 may not be transmitting audio and playback timing information over the network. In that case, if the new slave device 22(g') is the first slave device in the synchrony group, the zone player 11(n) that is operating as both the master device 21 and audio information channel device 23, can begin transmitting the audio and playback timing information over the network 12 when the slave device 22(g') is added to the synchrony group 20. The zone player 11(n) can maintain a count of the number of slave devices 22(g) in the synchrony group 20 as they join and disengage, and, if the number drops to zero, it can stop transmitting the audio and playback timing information over the network 12 to reduce the message traffic over the network 12.

The new slave device 22(g') added to the synchrony group 20 uses the network address of the audio information channel device 23 for several purposes. In particular, the new slave device 22(g') will, like the master device 21 (assuming the zone player 11(n) operating as the master device 21 is not also the audio information channel device 23), engage in SNTP transactions with the audio information channel device 23 to obtain the clock timing information from the audio information channel device 23. In addition, the new slave device 22(g') can notify the audio information channel device 23 that it is a new slave device 22(g') for the synchrony group 20 and provide the audio information channel device 23 with its network address. As will be described below, in one embodiment, particularly in connection with audio information obtained from a source, such as a digital data storage device, which can provide audio information at a rate that is faster than the rate at which it will be played, the audio information channel device 23 will buffer audio and timing information and broadcast it over the network 12 to the synchrony group 20 generally at a rate at which it is provided by the source. Accordingly, when a new slave device 22(g') joins the synchrony group 20, the playback timing information may indicate that the audio information that is currently being broadcast by the audio information channel device 23 using the multi-cast methodology is to be played back some time in the future. To reduce the delay with which the new slave device 22(g') will begin playback, the audio information channel device 23 can also retransmit previously transmitted audio and timing information that it had buffered to the new slave device 22(g') using the unicast network address of the slave device 22(g').

The master device 21 can also use the slave device control information exchanged with the slave devices 22(g) for other purposes. For example, the master device 21 can use the slave device control information to initiate a migration of the master from its zone player 11(n) to another zone player 11(n'). This may occur for any of a number of reasons, including, for example, that the master device 21 is terminating playback by it of the audio program and is leaving the synchrony group 20, but one or more of the other devices in the synchrony group is to continue playing the audio program. The master device 21 may also want to initiate a migration if it is overloaded, which can occur if, for example, the zone player 11(n) that is the master device 21 for its synchrony group is also operating as an audio information channel device 23 for another synchrony group.

The user can also use the user interface module 13 to adjust playback volume by the individual zone players 11(n) comprising the synchrony group. In that operation, the user interface module 13 provides information identifying the particular device whose volume is to be adjusted, and the level at which the volume is to be set to the master device 21. If the device whose volume is to be adjusted is the master device 21, the master device 21 can adjust its volume according to the information that it receives from the user interface module 13. On the other hand, if the device whose volume is to be adjusted is a slave device 22(g), the master device 21 can provide group slave control information to the respective slave device 22(g), to enable it to adjust its volume.

US 8,234,395 B2

13
14

The user can also use the user interface module **13** to enable a synchrony group **20** to cancel playing of the track in an audio program that is currently being played, and to proceed immediately to the next track. This may occur, for example, if the tracks for the program is in the form of a series of digital audio information files, and the user wishes to cancel playback of the track that is defined by one of the files. In that case, when the master device **21** receives the command to cancel playback of the current track, it will provide channel device control information to the audio information channel device **23** so indicating. In response, the audio information channel device **23** inserts control information into the audio and playback timing information, which will be referred to as a "resynchronize" command. In addition, the audio information channel device **23** will begin transmitting audio information for the next track, with timing information to enable it to be played immediately. The resynchronize command can also enable playback of a track to be cancelled before it has been played. Details of these operations will be described below.

As noted above, there may be multiple synchrony groups in the network audio system **10**, and further that, for example, a zone player **11**(*n*) may operate both as a master device **21** or a slave device **22**(*g*) in one synchrony group, and as the audio information channel device **23** providing audio and playback timing information and clock timing information for another synchrony group. An illustrative arrangement of this will be described in connection with FIG. **2**A. With reference to FIG. **2**A, that FIG. depicts elements of two synchrony groups, identified by reference numerals **20**(**1**) and **20**(**2**), respectively. For clarity, FIG. **2**A does not show a number of elements, the presence of which would be evident from FIGS. **1** and **2** as described above. For example, FIG. **2**A does not depict the audio information sources from which audio information is obtained for the synchrony groups or the audio reproduction devices that are used to produce sound for the master and slave devices, which are depicted in both FIGS. **1** and **2**. In addition, FIG. **2**A does not depict arrows that represent control information provided by the respective master devices to the slave devices in the respective synchrony groups, or to the audio information channel devices that provide audio and timing information for the respective synchrony groups, which are depicted in FIG. **2**. In addition, FIG. **2**A does not depict the arrows that represent the clock timing information provided by the audio information channel devices to the respective members of the respective synchrony groups, which are also depicted in FIG. **2**. As will be noted below, however, FIG. **2**A does depict arrows representing the audio and playback timing information provided by the respective audio information channel devices for the respective synchrony groups **20**(**1**), **20**(**2**), to the master and slave devices comprising the respective synchrony groups **20**(**1**), **20**(**2**).

Each synchrony group **20**(**1**), **20**(**2**) comprises elements of a number of zone players. A functional block diagram of a zone player will be described below in connection with FIG. **3**. Synchrony group **20**(**1**) includes a master device **21**(**1**) and "K" slave devices **22**(**1**)(**1**) through **22**(K)(**1**) (the index "1" in reference numeral **21**(**1**) and the last index in reference numeral **22**(**1**)(**1**) through **21**(K)(**1**) corresponds to the index of the synchrony group **20**(**1**) to which they belong) utilize zone players **11**(**1**) and **11**(K+1) respectively. Similarly, synchrony group **20**(**2**) includes a master device **21**(**2**) and "L" slave devices **22**(**1**)(**2**) through **22**(L)(**2**) that utilize zone players **11**(K+2) through **11**(K+L+2). In the illustrative arrangement depicted in FIG. **2**A, both synchrony groups **20**(**1**) and **20**(**2**) are controlled by the user interface module **13**, which can provide control information to, and receive

status information from, the master devices **21**(**1**) and **21**(**2**) independently. It will be appreciated that separate user interface modules may be provided to provide control information to, and receive status information from, the respective master devices **21**(**1**), **21**(**2**).

As noted above, the slave device **22**(**1**)(**2**) in synchrony group **20**(**2**) utilizes zone player **11**(K+3). In the illustrative arrangement depicted in FIG. **2**A, the audio information channel device **23**(**1**) that provides audio and playback timing information to the master and slave devices **21**(**1**), **22**(**1**)(**1**), . . . , **22**(K)(**1**) of synchrony group **20**(**1**) also utilizes zone player **11**(K+3). As noted above, this may occur if, for example, the audio information source that is to provide audio information to be played by the synchrony group **20**(**1**) is connected to the zone player **11**(K+3). Thus, when the master device **21**(**1**) of synchrony group **20**(**1**) exchanges channel device control information with the audio information channel device **23**(**1**), it is effectively exchanging channel device control information with the zone player **11**(K+3). Similarly, when the master and slave devices **21**(**1**), **22**(**1**)(**1**), . . . , **22**(K)(**1**) of synchrony group **20**(**1**) receive audio and playback timing information, as well as clock timing information, from the audio information channel device **23**(**1**), they are effectively receiving the information from the zone player **11**(K+3). FIG. **2**A depicts a multi-headed arrow representing audio and playback timing information transmitted by the zone player **11**(K+3), as audio information channel device **23**(**1**), to the master and slave devices **21**(**1**), **22**(**1**)(**1**), . . . , **11**(K)(**1**) comprising synchrony group **20**(**1**).

On the other hand, in the illustrative arrangement depicted in FIG. **2**A, the synchrony group **20**(**2**) utilizes a zone player **11**(K+L+3) as its audio information channel device **23**(**2**). As with synchrony group **20**(**1**), when the master device **21**(**2**) of synchrony group **20**(**2**) exchanges channel device control information with the audio information channel device **23**(**2**), it is effectively exchanging channel device control information with the zone player **11**(K+L+3). Similarly, when the master and slave devices **21**(**2**), **22**(**1**)(**2**), . . . , **22**(L)(**2**) of synchrony group **20**(**2**) receive audio and playback timing information, as well as clock timing information, from the audio information channel device **23**(**2**), they are effectively receiving the information from the zone player **11**(K+L+3). FIG. **2**A depicts a multi-headed arrow representing audio and playback timing information transmitted by the zone player **11**(K+3) as audio information channel device **23**(**2**) to the master and slave devices **21**(**2**), **22**(**1**)(**2**), . . . , **22**(L)(**2**) comprising synchrony group **20**(**2**).

In the illustrative arrangement depicted in FIG. **2**A, zone player **11**(K+L+3), which is the audio information channel device **23**(**2**) for synchrony group **20**(**2**), is not shown as being either a master or a slave device in another synchrony group. However, it will be appreciated that zone player **11**(K+L+3) could also be utilized as the master device or a slave device for another synchrony group. Indeed, it will be appreciated that the zone player that is utilized as the audio information channel device for synchrony group **20**(**2**) may also be a zone player that is utilized as the master device **21**(**1**) or a slave device **22**(**1**)(**1**), . . . , **22**(K)(**1**) in the synchrony group **20**(**1**).

A zone player **11**(*n*) that is utilized as one of more synchrony group may also be utilized as the audio information channel device for another synchrony group if the audio information source that is to supply the audio information that is to be played by the other synchrony group is connected to that zone player **11**(*n*). A zone player **11**(*n*) may also be utilized as the audio information channel device for the other synchrony group if, for example, the audio information source is an audio information source **16**(*m*) (FIG. **1**) that is

US 8,234,395 B2

15

connected to the network **12** or an audio information source that is available over a wide area network such as the Internet. The latter may occur if, for example, the zone player **11**(*n*) has sufficient processing power to operate as the audio information channel device and it is in an optimal location in the network **12**, relative to the zone players comprising the other synchrony group (that is the synchrony group for which it is operating as audio information channel device) for providing the audio and playback timing information to the members of the other synchrony group. Other circumstances under which the zone player **11**(*n*) that is utilized as a member of one synchrony group may also be utilized as the audio information channel device for another synchrony group will be apparent to those skilled in the art.

As was noted above, the master device **21** for a synchrony group **20** may be migrated from one zone player **11**(*n*) to another zone player **11**(*n'*). As was further noted above, the audio information channel device **23** for a synchrony group **20** may be migrated from one zone player **11**(*n*) to another zone player **11**(*n'*). It will be appreciated that the latter may occur if, for example, the audio information source that provides the audio program for the synchrony group is not connected to the zone player **11**(*n*) that is operating as the audio information channel device **23**, but instead is one of the audio information sources **16**(*m*) connected to the network **12** or a source available over a wide area network such as the Internet. Operations performed during a migration of an audio information channel device **23** from one zone player **11**(*n*) to another zone player **11**(*n'*) will generally depend on the nature of the audio information that is being channeled by the audio information channel device **23**. For example, if the audio information source provides streaming audio, the zone player **11**(*n*) that is currently operating as the audio information channel device **23** for the synchrony group **20**, can provide the following information to the other zone player **11**(*n'*) that is to become the audio information channel device **23** for the synchrony group **20**:

(a) the identification of the source of the streaming audio information,

(b) the time stamp associated with the frame that the zone player **11**(*n*) is currently forming, and

(c) the identifications of the zone players that are operating as the master device **21** and slave devices **22**(*g*) comprising the synchrony group **20**.

After the zone player **11**(*n'*) receives the information from the zone player **11**(*n*), it will begin receiving the streaming audio from the streaming audio information source identified by the zone player **11**(*n*), assemble the streaming audio information into frames, associate each frame with a time stamp, and transmit the resulting audio and playback timing information over the network **12**. The zone player **11**(*n'*) will perform these operations in the same manner as described above, except that, instead of using the time indicated by its digital to analog converter clock **34** directly in generating the time stamps for the frames, the initial time stamp will be related to the value of the time stamp that is provided by the zone player **11**(*n*) (reference item (b) above), with the rate at which the time stamps are incremented corresponding to the rate at which (that is, the zone player **11**(*n'*)'s) clock increments. In addition, the zone player **11**(*n'*) will notify the zone players that are operating as the master device **21** and slave devices **22**(*g*) of the synchrony group **20** that is the new audio information channel device **23** for the synchrony group **20**, and provide the multi-cast address that it will be using to multi-cast the audio and playback timing information, as well as its unicast network address. After the members of the synchrony group **20** receive the notification from the zone

16

player **11**(*n'*) indicating that it is the new audio information channel device **23** for the synchrony group **20**, they will receive the audio and playback timing information from the zone player **11**(*n'*) instead of the zone player **11**(*n*), using the multi-cast address provided by the zone player **11**(*n'*). In addition, they can utilize the zone player **11**(*n'*)'s unicast network address to obtain current time information therefrom. It will be appreciated that the zone player **11**(*n'*) will determine its current time in relation to the time stamp that is provided by the zone player **11**(*n*) (reference item (b) above) or the current time information that it received from the zone player **11**(*n*) using the SNTP protocol as described above.

Generally similar operations can be performed in connection with migrating the audio information channel device **23** from one zone player **11**(*n*) to another zone player **11**(*n'*) if the audio information is from one or more audio information files, such as may be the case if the audio information comprises MP3 or WAV files that are available from sources such as sources **16**(*m*) connected to the network **12** or over from sources available over a wide area network such as the Internet, except for differences to accommodate the fact that the audio information is in files. In that case, the zone player **11**(*n*) that is currently operating as the audio information channel device **23** for the synchrony group **20** can provide the following information to the zone player **11**(*n'*) that is to become the audio information channel device **23** for the synchrony group **20**:

(d) a list of the audio information files containing the audio information that is to be played;

(e) the identification of the file for which the zone player **11**(*n*) is currently providing audio and playback timing information, along with the offset into the file for which the current item of audio and playback timing information is being generated and the time stamp that the zone player **11**(*n*) is associating with that frame, and

(f) the identifications of the zone players that comprise the master device **21** and slave devices **22**(*g*) comprising the synchrony group **20**.

After the zone player **11**(*n'*) receives the information from the zone player **11**(*n*), it will begin retrieving audio information from the file identified in item (e), starting at the identified offset. In addition, the zone player **11**(*n'*) can assemble the retrieved audio information into frames, associate each frame with a time stamp and transmit the resulting audio and playback timing information over the network **12**. The zone player **11**(*n'*) will perform these operations in the same manner as described above, except that, instead of using the time indicated by its digital to analog converter clock **34** directly in generating the time stamps for the frames, the value of the initial time stamp will be related to the time stamp that is provided by the zone player **11**(*n*) (reference item (e) above), with the rate at which the time stamps are incremented corresponding to the rate at which its (that is, the zone player **11**(*n'*)'s) clock increments. In addition, the zone player **11**(*n'*) will notify the zone players that are operating as the master device **21** and slave devices **22**(*g*) of the synchrony group **20** that it is the new audio information channel device **23** for the synchrony group **20**, and provide the multi-cast address that it will be using to multi-cast the audio and playback timing information, as well as its unicast network address. After the members of the synchrony group **20** receive the notification from the zone player **11**(*n'*) indicating that it is the new audio information channel device **23** for the synchrony group **20**, they will receive the audio and playback timing information from the zone player **11**(*n'*) instead of the zone player **11**(*n*), using the multi-cast address provided by the zone player **11**(*n'*). In addition, they can utilize the zone player **11**(*n'*)'s

US 8,234,395 B2

17

unicast network address to obtain current time information therefrom. It will be appreciated that the zone player $11(n')$ will determine its current time in relation to the time stamp that is provided by the zone player $11(n)$ (reference item (b) above) or the current time information that it received from the zone player $11(n)$ using the SNTP protocol as described above. The zone player $11(n')$ will process successive audio information files in the list that it receives from the zone player $11(n)$ (reference item (d)).

Operations performed by the zone players $11(n)$ and $11(n')$ in connection with migration of the audio information channel device 23 for other types of audio information will be apparent to those skilled in the art. In any case, preferably, the zone player $11(n)$ will continue operating as an audio information channel device 23 for the synchrony group 20 for at least a brief time after it notifies the zone player $11(n')$ that it is to become audio information channel device for the synchrony group, so that the zone player $11(n')$ will have time to notify the zone players in the synchrony group 20 that it is the new audio information channel device 23 for the synchrony group.

Before proceeding further in describing operations performed by the exemplary network audio system 10, it would be helpful to provide a detailed description of an exemplary zone player $11(n)$ constructed in accordance with the invention. FIG. 3 depicts a functional block diagram of a an exemplary zone player $11(n)$ constructed in accordance with one exemplary embodiment of the invention. With reference to FIG. 3, the exemplary zone player $11(n)$ includes an audio information source interface 30, an audio information buffer 31, a playback scheduler 32, a digital to analog converter 33, an audio amplifier 35, an audio reproduction device interface 36, a network communications manager 40, and a network interface 41, all of which may operate under the control of a control module 42. The zone player $11(n)$ also has a device clock 43 that provides timing signals that control the general operations of the zone player $11(n)$. In addition, the zone player $11(n)$ includes a user interface module interface 44 that can receive control signals from the user interface module 13 (FIGS. 1 and 2) for controlling operations of the zone player $11(n)$, and provides status information to the user interface module 13.

Generally, the audio information buffer 31 buffers audio information, in digital form, along with playback timing information. If the zone player $11(n)$ is operating as the audio information channel device 23 (FIG. 2) for a synchrony group 20, the information that is buffered in the audio information buffer 31 will include the audio and playback timing information that will be provided to the devices 21 and $22(g)$ in the synchrony group 20. If the zone player $11(n)$ is operating as the master device 21 or a slave device $22(g)$ for a synchrony group, the information that is buffered in the audio information buffer 31 will include the audio and playback timing information that the zone player $11(n)$ is to play.

The audio information buffer 31 can receive audio and playback timing information from two sources, namely, the audio information source interface 30 and the network communications manager 40. In particular, if the zone player $11(n)$ is operating as the audio information channel device 23 for a synchrony group 20, and if the audio information source is a source $14(n)(s)$ connected to the zone player $11(n)$, the audio information buffer 31 will receive and buffer audio and playback timing information from the audio information source interface 30. On the other hand, if the zone player $11(n)$ is operating as the audio information channel device 23 for a synchrony group 20, and if the audio information source is a source $16(m)$ connected to the network 12, or a source

18

available over the wide area network, the audio information buffer 31 will receive and buffer audio and playback timing information from the network communications manager 40. It will be appreciated that, if the zone player $11(n)$ is not a member of the synchrony group, the zone player $11(n)$ will not play this buffered audio and playback timing information.

On yet another hand, if the zone player $11(n)$ is operating as the master device 21 or a slave device $22(g)$ in a synchrony group, and if the zone player $11(n)$ is not also the audio information channel device 23 providing audio and playback timing information for the synchrony group 20, the audio information buffer 31 will receive and buffer audio and playback timing information from the network communications manager 40.

The audio information source interface 30 connects to the audio information source(s) $14(n)(s)$ associated with the zone player $11(n)$. While the zone player $11(n)$ is operating as audio information channel device 23 for a synchrony group 20, and if the audio information is to be provided by a source $14(n)(s)$ connected to the zone player $11(n)$, the audio information source interface 30 will selectively receive audio information from one of the audio information source(s) $14(n)(s)$ to which the zone player is connected and store the audio information in the audio information buffer 21. If the audio information from the selected audio information source $14(n)(s)$ is in analog form, the audio information source interface 30 will convert it to digital form. The selection of the audio information source $14(n)(s)$ from which the audio information source interface 30 receives audio information is under control of the control module 42, which, in turn, receives control information from the user interface module through the user interface module interface 44. The audio information source interface 30 adds playback timing information to the digital audio information and buffers the combined audio and playback timing information in the audio information buffer 21.

More specifically, as noted above, the audio information source interface 30 receives audio information from an audio information source $14(n)(s)$, converts it to digital form if necessary, and buffers it along with playback timing information in the audio information buffer 21. In addition, the audio information source interface 30 will also provide formatting and scheduling information for the digital audio information, whether as received from the selected audio information source $14(n)(s)$ or as converted from an analog audio information source. As will be made clear below, the formatting and scheduling information will control not only playback by the zone player $11(n)$ itself, but will also enable other zone players $11(n')$, $11(n'')$, ... that may be in a synchrony group for which the zone player $11(n)$ is the master device, to play the audio program associated with the audio information in synchrony with the zone player $11(n)$.

In one particular embodiment, the audio information source interface 30 divides the audio information associated with an audio work into a series of frames, with each frame comprising digital audio information for a predetermined period of time. As used herein with respect to digital audio information (as may also be the case with other embodiments, an audio track may comprise any unit of audio information that is to be played without interruption. On the other hand, an audio program may comprise a series of one or more audio tracks that are to be played in succession. It will be appreciated that the tracks comprising the audio program may also be played without interruption, or alternatively playback between tracks may be interrupted by a selected time interval. FIG. 4 schematically depicts an illustrative framing strategy used in connection with one exemplary embodiment of the

19

invention for a digital audio stream comprising an audio work. More specifically, the exemplary embodiment shown in FIG. 4 depicts a framed digital audio stream 50 comprising a sequence of frames 51(1) through 51(F) (generally identified by reference numeral 51(f)). Each frame 51(f), in turn, comprises a series of audio samples 52(f)(1) through 52(f)(S) (generally identified by reference numeral 52(f)(s)) of the audio track. Preferably all of the frames will have the same number "S" of audio samples, although it will be appreciated from the following that is primarily for convenience. On the other hand, it will be appreciated that, the number of audio samples may differ from "S"; this may particularly be the case if the frame 51(f) contains the last audio samples for the digital audio stream for a particular audio work. In that case, the last frame 51(F) will preferably contain samples 52(F)(1) through 52(F)(x), where "x" is less than "S." Generally, it is desirable that the number of samples be consistent among all frames 51(f), and in that case padding, which will not be played, can be added to the last frame 51(F).

Associated with each frame 51(f) is a header 55(f) that includes a number of fields for storing other information that is useful in controlling playback of the audio samples in the respective frame 51(f). In particular, the header 55(f) associated with a frame 51(f) includes a frame sequence number field 56, an encoding type field 57, a sampling rate information field 58, a time stamp field 60, an end of track flag 61, and a length flag field 62. The header 55(f) may also include fields (not shown) for storing other information that is useful in controlling playback. Generally, the frame sequence number field 56 receives a sequence number "f" that identifies the relative position of the frame 51(f) in the sequence of frames 51(1) . . . 51(f) . . . 51(F) containing the digital audio stream 50. The encoding type field 57 receives a value that identifies the type of encoding and/or compression that has been used in generating the digital audio stream. Conventional encoding or compression schemes include, for example, the well-known MP3 and WAV encoding and/or compression schemes, although it will be appreciated that other schemes may be provided for as well. The sampling rate information field 58 receives sampling rate information that indicates the sampling rate for the audio samples 52(f)(s). As will be apparent to those skilled in the art, the sampling rate determines the rate at which the zone player 11(n) is to play the audio samples 52(f)(s) in the frame, and, as will be described below, determines the period of the digital to analog converter clock 34.

The condition of the end of work flag 61 indicates whether the frame 51(f) contains the last digital audio samples for the audio track associated with the framed digital audio work 50. If the frame 51(f) does not contain the audio samples that are associated with the end of the digital audio stream 50 for a respective audio work, the end of work flag will be clear. On the other hand, if the frame 51(f) does contain the audio samples that are associated with the end of the digital audio stream 50 for a respective audio work, the end of work flag 61 will be set. In addition, since the number of valid audio samples 52(F)(s) in the frame 51(F), that is, the samples that are not padding, may be less than "S," the default number of audio samples in a frame 51(f), the length flag field 62 will contain a value that identifies the number of audio samples in 52(F)(s) in the last frame 51(F) of the audio work 50. If, as noted above, the frames have a consistent number "S" of samples, the samples 52(F)(x+1) through 52(F)(S) will contain padding, which will not be played.

