Exhibit 53

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | PA3445US | 7302 |

22830        7590        01/18/2008
CARR & FERRELL LLP
2200 GENG ROAD
PALO ALTO, CA 94303

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 4117 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/18/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 10/816,217 | MILLINGTON, NICHOLAS A. J. |
| | **Examiner** | **Art Unit** | |
| | JEFFREY NICKERSON | 4117 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>21 November 2005</u>.

2a)☐ This action is **FINAL**.       2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>See Continuation Sheet</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>See Continuation Sheet</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☒ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>01 April 2004</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date <u>29 August 2006</u>.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

**Continuation Sheet (PTOL-326)**                                      **Application No.  10/816,217**

 Continuation of Disposition of Claims: Claims pending in the application are 1-6,9,10,19,20,31,33,65,66,86,91,109-114,117,118,121,127,128,138,139,141,156,201,202,206,218,219,221,229,233,244 and 549-576.


Continuation of Disposition of Claims: Claims rejected are 1-6,9,10,19,20,31,33,65,66,86,91,109-114,117,118,121,127,128,138,139,141,156,201,202,206,218,219,221,229,233,244 and 549-576.

Application/Control Number: 10/816,217                                          Page 2
Art Unit: 4117

# DETAILED ACTION

1.      This communication is in response to Application No. 10/816,217 filed on 1 April

2004.  The preliminary amendment presented on 21 November 2005, which cancels

claims 7-8, 11-18, 21-30, 32, 34-64, 67-85, 87-90, 92-108, 115-116, 119-120, 122-126,

129-137, 140, 142-155, 157-200, 203-205, 207-217, 220, 222-228, 230-232, 234-243,

245-548, provides change to claims 1, 3, 5-6, 9-10, 19-20, 65, 86, 91, 109, 111, 113-

114, 117-118, 121, 127-128, 138-139, 141, 156, 201-202, 206, 218-219, 221, 229, 233,

244, and adds claims 549-576 is hereby acknowledged.  Claims 1-6, 9-10, 19-20, 31,

33, 65-66, 86, 91, 109-114, 117-118, 121, 127-128, 138-139, 141, 156, 201-202, 206,

218-219, 221, 229, 233, 244, 549-576 have been carefully examined in view of

submitted accelerated examination support documents including the limitation(s) in the

claim(s) that are disclosed by the corresponding cited reference(s) and applicant's

explanation of how each of the claims are allegedly patentable over the references cited

in the provided information disclosure statement (IDS). In view of additional pertinent

references cited by examiner and applied as basis for the following rejection(s),

examiner finds that there are no issues (as reflected in this office action) that

necessarily warrant a telephone/personal interview to discuss/resolve. Furthermore, in

view of the multiple references (which presumably the applicant is unaware of) upon

which the following rejection(s) is/are based, examiner finds that there are no issues

that must possibly be addressed and/or solve via an interview, particularly without

Application/Control Number: 10/816,217                                          Page 3
Art Unit: 4117

providing the applicant the necessary time to review and considered the additional

references cited by examiner. However, the application is being treated under

accelerated examination under 37 C.F.R. 1.102, as such upon applicant's full

consideration of the hereby cited references, examiner remains open to an interview

upon request to discuss any possible issue/concern and/or any possible amendment or

submission to resolve any issue(s) identified by applicant (see MPEP 708.02 VIII

Prosecution Procedure (A)-(E)).


### *Priority*

2.      The later-filed application must be an application for a patent for an invention

which is also disclosed in the prior application (the parent or original non-provisional

application or provisional application). The disclosure of the invention in the parent

application and in the later-filed application must be sufficient to comply with the

requirements of the first paragraph of 35 U.S.C. 112.  See *Transco Products, Inc. v.*

*Performance Contracting, Inc.*, 38 F.3d 551, 32 USPQ2d 1077 (Fed. Cir. 1994).

        The disclosure of the prior-filed application, Application No. 60/490,768, fails to

provide adequate support or enablement in the manner provided by the first paragraph

of 35 U.S.C. 112 for one or more claims of this application.  A certified copy of the

provisional application to which priority is claimed has not been received by the Office.

As such, all enablement rejections made herewith are based solely upon the current

application's specification and not in view of provisional application No. 60/490,768.

Application/Control Number: 10/816,217                                      Page 4
Art Unit: 4117

The applicant may possibly overcome rejections/objections by providing a certified copy

of the provisional application and distinctly pointing out the sections contained within the

provisional that support the subject matter claimed or amended into the current

application.

### *Response to Amendment*

3.      The amendment filed 21 November 2005 is objected to under 35 U.S.C. 132(a)

because it introduces new matter into the disclosure.  35 U.S.C. 132(a) states that no

amendment shall introduce new matter into the disclosure of the invention.  The added

material which is not supported by the original disclosure is as follows:

        a.      The introduction of "visual" or "audiovisual" information being processed

        by the system.  The original filed disclosure focuses on processing "audio"

        information and **only mentions video processing as a consideration in how**

        **to delay the playing of the audio information by the system**.  The disclosure

        specifically suggests that the **video information is being processed**

        **independently of the current audio system invention**, and does not support

        the invention handling visual tracks or audiovisual tracks, as added into the

        specification and in claims 570 and 571.  (Pg 55, line 12-26)

        b.      The introduction of possible components in an audio reproduction device.

        While the original specification provides support for an external amplifier

        managed by the zone player (zone player to external amp to audio reproduction

Application/Control Number: 10/816,217                                                  Page 5
Art Unit: 4117

device), it does not provide support for "external amplifiers", "speakers", "other devices that change electrical signals into sound" or "visual displays" such as "cathode ray tubes" managed by the audio reproduction device (zone player to audio reproduction device to external amp) as added in the specification.  (Pg 54, line 1-9)

c.       The introduction of possible uses for embodiments of the inventions. While the original specification provides support for the system being operable in rooms, houses, offices, amphitheatres, and auditoriums, it does not provide support for being used in "motorized vehicles", "airplanes", "jets", "boats", "yachts" or "ships" as added in the specification. (Pg 6, lines 1-18)

d.       The introduction of how status information is conveyed by the display of the user interface module.  The original specification only provides support for the user interface module displaying "status information".  It does not discuss how this information should be displayed, or that it should "display visual images representative of the tasks being performed", as added in claim 559.  (Pg 12, line 25 – pg  13, line 15)

e.       The introduction of further interaction components of the user interface. The original specification does provide for a "motion sensor" or a "scroll wheel" as added in claims 560 and 561. (Pg 12, line 25 – pg 13, line 15)

f.       The introduction of the audio information being in a WMA format.  The original specification provides support for the use of MP3 and WAV formats, but not for the WMA format, as added in claim 569. (pg 48, line 20 – pg 49, line 12)

Application/Control Number: 10/816,217                                          Page 6
Art Unit: 4117

    g.    The introduction of the audio information source being an Apple iPod.  The
original specification provides support for the use of CDs players, radio receivers,
record turntables, PCs and PDAs, but does not provide support for the source
being an Apple iPod, as added in claim 572.  (Pg 6, line 19 – pg 7, line 6)
Applicant is required to cancel the new matter in the reply to this Office Action.


4.    Claims that have been cancelled by amendment, however, are not objected to at
all.


### *Specification*

5.    Applicant is reminded of the proper language and format for an abstract of the
disclosure.  The abstract should be in narrative form and generally limited to a single
paragraph on a separate sheet within the range of 50 to 150 words.  It is important that
the abstract not exceed 150 words in length since the space provided for the abstract
on the computer tape used by the printer is limited.  The form and legal phraseology
often used in patent claims, such as "means" and "said," should be avoided.  The
abstract should describe the disclosure sufficiently to assist readers in deciding whether
there is a need for consulting the full patent text for details.  The language should be
clear and concise and should not repeat information given in the title.  It should avoid
using phrases which can be implied, such as, "The disclosure concerns," "The
disclosure defined by this invention," "The disclosure describes," etc.

Application/Control Number: 10/816,217                                    Page 7

Art Unit: 4117

6.      The abstract of the disclosure is objected to because it contains implied

phraseology.  The phrase "is described" falls under the category of implied phraseology

and should be deleted.  Correction is required.  See MPEP § 608.01(b).

7.      The lengthy specification has not been checked to the extent necessary to

determine the presence of all possible minor errors.  Applicant's cooperation is

requested in correcting any errors of which applicant may become aware in the

specification.

## *Claim Objections*

8.      Claims 86, 91, 127, 139, 229, 555, 556, and 562 are objected to due to the

following noted minor informality: lack of antecedent basis.

Regarding claim 86, the limitation "the synchrony group" is recited in line 9.  There is

insufficient antecedent basis for this limitation in the claim. Correction is required.

Regarding claim 91 the limitation "the member device's clock rate" is recited in line 2.

There is insufficient antecedent basis for this limitation in the claim. Correction is

required.

Application/Control Number: 10/816,217                                           Page 8
Art Unit: 4117

Regarding claim 127, the limitation "the function" is recited in line 3. There is insufficient antecedent basis for this limitation in the claim. Correction is required.

Regarding claim 139, the limitation "the clock rate of a member device" is recited in line 3. There is insufficient antecedent basis for this limitation in the claim. Correction is required.

Regarding claim 229, the limitations "the device's synchrony group" and "the synchrony group" are recited in lines 2-4. There is insufficient antecedent basis for these limitations in the claim. Correction is required.

Regarding claim 555, the limitation "the synchrony group" is recited in line 2. There is insufficient antecedent basis for this limitation in the claim. Correction is required.

Regarding claim 556, the limitation "the user interface module" is recited in line 2. There is insufficient antecedent basis for this limitation in the claim. Correction is required.

Regarding claim 562, the limitation "the performance" is recited in line 2. There is insufficient antecedent basis for this limitation in the claim. Correction is required.

Application/Control Number: 10/816,217                                          Page 9

Art Unit: 4117

### *Claim Rejections - 35 USC § 112*

9.     The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

10.    Claims 559-561 and 569-572 are rejected under 35 U.S.C. 112, first paragraph, as failing to comply with the written description requirement.  The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention.

These claims contain limitations that were added in a preliminary amendment and were not supported by the original disclosure.  See **Response to Amendment** section above for new matter reasoning.

11.    The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

12.    Claims 109, 562 and 563 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Application/Control Number: 10/816,217                                    Page 10
Art Unit: 4117

Regarding claim 109, the limitation "associating each of the tasks with a time stamp" is immediately followed by the limitation "indicating a time, relative to a clock maintained by a task source device, at which the devices comprising the synchrony group are to execute the respective tasks". The second limitation quoted is a slightly narrower limitation compared to the first limitation quoted. However, the second limitation reads upon the first limitation, and though it appears applicant is attempting to distinguish between the time stamp and an indicated time, without proper definition of each within the claim, it results in confusion. There is no indication as to what devices are performing these respective steps and how time stamps differ from an indicated execution time.

Regarding claim 562, the phrase "without appreciable delay the performance of the tasks in synchrony" is confusing and does not make sense. For purposes of further examination the examiner will consider this to read "without appreciable delay that would affect performance of the tasks in synchrony".

Regarding claims 562 and 563, the limitation "appreciable delay" is indefinite and relative. The disclosure provides no definition of the term and/or indicates to the quantitative limitations on how long a delay must be before it would qualify as an "appreciable" one. For purposes of further examination the examiner will consider any synchronization task that takes delay into consideration while processing to meet this limitation.

Application/Control Number: 10/816,217                                      Page 11
Art Unit: 4117

## *Claim Rejections - 35 USC § 101*

13.    35 U.S.C. 101 reads as follows:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

14.    Claims 218, 219, 221, 229, 233, and 244 are rejected under 35 U.S.C. 101

because the claimed invention is directed to non-statutory subject matter.

Regarding claim 218, computer-related inventions whether descriptive or functionally

descriptive material are non-statutory categories when claimed as descriptive material

*per se* (see *Warmerdam, 33 F.3d at 1360 USPQ2d at 1759)*, falling under the "process"

category (i.e. inventions at that consist of a series of steps or acts to be performed). See

35 U.S.C. 100(b) ("The term process means, art, or method, and includes a new of a

known process, machine, manufacture, composition of matter or material").  Functional

descriptive material: "data structures" representing descriptive material *per se* or

computer program representing computer listing *per se* (i.e. software per se) when

embodied in a computer-readable media are still not statutory because they are not

capable of causing functional change in the computer.  However, a claimed computer-

readable *storage* medium encoded with a data structure, computer listing or computer

program, having defined structural and functional interrelationships between the data

Application/Control Number: 10/816,217                                        Page 12
Art Unit: 4117

structure, computer listing or computer program and the computer software and

hardware component, which permit the data structure's, listing or program's functionality

to be realized, is statutory (see MPEP §2106).  In this case, the applicant is making

claim to a "computer program comprising a computer readable medium", which is either

inherent (if the computer readable medium is not tangible, and therefore not statutory)

or impossible (if the computer readable medium is tangible).  The examiner

recommends changing the preamble to read: "A computer-readable storage medium

comprising a computer program …" in an effort to change the claim to statutory subject

matter.

Regarding claims 219, 221, 229, 223, and 244, these claims inherit the non-statutory

subject matter their parent claim contains.

### *Claim Rejections - 35 USC § 102*

15.     The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a) the invention was known or used by others in this country, or patented or described in a printed
> publication in this or a foreign country, before the invention thereof by the applicant for a patent.

Application/Control Number: 10/816,217                                    Page 13

Art Unit: 4117

16.    Claims 1-4, 31, 65-66, 91, 109-112, 118, 121, 139, 156, 201-202, 206, 218-219,

221, 244, 557, 562-563, 565-568, 570-571, 575, and 576 are rejected under 35

U.S.C. 102(a) as being anticipated by Jo et al ("Synchronized one-to-many media

streaming with adaptive playout control", 10 December 2002).


Regarding claim 1, Jo teaches a system comprising a plurality of devices, one of the

devices operating as a task source device and at least one other device operating as a

member of a synchrony group, (Jo: Figure 1 depicts a server distributing media for

playback to multiple clients)

        the task source device being configured to distribute a series of tasks to the

synchrony group, (Jo: Section 2.1 specifies the system is for scheduling audio/video

streams to multiple clients, using, for example, MPEG-2 or MPEG-4) each task being

associated with a time stamp indicating a time, relative to a clock maintained by the task

source device, at which the devices comprising the synchrony group at to execute the

respective task.  (Jo: Section 2.1 specifies the streams could be MPEG-2; section 2.2

specifies these inherently have a Presentation TimeStamp (PTS) in the header)


Regarding claim 2, Jo teaches a system in which the synchrony group comprises a

plurality of member devices. (Jo: Figure 1 depicts multiple clients)

Application/Control Number: 10/816,217                                      Page 14
Art Unit: 4117

Regarding claim 3, Jo teaches a system in which each device comprising a member of the synchrony group is further configured to execute each task that it receives from the task source device at the determined time.  (Jo: Section 2.2 specifies a PTS and executing playback based on the PTS)

Regarding claim 4, Jo teaches a system in which the member devices are configured to execute the respective tasks in synchrony.  (Jo: Section 2.4 specifies the objective of inter-client synchronization)

Regarding claim 31, Jo teaches a system in which at least one member device is further configured to adjust its clock rate. (Jo: abstract specifies the adjustment of the playback rate of the clients)

Regarding claim 65, Jo teaches a device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, (Jo: abstract specifies the playback of media using a target presentation time specified by the server) the device comprising:

an interface module (receiver buffers) configured to receive the series of tasks (Jo: section 2.2 specifies the clients have receiver buffers; See also Figure 1);

Application/Control Number: 10/816,217                                     Page 15
Art Unit: 4117

a current time retrieval module (scheduler) configured to obtain from the task

source a current time value (Jo: section 2.1 specifies the possible use of NTP for

employing tightly synced playback, which inherently retrieves current time information);

an execution time determination module (scheduler) configured to determine a

time at which the task is to be executed (Jo: section 2.2 specifies the scheduler controls

playback so that the presentation time is met; See also Figure 1);

and a task execution module (streaming media applications) configured to

execute each respective task (Jo: section 1 specifies streaming media applications are

controlling execution at the clients; See also Figure 1).

Regarding claim 66, Jo teaches a device further including a control module (controller)

for controlling the execution of commands received by the said interface module. (Jo:

section 2.2 specifies the controller acting in conjunction with the scheduler to execute

the tasks on time; See also Figure 1)

Regarding claim 91, this device claim comprises limitations substantially similar to that

of claim 31 and the same rationale of rejection is used, where applicable.

Regarding claim 109, Joe teaches a method of operating a system comprising the steps

of:

Application/Control Number: 10/816,217                                    Page 16

Art Unit: 4117

associating each of the tasks with a time stamp (Jo: section 2.2 specifies using a

presentation timestamp);

indicating a time, relative to a clock maintained by a task source device, at which

devices comprising the synchrony group are to execute the respective tasks. (Jo:

section 2.2 specifies the server using a presentation timestamp in the headers)

Regarding claim 110, this method claim comprises limitations substantially similar to

that of claim 2 and the same rationale of rejection is used, where applicable.

Regarding claim 111, this method claim comprises limitations substantially similar to

that of claim 3 and the same rationale of rejection is used, where applicable.

Regarding claim 112, this method claim comprises limitations substantially similar to

that of claim 4 and the same rationale of rejection is used, where applicable.

Regarding claim 118, Jo teaches a method in which the task source device is

configured to distribute tasks to the member devices using a selected multi-cast

transmission methodology.  (Jo: abstract)

Regarding claim 121, Jo teaches a method further comprising the step of controlling the

series of tasks to be distributed by the task source device.  (Jo: section 2.4 specifies the

Application/Control Number: 10/816,217                                    Page 17

Art Unit: 4117

use of client feedback using RTCP signaling to provide some server sided control of

distribution)


Regarding claim 139, this method claim comprises limitations substantially similar to

that of claim 31 and the same rationale of rejection is used, where applicable.


Regarding claim 156, Jo teaches the method further comprising the step of obtaining

information associated with the tasks from a single information source. (Jo: Figure 1

depicts the information coming from one server.  See also Figure 6, the simulation uses

one streaming server.)


Regarding claim 201, Jo teaches a method for operating a device comprising the steps

of:

        obtaining a series of tasks; (Jo: section 2.2 specifies the server can obtain the

streams from MPEG-2 programs)

        determining a time at which each respective task is to be executed;  (Jo: section

2.2 specifies the PTS exists in the frame, which inherently means the sender put it

there)

        transmitting the series of tasks from the device to at least one other device. (Jo:

abstract)

Application/Control Number: 10/816,217                                      Page 18
Art Unit: 4117

Regarding claim 202, this method claim comprises limitation substantially similar to that of claim 118 and the same rationale of rejection is used, where applicable.

Regarding claim 206, Jo teaches the method wherein in which the series of tasks includes a series of task sequences.  (Jo: section 2.2 specifies the streams are multiplexed audio and video which are sequenced with sequence numbers)

Regarding claim 218, this computer program claim comprises limitation substantially similar to that of claim 65 and the same rationale of rejection is used, where applicable.

Regarding claim 219, this computer program claim comprises limitation substantially similar to that of claim 66 and the same rationale of rejection is used, where applicable.

Regarding claim 221, this computer program claim comprises limitation substantially similar to that of claim 206 and the same rationale of rejection is used, where applicable.

Regarding claim 244, this computer program claim comprises limitation substantially similar to that of claim 31 and the same rationale of rejection is used, where applicable.

Regarding claim 553, Jo teaches the system wherein the clock rate of the at least one member device is adjusted in relation to a clock rate value maintained by the task

Application/Control Number: 10/816,217                                    Page 19
Art Unit: 4117

source device's clock.  (Jo: section 2.1, specifies the task source adjusts its target

presentation time and then distributes it, which results in the member devices adjusting

their playback rates; See also section 2.2)

Regarding claim 557, Jo teaches a system for synchronizing operations among a

plurality of digital data processing devices (Jo: abstract) comprising:

      at least one task distribution device (server) configured to distribute tasks over a

network (Jo: abstract; Figure 1, Server);

      at least one member device configured to perform the tasks in synchrony (Jo:

abstract; Figure 1, clients).

Regarding claim 562, Jo teaches the system wherein the task distribution device is

further configured to enable the at least one member device to initiate without

appreciable delay the performance of the tasks in synchrony. (Jo: abstract)

Regarding claim 563, Jo teaches the system wherein the task distribution device is

further configured to allow one or more additional member devices to join without

appreciable delay or disengage without appreciable delay the at least one member

device's synchronous performance.  (Jo: section 2.1 specifies clients can join through

the PIM-SM routing)

Application/Control Number: 10/816,217                                  Page 20
Art Unit: 4117

Regarding claim 565, Jo teaches the system wherein the at least one distribution device is independently clocked.  (Jo: section 2.4, specifies the use of server aided playback adjustment; section 2.4, description of figure 5 specifies using the server time information to guide the local client time information.)

Regarding claim 566, Jo teaches the system wherein the at least one member device is independently clocked.  (Jo: section 2.3 specifies the client can perform local playback adjustment without timing information from the server)

Regarding claim 567, Jo teaches wherein each of the tasks is associated with a time stamp relative to a clock maintained by the at least one task distribution device.  (Jo: section 2.2 specifies the use of a timestamp)

Regarding claim 568, Jo teaches wherein the tasks comprise audio tracks. (Jo: abstract specifies audio)

Regarding claim 570, Jo teaches wherein the tasks comprise visual tracks. (Jo: abstract specifies video)

Regarding claim 571, Jo teaches wherein the tasks comprise audiovisual tracks. (Jo: abstract specifies both audio and video; Figure 1 depicts the possibility of them buffering and playing concurrently)

Application/Control Number: 10/816,217                              Page 21
Art Unit: 4117

Regarding claim 575, Jo teaches wherein the time stamp represents when the at least one member device is to execute the task.  (Jo: section 2.2 specifies the PTS is for presentation execution time)

Regarding claim 576, Jo teaches a system for synchronizing the operations among a plurality of digital data processing devices comprising a zone player (controller) residing within one or more audio reproduction devices (clients).  (Jo: abstract)

### Claim Rejections - 35 USC § 103

17.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

18.    Claims 5, 9-10, 20, 33, 86, 113-114, 117, 127-128, 141, 229, 233, and 554-555 are rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002), and further in view of Anjum et al (US 2003/00992121 A1).

Application/Control Number: 10/816,217                                Page 22
Art Unit: 4117

Regarding claim 5, Jo teaches the use of a server streaming media across an IP based network to multiple clients while performing at least one type of synchrony group management operation.  (Jo: abstract)

Jo does not teach the use of a member device (client) operating as a master device configured to perform at least one type of synchrony group management operation.

Anjum, in a similar field of endeavor, teaches the use of a Bluetooth piconet that uses a master device to perform at least one type of synchrony group management operation. (Anjum: abstract and [0007])

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Anjum for using a specialized Bluetooth network for data communication.  The teachings of Anjum, when implemented in the Jo system, will allow one of ordinary skill to operate the client and server devices in a Bluetooth network.  One of ordinary skill in the art would be motivated to utilize the teachings of Anjum in the Jo system in order to use short range wireless communication as a Personal Area Network on an unlicensed radio band in a small setting.

Regarding claim 9, the Jo/Anjum system teaches comprising at least one additional device in which the master device is configured to enable the at least one addition device to join the synchrony group as a slave device.  (Anjum: [0004]-[0006] specifies slaves joining, See also Figure 1)

Application/Control Number: 10/816,217                                Page 23
Art Unit: 4117

Regarding claim 10, the Jo/Anjum system teaches in which the task source device is configured to distribute tasks to the member devices using a selected multi-cast transmission methodology.  (Jo: abstract)

Regarding claim 20, the Jo/Anjum system teaches in which the master device is configured to enable the task source device to migrate from one device (slave of first piconet) to another device (master of second piconet) in the system.  (Anjum: abstract specifies that a second piconet can be created with a new master acting as a task source to distribute information to second piconet)

Regarding claim 33, the Jo/Anjum system teaches in which at least one other device operates as a task source device configured to distribute tasks to a second synchrony group.  (Anjum: abstract specifies that a second piconet may be created with a new master acting as a task source to manage slaves)

Regarding claim 86, the Jo/Anjum system teaches further including:

        a migration information receiving module configured to receive migration information from the task source device;  (Anjum: [0009] specifies migration receiving necessary by a slave)

Application/Control Number: 10/816,217                                    Page 24
Art Unit: 4117

a migration control module configured to distribute the series of tasks to the

synchrony group.  (Jo: abstract specifies distributing the media)

Regarding claim 113, this method claim comprises limitation substantially similar to that

of claim 5 and the same rationale of rejection is used, where applicable.

Regarding claim 114, the Jo/Anjum system teaches further comprising the step of

controlling a master device's distribution of status information.  (Anjum: abstract)

Regarding claim 117, this method claim comprises limitation substantially similar to that

of claim 9 and the same rationale of rejection is used, where applicable.

Regarding claim 127, this method claim comprises limitation substantially similar or

broader to that of claim 20 and the same rationale of rejection is used, where

applicable.

Regarding claim 128, this method claim comprises limitation substantially similar to that

of claim 20 and the same rationale of rejection is used, where applicable.

Regarding claim 141, this method claim comprises limitation substantially similar to that

of claim 33 and the same rationale of rejection is used, where applicable.

Application/Control Number: 10/816,217                                    Page 25
Art Unit: 4117

Regarding claim 229, the Jo/Anjum system teaches in which in response to control information to enable another device to become a member of the device's synchrony group, the control module enables to transmit a command to the other device to enable the other device to become a member of the synchrony group.  (Anjum: [0009])

Regarding claim 233, the Jo/Anjum system teaches in which the interface module is further configured to enable the computer to transmit the tasks to at least one other device.  (Anjum: [0010], Jo: abstract)

Regarding claim 554, the Jo/Anjum system teaches wherein the device operating as the task source for the first synchrony group (master of second/helper piconet), is also operating as a member device of a second synchrony group (first piconet). (Anjum: abstract)

Regarding claim 555, the Jo/Anjum system teaches wherein the migration control module is further configured to notify the members of the synchrony group that it is to thereafter operate as the task source device.  (Anjum: [0025], [0032] description of step 490)

19.    Claim 19 is rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10

Application/Control Number: 10/816,217                                    Page 26
Art Unit: 4117

December 2002) and Anjum et al (US 2003/00992121 A1), in further view of Powers
(US 2004/0203378 A1).


Regarding claim 19, the Jo/Anjum system teaches the use of a master device managing

slaves and migrating devices.  However, the Jo/Anjum system does not teach the use of

a master device migrating from one device to another.

Powers, in a similar field of endeavor, teaches a slave device being promoted or

swapped with the master device.  (Powers: abstract)

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Powers for having dynamic master

devices.  The teachings of Powers, when implemented in the Jo/Anjum system, will

allow one of ordinary skill in the art to swap master devices with slave devices when

necessary or preferred.  One of ordinary skill in the art would be motivated to utilize the

teachings of Powers in the Jo/Anjum system in order to allow devices dynamically

manage their master, if, for instance, the master leaves the network.


20.    Claims 138, 564, 573, and 574 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive

playout control", 10 December 2002), and further in view of Miyabe et al (US

2001/0032188 A1).

Regarding claim 138, Jo teaches a distribution system using a media server (Jo: abstract), but Jo never discloses where the media server obtains its media from.

Miyabe et al, in a similar field of endeavor, teaches wherein task source devices (Miyabe: Figure 1A, items 114, 123, and 173) obtain information associated with the tasks from at least two types of information sources.  (Miyabe: Figure 1A, item 123 depicts two incoming information sources, one from item 121 and one from 131)

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Miyabe for having multiple different information sources.  The teachings of Miyabe, when implemented in the Jo system, will allow one of ordinary skill in the art to obtain media information from multiple outlets. One of ordinary skill in the art would be motivated to utilize the teachings of Miyabe in the Jo system in order for to allow the system to support a user who has multiple media source devices.

Regarding claim 564, the Jo/Miyabe system teaches wherein the at least one task distribution device is further configured to obtain information associated with the tasks from at least one information source.  (Miyabe: Figure 1A, items 123, 121, and 131)

Regarding claim 573, the Jo/Miyabe system teaches wherein the at least one information source is an Internet broadcast. (Miyabe: [0129])

Application/Control Number: 10/816,217                                      Page 28
Art Unit: 4117

Regarding claim 574, the Jo/Miyabe system teaches wherein the at least one
information source is a satellite broadcast. (Miyabe: Figure 1A, item 111 to item 112 to
item 113 to item 114)

21.    Claims 6, 551, and 556 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive
playout control", 10 December 2002) and Anjum et al (US 2003/00992121 A1), and
further in view of Tsuk et al (US 7,312,785 B2).

Regarding claim 6, the Jo/Anjum system teaches wherein the system contains a master
device, however, their system does not teach a user interface on the device.

Tsuk, in a similar field of endeavor, teaches the system further including a user
interface module configured to control the master device.  (Tsuk: abstract, Figure 7B)

It would have been obvious to one of ordinary skill in the art at the time the
invention was made to utilize the teachings of Tsuk for iPods with user interfaces.  The
teachings of Tsuk, when implemented in the Jo/Anjum system, will allow one of ordinary
skill in the art to use an iPod as any one of the devices in the system.  One of ordinary
skill in the art would be motivated to utilize the teachings of Tsuk in the Jo/Anjum
system in order to provide the user with easy interaction interfaces to control the
system.

Application/Control Number: 10/816,217                                    Page 29
Art Unit: 4117

Regarding claim 551, the Jo/Anjum/Tsuk system teaches wherein the master device is

further configured to provide status information related to the status of the synchrony

group to the user interface module.  (Tsuk: col 3, lines 35-54)


Regarding claim 556, this method claim comprises limitations substantially similar to

that of claim 551 and the same rationale of rejection is used, where applicable.


22.    Claims 558-561 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10

December 2002), and further in view of Tsuk et al (US 7,312,785 B2).


Regarding claim 558, the Jo system teaches wherein the system controls one or more

synchrony groups but does not teach an interface module.

        Tsuk, in a similar field of endeavor, teaches the system further including a user

interface module configured to control the synchrony groups.  (Tsuk: abstract, Figure

7B)

        It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Tsuk for iPods with user interfaces.  The

teachings of Tsuk, when implemented in the Jo system, will allow one of ordinary skill in

the art to use an iPod as any one of the devices in the system.  One of ordinary skill in

the art would be motivated to utilize the teachings of Tsuk in the Jo/Anjum system in

order to provide the user with easy interaction interfaces to control the system.

Application/Control Number: 10/816,217                                    Page 30
Art Unit: 4117

Regarding claim 559, the Jo/Tsuk system teaches wherein the user interface module is further configured to display visual images representative of the tasks being performed in synchrony. (Tsuk: col 3, lines 35-54)

Regarding claim 560, the Jo/Tsuk system teaches wherein the user interface module further comprises a motion sensor (scroll wheel) configured to activate the user interface module when moved by a user.  (Tsuk: col 15, line 63—col 16, line 12)

Regarding claim 561, the Jo/Tsuk system teaches wherein the user interface module further comprises a scroll wheel for selection of tasks (Tsuk: col 13, lines 32-47) to be performed in synchrony (Jo: abstract).

23.    Claim 572 is rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002) and Miyabe et al (US 2001/0032188 A1), and further in view of Tsuk et al (US 7,312,785 B2).

Regarding claim 572, the Jo/Miyabe system teaches information devices, but not one being an Apple iPod.

        Tsuk, in a similar field of endeavor, teaches wherein the device is an Apple iPod. (Tsuk: Figure 7B)

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Tsuk for using iPods as the devices. The teachings of Tsuk, when implemented in the Jo/Miyabe system, will allow one of ordinary skill in the art to use an iPod as any one of the devices in the system. One of ordinary skill in the art would be motivated to utilize the teachings of Tsuk in the Jo/Miyabe system because iPods are widely available, popular, and a commercial success.

24.    Claim 552 is rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002) and Anjum et al (US 2003/00992121 A1), in further view of Lo et al (US 6,031,818).

Regarding claim 552, the Jo/Anjum system teaches wherein the system retransmits data in a multicast fashion, and not selective unicast.

Lo, in a similar field of endeavor, teaches the system wherein the task source device is enabled to transmit at least one previously distributed task to the slave device using a selected unicast transmission methodology. (Lo: col 8, lines 14-54)

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Lo for using selective unicast retransmission. The teachings of Lo, when implemented in the Jo/Anjum system, will allow one of ordinary skill in the art to retransmit lost packets to member devices with

Application/Control Number: 10/816,217                                         Page 32
Art Unit: 4117

unicast methodology.  One of ordinary skill in the art would be motivated to utilize the

teachings of Lo in the Jo/Anjum system in order to conserve bandwidth and reduce

traffic.


25.    Claim 569 is rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al

("Synchronized one-to-many media streaming with adaptive playout control", 10

December 2002).


Regarding claim 569, Jo teaches wherein the tasks are audio tracks, but does not

explicitly state they could be in the WMA format.

       An official notice is taken that such use of the WMA format for audio files is well

known in the art.

       It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize any known and commonly used audio formats for  audio

files because it would have enabled practicing Jo's invention.


26.    Claims 549 and 550 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Jo et al ("Synchronized one-to-many media streaming with adaptive playout

control", 10 December 2002), and further in view of Flood (US 7,007,106 B1).


Regarding claim 549, Jo teaches obtaining from the task source device an indication of

a presentation time stamp and when to execute a task.  Jo does not teach wherein the

Application/Control Number: 10/816,217                                    Page 33
Art Unit: 4117

member device obtains the current time value of the task source device's clock on a periodic basis.

Flood, in a similar field of endeavor, teaches wherein the member device periodically obtains the task source device's clock information.  (Flood: col 18, lines 22-35)

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Flood for distributing the current time information on a periodic basis.  The teachings of Flood, when implemented in the Jo system, will allow one of ordinary skill in the art to ensure the member devices were always aware of the task source device's current time information by updating on regular intervals.  One of ordinary skill in the art would be motivated to utilize the teachings of Flood in the Jo system in order to update member devices of the task source's current time, which would ensure tighter synchronization.

Regarding claim 550, the Jo/Flood system teaches wherein each member device is further configured to determine, from the time stamp associated with each respective task and a time differential value representing the difference between the current time value indicated by the task source device's clock, and a current time value indicated by its respective clock, a time, relative to its respective clock, at which it is to execute the task.  (Flood: col 10, lines 50-63 specify calculating the offset between master and slave time and then processing the task based on a received time stamp and using this computed offset).

Application/Control Number: 10/816,217                                      Page 34
Art Unit: 4117

### *Cited Pertinent Prior Art*

27.    The prior art made of record and not relied upon is considered pertinent to applicant's disclosure:

  a.    Huang et al ("A synchronization infrastructure for multicast multimedia at the presentation layer", August 1997) discloses a system for multimedia multicasting with inter-client synchronization.

  b.    Ishibashi et al ("A group synchronization mechanism for live media in a multicast communications", 1997) discloses a system for multimedia multicasting with inter-client synchronization.

  c.    Ishibashi et al ("A group synchronization mechanism for stored media in multicast communications", 1997) discloses a system for multimedia multicasting with inter-client synchronization.

  d.    Anttila et al (US 2003/0126211 A1) discloses a media multicasting synchronization system.

  e.    Kang et al (US 2002/0090914 A1) discloses a piconet system with dynamic master/slave configurations.

  f.    Kim et al (US 6,836,788 B2) discloses a method for distributing media via multicasting trees with RTP.

  g.    Liou et al (US 2002/0112244 A1) discloses a system for synchronous media distribution using collaboration.

Application/Control Number: 10/816,217                                      Page 35
Art Unit: 4117

      h.     Moller (US 6,009,457) discloses a system for real-time audio distribution.

      i.     Russell (US 6,934,766 B1) discloses a method and apparatus for

synchronizing playback by considering network lag.

      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to JEFFREY NICKERSON whose telephone number is

(571)270-3631.  The examiner can normally be reached on M-Th, 8:30-6:30.

      If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Beatriz Prieto can be reached on 571-272-3902.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 10/816,217                                    Page 36
Art Unit: 4117

   Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/J. N./
Jeffrey Nickerson
Patent Examiner

         /Prieto, Beatriz/
      Supervisory Patent Examiner, Art Unit 4117

PTO/SB/21 (01-08)
Approved for use through 02/29/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FORM

*(to be used for all correspondence after initial filing)*

| | |
|---|---|
| Application Number | 10/816,217 |
| Filing Date | April 1, 2004 |
| First Named Inventor | Nicholas A. J. Millington |
| Art Unit | 2142 |
| Examiner Name | Jeffrey L. Nickerson |
| Attorney Docket Number | PA3445US |

| Total Number of Pages in This Submission | 29 |
|---|---|

## ENCLOSURES    *(Check all that apply)*

| | |
|---|---|
| ☐ Fee Transmittal Form | |
| ☐ Fee Attached | |
| ☑ Amendment/Reply | |
| ☐ After Final | |
| ☐ Affidavits/declaration(s) | |
| ☐ Extension of Time Request | |
| ☐ Express Abandonment Request | |
| ☐ Information Disclosure Statement | |
| ☐ Certified Copy of Priority Document(s) | |
| ☐ Reply to Missing Parts/ Incomplete Application | |
| ☐ Reply to Missing Parts under 37 CFR 1.52 or 1.53 | |

| | |
|---|---|
| ☑ Drawing(s) | |
| ☐ Licensing-related Papers | |
| ☐ Petition | |
| ☐ Petition to Convert to a Provisional Application | |
| ☐ Power of Attorney, Revocation Change of Correspondence Address | |
| ☐ Terminal Disclaimer | |
| ☐ Request for Refund | |
| ☐ CD, Number of CD(s) _____ | |
| ☐ Landscape Table on CD | |

| | |
|---|---|
| ☐ After Allowance Communication to TC | |
| ☐ Appeal Communication to Board of Appeals and Interferences | |
| ☐ Appeal Communication to TC **(Appeal Notice, Brief, Reply Brief)** | |
| ☐ Proprietary Information | |
| ☐ Status Letter | |
| ☑ Other Enclosure(s) (please identify below): | |
| 1) Confirmation Postcard. | |

**Remarks**

Total page number does not include confirmation postcard.

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT

| Firm Name | **Carr & Ferrell LLP**      **Cust. No. 22830** |
|---|---|
| Signature | *K. Brian Bathurst* |
| Printed name | K. Brian Bathurst |
| Date | April 17, 2008 | Reg. No. | 51,442 |

## CERTIFICATE OF TRANSMISSION/MAILING

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date shown below:

| Signature | *K. Brian Bathurst* | | |
|---|---|---|---|
| Typed or printed name | K. Brian Bathurst, Reg. No. 51,442 | Date | April 17, 2008 |

This collection of information is required by 37 CFR 1.5. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and1.14. This collection is estimated to 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*



# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**APPLICANT:**            Nicholas A. J. Millington

**APPLICATION NO.:**    10/816,217

**FILING DATE:**       April 1, 2004

**TITLE:**             System and Method for Synchronizing Operations Among a Plurality of Independently Clocked Digital Data Processing Devices

**EXAMINER:**         Jeffrey L. Nickerson

**ART UNIT:**           2142

**ATTY. DKT. NO.:**      PA3445US

**CONFIRMATION NO.:**   7302

---

CERTIFICATE OF MAILING UNDER 37 C.F.R. § 1.8

I hereby certify this correspondence is being deposited with the U.S. Postal Service in an envelope bearing sufficient postage for a first class mailing and addressed to Mail Stop Amendment, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 **April 17, 2008**.

*K. Brian Bathurst*

K. Brian Bathurst, Reg. No. 51,442

---

MAIL STOP AMENDMENT
COMMISSIONER FOR PATENTS
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450

## RESPONSE A

Examiner Nickerson:

In response to the office action mailed **January 18, 2008** (*Office Action*), please consider the following **amendments** and **remarks**. **Amendments to the claims** and **specification** begin on **page two** and **fourteen**, respectively. Applicant's **remarks** in response to the *Office Action* begin on **page twenty**. Applicant's **conclusions** as to the allowability of this application begin on **page twenty-eight**.

## AMENDMENTS TO THE CLAIMS

Please amend the claims as follows.

1.    (Previously presented) A system comprising a plurality of devices, one of the devices operating as a task source device and at least one other device operating as a member of a synchrony group,

the task source device being configured to distribute a series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to a clock maintained by the task source device, at which the devices comprising the synchrony group are to execute the respective task.

2.    (Original) A system as defined in claim 1 in which the synchrony group comprises a plurality of member devices.

3.    (Previously presented) A system as defined in claim 2 in which each device comprising a member of the synchrony group is further configured to execute each task that it receives from the task source device at the determined time.

4.    (Original) A system as defined in claim 3 in which the member devices are configured to execute respective tasks in synchrony.

5.    (Previously presented) A system as defined in claim 2 in which one of the member devices operates as a master device configured to perform at least one type of synchrony group management operation.

6.    (Previously presented) A system as defined in claim 5 further including a user interface module configured to control the master device.

7-8.    (Canceled)

9.    (Previously presented) A system as defined in claim 5, the system comprising at least one additional device in which the master device is configured to enable the at least one additional device to join the synchrony group as a slave device.

10.    (Previously presented) A system as defined in claim 9 in which the task source device is configured to distribute tasks to the member devices using a selected multi-cast transmission methodology.

11-18.  (Canceled)

19.    (Previously presented) A system as defined in claim 5 in which the member device operating as the master device is configured to enable the master device to migrate from one member device to another member device in the system.

20.    (Previously presented) A system as defined in claim 5 in which the master device is configured to enable the task source device to migrate from one device to another device in the system.

21-30.  (Canceled)

31.    (Original) A system as defined in claim 1 in which at least one member device is further configured to adjust its clock rate.

32.    (Canceled)

33.    (Original) A system as defined in claim 1 in which at least one other device operates as a task source device configured to distribute tasks to a second synchrony group.

3

34-64. (Canceled)

65.    (Previously presented) A device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, the device comprising:

     an interface module configured to receive the series of tasks;

     a current time retrieval module configured to obtain from the task source a current time value;

     an execution time determination module configured to determine a time at which the task is to be executed; and

     a task execution module configured to execute each respective task.

66.    (Original) A device as defined in claim 65 further including a control module for controlling execution of commands received by said interface module.

67-85. (Canceled)

86.    (Currently amended) A device as defined in claim 65 further including:

     a migration information receiving module configured to receive migration information from the task source device; and

     a migration control module configured to distribute the series of tasks to ~~the~~ a synchrony group.

87-90. (Canceled)

91.    (Currently amended) A device as defined in claim 65 further including a clock rate adjustment module configured to adjust ~~the~~ a member device's clock rate.

92-108. (Canceled)

109.  (Currently amended) A method of operating a system comprising the steps of:

distributing a series of tasks to a synchrony group, the synchrony group comprising at least one device; and

associating each of the tasks with a time stamp[[;]], wherein the time stamp indicates indicating a time, relative to a clock maintained by a task source device, at which the at least one device[[s]] comprising the synchrony group is are to execute the respective tasks.

110.  (Original) A method as defined in claim 109 in which the synchrony group comprises a plurality of member devices.

111.  (Previously presented) A method as defined in claim 110 further comprising the step of enabling a member of the synchrony group to execute each task that it receives from the task source device at the a determined time.

112.  (Original) A method as defined in claim 111 further comprising the step of enabling the member devices to execute respective tasks in synchrony.

113.  (Previously presented) A method as defined in claim 110 further comprising the step of enabling a member device to perform at least one type of synchrony group management operation.

114.  (Previously presented) A method as defined in claim 113 further comprising the step of controlling a master device's distribution of status information.

115-116. (Canceled)

117.  (Previously presented) A method as defined in claim 109, further comprising the step of enabling at least one additional device to join the synchrony group as a slave device.

118. (Previously presented) A method as defined in claim 110 further comprising the step of distributing tasks to the member devices using a selected multi-cast transmission methodology.

119-120. (Canceled)

121. (Previously presented) A method as defined in claim 109 further comprising the step of controlling the series of tasks to be distributed by the task source device.

122-126. (Canceled)

127. (Currently amended) A method as defined in claim 110 further comprising the step of migrating the a function of one member device to another member device.

128. (Previously presented) A method as defined in claim 127 further comprising the step of enabling the task source device to migrate from one device to another device in the system.

129-137. (Canceled)

138. (Previously presented) A method as defined in claim 109 further comprising the step of obtaining information associated with the tasks from at least two types of information sources.

139. (Currently amended) A method as defined in claim 110 further comprising the step of adjusting the a clock rate of a member device.

140. (Canceled)

141. (Previously presented) A method as defined in claim 109 further comprising the step of distributing tasks to a second synchrony group.

142-155. (Canceled)

156. (Previously presented) A method as defined in claim 109 further comprising the step of obtaining information associated with the tasks from a single information source.

157-200. (Canceled)

201. (Previously presented) A method of operating a device comprising the steps of:
    obtaining a series of tasks;
    determining a time at which each respective task is to be executed; and
    transmitting the series of tasks from the device to at least one other device.

202. (Previously presented) A method as defined in claim 201 further comprising the step of utilizing a selected multi-cast transmission methodology.

203-205. (Canceled)

206. (Previously presented) A method as defined in claim 201 in which the series of tasks includes a series of task sequences.

207-217. (Canceled)

218.    (Currently amended) A <u>computer readable storage medium having embodied thereon a</u> computer program<u>, the computer program being executable by a computer processor to</u> ~~for use in connection with a computer to~~ provide a device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, the computer program comprising ~~a computer-readable medium having encoded thereon~~:

an interface module configured to enable the computer to receive the series of tasks, each task being associated with a time stamp, each time stamp indicating a time value;

a current time retrieval module configured to enable the computer to obtain, from the task source, a current time values;

an execution time determination module configured to enable the computer to determine, from the time stamp associated with each respective task a time at which the task is to be executed; and

a task execution module configured to enable the computer to execute each respective task at the time determined by the execution time determination module.

219.    (Previously presented) A computer program as defined in claim 218 further including a control module for enabling said computer to control execution of commands received by the interface module.

220.    (Canceled)

221.    (Previously presented) A computer program as defined in claim 218 in which the series of tasks includes a series of task sequences.

222-228. (Canceled)

8

229.  (Currently amended) A computer program product as defined in claim 219 in which, in response to control information to enable another device to become a member of ~~the~~ a device's synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to become a member of the device's synchrony group.

230-232. (Canceled)

233.  (Previously presented) A computer program as defined in claim 218 in which the interface module is further configured to enable the computer to transmit the tasks to at least one other device.

234-243. (Canceled)

244.  (Previously presented) A computer program as defined in claim 218 further including a clock rate adjustment module configured to enable the computer to adjust the device's clock rate.

245-548. (Canceled)

549.  (Previously presented) The system of claim 1 wherein each member device is further configured to periodically obtain from the task source device an indication of a current time value indicated by the task source device's clock.

550. (Previously presented) The system of claim 549 wherein each member device is further configured to determine, from the time stamp associated with each respective task and a time differential value representing a difference between the current time value indicated by the task source device's clock, and a current time value indicated by its respective clock, a time, relative to its respective clock, at which it is to execute the task.

551. (Previously presented) The system of claim 6 wherein the master device is further configured to provide status information relating to the status of the synchrony group to the user interface module.

552. (Previously presented) The system of claim 10 wherein the task source device is enabled to transmit at least one previously distributed task to the slave device using a selected unicast transmission methodology.

553. (Previously presented) The system of claim 31 wherein the clock rate of the at least one member device is adjusted in relation to a clock rate value maintained by the task source device's clock.

554. (Previously presented) The system of claim 33 wherein the device operating as the task source device for the first synchrony group is also operating as a member device of a second synchrony group.

555. (Previously presented) The device of claim 86 wherein the migration control module is further configured to notify the members of the synchrony group that it is to thereafter operate as the task source device.

556. (Currently amended) The method of claim 114 wherein the master device is further enabled to provide status information relating to the status of the synchrony group to ~~the~~ a user interface module.

557. (Currently amended) A system for synchronizing operations among a plurality of digital data processing devices comprising:

an interface module configured to control one or more synchrony groups;

at least one task distribution device configured to distribute tasks over a network; and

at least one member device configured to perform the tasks in synchrony.

558. (Canceled)

559. (Canceled)

560. (Canceled)

561. (Canceled)

562. (Currently amended) The system of claim 557 wherein the task distribution device is further configured to enable the at least one member device to initiate ~~without appreciable delay the~~ a performance of the tasks in synchrony without delay perceivable by a listener.

563. (Currently amended) The system of claim 557 wherein the task distribution device is further configured to allow one or more additional member devices to join without ~~appreciable~~ delay perceivable by a listener or disengage without ~~appreciable~~ delay perceivable by a listener the at least one member device's synchronous performance.

564. (Previously presented) The system of claim 557 wherein the at least one task distribution device is further configured to obtain information associated with the tasks from at least one information source.

565. (Previously presented) The system of claim 557 wherein the at least one task distribution device is independently clocked.

566. (Previously presented) The system of claim 557 wherein the at least one member device is independently clocked.

567. (Previously presented) The system of claim 557 wherein each of the tasks is associated with a time stamp relative to a clock maintained by the at least one task distribution device.

568. (Previously presented) The system of claim 557 wherein the tasks comprise audio tracks.

569. (Canceled)

570. (Canceled)

571. (Canceled)

572. (Canceled)

573. (Previously presented) The system of claim 564 wherein the at least one information source is an Internet broadcast.

574. (Previously presented) The system of claim 564 wherein the at least one information source is a satellite broadcast.

575. (Previously presented) The system of claim 567 wherein the time stamp represents when the at least one member device is to execute the task.

576. (Previously presented) A system for synchronizing operations among a plurality of digital data processing devices comprising a zone player residing within one or more audio reproduction devices.

## REMARKS

Claims 1-6, 9, 10, 19, 20, 31, 33, 65, 66, 86, 91, 109-114, 117, 118, 121, 127, 128, 138, 139, 141, 156, 201, 202, 206, 218, 219, 221, 229, 233, 244, and 549-576 are pending in the present application. In view of the following remarks, Applicant respectfully requests reconsideration of the rejections and allowance of the Application.

### Priority

The Examiner asserts a certified copy of the prior-filed application, Provisional Application No. 60/490,768, filed on July 28, 2003, entitled "Method for Synchronizing Audio Playback Between Multiple Network Devices," [hereinafter "*Provisional*"] has not been received by the Office. *Office Action*, 3. Applicant respectfully points out that the *Provisional* is available on PAIR.

### Objections under 35 U.S.C. § 132(a)

The Examiner asserts that the amendment filed November 21, 2005 is objected to under 35 U.S.C. § 132(a) because it introduces new matter to the disclosure of the invention. *Office Action*, 4. In order to expedite prosecution of the present application, Applicant has accordingly amended the claims and specifications as specified by the Examiner and detailed as follows:

A.     The Examiner asserts that matter was added which was not supported by the original disclosure relating to visual or audiovisual information being processed by the system. *Office Action*, 4. Applicant traverses. Visual and audiovisual information is mentioned at least at page 1, lines 14-16. In order to expedite prosecution of the present application, Applicant has canceled amendments to the specification relating to visual or audiovisual information being processed by the system, and Applicant has canceled claims 570 and 571.

B.     The Examiner asserts that matter was added which was not supported by the original disclosure relating to possible components in an audio reproduction device.

*Office Action*, 4-5. Applicant has canceled amendments specifically relating to possible components in an audio reproduction device that the Examiner asserts is not supported by the original disclosure.

C.    The Examiner asserts that matter was added which was not supported by the original disclosure relating to possible uses for embodiments of the invention, specifically for being used in motorized vehicles, airplanes, jets, boats, yachts, or ships. *Office Action*, 5. Applicant has canceled amendments specifically relating to possible uses for embodiments of the invention that the Examiner asserts is not supported by the original disclosure (i.e. motorized vehicles, airplanes, jets, boats, yachts, or ships).

D.    The Examiner asserts that matter was added which was not supported by the original disclosure relating to how status information is conveyed by the display of the user interface module. *Office Action*, 5. Applicant has canceled claim 559.

E.    The Examiner asserts that matter was added which was not supported by the original disclosure relating to further interaction components of the user interface. *Office Action*, 5. Applicant has canceled claims 560 and 561.

F.    The Examiner asserts that matter was added which was not supported by the original disclosure relating to the audio information being in a WMA format. *Office Action*, 5. Applicant has canceled claim 569.

G.    The Examiner asserts that matter was added which was not supported by the original disclosure relating to the audio information source being an Apple iPod. *Office Action*, 6. Applicant has canceled claim 572.

As such, Applicant believes the present application to be in compliance with 35 U.S.C. § 132(a) and respectfully requests the Examiner's objection be withdrawn.

## Amendment to the Specification

The Examiner asserts that the abstract is objected to because it contains implied phraseology, citing MPEP § 608.01(b). *Office Action*, 6-7. The phrase "is described" has been deleted. Also, the abstract has been amended to omit "the form and legal phraseology often used in claims," as specified by the Examiner, and now falls within

the range of 50-150 words.  As, such, Applicant respectfully requests the Examiner's objection to the abstract be withdrawn.  Also, the Examiner requests Applicant's cooperation in correcting errors in the specification.  Applicant is currently unaware of any errors in the specification.

### Objections to the Claims

The Examiner asserts that claims 86, 91, 127, 139, 229, 555, 556, and 562 are objected to due to lack of antecedent basis.  *Office Action*, 7.  Applicant has amended claims 86, 91, 127, 139, 229, 556, and 562 to correct antecedent basis problems asserted by the Examiner.  Claim 555 has not been amended to correct antecedence since correcting the antecedent basis of claim 86 accomplishes this.  As such, Applicant respectfully requests the Examiner's objection to claims 86, 91, 127, 139, 229, 555, 556, and 562 be withdrawn.

### Rejections under 35 U.S.C. § 112 ¶ 1

The Examiner asserts that claims 559-561 and 569-572 are rejected under 35 U.S.C. § 112 ¶ 1 as failing to comply with the written description requirement.  *Office Action*, 9.  As discussed herein, Applicant has canceled claims 559-561 and 569-572.

### Rejections under 35 U.S.C. § 112 ¶ 2

The Examiner asserts that claims 109, 562, and 563 are rejected under 35 U.S.C. § 112 ¶ 2 as being indefinite for failing to particularly point out and distinctly claim the subject matter which Applicant regards as the invention.  *Office Action*, 9.  Claims 109, 562, and 563 have been amended to comply with 35 U.S.C. § 112 ¶ 2.  Claims 562 and 563 have been amended to include the limitation "delay perceivable by a listener," rather than "appreciable delay," which is supported at least in the specification at page 2, lines 16-23.  No new matter has been added by the amendments.  As such, Applicant respectfully requests the Examiner's rejection of claims 109, 562, and 563 under 35 U.S.C. § 112 ¶ 2 be withdrawn.

### Rejections under 35 U.S.C. § 101

The Examiner asserts that claims 218, 219, 221, 229, 233, and 244 are rejected under 35 U.S.C. § 101 because the claimed invention is directed to non-statutory subject matter. *Office Action*, 11.  Applicant has amended claim 218 such that it is now directed to a "computer readable storage medium having embodied thereon a computer program, the computer program being executable by a computer processor to …."  As such, Applicant believes the Examiner's rejection of claim 218 has been overcome and, as claims 219, 221, 229, 233, and 244 depend from claim 218, the Examiner's rejections of claims 219, 221, 229, 233, and 244 have also been overcome.  Applicant does not believe any new matter has been introduced and requests that the rejection of claims 218, 219, 221, 229, 233, and 244 under 35 U.S.C. § 101 be withdrawn.

### Other Amendments to the Claims

Applicant has amended claim 557.  As amended, claim 557 includes "… an interface module configured to control one or more synchrony groups …."  This is supported by at least by claim 558.  Claim 558 has been canceled.  As such, Applicant does not believe any new matter has been introduced by these amendments.

### Rejections under 35 U.S.C. § 102(a)

The Examiner asserts that claims 1-4, 31, 65-66, 91, 109-112, 118, 121, 139, 156, 201-202, 206, 218-219, 221, 244, 557, 562-563, 565-568, 570-571, 575, and 576 are rejected under 35 U.S.C. § 102(a) as being anticipated by Jo ("Synchronized one-to-many media streaming with adaptive playout control," December 10, 2002) [hereinafter "*Jo*"].  *Office Action*, 13.  Applicant traverses.

"A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." Verdegaal Bros. v. Union Oil Co. of California, 814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987).

Independent claims 1, 109, and 218

     With respect to claim 1, the Examiner asserts that *Jo* teaches "the task source device being configured to distribute a series of tasks to the synchrony group," as set forth in claim 1. *Office Action*, 13. The Examiner supports this assertion stating "Jo: Section 2.1 specifies the system is for scheduling audio/video streams to multiple clients, using, for example, MPEG-2 or MPEG-4." However, *Jo* explicitly states that "[t]o provide high-quality video streaming and ease the client adaption to network fluctuations and system dynamics, the **client-based adaptive playout** is adopted in this work." *Jo*, sect. 2.2, paragraph 1 (emphasis added). Therefore, no tasks are distributed to the clients. In fact, the "scheduler" is within the client, as can be seen in the magnified portion of *Jo*, FIG. 1. Because *Jo* does not distribute tasks to clients, *Jo* does not teach "the task source device being configured to distribute a series of tasks to the synchrony group," as recited in part in claim 1.

     The Examiner also asserts that *Jo* teaches "each task being associated with a time stamp indicating a time, relative to a clock maintained by the task source device, at which the devices comprising the synchrony group are to execute the respective task," as set forth in claim 1. *Office Action*, 13. The Examiner supports this assertion by noting that MPEG-2 files "have a Presentation TimeStamp (PTS) in the header." The mere presence of a timestamp in a header in *Jo* does not teach that a "task [is] associated with a time stamp," as set forth in claim 1.

     Further, *Jo's* PTS is not "a time stamp indicating a time … at which the devices … are to execute the respective task," as set forth in claim 1. The only function of a timestamp in *Jo* is to allow the scheduler to record the time of the presentation. *Jo*, sect. 2.2, paragraph 1. Since the PTS taught by *Jo* is not associated with a task and does not indicate a time at which a device is to execute a task, *Jo* fails to teach "each task being associated with a time stamp indicating a time, relative to a clock maintained by the task source device, at which the devices comprising the synchrony group are to execute the respective task," as recited in part in claim 1.

Based at least on the remarks herein, Applicant believes that independent claim 1 is in condition for allowance. Additionally, as independent claims 109 and 218 contain similar elements to those of independent claim 1, claims 109 and 218 are likewise in condition for allowance for at least the same reasons.

Independent claims 65, 201, and 557

Regarding claim 65, the Examiner asserts that *Jo* teaches "an interface module configured to receive the series of tasks." *Office Action*, 14. The Examiner supports this assertion by stating that in *Jo*, "the clients have receiver buffers." However, a receiver buffer as taught by *Jo* is not equivalent to the "interface module" of claim 65. In *Jo*, the receiver buffer merely serves to stack the multiplexed stream while it waits for decoding and playback. *Jo*, sect. 2.2, paragraph 1. Since the receiver buffer in *Jo* clearly is not an interface and is not configured to receive tasks, *Jo* does not teach "an interface module configured to receive the series of tasks," as recited in part in claim 65.

Based at least on the remarks herein, and as independent claim 65 contains similar elements to those of independent claim 1, Applicant believes that independent claim 65 is in condition for allowance. Additionally, as independent claims 201 and 557 contain similar elements to those of independent claims 1 and 65, claims 201 and 557 are likewise in condition for allowance for at least the same reasons.

Independent claim 576

The Examiner asserts that *Jo* teaches "a system for synchronizing operations among a plurality of digital data processing devices comprising a zone player residing within one or more audio reproduction devices," as recited in claim 576. *Office Action*, 21. The Examiner supports this assertion by equating the "controller" and "clients," disclosed in the abstract of *Jo*, with the "zone player" and "audio reproduction devices," respectively, set forth in claim 576. However, as shown in the magnified portion of *Jo's* FIG. 1, the controller only consists of a timer and monitor. Because a timer and monitor are clearly not the same as a zone player, *Jo* fails to teach "a system for synchronizing

operations among a plurality of digital data processing devices comprising a zone player residing within one or more audio reproduction devices," as recited in claim 576. Based at least on the remarks herein, Applicant believes that independent claim 576 is in condition for allowance.

Dependent claims

As a dependent claim incorporates by reference all the limitation of the claim from which it depends (see 35 U.S.C. § 112, ¶ 4), claims 2-4, 31, 66, 91, 110-112, 118, 121, 139, 156, 202, 206, 219, 221, 244, 562-563, 565-568, and 575 are allowable for at least the same reasons as the independent claim from which they depend.

## Rejections under 35 U.S.C. § 103(a)

The Examiner asserts that claims 5, 9-10, 20, 33, 86, 113-114, 117, 127-128, 141, 229, 233, and 554-555 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo*, and further in view of Anjum (U.S. Pub. 2003/00992121 A1) [hereinafter "*Anjum*"]. *Office Action*, 21. The Examiner asserts that claim 19 is rejected under 35 U.S.C. 103(a) as being unpatentable over *Jo* and *Anjum*, in further view of Powers (U.S. Pub. 2004/0203378 A1) [hereinafter "*Powers*"]. *Office Action*, 25-26. The Examiner asserts that claims 138, 564, 573, and 574 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo*, and further in view of Miyabe (U.S. Pub. 2001/0032188 A1) [hereinafter "*Miyabe*"]. *Office Action*, 26. The Examiner asserts that claims 6, 551, and 556 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo* and *Anjum*, and further in view of Tsuk (U.S. Pat. 7,312,785 B2) [hereinafter "*Tsuk*"]. *Office Action*, 28. The Examiner asserts that claim 552 is rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo* and *Anjum*, in further view of Lo (U.S. Pat. 6,031, 818) [hereinafter "*Lo*"]. *Office Action*, 31. The Examiner asserts that claims 549 and 550 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo*, and further in view of Flood (U.S. Pat. 7,007,106 B1) [hereinafter "*Flood*"]. *Office Action*, 32. Applicant traverses.

Applicant respectfully disagrees with the Examiner's rejection of claims 5, 9-10, 19-20, 33, 86, 113-114, 117, 127-128, 138, 141, 229, 233, 549-552, 554-556, 564, and 573-574, in that claims 5, 9-10, 19-20, 33, 86, 113-114, 117, 127-128, 138, 141, 229, 233, 549-552, 554-556, 564, and 573-574 depend from otherwise allowable claims as discussed in details herein.  "A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."  35 U.S.C. § 112, ¶ 4.  As *Anjum*, *Power*, *Miyabe*, *Tsuk*, *Lo*, and *Flood* do nothing to overcome the absent teachings of *Jo*, Applicant contends that dependent claims 5, 9-10, 19-20, 33, 86, 113-114, 117, 127-128, 138, 141, 229, 233, 549-552, 554-556, 564, and 573-574 are allowable for at least the same reasons as the independent claim from which they depend.

## CONCLUSION

Based on the foregoing amendments and remarks, Applicant believes the rejections to the claims have been overcome, and that the present application is in condition for allowance. The Examiner is invited to contact Applicant's undersigned representative with any questions concerning this matter.

Respectfully submitted,
Nicholas A. J. Millington

April 17, 2008                    By:    _K. Brian Bathurst_

K. Brian Bathurst, Reg. No. 51,442
**Carr & Ferrell** *LLP*
2200 Geng Road
Palo Alto, CA 94303
T: 650.812.3419
F: 650.812.3444

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | PA3445US | 7302 |

22830        7590        06/30/2008
CARR & FERRELL LLP
2200 GENG ROAD
PALO ALTO, CA 94303

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2142 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/30/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/816,217 | MILLINGTON, NICHOLAS A. J. |
| | Examiner | Art Unit |
| | JEFFREY NICKERSON | 2142 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>22 April 2008</u>.

2a)☒ This action is **FINAL**.    2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>See Continuation Sheet</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-6, 9-10, 19-20, 31, 33, 65-66, 86, 91, 109-114, 117-118, 121, 127-128, 138-139, 141, 156, 201-202, 206, 218-219, 221, 229, 233, 244, 549-557, 562-568, 573-576</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

**Continuation Sheet (PTOL-326)**                    **Application No.  10/816,217**

 Continuation of Disposition of Claims: Claims pending in the application are 1-6,9,10,19,20,31,33,65,66,86,91,109-114,117,118,121,127,128,138,139,141,156,201,202,206,218,219,221,229,233,244,549-557,562-568 and 573-576.

Application/Control Number: 10/816,217                                   Page 2
Art Unit: 2142

## DETAILED ACTION

1.      This communication is in response to Application No. 10/816,217 filed on

01 April 2004.   The amendment presented on 22 April 2008, which cancels

claims 558-561 and 569-572, and provides change to the specification and

claims 86, 91, 109, 139, 218, 229, 556-557, and 562-563, is hereby

acknowledged. Claims 1-6, 9-10, 19-20, 31, 33, 65-66, 86, 91, 109-114, 117-118,

121, 127-128, 138-139, 141, 156, 201-202, 206, 218-219, 221, 229, 233, 244,

549-557, 562-568, 573-576 have been examined.  The application remains under

accelerated examination as per MPEP 708.02 VIII.


Examiner Note: Claim 533 was missing from the grounds of rejection on the

Office Action dated 18 January 2008 (pg 13, #16) as being anticipated by Jo.

However, it was rejected in the body of the claim rejections (pgs 18-19).  This

was merely a typo, due in part to the sheer amount of claims and scattered

numbering.


### *Response to Amendment*

2.      The amendment presented on 22 April 2008 which provides change to the

specification and cancellation of claims removes the subject matter that was

previously deemed as "new matter".   Therefore, the objection under 35 USC

132(a) is hereby withdrawn.

Application/Control Number: 10/816,217                                                Page 3
Art Unit: 2142

## *Specification*

3.      The amendment presented on 22 April 2008 which provides change to the abstract and specification is noted.  All prior objections to the specification are hereby withdrawn.

## *Claim Objections*

4.      The amendment presented on 22 April 2008 providing changes to the claims is noted.  All prior objections to the claims are hereby withdrawn.

## *Claim Rejections - 35 USC § 112*

5.      The amendment presented on 22 April 2008 cancelling claims 559-561 and 569-571 is noted.  All prior rejections under 35 USC 112, first paragraph, are therefore obviated and hereby withdrawn.

6.      The amendment presented on 22 April 2008 providing change to claims 109 and 562-563 is noted.   The prior rejection under 35 USC 112, second paragraph, with respect to claim 109 is hereby withdrawn.

The rejections under 35 USC 112, second paragraph, with respect to claims 562 and 563 are hereby maintained.  The applicant has changed "appreciable delay" to "delay perceivable by the user".  Different users would have different levels of perception and this therefore creates a relative limitation, as the applicant never defines what is and is not considered "perceivable".  There is no provision in the

Application/Control Number: 10/816,217                                      Page 4
Art Unit: 2142

claim language (or disclosure) for the system having an AI that can learn what delay would be perceivable by each listener. Nor does the applicant disclose a "playback factor", a measurement defining what would be unperceivable to an average user in terms of frames and seconds and percent variation, as Jo does in section 2.2.

### *Claim Rejections - 35 USC § 101*

The amendment presented on 22 April 2008 providing change to claim 218 is noted. All prior rejections under 35 USC 101 are hereby withdrawn.

### *Response to Arguments*

7.      Applicant's arguments filed 22 April 2008 have been fully considered but they are not persuasive.

Applicant argues several limitations are not taught by Jo ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002) and therefore alleges that claims 1-4, 31, 65-66, 91, 109-112, 118, 121, 139, 156, 201-202, 206, 218-219, 221, 244, 553, 557, 562-563, 565-568, 570-571, 575, and 576 are not anticipated by Jo.

Independent claims 1, 109, and 218

First limitation argued: "the task source device being configured to distribute a series of tasks to the synchrony group." The examiner respectfully disagrees

Application/Control Number: 10/816,217                                          Page 5
Art Unit: 2142

with applicant's interpretation of Jo's teachings.  The applicant is correct in

asserting that the client's are adaptively playing back the tasks.  These tasks,

however, are streamed from a server (Jo: title, abstract, and introduction).


Second limitation argued: "each task being associated with a time stamp

indicating a time, relative to a clock maintained by the task source device, at

which the devices comprising the synchrony group are to execute the respective

task."  Applicant argues that MPEG-2 Presentation Time Stamps (PTS) do not

indicate a task is associated with the time stamp.  The examiner respectfully

disagrees with applicant's interpretation of Jo's teachings.  Each PTS in an

MPEG-2 stream is associated with a frame.  The examiner has included an

evidentiary document to indicate inherent features of the MPEG-2 system

(MPEG-2 Systems FAQ: question 17 and answer).


Third limitation argued: "a time stamp indicating a time … at which the devices …

are to execute the respective task."  Applicant argues that the PTS does not

indicate a time at which a task is to be executed.  The examiner respectfully

disagrees with applicant's interpretation of Jo's teachings.  Each PTS in an

MPEG-2 stream is associated with a frame and indicates the time at which it

should be presented.  The examiner has included an evidentiary document to

indicate inherent features of the MPEG-2 system (MPEG-2 Systems FAQ:

question 17 and answer).

Application/Control Number: 10/816,217                                          Page 6
Art Unit: 2142

Therefore, the rejections to these claims are maintained.


Independent claims 65, 201, and 557

First limitation argued: "an interface module configured to receive a series of tasks." Applicant argues that the receiver buffer merely stacks multiplexed streams while awaiting playback and does not actually receive the streams/tasks. The examiner respectfully disagrees with applicant's interpretation of Jo's teachings. Jo teaches streaming audio/video data from a server to the clients over an IP network (Jo: Figure 1). The clients must inherently have some type of network interface to be able to communicate on the IP network. Once received, the streamed media is placed into the receiver's buffer(s).


Therefore, the rejections to these claims are maintained.


Independent claim 576

In response to applicant's argument that the references fail to show certain features of applicant's invention, it is noted that the features upon which applicant relies (i.e. definition of a zone player) are not recited in the rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).


Therefore, the rejection to this claim is maintained.

Application/Control Number: 10/816,217                                   Page 7

Art Unit: 2142

Remaining dependent claims

Applicant argues the remaining dependent claims conditionally on the arguments

for the independents above.  Since applicant's arguments are not persuasive, the

rejections for these claims are all maintained.

### *Claim Rejections - 35 USC § 102*

8.      The text of those sections of Title 35, U.S. Code not included in this action

can be found in a prior Office action.

9.      Claims 1-4, 31, 65-66, 91, 109-112, 118, 121, 139, 156, 201-202, 206,

218-219, 221, 244, 553, 557, 562-563, 565-568, 575, and 576 are rejected under

35 U.S.C. 102(a) as being anticipated by Jo et al ("Synchronized one-to-many

media streaming with adaptive playout control", 10 December 2002) and

evidenced by MPEG-2 Systems FAQ.

Regarding claim 1, Jo teaches a system comprising a plurality of devices, one of

the devices operating as a task source device and at least one other device

operating as a member of a synchrony group, (Jo: Figure 1 depicts a server

distributing media for playback to multiple clients)

        the task source device being configured to distribute a series of tasks to

the synchrony group, (Jo: Section 2.1 specifies the system is for scheduling

Application/Control Number: 10/816,217                                    Page 8
Art Unit: 2142

audio/video streams to multiple clients, using, for example, MPEG-2 or MPEG-4)

each task being associated with a time stamp indicating a time, relative to a clock

maintained by the task source device, at which the devices comprising the

synchrony group at to execute the respective task (Jo: Section 2.1 specifies the

streams could be MPEG-2; section 2.2 specifies these inherently have a

Presentation TimeStamp (PTS) in the header that is associated with a frame and

indicates a time of execution).


Regarding claim 2, Jo teaches a system in which the synchrony group comprises

a plurality of member devices (Jo: Figure 1 depicts multiple clients).


Regarding claim 3, Jo teaches a system in which each device comprising a

member of the synchrony group is further configured to execute each task that it

receives from the task source device at the determined time (Jo: Section 2.2

specifies a PTS and executing playback based on the PTS).


Regarding claim 4, Jo teaches a system in which the member devices are

configured to execute the respective tasks in synchrony (Jo: Section 2.4 specifies

the objective of inter-client synchronization).

Application/Control Number: 10/816,217                                    Page 9
Art Unit: 2142

Regarding claim 31, Jo teaches a system in which at least one member device is further configured to adjust its clock rate (Jo: abstract specifies the adjustment of the playback rate of the clients).

Regarding claim 65, Jo teaches a device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, (Jo: abstract specifies the playback of media using a target presentation time specified by the server) the device comprising:

an interface module (receiver buffers) configured to receive the series of tasks (Jo: section 2.2 specifies the clients have receiver buffers; See also Figure 1);

a current time retrieval module (scheduler) configured to obtain from the task source a current time value (Jo: section 2.1 specifies the possible use of NTP for employing tightly synced playback, which inherently retrieves current time information);

an execution time determination module (scheduler) configured to determine a time at which the task is to be executed (Jo: section 2.2 specifies the scheduler controls playback so that the presentation time is met; See also Figure 1);

Application/Control Number: 10/816,217                                   Page 10
Art Unit: 2142

and a task execution module (streaming media applications) configured to

execute each respective task (Jo: section 1 specifies streaming media

applications are controlling execution at the clients; See also Figure 1).

Regarding claim 66, Jo teaches a device further including a control module

(controller) for controlling the execution of commands received by the said

interface module (Jo: section 2.2 specifies the controller acting in conjunction

with the scheduler to execute the tasks on time; See also Figure 1).

Regarding claim 91, this device claim comprises limitations found within claim 31

and the same rationale of rejection is used, where applicable.

Regarding claim 109, Jo teaches a method of operating a system comprising the

steps of:

distributing a series of tasks to a synchrony group, the syncrhony group

comprising at least one device (Jo: abstract, introduction, Figure 1);

associating each of the tasks with a time stamp (Jo: section 2.2 specifies

using a presentation timestamp), wherein the time stamp indicates a time,

relative to a clock maintained by a task source device, at which devices

Application/Control Number: 10/816,217                                    Page 11
Art Unit: 2142

comprising the synchrony group are to execute the respective tasks (Jo: section

2.2 specifies the server using a presentation timestamp in the headers).

Regarding claim 110, this method claim comprises limitations found within claim

2 and the same rationale of rejection is used, where applicable.

Regarding claim 111, this method claim comprises limitations found within claim

3 and the same rationale of rejection is used, where applicable.

Regarding claim 112, this method claim comprises limitations found within claim

4 and the same rationale of rejection is used, where applicable.

Regarding claim 118, Jo teaches a method in which the task source device is

configured to distribute tasks to the member devices using a selected multi-cast

transmission methodology.  (Jo: abstract)

Regarding claim 121, Jo teaches a method further comprising the step of

controlling the series of tasks to be distributed by the task source device.  (Jo:

section 2.4 specifies the use of client feedback using RTCP signaling to provide

some server sided control of distribution)

Application/Control Number: 10/816,217                                    Page 12
Art Unit: 2142

Regarding claim 139, this method claim comprises limitations found within claim 31 and the same rationale of rejection is used, where applicable.

Regarding claim 156, Jo teaches the method further comprising the step of obtaining information associated with the tasks from a single information source (Jo: Figure 1 depicts the information coming from one server.  See also Figure 6, the simulation uses one streaming server).

Regarding claim 201, Jo teaches a method for operating a device comprising the steps of:

   obtaining a series of tasks (Jo: section 2.2 specifies the server can obtain the streams from MPEG-2 programs);

   determining a time at which each respective task is to be executed (Jo: section 2.2 specifies the PTS exists in the frame, which inherently means the sender put it there);

   transmitting the series of tasks from the device to at least one other device (Jo: abstract).

Regarding claim 202, this method claim comprises limitations found within claim 118 and the same rationale of rejection is used, where applicable.

Application/Control Number: 10/816,217                                Page 13
Art Unit: 2142

Regarding claim 206, Jo teaches the method wherein in which the series of tasks includes a series of task sequences. (Jo: section 2.2 specifies the streams are multiplexed audio and video which are sequenced with sequence numbers)

Regarding claim 218, this computer readable storage medium claim comprises limitations found within claim 65 and the same rationale of rejection is used, where applicable.

Regarding claim 219, this computer readable storage medium claim comprises limitations found within claim 66 and the same rationale of rejection is used, where applicable.

Regarding claim 221, this computer readable storage medium claim comprises limitation found within claim 206 and the same rationale of rejection is used, where applicable.

Regarding claim 244, this computer readable storage medium claim comprises limitation found within claim 31 and the same rationale of rejection is used, where applicable.

Regarding claim 553, Jo teaches the system wherein the clock rate of the at least one member device is adjusted in relation to a clock rate value maintained by the task source device's clock (Jo: section 2.1, specifies the task source adjusts its

Application/Control Number: 10/816,217                                    Page 14

Art Unit: 2142

target presentation time and then distributes it, which results in the member

devices adjusting their playback rates; See also section 2.2).

Regarding claim 557, Jo teaches a system for synchronizing operations among a

plurality of digital data processing devices (Jo: abstract) comprising:

  an interface module configured to control one or more synchrony groups

(Jo: Figure 1, sever to IP network interface; See also section 1);

  at least one task distribution device (server) configured to distribute tasks

over a network (Jo: abstract; Figure 1, Server);

  at least one member device configured to perform the tasks in synchrony

(Jo: abstract; Figure 1, clients).

Regarding claim 562, Jo teaches the system wherein the task distribution device

is further configured to enable the at least one member device to initiate a

performance of the tasks in synchrony without delay perceivable by a listener

(Jo: abstract).

Regarding claim 563, Jo teaches the system wherein the task distribution device

is further configured to allow one or more additional member devices to join

without delay perceivable by a listener or disengage without delay perceivable by

a listener the at least one member device's synchronous performance (Jo:

section 2.1 specifies clients can join through the PIM-SM routing).

Application/Control Number: 10/816,217                                            Page 15
Art Unit: 2142

Regarding claim 565, Jo teaches the system wherein the at least one distribution device is independently clocked (Jo: section 2.4, specifies the use of server aided playback adjustment; section 2.4, description of figure 5 specifies using the server time information to guide the local client time information).

Regarding claim 566, Jo teaches the system wherein the at least one member device is independently clocked (Jo: section 2.3 specifies the client can perform local playback adjustment without timing information from the server).

Regarding claim 567, Jo teaches wherein each of the tasks is associated with a time stamp relative to a clock maintained by the at least one task distribution device (Jo: section 2.2 specifies the use of a timestamp).

Regarding claim 568, Jo teaches wherein the tasks comprise audio tracks (Jo: abstract specifies audio).

Regarding claim 575, Jo teaches wherein the time stamp represents when the at least one member device is to execute the task (Jo: section 2.2 specifies the PTS is for presentation execution time).

Regarding claim 576, Jo teaches a system for synchronizing the operations among a plurality of digital data processing devices comprising a zone player

Application/Control Number: 10/816,217                                      Page 16

Art Unit: 2142

(controller) residing within one or more audio reproduction devices (clients) (Jo:

abstract).

### *Claim Rejections - 35 USC § 103*

10.     The text of those sections of Title 35, U.S. Code not included in this action

can be found in a prior Office action.

11.     Claims 5, 9-10, 20, 33, 86, 113-114, 117, 127-128, 141, 229, 233, and

554-555 are rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al

("Synchronized one-to-many media streaming with adaptive playout control", 10

December 2002), and in further view of Anjum et al (US 2003/00992121 A1).

Regarding claim 5, Jo teaches the use of a server streaming media across an IP

based network to multiple clients while performing at least one type of synchrony

group management operation (Jo: abstract).

Jo does not teach the use of a member device (client) operating as a

master device configured to perform at least one type of synchrony group

management operation.

Anjum, in a similar field of endeavor, teaches the use of a Bluetooth

piconet that uses a master device to perform at least one type of synchrony

group management operation (Anjum: abstract and [0007]).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Anjum for using a specialized

Bluetooth network for data communication.  The teachings of Anjum, when implemented in the Jo system, will allow one of ordinary skill to operate the client and server devices in a Bluetooth network.  One of ordinary skill in the art would be motivated to utilize the teachings of Anjum in the Jo system in order to use short range wireless communication as a Personal Area Network on an unlicensed radio band in a small setting.

Regarding claim 9, the Jo/Anjum system teaches comprising at least one additional device in which the master device is configured to enable the at least one addition device to join the synchrony group as a slave device (Anjum: [0004]-[0006] specifies slaves joining, See also Figure 1).

Regarding claim 10, the Jo/Anjum system teaches in which the task source device is configured to distribute tasks to the member devices using a selected multi-cast transmission methodology (Jo: abstract).

Regarding claim 20, the Jo/Anjum system teaches in which the master device is configured to enable the task source device to migrate from one device (slave of first piconet) to another device (master of second piconet) in the system (Anjum: abstract specifies that a second piconet can be created with a new master acting as a task source to distribute information to second piconet).

Application/Control Number: 10/816,217                                    Page 18
Art Unit: 2142

Regarding claim 33, the Jo/Anjum system teaches in which at least one other device operates as a task source device configured to distribute tasks to a second synchrony group (Anjum: abstract specifies that a second piconet may be created with a new master acting as a task source to manage slaves).

Regarding claim 86, the Jo/Anjum system teaches further including:

    a migration information receiving module configured to receive migration information from the task source device (Anjum: [0009] specifies migration receiving necessary by a slave);

    a migration control module configured to distribute the series of tasks to a synchrony group (Jo: abstract specifies distributing the media).

Regarding claim 113, this method claim comprises limitation substantially found within claim 5 and the same rationale of rejection is used, where applicable.

Regarding claim 114, the Jo/Anjum system teaches further comprising the step of controlling a master device's distribution of status information (Anjum: abstract).

Regarding claim 117, this method claim comprises limitation found within claim 9 and the same rationale of rejection is used, where applicable.

Regarding claim 127, this method claim comprises limitation found within claim 20 and the same rationale of rejection is used, where applicable.

Regarding claim 128, this method claim comprises limitation found within claim 20 and the same rationale of rejection is used, where applicable.

Regarding claim 141, this method claim comprises limitation found within claim 33 and the same rationale of rejection is used, where applicable.

Regarding claim 229, the Jo/Anjum system teaches in which in response to control information to enable another device to become a member of a device's synchrony group, the control module enables to transmit a command to the other device to enable the other device to become a member of the device's synchrony group (Anjum: [0009]).

Regarding claim 233, the Jo/Anjum system teaches in which the interface module is further configured to enable the computer to transmit the tasks to at least one other device.  (Anjum: [0010], Jo: abstract)

Regarding claim 554, the Jo/Anjum system teaches wherein the device operating as the task source for the first synchrony group (master of second/helper piconet), is also operating as a member device of a second synchrony group (first piconet) (Anjum: abstract).

Application/Control Number: 10/816,217                                    Page 20
Art Unit: 2142

Regarding claim 555, the Jo/Anjum system teaches wherein the migration control module is further configured to notify the members of the synchrony group that it is to thereafter operate as the task source device (Anjum: [0025], [0032] description of step 490).

12.    Claim 19 is rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002), in view of Anjum et al (US 2003/00992121 A1), and in further view of Powers (US 2004/0203378 A1).

Regarding claim 19, the Jo/Anjum system teaches the use of a master device managing slaves and migrating devices.  However, the Jo/Anjum system does not teach the use of a master device migrating from one device to another.

Powers, in a similar field of endeavor, teaches a slave device being promoted or swapped with the master device.  (Powers: abstract)

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Powers for having dynamic master devices.  The teachings of Powers, when implemented in the Jo/Anjum system, will allow one of ordinary skill in the art to swap master devices with slave devices when necessary or preferred.  One of ordinary skill in the art would be motivated to utilize the teachings of Powers in the Jo/Anjum system in order to

Application/Control Number: 10/816,217                                          Page 21
Art Unit: 2142

allow devices dynamically manage their master, if, for instance, the master leaves the network.

13.    Claims 138, 564, 573, and 574 are rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002), and further in view of Miyabe et al (US 2001/0032188 A1).

Regarding claim 138, Jo teaches a distribution system using a media server (Jo: abstract), but Jo never discloses where the media server obtains its media from.

Miyabe et al, in a similar field of endeavor, teaches wherein task source devices (Miyabe: Figure 1A, items 114, 123, and 173) obtain information associated with the tasks from at least two types of information sources. (Miyabe: Figure 1A, item 123 depicts two incoming information sources, one from item 121 and one from 131)

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Miyabe for having multiple different information sources.  The teachings of Miyabe, when implemented in the Jo system, will allow one of ordinary skill in the art to obtain media information from multiple outlets.  One of ordinary skill in the art would be motivated to utilize the teachings of Miyabe in the Jo system in order for to allow the system to support a user who has multiple media source devices.

Application/Control Number: 10/816,217                                    Page 22
Art Unit: 2142

Regarding claim 564, the Jo/Miyabe system teaches wherein the at least one

task distribution device is further configured to obtain information associated with

the tasks from at least one information source (Miyabe: Figure 1A, items 123,

121, and 131).

Regarding claim 573, the Jo/Miyabe system teaches wherein the at least one

information source is an Internet broadcast (Miyabe: [0129]).

Regarding claim 574, the Jo/Miyabe system teaches wherein the at least one

information source is a satellite broadcast (Miyabe: Figure 1A, item 111 to item

112 to item 113 to item 114).

14.    Claims 6, 551, and 556 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Jo et al ("Synchronized one-to-many media streaming with

adaptive playout control", 10 December 2002) and Anjum et al (US

2003/00992121 A1), and further in view of Tsuk et al (US 7,312,785 B2).

Regarding claim 6, the Jo/Anjum system teaches wherein the system contains a

master device, however, their system does not teach a user interface on the

device.

        Tsuk, in a similar field of endeavor, teaches the system further including a

user interface module configured to control the master device.  (Tsuk: abstract,

Figure 7B)

Application/Control Number: 10/816,217                                          Page 23
Art Unit: 2142

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Tsuk for iPods with user interfaces. The teachings of Tsuk, when implemented in the Jo/Anjum system, will allow one of ordinary skill in the art to use an iPod as any one of the devices in the system. One of ordinary skill in the art would be motivated to utilize the teachings of Tsuk in the Jo/Anjum system in order to provide the user with easy interaction interfaces to control the system.

Regarding claim 551, the Jo/Anjum/Tsuk system teaches wherein the master device is further configured to provide status information related to the status of the synchrony group to the user interface module (Tsuk: col 3, lines 35-54).

Regarding claim 556, this method claim comprises limitations contained within that of claim 551 and the same rationale of rejection is used, where applicable.

15.    Claim 552 is rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002), in view of Anjum et al (US 2003/00992121 A1), and in further view of Lo et al (US 6,031,818).

Regarding claim 552, the Jo/Anjum system teaches wherein the system retransmits data in a multicast fashion, and not selective unicast.

Application/Control Number: 10/816,217                                          Page 24
Art Unit: 2142

Lo, in a similar field of endeavor, teaches the system wherein the task source device is enabled to transmit at least one previously distributed task to the slave device using a selected unicast transmission methodology (Lo: col 8, lines 14-54).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Lo for using selective unicast retransmission. The teachings of Lo, when implemented in the Jo/Anjum system, will allow one of ordinary skill in the art to retransmit lost packets to member devices with unicast methodology. One of ordinary skill in the art would be motivated to utilize the teachings of Lo in the Jo/Anjum system in order to conserve bandwidth and reduce traffic.

16.    Claims 549 and 550 are rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002), and in further view of Flood (US 7,007,106 B1).

Regarding claim 549, Jo teaches obtaining from the task source device an indication of a presentation time stamp and when to execute a task. Jo does not teach wherein the member device obtains the current time value of the task source device's clock on a periodic basis.

Flood, in a similar field of endeavor, teaches wherein the member device periodically obtains the task source device's clock information (Flood: col 18, lines 22-35).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Flood for distributing the current time information on a periodic basis. The teachings of Flood, when implemented in the Jo system, will allow one of ordinary skill in the art to ensure the member devices were always aware of the task source device's current time information by updating on regular intervals. One of ordinary skill in the art would be motivated to utilize the teachings of Flood in the Jo system in order to update member devices of the task source's current time, which would ensure tighter synchronization.

Regarding claim 550, the Jo/Flood system teaches wherein each member device is further configured to determine, from the time stamp associated with each respective task and a time differential value representing the difference between the current time value indicated by the task source device's clock, and a current time value indicated by its respective clock, a time, relative to its respective clock, at which it is to execute the task (Flood: col 10, lines 50-63 specify calculating the offset between master and slave time and then processing the task based on a received time stamp and using this computed offset).

Application/Control Number: 10/816,217                                      Page 26
Art Unit: 2142

### *Conclusion*

17.    **THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of this final action.

Application/Control Number: 10/816,217                                          Page 27
Art Unit: 2142

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JEFFREY NICKERSON whose telephone number is (571)270-3631.  The examiner can normally be reached on M-Th, 8:30-6:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Andrew Caldwell can be reached on 571-272-3868.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished applications is available through Private PAIR only.  For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/J. N./
Jeffrey Nickerson
Examiner, Art Unit 2142

/Andrew  Caldwell/
Supervisory Patent Examiner, Art Unit 2142

Case 1:24-cv-00131-JNR    Document 188-9    Filed 06/05/25    Page 92 of 448 PageID #:
13640



# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| **APPLICANT:** | Nicholas A. J. Millington |
| **APPLICATION NO.:** | 10/816,217 |
| **FILING DATE:** | April 1, 2004 |
| **TITLE:** | System and Method for Synchronizing Operations among a Plurality of Independently Clocked Digital Data Processing Device |
| **EXAMINER:** | Jeffrey L. Nickerson |
| **ART UNIT:** | 2142 |
| **CONFIRMATION NO.:** | 7302 |
| **ATTY. DKT. NO.:** | PA3445US |

---

CERTIFICATE OF MAILING UNDER 37 CFR § 1.8

I hereby certify this correspondence is being deposited with the U.S. Postal Service in an envelope bearing sufficient postage for a first class mailing and addressed to Mail Stop AF, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on September 2, 2008.

K. Brian Bathurst, Reg. No. 51,442

---

MAIL STOP AF
COMMISSIONER FOR PATENTS
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450

## RESPONSE B

Examiner Nickerson:

In response to the final office action mailed on **June 30, 2008** (*Final Action*), please consider the following **amendments** and **remarks**. Applicant's **amendments** to the claims begin on **page two**. Applicant's **remarks** in response to the *Final Action* begin on **page thirteen**. Applicant's **conclusions** as to the allowability of this application appear on **page seventeen**.

1

PTO/SB/21 (01-08)
Approved for use through 04/30/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FORM

*(to be used for all correspondence after initial filing)*

| | |
|---|---|
| Application Number | 10/816,217 |
| Filing Date | April 1, 2004 |
| First Named Inventor | Nicholas Millington |
| Art Unit | 2142 |
| Examiner Name | Jeffrey L. Nickerson |
| Total Number of Pages in This Submission | 18 | Attorney Docket Number | PA3445US |

## ENCLOSURES    *(Check all that apply)*

| | | |
|---|---|---|
| ☐ Fee Transmittal Form | ☐ Drawing(s) | ☐ After Allowance Communication to TC |
| ☐ Fee Attached | ☐ Licensing-related Papers | ☐ Appeal Communication to Board of Appeals and Interferences |
| ☑ Amendment/Reply | ☐ Petition | ☐ Appeal Communication to TC (Appeal Notice, Brief, Reply Brief) |
| ☐ After Final | ☐ Petition to Convert to a Provisional Application | ☐ Proprietary Information |
| ☐ Affidavits/declaration(s) | ☐ Power of Attorney, Revocation Change of Correspondence Address | ☐ Status Letter |
| ☐ Extension of Time Request | ☐ Terminal Disclaimer | ☑ Other Enclosure(s) (please identify below): |
| ☐ Express Abandonment Request | ☐ Request for Refund | 1) Confirmation Postcard. |
| ☐ Information Disclosure Statement | ☐ CD, Number of CD(s) | |
| | ☐ Landscape Table on CD | |
| ☐ Certified Copy of Priority Document(s) | **Remarks** | |
| ☐ Reply to Missing Parts/ Incomplete Application | Total page number does not include postcard. | |
| ☐ Reply to Missing Parts under 37 CFR 1.52 or 1.53 | | |

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT

| Firm Name | Carr & Ferrell LLP        Cust. No. 22830 |
|---|---|
| Signature | *K. Brian Belter* |
| Printed name | K. Brian Bathurst |
| Date | September 2, 2008 | Reg. No. | 51,442 |

## CERTIFICATE OF TRANSMISSION/MAILING

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date shown below:

| Signature | *K. Brian Belter* | | |
|---|---|---|---|
| Typed or printed name | K. Brian Bathurst, Reg. No. 51,442 | Date | September 2, 2008 |

This collection of information is required by 37 CFR 1.5. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and1.14. This collection is estimated to 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

OIPE IAP
SEP 0 5 2008
PATENT & TRADEMARK OFFICE

## AMENDMENTS TO THE CLAIMS

Please amend the claims as follows.

1. (Previously presented) A system comprising a plurality of devices, one of the devices operating as a task source device and at least one other device operating as a member of a synchrony group,

the task source device being configured to distribute a series of tasks to the synchrony group, each task being associated with a time stamp indicating a time, relative to a clock maintained by the task source device, at which the devices comprising the synchrony group are to execute the respective task.

2. (Original) A system as defined in claim 1 in which the synchrony group comprises a plurality of member devices.

3. (Previously presented) A system as defined in claim 2 in which each device comprising a member of the synchrony group is further configured to execute each task that it receives from the task source device at the determined time.

4. (Original) A system as defined in claim 3 in which the member devices are configured to execute respective tasks in synchrony.

5. (Previously presented) A system as defined in claim 2 in which one of the member devices operates as a master device configured to perform at least one type of synchrony group management operation.

6. (Previously presented) A system as defined in claim 5 further including a user interface module configured to control the master device.

2

7-8. (Canceled)

9. (Previously presented) A system as defined in claim 5, the system comprising at least one additional device in which the master device is configured to enable the at least one additional device to join the synchrony group as a slave device.

10. (Previously presented) A system as defined in claim 9 in which the task source device is configured to distribute tasks to the member devices using a selected multi-cast transmission methodology.

11-18. (Canceled)

19. (Previously presented) A system as defined in claim 5 in which the member device operating as the master device is configured to enable the master device to migrate from one member device to another member device in the system.

20. (Previously presented) A system as defined in claim 5 in which the master device is configured to enable the task source device to migrate from one device to another device in the system.

21-30. (Canceled)

31. (Original) A system as defined in claim 1 in which at least one member device is further configured to adjust its clock rate.

32. (Canceled)

33. (Original) A system as defined in claim 1 in which at least one other device operates as a task source device configured to distribute tasks to a second synchrony group.

34-64. (Canceled)

65. (Previously presented) A device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, the device comprising:

> an interface module configured to receive the series of tasks;

> a current time retrieval module configured to obtain from the task source a current time value;

> an execution time determination module configured to determine a time at which the task is to be executed; and

> a task execution module configured to execute each respective task.

66. (Original) A device as defined in claim 65 further including a control module for controlling execution of commands received by said interface module.

67-85. (Canceled)

86. (Previously presented) A device as defined in claim 65 further including:

> a migration information receiving module configured to receive migration information from the task source device; and

> a migration control module configured to distribute the series of tasks to a synchrony group.

87-90. (Canceled)

91. (Previously presented) A device as defined in claim 65 further including a clock rate adjustment module configured to adjust a member device's clock rate.

92-108. (Canceled)

4

109. (Previously presented) A method of operating a system comprising the steps of:

distributing a series of tasks to a synchrony group, the synchrony group comprising at least one device; and

associating each of the tasks with a time stamp, wherein the time stamp indicates a time, relative to a clock maintained by a task source device, at which the at least one device comprising the synchrony group is to execute the respective tasks.

110. (Original) A method as defined in claim 109 in which the synchrony group comprises a plurality of member devices.

111. (Previously presented) A method as defined in claim 110 further comprising the step of enabling a member of the synchrony group to execute each task that it receives from the task source device at the a determined time.

112. (Original) A method as defined in claim 111 further comprising the step of enabling the member devices to execute respective tasks in synchrony.

113. (Previously presented) A method as defined in claim 110 further comprising the step of enabling a member device to perform at least one type of synchrony group management operation.

114. (Previously presented) A method as defined in claim 113 further comprising the step of controlling a master device's distribution of status information.

115-116. (Canceled)

117. (Previously presented) A method as defined in claim 109, further comprising the step of enabling at least one additional device to join the synchrony group as a slave device.

118. (Previously presented) A method as defined in claim 110 further comprising the step of distributing tasks to the member devices using a selected multi-cast transmission methodology.

119-120. (Canceled)

121. (Previously presented) A method as defined in claim 109 further comprising the step of controlling the series of tasks to be distributed by the task source device.

122-126. (Canceled)

127. (Previously presented) A method as defined in claim 110 further comprising the step of migrating a function of one member device to another member device.

128. (Previously presented) A method as defined in claim 127 further comprising the step of enabling the task source device to migrate from one device to another device in the system.

129-137. (Canceled)

138. (Previously presented) A method as defined in claim 109 further comprising the step of obtaining information associated with the tasks from at least two types of information sources.

139. (Previously presented) A method as defined in claim 110 further comprising the step of adjusting a clock rate of a member device.

140. (Canceled)

141. (Previously presented) A method as defined in claim 109 further comprising the step of distributing tasks to a second synchrony group.

142-155. (Canceled)

156. (Previously presented) A method as defined in claim 109 further comprising the step of obtaining information associated with the tasks from a single information source.

157-200. (Canceled)

201. (Previously presented) A method of operating a device comprising the steps of:

      obtaining a series of tasks;

      determining a time at which each respective task is to be executed; and

      transmitting the series of tasks from the device to at least one other device.

202. (Previously presented) A method as defined in claim 201 further comprising the step of utilizing a selected multi-cast transmission methodology.

203-205. (Canceled)

206. (Previously presented) A method as defined in claim 201 in which the series of tasks includes a series of task sequences.

207-217. (Canceled)

218. (Previously presented) A computer readable storage medium having embodied thereon a computer program, the computer program being executable by a computer processor to provide a device for executing a series of tasks provided by a task source at times specified by the task source in relation to a clock maintained by the task source, the computer program comprising:

an interface module configured to enable the computer to receive the series of tasks, each task being associated with a time stamp, each time stamp indicating a time value;

a current time retrieval module configured to enable the computer to obtain, from the task source, a current time values;

an execution time determination module configured to enable the computer to determine, from the time stamp associated with each respective task a time at which the task is to be executed; and

a task execution module configured to enable the computer to execute each respective task at the time determined by the execution time determination module.

219. (Previously presented) A computer program as defined in claim 218 further including a control module for enabling said computer to control execution of commands received by the interface module.

220. (Canceled)

221. (Previously presented) A computer program as defined in claim 218 in which the series of tasks includes a series of task sequences.

222-228. (Canceled)

8

229. (Previously presented) A computer program product as defined in claim 219 in which, in response to control information to enable another device to become a member of a device's synchrony group, the control module enables the interface module to transmit a command to the other device to enable the other device to become a member of the device's synchrony group.

230-232. (Canceled)

233. (Previously presented) A computer program as defined in claim 218 in which the interface module is further configured to enable the computer to transmit the tasks to at least one other device.

234-243. (Canceled)

244. (Previously presented) A computer program as defined in claim 218 further including a clock rate adjustment module configured to enable the computer to adjust the device's clock rate.

245-548. (Canceled)

549. (Previously presented) The system of claim 1 wherein each member device is further configured to periodically obtain from the task source device an indication of a current time value indicated by the task source device's clock.

550. (Previously presented) The system of claim 549 wherein each member device is further configured to determine, from the time stamp associated with each respective task and a time differential value representing a difference between the current time value indicated by the task source device's clock, and a current time value indicated by its respective clock, a time, relative to its respective clock, at which it is to execute the task.

551. (Previously presented) The system of claim 6 wherein the master device is further configured to provide status information relating to the status of the synchrony group to the user interface module.

552. (Previously presented) The system of claim 10 wherein the task source device is enabled to transmit at least one previously distributed task to the slave device using a selected unicast transmission methodology.

553. (Previously presented) The system of claim 31 wherein the clock rate of the at least one member device is adjusted in relation to a clock rate value maintained by the task source device's clock.

554. (Previously presented) The system of claim 33 wherein the device operating as the task source device for the first synchrony group is also operating as a member device of a second synchrony group.

555. (Previously presented) The device of claim 86 wherein the migration control module is further configured to notify the members of the synchrony group that it is to thereafter operate as the task source device.

556. (Previously presented) The method of claim 114 wherein the master device is further enabled to provide status information relating to the status of the synchrony group to a user interface module.

557. (Previously presented) A system for synchronizing operations among a plurality of digital data processing devices comprising:

an interface module configured to control one or more synchrony groups;

at least one task distribution device configured to distribute tasks over a network; and

at least one member device configured to perform the tasks in synchrony.

558-561. (Canceled)

562. (Currently amended) The system of claim 557 wherein the task distribution device is further configured to enable the at least one member device to initiate a performance of the tasks in synchrony ~~without delay perceivable by a listener~~.

563. (Currently amended) The system of claim 557 wherein the task distribution device is further configured to allow one or more additional member devices to join ~~without delay perceivable by a listener~~ or disengage ~~without delay perceivable by a listener~~ the at least one member device's synchronous performance.

564. (Previously presented) The system of claim 557 wherein the at least one task distribution device is further configured to obtain information associated with the tasks from at least one information source.

565. (Previously presented) The system of claim 557 wherein the at least one task distribution device is independently clocked.

566. (Previously presented) The system of claim 557 wherein the at least one member device is independently clocked.

567. (Previously presented) The system of claim 557 wherein each of the tasks is associated with a time stamp relative to a clock maintained by the at least one task distribution device.

568. (Previously presented) The system of claim 557 wherein the tasks comprise audio tracks.

569-572. (Canceled)

573. (Previously presented) The system of claim 564 wherein the at least one information source is an Internet broadcast.

574. (Previously presented) The system of claim 564 wherein the at least one information source is a satellite broadcast.

575. (Previously presented) The system of claim 567 wherein the time stamp represents when the at least one member device is to execute the task.

576. (Previously presented) A system for synchronizing operations among a plurality of digital data processing devices comprising a zone player residing within one or more audio reproduction devices.

## REMARKS

Claims 1-6, 9, 10, 19, 20, 31, 33, 65, 66, 86, 91, 109-114, 117, 118, 121, 127, 128, 138, 139, 141, 156, 201, 202, 206, 218, 219, 221, 229, 233, 244, 549-557, 562-568, and 573-576 are pending in the present application.  In view of the foregoing amendments and the following remarks, Applicant respectfully requests reconsideration of the rejections and allowance of the application.

### Amendments to the Claims

Without conceding to the Examiner's rejections and for the purpose of expediting prosecution, Applicant has amended claims 562 and 563 by omitting the portions that stated "without delay perceivable by a listener."  Applicant reserves the right to pursue any or all of the original claims at a later time, either within the present application or in future application(s).  Applicant does not believe any new matter has been introduced by these amendments.

### Rejections under 35 U.S.C. § 112

The Examiner asserts that claims 562 and 563 are rejected under 35 U.S.C § 112 ¶ 2. *Final Action*, 3.  Applicant traverses.  In light of the current amendments to claims 562 and 563, Applicant contends that the rejection thereof under 35 U.S.C § 112 ¶ 2 is overcome.  As such, Applicant respectfully requests the rejection be withdrawn.

### Rejections under 35 U.S.C § 102

The Examiner asserts that claims 1-4, 31, 65, 66, 91, 109-112, 118, 121, 139, 156, 201, 202, 206, 218, 219, 221, 244, 553, 557, 562, 563, 565-568, 575, and 576 are rejected under 35 U.S.C. 102(a) as being anticipated by Jo ("Synchronized one-to-many media streaming with adaptive playout control," December 10, 2002) [hereinafter "*Jo*"]. *Final Action*, 7.  Applicant traverses.

13

## *JO* DOES NOT TEACH OR SUGGEST SYNCHRONY GROUP DEVICES EXECUTING TASKS PER A CLOCK MAINTAINED BY A TASK SOURCE DEVICE

Applicant wishes to briefly identify for the Examiner's reconsideration a few points for the patentability of Applicant's claims in light of the teachings of *Jo*:

Applicant's independent claim 1 recites, in part, "each task being associated with a time stamp indicating a time, **relative to a clock maintained by the task source device, at which the devices comprising the synchrony group are to execute the respective task.**"

**Jo does not teach or suggest this limitation.**

Instead, **Jo teaches "each client locally controls the playback speed to prevent buffer overflow/underflow."** *Jo*, Section 1.

Further, **Jo teaches "[b]ased on the timing and buffering status, the scheduler [within each client] controls the adaptive playout…"** *Jo*, Section 2.2.

Additionally, **Jo teaches "[i]n this paper, we assume that globally synchronized time reference is not available."** *Jo*, Section 2.3.

Applicant respectfully submits for this reason, at least, independent claim 1 should be allowed.  Additionally, as independent claims 65, 109, 201, 218, 557, and 576 include similar elements to those of independent claim 1, claims 65, 109, 201, 218, 557, and 576 are likewise patentable for at least the same reasons.

Furthermore, as a dependent claim incorporates by reference all the limitation of the claim from which it depends (see 35 U.S.C. § 112, ¶ 4), claims 2-4, 31, 66, 91, 110-112, 118, 121, 139, 156, 202, 206, 219, 221, 244, 553, 562, 563, 565-568, and 575 are allowable for at least the same reasons as the independent claim from which they depend.

14

## Rejections under 35 U.S.C. § 103

The Examiner asserts that claims 5, 9, 10, 20, 33, 86, 113, 114, 117, 127, 128, 141, 229, 233, 554, and 555 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo* in view of Anjum (U.S. Pub. No. 2003/00992121) [hereinafter "*Anjum*"]. *Final Action*, 16. The Examiner also asserts that claim 19 is rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo* in view of *Anjum*, and further in view of Powers (U.S. Pub. No. 2004/0203378) [hereinafter "*Powers*"]. *Final Action*, 20. Additionally, the Examiner asserts that claims 138, 564, 573, and 574 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo* in view of Miyabe (U.S. Pub. No. 2001/0032188) [hereinafter "*Miyabe*"]. *Final Action*, 21. The Examiner further asserts that claims 6, 551, and 556 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo* in view of Tusk (U.S. Pat. No. 7,312, 785) [hereinafter "*Tusk*"]. *Final Action*, 22. Moreover, the Examiner asserts that claim 552 is rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo* in view of *Anjum*, and further in view of Lo (U.S. Pat. No. 6,031,818) [hereinafter "*Lo*"]. *Final Action*, 23. Finally, the Examiner asserts that claims 549 and 550 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Jo* in view of Flood (U.S. Pat. No. 7,007,106) [hereinafter "*Flood*"]. *Final Action*, 24. Applicant traverses.

Applicant respectfully disagrees with the Examiner's rejection of claims 5, 6, 9, 10, 19, 20, 33, 86, 113, 114, 117, 127, 128, 138, 141, 229, 233, 549-552, 554-556, 564, 573, and 574, in that claims 5, 6, 9, 10, 19, 20, 33, 86, 113, 114, 117, 127, 128, 138, 141, 229, 233, 549-552, 554-556, 564, 573, and 574 depend from otherwise allowable claims as discussed in detail herein. (See 35 U.S.C. § 112, ¶ 4.) As neither *Anjum, Powers, Miyabe, Tusk, Lo*, nor *Flood* do anything to overcome the absent teachings of *Jo*, Applicant contends that dependent claims 5, 6, 9, 10, 19, 20, 33, 86, 113, 114, 117, 127, 128, 138, 141, 229, 233, 549-552, 554-556, 564, 573, and 574 are patentable over the cited references for at least the same reasons as the independent claim from which they depend.

**Finality of the Present Rejections**

MPEP § 706.07(e) provides that when "new facts or reasons are presented such as to convince the examiner that the previously rejected claims are in fact allowable ..., then the final rejection should be withdrawn." As such, and in view of the present remarks, Applicant respectfully requests the Examiner withdraw the finality of the present rejections.

## CONCLUSION

Based on the foregoing remarks, Applicant believes the rejections to the claims have been overcome, and that the present application is in condition for allowance. The Examiner is invited to contact Applicant's undersigned representative with any questions concerning this matter.

Respectfully submitted,
Nicholas A. J. Millington

September 2, 2008                    By: _K. Brian Bathurst_

K. Brian Bathurst, Reg. No. 51,442
**Carr & Ferrell** *LLP*
2200 Geng Road
Palo Alto, CA  94303
T: 650.812.3400
F: 650.812.3444

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | PA3445US | 7302 |

22830          7590          01/22/2009
CARR & FERRELL LLP
2200 GENG ROAD
PALO ALTO, CA 94303

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/22/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/816,217 | MILLINGTON, NICHOLAS  A. J. |
| | Examiner | Art Unit |
| | JEFFREY NICKERSON | 2442 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>04 December 2008</u>.

2a)☐ This action is **FINAL**.   2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>577-600</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>577-600</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

Application/Control Number: 10/816,217                                    Page 2
Art Unit: 2442

## DETAILED ACTION

1.      This communication is in response to Application No. 10/816,217 filed on 01 April 2004 as a non-provisional of Application No. 60/490,768 filed 28 July 2003. The request for continued examination presented on 04 December 2008, which cancels claims 1-6, 9-10, 19-20, 31, 33, 65-66, 86, 91, 109-114, 117-118, 121, 127-128, 138-139, 141, 156, 201-202, 206, 218-219, 221, 229, 233, 244, 549-557, 562-568, and 573-576, and adds claims 577-600, is hereby acknowledged. Claims 577-600 have been examined. The application remains under accelerated examination as per MPEP 708.02 VIII.

### *Response to Arguments*

2.      Applicant's arguments have been considered but are moot in view of the new ground(s) of rejection.

### *Claim Rejections - 35 USC § 112*

3.      The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

4.      The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

5.      Claims 577-600 are rejected under 35 U.S.C. 112, first paragraph, as failing to comply with the written description requirement. The claim(s) contains subject matter

Application/Control Number: 10/816,217                                          Page 3
Art Unit: 2442

which was not described in the specification in such a way as to reasonably convey to

one skilled in the relevant art that the inventor(s), at the time the application was filed,

had possession of the claimed invention.


Regarding claims 577, 590, and 600, these claims make claim to a tightly coupled

synchronized playback.  Applicant asserts that support for tightly coupled

synchronization can be found by the use of the term "simultaneous" throughout their

specification and claims, as originally filed.  The examiner respectfully disagrees, as the

term "simultaneous" has ambiguity (especially in the realm of computing, as nothing is

ever truly synchronous on two devices, merely deemed "synchronous" based on

arbitrary thresholds of the designer's choosing) and therefore has varying degrees of

definition.  The term "simultaneous" does not provide for adding any intricacies or

concepts surrounding the art of clock synchronization, just the intricacies as disclosed

by applicant's specification. If applicant believes there is support for "tightly coupled

synchronization" (according to whatever definition applicant has for this phrase, see 112

2nd below), then applicant should clearly define the phrase "tightly coupled

synchronization" in their claims and identify supporting sections of their specifications

for such a definition.


6.      Claims 577-600 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention.

Application/Control Number: 10/816,217                                Page 4
Art Unit: 2442

Regarding claims 577, 590, and 600, applicant uses the term "tightly coupled synchrony".  Applicant provides no definition for this term and one of ordinary skill in the art would not understand what it means.  Usually events are deemed "synchronous" or "simultaneous" if they occur within some predefined threshold/timeframe.  Events are typically determined to be "tightly coupled" if they occur in a shorter timeframe than a "loosely coupled" synchronization scheme. Again, the definitions are usually completely arbitrary and depend on the types of events and environment.  The examiner respectfully requests applicant to extrapolate the differences between "loosely coupled synchronization" and "tightly coupled synchronization", and to reference their specification indicating where this defining difference for "tightly coupled" is found.  For instance, and with regard to synchronizing clocks, the phrase "loosely coupled" *may* mean that the clocks have only their time offsets converge to zero.  Whereas "tightly coupled" clocks may mean that their time offsets, frequency offsets, and phase offsets all converge to zero.  Other definitions are possible, however, and, therefore, clarification is required.  For purposes of further examination the examiner will consider any attempts at synchrony to be tightly coupled.

Regarding claim 577, applicant appears to be attempting to claim "a plurality of devices in communication via the network, the plurality of devices comprising a source device and one or more playback devices."  See, for instance, the nearly equivalent claim 590.  However, as currently written (the source device comprises one of the plurality of

Application/Control Number: 10/816,217                                      Page 5
Art Unit: 2442

devices; etc), there is ambiguity as to whether the source device is a physical device or just a grouping of physical device(s).  The same applies for the playback devices. Clarification is requested and the examiner suggests changing the phrasing to mirror that of claim 590.  Further regarding claim 577, the last limitation contains the phrase "with the one or more playback devices".  However, there is ambiguity as to whether the "outputting" is the part reflected "with the one or more playback devices" (i.e. the one or more playback devices are outputting the media stream), whether the "tight synchrony" is the part reflected "with the one or more playback devices" (i.e. the media stream is being output by something, and the something is in tight synchrony with the playback devices), or both.


Regarding claims 581 and 582, these claims assert that an additional device, being added to the plurality of devices, is "*the* source device" or "one of *the* one or more playback devices." The examiner believes these phrases should be changed to something similar to "another source device", "another playback device", or "wherein the additional device is a playback or source device". "The source device" is already a part of the plurality of devices (or is one of devices a part of the source device? See 577 rejection above).  Further regarding the confusion, how can the source/playback device comprise one of the plurality of devices, which, when a device is added, then comprise the source/playback device?  Clarification is required.  Again, the examiner believes that the phrase should be "plurality of devices comprising a source and playback devices", not that "playback/source devices each comprising one of the plurality of devices".

Application/Control Number: 10/816,217                                    Page 6
Art Unit: 2442

Regarding claim 583, this claim contains the limitation "removing a device from the

plurality of devices without interrupting the outputting".  With reference to the ambiguity

of claim 577, it is unclear whether the uninterrupted output is with respect to the

removed device, the system as a whole, or a specific other playback device(s).

Regarding claims 578-580 and 584-589, these claims inherit the indefinite features of

their parent claims.

### *Claim Rejections - 35 USC § 101*

7.      35 U.S.C. 101 reads as follows:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

8.      Claim 600 is rejected under 35 U.S.C. 101 because the claimed invention is

directed to non-statutory subject matter.

Regarding claim 600, this claim makes claim to "a machine readable medium."  A claim

directed towards "a machine readable medium, having embodied thereon

instructions/program, that when executed causes one or more computers

to perform the following:" is **not** statutory, as applicant does not specifically define

"machine readable medium" in their specification as being only tangible mediums, and

the phrase therefore encompasses non-tangible mediums (such as signal waves over

Application/Control Number: 10/816,217                                    Page 7
Art Unit: 2442

air or water). A claim directed towards "a machine readable **storage** medium, having

embodied thereon instructions/program, that when executed by a processor cause one

or more computers to perform the following:" should overcome this rejection.


### Claim Rejections - 35 USC § 103

9.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.


10.     Claims 577, 580-583, 587-590, 592, 594-598, and 600 are rejected under 35

U.S.C. 103(a) as being unpatentable over Benslimane ("A Multimedia Synchronization

Protocol for Multicast Groups", 2000), and further in view of Mills ("Precision

Synchronization of Computer Network Clocks", 1994).


Regarding claim 590, Benslimane teaches a system for synchronizing media playback,

the system comprising:

        a plurality of devices configured to be in communication via a network, the

plurality of devices comprising a source device and one or more playback devices

(Benslimane: abstract);

Application/Control Number: 10/816,217                                    Page 8
Art Unit: 2442

wherein the source device is configured to transmit a media stream, the media stream comprising a time differential (Benslimane: section 3.1.1, Sync message's delta); and

wherein the one or more playback devices output the media stream in tightly coupled synchrony with the one or more playback devices, the tightly coupled synchrony based on the time differential (Benslimane: section 3.1.1 provides for calculating restitution time based on playback offset differential; section 3.1.2 provides for inter-client synchronization); and

wherein a transmission message is a media stream (Benslimane: abstract).

Benslimane does not teach wherein the transmission message comprises source-clock information related to an independent clock associated with the source device; or

wherein the one or more playback devices are configured to determine the time differential between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices based on the source-clock information.

Mills, in a similar field of endeavor, teaches wherein the transmission message comprises source-clock information related to an independent clock associated with the source device (Mills: section 2, specifically pg 3, LHS, last paragraph); and

wherein the one or more playback devices are configured to determine the time differential between the independent clock associated with the source device and one or more independent clocks associated with the playback devices based on the source-

Application/Control Number: 10/816,217                                    Page 9
Art Unit: 2442

clock information (Mills: pg 3, LHS; section 2.1, specifically pg 3 RHS, last paragraph to

start of section 3).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Mills for transmitting source clock

information to enable time offset calculations.  The teachings of Mills, when

implemented in the Benslimane system, will allow one of ordinary skill in the art to keep

the clocks of the transmitter and receiver very tightly synchronized and therefore

prevent significant drift or skew in the middle of playback.  One of ordinary skill in the art

would be motivated to utilize the teachings of Mills in the Benslimane system in order to

synchronize the playback of media between clients to a degree unperceivable to the

user.

Regarding claim 592, the Benslimane/Mills system teaches wherein the plurality of

devices are further configured such that devices can be added and removed from the

plurality of devices without interrupting the tightly coupled synchrony (Benslimane:

section 4).

Regarding claim 594, the Benslimane/Mills system teaches wherein a clock rate of the

one or more independent clocks associated with the one or more playback devices is

adjustable (Mills: pg 3, LHS provides for adjustable frequency NCOs; See also section

2.1, paragraphs 1-3).

Application/Control Number: 10/816,217                                    Page 10
Art Unit: 2442

Regarding claim 595, the Benslimane/Mills system teaches wherein the media stream comprises audio information (Benslimane: abstract).

Regarding claim 596, the Benslimane/Mills system teaches wherein the media stream comprises video information (Benslimane: abstract).

Regarding claim 597, the Benslimane/Mills system teaches wherein the source-clock information comprises a timestamp (Mills: pg 2, RHS, last paragraph).

Regarding claim 598, the Benslimane/Mills system teaches wherein one or more playback devices are operable with one or more of unicast transmission or multicast transmission (Benslimane: abstract).

Regarding claim 577, this method claim contains limitations found within that of claim 590 and the same rationale of rejection is used, where applicable.

Regarding claim 580, this method claim contains limitations found within that of claim 592 and the same rationale of rejection is used, where applicable.

Regarding claim 581, the Benslimane/Mills system teaches wherein the additional device is another source device (Mills: pg 2, Figure 1 provides for nested multicast groups; Benslimane: section 4 provides for adding).

Application/Control Number: 10/816,217                                    Page 11
Art Unit: 2442

Regarding claim 582, the Benslimane/Mills system teaches wherein the additional device comprises one or more playback devices (Benslimane: section 4).

Regarding claim 583, this method claim contains limitations found within that of claim 592 and the same rationale of rejection is used, where applicable.

Regarding claim 586, this method claim contains limitations found within that of claim 594 and the same rationale of rejection is used, where applicable.

Regarding claim 587, the Benslimane/Mills system teaches wherein determining the time differential is performed periodically (Mills: pg 3 LHS, last paragraph; pg 3, LHS, last paragraph).

Regarding claim 588, the Benslimane/Mills system teaches wherein the transmission of the media stream is performed by a multicast transmission methodology (Benslimane: section 1 provides for point-to-point comm.).

Regarding claim 589, the Benslimane/Mills system teaches wherein receiving the media stream is performed by a multicast transmission methodology (Benslimane: abstract).

Application/Control Number: 10/816,217                                Page 12

Art Unit: 2442

Regarding claim 600, this machine readable medium claim contains limitations found

within that of claim 590 and the same rationale of rejection is used, where applicable.


11.     Claims 578-579, 591, and 599 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Benslimane ("A Multimedia Synchronization Protocol for Multicast

Groups", 2000), in view of Mills ("Precision Synchronization of Computer Network

Clocks", 1994), and in further view of Official Notice.


Regarding claim 591, The Benslimane/Mills system does not teach further comprising

controlling one or more of the plurality of devices via a user interface module.

        An official notice is taken that such use of user interface modules for controlling

devices was well known in the art at the time the invention was made by one of ordinary

skill in the art.

        It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize any known controlling technique including a user interface

because it would have enabled practicing the Benslimane/Mills system.


Regarding claim 578, this method claim contains limitations found within that of claim

591 and the same rationale of rejection is used, where applicable.


Regarding claim 579, the Benslimane/Mills system does not teach further comprising

providing status information associated with one or more of the plurality of devices.

Application/Control Number: 10/816,217                                      Page 13
Art Unit: 2442

An official notice is taken that such use of providing status information for aid in awareness of controlled devices was well known in the art at the time the invention was made by one of ordinary skill in the art.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize any known controlled device awareness technique including a providing status information because it would have enabled practicing the Benslimane/Mills system.


Regarding claim 599, the Benslimane/Mills system teaches tightly coupled synchrony output of a media stream between devices (Benslimane: abstract).

The Benslimane/Mills system does not teach wherein the source device is capable of playback.

An official notice is taken that such use of a source device for playback was well known in the art at the time the invention was made by one of ordinary skill in the art.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize any known device for playback including the source device because it would have enabled practicing the Benslimane/Mills system.


12.    Claims 584-585 and 593 are rejected under 35 U.S.C. 103(a) as being unpatentable over Benslimane ("A Multimedia Synchronization Protocol for Multicast Groups", 2000), in view of Mills ("Precision Synchronization of Computer Network Clocks", 1994), and in further view Powers (US 2004/0203378 A1).

Application/Control Number: 10/816,217                                    Page 14
Art Unit: 2442

Regarding claim 593, the Benslimane/Mills system does not teach wherein a master device is a source device and a slave device is one or more playback devices (Benslimane: abstract).

The Benslimane/Mills system does not teach wherein a master device is further configured to be converted into one of the one or more slave devices; or

and wherein at least one of the one or more slave devices is further configured to be converted into the master device.

Powers, in a similar field of endeavor, teach wherein a master device is further configured to be converted into one of the one or more slave devices (Powers: [0007] provides for masters handing off master-ship to a slave); or

and wherein at least one of the one or more slave devices is further configured to be converted into the master device (Powers: [0007] provides for a slave being promoted).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Powers for having promotion/demotion scheme for multicast groups.  The teachings of Powers, when implemented in the Benslimane/Mills system, will allow one of ordinary skill in the art to promote playback devices to be the source device and demote source devices to mere playback devices. One of ordinary skill in the art would be motivated to utilize the teachings of Powers in the Benslimane/Mills system in order to allow recovery if the source suddenly leaves the

Application/Control Number: 10/816,217                                    Page 15
Art Unit: 2442

network, or the a playback device is deemed a more capable source device (more

processing power, more content, etc).


Regarding claim 584, this method claim contains limitations found within that of claim

593 and the same rationale of rejection is used, where applicable.


Regarding claim 585, the Benslimane/Mills/Powers system teaches wherein the tightly

coupled synchrony is uninterrupted (Benslimane: section 4 provides for network group

management operations while maintaining synchrony; Powers: [0007] wherein network

group management operations are promotion/demotion).

Application/Control Number: 10/816,217                                          Page 16
Art Unit: 2442

*Cited Pertinent Prior Art*

13.    The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

a.    Johnson (US 6,324,586 B1) discloses synchronizing clocks over a

network using a common reference.

b.    Sato (US 6,128,318) discloses synchronizing clocks on a master/slave

setup using timer offset values.

c.    Voth (US 6,199,169, 6,351,821 B1) discloses synchronizing clocks across

an entire cluster.

d.    Zwack (US 7,372,846 B2) discloses using relative time offset comparisons

when synchronizing.

e.    Bretl et al ("MPEG2 Tutorial", 2000) discloses how to synchronize (time,

frequency, and phase) a transmitter STC with a receiver STC in the mpeg

system using a PLL, and briefly discusses convergence time considerations

when designing the PLL.

Application/Control Number: 10/816,217                                          Page 17
Art Unit: 2442

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JEFFREY NICKERSON whose telephone number is (571)270-3631.  The examiner can normally be reached on M-Th, 8:30-6:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Andrew Caldwell can be reached on 571-272-3868.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished applications is available through Private PAIR only.  For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/J. N./                                              /Andrew Caldwell/
Jeffrey Nickerson                                    Supervisory Patent Examiner, Art
Examiner, Art Unit 2442                              Unit 2442

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| **APPLICANT:** | Nicholas A. J. Millington |
| **APPLICATION NO.:** | 10/816,217 |
| **FILING DATE:** | April 1, 2004 |
| **TITLE:** | System and Method for Synchronizing Operations among a Plurality of Independently Clocked Digital Data Processing Devices |
| **EXAMINER:** | Jeffrey L. Nickerson |
| **ART UNIT:** | 2442 |
| **CONF. NO.:** | 7302 |
| **ATTY. DKT. NO.:** | PA3445US |

MAIL STOP AMENDMENT
COMMISSIONER FOR PATENTS
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450

## RESPONSE D

Examiner Nickerson:

In response to the office action mailed **January 22, 2009** (*Office Action*), please consider the following **amendments** and **remarks**. **Amendments to the claims** begin on **page two**. Applicant's **remarks** in response to the *Office Action* begin on **page eight**. Applicant's **conclusions** as to the allowability of this Application appear on **page nineteen**.

## AMENDMENTS TO THE CLAIMS

Please amend the claims as follows.

1-576. (Canceled)

577. (Currently amended) A method for synchronizing media playback, the method comprising:

receiving a media stream from a source device via a network, the source device being ~~comprising~~ one of a plurality of devices in communication via the network, the media stream comprising source-clock information related to an independent clock associated with the source device;

determining a time differential between the independent clock associated with the source device and one or more independent clocks associated with one or more playback devices based on the source-clock information, each of the one or more playback devices being ~~comprising~~ one of the plurality of devices; and

outputting the media stream ~~in tight synchrony with the one~~ via two or more playback devices in synchrony~~, the tight synchrony~~ based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

578. (Previously presented) The method of claim 577, further comprising controlling one or more of the plurality of devices via a user interface module.

579. (Previously presented) The method of claim 577, further comprising providing status information associated with one or more of the plurality of devices.

580. (Previously presented) The method of claim 577, further comprising adding an additional device to the plurality of devices.

581. (Currently amended) The method of claim 580, wherein the additional device replaces ~~comprises~~ the source device as a new source device.

582. (Currently amended) The method of claim 580, wherein the additional device joins ~~comprises one of~~ the one or more playback devices as a new playback device.

583. (Currently amended) The method of claim 577, further comprising removing a device from the plurality of devices without interrupting the outputting of the media stream via the two or more playback devices.

584. (Previously presented) The method of claim 577, further comprising converting the source device into one of the one or more playback devices, and converting one of the one or more playback devices into the source device.

585. (Previously presented) The method of claim 584, wherein the tightly coupled synchrony is uninterrupted.

586. (Previously presented) The method of claim 577, further comprising adjusting a clock rate of the one or more independent clocks associated with one or more playback devices.

587. (Previously presented) The method of claim 577, wherein determining the time differential is performed periodically.

588. (Previously presented) The method of claim 577, wherein receiving the media stream is performed by a unicast transmission methodology.

589. (Previously presented) The method of claim 577, wherein receiving the media stream is performed by a multicast transmission methodology.

590. (Currently amended) A system for synchronizing media playback, the system comprising:

a plurality of devices configured to be in communication via a network, the plurality of devices comprising a source device and one or more playback devices;

wherein the source device is configured to transmit a media stream, the media stream comprising source-clock information related to an independent clock associated with the source device; and

wherein the one or more playback devices are configured to determine a time differential between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices based on the source-clock information, and to output the media stream ~~in tightly coupled synchrony with the one~~ <u>via two</u> or more playback devices <u>in synchrony</u>~~, the tightly coupled synchrony~~ based on the time differential<u>, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices</u>.

591. (Previously presented) The system of claim 590, further comprising a user interface module configured to control one or more of the plurality of devices.

592. (Previously presented) The system of claim 590, wherein the plurality of devices are further configured such that devices can be added and removed from the plurality of devices without interrupting the tightly coupled synchrony.

593. (Previously presented) The system of claim 590, wherein the source device is further configured to be converted into one of the one or more playback devices, and at least one of the one or more playback devices is further configured to be converted into the source device.

594. (Previously presented) The system of claim 590, wherein a clock rate of the one or more independent clocks associated with the one or more playback devices is adjustable.

595. (Previously presented) The system of claim 590, wherein the media stream comprises audio information.

596. (Previously presented) The system of claim 590, wherein the media stream comprises video information.

597. (Previously presented) The system of claim 590, wherein the source-clock information comprises a timestamp.

598. (Previously presented) The system of claim 590, wherein one or more playback devices are operable with one or more of unicast transmission or multicast transmission.

599. (Previously presented) The system of claim 590, wherein the source device is further configured to output the media stream in tightly coupled synchrony with the one or more playback devices.

600. (Currently amended) A machine readable <u>storage</u> medium having embodied thereon a program, the program providing instructions for a method for synchronizing media playback, the method comprising:

receiving a media stream from a source device via a network, the source device <u>being</u> ~~comprising~~ one of a plurality of devices in communication via the network, the media stream comprising source-clock information related to an independent clock associated with the source device;

determining a time differential between the independent clock associated with the source device and one or more independent clocks associated with one or more playback devices based on the source-clock information, each of the one or more playback devices <u>being</u> ~~comprising~~ one of the plurality of devices; and

outputting the media stream ~~in tight synchrony with the one~~ <u>via two</u> or more playback devices <u>in synchrony</u>~~, the tight synchrony~~ based on the time differential<u>, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices</u>.

# REMARKS

Claims 577-600 are pending in the present Application.  In view of the foregoing amendments and following remarks, Applicant respectfully requests reconsideration of the rejections and allowance of the Application.

## Statement of Substance of the Interviews

The undersigned representative engaged in telephonic interviews with Examiner Jeffrey L. Nickerson on April 9, 2009 and April 14, 2009.  Applicant and his representative extend their sincere thanks to the Examiner for his time and guidance during the aforementioned interviews.

During the course of the April 9th and April 14th interviews, the discussion was focused mainly on potential claim amendments to overcome the rejections under 35 U.S.C. § 112 ¶ 1 and § 112 ¶ 2.  The rejection under 35 U.S.C. § 101 was also discussed.  An agreement was reached on an amendment to claim 577 to overcome the § 112 rejections.

## Amendments to the Claims

Without conceding to the Examiner's rejections and for the purpose of expediting prosecution, Applicant has amended claims 577, 581, 582, 583, 590, and 600.

Independent claim 577, as amended, includes "outputting the media stream via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay

differences between the two or more playback devices." Independent claims 590 and 600 have been amended in a similar, albeit contextually appropriate, manner as claim 577. The amendment to exemplar claim 577 is supported, at least, by paragraphs [0005] and [0196] of the publication of the present Application (*Published Application*, see U.S. Pub. No. 2007/0038999).

Dependent claim 581, as amended, includes "wherein the additional device replaces the source device as a new source device." The amendment to claim 581 is supported, at least, by paragraphs [0026] and [0042] of the *Published Application*.

Dependent claim 582, as amended, includes "wherein the additional device joins the one or more playback devices as a new playback device." The amendment to claim 582 is supported, at least, by paragraphs [0022] and [0039] of the *Published Application*.

Dependent claim 583, as amended, includes "removing a device from the plurality of devices without interrupting the outputting of the media stream via the two or more playback devices." The amendment to claim 583 is supported, at least, by paragraphs [0022] and [0040] of the *Published Application*.

In addition, taking the suggestion of the Examiner (see *Office Action*, 7), Applicant has amended claim 600 to include a "machine readable storage medium," rather than a "machine readable medium." This amendment is supported, at least, by paragraph [0198] of the *Published Application*. Furthermore, claims 577 and 600 have been amended to address informalities.

Applicant reserves the right to pursue any or all of the original claims at a later time, either within the present Application or in future application(s). Applicant does not believe any new matter has been introduced by these amendments.

## Rejections under 35 U.S.C. § 112

The Examiner asserts that claims 577-600 are rejected under 35 U.S.C § 112 ¶ 1 as failing to comply with the written description requirement.  *Office Action*, 2.  In light of the present amendments to the claims, which omit recitation of tightly coupled synchronized playback, Applicant respectfully requests that the rejection under § 112 ¶ 1 be withdrawn.

The Examiner asserts that claims 577-600 are rejected under 35 U.S.C. § 112 ¶ 2 as being indefinite for failing to particularly point out and distinctly claim the subject matter which Applicant regards as the invention.  *Office Action*, 3.

The Examiner points to the term "tightly coupled synchrony" with respect to claims 577, 590, and 600.  *Office Action*, 4.  As mentioned, claims 577, 590, and 600 have been amended to omit this terminology.  Instead, amended claims 577, 590, and 600 include "the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices."  Applicant recognizes that synchronization thresholds are well known in the art, that those thresholds may vary, and that various thresholds can be set.  Perceived time-delay differences are also well known in the art and may be manifested as echoes, delays, and/or interferences perceived by an observer.

The Examiner asserts that there is ambiguity in claim 577 with respect to the relationship between the source device, the playback devices, and the plurality of devices.  *Office Action*, 4-5.  Claims 577 and 600 have been amended to include "the source device being one of a plurality of devices," rather than "the source device comprising one of a plurality of devices."  Similarly, claims

577 and 600 have been amended to include "each of the one or more playback devices being one of the plurality of devices," rather than "each of the one or more playback devices comprising one of the plurality of devices."  Applicant believes any ambiguity with respect to the relationship between the source device, the playback devices, and the plurality of devices has been resolved by the aforementioned amendments to claims 577 and 600.

The Examiner asserts that confusion may arise in claims 581 and 582 with respect to the additional device.  *Office Action*, 5.  Applicant believes any potential for confusion with respect to the additional device has been sufficiently addressed by the present amendments to claims 581 and 582.

The Examiner asserts that there is ambiguity in claim 583 with respect to the uninterrupted output.  *Office Action*, 6.  Applicant believes the present amendment to claim 583 resolves any ambiguity with respect to the uninterrupted output.

Based at least on the amendments and remarks herein, Applicant believes the rejection of claims 577-600 under 35 U.S.C. § 112 ¶ 2 is overcome and respectfully requests withdrawal of the same.

## Rejections under 35 U.S.C. § 101

The Examiner asserts that claim 600 is rejected under 35 U.S.C. § 101 as being directed to non-statutory subject matter.  *Office Action*, 6.  The Examiner states that "[a] claim directed towards 'a machine readable medium …' is **not** statutory."  *Office Action*, 6 (emphasis in original).  The Examiner then states that "[a] claim directed towards 'a machine readable **storage** medium …' should overcome this rejection."  *Office Action*, 7 (emphasis in original).  Applicant has amended claim 600 accordingly, as indicated above.  Applicant believes one of

ordinary skill in the art, at least in light of paragraph [0198] of the *Published Application*, would not interpret "machine readable storage medium" to include transient signals or signal transmission media.  As such, Applicant believes the § 101 rejection is overcome and should be withdrawn.

## <u>Rejections under 35 U.S.C. § 103</u>

The Examiner asserts that claims 577, 580-583, 587-590, 592, 594-598, and 600 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Benslimane, "A Multimedia Synchronization Protocol for Multicast Groups" (*Benslimane*) in view of Mills, "Precision Synchronization of Computer Network Clocks"(*Mills*). *Office Action*, 7.  Applicant respectfully traverses.

**1.  *Benslimane* fails to teach or make obvious a source device configured to transmit a media stream comprising source-clock information.**

Regarding independent claim 590, the Examiner asserts that *Benslimane* teaches "wherein the source device is configured to transmit a media stream, the media stream comprising **a time differential**."  *Office Action*, 8 (citing the "Sync message's delta" from *Benslimane*, sect. 3.1.1) (emphasis added).  Applicant notes that claim 590 actually sets forth "wherein the source device is configured to transmit a media stream, the media stream comprising **source-clock information related to an independent clock associated with the source device**."  (Emphasis added).  Applicant believes *Benslimane* fails to teach this element or make this element obvious for at least the following reasons.

First, the time differential described in claim 590 is determined by the playback devices based on information included in the media stream (*i.e.,* the source-clock information) and the independent clocks associated with the

playback devices themselves.  Therefore, the **time differential** of claim 590 exists at the playback devices and is not comprised by the media stream.

Second, a media stream comprising some particular information, such as the media stream of claim 590, is not equivalent to *Benslimane's* sync message. *Benslimane's* sync message is merely a discrete unit of information (*i.e.*, SYNC($\delta_i$, $d_i$, $\tau_s$, $d^{max}$)).  As thoroughly described in the record, the term 'media stream' is commonly understood as a continuous sequence of audio or audio-and-video through a network.  *Benslimane* is silent with respect to the sync message comprising a continuous sequence of audio or audio-and-video, and is silent with respect the sync message being included in a continuous sequence of audio or audio-and-video.  Additionally, *Benslimane* explains that "[i]n this paper, message broadcasts between the server and the clients are supposed to be an atomic action where only one message is taken into account and not n." *Benslimane*, sect. 3.

Third, the alleged 'time differential' of *Benslimane* (*i.e.*, the sync message's $\delta_i$) is described as the "difference of time between arrival RESPONSE message from $C_i$ and the one having made the maximum delay."  *Benslimane*, sect. 3.1.1. Contrastingly, the time differential set forth in claim 590 is "a time differential between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices based on the source-clock information."  A time differential between independent clocks of different devices is not disclosed or obvious in view of a difference of time between two messages received by the same device.

Based at least on these remarks, Applicant contends that *Benslimane* fails to teach or suggest "wherein the source device is configured to transmit a media stream, the media stream comprising source-clock information related to an independent clock associated with the source device," as set forth in claim 590.

Furthermore, Applicant believes the Examiner's assertion that *Benslimane* teaches "wherein the source device is configured to transmit a media stream, the media stream comprising a time differential" is moot.

In order "[t]o support the conclusion that the claimed invention is directed to obvious subject matter, either the references must expressly or impliedly suggest the claimed invention." *Ex parte Clapp*, 227 USPQ 972, 973 (Bd. Pat. App. & Inter. 1985). Since the teachings of *Benslimane* in view of *Mills* fail to disclose or suggest the claimed invention, either expressly or impliedly, the rejection of claim 590 is overcome. Additionally, as independent claims 577 and 600 include similar elements to those of independent claim 590, claims 577 and 600 are likewise patentable for at least the same reasons. Furthermore, as a dependent claim incorporates by reference all the limitations of the claim from which it depends (see 35 U.S.C. § 112 ¶ 4), the rejection of claims 580-583, 587-588, 592, and 594-598 under 35 U.S.C. § 103(a) is overcome for at least the same reasons as the independent claim from which they depend.

**2.  *Benslimane* fails to teach or make obvious outputting a media stream in synchrony based on a time differential, as set forth in the claims.**

Regarding independent claim 590, the Examiner asserts that *Benslimane* teaches "wherein the one or more playback devices output the media stream in tightly coupled synchrony with the one or more playback devices, the tightly coupled synchrony based on the time differential." *Office Action*, 8. Applicant notes that amended claim 590 includes "output[ting] the media stream via two or more playback devices in synchrony based on the time differential." In both cases, however, the synchronous output is based on the time differential. In support of this assertion, the Examiner alleges that sect. 3.1.1. of *Benslimane*

"provides for calculating restitution time based on playback offset differential." *Office Action*, 8.

Applicant believes the Examiner is equating a "playback offset differential" with the time differential of claim 590. Applicant respectfully notes that, in claim 590, the "time differential [is] between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices." Furthermore, Applicant observes a contradiction in that the Examiner first equates the time differential of claim 590 with the delta of the sync message (*i.e.*, the "$\delta_i$" in SYNC($\delta_i$, $d_i$, $\tau_s$, $d^{max}$)), as discussed above.

Nevertheless, Applicant disagrees that *Benslimane* calculates restitution time based on playback offset differential. *Benslimane* defines restitution time as:

$$T_{rest\,i}{}^1 = h_i + d^{\max} - d_i,$$

where $h_i = s_i + \delta_i + 2 \cdot d_i$. None of the variables that the restitution time is defined by appear to be a playback offset differential. *Benslimane* defines the constituent variables of the restitution time in sect. 3.1.1. as follows:

$s_i$ = local reception time;

$\delta_i$ = difference of time between arrival RESPONSE message from $C_i$ and the one having made the maximum delay;

$d_i$ = delay between the server $S$ and the client $C_i$; and

$d^{max}$ = the maximum delay of all clients.

Clearly, *Benslimane* does not calculate restitution time based on playback offset differential, but rather as a combination of local receipt times, arrival times, and delays. As such, *Benslimane* fails to teach "output[ting] the media stream … in synchrony based on the time differential," as set forth in claim 590.

In order "[t]o support the conclusion that the claimed invention is directed to obvious subject matter, either the references must expressly or impliedly suggest the claimed invention." *Ex parte Clapp*, 227 USPQ 972, 973 (Bd. Pat. App. & Inter. 1985). Since the teachings of *Benslimane* in view of *Mills* fail to suggest the claimed invention, either expressly or impliedly, the rejection of claim 590 is overcome. Additionally, as independent claims 577 and 600 include similar elements to those of independent claim 590, claims 577 and 600 are likewise patentable for at least the same reasons. Furthermore, as a dependent claim incorporates by reference all the limitations of the claim from which it depends (see 35 U.S.C. § 112 ¶ 4), the rejection of claims 580-583, 587-588, 592, and 594-598 under 35 U.S.C. § 103(a) is overcome for at least the same reasons as the independent claim from which they depend.

### 3. The combination of *Benslimane* and *Mills* would not be likely or obvious to one of ordinary skill in the art.

The Examiner asserts that "[i]t would have been obvious to one of ordinary skill in the art … to utilize the teachings of Mills … implemented in the Benslimane system." *Office Action*, 9. Applicant respectfully disagrees.

*Benslimane* explains that "[f]our sources of asynchrony can disrupt synchronization: delay jitter, local clock drift, different collection times and different initial playback times." *Benslimane*, sect. 1. *Benslimane* further notes that, "[i]n this work, we are interested in delay jitter networks … [wherein] [d]elay jitter is the variation in the delays experienced by packets transmitted across a network." *Benslimane*, sect. 1. *Mills*, on the other hand, is directed to minimizing relative clock drift between networked computers. See, *e.g.*, *Mills*, Abstract. Since *Benslimane* and *Mills* do not address the same types of

asynchrony, it would not be obvious to one of ordinary skill in the art to combine the teachings of *Benslimane* and *Mills*. As such, the § 103 rejection is overcome.

### 4. *Mills* is nonanalogous to the subject matter set forth in the claims.

MPEP § 2141.01(a) I provides that in order "to rely on a reference under 35 U.S.C. 103, it must be analogous prior art." The Examiner asserts that *Mills* is "in a similar field of endeavor." *Office Action*, 8. Applicant respectfully disagrees. *Mills* is merely directed toward precisely synchronizing computer network clocks, as indicated by the Title, Abstract, and elsewhere throughout *Mills*. The present claims, in contrast, are directed toward systems, methods, and machine readable storage media for synchronizing media playback. The court has found "similarities and differences in structure and function of the inventions to carry … great[] weight" in evidencing 'nonanalogy' or 'analogy.' *In re Ellis*, 476 F.2d 1370, 1372, 177 USPQ 526, 527 (CCPA 1973). Since *Mills* is clearly nonanalogous to the inventions set forth in the claims, Applicant contends that *Mills* cannot be relied upon to support a rejection under 35 U.S.C. § 103(a).

### 5. Claims depending from allowable claims are likewise allowable.

The Examiner asserts that claims 578, 579, 591, and 599 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Benslimane* in view of *Mills*, and further in view of Official Notice. *Office Action*, 12. The Examiner also asserts that claims 584, 585, and 593 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Benslimane* in view of *Mills*, and further in view of U.S. Pub. No. 2004/0203378 (*Powers*). *Office Action*, 13. Applicant respectfully traverses. 578, 579, 584, 585, 591, 593, and 599

Applicants respectfully disagree with the Examiner's rejection of claims 578, 579, 584, 585, 591, 593, and 599, in that claims 2578, 579, 584, 585, 591, 593,

and 599 depend from otherwise allowable claims as discussed in detail herein. "A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112 ¶ 4. As such, Applicant contends that dependent claims 578, 579, 584, 585, 591, 593, and 599 are allowable over the cited references for at least the same reasons as the independent claim from which they depend.

# CONCLUSION

The rejection of claims 577-600 under 35 U.S.C. § 112 ¶ 1 is overcome because claims 577-600 comply with the written description requirement, at least, in light of the present amendments to the claims.  The rejection of claims 577-600 under 35 U.S.C. § 112 ¶ 2 is overcome in that claims 577-600 particularly point out and distinctly claim the subject matter which Applicant regards as the invention.  The rejection of claim 600 under 35 U.S.C. § 101 is overcome because claim 600, as amended, is directed to statutory subject matter.

The rejection of claims 577-600 under 35 U.S.C. § 103(a) is overcome because the cited references fail to teach or make obvious each and every claimed element.  Additionally, combining the references would not be obvious to one of ordinary skill in the art.  Furthermore, the *Mills* reference is nonanalogous.

Based on the foregoing remarks, Applicant believes the rejections to the claims have been overcome, and that the present application is in condition for allowance.  The Examiner is invited to contact Applicant's undersigned representative with any questions concerning this matter.

Respectfully submitted,
Nicholas A. J. Millington

**April 22, 2009**                    By: _____/Ian C. Schick/_____
                                        Ian C. Schick, Ph.D. (Reg. No. 63,293)
                                        **Carr & Ferrell** *LLP*
                                        2200 Geng Road
                                        Palo Alto, CA  94303
                                        T: 650.812.3400
                                        F: 650.812.3444

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | PA3445US | 7302 |

22830        7590        07/13/2009
CARR & FERRELL LLP
2200 GENG ROAD
PALO ALTO, CA 94303

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/13/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/816,217 | MILLINGTON, NICHOLAS A. J. |
| | Examiner | Art Unit | |
| | JEFFREY NICKERSON | 2442 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on *22 April 2009*.

2a)☒ This action is **FINAL**.    2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

4)☒ Claim(s) *577-600* is/are pending in the application.

   4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *577-600* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.

   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All   b)☐ Some * c)☐ None of:

   1.☐ Certified copies of the priority documents have been received.

   2.☐ Certified copies of the priority documents have been received in Application No. _____.

   3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

   * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO/SB/08)
   Paper No(s)/Mail Date *26 June 2009*.

4) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____ .

Application/Control Number: 10/816,217                                    Page 2

Art Unit: 2442

## DETAILED ACTION

1.      This communication is in response to Application No. 10/816,217 filed on 01 April

2004 as a non-provisional of Application No. 60/490,768 filed on 28 July 2003. The

response presented on 22 April 2009, which provides change to claims 577, 581-583,

590, and 600 is hereby acknowledged. Claims 577-600 have been examined.  This

application remains under accelerated examination as per MPEP 708.02 VIII.


### Claim Rejections - 35 USC § 112

2.      Applicant's response filed 22 April 2009 providing change to claims 577, 590,

and 600 is noted.  All prior rejections under 35 USC 112, first and second paragraphs,

are hereby withdrawn.


### Claim Rejections - 35 USC § 101

3.      Applicant's response file 22 April 2009 providing change to claim 600 and

corresponding arguments is noted.  Applicant's arguments are persuasive and,

therefore, all prior rejections under 35 USC 101 are hereby withdrawn.


### Response to Arguments

4.      Applicant's arguments filed 22 April 2009 have been fully considered but they are

not persuasive.


Independent claims 577, 590, and 600

Application/Control Number: 10/816,217                                        Page 3
Art Unit: 2442

In response to applicant's arguments against the references individually (Applicant's

arguments: pgs 12-14 argument #1), one cannot show nonobviousness by attacking

references individually where the rejections are based on combinations of references.

See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.,* 800

F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).


In response to applicant's argument that the references fail to show certain features of

applicant's invention, it is noted that the features upon which applicant relies (i.e.,

definition of "media stream"; Applicant's arguments: pg 13, pars 1-2) are not recited in

the rejected claim(s).  Although the claims are interpreted in light of the specification,

limitations from the specification are not read into the claims.  See *In re Van Geuns*, 988

F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).


In response to applicant's arguments against the references individually (Applicant's

arguments: pgs 14-16 argument #2), one cannot show nonobviousness by attacking

references individually where the rejections are based on combinations of references.

See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.,* 800

F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).


In response to applicant's argument that the references fail to show certain features of

applicant's invention, it is noted that the features upon which applicant relies (i.e., the

time differential being a playback offset differential; Applicant's arguments: pg 15, pars

Application/Control Number: 10/816,217                                    Page 4
Art Unit: 2442

1-4) are not recited in the rejected claim(s).  Although the claims are interpreted in light

of the specification, limitations from the specification are not read into the claims.  See

*In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).


In response to applicant's arguments that Benslimane's restitution time is not based on

a time differential, the examiner respectfully disagrees.  As indicated and admitted by

applicant, Benslimane's calculated restitution time is based on the received delta.


Applicant further argues that it would not be obvious to combine the teachings of

Benslimane with the teachings of Mills, because Mills is directed towards minimizing

relative clock drift on networked devices.  The examiner respectfully disagrees.  One of

ordinary skill in the art would be motivated to utilize the teachings of Mills with

Benslimane in order to ensure extremely precise synchronization, and for the reasons

stated in the Non-Final rejection dated 22 January 2009.


Applicant further argues that Mills is nonanalogous art.  The examiner respectfully

disagrees.  Both Mills and Benslimane are directed towards synchronizing functionality

on networked devices.


Applicant's arguments are ultimately unpersuasive and, therefore, the rejections of

these claims are hereby maintained.

Application/Control Number: 10/816,217                                        Page 5
Art Unit: 2442

Dependent claims 578-589, 591-599

Applicant argues these claims conditionally on that of their parent claim(s).


Applicant's arguments are ultimately unpersuasive and, therefore, the rejections of

these claims are hereby maintained.


### Claim Rejections - 35 USC § 103

5.      The text of those sections of Title 35, U.S. Code not included in this action can

be found in a prior Office action.


6.      Claims 577, 580-583, 587-590, 592, 594-598, and 600 are rejected under 35

U.S.C. 103(a) as being unpatentable over Benslimane ("A Multimedia Synchronization

Protocol for Multicast Groups", 2000), and further in view of Mills ("Precision

Synchronization of Computer Network Clocks", 1994).


Regarding claim 590, Benslimane teaches a system for synchronizing media playback,

the system comprising:

        a plurality of devices configured to be in communication via a network, the

plurality of devices comprising a source device and one or more playback devices

(Benslimane: abstract);

Application/Control Number: 10/816,217                                                                 Page 6
Art Unit: 2442

wherein the source device is configured to transmit a media stream, the media stream comprising a time differential (Benslimane: section 3.1.1, Sync message's delta); and

wherein the one or more playback devices output the media stream via two playback devices in synchrony, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices (Benslimane: section 3.1.1 provides for calculating restitution time based on the sync delta; section 3.1.2 provides for inter-client synchronization); and

wherein a transmission message is a media stream (Benslimane: abstract).

Benslimane does not teach wherein the transmission message comprises source-clock information related to an independent clock associated with the source device; or

wherein the one or more playback devices are configured to determine the time differential between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices based on the source-clock information.

Mills, in a similar field of endeavor, teaches wherein the transmission message comprises source-clock information related to an independent clock associated with the source device (Mills: section 2, specifically pg 3, LHS, last paragraph); and

wherein the one or more playback devices are configured to determine the time differential between the independent clock associated with the source device and one or

Application/Control Number: 10/816,217                                      Page 7
Art Unit: 2442

more independent clocks associated with the playback devices based on the source-clock information (Mills: pg 3, LHS; section 2.1, specifically pg 3 RHS, last paragraph to start of section 3); and

wherein the degree of synchrony is such that the differentials is unperceivable by a user (Mills: abstract).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Mills for transmitting source clock information to enable time offset calculations. The teachings of Mills, when implemented in the Benslimane system, will allow one of ordinary skill in the art to keep the clocks of the transmitter and receiver very tightly synchronized and therefore prevent significant drift or skew in the middle of playback. One of ordinary skill in the art would be motivated to utilize the teachings of Mills in the Benslimane system in order to synchronize the playback of media between clients to a degree unperceivable to the user.

Regarding claim 592, the Benslimane/Mills system teaches wherein the plurality of devices are further configured such that devices can be added and removed from the plurality of devices without interrupting the tightly coupled synchrony (Benslimane: section 4).

Regarding claim 594, the Benslimane/Mills system teaches wherein a clock rate of the one or more independent clocks associated with the one or more playback devices is

Application/Control Number: 10/816,217                                    Page 8
Art Unit: 2442

adjustable (Mills: pg 3, LHS provides for adjustable frequency NCOs; See also section 2.1, paragraphs 1-3).

Regarding claim 595, the Benslimane/Mills system teaches wherein the media stream comprises audio information (Benslimane: abstract).

Regarding claim 596, the Benslimane/Mills system teaches wherein the media stream comprises video information (Benslimane: abstract).

Regarding claim 597, the Benslimane/Mills system teaches wherein the source-clock information comprises a timestamp (Mills: pg 2, RHS, last paragraph).

Regarding claim 598, the Benslimane/Mills system teaches wherein one or more playback devices are operable with one or more of unicast transmission or multicast transmission (Benslimane: abstract).

Regarding claim 577, this method claim contains limitations found within that of claim 590 and the same rationale of rejection is used, where applicable.

Regarding claim 580, this method claim contains limitations found within that of claim 592 and the same rationale of rejection is used, where applicable.

Application/Control Number: 10/816,217                                              Page 9
Art Unit: 2442

Regarding claim 581, the Benslimane/Mills system teaches wherein the additional

device replaces the source device as a new source device (Mills: pg 2, Figure 1

provides for nested multicast groups; Benslimane: section 4 provides for adding and

leaving).

Regarding claim 582, the Benslimane/Mills system teaches wherein the additional

device joins the one or more playback devices as a new playback device (Benslimane:

section 4 for adding and leaving).

Regarding claim 583, this method claim contains limitations found within that of claim

592 and the same rationale of rejection is used, where applicable.

Regarding claim 586, this method claim contains limitations found within that of claim

594 and the same rationale of rejection is used, where applicable.

Regarding claim 587, the Benslimane/Mills system teaches wherein determining the

time differential is performed periodically (Mills: pg 3 LHS, last paragraph; pg 3, LHS,

last paragraph).

Regarding claim 588, the Benslimane/Mills system teaches wherein the transmission of

the media stream is performed by a multicast transmission methodology (Benslimane:

section 1 provides for point-to-point comm.).

Application/Control Number: 10/816,217                                    Page 10
Art Unit: 2442

Regarding claim 589, the Benslimane/Mills system teaches wherein receiving the media
stream is performed by a multicast transmission methodology (Benslimane: abstract).

Regarding claim 600, this machine readable medium claim contains limitations found
within that of claim 590 and the same rationale of rejection is used, where applicable.

7.      Claims 578-579, 591, and 599 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Benslimane ("A Multimedia Synchronization Protocol for Multicast
Groups", 2000), in view of Mills ("Precision Synchronization of Computer Network
Clocks", 1994), and in further view of Official Notice.

Regarding claim 591, The Benslimane/Mills system does not teach further comprising
controlling one or more of the plurality of devices via a user interface module.

        An official notice is taken that such use of user interface modules for controlling
devices was well known in the art at the time the invention was made by one of ordinary
skill in the art.

        It would have been obvious to one of ordinary skill in the art at the time the
invention was made to utilize any known controlling technique including a user interface
because it would have enabled practicing the Benslimane/Mills system.

Application/Control Number: 10/816,217                                Page 11
Art Unit: 2442

Regarding claim 578, this method claim contains limitations found within that of claim 591 and the same rationale of rejection is used, where applicable.


Regarding claim 579, the Benslimane/Mills system does not teach further comprising providing status information associated with one or more of the plurality of devices.

An official notice is taken that such use of providing status information for aid in awareness of controlled devices was well known in the art at the time the invention was made by one of ordinary skill in the art.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize any known controlled device awareness technique including a providing status information because it would have enabled practicing the Benslimane/Mills system.


Regarding claim 599, the Benslimane/Mills system teaches tightly coupled synchrony output of a media stream between devices (Benslimane: abstract).

The Benslimane/Mills system does not teach wherein the source device is capable of playback.

An official notice is taken that such use of a source device for playback was well known in the art at the time the invention was made by one of ordinary skill in the art.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize any known device for playback including the source device because it would have enabled practicing the Benslimane/Mills system.

Application/Control Number: 10/816,217                                    Page 12
Art Unit: 2442

8.    Claims 584-585 and 593 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Benslimane ("A Multimedia Synchronization Protocol for Multicast

Groups", 2000), in view of Mills ("Precision Synchronization of Computer Network

Clocks", 1994), and in further view Powers (US 2004/0203378 A1).


Regarding claim 593, the Benslimane/Mills system does not teach wherein a master

device is a source device and a slave device is one or more playback devices

(Benslimane: abstract).

       The Benslimane/Mills system does not teach wherein a master device is further

configured to be converted into one of the one or more slave devices; or

       and wherein at least one of the one or more slave devices is further configured to

be converted into the master device.

       Powers, in a similar field of endeavor, teach wherein a master device is further

configured to be converted into one of the one or more slave devices (Powers: [0007]

provides for masters handing off master-ship to a slave); or

       and wherein at least one of the one or more slave devices is further configured to

be converted into the master device (Powers: [0007] provides for a slave being

promoted).

       It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Powers for having promotion/demotion

scheme for multicast groups.  The teachings of Powers, when implemented in the

Application/Control Number: 10/816,217                                    Page 13
Art Unit: 2442

Benslimane/Mills system, will allow one of ordinary skill in the art to promote playback devices to be the source device and demote source devices to mere playback devices. One of ordinary skill in the art would be motivated to utilize the teachings of Powers in the Benslimane/Mills system in order to allow recovery if the source suddenly leaves the network, or the a playback device is deemed a more capable source device (more processing power, more content, etc).

Regarding claim 584, this method claim contains limitations found within that of claim 593 and the same rationale of rejection is used, where applicable.

Regarding claim 585, the Benslimane/Mills/Powers system teaches wherein the tightly coupled synchrony is uninterrupted (Benslimane: section 4 provides for network group management operations while maintaining synchrony; Powers: [0007] wherein network group management operations are promotion/demotion).

Application/Control Number: 10/816,217                                      Page 14
Art Unit: 2442

### *Citation of Pertinent Prior Art*

9.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

    a.      Davis (US 2009/0157905 A1) discloses synchronizing clocks across a

network using various factors.

    b.      Moore (US 7,206,367 B1) discloses an audiovisual multicast inter-client

synchronization system that adjusts local device clocks based on a main

reference.

### *Conclusion*

**THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the mailing date of this final action.

Application/Control Number: 10/816,217                              Page 15
Art Unit: 2442

Any inquiry concerning this communication or earlier communications from the examiner should be directed to JEFFREY NICKERSON whose telephone number is (571)270-3631.  The examiner can normally be reached on M-Th, 9:00am - 7:00pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Andrew Caldwell can be reached on (571)272-3868.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/J. N./
Jeffrey Nickerson
Examiner, Art Unit 2442

/Andrew Caldwell/
Supervisory Patent Examiner, Art Unit 2442

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT:              Nicholas A. J. Millington

APPLICATION NO.:        10/816,217

FILING DATE:            April 1, 2004

TITLE:                  System and Method for Synchronizing Operations
                        among a Plurality of Independently Clocked Digital
                        Data Processing Devices

EXAMINER:               Jeffrey L. Nickerson

ART UNIT:               2442

CONF. NO.:              7302

ATTY. DKT. NO.:         PA3445US

---

MAIL STOP AF
COMMISSIONER FOR PATENTS
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450

## RESPONSE E

Examiner Nickerson:

In response to the final office action mailed **July 13, 2009** (*Office Action*), please consider the following **remarks**. While no amendments are made to the claims, a **listing of the claims** provided for the Examiner's convenience beginning on **page two**. The Applicant's **remarks** in response to the *Office Action* begin on **page seven**. The Applicant's **conclusions** as to the allowability of this application appear on **page fourteen**.

## CLAIMS

The claims are pending as follows.

1-576. (Canceled)

577. (Previously presented) A method for synchronizing media playback, the method comprising:

receiving a media stream from a source device via a network, the source device being one of a plurality of devices in communication via the network, the media stream comprising source-clock information related to an independent clock associated with the source device;

determining a time differential between the independent clock associated with the source device and one or more independent clocks associated with one or more playback devices based on the source-clock information, each of the one or more playback devices being one of the plurality of devices; and

outputting the media stream via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

578. (Previously presented) The method of claim 577, further comprising controlling one or more of the plurality of devices via a user interface module.

579. (Previously presented) The method of claim 577, further comprising providing status information associated with one or more of the plurality of devices.

580. (Previously presented) The method of claim 577, further comprising adding an additional device to the plurality of devices.

581. (Previously presented) The method of claim 580, wherein the additional device replaces the source device as a new source device.

582. (Previously presented) The method of claim 580, wherein the additional device joins the one or more playback devices as a new playback device.

583. (Previously presented) The method of claim 577, further comprising removing a device from the plurality of devices without interrupting the outputting of the media stream via the two or more playback devices.

584. (Previously presented) The method of claim 577, further comprising converting the source device into one of the one or more playback devices, and converting one of the one or more playback devices into the source device.

585. (Previously presented) The method of claim 584, wherein the tightly coupled synchrony is uninterrupted.

586. (Previously presented) The method of claim 577, further comprising adjusting a clock rate of the one or more independent clocks associated with one or more playback devices.

587. (Previously presented) The method of claim 577, wherein determining the time differential is performed periodically.

588. (Previously presented) The method of claim 577, wherein receiving the media stream is performed by a unicast transmission methodology.

589. (Previously presented) The method of claim 577, wherein receiving the media stream is performed by a multicast transmission methodology.

590. (Previously amended) A system for synchronizing media playback, the system comprising:

a plurality of devices configured to be in communication via a network, the plurality of devices comprising a source device and one or more playback devices;

wherein the source device is configured to transmit a media stream, the media stream comprising source-clock information related to an independent clock associated with the source device; and

wherein the one or more playback devices are configured to determine a time differential between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices based on the source-clock information, and to output the media stream via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

591. (Previously presented) The system of claim 590, further comprising a user interface module configured to control one or more of the plurality of devices.

592. (Previously presented) The system of claim 590, wherein the plurality of devices are further configured such that devices can be added and removed from the plurality of devices without interrupting the tightly coupled synchrony.

593. (Previously presented) The system of claim 590, wherein the source device is further configured to be converted into one of the one or more playback devices, and at least one of the one or more playback devices is further configured to be converted into the source device.

594. (Previously presented) The system of claim 590, wherein a clock rate of the one or more independent clocks associated with the one or more playback devices is adjustable.

595. (Previously presented) The system of claim 590, wherein the media stream comprises audio information.

596. (Previously presented) The system of claim 590, wherein the media stream comprises video information.

597. (Previously presented) The system of claim 590, wherein the source-clock information comprises a timestamp.

598. (Previously presented) The system of claim 590, wherein one or more playback devices are operable with one or more of unicast transmission or multicast transmission.

599. (Previously presented) The system of claim 590, wherein the source device is further configured to output the media stream in tightly coupled synchrony with the one or more playback devices.

600. (Previously presented) A machine readable storage medium having embodied thereon a program, the program providing instructions for a method for synchronizing media playback, the method comprising:

receiving a media stream from a source device via a network, the source device being one of a plurality of devices in communication via the network, the media stream comprising source-clock information related to an independent clock associated with the source device;

determining a time differential between the independent clock associated with the source device and one or more independent clocks associated with one or more playback devices based on the source-clock information, each of the one or more playback devices being one of the plurality of devices; and

outputting the media stream via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

## REMARKS

Claims 577-600 have been examined and are pending in the present application.  In view of the following remarks, the Applicant respectfully requests reconsideration of the rejections and allowance of the application.

### Rejections under 35 U.S.C. § 103

The Examiner asserts that claims 577, 580-583, 586-590, 592, 594-598, and 600 are rejected under 35 U.S.C. § 103(a) as being unpatentable over "A Multimedia Synchronization Protocol for Multicast Groups" (*Benslimane*) in view of "Precision Synchronization of Computer Network Clocks" (*Mills*).  *Office Action*, 5 (also see *Office Action*, 9 with respect to claim 586).  The Applicant respectfully traverses the rejection because the cited references, separately and in combination, fail to disclose all of the claimed elements for at least the reasons discussed below.

Parenthetically, similar reasons to those discussed below were included in the response dated April 22, 2009 (*Response D*).  The Applicant does not believe the Examiner has properly responded to the arguments included in *Response D*. In response to the Applicant's arguments included in *Response D*, the Examiner repeatedly pointed to case law and stated that "one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references."  *Office Action*, 3 (citing *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981) and *In re Merck & Co.*, 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986)).

The Applicant does not disagree with precedent established by the courts. The Applicant's arguments, however, were in direct response to those presented by the Examiner in which the Examiner asserted that certain claim elements were taught by a **single reference**. The Applicant respectfully submits that when the Examiner uses a **single reference** to assert that a **particular claim element** is taught, the Applicant's attack of that singular reference is appropriate to show that the particular claim element is not disclosed by the reference, and that therefore the entire claim is not disclosed or suggested by the prior art.

Dismissing the Applicant's arguments in this manner is improper, at least, because "[w]here the applicant traverses any rejection, the examiner should, if he or she repeats the rejection, take note of the applicant's argument and **answer the substance of it**." MPEP § 707.07(f) (emphasis added); also see *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995) and MPEP § 2145. Answering the substance of the Applicant's arguments is critical because "of the fact that in every case the applicant is entitled to a full and fair hearing, and that **a clear issue** between applicant and examiner should be developed." MPEP § 706.07 (emphasis added).

**1. The cited references fail to disclose a source device that is configured to transmit a media stream, wherein the media stream comprises <u>source-clock information related to an independent clock associated with the source device</u>.**

The combination of *Benslimane* and *Mills* fails to disclose that "the source device is configured to transmit a media stream, the media stream comprising **source-clock information related to an independent clock associated with the source device**," as set forth in independent claims 577 and 590 (emphasis added). The Examiner asserts that *Benslimane* discloses an altered form of this claim

8

element, particularly that "the source device is configured to transmit a media stream, the media stream comprising **a time differential**." *Office Action*, 6 (citing the "Sync message's delta" from *Benslimane*, sect. 3.1.1) (emphasis added). It must be noted that "[a]ll words in a claim must be considered in judging the patentability of that claim against the prior art," not alternative terms of the Examiner's choosing. *In re Wilson*, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970). Nevertheless, as discussed in *Response D*, the Applicant believes that the cited references fail to disclose that "the source device is configured to transmit a media stream, the media stream comprising **source-clock information related to an independent clock associated with the source device**," as set forth in independent claim 590 (emphasis added), for at least the following reasons.

First, the time differential described in claim 590 (not to be confused with the source-clock information related to an independent clock associated with the source device) is not included in the media stream. Instead, the time differential set forth in claim 590 is determined by the playback devices based on information included in the media stream (*i.e.*, the source-clock information) and the independent clocks associated with the playback devices themselves. Therefore, the **time differential** of claim 590 exists at the playback devices and is clearly not comprised by the media stream. As such, the assertion that *Benslimane* discloses "the source device is configured to transmit a media stream, the media stream comprising **a time differential**" is inconsequential.

Second, the media stream set forth in claim 590 cannot be equated to the sync message of *Benslimane*. *Benslimane's* sync message is merely a discrete unit of information (*i.e.*, SYNC($\delta_i$, $d_i$, $\tau_s$, $d^{max}$)). As commonly known and thoroughly described in the record, the term 'media stream' is understood as a continuous sequence of audio or audio-and-video through a network. *Benslimane* is silent with respect to the sync message comprising a continuous sequence of audio or

9

audio-and-video, and is silent with respect the sync message being included in a continuous sequence of audio or audio-and-video. *Benslimane* supports this reasoning by explaining that "[i]n this paper, message broadcasts between the server and the clients are supposed to be **an atomic action where only one message** is taken into account and not n." *Benslimane*, sect. 3 (emphasis added).

Third, the alleged 'time differential' of *Benslimane* (*i.e.*, the sync message's $\delta_i$) is described as the "difference of time between arrival RESPONSE message from $C_i$ and the one having made the maximum delay." *Benslimane*, sect. 3.1.1. Contrastingly, the time differential set forth in claim 590 is "a time differential between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices based on the source-clock information." A time differential between independent clocks of different devices is not disclosed or obvious in view of a difference of time between two messages received by the same device.

Based at least on these remarks, Applicant contends that *Benslimane*, separately or in combination with *Mills*, fails to disclose "wherein the source device is configured to transmit a media stream, the media stream comprising source-clock information related to an independent clock associated with the source device," as set forth in independent claims 577 and 590. Furthermore, Applicant believes the Examiner's assertion that *Benslimane* teaches "wherein the source device is configured to transmit a media stream, the media stream comprising a time differential" is moot because a "media stream comprising a time differential" is not claimed.

**2. The cited references fail to disclose one or more playback devices configured to output a media stream via two or more playback devices in synchrony based on a time differential, wherein the two or more playback devices are in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.**

The combination of *Benslimane* and *Mills* fails to disclose that "the one or more playback devices are configured … to output the media stream via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices," as set forth in claim 590. The Examiner asserts, however, that *Benslimane* discloses this element in that "sect. 3.1.1 provides for calculating restitution time based on playback offset differential," while sect. 3.1.2 "provides for inter-client synchronization." *Office Action*, 6. The Applicant respectfully disagrees with this assertion.

As discussed in *Response D*, the Applicant believes the Examiner is equating a "playback offset differential" with the time differential of claim 590. The Applicant respectfully notes that, in claim 590, the "time differential [is] between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices." Furthermore, the Applicant observes a contradiction in that the Examiner first equates the time differential of claim 590 with the delta of the sync message (*i.e.*, the "$\delta_i$" in SYNC($\delta_i$, $d_i$, $\tau_s$, $d^{max}$)), as discussed above.

Nevertheless, Applicant disagrees that *Benslimane* calculates restitution time based on playback offset differential.  *Benslimane* defines restitution time as:

$$T_{rest\,i}^{\ 1} = h_i + d^{\max} - d_i\,,$$

where $h_i = s_i + \delta_i + 2 \cdot d_i$.  None of the variables that the restitution time is defined by appear to be a playback offset differential.  *Benslimane* defines the constituent variables of the restitution time in sect. 3.1.1. as follows:

$s_i$ = local reception time;

$\delta_i$ = difference of time between arrival RESPONSE message

from $C_i$ and the one having made the maximum delay;

$d_i$ = delay between the server $S$ and the client $C_i$; and

$d^{max}$ = the maximum delay of all clients.

Clearly, *Benslimane* does not calculate restitution time based on playback offset differential, but rather as a combination of local receipt times, arrival times, and delays.  As such, *Benslimane* fails to teach "output[ting] the media stream … in synchrony based on the time differential," as set forth in claim 590.

Based at least on these remarks, Applicant contends that *Benslimane*, separately or in combination with *Mills*, fails to disclose "the one or more playback devices are configured … to output the media stream via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices," as set forth in claim 590.

The Applicant has provided evidence that the combination of the cited references fail to disclose all of the elements claimed in independent claim 590. To support a conclusion that the claim would have been obvious requires that **all** the claimed elements were known in the prior art and that one skilled in the art could have combined those elements. See *KSR International Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1739 (2007)(emphasis added); see also MPEP § 2143. Therefore, claim 590 is patentable over the cited references. Additionally, as independent claims 577 and 600 include similar elements to those of independent claim 590, claims 577 and 600 are likewise patentable for at least the same reasons. Furthermore, as a dependent claim incorporates by reference all the limitations of the claim from which it depends (see 35 U.S.C. § 112 ¶ 4), claims 580-583, 587-588, 592, and 594-598 are patentable for at least the same reasons as the independent claim from which they depend.

The Examiner further asserts that claims 578, 579, 591, and 599 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Benslimane* in view of *Mills*, and further in view of Official Notices (*Office Action*, 10) and that claims 584, 585, and 593 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Benslimane* in view of *Mills*, and further in view of U.S. Pub. No. 2004/0203378 (*Powers*). *Office Action*, 12. The Applicant respectfully traverses these rejections. As a dependent claim incorporates by reference all the limitations of the claim from which it depends (see 35 U.S.C. § 112 ¶ 4), claims 578, 579, 584, 585, 591, 593, and 599 are patentable for at least the same reasons as the independent claim from which they depend.

## CONCLUSION

The Applicants submit this response within two months of the mailing date of the *Office Action* and respectfully request an Advisory Action.

The rejection of claims 577-600 under 35 U.S.C. § 103(a) is overcome because the cited references, in combination and separately, fail to disclose each and every claimed element.

Based on the foregoing remarks, the Applicant believes the rejections to the claims have been overcome, and that the present application is in condition for allowance.  The Examiner is invited to contact the Applicant's undersigned representative with any questions concerning this matter.

Respectfully submitted,
Nicholas A. J. Millington

**September 11, 2009**            By:        /Ian C. Schick/        
Ian C. Schick, Ph.D. (Reg. No. 63,293)
**Carr & Ferrell** *LLP*
2200 Geng Road
Palo Alto, CA  94303
T: 650.812.3400
F: 650.812.3444

U NITED S TATES P ATENT AND T RADEMARK O FFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | PA3445US | 7302 |

22830        7590        09/28/2009
CARR & FERRELL LLP
2200 GENG ROAD
PALO ALTO, CA 94303

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/28/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| | Application No. | Applicant(s) |
|---|---|---|
| ***Advisory Action***<br>***Before the Filing of an Appeal Brief*** | *10/816,217* | MILLINGTON, NICHOLAS  A. J. |
| | Examiner | Art Unit | |
| | JEFFREY NICKERSON | 2442 | |

--The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

THE REPLY FILED 11 September 2009 FAILS TO PLACE THIS APPLICATION IN CONDITION FOR ALLOWANCE.

1. ☒ The reply was filed after a final rejection, but prior to or on the same day as filing a Notice of Appeal. To avoid abandonment of this application, applicant must timely file one of the following replies: (1) an amendment, affidavit, or other evidence, which places the application in condition for allowance; (2) a Notice of Appeal (with appeal fee) in compliance with 37 CFR 41.31; or (3) a Request for Continued Examination (RCE) in compliance with 37 CFR 1.114. The reply must be filed within one of the following time periods:

   a) ☐   The period for reply expires _____months from the mailing date of the final rejection.

   b) ☒   The period for reply expires on: (1) the mailing date of this Advisory Action, or (2) the date set forth in the final rejection, whichever is later.  In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of the final rejection.

       Examiner Note: If box 1 is checked, check either box (a) or (b). ONLY CHECK BOX (b) WHEN THE FIRST REPLY WAS FILED WITHIN TWO MONTHS OF THE FINAL REJECTION. See MPEP 706.07(f).

Extensions of time may be obtained under 37 CFR 1.136(a).  The date on which the petition under 37 CFR 1.136(a) and the appropriate extension fee have been filed is the date for purposes of determining the period of extension and the corresponding amount of the fee.  The appropriate extension fee under 37 CFR 1.17(a) is calculated from: (1) the expiration date of the shortened statutory period for reply originally set in the final Office action; or (2) as set forth in (b) above, if checked.  Any reply received by the Office later than three months after the mailing date of the final rejection, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

<u>NOTICE OF APPEAL</u>

2. ☐ The Notice of Appeal was filed on _____.  A brief in compliance with 37 CFR 41.37 must be filed within two months of the date of filing the Notice of Appeal (37 CFR 41.37(a)), or any extension thereof (37 CFR 41.37(e)), to avoid dismissal of the appeal. Since a Notice of Appeal has been filed, any reply must be filed within the time period set forth in 37 CFR 41.37(a).

<u>AMENDMENTS</u>

3. ☐ The proposed amendment(s) filed after a final rejection, but prior to the date of filing a brief, will <u>not</u> be entered because

   (a)☐ They raise new issues that would require further consideration and/or search (see NOTE below);

   (b)☐ They raise the issue of new matter (see NOTE below);

   (c)☐ They are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal; and/or

   (d)☐ They present additional claims without canceling a corresponding number of finally rejected claims.

       NOTE: _____.  (See 37 CFR 1.116 and 41.33(a)).

4. ☐ The amendments are not in compliance with 37 CFR 1.121. See attached Notice of Non-Compliant Amendment (PTOL-324).

5. ☐ Applicant's reply has overcome the following rejection(s): _____.

6. ☐ Newly proposed or amended claim(s) _____ would be allowable if submitted in a separate, timely filed amendment canceling the non-allowable claim(s).

7. ☒ For purposes of appeal, the proposed amendment(s): a) ☐  will not be entered, or b) ☒  will be entered and an explanation of how the new or amended claims would be rejected is provided below or appended.

   The status of the claim(s) is (or will be) as follows:

   Claim(s) allowed: _____.

   Claim(s) objected to: _____.

   Claim(s) rejected: <u>577-600</u>.

   Claim(s) withdrawn from consideration: _____.

<u>AFFIDAVIT OR OTHER EVIDENCE</u>

8. ☐ The affidavit or other evidence filed after a final action, but before or on the date of filing a Notice of Appeal will <u>not</u> be entered because applicant failed to provide a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented.  See 37 CFR 1.116(e).

9. ☐ The affidavit or other evidence filed after the date of filing a Notice of Appeal, but prior to the date of filing a brief, will <u>not</u> be entered because the affidavit or other evidence failed to overcome <u>all</u> rejections under appeal and/or appellant fails to provide a showing a good and sufficient reasons why it is necessary and was not earlier presented.  See 37 CFR 41.33(d)(1).

10. ☐ The affidavit or other evidence is entered. An explanation of the status of the claims after entry is below or attached.

<u>REQUEST FOR RECONSIDERATION/OTHER</u>

11. ☒ The request for reconsideration has been considered but does NOT place the application in condition for allowance because: <u>See Continuation Sheet.</u>

12. ☐ Note the attached Information *Disclosure* Statement(s). (PTO/SB/08) Paper No(s). _____

13. ☐ Other: _____.

   /Andrew Caldwell/
   Supervisory Patent Examiner, Art Unit 2442

Continuation of 11. does NOT place the application in condition for allowance because:

Re Argument #1a:
Applicant argues the combined teachings fail to render obvious the following "the source device configured to transmit a media stream, the media stream comprising source-clock information related to an independent clock associated with the source device".  During such argument, applicant attacks solely the Benslimane reference.

These arguments are unpersuasive, as applicant ignores all teachings of Mills as utilized in the final rejection.  Benslimane teaches for a source device configured to transmit a media stream (Benslimane: abstract), wherein such media streams contain timing information (Benslimane: pg 457, LHS), and specifically where timing information is a time differential (Benslimane: section 3.1.1).  Thus Benslimane provides for a source device configured to transmit a media stream, the media stream comprising timing information, specifically a time differential.  Mills was cited for teaching timing information comprising source-clock information related to an independent clock associated with the source device (Mills:, section 2, pg 3, LHS, last paragraph).  Thus the combined teachings provide for the above-argued limitation.

Re Argument #1b:
Applicant argues that the combined teachings fail to render obvious the media stream as claimed.

These arguments are unpersuasive.  As indicated above, the combined teachings provide for media streams containing timing information.  A reference supporting sending timing information without a media stream does not imply it does not support sending timing information within a media stream.

Re Argument #2:
Applicant asserts the combined teachings fail to render obvious the following "outputting the media stream via two or more playback devices in synchrony based on the time differential, the two or more playback….".  Applicant attacks solely the Benslimane reference.

These arguments are unpersuasive.  As indicated in the final rejection, both mills and benslimane are cited for the rejection of this claim.  Benslimane was cited for outputting a stream via two playback devices in synchrony based on a time differential… (Benslimane: section 3.1.1-3.1.2).  Mills was cited for teaching the timing differential being that of the claimed, as indicated above, and cited in the final rejection (Mills: pg 3, LHS; section 2.1, pg 3, RHS).

Applicants arguments are ultimately unpersuasive and, therefore, the rejection of these claims are hereby maintained as indicated in the Final Rejection.

Doc Code: AP.PRE.REQ

PTO/SB/33 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# PRE-APPEAL BRIEF REQUEST FOR REVIEW

| Docket Number (Optional) |
|---|
| PA3445US |

| I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to "Mail Stop AF, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450" [37 CFR 1.8(a)] | Application Number | Filed |
|---|---|---|
| | 10/816,217 | 2004-04-01 |
| on _____ | First Named Inventor | |
| Signature_____ | Nicholas A. J. Millington | |
| Typed or printed name _____ | Art Unit | Examiner |
| | 2442 | Jeffrey L. Nickerson |

Applicant requests review of the final rejection in the above-identified application.  No amendments are being filed with this request.

This request is being filed with a notice of appeal.

The review is requested for the reason(s) stated on the attached sheet(s).
Note:  No more than five (5) pages may be provided.

I am the

☐ applicant/inventor.

☐ assignee of record of the entire interest.
See 37 CFR 3.71. Statement under 37 CFR 3.73(b) is enclosed.
(Form PTO/SB/96)

☑ attorney or agent of record.
Registration number _____63,293_____.

☐ attorney or agent acting under 37 CFR 1.34.

Registration number if acting under 37 CFR 1.34 _____

/Ian C. Schick/
_____
Signature

Ian C. Schick
_____
Typed or printed name

650-812-3400
_____
Telephone number

October 13, 2009
_____
Date

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required.
Submit multiple forms if more than one signature is required, see below*.

☐ *Total of _____ forms are submitted.

This collection of information is required by 35 U.S.C. 132. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11, 1.14 and 41.6. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Mail Stop AF, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| **APPLICANT:** | Nicholas A. J. Millington |
| **APPLICATION NO. :** | 10/816,217 |
| **FILING DATE:** | April 1, 2004 |
| **TITLE:** | System and Method for Synchronizing Operations among a Plurality of Independently Clocked Digital Data Processing Devices |
| **EXAMINER:** | Jeffrey L. Nickerson |
| **ART UNIT:** | 2442 |
| **CONF. NO.:** | 7302 |
| **ATTY. DKT. NO.:** | PA3445US |

### BRIEF IN SUPPORT OF PRE-APPEAL REQUEST FOR REVIEW

In the final office action mailed July 13, 2009 (*Final Action*), the Examiner asserts that independent claims 577, 590, and 600 are rejected under 35 U.S.C. § 103(a) as being unpatentable over "A Multimedia Synchronization Protocol for Multicast Groups" (*Benslimane*) in view of "Precision Synchronization of Computer Network Clocks" (*Mills*). This rejection was maintained in the advisory action mailed September 28, 2009 (*Advisory Action*). The Applicant respectfully disagrees and requests pre-appeal review.

**ERROR I:** **The Examiner failed to properly respond to arguments provided by the Applicant thus denying a full and fair hearing.**

The Section 103 rejection included in the *Final Action* is essentially a restatement of the rejection included in the office action mailed January 22, 2009 (*Office Action*). The Applicant provided arguments against the Section 103 rejection in the response dated April 22, 2009 (*Response D*). The Applicant does not believe the Examiner properly responded to the arguments included in *Response D* in the *Final Action*. Instead, the Examiner repeatedly pointed to case law and stated that "one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references." *Final Action*, 3 (citing *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981) and *In re Merck & Co.*, 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986)). This view was reiterated in the *Advisory Action*.

1

The Applicant does not disagree with precedent established by the courts. The Applicant's arguments, however, were in direct response to the Examiner's assertion that certain claim elements were taught by a **single reference**. For example, the Examiner asserts that *Benslimane* discloses "output[ing] the media stream via two or more playback devices in synchrony," as set forth in claim 590. *Office Action*, 6. The Applicant respectfully submits that when the Examiner uses a **single reference** to assert that a **particular claim element** is taught, the Applicant's attack of that singular reference is appropriate to show that the particular claim element is not disclosed by the reference, and that therefore the entire claim is not disclosed or suggested by the prior art.

Dismissing the Applicant's arguments in this manner is improper, at least, because "[w]here the applicant traverses any rejection, the examiner should, if he or she repeats the rejection, take note of the applicant's argument and **answer the substance of it**." MPEP § 707.07(f) (emphasis added); also see *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995) and MPEP § 2145. Answering the substance of the Applicant's arguments is critical because "of the fact that in every case the applicant is entitled to a full and fair hearing, and that **a clear issue** between applicant and examiner should be developed." MPEP § 706.07 (emphasis added).

**ERROR II:** **The Examiner cannot support a rejection solely by alleging that a cited reference discloses subject matter that is outside the scope of the claims.**

To support a conclusion that the claim would have been obvious requires that **all the claimed elements** were known in the prior art and that one skilled in the art could have combined those elements. See *KSR International Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1739 (2007)(emphasis added); see also MPEP § 2143. Independent claim 590, for example, sets forth that "the source device is configured to transmit a media stream, the media stream comprising **source-clock information related to an independent clock associated with the source device**" (emphasis added). In the *Office Action* and the *Final Action*, the Examiner substitutes a portion of this claim language for a phrase that severely alters the meaning and implication of the claim as a whole, and asserts that *Benslimane* discloses this altered form of the claim language to support the Section 103 rejection. Particularly, the Examiner asserts that *Benslimane* discloses

2

that "the source device is configured to transmit a media stream, the media stream comprising **a time differential**." *Final Action*, 6 (citing the "Sync message's delta" from *Benslimane*, sect. 3.1.1) (emphasis added). The Applicant respectfully submits that the Examiner cannot support a rejection by alleging that a cited reference discloses subject matter that is outside the scope of the claims.

The **time differential** described in claim 590 (not to be confused with the **source-clock information related to an independent clock associated with the source device**) is not included in the media stream. Instead, the time differential is determined by the playback devices based on information included in the media stream (*i.e.*, the source-clock information) and the independent clocks associated with the playback devices themselves. Therefore, the **time differential** exists at the playback devices and is clearly **not** comprised by the media stream. As such, the assertion that *Benslimane* discloses "the source device is configured to transmit a media stream, the media stream comprising **a time differential**" is inconsequential and cannot be used to support the rejection under Section 103 because a "media stream comprising a time differential" is not claimed.

**ERROR III:  The cited references do not disclose all of the claimed elements and therefore cannot support an obviousness rejection.**

As noted above, to support a conclusion that the claim would have been obvious requires that **all the claimed elements** were known in the prior art and that one skilled in the art could have combined those elements. See *KSR International Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1739 (2007)(emphasis added); see also MPEP § 2143. The Applicant maintains that the cited references describe approaches for solving unrelated problems and fail to disclose all of the claimed elements. Specifically, *Mills* merely discloses a network time protocol to synchronize network clocks, whereas *Benslimane* merely discloses network synchronization by measuring network propagation delays. The Applicant contends that the approaches disclosed by the references—separately or combined—would not yield synchronized consumption of data across multiple clients (*i.e.*, "output[ting] the media stream via two or more playback

devices in synchrony," as set forth in claim 590).  This contention is supported, at least, by the
evidence provided below.

The media stream set forth in the claims cannot be equated to the sync message of
*Benslimane*, as asserted by the Examiner.  *Final Action*, 6.  *Benslimane's* sync message is merely a
discrete unit of information (*i.e.*, SYNC($\delta_i$, $d_i$, $\tau_s$, $d^{max}$)).  As commonly known and thoroughly
described in the record, the term 'media stream' is understood as a continuous sequence of
audio or audio-and-video through a network.  *Benslimane* is silent with respect to the sync
message comprising a continuous sequence of audio or audio-and-video, and is silent with
respect the sync message being included in a continuous sequence of audio or audio-and-
video.  The Examiner attempts to defend this clear shortcoming stating that "a reference
supporting sending timing information without a media stream does not imply it does not
support sending timing information within a media stream."  *Advisory Action*, continuation
sheet.  *Benslimane* supports the Applicant's reasoning and directly contradicts the Examiner's
reasoning by explaining that "[i]n this paper, message broadcasts between the server and the
clients are supposed to be an **atomic action** where only **one message** is taken into account and
**not n**" (*Benslimane*, sect. 3 (emphasis added)), thus arguably teaching away from the claimed
invention.  See *In re Geisler*, 116 F.3d 1465, 1471, 43 USPQ2d 1362, 1366 (Fed. Cir. 1997).

The time differential set forth in the claims cannot be equated to the sync message's $\delta_i$ of
*Benslimane*, as asserted by the Examiner.  *Final Action*, 6.  The sync message's $\delta_i$ is described as
the "difference of time between arrival RESPONSE message from $C_i$ and the one having made
the maximum delay."  *Benslimane*, sect. 3.1.1.  Contrastingly, the time differential set forth in
claim 590 is "a time differential between the independent clock associated with the source
device and one or more independent clocks associated with the one or more playback devices
based on the source-clock information."  A time differential between independent clocks of
different devices is not disclosed or obvious in view of a difference of time between two
messages received by the same device.

The combination of *Benslimane* and *Mills* fails to disclose "output[ting] the media stream
via two or more playback devices in synchrony **based on the time differential**," as set forth in
claim 590.  The Examiner asserts, however, that *Benslimane* discloses this element in that "sect.

4

3.1.1 provides for calculating restitution time based on playback offset differential," while sect. 3.1.2 "provides for inter-client synchronization." *Final Action*, 6. The Applicant respectfully disagrees at least because a "playback offset differential" cannot be equated to the time differential of claim 590. (The Applicant notes a contradiction in the Examiner's reasoning in that the time differential of claim 590 was first equated with the delta of the sync message (*i.e.*, the "$\delta_i$" in SYNC($\delta_i$, $d_i$, $\tau_s$, $d^{max}$)), as discussed above.) The Applicant respectfully submits that, in claim 590, the "time differential [is] between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices." Furthermore, *Benslimane* clearly does not calculate restitution time based on playback offset differential. *Benslimane* defines restitution time as $T_{rest\,i}^{\,1} = h_i + d^{max} - d_i$, where $h_i = s_i + \delta_i + 2 \cdot d_i$. None of the variables that the restitution time is defined to be a playback offset differential ($s_i$ = local reception time; $\delta_i$ = difference of time between arrival RESPONSE message from $C_i$ and the one having made the maximum delay; $d_i$ = delay between the server $S$ and the client $C_i$; and $d^{max}$ = the maximum delay of all clients). Clearly, *Benslimane* does not calculate restitution time based on playback offset differential, but rather as a combination of local receipt times, arrival times, and delays. As such, *Benslimane* fails to teach "output[ting] the media stream … in synchrony based on the time differential," as set forth in claim 590.

The Applicant respectfully requests the passage of the present application to allowance. The Examiner is invited to contact the Applicant's undersigned representative with any questions concerning this matter.

Respectfully submitted,
Nicholas A. J. Millington

**October 13, 2009**                    By:    _____/Ian C. Schick/_____
                                               Ian C. Schick, Ph.D. (Reg. No. 63,293)
                                               **CARR & FERRELL** *LLP*
                                               2200 Geng Road
                                               Palo Alto, CA  94303
                                               T: 650.812.3400
                                               F: 650.812.3444

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| **APPLICANT:** | Nicholas A. J. Millington |
| **APPLICATION NO.:** | 10/816,217 |
| **FILING DATE:** | April 1, 2004 |
| **TITLE:** | System and Method for Synchronizing Operations among a Plurality of Independently Clocked Digital Data Processing Devices |
| **EXAMINER:** | Jeffrey L. Nickerson |
| **ART UNIT:** | 2442 |
| **CONF. NO.:** | 7302 |
| **ATTY. DKT. NO.:** | PA3445US |

MAIL STOP AF
COMMISSIONER FOR PATENTS
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450

### RESPONSE F and REQUEST FOR CONTINUED EXAMINATION

Examiner Nickerson:

In response to the final office action mailed July 13, 2009 (*Office Action*) and the *Notice of Panel Decision from Pre-Appeal Brief Review* mailed **December 8, 2010**, please consider the following **remarks**. A **listing of the claims** begins on **page two**. The Applicant's **remarks** in response to the *Office Action* begin on **page seven**. The Applicant's **conclusions** as to the allowability of this application appear on **page fourteen**. A Request for Continued Examination and any required extension fees are submitted concurrently with this Response.

# CLAIMS

The claims are pending as follows.

1-576. (Canceled)

577. (Currently Amended) A method for synchronizing media playback, the method comprising:

receiving a media stream from a source device via a network, the source device being one of a plurality of devices in communication via the network, the media stream comprising source-clock information related to ~~an~~ a first independent clock associated with the source device and media data;

determining a time differential between the first independent clock associated with the source device and one or more second independent clocks associated with one or more playback devices, the time differential based on the source-clock information received from the source device, each of the one or more playback devices being one of the plurality of devices; and

outputting the media stream media data via two or more playback devices in synchrony based on the time differential determined based on the source-clock information, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

578. (Previously presented) The method of claim 577, further comprising controlling one or more of the plurality of devices via a user interface module.

579. (Previously presented) The method of claim 577, further comprising providing status information associated with one or more of the plurality of devices.

580. (Previously presented) The method of claim 577, further comprising adding an additional device to the plurality of devices.

581. (Previously presented) The method of claim 580, wherein the additional device replaces the source device as a new source device.

582. (Previously presented) The method of claim 580, wherein the additional device joins the one or more playback devices as a new playback device.

583. (Previously presented) The method of claim 577, further comprising removing a device from the plurality of devices without interrupting the outputting of the media stream via the two or more playback devices.

584. (Previously presented) The method of claim 577, further comprising converting the source device into one of the one or more playback devices, and converting one of the one or more playback devices into the source device.

585. (Previously presented) The method of claim 584, wherein the tightly coupled synchrony is uninterrupted.

586. (Previously presented) The method of claim 577, further comprising adjusting a clock rate of the one or more independent clocks associated with one or more playback devices.

587. (Previously presented) The method of claim 577, wherein determining the time differential is performed periodically.

588. (Previously presented) The method of claim 577, wherein receiving the media stream is performed by a unicast transmission methodology.

589. (Previously presented) The method of claim 577, wherein receiving the media stream is performed by a multicast transmission methodology.

590. (Currently Amended) A system for synchronizing media playback, the system comprising:

a plurality of devices configured to be in communication via a network, the plurality of devices comprising a source device and one or more playback devices;

wherein the source device is configured to transmit a media stream, the media stream comprising media data and source-clock information related to an a first independent clock associated with the source device; and

wherein the one or more playback devices are configured to determine a time differential between the first independent clock associated with the source device and one or more second independent clocks associated with the one or more playback devices, the time differential based on the source-clock information, the one or more playback devices further configured to and to output the media stream via two or more playback devices media data in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

591. (Previously presented) The system of claim 590, further comprising a user interface module configured to control one or more of the plurality of devices.

592. (Previously presented) The system of claim 590, wherein the plurality of devices are further configured such that devices can be added and removed from the plurality of devices without interrupting the tightly coupled synchrony.

593. (Previously presented) The system of claim 590, wherein the source device is further configured to be converted into one of the one or more playback devices, and at least one of the one or more playback devices is further configured to be converted into the source device.

594. (Previously presented) The system of claim 590, wherein a clock rate of the one or more independent clocks associated with the one or more playback devices is adjustable.

595. (Previously presented) The system of claim 590, wherein the media stream comprises audio information.

596. (Previously presented) The system of claim 590, wherein the media stream comprises video information.

597. (Previously presented) The system of claim 590, wherein the source-clock information comprises a timestamp.

598. (Previously presented) The system of claim 590, wherein one or more playback devices are operable with one or more of unicast transmission or multicast transmission.

599. (Previously presented) The system of claim 590, wherein the source device is further configured to output the media stream in tightly coupled synchrony with the one or more playback devices.

600. (Currently Amended) A machine readable storage medium having embodied thereon a program, the program providing instructions for a method for synchronizing media playback, the method comprising:

receiving a media stream from a source device via a network, the source device being one of a plurality of devices in communication via the network, the media stream comprising source-clock information related to ~~an~~ a first independent clock associated with the source device and media data;

determining a time differential between the first independent clock associated with the source device and one or more second independent clocks associated with one or more playback devices, the time differential based on the source-clock information, each of the one or more playback devices being one of the plurality of devices; and

outputting the media stream media data via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

## REMARKS

Claims 577-600 were previously pending.  Claims 577, 590 and 600 are amended herein.  Claims 577-600 are pending in the present application.  In view of the following remarks, the Applicant respectfully requests reconsideration of the rejections and allowance of the application.

### Examiner Interview

The Examiner and the Applicant's agent engaged in a telephonic interview on April 8, 2010.  During the interview, the patentability of representative claim 1 was discussed in view of proposed amendments and arguments.  No agreement was reached regarding the patentability of pending claims.  The Applicant thanks the Examiner for the interview.

### Rejections under 35 U.S.C. § 103

The Examiner asserts that claims 577, 580-583, 587-590, 592, 594-598, and 600 are rejected under 35 U.S.C. § 103(a) as being unpatentable over "A Multimedia Synchronization Protocol for Multicast Groups" (*Benslimane*) in view of "Precision Synchronization of Computer Network Clocks" (*Mills*).  *Office Action*, 5 (also see *Office Action*, 9 with respect to claim 586).  The Applicant respectfully disagrees with the rejection for at least the reasons discussed below.

*In re Keller*

The Applicant notes that the Examiner's response to selected portions of Applicant's arguments was to indicate "one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references.  See *In re Keller*, 642, F.2d 413, 208 USPQ 871

7

(CCPA 1981); In re Merck & Co., 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986)." *Office Action*, 3. To expedite prosecution, the Applicant has addressed each reference cited against the pending claims below. Accordingly, the Applicant respectfully requests the Examiner address the substance of the Applicant's remarks for each claim element.

*The cited references fail to disclose a source device that is configured to transmit a media stream, wherein the media stream comprises source-clock information related to an independent clock associated with the source device and media data.*

**Benslimane** and **Mills** **fails to disclose a source device configured to transmit a "media stream" comprising "source-clock information related to an independent clock associated with the source device" and "media data"** as set forth in independent claims 577 and 577 (emphasis added). *Benslimane* discloses a protocol for estimating synchronization times for devices based on a messaging hand-shake mechanism. A request message is sent by a source to receivers. The receivers receive the message and send a response message to the source. The source receives the response messages from the receivers and notes the slowest response. *Benslimane,* § 3.1.1. Clients restitute and transmit subsequently received media data based on a "SYNC message" that includes an arrival time period, delay, transmission rate, and maximal delay received from the source and determined via messages. *Benslimane,* § 3.1.1.

*Mills* discloses a mechanism for synchronizing computer clocks over the Internet. *Mills*, Abstract. A Network Time Protocol (NTP) requires a server to send a time-stamped message to subnet peers via Internet topology. Each subnet peer receives and returns the message via the topology comprising the Internet, wherein the messages include a time stamp added by the subnet peer. One of

the subnets is designated as providing the most accurate time based on interval intersections and clustering and likelihood principles. *Mills*, § 2, p. 2-3.

*Benslimane* does not disclose a source device that transmits a "media stream" which includes both "source clock information" related to a source device independent clock and "media data" as recited in claim 577. *Benslimane* discloses transmitting messages by a server to a client and determining delay time based on return messages received by the server from each client. There is no disclosure in *Benslimane* that the "messages" include any "source-clock information" or that they include "media data" as claimed in claim 577.

*Mills* does not cure the deficiencies of *Benslimane* with respect to a media stream which includes both "source clock information" related to a source device independent clock and "media data." Similar to *Benslimane*, *Mills* discloses transmitting "messages" between a server and subnet; the "messages" are to identify a subnet suitable to provide an accurate time over the topology of the Internet. There is no disclosure in Mills that Internet-based messages between a server and a subnet include "media data."

**Benslimane does not disclose a time differential determined by the playback devices based on information included in the media stream (*i.e.*, the source-clock information) and the independent clocks associated with the playback devices** themselves as set forth in claim 577. Therefore, the **time differential** of claim 577 is determined at the **playback devices**. *Benslimane* discloses determining an arrival time period by a "server" which records the time a message is sent and the time a corresponding response arrives at the server; the arrival time period is determined *independently* of any clock in the client. As such, *Benslimane* does not disclose "**determining a time differential** between the first independent clock associated with the source device and one or

9

more **second independent clocks associated with one or more playback devices**" wherein the "time differential based on the source-clock information received from the source device" as recited in claim 25.

**Combining the systems of *Benslimane* and *Mills* would not make the subject matter of claim 25 obvious**. *Benslimane* discloses clients that restitute and transmit received media data based on a "SYNC message" generated from the roundtrip arrival time of a message sent by a server to a client. *Mills* discloses transmitting messages between a server and subnet to determine which subnet provides an accurate time over the Internet. The combination of *Benslimane* and *Mills* would result in Internet-based client devices that restitute and transmit received media data based on a "SYNC message" derived from roundtrip arrival data of "messages" sent between an Internet server and the Internet-based client. The combination of *Benslimane* and *Mills* does not teach that a "media stream" includes any "source-clock information" and "media data" as claimed in claim 577.

**The Applicant respectfully disagrees with the Examiner's interpretation of *Benslimane* and *Mills* with respect to disclosing a "media stream."** In support of the rejection of claim 577, the Examiner indicates that *Benslimane* discloses a "source device configured to transmit a media stream." *Benslimane* discloses that a "message" is sent from a server to a client device, and a message is returned by the client to the server. *Benslimane*, § 3.1.1, at "Description." There is no disclosure that the "message" of *Benslimane* is a media stream. *Mills* similarly discloses sending a singular "message" without any media; there is no disclosure in Mills regarding transmitting media data via a media stream.

The Examiner appears to suggest that under the broadest reasonable interpretation, a stream of media may include a single message with no media. The Applicant respectfully disagrees. "Media" is widely known to those of ordinary skill in the art of data processing and transmission to include images, audio and video, and "stream" is likewise known by those of ordinary skill in the art as a continuous transfer. (see *Benslimane*, § 1, Introduction, LHS). Notwithstanding the commonly understood meaning of "media stream," the Applicant has amended claim 1 to indicate that a media stream includes "media data" in addition to the "source-clock information."

*The cited references fail to disclose one or more playback devices configured to output a media stream via two or more playback devices in synchrony based on a time differential, wherein the two or more playback devices are in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.*

The combination of *Benslimane* and *Mills* fails to disclose that "the one or more playback devices are configured … to output the media stream via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices," as set forth in claim 577. The Examiner asserts, however, that *Benslimane* discloses this element in that "sect. 3.1.1 provides for calculating restitution time based on playback offset differential," while sect. 3.1.2 "provides for inter-client synchronization." *Office Action*, 6. The Applicant respectfully disagrees with this assertion.

*Mills* also fails to disclose this element, at least because there is no indication in *Mills* that any media is sent to the subnets.

As discussed in *Response D*, the Applicant believes the Examiner is equating a "playback offset differential" with the time differential of claim 577. **"Playback offset differential" is disclosed in *Benslimane*, not the claimed embodiments, and is addressed herein to explain why *Benslimane* fails to teach "output[ting] the media stream … in synchrony based on the time differential," as set forth in claim 577.** The Applicant respectfully notes that, in claim 577, the "time differential [is] between the independent clock associated with the source device and one or more independent clocks associated with the one or more playback devices." Furthermore, the Applicant observes a contradiction in that the Examiner first equates the time differential of claim 577 with the delta of the sync message (*i.e.*, the "$\delta_i$" in SYNC($\delta_i$, $d_i$, $\tau_s$, $d^{max}$)), as discussed above.

Nevertheless, Applicant disagrees that *Benslimane* calculates restitution time based on playback offset differential. *Benslimane* defines restitution time as:

$$T_{rest\,i}^{\;1} = h_i + d^{max} - d_i,$$

where $h_i = s_i + \delta_i + 2 \cdot d_i$. None of the variables that the restitution time is defined by appear to be a playback offset differential. *Benslimane* defines the constituent variables of the restitution time in sect. 3.1.1. as follows:

$s_i$ = local reception time;

$\delta_i$ = difference of time between arrival RESPONSE message from $C_i$ and the one having made the maximum delay;

$d_i$ = delay between the server $S$ and the client $C_i$; and

$d^{max}$ = the maximum delay of all clients.

Clearly, *Benslimane* does not calculate restitution time based on playback offset differential, but rather as a combination of local receipt times, arrival times, and

delays.  Moreover, as mentioned above, there is no disclosure in *Mills* regarding outputting any media stream whatsoever.  **As such, *Benslimane* and *Mills* fails to teach "output[ting] the media stream … in synchrony based on the time differential," as set forth in claim 577.**

The Applicant has provided evidence that the combination of the cited references fail to disclose all of the elements claimed in independent claim 590. Therefore, claim 577 is patentable over the cited references.

Independent claims 590 and 600 include similar patentable elements to those of independent claim 577 and are likewise patentable for at least the same reasons.  Furthermore, as a dependent claim incorporates by reference all the limitations of the claim from which it depends (see 35 U.S.C. § 112 ¶ 4), claims 580-583, 587-588, 592, and 594-598 are patentable for at least the same reasons as the independent claim from which they depend.

The Examiner further asserts that claims 578, 579, 591, and 599 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Benslimane* in view of *Mills*, and further in view of Official Notices (*Office Action*, 10) and that claims 584, 585, and 593 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Benslimane* in view of *Mills*, and further in view of U.S. Pub. No. 2004/0203378 (*Powers*).  *Office Action*, 12.  The Applicant respectfully traverses these rejections. As a dependent claim incorporates by reference all the limitations of the claim from which it depends (see 35 U.S.C. § 112 ¶ 4), claims 578, 579, 584, 585, 591, 593, and 599 are patentable for at least the same reasons as the independent claim from which they depend.

## CONCLUSION

The rejection of claims 577-600 under 35 U.S.C. § 103(a) is overcome because the cited references, in combination and separately, fail to disclose each and every claimed element.

A Request for Continued Examination and any extension fees required are included herewith this Response.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-0600 for any matter in connection with this response, including any fee for extension of time, which may be required.

Based on the foregoing remarks, the Applicant believes the rejections to the claims have been overcome, and that the present application is in condition for allowance. The Examiner is invited to contact the Applicant's undersigned representative with any questions concerning this matter.

Respectfully submitted,
Nicholas A. J. Millington

**May 7, 2010**            By:            /Steve Bachmann/
                                    Steve Bachmann (Reg. No. 50,806)
                                    **Carr & Ferrell** *LLP*
                                    2200 Geng Road
                                    Palo Alto, CA  94303
                                    T: 650.812.3400
                                    F: 650.812.3444

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | PA3445US | 7302 |

22830        7590        06/25/2010
CARR & FERRELL LLP
2200 GENG ROAD
PALO ALTO, CA 94303

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/25/2010 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 10/816,217 | MILLINGTON, NICHOLAS A. J. |
| | Examiner | Art Unit | |
| | JEFFREY NICKERSON | 2442 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>07 May 2010</u>.

2a)☐ This action is **FINAL**.      2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>577-600</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>577-600</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
Paper No(s)/Mail Date <u>12 May 2010</u>.

4)☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

Application/Control Number: 10/816,217                                      Page 2
Art Unit: 2442

## DETAILED ACTION

1.      This communication is in response to Application No. 10/816,217 filed on 01 April

2004 with a domestic priority date of 28 July 2003. The request for continued

examination presented on 07 May 2010, which provides change to claims 577, 590, and

600, and presents arguments, is hereby acknowledged. Claims 577-600 are currently

pending and have been examined.

### *35 USC § 112*

2.      The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of
> making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the
> art to which it pertains, or with which it is most nearly connected, to make and use the same and shall
> set forth the best mode contemplated by the inventor of carrying out his invention.

### *Claim Rejections*

3.      Claims 577-600 are rejected under 35 U.S.C. 112, first paragraph, because the

specification, while being enabling for "outputting the media stream media data …

based on the time differential and source-clock information", does not reasonably

provide enablement for "outputting the media stream media data … based on the time

differential determined based on the source-clock information" when the source-clock

information is within the media stream.  The specification does not enable any person

skilled in the art to which it pertains, or with which it is most nearly connected, to make

or use the invention commensurate in scope with these claims.

Application/Control Number: 10/816,217                                          Page 3
Art Unit: 2442

Applicant's disclosure has been carefully examined to determine the scope of applicant's invention.  Applicant discloses sending a media stream from a source to a receiver, the media streams being embedded with *timestamp data* as a time for presentation of the data, the timestamp being a source's time for playback relative to the source clock (Specification: for instance, pg 30, second paragraph; pg 37, second paragraph).  The receiver then uses SNTP to calculate a clock differential between the source clock and the receiver clock (Specification: for instance, pg 17, first paragraph). The receiver then calculates a local presentation time for playback relative to its own local clock using the timestamp data and the clock differential (Specification: for instance, pg 17, first paragraph; pg 51, second paragraph).

Applicant's claim, however, recites calculating the differential based on "source-clock information" within the media stream.  If the "source-clock information" is interpreted as being the source's clock time, then applicant's disclosure does not support piggybacking the source's clock data time within the media stream (it instead specifically recites using separate SNTP transactions to obtain it; pg 18, second paragraph).  If the "source-clock information" is interpreted as being the timestamp indicating the time for playback relative to the source clock (which the examiner believes in the correct interpretation, see for instance claim 597), then the applicant's disclosure does not support determining the differential based on the "source-clock information" of the media stream.

Application/Control Number: 10/816,217                                    Page 4

Art Unit: 2442

### *35 USC § 103*

4.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

### *Response to Arguments*

5.      Applicant's amendments and arguments, with respect to the rejections under 35

USC 103(a), have been fully considered but are moot in view of the new grounds of

rejection.

### *Claim Rejections*

6.      Claims 577, 586-587, 589-591, 594-595, 597-598, and 600 are rejected under 35

U.S.C. 103(a) as being unpatentable over Goddard (US 7,324,857 B2), and in further

view of Mills ("Precision Synchronization of Computer Network Clocks", 1994).

Regarding claim 590, Goddard teaches a system for synchronizing media playback

(Goddard: abstract), comprising:

a plurality of devices configured to be in communication via a network, the

plurality of devices comprising a source device and one or more playback devices

(Goddard: abstact; Figure 1);

Application/Control Number: 10/816,217                                    Page 5
Art Unit: 2442

wherein the source device is configured to transmit a media stream, the media stream comprising control information relating to timing information of the source device and media data (Goddard: col 4, lines 35-64 for sending command packets within audio stream, the command packets being related to the eventual differential calculation);

wherein the source device determines a time differential between a first time value associated with the source device and one or more second time values associated with one or more playback devices (Goddard: col 4, lines 35-64 provides for determining time difference for each receiver), the time differential based on the control information (Goddard: col 4, lines 35-64 provides for time difference being obtained);

outputting the media stream media data via two or more playback devices in synchrony based on the time differential determined based on the control information (Goddard: col 4, lines 35-64 provides the playback devices adjust their playback times accordingly), the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices (Goddard: abstract; col 1, lines 54-58).

Goddard does not teach wherein the control information is source-clock information related to a first independent clock associated with the source device;

wherein determining a time differential is between a first time value and one or more second time values comprising determining a time differential between a first independent clock and one or more second independent clocks; or

wherein the receiving device determines the timing differential.

Application/Control Number: 10/816,217                                    Page 6
Art Unit: 2442

Mills, in a similar field of endeavor, teaches wherein the control information is

source-clock information related to a first independent clock associated with the source

device (Mills: section 2, specifically pg 3, LHS, last paragraph); and

wherein determining a time differential is between a first time value and one or

more second time values comprising determining a time differential between a first

independent clock and one or more second independent clocks (Mills: pg 3, LHS;

section 2.1, specifically pg 3 RHS, last paragraph to start of section 3); and

wherein the receiving devices determines the timing differential (Mills: pg 2,

section 2, first paragraph).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Mills for having the clients pull clock

information required for clock synchronization. The teachings of Mills, when

implemented in the Goddard system, will allow one of ordinary skill in the art to have the

playback devices pull NTP information from the source. One of ordinary skill in the art

would be motivated to utilize the teachings of Mills in the Goddard system in order to

synchronize the clocks of the source and playback devices by allowing the playback

device to calculate the timing differential.

Regarding claim 591, the Goddard/Mills system teaches further comprising a user

interface module configured to control one or more of the plurality of devices (Goddard:

col 5, lines 31-55).

Application/Control Number: 10/816,217                                      Page 7

Art Unit: 2442

Regarding claim 594, the Benslimane/Mills system teaches wherein a clock rate of the one or more independent clocks associated with the one or more playback devices is adjustable (Mills: pg 3, LHS provides for adjustable frequency NCOs; See also section 2.1, paragraphs 1-3).

Regarding claim 595, the Goddard/Mills system teaches wherein the media stream comprises audio information (Goddard: abstract).

Regarding claim 597, the Goddard/Mills system teaches wherein the source-clock information comprises a timestamp (Mills: pg 2, RHS, last paragraph).

Regarding claim 598, the Goddard/Mills system teaches wherein one or more playback devices are operable with one or more of unicast transmission or multicast transmission (Goddard: col 1, lines 59-67).

Regarding claim 577, this method claim contains limitations found within that of claim 590 and the same rationale of rejection is used, where applicable.

Regarding claim 578, this method claim contains limitations found within that of claim 591 and the same rationale of rejection is used, where applicable.

Application/Control Number: 10/816,217                                    Page 8
Art Unit: 2442

Regarding claim 586, this method claim contains limitations found within that of claim

594 and the same rationale of rejection is used, where applicable.


Regarding claim 587, the Goddard/Mills system teaches wherein determining the time

differential is performed periodically (Mills: pg 3 LHS, last paragraph; pg 3, LHS, last

paragraph).


Regarding claim 589, the Goddard/Mills system teaches wherein receiving the media

stream is performed by a multicast transmission methodology (Goddard: col 1, lines 59-

67).


Regarding claim 600, this machine readable medium claim contains limitations found

within that of claim 590 and the same rationale of rejection is used, where applicable.


7.      Claims 580-583, 592, and 596 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Goddard (US 7,324,857 B2); in view of Mills ("Precision

Synchronization of Computer Network Clocks", 1994); and in further view of Benslimane

("A Multimedia Synchronization Protocol for Multicast Groups", 2000).


Regarding claim 592, the Goddard/Mills system does not teach wherein the plurality of

devices are further configured such that devices can be added and removed from the

plurality of devices without interrupting the tightly coupled synchrony.

Application/Control Number: 10/816,217                                     Page 9
Art Unit: 2442

Benslimane, in a similar field of endeavor, teaches wherein the plurality of

devices are further configured such that devices can be added and removed from the

plurality of devices without interrupting the tightly coupled synchrony (Benslimane:

section 4).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Benslimane for enabling clients to join the

multicast group without interrupting synchrony. The teachings of Benslimane, when

implemented in the Goddard/Mills system, will allow one of ordinary skill in the art to

have new clients join a multicast group that is pulling clocking information from a source

device. One of ordinary skill in the art would be motivated to utilize the teachings of

Benslimane in the Goddard/Mills system in order to enable new users to join the

playback group.

Regarding claim 596, the Benslimane/Mills system teaches wherein the media stream

comprises video information (Benslimane: abstract).

Regarding claim 580, this method claim contains limitations found within that of claim

592 and the same rationale of rejection is used, where applicable.

Regarding claim 581, the Benslimane/Mills system teaches wherein the additional

device replaces the source device as a new source device (Mills: pg 2, Figure 1

Application/Control Number: 10/816,217                                          Page 10
Art Unit: 2442

provides for nested multicast groups; Benslimane: section 4 provides for adding and

leaving).


Regarding claim 582, the Benslimane/Mills system teaches wherein the additional

device joins the one or more playback devices as a new playback device (Benslimane:

section 4 for adding and leaving).


Regarding claim 583, this method claim contains limitations found within that of claim

592 and the same rationale of rejection is used, where applicable.


8.      Claims 578-579, 591, and 599 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Goddard (US 7,324,857 B2), in view of Mills ("Precision

Synchronization of Computer Network Clocks", 1994), and in further view of Official

Notice.


Regarding claim 579, the Goddard/Mills system does not teach further comprising

providing status information associated with one or more of the plurality of devices.

        An official notice is taken that such use of providing status information for aid in

awareness of controlled devices was well known in the art at the time the invention was

made by one of ordinary skill in the art.

        It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize these known teachings for providing status information.

Application/Control Number: 10/816,217                                    Page 11
Art Unit: 2442

These known teachings, when implemented in the Goddard/Mills system, will allow one

of ordinary skill in the art to monitor the statuses of the playback devices with the source

device. One of ordinary skill in the art would be motivated to utilize these known

teachings in the Goddard/Mills system in order to allow a user of the source device,

such as presenter, identify when playback devices are not operating properly.


Regarding claim 588, the Goddard/Mills system does not teach wherein the

transmission of the media stream is performed by a unicast transmission methodology.

An official notice is taken that such use of unicast for distribution of media

information was well known in the art at the time the invention was made by one of

ordinary skill in the art.

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize these known teachings for using unicast. These known

teachings, when implemented in the Goddard/Mills system, will allow one of ordinary

skill in the art to target a specific playback device to send control information. One of

ordinary skill in the art would be motivated to utilize these known teachings in the

Goddard/Mills system in order to allow a user of the source device, control the playback

devices individually.


Regarding claim 599, the Goddard/Mills system teaches tightly coupled synchrony

output of a media stream between devices (Goddard: col 1, lines 54-58).

Application/Control Number: 10/816,217                                    Page 12
Art Unit: 2442

The Goddard/Mills system does not teach wherein the source device is capable of playback.

An official notice is taken that such use of a source device for playback was well known in the art at the time the invention was made by one of ordinary skill in the art.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize these known teachings for enabling the source device to playback the audio as well. These known teachings, when implemented in the Goddard/Mills system, will allow one of ordinary skill in the art to have the source device act as a playback device. One of ordinary skill in the art would be motivated to utilize these known teachings in the Goddard/Mills system in order to increase the devices capable of playing back the media and obtain more coverage area.

9.    Claims 584 and 593 are rejected under 35 U.S.C. 103(a) as being unpatentable over Goddard (US 7,324,857 B2); in view of Mills ("Precision Synchronization of Computer Network Clocks", 1994); and in further view Powers (US 2004/0203378 A1).

Regarding claim 593, the Goddard/Mills system teaches wherein a master device is a source device and a slave device is one or more playback devices (Goddard: Figure 3; col 4, lines 35-64).

The Goddard/Mills system does not teach wherein a master device is further configured to be converted into one of the one or more slave devices; or

Application/Control Number: 10/816,217                                        Page 13
Art Unit: 2442

and wherein at least one of the one or more slave devices is further configured to be converted into the master device.

Powers, in a similar field of endeavor, teach wherein a master device is further configured to be converted into one of the one or more slave devices (Powers: [0007] provides for masters handing off master-ship to a slave); or

and wherein at least one of the one or more slave devices is further configured to be converted into the master device (Powers: [0007] provides for a slave being promoted).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Powers for having promotion/demotion scheme for multicast groups.  The teachings of Powers, when implemented in the Goddard/Mills system, will allow one of ordinary skill in the art to promote playback devices to be the source device and demote source devices to mere playback devices. One of ordinary skill in the art would be motivated to utilize the teachings of Powers in the Goddard/Mills system in order to allow recovery if the source suddenly leaves the network, or the a playback device is deemed a more capable source device (more processing power, more content, etc).


Regarding claim 584, this method claim contains limitations found within that of claim 593 and the same rationale of rejection is used, where applicable.

Application/Control Number: 10/816,217                                              Page 14
Art Unit: 2442

10.    Claim 585 is rejected under 35 U.S.C. 103(a) as being unpatentable over

Goddard (US 7,324,857 B2); in view of Mills ("Precision Synchronization of Computer

Network Clocks", 1994) and Powers (US 2004/0203378 A1); and in further view of

Benslimane ("A Multimedia Synchronization Protocol for Multicast Groups", 2000).


Regarding claim 585, the Goddard/Mills/Powers system fails to teach wherein the tightly

coupled synchrony is uninterrupted.

       Benslimane, in a similar field of endeavor, teaches wherein the plurality of

devices are further configured such that devices can be added and removed from the

plurality of devices without interrupting the tightly coupled synchrony (Benslimane:

section 4).

       It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Benslimane for enabling clients to join the

multicast group without interrupting synchrony. The teachings of Benslimane, when

implemented in the Goddard/Mills/Powers system, will allow one of ordinary skill in the

art to have new clients join a multicast group that is pulling clocking information from a

source device. One of ordinary skill in the art would be motivated to utilize the teachings

of Benslimane in the Goddard/Mills/Powers system in order to enable new users to join

the playback group.

Application/Control Number: 10/816,217                                    Page 15

Art Unit: 2442

### *Citation of Pertinent Prior Art*

11.    The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

a.    Sullivan et al (US 7,209,795 B2; US 7,392,102 B2) discloses a

synchronized multicast audio broadcast system that inserts timing control

information into the media stream.

Application/Control Number: 10/816,217                                      Page 16
Art Unit: 2442

## *Conclusion*

12.     Any inquiry concerning this communication or earlier communications from the examiner should be directed to JEFFREY NICKERSON whose telephone number is (571)270-3631. The examiner can normally be reached on M-Th, 9:00am - 7:00pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Philip Lee can be reached on (571)272-3967. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/J. N./                                             /Philip C Lee/
Examiner, Art Unit 2442                             Acting SPE of Art Unit 2442

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| **APPLICANT:** | Nicholas A. J. Millington |
| **APPLICATION NO.:** | 10/816,217 |
| **FILING DATE:** | April 1, 2004 |
| **TITLE:** | System and Method for Synchronizing Operations among a Plurality of Independently Clocked Digital Data Processing Devices |
| **EXAMINER:** | Jeffrey L. Nickerson |
| **ART UNIT:** | 2442 |
| **CONF. NO.:** | 7302 |
| **ATTY. DKT. NO.:** | PA3445US |

---

### RESPONSE G

Dear Examiner Nickerson:

In response to the office action mailed June 25, 2009 (*Office Action*), please consider the following **remarks**. A **listing of the claims** begins on **page two**. The Applicant's **remarks** in response to the *Office Action* begin on **page seven**. The Applicant's **conclusions** as to the allowability of this application appear on **page thirteen**. Any required extension fees are submitted concurrently with this Response.

# CLAIMS

The claims are pending as follows.

1-576. (Canceled)

577. (Previously Presented) A method for synchronizing media playback, the method comprising:

receiving a media stream from a source device via a network, the source device being one of a plurality of devices in communication via the network, the media stream comprising source-clock information related to a first independent clock associated with the source device and media data;

determining a time differential between the first independent clock associated with the source device and one or more second independent clocks associated with one or more playback devices, the time differential based on the source-clock information received from the source device, each of the one or more playback devices being one of the plurality of devices; and

outputting the media stream media data via two or more playback devices in synchrony based on the time differential determined based on the source-clock information, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

578. (Previously presented) The method of claim 577, further comprising controlling one or more of the plurality of devices via a user interface module.

579. (Previously presented) The method of claim 577, further comprising
providing status information associated with one or more of the plurality of
devices.

580. (Previously presented) The method of claim 577, further comprising adding
an additional device to the plurality of devices.

581. (Previously presented) The method of claim 580, wherein the additional
device replaces the source device as a new source device.

582. (Previously presented) The method of claim 580, wherein the additional
device joins the one or more playback devices as a new playback device.

583. (Previously presented) The method of claim 577, further comprising
removing a device from the plurality of devices without interrupting the
outputting of the media stream via the two or more playback devices.

584. (Previously presented) The method of claim 577, further comprising
converting the source device into one of the one or more playback devices, and
converting one of the one or more playback devices into the source device.

585. (Previously presented) The method of claim 584, wherein the tightly coupled
synchrony is uninterrupted.

586. (Previously presented) The method of claim 577, further comprising
adjusting a clock rate of the one or more independent clocks associated with one
or more playback devices.

587. (Previously presented) The method of claim 577, wherein determining the time differential is performed periodically.

588. (Previously presented) The method of claim 577, wherein receiving the media stream is performed by a unicast transmission methodology.

589. (Previously presented) The method of claim 577, wherein receiving the media stream is performed by a multicast transmission methodology.

590. (Previously Presented) A system for synchronizing media playback, the system comprising:

a plurality of devices configured to be in communication via a network, the plurality of devices comprising a source device and one or more playback devices;

wherein the source device is configured to transmit a media stream, the media stream comprising media data and source-clock information related to a first independent clock associated with the source device; and

wherein the one or more playback devices are configured to determine a time differential between the first independent clock associated with the source device and one or more second independent clocks associated with the one or more playback devices, the time differential based on the source-clock information, the one or more playback devices further configured to output the media stream media data in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

591. (Previously presented) The system of claim 590, further comprising a user interface module configured to control one or more of the plurality of devices.

592. (Previously presented) The system of claim 590, wherein the plurality of devices are further configured such that devices can be added and removed from the plurality of devices without interrupting the tightly coupled synchrony.

593. (Previously presented) The system of claim 590, wherein the source device is further configured to be converted into one of the one or more playback devices, and at least one of the one or more playback devices is further configured to be converted into the source device.

594. (Previously presented) The system of claim 590, wherein a clock rate of the one or more independent clocks associated with the one or more playback devices is adjustable.

595. (Previously presented) The system of claim 590, wherein the media stream comprises audio information.

596. (Previously presented) The system of claim 590, wherein the media stream comprises video information.

597. (Previously presented) The system of claim 590, wherein the source-clock information comprises a timestamp.

598. (Previously presented) The system of claim 590, wherein one or more playback devices are operable with one or more of unicast transmission or multicast transmission.

599. (Previously presented) The system of claim 590, wherein the source device is further configured to output the media stream in tightly coupled synchrony with the one or more playback devices.

600. (Previously Presented) A machine readable storage medium having embodied thereon a program, the program providing instructions for a method for synchronizing media playback, the method comprising:

   receiving a media stream from a source device via a network, the source device being one of a plurality of devices in communication via the network, the media stream comprising source-clock information related to a first independent clock associated with the source device and media data;

   determining a time differential between the first independent clock associated with the source device and one or more second independent clocks associated with one or more playback devices, the time differential based on the source-clock information, each of the one or more playback devices being one of the plurality of devices; and

   outputting the media stream media data via two or more playback devices in synchrony based on the time differential, the two or more playback devices being in synchrony when a user observing the outputting of the media stream is unable to perceive time-delay differences between the two or more playback devices.

# REMARKS

Claims 577-600 were previously pending.  Claims 577, 583, 590, 595, 596, 599 and 600 are amended herein.  Claims 577-600 are pending in the present application.  In view of the following remarks, the Applicant respectfully requests reconsideration of the rejections and allowance of the application.

## Rejections under 35 U.S.C. § 112

Claims 577-600 were rejected under 35 U.S.C. § 112 for allegedly failing to comply with the enablement requirement.  The Examiner states his belief that the claimed feature of "outputting the media stream media data…based on the time differential and source-clock information" does not reasonably provide enablement for "outputting the media stream media data…based on the time differential determined based on the source-clock information" when the source-clock information is within the media stream.

The Applicant respectfully traverses the rejection.  The Examiner seems to incorrectly infer a limitation that the source-clock information must originate from the same stream as the media data.  The Applicant disagrees with this characterization.  Figure 2 of the present application (*Instant Application*) shows that each slave device may receive media data (e.g., "AUD+PBTIME INFO") and source-clock information (e.g., "AICD CLK INFO") in a streamed format. Furthermore, the examiner seems to assert that SNTP is the means by which a clock differential between the source clock and the receiver clock, is determined. However, SNTP is used in merely the exemplary embodiment, and the Instant Application is not limited to use of SNTP to determine the clock differential. See the Instant Application at page 16, second paragraph, and Figure 2.  Applicant

therefore asserts that the Examiner's rejections of independent claims 577, 590, and 600 under 35 U.S.C. § 112, and all claims that depend therefrom, are overcome.

### Rejections under 35 U.S.C. § 103

The Examiner asserts that claims 577, 586-587, 589-591, 594-595, 597-598, and 600 are rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 7,324,857 (*Goddard*) in view of "Precision Synchronization of Computer Network Clocks" (*Mills*). *Office Action*, 6. The Applicant respectfully disagrees with the rejection for at least the reasons discussed below.

*The cited references fail to disclose a source device that is configured to transmit a media stream, wherein the media stream comprises source-clock information related to an independent clock associated with the source device and media data.*

**Goddard and Mills fail to disclose a source device configured to transmit a "media stream" comprising "source-clock information related to an independent clock associated with the source device" and "media data"** as set forth in independent claim 577 (emphasis added). *Goddard* describes synchronizing the playback of the audio from two or more audio receivers. *Goddard* uses control codes embedded in a multicast multimedia stream to cause specific receiving devices to emit audio patterns which can then be detected by a microphone connected to the source of the multimedia stream. *Goddard* at col. 3, lines 1-13. The control code is seemingly processed by the audio receivers to generate an audio pattern. *Goddard* at col. 3, lines 59-61. The audio patterns may or may not be audible to the human ear. The source may then determine the total latency from sending to playback. The source may then send command packets to each playback device to determine how much additional latency it

needs to introduce into the playback stream to achieve synchronization.  *Goddard* at col. 3, lines 1-13.

*Mills* discloses a mechanism for synchronizing computer clocks over the Internet.  *Mills*, Abstract.  A Network Time Protocol (NTP) requires a server to send a time-stamped message to subnet peers via Internet topology.  Each subnet peer receives and returns the message via the topology comprising the Internet, wherein the messages include a time stamp added by the subnet peer.  One of the subnets is designated as providing the most accurate time based on interval intersections and clustering and likelihood principles.  *Mills*, § 2, p. 2-3.

*Goddard* does not disclose a source device that transmits a "media stream" which includes both "source clock information" related to a source device independent clock and "media data" as recited in claim 577.  *Goddard* discloses a multimedia stream having control codes embedded therein to cause specific receiving devices to emit audio patterns which can then be detected by a microphone.  There is no disclosure in *Goddard* that the "control codes" include any "source-clock information" as claimed in claim 577.

*Mills* does not cure the deficiencies of *Goddard* with respect to a media stream which includes both "source clock information" related to a source device independent clock and "media data."  *Mills* discloses transmitting "messages" between a server and subnet; the "messages" are to identify a subnet suitable to provide an accurate time over the topology of the Internet.  There is no disclosure in Mills that Internet-based messages between a server and a subnet include "media data."

**Combining the systems of *Goddard* and *Mills* would not make the subject matter of claim 577 obvious**.  The Examiner asserts, without further explanation, that "it would have been obvious to one of ordinary skill in the art

9

at the time the invention was made to utilize the teachings of Mills for having the
clients pull clock information required for clock synchronization. The teachings
of Mills, when implemented in the Goddard system, will allow one of ordinary
skill in the art to have playback devices pull NTP information from the source."
*Office Action*, 6.  The Applicant believes that this statement by the Examiner is a
prohibited conclusion in that it is unsupported by any reasoning.  "[R]ejections
on obviousness cannot be sustained by mere conclusory statements"; "there must
be some articulated reasoning with some rational underpinning to support the
legal conclusion of obviousness."  *KSR International Co. v. Teleflex Inc.*, 550
USPQ2d 1385, 1396 (2007).   The Examiner has failed to demonstrate a rational
underpinning to support the legal conclusion of obviousness.  There is no
teaching or even a suggestion in the cited art to combine *Goddard* and *Mills*.  The
fact that a combination of references *might* improve a system (assuming such a
combination even worked) in no way evidences that the combination is obvious
and proper.  Further, the Examiner is impermissibly using hindsight.  The mere
assertion that combining references with a feature from another reference *might*
produce something desirable in no way means that the combination is *obvious*.

In fact, if one were to combine *Goddard* with *Mills*, the technology defined
by claim 577 would not be obtained.  *Goddard* discloses using control codes
embedded in a multicast multimedia stream to cause specific receiving devices to
emit audio patterns which can then be detected by a microphone connected to
the source of the multimedia stream.  *Mills* discloses transmitting messages
between a server and subnet to determine which subnet provides an accurate
time over the Internet.  The combination of *Goddard* and *Mills* would result in
transmitting messages in multimedia stream that emit audio patterns which can
be detected by a microphone connected to the source of the multimedia stream.

10

Such a system would not be able to, for example, synchronize playback devices in separate rooms, where the audio patterns would not be received by the source device.  The combination of *Goddard* and *Mills* furthermore fails to teach that a "media stream" includes any "source-clock information" and "media data" as claimed in claim 577.

The Applicant has provided evidence that the combination of the cited references fail to disclose all of the elements claimed in independent claim 577. Therefore, claim 577 is patentable over the cited references.

Independent claims 590 and 600 include similar patentable elements to those of independent claim 577 and are likewise patentable for at least the same reasons.  Furthermore, as a dependent claim incorporates by reference all the limitations of the claim from which it depends (see 35 U.S.C. § 112 ¶ 4), claims 586-587, 589, 591, 594-595, 597 and 598 are patentable for at least the same reasons as the independent claim from which they depend.

The Examiner asserts that claims 580-583, 592, and 596 are rejected under 35 U.S.C. § 103(a) as being unpatentable over "A Multimedia Synchronization Protocol for Multicast Groups" (*Benslimane*) in view of *Mill*. *Office Action*, 7.  The Examiner further asserts that claims 578, 579, 591, and 599 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Goddard* in view of *Mills*, and further in view of Official Notices (*Office Action*, 8) and that claims 584 and 593 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Goddard* in view of *Mills*, and further in view of U.S. Pub. No. 2004/0203378 (*Powers*).  *Office Action*, 9. Claim 585 is also rejected under 35 U.S.C. § 103(a) as being unpatentable over *Goddard* in view of *Mills* and *Goddard* in further view of *Benslimane*.  The Applicant respectfully traverses these rejections.  As a dependent claim incorporates by reference all the limitations of the claim from which it depends

(see 35 U.S.C. § 112 ¶ 4), claims 578- 585, 591-593, 596, and 599 are patentable for at least the same reasons as the independent claim from which they depend.

## CONCLUSION

The rejection of claims 577-600 under 35 U.S.C. § 103(a) is overcome because the cited references, in combination and separately, fail to disclose each and every claimed element.

A Request for Continued Examination and any extension fees required for submitting the present response up to the current date are included herewith this Response. The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit Account No. 06-0600 for any matter in connection with this response, including any fee for extension of time, which may be required.

Based on the foregoing remarks, the Applicant believes the rejections to the claims have been overcome, and that the present application is in condition for allowance. The Examiner is invited to contact the Applicant's undersigned representative with any questions concerning this matter.

Respectfully submitted,
Nicholas A. J. Millington

**December 9, 2010**          By:          /Steve Bachmann/

Steve Bachmann (Reg. No. 50,806)
**Carr & Ferrell** *LLP*
120 Constitution Drive
Menlo Park, CA 94025
T: 650.812.3400
F: 650.812.3444

13

U<small>NITED</small> S<small>TATES</small> P<small>ATENT AND</small> T<small>RADEMARK</small> O<small>FFICE</small>

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | 20218/04-0401 (PA3445US) | 7302 |

14458        7590        06/21/2011

Mark Triplett (Sonos, Inc.)
150 S. Wacker Drive
Suite 2100
Chicago, IL 60606

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/21/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/816,217 | MILLINGTON, NICHOLAS A. J. |
| | Examiner | Art Unit | |
| | JEFFREY NICKERSON | 2442 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *28 April 2011 and 13 June 2011*.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *601-620* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *601-620* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

Application/Control Number: 10/816,217                                      Page 2
Art Unit: 2442

## DETAILED ACTION

1.      This communication is in response to Application No. 10/816,217 filed on 01 April

2004 with a domestic priority dating back to 28 July 2003. The request for continued

examination presented on 28 April 2011, which cancels claims 577-600, adds claims

601-620, and presents arguments, is hereby acknowledged. The supplemental

response presented on 13 June 2011, which amends claims 601 and 614, and present

arguments, is hereby acknowledged and is entered-in-full.  The instant application

remains under accelerated examination as per MPEP 708.02 VIII.  Claims 601-620 are

currently pending and are subject to examination.


### *Specification*

2.      Applicant's responses, filed 28 April 2011 and 13 June 2011, canceling claims

and adding new claims is noted.  All outstanding objections to the specification are

obviated and hereby withdrawn.

Application/Control Number: 10/816,217                                    Page 3

Art Unit: 2442

## *35 USC § 112*

3.    The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

### *Response to Arguments*

4.    Applicant's responses, filed 28 April 2011 and 13 June 2011, canceling claims and adding new claims is noted.  All outstanding rejections under 35 USC 112 are obviated and hereby withdrawn.

## *35 USC § 103*

5.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

### *Response to Arguments*

6.    Applicant's responses, filed 28 April 2011 and 13 June 2011, canceling claims and adding new claims is noted.  All outstanding rejections under 35 USC 103 are obviated and hereby withdrawn.  However, new rejections may appear below.

Application/Control Number: 10/816,217                                                Page 4
Art Unit: 2442

*Claim Rejections*

7.      Claims 601-606, 608, and 610-619 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive

playout control", 10 December 2002), and in further view of Van der Schaar et al (US

2003/0066094 A1).


Regarding claim 601, the Jo system teaches a method for synchronizing audio playback

(Jo: abstract for inter-client synchronization), comprising:

        receiving by a playback device a plurality of frames from a source device over a

network (Jo: section 1, Fig 1; section 1, pars 1-3; section 2.1, par 1 provides for MPEG

streams which inherently comprise frames; see, for example, section 3.1 Table 1,

paragraph under table 1),

        wherein each frame of the plurality of frames is associated with audio information

and a time indicating when to play the audio information of the respective frame (Jo:

section 2.2, first paragraph provides each frame of stream is associated with

audio/video data and the presentation timestamp PTS);

        outputting audio information based on the plurality of frames via the playback

device by playing audio information for each respective frame based on a clock of the

playback device, the clock of the playback device being independent of a clock of the

source playback device (Jo: section 2.1, first two paragraphs for audio/video stream

playback; section 2.3, paragraph 2 *we assume the globally synchronized time reference*

*is not available. To synchronize... each client manages the synchronization based on its*

Application/Control Number: 10/816,217                                    Page 5
Art Unit: 2442

*own time reference, namely local virtual time*; this also provides each client is using a

local clock, independent of any source clock, or PTS reference clock, for playback); and

adjusting a speed at which the playback device outputs the audio information,

wherein the speed is adjusted based on a comparison between an expected output time

of audio information for a particular frame and the output time (Jo: section 2.3,

paragraph 2; provides "*each client compares its current presentation time to the virtual*

*one",* and when the difference is greater than a threshold it fastens or loosens playback

speed).

Jo fails to explicitly address how the streams are being timestamped with a PTS,

and thus fails to teach:

wherein the time indicating when to play each frame is based on a clock of the

source device; or

wherein an output time of the audio information for each respective frame is

converted for the clock of the playback device based on both the time associated with

each respective frame and a time differential between the clock of the source device

and the clock of the playback device.

Van der Schaar, in a similar field of endeavor, teaches wherein the time

indicating when to play each frame is based on a clock of the source device (van der

Schaar: [0002] provides that in an MPEG stream the broadcaster periodically transmits

their system time clock SCR value (via a PCR timestamp) and assigns the presentation

timestamp PTS for packets (ie frames) to be presented based on its own clock); and

Application/Control Number: 10/816,217                                          Page 6
Art Unit: 2442

wherein an output time of the audio information for each respective frame is converted for the clock of the playback device based on both the time associated with each respective frame and a time differential between the clock of the source device and the clock of the playback device (van der Schaar: Figure 3A, 3B; abstract, [0027] provides the receiver's clock is not same value as broadcaster's, but synchronizes frequency and phase; [0028]-[0032], particularly [0030] with ref to Fig 3A, provides for replacing PTS with the offset between the broadcaster and receiver clocks).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of van der Schaar for converting the PTS of each packet as needed. The teachings of van der Schaar, when implemented in the Jo system, will allow one of ordinary skill in the art to convert the PTS of a MPEG stream's packet prior to playback. One of ordinary skill in the art would be motivated to utilize the teachings of van der Schaar in the Jo system in order to ensure a discontinuity in a source's clock information did not invalidate playback of packets at a receiver device.

Regarding claim 602, the Jo/VanDerSchaar system teaches further comprising computing the time differential at a plurality of different instances while outputting audio information via the playback device and using a currently computed time differential to determine the output time of the audio information for each respective frame (van der Schaar: [0002], Fig. 3a provides the SCR and offset determination occur periodically over time and during playback).

Application/Control Number: 10/816,217                                    Page 7
Art Unit: 2442

Regarding claim 603, the Jo/VanDerSchaar system teaches further comprising receiving by the playback device timing information of the clock of the source device (VanDerSchaar: [0002]).

Regarding claim 604, the Jo/VanDerSchaar system teaches further comprising determining by the playback device the time differential using the timing information of the clock of the source device and timing information of the clock of the playback device (VanDerSchaar: Fig 3a, [0029]-[0032] provides receiver determines offset between encoder STC and local STC).

Regarding claim 605, the Jo/VanDerSchaar system teaches wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the source device (VanDerSchaar: [0033] provides for both positive and negative offset adjustments).

Regarding claim 606, the Jo/VanDerSchaar system teaches further comprising buffering by the playback device the audio information along with the output time prior to the step of outputting the audio information (Jo: section 2.1 provides for buffering the stream).

Application/Control Number: 10/816,217                                              Page 8
Art Unit: 2442

Regarding claim 608, the Jo/VanDerSchaar system teaches wherein the plurality of frames received from the source device are performed by a multicast transmission methodology (Jo: abstract).

Regarding claim 610, the Jo/VanDerSchaar system teaches wherein adjusting the speed at which the playback device outputs the audio information comprises adjusting the clock of the playback device (Jo: section 2.4, paragraph 4 provides the local virtual timer is adjusted).

Regarding claim 611, the Jo/VanDerSchaar system teaches wherein the playback device is one of a plurality of playback devices in a synchrony group (Jo: abstract provides this is for a many-client synchrony group, section 2.1 paragraph 1 provides for 100 clients).

Regarding claim 612, the Jo/VanDerSchaar system teaches wherein the synchrony group is dynamically configurable, such that a number of the plurality of playback devices in the synchrony group is adjustable (Jo: section 2.1, paragraph 1 provides this is a SSM network, which requires clients to actively join multicast groups).

Application/Control Number: 10/816,217                                    Page 9
Art Unit: 2442

Regarding claim 613, the Jo/VanDerSchaar system teaches wherein the playback

device receives the plurality of frames from the source device over a wireless network

(VanDerSchaar: [0018] provides for using satellite networks).

Regarding claims 614-619, these claims contain limitations found within that of claims

601-606, respectively, and the same rationale of rejection is used, where applicable.

8.      Claims 607 and 620 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Jo et al ("Synchronized one-to-many media streaming with adaptive playout

control", 10 December 2002); in view of Van der Schaar et al (US 2003/0066094 A1);

and in further view of Mane (US 2003/0195964 A1).

Regarding claim 607, the Jo/VanDerSchaar teaches the source multicasting the frames-

for-playback to playback devices (Jo: abstract), but does not teach:

        receiving by the playback device a multicast address that the source device is

using to broadcast the plurality of frames prior to the step of receiving the plurality of

frames.

        Mane, in a similar field of endeavor, teaches receiving by the playback device a

multicast address that the source device is using to broadcast the plurality of frames

prior to the step of receiving the plurality of frames (Mane: [0039] the MMM tells the

client which multicast group address to listen to for their request).

Application/Control Number: 10/816,217                                              Page 10
Art Unit: 2442

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Mane for telling the clients which

multicast address to listen to. The teachings of Mane, when implemented in the

Jo/VanDerSchaar system, will allow one of ordinary skill in the art to manage multiple

multicast groups for streaming media data and inter-client synchronizing each multicast

group. One of ordinary skill in the art would be motivated to utilize the teachings of

Mane in the Jo/VanDerSchaar system in order to direct a client to join a particular

multicast group or listen to a particular multicast group address for content the client

may be requesting that is multicasted.


Regarding claim 620, this claim contains limitations found within that of claim 607 and

the same rationale of rejection is used, where applicable.


9.      Claim 609 is rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al

("Synchronized one-to-many media streaming with adaptive playout control", 10

December 2002); in view of Van der Schaar et al (US 2003/0066094 A1); and in further

view of Kim et al (US 6,836,788 B2).


Regarding claim 609, the Jo/VanDerSchaar system does not explicitly teach wherein

the source device is a second playback device.

Kim, in a similar field of endeavor, teaches wherein the source device is a

second playback device (Kim: Figure 2, items 212 for example; col 3, lines 32-59

Application/Control Number: 10/816,217                                    Page 11
Art Unit: 2442

provides that receivers receiving multimedia for playback can also be multicast group

leader nodes).

It would have been obvious to one of ordinary skill in the art at the time the

invention was made to utilize the teachings of Kim for having tiered multicast groups.

The teachings of Kim, when implemented in the Jo/VanDerSchaar system, will allow

one of ordinary skill in the art to cascade out streaming media to multiple tiered

multicast groups in synchrony. One of ordinary skill in the art would be motivated to

utilize the teachings of Kim in the Jo/VanDerSchaar system in order to reduce the

likelihood of overloading a root multicast group streamer.


### *Citation of Pertinent Prior Art*

10.    The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

a.    Mani et al (US 2004/0001591 A1) discloses converting the PTS of

received MPEG packets to account of source clock discontinuities.

Application/Control Number: 10/816,217                                      Page 12
Art Unit: 2442

### *Conclusion*

11.     Any inquiry concerning this communication or earlier communications from the examiner should be directed to JEFFREY NICKERSON whose telephone number is (571)270-3631.  The examiner can normally be reached on M-Th, 9:00am - 7:00pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Glenton Burgess can be reached on (571)272-3949.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Jeffrey  Nickerson/
Examiner, Art Unit 2442

PATENT
Application Number 10/816,217

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants: Nicholas A.J. Millington

Serial No.: 10/816,217

Filed: April 1, 2004

For: System and Method for Synchronizing
Operations Among a Plurality of
Independently Clocked Digital Data
Processing Devices

Group Art Unit: 2442

Confirmation No.: 7302

Examiner: Jeffrey L. Nickerson

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

I hereby certify that this paper is
being electronically deposited with
the United States Patent and
Trademark Office on this date:

**September 14, 2011**

**/Christopher N. George/**
Christopher N. George
Registration No.: 51,728
Attorney for Applicants

## RESPONSE TO OFFICE ACTION DATED JUNE 21, 2011

Mail Stop Non-Fee Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Please enter and consider the following amendments and remarks.

**The Status of the Claims** is reflected in the listing of claims that begins on page 2 of this paper.

**Remarks** begin on page 6 of this paper.

PATENT
Application Number 10/816,217

## AMENDMENTS TO THE CLAIMS

The following is a complete listing of the claims. This listing of claims will replace all prior versions, and listings, of claims in the application.

1-600. (Canceled)

601. (Previously Presented) A method for synchronizing audio playback, the method comprising:

receiving by a playback device a plurality of frames from a source device over a network, wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the respective frame, wherein the time is based on a clock of the source device;

outputting audio information based on the plurality of frames via the playback device by playing audio information for each respective frame based on a clock of the playback device, which is independent of the clock of the source device, wherein an output time of the audio information for each respective frame is converted for the clock of the playback device based on both the time associated with each respective frame and a time differential between the clock of the source device and the clock of the playback device; and

adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the output time.

602. (Previously Presented) The method of claim 601, further comprising computing the time differential at a plurality of different instances while outputting audio information via the playback device and using a currently computed time differential to determine the output time of the audio information for each respective frame.

603. (Previously Presented) The method of claim 601, further comprising receiving by the playback device timing information of the clock of the source device.

PATENT
Application Number 10/816,217

604. (Previously Presented) The method of claim 603, further comprising determining by the playback device the time differential using the timing information of the clock of the source device and timing information of the clock of the playback device.

605. (Previously Presented) The method of claim 601, wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the source device.

606. (Currently Amended) The method of claim 601, further comprising buffering by the playback device the audio information along with the output time prior to ~~the step of~~ outputting the audio information.

607. (Currently Amended) The method of claim 601, further comprising receiving by the playback device a multicast address that the source device is using to broadcast the plurality of frames prior to ~~the step of~~ receiving the plurality of frames.

608. (Previously Presented) The method of claim 601, wherein the plurality of frames received from the source device are performed by a multicast transmission methodology.

609. (Previously Presented) The method of claim 601, wherein the source device is a second playback device.

610. (Previously Presented) The method of claim 601, wherein adjusting the speed at which the playback device outputs the audio information comprises adjusting the clock of the playback device.

611. (Previously Presented) The method of claim 601, wherein the playback device is one of a plurality of playback devices in a synchrony group.

PATENT
Application Number 10/816,217

612. (Previously Presented) The method of claim 611, wherein the synchrony group is dynamically configurable, such that a number of the plurality of playback devices in the synchrony group is adjustable.

613. (Previously Presented) The method of claim 601, wherein the playback device receives the plurality of frames from the source device over a wireless network.

614. (Previously Presented) A non-transitory computer readable medium having stored therein instructions executable by a processor to perform a method comprising:

receiving by a playback device a plurality of frames from a source device over a network, wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the respective frame, wherein the time is based on a clock of the source device;

outputting audio information based on the plurality of frames via the playback device by playing audio information for each respective frame based on a clock of the playback device, which is independent of the clock of the source device, wherein an output time of the audio information for each respective frame is converted for the clock of the playback device based on both the time associated with each respective frame and a time differential between the clock of the source device and the clock of the playback device; and

adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the output time.

615. (Currently Amended) The non-transitory computer readable medium of claim 614, further comprising instructions to perform ~~the step of~~ computing the time differential at a plurality of different instances while outputting audio information via the playback device and using a currently computed time differential to determine the output time of the audio information for each respective frame.

PATENT
Application Number 10/816,217

616. (Currently Amended) The non-transitory computer readable medium of claim 614, further comprising instructions to perform ~~the step of~~ receiving by the playback device timing information of the clock of the source device.

617. (Currently Amended) The non-transitory computer readable medium of claim 616, further comprising instructions to perform ~~the step of~~ determining by the playback device the time differential using the timing information of the clock of the source device and timing information of the clock of the playback device.

618. (Previously Presented) The non-transitory computer readable medium of claim 614, wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the source device.

619. (Currently Amended) The non-transitory computer readable medium of claim 614, further comprising instructions to perform ~~the step of~~ the playback device buffering the audio information along with the output time prior to ~~the step of~~ outputting the audio information.

620. (Currently Amended) The non-transitory computer readable medium of claim 614, further comprising instructions to perform ~~the step of~~ receiving by the playback device a multicast address that the source device is using to broadcast the plurality of frames prior to ~~the step of~~ receiving the plurality of frames.

PATENT
Application Number 10/816,217

# REMARKS

## I.  Status of the Claims

Claims 601-620 are pending in the present application. By this Response, claims 606, 607, 615, 616, 617, 619, and 620 have been amended to remove the unnecessary word "step" from the claims. Reconsideration and withdrawal of the rejections of this application in view of the amendment is respectfully requested as the application is in condition for allowance.

## II.  Interview Request

The Applicant hereby expressly requests an interview with the Examiner in advance of an Office Action in reply to the present Request for Continued Examination. The Applicant believes that an interview will help achieve a mutual understanding between the Examiner and the Applicant and thereby advance the prosecution of the application to a Notice of Allowance. The Examiner is invited to contact the Applicant's representative Christopher N. George at (312) 580-1836 to schedule the interview at a date and time convenient to the Examiner.

## III.  Claim Rejections

Claims 601-606, 608, and 610-619 have been rejected under 35 U.S.C. 103(a) as unpatentable over Jo ("Synchronized one-to-many media streaming with adaptive playout control,"10 December 2002) in view of Van der Schaar et al. ("Van der Schaar," US Application Publication 2003/0066094). Claims 607 and 620 have been rejected as unpatentable over Jo in view of Van der Schaar and further in view of Mane ("Mane," US Application Publication 2003/0095848). Claim 609 has been rejected as unpatentable over Jo in view of Van der Schaar and further in view of Kim et al. ("Kim," US Patent 6,836,788). The Applicant appreciates the examiner's efforts in the thorough examination of this application. The Applicant respectively traverses and requests reconsideration of the rejections for at least the following reasons.

Independent claim 601 recites a method for synchronizing audio playback. The Office Action relies on Jo to provide support for synchronizing audio playback. For instance, the Office Action alleged that Jo teaches "adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the output time" by citing to Jo, section 2.3, paragraph 2.

The Applicant respectfully disagrees, as Jo does not, among other things, make a comparison between such claimed values. More particularly, Jo does not compare "an expected output time of audio information for a particular frame" and "the output time."

First, Section 2.3, paragraph 2, upon which the Office Action relies in making the rejection, is directed to Jo's mechanism for "intra-client synchronization" versus "inter-client synchronization." *Intra*-client synchronization deals with the discrepancy in the audio and its corresponding video. This is a different objective from Applicant's objective and therefore does not support the modification proposed in the Office Action, more of which is discussed below. With respect to *inter*-client synchronization, Jo itself in section 2.1 recognizes that "…one can expect clients to lose synchronization easily and play slightly different portion of stream compared to other clients."

Within that intra-client context, Jo compares a presentation time, PTS, to the local virtual time and adjusts playback speed to go faster or slower whenever this difference gets outside of a certain range. First, PTS is different from the claimed "output time" by multiple degrees. The Office Action kindly acknowledges this deficiency, more of which is described below. For the record, however, Jo states that the PTS is a presentation time that is located at the header of the MPEP-2 program stream before it is sent to the clients. Jo is silent as to whether the PTS is based on a clock of the source device, but it is clear that Jo does not convert PTS at all, much less converting an output time for the clock of a playback device. Second, there is no indication in Jo that its "local virtual time" bears any resemblance to the Applicant's claimed "expected output time." In fact, it appears that Jo's local virtual time refers merely to a local clock time and not to the Applicant's claimed "expected output time of the audio information for a particular frame". As such, the fact that the system described in Jo might perform a comparison between PTS and the local virtual time to achieve *intra*-client synchronization does not rise to the level of teaching or even suggesting what the Applicant has claimed in the method of claim 601.

The Office Action kindly points out that Jo fails to teach "wherein the time indicating when to play each frame is based on a clock of the source device; or wherein an output time of the audio information for each respective frame is converted for the clock of the playback device based on both the time associated with each respective frame and a time differential between the clock of the source device and the clock of the playback device." The Office Action looks to Van der Schaar for allegedly converting the PTS of each packet as needed. As discussed below,

however, Van der Schaar's modification of PTS does not teach or suggest Applicant's claimed conversion.

First, the Office Action states that "One of ordinary skill in the art would be motivated to utilize the teachings of Van der Schaar in the Jo system in order to ensure a discontinuity in a source's clock information did not invalidate playback of packets at a receiver device." The Applicant respectfully disagrees because the Van der Schaar reference addresses a different problem and, for at least this reason, such motivation to utilize or combine would not exist. The "discontinuity" described in Van der Schaar is not due to the source clock itself being different from the clock of a playback device, but rather is due to the MPEG broadcast stream being based on different source clocks; for example, when the channel is changed or a commercial breaks-in, different source clocks may affect the MPEG broadcast stream. Particularly, Van der Schaar attempts to make the implementation of the audio and video decoders more convenient by insulating them from PTS discontinuities that result from the fact that the receiver can transition at any time and without warning from decoding an MPEG-2 stream generated by one encoder with one clock to an MPEG-2 stream generated by a different encoder with a different clock.

In addition to addressing different issues and possessing different motivations, Van der Schaar does not make up for the deficiencies found in Jo. For example, as with Jo, Van der Schaar also does not teach "wherein an output time of the audio information for each respective frame is converted for the clock of the playback device." The PTS modification in Van der Schaar does not convert the output time for the clock of the playback device, but rather the modification is made to insulate the audio/video decoders *in a single receiver* from the PTS discontinuities. The conversion of an output time for each frame claimed in claim 601 is one of the elements that enables synchronization amongst a number of playback devices because a playback device would convert the time to play based on the source clock to its own clock time – a situation in which Van der Schaar would not work.

Particularly, the Applicant's claimed conversion of an output time of audio information for each frame is based on (1) the time indicating when to play the audio information of each respective frame and (2) a time differential between the clock of the source device and the clock of the playback device. However, with respect to (2), the offset used to modify PTS in Van der Schaar is not a "time differential." The Van der Schaar receiver does not know the value of the time on the local clock relative to the time on the master clock. Particularly, the PCR is a program clock reference, stamped in history and transmitted to a receiver, whereas the internal

PATENT
Application Number 10/816,217

system time is a current time. The difference between these values, such as discussed by Van der Schaar, does not yield a time differential as understood by one skilled in the art. For example, if a time differential is determined between two watches, it may be determined that a first watch is one minute faster than a second watch. But, if a difference is determined between what the first watch said some unknown time ago (e.g., PCR) and what the second watch says now (e.g., internal system time), this comparison equates to what Van der Schaar is doing, which is not the same as Applicant's claimed time differential. As such, Van der Schaar does not teach or suggest Applicant's claimed conversion.

Accordingly, the Applicant submits that a combination of Jo and van der Schaar, with or without Mane or Kim, fails to provide a *prima facie* case of obviousness with respect to claim 601. Reconsideration of the rejection of claims 601 – 613 is respectfully requested.

The Applicant respectfully submits that independent claim 614 should also be in condition for allowance. As with independent claim 601, discussed above, the Office Action relies on Jo to provide support for synchronizing audio playback. However, as discussed above, among other things, Jo makes <u>no</u> comparison between "an expected output time of audio information for a particular frame" and "the output time." Section 2.3, paragraph 2, upon which the Office Action relies in making the rejection, is directed to Jo's mechanism for "intra-client synchronization" versus "inter-client synchronization." *Intra*-client synchronization deals with the discrepancy in the audio and its corresponding video. This is a different objective from Applicant's objective and therefore does not support the modification proposed in the Office Action (more of which is discussed below). In fact, Jo itself in section 2.1 recognizes that, for *inter*-client synchronization, "…one can expect clients to lose synchronization easily and play slightly different portion of stream compared to other clients."

Within the *intra*-client context, Jo compares a presentation time, PTS, to a local virtual time and adjusts playback speed to go faster or slower whenever this difference gets outside of a certain range. As kindly acknowledged in the Office Action, PTS is different from the claimed "output time" in numerous respects. Jo states that the PTS is a presentation time that is located at the header of the MPEP-2 program stream before it is sent to the clients. Jo is silent as to whether the PTS is based on a clock of the source device, but it is clear that Jo does not convert the PTS at all, much less convert the PTS for the clock of a playback device. Additionally, there is no

PATENT
Application Number 10/816,217

indication in Jo that its "local virtual time" has any resemblance to the Applicant's claimed "expected output time." In fact, it seems that Jo's local virtual time refers merely to a local clock time and not to the Applicant's claimed "expected output time of the audio information for a particular frame." As such, the fact that the system described in Jo might perform a comparison between PTS and the local virtual time to achieve *intra*-client synchronization does not rise to the level of teaching or even suggesting what the Applicant has claimed in the article of manufacture recited in claim 614.

While the Office Action looks to Van der Schaar for allegedly converting the PTS of each packet as needed, Van der Schaar makes no attempt to achieve simultaneity of playback on two or more rendering devices. Van der Schaar's modification of PTS does not teach or suggest the Applicant's claimed conversion.

As with Jo, there are fundamental differences in the way these systems operate which do not allow the cited references to teach or suggest the recitations of claim 614. The Van der Schaar reference addresses a different problem and motivation to use Van der Schaar with Jo to provide the claimed article of manufacture. For example, the "discontinuity" described in Van der Schaar is not due to the source clock itself being different from the clock of a playback device, but rather is due to the MPEG broadcast stream being based on different source clocks; for example, when the channel is changed or a commercial breaks-in. Particularly, Van der Schaar attempts to make the implementation of the audio and video decoders more convenient by insulating them from PTS discontinuities that result from the fact that the receiver can transition at any time and without warning from decoding an MPEG-2 stream generated by one encoder with one clock to an MPEG-2 stream generated by a different encoder with a different clock.

As discussed above, in addition to addressing different issues and possessing different motivations, Van der Schaar does not make up for the deficiencies found in Jo. For example, Van der Schaar also does not teach "wherein an output time of the audio information for each respective frame is converted for the clock of the playback device." The PTS modification in Van der Schaar does not convert the output time for the clock of the playback device, but rather the modification is made to insulate the audio/video decoders in a single receiver from the PTS discontinuities. The conversion claimed in claim 614 is one of the elements that enables synchronization amongst a number of playback devices because a playback device would convert the time to play based on the source clock to its own clock time – a situation in which Van der Schaar would not work.

Particularly, the Applicant's claimed conversion is based on (1) the time indicating when to play the audio information of each respective frame and (2) a time differential between the clock of the source device and the clock of the playback device. However, with respect to (2), the offset used to modify the PTS in Van der Schaar is not a "time differential." The Van der Schaar receiver does not know the value of the time on the local clock relative to the time on the master clock. Particularly, the PCR is a program clock reference, stamped in history and transmitted to a receiver, whereas the internal system time is a current time. The difference between these values, as discussed in Van der Schaar, does not yield a time differential as understood by one skilled in the art.  For example, a difference between a prior time on a first watch (e.g., the PCR) and the current time on a second watch (e.g., the internal system time) is not the same time differential as recited in claim 614. As such, Van der Schaar does not teach or suggest the Applicant's claimed conversion.

Accordingly, the Applicant submits that a combination of Jo and van der Schaar, with or without Mane or Kim, fails to provide a *prima facie* case of obviousness with respect to claim 614. Reconsideration of the rejection of claims 614 – 620 is respectfully requested.

Before closing, the applicants note that at least the following amendments are either broadening or clarifying and, thus, not necessary for patentability:

1.  The deletion of "the step of" in claims 606, 607, 615, 616, 617, 619, and 620.

The above noted amendments are either broadening, or are merely clarifying in that the amended claims are intended to state the same thing as the claim was intended to state prior to amendment (i.e., to have the same scope both before and after the amendments).  Consequently, these broadening or clarifying amendments do not give rise to prosecution history estoppel or limit the scope of equivalents of the claims under the doctrine of equivalents.

PATENT
Application Number 10/816,217

IV. **Conclusion**

All the stated grounds of objection and rejection have been respectfully traversed, accommodated, or rendered moot. The Applicant therefore submits that the present application is in condition for allowance.

In general, the Office Action makes various statements regarding the pending claims and the cited references that are now moot in light of the above. Thus, the Applicant will not address such statements at the present time. However, the Applicant expressly reserves the right to challenge such statements in the future should the need arise (e.g., if such statement should become relevant by appearing in a rejection of any current or future claim). Additionally, the Applicant expressly reserves the right to challenge or address statements made previously during the prosecution that may have been incorrect or are no longer applicable.

If the Examiner has any questions or if the Applicant can be of any assistance, the Examiner is invited and encouraged to contact the Applicant. The Commissioner is authorized to charge any necessary fees or credit any overpayment to Deposit Account Number 50-2455.

Respectfully submitted,

HANLEY, FLIGHT & ZIMMERMAN, LLC.
USPTO Customer Number 14458
Suite 2100
150 South Wacker Drive
Chicago, Illinois 60606
(312) 580-1020

By:    /Christopher N. George/
       Christopher N. George
       Registration No. 51,728
       Attorney for Applicants

**September 14, 2011**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | 20218/04-0401 (PA3445US) | 7302 |

| |
|---|
| 14458          7590          10/21/2011 |
| Mark Triplett (Sonos, Inc.) |
| 150 S. Wacker Drive |
| Suite 2100 |
| Chicago, IL 60606 |

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/21/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/816,217 | MILLINGTON, NICHOLAS A. J. |
| | Examiner | Art Unit |
| | JEFFREY NICKERSON | 2442 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>14 September 2011</u>.

2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5) ☒ Claim(s) <u>601-620</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>601-620</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some * c) ☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____.

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

Application/Control Number: 10/816,217                                        Page 2
Art Unit: 2442

## DETAILED ACTION

1.      This communication is in response to Application No. 10/816,217 filed on 01 April

2004 with a domestic priority dating back to 28 July 2003. The response presented on

14 September 2011, which amends claims 607, 615-617, and 619-620, and presents

arguments, is hereby acknowledged. Claims 601-620 are currently pending and subject

to examination.  The instant application remains under accelerated examination as per

MPEP 708.02 VIII.


### *35 USC § 103*

2.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.


### *Response to Arguments*

3.      Applicant's amendments and arguments, filed in the response dated 14

September 2011, with respect to the rejections under 35 USC 103(a) have been fully

considered but they are not persuasive.


Independent claims 601, 614

Application/Control Number: 10/816,217                                    Page 3
Art Unit: 2442

Applicant argues the combined teachings of Jo and VanDerSchaar fail to render

obvious at least one limitation found within these claims.  Specifically, applicant argues

the combined teachings fail to render obvious the following:

> *"wherein the speed is adjusted based on a comparison between an expected*
>
> *output time of audio information for a particular frame and the output time"*.

Applicant's arguments are based on the premise that Jo merely discloses comparing

the PTS to the local virtual time and adjusts playback accordingly to accomplish intra-

client synchronization.  Applicant alleges the PTS is different from the claimed output

time, and that the Jo's local virtual time is different from the claimed expected output

time.  Lastly applicant alleges that Jo is achieving intra-client synchronization with his

process, and therefore differs from applicant's claimed invention.


The examiner respectfully disagrees and finds these arguments unpersuasive.  Jo

defines an actual current presentation time (Jo: section 2.3, par 2: *the current*

*presentation time Tc,t*; *the actual (Tc,t) presentation time*), but does not indicate this is

necessarily the PTS.  With respect to Jo's "actual current presentation time" being

different from applicant's claimed "output time", it is noted that applicant's claim does

not explicitly define what an "output time" is and thus the examiner must give the term

its broadest reasonable interpretation consistent with the specification. Applicant's

specification does not recite the phrase "output time", but one of ordinary skill would

recognize this term to mean a time at which data is being played back or presented.

Thus the examiner finds that the claimed "output time" is equivalent to Jo's actual

Application/Control Number: 10/816,217                                          Page 4
Art Unit: 2442

current presentation time.  With respect to Jo's virtual time being different from the

claimed expected output time, again, it is noted that applicant's claim does not explicitly

define the term "expected output time" and, therefore, the examiner must give the term

its broadest reasonable interpretation consistent with the specification.  Again, this term

is not recited in applicant's specification, but one of ordinary skill would recognize this

term to mean a time at which the presentation of data is expected or intended.  Jo

discloses that the local virtual time is a *estimate[d] virtual presentation* time, and that a

client attempts to adapt its playback to make the local presentation time to be that of the

virtual presentation time (Jo: section 2.4, par 4 *adapt the local presentation time to its*

*virtual presentation time*), and thus one of ordinary skill would recognize the virtual

presentation time is the intended presentation time.  Thus the examiner finds the

claimed "expected output time" is equivalent to Jo's virtual presentation time.  With

respect to Jo attempting to achieve intra-client synchronization, the examiner does not

indentify any language within the claim that requires the claim to be directed solely

towards inter-client synchronization methodology.  Furthermore, Jo acknowledges that

*server-aided client adaptation [for inter-client synchronization] is tightly coupled with*

*local playout adaptation* (Jo: section 2.4, par 3).  Thus the examiner maintains that Jo

teaches the above-argued limitation when Jo discloses fastening and loosening

playback speed based on comparing a virtual presentation time (which is a target

presentation time, see Jo: section 2.4, par 4) to an actual current presentation time (Jo:

section 2.3, par 2-3; section 2.4, par 3-4).

Application/Control Number: 10/816,217                                           Page 5
Art Unit: 2442

Applicant argues that Jo is directed to completing a different objective than applicant's

disclosure.  Specifically applicant argues that Jo is directed towards intra-client

synchronization, whereas applicant's disclosure recites an objective for inter-client

synchronization.


The examiner respectfully disagrees and finds these arguments unpersuasive.  The

courts have held that prior art solving a problem different from that of applicant may be

considered for purposes of obviousness.  (*"[t]he first error…in this case was…holding*

*that courts and patent examiners should look only to the problem the patentee was*

*trying to solve"*. See *KSR International Co. v. Teleflex Inc.*, 550 U.S. ___, ___, 82

USPQ2d 1385, 1397 (2007).)  Futhermore, the examiner maintains that both Jo and

applicant's invention are directed towards solving a problem of inter-client

synchronization, and finds Jo to be an analogous art.  An art is analogous if it is in a

similar field of endeavor.  In re Deminski, 796 F.2d 436, 442 (Fed. Cir. 1986); see also

In re Wood, 599 F.2d 1032, 1036 (CCPA 1979).  With regard to determining the scope

of analogous arts and fields of endeavor, the courts have held the scope may be

determined solely based on applicant's claimed invention. In re Bigio, 381 F.3d 1320,

1325 (Fed. Cir. 2004).  It may be improper to construe the scope of analogous arts

based on the (applicant's) specification in its entirety (or the inventor themselves), when

the claims are relatively broad with respect to the specification.  Both applicant's

claimed invention and the Jo reference are directed towards receiving audio information

over a network, playing back the audio information, and adjusting the speed of

Application/Control Number: 10/816,217                                           Page 6
Art Unit: 2442

playback.  Thus, the examiner finds that the cited references are in a similar field of

endeavor and an analogous art.


Applicant further argues it would not be obvious to combine the teachings of

VanDerSchaar with that Jo.  Applicant's argument is based on the premise that

VanDerSchaar is addressing a different problem and therefore no motivation would

exist to one of ordinary skill in the art.


The examiner respectfully disagrees and finds these arguments unpersuasive.  .  The

courts have held that prior art solving a problem different from that of applicant may be

considered for purposes of obviousness.  (*"[t]he first error…in this case was…holding*

*that courts and patent examiners should look only to the problem the patentee was*

*trying to solve"*. See *KSR International Co. v. Teleflex Inc.*, 550 U.S. ___, ___, 82

USPQ2d 1385, 1397 (2007)).  Furthermore, it is recognized that obviousness may be

established by combining or modifying the teachings of the prior art to produce the

claimed invention where there is some teaching, suggestion, or motivation to do so

found either in the references themselves or in the knowledge generally available to one

of ordinary skill in the art.  See *In re Fine*, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir.

1988), *In re Jones*, 958 F.2d 347, 21 USPQ2d 1941 (Fed. Cir. 1992), and *KSR*

*International Co. v. Teleflex, Inc.*, 550 U.S. 398, 82 USPQ2d 1385 (2007).  In the instant

case, the examiner articulated a motivating rationale for why one of ordinary skill in the

Application/Control Number: 10/816,217                                    Page 7
Art Unit: 2442

art would modify Jo with VanDerSchaar: to ensure a discontinuity in a source clock

information did not invalidate playback at a receiver device.


Applicant further argues the combined teachings fail to render obvious at least one

limitation within these claims.  Specifically, applicant argues the combined teachings fail

to render obvious the following:

> *"wherein an output time of the audio information for each respective frame is*
>
> *converted for the clock of the playback device"*;
>
> *"wherein the conversion is based on both the time associated with each*
>
> *respective frame and a time differential between the clock of the source device*
>
> *and the clock of the playback device"*.

Applicant's argument is based on the premise that the PTS modification disclosed by

VanDerSchaar is not the same as the claimed conversion of an output time.  Applicant

further alleges that the offset of VanDerSchaar is not a time differential because the

receiver does not know both the values of the local system time clock and the source

system time clock.


The examiner respectfully disagrees and finds these arguments unpersuasive.  With

regard to the first of the above-argued limitations, VanDerSchaar discloses a

Presentation TimeStamp (PTS) that is associated with each respective frame, and that

the PTS is an output time for the data (VanDerSchaar: [0002] *MPEG-2 broadcast*

*stream contains ... PTS, which identifies time ... at which the packet must be decoded*

Application/Control Number: 10/816,217                                              Page 8
Art Unit: 2442

*and presented for display*).  VanDerSchaar further teaches that the PTS is modified by
adding an offset value in order to make the timestamp valid for the playback device's
clock (VanDerSchaar: [0031]-[0032]).  Thus the examiner finds that VanDerSchaar
teaches the first of the above-argued limitations.

With respect to the second of the above-argued limitations, VanDerSchaar
discloses that in order to perform the PTS modification, an offset is calculated as the
difference between the encoder STC (on source device) and the local STC (on receiver
playback device) (VanDerSchaar: Fig 3a, [0030]-[0032]).  The modification of the PTS
then occurs by adding (or subtracting, if negative) the offset to the PTS within the
received packets.  Thus the examiner finds that VanDerSchaar teaches the second of
the above-argued limitations.  While applicant argues that the receiver playback device
cannot possibly know the source's system time clock, the examiner disagrees, as the
receiver derives the source time clock from program clock references (VanDerSchaar:
[0030]) and applicant's claimed invention does not exclude such a derivation of the
source's system time clock.


Applicant's arguments were ultimately unpersuasive and, therefore, the rejections of
these claims are hereby maintained.


Dependent claims 602-613, 615-620
Applicant argues these claims conditionally based upon the arguments presented for
their parent claim(s).

Application/Control Number: 10/816,217                                      Page 9
Art Unit: 2442

Applicant's arguments were ultimately unpersuasive and, therefore, the rejections of these claims are hereby maintained.

*Claim Rejections*

4.      Claims 601-606, 608, and 610-619 are rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002), and in further view of Van der Schaar et al (US 2003/0066094 A1).

Regarding claim 601, the Jo system teaches a method for synchronizing audio playback (Jo: abstract for inter-client synchronization), comprising:

receiving by a playback device a plurality of frames from a source device over a network (Jo: section 1, Fig 1; section 1, pars 1-3; section 2.1, par 1 provides for MPEG streams which inherently comprise frames; see, for example, section 3.1 Table 1, paragraph under table 1),

wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the respective frame (Jo: section 2.2, first paragraph provides each frame of stream is associated with audio/video data and the presentation timestamp PTS);

outputting audio information based on the plurality of frames via the playback device by playing audio information for each respective frame based on a clock of the

Application/Control Number: 10/816,217                                    Page 10
Art Unit: 2442

playback device, the clock of the playback device being independent of a clock of the

source playback device (Jo: section 2.1, first two paragraphs for audio/video stream

playback; section 2.3, paragraph 2 *we assume the globally synchronized time reference*

*is not available. To synchronize... each client manages the synchronization based on its*

*own time reference, namely local virtual time*; this also provides each client is using a

local clock, independent of any source clock, or PTS reference clock, for playback; See

also section 2.4, paragraphs 3-4); and

adjusting a speed at which the playback device outputs the audio information,

wherein the speed is adjusted based on a comparison between an expected output time

of audio information for a particular frame and the output time (Jo: section 2.3,

paragraph 2; provides "*each client compares its current presentation time to the virtual*

*one*", and when the difference is greater than a threshold it fastens or loosens playback

speed; See also section 2.4, paragraphs 3-4).

Jo fails to explicitly address how the streams are being timestamped with a PTS,

and thus fails to teach:

wherein the time indicating when to play each frame is based on a clock of the

source device; or

wherein an output time of the audio information for each respective frame is

converted for the clock of the playback device based on both the time associated with

each respective frame and a time differential between the clock of the source device

and the clock of the playback device.

Application/Control Number: 10/816,217                                    Page 11
Art Unit: 2442

Van der Schaar, in a similar field of endeavor, teaches wherein the time indicating when to play each frame is based on a clock of the source device (van der Schaar: [0002] provides that in an MPEG stream the broadcaster periodically transmits their system time clock SCR value (via a PCR timestamp) and assigns the presentation timestamp PTS for packets (ie frames) to be presented based on its own clock); and

wherein an output time of the audio information for each respective frame is converted for the clock of the playback device based on both the time associated with each respective frame and a time differential between the clock of the source device and the clock of the playback device (van der Schaar: Figure 3A, 3B; abstract, [0027] provides the receiver's clock is not same value as broadcaster's, but synchronizes frequency and phase; [0028]-[0032], particularly [0030] with ref to Fig 3A, provides for replacing PTS with the offset between the broadcaster and receiver clocks).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of van der Schaar for converting the PTS of each packet as needed. The teachings of van der Schaar, when implemented in the Jo system, will allow one of ordinary skill in the art to convert the PTS of a MPEG stream's packet prior to playback. One of ordinary skill in the art would be motivated to utilize the teachings of van der Schaar in the Jo system in order to ensure a discontinuity in a source's clock information did not invalidate playback of packets at a receiver device.

Regarding claim 602, the Jo/VanDerSchaar system teaches further comprising computing the time differential at a plurality of different instances while outputting audio

information via the playback device and using a currently computed time differential to determine the output time of the audio information for each respective frame (van der Schaar: [0002], Fig. 3a provides the SCR and offset determination occur periodically over time and during playback).

Regarding claim 603, the Jo/VanDerSchaar system teaches further comprising receiving by the playback device timing information of the clock of the source device (VanDerSchaar: [0002]).

Regarding claim 604, the Jo/VanDerSchaar system teaches further comprising determining by the playback device the time differential using the timing information of the clock of the source device and timing information of the clock of the playback device (VanDerSchaar: Fig 3a, [0029]-[0032] provides receiver determines offset between encoder STC and local STC).

Regarding claim 605, the Jo/VanDerSchaar system teaches wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the

Application/Control Number: 10/816,217                                      Page 13
Art Unit: 2442

source device (VanDerSchaar: [0033] provides for both positive and negative offset adjustments).

Regarding claim 606, the Jo/VanDerSchaar system teaches further comprising buffering by the playback device the audio information along with the output time prior to the step of outputting the audio information (Jo: section 2.1 provides for buffering the stream).

Regarding claim 608, the Jo/VanDerSchaar system teaches wherein the plurality of frames received from the source device are performed by a multicast transmission methodology (Jo: abstract).

Regarding claim 610, the Jo/VanDerSchaar system teaches wherein adjusting the speed at which the playback device outputs the audio information comprises adjusting the clock of the playback device (Jo: section 2.4, paragraph 4 provides the local virtual timer is adjusted).

Regarding claim 611, the Jo/VanDerSchaar system teaches wherein the playback device is one of a plurality of playback devices in a synchrony group (Jo: abstract provides this is for a many-client synchrony group, section 2.1 paragraph 1 provides for 100 clients).

Application/Control Number: 10/816,217                                    Page 14
Art Unit: 2442

Regarding claim 612, the Jo/VanDerSchaar system teaches wherein the synchrony

group is dynamically configurable, such that a number of the plurality of playback

devices in the synchrony group is adjustable (Jo: section 2.1, paragraph 1 provides this

is a SSM network, which requires clients to actively join multicast groups).


Regarding claim 613, the Jo/VanDerSchaar system teaches wherein the playback

device receives the plurality of frames from the source device over a wireless network

(VanDerSchaar: [0018] provides for using satellite networks).


Regarding claims 614-619, these claims contain limitations found within that of claims

601-606, respectively, and the same rationale of rejection is used, where applicable.


5.      Claims 607 and 620 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Jo et al ("Synchronized one-to-many media streaming with adaptive playout

control", 10 December 2002); in view of Van der Schaar et al (US 2003/0066094 A1);

and in further view of Mane (US 2003/0195964 A1).


Regarding claim 607, the Jo/VanDerSchaar teaches the source multicasting the frames-

for-playback to playback devices (Jo: abstract), but does not teach:

        receiving by the playback device a multicast address that the source device is

using to broadcast the plurality of frames prior to the step of receiving the plurality of

frames.

Application/Control Number: 10/816,217                                    Page 15
Art Unit: 2442

Mane, in a similar field of endeavor, teaches receiving by the playback device a multicast address that the source device is using to broadcast the plurality of frames prior to the step of receiving the plurality of frames (Mane: [0039] the MMM tells the client which multicast group address to listen to for their request).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Mane for telling the clients which multicast address to listen to. The teachings of Mane, when implemented in the Jo/VanDerSchaar system, will allow one of ordinary skill in the art to manage multiple multicast groups for streaming media data and inter-client synchronizing each multicast group. One of ordinary skill in the art would be motivated to utilize the teachings of Mane in the Jo/VanDerSchaar system in order to direct a client to join a particular multicast group or listen to a particular multicast group address for content the client may be requesting that is multicasted.

Regarding claim 620, this claim contains limitations found within that of claim 607 and the same rationale of rejection is used, where applicable.

6.    Claim 609 is rejected under 35 U.S.C. 103(a) as being unpatentable over Jo et al ("Synchronized one-to-many media streaming with adaptive playout control", 10 December 2002); in view of Van der Schaar et al (US 2003/0066094 A1); and in further view of Kim et al (US 6,836,788 B2).

Application/Control Number: 10/816,217                                        Page 16
Art Unit: 2442

Regarding claim 609, the Jo/VanDerSchaar system does not explicitly teach wherein the source device is a second playback device.

Kim, in a similar field of endeavor, teaches wherein the source device is a second playback device (Kim: Figure 2, items 212 for example; col 3, lines 32-59 provides that receivers receiving multimedia for playback can also be multicast group leader nodes).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Kim for having tiered multicast groups. The teachings of Kim, when implemented in the Jo/VanDerSchaar system, will allow one of ordinary skill in the art to cascade out streaming media to multiple tiered multicast groups in synchrony. One of ordinary skill in the art would be motivated to utilize the teachings of Kim in the Jo/VanDerSchaar system in order to reduce the likelihood of overloading a root multicast group streamer.

Application/Control Number: 10/816,217                                        Page 17
Art Unit: 2442

### *Conclusion*

7.      **THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the mailing date of this final action.

Application/Control Number: 10/816,217                                    Page 18
Art Unit: 2442

8.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to JEFFREY NICKERSON whose telephone number is

(571)270-3631.  The examiner can normally be reached on M-Th, 9:00am - 7:00pm.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Glenton Burgess can be reached on (571)272-3949.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

        Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/J. N./
Examiner, Art Unit 2442

/Douglas B Blair/
Primary Examiner, Art Unit 2442

PATENT

Application Number 10/816,217

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicants: Nicholas A.J. Millington | ) | I hereby certify that this paper is |
| | ) | being electronically deposited with |
| Serial No.: 10/816,217 | ) | the United States Patent and |
| | ) | Trademark Office on this date: |
| Filed: April 1, 2004 | ) | |
| | ) | |
| For: System and Method for Synchronizing | ) | **November 30, 2011** |
| Operations Among a Plurality of | ) | |
| Independently Clocked Digital Data | ) | |
| Processing Devices | ) | |
| | ) | **/Christopher N. George/** |
| Group Art Unit: 2442 | ) | Christopher N. George |
| | ) | Registration No.: 51,728 |
| Confirmation No.: 7302 | ) | Attorney for Applicants |
| | | |
| Examiner: Jeffrey L. Nickerson | | |

## SUBMISSION WITH REQUEST FOR CONTINUED EXAMINATION

Mail Stop Non-Fee Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

 Please enter and consider the following amendments and remarks submitted in conjunction with a Request for Continued Examination.

 **The Status of the Claims** is reflected in the listing of claims that begins on page 2 of this paper.

 **Remarks** begin on page 7 of this paper.

## AMENDMENTS TO THE CLAIMS

The following is a complete listing of the claims. This listing of claims will replace all prior versions, and listings, of claims in the application.

1-600. (Canceled)

601. (Currently Amended) A method for synchronizing audio playback amongst a plurality of separate audio playing devices, the method comprising:

receiving by a playback device a multicast stream including a plurality of frames from a source device over a local network, wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the respective frame, wherein the time is based on a clock of the source device, which is independent of a clock of the playback device, and wherein the playback device is configured to play the audio information in synchrony with the source device;

periodically receiving by the playback device a unicast message transmitted from the source device, the unicast message separate from the multicast stream and including clock information of the source device;

computing a time differential between the clock of the source device and clock of the playback device based on a most recently received unicast message;

outputting audio information based on the plurality of frames via the playback device by playing audio information for each respective frame based on a clock of the playback device, which is independent of the clock of the source device, wherein [[an]] a computed output time of the audio information for each respective frame is converted for the clock of the playback device based on both the time associated with each respective frame and a most recent computation of the time differential between the clock of the source device and the clock of the playback device; and

adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the <u>computed</u> output time.

602. (Previously Presented) The method of claim 601, further comprising computing the time differential at a plurality of different instances while outputting audio information via the playback device and using a currently computed time differential to determine the output time of the audio information for each respective frame.

603. (Previously Presented) The method of claim 601, further comprising receiving by the playback device timing information of the clock of the source device.

604. (Previously Presented) The method of claim 603, further comprising determining by the playback device the time differential using the timing information of the clock of the source device and timing information of the clock of the playback device.

605. (Previously Presented) The method of claim 601, wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the source device.

606. (Previously Presented) The method of claim 601, further comprising buffering by the playback device the audio information along with the output time prior to outputting the audio information.

607. (Previously Presented) The method of claim 601, further comprising receiving by the playback device a multicast address that the source device is using to broadcast the plurality of frames prior to receiving the plurality of frames.

608. (Previously Presented) The method of claim 601, wherein the plurality of frames received from the source device are performed by a multicast transmission methodology.

609. (Previously Presented) The method of claim 601, wherein the source device is a second playback device.

610. (Previously Presented) The method of claim 601, wherein adjusting the speed at which the playback device outputs the audio information comprises adjusting the clock of the playback device.

611. (Previously Presented) The method of claim 601, wherein the playback device is one of a plurality of playback devices in a synchrony group.

612. (Previously Presented) The method of claim 611, wherein the synchrony group is dynamically configurable, such that a number of the plurality of playback devices in the synchrony group is adjustable.

613. (Previously Presented) The method of claim 601, wherein the playback device receives the plurality of frames from the source device over a wireless network.

614. (Currently Amended) A non-transitory computer readable medium having stored therein instructions executable by a processor to perform a method for synchronizing audio playback amongst a plurality of separate audio playing devices, the method comprising:

receiving by a playback device a multicast stream including a plurality of frames from a source device over a local network, wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the respective frame, wherein the time is based on a clock of the source device, which is independent of a clock of the playback device, and wherein the playback device is configured to play the audio information in synchrony with the source device;

periodically receiving by the playback device a unicast message transmitted from the source device, the unicast message separate from the multicast stream and including clock information of the source device;

computing a time differential between the clock of the source device and clock of the playback device based on a most recently received unicast message;

outputting audio information based on the plurality of frames via the playback device by playing audio information for each respective frame based on a clock of the playback device, ~~which is independent of the clock of the source device,~~ wherein [[an]] a computed output time of the audio information for each respective frame is converted for the clock of the playback device based on both the time associated with each respective frame and a most recent computation of the time differential between the clock of the source device and the clock of the playback device; and

adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the computed output time.

615. (Previously Presented) The non-transitory computer readable medium of claim 614, further comprising instructions to perform computing the time differential at a plurality of different instances while outputting audio information via the playback device and using a currently computed time differential to determine the output time of the audio information for each respective frame.

616. (Previously Presented) The non-transitory computer readable medium of claim 614, further comprising instructions to perform receiving by the playback device timing information of the clock of the source device.

617. (Previously Presented) The non-transitory computer readable medium of claim 616, further comprising instructions to perform determining by the playback device the time differential using the timing information of the clock of the source device and timing information of the clock of the playback device.

618. (Previously Presented) The non-transitory computer readable medium of claim 614, wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with

PATENT

Application Number 10/816,217

each respective frame when the clock of the playback device is behind the clock of the source device.

619. (Previously Presented) The non-transitory computer readable medium of claim 614, further comprising instructions to perform the playback device buffering the audio information along with the output time prior to outputting the audio information.

620. (Previously Presented) The non-transitory computer readable medium of claim 614, further comprising instructions to perform receiving by the playback device a multicast address that the source device is using to broadcast the plurality of frames prior to receiving the plurality of frames.

PATENT

Application Number 10/816,217

# REMARKS

## I.  Status of the Claims

Claims 601-620 are pending in the present application. By this Response, claims 601 and 614 have been amended. The claims have been amended to expedite an allowance of claims, and the Applicant reserves the right to pursue some or all of the previously pending claims, which the Applicant feels are allowable over the cited art of record, in a continuation application. Reconsideration and withdrawal of the rejections of this application in view of the amendment is respectfully requested, as the application is in condition for allowance.


## II.  Interview Summary and Request

The Applicant thanks Examiner Nickerson for his time in the in-person interview of November 29, 2011, to discuss amendments to expedite allowance of claims. While the Applicant respectfully submits that the previous claims were allowable over the cited art of record, the Applicant thanks the Examiner for the productive discussion and agreement that the pending claims, as amended, were allowable over the cited art of record. In addition, the Applicant thanks the Examiner for his agreement to contact the Applicant following his subsequent search to discuss any remaining issues before advancing the application to Allowance. As discussed, the Examiner is to contact the Applicant's representative Christopher N. George at (312) 580-1836 to schedule the interview at a date and time convenient to the Examiner.


## III.  Claim Rejections

Claims 601-606, 608, and 610-619 have been rejected under 35 U.S.C. 103(a) as unpatentable over Jo ("Synchronized one-to-many media streaming with adaptive playout control,"10 December 2002) in view of Van der Schaar et al. ("Van der Schaar," US Application Publication 2003/0066094). Claims 607 and 620 have been rejected as unpatentable over Jo in view of Van der Schaar and further in view of Mane ("Mane," US Application Publication 2003/0095848). Claim 609 has been rejected as unpatentable over Jo in view of Van der Schaar and further in view of Kim et al. ("Kim," US Patent 6,836,788). The Applicant appreciates the Examiner's efforts in the thorough examination of this application and submits that, as agreed upon by the Examiner, these rejections are moot in view of the present Amendments. The

PATENT

Application Number 10/816,217

Applicant, however, provides the following additional reasons to respectively traverse and request reconsideration of the rejections.

Independent claim 601 recites a method for synchronizing audio playback amongst a plurality of separate audio playing devices. Van der Schaar, for example, mentions an audio/video signal broadcast to a television and seeks to synchronize the presentation of audio and video from that signal out of the television. Van der Schaar makes no mention of synchronizing audio playback among a plurality of separate audio playing devices. Further, a playback device according to claim 601 receives a multicast stream of frames over a *local* network. On this local network, the playback device is configured to play the received audio information *in synchrony with the source device*.

Additionally, rather than including timing information in a PCR or PTS field of an MPEG-2 stream, the method of claim 601 recites periodically receiving at a playback device from a source device a unicast message including clock information of the source device to be used to compute a time differential between the clock of the source device and clock of the playback device. Further, rather than, as in Van der Schaar, determining an offset in response to a discontinuity caused by a change in encoders, the method of claim 601 recites computing a time differential between the source device clock and playback device clock based on the periodically received unicast message. Thus, Van der Schaar is addressing a different problem (switching between multiple encoders with multiple clocks that introduce discontinuity) and describes a different solution than the method of claim 601.

As recited in the method of claim 601, a most recent periodic computation of the time differential is used to compute an output time for audio information. Claim 601 states that a computer output time is based on (1) the time indicating when to play the audio information of each respective frame (according to the source clock) and (2) a time differential between the clock of the source device and the clock of the playback device. The computed output time is used for both playback of the audio information and for comparison to an expected output time to adjust a speed at which the playback device outputs the audio information. Conversely, Jo simply records an actual time at which the audio is output.

Accordingly, the Applicant submits that a combination of Jo and van der Schaar, with or without Mane or Kim, fails to provide a *prima facie* case of obviousness with respect to claim 601. Reconsideration of the rejection of claims 601 – 613 is respectfully requested.

PATENT

Application Number 10/816,217

The Applicant respectfully submits that independent claim 614 should also be in condition for allowance. As with independent claim 601, discussed above, and as agreed upon by the Examiner, the cited art fails to teach or suggest the recitations of claim 614. For example, none of the cited art of record teaches or suggests synchronizing audio playback amongst a plurality of separate audio playing devices, as recited in claim 614. None of the cited art of record teaches or suggests receiving by a playback device a multicast stream from a source device over a local network, wherein the playback device is configured to play the audio information in synchrony with the source device, as recited in claim 614. None of the cited art of record teaches or suggests receiving by the playback device a unicast message transmitted from the source device, the unicast message separate from the multicast stream and including clock information of the source device, or computing a time differential between the clock of the source device and clock of the playback device based on the unicast message, as recited in claim 614. None of the cited art teaches or suggests a computed output time of the audio information for each respective frame is converted for the clock of the playback device based on both the time associated with each respective frame and a most recent computation of the time differential between the clock of the source device and the clock of the playback device. Further, none of the cited art of record teaches or suggests adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the computed output time, as recited in claim 614.

Accordingly, the Applicant submits that a combination of Jo and van der Schaar, with or without Mane or Kim, fails to provide a *prima facie* case of obviousness with respect to claim 614. Reconsideration of the rejection of claims 614 – 620 is respectfully requested.

PATENT

Application Number 10/816,217

## IV.    Conclusion

All the stated grounds of objection and rejection have been respectfully traversed, accommodated, or rendered moot. The Applicant therefore submits that the present application is in condition for allowance.

In general, the Office Action makes various statements regarding the pending claims and the cited references that are now moot in light of the above.  Thus, the Applicant will not address such statements at the present time.  However, the Applicant expressly reserves the right to challenge such statements in the future should the need arise (e.g., if such statement should become relevant by appearing in a rejection of any current or future claim). Additionally, the Applicant expressly reserves the right to challenge or address statements made previously during the prosecution that may have been incorrect or are no longer applicable.

If the Examiner has any questions or if the Applicant can be of any assistance, the Examiner is invited and encouraged to contact the Applicant.  The Commissioner is authorized to charge any necessary fees or credit any overpayment to Deposit Account Number 50-2455.


Respectfully submitted,

HANLEY, FLIGHT & ZIMMERMAN, LLC.
USPTO Customer Number 14458
Suite 2100
150 South Wacker Drive
Chicago, Illinois 60606
(312) 580-1020

By:    /Christopher N. George/
Christopher N. George
Registration No. 51,728
Attorney for Applicants

**November 30, 2011**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

14458      7590      12/27/2011

Mark Triplett (Sonos, Inc.)
150 S. Wacker Drive
Suite 2100
Chicago, IL 60606

| EXAMINER |
| --- |
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2442 | |

DATE MAILED: 12/27/2011

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | 20218/04-0401 (PA3445US) | 7302 |

TITLE OF INVENTION: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/27/2012 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to: <u>Mail</u>**

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

**or <u>Fax</u>**   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

14458      7590      12/27/2011

Mark Triplett (Sonos, Inc.)
150 S. Wacker Drive
Suite 2100
Chicago, IL 60606

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

|  |  |
|---|---|
| | (Depositor's name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | 20218/04-0401 (PA3445US) | 7302 |

TITLE OF INVENTION: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | YES | $870 | $300 | $0 | $1170 | 03/27/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| NICKERSON, JEFFREY L | 2442 | 709-205000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2.** For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :    ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

**4a. The following fee(s) are submitted:**

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.

☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

| *Notice of Allowability* | Application No. | Applicant(s) | |
|---|---|---|---|
| | 10/816,217 | MILLINGTON, NICHOLAS A. J. | |
| | Examiner | Art Unit | |
| | JEFFREY NICKERSON | 2442 | |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the RCE filed on 30 November 2011*.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *601-620*.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All    b) ☐ Some*   c) ☐ None    of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____.

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
      1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.
   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
      Paper No./Mail Date _____.

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date *11/30/2011*
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application
6. ☒ Interview Summary (PTO-413), Paper No./Mail Date *12/15/2011*.
7. ☒ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____.

/Jeffrey Nickerson/
Examiner, Art Unit 2442

Application/Control Number: 10/816,217                                           Page 2
Art Unit: 2442

### NOTICE OF ALLOWABILITY

1.      This communication is in response to Application No. 10/816,217 filed on 01 April

2004 with a domestic benefit dating back to 28 July 2003. The request for continued

examination presented on 30 November 2011, which amends claims 601 and 614, is

hereby acknowledged. Claims 601-620 are currently pending and subject to

examination.


### *Examiner's Amendment*

2.      An examiner's amendment to the record appears below. Should the changes

and/or additions be unacceptable to applicant, an amendment may be filed as provided

by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be

submitted no later than the payment of the issue fee.

        Authorization for this examiner's amendment was given in a telephone interview

with Christopher George (51728) on 15 December 2011.


The claim listing below shall replace all prior versions of the claims:

Application/Control Number: 10/816,217                                    Page 3
Art Unit: 2442

**Claim Listing:**

1-600. (Canceled)

601. (Currently Amended) A method for synchronizing audio playback of a plurality of separate audio playing devices with one another, the method comprising:

receiving, by a playback device, a multicast stream including a plurality of frames from a source device over a local network, wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the respective frame, wherein the time is based on a clock of the source device, which is independent of a clock of the playback device;

periodically receiving, by the playback device, a unicast message transmitted from the source device, the unicast message separate from the multicast stream and including clock information of the source device;

computing, by the playback device, a time differential between the clock of the source device and the clock of the playback device based on a most recently received unicast message;

converting, by the playback device and for each frame of the plurality of frames, a computed output time of the audio information for each respective frame, the converting based on both the time associated with each respective frame and a most recent computation of the time differential;

outputting, by the playback device, audio information based on the plurality of frames by playing audio information for each respective frame based on a clock of the playback device, wherein the playback device is configured to output the audio information in synchrony with the source device ; and

adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time

Application/Control Number: 10/816,217                                                    Page 4
Art Unit: 2442

of audio information for a particular frame and the computed output time of the particular frame.

602. (Currently Amended) The method of claim 601, wherein the computing a time differential occurs periodically.

603. (Currently Amended) The method of claim 602, wherein the converting a computed output time is in response to computing the most recent computation of the time differential.

604. (Currently Amended) The method of claim 602, wherein the computing a time differential is in response to receiving the most recently received unicast message.

605. (Previously Presented) The method of claim 601, wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the source device.

606. (Previously Presented) The method of claim 601, further comprising buffering by the playback device the audio information along with the output time prior to outputting the audio information.

607. (Currently Amended) The method of claim 601, further comprising receiving by the playback device a multicast address that the source device is using to multicast the plurality of frames prior to receiving the plurality of frames.

608. (Currently Amended) The method of claim 601, wherein the plurality of frames received from the source device are performed by a group multicast transmission methodology.

Application/Control Number: 10/816,217                                    Page 5
Art Unit: 2442

609. (Previously Presented) The method of claim 601, wherein the source device is a second playback device.

610. (Previously Presented) The method of claim 601, wherein adjusting the speed at which the playback device outputs the audio information comprises adjusting the clock of the playback device.

611. (Previously Presented) The method of claim 601, wherein the playback device is one of a plurality of playback devices in a synchrony group.

612. (Previously Presented) The method of claim 611, wherein the synchrony group is dynamically configurable, such that a number of the plurality of playback devices in the synchrony group is adjustable.

613. (Previously Presented) The method of claim 601, wherein the playback device receives the plurality of frames from the source device over a wireless network.

614. (Currently Amended) A non-transitory computer readable medium comprising instructions for synchronizing audio playback of a plurality of separate audio playing devices with one another, the instructions, when executed by a processor, cause the processor to perform the following:

receiving, by a playback device, a multicast stream including a plurality of frames from a source device over a local network, wherein each frame of the plurality of frames is associated with audio information and a time indicating when to play the audio information of the respective frame, wherein the time is based on a clock of the source device, which is independent of a clock of the playback device;

periodically receiving, by the playback device, a unicast message transmitted from the source device, the unicast message separate from the multicast stream and including clock information of the source device;

Application/Control Number: 10/816,217                                                    Page 6
Art Unit: 2442

computing, by the playback device, a time differential between the clock of the source device and the clock of the playback device based on a most recently received unicast message;

converting, by the playback device and for each frame of the plurality of frames, a computed output time of the audio information for each respective frame, the converting based on both the time associated with each respective frame and a most recent computation of the time differential;

outputting, by the playback device, audio information based on the plurality of frames by playing audio information for each respective frame based on a clock of the playback device, wherein the playback device is configured to output the audio information in synchrony with the source device; and

adjusting a speed at which the playback device outputs the audio information, wherein the speed is adjusted based on a comparison between an expected output time of audio information for a particular frame and the computed output time of the particular frame.

615. (Currently Amended) The non-transitory computer readable medium of claim 614, wherein the computing a time differential occurs periodically.

616. (Currently Amended) The non-transitory computer readable medium of claim 615, wherein the converting a computed output time is in response to computing the most recent computation of the time differential.

617. (Currently Amended) The non-transitory computer readable medium of claim 615, wherein the computing a time differential is in response to receiving the most recently received unicast mesage.

618. (Previously Presented) The non-transitory computer readable medium of claim 614, wherein the output time of the audio information for each respective frame is determined for the clock of the playback device by adding the time differential to the

time associated with each respective frame when the clock of the playback device is ahead of the clock of the source device and by subtracting the time differential to the time associated with each respective frame when the clock of the playback device is behind the clock of the source device.

619. (Currently Amended) The non-transitory computer readable medium of claim 614, further comprising instructions to cause the playback device to buffer the audio information along with the output time prior to outputting the audio information.

620. (Currently Amended) The non-transitory computer readable medium of claim 614, further comprising instructions to cause the playback device to receive a multicast address that the source device is using to multicast the plurality of frames prior to receiving the plurality of frames.

Application/Control Number: 10/816,217                                    Page 8
Art Unit: 2442

### *Reasons for Allowance*

3.      The following is an examiner's statement of reasons for allowance:

a.      The prior art of record discloses synchronizes audio playback between clients and updating timestamps embedded within media frames based on an offset between local client clock and source client clock.

b.      The prior art of record fails to render obvious a local playback device: periodically receiving clock information from the source device in a unicast message separate from the multicast stream, computing a time differential between the source and local clocks based on the unicast message, and converting for each frame an computed output time based on the computed differential and the time associated with the frame.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Application/Control Number: 10/816,217                                    Page 9
Art Unit: 2442

### *Citation of Pertinent Prior Art*

4.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

     c.      Akyildiz et al ("Multimedia Group Synchronization Protocols for Integrated

Services Networks", 1996) discloses various group media playback

synchronization protocols.

     d.      Schulzrinne et al ("RTP: A Transport Protocol for Real-Time Applications",

July 2003) discloses RTP and RTCP.

     e.      Sullivan et al (US 2003/0198257 A1; US 7,333,519 B2) discloses

synchronizing audio playback devices with a control pulse.

     f.      Blank et al (US 2004/0252400 A1) discloses synchronizing multiple media

playback devices by synchronizing to a master clock.

     g.      Goldberg et al (US 2007/0142944 A1) discloses synchronizing playback

between multiple ad hoc audio devices.

     h.      Kowalski (US 6,631,410 B1) discloses a system for synchronizing multiple

client audio devices in a mesh network.

     i.      Edens (US 6,611,537 B1) discloses a home media network that

synchronizes playback between rooms.

     j.      Shaw et al (US 5,815,689) discloses a system for synchronizing data

streams with reference to a master clock.

     k.      Ushimaru (US 2003/0231871 A1) discloses a system for synchronizing an

audio device to a video device.

Application/Control Number: 10/816,217                                      Page 10
Art Unit: 2442

### *Conclusion*

5.      Any inquiry concerning this communication or earlier communications from the examiner should be directed to JEFFREY NICKERSON whose telephone number is (571)270-3631.  The examiner can normally be reached on M-Th, 9:00am - 7:00pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Glenton Burgess can be reached on (571)272-3949.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished applications is available through Private PAIR only.  For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/Jeffrey  Nickerson/
Examiner, Art Unit 2442

| ***Examiner-Initiated Interview Summary*** | Application No. | Applicant(s) |
| --- | --- | --- |
| | 10/816,217 | MILLINGTON, NICHOLAS A. J. |
| | Examiner | Art Unit | |
| | JEFFREY NICKERSON | 2442 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) _JEFFREY NICKERSON_.                    (3)_Christopher George (51728)_.

(2) _____.                                 (4)_____.

Date of Interview: _15 December 2011_.

Type:    ☒ Telephonic    ☐ Video Conference
         ☐ Personal [copy given to: ☐ applicant    ☐ applicant's representative]

Exhibit shown or demonstration conducted:    ☐ Yes    ☒ No.
    If Yes, brief description: _____.

Issues Discussed    ☐101  ☐112  ☐102  ☐103  ☒Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: _601-620_.

Identification of prior art discussed: _N/A_.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

_The examiner presented a proposed examiner amendment to the claims as per the attached Examiner Amendment. Applicant authorized entry of the proposed examiner amendment._.

**Applicant recordation instructions**: It is not necessary for applicant to provide a separate record of the substance of interview.

**Examiner recordation instructions**: Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☒ Attachment

| /Jeffrey Nickerson/ Examiner, Art Unit 2442 | |
| --- | --- |



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/816,217 | 04/01/2004 | Nicholas A. J. Millington | 20218/04-0401 (PA3445US) | 7302 |

14458      7590      12/27/2011

Mark Triplett (Sonos, Inc.)
150 S. Wacker Drive
Suite 2100
Chicago, IL 60606

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

DATE MAILED: 12/27/2011

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 318 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 318 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Exhibit 54

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/297,000 | 11/15/2011 | Nicholas A. J. Millington | 20218/11-0901 | 5138 |

14458          7590          09/13/2012

Mark Triplett (Sonos, Inc.)
150 S. Wacker Drive
Suite 2100
Chicago, IL 60606

| EXAMINER |
|---|
| NICKERSON, JEFFREY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/13/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 13/297,000 | MILLINGTON, NICHOLAS A. J. |
| | **Examiner** | **Art Unit** |
| | JEFFREY NICKERSON | 2442 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

### Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS,
WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

### Status

1)☒ Responsive to communication(s) filed on <u>29 May 2012</u>.

2a)☒ This action is **FINAL**.          2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on
    _____ ; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
    closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

### Disposition of Claims

5)☒ Claim(s) <u>1-23</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>1-23</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

### Application Papers

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

### Priority under 35 U.S.C. § 119

13)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____ .

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage
        application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date <u>05/29/2012</u>.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

Application/Control Number: 13/297,000                                      Page 2

Art Unit: 2442

## DETAILED ACTION

1.      This communication is in response to Application No. 13/297,000 filed on 15

November 2011 with a domestic benefit dating back to 28 July 2003. The response

presented on 29 May 2012, which amends claims1, 3, 5-7, 9-10, 12-14, 20, adds claims

21-22, and presents arguments, is hereby acknowledged. Claims 1-23 are currently

pending and subject to examination.

### *35 USC § 103*

2.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

### *Response to Arguments*

3.      Applicant's amendments and arguments, filed in the response dated 29 May

2012, with respect to the rejections under 35 USC 103(a) have been fully considered

but they are not persuasive.

Independent claims 1, 13, 14, and 20

Applicant argues the combined teachings fail to render obvious at least one limitation

within these claims.  Specifically, applicant argues the combined teachings fail to render

obvious the following:

Application/Control Number: 13/297,000                                              Page 3
Art Unit: 2442

> *"receiving, by a computing device, control information from a user interface that*
> *controls audio playback in a plurality of zones on a local network, each zone*
> *containing at least one audio device, the control information comprising a user*
> *selection of at least two zones of the plurality of zones to establish a synchrony*
> *group, wherein the computing device is further configured to reproduce audio*
> *information upon command".*

Applicant's argument is based on the premise that in Goldberg, both the broadcast unit
user and the receive unit user have control over whether they are part of the synchrony
cluster and whether they are playing back audio in synchrony, whereas the claim may
require just a single device to control the cluster's member zones and direct audio
playback.


The examiner respectfully disagrees and finds these arguments unpersuasive. It is
noted that the features upon which applicant relies (i.e., "only one device being in
control of the synchrony groups and controlling audio playback among the synchrony
groups") are not recited in the rejected claims.  Although the claims are interpreted in
light of the specification, limitations from the specification are not read into the claims.
See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).  Notably,
Goldberg teaches beyond the claimed invention because while all units may participate
in determining synchrony group membership and what audio files are being
broadcasted and played back, Goldberg also teaches the embodiment where the

Application/Control Number: 13/297,000                                              Page 4
Art Unit: 2442

broadcaster dictates all such actions.  Furthermore the claim does not recite that "the computing device" is the only device capable of controlling the zones' devices.

The examiner finds that Goldberg teaches the broadcast unit ha"ing a user interface that receives control informati'n for controlling audio playback in the plurality of cluster devices (i.e., multiple subclusters of the cluster; See Fig 33) (Goldberg: [0299]; [0254]; [0312]-[0314]), the control information being for example start and stop of song, or song selection (Goldberg: [0176]; [0299]; [0312]-[0314]).  The examiner further finds that the computing device is configured to reproduce audio information upon command (Goldberg: [0312] *user selects song from the display to play*; [0314] *song file is played on the local unit [] and is streamed to [the other units that are part of the synchrony cluster]*).  The examiner further finds that Goldberg teaches the broadcast unit can be in sole control of who joins the synchrony cluster by a user selecting "yes" or "no" to allow/disallow a unit from joining the synchrony cluster (Goldberg: Fig 19, "broadcaster" rule; [0230]).  With such indications, the broadcast unit is receiving a user selection of which zones (ie, either individual units, or multiple subcluster representatives) are allowed to join the cluster to establish a synchrony group.  Therefore the examiner finds that Goldberg teaches the above-argued limitations.


Applicant's arguments were ultimately unpersuasive and, therefore, the rejections of these claims are hereby maintained.

Application/Control Number: 13/297,000                                    Page 5
Art Unit: 2442

Dependent claims 2-12 and 15-19

Applicant argues these claims conditionally based upon arguments presented for their

parent claim(s).


Applicant's arguments were ultimately unpersuasive and, therefore, the rejections of

these claims are hereby maintained.


*Claim Rejections*

4.      Claims 1-13 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Goldberg et al (US 2007/0142944 A1); and in further view of VanDeusen et al (US

6,598,172 B1).


Regarding claim 1, Goldberg teaches a method for providing synchronized playback

amongst a plurality of audio devices (Goldberg: abstract), comprising:

        receiving, by a computing device, control information from a user interface that

controls audio playback in a plurality of zones on a local network (Goldberg: [0312]-

[0314]), each zone containing at least one audio device (Goldberg: Fig 9A-9B); wherein

the control information comprises a user selection of at least two zones of the plurality

of zones to establish a synchrony group (Goldberg: Fig 19, "broadcaster" rule, [0230]);

and wherein the computing device is further configured to reproduce audio information

upon command (Goldberg: [0314]; [0299]);

Application/Control Number: 13/297,000                                     Page 6
Art Unit: 2442

retrieving, by the computing device, audio information from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming audio service (Goldberg: Fig 8a; [0189]-[0191]; [0312]);

transmitting audio information and timing information to the audio devices of the at least two zones over the local network from the computer device (Goldberg: [0202]; [0321] for inserting control signal into packet);

wherein the timing information is generated at the computing device (Goldberg: [0202]-[0203] provides for broadcast unit generating the 'currently played sample number' and broadcasting it as synchronization signal);

wherein the timing information is to be used to play the audio information by the audio devices of the at least two zones in synchrony (Goldberg: [0202]).

Goldberg does not explicitly teach that the computing device inserts the timestamp.

VanDeusen, in a similar field of endeavor, elaborates on the encoding and packeting process, and teaches the computing device inserting timestamp data (VanDeusen: col 2, lines 39-57).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of VanDeusen for inserting timestamp information. The teachings of VanDeusen, when implemented in the Goldberg system, will allow one of ordinary skill in the art to encode and packetize audio data. One of ordinary skill in the art would be motivated to utilize the teachings of VanDeusen in the Goldberg system in order to effect the encoding and packetization of audio.

Regarding claim 2, the Goldberg/VanDeusen system teaches wherein the computing device comprises a personal computer (Goldberg: [0102]).

Regarding claim 3, the Goldberg/VanDeusen system teaches further comprising transmitting the plurality of frames to the plurality of audio devices responsive to receiving a user command via a user interface of the personal computer (Goldberg: Figs 22-23; [0312]).

Regarding claim 4, the Goldberg/VanDeusen system teaches wherein the computing device comprises a mobile computing device (Goldberg: [0102]).

Regarding claim 5, the Goldberg/VanDeusen system teaches further comprising transmitting the plurality of frames to the plurality of audio devices responsive to receiving a user command via a user interface of the mobile computing device (Goldberg: Figs 22-23; [0312]).

Regarding claim 6, the Goldberg/VanDeusen system teaches wherein the computing device is configured to play the audio information in synchrony with the plurality of audio devices (Goldberg: Fig 3b; [0136]).

Regarding claim 7, the Goldberg/VanDeusen system teaches wherein the computing device is configured to play different audio information than the plurality of audio devices and at the same time as the plurality of audio devices play the audio information (Goldberg: [0173]-[0174] for broadcast playing back audio voice from recipients during songs).

Regarding claim 8, the Goldberg/VanDeusen system teaches wherein the locally stored digital audio file is stored on a personal computer or a mobile computing device configured to store digital information (Goldberg: [0004]).

Regarding claim 9, the Goldberg/VanDeusen system teaches further comprising wirelessly transmitting the plurality of frames to the plurality of audio devices (Goldberg: [0018]).

Regarding claim 10, the Goldberg/VanDeusen system teaches wherein the computing device comprises a user interface to receive a user command to transmit the plurality of frames (Goldberg: Fig 23, step 1302 triggers 1310; [0312]-[0314]).

Regarding claim 11, the Goldberg/VanDeusen system teaches wherein the user interface is to enable a user to at least one of select an audio track, display status information, and display an upcoming audio playback selection (Goldberg: Figs 18; [0236]).

Application/Control Number: 13/297,000                                          Page 9
Art Unit: 2442

Regarding claim 12, the Goldberg/VanDeusen system teaches wherein the user interface is to enable a user to select one or more of the plurality of audio devices for audio playback (Goldberg: [0209]-[0214]).

Regarding claim 13, this non-transitory computer readable medium claim contains limitations found within that of claim 1 and the same rationale of rejection is used, where applicable.

Regarding claim 21, the Goldberg/VanDeusen system teaches wherein the audio device comprises a zone player (Goldberg: [0188] provides the receive units are also playing back the audio).

Regarding claim 22, the Goldberg/VanDeusen system teaches wherein the control information received by the computing device further turns on the computing device to enable the computing device to transmit the audio information and timing information to the audio devices of the at least two zones (Goldberg: [0105] provides for the units having an on/off switch as part of UI, powering on of which *enables* the device to perform its functionality).

5.      Claims 14-20 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Goldberg et al (US 2007/0142944 A1); in view of VanDeusen et al (US 6,598,172 B1);

and in further view of Cullison et al (US 4,296,278).


Regarding claim 14, the Goldberg/VanDeusen system teaches a method for providing

synchronized audio amongst a plurality of audio devices (Goldberg: abstract),

comprising:

receiving, by a computing device, control information from a user interface that

controls audio playback in a plurality of zones on a local network (Goldberg: [0312]-

[0314]), each zone containing at least one audio device (Goldberg: Fig 9A-9B); wherein

the control information comprises a user selection of at least two zones of the plurality

of zones to establish a synchrony group (Goldberg: Fig 19, "broadcaster" rule, [0230]);

and wherein the computing device is further configured to reproduce audio information

upon command (Goldberg: [0314]; [0299]);

receiving, by an audio device, a plurality of frames over a local network from a

computing device, each frame of the plurality of frames to include audio information and

timing information, wherein the timing information is to be used to play the audio

information by the audio device in synchrony with another receiving audio device

(Goldberg: [0202]; [0321] for inserting control signal into packet);

converting, by the audio device, the audio information from a digital form into an

analog signal to be output based on the timing information via a speaker (Goldberg:

[0106]-[0109]; VanDeusen: col 2, line 66 – col 3, line 35).

Application/Control Number: 13/297,000                                          Page 11
Art Unit: 2442

The Goldberg/VanDeusen system fails to explicitly recite the signal is output via an amplifier and speaker driver.

Cullison, in a similar field of endeavor, teaches the signal is output via an amplifier and speaker driver (Cullison: Fig 1, items 11, 23; col 3, lines 21-44).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Cullison for using an amplifier and speaker driver to output the audio. The teachings of Cullison, when implemented in the Goldberg/VanDeusen system, will allow one of ordinary skill in the art to amplify the audio signal to be played back. One of ordinary skill in the art would be motivated to utilize the teachings of Cullison in the Goldberg/VanDeusen system in order to ensure the signal was the correct amplitude when output and hearable by users.

Regarding claim 15, the Goldberg/VanDeusen/Cullison system teaches wherein the computing device comprises a mobile computing device (Goldberg: [0102]).

Regarding claim 16, the Goldberg/VanDeusen/Cullison system teaches wherein the computing device comprises a personal computer (Goldberg: [0102]).

Regarding claim 17, the Goldberg/VanDeusen/Cullison system teaches wherein the audio information is from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming audio service (Goldberg: Fig 8a; [0189]-[0191]; [0312]).

Application/Control Number: 13/297,000                                    Page 12
Art Unit: 2442

Regarding claim 18, the Goldberg/VanDeusen/Cullison system teaches wherein the local network comprises a wired network (Goldberg: [0303]).

Regarding claim 19, the Goldberg/VanDeusen/Cullison system teaches wherein the local network comprises a wireless network (Goldberg: [0303]).

Regarding claim 20, this claim contains limitations found within that of claim 14 and the same rationale of rejection is used where applicable.

6.    Claim 23 is rejected under 35 U.S.C. 103(a) as being unpatentable over Goldberg et al (US 2007/0142944 A1); in view of VanDeusen et al (US 6,598,172 B1); and in further view of Anderson et al (US 5,406,634).

Regarding claim 23, the Goldberg/VanDeusen system teaches wherein the control information receiving comprises independent messages for each of the audio devices of the at least two zones (Goldberg: [0258]-[0266]).

The Goldberg/VanDeusen system fails to explicitly teach wherein the control information comprises independent volume control for each of the audio devices, and wherein the independent volume control is sent to each of the audio devices.

Anderson, in a similar field of endeavor, teaches wherein the control information comprises independent volume control for each of the audio devices (Anderson: Fig 6,

Application/Control Number: 13/297,000                                      Page 13
Art Unit: 2442

master control UI for selecting specific speaker and its parameters to set; col 6, lines 53-65; col 5, lines 51-65 provides mixer gain is volume), and wherein the independent volume control is sent to each of the audio devices (Anderson: col 1, lines 6-13; claim 10).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to utilize the teachings of Anderson for enabling centralized control of independent audio devices. The teachings of Anderson, when implemented in the Goldberg/VanDeusen system, will allow one of ordinary skill in the art to individually control the volume of each audio device of the cluster from the broadcast unit. One of ordinary skill in the art would be motivated to utilize the teachings of Anderson in the Goldberg/VanDeusen system in order to enable a centralized control point to manage the synchronized devices if, for instance, they are in an environment where control is needed by a single entity (e.g., an auditorium).

### *Citation of Pertinent Prior Art*

7.      The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

        a.      Tomassetti et al (US 2003/0023741 A1) discloses a home audio network system where audio devices are divided into zones and each zone is individually controlled by a controller within the zone.

Application/Control Number: 13/297,000                                      Page 14
Art Unit: 2442

### *Conclusion*

8.      Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

      A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

Application/Control Number: 13/297,000                                    Page 15
Art Unit: 2442

9.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to JEFFREY NICKERSON whose telephone number is

(571)270-3631.  The examiner can normally be reached on M-Th, 9:00am - 7:00pm.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Glenton Burgess can be reached on (571)272-3949.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

        Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

| /Jeffrey  Nickerson/<br>Primary Examiner, Art Unit 2442 |  |
|---|---|

Doc code: RCE
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
### (Submitted Only via EFS-Web)

| Application Number | 13297000 | Filing Date | 2011-11-15 | Docket Number (if applicable) | SNS-71301.US.01 | Art Unit | 2442 |
| First Named Inventor | Nicholas A.J. Millington | | | Examiner Name | Jeffrey Nickerson | | |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

### SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

☐ Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

    ☐ Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

    ☐ Other _____

☒ Enclosed

    ☒ Amendment/Reply

    ☐ Information Disclosure Statement (IDS)

    ☐ Affidavit(s)/ Declaration(s)

    ☐ Other

### MISCELLANEOUS

☐ Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months _____
(Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

☐ Other _____

### FEES

**The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
☐ The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to Deposit Account No _____

### SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

☒ Patent Practitioner Signature

☐ Applicant Signature

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Robert J. Irvine III/ | Date (YYYY-MM-DD) | 2013-03-12 |
| Name | Robert J. Irvine III | Registration Number | 41865 |

This collection of information is required by 37 CFR 1.114.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PATENT APPLICATION
71301.US.01/11-0901

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant: Nicholas A.J. Millington | ) | |
| | ) | |
| Serial No.: 13/297,000 | ) | Examiner:  Jeffrey Nickerson |
| | ) | |
| Filed: November 15, 2011 | ) | |
| | ) | |
| Group Art Unit: 2447 | ) | |
| | ) | |
| SYSTEM AND METHOD FOR SYNCHRONIZING | ) | |
| OPERATIONS AMONG A PLURALITY OF | ) | |
| INDEPENDENTLY CLOCKED DIGITAL DATA | ) | |
| PROCESSING DEVICES | ) | |

## REQUEST FOR CONTINUING EXAMINATION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Please enter and consider the following amendments and remarks submitted in response to the Office Action dated September 13, 2012.

**The Status of the Claims** is reflected in the listing of claims that begins on page 2 of this paper.

**Remarks** begin on page 9 of this paper.

1

PATENT APPLICATION
71301.US.01/11-0901

AMENDMENTS TO THE CLAIMS

The following is a complete listing of the claims. This listing of claims will replace all prior versions, and listings, of claims in the application.

1. (Currently Amended) A method for providing synchronized audio play back amongst a plurality of audio devices, the method comprising:

receiving, at a computing device, identifying information for each of a plurality of connected audio devices, each of the plurality of connected audio devices being unilaterally configurable into zone groups by the computing device;

receiving, by a computing device, control information from a user interface that controls audio play back in a plurality of zones on a local network, each zone containing at least one audio device, the control information comprising a user selection of at least two zones of the plurality of zones to establish a synchrony group, wherein the computing device is further configured to reproduce audio information upon command;

retrieving, by the computing device, audio information from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service;

transmitting, by the computing device to the audio devices of the at least two zones, current clock timing information for a clock of the computing device;

transmitting audio information and playback timing information to the audio devices of the at least two zones over the local network from the computing device, wherein the playback timing information is generated at the computing device, and wherein the playback timing information identifies a playback time relative to the clock of the computing device, and is to be used to play the audio information by the audio devices of the at least two zones in synchrony.

PATENT APPLICATION
71301.US.01/11-0901

2. (Original) The method of claim 1, wherein the computing device comprises a personal computer.

3. (Currently Amended) The method of claim 2, further comprising transmitting [[the]] a plurality of frames to the ~~at least two~~ audio devices of the at least two zones responsive to receiving a user command via the user interface of the personal computer.

4. (Original) The method of claim 1, wherein the computing device comprises a mobile computing device.

5. (Currently Amended) The method of claim 4, further comprising transmitting ~~the~~ a plurality of frames to the ~~at least two~~ audio devices of the at least two zones responsive to receiving a user command via the user interface of the mobile computing device.

6. (Currently Amended) The method of claim 1, wherein the computing device is configured to play the audio information in synchrony with the ~~at least two~~ audio devices of the at least two zones.

7. (Currently Amended) The method of claim 1, wherein the computing device is configured to play different audio information than the ~~at least two~~ audio devices of the at least two zones and at the same time as the ~~plurality of~~ audio devices of the at least two zones play the audio information.

PATENT APPLICATION
71301.US.01/11-0901

8. (Original) The method of claim 1, wherein the locally stored digital audio file is stored
on a personal computer or a mobile computing device configured to store digital
information.

9. (Currently Amended) The method of claim 1, further comprising wirelessly
transmitting ~~the~~ a plurality of frames to the ~~at least two~~ audio devices of the at least two
zones.

10. (Previously Presented) The method of claim 1, wherein the computing device
comprises the user interface to receive a user command to transmit the plurality of
frames.

11. (Original) The method of claim 10, wherein the user interface is to enable a user to at
least one of select an audio track, display status information, and display an upcoming
audio playback selection.

12. (Previously Presented) The method of claim 10, wherein the user interface is to
enable a user to select the volume level for each of the at least two audio devices.

13. (Currently Amended) A non-transitory computer readable medium having stored
therein instructions executable by a processor to perform a method comprising:

     receiving, at a computing device, identifying information for each of a plurality of
connected audio devices, each of the plurality of connected audio devices being

4

unilaterally configurable into zone groups by the computing device;

receiving, by a computing device, control information from a user interface that controls audio play back in a plurality of zones on a local network, each zone containing at least one audio device, the control information comprising a user selection of at least two zones of the plurality of zones to establish a synchrony group, wherein the computing device is further configured to reproduce audio information upon command;

retrieving, by the computing device, audio information from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service;

transmitting, by the computing device to the audio devices of the at least two zones, current clock timing information for a clock of the computing device;

transmitting audio information and playback timing information to the audio devices of the at least two zones over the local network from the computing device, wherein the playback timing information is generated at the computing device, and wherein the playback timing information identifies a playback time relative to the clock of the computing device, and is to be used to play the audio information by the audio devices of the at least two zones in synchrony.


14. (Currently Amended) A method for providing synchronized audio amongst a plurality of audio devices, the method comprising:

transmitting, by an audio device, identifying information associated with the audio device;

receiving, at the audio device, a unilateral configuration command to join a zone

PATENT APPLICATION
71301.US.01/11-0901

group;

receiving, by [[an]] the audio device, audio information, current clock timing
information, and playback timing information over a local network from a computing
device, the computing device transmitting the audio information, current clock timing
information, and playback timing information to a user-selected synchrony group
including at least two zones, wherein the audio device is included in a first zone of the at
least two zones and a second audio device is included in a second zone of the at least two
zones, wherein the playback timing information is generated at the computing device and
transmitted to the audio devices of the at least two zones, and wherein the current clock
timing information and the playback timing information is to be used to play the audio
information by the audio device in synchrony with the second receiving audio device of
the second zone; and

converting, by the audio device, the audio information from a digital form into an
analog signal to be output based on the current clock timing information and the playback
timing information via an amplifier and a speaker driver.


15. (Currently Amended) The method of claim 14 15, wherein the computing device
comprises a mobile computing device.


16. (Original) The method of claim 15, wherein the computing device comprises a
personal computer.


17. (Original) The method of claim 15, wherein the audio information is from any of a

PATENT APPLICATION
71301.US.01/11-0901

locally stored digital audio file, a remotely stored digital audio file via a wide area

network, and a streaming digital audio service.


18. (Original) The method of claim 15, wherein the local network comprises a wired

network.


19. (Original) The method of claim 15, wherein the local network comprises a wireless

network.


20. (Currently Amended) A non-transitory computer readable medium having stored

therein instructions executable by a processor to perform a method comprising:

    transmitting, by an audio device, identifying information associated with the

audio device;

    receiving, at the audio device, a unilateral configuration command to join a zone

group;

    receiving, by an audio device, audio information, current clock timing

information, and playback timing information over a local network from a computing

device, the computing device transmitting the audio information, current clock timing

information and playback timing information to a user-selected synchrony group

including at least two zones, wherein the audio device is included in a first zone of the at

least two zones and a second audio device is included in a second zone of the at least two

zones, wherein the timing information is generated at the computing device and

transmitted to the audio devices of the at least two zones, and wherein the current clock

PATENT APPLICATION
71301.US.01/11-0901

timing information and playback timing information is to be used to play the audio

information by the audio device in synchrony with the second receiving audio device of

the second zone; and

converting, by the audio device, the audio information from a digital form into an

analog signal to be output based on the current clock timing information and playback

timing information via an amplifier and a speaker driver.


21. (Previously Presented) The method of claim 1, wherein the audio device comprises a

zone player.


22. (Currently Amended) The method of claim 1, wherein the control information

received by the computing device further turns on the computing device to enable the

computing device to transmit the audio information, current clock timing information and

playback timing information to the audio devices of the at least two zones.


23. (Previously Presented) The method of claim 1, wherein the control information

received by the computing device comprises independent volume control for each of the

audio devices of the at least two zones, and wherein the independent volume control is

sent to each of the audio devices.

## REMARKS

### I. Status of the Claims

Claims 1-23 are pending in the present application. By this Response, claims 1, 3, 5, 6, 7, 9, 13, 14, 15, 20, and 22 have been amended.  No new matter has been added through these amendments. The claims have been amended to expedite an allowance of claims, and the Applicant reserves the right to pursue some or all of the previously pending claims, which the Applicant feels are allowable over the cited art of record, in a continuation application. Reconsideration and withdrawal of the rejections of this application in view of the amendments is respectfully requested, as the application is in condition for allowance.

### II. Interview Summary

Applicants thank the Examiner for the telephonic interview of March 8, 2013. Applicant's representative Robert Irvine and Examiner Nickerson participated in the interview.  The Goldberg reference (US 2007/0142944 AI) was discussed with respect to claim 1, and Applicant (through their representative) reiterated that Goldberg was directed to a peer to peer music sharing system that does not provide unilateral control in the formation of music sharing groups.

Applicant proposed an amendment to claim 1 substantially as follows:

1. (Currently Amended) A method for providing synchronized audio play back amongst a plurality of audio devices, the method comprising:
     receiving, at a computing device, identifying information for each of a plurality of connected audio devices, each of the plurality of connected audio devices controllable by the computing device, and being configurable into zone groups by the computing device;
     receiving, by [[a]] the computing device, control information from a user interface, wherein the user interface that controls audio play back in a plurality of zones on a local network, each zone containing at least one of the plurality of connected audio devices, and wherein the control information comprises comprising a user selection of at

PATENT APPLICATION
71301.US.01/11-0901

least two zones of the plurality of zones, and wherein the receipt of the control
information causes the computing device to instruct the connected audio devices of the at
least two zones to automatically join a synchrony group with the computing device~~to
establish a synchrony group~~, ~~wherein the computing device is further configured to
reproduce audio information upon command~~;

      retrieving, by the computing device, audio information from any of a locally
stored digital audio file, a remotely stored digital audio file via a wide area network, and
a streaming digital audio service;

      transmitting, by the computing device to the audio devices of the at least two
zones, clock timing information for a clock of the computing device;

      transmitting audio information and playback timing information to the audio
devices of the at least two zones over the local network from the computing device,
wherein the playback timing information is generated at the computing device, and
wherein the playback timing information identifies a playback time relative to the clock
of the computing device, and is to be used to play the audio information by the audio
devices of the at least two zones in synchrony.

No exhibit or demonstration was shown.  The discussion was helpful in clarifying the

issues, and the Examiner agreed to consider further claim amendments directed to

clarifying this distinction. No agreement was reached with respect to allowability or to a

particular amendment.


**III. Claim Rejections**

Claims 1-13 have been rejected under 35 U. S. C. 103(a) as allegedly unpatentable over

Goldberg et al (US 2007/0142944 AI); and in further view of VanDeusen et al (US

6,598,172 Bl).  Claims 14-20 stand rejection based on Goldberg in view of VanDeusen

and further in view of Cullison (US 4,296,278). Applicant respectfully traverses these

rejections, as set forth below.


      **A.**      **The prior art fails to disclose "*connected audio devices being
unilaterally configurable into zone groups by the computing device*"**

      The elements of the amended independent claims 1, 13, 14, and 20 clarify that the

connected audio devices are not peer devices under the control of separate users as in

PATENT APPLICATION
71301.US.01/11-0901

Goldberg.  Rather, they are unilaterally configurable into zone groups based on communications from the computing device.  The unilateral configurability of the claim means that the audio devices are not under control of a peer user where such a user would cause the device to issue a request message to join the group.  Rather, any connected audio device may be configured by the computing device without the computing device having first received a user-initiated request.

Goldberg simply does not provide for unilateral control of the audio devices. Goldberg describes a system operated by multiple users, in which control of audio play back from each unit and/or DJ is held by a different user of each device. See, e.g., paragraph [0095] of Goldberg. Goldberg mentions that one device, controlled by one user, is a broadcaster and another device, controlled by a different user, is a receiver. Users of both broadcasters and receivers in Goldberg maintain control of audio playback of their respective device. The user of a broadcaster can choose to broadcast audio and the user of a receiver can choose to play back the audio, but the user of each device in Goldberg maintains control of audio playback over itself. In other words, Goldberg requires "mutual acceptance" amongst users before audio play back can happen.

The elements of the amended independent claims 1, 13, 14, and 20 clarify that the connected audio devices are not peer devices under the control of separate users as in Goldberg.  Applicant's review of the VanDeusen and Cullison references indicates that the unilateral configurability is absent from those references as well, and thus do not make up the deficiencies of Goldberg.  For at least these reasons, a theoretical combination of Goldberg, VanDeusen and Cullison cannot form a prima facie case of obviousness with respect to the amended independent claims.

PATENT APPLICATION
71301.US.01/11-0901

**B.    The prior art fails to disclose "*playback timing information identifies a playback time relative to the clock of the computing device*"**

The Goldberg reference describes a type of peer synchronization whereby a given element may rebroadcast the audio information with altered timing information in the form of a relative "hop" number parameter "N". That is, each receiving device alters the timing information before retransmitting it to its peer devices. Similarly, other synchronization schemes of Goldberg allow newly-joined receive units to begin playback of content already being played by other devices based on a time stamp relative to the beginning of a file (See Goldberg para 0202). Thus, Goldberg and the other cited references do not describe the use of playback timing information being sent to all the audio devices of the group where the timing information is relative to the clock of the transmitter (the computing device).

In view of the foregoing, it is respectfully submitted that all pending claims are in condition for allowance. Reconsideration and passage of the application through to allowance is respectfully requested.

## IV. Conclusion

All the stated grounds of objection and rejection have been respectfully traversed, accommodated, or rendered moot. The Applicant therefore submits that the present application is in condition for allowance. In general, the Office Action makes various statements regarding the pending claims and the cited references that are now moot in light of the above. Thus, the Applicant will not address such statements at the present time. However, the Applicant expressly reserves the right to challenge such statements in

the future should the need arise (e.g., if such statement should become relevant by appearing in a rejection of any current or future claim). Additionally, the Applicant expressly reserves the right to challenge or address statements made previously during the prosecution that may have been incorrect or are no longer applicable. If the Examiner has any questions or if the Applicant can be of any assistance, the Examiner is invited and encouraged to contact the Applicant.

Respectfully submitted,
TECHLAW LLP

By: /Robert J. Irvine III/
Robert J. Irvine III
Registration No. 41,865
Attorney for Applicants
(312) 834-4334



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 107361  7590  07/06/2015 | | EXAMINER |
| McDonnell Boehnen Hulbert & Berghoff LLP | | SURVILLO, OLEG |
| Sonos, Inc. | | |
| 300 South Wacker Drive | ART UNIT | PAPER NUMBER |
| Chicago, IL 60606 | 2442 | |

DATE MAILED: 07/06/2015

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/297,000 | 11/15/2011 | Nicholas A. J. Millington | 11-0901 (MBHB 15-506-CON) | 5138 |

TITLE OF INVENTION: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 10/06/2015 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

**or <u>Fax</u>   (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

107361       7590       07/06/2015
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/297,000 | 11/15/2011 | Nicholas A. J. Millington | 11-0901 (MBHB 15.506-CON) | 5138 |

TITLE OF INVENTION: SYSTEM AND METHOD FOR SYNCHRONIZING OPERATIONS AMONG A PLURALITY OF INDEPENDENTLY CLOCKED DIGITAL DATA PROCESSING DEVICES

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $960 | $0 | $0 | $960 | 10/06/2015 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SURVILLO, OLEG | 2442 | 709-231000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)**

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE       (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

**4a. The following fee(s) are submitted:**

☐ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status (from status indicated above)**

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

_NOTE:_ Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

_NOTE:_ If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

_NOTE:_ Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____   Date _____

Typed or printed name _____   Registration No. _____

Page 2 of 3

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.       OMB 0651-0033       U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/297,000 | 11/15/2011 | Nicholas A. J. Millington | 11-0901 (MBHB 15-506-CON) | 5138 |

107361    7590    07/06/2015
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| SURVILLO, OLEG |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

DATE MAILED: 07/06/2015

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

### OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

### Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| | Application No. | Applicant(s) |
|---|---|---|
| ***Notice of Allowability*** | 13/297,000 | MILLINGTON, NICHOLAS  A. J. |
| | **Examiner** | **Art Unit** | **AIA (First Inventor to File) Status** |
| | OLEG SURVILLO | 2442 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application.  If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.**  This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant.  See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *Request for Continued Examination dated March 12, 2013*.

     ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on_____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-28*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov .

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

     **Certified copies:**

       a) ☐ All   b) ☐ Some   *c) ☐ None of the:

         1. ☐ Certified copies of the priority documents have been received.

         2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

         3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

     * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below.  Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

     ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

     **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☒ Notice of References Cited (PTO-892)
2. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date See Continuation Sheet
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
4. ☒ Interview Summary (PTO-413), Paper No./Mail Date *20150625* .

5. ☒ Examiner's Amendment/Comment
6. ☒ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

/OLEG SURVILLO/
Primary Examiner, Art Unit 2442

**Continuation Sheet (PTOL-37)**                                                              **Application No.  13/297,000**


 Continuation of Attachment(s) 2. Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date: 04/03/13; 05/07/13; 02/08/14;
04/14/14; 05/23/14; 07/07/14; 08/12/14; 11/14/14; 02/04/15; 03/16/15; 04/21/15; 05/27/15.

Application/Control Number: 13/297,000                                    Page 2
Art Unit: 2442

## EXAMINER'S AMENDMENT / COMMENT

### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114, including the fee set forth in 37 CFR 1.17(e), was filed in this application after final rejection. Since this application is eligible for continued examination under 37 CFR 1.114, and the fee set forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action has been withdrawn pursuant to 37 CFR 1.114. Applicant's submission filed on March 12, 2013 has been entered.


### *Response to Arguments*

With regard to the Applicant's remarks dated March 12, 2013:

Applicant's amendment to the specification, dated November 7, 2013 has been fully considered and is entered.

Regarding the rejection of claims 1-23 under 35 U.S.C. 103(a), Applicant's amendment and arguments have been fully considered. Applicants argue at page 12 of Remarks as filed that Goldberg fails to disclose *"playback timing information identifies a playback time relative to the clock of the computing device"*. Examiner agrees. Therefore, the rejection has been withdrawn. In light of further amendments, as presented below, no better art exists to teach all of the claimed limitations as in independent claims 1, 13, 14, 20, 26, and 28. Therefore, no new grounds of rejection are made. No other previously-made grounds of rejection remain. Claims 1-28 are allowable.

Application/Control Number: 13/297,000                                    Page 3
Art Unit: 2442

### *Examiner's Amendment*

Examiner's amendment to the record appears below. Should the changes be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be filed no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in a communication with Jeffrey P. Armstrong, Reg. No.: 54,967, on June 25, 2015.

The following listing of claims replaces all prior versions and listings of claims in this application:

Application/Control Number: 13/297,000                              Page 4
Art Unit: 2442

1.      (Currently Amended)      A <u>tangible, non-transitory computer-readable media having instructions encoded thereon, wherein the instructions, when executed by one or more processors of a computing device, cause the computing device to perform a</u> method for providing synchronized audio play back amongst a plurality of audio devices, the method comprising:

~~receiving, at a computing device, identifying information for each of a plurality of connected audio devices, each of the plurality of connected audio devices being unilaterally configurable into zone groups by the computing device;~~

receiving, by [[a]] <u>the</u> computing device, control information from a user interface that controls audio play back in a plurality of zones on a local network, each zone containing at least one audio device, the control information comprising a user selection of at least two zones of the plurality of zones to establish a synchrony group, wherein the computing device is further configured to reproduce audio information upon command;

retrieving, by the computing device, audio information from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service;

transmitting, by the computing device to the audio devices of the at least two zones, current clock timing information for a clock of the computing device;

transmitting audio information and playback timing information to the audio devices of the at least two zones over the local network from the computing device, wherein the playback timing information is generated at the computing device, and wherein the playback timing information identifies a playback time relative to the clock of

Application/Control Number: 13/297,000                                          Page 5
Art Unit: 2442

the computing device, and is ~~to be used to~~ <u>for use in</u> play<u>back of</u> the audio information by the audio devices of the at least two zones in synchrony<u>, wherein the audio devices of the at least two zones remain independently clocked during the synchronous playback of the audio information</u>.


     2.    (Currently Amended)  The ~~method~~ <u>computer-readable media</u> of claim 1, wherein the computing device comprises a personal computer.


     3.    (Currently Amended)  The ~~method~~ <u>computer-readable media</u> of claim 2, <u>wherein the method</u> further ~~comprising~~ <u>comprises</u> transmitting<u>, by the computing device,</u> a plurality of frames to the audio devices of the at least two zones responsive to receiving a user command via the user interface of the personal computer.


     4.    (Currently Amended)  The ~~method~~ <u>computer-readable media</u> of claim 1, wherein the computing device comprises a mobile computing device<u>.</u>


     5.    (Currently Amended)  The ~~method~~ <u>computer-readable media</u> of claim 4, <u>wherein the method</u> further ~~comprising~~ <u>comprises</u> transmitting<u>, by the computing device,</u> a plurality of frames to the audio devices of the at least two zones responsive to receiving a user command via the user interface of the mobile computing device.

Application/Control Number: 13/297,000                                      Page 6
Art Unit: 2442

6.    (Currently Amended)  The ~~method~~ computer-readable media of claim 1, wherein the computing device is configured to play the audio information in synchrony with the audio devices of the at least two zones.

7.    (Currently Amended)  The ~~method~~ computer-readable media of claim 1, wherein the computing device is configured to play different audio information than the audio devices of the at least two zones and at the same time as the audio devices of the at least two zones play the audio information.

8.    (Currently Amended)  The ~~method~~ computer-readable media of claim 1, wherein the locally stored digital audio file is stored on a personal computer or a mobile computing device configured to store digital information.

9.    (Currently Amended)  The ~~method~~ computer-readable media of claim 1, wherein the method further ~~comprising~~ comprises wirelessly transmitting, by the computing device, a plurality of frames to the audio devices of the at least two zones.

10.    (Currently Amended)  The ~~method~~ computer-readable media of claim [[1]] 5, wherein the computing device comprises the user interface configured to receive [[a]] the user command ~~to transmit the plurality of frames~~.

Application/Control Number: 13/297,000                                    Page 7
Art Unit: 2442

11.    (Currently Amended)  The ~~method~~ computer-readable media of claim 10, wherein the user interface is configured to enable a user to at least one of select an audio track, display status information, and display an upcoming audio playback selection.


12.    (Currently Amended)  The ~~method~~ computer-readable media of claim 10, wherein the user interface is configured to enable a user to select the volume level for each of the ~~at least two~~ audio devices of the at least two zones.


13.    (Currently Amended)  A computing device comprising:

one or more processors; and

tangible, non-transitory computer readable medium having stored therein instructions, wherein the instructions, when executed by the one or more ~~executable by a~~ processors cause the computing device to perform a method comprising:

~~receiving, at a computing device, identifying information for each of a plurality of connected audio devices, each of the plurality of connected audio devices being unilaterally configurable into zone groups by the computing device;~~

receiving, by [[a]] the computing device, control information from a user interface that controls audio play back in a plurality of zones on a local network, each zone containing at least one audio device, the control information comprising a user selection of at least two zones of the plurality of zones to establish a synchrony group, wherein the computing device is further configured to reproduce audio information upon command;

Application/Control Number: 13/297,000                                        Page 8
Art Unit: 2442

retrieving, by the computing device, audio information from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service;

transmitting, by the computing device to the audio devices of the at least two zones, current clock timing information for a clock of the computing device;

transmitting audio information and playback timing information to the audio devices of the at least two zones over the local network from the computing device, wherein the playback timing information is generated at the computing device, and wherein the playback timing information identifies a playback time relative to the clock of the computing device, and is ~~to be used to~~ for use in play~~back of~~ the audio information by the audio devices of the at least two zones in synchrony, wherein the audio devices of the at least two zones remain independently clocked during the synchronous playback of the audio information.

14.      (Currently Amended)  A first audio device comprising:

one or more processors; and

tangible, non-transitory computer-readable media having instructions encoded therein, wherein the instructions, when executed by the one or more processors, cause the first audio device to perform a method for providing synchronized audio playback amongst a plurality of  audio devices comprising the first audio device and at least a second audio device, the method comprising:

Application/Control Number: 13/297,000                                    Page 9
Art Unit: 2442

transmitting, by [[an]] the first audio device to a computing device, identifying information associated with the first audio device;

receiving, at the first audio device from the computing device, a ~~unilateral~~ configuration command to join a zone group;

receiving, by the first audio device, audio information, current clock timing information, and playback timing information over a local network from [[a]] the computing device, the computing device transmitting the audio information, the current clock timing information, and the playback timing information to a user-selected synchrony group including at least two zones, wherein the first audio device is included in a first zone of the at least two zones and [[a]] the second audio device is included in a second zone of the at least two zones, wherein the playback timing information is generated at the computing device and transmitted to the first and second audio devices of the at least two zones, and wherein the first audio device uses the current clock timing information and the playback timing information ~~is used~~ to playback the audio information ~~by the audio device~~ in synchrony with the second ~~receiving~~ audio device ~~of the second zone~~, wherein the first and second audio devices remain independently clocked during the synchronous playback of the audio information; and

converting, by the first audio device, the audio information from a digital form into an analog signal to be output based on the current clock timing information and the playback timing information via an amplifier and a speaker driver.

Application/Control Number: 13/297,000                                    Page 10
Art Unit: 2442

15.    (Currently Amended)  The ~~method~~ <u>first audio device</u> of claim 14, wherein the computing device comprises a mobile computing device.

16.    (Currently Amended)  The ~~method~~ <u>first audio device</u> of claim 15, wherein the computing device comprises a personal computer.

17.    (Currently Amended)  The ~~method~~ <u>first audio device</u> of claim 15, wherein the audio information is from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service.

18.    (Currently Amended)  The ~~method~~ <u>first audio device</u> of claim 15, wherein the local network comprises a wired network.

19.    (Currently Amended)  The ~~method~~ <u>first audio device</u> of claim 15, wherein the local network comprises a wireless network.

20.    (Currently Amended)  A <u>tangible,</u> non-transitory computer readable medium having stored therein instructions<u>, wherein the instructions when executed</u> ~~executable~~ by [[a]] <u>one or more</u> processor<u>s cause a first audio device</u> to perform a method comprising:

transmitting, by [[an]] <u>the first</u> audio device <u>to a computing device</u>, identifying information associated with the <u>first</u> audio device;

Application/Control Number: 13/297,000                                    Page 11
Art Unit: 2442

receiving, at the first audio device from the computing device, a ~~unilateral~~ configuration command to join a zone group;

receiving, by [[an]] the first audio device, audio information, current clock timing information, and playback timing information over a local network from [[a]] the computing device, the computing device transmitting the audio information, the current clock timing information, and the playback timing information to a user-selected synchrony group including at least two zones, wherein the first audio device is included in a first zone of the at least two zones and a second audio device is included in a second zone of the at least two zones, wherein the timing information is generated at the computing device and transmitted to the audio devices of the at least two zones, and wherein the first audio device uses the current clock timing information and the playback timing information ~~is to be used~~ to playback the audio information ~~by the audio device~~ in synchrony with the second ~~receiving~~ audio device ~~of the second zone~~, wherein the first and second audio devices remain independently clocked during the synchronous playback of the audio information; and

converting, by the first audio device, the audio information from a digital form into an analog signal to be output based on the current clock timing information and the playback timing information via an amplifier and a speaker driver.


21.    (Currently Amended)  The ~~method~~ computer readable media of claim 1, wherein each of the audio devices of the at least two zones comprises a zone player.

Application/Control Number: 13/297,000                                    Page 12
Art Unit: 2442

22.     (Currently Amended)   The ~~method~~ <u>computer readable media</u> of claim 1, wherein the control information received by the computing device further turns on the computing device [[to]] <u>and</u> enable<u>s</u> the computing device to transmit the audio information, <u>the</u> current clock timing information<u>,</u> and <u>the</u> playback timing information to the audio devices of the at least two zones.

23.     (Currently Amended)   The ~~method~~ <u>computer readable media</u> of claim 1, wherein the control information received by the computing device comprises independent volume control for each of the audio devices of the at least two zones, and wherein the independent volume control is sent to each of the audio devices.

24.     (New)  The computer-readable media of claim 1, wherein the method further comprises:

receiving, at the computing device, identifying information for each of a plurality of connected audio devices, each of the plurality of connected audio devices being unilaterally configurable into zone groups by the computing device.

25.     (New)  The computing device of claim 13, wherein the method further comprises:

receiving, at the computing device, identifying information for each of a plurality of connected audio devices, each of the plurality of connected audio devices being unilaterally configurable into zone groups by the computing device.

Application/Control Number: 13/297,000                                    Page 13
Art Unit: 2442

26.    (New)  A method of implementing synchronized audio play back amongst a plurality of audio devices, wherein the method is performed by a computing device, and wherein the method comprises:

receiving control information from a user interface that controls audio playback in a plurality of zones on a local network, each zone containing at least one audio device, the control information comprising a user selection of at least two zones of the plurality of zones to establish a synchrony group, wherein the computing device is further configured to reproduce audio information upon command;

retrieving audio information from any of a locally stored digital audio file, a remotely stored digital audio file via a wide area network, and a streaming digital audio service;

transmitting to the audio devices of the at least two zones, current clock timing information for a clock of the computing device;

transmitting the audio information and the playback timing information to the audio devices of the at least two zones over the local network from the computing device, wherein the playback timing information is generated at the computing device, and wherein the playback timing information identifies a playback time relative to the clock of the computing device, and is for use in playback of the audio information by the audio devices of the at least two zones in synchrony, wherein the audio devices of the at least two zones remain independently clocked during the synchronous playback of the audio information.

Application/Control Number: 13/297,000                                    Page 14
Art Unit: 2442

27.      (New)  The method of claim 26, wherein the computing device comprises

a mobile computing device.

28.      (New)  A method of implementing synchronized audio play back amongst a

plurality of audio devices, wherein the method is performed by a first audio device, and

wherein the method comprises:

transmitting identifying information associated with the first audio device from the

first audio device to a computing device;

receiving a configuration command to join a zone group from the computing

device;

receiving audio information, current clock timing information, and playback timing

information over a local network from the computing device, the computing device

transmitting the audio information, the current clock timing information, and the playback

timing information to a user-selected synchrony group including at least two zones,

wherein the first audio device is included in a first zone of the at least two zones and a

second audio device is included in a second zone of the at least two zones, wherein the

playback timing information is generated at the computing device and transmitted to the

first and second audio devices of the at least two zones, and wherein the first audio

device uses the current clock timing information and the playback timing information to

playback the audio information in synchrony with the second audio device, wherein the

Application/Control Number: 13/297,000                                     Page 15

Art Unit: 2442

first and second audio devices remain independently clocked during the synchronous

playback of the audio information; and

      converting the audio information from a digital form into an analog signal to be

output based on the current clock timing information and the playback timing information

via an amplifier and a speaker driver.

Application/Control Number: 13/297,000                                          Page 16
Art Unit: 2442

### *Allowed Claims*

Claims 1-28 are allowed.


### *Reasons for Allowance*

The following is an examiner's statement of reasons for allowance:

none of the qualifying prior art references of record, taken alone or in combination, disclose or reasonably suggest: a combination of elements as claimed in independent claim 26, including transmitting the audio information and the playback timing information to the audio devices of the at least two zones over the local network from the computing device, wherein the playback timing information is generated at the computing device, and wherein the playback timing information identifies a playback time relative to the clock of the computing device, and is for use in playback of the audio information by the audio devices of the at least two zones in synchrony, wherein the audio devices of the at least two zones remain independently clocked during the synchronous playback of the audio information. Independent claims 1, 13, 14, 20, and 28 contain similar limitations. Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."


### *Conclusion*

Application/Control Number: 13/297,000                                    Page 17
Art Unit: 2442

Any inquiry concerning this communication or earlier communications from the examiner should be directed to OLEG SURVILLO whose telephone number is (571)272-9691. The examiner can normally be reached on Mon-Thu 10:00am - 7:30pm; Fri 10:00am - 6:30pm EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Glenton B. Burgess can be reached on 571-272-3949. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/OLEG SURVILLO/
Primary Examiner, Art Unit 2442

Exhibit 55

US008938312B2

(12) **United States Patent**      (10) **Patent No.:**      **US 8,938,312 B2**

Millington et al.      (45) **Date of Patent:**      **Jan. 20, 2015**

(54) **SMART LINE-IN PROCESSING**

(75) Inventors: **Nicholas Millington**, Santa Barbara, CA (US); **Tom Cullen**, Santa Barbara, CA (US); **Robert Reimann**, Santa Barbara, CA (US); **Brent Lehman**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 918 days.

(21) Appl. No.: **13/089,167**

(22) Filed:   **Apr. 18, 2011**

(65)   **Prior Publication Data**

US 2012/0263318 A1   Oct. 18, 2012

(51) **Int. Cl.**
   *G06F 17/00*      (2006.01)
   *G11B 27/10*      (2006.01)
   *H03G 3/10*      (2006.01)
   *H03G 3/30*      (2006.01)

(52) **U.S. Cl.**
   CPC .................. *G11B 27/10* (2013.01); *H03G 3/10* (2013.01); *H03G 3/3026* (2013.01)
   USPC ...................................................... **700/94**

(58) **Field of Classification Search**
   USPC ...................................................... 700/94
   See application file for complete search history.

(56)   **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,999,827 B1 * | 2/2006 | Yong | 700/94 |
| 7,302,468 B2 * | 11/2007 | Wijeratne | 709/205 |
| 7,728,911 B2 * | 6/2010 | Lacy et al. | 348/706 |
| 7,908,637 B2 * | 3/2011 | Kwon et al. | 725/139 |

| | | | |
|---|---|---|---|
| 7,930,644 B2 * | 4/2011 | Silva et al. | 715/771 |
| 8,054,987 B2 * | 11/2011 | Seydoux | 381/79 |
| 8,055,363 B2 * | 11/2011 | Lee | 700/94 |
| 8,275,307 B2 * | 9/2012 | Doyle, III | 455/3.06 |
| 8,639,370 B2 * | 1/2014 | Torrini et al. | 700/94 |
| 2002/0072816 A1 * | 6/2002 | Shdema et al. | 700/94 |
| 2002/0098878 A1 * | 7/2002 | Mooney et al. | 455/569 |
| 2003/0023329 A1 * | 1/2003 | Brooks et al. | 700/94 |
| 2004/0031853 A1 | 2/2004 | Peng | |
| 2004/0081099 A1 * | 4/2004 | Patterson et al. | 370/241 |
| 2004/0239816 A1 * | 12/2004 | Ando | 348/705 |
| 2005/0100174 A1 * | 5/2005 | Howard et al. | 381/86 |
| 2005/0281138 A1 * | 12/2005 | Shimozawa et al. | 369/30.04 |
| 2006/0029005 A1 * | 2/2006 | Slemmer et al. | 370/270 |
| 2006/0089735 A1 * | 4/2006 | Atkinson | 700/94 |
| 2006/0229752 A1 * | 10/2006 | Chung | 700/94 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2001210019 | 8/2001 |
| JP | 2003045166 | 2/2003 |
| JP | 2006217116 | 8/2006 |
| JP | 2007323789 | 12/2007 |
| KR | 20040031853 | 4/2004 |

OTHER PUBLICATIONS

International Searching Authority, "Search Report," issued in connection with International Application Serial No. PCT/US12/33946, mailed on Aug. 13, 2012, 3 pages.

(Continued)

*Primary Examiner* — Paul McCord

(74) *Attorney, Agent, or Firm* — Hanley, Flight and Zimmerman, LLC

(57)   **ABSTRACT**

Technology for smart line-in processing in an audio environment is disclosed. Particularly, the embodiments described herein provide automated source switching in an audio environment where a number of audio sources may exist and volume control.

**19 Claims, 22 Drawing Sheets**



**US 8,938,312 B2**

Page 2

(56)            **References Cited**

U.S. PATENT DOCUMENTS

2010/0054709  A1      3/2010  Misawa et al.
2010/0274372  A1 *  10/2010  Nielsen et al.  .................  700/94

OTHER PUBLICATIONS

International Searching Authority, "Written Opinion," issued in connection with International Application Serial No. PCT/US12/33946, mailed on Aug. 13, 2012, 7 pages.

International Bureau, "International Preliminary Report on Patentability", issued in connection with International patent application No. PCT/US2012/033946, mailed on Oct. 22, 2013, 8 pages.
"Response to the Written Opinion of the International Searching Authority", issued in connection with European Patent application No. 127179991, dated Jun. 30, 2014, 9 pages.
Japanese Patent Office, "Office action", issued in connection with Japanese patent application No. 2014-506484, issued on Oct. 28, 2014, 5 pages.

* cited by examiner



*FIG. 1*



*FIG. 2A*



**FIG. 2B**

260



FIG. 2C



*FIG. 2D*



*FIG. 3A*



FIG. 3B



*FIG. 4*



FIG. 5A



*FIG. 5B*



FIG. 5C



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10A



*FIG. 10B*



*FIG. 10C*



*FIG. 10D*



**FIG. 10E**



*FIG. 10F*



*FIG. 11*

US 8,938,312 B2

1

**SMART LINE-IN PROCESSING**

BACKGROUND

The presently described technology is directed towards technology for use in the area of consumer electronics. In particular, certain embodiments are directed to smart line-in processing for use in an audio environment.

Music is very much a part of our everyday lives. And thanks to the advancement of technology, music content is now more accessible than ever. The same can be said of other types of media, such as television, movies, and other audio and video content. In fact, now a user can even access the content over the Internet through an online store, an Internet radio station, online music service, online movie service, and the like, in addition to the more traditional means of accessing audio and video content.

The demand for such audio and video content continues to surge. Given the high demand over the years, technology used to access and play such content has likewise improved. Even still, technology used in accessing the content and the play back of such content can be significantly improved or developed in ways that the market or end users may not anticipate.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the presently described technology will become better understood by a person skilled in the art with regard to the following description, appended claims, and accompanying drawings where:

FIG. **1** shows an illustrative configuration in which certain embodiments may be practiced;

FIG. **2**A shows an illustrative functional block diagram of a player in accordance with certain embodiments;

FIG. **2**B shows an example of a controller that may be used to remotely control one or more players of FIG. **2**A;

FIG. **2**C shows an example of a controller that may be used to remotely control one or more players of FIG. **2**A;

FIG. **2**D shows an example internal functional block diagram of a controller in accordance with certain embodiments;

FIG. **3**A provides an illustration of a zone scene configuration;

FIG. **3**B shows that a user defines multiple groups to be gathered at the same time;

FIG. **4** shows an example user interface that may be displayed on a controller or a computer of FIG. **1**;

FIG. **5**A shows an example user interface to allow a user to form a scene;

FIG. **5**B shows another example user interface to allow a user to form a scene;

FIG. **5**C shows an example user interface to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively;

FIG. **6** shows a flowchart or process of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone;

FIG. **7** shows an illustrative configuration in which an audio source is played back on two players in accordance to an embodiment;

FIG. **8** shows an illustrative configuration of a pairing amongst multiple players in accordance to an embodiment;

FIG. **9** shows a flowchart or process of grouping a plurality of audio products to play separated sound tracks in synchronization to simulate a multi-channel listening environment;

FIGS. **10**A to **10**F show example snapshots of a controller used in certain embodiments; and

2

FIG. **11** shows an illustrative configuration of smart in-line processing, in accordance with certain embodiments.

In addition, the drawings are for the purpose of illustrating certain embodiments, but it is understood that the inventions are not limited to the arrangements and instrumentality shown in the drawings.

DETAILED DESCRIPTION

I. Overview

The embodiments described herein relate to smart line-in processing. The embodiments are particularly useful in a networked environment where a playback device is capable of playing audio data from two or more different sources, and at least one of the sources receives its audio data from an audio device via a line-in connection. An advantage of certain embodiments described herein, among many other advantages, is that a listener can control the audio device itself and let the system detect a line-in signal and automatically switch the source of the playback device to play from the audio device. As such, the listener does not have to manually switch the source of the playback device before playing the audio device. Another advantage of certain embodiments described herein is that the system may allow the listener to switch the playback device to a different source even while the line-in signal is still present. Yet another advantage of certain embodiments described herein is that the system is capable of rearming itself such that the system can switch the source back to the audio device, should the system once again detect the line-in signal. The embodiments may also find utility in connection with any environment for which multi-source playback is desired.

In certain embodiments, a playback device is idle and therefore not producing sound or the playback device is configured to receive and play a first audio data stream from a first source. The playback device is further capable to receive and play a second audio data stream from a second source. The second source is coupled to an audio device through a line-in connector on the second source. A listener commands the audio device to play audio. The second source is configured, such that when a signal is detected on the line-in connector, the second source automatically switches the playback device to play audio from the audio device via the second audio data stream. The switch to play audio from the audio device may optionally be performed only after the second source detects a signal on the line-in connector for a threshold time. The playing of the second audio data stream may override the playing of the first audio data stream. The playback device and any of the first source and second source may be components of a single apparatus, or the playback device may be separate from any of the first source and second source and communicate with one another, such as over a network.

In certain embodiments, a playback device is configured to receive and play audio from a source, where the source receives the audio from an audio device coupled to the source via a line-in connector. During play of the audio from the audio device, a listener commands the playback device to play a new audio data stream from a different source. Upon receipt of the command, the playback device switches to play the new audio data stream. The playback device subsequently instructs the source to stop sending the audio of the audio device to the playback device. The source stops sending the audio to the playback device and waits until it no longer detects a signal on its line-in connector for an interval of time. When a signal is not detected on the line-in connector for the interval of time, the source is ready to automatically switch

US 8,938,312 B2

3

the playback device to play audio from the audio device, should the source once again detect a signal on its line-in connector. The playback device and any of the source and the different source may be components of a single apparatus, or the playback device may be separate from any of the source and the different source and communicate with one another, such as over a network.

In certain embodiments, the playback device is configured to output audio data according to a first volume level. When the playback device is automatically switched to play audio from a new source, where the new source receives the audio from an audio device coupled to the new source via a line-in connector, the volume of the playback device is modified to a second volume level. The second volume level is set such that increased dynamic range is given to a volume control of the audio device connected via line-in to the new source. When the playback device switches to play audio from a source that is different from the new source having the line-in connector, the volume of the playback device is returned to a safe volume level such that the audio is not played back to the listener at a high level.

In certain embodiments, a playback device comprises a network interface, a processor, and optionally, any of: an amplifier and a speaker driver. The network interface may be configured to receive and transmit audio data over a network. The amplifier, if the playback device is so equipped, powers the optional speaker driver. The processor processes audio data to be sent to another device for actual playback, output through the speaker driver if the playback device is so configured, or both. The playback device further comprises a line-in connector for receiving audio from an audio device. The playback device may implement automatic source switching, such that when a signal is detected on the line-in connector, the playback device automatically triggers the audio from the audio device to be played by the playback device itself, to be played by another device in communication with this playback device, or by both. The automatic switch to play audio from the audio device may optionally be performed only after a signal is detected on the line-in connector for a threshold time.

In certain embodiments, a playback device comprises a network interface, a processor, an amplifier, and a speaker driver. The network interface may be configured to receive and transmit audio data over a network. The amplifier powers the speaker driver. The processor processes audio data to be output through the speaker driver. The playback device may be automatically switched to play streaming audio data that is received from a source device. The source device includes a line-in connector, through which an audio device is connected. When a signal is detected on the line-in connector of the source device, thereby indicating that a listener wishes to hear audio from the audio device, the playback device receives a command from the source device to automatically play the streaming audio data from the audio device. The automatic switch to play audio from the audio device may optionally be performed only after a signal is detected on the line-in connector for a threshold time.

These embodiments and many additional embodiments are described more below. Further, the detailed description is presented largely in terms of illustrative environments, systems, procedures, steps, logic blocks, processing, and other symbolic representations that directly or indirectly resemble the operations of data processing devices coupled to networks. These process descriptions and representations are typically used by those skilled in the art to most effectively convey the substance of their work to others skilled in the art. Numerous specific details are set forth in order to provide a

4

thorough understanding of the present invention. However, it is understood to those skilled in the art that certain embodiments of the present invention may be practiced without certain, specific details. In other instances, well known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the embodiments.

Reference herein to "embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of this phrase in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. The embodiments described herein, explicitly and implicitly understood by one skilled in the art, may be combined with other embodiments.

II. Example Environment

Referring now to the drawings, in which like numerals may refer to like parts throughout the several views. FIG. **1** shows an exemplary configuration **100** in which certain embodiments may be practiced. The configuration **100** may represent, but not be limited to, a part of a residential home, a business building, or a complex with multiple zones. There are a number of multimedia players of which three examples **102**, **104** and **106** are shown as audio devices. Each of the audio devices may be installed or provided in one particular area or zone and hence referred to as a zone player herein. It is understood that a zone can comprise more than one zone player.

As used herein, unless explicitly stated otherwise, an audio source or audio sources are generally in digital format and can be transported or streamed over a data network. To facilitate the understanding of the example environment of FIG. **1**, it is assumed that the configuration **100** represents a home. Though, it is understood that this technology is not limited to its place of application. Referring back to FIG. **1**, the zone players **102** and **104** may be located in one or two of the bedrooms while the zone player **106** may be installed or positioned in a living room. All of the zone players **102**, **104**, and **106** are coupled directly or indirectly to a data network **108**. In addition, a computing device **110** is shown to be coupled on the network **108**. In reality, any other device such as a home gateway device, a storage device, or an MP3 player may be coupled to the network **108** as well.

The network **108** may be a wired network, a wireless network or a combination of both. In one example, all devices including the zone players **102**, **104**, and **106** are coupled to the network **108** by wireless means based on an industry standard such as IEEE 802.11. In yet another example, all devices including the zone players **102**, **104**, and **106** are part of a local area network that communicates with a wide area network (e.g., the Internet). In still another example, all devices including the zone players **102**, **104** and **106** and a controller **142** forms an ad-hoc network and may be specifically named, e.g., a household identifier: Smith Family, to be differentiated from a similar neighboring setup with a household identifier, e.g., Kallai Family.

Many devices on the network **108** are configured to download and store audio sources. For example, the computing device **110** can download audio sources, such as music or audio associated with videos, from the Internet (e.g., the "cloud") or some other source and store the downloaded audio sources locally for sharing with other devices on the Internet or the network **108**. The computing device **110** or any

US 8,938,312 B2

5                                                            6

of the zone players **102**, **104**, and **106** can also be configured to receive streaming audio. Shown as a stereo system, the device **112** is configured to receive an analog audio source (e.g., from broadcasting) or retrieve a digital audio source (e.g., from a compact disk). The analog audio sources can be converted to digital audio sources. In accordance with certain embodiments, the various audio sources may be shared among the devices on the network **108**.

Two or more zone players (e.g., any two or more of the zone players **102**, **104**, and **106**) may be grouped together to form a new zone group. Any combinations of zone players and an existing zone group may be grouped together. In one instance, a new zone group is formed by adding one zone player to another zone player or an existing zone group.

In certain embodiments, there are two or more zone players in one environment (e.g., a living room in a house). Instead of grouping these two zone players to play back the same audio source in synchrony, these two zone players may be configured to play two separate sounds in left and right channels. In other words, the stereo effects of a sound are reproduced or enhanced through these two zone players, one for the left sound and the other for the right sound. Likewise, for a 3-channel (or 2.1 sound effects) sound, three such zone players may be reconfigured as if there are three speakers: left and right speakers and a subwoofer to form a stereo sound. The details of the reconfiguring the zone players and operating these audio products are described more below. Similar configurations with multiple channels (greater than 3, such as 4, 5, 6, 7, 9 channels and so on) also apply. For example, configurations that use more than two channels may be useful in television and theater type settings, where video content such as in the form of television and movies is played together with audio content that contains more than two channels. Further, certain music might similarly be encoded with more than two channel sound.

In certain embodiments, two or more zone players may be consolidated to form a single, consolidated zone player. The consolidated zone player may further be paired with a single zone player or yet another consolidated zone player. A consolidated zone player may comprise one or more individual playback devices. Each playback device of a consolidated playback device is preferably set in a consolidated mode.

According to certain embodiments, one can continue to do any of: group, consolidate, and pair until a desired configuration is complete. The actions of grouping, consolidation, and pairing are preferably performed through a control interface and not by physically connecting and re-connecting speaker wire, for example, to individual, discrete speakers to create different configurations. As such, certain embodiments described herein provide a more flexible and dynamic platform through which sound reproduction can be offered to the end-user.

According to certain embodiments, a particular zone player (e.g., any of zone players **102**, **104**, and **106**) may be configured to receive a first audio data stream from a first source. The first source might obtain the first audio data stream from any of a downloaded song(s) (e.g., a music file stored on an accessible hard-drive), Internet radio station, online music service, online movie service, and the like, in addition to the more traditional means of accessing audio and video content. The zone player may be further capable to receive and play a second audio data stream from a second source. The second source may be coupled to an audio device through a line-in connector on the second source. In certain embodiments, an audio device might include any of an audio signal source device, such as a record player, radio, cassette player, CD player, DVD player, etc. In certain embodiments,

an audio source may include a wireless networking device, such as an AirPort Express, which is an audio device that is commercially offered for sale by Apple, Inc. The AirPort Express may provide streaming audio data to the line-in connection of the second source. Audio data from the AirPort Express device may be controlled via a graphical interface, such as an iTunes music player, which may be separate from a controller of the playback device or the second source. It is understood that the first and second sources may include zone players (e.g., any of zone players **102**, **104**, and **106**).

A listener may command the audio device to play audio (e.g., without having to manually switch sources on the zone player). For example, if the audio device is an AirPort Express, a listener may use an AirPort-enabled computer or smart phone with an iTunes music player, for example, to command the audio device to play. The second source is configured, such that when a signal is detected on the line-in connector, the second source automatically switches the zone player to play audio from the audio device via the second audio data stream. The switch to play audio from the audio device may optionally be performed only after the second source detects a signal on the line-in connector for a threshold time. An example threshold time is 300 milliseconds or less, though any programmed time can work. The play back of the second audio data stream may override the play back of the first audio data stream. The zone player and any of the first source and second source may be components of a single apparatus, or the playback device may be separate from any of the first source and second source and communicate with one another, such as over a network.

At some later point in time, with the audio device connected to the second source via its line-in connector still playing, the listener may decide to play a new audio data stream from a different source and responsively input a command that is communicated to the zone player to play the new audio data stream. The zone player receives the command and switches to the listener's desired source and the new audio data stream is played. The zone player subsequently instructs the second source having the line-in connector to stop sending its audio data stream to the zone player. At this point, the second source waits until it no longer detects a signal on its line-in connector for an interval of time. An example interval of time is 13 seconds or less, though any programmed time can work. The second source is now armed (or rearmed) and once again ready to automatically switch the playback on the zone player to the audio data stream from the second source, should the second source once again detect a signal on its line-in connector from the audio device.

An advantage of certain embodiments described above is that the listener can control the audio device itself (e.g., such as by pressing "play" or "stop" on the audio device itself or by pressing "play" or "stop" on a graphical interface associated with the audio device) and let the system detect a line-in signal and automatically switch the source of the zone player, without requiring the listener from having to manually switch the zone player source.

Another advantage of certain embodiments described above is that the system may allow the listener to switch the playback device to a different source even while the line-in signal is still present.

Yet another advantage of certain embodiments described above is that the system is capable of rearming itself such that the system can switch the source back to the audio device, should the system once again detect the line-in signal.

According to some embodiments, a particular zone player (e.g., any of zone players **102**, **104**, and **106**) is configured to output audio data according to a first volume level. When the

US 8,938,312 B2

7
8

zone player is automatically switched to play an audio data stream from a new source having a line-in connector, the volume of the zone player is modified to a second volume level. The second volume level is set such that increased dynamic range is given to a volume control of the line-in connected source. An example second volume level is 75 percent of total volume. When the zone player switches once again to play an audio stream from a source that is different from the new source having the line-in connector, the volume of the zone player is returned to a safe volume level such that that audio is not played back to the listener at a high level. An example safe volume level is 25 percent of total volume.

It is understood that the technology described herein is not limited to its place of application. For example, it is understood that zones and zone players, and the embodiments described herein, may also be used in vehicles, on water craft, airplanes, amphitheaters, outdoors, along the streets in a village or city, and so on, in addition to homes, offices, gyms, schools, hospitals, hotels, movie theaters, malls, stores, casinos, museum, entertainment parks, or any other place where audio content is played. As such, it will be appreciated that the embodiments described herein may be used in connection with any system or application for which a certain audio system configuration is desired.

III. Example Playback Devices

Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a zone player 200 in accordance with an embodiment. The zone player 200 includes a network interface 202, line-in connection 220, processor 204, memory 206, audio processing circuit 210, module 212, optionally, audio amplifier 214 that may be internal or external, and optionally, speaker unit 218 connected to the audio amplifier 214. The network interface 202 facilitates a data flow between a data network (i.e., the data network 108 of FIG. 1) and the zone player 200 and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols used in the Internet is TCP/IP (Transmission Control Protocol/Internet Protocol). In general, a network interface 202 manages the assembling of an audio source or file into smaller packets that are to be transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface 202 handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player 200. Accordingly, in certain embodiments, each of the packets includes an IP-based source address as well as an IP-based destination address.

The network interface 202 may include one or both of a wireless interface 216 and a wired interface 217. The wireless interface 216, also referred to as an RF interface, provides network interface functions by a wireless means for the zone player 200 to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b, 802.11g, 802.11n, or 802.15.1). The wired interface 217 provides network interface functions by a wired means (e.g., an Ethernet cable). In one embodiment, a zone player includes both of the interfaces 216 and 217, and other zone players include only a RF or wired interface. Thus these other zone players communicate with other devices on a network or retrieve audio sources via the zone player. The processor 204 is configured to control the operation of other parts in the zone player 200. The memory 206 may be loaded with one or more software modules that can be executed by the processor 204 to achieve desired tasks. According to one embodiment, a software module implementing an embodi-

ment, such as described herein, is executed, the processor 204 operates in accordance with the software module in reference to a saved zone group configuration characterizing a zone group created by a user, the zone player 200 is caused to retrieve an audio source from another zone player or a device on the network and synchronize the players in the zone group to play back the audio source as desired. According to another embodiment, a software module implementing an embodiment described herein creates a pair between two or more zone players to create a desired multi-channel audio environment.

According to another embodiment, a software module implementing one or more embodiments described herein allows for automated source switching. For example, processor 204 operates in accordance with a software module for determining that an audio signal is present at the line-in connector 220 and responsively switches a source of a zone player or playback device to the audio device. Processor 204, in accordance with a software module, may further receive an instruction to stop the play back of audio data from the audio device even when the audio signal is present at the line-in connector 220. Processor 204, in accordance with a software module, may further determine that the audio signal is no longer present at the line-in connector 220 and responsively rearm, such that a subsequent presence of the audio signal will switch the source to the audio device.

Line-in connection 220 may include a socket for a jack plug or some other audio connector and may be coupled to the audio processing circuit 210. In certain embodiments, the line-in connection 220 includes a socket for any of a 0.25 inch plug, a 3.5 mm plug, and a 2.5 mm plug. An illustrative setup may include connecting an AirPort Express via its 3.5 mm stereo mini-jack connection to the zone player 200 via its 3.5 mm connection (e.g., line-in connection 220).

According to one embodiment, the memory 206 is used to save one or more saved zone configuration files that may be retrieved for modification at any time. Typically, a saved zone group configuration file is transmitted to a controller (e.g., the controlling device 140 or 142 of FIG. 1, a computer, a portable device, or a TV) when a user operates the controlling device. The zone group configuration provides an interactive user interface so that various manipulations or control of the zone players may be performed.

In certain embodiments, the audio processing circuit 210 resembles the circuitry in an audio playback device and includes one or more analog-to-digital converters (ADC), one or more digital-to-analog converters (DAC), an audio preprocessing part, an audio enhancement part or a digital signal processor and others. In operation, when an audio source is retrieved via the network interface 202, the audio source is processed in the audio processing circuit 210 to produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier 214 for playback on speakers. In addition, the audio processing circuit 210 may include necessary circuitry to process analog signals as inputs to produce digital signals for sharing with other devices on a network.

Depending on an exact implementation, the module 212 may be implemented as a combination of hardware and software. In one embodiment, the module 212 is used to save a scene. The audio amplifier 214 is typically an analog circuit that powers the provided analog audio signals to drive one or more speakers.

It is understood that zone player 200 is an example of a playback device. Examples of playback devices include those zone players that are commercially offered for sale by Sonos, Inc. of Santa Barbara, Calif. They currently include a Zone-

US 8,938,312 B2

9

Player 90, ZonePlayer 120, and Sonos S5. The ZonePlayer 90 is an example zone player without a built-in amplifier, whereas the ZonePlayer 120 is an example zone player with a built-in amplifier. The S5 is an example zone player with a built-in amplifier and speakers. In particular, the S5 is a five-driver speaker system that includes two tweeters, two mid-range drivers, and one subwoofer. When playing audio content via the S5, the left audio data of a track is sent out of the left tweeter and left mid-range driver, the right audio data of a track is sent out of the right tweeter and the right mid-range driver, and mono bass is sent out of the subwoofer. Further, both mid-range drivers and both tweeters have the same equalization (or substantially the same equalization). That is, they are both sent the same frequencies, just from different channels of audio. While the S5 is an example of a zone player with speakers, it is understood that a zone player with speakers is not limited to one with a certain number of speakers (e.g., five speakers as in the S5), but rather can contain one or more speakers. Further, a zone player may be part of another device, which might even serve a primary purpose different than audio.

IV. Example Controller

Referring now to FIG. 2B, there is shown an exemplary controller 240, which may correspond to the controlling device 140 or 142 of FIG. 1. The controller 240 may be used to facilitate the control of multi-media applications, automation and others in a complex. In particular, the controller 240 is configured to facilitate a selection of a plurality of audio sources available on the network, controlling operations of one or more zone players (e.g., the zone player 200) through a RF interface corresponding to the wireless interface 216 of FIG. 2A. According to one embodiment, the wireless means is based on an industry standard (e.g., infrared, radio, wireless standard IEEE 802.11a, 802.11b 802.11g, 802.11n, or 802.15.1). When a particular audio source is being played in the zone player 200, a picture, if there is any, associated with the audio source may be transmitted from the zone player 200 to the controller 240 for display. In one embodiment, the controller 240 is used to synchronize audio playback of more than one zone player by grouping the zone players in a group. In another embodiment, the controller 240 is used to control the volume of each of the zone players in a zone group individually or together.

In an embodiment, the controller 240 is used to create a pairing between two or more playback devices to create or enhance a multi-channel listening environment. For example, the controller 240 may be used to select and pair two or more playback devices. In addition, the controller 240 may be used to turn pairing on or off. The controller 240 may also be used to consolidate playback devices, and further to set a particular playback device in consolidated mode. Accordingly, in some embodiments, the controller 240 provides a flexible mechanism for dynamically configuring a multi-channel audio environment. In some instances, the pairing creates a multi-channel listening environment. In some instances, the pairing enhances a multi-channel listening environment by increasing the separation between devices. For example, two individual playback devices, which are positioned at a distance from each other, may provide more channel separation to the listener than the audio coming from only a single device.

The user interface for the controller 240 includes a screen 242 (e.g., a LCD screen) and a set of functional buttons as follows: a "zones" button 244, a "back" button 246, a "music" button 248, a scroll wheel 250, "ok" button 252, a set of transport control buttons 254, a mute button 262, a volume

10

up/down button 264, a set of soft buttons 266 corresponding to the labels 268 displayed on the screen 242.

The screen 242 displays various screen menus in response to a user's selection. In one embodiment, the "zones" button 244 activates a zone management screen or "Zone Menu", which is described in more details below. The "back" button 246 may lead to different actions depending on the current screen. In one embodiment, the "back" button triggers the current screen display to go back to a previous one. In another embodiment, the "back" button negates the user's erroneous selection. The "music" button 248 activates a music menu, which allows the selection of an audio source (e.g., a song) to be added to a zone player's music queue for playback.

The scroll wheel 250 is used for selecting an item within a list, whenever a list is presented on the screen 242. When the items in the list are too many to be accommodated in one screen display, a scroll indicator such as a scroll bar or a scroll arrow is displayed beside the list. When the scroll indicator is displayed, a user may rotate the scroll wheel 250 to either choose a displayed item or display a hidden item in the list. The "OK" button 252 is used to confirm the user selection on the screen 242.

There are three transport buttons 254, which are used to control the effect of the currently playing song. For example, the functions of the transport buttons may include play/pause and forward/rewind a song, move forward to a next song track, or move backward to a previous track. According to one embodiment, pressing one of the volume control buttons such as the mute button 262 or the volume up/down button 264 activates a volume panel. In addition, there are three soft buttons 266 that can be activated in accordance with the labels 268 on the screen 242. It is understood that, in a multi-zone system, there may be multiple audio sources being played respectively in more than one zone players. The music transport functions described herein shall apply selectively to one of the sources when a corresponding one of the zone players or zone groups is selected.

FIG. 2C shows an exemplary controller 260 which may correspond to the controlling device 140 or 142 of FIG. 1. The controller 260 is provided with a touch screen that allows a user to interact with the controller, for example, to navigate a playlist of many items, to control operations of one or more players. In one embodiment as it will be further shown in FIGS. 10A to 10F, a user may interact with the controller to make a multi-channel audio environment, such as create a stereo pair for example, and may even be used to separate the multi-channel audio environment, such as disengage a stereo pair. It should be noted that other network-enabled portable devices such as an iPhone, iPad or any other smart phone or network-enabled device may be used as a controller to interact or control multiple zone players in an environment (e.g., a networked computer such as a PC or Mac may also be used as a controller). According to one embodiment, an application may be downloaded into a network enabled device. Such an application may implement most of the functions discussed above for the controller 240 using a navigating mechanism or touch screen in the device. Those skilled in the art will appreciate the flexibility of such an application and its ability to be ported to a new type of portable device given the detailed description herein.

FIG. 2D illustrates an internal functional block diagram of an exemplary controller 270, which may correspond to the controller 240 of FIG. 2B, a computing device, smart phone, or any other communicative device. The screen 272 on the controller 270 may be an LCD screen. The screen 272 communicates with and is commanded by a screen driver 274 that is controlled by a microcontroller (e.g., a processor) 276. The

US 8,938,312 B2

11                                                                12

memory **282** may be loaded with one or more application modules **284** that can be executed by the microcontroller **276** with or without a user input via the user interface **278** to achieve desired tasks. In one embodiment, an application module is configured to facilitate grouping a number of selected zone players into a zone group and synchronizing the zone players for one audio source. In another embodiment, an application module is configured to control together the audio sounds (e.g., volume) of the zone players in a zone group. In operation, when the microcontroller **276** executes one or more of the application modules **284**, the screen driver **274** generates control signals to drive the screen **272** to display an application specific user interface accordingly, more of which will be described below.

The controller **270** includes a network interface **280** referred to as a RF interface **280** that facilitates wireless communication with a zone player via a corresponding RF interface thereof. In one embodiment, the commands such as volume control and audio playback synchronization are sent via the RF interfaces. In another embodiment, a saved zone group configuration is transmitted between a zone player and a controller via the RF interfaces. The controller **270** may control one or more zone players, such as **102**, **104** and **106** of FIG. **1**. Nevertheless, there may be more than one controller, each preferably in a zone (e.g., a room or rooms nearby each other) and configured to control any one and all of the zone players.

In one embodiment, a user creates a zone group including at least two zone players from the controller **240** that sends signals or data to one of the zone players. As all the zone players are coupled on a network, the received signals in one zone player can cause other zone players in the group to be synchronized so that all the zone players in the group play back an identical audio source or a list of identical audio sources in a timely synchronized manner such that no (or substantially no) audible delays or hiccups could be heard. Similarly, when a user increases the audio volume of the group from the controller, the signals or data of increasing the audio volume for the group are sent to one of the zone players and causes other zone players in the group to be increased together in volume and in scale.

According to one implementation, an application module is loaded in memory **282** for zone group management. When a predetermined key (e.g. the "zones" button **244**) is activated on the controller **240**, the application module is executed in the microcontroller **276**. The input interface **278** coupled to and controlled by the microcontroller **276** receives inputs from a user. A "Zone Menu" is then displayed on the screen **272**. The user may start grouping zone players into a zone group by activating a "Link Zones" or "Add Zone" soft button, or de-grouping a zone group by activating an "Unlink Zones" or "Drop Zone" button. The detail of the zone group manipulation will be further discussed below.

As described above, the input interface **278** includes a number of function buttons as well as a screen graphical user interface. It should be pointed out that the controller **240** in FIG. **2**B is not the only controlling device that may practice the embodiments. Other devices that provide the equivalent control functions (e.g., a computing device, a hand-held device) may also be configured to practice the present invention. In the above description, unless otherwise specifically described, it is clear that keys or buttons are generally referred to as either the physical buttons or soft buttons, enabling a user to enter a command or data.

One mechanism for 'joining' zone players together for music playback is to link a number of zone players together to form a group. To link a number of zone players together, a user may manually link each zone player or room one after the other. For example, there is a multi-zone system that includes the following zones:

Bathroom
Bedroom
Den
Dining Room
Family Room
Foyer

If a user wishes to link five of the six zone players using the current mechanism, the user may start with a single zone and then manually link each zone to that zone. This mechanism may be sometimes quite time consuming. According to one embodiment, a set of zones can be dynamically linked together using one command. Using what is referred to herein as a theme or a zone scene, zones can be configured in a particular scene (e.g., morning, afternoon, or garden), where a predefined zone grouping and setting of attributes for the grouping are automatically effectuated.

For instance, a "Morning" zone scene/configuration command would link the Bedroom, Den and Dining Room together in one action. Without this single command, the user would need to manually and individually link each zone. FIG. **3**A provides an illustration of one zone scene, where the left column shows the starting zone grouping—all zones are separate, the column on the right shows the effects of grouping the zones to make a group of 3 zones named after "Morning".

Expanding this idea further, a Zone Scene can be set to create multiple sets of linked zones. For example, a user creates 3 separate groups of zones, the downstairs zones would be linked together, the upstairs zones would be linked together in their own group, and the outside zones (in this case the patio) would move into a group of its own.

In one embodiment as shown in FIG. **3**B, a user defines multiple groups to be gathered at the same time. For example: an "Evening Scene" is desired to link the following zones:

Group 1
Bedroom
Den
Dining Room
Group 2
Garage
Garden

where Bathroom, Family Room and Foyer should be separated from any group if they were part of a group before the Zone Scene was invoked.

A feature of certain embodiments is that that zones do not need to be separated before a zone scene is invoked. In one embodiment, a command is provided and links all zones in one step, if invoked. The command is in a form of a zone scene. After linking the appropriate zones, a zone scene command could apply the following attributes:

Set volumes levels in each zones (each zone can have a different volume)
Mute/Unmute zones.
Select and play specific music in the zones.
Set the play mode of the music (Shuffle, Repeat, Shuffle-repeat)
Set the music playback equalization of each zone (e.g., bass treble).

A further extension of this embodiment is to trigger a zone scene command as an alarm clock function. For instance the zone scene is set to apply at 8:00 am. It could link appropriate zones automatically, set specific music to play and then stop the music after a defined duration. Although a single zone may be assigned to an alarm, a scene set as an alarm clock provides a synchronized alarm, allowing any zones linked in

US 8,938,312 B2

13

14

the scene to play a predefined audio (e.g., a favorable song, a predefined playlist) at a specific time or for a specific duration. If, for any reason, the scheduled music failed to be played (e.g., an empty playlist, no connection to a share, failed UPnP, no Internet connection for an Internet Radio station), a backup buzzer will sound. This buzzer will be a sound file that is stored in a zone player.

FIG. 4 shows an exemplary user interface 400 that may be displayed on a controller 142 or a computer 110 of FIG. 1. The interface 400 shows a list of items that may be set up by a user to cause a scene to function at a specific time. In the embodiment shown in FIG. 4, the list of items includes "Alarm", "Time", "Zone", "Music", "Frequency" and "Alarm length". "Alarm" can be set on or off. When "Alarm" is set on, "Time" is a specific time to set off the alarm. "Zone" shows which zone players are being set to play a specified audio at the specific time. "Music" shows what to be played when the specific time arrives. "Frequency" allows the user to define a frequency of the alarm. "Alarm length" defines how long the audio is to be played. It should be noted that the user interface 400 is provided herein to show some of the functions associated with setting up an alarm. Depending on an exact implementation, other functions, such as time zone, daylight savings, time synchronization, and time/date format for display may also be provided.

According to one embodiment, each zone player in a scene may be set up for different alarms. For example, a "Morning" scene includes three zone players, each in a bedroom, a den, and a dining room. After selecting the scene, the user may set up an alarm for the scene as whole. As a result, each of the zone players will be activated at a specific time.

FIG. 5A shows a user interface 500 to allow a user to form a scene. The panel on the left shows the available zones in a household. The panel on the right shows the zones that have been selected and to be grouped as part of this scene. Depending on an exact implementation of a user interface 500, Add/Remove buttons may be provided to move zones between the panels, or zones may be dragged along between panels.

FIG. 5B shows another user interface 520 to allow a user to form a scene. The user interface 520 that may be displayed on a controller or a computing device, lists available zones in a system. A checkbox is provided next to each of the zones so that a user may check in the zones to be associated with the scene.

FIG. 5C shows a user interface 510 to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively. As shown in the user interface 510, the 'Volumes . . .' button (shown as sliders, other forms are possible) allows the user to affect the volumes of the associated zone players when a zone scene is invoked. In one embodiment, the zone players can be set to retain whatever volume that they currently have when the scene is invoked. Additionally the user can decide if the volumes should be unmuted or muted when the scene is invoked.

V. Providing Example Player Themes or Zone Scenes

FIG. 6 shows a flowchart or process 600 of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone. The process 600 is presented in accordance with one embodiment of the present invention and may be implemented in a module to be located in the memory 282 of FIG. 2C.

The process 600 is initiated when a user decides to proceed with a zone scene at 602. The process 600 then moves to 604 where it allows a user to decide which zone players to be associated with the scene. For example, there are ten players in a household, and the scene is named after "Morning". The user may be given an interface to select four of the ten players to be associated with the scene. At 606, the scene is saved. The scene may be saved in any one of the members in the scene. In the example of FIG. 1, the scene is saved in one of the zone players and displayed on the controller 142. In operation, a set of data pertaining to the scene includes a plurality of parameters. In one embodiment, the parameters include, but may not be limited to, identifiers (e.g., IP address) of the associated players and a playlist. The parameters may also include volume/tone settings for the associated players in the scene. The user may go back to 602 to configure another scene if desired.

Given a saved scene, a user may activate the scene at any time or set up a timer to activate the scene at 610. The process 600 can continue when a saved scene is activated at 610. At 612, upon the activation of a saved scene, the process 600 checks the status of the players associated with the scene. The status of the players means that each of the players shall be in condition to react in a synchronized manner. In one embodiment, the interconnections of the players are checked to make sure that the players communicate among themselves and/or with a controller if there is such a controller in the scene.

It is assumed that all players associated with the scene are in good condition. At 614, commands are executed with the parameters (e.g., pertaining to a playlist and volumes). In one embodiment, data including the parameters is transported from a member (e.g., a controller) to other members in the scene so that the players are caused to synchronize an operation configured in the scene. The operation may cause all players to play back a song in identical or different volumes or to play back a pre-stored file.

VI. Example Multi-Channel Environments

FIG. 7 shows an example configuration in which an audio source is played back on two players 702 and 704, according to an example embodiment. These two players 702 and 704 may be located in and around one place (e.g., a hall, room, or nearby rooms) and are designated to play two sound tracks respectively. For example, an audio source may have left and right sound channels or tracks (e.g., stereo sound). Instead of grouping the players 702 and 704 to play back the audio source together in synchrony, when each player 702 and 704 plays the same audio content at substantially the same time, the players 702 and 704 can be paired to play different channels of the audio source in synchrony. As a result of pairing, the stereo sound effects can be simulated or enhanced via two players 702 and 704 versus one player or none of the players, for example.

In certain embodiments, each player of players 702 and 704 includes a network interface, one or more speaker drivers (two or more speaker drivers in some instances, such as when the player can play in stereo mode absent pairing), an amplifier, and a processor, such as shown in FIG. 2A. The network interface receives audio data over a network. One or more amplifiers power the speaker drivers. The processor processes the audio data to be output through the speaker drivers. The processor may further configure a first equalization of the output from the speaker drivers in accordance with a first type of pairing and configuring a second equalization of the output from the speaker drivers in accordance with a second type of pairing.

In an embodiment, the two players 702 and 704 are configured to output a plurality of audio channels independent of each other. For example, each player 702 and 704 may be configured to output audio content in stereo independently

US 8,938,312 B2

15                                                                16

from each other. Subsequent to pairing, one playback device (e.g., player **702**) is configured to output a first subset of the plurality of audio channels and the other playback device (e.g., player **704**) is configured to output a second subset of the plurality of audio channels. The first and second subsets are different. In this example, subsequent to pairing players **702** and **704**, player **702** might play the right channel and player **704** might play the left channel. In another example, player **702** might play the right channel plus a center channel (e.g., in television or theater mode) and player **704** might play the left channel plus the center channel. Even in the latter example, the first and second subsets are different in that player **702** is playing channels Right+Center and player **704** is playing channels Left+Center. In yet another embodiment, subsequent to pairing, player **702** might play all channels except certain bass frequencies, which may be played via player **704**, thereby using player **704** as a subwoofer.

In another embodiment, a collection of three or more playback devices (e.g., players **702**, **704**, and one or more additional players) are each configured to output a plurality of audio channels independent of another playback device in the collection. Subsequent to pairing, each of the playback devices is configured to output a generally different audio channel(s) from the collection. This embodiment is particularly useful in a television or movie theater setting where a particular playback device of the multiple playback devices is configured to output in two-channel or stereo mode at one time (e.g., when playing a song), and subsequent to pairing, is configured to output as a front-right channel, a front-center channel, a front-left channel, a rear-right channel, a rear-left channel, and so on (e.g., when watching a movie or television).

In another embodiment, one of the paired playback devices (e.g., player **702** or player **704**) processes the data of the audio item, essentially separating the data into channels, each of the channels representing a single-sound track, for example, and being played back in one of the playback devices, thus creating or enhancing a multi-channel listening environment. In an alternative embodiment, both playback devices (e.g., players **702** and **704**) may receive and process the data of the audio item and each playback device may output only the audio content designated for the respective player. For example, player **702** might receive both left and right channel audio, but only play the left channel, whereas player **704** might also receive both left and right channel audio, but only play the right channel.

In another embodiment, two or more playback devices (e.g., players **702** or **704**) may be grouped into a single or consolidated playback device and the consolidated playback device (e.g., consolidated player **702+704**) may be paired with one or more playback devices. For instance, two playback devices maybe grouped into a first consolidated playback device and two additional playback devices maybe grouped into a second consolidated playback device. Then, the first and second consolidated playback devices may be paired to create or enhance a multi-channel listening environment.

In certain embodiments, a playback device (e.g., either player **702** or **704**) that is configured to output an audio channel is paired with one or more additional playback devices, such that the playback device is configured to output a different audio channel than previously configured. For instance, the playback device might be configured to output a right channel in stereo mode, but subsequent to being paired with one or more additional playback devices, might be con-

figured to output a rear, right channel in theater mode. The playback device may be paired to one or more other playback devices.

In certain embodiments, a playback device (e.g., either player **702** or **704**) that is configured to output a plurality of audio channels is paired with one or more additional playback devices, such that the playback device is configured to output a subset of the plurality of audio channels relative to the one or more additional playback devices. For instance, the playback device might be configured to output in two-channel or stereo mode, but subsequent to being paired with one or more playback devices might be configured to output a right or left channel. The playback device may be paired to one or more other playback devices.

According to certain embodiments, the action of pairing two or more playback devices is triggered based on a command from a user via a control interface (e.g., a manual command) or responsive to an event (e.g., an automatic command). For example, using a controller, a user can create a pairing between two or more playback devices or disengage the pairing between two or more playback devices. In another example, pairing may be triggered by the audio content itself, a signal received from a source device, or some other predefined event, such that pairing occurs when the event is detected by the controller or playback device, for example. In addition, another device might be programmed to detect the event and provide a pairing signal to the controller and/or playback devices.

Further, it is understood that going from a configuration of no pairing (unpaired or non paired) to a configuration of pairing or from one kind of pairing (e.g., a pairing used in a type of stereo mode or theater mode) to a different kind of pairing (e.g., another pairing used in a type of stereo mode or theater mode) are all various types of "pairing" that can occur according to certain embodiments. In addition, disengaging a pairing between multiple playback devices might go from pairing to no pairing or from pairing of a first kind back to pairing of a previous kind, for example.

In one example, a first type of pairing might include "no pairing" with another playback device and a second type of pairing might include pairing with one or more additional playback devices. In a second example, a first type of pairing might include pairing with a second playback device and a second type of pairing might include pairing with a plurality of playback devices. In a third example, a first type of pairing might include reproducing two channel sound via the speaker drivers and a second type of pairing comprises reproducing no more than one channel of the two channel sound via the speaker drivers. In a fourth example, a first type of pairing might comprise reproducing a first audio channel via the speaker drivers and the second type of pairing might include reproducing a second audio channel via the speaker drivers. In a fifth example, a first type of pairing might include reproducing the audio content via the speaker drivers in stereo mode and a second type of pairing might include reproducing the audio content via the speaker drivers in theater mode. In a sixth example, a first type of pairing might include reproducing the audio content via the speaker drivers and a second type of pairing comprises reproducing the audio content via the speaker drivers when in consolidated mode. It is understood that various variations and modifications may be made to the examples described just above with the attainment of some or all of the advantages of the technology described herein.

According to certain embodiments, the configuration of a playback device may include any of: changing the equalization of the playback device by changing the equalization of one or more specific speaker drivers and optimizing the syn-

US 8,938,312 B2

17                                                                18

chronization between paired devices. Changing the equalization of the playback device might include any of: turning on or off (or effectively muting) one or more specific speaker drivers, changing the channel output of one or more speaker drivers, changing the frequency response of one or more specific speaker drivers, changing the amplifier gain of any particular speaker driver, changing the amplifier gain of the playback device as a whole.

In certain embodiments, changing the equalization of a playback device (e.g., changing the equalization of one or more speaker drivers of the playback device) may affect frequency dependent parameters. Examples might include the adjustment of the strength of frequencies within the audio data, a phase adjustment, and time-delay adjustment. In addition, a particular equalization may use a first type of pass filter, such as one that attenuates high, middle, or low frequencies, for example, while allowing other frequencies to pass unfiltered (or substantially unfiltered). Filters might also be different kinds or of a different order (e.g., first order filter, second order filter, third order filter, fourth order filter, and so on). For example, a first equalization of a playback device might include using a first type of pass filter to modify the output based on a first type of pairing and a second equalization of the playback device might include using a second type of pass filter to modify the output based on the second type of pairing. In this example, the first and second type of pass filters have one or different properties and/or behaviors, thus changing the equalization and sonic behavior of the device.

By way of illustration, when two S5 devices are paired to create a stereo pair, for example, one S5 device may be configured as the "left" and the other S5 device may be configured as the "right." In one embodiment, the user may determine which is left or right. In this configuration, for example, the left and right audio data may be sent to both S5 devices, but the left audio data of the track is played out of the S5 device configured as left and the right audio data of a track is played out of the S5 device configured as right. In addition, the equalization of each S5 device is changed in an attempt to reduce or eliminate certain constructive or destructive interference. For example, one tweeter on each S5 device may be turned off or substantially muted. In certain embodiments, the crossover frequency to each driver may even be changed from a previous configuration so that two or more drivers are not necessarily outputting the exact same audio data, otherwise constructive and/or destructive interference may occur. In certain embodiments, the amplifier gain is adjusted for a particular speaker driver and/or for the playback device as a whole.

In operation, according to certain embodiments, a controller 706 (e.g., a controller 142 of FIG. 1 or 240 of FIG. 2B or a portable device) is used to initiate the operation. Through a user interface, the controller 706 causes a player 702 to retrieve the audio source, provided the audio source is on a network 708 (e.g., the Internet or a local area network). Similarly, the controller 706 may also cause a designated device (e.g., another networked device) to establish a communication session with the player 702 to deliver the requested audio source. In any case, either one or both of the players 702 and 704 may have access to the data representing the audio source.

In certain embodiments, a module in the player 702 is activated to process the data. According to one embodiment, the right and left sound tracks are separated. One sound track is retained locally in one player and the other sound track is pushed or uploaded to the other device (e.g., via an ad-hoc network). When the right and left sound tracks are played

back simultaneously or substantially simultaneously, the stereo sound effect can be appreciated.

In another embodiment, several tracks are separated, such as in television or theater mode. For example, the tracks may be separated into a center channel, right front channel, left front channel, right rear channel, left rear channel, and so on. Accordingly, one or more sound tracks may be retained locally in one player and the other sound tracks are pushed or uploaded to the other devices.

In yet another embodiment, one player might process the data and retain one or more tracks locally, while the remaining data is sent onto another player. The receiving player may then process the data and retain one or more tracks locally and send any remaining data onto another player. This process, or one like it, may continue until all of the tracks are retained locally by corresponding player devices.

In yet another embodiment, each player might receive and process the data and play only the channel or channels that are designated for that player.

In certain embodiments, it is important to maintain good synchronization, especially when pairing two or more independently clocked playback devices so that the multi-channel audio content is played back as it was originally intended. According to an embodiment, a message may be initiated from one device to another that is also activated to send back an acknowledgement. Upon receiving the acknowledgement, the time delay in transporting data from one device to another can be measured. The time delay will be considered when synchronizing the two players to play back the two separated sound tracks. In certain embodiments, if sending a packet (e.g., a packet in accordance with SNTP protocol) to a playback device and receiving a response takes more than fifteen milliseconds, for example, the timing information contained within that packet, such as clock information, is discarded. If sending and receiving a packet is less than fifteen milliseconds, then the information from the packet is used to adjust playback, if so necessary.

Additional details of synchronizing operations of two or more independently clocked players are provided in commonly assigned US application Ser. No. 10/816,217, filed Apr. 1, 2004, entitled "System and Method For Synchronizing Operations Among A Plurality Of Independently Clocked Digital Data Processing Devices" which is hereby incorporated by reference.

FIG. 8 shows an example configuration of a pairing amongst multiple players 802, 804, 806, 808, 810, and 812 in a theater-like environment, in accordance to an embodiment. Player 802 may operate as a front-left channel, player 804 may operate as a center channel, player 806 may operate as a front-right channel, player 808 may operate as a subwoofer, player 810 may operate as a rear, right channel, and player 812 may operate as a rear, right channel. In this example, the players 802, 804, 806, 808, 810, and 812 are wirelessly coupled over network 816 so as to receive and transmit data over a wireless network, and obtain power from power outlets in the wall or through some other power source (e.g., a battery). Players 802, 804, 806, 808, 810, and 812 may be wired, if so configured in an alternate embodiment. Controller 814 may be a network-enabled device, examples of which include a smart phone, tablet computer, laptop computer, desktop computer, or a television.

In one embodiment, a designated player, such as player 804, receives multi-channel audio content from a source 816. Source 816 might include audio and/or video content downloaded or streamed from the Internet, a DVD or Blu-Ray player, or from some other source of audio and/or video content. Player 804 separates the multi-channel audio and

US 8,938,312 B2

19                                                                      20

sends respective audio channels to its playback owner. For example, if a particular audio channel is designated for the front, right speaker, then that content is wirelessly directed from player **804** to player **802**, and so on. Players **802**, **804**, **806**, **808**, **810**, and **812** play the audio content synchronously, so as to create a multi-channel listening environment. Moreover, if source **816** provides video content along with audio content, then the audio content is preferably played in synchrony with the video content.

In another embodiment, each player of players **802**, **804**, **806**, **808**, **810**, and **812** may separate out its own one or more channels for playback. That is, either all audio content, or a portion thereof, is sent to each player (e.g., from source **816** or another playback device) and the player itself obtains its own data for playback.

In addition, players **802**, **804**, **806**, **808**, **810**, and **812** may be reconfigured to operate in many different configurations, such as described above. For example, players **802** and **806** may be paired to operate in stereo mode, while the other players remain in sleep mode or turned off (player **808** may remain on in any particular configuration, if so desired and configured, because it is operating as a subwoofer). In another example, players **802** and **810** may be consolidated and output left channel audio, while players **806** and **812** may be consolidated and output right channel audio. In yet another example, some of players **802**, **804**, **806**, **808**, **810**, and **812** are consolidated into a single player and paired with additional playback devices, such as in an adjacent room. In a further example, players **802**, **804**, **806**, **808**, **810**, and **812** are grouped and not paired, when the audio content is music (versus movie content, for example). These are just some configuration examples. Many other configurations are possible using the teachings described herein.

FIG. **9** shows a flowchart or process **900** of grouping a plurality of audio products to play separated sound tracks in synchronization to simulate a multi-channel listening environment. The process **900** is presented in accordance with certain embodiments and may be implemented in a module to be located in the memory **282** of FIG. 2D. To facilitate the description of process **900**, a listening environment of stereo sound with left and right channels is described. Those skilled in the art can appreciate that the description can be equally applied to other forms of multi-channel listening environment (e.g., three, five, seven channel environments).

Typically, there is a plurality of players being controlled by one or more controllers, where these players are disposed in various locations. For example, there are five players in a house; three of them are respectively disposed in three rooms while two players are disposed in a larger room. Accordingly, these two players would be candidates to be paired to simulate a stereo listening environment, instead of just playing synchronized audio from both in a grouped fashion. In another example, there are four players in a large space or adjacent spaces, two pairs of the players may be paired to simulate a stereo listening environment, in which two players in one consolidated pair can be grouped to play back one (left) sound track and the other two in the other consolidated pair can be grouped to play back one (right) sound track.

In any case, two groups of players or two players are decided to be paired at **902**. If no players are paired, the process **900** will not be activated. It is assumed that two players from a group of players being controlled by a controller are selected to be paired at **902**. The process **900** proceeds.

At **904**, a user may decide which player is to play back which sound track. Depending on the location of the user or listener(s) with respect to the selected players, it is assumed that a player or unit A is chosen to play back a left sound track and another player or unit B is chosen to play back a right sound track. In an alternative embodiment, the players themselves (or the controller) may automatically determine which unit is configured to play the right channel and which unit is configured to play the left channel without input from the user.

According to one embodiment, a time delay in transporting data between the two units A and B is measured at **906**. This time delay may facilitate sound synchronization between the two units as one of the units will receive a processed sound track from the other. The user may continue to operate on a controller to select a title (e.g., an audio source or an item from a playlist) for playback on the two units at **910**.

Once the title is determined at **912**, the data for the title is accessed. Depending on where the data is located, the controller may be configured to cause one of the two units to obtain or stream in the data. In one embodiment, the controller or unit A initiates a request to a remotely-networked device providing or storing the data. Assuming an authentication procedure, if any, completes successfully, the remote device starts to upload the data to the unit A. Likewise, if the data is locally stored in the unit A, the data can be accessed locally without requesting the same from the network. As the data is being received or accessed in the unit A, a processing module is activated in the unit A to process the data, essentially separating the data into two streams of sound tracks at **914**. In an alternative embodiment, each unit may receive and process the data, essentially separating the data into a stream to be played by the respective unit.

At **916**, one of the streams is uploaded from the unit A to unit B via a local network (e.g., the ad-hoc network formed by all the players being controlled by the controller). As the streams are being distributed, the two units are configured to play back the streams respectively, each reproducing the sound of a single sound track at **918**. Together, in synchrony, the two units create a stereo sound listening environment.

It should be noted that the delay time, if noticeable, may be incorporated into the unit A to delay the consumption of the stream by the delay time to synchronize with the unit B. Alternatively, a non-selected player may be used to process a streaming data of the title and configured to supply two streams to the pair of players, thus equalizing the delay time that would be otherwise experienced by the unit B.

FIGS. **10A-10F** show illustrative screenshots of a controller for creating a stereo pair in accordance with certain embodiments. The screenshots are from a computing device (e.g., a tablet computer, laptop, or desktop) used as a controller. Those skilled in the art can appreciate that FIGS. **10A-10F** may be readily modified to be used in a portable device with network capability, such as, for example, iPhone or iTouch or other smart phone or other network-enabled devices. Additionally, the controller might exist as part of a player itself or directly/indirectly coupled to the player, and therefore such screenshots may be modified accordingly—such a controller need not have network capability as the player will have network connectivity.

FIG. **10A** shows a graphic interface **1000** that may be displayed on a controller when a user desires to create a stereo pair with two players in a system. It is understood that the system may include two or more players. If a stereo pair is desired, such as discussed with respect to the example of FIGS. **10A-10F**, then any two players (one or both of which may be a consolidated player) in the system may be paired. However, if pairing more than two players is desired, such as creating an environment which is capable of playing more than two channel audio data, then the graphic interface **1000**

US 8,938,312 B2

21

22

may include an additional option or options. For example, an option might include "Make a Movie Surround Sound Pairing," "Make a Music Surround Sound Pairing," or "Make a Dolby Pro Logic Pairing." Any descriptive language may be used to appropriately indicate to the user the type of pairing that can be created. Upon selecting an option, a setup wizard on the controller may help the user appropriately configure the system such that multi-channel discrete audio may be effectively realized by the system.

Turning back to FIG. 10A, the interface 1000 allows a user to initiate a stereo pair with a zone player named "ZPS5-Black." In certain embodiments, the system recognizes that ZPS5-Black is part of a particular zone (e.g., kitchen, family room, bedroom, and so on). The system may allow the user to pair ZPS5-Black with another player in the same zone only, or alternatively, the system may allow the user to pair ZPS5-Black with another player in a different zone (such as an adjacent zone). Pairing players in different zones may be particularly useful when an open space is divided into two or more zones (e.g., an open space might include a kitchen and family room, for example).

Additionally, the system may be programmed such that pairing players from different zones creates another zone to reflect the players in paired mode (e.g., a single kitchen-family room zone during paired operation might originate from a kitchen zone and a family room zone during non-paired operation). In such an embodiment, a user may be able to switch between zones or dynamically create new zones.

In certain embodiments, if another similar player is available to be paired, then the screenshot of FIG. 10B may be displayed. If the user wishes to continue with creating a pair, then the user may select "OK." If not, then the user may select "Cancel." In another embodiment, a different player (e.g., a player that is not an S5) may be paired together. That is, different types of players may be paired, if the players are so designed to be paired. To accommodate the differences in player type, the equalization of one or more players may be adjusted accordingly to compensate for things like the number and size of speaker drivers used in one player versus the other player. In yet another embodiment, a list of the players in the system may be displayed (not shown), from which the user selects two or more players to make the stereo pair. The list of players may be automatically determined by the system based on a player's particular location within a home, room, or configuration with other players within a room, for example.

Turning now to FIG. 10C, in this example, it is assumed that the user may select a zone player named "ZPS5-White" to be paired with "ZPS5-Black" to create a stereo pair. If so desired, the user may select "OK" to proceed with the pairing. Otherwise, the user may select "Cancel." In certain embodiments, ZPS5-White may be in the same zone as ZPS5-Black. In other embodiments, ZPS5-White may be in a different zone as ZPS5-Black.

Upon selecting "OK" in FIG. 10C, a screenshot like that of FIG. 10D may be displayed to the user, thereby instructing the user to press the mute button (or some other designated button) on the "LEFT" player of the stereo pair. Further, a light on the players may flash to further indicate that each of the players is a possibility for left channel pairing. Upon selection of the left player, FIG. 10E may be displayed to inform the user that a pair has been created along with a name for the pair, if so desired. Responsively, the system will play the left channel audio from the user designated player and will automatically play the right channel audio from the other player. FIG. 10F provides an example screenshot to allow the user to separate the stereo pair if so desired.

In an alternative embodiment, the creation of a stereo pair may be an option for a particular zone or a number of zones (e.g., a household of zones). For example, an option like "Create a Stereo Pair" may exist such that upon selection, a setup wizard may launch asking the user to press a flashing mute button (or some other designated button) on whichever speaker the user wanted to be the left speaker in the zone, a portion of zones, or all of the zones. In one embodiment, flashing would occur for all of the same speaker types. In another embodiment, flashing would occur for all speaker types that are capable of being paired. After choosing the left speaker, the wizard screen would ask the user to do the same for the right speaker. Preferably, only the speakers that are capable of being paired as the right speaker are flashing so as to appropriately narrow the choices for the user.

Additionally, in one embodiment and as shown in FIG. 3A or 3B, a graphic display is provided to show to the user all the players in a system and how they are grouped or named. A nickname for the stereo pair in the display 1040 may be highlighted and would be further displayed in FIG. 3A if FIG. 3A is modified after the stereo pair is complete

A similar graphic interface may be used to create a pair in an environment having more than two channels. For example, in a home theater environment, the system may list more than two separate players from which the user can create a pairing by selecting which player is to operate as the front right, center, front left, rear right, and rear left. A subwoofer may also be added to the list, so that it can be integrated into the multi-channel pairing by the user.

As an example, similar to what is described in the various embodiments above with respect to creating a stereo pair, the system may flash an indicator light on all relevant players and a setup wizard may ask the user to select the "front-left," then the "front-right," then the "front-center," then the "rear-left," then the "rear-right," and so on until all of the players are appropriately paired. Preferably, only the speakers that are capable of being paired as the next speaker are flashing so as to appropriately narrow the choices for the user.

VII. Example Smart Line-in Processing

FIG. 11 shows an example configuration of smart line-in processing, in accordance with an embodiment. System 1100 includes a playback device 1102, a first source 1104, a second source 1106 having a line-in connector 1108, and an audio device 1110. The playback device 1102 and any of the first source 1104 and the second source 1106 may be components of a single apparatus (e.g., a single playback device), or the playback device 1102 may be separate from any of the first source 1104 and second source 1106 and communicate with one another, such as over a wired or wireless network. By way of illustration, the playback device 1102 may be a zone player or playback device such as shown in FIGS. 1, 2A, 7, and 8. Additionally, it is understood that first source 1104 and second source 1106 may also each be a playback device, such as described herein.

In certain embodiments, the playback device 1102 is idle and therefore not producing sound. Alternatively, the playback device 1102 is configured to receive and play a first audio data stream from the first source 1104. The playback device 1102 is further capable to receive and play a second audio data stream from the second source 1106. The second source 1106 is coupled to an audio device 1110 through a line-in connector 1108 on the second source 1106. Line-in connector 1108 may include a TRS type connector/socket (e.g., a TRS connector may be referred to as an audio jack, jack plug, stereo plug, mini-jack, and mini-stereo). Other

US 8,938,312 B2

23                                                                            24

types of connectors may also be used depending on the application. Further, a digital audio connection may be made instead of an analog audio connection. Such as described above, an example audio device **1110** may include a wireless networking device, such as an AirPort Express, which is a product that is commercially offered for sale by Apple, Inc.

A listener (e.g., user of **1100**) commands the audio device **1110** to play audio (e.g., via a separate control interface like an iTunes music controller). The second source **1106** is configured, such that when a signal is detected on the line-in connector **1108**, the second source **1106** automatically switches the playback device **1102** to play audio from the audio device **1110** via the second audio data stream. The switch to play audio from the audio device **1110** may optionally be performed only after the second source **1106** detects a signal on the line-in connector **1108** for a threshold time (e.g., 300 milliseconds or less). It is understood that the playing of the second audio data stream may override the playing of the first audio data stream, if the playback device **1102** was receiving and/or playing audio from the first source **1104**. Additionally, when the playback device **1102** is automatically switched to play audio from the second source **1106**, where the second source **1106** receives the audio from the audio device **1110** coupled to the second source **1106** via the line-in connector **1108**, the volume of the playback device **1102** is modified to a second volume level. The second volume level is set such that increased dynamic range is given to a volume control of the audio device **1110** connected via line-in to the second source **1106**.

In another illustration, the playback device **1102** is configured to receive and play audio from the second source **1106**. During play, a listener commands the playback device **1102** via a controller (such as shown in FIG. 2D) to instead play the first audio data stream from the first source **1104**. Upon receipt of the command, the playback device **1102** switches to play the first audio data stream. The playback device **1102** subsequently instructs the second source **1106** to stop sending the audio of the audio device **1110** to the playback device **1102**. The second source **1106** stops sending the audio to the playback device **1102** and waits until it no longer detects a signal on its line-in connector **1108** for an interval of time. When a signal is not detected on the line-in connector **1108** for the interval of time (e.g., 13 seconds or less), the second source **1106** is ready to automatically switch the playback device **1102** to play audio from the audio device **1110**, should the second source **1106** once again detect a signal on its line-in connector **1108**. Additionally, when the playback device **1102** switches to play the first audio data stream, the volume of the playback device **1102** is returned to a safe volume level such that the audio is not played back to the listener at a high level. While a high level may be programmed to taste, an example of a safe volume level is less than 100 db.

### VII. Conclusion

The components, elements, and/or functionality of the systems discussed above may be implemented alone or in combination in various forms in hardware, firmware, and/or as a set of instructions in software, for example. Certain embodiments may be provided as a set of instructions residing on a computer-readable medium, such as a memory, hard disk, CD-ROM, DVD, and/or EPROM, for execution on a processing device, such as a controller and/or playback device.

Various inventions have been described in sufficient detail with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement and combination of parts may be resorted without departing from the spirit and scope of the invention as claimed. While the embodiments discussed herein may appear to include some limitations as to the presentation of the information units, in terms of the format and arrangement, the embodiments have applicability well beyond such embodiment, which can be appreciated by those skilled in the art. Accordingly, the scope of the present invention is defined by the appended claims rather than the forgoing description of embodiments.

We claim:

**1**. A playback device comprising:
a line-in connector for receiving a first audio signal;
a network interface;
  a processor; and
  a non-transitory computer readable storage medium having stored therein instructions executable by the processor to:
    determine whether the first audio signal is present at the line-in connector;
    in response to determining that the first audio signal is present at the line-in connector, (i) cease playback of a second audio signal being played by the playback device, wherein the second audio signal is not present at the line-in connector, and (ii) cause the playback device to play the first audio signal;
    receive, via the network interface, a first instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the line-in connector;
    determine that the first audio signal is no longer present at the line-in connector; and
    in response to determining that the first audio signal is no longer present at the line-in connector, arm the playback device such that a subsequent presence of the first audio signal at the line-in connector causes the playback device to play the first audio signal.

**2**. The playback device of claim **1** wherein the network interface is configured to transmit the audio data over a network to another playback device.

**3**. The playback of claim **1** further comprising a network interface to facilitate communication on a network, wherein the network interface is configured to receive the instruction.

**4**. The playback device of claim **1**, wherein the instructions are further executable by the processor to determine that the first audio signal is present at the line-in connector for a threshold time before causing the playback device to play the first audio signal.

**5**. The playback device of claim **1**, wherein the instructions are further executable by the processor to determine that the first audio signal is no longer present at the line-in connector for an interval period before responsively arming.

**6**. The playback device of claim **1** further comprising an amplifier for powering one or more speaker drivers.

**7**. The playback device of claim **1**, wherein the instructions are further executable by the processor to modify a volume level of the playback device to a predetermined volume when the playback device plays the first audio signal.

**8**. The playback device of claim **1**, wherein the instructions are further executable by the processor to modify a volume level of the playback device to a predetermined volume when the playback device plays the second audio signal.

**9**. The playback device of claim **1**, wherein the first audio signal is received from an audio device, and wherein the audio device is controllable independent of the playback device.

US 8,938,312 B2

25

**10**. A tangible computer-readable storage medium including instructions which, when executed by a processor, implement a method for providing audio to a playback device, the method comprising:

determining whether a first audio signal is being received via a line-in connector of a playback device;

in response to determining that the first audio signal is being received via the line-in connector, (i) ceasing playback of a second audio signal being played by the playback device, wherein the second audio signal is not being received via the line-in connector, and (ii) receiving, via a network interface of the playback device, a first instruction to stop the playback device from playing the first audio signal while the first audio signal is still being received via the line-in connector;

determining that the first audio signal is no longer being received via the line-in connector; and

in response to determining that the first audio signal is no longer present at the line-in connector, arming the playback device such that a subsequent reception of the first audio signal via the line-in connector causes the playback device to play the first audio signal.

**11**. The computer-readable storage medium of claim **10**, further comprising determining that the first audio signal has been received for a threshold time before causing the playback device to play the first audio signal.

**12**. The computer-readable storage medium of claim **10**, further comprising determining the second audio signal to be no longer present via the line-in connector for an interval period before responsively arming the playback device.

**13**. The computer-readable storage medium of claim **10**, further comprising modifying a volume level of the playback device to a predetermined volume when the playback device plays the first audio signal.

**14**. The computer-readable storage medium of claim **10**, further comprising modifying a volume level of the playback device to a predetermined volume when the playback device plays the second audio signal.

26

**15**. The computer-readable storage medium of claim **10**, wherein the first audio signal is received from an audio device, and wherein the audio device is controlled independent of the playback device.

**16**. A method for providing audio to a playback device, the method comprising:

determining, using a processor, whether a first audio signal is being received via a line-in connector of a playback device;

in response to determining that the first audio signal is being received via the line-in connector, (i) ceasing playback of a second audio signal being played by the playback device, wherein the second audio signal is not being received via the line-in connector, and (ii) receiving, via a network interface of the playback device, an instruction to stop the playback device from playing the first audio signal while the first audio signal is still being received via the line-in connector;

determining, using the processor, that the first audio signal is no longer being received via the line-in connector; and

in response to determining that the first audio signal is no longer present at the line-in connector, arming the playback device such that a subsequent reception of the first audio signal via the line-in connector causes the playback device to play the first audio signal.

**17**. The method of claim **16**, further comprising determining that the first audio signal has been received for a threshold time before causing the playback device to play the first audio signal.

**18**. The method of claim **16**, further comprising determining the first audio signal to be no longer present via the line-in connector for an interval period before responsively arming the playback device.

**19**. The method of claim **16**, further comprising modifying a volume level of the playback device to a predetermined volume when the playback device plays the first audio signal.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,938,312 B2                                    Page 1 of 1
APPLICATION NO.     : 13/089167
DATED               : January 20, 2015
INVENTOR(S)         : Nicholas Millington et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page, under abstract "19 Claims, 22 Drawing Sheets" should read --18 Claims, 22 Drawing Sheets--.


In the Claims

In Column 24, line 43 (Claim 3): Delete "The playback of claim 1 further comprising a network interface to facilitate communication on a network, wherein the network interface is configured to receive the instruction".

In Column 25, line 1 (Claim 10): Delete "tangible" and insert --Non-Transitory--.


Signed and Sealed this
Fifth Day of May, 2015

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

Exhibit 56

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/561,421 | 12/05/2014 | Nicholas A.J Millington | 11-0403-CON1214 | 4184 |

107361          7590          04/07/2016
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| MCCORD, PAUL C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2656 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/07/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| **Office Action Summary** | **Application No.** 14/561,421 | **Applicant(s)** MILLINGTON ET AL. |
|---|---|---|
| | **Examiner** PAUL MCCORD | **Art Unit** 2656 | **AIA (First Inventor to File) Status** No |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on *12/5/14*.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL**.  2b) ☒ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) *1-19* is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) *1-19* is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☒ The drawing(s) filed on *12/5/14* is/are: a) ☒ accepted or b) ☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
  a) ☐ All  b) ☐ Some**  c) ☐ None of the:
  1. ☐ Certified copies of the priority documents have been received.
  2. ☐ Certified copies of the priority documents have been received in Application No. _____.
  3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
4) ☐ Other: _____.

Application/Control Number: 14/561,421                                    Page 2
Art Unit: 2656

1.      The present application is being examined under the pre-AIA first to invent provisions.

The present application is being examined under the pre-AIA first to invent provisions.


**DETAILED ACTION**


***Claim Rejections - 35 USC § 103***


1.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

2.      The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966), that are applied for establishing a background for determining obviousness under 35

U.S.C. 103(a) are summarized as follows:

1.      Determining the scope and contents of the prior art.
2.      Ascertaining the differences between the prior art and the claims at issue.
3.      Resolving the level of ordinary skill in the pertinent art.
4.      Considering objective evidence present in the application indicating obviousness or nonobviousness.

3.      This application currently names joint inventors.  In considering patentability of the

claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various

claims was commonly owned at the time any inventions covered therein were made absent any

evidence to the contrary.  Applicant is advised of the obligation under 37 CFR 1.56 to point out

the inventor and invention dates of each claim that was not commonly owned at the time a later

Application/Control Number: 14/561,421                                          Page 3

Art Unit: 2656

invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c)

and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

4.      Claims 1-19 rejected under 35 U.S.C. 103(a) as being unpatentable over Shdema:

20020072816 further in view of Ando: 20040239816 further in view of Slemmer: 20060029005.

5.      Regarding claim 1, 17

        Shdema teaches:

        A playback device and method comprising:

        a line-in connector for receiving a first audio signal (Shdema: see at least ¶ 8, 45-

53; Fig 2, 3: line inputs 140A, 140B, 140C; microphone input 124);

        a network interface (Shdema: ¶ 51-65; Fig 3, 8);

        a processor (Shdema: ¶ 36-45: Fig 1, 2: user interface in concert with audio

management system): and

        a non-transitory computer readable storage medium having stored therein

instructions executable by the processor to:

        determine that the first audio signal is present at the line-in connector (Shdema: ¶

45-53; Fig 2, 3: such as by adaptive analyzer 126 which analyzes a microphone signal

when audio output is present);

        and further functional to, (i) cease playback of a second audio signal being played

by the playback device, wherein the second audio signal is not present at the line-in

connector, (ii) cause the playback device to play at least a first portion of the first audio

signal (Shdema: ¶ 51-65; Fig 3: the instant computer steps are considered to claim no

Application/Control Number: 14/561,421                                        Page 4
Art Unit: 2656

more than switching a stream input; this basic switching functionality is a low level

utility of the multiplexor 148), and

    (iii) cause the playback device to transmit, via the network interface, at least a

second portion of the first audio signal to another playback device (Shdema: Abstract: ¶

2; Fig 1: the system functions to select a particular input and communicate the audio

therefrom to a plurality of networked speakers over plural networks and zones).

    .

    Shdema does not explicitly teach automatically switching among first and second

interface received audio signals in a manner operable to:

    receive an instruction to stop the playback device from playing the first audio

signal while the first audio signal is still present at the first interface; and

    arm the playback device such that a subsequent presence of the first audio signal

at the first interface causes the playback device to play the first audio signal.

    In a related field of endeavor Ando teaches:

    An apparatus for providing audio, the apparatus comprises:

    a connector for receiving an audio signal from an audio device (Ando: ¶ 15-23;

Fig 1: a system receives input from audio audio/video devices at interfaces C1, C2);

    and a processor for determining that the audio signal is present at the connector

and responsively switching a source of a playback device to the audio device (Ando: ¶

25-30: Fig 1, 3: processor 11 functional to determine presence of a signal and selectively

switch an input based upon presence of an input or user preference of a plurality of

sensed input)

Application/Control Number: 14/561,421                                             Page 5
Art Unit: 2656

for receiving an instruction to stop the play back of audio data from the audio

device even when the audio signal is present at the line-in connector (Ando: Fig 3: ST5

stops playback from a particular sensed device based upon user explicit instructions or set

preferences),

and for determining that the audio signal is no longer present at the line-in

connector and responsively rearming such that a subsequent presence of the audio signal

will switch the source to the audio device (Ando: Fig 3: an iterative loop is created

functional to re-sense connected or disconnected devices).

Ando further discloses plural AV apparatus 1(Ando: Fig 1: AV apparatus 2, 3)

functional to output a digital audio signal. It would have been obvious to one of ordinary

skill in the art at the time of the invention to operate the networked speaker system of

Shdema in concert with input detection functional to select input audio as taught or

suggested by Ando. The average skilled practitioner would have been motivated to do so

for the purpose of automatically configuring a digital audio network in response to a

desired playback channel and would have expected predictable results therefrom.

Shdema and Ando teaches input detection within a configurable playback system

functional to detect the absence of a signal and to re-sense or otherwise reconfigure input

sensing but does not explicitly teach configuring a plurality of playback devices in

response to determining the presence or absence of signals at an input and reconfiguring

or re-arming of the system to respond again to a subsequent signal at the line input after

an instruction is received to stop playback and in response to the determination that a

signal is no longer present at the line input.

Application/Control Number: 14/561,421                                      Page 6
Art Unit: 2656

In a related field of endeavor Slemmer teaches:

A system method and medium bearing coded instructions for aggregating device interaction among a plurality of playback devices (Slemmer: Abstract: Fig 1, 2, 3) wherein a state change such as an active signal input at a first device (Slemmer: ¶ 52) functions to consult a set of configuration rules associating particular second, third etc. device states with the state change of the first device (Slemmer: ¶ 65-71; Fig 8, 9) A second state change at a first device functions to rearm or reconfigure the system for subsequent playback under direction of the state change . It would have been obvious to one of ordinary skill in the art at the time of the invention to iterate among system configurations based upon state changes as taught or suggested by Slemmer in concert with the input detection and response taught or suggested by Ando in view of Shdema. The average skilled practitioner would have been motivated to do so for the purpose of aggregating rules directing state changes within a plurality of playback devices in an audio environment and would have expected predictable results therefrom.

6.      Regarding claim 2

Shdema in view of Ando in view of Slemmer teaches or suggests:

The playback device of claim 1, wherein transmitting at least the second portion of the first audio signal to another playback device comprises transmitting all portions of the first audio signal to another playback device (Shdema: see at least ¶ 61; Fig 8-10: configuration of particular channels to particular playback devices in a manner functional to reproduce audio channels under direction of speaker control data.) While Shdema, Ando, Slemmer do not explicitly teach the provision of a mono channel from a speaker or

Application/Control Number: 14/561,421                                    Page 7
Art Unit: 2656

subset of speakers in the speaker network Examiner takes official notice that mirroring of a signal in this way was well known in the art at the time of the instant application and would have been obvious to include. The average skilled practitioner would have been motivated to do so for at least the purpose of broadcasting a single channel such as a public address or radio DJ commentary channel to all/any of the playback devices in between media items and would have expected predictable results therefrom.

7.      Regarding claim 3

        Shdema in view of Ando in view of Slemmer teaches or suggests:

        The playback device of claim 2, wherein causing the playback device to play at least the first portion of the first audio signal comprises causing the playback device to play all portions of the first audio signal. Please see claim 2 above; not only can the instant claim be accomplished by the official notice playback of a commentary between media the instant claim may also be accomplished by playing back the entirety of a channel upon a particular playback device.

8.      Regarding claim 4

        Shdema in view of Ando in view of Slemmer teaches or suggests:

        The playback device of claim 2, wherein causing the playback device to play at least the first portion of the first audio signal comprises causing the playback device to play a subset of channels of the first audio signal (Shdema: see at least ¶ 61; Fig 8-10: setup of the speakers allows for each speaker device to determine its particular portion/ of a playback stream)

9.      Regarding claim 5

Application/Control Number: 14/561,421                                    Page 8
Art Unit: 2656

Shdema in view of Ando in view of Slemmer teaches or suggests:

The playback device of claim 4, wherein the subset of channels of the first audio signal consists of one of a left channel or a right channel. (see Shdema: ¶ 55-69; Fig 8-10: system configured by control data to reproduce particular audio channels)

Examiner takes official notice that the stereo was a well-known format for digital audio content at the time of the instant specification and would have been an obvious inclusion from a digital audio source. The average skilled practitioner would have been motivated to do so for the purpose of reproducing stereo from a subset of the playback devices of Shdema and would have expected predictable results therefrom.

10.      Regarding claim 6

Shdema in view of Ando in view of Slemmer teaches or suggests:

The playback device of claim 1, wherein transmitting at least the second portion of the first audio signal to another playback device comprises transmitting a subset of channels of the first audio signal to another playback device. (Shdema: ¶ 43-50; Fig 6, 8-10)

11.      Regarding claim 7

Shdema in view of Ando in view of Slemmer teaches or suggests:

The playback device of claim 6, wherein the subset of channels of the first audio signal is a first subset of channels of the first audio signal, and wherein causing the playback device to play at least the first portion of the first audio signal comprises causing the playback device to play a second subset of channels of the first audio signal, wherein the first subset of channels is different from the second subset of channels. (see

above claims 6, see also Shdema: ¶ 43-50 Fig 6, 8-10: configuration of a network of devices to reproduce stereo, surround etc. based on transmitted speaker control data)

12.    Regarding claim 8

Shdema in view of Ando in view of Slemmer teaches or suggests:

The playback device of claim 1, wherein the playback device is a first playback device and the another playback device is a second playback device (Shdema: Fig 6), and wherein the instructions are further executable by the processor to:

cause the playback device to transmit, via the network interface, at least a third portion of the first audio signal to a third playback device. (Shdema: ¶ 43-50: Fig 1: receipt of multiplexed audio signals and attendant metadata designating a particular audio channel for playback upon a particular computerized speaker or by a particular shared or individual parameter; Slemmer: ¶ 11; Figs 7-11: rules designate parameters for a particular device or for groups thereof)

13.    Regarding claim 9

Shdema in view of Ando in view of Slemmer teaches or suggests:

The first playback device of claim 8, wherein the first portion of the first audio signal, the second portion of the first audio signal, and the third portion of the first audio signal are the same. (please see claim 2 above in regard to the well-known nature mono/mirroring and the obvious utility of presenting such audio through a network of speaker devices) Shdema functions to direct plural channels of an audio stream such as a stereo or surround stream to individual instances of the networked loudspeaker devices (Shdema: ¶ 66-72; Fig 1.) It would have been one of ordinary skill in the art to operate

Application/Control Number: 14/561,421                                    Page 10
Art Unit: 2656

the Shdema system based on the Slemmer taught rules and thereby create a stereo,

surround or other user desired speaker configuration to reproduce particular channels

assigned to the individual instanced loudspeakers of the configuration and would have

expected predictable results therefrom.

14.    Regarding claim 10 - please see above claims 4, 9

15.    Regarding claim 11, 12 – please see above claims 4, 9

16.    Regarding claim 13

      Shdema in view of Ando in view of Slemmer teaches or suggests:

      The playback device of claim 1, wherein the instructions are further executable by

the processor to: cause the playback device to generate timing information associated

with the first audio signal; and cause the playback device to transmit, via the network

interface, the generated timing information to the another playback device (see at least

Shdema: ¶ 64; Fig 8: Shdema transmits at least delay parameters relative to particular

playback devices/channels; Slemmer: ¶ 48-57: the Slemmer devices reference data

transmitted among devices at particular time slots.)

17.    Regarding claim 14

      Shdema in view of Ando in view of Slemmer teaches or suggests:

      The playback device of claim 1, wherein transmitting at least the second portion

of the first audio signal comprises: sampling the first audio signal; and generating data

packets comprising at least the second portion of the first audio signal (Shdema: Fig 3:

use of A/D converter 144 in concert with multiplexor 148.)

18.    Regarding claim 15

Application/Control Number: 14/561,421                                    Page 11
Art Unit: 2656

Shdema in view of Ando in view of Slemmer teaches or suggests:

The playback device of claim 1, wherein the instructions are further executable by the processor to: cease playback of the first portion of the first audio signal; cause the playback device to play the second audio signal; and while playing the second audio signal, transmit the first audio signal to the another playback device. This comprises no more than a rearrangement or reconfiguration of the known parts of the Shdema, Ando, Slemmer devices based upon play designations or particular speaker control data (see at least Shdema: Fig 6, 8-10.)

19.    Regarding claim 16 – please see above claims 4, 9-12

20.    Regarding claim 18 – please see above claims 2, 4-7; furthermore, the set of all channel may be considered at least a subset of the instant signal

21.    Regarding claim 19 – please see above claims 2, 4-7, 9-12


### *Conclusion*


22.    The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.


8521316 remote control of media selection in a network of wireless playback devices

8423893 wireless remote control of networked speakers

7539551 remote control of wireless audio devices

Application/Control Number: 14/561,421                                    Page 12
Art Unit: 2656

20080152165 ad hoc local network of audio playback devices functional to retrieve

signal over the internet

20080092204 wireless remote control for audio network

20060205349 remote configuration of a local network of playback devices

20060173972 audio sharing system

20040237750 audio equalization system

20040015252 meta-structure/GUI for controlling a plurality of playback devices

20080077261 media device remoter controls LAN and ad hoc sub-net of playback

devices

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to PAUL MCCORD whose telephone number is (571)270-3701.

The examiner can normally be reached on M-F 7:30AM - 5:00PM EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, CURTIS KUNTZ can be reached on (571)272-7499.  The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 14/561,421                                    Page 13
Art Unit: 2656

     Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/PAUL MCCORD/
Primary Examiner, Art Unit 2656

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No.: 11-0403-CON1214)
(MBHB Docket No. 15-1433-US-CON)

| | | |
|---|---|---|
| In the Application of: | ) | |
| | ) | |
| Millington | ) | Art Unit: 2656 |
| | ) | |
| Serial No.: 14/561,421 | ) | Examiner: McCord |
| | ) | |
| Filed: December 5, 2014 | ) | Confirmation No. 4184 |
| | ) | |
| For: Smart-Line In Processing in a Group | ) | |
| | ) | |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO THE NON-FINAL OFFICE ACTION
### MAILED APRIL 7, 2016

Applicant submits the following **AMENDMENTS** and **REMARKS** in response to the Non-Final Office Action mailed on April 7, 2016 in the above-referenced application.

**AMENDMENTS TO THE CLAIMS** begin on page 2.

**REMARKS** begin on page 8.

The Office is hereby authorized to charge any underpayment of fees or credit any overpayment of fees in connection with the prosecution of the above-captioned application to Deposit Account 13-2490.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

1

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date: December 5, 2014

## AMENDMENTS TO THE CLAIMS

1.      (Currently Amended)  A playback device comprising:

a line-in connector ~~for receiving~~ <u>configured to receive</u> a first audio signal;

a network interface;

a processor[[:]]<u>;</u> and

a <u>tangible,</u> non-transitory computer readable storage medium having stored therein instructions executable by the processor<u>,</u> [[to]] <u>wherein the instructions, when executed by the processor, cause the playback device to perform functions comprising</u>:

<u>playback a second audio signal;</u>

<u>while playing back the second audio signal,</u> ~~determine~~ <u>determining</u> that the first audio signal is present at the line-in connector; and

in response to determining that the first audio signal is present at the line-in connector, (i) ~~cease~~ <u>ceasing</u> playback of [[a]] <u>the</u> second audio signal being played by the playback device, wherein the second audio signal is not present at the line-in connector, (ii) ~~cause~~ <u>causing</u> the playback device to play at least a first portion of the first audio signal, and (iii) ~~cause~~ <u>causing</u> the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device.


2.      (Original)  The playback device of claim 1, wherein transmitting at least the second portion of the first audio signal to another playback device comprises transmitting all portions of the first audio signal to another playback device.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

2

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date:  December 5, 2014

3.      (Original)   The playback device of claim 2, wherein causing the playback device to play at least the first portion of the first audio signal comprises causing the playback device to play all portions of the first audio signal.

4.      (Original)   The playback device of claim 2, wherein causing the playback device to play at least the first portion of the first audio signal comprises causing the playback device to play a subset of channels of the first audio signal.

5.      (Original)  The playback device of claim 4, wherein the subset of channels of the first audio signal consists of one of a left channel or a right channel.

6.      (Original)  The playback device of claim 1, wherein transmitting at least the second portion of the first audio signal to another playback device comprises transmitting a subset of channels of the first audio signal to another playback device.

7.      (Original)  The playback device of claim 6, wherein the subset of channels of the first audio signal is a first subset of channels of the first audio signal, and wherein causing the playback device to play at least the first portion of the first audio signal comprises causing the playback device to play a second subset of channels of the first audio signal, wherein the first subset of channels is different from the second subset of channels.

8.      (Currently Amended)  The playback device of claim 1, wherein the playback device is a first playback device and the another playback device is a second playback device, and wherein the instructions, when executed ~~are further executable~~ by the processor, cause the playback device to perform further functions comprising:

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

3

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date: December 5, 2014

~~cause~~ <u>causing</u> the playback device to transmit, via the network interface, at least a third portion of the first audio signal to a third playback device.

9.     (Original)  The first playback device of claim 8, wherein the first portion of the first audio signal, the second portion of the first audio signal, and the third portion of the first audio signal are the same.

10.     (Original)  The first playback device of claim 8, wherein the first portion of the first audio signal, the second portion of the first audio signal, and the third portion of the first audio signal are different.

11.     (Currently Amended)    The playback device of claim 1, wherein the instructions<u>, when executed</u> ~~are further executable~~ by the processor<u>, cause the playback device</u> to <u>perform further functions comprising</u>:

~~cause~~ <u>causing</u> the playback device to receive a command to form a group with the another playback device.

12.     (Original)  The playback device of claim 11, wherein the command to form the group with the another playback device comprises a command to form a stereo pair with the another playback device.

13.     (Currently Amended)    The playback device of claim 1, wherein the instructions<u>, when executed</u> ~~are further executable~~ by the processor<u>, cause the playback device</u> to <u>perform further functions comprising</u>:

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

4

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date: December 5, 2014

~~cause~~ <u>causing</u> the playback device to generate timing information associated with the first audio signal; and

cause the playback device to transmit, via the network interface, the generated timing information to the another playback device.

14.    (Original)  The playback device of claim 1, wherein transmitting at least the second portion of the first audio signal comprises:

sampling the first audio signal; and

generating data packets comprising at least the second portion of the first audio signal.

15.    (Currently Amended)   The playback device of claim 1, wherein the instructions<u>, when executed</u> ~~are further executable~~ by the processor<u>, further cause the playback device</u> to <u>perform further functions comprising</u>:

~~cease~~ <u>ceasing</u> playback of the first portion of the first audio signal;

~~cause~~ <u>causing</u> the playback device to play the second audio signal; and

while playing the second audio signal, transmit<u>ting</u> the first audio signal to the another playback device.

16.    (Original)  The playback device of claim 1, wherein the first portion of the first audio signal and the second portion of the first audio signal are the same.

17.    (Original)  A method comprising:

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

5

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date:  December 5, 2014

determining, by a playback device, that a first audio signal is present at a line-in connector; and

in response to determining that the first audio signal is present at the line-in connector, the playback device: (i) ceasing playback of a second audio signal being played by the playback device, wherein the second audio signal is not present at the line-in connector, (ii) playing at least a first portion of the first audio signal, and (iii) transmitting, via a network interface, at least a second portion of the first audio signal to another playback device.

18.     (Original)  The method of claim 17, wherein transmitting at least the second portion of the first audio signal to another playback device comprises transmitting all portions of the first audio signal to another playback device, and wherein causing the playback device to play at least the first portion of the first audio signal comprises causing the playback device to play a subset of channels of the first audio signal.

19.     (Currently Amended)  The method of claim 17, <u>wherein playing at least the first portion of the first audio signal comprises playing a subset of channels of the first audio signal,</u> wherein the subset of channels of the first audio signal is a first subset of channels of the first audio signal, wherein transmitting at least the second portion of the first audio signal to another playback device comprises transmitting a subset of channels of the first audio signal to another playback device, and wherein causing the playback device to play at least the first portion of the first audio signal comprises causing the playback

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

6

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date:  December 5, 2014

device to play a second subset of channels of the first audio signal, wherein the first subset of channels is different from the second subset of channels.

20.    (New) Tangible, non-transitory computer readable storage media having stored therein instructions executable by a processor, wherein the instructions, when executed by the processor, cause a playback device to perform a method comprising:

playback a second audio signal;

while playing back the second audio signal, determining that the first audio signal is present at an line-in connector; and

in response to determining that the first audio signal is present at the line-in connector, (i) ceasing playback of the second audio signal being played by the playback device, wherein the second audio signal is not present at the line-in connector, (ii) causing the playback device to play at least a first portion of the first audio signal, and (iii) causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

7

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date: December 5, 2014

# REMARKS

## I.        Summary of the Claims

Claims 1-20 are pending; claims 1, 17, and 20 are independent.  Without conceding the merits of the rejections set forth in the Office Action, Applicant has added new claim 20 and amended claims 1, 8, 11, 13, 15, and 19 to further clarify the claim language and to generally put the claims in better condition for allowance and issue.  No new matter has been added.

## II.        Summary of the Non-Final Office Action Mailed April 7, 2016

In the Non-Final Office Action mailed on April 7, 2016, the Examiner rejected claims 1-19 under 35 U.S.C. § 103(a) as allegedly unpatentable over U.S. Pub. 2002/0072816 ("Shdema"), U.S. Pub. 2004/0239816 ("Ando"), and U.S. Pub. 2006/0029005 ("Slemmer").

## III.        Summary of the Examiner Interview Conducted on July 6 2016

A telephonic Examiner Interview occurred on June 6, 2016.  Participants included Examiner Paul C. McCord and Applicant's Representatives, Chris Butts and Jeff Armstrong. During the Examiner Interview, the participants discussed proposed amendments to claim 1 and the Shdema, Ando, and Slemmer references.  No exhibits were shown and no demonstrations were conducted.  Participants agreed the arguments presented herein distinguish the claims over the Shdema, Ando, and Slemmer references.  No agreement on allowability of the claims was reached.  Applicant agreed to file the present Response with amendments and arguments for further review and consideration.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

8

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date:  December 5, 2014

## IV.    Response to the § 103 Rejections

The claims are patentable over Shdema, Ando, and Slemmer for at least the reason that the combination of Shdema, Ando, and Slemmer fails to teach or suggest all the elements recited in the claims.  For example, with reference to independent claim 1, the combination of Shdema, Ando, and Slemmer fails to teach or suggest at least "in response to determining that the first audio signal is present at the line-in connector, (i) ceasing playback of the second audio signal being played by the playback device, wherein the second audio signal is not present at the line-in connector, (ii) causing the playback device to play at least a first portion of the first audio signal, and (iii) causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device" in combination with the other elements in the claims.

First, the Office Action does not cite Slemmer for disclosing any aspect of "in response to determining that the first audio signal is present at the line-in connector, (i) ceasing playback of the second audio signal being played by the playback device, wherein the second audio signal is not present at the line-in connector, (ii) causing the playback device to play at least a first portion of the first audio signal, and (iii) causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device." Office Action, p. 6.  Applicant's review of Slemmer likewise found no teaching or suggestion of this feature of claim 1.

Second, the Office Action suggests that Ando discloses "in response to determining that the first audio signal is present at the line-in connector, (i) ceasing playback of the second audio signal being played by the playback device, wherein the

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

9

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date: December 5, 2014

second audio signal is not present at the line-in connector, (ii) causing the playback device to play at least a first portion of the first audio signal." Office Action, pp. 5-6. But the Office Action does not cite Ando for disclosing the feature of "causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device," Office Action, pp. 5-6, and Applicant's review of Ando likewise found no teaching or suggestion of this feature.

Finally, the addition of Shdema does not overcome the deficiencies of Slemmer and Ando for at least the reason that Shdema also fails to teach or suggest the feature of "causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device" of claim 1 that is lacking in Slemmer and Ando. But even assuming *arguendo* that Shdema taught this, the Office Action fails to identify any teaching or suggestion of a causal link in Shdema and/or Ando between (a) the step of "in response to determining that the first audio signal is present at the line-in connector" purportedly taught in Ando and (b) the step of "causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device" purportedly taught in Shdema.

A causal link between these two steps is explicitly required by the plain language of claim 1, which states that, "in response to determining that the first audio signal is present at the line-in connector...causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device." See, e.g., *Ex Parte Jerding*, BPAI, 2009-1407, p. 9 (Decided Dec. 22,

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

10

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date: December 5, 2014

2009) (reversing § 103 rejection because "the Examiner erred in interpreting the term 'responsive to' broadly, as requiring only that an action follow a preceding event, without further requiring that the action be a ***necessary*** ***result*** of the preceding event") (emphasis added).  Here, the Office Action does not identify how the outcome purportedly disclosed in Shdema (i.e., "causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device") is a ***necessary*** ***result*** of the function purportedly disclosed in Ando (i.e., "in response to determining that the first audio signal is present at the line-in connector").  See Ex *Parte Jerding*, BPAI, 2009-1407.  Applicant's review of Shdema and Ando likewise found no teaching or suggestion of any causal link between these features.  Therefore, the combination of Shdema and Ando does not teach or suggest the feature of "in response to determining that the first audio signal is present at the line-in connector...causing the playback device to transmit, via the network interface, at least a second portion of the first audio signal to another playback device" recited in claim 1.

Because the Shdema, Ando, and Slemmer, whether considered individually or in combination, fail to teach or suggest all the elements recited in independent claim 1, Applicant submits that independent claim 1 is patentable over Shdema, Ando, and Slemmer.  And because independent claims 17 and 20 recite elements similar to those recited in independent claim 1, Applicant further submits that independent claims 17 and 20 are patentable over Shdema, Ando, and Slemmer for reasons similar to those articulated for claim 1.  Furthermore, and without conceding the merits of the other

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

11

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date: December 5, 2014

assertions set forth in the Office Action, Applicant submits that the pending dependent claims are patentable over Shdema, Ando, and Slemmer for at least the reason that they depend from patentable independent claims.

### V.    Conclusion

If further dialog would advance consideration and allowance of the application, Applicant invites the Office to contact the undersigned attorney at 312-913-0001.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date: _July 7, 2016_              By: __/Jeffrey P. Armstrong/__
                                  Jeffrey P. Armstrong
                                  Reg. No. 54,967

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

12

Docket No.: 11-0403-CON1214
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/561,421
Filing Date: December 5, 2014

Exhibit 57

U̲N̲I̲T̲E̲D̲ S̲T̲A̲T̲E̲S̲ P̲A̲T̲E̲N̲T̲ A̲N̲D̲ T̲R̲A̲D̲E̲M̲A̲R̲K̲ O̲F̲F̲I̲C̲E̲

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/628,999 | 02/23/2015 | Nicholas A.J. Millington | 11-0403-CON0115 | 9044 |

107361        7590        04/07/2016
McDonnell Boehnen Hulbert & Berghoff LLP
Sonos, Inc.
300 South Wacker Drive
Chicago, IL 60606

| EXAMINER |
|---|
| MCCORD, PAUL C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2656 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/07/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| **Office Action Summary** | **Application No.**<br>14/628,999 | **Applicant(s)**<br>MILLINGTON ET AL. |
|---|---|---|
| | **Examiner**<br>PAUL MCCORD | **Art Unit**<br>2656 | **AIA (First Inventor to File)**<br>**Status**<br>No |

| **Office Action Summary** | **Application No.**<br>14/628,999 | **Applicant(s)**<br>MILLINGTON ET AL. | |
|---|---|---|---|
| | **Examiner**<br>PAUL MCCORD | **Art Unit**<br>2656 | **AIA (First Inventor to File) Status**<br>No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

### Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

### Status

1) ☒ Responsive to communication(s) filed on _2/23/15_.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**   2b) ☒ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

### Disposition of Claims*

5) ☒ Claim(s) _1-20_ is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) _1-20_ is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

### Application Papers

10) ☐ The specification is objected to by the Examiner.
11) ☒ The drawing(s) filed on _2/23/15_ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

### Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some**   c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

Application/Control Number: 14/628,999                                Page 2
Art Unit: 2656

The present application is being examined under the pre-AIA first to invent provisions.


# DETAILED ACTION


### *Claim Rejections - 35 USC § 101*


1.      35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or
any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and
requirements of this title.


2.      Claims 19-20 rejected under 35 U.S.C. 101 because the claimed invention is directed to

non-statutory subject matter because the broadest reasonable interpretation of the claimed

medium embraces a carrier wave embodiment. A tangible medium can be considered as that

which is merely physically extant; a carrier wave can be considered tangible in this sense.


### *Claim Rejections - 35 USC § 103*


3.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

        (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
        section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
        such that the subject matter as a whole would have been obvious at the time the invention was made to a person
        having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the
        manner in which the invention was made.

Application/Control Number: 14/628,999                                    Page 3
Art Unit: 2656

4.     The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966), that are applied for establishing a background for determining obviousness under 35

U.S.C. 103(a) are summarized as follows:

  1.     Determining the scope and contents of the prior art.
  2.     Ascertaining the differences between the prior art and the claims at issue.
  3.     Resolving the level of ordinary skill in the pertinent art.
  4.     Considering objective evidence present in the application indicating obviousness
         or nonobviousness.

5.     This application currently names joint inventors.  In considering patentability of the

claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various

claims was commonly owned at the time any inventions covered therein were made absent any

evidence to the contrary.  Applicant is advised of the obligation under 37 CFR 1.56 to point out

the inventor and invention dates of each claim that was not commonly owned at the time a later

invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c)

and potential 35 U.S.C. 102(e), (f) or (g) prior art under 35 U.S.C. 103(a).

6.     Claims 1-20 rejected under 35 U.S.C. 103(a) as being unpatentable over Shdema:

20020072816 further in view of Ando: 20040239816 further in view of Slemmer: 20060029005.

7.     Regarding claim 1, 10, 19

         Shdema teaches:

         A digital audio network comprising an audio management system consisting of

plural line inputs (Shdema: see at least ¶ 8; Fig 3: line inputs 140A, 140B, 140C) and

digital inputs (Shdema: ¶ 51-65; Fig 3, 8) comprising:

         a first interface for receiving a first audio signal from a first audio source, wherein

the playback device and the first audio source are within a given media playback system

Application/Control Number: 14/628,999                                                Page 4
Art Unit: 2656

(Shdema: ¶ 57; Fig 3; various analog audio sources; digital audio sources including a dvd

player functional on a local digital network);

     a second interface for receiving a second audio signal from a second audio source,

wherein the second audio source is outside of the given media playback system (Shedma:

¶ 57; Fig 3: cable end of set top box functional to receive media from a network source);

     a processor (Shdema: ¶ 36-45: Fig 1, 2: user interface in concert with audio

management system): and

     a non-transitory computer readable storage medium having stored therein

instructions (Shdema: ¶ 50 etc.) executable by the processor to:

     cause the playback device to playback the second audio signal (Shdema: ¶ 36-45;

Figs 8-11: playout of a stream from a determined input device such as a media retrieved

from a digital library via the set top box);

     determine that the first audio signal is present at the first interface (Shdema: ¶ 45-

53; Fig 2, 3: such as by adaptive analyzer 126);

     and further functional to, (i) cease playback of the second audio signal being

played by the playback device and (ii) cause the playback device to playback the first

audio signal (Shdema: ¶ 51-65; Fig 3: the instant computer steps are considered to claim

no more than switching a stream input; this basic switching functionality is a low level

utility of the multiplexor 148);

     wherein the system functions to select a particular input and communicate the

audio therefrom to a plurality of networked speakers over plural networks and zones

(Shdema: Abstract: ¶ 2; Fig 1 etc.).

Application/Control Number: 14/628,999                                    Page 5
Art Unit: 2656

Shdema does not explicitly teach automatically switching among first and second interface received audio signals in a manner operable to:

receive an instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface; and

arm the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal.

In a related field of endeavor Ando teaches:

An apparatus for providing audio, the apparatus comprises:

a connector for receiving an audio signal from an audio device (Ando: ¶ 15-23; Fig 1: a system receives input from audio audio/video devices at interfaces C1, C2);

and a processor for determining that the audio signal is present at the connector and responsively switching a source of a playback device to the audio device (Ando: ¶ 25-30: Fig 1, 3: processor 11 functional to determine presence of a signal and selectively switch an input based upon presence of an input or user preference of a plurality of sensed input)

for receiving an instruction to stop the play back of audio data from the audio device even when the audio signal is present at the line-in connector (Ando: Fig 3: ST5 stops playback from a particular sensed device based upon user explicit instructions or set preferences),

and for determining that the audio signal is no longer present at the line-in connector and responsively rearming such that a subsequent presence of the audio signal

Application/Control Number: 14/628,999                                                    Page 6
Art Unit: 2656

will switch the source to the audio device (Ando: Fig 3: an iterative loop is created

functional to re-sense connected or disconnected devices).

Ando further discloses plural AV apparatus 1(Ando: Fig 1: AV apparatus 2, 3)

functional to output a digital audio signal. It would have been obvious to one of ordinary

skill in the art at the time of the invention to operate the networked speaker system of

Shdema in concert with input detection functional to select input audio in response to a

desired playback channel as taught or suggested by Ando. The average skilled

practitioner would have been motivated to do so for the purpose of automatically

configuring a digital audio network and would have expected predictable results

therefrom.

Shdema and Ando teaches input detection within a configurable playback system

functional to detect the absence of a signal to re-sense or otherwise reconfigure input

sensing but does not explicitly teach configuring a plurality of playback devices in

response to determining the presence or absence of signals at an input and reconfiguring

or re-arming of the system to respond again to a subsequent signal at the line input after

an instruction is received to stop playback and in response to the determination that a

signal is no longer present at the line input.

In a related field of endeavor Slemmer teaches:

A system method and medium bearing coded instructions for aggregating device

interaction among a plurality of playback devices (Slemmer: Abstract: Fig 1, 2, 3)

wherein a state change such as an active signal input at a first device (Slemmer: ¶ 52)

functions to consult a set of configuration rules associating particular second, third etc.

Application/Control Number: 14/628,999                                    Page 7
Art Unit: 2656

device states with the state change of the first device (Slemmer: ¶ 65-71; Fig 8, 9) A second state change at a first device functions to rearm or reconfigure the system for subsequent playback under direction of the state change . It would have been obvious to one of ordinary skill in the art at the time of the invention to iterate among system configurations based upon state changes as taught or suggested by Slemmer in concert with the input detection and response taught or suggested by Ando in view of Shdema. The average skilled practitioner would have been motivated to do so for the purpose of aggregating rules directing state changes within a plurality of playback devices in an audio environment and would have expected predictable results therefrom.

8.      Regarding claim 2, 11, 20

        Shdema in view of Ando in view of Slemmer teaches or suggests:

        The playback device of claim 1, wherein the first interface comprises a line-in connector. (Shdema: see at least ¶ 8; Fig 3: line inputs 140A, 140B, 140C)

9.      Regarding claim 3, 12

        Shdema in view of Ando in view of Slemmer teaches or suggests:

        The playback device of claim 2, wherein the second interface comprises one of a wireless or a wired network interface. (Shdema: ¶ 57: set top box comprises a wired interface; wireless interfaces encompassed generally)

10.     Regarding claim 4, 13

        Shdema in view of Ando in view of Slemmer teaches or suggests:

        The playback device of claim 1, wherein the instructions are further executable by the processor to:

Application/Control Number: 14/628,999                                    Page 8
Art Unit: 2656

       determine that the first audio signal is no longer present at the first interface

(Ando: Fig 3); and arm the playback device in response to determining that the first audio

signal is no longer present at the first interface (Ando: Fig 3: an iterative loop is created

functional to re-sense connected or disconnected devices).

11.      Regarding claim 5, 14

       Shdema in view of Ando in view of Slemmer teaches or suggests:

       The playback device of claim 1, wherein the second audio source is on the

Internet. Examiner takes official notice that the internet was a well-known source for

digital audio content at the time of the instant specification and would have been an

obvious inclusion as a digital audio source, such as by the access of library server by the

set top box of the Shdema source cluster for at least the purpose of receiving a media

desired by a user.

12.      Regarding claim 6, 15

       Shdema in view of Ando in view of Slemmer teaches or suggests:

       The playback device of claim 1, wherein the instructions are further executable by

the processor to: cause the playback device to transmit at least a portion of the first audio

signal to another playback device. (Shdema: Fig 6)

13.      Regarding claim 7, 16

       Shdema in view of Ando in view of Slemmer teaches or suggests:

       The playback device of claim 1, wherein the instructions are further executable by

the processor to: cause the playback device to transmit at least a portion of the second

audio signal to another playback device. (Shdema: Fig 6)

14.      Regarding claim 8, 17

Shdema in view of Ando in view of Slemmer teaches or suggests:

The playback device of claim 7, wherein the instructions are further executable by the processor to:

cause the playback device to receive a command to form a group with the another playback device. (Shdema: ¶ 43-50: Fig 1: receipt of multiplexed audio signals and attendant metadata designating a particular audio channel for playback upon a particular computerized speaker or by a particular shared or individual parameter); (Slemmer: ¶ 11; Figs 7-11: rules designate parameters for a particular device or for groups thereof)

15.      Regarding claim 9, 18

Shdema in view of Ando in view of Slemmer teaches or suggests:

The playback device of claim 17, wherein the command to form the group with the another playback device comprises a command to form a stereo pair with the another playback device. Shdema functions to direct plural channels of an audio stream such as a stereo or surround stream to individual instances of the networked loudspeaker devices (Shdema: ¶ 66-72; Fig 1.) It would have been one of ordinary skill in the art to operate the Shdema system based on the Slemmer taught rules and thereby create a stereo, surround or other user desired speaker configuration to reproduce particular channels assigned to the individual instanced loudspeakers of the configuration and would have expected predictable results therefrom.

Application/Control Number: 14/628,999                                         Page 10

Art Unit: 2656

*Conclusion*


16.     The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure.

8521316 remote control of media selection in a network of wireless playback devices

8423893 wireless remote control of networked speakers

7539551 remote control of wireless audio devices

20080152165 ad hoc local network of audio playback devices functional to retrieve

signal over the internet

20080092204 wireless remote control for audio network

20060205349 remote configuration of a local network of playback devices

20060173972 audio sharing system

20040237750 audio equalization system

20040015252 meta-structure/GUI for controlling a plurality of playback devices

20080077261 media device remoter controls LAN and ad hoc sub-net of playback

devices

20080216125 stereo etc. grouping of plural playback devices


Any inquiry concerning this communication or earlier communications from the

examiner should be directed to PAUL MCCORD whose telephone number is (571)270-3701.

The examiner can normally be reached on M-F 7:30AM - 5:00PM EST.

Application/Control Number: 14/628,999                                    Page 11
Art Unit: 2656

     If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, CURTIS KUNTZ can be reached on (571)272-7499. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

     Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/PAUL MCCORD/
Primary Examiner, Art Unit 2656



McDonnell Boehnen Hulbert & Berghoff    300 South Wacker Drive    312-913-0001 phone
Law Offices                              Chicago, Illinois 60606-6709    312-913-0002 fax
                                         www.mbhb.com

July 5, 2016

Via email: paul.mccord@uspto.gov

Examiner Paul McCord
U.S. Patent & Trademark Office
P.O. Box 1450
Arlington, VA 22313-1450

**RE:  Interview Agenda for 14/628,999 (Sonos 11-0403-CON0115; MBHB 15-1436-US-CON2)**

Examiner McCord:

Thank you for agreeing to interview the above-referenced application on Wednesday, July 6, 2016, at 10:30am ET / 9:30am CT.  An agenda of topics is outlined below:

**Agenda for the Examiner Interview:**
- The § 103 rejections in the Non-Final Office Action mailed April 7, 2016
- Claim 1
- Cited references:
  - U.S. Pub. 2002/0072816 ("Shdema")
  - U.S. Pub. 2004/0239816 ("Ando")
  - U.S. Pub. 2006/0029005 ("Slemmer")

**Proposed Amendments:**
Without conceding the merits of the rejections, and solely in an attempt to advance prosecution, Applicant submits the following amendments for consideration.

1.    (Proposed Amendment)  A playback device comprising:

a first interface ~~for receiving~~ configured to receive a first audio signal from a first audio source, wherein the playback device and the first audio source are within a given media playback system;

a second interface ~~for receiving~~ configured to receive a second audio signal from a second audio source, wherein the second audio source is outside of the given media playback system;

a processor[[:]]; and

1

a <u>tangible,</u> non-transitory computer readable storage medium having stored therein instructions executable by the processor, [[to]] <u>wherein the instructions, when executed by the processor, cause the playback device to perform functions comprising</u>:

cause the playback device to playback the second audio signal;

<u>while playing back the second audio signal,</u> determine that the first audio signal is present at the first interface;

in response to determining that the first audio signal is present at the first interface, (i) cease playback of the second audio signal being played by the playback device and (ii) cause the playback device to playback the first audio signal;

receive an instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface; and

<u>in response to receiving the instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface,</u> arm the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal.

**Arguments for Consideration:**

**Response to the 35 U.S.C. § 103 Rejections**

- The combination of Shdema, Ando, and Slemmer fails to teach or suggest at least "in response to receiving the instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface, arm the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal."
- The Office Action acknowledges, and Applicant agrees, that Shdema and Ando do not teach or suggest "in response to receiving the instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface, arm the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal." See, Office Action, p. 6.
- The addition of Slemmer does not overcome the deficiencies of Shdema and Ando because Slemmer also fails to teach or suggest "in response to receiving the instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface, arm the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal."
- In contrast to the claims, Slemmer is directed to causing a state change in a second device in response to detecting a state change in a first device. Slemmer, ¶ 12 ("detecting a change of state at a first device and in response to detecting the change of state, transmitting a change of state message to the aggregator. The aggregator receives the change of state message and references interaction rules in relation to the change of state of the first device to determine a

2

change of state instruction for a second device of the plurality. The aggregator then transmits the change of state instruction to the second device"}

- As an example, Slemmer explains at ¶ 4: "Often, the state of one or more of the electronic devices is related to the state of one or more other electronic devices within the same environment. For example, a user may be watching television (TV) when the telephone rings. The user wishes to answer the call, but to effectively communicate with the caller, the user must mute the television so that sound from the TV does not interfere with the telephone conversation. Every time a telephone call is to be answered while the user watches TV, the user must again repeat the muting process. For each call, once the user hangs up the phone, the TV must be manually unmuted so that the user can once again listen to the TV program being watched."

- In operation, "After detecting the change of state [of a first device], the processor 206 references the rules of device interaction stored in the memory 208 to determine whether a communication [to a second device] is necessary, who [i.e., which second device] should receive the communication, and the particular information to include [in the communication to the second device] at rule operation 304. The processor 206 performs a look-up of the state change that has been detected [at the first device] to find the interaction rule that is appropriate [i.e., to determine what other devices should execute a state change in response to the state change at the first device]. The processor 206 then communicates according to the appropriate interaction rule by sending a message through transmitter 212 [to the identified second device] at communicate operation 306."

- Slemmer nowhere describes causing any particular state change at an individual device in response to detecting some state change that particular device, much less the specific feature of "in response to receiving the instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface, arm the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal."


If you have questions, or if you would like additional information to prepare for the interview, please feel free to call me.

Best regards,

Jeff Armstrong
312-913-2104 (office)

3

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No.: 11-0403-CON0115)
(MBHB Docket No. 15-1433-US-CON2)

| | | |
|---|---|---|
| In the Application of: | ) | |
| | ) | |
| Millington | ) | Art Unit: 2656 |
| | ) | |
| Serial No.:    14/628,999 | ) | Examiner: McCord |
| | ) | |
| Filed: February 23, 2015 | ) | Confirmation No. 9044 |
| | ) | |
| For: Smart-Line In Processing | ) | |
| | ) | |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## RESPONSE TO THE NON-FINAL OFFICE ACTION
## MAILED APRIL 7, 2016

Applicant submits the following **AMENDMENTS** and **REMARKS** in response to the

Non-Final Office Action mailed on April 7, 2016 in the above-referenced application.

**AMENDMENTS TO THE CLAIMS** begin on page 2.

**REMARKS** begin on page 8.

The Office is hereby authorized to charge any underpayment of fees or credit any

overpayment of fees in connection with the prosecution of the above-captioned application

to Deposit Account 13-2490.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

1

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date: February 23, 2015

## AMENDMENTS TO THE CLAIMS

1.      (Currently Amended)  A playback device comprising:

a first interface ~~for receiving~~ <u>configured to receive</u> a first audio signal from a first audio source, wherein the playback device and the first audio source are within a given media playback system;

a second interface ~~for receiving~~ <u>configured to receive</u> a second audio signal from a second audio source, wherein the second audio source is outside of the given media playback system;

a processor[[:]]<u>;</u> and

a <u>tangible,</u> non-transitory computer readable storage medium having stored therein instructions executable by the processor<u>,</u> [[to]] <u>wherein the instructions, when executed by the processor, cause the playback device to perform functions comprising</u>:

~~cause~~ <u>causing</u> the playback device to playback the second audio signal;

<u>while playing back the second audio signal,</u> ~~determine~~ <u>determining</u> that the first audio signal is present at the first interface;

in response to determining that the first audio signal is present at the first interface, (i) ~~cease~~ <u>ceasing</u> playback of the second audio signal being played by the playback device and (ii) ~~cause~~ <u>causing</u> the playback device to playback the first audio signal;

~~receive~~ <u>receiving</u> an instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface; [[and]]

<u>determining that the first audio signal is no longer present at the first interface; and</u>

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

2

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date:  February 23, 2015

<u>in response to determining that the first audio signal is no longer present at the first interface,</u> arm<u>ing</u> the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal.

2.    (Original)    The playback device of claim 1, wherein the first interface comprises a line-in connector.

3.    (Original)    The playback device of claim 2, wherein the second interface comprises one of a wireless or a wired network interface.

4.    (Canceled)

5.    (Currently Amended)    The playback device of claim 1, wherein the second audio source is ~~on the~~ <u>an</u> Internet<u>-accessible audio source</u>.

6.    (Currently Amended)    The playback device of claim 1, wherein the instructions<u>, when executed</u> ~~are further executable~~ by the processor<u>, cause the playback device</u> to <u>perform further functions comprising</u>:

~~cause~~ <u>causing</u> the playback device to transmit at least a portion of the first audio signal to another playback device.

7.    (Currently Amended)    The playback device of claim 1, wherein the instructions<u>, when executed</u> ~~are further executable~~ by the processor<u>, cause the playback device</u> to <u>perform further functions comprising</u>:

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

3

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date: February 23, 2015

~~cause~~ <u>causing</u> the playback device to transmit at least a portion of the second audio signal to another playback device.

8.      (Currently Amended)    The playback device of claim 7, wherein the instructions<u>, when executed</u> ~~are further executable~~ by the processor<u>, cause the playback device</u> to <u>perform further functions comprising</u>:

cause the playback device to receive a command to form a group with the another playback device.

9.      (Original)  The playback device of claim 8, wherein the command to form the group with the another playback device comprises a command to form a stereo pair with the another playback device.

10.     (Currently Amended)  A <u>tangible, non-transitory computer-readable memory comprising instructions encoded therein, wherein the instructions, when executed, cause a playback device to perform a</u> method comprising:

causing, by [[a]] <u>the</u> playback device, playback of a second audio signal, wherein the playback device comprises a second interface ~~for receiving~~ <u>configured to receive</u> the second audio signal from a second audio source, wherein the second audio source is outside of a given media playback system;

<u>while the playback device is playing back the second audio signal,</u> determining, by the playback device, that a first audio signal is present at a first interface <u>configured to receive the first audio signal from a first audio source</u>, ~~wherein the playback device comprises a first interface for receiving the first audio signal from a first audio source,~~

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

4

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date: February 23, 2015

wherein the playback device and the first audio source are within [[a]] the given media playback system;

in response to determining that the first audio signal is present at the first interface, (i) ceasing playback of the second audio signal being played by the playback device and (ii) causing the playback device to playback the first audio signal;

receiving an instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface; [[and]]

determining that the first audio signal is no longer present at the first interface; and

in response to determining that the first audio signal is no longer present at the first interface, arming the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal.

11.     (Currently Amended)     The ~~method~~ tangible, non-transitory computer-readable memory of claim 10, wherein the first interface comprises a line-in connector.

12.     (Currently Amended)     The ~~method~~ tangible, non-transitory computer-readable memory of claim 11, wherein the second interface comprises one of a wireless or a wired network interface.

13.     (Canceled)

14.     (Currently Amended)     The ~~method~~ tangible, non-transitory computer-readable memory of claim 10, wherein the second audio source is ~~on the~~ an Internet-accessible audio source.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

5

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date: February 23, 2015

15.    (Currently Amended)    The ~~method~~ tangible, non-transitory computer-readable memory of claim 10, wherein the method further ~~comprising~~ comprises:

causing the playback device to transmit at least a portion of the first audio signal to another playback device.

16.    (Currently Amended)    The ~~method~~ tangible, non-transitory computer-readable memory of claim 10, wherein the method further ~~comprising~~ comprises:

causing the playback device to transmit at least a portion of the second audio signal to another playback device.

17.    (Currently Amended)    The ~~method~~ tangible, non-transitory computer-readable memory of claim 16, wherein the method further ~~comprising~~ comprises:

causing the playback device to receive a command to form a group with the another playback device.

18.    (Currently Amended)    The ~~method~~ tangible, non-transitory computer-readable memory of claim 17, wherein the command to form the group with the another playback device comprises a command to form a stereo pair with the another playback device.

19.    (Currently Amended)    A ~~tangible computer-readable storage medium including instructions which, when executed by a processor, implement a~~ method comprising:

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

6

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date:  February 23, 2015

causing, by a playback device, playback of a second audio signal, wherein the playback device comprises a second interface for receiving the second audio signal from a second audio source, wherein the second audio source is outside of a given media playback system;

while the playback device is playing back the second audio signal, determining, by the playback device, that a first audio signal is present at a first interface configured to receive the first audio signal from a first audio source, ~~wherein the playback device comprises a first interface for receiving the first audio signal from a first audio source,~~ wherein the playback device and the first audio source are within [[a]] the given media playback system;

in response to determining that the first audio signal is present at the first interface, (i) ceasing playback of the second audio signal being played by the playback device and (ii) causing the playback device to playback the first audio signal;

receiving an instruction to stop the playback device from playing the first audio signal while the first audio signal is still present at the first interface; [[and]]

determining that the first audio signal is no longer present at the first interface; and

in response to determining that the first audio signal is no longer present at the first interface, arming the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal.

20.    (Currently Amended)  The ~~computer-readable storage medium~~ method of claim 19, wherein the first interface comprises a line-in connector.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

7

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date:  February 23, 2015

## REMARKS

### I.    Summary of the Claims

Claims 1-3, 5-12, and 14-20 are pending; claims 1, 10, and 19 are independent. Without conceding the merits of the rejections set forth in the Office Action, Applicant has canceled claims 4 and 13, and  amended claims 1, 5-8, 10-12, and 14-20 to further clarify the claim language and to generally put the claims in better condition for allowance and issue.  No new matter has been added.

### II.    Summary of the Non-Final Office Action Mailed April 7, 2016

In the Non-Final Office Action mailed on April 7, 2016, the Examiner rejected claims 1-20 under 35 U.S.C. § 103(a) as allegedly unpatentable over U.S. Pub. 2002/0072816 ("Shdema"), U.S. Pub. 2004/0239816 ("Ando"), and U.S. Pub. 2006/0029005 ("Slemmer").

### III.    Summary of the Examiner Interview Conducted on July 6 2016

A telephonic Examiner Interview occurred on June 6, 2016.  Participants included Examiner Paul C. McCord and Applicant's Representatives, Chris Butts and Jeff Armstrong. During the Examiner Interview, the participants discussed proposed amendments to claim 1 and the Shdema, Ando, and Slemmer references.  No exhibits were shown and no demonstrations were conducted.  Participants agreed the proposed amendments and arguments distinguished the claims over the Shdema, Ando, and Slemmer references.  No agreement on allowability of the claims was reached.  Applicant agreed to file the present Response with amendments and arguments for further review and consideration.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

8

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date:  February 23, 2015

## IV.    Response to the § 103 Rejections

The claims are patentable over Shdema, Ando, and Slemmer for at least the reason that the combination of Shdema, Ando, and Slemmer fails to teach or suggest all the elements recited in the claims.  For example, with reference to independent claim 1, the combination of Shdema, Ando, and Slemmer fails to teach or suggest at least "in response to determining that the first audio signal is no longer present at the first interface, arming the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal" in combination with the other elements in the claims.

The Office Action acknowledges, and Applicant agrees, that Shdema and Ando do not teach or suggest "arming the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal."  See, Office Action, p. 6.  Therefore, Shdema and Ando cannot possibly teach or suggest the more narrowly-tailored feature of "in response to determining that the first audio signal is no longer present at the first interface, arming the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal."

The addition of Slemmer does not overcome the deficiencies of Shdema and Ando because Slemmer also fails to teach or suggest "in response to determining that the first audio signal is no longer present at the first interface, arming the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal."  In contrast to the claims,

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

9

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date:  February 23, 2015

Slemmer is directed to causing a state change in a second device in response to detecting a state change in a first device.  Slemmer, ¶ 12 ("detecting a change of state at a first device and in response to detecting the change of state, transmitting a change of state message to the aggregator. The aggregator receives the change of state message and references interaction rules in relation to the change of state of the first device to determine a change of state instruction for a second device of the plurality. The aggregator then transmits the change of state instruction to the second device").

As an example, Slemmer explains at ¶ 4:  "Often, the state of one or more of the electronic devices is related to the state of one or more other electronic devices within the same environment. For example, a user may be watching television (TV) when the telephone rings. The user wishes to answer the call, but to effectively communicate with the caller, the user must mute the television so that sound from the TV does not interfere with the telephone conversation. Every time a telephone call is to be answered while the user watches TV, the user must again repeat the muting process. For each call, once the user hangs up the phone, the TV must be manually unmuted so that the user can once again listen to the TV program being watched." In operation, "After detecting the change of state [of a first device], the processor 206 references the rules of device interaction stored in the memory 208 to determine whether a communication [to a second device] is necessary, who [i.e., which second device] should receive the communication, and the particular information to include [in the communication to the second device] at rule operation 304. The processor 206 performs a look-up of the state change that has been detected [at the first device] to

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

10

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date:  February 23, 2015

find the interaction rule that is appropriate [i.e., to determine what other devices should execute a state change in response to the state change at the first device]. The processor 206 then communicates according to the appropriate interaction rule by sending a message through transmitter 212 [to the identified second device] at communicate operation 306."

Slemmer nowhere describes causing any particular state change at an individual device in response to detecting some state change at that particular device, much less the specific feature of "in response to determining that the first audio signal is no longer present at the first interface, arming the playback device such that a subsequent presence of the first audio signal at the first interface causes the playback device to play the first audio signal" recited in independent claim 1.

Because Shdema, Ando, and Slemmer, whether considered individually or in combination, fail to teach or suggest all the elements recited in independent claim 1, Applicant submits that independent claim 1 is patentable over Shdema, Ando, and Slemmer.  And because independent claims 10 and 19 recite elements similar to those recited in independent claim 1, Applicant further submits that independent claims 10 and 19 are patentable over Shdema, Ando, and Slemmer for reasons similar to those articulated for claim 1.  Furthermore, and without conceding the merits of the other assertions set forth in the Office Action, Applicant submits that the pending dependent claims are patentable over Shdema, Ando, and Slemmer for at least the reason that they depend from patentable independent claims.

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 913-0001

11

Docket No.: 11-0403-CON0115
MBHB Docket No. 15-1433-CON
Application Serial Number: 14/628,999
Filing Date:  February 23, 2015

## VI.    Conclusion

If further dialog would advance consideration and allowance of the application,

Applicant invites the Office to contact the undersigned attorney at 312-913-0001.

Respectfully submitted,
McDonnell Boehnen Hulbert & Berghoff LLP

Date:  July 7, 2016             By:   /Jeffrey P. Armstrong/
                                Jeffrey P. Armstrong
                                Reg. No. 54,967