The time stamp field 60 stores a time stamp that identifies the time at which the zone player 11(n) is to play the respective frame. More specifically, for each frame of a framed

20

digital audio stream 50 that is buffered in the audio information buffer 21, the audio information source interface 30, using timing information from the digital to analog converter clock 34, will determine a time at which the zone player 11(n) is to play the respective frame, and stores a time stamp identifying the playback time in the time stamp field 60. The time stamp associated with each frame will later be used by the playback scheduler 32 to determine when the portion of the digital audio stream stored in the frame is to be coupled to the digital to analog converter 33 to initiate play back. It will be appreciated that the time stamps that are associated with frames in sequential frames 51(1), 51(2), . . . , 51(F), will be such that they will be played back in order, and without an interruption between the sequential frames comprising the digital audio stream 50. It will further be appreciated that, after a time stamp has been determined for the first frame, stored in frame 51(1), of a digital audio stream 50, the audio information source interface 30 can determine time stamps for the subsequent frame 51(2), 51(3), . . . , 51(F) in relation to the number of samples "S" in the respective frames and the sample rate. The time stamps will also preferably be such that frames will be played back after some slight time delay after they have been buffered in the audio information buffer 21; the purpose for the time delay will be made clear below.

Returning to FIG. 3, in addition to dividing the digital audio information into frames, the audio information source interface 30 also aggregates and/or divides the frames 51(f) as necessary into packets, each of which will be of a length that would fit into a message for transmission over the network, and associates each packet with a packet sequence number. For example, if a packet will accommodate multiple frames 51(f), 51(f+1), . . . 51(f+y−1), it will aggregate them into a packet and associate them with a packet number, for example p(x). If the entire frames 51(f) and 51(f+y−1) was accommodated in packet p(x), where "x" is the sequence number, which will occur if the size of a packet is an exact multiple of the frame size, the next packet, p(x+1) will begin with frame 51(f+y) and will include frames 51(f+y), . . . , 51(f+2y−1). Subsequent packets p(x+2), . . . will be formed in a similar manner. On the other hand, if the packet length will not accommodate an exact multiple of the frame size, the last frame in the packet will be continued at the beginning of the next packet.

If the audio information source interface 30 is aware of track boundaries, which may be the case if the tracks are divided into files, the packets will reflect the track boundaries, that is, the packets will not contain frames from two tracks. Thus, if the last frames associated with a track are insufficient to fill a packet, the packet will contain padding from the last frame associated with the track to the end of the packet, and the next packet will begin with the first frames associated with the next track.

In one embodiment, the audio information source interface 30 stores the packets in the audio information buffer 31 in a ring buffer. As is conventional, a ring buffer includes a series of storage locations in the buffer. Each entry will be sufficient to store one packet. Four pointers are used in connection with the ring buffer, a first pointer pointing to the beginning of the ring buffer, a second pointer pointing to the end of the ring buffer, an third "write" pointer pointing to the entry into which a packet will be written and a fourth "read" pointer pointing to the entry from which packet will be read for use in playback. When a packet is read from the ring buffer for playback, it will be read from the entry pointed to by the read pointer. After the packet has been read, the read pointer will be advanced. If the read pointer points beyond the end of the

US 8,234,395 B2

21

ring buffer, as indicated by the end pointer, it will be reset to point to the entry pointed to by the beginning pointer, and the operations can be repeated.

On the other hand, when the audio information source interface **30** stores a packet in the ring buffer, first determine whether the entry pointed to by the write pointer points to the same entry as the entry pointed to by the read pointer. If the write pointer points to the same entry as the entry pointed to by the read pointer, the entry contains at least a portion of a packet that has not yet been read for playback, and the audio information source interface **30** will delay storage of the packet until the entire packet has been read and the read pointer advanced. After the read pointer has been advanced, the audio information source interface **30** can store the packet in the entry pointed to by the write pointer. After the packet has been stored, the audio information source interface **30** will advance the write pointer. If the write pointer points beyond the end of the ring buffer, as indicated by the end pointer, it will be reset to point to the entry pointed to by the beginning pointer, and the operations can be repeated.

As noted above, the zone player **11**(n) can operate both as an audio information channel device **23** and a member of the synchrony group **20** of which it is a member. In that case, the audio information buffer **31** can contain one ring buffer. On the other hand, the zone player **11**(n) can operate as an audio information channel device **23** for one synchrony group **20**(1) (FIG. **2**A) and a member of another synchrony group **20**(2). In that case, the audio information buffer **31** would maintain two ring buffers, one for the audio and timing information associated with synchrony group **20**(1), and the other for the audio and timing information associated with synchrony group **20**(2). It will be appreciated that, in the latter case, the zone player **11**(n) will only use the audio and timing information that is associated with synchrony group **20**(2) for playback.

The playback scheduler **32** schedules playback of the audio information that is buffered in the audio information buffer **31** that is to be played by the zone player **11**(n). Accordingly, under control of the playback scheduler **32**, the digital audio information that is buffered in the audio information buffer **21** that is to be played by the zone player **11**(n) is transferred to the digital to analog converter **33** for playback. As noted above, if the zone player **11**(n) is operating as an audio information channel device **23** for a synchrony group **20** for which it is not a member, the playback scheduler **32** will not schedule the digital audio information that is to be played by that synchrony group **20** for playback. The playback scheduler **32** only schedules the digital audio information, if any, that is buffered in the audio information buffer **31** that is associated with a synchrony group for which the zone player **11**(n) is a member, whether as master device **21** or a slave device **22**(g).

Essentially, the playback scheduler **32** makes use of the read pointer associated with the circular buffer that contains the audio and playback timing information that is to be played by the zone player **11**(n). The playback scheduler **32** retrieves the packet information from the entry of the ring buffer pointed to by the read pointer, and then advances the ring pointer as described above. The playback scheduler **32** determines the boundaries of the frames in the packet and uses the time stamps in the time stamp fields **60** associated with the respective frame **51**(f), along with timing information provided by the zone player **11**(n)'s digital to analog converter clock **34**, to determine when the respective frame is to be transferred to the digital to analog converter **33**. Generally, when the time stamp associated with a buffered digital audio information frame corresponds to the current time as indicated by the digital to analog converter clock **34**, the playback

22

scheduler **32** will enable the respective frame to be transferred to the digital to analog converter **33**.

The digital to analog converter **33**, also under control of the digital to analog converter clock **34**, converts the buffered digital audio information to analog form, and provides the analog audio information to the audio amplifier **35** for amplification. The amplified analog information, in turn, is provided to the audio reproduction devices **15**(n)(r) through the audio reproduction device interface **36**. The audio reproduction devices **15**(n)(r) transform the analog audio information signal to sound thereby to provide the audio program to a listener. The amount by which the audio amplifier **35** amplifies the analog signal is controlled by the control module **42**, in response to volume control information provided by the user through the user interface module **13**.

The network communications manager **40** controls network communications over the network **12**, and the network interface **41** transmits and receives message packets over the network **12**. The network communications manager **40** generates and receives messages to facilitate the transfer of the various types of information described above in connection with FIG. **2**, including the channel device control information, slave device control information, audio and playback timing information and the audio information channel device's clock timing information. In connection with the channel device control information and the slave device control information, the network communications manager **40** will generate messages for transfer over the network **12** in response to control information from the control module **42**. Similarly, when the network communications manager **40** receives messages containing channel device control information and slave device control information, the network communications manager will provide the information to the control module **42** for processing.

With regards to the audio information channel device's clock timing information, as noted above, the master device **21** and slave devices **22**(g) of the synchrony group **20** obtain the clock timing information from the audio information channel device **23** using the well-known SNTP. If the zone player **11**(n) is operating as the audio information channel device **23** for a synchrony group, during the SNTP operation, it will provide its current time, particularly a current time as indicated by its digital to analog converter clock **34**. On the other hand, if the zone player **11**(n) is operating as the master device **21** or slave device **22**(g) of a synchrony group **20**, it will receive the clock timing information from the audio information channel device **23**. After the respective device **21**, **22**(g) has obtained the audio information channel device's clock timing information, it will generate a differential time value ΔT representing the difference between the time T indicated by its digital to analog converter clock **34** and the current time information from the audio information channel device **23**. The differential time value will be used to update the time stamps for the frames of the digital audio stream **50** (FIG. **4**) that are received from the audio information channel device.

With regards to the audio and playback timing information, operations performed by the network communications manager **40** will depend on whether

(i) the audio and playback timing information has been buffered in the audio information buffer **31** for transmission, as audio information channel device **23**, over the network **12** to the master device **21** and/or slave devices **22**(g) of a synchrony group, or

(ii) the audio and playback timing information has been received from the network **12** to be played by the zone player

US 8,234,395 B2

23

11($n$) as either the master device 21 for a synchrony group or a slave device in a synchrony group.

It will be appreciated that the network communications manager 40 may be engaged in both (i) and (ii) contemporaneously, since the zone player 11($n$) may operate both as the audio information channel device 23(1) for a synchrony group 20(1) (reference FIG. 2A) of which it is not a member, and a member of another synchrony group 20(2) for which another zone player 11($n'$) is the audio information channel device 23(2). With reference to item (i) above, after a packet that is to be transmitted has been buffered in the respective ring buffer, the network communications manager 40 retrieves the packet, packages it into a message and enables the network interface 41 to transmit the message over the network 12. If the control module 42 receives control information from the user interface module 13 (if the master device 21 is also the audio information channel device 23 for the synchrony group 20) or from the master device (if the master device 21 is not the audio information channel device 23 for the synchrony group 20) that would require the transmission of a "resynchronize" command as described above, the control module 42 of the audio information channel device 23 enables the network communications manager 40 to insert the command into a message containing the audio and playback timing information. Details of the operations performed in connection with the "resynchronize" command will be described below. As noted above, the "resynchronize" command is used if the user enables a synchrony group to terminate the playback of a track that is currently being played, or cancel playback of a track whose playback has not begun.

On the other hand, with reference to item (ii) above, if network interface 41 receives a message containing a packet containing frames of audio and playback timing information that the zone player 11($n$) is to play either as a master device 21 or a slave device for a synchrony group 20, the network interface 41 provides the audio and playback timing information to the network communications manager 40. The network communications manager 40 will determine whether the packet contains a resynchronize command and, if so, notify the control module 42, which will enable operations to be performed as described below. In any case, the network communications manager 40 will normally buffer the various frames comprising the audio and playback timing information in the audio information buffer 31, and in that operation will generally operate as described above in connection with the audio information source interface 30. Before buffering them, however, the network communications manager 40 will update their time stamps using the time differential value described above. It will be appreciated that the network communications manager 40 will perform similar operations whether the messages that contain the packets were multicast messages or unicast messages as described above

The updating of the time stamps by the master device 21 and the slave devices 22($g$) in the synchrony group 20 will ensure that they all play the audio information synchronously. In particular, after the network communications manager 40 has received a frame 51($f$) from the network interface 41, it will also obtain, from the digital to analog converter clock 34, the zone player 11($n$)'s current time as indicated by its digital to analog converter clock 34. The network communications manager 40 will determine a time differential value that is the difference between the slave device's current clock time, as indicated by its digital to analog converter 34, and the audio information channel device's time as indicated by the audio information channel device's clock timing information. Accordingly, if the master or slave device's current time has

24

a value $T_S$ and the audio information channel device's current time, as indicated by the clock timing information, has a value $T_C$, the time differential value $\Delta T = T_S - T_C$. If the current time of the master or slave device in the synchrony group 20, as indicated by its digital to analog converter clock 34, is ahead of the audio information channel device's clock time as indicated by the clock timing information received during the SNTP operation, the time differential value will have a positive value. On the other hand, if the master or slave device's current time is behind the audio information channel device's clock time, the time differential value $\Delta T$ will have a negative value. If the zone player 11($n$) obtains clock timing information from the audio information channel device 23 periodically while it is a member of the synchrony group 20, the network communications manager 40 can generate an updated value for the time differential value $\Delta T$ when it receives the clock timing information from the audio information channel device 23, and will subsequently use the updated time differential value.

The network communications manager 40 uses the time differential value $\Delta T$ that it generates from the audio information channel device timing information and zone player 11($n$)'s current time to update the time stamps that will be associated with the digital audio information frames that the zone player 11($n$) receives from the audio information channel device. For each digital audio information frame that is received from the audio information channel device, instead of storing the time stamp that is associated with the frame as received in the message in the audio information buffer 21, the network communications manager 40 will store the updated time stamp with the digital audio information frame. The updated time stamp is generated in a manner so that, when the zone player 11($n$), as a member of the synchrony group plays back the digital audio information frame, it will do so in synchrony with other devices in the synchrony group.

More specifically, after the zone player 11($n$)'s network interface 41 receives a message containing a packet that, in turn, contains one or more frames 51($f$), it will provide the packet to the network communications manager 40. For each frame 51($f$) in the packet that the network communications manager 40 receives from the network interface 41, the network communications manager 40 will add the time differential value $\Delta T$ to the frame's time stamp, to generate the updated time stamp for the frame 51($f$), and store the frame 51($f$), along with the header 55($f$) with the updated time stamp in the audio information buffer 31. Thus, for example, if a frame's time stamp has a time value $T_F$, the network communications manager 40 will generate an updated time stamp $T^U_F$ having a time value $T^U_F = T_F + \Delta T$. Since time value $T^U_F$ according to the slave device's digital to analog converter clock 34 is simultaneous to the time value $T_F$ according to the audio information channel device's digital to analog converter clock 34, the zone player 11($n$) device will play the digital audio information frame at the time determined by the audio information channel device 23. Since all of the members of the synchrony group 20 will perform the same operations, generating the updated time stamps $T^U_F$ for the various frames 51($f$) in relation to their respective differential time values, all of the zone players 11($n$) in the synchrony group 20 will play them synchronously. The network communications manager 40 will generate updated time stamps $T^U_F$ for all of the time stamps 60 in the packet, and then store the packet in the audio information buffer 31.

It will be appreciated that, before storing a packet in the audio information buffer 21, the network communications manager 40 can compare the updated time stamps $T^U_F$ associated with the frames in the packet to the slave device's

US 8,234,395 B2

25
26

current time as indicated by its digital to analog converter clock **34**. If the network communications manager **40** determines the time indicated by the updated time stamps of frames **51**(*f*) in the packet are earlier than the zone player's current time, it can discard the packet instead of storing it in the audio information buffer **21**, since the zone player **11**(*n*) will not play them. That is, if the updated time stamp has a time value T$^{U}_{F}$ that identifies a time that is earlier than the zone player's current time T$_x$ as indicated by the zone player's digital to analog converter clock **34**, the network communications manager **40** can discard the packet.

If the zone player **11**(*n*) is operating as the master device **21** of a synchrony group **20**, when the user, through the user interface module **13**, notifies the zone player **11**(*n*) that another zone player **11**(*n'*) is to join the synchrony group **20** as a slave device **22**(*g*), the control module **42** of the zone player **11**(*n*) enables the network communications manager **40** to engage in an exchange of messages, described above in connection with FIG. **2**, to enable the other zone player **11**(*n'*) to join the synchrony group **20** as a slave device. As noted above, during the message exchange, the messages generated by the network communications manager **40** of the zone player **11**(*n*) will provide the network communications manager of the zone player **11**(*n'*) that is to join the synchrony group **20** with information such as the multi-cast address being used by the audio information channel device **23** that is providing the audio program to the synchrony group **20**, as well as a unicast network address for the audio information channel device **23**. After receiving that information, the network communications manager and network interface of the zone player **11**(*n'*) that is to join the synchrony group **20** can begin receiving the multi-cast messages containing the audio program for the synchrony group, engage in SNTP transactions with the audio information channel device **23** to obtain the latter's current time, and also enable the audio information channel device **23** to send the zone player **11**(*n'*) frames **51**(*f*) that it had previously broadcast using the unicast message transmission methodology as described above.

On the other hand, if the network communications manager **40** and network interface **41** of the zone player **11**(*n*) receive a message over the network **12** indicating that it is to become a slave device **22**(*g*) of a synchrony group for which another zone player **11**(*n'*) is the master device, the network communications manager **40** for zone player **11**(*n*) will provide a notification to the control module **42** of zone player **11**(*n*). Thereafter, the control module **42** of zone player **11**(*n*) can enable the network communications manager **40** of zone player **11**(*n*) to perform the operations described above to enable it to join the synchrony group **20**.

As noted above, the user, using user interface module **13**, can enable the synchrony group to terminate playback of a track of an audio program that is currently being played. After playback of a track that is currently being played has been terminated, playback will continue in a conventional manner with the next track that has been buffered in the audio information buffer **31**. It will be appreciated that could be the next track that is on the original play list, or a previous track. In addition, the user can enable the synchrony group **20** to cancel playback of a track that it has not yet begun to play, but for which buffering of packets has begun in the synchrony group **20**. Both of these operations make use of the "resynchronize" command that the master device **21** of the synchrony group **20** can enable the audio information channel device **23** to include in the multi-cast message stream that it transmits to the synchrony group **20**. Generally, in response to receipt of the resynchronize command, the members of the synchrony group **20** flush the ring buffer containing the packets that they

are to play in the future. In addition, if the members of the synchrony group provide separate buffers for their respective digital to analog converters **33**, the members will also flush those buffers as well. After the audio information channel device transmits a packet containing the resynchronize command:

(i) in the case of the use of the resynchronize command to terminate playing of a track that is currently being played, the audio information channel device **23** will begin multi-casting packets for the next track, to begin play immediately, and will continue through the play list in the manner described above; and

(ii) in the case of the use of the resynchronize command to cancel play of a track for which buffering has begun, but which is to be played in the future, the audio information channel device **23** will begin multi-casting packets for the track after the track that has been cancelled, to be played beginning at the time the cancelled track was to begin play, and will also continue through the play list in the manner described above.

It will be appreciated that,

(a) in the first case (item (i) directly above), the resynchronize command can enable the read pointer to be set to point to the entry in the circular buffer into which the first packet for the next track will be written, which will correspond to the entry to which the write pointer points, but

(b) in the second case (item (ii) directly above), the resynchronize command can enable the write pointer for the circular buffer to be set to point to the entry that contains the first packet for the track whose play is being cancelled.

It will further be appreciated that, if a track is cancelled for which buffering has not begun, the resynchronize command will generally not be necessary, since the audio information channel device **23** for the synchrony group **20** need only delete that track from the play list.

Operations performed in connection with use of the resynchronize command to cancel playback of a track that is currently being played will be described in connection with Packet Sequence A below, and operations performed in connection with the use of the resynchronize command to cancel playback of a track that is has not yet begun to play, but for which buffering of packets has begun, will be described in connection with Packet Sequence B below.

Packet Sequence A
(A1.0) [packet **57**]
(A1.1 [continuation of frame **99**]
(A1.2) [frame **100**, time=0:00:01, type=mp3 audio]
(A1.3) [frame **101**, time=0:00:02, type=mp3 audio]
(A1.4) [frame **102**, time=0:00:03, type=mp3 audio]
(A2.0) [packet **58**]
(A2.1) [continuation of frame **102**]
(A2.2) [frame **103**, time=0:00:04, type=mp3 audio]
(A2.3) [frame **104**, time=0:00:05, type=mp3 audio]
(A2.4) [frame **105**, time=0:00:06, type=mp3 audio]
(A3.0) [packet **59**]
(A3.1) [continuation of frame **105**]
(A3.2) [frame **106**, time=0:00:07, type=mp3 audio]
(A3.3) [frame **107**, time=0:00:08, type=mp3 audio]
(A3.4) [frame **108**, time=0:00:09, type=mp3 audio]
(A4.0) [packet **60**]
(A4.1) [continuation of frame **108**]
(A4.2) [frame **109**, time=0:00:10, type=mp3 audio]
(A4.3) [Resynchronize command]
(A4.4) [Padding, if necessary]
(A5.0) [packet **61**]
(A5.1) [frame **1**, time=0:00:07, type=mp3 audio]
(A5.2) [frame **2**, time=0:00:08, type=mp3 audio]

US 8,234,395 B2

27

(A5.3) [frame **3**, time=0:00:09, type=mp3 audio]
(A5.4) [frame **4**, time=0:00:10, type=mp3 audio]
(A6.0) [packet **62**]
(A6.1) [continuation of frame **4**]
(A6.2) [frame **5**, time=0:00:11, type=mp3 audio]
(A6.3) [frame **6**, time=0:00:12, type=mp3 audio]
(A6.4) [frame **7**, time=0:00:13, type=mp3 audio]

Packet Sequence A comprises a sequence of six packets, identified by packet **57** through packet **62**, that the audio information channel device **23** multi-casts in respective messages to the members of a synchrony group **20**. It will be appreciated that the series of messages that the audio information channel device **23** may multi-cast to the synchrony group **20** may include a messages prior to the packet **57**, and may also include messages after packet **62**. Each packet comprises a packet header, which is symbolized by lines (A1.0), (A2.0), . . . (A6.0) in Packet Sequence A, and will generally also include information associated with at least a portion of a frame. In the packets represented in Packet Sequence A, each packet includes information associated with a plurality of frames. Depending on the lengths of the packets, each packet may contain information associated with a portion of a frame, an entire frame, or multiple frames. In the illustration represented by Packet Sequence A, it is assumed that each packet may contain information associated with multiple frames. In addition, it is assumed that a packet does not necessarily contain information associated with an integral number of frames; in that case, a packet may contain information associated with a portion of a frame, and the next packet will contain the information associated with the rest of a frame.

The frames and associated header playback timing information contained in the various packets are symbolized by lines (A1.1), (A1.2), . . . , (A1.4), (A2.1), . . . (A6.4) of Packet Sequence A. Thus, for example, line (A1.2) of packet **57** represents the one-hundredth frame, that is, frame **51**(**100**) (reference FIG. **4**), of the track whose audio information is being transmitted in the sequence of packets that includes packet **57**. The frame **51**(**100**) is to be played at an illustrative time, according to the audio information channel device's digital to analog converter clock, of "time=0:00:01," and the frame is encoded and/or compressed using the well-known MP3 encoding and compression methodology. In that case, the legend "time=0:00:01" represents the time stamp that would be included in field **60** (FIG. **4**) of the header associated with the frame **50**(**100**) as multi-cast by the audio information channel device for the synchrony group. It will be appreciated that the playback time and encoding/compression methodology will be referred in the header **55**(**100**) that is associated with the frame **51**(**100**). It will also be appreciated that the header may also contain additional information as described above.

Similarly, line (A1.3) of packet **57** represents the one-hundred and first frame, that is, frame **51**(**101**), of the track whose audio information is being transmitted in the sequence of packets that includes packet **57**. The frame **51**(**101**) is to be played at an illustrative time, according to the audio information channel device's digital to analog converter clock, of "0:00:02," and the frame is encoded and/or compressed using the MP3 encoding and compression methodology. Line (A1.4) of packet **57** represents similar information, although it will be appreciated that, depending on the length of packet **57**, the line may not represent the information for an entire frame **51**(**102**) and/or its associated header. If the length of packet **57** is not sufficient to accommodate the information for the entire frame **51**(**102**) and/or associated header, the information will continue in packet **58**, as represented by line

28

(A2.1) in Packet Sequence A. Similarly, if the length of packet **56** was not sufficient to contain the information for an entire frame **51**(**99**) preceding frame **51**(**100**), packet **57** (lines (A1.0) through 1.4) may contain any information from frame **51**(**99**) that packet **56** was unable to accommodate.

As noted above, when the master device **21** or a slave device **22**(**g**) in the synchrony group **20** receives the packet **57**, its respective network communications manager **40** will update the time stamps associated with the various frames **51**(**f**) as described above before buffering the respective frames in the respective audio information buffer **31**.

Packets **58** and **59** contain information that is organized along the lines described above in connection with packet **57**.

Packet **60** also contains, as represented by lines (A4.1) and (A4.2), information that is organized along the lines of the information represented by lines (Ax.1) and (Ax.2) ("x" equals an integer) described above in connection with packets **57** through **59**. On the other hand, packet **60** contains a resynchronize command, as represented by line (A4.3). Packet **60** also may contain padding, as represented by line 4.4, following the resynchronize command. As noted above, the master device **21** of a synchrony group **20** will enable the audio information channel device **23** that is providing audio information to the synchrony group **20** to multi-cast a message containing the resynchronize command when it receives notification from the user interface module **13** that the user wishes to cancel playback of a track that is currently being played. In the example depicted in Packet Sequence A, as will be described below, the audio information channel device **23** receives notification from the master device **21** that the user wishes to cancel playback of a track at a time corresponding to "time=0:00:07" according to its digital to analog converter clock **34**, and, in line (A4.3) of packet **60** it will provide the resynchronize command, followed by padding, if necessary.

As will be apparent from examining lines (A3.1) through (A3.4) of packet **59** and lines (A4.1) and (A4.2) of packet **60**, although the audio information channel device **23** has received the notification from the synchrony group's master device **21** to multi-cast the resynchronize command at a time corresponding to "time=0:00:07" according to the clock time indicated by its digital to analog converter clock **34**, it (that is, the audio information channel device **23**) has already multi-cast messages containing frames that are to be played at that time and subsequently. That is, the audio information channel device **23** has, multi-cast in packet **59**, frames **51**(**106**) through **51**(**108**) that contain time stamps "time=0:00:07," "time=0:00:08" and "time=0:00:09," respectively, and, in packet **60**, in addition to the continuation of frame **51**(**108**), frame **51**(**109**) that contains time stamp "time=0:00:10." (It will be appreciated that the times indicated by the illustrative time stamps are for illustration purposes only, and that in an actual embodiment the time stamps may have different values and differentials.)

As noted above, the audio information channel device **23** multi-casts a message containing a packet that, in turn, contains the resynchronize command when it receives the notification from the master device **21** to do so. In the example depicted in Packet Sequence A, the packet will be multi-cast when the audio information channel device's digital to analog converter clock time corresponds to "0:00:07." Subsequently, two things happen. In one aspect, when the master device **21** and slave devices **22**(**g**) receive the packet that contains the resynchronize command, they will stop playing the audio program that they are playing.

In addition, the audio information channel device **23** will begin transmitting frames containing audio information for the next track, including therewith time stamps immediately

US 8,234,395 B2

29

following the digital to analog converter clock time at which the packet including the resynchronize command was transmitted. Accordingly, and with further reference to Packet Sequence A, the audio information channel device **23** will multi-cast a message containing packet **61**. As indicated above, packet **61** contains, as represented in lines (A5.1) through (A5.3), frames **51(1)** through **51(3)**, which are the first three frames of the next track of the audio program that is to be played. It is also compressed and encoded using the MP3 encoding and compression scheme, and it is accompanied by time stamps "time=0:00:07," "time=0:00:08" and "time=0:00:10." As noted above, the time stamp "time=0:00:07" corresponds to the clock time at which the audio information channel device **23** multi-casts the resynchronize command, and, when the master device **21** and slave devices **22(g)** receive these frames, they would be expected to begin playing them very shortly, if not immediately after the audio information channel device **23** multi-casts the message containing the packet that, in turn, contains the resynchronize command. Packet **61** also includes at least a portion of the next frame, that is, frame **51(4)**, for that track. In addition, Packet Sequence A depicted above further includes a subsequent packet, namely, packet **62**, that contains any necessary continuation of frame **51(4)**, as well as three subsequent frames. If any additional packets are required for the track, as well as for subsequent tracks, they can be multi-cast in a similar manner.

As further noted above, the resynchronize command can also be used to cancel playing of one or more tracks for which playback has begun. This will be illustrated in connection with Packet Sequence B:

Packet Sequence B

(B1.0) [packet **157**]
(B1.1) [continuation of frame **99**]
(B1.2) [frame **100**, time=0:00:01, type=mp3 audio]
(B1.3) [frame **101**, time=0:00:02, type=mp3 audio]
(B1.4) [frame **102**, time=0:00:03, type=mp3 audio]
(B2.0) [packet **158**]
(B2.1) [continuation of frame **102**]
(B2.2) [frame **103**, time=0:00:04, type=mp3 audio]
(B2.3) [frame **104**, time=0:00:05, type=mp3 audio]
(B2.4) [frame **105**, time=0:00:06, type=mp3 audio]
(B3.0) [packet **159**]
(B3.1) [continuation of frame **105**]
(B3.2) [frame **106**, time=0:00:07, type=mp3 audio]
(B3.3) [track boundary notification]
(B3.4) [Padding, if necessary]
(B4.0) [packet **160**]
(B4.1) [frame **1**, time=0:00:08, type=mp3 audio]
(B4.2) [frame **2**, time=0:00:09, type=mp3 audio]
(B4.3) [frame **3**, time=0:00:10, type=mp3 audio]
(B5.0) [packet **161**]
(B5.1) [continuation of frame **3**]
(B5.2) [frame **4**, time=0:00:11, type=mp3 audio]
(B5.3) [Resynchronize, after packet **159**]
(B5.4) [Padding, if necessary]
(B6.0) [packet **162**]
(B6.1) [frame **1**, time=0:00:08, type=mp3 audio]
(B6.2) [frame **2**, time=0:00:09, type=mp3 audio]
(B6.3) [frame **3**, time=0:00:10, type=mp3 audio]
(B6.4) [frame **4**, time=0:00:11, type=mp3 audio]
(B7.0) [packet **163**]
(B7.1) [continuation of frame **4**]
(B7.2) [frame **5**, time=0:00:12, type=mp3 audio]
(B7.3) [frame **6**, time=0:00:13, type=mp3 audio]
(B7.4) [frame **7**, time=0:00:14, type=mp3 audio]

30

Packet Sequence B comprises a series of seven packets, identified by packet **157** through **163**, that the audio information channel device **23** multi-casts to the members of a synchrony group **20**. As with Packet Sequence A, it will be appreciated that the series of packets that the audio information channel device **23** may multi-cast to the synchrony group **20** may include packets prior to the packet **157**, and may also include packets after packet **162**. Each packet comprises a packet header, which is symbolized by lines (B1.0), (B2.0), . . . (B7.0) in Packet Sequence B. As in Packet Sequence A, each packet will also generally include information associated with at least a portion of a frame **51(f)** along with its associated frame **55(f)**. As in the packets represented in Packet Sequence A, each packet includes information associated with a plurality of frames. Depending on the lengths of the packets, each packet may contain information associated with a portion of a frame, an entire frame, or multiple frames. Further, as with Packet Sequence A, it is assumed that each packet may contain information associated with multiple frames. In addition, it is assumed that a packet does not necessarily contain information associated with an integral number of frames; in that case, a packet may contain information associated with a portion of a frame, and the next packet will contain the information associated with the rest of a frame.

The structures of the packets represented by Packet Sequence B are similar to those described above in connection with Packet Sequence A, and will not be repeated here. Generally, Packet Sequence B illustratively contains a sequence of packets that represent at least portions of three tracks that may have been selected from, for example, a play list. In particular, packets **157** through **159** represent frames from a portion of one track, packets **160** and **161** represent frames from a second track and packets **162** and **163** represent frames from a third track. The play list indicated that the first, second and third tracks were to be played in that order. With particular reference to Packet Sequence B, it should be noted that line (B3.3) indicates that packet **159** includes an indication that packet contains the last frame for the track, and line (B3.4) provides for padding to the end of the packet. The first frame of the next track begins in packet **160**.

In connection with the use of the resynchronize command to cancel playback of a track, at least a portion of which the audio information channel device **23** has multi-cast to the members of the synchrony group, packet **161**, in line (B5.3) represents a resynchronize command that indicates that resynchronization is to occur after packet **159**, that is, immediately after the packet that contains the last frame of the first of the three tracks represented by the packets in Packet Sequence B. It should be noted that the resynchronize command is in the packet **161**, while the resynchronization is to occur at packet **160**, that is, the synchrony group is to not play the track starting with packet **160**, but instead is to begin playing the track frames for which begin with the next packet, that is, packet **162**. As with Packet Sequence A, in Packet Sequence B the audio information channel device **23**, in packet **162** and **163**, multi-casts frames whose time stamps indicate that they are to be played when the frames that were multi-cast in packets **160** and **161** were to be played. By use of the resynchronize command and specifying a packet in this manner, the audio information channel device can cancel playback of a track for which playback has not yet begun.

It will be appreciated that the resynchronize command is generally not necessary for cancelling play back of a track that the audio information channel device **23** has not started multi-casting to the synchrony group **20**, since the audio

US 8,234,395 B2

31                                                                  32

information channel device **23** itself can re-order the play list to accommodate the cancellation.

The invention provides a number of advantages. In particular, the invention provides a network audio system in which a number of devices share information can reproduce audio information synchronously, notwithstanding the fact that packets, which may contain digital audio information, transmitted over the network to the various zone players connected thereto may have differing delays and the zone players operate with independent clocks. Moreover, although the invention has been described in connection with audio information, it will be appreciated that the invention will find utility in connection with any type of isochronous information for which synchrony among devices is desired. The system is such that synchrony groups are created and destroyed dynamically, and in such a manner as to avoid requiring a dedicated device as the master device.

It will be appreciated that a number of changes and modifications may be made to the network audio system **10** as described above. For example, although the invention has been described as providing that the audio information channel device **23** provides digital audio information to the members synchrony group **20** that has been encoded using particular types of encoding and compression methodologies, it will be appreciated that the audio information channel device **23** can provide digital audio information to various members of the synchrony group **20** that have been encoded and compressed using different types of encoding and compression methodologies, and, moreover, for which different sampling rates have been used. For example, the audio information channel device **23** may provide digital audio information to the master device **21** and slave devices **22**(1) through **22**($g_1$) using the MP3 methodology at a specified sampling rate, the digital audio information for the same program to slave devices **22**($g_1$+1) through **22**($g_2$) using the WAV methodology at one specified sampling rate, and to slave devices **22**($g_2$+1) through **22**(G) using the WAV methodology at another specified sampling rate. In that case, the audio information channel device **23** can specify the particular encoding and compression methodology that has been used in the encoding type field **57** associated with each frame and the sampling rate in the sampling rate field **58**. Moreover, since the encoding and compression type and sampling rate are specified for each frame, the encoding and compression type and sampling rate can be changed from frame to frame. The audio information channel device **23** may use different multicast addresses for the different encoding and compression types and sampling rates, but it will be appreciated that would not be required.

It will be appreciated that two advantages of providing that the encoding and compression methodology and the sampling rate is provided on a frame-by-frame basis, instead of on, for example, a track-by-track basis, is that would facilitate a slave device joining the synchrony group **20** at a frame mid-track, without requiring, for example, the master device **21** or the audio information channel device **23** to notify it of the encoding and compression methodology or the sampling rate.

Another modification is that, instead of the network communications manager **40** of a member of a synchrony group **20** generating the updated time stamp $T^U_F$ for a digital audio information frame by adding the time differential value ΔT to the time stamp $T_F$ associated with a frame, the network communications manager **40** may instead generate the updated time stamp $T^U_F$ by subtracting the differential time value ΔT from the member's current time $T_S$ as indicated by the member's digital to analog converter clock **34** at the time at which

the digital audio information is received. It will be appreciated, however, that there may be variable time delays in processing of messages by the slave device's network communications manager **40**, and so it may be preferable to generate the time differential value ΔT using the time stamp $T_F$ provided by the audio information channel device **23**.

In addition, instead of the network communications manager **40** of a member of a synchrony group generating an updated time stamp to reflect the difference between the times indicated by the member's digital to analog converter clock and the audio information channel device's digital to analog converter clock, the network communications manager **40** can generate the time differential value ΔT and provide it to the member's playback scheduler **32**. In that case, the member's network communications manager **40** can store each digital audio information frame along with the time stamp $T_F$ as received from the master device in the audio information buffer **21**. The playback scheduler **32** can utilize the time differential value ΔT, and the time stamps $T_F$ associated with the digital audio information frames, to determine when the respective digital audio information frames are to be played. In determining when a digital audio information frame is to be played, the playback scheduler can add the time differential value to the time stamp $T_F$ associated with the digital audio frame, and enable the digital audio frame to be coupled to the digital to analog converter **33** when the time indicated by the sum corresponds to the current time as indicated by the slave device's digital to analog converter clock **34**. Alternatively, when the member's digital to analog converter clock **34** updates its current time $T_S$, the playback scheduler can generate an updated current time $T'_S$ by subtracting the differential time value ΔT from the current time $T_s$, and using the updated current time $T'_S$ to determine when to play a digital audio information frame.

As described above, the members of a synchrony group **20** periodically obtain the audio information channel device's current time value and uses the current time value that it receives from the audio information channel device to periodically update the time differential value ΔT that it uses in updating the time stamps associated with the various frames. It will be appreciated that, if the digital to analog converter clock(s) associated with the member(s) of a synchrony group **20** are ensured to have the same rate as the digital to analog converter clock, a member need only obtain the current time value from the audio information channel device once, at the beginning of playback.

As another alternative, if the zone players are provided with digital to analog converter clock **34** whose time and rate can be set by an element such as the network communications manager **40**, when a zone player **11**(*n*) is operating as a member of a synchrony group **20**, its network communications manager **40** can use the various types of timing information that it receives from the audio information channel device **23**, including the current time information and the playback timing information indicated by the time stamps that are associated with the various frames **51**(*f*) comprising the audio and playback timing information that it receives, to adjust the synchrony group member's digital to analog converter clock's time value and/or the clock rate that it uses for playback. If the clock's time value is to be adjusted, when the synchrony group member's network communications manager **40** initially receives the current time information from the audio information channel device **23** for the synchrony group **20**, the network communications manager **40** can set the synchrony group member's digital to analog converter clock **34** to the current time value as indicated by the audio information channel device's current time information. The

US 8,234,395 B2

33

34

network communications manager **40** can set the clock **34** to the current time value indicated by the audio information channel device's current time information once, or periodically as it receives the current time information.

Alternatively or in addition, the synchrony group member's network communications manager **40** can use one or both of the current time information and/or the playback timing information in the time stamps associated with the respective frames **51**(*f*) to adjust the clock rate of the clock **34** that it uses for playback. For example, when the synchrony group member's network communications manager **40** receives a frame **51**($f_X$) having a time stamp having a time value $T_{f_X}$, it can generate the updated time value $T^U_{f_X}=T_{f_X}+\Delta T$ as described above, and store the frame with the time stamp with the updated time value in the audio information buffer **30**. In addition, since both the number of samples in a frame and the sampling rate, which determines the rate at which the frame is to be played, are known to the network communications manager **40**, it can use that information, along with the updated time value $T^U_{f_X}$, that is to be used for frame **51**($f_X$) to generate an expected updated time value $T^E_{f_{X+1}}$ that is expected for the updated time stamp of the next frame **51**($f_{X+1}$). After the synchrony group member's network communications manager **40** receives the next frame **51**($f_{X+1}$), it can generate the updated time value $T^U_{f_{X+1}}$ and compare that value to the expected updated time value $T^E_{f_{X+1}}$. If the two time values do not correspond, or if the difference between them is above a selected threshold level, the clock that is used by the audio information channel device **23** to generate the time stamps is advancing at a different rate than the synchrony group member's digital to analog converter clock **34**, and so the network communications manager **40** can adjust the rate of the digital to analog converter clock **34** to approach that of the clock used by the audio information channel device **23** so that the differential time value $\Delta T$ is constant. On the other hand, if the two time values do correspond, then the time differential value $\Delta T$ is constant, or the difference is below a threshold level, and the network communications manager **40** need not change the clock rate of the digital to analog converter clock **34**. It will be appreciated that, if the clock rate is to be adjusted, the rate adjustment can be fixed, or it can vary based on, for example, the difference between the updated time value $T^U_{f_{X+1}}$ and the expected updated time value $T^E_{f_{X+1}}$.

It will also be appreciated that, if no rate adjustment is performed for one frame **51**($f_{X+1}$), the synchrony group member's network communications manager **40** can generate an expected updated time value $T^E_{f_{X+2}}$ that is expected for the updated time stamp of the next frame **51**($f_{X+2}$) using the updated time value $T^U_{f_X}$ determined for frame **51**($f_X$), along with the number of samples in a frame and the sampling rate, and compare the expected updated time value $T^E_{f_{X+2}}$ to the updated time value $T^U_{f_{X+2}}$ that it generates when it receives frame **51**($f_{X+2}$). At that point, if the network communications manager **41** determines that two time values do not correspond, or if the difference between them is above a selected threshold level, it can adjust the rate of the digital to analog converter clock **34**. Similar operations can be performed if no rate adjustment is performed for several successive frames **51**($f_{X+1}$), **51**($f_{X+2}$), . . . . This will accommodate the possibility that the rate differential between the clock **34** and the clock used by the audio information channel device **23** in generating the time stamps have rates that differ by an amount sufficiently small that it cannot be detected using time stamps of two or more successive frames.

Instead or in addition to adjusting the clock rate as described above, the synchrony group member's network communications manager **40** can perform similar operations

in connection with adjusting the clock rate in connection with the current time information that it receives from the audio information channel device **23**.

Furthermore, although the network audio system **10** has been described such that the master device **21** of a synchrony group **20** can, in response to control information provided thereto by a user through the user interface module **13**, provide a notification to a zone player **11**(*n*) that it is to become a member of its synchrony group **20** as a slave device **22**(*g*), it will be appreciated that the user interface module **13** can provide the notification directly to the zone player **11**(*n*) that is to become a member of the synchrony group **20**. In that case, the zone player **11**(*n*) can notify the master device **21** that it is to become a slave device **22**(*g*) in the synchrony group **20**, after which the master device **21** can provide information regarding the synchrony group **20**, including the multi-cast and unicast addresses of the audio information channel device and other information as described above.

Similarly, although the network audio system **10** has been described such that the master device **21** of a synchrony group **20** can, in response to control information provided thereto by a user through the user interface module **13**, provide a command to a slave device **22**(*g*) to enable the slave device **22**(*g*) to adjust its volume, it will be appreciated that the user interface module **13** can provide control information directly to the slave device **22**(*g*) to enable the slave device **22**(*g*) to adjust its volume.

In addition, although the network audio system **10** has been described such that each frames **51**(*f*) is associated with a frame sequence number (reference field **56**, FIG. **4**), it will be appreciated that, if the packets described above in connection with Packet Sequence A and Packet Sequence B are provided with packet sequence numbers, the frame sequence numbers need not be provided, since the packet sequence numbers can suffice for defining the frame sequencing.

Furthermore, although the network audio system **10** has been described such that the zone players **11**(*n*) are provided with an audio amplifier **35** for amplifying the analog signal provided by the respective digital to analog converters **33**, it will be appreciated that a zone player may be provided that does not itself include an audio amplifier. In that case, the analog signal may be coupled to an external amplifier for amplification as necessary before being provided to the audio reproduction device(s) **15**(*n*)(*r*). It will be appreciated that a single zone player **11**(*n*) may be provided with multiple audio amplifiers and audio reproduction device interfaces, and, if necessary, multiple digital to analog converters **33**, to provide audio programs for corresponding numbers of synchrony groups.

Similarly, although the zone players **11**(*n*) have been described such that they may be connected to one or more audio information sources, it will be appreciated that an audio information source may form part of and be integrated into a zone player **11**(*n*). For example, a zone player may include a compact disk player, cassette tape player, broadcast radio receiver, or the like, that has been integrated into it. In addition, as noted above, an individual zone player **11**(*n*) may be connected to multiple audio information sources and may contemporaneously operate as the audio information channel device **23** for multiple synchrony groups.

In addition, although FIG. **1** shows the network audio system **10** as including one user interface module **13**, it will be appreciated that the system **10** may include a plurality of user interface modules. Each user interface module be useful for controlling all of the zone players as described above, or alternatively one or more of the user interface modules may be useful for controlling selected subsets of the zone players.

US 8,234,395 B2

35

36

Moreover, it will be appreciated that, although the invention has been described in connection with audio information, it will be appreciated that the invention will find utility in connection with any type of information for which synchrony among devices connected to a network is desired.

As noted above, while a zone player $11(n)$ is operating as audio information channel device 23 for a synchrony group 20, when the zone player $11(n)$'s audio information source interface 30 or network communications manager 40 stores digital audio information frames based on audio information from an audio information source $14(n)(s)$ in the audio information buffer 31, it will provide time stamps for the respective frames to schedule them for playback after some time delay after they have been buffered in the audio information buffer 31. The delay is provided so that, for other zone players $11(n')$, $11(n'')$, . . . that are operating as members of a synchrony group, there will be sufficient time for the audio and playback timing information to be transferred over the network 12 to those other zone players $11(n')$, $11(n'')$, . . . so that it can be processed and played by them at the appropriate time as described above. The time period that is selected for the time delay may be fixed or variable, and in either case may be based on a number of factors. If the time period selected for the time delay is fixed, it may be based on, for example, factors such as an estimate of the maximum latency in the network 12, the estimated maximum loading of the various components comprising the zone players $11(n)$, and other estimates as will be appreciated by those skilled in the art.

The time delay may be the same for audio information from all types of audio information sources, and may be constant over the entire period that the synchrony group 20 is playing an audio work. Alternatively, different time delays may be utilized based on various criteria. For example, if the audio information is to be played independently of information associated with other types of media, the time delay may be selected to be relatively long, on the order of a significant fraction of a second, or longer. On the other hand, if the audio information is to be played contemporaneously with, for example, video information, which may be supplied by, for example, a video disk, video tape cassette, over cable, satellite, or broadcast television, which may not be buffered or which may be displayed independently of the network audio system 10, it may be undesirable to provide for such a lengthy delay, since the time delay of the audio playback, in relation to the video display, may be noticeable. In that case, the zone player $11(n)$ may provide for a much shorter time delay. In one embodiment, the time delay provided for audio information to be played concurrently with video information is selected to be generally on the order of fifty milliseconds, which would barely, if at all, be perceptible to someone viewing the video. Other desirable time delays for information from other types of sources will be apparent to those skilled in the art.

As yet a further possibility, the zone player $11(n)$, when operating as an audio information channel device 23 for a synchrony group 20, can dynamically determine the time delay based on a number of conditions in the network audio system 10, including, for example, the message transfer latency in network 12, the loading of microprocessors or other components that are used in the various zone players $11(n')$, $11(n'')$, . . . that may comprise a synchrony group 20, as well as other factors. For example, if the audio information channel device 23 determines that the latency in the network 12 has increased beyond a selected threshold, the audio information channel device 23 can adjust the delay to increase the likelihood that the members of the synchrony group 20 will be able to receive the packets and process the frames so that they will be able to play them at the appropriate times. Similarly, if the audio information channel device 23 is notified that a member of the synchrony group 20 to which it provides audio information requires additional time to receive and process the frames that it transmits, the audio information channel device 23 can adjust the delay accordingly. It will be appreciated that, to reduce or minimize possible discontinuities in the audio playback by the members of the synchrony group, the audio information channel device 23 can, instead of adjusting the time delay during a particular audio track, adjust the time delay between tracks, during silent periods of a track or otherwise as will be appreciated by those skilled in the art. In addition, the audio information channel device 23 can use conventional audio compression methodologies to facilitate a speeding up and/or slowing down of playback of an audio track while it is in the process of providing additional time delay. Generally, the members of the synchrony group 20 can provide notifications to the audio information channel device 23 if they determine that they will need an additional time delay, and the audio information channel device 23 can adjust the time delay in accordance with the notifications from the members of the synchrony group 20.

1. A system comprising plurality of devices, one of the devices operating as a task source device and at least one other device operating as a member of a synchrony group,

A. the task source device being configured to distribute a series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to a clock maintained by the task source device, at which the devices comprising the synchrony group are to execute the respective task;

B. each member device being configured to:

(i) periodically obtain from the task source device an indication of a current time value indicated by the task source device's clock, and

(ii) determine, from the time stamp associated with each respective task and a time differential value representing a difference between the current time value indicated by the task source device's clock, and a current time value indicated by its respective clock, a time, relative to its respective clock, at which it is to execute the task.

3. A system as defined in claim 2 in which each device comprising a member of the synchrony group is further configured to execute each task that it receives from the task source device at the determined time, thereby to facilitate execution by them of respective tasks in the series in respective timing relationships relative to the time indicated by the task source device's clock.

5. A system as defined in claim 2 in which one of the member devices operates as a master device for the synchrony group, any other member devices comprising respective slave devices, the master device being configured to perform at least one type of synchrony group management operation in connection with the member devices comprising the synchrony group.

6. A system as defined in claim 5 further including a user interface module configured to control the master device's performance of said at least one type of synchrony group management operation, the master device being further configured to provide status information relating to the status of the synchrony group to the user interface module.

7. A system as defined in claim 6 in which the status information includes identifications of the devices comprising the synchrony group.

8. A system as defined in claim 6 in which the status information includes an identification of the task currently being executed.

US 8,234,395 B2

37

9. A system as defined in claim **5**, the system comprising at least one additional device, in which, in one type of synchrony group management operation, the master device is configured to enable the at least one additional device to join the synchrony group as a slave device.

10. A system as defined in claim **9** in which the task source device is configured to distribute tasks to the member devices using a selected multi-cast transmission methodology, the member devices being configured to buffer the tasks until they are to be executed, and further in which, when the at least one additional device joins the synchrony group as a slave device, the task source device is enabled to transmit at least one previously distributed task to the slave device using a selected unicast transmission methodology.

11. A system as defined in claim **5** in which, in at least one type of synchrony group management operation, the master device is configured to enable the task source device to join the synchrony group as a slave device, the task source device continuing to operate as the task source device for the synchrony group.

12. A system as defined in claim **5** in which, in at least one type of synchrony group management operation, the master device is configured to enable a slave device to disengage from the synchrony group, the disengaged slave device thereafter not being a member device in the synchrony group.

13. A system as defined in claim **5** in which, in at least one type of synchrony group management operation, the master device is configured to control the series of tasks to be distributed by the task source device.

14. A system as defined in claim **5** in which, in at least one type of synchrony group management operation, the master device is further configured to control execution by the member devices of the tasks that have been distributed by the task source device.

15. A system as defined in claim **14** in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, and further in which in at least one type of synchrony group management operation, the master device is configured to enable the member devices to terminate execution of a task sequence that is currently executed.

16. A system as defined in claim **15** in which, in the synchrony group management operation enabling the member devices to terminate execution of a task sequence that is currently being executed, the master device enables the task source device to distribute a command to enable the member devices to terminate execution of the task sequence, the member devices being configured to, after receiving the command, terminate execution of the task sequence.

17. A system as defined in claim **14** in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, and further in which at least one type of synchrony group management operation, the master device is configured to enable the member devices to cancel execution of a task sequence that has been previously distributed, but for which execution has not begun.

18. A system as defined in claim **17** in which, in the synchrony group management operation enabling the member devices to cancel execution of a task sequence that has been previously distributed but for which execution has not begun, the master device enables the task source device to distribute a command to enable the member devices to cancel execution of the task sequence, the member devices being configured to, after receiving the command, cancel execution of the task sequence.

19. A system as defined in claim **5** in which, in at least one type of synchrony group management operation, the member

38

device operating as the master device is configured to enable the master device to migrate from one member device to another member device in the synchrony group.

20. A system as defined in claim **5** in which, in at least one type of synchrony group management operation, the master device is configured to enable the task source device to migrate from one device to another device in the system.

21. A system as defined in claim **20** in which

A. the device operating as the task source device is configured to, after being enabled to migrate the task source device to said other device, provide migration information to the other device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices,

B. the other device being configured to, after receiving the migration information,

i. distribute the series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the task source device, at which the devices comprising the synchrony group are to execute the respective task, and

ii. notify the members of the synchrony group that it is to thereafter operate as the task source device.

22. A system as defined in claim **21** in which the information respecting the tasks that are to be distributed is a source of streaming information, the other device being configured to, after receiving the migration information, assemble the streaming information into tasks and associate each task with a said time stamp.

23. A system as defined in claim **21** in which the information respecting the tasks that are to be distributed is in a file identified in the migration information, the other device being configured to obtain information from the identified file, assemble the information into tasks and associate each task with a said time stamp.

24. A system as defined in claim **23** in which the information respecting the tasks that are to be distributed begins at an offset, identified in the migration information, into the identified file, the other device being configured to assemble the information from a position in the file associated with the identified offset.

25. A system as defined in claim **23** in which the information respecting the tasks that are to be distributed is in a series of files identified in the migration information, the other device being configured to obtain information from successive files in the series assemble the information into tasks and associate each task with as said time stamp.

26. A system as defined in claim **1** in which the task source device is further configured to distribute the tasks using a selected multi-cast message transmission methodology.

27. A system as defined in claim **1** in which the task source device is configured to provide, associated with at least one task, a time stamp indicating a task execution time later than the time currently indicated by the clock maintained by the task source device.

28. A system as defined in claim **27** in which the task source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be executed by the member devices at the time indicated by the time stamp.

29. A system as defined in claim **28** in which the task source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the

US 8,234,395 B2

**39**

task source device can be distributed to the member devices for execution at the time indicated by the time stamp

30. A system as defined in claim **27** in which task source device is configured to obtain information associated with the tasks from at least two types of information sources, the task source device being further configured to select, for each task the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective task.

31. A system as defined in claim **1** in which at least one member device is further configured to adjust its clock rate in relation to a clock rate value maintained by the task source device's clock.

32. A system as defined in claim **31** in which the at least one member device is configured to adjust its clock rate in relation to time stamps associated with respective ones of the tasks received from the task source device.

34. A system as defined in claim **1** in which at least one member device comprises:

A. a task receiving module configured to receive the series of tasks,

B. a current time retrieval module configured to obtain, from the task source device, the current time value as indicated by the task source's clock;

C. an execution time determination module configured to determine, from the time stamp associated with each respective task and a tirrie differential value representing a difference between the current time value obtained by the current time retrieval module and a current time value indicated by a clock maintained by the device, a time, relative to the member device's respective clock at which the task is to be executed; and

D. a task execution module configured to execute each respective task at the time determined by the execution time determination module.

35. A system as defined in claim **34** further including a control module for controlling execution of commands received by said interface module.

36. A system as defined in claim **35** in which the at least one member device further comprises a buffer configured to buffer tasks that the task receiving module receives from the task source device until they are to be executed, the task execution module being configured to execute the buffered tasks at the times determined by the execution time determination module.

37. A system as defined in claim **36** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the interface module being further configured to receive task execution control commands for controlling task execution, the control module being configured to, in response to receipt of at least one task execution control command for controlling task execution, enable the task execution module to terminate execution of a task sequence currently being executed, being configured to not execute subsequent tasks in the task sequence that have been buffered.

38. A system as defined in claim **37** in which the control module is configured to enable the task execution module to resume execution of at least one task associated with a subsequent task sequence at a time determined by the execution time determination module.

39. A system as defined in claim **36** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the interface module being further configured to receive task execution control commands for controlling task execution, the control module being configured to, in response to receipt of at least one task

**40**

execution control command to cancel execution of a task sequence for which at least one task has been buffered but for which execution has not begun, enable the task execution module to not execute tasks from that task sequence that have been buffered.

40. A system as defined in claim **39** in which the control module is configured to enable the task execution module to resume execution of at least one task associated with a task sequence subsequent to the task sequence for which at least one task has been buffered but for which execution has not begun.

41. A system as defined in claim **34** in which the member device includes:

A. a migration information receiving module configured to receive migration information from the task source device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group, and

B. a migration control module configure to, after the migration information has been received,

i. distribute the series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the task source device, at which the devices comprising the synchrony group are to execute the respective task, and

ii. notify the members of the synchrony group that it is to thereafter operate as the task source device.

42. A system as defined in claim **41** in which the information respecting the tasks that are to be distributed is a source of streaming information, the migration control module being configured to, after the migration information has been received, assembling the streaming information into tasks and associate each task with a said time stamp.

43. A system as defined in claim **41** in which the information respecting the tasks that are to be distributed is in a file identified in the migration information, the migration control module being configured to obtain information from the identified file, assemble the information into tasks and associate each task with a said time stamp.

44 A system as defined in claim **43** in which the information respecting the tasks that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control module being configured to assemble the information from a position in the file associated with the identified offset.

45. A system as defined in claim **43** in which the information respecting the tasks that are to be distributed is in a series of files identified in the migration information, the migration control module being configured to obtain information from successive files in the series assemble the information into tasks and associate each task with as said time stamp.

46. A system as defined in claim **34** in which the member device further includes a clock rate adjustment module configured to adjust the member device's clock rate in relation to a clock rate value maintained by the task source device's clock.

47. A system as defined in claim **46** in which the clock rate adjustment module is configured to adjust the clock rate in relation to time stamps associated with respective ones of the tasks received from the task source device.

48. A system as defined in claim **1** in which the task source device comprises:

A. a task acquisition module configured to obtain respective ones of the tasks;

US 8,234,395 B2

41 42

B. a task execution time determination module configured to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission module configured to transmit the series of tasks to said at least one other device; and

D. an execution control command generation module configured to, in response to a predetermined event, enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to modify the execution sequence of the tasks transmitted thereto.

49. A system as defined in claim 48 in which the task transmission module is configured to utilize a selected multi-cast transmission methodology.

50. A system as defined in claim 48 in which the predetermined event comprises input indicia provided by an operator.

51. A system as defined in claim 50 in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to control execution of at least one task in relation to the time the predetermined event occurs.

52. A system as defined in claim 51 in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to terminate execution of a task that it is currently executing and/or to not execute at least one task that is to be executed subsequent to the predetermined event.

53. A system as defined in claim 51 in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation module being configured to, in response to said predetermined event,

(i) enable the task transmission module to insert into the series of tasks transmitted by the task transmission module, a command enabling the at least one other device to terminate execution of the currently executing task and/or to not execute at least one subsequent task, if any, in the task sequence including the currently executing task; and

(ii) enable

(a) the task execution time determination module to provide that time stamps associated with tasks of task sequences subsequent to the task sequence currently being executed will reflect the termination and/or non-execution of tasks from the task sequence of the task that is currently being executed, and

(b) the task transmission module to transmit the tasks of the subsequent task sequences to the at least one other device.

54. A system as defined in claim 53 in which the task transmission module is configured to insert a command to enable the at least one other device to not execute all tasks in the task sequence subsequent to the terminated and/or non-executed task.

55. A system as defined in claim 48 in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to control execution of a task in relation to the task's position in the series of tasks.

56. A system as defined in claim 55 in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the

task transmission module a command to enable the at least one other device to cancel execution of a task in relation to the task's position in the series of tasks.

57. A system as defined in claim 55 in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted task in relation to the task's position in the series of tasks.

58. A system as defined in claim 57 in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted task, in relation to the task's position in the series of tasks, for which execution has not begun.

59. A system as defined in claim 55 in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation module being configured to, in response to said predetermined event,

(i) enable the task transmission module to insert into the series of tasks transmitted by the task transmission module, a command enabling the at least one other device to cancel execution of a task sequence for which execution has not begun; and

(ii) enable

(a) the task execution time determination module to provide that time stamps associated with tasks of task sequences subsequent to the task sequence whose execution was cancelled will reflect the cancellation, and

(b) the task transmission module to transmit the tasks of the subsequent task sequences to the at least one other device.

60. A system as defined in claim 1 in which the task source device comprises:

A. a task acquisition module configured to obtain respective ones of the tasks;

B. a task execution time determination module configured to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission module configured to transmit the series of tasks to said at least one other device; and

D. a task source device migration control module configured to, in response to a predetermined event, provide migration information to another device, the migration information including a source for information respecting the tasks to be distributed, timing relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group.

61. A system as defined in claim 60 in which the task source device is configured to provide, associated with at least one task, a time stamp indicating a task execution time later than the time currently indicated by the clock maintained by the task source device.

62. A system as defined in claim 61 in which the task source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be executed by the member devices at the time indicated by the time stamp.

63. A system as defined in claim 62 in which the task source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the

US 8,234,395 B2

43

task source device can be distributed to the member devices for execution in the time indicated by the time stamp.

64. A system as defined in claim **62** in which task source device is configured to obtain information associated with the tasks from at least two types of information sources, the task source device being further configured to select, for each task the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective task.

65. A device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, the device comprising

A. an interface module configured to receive the series of tasks, each task being associated with a time stamp, each time stamp indicating a time value relative to a time indicated a clock maintained by the task source, at which the device is to execute the respective task;

B. a current time retrieval module configured to obtain, from the task source, a current time value as indicated by the task source's clock;

C. an execution time determination module configured to determine, from the time stamp associated with each respective task and a time differential value representing a difference between the current time value obtained by the current time retrieval module and a current time value indicated by a clock maintained by the device, a time, relative to the device's respective clock, at which the task is to be executed; and

D. a task execution module configured to execute each respective task at the time determined by the execution time determination module.

67. A device as defined in claim **65** further comprising a buffer configured to buffer tasks that the interface module has received until they are to be executed, the task execution module being configured to execute the buffered tasks at the times determined by the execution time determination module.

68. A device as defined in claim **67** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the interface module being further configured to receive task execution control commands for controlling task execution, the control module being configured to, in response to receipt of at least one task execution control command for controlling task execution, enable the task execution module to terminate execution of a task sequence currently being executed, being configured to not execute subsequent tasks in the task sequence that have, been buffered.

69. A device as defined in claim **68** in which the control module is configured to enable the task execution module to resume execution of at least one task associated with a subsequent task sequence at a time determined by the execution time determination module.

70. A device as defined in claim **69** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the interface module being further configured to receive task execution control commands for controlling task execution, the control module being configured to, in response to receipt of at least one task execution control command to cancel execution of a task sequence for which at least one task has been buffered but for which execution has not begun, enable the task execution module to not execute tasks from that task sequence that have been buffered.

71. A device as defined in claim **70** in which the control module is configured to enable the task execution module to resume execution of at least one task associated with a task

44

sequence subsequent to the task sequence for which at least one task has been buffered but for which execution has not begun.

72. A device as defined in claim **66**, the control module being configured to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive tasks for execution by the task execution module.

73. A device as defined in claim **72** in which the control module is configured to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive tasks currently being transmitted using a selected multi-cast transmission methodology, and further to retrieve at least one previously distributed task using a selected unicast transmission methodology.

74. A device as defined in claim **65** in which the control module is configured to, in receipt of a command to disengage from a synchrony group, disable the interface module from receiving tasks and the task execution module from executing previously received tasks that have not yet been executed.

75. A device as defined in claim **65** further comprising a user interface module interface module configured to receive'control information from a user interface module, the control module being configured to enable selected operations to be performed in response to the control information.

76. A device as defined in claim **75** in which, in response to control information to enable another device to become a member of the device's synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to become a member of the synchrony group.

77. A device as defined in claim **75** in which, in response to control information to enable another device that is a member of the device's synchrony group to disengage from the synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to disengage from the synchrony group.

78. A device as defined in claim **75** in which, in response to control information to enable the task source to begin operating, the control module performs selected operations to enable the task source to begin operating.

79. A device as defined in claim **78**, the device also operating as the task source, the device including a task generator module configured to, under control of the control module, obtain information from which the tasks are to be generated and generate the tasks.

80. A device as defined in claim **79** in which the interface module is further configured to transmit the tasks to at least one other device.

81. A device as defined in claim **79** in which the device is not the task source, the control module being configured to enable the interface module to transmit a command to enable the task source to operate.

82. A device as defined in claim **81** in which tasks are divided into a series of task sequences, and, in response to receipt of control information enabling execution of a sequence of tasks currently being executed to be terminated, the control module is configured to enable the interface module to transmit a command to enable the task source to insert a resynchronize command in the series of tasks associated with the task sequence to enable termination of execution of the task sequence.

83. A device as defined in claim **81** in which tasks are divided into a series of task sequences, and, in response to receipt of control information enabling execution of a sequence of tasks at least a portion of which have been received, but which are not being executed, the control module is configured to enable the interface module to transmit a command to enable

US 8,234,395 B2

45

the task source to insert a resynchronize command in the series of commands to disable execution of the task sequence.

84. A device as defined in claim **75** in which the control module is configured to enable the user interface module interface module to transmit status information to the user interface module.

85. A device as defined in claim **84** in which the status information includes the execution status of at least one task.

86. A device as defined in claim **65** further including:

A. a migration information receiving module configured to receive migration information from the task source device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group, and

B. a migration control module configured to, after the migration information has been received,

i. distribute the series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the task source device, at which the devices comprising the synchrony group are to execute the respective task, and

ii. notify the members of the synchrony group that it is to thereafter operate as the task source device.

87. A device as defined in claim **86** in which the information respecting the tasks that are to be distributed is a source of streaming information, the migration control module being configured to, after the migration information has been received, assembling the streaming information into tasks and associate each task with a said time stamp.

88. A device as defined in claim **86** in which the information respecting the tasks that are to be distributed is in a file identified in the migration information, the migration control module being configured to obtain information from the identified file, assemble the information into tasks and associate each task with a said time stamp.

89. A device as defined in claim **88** in which the information respecting the tasks that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control module being configured to assemble the information from a position in the file associated with the identified offset.

90. A device as defined in claim **89** in which the information respecting the tasks that are to be distributed is in a series of files identified in the migration information, the migration control module being configured to obtain information from successive files in the series assemble the information into tasks and associate each task with as said time stamp.

91. A device as defined in claim **65** further including a clock rate adjustment module configured to adjust the member device's clock rate in relation to a clock rate value maintained by the task source device's clock.

92. A task source device for distributing a series of tasks for execution by at least one other device at respective execution times, the task source device comprising:

A. a task acquisition module configured to obtain respective ones of the tasks;

B. a task execution time determination module configured to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission module configured to transmit the series of tasks to said at least one other device; and

D. an execution control command generation module configured to, in response to a predetermined event, enable the task

46

transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to modify the execution sequence of the tasks transmitted therein.

93. A task source device as defined in claim **92** in which the task transmission module is configured to utilize a selected multi-cast transmission methodology.

94. A task source device as defined in claim **92** in which the predetermined event comprises input indicia provided by an operator.

95. A task source device as defined in claim **94** in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to control execution of at least one task in relation to the time the predetermined event occurs.

96. A task source device as defined in claim **95** in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to terminate execution of a task that it is currently executing and/or to not execute at least one task that is to be executed subsequent to the predetermined event.

97. A task source device as defined in claim **95** in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation module being configured to, in response to said predetermined event,

(i) enable the task transmission module to insert into the series of tasks transmitted by the task transmission module, a command enabling the at least one other device to terminate execution of the currently executing task and/or to not execute at least one subsequent task, if any, in the task sequence including the currently executing task; and

(ii) enable

(a) the task execution time determination module to provide that time stamps associated with tasks of task sequences subsequent to the task sequence currently being executed will reflect the termination and/or non-execution of tasks from the task sequence of the task that is currently being executed, and

(b) the task transmission module to transmit the tasks of the subsequent task sequences to the at least one other device.

98. A task source device as defined in claim **97** in which the task transmission module is configured to insert a command to enable the at least one other device to not execute all tasks in the task sequence subsequent to the terminated and/or non-executed task.

99. A task source device as defined in claim **92** in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to control execution of a task in relation to the task's position in the series of tasks.

100. A task source device as defined in claim **99** in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to cancel execution of a task in relation to the task's position in the series of tasks.

101. A task source device as defined in claim **99** in which, in response to said predetermined event, the execution control command generation module is configured to enable the task

US 8,234,395 B2

47

transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted task in relation to the task's position in the series of tasks.

102. A task source device as defined in claim 101 in which, in response to said predetermined event, the execution control command generation module is configured to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted task, in relation to the task's position in the series of tasks, for which execution has not begun.

103. A task source device as defined in claim 99 in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation module being configured to, in response to said predetermined event,

(i) enable the task transmission module to insert into the series of tasks transmitted by the task transmission module, a command enabling the at least one other device to cancel execution of a task sequence for which execution has not begun; and
(ii) enable

(a) the task execution time determination module to provide that time stamps associated with tasks of task sequences subsequent to the task sequence whose execution was cancelled will reflect the cancellation, and
(b) the task transmission module to transmit the tasks of the subsequent task sequences to the at least one other device.

104. A task source device for distributing a series of tasks for execution by at least one other device at respective execution times, the task source device comprising:

A. a task acquisition module configured to obtain respective ones of the tasks;
B. a task execution time determination module configured to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time, the task execution time determination module being configured to provide, associated with at least one task, a time stamp indicating a task execution time later than the time currently indicated by a clock maintained by the task source device; and
C. a task transmission module configured to transmit the series of tasks to said at least one other device.

105. A system as defined in claim 104 in which the task source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be executed by the member devices at the time indicated by the time stamp.

106. A system as defined in claim 105 in which the task source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be distributed to the member devices for execution at the time indicated by the time stamp.

107. A system as defined in claim 104 in which task source device is configured to obtain information associated with the tasks from at least two types of information sources, the task source device being further configured to select, for each task the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective task.

108. A task source device for distributing a series of tasks for execution by at least one other device, the task source device comprising:

48

A. a task acquisition module configured to obtain respective ones of the tasks;
B. a task execution time determination module configured to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;
C. a task transmission module configured to transmit the series of tasks to said at least one other device; and
D. a task source device migration control module configured to, in response to a predetermined event, provide migration information to another device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group.

109. A method of operating a system comprising plurality of devices, one of the devices operating as a task source device and at least one other device operating as a member of a synchrony group,

A. the task source device being enabled to distribute a series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to a clock maintained by the task source device, at which the devices comprising the synchrony group are to execute the respective task;
B each member device being enabled to:

(i) periodically obtain from the task source device an indication of a current time value indicated by the task source device's clock, and
(ii) determine, from the time stamp associated with each respective task and a time differential value representing a difference between the current time value indicated by the task source device's clock, and a current time value indicated by its respective clock, a time, relative to its respective clock, at which it is to execute the task.

111. A method as defined in claim 110 in which each device comprising a member of the synchrony group is further enabled to execute each task that it receives from the task source device at the determined time, thereby to facilitate execution by them of respective tasks in the series in respective timing relationships relative to the time indicated by the task source device's clock.

113. A method as defined in claim 110 in which one of the member devices operates as a master device for the synchrony group, any other member devices comprising respective slave devices, the master device being enabled to perform at least one type of synchrony group management operation in connection with the member devices comprising the synchrony group.

114. A method as defined in claim 113 further including a user interface module enabled to control the master device's performance of said at least one one type of synchrony group management operation, the master device being further enabled to provide status information relating to the status of the synchrony group to the user interface module.

115. A method as defined in claim 114 in which the status information includes identifications of the devices comprising the synchrony group.

116. A method as defined in claim 114 in which the status information includes an identification of the task currently being executed.

117. A method as defined in claim 113, the method comprising at least one additional device, in which, in one type of synchrony group management operation, the master device is enabled to enable the at least one additional device to join the synchrony group as a slave device.

118. A method as defined in claim 117 in which the task source device is enabled to distribute tasks to the member

US 8,234,395 B2

49

devices using a selected multi-cast transmission methodology, the member devices being enabled to buffer the tasks until they are to be executed, and further in which, when the at least one additional device joins the synchrony group as a slave device, the task source device is enabled to transmit at least one previously distributed task to the slave device using a selected unicast transmission methodology.

119. A method as defined in claim 113 in which, in at least one type of synchrony group management operation, the master device is enabled to enable the task source device to join the synchrony group as a slave device, the task source device continuing to operate as the task source device for the synchrony group.

120. A method as defined in claim 113 in which, in at least one type of synchrony group management operation, the master device is enabled to enable a slave device to disengage from the synchrony group, the disengaged slave device thereafter not being a member device in the synchrony group.

121. A method as defined in claim 113 in which, in at least one type of synchrony group management operation, the master device is enabled to control the series of tasks to be distributed by the task source device.

122. A method as defined in claim 113 in which, in at least one type of synchrony group management operation, the master device is further enabled to control execution by the member devices of the tasks that have been distributed by the task source device.

123. A method as defined in claim 122 in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, and further in which in at least one type of synchrony group management operation, the master device is enabled to enable the member devices to terminate execution of a task sequence that is currently being executed.

124. A method as defined in claim 123 in which, in the synchrony group management operation enabling the member devices to terminate execution of a task sequence that is currently being executed, the master device enables the task source device to distribute a command to enable the member devices to terminate execution of the task sequence, the member devices being enabled to, after receiving the command, terminating execution of the task sequence.

125. A method as defined in claim 122 in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, and further in which at least one type of synchrony group management operation, the master device is enabled to enable the member devices to cancel execution of a task sequence that has been previously distributed, but for which execution has not begun.

126. A method as defined in claim 125 in which, in the synchrony group management operation enabling the member devices to cancel execution of a task sequence that has been previously distributed but for which execution has not begun, the master device enables the task source device to distribute a command to enable the member devices to cancel execution of the task sequence, the member devices being enabled to, after receiving the command, cancel execution of the task sequence.

127. A method as defined in claim 113 in which, in at least one type of synchrony group management operation, the member device operating as the master device is enabled to enable the master device to migrate from one member device to another member device in the synchrony group.

128. A method as defined in claim 113 in which, in at least one type of synchrony group management operation, the master

50

device is enabled to perform the step of enabling the task source device to migrate from one device to another device in the system.

129. A method as defined in claim 128 in which
A. the device operating as the task source device is enable to perform the step of, after being enabled to migrate the task source device to said other device, providing migration information to the other device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices,
B. the other device is enabled to, after receiving the migration information, perform the steps of
i. distributing the series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the task source device, at which the devices comprising the synchrony group are to execute the respective task, and
ii. notifying the members of the synchrony group that it is to thereafter operate as the task source device.

130. A method as defined in claim 129 in which the information respecting the tasks that are to be distributed is a source of streaming information, the other device being enabled to, after receiving the migration information, perform the steps of assembling the streaming information into tasks and associating each task with a said time stamp.

131. A method as defined in claim 129 in which the information respecting the tasks that are to be distributed is in a file identified in the migration information, the other device being enabled to perform the steps of obtaining information from the identified file, assembling the information into tasks and associating each task with a said time stamp.

132. A method as defined in claim 131 in which the information respecting the tasks that are to be distributed begins at an offset, identified in the migration information, into the identified file, the other device being enabled to perform the step of assembling the information from a position in the file associated with the identified offset.

133. A method as defined in claim 131 in which the information respecting the tasks that are to be distributed is in a series of files identified in the migration information, the other device being enabled to perform the step of obtaining information from successive files in the series assemble the information into tasks and associate each task with as said time stamp.

134. A method as defined in claim 109 in which the task source device is further enabled to distribute the tasks using a selected multi-cast message transmission methodology.

135. A method as defined in claim 109 in which the task source device is enabled to perform the step of providing, provide, associated with at least one task, a time stamp indicating a task execution time later than the time currently indicated by the clock maintained by the task source device.

136. A method as defined in claim 135 in which the task source device is enabled to perform the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be executed by the member devices at the time indicated by the time stamp.

137. A method as defined in claim 136 in which the task source device is enabled to perform the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at

US 8,234,395 B2

51

52

least one task distributed by the task source device can be distributed to the member devices for execution at the time indicated by the time stamp.

138. A method as defined in claim **135** in which task source device is enabled to perform the steps of obtaining information associated with the tasks from at least two types of information sources, and selecting, for each task, the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective task.

139. A method as defined in claim **109** in which at least one member device is further enabled to perform the step of adjusting its clock rate in relation to a clock rate value maintained by the task source device's clock.

140. A method as defined in claim **139** in which the at least one member device is enabled to perform the step of adjusting its clock rate in relation to time stamps associated with respective ones of the tasks received from the task source device.

141. A method as defined in claim **109** in which at least one other device operates as a task source device enabled to distribute tasks to a second synchrony group, the device operating as the task source device for the first synchrony group also operating as a member device of a second synchrony group.

142. A method as defined in claim **109** including, within a member device,

A. a task receiving step of receiving the series of tasks,

B. a current time retrieval step of obtaining, from the task source device, the current time value as indicated by the task source's clock;

C. an execution time determination step of determining, from the time stamp associated with each respective task and a time differential value representing a difference between the current time value obtained during the current time retrieval step and a current time value indicated by a clock maintained by the device, a time, relative to the member device's respective clock at which the task is to be executed; and

D. a task execution step of executing each respective task at the time determined during the execution time determination step.

143. A method as defined in claim **142** further including a control step for controlling execution of commands received during the task receiving step.

144. A method as defined in claim **143** in which the at least one member device further comprises a buffer configured to buffer tasks received from the task source device during the task receiving step until they are to be executed, the task execution step including the step of executing the buffered tasks at the times determined during the execution time determination step.

145. A method as defined in claim **144** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the task receiving step being further enabled to receive task execution control commands for controlling task execution, the control step including the step of, in response to receipt of at least one task execution control command for controlling task execution, controlling the task execution step to terminate execution of a task sequence currently being executed, and further to not execute subsequent tasks in the task sequence that have been buffered.

146. A method as defined in claim **145** in which the control step includes the step of enabling the task execution step to resume execution of at least one task associated with a subsequent task sequence at a time determined during the execution time determination step.

147. A method as defined in claim **144** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the task receiving step including the step of receiving task execution control commands for controlling task execution, the control step including the step of, in response to receipt of at least one task execution control command to cancel execution of a task sequence for which at least one task has been buffered but for which execution has not begun, providing that tasks from that task sequence that have been buffered not be executed.

148. A method as defined in claim **147** in which the control step includes the step of enabling execution to resume of at least one task associated with a task sequence subsequent to the task sequence for which at least one task has been buffered but for which execution has not begun.

149. A method as defined in claim **142** in which the member device performs:

A. migration information receiving step of receiving migration information from the task source device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group, and

B. a migration control step of, after the migration information has been received,

i. distributing the series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the task source device, at which the devices comprising the synchrony group are to execute the respective task, and

ii. notifying the members of the synchrony group that it is to thereafter operate as the task source device.

150. A method as defined in claim **149** in which the information respecting the tasks that are to be distributed is a source of streaming information, the migration control step includes the steps of, after the migration information has been received, assembling the streaming information into tasks and associating each task with a said time stamp.

151. A method as defined in claim **149** in which the information respecting the tasks that are to be distributed is in a file identified in the migration information, the migration control step including the steps of obtaining information from the identified file, assembling the information into tasks and associating each task with a said time stamp.

152. A method as defined in claim **151** in which the information respecting the tasks that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control step including the step of assembling the information from a position in the file associated with the identified offset.

153. A method as defined in claim **151** in which the information respecting the tasks that are to be distributed is in a series of files identified in the migration information, the migration control step including the steps of obtaining information from successive files in the series assemble the information into tasks and associating each task with as said time stamp.

154. A method as defined in claim **142** in which the member device is further enabled to perform a clock rate adjustment step including the step of adjusting the member device's clock rate in relation to a clock rate value maintained by the task source device's clock.

155. A method as defined in claim **154** in which the clock rate adjustment step includes the step of determining adjust the clock rate in relation to time stamps associated with respective ones of the tasks received from the task source device.

US 8,234,395 B2

53

156. A method as defined in claim **109** including, within a task source device,

A. a task acquisition step of obtaining respective ones of the tasks;

B. a task execution time determination step of determining a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission step of transmitting the series of tasks to said at least one other device; and

D. an execution control command generation step of, in response to a predetermined event and during the task transmission step, the insertion into the series of tasks transmitted by the task transmission module of a command to enable the at least one other device to modify the execution sequence of the tasks transmitted thereto.

157. A method as defined in claim **156** in which the task transmission step includes the step of utilizing a selected multi-cast transmission methodology.

158. A method as defined in claim **156** in which the predetermined event includes the step of receiving input indicia provided by an operator.

159. A method as defined in claim **158** in which the execution control command generation step includes the step of enabling, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to control execution of at least one task in relation to the time the predetermined event occurs.

160. A method as defined in claim **159** in which, the execution control command generation step includes the step of enabling, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to terminate execution of a task that it is currently executing and/or to not execute at least one task that is to be executed subsequent to the predetermined event.

161. A method as defined in claim **159** in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation step including the steps of, in response to said predetermined event,

(i) enabling during the task transmission step the insertion, into the series of tasks, of a command enabling the at least one other device to terminate execution of the currently executing task and/or to not execute at least one subsequent task, if any, in the task sequence including the currently executing task; and

(ii) enabling

(a) during the task execution time determination step, that time stamps associated with tasks of task sequences subsequent to the task sequence currently being executed will reflect the termination and/or non-execution of tasks from the task sequence of the task that is currently being executed, and

(b) during the task transmission step, the transmission of the tasks of the subsequent task sequences to the at least one other device.

162. A method as defined in claim **161** in which the task transmission step includes the step of inserting a command into the task sequence to enable the at least one other device to not execute all tasks in the task sequence subsequent to the terminated and/or non-executed task.

163. A method as defined in claim **159** in which the execution control command generation step include the step of enabling, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks

54

of a command to enable the at least one other device to control execution of a task in relation to the task's position in the series of tasks.

164. A method as defined in claim **163** in which the execution control command generation step includes the step of, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to cancel execution of a task in relation to the task's position in the series of tasks.

165. A method as defined in claim **163** in which the execution control command generation step includes the step of enabling, in response to said predetermined event and during the task transmission step, the inserting into the series of tasks of a command to enable the at least one other device to cancel execution of a previously-transmitted task in relation to the task's position in the series of tasks.

166. A method as defined in claim **165** in which, the execution control command generation step includes the step of, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to cancel execution of a previously-transmitted task, in relation to the task's position in the series of tasks, for which execution has not begun.

167. A method as defined in claim **163** in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation step including the steps of, in response to said predetermined event,

(i) enabling, during the task transmission step, the insertion, into the series of tasks, of a command enabling the at least one other device to cancel execution of a task sequence for which execution has not begun; and

(ii) enabling

(a) during the task execution time determination step, that time stamps associated with tasks of task sequences subsequent to the task sequence whose execution was cancelled will reflect the cancellation, and

(b) during the task transmission step, the transmission of the tasks of the subsequent task sequences to the at least one other device.

168. A method as defined in claim **109** in which the task source device is enabled to perform

A. a task acquisition step of obtaining respective ones of the tasks;

B. a task execution time determination step of determining a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission step of transmitting the series of tasks to said at least one other device; and

D. a task source device migration control step of, in response to a predetermined event, providing migration information to another device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group.

169. A method as defined in claim **109** in which the task source device is enabled to perform the step of providing, associated with at least one task, a time stamp indicating a task execution time later than the time currently indicated by the clock maintained by the task source device.

170. A method as defined in claim **169** in which the task source device is enabled to perform the step of selecting the

US 8,234,395 B2

55

delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be executed by the member devices at the time indicated by the time stamp.

171. A method as defined in claim **170** in which the task source device is enabled to perform the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be distributed to the member devices for execution at the time indicated by the time stamp

172. A method as defined in claim **169** in which task source device is enabled to perform the step of obtaining information associated with the tasks from at least two types of information sources, and selecting for each task the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective task.

173. A method of operating a device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, the method including

A. a task receiving step of receiving the series of tasks, each task being associated with a time stamp, each time stamp indicating a time value relative to a time indicated a clock maintained by the task source, at which the device is to execute the respective task;

B. a current time retrieval module of obtaining, from the task source, a current time value as indicated by the task source's clock;

C. an execution time determination step of determining, from the time stamp associated with each respective task and a time differential value representing a difference between the current time value obtained during the current time retrieval step and a current time value indicated by a clock maintained by the device, a time, relative to the device's respective clock, at which the task is to be executed; and

D. a task execution module step of executing each respective task at the time determined during the execution time determination step.

174. A method as defined in claim **173** further including a control step for controlling execution of commands received by said interface module.

175. A method as defined in claim **174** further comprising a buffer configured to buffer tasks that have been received until they are to be executed, the task execution step including the step of executing the buffered tasks at the times determined during the execution time determination step.

176. A method as defined in claim **175** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the interface module being further enabled to receive task execution control commands for controlling task execution, the control module being enabled to, in response to receipt of at least one task execution control command for controlling task execution, enable the task execution module to terminate execution of a task sequence currently being executed, being enabled to not execute subsequent tasks in the task sequence that have been buffered.

177. A method as defined in claim **176** in which the control step includes the step of enabling task execution to resume execution with at least one task associated with a subsequent task sequence at a time determined during the execution time determination step.

178. A method as defined in claim **175** in which the series of tasks includes a series of task sequences with each task

56

sequence including a subset of the series of tasks, the task receiving step including the step of receiving task execution control commands for controlling task execution, the control step, in response to receipt of at least one task execution control command to cancel execution of a task sequence for which at least one task has been buffered but for which execution has not begun, including the step of providing that task execution not including execution of tasks from that task sequence that have been buffered.

179. A method as defined in claim **178** in which the control step includes the step of enabling task execution to resume execution of at least one task associated with a task sequence subsequent to the task sequence for which at least one task has been buffered but for which execution has not begun.

180. A method as defined in claim **173**, the control step including the step of, in response to receipt of a command to become a member of a synchrony group, receiving tasks during the task receiving step for execution during the task execution step.

181. A method as defined in claim **180** in which the control step includes the step of, in response to receipt of a command to become a member of a synchrony group, enable the task receiving step to include the step of receiving tasks currently being transmitted using a selected multi-cast transmission methodology, and further to include the step of retrieving at least one previously distributed task using a selected unicast transmission methodology.

182. A method as defined in claim **173** in which the control step includes the steps of, in receipt of a command to disengage from a synchrony group, disabling the receipt of tasks and the execution of previously-received tasks that have not yet been executed.

183. A method as defined in claim **173** further comprising a user interface module control information receiving step of receiving control information from a user interface module, the control step including the step of enabling selected operations to be performed in response to the control information.

184. A method as defined in claim **183** in which, in response to control information to enable another device to become a member of the device's synchrony group, the control step includes the step of transmitting a command to the other device to enable the other device to become a member of the synchrony group.

185. A method as defined in claim **183** in which, in response to control information to enable another device that is a member of the device's synchrony group to disengage from the synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to disengage from the synchrony group.

186. A method as defined in claim **185** in which, in response to control information to enable the task source to begin operating, the control step includes the step of performing selected operations to enable the task source to begin operating.

187. A method as defined in claim **186**, the device also operating as the task source, the method including a task generation steps of, under control of the control step, obtaining information from which the tasks are to be generated and generating the tasks.

188. A method as defined in claim **187** further including the step of transmitting the tasks to at least one other device.

189. A method as defined in claim **187** in which the device is not the task source, the control step including the step of enabling the transmission of a command to enable the task source to operate.

190. A method as defined in claim **189** in which tasks are divided into a series of task sequences, and, in response to

US 8,234,395 B2

57 58

receipt of control information enabling execution of a sequence of tasks currently being executed to be terminated, the control step includes the step of transmitting a command to enable the task source to insert a resynchronize command in the series of tasks associated with the task sequence to enable termination of execution of the task sequence.

191. A method as defined in claim **189** in which tasks are divided into a series of task sequences, and, in response to receipt of control information enabling execution of a sequence of tasks at least a portion of which have been received, but which are not being executed, the control step includes the step of transmitting a command to enable the task source to insert a resynchronize command in the series of commands to disable execution of the task sequence.

192. A method as defined in claim **174** in which the control step includes the step of transmitting status information to the user interface module.

193. A method as defined in claim **192** in which the status information includes the execution status of at least one task.

194. A method as defined in claim **173** in which the member device performs:

A. migration information receiving step of receiving migration information from the task source device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group, and

B. a migration control step of, after the migration information has been received,

i. distributing the series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the task source device, at which the devices comprising the synchrony group are to execute the respective task, and

ii. notifying the members of the synchrony group that it is to thereafter operate as the task source device.

195. A method as defined in claim **194** in which the information respecting the tasks that are to be distributed is a source of streaming information, the migration control step includes the steps of, after the migration information has been received, assembling the streaming information into tasks and associating each task with a said time stamp.

196. A method as defined in claim **194** in which the information respecting the tasks that are to be distributed is in a file identified in the migration information, the migration control step including the steps of obtaining information from the identified file, assembling the information into tasks and associating each task with a said time stamp.

197. A method as defined in claim **196** in which the information respecting the tasks that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control step including the step of assembling the information from a position in the file associated with the identified offset.

198. A method as defined in claim **196** in which the information respecting the tasks that are to be distributed is in a series of files identified in the migration information, the migration control step including the steps of obtaining information from successive files in the series assemble the information into tasks and associating each task with as said time stamp.

199. A method as defined in claim **173** in which the member device is further enabled to perform a clock rate adjustment step including the step of adjusting the member device's clock rate in relation to a clock rate value maintained by the task source device's clock.

200. A method as defined in claim **199** in which the clock rate adjustment step includes the step of determining adjust the clock rate in relation to time stamps associated with respective ones of the tasks received from the task source device.

201. A method of operating a device for distributing a series of tasks for execution by at least one other device at respective execution times, the method comprising:

A. a task acquisition step of obtaining respective ones of the tasks;

B. a task execution time determination step of determining a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission step of transmitting the series of tasks to said at least one other device; and

D. an execution control command generation step of, in response to a predetermined event and during the task transmission step, the insertion into the series of tasks transmitted by the task transmission module of a command to enable the at least one other device to modify the execution sequence of the tasks transmitted thereto.

202. A method as defined in claim **201** in which the task transmission step includes the step of utilizing a selected multi-cast transmission methodology.

203. A method as defined in claim **201** in which the predetermined event includes the step of receiving input indicia provided by an operator.

204. A method as defined in claim **203** in which the execution control command generation step includes the step of enabling, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to control execution of at least one task in relation to the time the predetermined event occurs.

205. A method as defined in claim **204** in which, the execution control command generation step includes the step of enabling, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to terminate execution of a task that is it currently executing and/or to not execute at least one task that is to be executed subsequent to the predetermined event.

206. A method as defined in claim **203** in which the series of tasks includes a series of task sequences with each'task sequence including a sub-set of the series of tasks, the execution control command generation step including the steps of, in response to said predetermined event,

(i) enabling during the task transmission step the insertion, into the series of tasks, of a command enabling the at least one other device to terminate execution of the currently executing task and/or to not execute at least one subsequent task; if any, in the task sequence including the currently executing task; and

(ii) enabling

(a) during the task execution time determination step, that time stamps associated with tasks of task sequences subsequent to the task sequence currently being executed will reflect the termination and/or non-execution of tasks from the task sequence of the task that is currently being executed, and

(b) during the task transmission step, the transmission of the tasks of the subsequent task sequences to the at least one other device.

207. A method as defined in claim **206** in which the task transmission step includes the step of inserting a command into the task sequence to enable the at least one other device to not execute all tasks in the task sequence subsequent to the terminated and/or non-executed task.

US 8,234,395 B2

59

208. A method as defined in claim **201** in which the execution control command generation step include the step of enabling, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to control execution of a task in relation to the task's position in the series of tasks;

209. A method as defined in claim **208** in which the execution control command generation step includes the step of, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to cancel execution of a task in relation to the task's position in the series of tasks.

210. A method as defined in claim **208** in which the execution control command generation step includes the step of enabling, in response to said predetermined event and during the task transmission step, the inserting into the series of tasks of a command to enable the at least one other device to cancel execution of a previously-transmitted task in relation to the task's position in the series of tasks.

211. A method as defined in claim **210** in which, the execution control command generation step includes the step of, in response to said predetermined event and during the task transmission step, the insertion into the series of tasks of a command to enable the at least one other device to cancel execution of a previously-transmitted task, in relation to the task's position in the series of tasks, for which execution has not begun.

212. A method as defined in claim **208** in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation step including the steps of, in response to said predetermined event,

(i) enabling, during the task transmission step, the insertion, into the series of tasks, of a command enabling the at least one other device to cancel execution of a task sequence for which execution has not begun; and

(ii) enabling

(a) during the task execution time determination step, that time stamps associated with tasks of task sequences subsequent to the task sequence whose execution was cancelled will reflect the cancellation, and

(b) during the task transmission step, the transmission of the tasks of the subsequent task sequences to the at least one other device.

213. A method of operating a device for distributing a series of tasks for execution by at least one other device at respective execution times, the method comprising:

A. a task acquisition step of obtaining respective ones of the tasks;

B. a task execution time determination step of determining a time at which each respective task is to be executed, and to associating the respective task with a time stamp indicating its execution time, the task execution time determination step including the step of providing, associated with at least one task, a time stamp indicating a task execution time later than the time currently indicated by a clock maintained by the task source device; and

C. a task transmission step of transmitting the series of tasks to said at least one other device.

214. A method as defined in claim **213** in which the task execution time determination step includes the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that

60

the at least one task distributed by the device can be executed by at least one other device at the time indicated by the time stamp.

215. A method as defined in claim **214** in which the task execution time determination step includes the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the device can be distributed to other devices over a network for execution by the other devices at the time indicated by the time stamp.

216. A method as defined in claim **213** in which task acquisition step includes the step of obtaining information associated with the tasks from at least two types of information sources, the task execution time determination step including the step of selecting, for each task the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective task.

217. A method of operating a device for distributing a series of tasks for execution by at least one other device, the method comprising:

A. a task acquisition module configured to obtain respective ones of the tasks;

B. a task execution time determination module configured to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission module configured to transmit the series of tasks to said at least one other device; and

D. a task source device migration control module configured to, in response to a predetermined event, provide migration information to another device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group.

218. A computer program product for use in connection with a computer to provide a device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, the computer program product comprising a computer readable medium having encoded thereon:

A. an interface module configured to enable the computer to receive the series of tasks, each task being associated with a time stamp, each time stamp indicating a time value relative to a time indicated a clock maintained by the task source, at which the device is to execute the respective task;

B. a current time retrieval module configured to enable the computer to obtain, from the task source, a current time value as indicated by the task source's clock;

C. an execution time determination module configured to enable the computer to determine, from the time stamp associated with each respective task and a time differential value representing a difference between the current time value obtained by the current time retrieval module and a current time value indicated by a clock maintained by the device, a time, relative to the device's respective clock, at which the task is to be executed; and

D. a task execution module configured to enable the computer to execute each respective task at the time determined by the execution time determination module.

219. A computer program product as defined in claim **218** further including a control module for enabling said computer to control execution of commands received by the interface module.

220. A computer program product as defined in claim **219** further comprising a buffer module configured to enable the

US 8,234,395 B2

61

computer to buffer tasks received by the interface module until they are to be executed, the task execution module being configured to enable the computer to execute the buffered tasks at the times determined by the execution time determination module.

221. A computer program product as defined in claim **220** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the interface module being further configured to enable the computer to receive task execution control commands for controlling task execution, the control module being configured to enable the computer to, in response to receipt of at least one task execution control command for controlling task execution, enable the task execution module to terminate execution of a task sequence currently being executed, being configured to enable the computer to not execute subsequent tasks in the task sequence that have been buffered.

222. A computer program product as defined in claim **220** in which the control module is configured to enable the computer to enable the task execution module to resume execution of at least one task associated with a subsequent task sequence at a time determined by the execution time determination module.

223. A computer program product as defined in claim **219** in which the series of tasks includes a series of task sequences with each task sequence including a subset of the series of tasks, the interface module being further configured to enable the computer to receive task execution control commands for controlling task execution, the control module being configured to enable the computer to, in response to receipt of at least one task execution control command to cancel execution of a task sequence for which at least one task has been buffered but for which execution has not begun, enable the task execution module to not execute tasks from that task sequence that have been buffered.

224. A computer program product as defined in claim **223** in which the control module is configured to enable the computer to enable the task execution module to resume execution of at least one task associated with a task sequence subsequent to the task sequence for which at least one task has been buffered but for which execution has not begun.

225. A computer program product as defined in claim **219**, the control module being configured to enable the computer to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive tasks for execution by the task execution module.

226. A computer program product as defined in claim **225** in which the control module is configured to enable the computer to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive tasks currently being transmitted using a selected multi-cast transmission methodology, and further to retrieve at least one previously distributed task using a selected unicast transmission methodology.

227. A computer program product as defined in claim **219** in which the control module is configured to enable the computer to, in receipt of a command to disengage from a synchrony group, disable the interface module from receiving tasks and the task execution module from executing previously received tasks that have not yet been executed.

228. A computer program product as defined in claim **219** further comprising a user interface module interface module configured to receive control information from a user interface module, the control module being configured to enable the computer to enable selected operations to be performed in response to the control information.

62

229. A computer program product as defined in claim **228** in which, in response to control information to enable another device to become a member of the device's synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to become a member of the synchrony group.

230. A computer program product as defined in claim **228** in which, in response to control information to enable another device that is a member of the device's synchrony group to disengage from the synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to disengage from the synchrony group.

231. A computer program product as defined in claim **228** in which, in response to control information to enable the task source to begin operating, the control module performs selected operations to enable the task source to begin operating.

232. A computer program product as defined in claim **231**, the device also operating as the task source, the device including a task generator module configured to enable the computer to, under control of the control module, obtain information from which the tasks are to be generated and generate the tasks.

233. A computer program product as defined in claim **232** in which the interface module is further configured to enable the computer to transmit the tasks to at least one other device.

234. A computer program product as defined in claim **232** in which the device is not the task source, the control module being configured to enable the computer to enable the interface module to transmit a command to enable the task source to operate.

235. A computer program product as defined in claim **234** in which tasks are divided into a series of task sequences, and, in response to receipt of control information enabling execution of a sequence of tasks currently being executed to be terminated, the control module is configured to enable the computer to enable the interface module to transmit a command to enable the task source to insert a resynchronize command in the series of tasks associated with the task sequence to enable termination of execution of the task sequence.

236. A computer program product as defined in claim **234** in which tasks are divided into a series of task sequences, and, in response to receipt of control information enabling execution of a sequence of tasks at least a portion of which have been received, but which are not being executed, the control module is configured to enable the computer to enable the interface module to transmit a command to enable the task source to insert a resynchronize command in the series of commands to disable execution of the task sequence.

237. A computer program product as defined in claim **228** in which the control module is configured to enable the computer to enable the user interface module interface module to transmit status information to the user interface module.

238. A computer program product as defined in claim **237** in which the status information includes the execution status of at least one task.

239. A computer program product as defined in claim **218** further including:

A. a migration information receiving module configured to enable the computer to receive migration information from the task source device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group, and

B. a migration control module configured to enable the computer to, after the migration information has been received,

US 8,234,395 B2

63

i. distribute the series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the task source device, at which the devices comprising the synchrony group are to execute the respective task, and

ii. notify the members of the synchrony group that it is to thereafter operate as the task source device.

240. A computer program product as defined in claim 239 in which the information respecting the tasks that are to be distributed is a source of streaming information, the migration control module being configured to enable the computer to, after the migration information has been received, assemble the streaming information into tasks and associate each task with a said time stamp.

241. A computer program product as defined in claim 239 in which the information respecting the tasks that are to be distributed is in a file identified in the migration information, the migration control module being configured to enable the computer to obtain information from the identified file, assemble the information into tasks and associate each task with a said time stamp.

242. A computer program product as defined in claim 241 in which the information respecting the tasks that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control module being configured to enable the computer to assemble the information from a position in the file associated with the identified offset.

243. A computer program product as defined in claim 241 in which the information respecting the tasks that are to be distributed is in a series of files identified in the migration information, the migration control module being configured to enable the computer to obtain information from successive files in the series assemble the information into tasks and associate each task with as said time stamp.

244. A computer program product as defined in claim 218 further including a clock rate adjustment module configured to enable the computer to adjust the member device's clock rate in relation to a clock rate value maintained by the task source device's clock.

245. A computer program product as defined in claim 244 in which the clock rate adjustment module is configured to enable the computer to adjust the clock rate in relation to time stamps associated with respective ones of the tasks received from the task source device.

246. A computer program product for use in connection with a computer to provide a task source device for distributing a series of tasks for execution by at least one other device at respective execution times, the computer program product comprising a computer readable medium having encoded thereon:

A. a task acquisition module configured to enable the computer to obtain respective ones of the tasks;

B. a task execution time determination module configured to enable the computer to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission module configured to enable the computer to transmit the series of tasks to said at least one other device; and

D. an execution control command generation module configured to enable the computer to, in response to a predetermined event, enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to modify the execution sequence of the tasks transmitted thereto.

64

247. A computer program product as defined in claim 246 which the task transmission module is configured to enable the computer to utilize a selected multi-cast transmission methodology.

248. A computer program product as defined in claim 246 in which the predetermined event comprises input indicia provided by an operator.

249. A computer program product as defined in claim 246 in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to control execution of at least one task in relation to the time the predetermined event occurs.

250. A computer program product as defined in claim 249 in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to terminate execution of a task that it is currently executing and/or to not execute at least one task that is to be executed subsequent to the predetermined event.

251. A computer program product as defined in claim 249 in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation module being configured to enable the computer to, in response to said predetermined event,

(i) enable the task transmission module to insert into the series of tasks transmitted by the task transmission module, a command enabling the at least one other device to terminate execution of the currently executing task and/or to not execute at least one subsequent task, if any, in the task sequence including the currently executing task; and

(ii) enable

(a) the task execution time determination module to provide that time stamps associated with tasks of task sequences subsequent to the task sequence currently being executed will reflect the termination and/or non-execution of tasks from the task sequence of the task that is currently being executed, and

(b) the task transmission module to transmit the tasks of the subsequent task sequences to the at least one other device.

252. A computer program product as defined in claim 251 in which the task transmission module is configured to enable the computer to insert a command to enable the at least one other device to not execute all tasks in the task sequence subsequent to the terminated and/or non-executed task.

253. A computer program product as defined in claim 246 in which, in response to said 1 predetermined event, the execution control command generation module is configured to enable the computer to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to control execution of a task in relation to the task's position in the series of tasks.

254. A computer program product as defined in claim 253 in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to cancel execution of a task in relation to the task's position in the series of tasks.

255. A computer program product as defined in claim 254 in which, in response to said predetermined event, the execution

US 8,234,395 B2

65

control command generation module is configured to enable the computer to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted task in relation to the task's position in the series of tasks.

256. A computer program product as defined in claim 255 in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the task transmission module to insert into the series of tasks transmitted by the task transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted task, in relation to the task's position in the series of tasks, for which execution has not begun.

257. A computer program product as defined in claim 253 in which the series of tasks includes a series of task sequences with each task sequence including a sub-set of the series of tasks, the execution control command generation module being configured to enable the computer to, in response to said predetermined event,

(i) enable the task transmission module to insert into the series of tasks transmitted by the task transmission module, a command enabling the at least one other device to cancel execution of a task sequence for which execution has not begun; and

(ii) enable

(a) the task execution time determination module to provide that time stamps associated with tasks of task sequences subsequent to the task sequence whose execution was cancelled will reflect the cancellation, and

(b) the task transmission module to transmit the tasks of the subsequent task sequences to the at least one other device.

258. A computer program product for use in connection with a computer to provide a task source device for distributing a series of tasks for execution by at least one other device at respective execution times, the computer program product comprising a computer readable medium having encoded thereon:

A. a task acquisition module configured to enable the computer to obtain respective ones of the tasks;

B. a task execution time determination module configured to enable the computer to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time, the task execution time determination module being configured to enable the computer to provide, associated with at least one task, a time stamp indicating a task execution time later than the time currently indicated by a clock maintained by the task source device; and

C. a task transmission module configured to enable the computer to transmit the series of tasks to said at least one other device.

259. A computer program product as defined in claim 258 in which the task execution time determination module is configured to enable the computer to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be executed by the member devices at the time indicated by the time stamp.

260. A computer program product as defined in claim 259 in which the task execution time determination module is configured to enable the computer to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one task distributed by the task source device can be distributed to the member devices for execution at the time indicated by the time stamp.

66

261. A computer program product as defined in claim 258 in which task acquisition module is configured to enable the computer to obtain information associated with the tasks from at least two types of information sources, the task execution time determination module being configured to enable the computer to select, for each task the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective task.

262. A computer program product for use in connection with a computer to provide a task source device for distributing a series of tasks for execution by at least one other device, the computer program product comprising a computer readable medium having encoded thereon:

A. a task acquisition module configured to enable the computer to obtain respective ones of the tasks;

B. a task execution time determination module configured to enable the computer to determine a time at which each respective task is to be executed, and to associate the respective task with a time stamp indicating its execution time;

C. a task transmission module configured to enable the computer to transmit the series of tasks to said at least one other device; and

D. a task source device migration control module configured to enable the computer to, in response to a predetermined event, provide migration information to another device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group.

263. A system comprising a plurality of devices,

A. one device being enabled to operate as a task source device, the task source device being enabled to transmit a series of tasks to the other devices, each task being associated with execution time information;

B. at least one device being enabled to operate as a task execution device, the task execution device being enabled to receive the series of tasks from the network and executing each respective task at a time in relation to the timing information associated with the respective task; and

C. one device being enabled to operate as a control device, the control device being enabled to control operations of the task source device and the task execution device.

264. A system as defined in claim 263 in which the device that is enabled to operate as the control device is also enabled to operate as a task execution device.

265. A system as defined in claim 263 in which the device that is enabled to operate as the control device is also enabled to operate as the task source device.

266. A system as defined in claim 263 in which the device that is enabled to operate as the task source device is also enabled to operate as a task execution device.

267. A system for facilitating processing of data by device operating as a member of a synchrony group, synchronously with a clock maintained by a data source device that provides the data to the synchrony group,

A. the data source device being configured to divide the data into a series of frames for distribution to the synchrony group, each frame being associated with a time stamp indicating a time, relative to a clock maintained by the data source device, at which the devices comprising the synchrony group are to process the frame;

B. each member device in the synchrony group being configured to:

(i) periodically obtain from the data source device an indication of a current time value indicated by the data source device's clock;

US 8,234,395 B2

67 68

(ii) receive the series of frames from the data source device;

(iii) determine, from the time stamp associated with each respective frame and a time differential value representing a difference between the current time value indicated by the data source device's clock, a current time value indicated by the member device's respective clock, a time, relative to the member device's respective clock, at which the member device is to process the frame; and

(iv) process the respective frame at the determined time.

268. A system as defined in claim **267** in which at least one frame comprises audio data, each member device, while processing each frame, producing sound represented by the respective frame.

269. A system as defined in claim **267** comprising a plurality of member devices, the member devices processing each frame synchronously in relation to the clock maintained by the data source device so that they all produce sound represented by the respective frame synchronously.

270. A system as defined in claim **269** in which the data source device is configured to provide time stamps for at least two successive frames so that the member devices will play them with a selected time interval therebetween.

271. A system as defined in claim **270** in which the time interval is zero.

272. A system as defined in claim **269** in which one of the member devices operates as a master device for the synchrony group, any other member devices comprising respective slave devices, the master device being configured to perform at least one type of synchrony group management operation in connection with the member devices comprising the synchrony group.

273. A system as defined in claim **272** in which the master device is further configured to provide status information relating to the status of the synchrony group to the user interface module.

274. A system as defined in claim **273** in which the status information includes identifications of the devices comprising the synchrony group.

275. A system as defined in claim **273** in which each frame is associated with a frame sequence, each frame sequence comprising at least one frame, the frame or frames comprising each frame sequence being associated with an audio track, each audio track being associated with an identifier, the status information including the identification of the audio track currently being played.

276. A system as defined in claim **272**, the system comprising at least one additional device, in which, in one type of synchrony group management operation, the master device is configured to enable the at least one additional device to join the synchrony group as a slave device.

277. A system as defined in claim **276** in which the data source device is configured to distribute frames to the member devices using a selected multi-cast transmission methodology, the member devices being configured to buffer the frames until they are to be played, and further in which, when the at least one additional device joins the synchrony group as a slave device, the data source device is enabled to transmit at least one previously distributed frame to the slave device using a selected unicast transmission methodology.

278. A system as defined in claim **272** which; in at least one type of synchrony group management operation, the master device is configured to enable the data source device to join the synchrony group as a slave device, the data source device continuing to operate as the data source device for the synchrony group.

279. A system as defined in claim **272** in which, in at least one type of synchrony group management operation, the master

device is configured to enable a slave device to disengage from the synchrony group, the disengaged slave device thereafter not being a member device in the synchrony group and not playing frames distributed by the data source device.

280. A system as defined in claim **272** in which, in at least one type of synchrony group management operation, the master device is configured to control the series of frames to be distributed by the data source device.

281. A system as defined in claim **280** in which each frame is associated with a frame sequence, each frame sequence comprising at least one frame, the frame or frames comprising each frame sequence being associated with an audio track, the master device being configured to control the frames to be distributed by the data source device on a track-by-track basis.

282. A system as defined in claim **281** in which, in at least one type of synchrony group management operation, the master device is further configured to control playback by the member devices of the frames associated with the respective audio tracks that have been distributed by the data source device in response to control information from the user interface module.

283. A system as defined in claim **282** in which, in response to control information from the user interface module to facilitate control of playback by the member devices, the master device is configured to enable the data source device to distribute a playback control command to the member devices.

284. A system as defined in claim **283** in which a playback control command enables the member devices to terminate playback of a track that is currently being played back.

285. A system as defined in claim **284** in which the playback control command enables the member devices to terminate playback of a track with a frame subsequent to a frame currently being played.

286. A system as defined in claim **283** in which the playback control command enables the member devices to cancel playback of a track at least one of whose frames has been previously distributed, but for which playback has not begun.

287. A system as defined in claim **272** in which, in at least one type of synchrony group management operation, the member device operating as the master device is configured to enable the master device to migrate from itself to another member device in the synchrony group.

288. A system as defined in claim **272** in which, in at least one type of synchrony group management operation, the master device is configured to enable the data source device to migrate from one device to another device in the system.

289. A system as defined in claim **288** in which

A. the device operating as the data source device is configured to, after being enabled to migrate the data source device to said other device, provide migration information to the other device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices,

B. the other device being configured to, after receiving the migration information,

i. distribute the series of frames to the synchrony group, each frame being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the data source device, at which the devices comprising the synchrony group are to execute the respective frame, and

ii. notify the members of the synchrony group that it is to thereafter operate as the data source device.

290. A system as defined in claim **289** in which the information respecting the frames that are to be distributed is a source

US 8,234,395 B2

69

70

of streaming information, the other device being configured to, after receiving the migration information, assemble the streaming information into frames and associate each frame with a said time stamp.

291. A system as defined in claim 289 in which the information respecting the frames that are to be distributed is in a file identified in the migration information, the other device being configured to obtain information from the identified file, assemble the information into frames and associate each frame with a said time stamp.

292. A system as defined in claim 291 in which the information respecting the frames that are to be distributed begins at an offset, identified in the migration information, into the identified file, the other device being configured to assemble the information from a position in the file associated with the identified offset.

293. A system as defined in claim 291 in which the information respecting the frames that are to be distributed is in a series of files identified in the migration information, the other device being configured to obtain information from successive files in the series assemble the information into frames and associate each frame with as said time stamp.

294. A system as defined in claim 267 in which the data source device is further configured to distribute the frames using a selected multi-cast message transmission methodology.

295. A system as defined in claim 267 in which the data source device is configured to provide, associated with at least one frame, a time stamp indicating a frame execution time later than the time currently indicated by the clock maintained by the data source device.

296. A system as defined in claim 295 in which the data source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be executed by the member devices at the time indicated by the time stamp.

297. A system as defined in claim 296 in which the data source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be distributed to the member devices for execution at the time indicated by the time stamp.

298. A system as defined in claim 295 in which data source device is configured to obtain information associated with the frames from at least two types of information sources, the data source device being further configured to select, for each frame the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective frame.

299. A system as defined in claim 267 in which at least one member device is further configured to adjust its clock rate in relation to a clock rate value maintained by the data source device's clock.

300. A system as defined in claim 299 in which the at least one member device is configured to adjust its clock rate in relation to time stamps associated with respective ones of the frames received from the data source device.

301. A system as defined in claim 267 in which at least one other device operates as a data source device configured to distribute frames to a second synchrony group, the device operating as the data source device for the first synchrony group also operating as a member device of a second synchrony group.

302. A system as defined in claim 267 in which at least one member device comprises:

A. an interface module configured to receive the series of frames, each frame being associated with a time stamp, each

time stamp indicating a time value relative to a time indicated a clock maintained by the data source, at which the device is to process the respective frame;

B. a current time retrieval module configured to obtain, from the data source, a current time value as indicated by the data source's clock;

C. an processing time determination module configured to determine, from the time stamp associated with each respective frame and a time differential value representing a difference between the current time value obtained by the current time retrieval module and a current time value indicated by a clock maintained by the device, a time, relative to the device's respective clock, at which the frame is to be processed; and

D. a frame processing module configured to process each respective frame at the time determined by the processing time determination module.

303. A system as defined in claim 302 in which the at least one frame comprises audio data, each member device, while processing each frame, producing a signal representing sound represented by the respective frame.

304. A system as defined in claim 302 further including a control module for controlling execution of commands received by said interface module.

305. A device as defined in claim 304 further comprising a buffer configured to buffer frames that the interface module has received until they are to be processed, the frame processing module being configured to process the buffered frames at the times determined by the processing time determination module.

306. A system as defined in claim 305 in which the each frame is associated with a track, each track including at least one frame, the interface module being further configured to receive playback control commands for controlling processing of tracks, the control module being configured to execute at least one playback control command controlling track processing.

307. A system as defined in claim 306 in which at least one type of playback control command enables the control module to, in turn, enable the frame processing module to terminate playback of a track that is currently being played back.

308. A system as defined in claim 307 in which the playback control command enables the control module to terminate playback of a track with a frame subsequent to a frame currently being played.

309. A system as defined in claim 306 in which the playback control command enables the control module to cancel playback of a track at least one of whose frames has been previously distributed, but for which playback has not begun.

310. A system as defined in claim 306 in which the control module is configured to enable the frame processing module to resume processing of at least one frame associated with a subsequent track at a time determined by the processing time determination module.

311. A system as defined in claim 302 in which the member device includes: A. a migration information receiving module configured to receive migration information from the task source device, the migration information including a source for information respecting the tasks to be distributed, timing information relative to the clock maintained by the task source device and identifications of the member devices of the synchrony group, and

B. a migration control module configure to, after the migration information has been received,

i. distribute the series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to the timing information that it receives from the

US 8,234,395 B2

71

72

device operating as the task source device, at which the devices comprising the synchrony group are to execute the respective task, and

ii. notify the members of the synchrony group that it is to thereafter operate as the task source device.

312. A system as defined in claim **311** in which the information respecting the frames that are to be distributed is a source of streaming information, the migration control module being configured to, after the migration information has been received, assembling the streaming information into frames and associate each frame with a said time stamp.

313. A system as defined in claim **311** in which the information respecting the frames that are to be distributed is in a file identified in the migration information, the migration control module being configured to obtain information from the identified file, assemble the information into frames and associate each frame with a said time stamp.

314. A system as defined in claim **313** in which the information respecting the frames that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control module being configured to assemble the information from a position in the file associated with the identified offset.

315. A system as defined in claim **313** in which the information respecting the frames that are to be distributed is in a series of files identified in the migration information, the migration control module being configured to obtain information from successive files in the series assemble the information into frames and associate each frame with as said time stamp.

316. A system as defined in claim **302** in which the member device further includes a clock rate adjustment module configured to adjust the member device's clock rate in relation to a clock rate value maintained by the data source device's clock.

317. A system as defined in claim **316** in which the clock rate adjustment module is configured to adjust the clock rate in relation to time stamps associated with respective ones of the frames received from the data source device.

318. A system as defined in claim **267** in which the data source device comprises:

A. a frame acquisition module configured to obtain respective ones of the frames;

B. a frame execution time determination module configured to determine a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission module configured to transmit the series of frames to said at least one other device; and

D. an execution control command generation module configured to, in response to a predetermined event, enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to modify the execution sequence of the frames transmitted thereto.

319. A system as defined in claim **318** in which at least one frame comprises audio data, each member device, while processing each frame, producing generating a signal representing sound represented by the respective frame.

320. A system as defined in claim **318** in which the frame transmission module is configured to utilize a selected multicast transmission methodology.

321. A system as defined in claim **318** in which the predetermined event comprises input indicia provided by an operator.

322. A system as defined in claim **321** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame trans-

mission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to control execution of at least one frame in relation to the time the predetermined event occurs.

323. A system as defined in claim **322** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to terminate execution of a frame that it is, currently executing and/or to not execute at least one frame that is to be executed subsequent to the predetermined event.

324. A data source device as defined in claim **323** in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation module being configured to, in response to said predetermined event, (i) enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module, a command enabling the at least one other device to terminate execution of the currently executing frame and/or to not execute at least one subsequent frame, if any, in the frame sequence including the currently executing frame; and (ii) enable

(a) the frame execution time determination module to provide that time stamps associated with frames of frame sequences subsequent to the frame sequence currently being executed will reflect the termination and/or non-execution of frames from the frame sequence of the frame that is currently being executed, and

(b) the frame transmission module to transmit the frames of the subsequent frame sequences to the at least one other device.

325. A system as defined in claim **324** in which the frame transmission module is configured to insert a command to enable the at least one other device to not execute all frames in the frame sequence subsequent to the terminated and/or non-executed frame.

326. A system as defined in claim **267** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to control execution of a frame in relation to the frame's position in the series of frames.

327. A system as defined in claim **326** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a frame in relation to the frame's position in the series of frames.

328. A system as defined in claim **326** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted frame in relation to the frame's position in the series of frames.

329. A system as defined in claim **328** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a previously-

US 8,234,395 B2

73

transmitted frame, in relation to the frame's position in the series of frames, for which execution has not begun.

330. A system as defined in claim **327** in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation module being configured to, in response to said predetermined event,

(i) enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module, a command enabling the at least one other device to cancel execution of a frame sequence for which execution has not begun; and

(ii) enable

(a) the frame execution time determination module to provide that time stamps associated with frames of frame sequences subsequent to the frame sequence whose execution was cancelled will reflect the cancellation, and

(b) the frame transmission module to transmit the frames of the subsequent frame sequences to the at least one other device.

331. A system as defined in claim **267** in which the data source device comprises:

A. a frame acquisition module configured to obtain respective ones of the frames;

B. a frame execution time determination module configured to determine a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission module configured to transmit the series of frames to said at least one other device; and

D. a data source device migration control module configured to, in response to a predetermined event, provide migration information to another device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group.

332. A system as defined in claim **331** in which the data source device is configured to provide, associated with at least one frame, a time stamp indicating a frame execution time later than the time currently indicated by the clock maintained by the data source device.

333. A system as defined in claim **332** in which the data source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be executed by the member devices at the time indicated by the time stamp.

334. A system as defined in claim **333** in which the data source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be distributed to the member devices for execution at the time indicated by the time stamp.

335. A system as defined in claim **333** in which data source device is configured to obtain information associated with the frames from at least two types of information sources, the data source device being further configured to select, for each frame the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective frame.

336. A device for processing a series of frames of data provided by a data source at times specified by the data source in relation to a clock maintained by the data source, the device comprising

A. an interface module configured to receive the series of frames, each frame being associated with a time stamp, each

74

time stamp indicating a time value relative to a time indicated a clock maintained by the data source, at which the device is to process the respective frame;

B. a current time retrieval module configured to obtain, from the data source, a current time value as indicated by the data source's clock;

C. an processing time determination module configured to determine, from the time stamp associated with each respective frame and a time differential value representing a difference between the current time value obtained by the current time retrieval module and a current time value indicated by a clock maintained by the device, a time, relative to the device's respective clock, at which the frame is to be processed; and

D. a frame processing module configured to process each respective frame at the time determined by the processing time determination module.

337. A device as defined in claim **336** in which the frame comprises audio data, each member device, while processing each frame, producing a signal representing sound represented by the respective frame.

338. A device as defined in claim **336** further including a control module for controlling execution of commands received by said interface module.

339. A device as defined in claim **336** further comprising a buffer configured to buffer frames that the interface module has received until they are to be processed, the frame processing module being configured to process the buffered frames at the times determined by the processing time determination module.

340. A device as defined in claim **339** in which the each frame is associated with a track, each track including at least one frame, the interface module being further configured to receive playback control commands for controlling processing of tracks, the control module being configured to execute at least one playback control command controlling track processing.

341. A device as defined in claim **340** in which at least one type of playback control command enables the control module to, in turn, enable the frame processing module to terminate playback of a track that is currently being played back.

342. A device as defined in claim **341** in which the playback control command enables the control module to terminate playback of a track with a frame subsequent to a frame currently being played.

343. A device as defined in claim **340** in which the playback control command enables the control module to cancel playback of a track at least one of whose frames has been previously distributed, but for which playback has not begun.

344. A device as defined in claim **340** in which the control module is configured to enable the frame processing module to resume processing of at least one frame associated with a subsequent track at a time determined by the processing time determination module.

345. A device as defined in claim **338**, the control module being configured to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive frames for processing by the frame processing module.

346. A device as defined in claim **345** in which the control module is configured to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive frames currently being transmitted using a selected multi-cast transmission methodology, and further to retrieve at least one previously distributed frame using a selected unicast transmission methodology.

347. A device as defined in claim **346** in which the control module is configured to, in receipt of a command to disengage

US 8,234,395 B2

75

76

from a synchrony group, disable the interface module from receiving frames and the frame processing module from processing previously received frames that have not yet been processed.

348. A device as defined in claim **336** further comprising a user interface module interface module configured to receive control information from a user interface module, the control module being configured to enable selected operations to be performed in response to the control information.

349. A device as defined in claim **348** in which, in response to control information to enable another device to become a member of the device's synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to become a member of the synchrony group.

350. A device as defined in claim **349** in which, in response to control information to enable another device that is a member of the device's synchrony group to disengage from the synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to disengage from the synchrony group.

351. A device as defined in claim **348** in which, in response to control information to enable the data source to begin operating, the control module performs selected operations to enable the data source to begin operating.

352. A device as defined in claim **351**, the device also operating as the data source, the device including a frame generator module configured to, under control of the control module, obtain information from which the frames are to be generated and generate the frames.

353. A device as defined in claim **342** in which the interface module is further configured to transmit the frames to at least one other device.

354. A device as defined in claim **343** in which the device is not the data source, the control module being configured to enable the interface module to transmit a command to enable the data source to operate.

355. A device as defined in claim **354** in which each frame is associated with a track, each track including at least one frame, and, in response to receipt of control information enabling processing of a track currently being processed to be terminated, the control module is configured to enable the interface module to transmit a command to enable the data source to insert a resynchronize command in the series of frames associated with the track to enable termination of processing of the track.

356. A device as defined in claim **354** in which each frame is associated with a track, each track including at least one frame, and, in response to receipt of control information enabling processing of a track at least a portion of which has been received, but for which processing has not begun, the control module is configured to enable the interface module to transmit a command to enable the data source to insert a resynchronize command in the series of commands to disable processing of the track.

357. A device as defined in claim **344** in which the control module is configured to enable the user interface module interface module to transmit status information to the user interface module.

358. A device as defined in claim **357** in which the status information includes the processing status of at least one frame.

359. A device as defined in claim **336** further including:

A. a migration information receiving module configured to receive migration information from the data source device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group, and

B. a migration control module configured to, after the migration information has been received,

i. distribute the series of frames to the synchrony group, each frame being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the data source device, at which the devices comprising the synchrony group are to execute the respective frame, and

ii. notify the members of the synchrony group that it is to thereafter operate as the data source device.

360. A device as defined in claim **359** in which the information respecting the frames that are to be distributed is a source of streaming information, the migration control module being configured to, after the migration information has been received, assembling the streaming information into frames and associate each frame with a said time stamp.

361. A device as defined in claim **359** in which the information respecting the frames that are to be distributed is in a file identified in the migration information, the migration control module being configured to obtain information from the identified file, assemble the information into frames and associate each frame with a said time stamp.

362. A device as defined in claim **361** in which the information respecting the frames that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control module being configured to assemble the information from a position in the file associated with the identified offset.

363. A device as defined in claim **361** in which the information respecting the frames that are to be distributed is in a series of files identified in the migration information, the migration control module being configured to obtain information from successive files in the series assemble the information into frames and associate each frame with as said time stamp.

364. A device as defined in claim **336** further including a clock rate adjustment module configured to adjust the member device's clock rate in relation to a clock rate value maintained by the data source device's clock.

365. A data source device for distributing a series of frames for execution by at least one other device at respective execution times, the data source device comprising:

A. a frame acquisition module configured to obtain respective ones of the frames;

B. a frame execution time determination module configured to determine a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission module configured to transmit the series of frames to said at least one other device; and

D. an execution control command generation module configured to, in response to a predetermined event, enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to modify the execution sequence of the frames transmitted thereto.

366. A data source device as defined in claim **365** in which the frame transmission module is configured to utilize a selected multi-cast transmission methodology.

367. A data source device as defined in claim **365** in which the predetermined event comprises input indicia provided by an operator.

368. A data source device as defined in claim **367** in which, in response to said predetermined event, the execution control

US 8,234,395 B2

77                                                        78

command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to control execution of at least one frame in relation to the time the predetermined event occurs.

369. A data source device as defined in claim **368** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to terminate execution of a frame that it is currently executing and/or to not execute at least one frame that is to be executed subsequent to the predetermined event.

370. A data source device as defined in claim **368** in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation module being configured to, in response to said predetermined event, (i) enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module, a command enabling the at least one other device to terminate execution of the currently executing frame and/or to not execute at least one subsequent frame, if any, in the frame sequence including the currently executing frame; and (ii) enable

(a) the frame execution time determination module to provide that time stamps associated with frames of frame sequences subsequent to the frame sequence currently being executed will reflect the termination and/or non-execution of frames from the frame sequence of the frame that is currently being executed, and

(b) the frame transmission module to transmit the frames of the subsequent frame sequences to the at least one other device.

371. A data source device as defined in claim **370** in which the frame transmission module is configured to insert a command to enable the at least one other device to not execute all frames in the frame sequence subsequent to the terminated and/or non-executed frame.

372. A data source device as defined in claim **362** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to control execution of a frame in relation to the frame's position in the series of frames.

373. A data source device as defined in claim **372** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a frame in relation to the frame's position in the series of frames.

374. A data source device as defined in claim **371** in which, in response to said predetermined event, the execution control command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted frame in relation to the frame's position in the series of frames.

375. A data source device as defined in claim **374** in which, in response to said predetermined event, the execution control

command generation module is configured to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted frame, in relation to the frame's position in the series of frames, for which execution has not begun.

376. A data source device as defined in claim **371** in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation module being configured to, in response to said predetermined event, (i) enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module, a command enabling the at least one other device to cancel execution of a frame sequence for which execution has not begun; and

(ii) enable

(a) the frame execution time determination module to provide that time stamps associated with frames of frame sequences subsequent to the frame sequence whose execution was cancelled will reflect the cancellation, and

(b) the frame transmission module to transmit, the frames of the subsequent frame sequences to the at least one other device.

377. A data source device for distributing a series of frames for execution by at least one other device at respective execution times, the data source device comprising:

A. a frame acquisition module configured to obtain respective ones of the frames;

B. a frame execution time determination module configured to determine a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time, the frame execution time determination module being configured to provide, associated with at least one frame, a time stamp indicating a frame execution time later than the time currently indicated by a clock maintained by the data source device; and

C. a frame transmission module configured to transmit the series of frames to said at least one other device.

377. A system as defined in claim **377** in which the data source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be executed by the member devices at the time indicated by the time stamp.

379. A system as defined in claim **378** in which the data source device is configured to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be distributed to the member devices for execution at the time indicated by the time stamp.

380. A system as defined in claim **377** in which data source device is configured to obtain information associated with the frames from at least two types of information sources, the data source device being further configured to select, for each frame the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective frame.

381. A data source device for distributing a series of frames for execution by at least one other device, the data source device comprising:

A. a frame acquisition module configured to obtain respective ones of the frames;

B. a frame execution time determination module configured to determine a time at which each respective frame is to be

US 8,234,395 B2

79

80

executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission module configured to transmit the series of frames to said at least one other device; and

D. a data source device migration control module configured to, in response to a predetermined event, provide migration information to another device, the migration information including a source for information respecting the frames to be distributed, tithing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group.

382. A method for operating a system to facilitate processing of data by device operating as a member of a synchrony group, synchronously with a clock maintained by a data source device that provides the data to the synchrony group, the method including the steps of

A. enabling the data source device being to divide the data into a series of frames for distribution to the synchrony group, each frame being associated with a time stamp indicating a time, relative to a clock maintained by the data source device, at which the devices comprising the synchrony group are to process the frame;

B. enabling each member device in the synchrony group to:

(i) periodically obtain from the data source device an indication of a current time value indicated by the data source device's clock;

(ii) receive the series of frames from the data source device;

(iii) determine, from the time stamp associated with each respective frame and a time differential value representing a difference between the current time value indicated by the data source device's clock, a current time value indicated by the member device's respective clock, a time, relative to the member device's respective clock, at which the member device is to process the frame; and

(iv) process the respective frame at the determined time.

383. A method as defined in claim 382 in which at least one frame comprises audio data, each member device, while processing each frame, being enabled to generate a signal representing sound represented by the respective frame.

384. A method as defined in claim 382, the system comprising a plurality of member devices, the method including the steps of enabling the member devices to process each frame synchronously in relation to the clock maintained by the data source device so that they all produce sound represented by the respective frame synchronously.

385. A method as defined in claim 384 including the step of enabling the data source device to provide time stamps for at least two successive frames so that the member devices will play them with a selected time interval therebetween.

386. A method as defined in claim 385 in which the time interval is zero.

387. A method as defined in claim 382 in which one of the member devices operates as a master device for the synchrony group, any other member devices comprising respective slave devices, the method including the step of enabling the master device to perform at least one type of synchrony group management operation in connection with the member devices comprising the synchrony group.

388. A method as defined in claim 387, the method including the step of enabling the master device to perform at least one type of synchrony group management operation in response to control information provided thereto by a user interface module.

389. A method as defined in claim 388 further including the step of enabling the master device to provide status information relating to the status of the synchrony group to the user interface module.

390. A method as defined in claim 389 in which the status information includes identifications of the devices comprising the synchrony group.

391. A method as defined in claim 389 in which each frame is associated with a frame sequence, each frame sequence comprising at least one frame, the frame or frames comprising each frame sequence being associated with an audio track, each audio track being associated with an identifier, the status information including the identification of the audio track currently being played.

392. A method as defined in claim 388 the method comprising at least one additional device, in which, in one type of synchrony group management operation, the master device is configured to enable the at least one additional device to join the synchrony group as a slave device.

393. A method as defined in claim 392 in which the data source device is configured to distribute frames to the member devices using a selected multi-cast transmission methodology, the member devices being configured to buffer the frames until they are to be played, the method including the step of, when the at least one additional device joins the synchrony group as a slave device, the enabling the data source device to transmit at least one previously distributed frame to the slave device using a selected unicast transmission methodology.

394. A method as defined in claim 387 in which, in at least one type of synchrony group management operation, the method includes the step of enabling the master device to enable the data source device to join the synchrony group as a slave device, the data source device continuing to operate as the data source device for the synchrony group.

395. A method as defined in claim 387 in which, in at least one type of synchrony group management operation, the method includes the step of enabling the master device to enable a slave device to disengage from the synchrony group, the disengaged slave device thereafter not being a member device in the synchrony group and not playing frames distributed by the data source device.

396. A method as defined in claim 387 in which, in at least one type of synchrony group management operation, the method includes the step of enabling the master device to control the series of frames to be distributed by the data source device.

397. A method as defined in claim 387 in which each frame is associated with a frame sequence, each frame sequence comprising at least one frame, the frame or frames comprising each frame sequence being associated with an audio track, the method including the step of enabling the master device being configured to control the frames to be distributed by the data source device on a track-by-track basis.

398. A method as defined in claim 387 in which, in at least one type of synchrony group management operation, the method includes the step of enabling the master device to control playback by the member devices of the frames associated with the respective audio tracks that have been distributed by the data source device in response to control information from the user interface module.

399. A method as defined in claim 387 in which, in response to control information from the user interface module to facilitate control of playback by the member devices, the method includes the step of enabling the master device to enable the data source device to distribute a playback control command to the member devices.

400. A method as defined in claim 399 in which a playback control command enables the member devices to terminate playback of a track that is currently being played back.

US 8,234,395 B2

81

82

401. A method as defined in claim **399** in which the playback control command enables the member devices to terminate playback of a track with a frame subsequent to a frame currently being played.

402. A method as defined in claim **399** in which the playback control command enables the member devices to cancel playback of a track at least one of whose frames has been previously distributed, but for which playback has not begun.

403. A method as defined in claim **387** in which, in at least one type of synchrony group management operation, the method includes the step of enabling the member device operating as the master device to enable the master device to migrate from itself to another member device in the synchrony group.

404. A method as defined in claim **403** in which, in at least one type of synchrony group management operation, the method includes the step of enabling the master device to enable the data source device to migrate from one device to another device in the system.

405. A method as defined in claim **404** in which

A. the device operating as the data source device is enable to perform the step of, after being enabled to migrate the data source device to said other device, providing migration information to the other device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices,

B. the other device is enabled to, after receiving the migration information, perform the steps of

i. distributing the series of frames to the synchrony group, each frame being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the data source device, at which the devices comprising the synchrony group are to execute the respective frame, and

ii. notifying the members of the synchrony group that it is to thereafter operate as the data source device.

406. A method as defined in claim **405** in which the information respecting the frames that are to be distributed is a source of streaming information, the other device being enabled to, after receiving the migration information, perform the steps of assembling the streaming information into frames and associating each frame with a said time stamp.

407. A method as defined in claim **405** in which the information respecting the frames that are to be distributed is in a file identified in the migration information, the other device being enabled to perform the steps of obtaining information from the identified file, assembling the information into frames and associating each frame with a said time stamp.

408. A method as defined in claim **407** in which the information respecting the frames that are to be distributed begins at an offset, identified in the migration information, into the identified file, the other device being enabled to perform the step of assembling the information from a position in the file associated with the identified offset.

409. A method as defined in claim **407** in which the information respecting the frames that are to be distributed is in a series of files identified in the migration information, the other device being enabled to perform the step of obtaining information from successive files in the series assemble the information into frames and associate each frame with as said time stamp.

410. A method as defined in claim **382** including the step in which the data source is further configured to distribute the frames using a selected multi-cast message transmission methodology, the device being enabled to receive the frames using the selected multi-cast message transmission methodology.

411. A method as defined in claim **382** in which the data source device is enabled to perform the step of providing, provide, associated with at least one frame, a time stamp indicating a frame execution time later than the time currently indicated by the clock maintained by the data source device.

412. A method as defined in claim **411** in which the data source device is enabled to perform the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be executed by the member devices at the time indicated by the time stamp.

413. A method as defined in claim **411** in which the data source device is enabled to perform the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be distributed to the member devices for execution at the time indicated by the time stamp.

414. A method as defined in claim **411** in which data source device is enabled to perform the steps of obtaining information associated with the frames from at least two types of information sources, and selecting, for each frame, the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective frame.

415. A method as defined in claim **382** in which at least one member device is further enabled to perform the step of adjusting its clock rate in relation to a clock rate value maintained by the data source device's clock.

416. A method as defined in claim **415** in which the at least one member device is enabled to perform the step of adjusting its clock rate in relation to time stamps associated with respective ones of the frames received from the data source device.

417. A method as defined in claim **382** in which at least one other device operates as a data source device configured to distribute frames to a second synchrony group, the method including the steps of enabling the device to operate both as the data source device for the first synchrony group and also operating as a member device of a second synchrony group.

418. A method as defined in claim **382** including, within a member device,

A. a frame receiving step of receiving the series of frames,

B. a current time retrieval step of obtaining, from the data source device, the current time value as indicated by the frame source's clock;

C. an execution time determination step of determining, from the time stamp associated with each respective frame and a time differential value representing a difference between the current time value obtained during the current time retrieval step and a current time value indicated by a clock maintained by the device, a time, relative to the member device's respective clock at which the frame is to be executed; and

D. a frame execution step of executing each respective frame at the time determined during the execution time determination step.

419. A method as defined in claim **418** further including a control step for controlling execution of commands received during the frame receiving step.

420. A method as defined in claim **419** in which the at least one member device further comprises a buffer configured to buffer frames received from the data source device during the frame receiving step until they are to be executed, the frame

US 8,234,395 B2

83                                                                 84

execution step including the step of executing the buffered frames at the times determined during the execution time determination step.

420. A method as defined in claim **420** in which the series of frames includes a series of frame sequences with each frame sequence including a subset of the series of frames, the frame receiving step being further enabled to receive frame execution control commands for controlling frame execution, the control step including the step of, in response to receipt of at least one frame execution control command for controlling frame execution, controlling the frame execution step to terminate execution of a frame sequence currently being executed, and further to not execute subsequent frames in the frame sequence that have been buffered.

422. A method as defined in claim **421** in which the control step includes the step of enabling the frame execution step to resume execution of at least one frame associated with a subsequent frame sequence at a time determined during the execution time determination step.

423. A method as defined in claim **420** in which the series of frames includes a series of frame sequences with each frame sequence including a subset of the series of frames, the frame receiving step including the step of receiving frame execution control commands for controlling frame execution, the control step including the step of, in response to receipt of at least one frame execution control command to cancel execution of a frame sequence for which at least one frame has been buffered but for which execution has not begun, providing that frames from that frame sequence that have been buffered not be executed.

424. A method as defined in claim **423** in which the control step includes the step of enabling execution to resume of at least one frame associated with a frame sequence subsequent to the frame sequence for which at least one frame has been buffered but for which execution has not begun.

425. A method as defined in claim **418** in which the member device performs:

A. migration information receiving step of receiving migration information from the data source device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group, and

B. a migration control step of, after the migration information has been received,

i. distributing the series of frames to the synchrony group, each frame being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the data source device, at which the devices comprising the synchrony group are to execute the respective frame, and

ii. notifying the members of the synchrony group that it is to thereafter operate as the data source device.

426. A method as defined in claim **425** in which the information respecting the frames that are to be distributed is a source of streaming information, the migration control step includes the steps of, after the migration information has been received, assembling the streaming information into frames and associating each frame with a said time stamp.

427. A method as defined in claim **425** in which the information respecting the frames that are to be distributed is in a file identified in the migration information, the migration control step including the steps of obtaining information from the identified file, assembling the information into frames and associating each frame with a said time stamp.

428. A method as defined in claim **427** in which the information respecting the frames that are to be distributed begins at

an offset, identified in the migration information, into the identified file, the migration control step including the step of assembling the information from a position in the file associated with the identified offset.

429. A method as defined in claim **427** in which the information respecting the frames that are to be distributed is in a series of files identified in the migration information, the migration control step including the steps of obtaining information from successive files in the series assemble the information into frames and associating each frame with as said time stamp.

430. A method as defined in claim **418** in which the member device is further enabled to perform a clock rate adjustment step including the step of adjusting the member device's clock rate in relation to a clock rate value maintained by the data source device's clock.

431. A method as defined in claim **430** in which the clock rate adjustment step includes the step of determining adjust the clock rate in relation to time stamps associated with respective ones of the frames received from the data source device.

432. A method as defined in claim **382** of operating a device for distributing a series of frames for execution by at least one other device at respective execution times, the method comprising:

A. a frame acquisition step of obtaining respective ones of the frames;

B. a frame execution time determination step of determining a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission step of transmitting the series of frames to said at least one other device; and

D. an execution control command generation step of, in response to a predetermined event and during the frame transmission step, the insertion into the series of frames transmitted by the frame transmission module of a command to enable the at least one other device to modify the execution sequence of the frames transmitted thereto.

433. A method as defined in claim **432** in which the frame transmission step includes the step of utilizing a selected multi-cast transmission methodology.

434. A method as defined in claim **432** in which the predetermined event includes the step of receiving input indicia provided by an operator.

435. A method as defined in claim **434** in which the execution control command generation step includes the step of enabling, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to control execution of at least one frame in relation to the time the predetermined event occurs.

436. A method as defined in claim **435** in which, the execution control command generation step includes the step of enabling, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to terminate execution of a frame that it is currently executing and/or to not execute at least one frame that is to be executed subsequent to the predetermined event.

437. A method as defined in claim **434** in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation step including the steps of, in response to said predetermined event,

(i) enabling during the frame transmission step the insertion, into the series of frames, of a command enabling the at least one other device to terminate execution of the currently

US 8,234,395 B2

85 86

executing frame and/or to not execute at least one subsequent frame, if any, in the frame sequence including the currently executing frame; and

(ii) enabling

(a) during the frame execution time determination step, that time stamps associated with frames of frame sequences subsequent to the frame sequence currently being executed will reflect the termination and/or non-execution of frames from the frame sequence of the frame that is currently being executed, and

(b) during the frame transmission step, the transmission of the frames of the subsequent frame sequences to the at least one other device.

438. A method as defined in claim 437 in which the frame transmission step includes the step of inserting a command into the frame sequence to enable the at least one other device to not execute all frames in the frame sequence subsequent to the terminated and/or non-executed frame.

439. A method as defined in claim 435 in which the execution control command generation step include the step of enabling, in response to said predetermined event and during the frame transmission step, the insertion in the series of frames of a command to enable the at least one other device to control execution of a frame in relation to the frame's position in the series of frames.

440. A method as defined in claim 439 in which the execution control command generation step includes the step of, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to cancel execution of a frame in relation to the frame's position in the series of frames.

441. A method as defined in claim 439 in which the execution control command generation step includes the step of enabling, in response to said predetermined event and during the frame transmission step, the inserting into the series of frames of a command to enable the at least one other device to cancel execution of a previously-transmitted frame in relation to the frame's position in the series of frames.

442. A method as defined in claim 441 in which, the execution control command generation step includes the step of, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to cancel execution of a previously-transmitted frame, in relation to the frame's position in the series of frames, for which execution has not begun.

443. A method as defined in claim 439 in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation step including the steps of, in response to said predetermined event,

(i) enabling, during the frame transmission step, the insertion, into the series of frames, of a command enabling the at least one other device to cancel execution of a frame sequence for which execution has not begun; and

(ii) enabling

(a) during the frame execution time determination step, that time stamps associated with frames of frame sequences subsequent to the frame sequence whose execution was cancelled will reflect the cancellation, and

(b) during the frame transmission step, the transmission of the frames of the subsequent frame sequences to the at least one other device.

444. A method as defined in claim 382 in which the data source device is enabled to perform

A. a frame acquisition step of obtaining respective ones of the frames;

B. a frame execution time determination step of determining a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission step of transmitting the series of frames to said at least one other device; and

D. a data source device migration control step of, in response to a predetermined event, providing migration information to another device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group.

445. A method as defined in claim 382 in which the data source device is enabled to perform the step of providing, associated with at least one frame, a time stamp indicating a frame execution time later than the time currently indicated by the clock maintained by the data source device.

446. A method as defined in claim 445 in which the data source device is enabled to perform the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be executed by the member devices at the time indicated by the time stamp.

447. A method as defined in claim 446 in which the data source device is enabled to perform the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be distributed to the member devices for execution at the time indicated by the time stamp.

448. A method as defined in claim 445 in which data source device is enabled to perform the step of obtaining information associated with the frames from at least two types of information sources, and selecting for each frame the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective frame.

449. A method of enabling a device to process a series of frames of data provided by a data source at times specified by the data source in relation to a clock maintained by the data source, the device comprising

A. an interface step of receiving the series of frames, each frame being associated with a time stamp, each time stamp indicating a time value relative to a time indicated a clock maintained by the data source, at which the device is to process the respective frame;

B. a current time retrieval step of obtaining, from the data source, a current time value as indicated by the data source's clock;

C. an processing time determination step of determining, from the time stamp associated with each respective frame and a time differential value representing a difference between the current time obtained during the current time retrieval step and a current time value indicated by a clock maintained by the device, a time, relative to the device's respective clock, at which the frame is to be processed; and

D. a frame processing step of processing each respective frame at the time determined during the processing time determination step.

450. A method as defined in claim 449 in which at least one frame comprises audio data, each member device, while pro-

US 8,234,395 B2

87

88

cessing said at least one frame, generating a signal representing sound represented by the respective frame.

451. A method as defined in claim **449** further including a control step for controlling execution of commands received by said device.

452. A method as defined in claim **451** further comprising a buffer configured to buffer frames that the interface module has received until they are to be processed, the frame processing step including the step of processing the buffered frames at the times determined during the processing time determination step.

453. A method as defined in claim **451** in which the each frame is associated with a track, each track including at least one frame, the interface module being further configured to receive playback control commands for controlling processing of tracks, the method including the step of enabling the control module to execute at least one playback control command controlling track processing.

454. A method as defined in claim **453** including the step of, in response to at least one type of playback control command, enabling the control module to, in turn, enable the frame processing module to terminate playback of a track that is currently being played back.

455. A method as defined in claim **454** including the step of, in response to the playback control command, enabling the control module to terminate playback of a track with a frame subsequent to a frame, currently being played.

456. A method as defined in claim **452** including the step of, in response to the playback control command, enabling the control module to cancel playback of a track at least one of whose frames has been previously distributed, but for which playback has not begun.

457. A method as defined in claim **453** including the step of enabling the control module to enable the frame processing module to resume processing of at least one frame associated with a subsequent track at a time determined by the processing time determination module.

458. A method as defined in claim **449** including the step of enabling the control module to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive frames for processing by the frame processing module.

459. A method as defined in claim **458** including the step of enabling the control module to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive frames currently being transmitted using a selected multi-cast transmission methodology, and further to retrieve at least one previously distributed frame using a selected unicast transmission methodology.

460. A method as defined in claim **449** including the step of enabling the control module to, in receipt of a command to disengage from a synchrony group, disable the interface module from receiving frames and the frame processing module from processing previously received frames that have not yet been processed.

461. A method as defined in claim **449**, further including the steps of receiving control information from a user interface module, and enabling the control module to enable selected operations to be performed in response to the control information.

462. A method as defined in claim **461** including the step of, in response to control information to enable another device to become a member of the device's synchrony group, enabling the control module to enable the interface module to transmit a command to the other device to enable the other device to become a member of the synchrony group.

463. A method as defined in claim **461** including the step of, in response to control information to enable another device that is a member of the device's synchrony group to disengage from the synchrony group, enabling the control module to enable transmission of a command to the other device to enable the other device to disengage from the synchrony group.

464. A method as defined in claim **461** including the step of, in response to control information to enable the data source to begin operating, enabling the control module to perform selected operations to enable the data source to begin operating.

465. A method as defined in claim **464**, the device also operating as the data source, the method including a frame generator step of, under control of the control module, obtaining information from which the frames are to be generated and generating the frames.

466. A method as defined in claim **465** further comprising the step of transmitting the frames to at least one other device.

467. A method as defined in claim **465** in which the device is not the data source, the method including the step of enabling the control module to enable transmission of a command to enable the data source to operate.

468. A method as defined in claim **467** in which each frame is associated with a track, each track including at least one frame, and, in response to receipt of control information enabling processing of a track currently being processed to be terminated, the method including the step of enabling the control module to enable transmission of a command to enable the data source to insert a resynchronize command in the series of frames associated with the track to enable termination of processing of the track.

469. A method as defined in claim **467** in which each frame is associated with a track, each track including at least one frame, and, in response to receipt of control information enabling processing of a track at least a portion of which has been received, but for which processing has not begun, the method including the step of enabling the control module to enable transmission of a command to enable the data source to insert a resynchronize command in the series of commands to disable processing of the track.

470. A method as defined in claim **451** further including the step of enabling the control module to enable the user interface module interface module to transmit status information to the user interface module.

471. A method as defined in claim **470** in which the status information includes the processing status of at least one frame.

472. A method as defined in claim **469** in which the member device performs:

A. migration information receiving step of receiving migration information from the data source device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group, and

B. a migration control step of, after the migration information has been received,

i. distributing the series of frames to the synchrony group, each frame being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the data source device, at which the devices comprising the synchrony group are to execute the respective frame, and

ii. notifying the members of the synchrony group that it is to thereafter operate as the data source device.

US 8,234,395 B2

89

90

473. A method as defined in claim **472** in which the information respecting the frames that are to be distributed is a source of streaming information, the migration control step includes the steps of, after the migration information has been received, assembling the streaming information into frames and associating each frame with a said time stamp.

474. A method as defined in claim **472** in which the information respecting the frames that are to be distributed is in a file identified in the migration information, the migration control step including the steps of obtaining information from the identified file, assembling the information into frames and associating each frame with a said time stamp.

475. A method as defined in claim **474** in which the information respecting the frames that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control step including the step of assembling the information from a position in the file associated with the identified offset.

476. A method as defined in claim **474** in which the information respecting the frames that are to be distributed is in a series of files identified in the migration information, the migration control step including the steps of obtaining information from successive files in the series assemble the information into frames and associating each frame with as said time stamp.

477. A method as defined in claim **449** in which the member device is further enabled to perform a clock rate adjustment step including the step of adjusting the member device's clock rate in relation to a clock rate value maintained by the data source device's clock.

478. A method as defined in claim **477** in which the clock rate adjustment step includes the step of determining adjust the clock rate in relation to time stamps associated with respective ones of the frames received from the data source device.

479. A method of operating a device for distributing a series of frames for execution by at least one other device at respective execution times, the method comprising:

A. a frame acquisition step of obtaining respective ones of the frames;

B. a frame execution time determination step of determining a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission step of transmitting the series of frames to said at least one other device; and

D. an execution control command generation step of, in response to a predetermined event and during the frame transmission step, the insertion into the series of frames transmitted by the frame transmission module of a command to enable the at least one other device to modify the execution sequence of the frames transmitted thereto.

480. A method as defined in claim **479** in which at least one frame comprises audio data.

481. A method as defined in claim **479** in which the frame transmission step includes the step of utilizing a selected multi-cast transmission methodology.

482. A method as defined in claim **479** in which the predetermined event includes the step of receiving input indicia provided by an operator.

483. A method as defined in claim **482** in which the execution control command generation step includes the step of enabling, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to control execution of at least one frame in relation to the time the predetermined event occurs.

484. A method as defined in claim **483** in which, the execution control command generation step includes the step of enabling, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to terminate execution of a frame that it is currently executing and/or to not execute at least one frame that is to be executed subsequent to the predetermined event.

485. A method as defined in claim **482** in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation step including the steps of, in response to said predetermined event,

(i) enabling during the frame transmission step the insertion, into the series of frames, of a command enabling the at least one other device to terminate execution of the currently executing frame and/or to not execute at least one subsequent frame, if any, in the frame sequence including the currently executing frame; and

(ii) enabling

(a) during the frame execution time determination step, that time stamps associated with frames of frame sequences subsequent to the frame sequence currently being executed will reflect the termination and/or non-execution of frames from the frame sequence of the frame that is currently being executed, and

(b) during the frame transmission step, the transmission of the frames of the subsequent frame sequences to the at least one other device.

486. A method as defined in claim **485** in which the frame transmission step includes the step of inserting a command into the frame sequence to enable the at least one other device to not execute all frames in the frame sequence subsequent to the terminated and/or non-executed frame.

487. A method as defined in claim **479** in which the execution control command generation step include the step of enabling, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to control execution of a frame in relation to the frame's position in the series of frames.

488. A method as defined in claim **487** in which the execution control command generation step includes the step of, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to cancel execution of a frame in relation to the frame's position in the series of frames.

489. A method as defined in claim **487** in which the execution control command generation step includes the step of enabling, in response to said predetermined event and during the frame transmission step, the inserting into the series of frames of a command to enable the at least one other device to cancel execution of a previously-transmitted frame in relation to the frame's position in the series of frames.

490. A method as defined in claim **489** in which, the execution control command generation step includes the step of, in response to said predetermined event and during the frame transmission step, the insertion into the series of frames of a command to enable the at least one other device to cancel execution of a previously-transmitted frame, in relation to the frame's position in the series of frames, for which execution has not begun.

491. A method as defined in claim **488** in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the

US 8,234,395 B2

91

92

execution control command generation step including the steps of, in response to said predetermined event,

(i) enabling, during the frame transmission step, the insertion, into the series of frames, of a command enabling the at least one other device to cancel execution of a frame sequence for which execution has not begun; and

(ii) enabling

(a) during the frame execution time determination step, that time stamps associated with frames of frame sequences subsequent to the frame sequence whose execution was cancelled will reflect the cancellation, and

(b) during the frame transmission step, the transmission of the frames of the subsequent frame sequences to the at least one other device.

492. A method of operating a device for distributing a series of frames for execution by at least one other device at respective execution times, the method comprising:

A. a frame acquisition step of obtaining respective ones of the frames;

B. a frame execution time determination step of determining a time at which each respective frame is to be executed, and to associating the respective frame with a time stamp indicating its execution time, the frame execution time determination step including the step of providing, associated with at least one frame, a time stamp indicating a frame execution time later than the time currently indicated by a clock maintained by the data source device; and

C. a frame transmission step of transmitting the series of frames to said at least one other device.

493. A method as defined in claim **492** in which at least one frame comprises audio data.

494. A method as defined in claim **492** in which the frame execution time determination step includes the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the device can be executed by at least one other device at the time indicated by the time stamp.

495. A method as defined in claim **494** in which the frame execution time determination step includes the step of selecting the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the device can be distributed to other devices over a network for execution by the other devices at the time indicated by the time stamp.

496. A method as defined in claim **492** in which frame acquisition step includes the step of obtaining information associated with the frames from at least two types of information sources, the frame execution time determination step including the step of selecting, for each frame the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective frame.

497. A method of operating a device for distributing a series of frames for execution by at least one other device, the method comprising:

A. a frame acquisition module configured to obtain respective ones of the frames;

B. a frame execution time determination module configured to determine a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission module configured to transmit the series of frames to said at least one other device; and

D. a data source device migration control module configured to, in response to a predetermined event, provide migration information to another device, the migration information

including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group.

498. A method as defined in claim **497** in which at least one frame comprises audio data.

499. A computer program product for use in connection with a computer to provide a device for processing a series of frames of data provided by a data source at times specified by the data source in relation to a clock maintained by the data source, the computer program product comprising a computer-readable medium having encoded thereon

A. an interface module configured to enable the computer to receive the series of frames, each frame being associated with a time stamp, each time stamp indicating a time value relative to a time indicated a clock maintained by the data source, at which the device is to process the respective frame;

B. a current time retrieval module configured to enable the computer to obtain, from the data source, a current time value as indicated by the data source's clock;

C. an processing time determination module configured to enable the computer to determine, from the time stamp associated with each respective frame and a time differential value representing a difference between the current time value obtained by the current time retrieval module and a current time value indicated by a clock maintained by the device, a time, relative to the device's respective clock, at which the frame is to be processed; and

D. a frame processing module configured to enable the computer to process each respective frame at the time determined by the processing time determination module.

500. A computer program product as defined in claim **499** in which at least one frame comprises audio data, the computer, while processing said frame, generating a signal representing sound represented by the respective frame.

501. A computer program product as defined in claim **499** further including a control module a control module for enabling said computer to control execution of commands received by the interface module.

502. A computer program product as defined in claim **501** further comprising a buffer configured to enable the computer to buffer frames that the interface module has received until they are to be processed, the frame processing module being configured to enable the computer to process the buffered frames at the times determined by the processing time determination module.

503. A computer program product as defined in claim **502** in which the each frame is associated with a track, each track including at least one frame, the interface module being further configured to enable the computer to receive playback control commands for controlling processing of tracks, the control module being configured to enable the computer to execute at least one playback control command controlling track processing.

504. A computer program product as defined in claim **503** in which at least one type of playback control command enables the control module to, in turn, enable the frame processing module to terminate playback of a track that is currently being played back.

505. A computer program product as defined in claim **504** in which the playback control command enables the control module to terminate playback of a track with a frame subsequent to a frame currently being played.

506. A computer program product as defined in claim **503** in which the playback control command enables the control

US 8,234,395 B2

93

module to cancel playback of a track at least one of whose frames has been previously distributed, but for which playback has not begun.

507. A computer program product as defined in claim **503** in which the control module is configured to enable the computer to enable the frame processing module to resume processing of at least one frame associated with a subsequent track at a time determined by the processing time determination module.

508. A computer program product as defined in claim **501**, the control module being configured to enable the computer to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive frames for processing by the frame processing module.

509. A computer program product as defined in claim **508** in which the control module is configured to enable the computer to, in response to receipt of a command to become a member of a synchrony group, enable the interface module to receive frames currently being transmitted using a selected multi-cast transmission methodology, and further to retrieve at least one previously distributed frame using a selected unicast transmission methodology.

510. A computer program product as defined in claim **501** in which the control module is configured to enable the computer to, in receipt of a command to disengage from a synchrony group, disable the interface module from receiving frames and the frame processing module from processing previously received frames that have not yet been processed.

511. A computer program product as defined in claim **501** further comprising a user interface module interface module configured to receive control information from a user interface module, the control module being configured to enable the computer to enable selected operations to be performed in response to the control information.

512. A computer program product as defined in claim **511** in which, in response to control information to enable another device to become a member of the device's synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to become a member of the synchrony group.

513. A computer program product as defined in claim **511** in which, in response to control information to enable another device that is a member of the device's synchrony group to disengage from the synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to disengage from the synchrony group.

514. A computer program product as defined in claim **511** in which, in response to control information to enable the data source to begin operating, the control module performs selected operations to enable the data source to begin operating.

515. A computer program product as defined in claim **514**, the device also operating as the data source, the device including a frame generator module configured to enable the computer to, under control of the control module, obtain information from which the frames are to be generated and generate the frames.

516. A computer program product as defined in claim **515** in which the interface module is further configured to enable the computer to transmit the frames to at least one other device.

517. A computer program product as defined in claim **515** in which the device is not the data source, the control module being configured to enable the computer to enable the interface module to transmit a command to enable the data source to operate.

94

518. A computer program product as defined in claim **517** in which each frame is associated with a track, each track including at least one frame, and, in response to receipt of control information enabling processing of a track currently being processed to be terminated, the control module is configured to enable the computer to enable the interface module to transmit a command to enable the data source to insert a resynchronize command in the series of frames associated with the track to enable termination of processing of the track.

519. A computer program product as defined in claim **517** in which each frame is associated with a track, each track including at least one frame, and, in response to receipt of control information enabling processing of a track at least a portion of which has been received, but for which processing has not begun, the control module is configured to enable the computer to enable the interface module to transmit a command to enable the data source to insert a resynchronize command in the series of commands to disable processing of the track.

520. A computer program product as defined in claim **517** in which the control module is configured to enable the computer to enable the user interface module interface module to transmit status information to the user interface module.

521. A computer program product as defined in claim **520** in which the status information includes the processing status of at least one frame.

522. A computer program product as defined in claim **499** further including:

A. a migration information receiving module configured to enable the computer to receive migration information from the data source device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group, and

B. a migration control module configured to enable the computer to, after the migration information has been received,

i. distribute the series of frames to the synchrony group, each frame being associated with a time stamp indicating a time, relative to the timing information that it receives from the device operating as the data source device, at which the devices comprising the synchrony group are to execute the respective frame, and

ii. notify the members of the synchrony group that it is to thereafter operate as the data source device.

523. A computer program product as defined in claim **522** in which the information respecting the frames that are to be distributed is a source of streaming information, the migration control module being configured to enable the computer to, after the migration information has been received, assemble the streaming information into frames and associate each frame with a said time stamp.

524. A computer program product as defined in claim **522** in which the information respecting the frames that are to be distributed is in a file identified in the migration information, the migration control module being configured to enable the computer to obtain information from the identified file, assemble the information into frames and associate each frame with a said time stamp.

525. A computer program product as defined in claim **524** in which the information respecting the frames that are to be distributed begins at an offset, identified in the migration information, into the identified file, the migration control module being configured to enable the computer to assemble the information from a position in the file associated with the identified offset.

US 8,234,395 B2

95

96

526. A computer program product as defined in claim **524** in which the information respecting the frames that are to be distributed is in a series of files identified in the migration information, the migration control module being configured to enable the computer to obtain information from successive files in the series assemble the information into frames and associate each frame with as said time stamp.

527. A computer program product as defined in claim **499** further including a clock rate adjustment module configured to enable the computer to adjust the member device's clock rate in relation to a clock rate value maintained by the data source device's clock.

528. A computer program product as defined in claim **527** in which the clock rate adjustment module is configured to enable the computer to adjust the clock rate in relation to time stamps associated with respective ones of the frames received from the data source device.

529. A computer program product for use in connection with a computer to provide a data source device for distributing a series of frames for execution by at least one other device at respective execution times, the computer program product comprising a computer readable medium having encoded thereon:

A. a frame acquisition module configured to enable the computer to obtain respective ones of the frames;

B. a frame execution time determination module configured to enable the computer to determine a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission module configured to enable the computer to transmit the series of frames to said at least one other device; and

D. an execution control command generation module configured to enable the computer to, in response to a predetermined event, enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to modify the execution sequence of the frames transmitted thereto.

530. A computer program product as defined in claim **529** in which at least one frame comprises audio data.

531. A computer program product as defined in claim **529** in which the frame transmission module is configured to enable the computer to utilize a selected multi-cast transmission methodology.

532. A computer program product as defined in claim **529** in which the predetermined event comprises input indicia provided by an operator.

533. A computer program product as defined in claim **529** in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to control execution of at least one frame in relation to the time the predetermined event occurs.

534. A computer program product as defined in claim **533** in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to terminate execution of a frame that it is currently executing and/or to not execute at least one frame that is to be executed subsequent to the predetermined event.

535. A computer program product as defined in claim **533** in which the series of frames includes a series of frame

sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation module being configured to enable the computer to, in response to said predetermined event,

(i) enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module, a command enabling the at least one other device to terminate execution of the currently executing frame and/or to not execute at least one subsequent frame, if any, in the frame sequence including the currently executing frame; and

(ii) enable

(a) the frame execution time determination module to provide that time stamps associated with frames of frame sequences subsequent to the frame sequence currently being executed will reflect the termination and/or non-execution of frames from the frame sequence of the frame that is currently being executed, and

(b) the frame transmission module to transmit the frames of the subsequent frame sequences to the at least one other device.

536. A computer program product as defined in claim **535** in which the frame transmission module is configured to enable the computer to insert a command to enable the at least one other device to not execute all frames in the frame sequence subsequent to the terminated and/or non-executed frame.

537. A computer program product as defined in claim **529** in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to control execution of a frame in relation to the frame's position in the series of frames.

538. A computer program product as defined in claim **537** in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a frame in relation to the frame's position in the series of frames.

539. A computer program product as defined in claim **537** in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted frame in relation to the frame's position in the series of frames.

540. A computer program product as defined in claim **539** in which, in response to said predetermined event, the execution control command generation module is configured to enable the computer to enable the frame transmission module to insert into the series of frames transmitted by the frame transmission module a command to enable the at least one other device to cancel execution of a previously-transmitted frame, in relation to the frame's position in the series of frames, for which execution has not begun.

541. A computer program product as defined in claim **537** in which the series of frames includes a series of frame sequences with each frame sequence including a sub-set of the series of frames, the execution control command generation module being configured to enable the computer to, in response to said predetermined event,

(i) enable the frame transmission module to insert into the series of frames transmitted by the frame transmission mod-

US 8,234,395 B2

97

ule, a command enabling the at least one other device to cancel execution of a frame sequence for which execution has not begun; and

(ii) enable

(a) the frame execution time determination module to provide that time stamps associated with frames of frame sequences subsequent to the frame sequence whose execution was cancelled will reflect the cancellation, and

(b) the frame transmission module to transmit the frames of the subsequent frame sequences to the at least one other device.

542. A computer program product for use in connection with a computer to provide a data source device for distributing a series of frames for execution by at least one other device at respective execution times, the computer program product comprising a computer readable medium having encoded thereon:

A. a frame acquisition module configured to enable the computer to obtain respective ones of the frames;

B. a frame execution time determination module configured to enable the computer to determine a time at which each respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time, the frame execution time determination module being configured to enable the computer to provide, associated with at least one frame, a time stamp indicating a frame execution time later than the time currently indicated by a clock maintained by the data source device; and

C. a frame transmission module configured to enable the computer to transmit the series of frames to said at least one other device.

543. A computer program product as defined in claim 542 in which the data is audio data.

544. A computer program product as defined in claim 542 in which the frame execution time determination module is configured to enable the computer to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be executed by the member devices at the time indicated by the time stamp.

545. A computer program product as defined in claim 544 in which the frame execution time determination module is configured to enable the computer to select the delay interval between the time indicated by the time stamp and the current time so to be sufficient to provide that the at least one frame distributed by the data source device can be executed by the member devices for execution at the time indicated by the time stamp.

546. A computer program product as defined in claim 542 in which frame acquisition module is configured to enable the computer to obtain information associated with the frames from at least two types of information sources, the frame execution time determination module being configured to enable the computer to select, for each frame the delay interval between the time indicated by the time stamp and the current time based on the information source type that is associated with the respective frame.

547. A computer program product for use in connection with a computer to provide a data source device for distributing a series of frames for execution by at least one other device, the computer program product comprising a computer readable medium having encoded thereon:

A. a frame acquisition module configured to enable the computer to obtain respective ones of the frames;

B. a frame execution time determination module configured to enable the computer to determine a time at which each

98

respective frame is to be executed, and to associate the respective frame with a time stamp indicating its execution time;

C. a frame transmission module configured to enable the computer to transmit the series of frames to said at least one other device; and

D. a data source device migration control module configured to enable the computer to, in response to a predetermined event, provide migration information to another device, the migration information including a source for information respecting the frames to be distributed, timing information relative to the clock maintained by the data source device and identifications of the member devices of the synchrony group.

548. A computer program product as defined in claim 547 in which the data is audio data.

It will be appreciated that a system in accordance with the invention can be constructed in whole or in part from special purpose hardware or a general purpose computer system, or any combination thereof, any portion of which may be controlled by a suitable program. Any program may in whole or in part comprise part of or be stored on the system in a conventional manner, or it may in whole or in part be provided in to the system over a network or other mechanism for transferring information in a conventional manner. In addition, it will be appreciated that the system may be operated and/or otherwise controlled by means of information provided by an operator using operator input elements (not shown) which may be connected directly to the system or which may transfer the information to the system over a network or other mechanism for transferring information in a conventional manner.

The foregoing description has been limited to a specific embodiment of this invention. It will be apparent, however, that various variations and modifications may be made to the invention, with the attainment of some or all of the advantages of the invention. It is the object of the appended claims to cover these and such other variations and modifications as come within the true spirit and scope of the invention.

What is claimed as new and desired to be secured by Letters Patent of the United States is:

1. A method for synchronizing audio playback of a plurality of separate audio playing devices with one another, the method comprising:

receiving, by a playback device, a multicast stream including a plurality of frames from a source device over a local network, wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the respective frame, wherein the time is based on a clock of the source device, which is independent of a clock of the playback device;

periodically receiving, by the playback device, a unicast message transmitted from the source device, the unicast message separate from the multicast stream and including clock information of the source device;

computing, by the playback device, a time differential between the clock of the source device and the clock of the playback device based on a most recently received unicast message;

converting, by the playback device and for each frame of the plurality of frames, a computed output time of the audio information for each respective frame, the converting based on both the time associated with each respective frame and a most recent computation of the time differential;

outputting, by the playback device, audio information based on the plurality of frames by playing audio information for each respective frame based on a clock of the

US 8,234,395 B2

99

100

playback device, wherein the playback device is configured to output the audio information in synchrony with the source device; and

adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the computed output time of the particular frame.

**2**. The method of claim **1**, wherein the computing a time differential occurs periodically.

**3**. The method of claim **2**, wherein the converting a computed output time is in response to computing the most recent computation of the time differential.

**4**. The method of claim **2**, wherein the computing a time differential is in response to receiving the most recently received unicast message.

**5**. The method of claim **1**, wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the source device.

**6**. The method of claim **1**, further comprising buffering by the playback device the audio information along with the output time prior to outputting the audio information.

**7**. The method of claim **1**, further comprising receiving by the playback device a multicast address that the source device is using to multicast the plurality of frames prior to receiving the plurality of frames.

**8**. The method of claim **1**, wherein the plurality of frames received from the source device are performed by a group multicast transmission methodology.

**9**. The method of claim **1**, wherein the source device is a second playback device.

**10**. The method of claim **1**, wherein adjusting the speed at which the playback device outputs the audio information comprises adjusting the clock of the playback device.

**11**. The method of claim **1**, wherein the playback device is one of a plurality of playback devices in a synchrony group.

**12**. The method of claim **11**, wherein the synchrony group is dynamically configurable, such that a number of the plurality of playback devices in the synchrony group is adjustable.

**13**. The method of claim **1**, wherein the playback device receives the plurality of frames from the source device over a wireless network.

**14**. A non-transitory computer readable medium comprising instructions for synchronizing audio playback of a plurality of separate audio playing devices with one another, the instructions, when executed by a processor, cause the processor to perform the following:

receiving, by a playback device, a multicast stream including a plurality of frames from a source device over a local network, wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the

respective frame, wherein the time is based on a clock of the source device, which is independent of a clock of the playback device;

periodically receiving, by the playback device, a unicast message transmitted from the source device, the unicast message separate from the multicast stream and including clock information of the source device;

computing, by the playback device, a time differential between the clock of the source device and the clock of the playback device based on a most recently received unicast message;

converting, by the playback device and for each frame of the plurality of frames, a computed output time of the audio information for each respective frame, the converting based on both the time associated with each respective frame and a most recent computation of the time differential;

outputting, by the playback device, audio information based on the plurality of frames by playing audio information for each respective frame based on a clock of the playback device, wherein the playback device is configured to output the audio information in synchrony with the source device; and

adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the computed output time of the particular frame.

**15**. The non-transitory computer readable medium of claim **14**, wherein the computing a time differential occurs periodically.

**16**. The non-transitory computer readable medium of claim **15**, wherein the converting a computed output time is in response to computing the most recent computation of the time differential.

**17**. The non-transitory computer readable medium of claim **15**, wherein the computing a time differential is in response to receiving the most recently received unicast message.

**18**. The non-transitory computer readable medium of claim **14**, wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the source device.

**19**. The non-transitory computer readable medium of claim **14**, further comprising instructions to cause the playback device to buffer the audio information along with the output time prior to outputting the audio information.

**20**. The non-transitory computer readable medium of claim **14**, further comprising instructions to cause the playback device to receive a multicast address that the source device is using to multicast the plurality of frames prior to receiving the plurality of frames.

\* \* \* \* \*